Lawrence M. Meadows, Pro Se
1900 Sunset Harbour Dr. #2112
Miami Beach, FL 33139
Phone: 516-982-7718
Facsimile: 435-604-7850
lawrencemeadows@yahoo.com

FILED by ___PG___ D.C.

OCT 1 6 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

---

## IN THE UNITED STATES DISTRICT COURT

## FLORIDA SOUTHERN DISTRICT

---

| | |
|---|---|
| **LAWRENCE M. MEADOWS,** | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| v. | |
| **ALLIED PILOTS ASSOCIATION,** | **Case No: 1:17-cv-22589-JLK** |
| a Texas Labor Association, and | |
| **PAM TORELL,** | |
| An individual, and | |
| **DOES 1-10,** | |
| Defendants. | **JURY TRAIL DEMANDED** |

---

**COMES NOW**, the Pro Se Plaintiff, Lawrence M. Meadows, who hereby, files the following Amended Complaint to sue Defendants and states as follows:

### I.   JURISDICTION AND VENUE

1.          Plaintiffs' claims are filed pursuant to 28 U.S.C. § 1331 and § 1337(a) in that this suit seeks to enforce the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.,* and the Labor Management Reporting and Disclosure Act of 1959, ("LMRDA"), 29 U.S.C. §401 et. seq., both

1
FIRST AMENDED COMPLAINT

of which are Acts of Congress regulating/protecting Commerce. Venue is proper under 28

U.S.C. § 1391 in that defendants have either substantial contacts, or with respect to the Allied

Pilots Association, it has members in the state of Florida; Pam Torell is domiciled in the state of

Florida, and the Plaintiff is also domiciled in the state of Florida and is subject to personal

jurisdiction.

## II.   PARTIES

2.         Plaintiff, Lawrence M. Meadows is domiciled in the state of Florida, and as a

*"pilot employee"* of American Airlines, Inc. ("American", "AA" or "Company"), he is also a

member of the class and craft of pilots, exclusively represented by his "union representative"

the Defendant Allied Pilots Association, as defined under U.S.C 45 §151- Fifth. Railway

Labor Act. Additionally, since being hired in 1991, he has continuously been a member in

good standing of the Allied Pilots Association, except that to the extent during that certain

times when his union secretly had declared and treated Meadows as a non-member, and

recently openly reinterpreted its constitution and bylaws. Regardless, since 1991 he has

continually been an APA union "member in good standing" as defined under the Labor

Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et. seq.*

3.         Defendant, Allied Pilots Association (hereinafter "APA" or "Union"), is an

unincorporated association and labor organization, headquartered in Texas, with members in

the state of Florida, and is the exclusive bargaining agent and *"representative"* of the 15,000

pilots at American Airlines, Inc., and obligated to enforce and negotiate the pilot's collective

bargaining agreement ("CBA" or "JCBA") as defined under 1 Sixth of the RLA, 45 U.S.C. §

151.Sixth.  As such, APA owes ALL the pilot employees of American Airlines (whether or

not they are an APA members) a statutory duty of fair representation ("DFR"), including

Meadows. Additionally, APA is a "labor organization" governed by the LMRDA, as defined under 29 U.S.C. 402 (i and j). APA has three elected National Officers consisting of its President, Vice-President, and Secretary Treasurer.  The APA Board of Directors ("BOD") is APA's supreme policy making body, made up of 22 Directors, one Chairman and one Vice Chairman elected from each of the APA's eleven pilot bases ("Domiciles") at major airports from which American operates throughout the United States.

4.        Defendant, Pam Torell, is an individual who is domiciled in Florida, and also works full-time in Dallas, TX as an APA National Officer, serving as its Secretary-Treasurer.

5.        DOES 1-10, are unknown individuals who had a role in the deprivation of Meadows contractual and statutory rights.

### III.   STATEMENT OF FACTS

#### *Background*

6.        Plaintiff, Lawrence M. Meadows brings this action against his representative, the Allied Pilots Association, for violations of his statutory rights pursuant to the RLA, 45 U.S.C. § 151 et seq., the LMRDA, 29 U.S.C. §401 et. seq., and also for APA's material breaches of its contractual obligations under the APA Constitution and Bylaws.

7.        The Railway Labor Act was originally enacted in 1926 to govern labor-employment relations is the rail industry, and was designed to, among other things, *"provide for the prompt an orderly settlement of all disputes growing of grievance or out of the interpretation or application of collective bargaining Agreements.",*

8.        The Labor Management Reporting and Disclosure Act ("LMRDA"), was originally enacted in 1959, stating its purpose and policy in relevant part;

> SEC. 2. (a) The Congress finds that, in the public interest, **it continues to be the responsibility of the Federal Government to protect employees' rights to**

**organize, choose their own representatives, bargain collectively, and otherwise engage in concerted activities for their mutual aid or protection; that the relations between employers and labor organizations and the millions of workers they represent have a substantial impact on the commerce of the Nation;** and that in order to accomplish the objective of a free flow of commerce **it is essential that labor organizations,** employers, **and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations,** particularly as they affect labor-management relations.

(b) The Congress further finds, from recent investigations in the labor and management fields, that **there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations,** employers, labor relations consultants, and their officers and representatives.

**(c) The Congress, therefore, further finds and declares that the enactment of this Act is necessary to eliminate or prevent improper practices on the part of labor organizations,** employers, labor relations consultants, **and their officers and representatives which distort and defeat the policies of the Labor Management Relations Act, 1947, as amended, and the Railway Labor Act, as amended, and have the tendency or necessary effect of burdening or obstructing commerce...** [Emphasis Added] LMRDA, 29 U.S.C. §401.

9.          The APA Constitution and Bylaws ("C&B"), Article 1 Section 4.A., states in

relevant part; *"This Constitution and Bylaws shall be the supreme law of APA."* During the

federal lawsuit of, *"Meadows v. APA and American Airlines"* (UDC, Case No. 2:14-cv-

00115-DS) the APA in its pleadings admitted that; 1) long term disabled MDD pilot

Meadows is in fact a member of APA, and asserted 2) the *"The terms and conditions of*

*Meadows' APA membership are governed by the APA Constitution and Bylaws.",* and

further asserted 3) that the APA C&B is indeed a binding contract, stating, *"[Meadows]*

*does not challenge—nor could he—the long settled notion that the C&B is binding on*

*him as a contract with the APA."*

10.          In this Amended Complaint Plaintiff alleges that; 1) his union "representative", Defendant APA, breached its duty of fair representation in violation of RLA, 45 U.S.C. § 151 *et seq.*, treating him in  arbitrary, discriminatory, and bad faith manner by willfully failing to protect his relative seniority on the American Airlines pilot's newly Integrated Seniority List ("ISL"),  2) that APA also breached its duty of fair representation in violation of  RLA, 45 U.S.C. § 151 *et seq.*, by failing to timely, process and prosecute Meadows' MOU Grievance which protested the unfair, inequitable, and disparate treatment of his seniority rights in violation of the collective bargaining agreement during the SLI Proceedings, 3) that APA also breached its duty of fair representation in violation of  RLA, 45 U.S.C. § 151 *et seq.*, by failing to protect induvial and collective rights of Meadows and similarly situated disabled pilots by not prosecuting DFW Base Grievance 12-012, 4) APA breached its contractual obligation owed its disabled pilots in violation of its C&B *"to maintain uniform principle of seniority and perpetuation thereof.",* 5) APA breached its contractual obligation owed Meadows and similarly situated disabled pilots in violation of its C&B, *"To protect the individual and collective rights of the members of the APA and to promote their professional interests, including timely prosecution of individual and collective grievances.",* 6) APA violated  Meadows' LMRDA, 29 USC §101(a)(2), Union Member Right of Freedom of Speech and Assembly in the union hall, 7) APA violated Meadows' LMRDA, 29 USC §101(a)(1), Union Member Right of Equal Participation and Privileges, 8) APA violated Meadows' LMRDA, 29 USC §101(a)(4),  Union Member Right of Protection of the Right to Sue without fear of retaliation, and 9) Defendant Pam Torell, while serving as APA Secretary Treasurer, breached her fiduciary responsibility as an officer of a labor organization, LMRDA, 29 U.S.C. Sec 501.

FIRST AMENDED COMPLAINT

### *Employment History*

11.         Plaintiff, graduated cum laude from Embry-Riddle Aeronautical University in 1985, with a B.S. Degree in Aeronautical Engineering. Upon graduation, he became a commissioned Officer in the U.S. Air Force, and served on active duty as a military pilot flying T-37, T-38, and C-9A aircraft, until he was honorably discharged in 1991.

12.         Plaintiff was hired by as a pilot employee by American Airlines in October 1991, flying DC-10, B-727, MD-11, and B-777 aircraft.

13.         Since his date of hire Plaintiff has continuously been a union member in good standing; and as a member of the craft or class of pilots employed by American, the APA owes him a Duty of Fair Representation under the Railway Labor Act.

### *Disability History*

14.         Plaintiff suffered from a debilitating illness, which has prevented him from obtaining the needed FAA medical certification to perform his duties as a pilot.

15.         Therefore, in June 2004, the American Airlines Corporate Medical Director approved Plaintiff for the pilot long term disability ("LTD") benefits provided for under the CBA, which were funded by the Company's *"Pilot Retirement Benefit Program" ("Program")*.

16.         Regardless, to date Plaintiff continuously has remained a *"Participant"* under the terms of the *"Program"*, and was entitled to receive, and accrue full pension Credited Service; based his uninterrupted service in eligible statuses of either, *"Active Pilot Employee"* on the *"Pilot System Seniority List"*, *"Unpaid Sick Leave of Absence (USLOA)"* as approved by the Corporate Medical Director, or on a Disability benefit defined under the *"Program" and "Plan"*.

6
FIRST AMENDED COMPLAINT

17.         On December 26, 2007, AA's Corporate Medical Director, without cause or notice, abruptly terminated Plaintiff's then existing disability benefits under the old pension funded *"Program"*; and unilaterally placed him in an approved *"USLOA"* status.

18.         Plaintiff timely filed an Administrative Appeal to American Airlines Pension Benefits Administration Committee ("PBAC"), who reviewed and denied his disability claim through third party disability claims evaluator, Western Medical Evaluators ("WME") on June 8, 2008.

19.         Supplement-F of the pilot's CBA, Supp-F required that all disability claim disputes be referred to a *"Clinical-source"*; but AA and APA violated this clause of the CBA, because WME was nothing more than an administrative medical billing service.

20.         WME was not a *"Clinical-source"* as required under the CBA, but instead was a tiny 6 employee medical billing service that was rife with fraud and procedural irregularities; WME's corporate medical director medical license had been revoked by the Texas Medical Board, it's office manager was a convicted felon, and its principals fabricated and forged doctors' evaluation reports.

21.         After two years of waiting, and APA's failure to resolve his disability dispute, Plaintiff timely filed an individual ERISA disability lawsuit against American Airlines in U.S. District Court, of the Florida Southern District ("FLSD") at his own expense.

22.         On March 23, 2011, the Plaintiff was allowed to conduct special court ordered depositions of AA's Corporate Medical Director, Chief Nurse, and HR Senior Budget Analyst.

23.         Based on those depositions, and AA's last minute, untimely production of documents; the Plaintiff, discovered the existence of the secret *"Pilot Disability Nurse Case Management Cost Savings"* reports; which were used by American Airline's Medical

FIRST AMENDED COMPLAINT

Department to fraudulently deny and/or terminate rightful pilot disability benefits based on *"cost savings"* alone. These reports showed that 421 pilots were receiving disability benefits; and that during December 2007 Plaintiff was one of 84 pilots being tracked and targeted for cost savings, all of whom had their benefits terminated.

24.         The very next day On March 24, 2011, before all the evidence was in the record, FLSD Court abruptly entered Final Summary Judgment order in favor of AA.

25.         Shortly thereafter, Plaintiff was shocked to discover that AA's third party disability claims reviewer, WME, used in furtherance of AA's *"Pilot Disability Nurse Case Management Cost Savings"* scheme, was shut down for felony medical claim fraud.

26.         Eventually WME was shuttered, its principals were charged with felony medical claim fraud, sentenced to confinement, and forced to pay fines and restitution to its victims.

27.         Not until mid-2011, did Plaintiff discover documents which show AA terminated WME's contract on August 8, 2008, within one day of its principals being indicted for felony medical claim fraud. APA knew this, but never disclosed to Meadows, or other similar situated disabled pilots; thereby prejudicing their ability to successfully litigate their claims.

28.         AA or APA never subsequently offered Plaintiff a proper claim re-review by the WME's legitimate institutional replacement reviewer, the Mayo Clinic.

29.         In mutually selecting WME, a medical billing service, both AA and APA willfully violated the CBA, by failing to provide its disabled pilots a full and fair review of their disability claims by a *"Clinical-source"* as required under Supplement-F.

30.         American Airlines and APA also breached their fiduciary to duty by failing to exercise proper due diligence, when mutually selecting WME, which was in fact a procedurally flawed and fraudulent disability claims reviewer.

31.          In April 2011, Plaintiff timely filed a Notice of Appeal with the 11th Cir., and a Rule 59 with the FLSD based the newfound evidence, but the FLSD denied said motion, due to lack of jurisdiction.

32.          Just a couple of days after Plaintiff exposed that American Airlines was a conflicted fiduciary; which was attempting to aide with the gross underfunding of its pension plans, by implementing the secret *"Pilot Disability Nurse Case Management Cost Savings"* scheme, facilitated through a fraudulent claims reviewer. AA retaliated, and attempted to punish Plaintiff by falsifying meet and confer certifications in order to file untimely and unmeritorious costs and attorney's fees motions totaling $52,680.20 for 3 depositions.

33.          Subsequently, Plaintiff filed a Rule 11 motion; and the FLSD Court struck AA's pleadings, and denied its cost and attorney's fee motions as moot.

34.          In June 2011, based on his ERISA disability suit denial, and American Airlines steadfast refusal to acknowledge his disabling condition; Plaintiff, mailed a certified request to AA Corporate Medical Director, requesting Fitness for Duty Exam and issue a Return to Work ("RTW") clearance, as provided by Sec. 20 of the CBA. But the Corporate Medical director never responded, ignoring said request.

### *Plaintiff Engaged in Protected SOX-WB Activity*

35.          Based on American Airlines pilot disability cost savings scheme, implemented through the use of WME, Plaintiff reasonably believed AA was intentionally underfunding pilot's rightful disability pension funding obligations, which thereby artificially inflated its corporate earnings reported on their financial statements. Which for publicly traded company, gives rise to securities fraud under the Sarbanes-Oxley ("SOX") Act.

FIRST AMENDED COMPLAINT

36.     On July 18, 2011, based on his reasonable belief of SOX fraud, Plaintiff engaged

in protected whistleblower activity, and reported the fraudulent *"cost savings"* scheme to

AA's Managers and counsel; and eventually, on September 12, 2011, he filed a formal SOX-

Whistleblower ("SOX-WB") Complaint with OSHA.

37.     Over two years later, after American Airlines bankruptcy stay was lifted; the

Department of Labor Docketed Plaintiff's SOX-WB Complaint for an ALJ bench trial

hearing on June 9, 2014 in Salt Lake City, Utah.

### *Plaintiff's Purported Termination - Removal from Seniority List - 2nd Disability Claim*

38.     On August 5, 2011, just two weeks after Plaintiff engaged in protected SOX -

Whistleblower activity; AA had refused to acknowledge existence of his disabling condition,

and threatened that unless he obtained an FAA medical certificate or identified a Reasonable

Accommodation within 60 days, that his employment his employment would end. That was

an unreasonable request, as AA's Medical Director previously stated in an email that it

would take Meadows at least *"3 – 6 months"* to get his FAA medical certificate. Regardless,

Meadows identified many non-flying positions and requested reassignment as a Reasonable

Accommodation, and also applied for his FAA medical.

39.     On September 14, 2011, to defend against the AA's thinly veiled threat

termination, Plaintiff at his own expense underwent a clinical examination and also applied

for an FAA medical certificate to American's then new disability claims reviewer, the Mayo

Clinic; who verified the existence of his continuous disabling illness.

40.     During that entire time-frame Plaintiff remained on the American's   *"Pilot

System Seniority List",* and was considered an *"Active Pilot Employee"* on an *"Authorized*

*Leave of Absence",* who received compensation from the Company. As such he met eligibility criteria for disability benefits under the new *"PLTD Plan".*

41.        On October 1, 2011, using Mayo's evaluation, Plaintiff submitted a renewed disability benefits claim under the *"PLTD Plan".* Which American Airlines subsequently approved, albeit with benefit payments commencing on Dec. 13, 2011; thereby denying him of four years of retroactive pay/benefits.

42.        On November 4, 2011, in complete disregard of the Plaintiff's SOX-WB protections, his pending disability benefits claim, his written requests for a reasonable accommodation, and his pending FAA medical application; Meadows was shocked to learn during a telephone call with a company administrator that he had purportedly been "administratively terminated" without cause, an investigation, hearing or written notice from his chief pilot superior, in an egregious violation of the pilots' CBA.

43.        At that same time AA also removed Meadows' from the *"Pilot System Seniority List"* in violation of the Sec. 13 of the CBA, and revoked Plaintiff's lifetime non-revenue travel benefits.

44.        Despite American Airlines and APA's contentions that Plaintiff was *"administratively terminated";* he is currently still considered both an *"Employee"* and *"Pilot Employee", as* defined under the terms of the American Airlines Pilot "*LTD Plan"* a "pilot employee". Who is on the Company's payroll, receiving collectively bargained pilot disability pay in the form of W-2 employee wages subject to Federal Income Tax withholding, and Active *"Pilot Employee"* Benefits Package (except 401k contribution and non-revenue travel) as negotiated under the CBA.

### ***Plaintiff Files Company Termination Grievance #12-011***

45.         In response, on February 4, 2012 Plaintiff timely filed an individual Company termination grievance #12-011 in accordance with Sec. 21 of the CBA, citing his improper discharge and removal from the seniority list in violation of the CBA; along with contributing factors of retaliation in violation of his SOX-WB protections, and failure to offer a Reasonable Accommodation in violation of the American's with Disabilities Act ("ADA").

46.         On July 10, 2013, APA confirmed in writing that preserved Meadows' grievance 12-011 in the APA general Proof of Claim filed in American's bankruptcy proceedings, thereby preserving all claims damages flowing from that grievance.

47.         Further, on December 7, 2012, APA specifically preserved Plaintiff's grievance #12-011, as one of the only 39 most meritorious, out of 270 open grievances; and excluded it from the as APA-AA Settlement Consideration and Bankruptcy Protections agreement, and incorporated it by explicit reference into LOA 12-01 of the pilot's new Joint CBA ("JCBA").

48.         Plaintiff's grievance 12-011 bypassed the 1st step, and was first heard as appeal grievance by the Vice President of the Flight Department on April 25, 2013. (2nd step)

49.         APA staff attorney, Chuck Hairston was assigned to process Plaintiffs grievance, and in preparation of the hearing he submitted a 17-page grievance hearing briefing, which contained detailed arguments for his contractual and statutory (SOX and ADA) claims. Further, Hairston confirmed in writing that APA supported his statutory claim.

50.         Previously unknown to Plaintiff before his grievance hearing, was the fact that Mr. Hairston, was the very attorney responsible for mutually selecting fraudulent disability claims reviewer WME (the very same company that denied Plaintiffs first disability benefits claim), and selected them over the Mayo because it was $350 cheaper per pilot evaluation.

51.         On June 6, 2013, AA denied Plaintiff's grievance, re-asserting its decision to remove Meadows from the seniority list under Sec. 11 of the CBA.

52.         In response, on June 28, 2013, APA President, Keith Wilson, notified American in writing that he was, *"protesting the Company's action of removing him from the seniority list and discharging him from American Airlines.",* and escalated Plaintiffs grievance to a Pre-Arbitration Conference (PAC, 3rd step).

53.         The PAC was held on August 6, 2013. APA counsel submitted a settlement brief on Meadows' behalf which offered global settlement in exchange for, 1) Reinstatement to the seniority list, 2) Restoration of his non-revenue travel benefits, and 3) Reasonable Accommodation within his bargaining unit. But the Company declined to settle.

54.         On August 21 2013, after the PAC settlement failed; in accordance with his rights under the CBA and RLA, Meadows made a written request to APA, asking, *"I respectfully request the Association President appeal my grievance 12-011 to the System Board of Adjustment for a final review."* (RLA System Board, 4th Step).

55.         On August 29, 2013, after over 18 months after filing, preserving, hearing, and appealing grievance #12-011, APA President, Keith Wilson, wrote Meadows and refused to arbitrate his grievance at System Board, because he suddenly believed that Meadows' grievance 12-011 did not raise any contractual violations (which are belied APA's prior actions), and that Meadows had statutory claims (under SOX and ADA) which he was already pursuing in the appropriate federal forums.

56.         On September 18, 2013, Plaintiff send a certified letter to APA's President, stating; *"I respectfully ask you to reconsider your decision and appeal my grievance to a System Board before the 30-day deadline to do so expires on tomorrow."* Plaintiff, followed

up via email and telephone, but the APA President never responded, and ignored his request to reconsider appealing his grievance to a System Board.

57.         In September 2014, U.S Bankruptcy Judge Sean Lane, during American's bankruptcy proceedings, issued and order stating that Meadows shall only be permitted to arbitrate his claims under grievance 12-011, holding in relevant part;

> "**ORDERED** that, notwithstanding the foregoing, Meadows shall be permitted to arbitrate Grievance 12-011 before the System Board to the extent ~~that such arbitration is limited in scope to claims involving the interpretation of the CBA and provides remedies, if any and if appropriate, that are customary under the grievance procedures created by the RLA~~ *permitted by applicable law*; [Strike-out and Emphasis as in Order].

58.         On September 14, 2014, American subsequently stated in another court pleading that it agreed to arbitrate Meadows' grievance 12-011, leaving APA as the only party unreasonably refusing to move it forward, stating;

> "American has informed Meadows and the APA that it will comply with any agreement of the parties to submit the grievances to a System Board hearing or, if no agreement can be reached between Meadows and APA, with any order of this Court." [Emphasis Added].

59.         Despite, Judge Lane's Order, and American's agreement to arbitrate grievance 12-011, and recently failed settlement discussions between APA and Meadows, APA outrageously has abandoned its duty otherwise owed Meadows, and refused to represent Meadows and arbitrate his grievance before a RLA System Board.

60.         On information and belief, APA's last minute refusal to arbitrate his grievance #12-011, was done in retaliation by APA's President and Legal Director, due to the hostility and personal animus exhibited by certain APA Officers; whom Meadows personally cross-examined, during the previous months (July 2013) APA Equity Distribution Arbitration proceeding. Wherein, Meadows exposed APA's arbitrary, discriminatory, bad-faith treatment of Meadows and similarly situated long term disabled ("LTD") pilots, and medical disability

dropped from AA ("MDD"), which improperly deprived those pilots of their fair share of the $1B pilot equity distribution, shorting them of millions of dollars. (see SOF 74 - 83 below).

### *American's LTD Employment Status Versus APA's MDD Member Status Description*

61.        It is important to understand the correlation between LTD and MDD status codes. American Airlines assigns status code of "LTD" to pilots like Meadows who are receiving pilot long term disability benefits. After five years on LTD, American has removed certain pilots from the pilot seniority list in violation of the CBA, but they remain on LTD. APA then assigns those pilots an internal member status code of "MDD" (Medical Disability Dropped by AA), for its own administrative purposes.

62.        LTD/MDD pilots under American's Pilot LTD Plan, are still defined as *"Pilot Employees"* who continue to receive collectively bargained disability benefits in the form of pilot employee W-2 wages subject to federal tax withholding, and Active "Pilot Employee" benefits package (medical, dental, vision, life, insurance, travel, pension accrual, etc.).

63.        American has engaged in unlawful practice of removing pilots on LTD greater than 5 years from the seniority list, in violation of the plain and unambiguous language of the CBA, and the ADA's strict prohibition of such "no-leave" polices that result in automatic termination after an employee is on medical leave for a specified period of time.

64.        The ADA, 42 U.S.C §12101, requires employers to offer Reasonable Accommodations, consisting of either reassignment to vacant positions, or as much additional medical leave as necessary until such time that the employee is medically qualified to return to their original position and seniority. The EEOC has investigated American from 2009-2015, and subsequently sued them for engaging in a nation-wide pattern and practice of disability discrimination, and was recently fined $9.8M and forced to enter a Consent Decree.

65.        APA has allowed this discrimination to occur against its LTD/MDD pilots

unabated. Further, despite filing collective grievances LGA Base grievance 11-054 and DFW

Base grievance 12-012, along Meadows' individual grievance 12-011, APA has failed to

timely prosecute and has allowed these LTD/MDD grievances remain open and languish for

6 years. Because, APA has failed to prosecute these grievances it has left Meadows and

similarly situated LTD/MDD pilots who become medically recertified, subject to whims of

American, who arbitrarily "invites" some to return, while refusing to reinstate certain pilots

they deem to be problematic employees (those with lawsuits, whistleblower complaints, etc.).

66.        Further, APA has failed its duty to enforce the CBA, and allowed American to

subjectively reinterpret the contractual language of Sec. 11.D.1, to remove pilots on LTD

greater than 5 years from the seniority list in violation of the CBA.

67.        For these LTD pilots, APA has created an internal status code for these pilots

called, Medical Disability Dropped from AA ("MDD"), used for the improper purpose of

codifying these pilots as members no longer in good standing who are not allowed to vote in

violation of their LMRDA, Union Member Bill of Rights, 29 U.S.C. §101(a).

68.        Meadows is currently in a Company LTD status, and in an APA MDD member

status. Hereinafter, he will refer to his status as "LTD/MDD", which includes 241other

similarly situated disabled APA members, who have lost their seniority rights as a direct

result of Defendant APA's unlawful, willful, arbitrary, discriminatory, and bad-faith

treatment.

### *APA Has Filed Collective Grievances On behalf of Meadows and Similarly Situated LTD/MDD Pilots*

69.        This removal or dropping from the seniority list of LTD pilots in violation of Sec

11.D.1 of the CBA, who are thereafter coded as MDD by APA, is one of the key issues

raised in both of Meadows grievances. APA has also identified this as a major problem and filed two pilot domicile base grievances over the very same issue.

70.    Indeed, of the key Objective noted in APA's Constitution and Bylaws Article II.B is to; *"To protect the individual and collective rights of the members of the APA and to promote their professional interests, including timely prosecution of individual and collective grievances. "*, and Article II.D. further states to, " *maintain uniform principles of seniority and perpetuation thereof."*

71.    On August 18, 2011, APA's New York ("LGA") base representatives filed LGA base grievance #11-054, on behalf of all MDD pilots system-wide; which protested the Company's failure to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. It was submitted to System Board on 8/21/13, but was abandoned before it was heard, and secretly settled on a non-precedent basis for just one particular MDD pilot, who was quietly reinstated to the seniority list.

72.    On May 22, 2012, APA Dallas ("DFW") Base Chairman, Capt. Rusty McDaniels, filed DFW Domicile Grievance #12-012 on behalf of all Meadows and all other similarly situated MDD pilots system-wide, which is currently pending an appeal hearing, and states and protests in relevant part;

> *"Pursuant to the May 1, 2003, Agreement between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the ; undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."*

73.         On January 2, 2013, American Airlines during its bankruptcy proceedings filed an

Objection to Meadows' Motion to Lift Stay, wherein it asserted that *"Meadows is currently a*

*party pursuant to American's"* CBA, and that **Grievance 12-012 was** *"filed on behalf of*

*Meadows"*, **and would resolve his claims,** stating in relevant part;

> "The automatic stay should not, however, be modified to allow Meadows to initiate
> new, additional judicial proceedings to (i) determine his employment status, and (ii)
> determine which benefit plan applies to him (the "New Proceedings") **because the
> issues that would be raised in the New Proceedings may be disposed
> of**...**through the APA Grievance (as hereinafter defined) to which Meadows is
> party pursuant to American's collective bargaining agreement ("CBA") with
> the Allied Pilots Association ("APA")."** ; and,

> "...**the APA filed a grievance (DFW Domicile Grievance No. 12012) (the
> "APA Grievance") on behalf of Meadows** and certain other DFW based pilots
> that had **been terminated because of the Five-Year Rule, asserting that they
> had not received adequate notice of their terminations.** The APA Grievance is
> pending. **Unless resolved in that process, it will be decided by a Board of
> Adjustment under the CBA** as required by the Railway Labor Act, 49 U.S.C. §
> 184." [Emphasis Added].

74.         In December 2015, APA Staff Attorney Mark Meyers, admitted in his sworn

testimony that grievance DFW base Grievance 12-012, was still pending and applied to ALL

similarly situated MDD pilots system-wide, including Meadows.

75.         To date, some 6 years after APA filed Grievance 12-012, on behalf of Meadows

and 240 other similarly situated MDD pilots, it has failed to process and schedule a hearing,

much less arbitrate this Grievance to a RLA System Board of adjustment, in breach of APA's

duty under the its C&B, the CBA and the RLA.

### *APA's Arbitrary Treatment of LTD/MDD During The Pilots' Equity Distribution Proceedings*

76.         As part of the AA-APA Bankruptcy Settlement Agreement, APA was charged

with distributing approximately $1B in equity to each of its pre-merger 8,400 legacy AA

members, or roughly of an average of $100,000 plus per pilot; hereinafter the APA Equity Distribution Proceedings ("ED").

77.         APA's Equity Distribution Committee ("EDC") created Eligibility and Distribution Methodology Rules; which showed Plaintiff was clearly entitled to a full payout from all four equity silos, or about $135,000, based comparison to pilots of similar seniority and service.

78.         However, in Plaintiff's case APA's EDC did not follow its own distribution rules, and instead said it *"looked at the totality of the situation..."*, and manually adjusted his status; leaving him with only a partial payout from just two of the four silos, which amounted to only $35,459.96.  Moreover, APA did not even notice any other MDD pilots of their eligibility to participate in the equity distribution.

79.         APA's EDC website also contained data errors incorrectly showing Plaintiff only had 17.5 years of Pension Credited Service, as opposed to his correct amount of 20 years. Which not only significantly reduced his equity payout, but also reduced his annual pension annuity by $4,265.72/year.

80.         Plaintiff filed a formal APA Equity Distribution Arbitration Challenge, which was heard by RLA Arbitrator Stephen Goldberg on July 13, 2013. Wherein, amongst other things he argued that APA refused to correct data errors related to his status and years of pension credited service, and ignored his full eligibility status in violation of APA's published Equity Distribution Eligibility and Distribution Methodology Rules,

81.         Ultimately, on October 17, 2013, RLA Arbitrator Goldberg issued his final Decision and Award, which awarded Meadows a full share pay-out from all from all four silos of the Equity Distribution (which amounted to $135,892, or $100k more than APA had improperly readjusted in its initial calculations), holding in relevant part;

" ***FO Meadows filed a grievance in February 2012 alleging that the reason why American removed him from the seniority list was not that he had been on sick leave for more than five years (which would have called for his removal in 2009), but because he had filed a 2011 Sarbanes-Oxley complaint against American.*** *APA has submitted that grievance to a Pre-Arbitration Conference, noting that the grievance "protest[ed] the Company's action in removing him from the seniority list and discharging him from American Airlines...*

***I do, however, hold that it is arbitrary for*** *APA to treat pilots who have a pending TAG grievance as sufficiently likely to be successful that they will be treated, for purposes of Equity Fund eligibility, as if they will be successful,* ***while treating differently pilots [Meadows] who have a pending non-TAG grievance that challenges an administrative termination****. APA offers no explanation for this different treatment...*

***APA ignores the fact that it also is advocating for FO Meadows, albeit for reinstatement to the seniority list.***"   [Emphasis Added].

82.       In those proceedings, RLA Arbitrator Goldberg essentially found that APA had ignored its duty otherwise owed Meadows, and treated his Grievance 12-011 arbitrarily, failing to treat it as sufficiently likely to prevail as compared to other non-LTD/MDD pilots' termination grievances. Further, he concluded if Meadows grievance 12-011 was sustained, it was reasonable to assume that his *"administrative termination"* would be overturned and he would be retroactively reinstated to the pilot's seniority list, holding in relevant part;

**Hence, if his grievance is sustained, FO Meadows' administrative termination will be overturned, and he will be back on the seniority list, presumably retroactive to the date he was removed, i.e., November 4, 2011.** It is equally safe to assume that if his grievance is sustained, the arbitrator would not countenance his removal from the seniority list in the period between November 4, 2011, and the date of the arbitration award.

**In sum, then, it is reasonable to assume that if the grievance is sustained, FO Meadows would be treated by the arbitrator as a pilot who should have been on the seniority list on January 1, 2013, the date on which pilots on the seniority list are eligible for recovery from all four silos, even if they were on LTD status."** [Emphasis Added].

83.     Meadows was the only pilot out of 1,200 who filed arbitral challenges, who was awarded a full share payout from all four silos of APA's Equity Distribution. Additionally, due to his testimony and evidence presented, APA was forced to also award approximately another 200 LTD pilots three silos instead of two, increasing their payouts by an average of approximately $30,000. Thus, because of Meadows arguments, APA was ordered to distribute over $6M additional equity to its LTD and MDD pilots.

84.     Immediately, after those Equity Distribution proceedings, and especially after the Meadows' favorable Decision and Award, APA began to exhibit extreme animus and treated him with hostility, and suddenly refused to submit his ongoing Grievance 12-011 to the final step of arbitration before a RLA System Board of Adjustment; which appeared to was a retaliatory attempt to work *hand in glove* with American to sabotage  and abandon the APA's previous timely preservation of not only Meadows' contractual claims, but also his statutory SOX and ADA claims explicitly referenced within Grievance 12-011.

### *Meadows's files his 2nd Company Termination Grievance #13-064*

85.     On October 31, 2013, Meadows filed a second individual grievance #13-064) which protected Company's violations of the CBA Sec. 13 & 11, as an appeal directly to American's Exec V.P. of Flight.

86.     In this grievance Meadows explicitly reasserted that the Company was abrogating his pilot seniority and had purportedly *"administratively terminated"* him in violation the Sec. 13 and 11 of the CBA, as explained in further detail below.

87.     First and Foremost, **CBA Section 13 *"Seniority"*,** is the controlling Section as it relates directly to pilot seniority issues.  Further, the language of **Section 13.C. *"Retention of***

*Seniority"*, explicitly dictates that, "*a pilot once having established seniority, shall not lose such seniority except as provided in this Section [13]."*

88.          Second and more importantly, **Section 13.F. *"Loss of Seniority"***; only allows for forfeiture of pilot seniority under the four distinct circumstances for, "*A pilot who (1) resigns from service of the company, (2) retires, or is (3) discharged for just cause...,* or (4) fails *"to return to duty as a pilot "* from a furlough recall.

89.          None of those circumstances apply to Meadows personally; as he never resigned, retired, been discharged for cause, nor was he ever furloughed.  Therefore, the Company had no contractual basis whatsoever to remove Meadows the seniority list, much less *"administratively terminate"* his employment. In fact, the term *"administrative termination"* does not exist anywhere in the CBA

90.          Third, **Section 13.C. *"Retention of Seniority"***, goes on to state *"nor shall such pilots* **relative position** *on the Pilots' System Seniority List be changed for any reason...except as provided in paragraph B. of this Section [13]."*

91.          Fourth, **Section 13.B. "Seniority Date", goes** on to state that a pilot, *"shall continue to accrue [seniority] during such period of duty except as otherwise provided in Section 11..."*

92.          Fifth and finally, **Section 11.D.1 *"Sickness and Injury Leaves"***, does not in any way explicitly provide for the *"administrative termination"* of a sick or LTD pilot, nor the forfeiture of such pilot's seniority by removing them from the Pilot System Seniority List. This Section only speaks to the fact that, *"a pilot shall be allowed to retain and continue to accrue"* his relative position on the seniority list during sick leaves of absence, which do not

exceed total continuous period of five (5) years. Nothing more. Regardless, the past-practice is for LTD pilots to be slotted in at their original relative position on the seniority list.

93.      On December 13, 2013 the Company sent a certified mailing, acknowledging Meadows new grievance 13-064, and directing him to contact APA to schedule a hearing. That same day APA staff attorney, Mr. Chuck Hairston contacted Meadows to schedule a hearing, but explicitly told Meadows that he is not a member, that APA does not represent him, and owes him no duty (despite its contractual and statutory obligations to the contrary).

94.      On February 27, 2014, grievance #13-064 was initially heard as an appeal grievance (step 2). APA's attorney, Mr. Hairston and two base representatives attended the hearing, but at the start of the hearing, Hairston admitted he was not representing Meadows in an official capacity, and would be taking no role in support of this grievance.

95.      Subsequently, On March 23, 2014 the V.P. of Flight issued a written denial of grievance #13-064, and on April 2, 2014, Meadows requested the APA President to appeal his second grievance to a PAC, but said request for resolution was denied on April 23, 2014.

96.      Eventually, on July 17, 2014, Meadows amended his Utah district court DFR lawsuit against APA, to compel both grievance 12-011 and 13-064 to arbitration before a RLA System Board of Adjustment. (as described in more detail below).

### *Plaintiff Sues APA To Compel Arbitration of His Grievances*

97.      On January 17, 2014, Meadows took extra efforts to ensure that his valuable CBA, SOX-WB, and ADA claims contained in grievance 12-011 continued to be preserved. These claims provide for make whole remedies including back pay/benefits, reinstatement/reasonable

accommodation, and forward pay/benefits, are valued at $5.069M, as calculated by Meadows economic expert[1].

98.        To that end, Meadows put APA on written notice that he still had valuable legal remedies that flowed from grievance #12-011 (i.e.; a federal lawsuit to compel arbitration of grievance 12-011), and requested APA continue to preserve that grievance as listed in APA's original Proof of Claim (POC) filing in American's bankruptcy proceedings.

99.        On February 19, 2014, Meadows filed a lawsuit, *"Meadows v. APA and American Airlines"* (UDC, Case No. 2:14-cv-00115-DS), which sued APA to compel arbitration of his Grievance 12-011 before a RLA system Board of Adjustment, and named American as a required party. That matter is still pending appeal, which is stayed due to another pending appeal of a related order in American's bankruptcy proceedings.

100.       On February 26, 2014, Meadows and is Miami Union base representatives traveled separately to Dallas, to personally attend a hearing the following morning for his second grievance 13-064, before American's V.P of the Flight Department.

101.       On the next morning, on February 27, 2014, Meadows attempted to meet with his Miami Union bases representatives at APA Headquarters, to pre-brief his grievance hearing. But he was told that APA's Legal Director having just learned of his recently filed DFR lawsuit, refused him access into the building. Thus, Meadows was forced to meet his Miami representatives in the parking lot just minutes before his grievance hearing. This, severely

---

[1]        APA was provided a detailed 19 page, economic expert report  prepared by a Berkeley research Group economist, which valued Meadows' American Airlines piloting career at $5.609M (under the old CBA rates), to include back pay/benefits, and reinstatement to the pilot seniority list, retroactive to the date he was unlawfully removed, and reassignment to a non-flying job as a reasonable accommodation within the pilots bargaining unit (based on AA's past-practice of Special Assignment jobs),  until such time he was medical certified to return to the cockpit, thru age 65 retirement.

FIRST AMENDED COMPLAINT

prejudiced Meadows hearing preparation, and was obviously retaliation in violation of

Meadows LMRDA Right to Sue, 29 U.S.C. § 101(a)(4).

102.        On July, 17, 2014, Meadows amended his Utah DFR complaint with additional

LMRDA claims; which on 11/15/14 were dismissed w/o prejudice, until such time that he

first exhausted his internal union Article VII remedies. Which he subsequently timely filed,

and prosecuted for over two years through 10/18/18, until APA improperly foreclosed him.

### *APA Continues to Retaliate And Eliminates Meadows Grievance from its Proof of Claim*

103.        On February 28, 2014, Meadows while in Dallas, met with AA Senior Attorney,

Marjorie Powell.  Who told him that AA intended file an Objection to all of Meadows

claims, and that she was "informed" that APA was no longer preserving Meadows grievance

in its POC, but he didn't believe her and thought she was posturing.

104.        In fact, on March 7, 2014, unbeknownst to Meadows, APA's Sec-Treasurer, Pam

Torell, amended APA's general Proof of Claim ("POC") in American's bankruptcy

proceedings without notice to Meadows or the membership, and unilaterally eliminated

Meadows' grievance 12-011, in spite of Meadows prior written requests to continue to

preserve it.

105.        On March 14, 2014, American filed an Objection to Meadows claim in its

bankruptcy proceedings, and only ten days after discovering and reading it did Meadows

himself learn that APA had indeed eliminated his grievance 12-011 from its POC, stating;

> "the APA filed Proof of Claim No. 13866 (the "Amended APA Claim") against
> American Airlines Inc. in the unliquidated amount of $2,699,952.00. The
> Amended APA Claim was asserted on behalf of the APA itself, as well as each
> individual member pilot**. The Amended APA Claim amended the APA Claim
> to update the list of claims excluded from the settlement approved by the
> APA Order, and the updated list of Excluded Claims does not include
> Grievance 12-011."** [Emphasis Added].

106.         On March 25, 2014, Meadows began writing certified letters to APA's President,

Board of Directors, Secretary Treasurer, and Legal Director demanding an answer as to why

APA had eliminated his grievance without his knowledge, and requested that APA re-amend its

POC and add it back.  Meadows even called APA's bankruptcy counsel, Joshua Taylor; who later

appeared on behalf of American to help defeat Meadows claims.

107.         Despite Meadows numerous requests, APA took no action to re-amend its POC,

in so doing it abruptly abandoned without notice not only Meadows' contractual claims, but also

his valuable statutory ADA and SOX claims, originally preserved by APA in general POC Claim

and subsequent incorporation of Grievance 12-011 into the collective bargaining agreement.

108.         On April 17, 2014, the U.S. Bankruptcy Court of the SDNY heard argument on

American's Objection to Meadows' personal and APA's POCs. During that hearing American

admitted that while Meadows' grievance 12-011 had alluded to statutory SOX-WB and ADA

claims, but that they believed it was based purely on violations of the contract, since it was

submitted pursuant to Sec. 21 of the CBA.

109.         American's attorneys also stated they weren't objecting to determination of the
grievance with respect to terms of the CBA itself, and admitted to the court that the grievance
#12-011, *"will run its process under the union and collective bargaining agreement processes --
outside of this court."* Additionally, American's attorneys specifically requested an Order which
stated in part, *"Meadows shall be permitted to arbitrate Grievance 12-011 before the System
Board..."*

110.         During that hearing, APA's general counsel, Steve Hoffman, and its bankruptcy

counsel, Joshua Taylor, made a surprise appearance at the hearing. They did not appear in their

official capacity as Meadows union representative/agents. Quite the inapposite. Further, they did

so without filing notice or any pleadings with the bankruptcy court; and without Meadows

knowledge, request, nor consent.

111.        Outrageously, just prior to the conclusion of American's April 17, 2014 bankruptcy claim objection hearing, without being called upon, Mr. Hoffman abruptly stood up and made oral arguments completely contrary to Meadows position; and in so doing bolstered AA's arguments, asserting that there were no contractual claims and that APA didn't support his statutory claims (despite APA attorney's prior written statements to the contrary).

112.        APA's as Meadows union representative/agents, disingenuously took a position against Meadows, on behalf of is adversary; and worked hand-in-glove with American to thwart his contractual and statutory claims in those proceedings. This, only further highlighted APA's animus and retaliatory hostility toward Meadows, in a willful violation of the Duty of Fair representation which otherwise owed him as an airline employee under the RLA and APA C&B.

113.        As a result of APA's positions taken in that hearing in support American's Claim Objection, Judge Sean Lane issued an Order; stating 'Meadows shall be permitted to arbitrate" his contractual claims under grievance 12-011 (which APA argued they didn't support), but disallowed Meadows' statutory SOX and ADA claims (based on APA's argument). Thereby, depriving Meadows of the valuable make whole and reinstatement remedies those claims would have otherwise provided him.

114.        So in effect APA left Meadows *remediless*, by taking deliberate steps to not only to abandoned prosecution of his contractual claims (previously asserting he was pursuing statutory claims in the appropriate forums), but then subsequently went so far as to aide American in the disallowance his statutory claims originally preserved and supported by APA.

### *APA' s President and BOD Refused to Process Meadows' Petition for Seniority Number Reinstatement in Violation of Its Very Own Policy Manual*

115.     On March 20, 2014, in response to the problem of LTD/MDD pilots who like

Meadows who were being dropped from the seniority list, the APA Board of Directors

recently took action, and added the following amendment to its policy manual;

**"1.22 Reinstatement of Pilot's Seniority Number for Those on MDSB[2] [LTD] Greater Than Five Years**

A.   <u>As soon as practicable, the President shall inform the APA Board of Directors, in writing, of the circumstance underlying the request of the pilot who petitioned APA for support of reinstatement of their original relative AA seniority number of a pilot wishing to return to the seniority list after greater than five years on MDSB.</u> The President shall state whether the petitioning pilot was/is an APA member in good standing. The Board members shall then have seven days to consider each case and must advise the President of any noted objections, in writing, within the seven-day period of their objection(s). Absent any written objection(s) from an individual Board member, the President shall then have the authority to sign a letter authorizing reinstatement of said pilot's seniority number.

B.   <u>If the President chooses not to agree to reinstate a pilot's seniority number for any reason, or there is a Board member objection, the said pilot shall have the opportunity to directly petition the APA Board of Directors for seniority number reinstatement.</u> The BOD shall retain final decision authority in each seniority number restoration case by majority vote. (03/20/2014)" [Emphasis Added].

116.     That very same day, in accordance with the newly amended APA Policy Manual

Section 1.22.A, Meadows submitted a certified demand letter to APA Pres. Wilson; which

petitioned for reinstatement of his original relative AA seniority number. But, the Pres.

Wilson, never processed Meadows' petition for seniority reinstatement within the required

seven days.

117.     Thereafter, Meadows engaged in numerous correspondence with APA Legal, and

eventually petitioned directly to the APA BOD, but they still refused to process Meadows

petition for seniority reinstatement.

---

[2]     "MDSB" is another Company employment status code ascribed to pilots who receive collective bargained older pension funded benefits under the older pilot pension funded "Program", it is akin to "LTD" which is ascribed to pilots receiving collectively bargained disability benefits under the newer Company funded "Plan".

FIRST AMENDED COMPLAINT

118.     On April 22, 2014, Meadows sent an email to APA's Legal Director, threatening

to filed a discrimination unless APA reinstated his seniority; stating in part;

> "Just to be clear, if APA is absolutely refusing to process my petition on the basis
> of medical disability, then please advise Bennett [APA Legal Director] that
> <u>myself and many other similarly situated pilots will be filing EEOC charges on
> that matter. I truly prefer to avoid such action, but unless I hear otherwise I will
> do so on Wednesday morning.</u>"

### *Without Notice APA Unlawfully Locked-Out Meadows and all Similarly Situated LTD/MDD Pilots From the Virtual Union Hall (C&R)*

119.     For over 20 years, APA on its website has maintained a member only website

discussion forum, called Challenge and Response ("C&R"), which serves as a virtual union

hall for APA's pilot members. Wherein, pilots freely assemble and speak out, by posting

various topics affecting them, and engaging discussion threads.

120.     APA Maintains a C&R Acceptable Use Policy ("AUP") which limits use to

Active, Retired, and Furloughed Members, and is published on APA's website as follows;

### *Challenge & Response/Membership Forums*

> The following specific Terms and Conditions of Use apply to Challenge &
> Response and other unmoderated member electronic forums ("Forums").
> *Members Only:* Authorization to participate in the Forums is restricted
> exclusively to **active, retired, and furloughed APA members.**

121.     APA' past-practice was to treat Meadows and all other similarly situated disabled

LTD/MDD pilots as Active APA Members for purposes of accessing C&R since its

inception over 20 years ago, and for all other rights, privileges, and benefits of membership,

including voting, committee membership; and for *"participation in Association sponsored*

*programs",* such as the ***APA Group Term Life & Voluntary Accidental Death &***

***Dismemberment Insurance Plan, For Active Members,*** which specifically provides that,

*"Disabled Members are considered Active until age 65 or Retirement (if earlier)."* (Plan Doc. Pg. 6, footnote 1).

122.     Additionally, before Pam Torell was elected Secretary-Treasurer in 2013, the long-standing past practice of her predecessors in that office was to issue Meadows and other LTD/ MDD pilots, Active APA Membership cards; with which they enjoyed rights of as member in good standing, including but not limited to attending union meetings and voting.

123.     On March 27, 2014, APA LTD/MDD member, Meadow made a post on C&R, that was highly critical of APAs leadership; and discussed in detail APA's representational failures abandonment of those LTD/MDD pilots' disability benefits termination claims and unlawful removals of from the seniority list. Further, revealed American's *"pilot disability cost savings"* scheme, facilitated through the use a fraudulent 3rd party pilot disability claims reviewer mutually selected by APA, and the resultant 84+ LTD pilots who had their disability benefits wrongfully terminated. This became the most viewed actively discussed thread on C&R in the weeks that followed.

124.     By way of background, over one year later in discovery in the case of another LTD/MDD pilots; Meadows learned that on March 28, 2014, the very next day after his C&R post; that APA Pres. Keith Wilson, and Sec-Treasurer Pam Torell sought legal advice from APA general counsel regarding that C&R Post and the subsequent lock-out.

125.     On April 22, 2014, Meadows sent an email to APA Legal, and stated;

> "Just to be clear, if APA is absolutely refusing to process my petition on the basis of medical disability, then please advise Bennett [APA Legal Director] that <u>myself and many other similarly situated pilots will be filing EEOC charges on that matter. I truly prefer to avoid such action, but unless I hear otherwise I will do so on Wednesday morning.</u>"

126.       Less than two hours after Meadows threatened to file an EEOC charge, without notice and in violation of its own policy, APA abruptly revoked of Meadows and all other disabled LTD and MDD pilots access to the entire APA member website including C&R. This action was later found to be an unlawful violation of the LMRDA free speech rights of similarly situated MDD pilot, Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14cv-80518, Jan. 4, 2017); wherein, **Judge Hurley, opined that the APA BOD who sought the directive to lock-out APA's disabled MDD pilots was *"likely motivated by a desire to silence a group he viewed as combative and litigious."*** [Emphasis Added].

127.       Meadows immediately contacted the APA webmaster to troubleshoot his inability to login to the APA website; but was shocked when the IT manager informed him that it was not a technical error, but instead an *"executive decision"* designed to lockout all disabled pilots from APA's website, because they were deemed to not be members.

128.       On information and belief Meadows learned that this " C&R lock-out" was in retaliation for his threat of an EEOC charge, and the numerous website postings of he and other LTD/MDD members who were highly critical of APA and its leaders. Further, Meadows's Miami union base representative, said that the lockout was done at the behest direction of APA's President Keith Wilson, and Legal Director Bennett Boggess.

129.       The Association for Union Democracy (AUD), found APA's lockout of disabled pilot members to be outrageous. The AUD was so highly offended that it assigned an attorney to investigate the matter, and also published a two-page article in its bi-monthly national newsletter the "Union Democracy Review" that was critical of APA actions. (Exhibit A).

### *APA's Disingenuous Course of Conduct Taking Wildly Inconsistent Positions on LTD and MDD Membership Status From Forum To Forum As it best Suited Its Legal Arguments*

31

FIRST AMENDED COMPLAINT

130.     However, not until over a year later, did Meadows discover, that on April 22, 2014, the same day as APA locked-out its LTD/MDD members from C&R, a Special APA BOD meeting was held with National Officers, BOD, and general counsel present.  During a secret closed session of the meeting, the BOD took an informal vote (in violation of APA policy, votes and motions must be in open session), based on which Dallas Chairman and APA Membership Committee Chair issued a directive that APA's MDD pilots are no longer members, for the improper purpose of revoking their C&R access, which stated in part;

> "Per conversation with the BOD in the SBOD meeting on 4-22-14 **remove MDD pilot's access to the APA web site. These pilots are not members of APA,** are not on the seniority list and do not have access to APA benefits" [Emphasis Added].

131.     On July 22, 2014, Meadows amended his complaint in, *"Meadows v. APA and American Airlines"* (UDC, Case No. 2:14-cv-00115-DS), and added an additional breach of DFR claim for his second individual grievance 13-064, and also an LMRDA claim for violating his Union Member Bill of Rights, in particular freedom of speech and assembly.

132.     Thereafter, on August 5, 2014, APA's general counsel in its pleadings to the Utah District Court asserted that ; 1) long term disabled MDD pilot Meadows is in fact a member of APA, and  2) the *"The terms and conditions of Meadows' APA membership are governed by the APA Constitution and Bylaws.",* and 3) *"As a condition of membership in the APA, Members of the Association shall accept and agree to abide by the Constitution and Bylaws of the APA . . . .",* and  further 4) **the APA C&B is indeed a binding contract,** asserting that, ***"[Meadows] does not challenge—nor could he—the long settled notion that the C&B is binding on him as a contract with the APA."***

133.        Those, material misrepresentations of fact to the U.S. District Court, were made for the improper purpose of depriving Meadows of his individual statutory right to compel arbitration of his grievances before a RLA system board; which was on the heels, of AP BOD' April 2014, secret declaration that Meadows and similarly situated LTD/MDD pilots were not members of APA for the improper purpose of revoking his access to the virtual union hall (C&R).

134.        Further, APA material misrepresented existing case law, wrongful asserting that as an RLA employee was not entitled to individual statutory right to compel arbitration of his grievances before a System Board; which was in stark contradiction to the adverse ruling APA itself received for denying the individual right to arbitration of the grievance of several other American pilots, who sought to enforce that right. See *Brady v. Allied Pilots association and American Airlines, Inc.* (NDTX, No. 3:03-CV-0984-D, Dec. 15, 2003), which upheld their statutory right to arbitrate their grievances to an RLA system board, relying on similar rulings in several other circuits.

135.        Moreover, November 5, 2015, based on APA's former general counsel's misrepresentation that Meadows was an APA member bound by its C&B, it also improperly argued for and successful obtained an order dismissing Meadows LMRDA claims without prejudice, until he exhausted his internal union remedies (under APA's C&B, Article VII Charges), which required him to be an APA member in good standing to file and exhaust. The UDC Court's Order stated in relevant part *"Therefore, the Court holds that Plaintiff must exhaust his union remedies before filing his LMRDA claim."*

136.        APA attempted to make the same disingenuous argument in the similar and parallel LMRDA case of *Emery Id.*, but FLSD Judge Hurley saw through APA's

disingenuous argument and determined that it was futile for MDD pilots Emery to exhaust internal union remedies (who like Meadows was also declared a non-member); thus, her LMRDA claims were ripe and heard a 4 -day trial.

137.        Accordingly, on April 6 and 14, 2015, Meadows timely filed Article VII charges Against APA President Keith Wilson and APA Sec-Treasurer Pam Torell, for unlawfully locking-out him and similarly situated LTD/MDD pilots from C&R, and refusing to issue him an Active Membership Card. APA deemed the charges cognizable, and those matters were heard by the APA Appeal Board ("APA AB").

138.        Unsurprisingly, on November 19, 2015, the APA AB, having been advised by the same general counsel who was litigating against Meadows in the UDC, issued a decision dismissing Meadows charges that APA Pres. Wilson action of locking-out Meadows from C&R violated APA policy was unlawful violation of the LMRDA, holding in part; *"the charges against President Wilson are without merit."*

139.        On June 30, 2016, in apparent attempt to cover for APA's general counsel's misrepresentation to the UDC (and pending Rule 11 and 60 motions), on his last day in office APA Pres. Wilson, issued a Presidential Constitutional Interpretation of the APA C&B, which reversed the April 2014 BOD directive that Meadows and similarly situated LTD/MDD pilots were non-members, and suddenly declared that they were instead now Inactive APA Members (who can't vote, hold office, chair committees, or attend meetings) But, there is no such term as "Inactive" or Active" member under the LMRDA, 29 U.S.C. § 401 ¶(o), under which the only type of member is a *"member in good standing."*

140.        Further. in his Constitutional Interpretation, Pres. Wilson also improperly interpreted the CBA, which is in direct violation of the Railway Labor Act ("RLA") 45

U.S.C. §151 *et seq.*, mandate that such interpretations of a collective bargaining agreement are subject to the exclusive jurisdiction of a RLA System Board, therefore, Wilson's interpretation must be deemed invalid and unenforceable on its face as a matter of law.

141.     On July 1, 2016 APA's new President CA Dan Carey mandated that the APA BOD consider following hypothetical question in his July 1, 2016 blast "Challenges Ahead";

> *"I have asked them [APA's Officers]to consider one question I want us to ask in everything we do: Is this good for the members we serve?"*

142.     On September 28, 2016, during the Article VII hearing of *Meadows v. Wilson*, APA Membership Committee Chairman, Rusty McDaniels (*very same APA BOD officer who issued directive that MDD were non-members in April 2014*), admitted during his sworn testimony LTD/MDD pilots remained members in good standing if they were current in their dues, and in good standing prior to going on a disability status, as was the case for Meadows. (*Wilson* Art. VII. Hrg. Tr. 9/27/16, 178:2-7 and 198:1-3).

143.     Since the APA C&B does explicitly not define member in good standing, Arbitrator Wolitz addressed that issue in the Article VII Arbitration of *Annable v Wissing* (AAA Case No. 71-300-00050-004, Jan. 10, 2005, pg. 22), wherein Arbitrator Wolitz defined a *"member in good standing"* someone who, *"pays his current dues and*

FIRST AMENDED COMPLAINT

*assessments"*, stating in relevant part;

....

> *The Constitution and Bylaws specifically provide in Article VII (A) that
> a member is subject to fine, suspension, or expulsion. It also provides in Article
> III, Section 5, that a member is in good standing so long as he pays his current
> dues and assessments. There is no other requirement for good standing status.*
>
> *Members in good standing are*
>
> *entitled to participate actively in all APA activities and ... to all the rights
> privileges, and benefits of membership in APA. (Article III, Section 7.)*
>
> ...
>
> *Only members in good standing and retired members shall be eligible
> for national office. Only active members in good standing shall be eligible
> for the office of Domicile Chairman and Vice Chairman...at their domicile.
> (Article V, Section 2)*

144.        Indeed, the APA AB Article VII proceeding, of *Sproc v. APA Nat. Officers* (APA

AB, Nov. 30, 2012, pg. 4), applied the prior Article VII case law and arbitral precedent from

*Annable v. Wissing*, and used Arbitrator Wolitz's definition of "member in good standing', <u>to

rule that then LTD Inactive APA member (and then sitting APA AB Committee Member)</u> **Joe

Barkate**<u>, having paid all his dues and assessments up to the date of his disability, indeed

remained a member in good standing,</u> holding as follows,

> Therefore, one can reasonably conclude that the term "member in good standing" refers
> to whether a member has fulfilled his financial obligation to the Association. First Officer
> Barkate has no current financial obligation to pay dues and at the time of his appointment had
> fulfilled his commitments.
>
> This Board's interpretation of the relevant passages of the APA Constitution and Bylaws
> pertaining to the meaning of "in good standing" is essentially the same as that highlighted in
> Arbitrator Wolitz's decision (*Annable v. Wissing, AAA Case No. 71 300 00050 004, January
> 10th, 2005, pg. 22).*

Additionally, the APA AB decision in *Sproc Id.* with respect to LTD Inactive APA member Joe

Barkate, was left undisturbed on appeal to Arbitrator Valdverde

145.        Moreover, the APA Constitution and Bylaws, Article III, Sec. 7.A. states a;

*"member in good standing is entitled to participate actively in all APA activities and is entitled to all of the rights, privileges, and benefits of membership in the APA."*

146.        Furthermore, the APA C&B Art. 1 Sec. 6, states that APA is governed by the

Parliamentary Law of Roberts Rules of Order (" RONR"), which in turn adheres to the

doctrine of the hierchy of laws, i.e.; statutory laws are superior to state laws, corporate

charters, and Constitution & Bylaws, (in this case the APA C&B). Indeed, in the Article VII

Arbitration Decision and Award of *Sproc v. APA Nat. Officers*, Arbitrator Valverde applying

that doctrine, held that the C&B cannot preclude federal law of the RLA, or similarly in this

case the LMRDA.

147.        Therefore, it is well settled that under APA's C&B inferior to, and simply cannot

preclude the superior statutory law of LMRDA, any pilot who meets requirements of a "member

in good standing" as define under the LMRDA.

148.        Regardless, to the extent APA has subjectively reinterpreted in its C&B to imply

that LTD/MDD members such as Meadows, are not in good standing and do not have full

membership rights, is plainly superseded by the plain and unambiguous language of the

LMRDA Union Member Bill of Rights, 29 U.S.C. §411, Sec. 101(b), which mandates that;

> ***"(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect."*** (29 U.S.C. §411, Sec. 101(b). [Emphasis Added].

149.        Just as was proven in the federal LMRDA suit of similarly situated APA MDD

member, Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14-cv-80518,

Jan. 4, 2017); that suit involved APA's refusal to issue her and similarly situated LTD/MDD

pilots APA membership cards, and locking them all out of the members only website

discussion forum, C&R, in violation of her LMRDA free speech rights. Tellingly, on the eve

of the four-day trial, sensing an impending loss APA suddenly issued all similarly

LTD/MDD pilots, including Meadows, Inactive APA Membership cards; but those cards are

worthless, as they do not afford such members access to local domicile or BOD union

meetings.

150.         Thereafter, the honorable Judge Hurley found that LTD/MDD pilot Emery was

indeed APA union member entitled to rights under the LMRDA, and in particular in her case

LMRDA Free Speech. Accordingly, on January 4, 2017, Judge Hurley entered a Ruling that

the APA's C&R lock-out amounted to an impermissible infringement of APA LTD/MDD

member *Emery's* Free Speech Rights in an unlawful violation of the LMRDA. Further, that

**Court issued an Injunction ordering APA to treat disabled LTD/MDD APA member**

**Kathy Emery as an Active APA member in good standing and immediately reinstate**

**her access to C&R.**

151.         Furthermore, in April 2017, APA filed an answer in the yet another subsequent

case breach of DFR of *Emery v. APA* (FLSD, Case No. 9:16-cv-80243-KAM) and admitted

that, Kathy Emery, as an APA MDD member was indeed a member in good standing.

152.         Thus, for purposes of APA membership, LTD/MDD pilot, Meadows is situated

exactly like Emery, and thus there is precedent in this circuit that supports the fact that

Meadows must also be treated as member in good standing under the LMRDA, who is

entitled to full Union Members.

153.         As a direct result of the *Emery* ruling/Injunction, APA President Dan Carey

issued an Official APA Communication, **"Your Access to C&R"**, which had the effect of

treating LTD/MDD pilots as Active members for purpose of accessing C&R, and stated in

relevant part;

*Today, January 13, 2017, APA President Dan Carey directed that all inactive APA members with an APA status of MDD (Medical Disability Dropped) be granted access to Challenge and Response (C&R).*

154.       However, President Carey reinstated all disabled APA LTD/MDD members, without any modification to the existing AUP which states relevant part;

### Challenge & Response/membership Forums
The following specific Terms and Conditions of Use apply to Challenge & Response and other unmoderated member electronic forums ("Forums"). *Members Only:* Authorization to participate in the Forums is restricted exclusively to **active, retired, and furloughed APA members;**

155.       Therefore, since APA has deemed disabled LTD/MDD pilots to be Inactive Members (in violation of LMRDA) these pilots, are neither Retired or Furloughed; thus, in order to grant them C&R access based on the existing C&R AUP, they must be considered Active APA members. Otherwise, said access would amount to an APA Policy violation.

156.       Given, that standing policy violation, LTD/MDD members C&R access is tenuous at best, and can now be suddenly revoked with yet another Presidential Constitutional Interpretation, and/or a BOD vote, who as per the APA C&B reserves the right to declare any unilateral Presidential action to be invalid at any time.

157.       Additionally, active membership cards are mandatory for attendance of all APA union meetings, but since taking office in July 2013, APA National Officer, Pam Torell, was the first Secretary-Treasurer to refuse to issue LTD/MDD pilots APA membership cards; and in so doing she deprived disabled pilots of freedom of speech and assembly in physical union hall, equal rights to participation and privileges of union membership (voting, holding office sitting on committees. Not until three years later, in December 2017, in the midst of the Emery LMRDA trial (under threat of an adverse ruling), did she finally issue LTD/MDD

membership cards, albeit only worthless inactive ones (which don't afford any member in good standing rights).

158.         On March 1, 2017, the APA Appeal Board held a hearing into Meadows Article VII charges against Pam Torell for her violations committed against Meadows and all other LTD/MDD pilots. After being called as a witness and sworn in, she walked out of the hearing in the middle of her testimony without being released, and refused to appear for the second day. Accordingly, the APA Appeal Board admonished her for usurping their authority noting that her appearance was not voluntary but mandatory, and sanctioned her.

159.         Outrageously, when Meadows appeared for the second day of the *Torell* Proceedings, he was refused access into APA Headquarters. He demanded an explanation from the receptionist, who informed him there was a standing order from APA's Legal Director, Bennett Boggess that he was not allowed in building. That was odd, especially considering that Mr. Boggess had been fired three months prior to that.

160.         Ultimately, in July 14, 2017, the Appeal Board posted its decision on the Appeals Board tab of the APA website. Wherein they CENSURED Pam Torell, because she failed to uphold her constitutional duty to issue LTD/MDD pilots APA membership for 3 plus years, ruling in relevant part;

> "As the Secretary-Treasurer, Captain Torell was tasked with maintaining accurate records and issuing membership cards according to those records, and Captain Torell failed to do this. **The Appeal Board formally censures Captain Torell for violating Article VII, Section A (7) and for failure to carry out the Secretary-Treasurer duties entrusted to her."** [Emphasis Added].

161.         Thereafter, on July 17, 2017, because the APA AB only found Pam Torell guilty of 1 on the 5 charges, and ignored her breach of fiduciary responsibility charges, Meadows timely filed an appeal to a neutral arbitrator.

162.        But the APA AB never published its *Torell* decision in an APA Communications

Blast or News Digest, nor did it inform the membership. Subsequently, Meadows posted a

link to the decision on C&R, and within one week APA Sec-Treasurer Pam Torell removed

her adverse AB decision from the APA website altogether. (*It must be noted that one of her*

*official duties is acting as the administrative clearing house in all Article VII proceedings,*

*akin to the clerk of court*).

163.        In spring of 2017, Meadows also began to engage in settlement discussions with

APA's new general counsel, seeking to schedule grievance 12-011 and 12-012 before a RLA

System Board of Adjustment.  Ultimately, on June 30, 2017 APA's general counsel agreed to

do so unconditionally, and promised that the following week APA would inform the

Company (*which it had already agreed to do in Sep. 2014*) that APA finally agreeing to

arbitrate grievance 12-011 before a RLA System Board.

164.        However, instead of contacting the Company as promised, APA instead side-

tracked and delayed the deal, and assigned staff attorney Mark Meyers (*who has a long*

*history of animus towards LTD/MDD members*) to work on an "agreement" for Meadows'

grievance, which took over three months to draft.

165.        On July 11, 2017, sensing his deal was being side-tracked, Meadows filed this

instant lawsuit for breach of DFR the SLI proceedings. Initially, he delayed service in hopes

of achieving a settlement, but after waiting 89 days and APA failing to have produced a

settlement agreement, he finally served APA on October 6, 2017.

166.        On October 16, 2017, APA finally produced its settlement agreement.  However,

Meadows' Miami union representative, Captain ("CA") Ed Sicher, was outraged and he

informed APA's President and general counsel that that agreement was onerous and wholly

unacceptable as written and demanded it be modified; because it sought for Meadows to waive his right to representation, waive any associated DFR claims, and to allow APA to offer testimony during his arbitration that was contrary to his position.

167.     On October 18, 2017, Meadows filed a to Motion To Stay these instant proceedings based on his ongoing settlement talks to arbitrate individual grievance 12-011 and collective grievnce12-012, as well as continuing, "to exhaust his administrative internal union remedies under Article VII of APA's Constitution and Bylaws (C&B), involving APA's American Airlines Pilots Seniority Integration Committee ("AAPSIC"), for its willful violation of APA's C&B, Art. II.D., *"to maintain uniform principles of seniority and the perpetuation thereof."*

168.     On October, 18, 2017, immediately after Meadows asserted in his Motion that he was still exhausting his administrative and internal union remedies in his Motion to Stay, Court, APA's current President Dan Carey issued a Presidential C&B Interpretation that declared that Meadows and all Inactive APA Members (*to include all LTD/MDD pilots and pilots on LTD > 12 months*) are no longer considered members in good standing.

169.     On information and belief, CA Carey was asked to sign the C&B Interpretation at the behest of APA Staff Attorney Mark Meyers who drafted it.

170.     The timing of this Presidential Interpretation is suspect at best, and was obviously one solely for the improper purpose of foreclosing the Meadows from pursuing very same Article VII internal union remedies, which APA's prior general counsel argued for and successful obtain the prior order from the UDC (*based on its misrepresentations that Meadows was a member in good standing*), which dismissed Meadows' LMRDA claims without prejudice, forcing him to first exhaust his internal union remedies in the first place.

171.    Therefore, now that APA has come full circle, and yet again treated Meadows as a non-member; it has thusly, deliberately foreclosed from his administrative and internal union remedies, pursuing them any further would be futile. Thus, as of 10/18/17 all of his Duty of Fair Representation, LMRDA and breach of contract claims are finally ripe to litigated in federal court.

172.    In Sum, APA has willfully engaged in a malicious, arbitrary, discriminatory and in bad-faith continuing course of conduct, and has unlawfully taken wildly inconsistent positions with respect to the membership status of Meadows and similarly situated LTD/MDD pilots, for the improper purpose of depriving them of their constitutional, statutory and contractual rights.  Including but not limited to, 1) the APA BOD declaring LTD/MDD to be non-members and directing the APA President to unlawfully lock them out of C&R, coupled with 2) APA's Sec-Treasurer's refusal to issue LTD/MDD active membership card. This had the effect of depriving these pilots access to both the virtual and physical union hall, during the most crucial contract negotiations of their airline careers, relating to the merger of the US Airways and American Airlines which also involved the integration of the pilot seniority lists, and creation of a new Joint CBA.

173.    Whereby, APA's discriminatory exclusion and bad faith treatment, severely prejudiced Meadows and all other similarly situated LTD/MDD pilots. Who as a result suffered the loss of constitutional, contractual, and statutory rights, along with their union member union privileges/benefits; but worst of all, Meadows and other LTD/MDD pilots were stripped of their valuable seniority rights, and restoration of the airline piloting careers.

### AMERICAN AIRLINES AND ALLIED PILOTS ASSOCIATION
### PILOTS' SENIORITY LIST INTEGRATION ("SLI") PROCEEDINGS

174.        In the midst of APA's retaliatory and discriminatory actions taken against

Meadows and other similarly situated LTD/MDD pilots. APA further ignored its duty and

abandoned representation of these pilots, treating them disparately in American and APA's

post-merger pilot Seniority List Integration Proceedings ("SLI").

175.        On January 15, 2013, American Airlines, Inc. ("American" or "AA") and U.S.

Airways ("US") executed a merger agreement entitled, Memorandum of Understanding of

Contingent Collective Bargaining Agreement ("MOU), which outlined the terms of the

merger to create the new American Airlines Group, and was signed by AA, US, and APA.

176.        The merger required which required the integration of all three associated pilot

group's seniority lists, to include the list of Legacy American Airlines ("LAA") pilots, and

the Legacy U.S. Airways ("LUS") east and west pilots.

177.        Since 1963, APA has been the exclusive bargaining agent of all LAA pilots, and

remained such during the merger with U.S. Airways, and is now the representative of all

pilots in the new American Airlines Group.

178.        On September 4, 2014, in accordance with the MOU, AA, US, and APA,

executed a Seniority Integration Protocol Agreement ("SIPA"), which described the

methodology to be used to integrate the seniority lists of the LAA pilots, LUS East and West

pilots, and which would be decided by the Seniority List Integration ("SLI") arbitration

proceedings, chaired by a panel of three arbitrators.

179.        APA on behalf of its members, the legacy AA pilots, created the American

Airlines Pilots Seniority Integration Committee ("AAPSIC"), which consisted of nine APA

committee members, tasked with representing and protecting the seniority rights and interests

of LAA pilots during the Seniority List Integration ("SLI") Arbitration proceedings.

FIRST AMENDED COMPLAINT

Although, the AAPSIC was purported to be acting independently, it was actual worked hand-in-glove with and used the very same counsel as APA, who acted as a hostile adversary and attacked Meadows seniority and other related claims in this and other forums.

180.         Meadows is a LAA pilot who was hired in 1991, in the following four-part bid status, MIA/FO/777/MDSB. He is currently receiving pilot long term disability benefits for more than five years, and the Company purportedly removed (*"dropped")* him from the pre-merger LAA pilot seniority list on 10/24/2011, in retaliation for engaging in protected SOX-Whistleblower activity; which actions Meadows timely protested via grievances and litigation which were pending during the pendency of the SLI proceedings, and still are.

181.          As described previously, APA currently lists Meadows and other similarly situated LAA pilots who have been on disability for greater than 5 years, using an internal status code of Medical Disability Dropped from AA seniority list ("MDD"). As of the SLI snap-shot date of December 9, 2016, there were some 239 disabled LAA pilots in "MDD" status.

182.         Meadows and other MDD pilots, receive collectively bargained disability pay in the form of W-2 employee wages subject to tax-withholding, along with Active *"Pilot Employee"* Benefits package (Medical, Dental, Vision, Life Insurance, excluding travel and 401k), as negotiated under the CBA, Letter KK, LAA Pilot LTD Plan. In which the Plan terms define these pilots as *"Inactive Pilots" "Employees" and "Pilot Employees"*.

183.        Accordingly, the AAPSIC treated many (at least 11) of these LAA MDD disabled

pilots as *"Inactive" "Pilot Employees"* [3], and *"pulled and plugged"* [4] them. Thereby

preserving their original relative position on the AAPSIC certified seniority list submitted to

the SLI Arbitral Board.

184.        These certain MDD pilots who received favorable treatment relative to Meadows,

included very senior Captains, and none of them had outstanding individual grievances or

litigation pending against the Company or the union. Meanwhile, most (approximately 228)

MDD pilots including Meadows, who had pending litigation were not protected in

accordance with the SIPA, and were not pulled and plugged, thus did not have their relative

seniority protected on the certified list.

185.        Based on the treatment of other similarly situated MDD pilots, Meadows should

have been treated as an *"Inactive Pilot"* and *"pulled and plugged"* at seniority number 4102

on the AAPSIC certified list, and placed immediately junior to his new-hire class mate, Jon

Scruggs, EE332721 who was placed at seniority number 4101.

186.        In late February 2016, Meadows first learned that the AAPSIC failed to include

him on the certified seniority list, but only includes him on SLI Joint Exhibit 0006A *AAPSIC*

---

[3]        At least the treatment of these LTD/MDD pilots is consistent with Arbitrator Fishgold's 7,300 cockpit
Crewmember Floor Arbitration decision, as upheld by the U.S. District Court of D.C.; which held that pilots on
medical disability while *"on inactive status"* were counted as being on the pilot seniority list; because they are still
considered employees and cockpit crewmembers, and in particular, ***"those on medical disability receive streams
of income, retain seniority rights to return, and are carried on APA's membership data base."*** Moreover, these
pilots are also defined as both *"Employees* and *"Pilot Employees"* under terms of 2004 LAA Pilot LTD Plan.

[4]        "Pulled and Plugged" refers to the practice of inserting an "inactive" LTD/MDD "pilot employee" into their
original relative positon on the LAA pilot seniority list, for purposes of protecting their positon and seniority
number, when the LAA was merged with the LUS East and West list, Thereby, serving as seniority placeholder,
protecting these pilots original and integrated relative seniority on the new integrated seniority list ("ISL").

*Certified List[5]*, which was a scabbed on sheet separate from the actual "certified seniority list", and was simply entitled "TAG" (Terminated Awaiting Grievance'). That "TAG" Sheet, incorrectly showed Meadows holding LAA seniority 6085 (instead of the correct number of 4102) along with other errors of his relevant employment data. And was never used by the SLI arbitral board in its Decision and Award and final ISL.

187.        To the extent, APA's AAPSIC Committee Chairman alleges that he merely blindly accepted and relied upon that erroneous data that was provided by AA; then arguendo, he should have *"pulled and plugged"* Meadows at number 6085 (*based on erroneous AAPSIC data, but his actual number should have been 4101*). However, his argument doesn't pass muster, because the Seniority Integration Protocol Agreement ("SIPA") ¶ 2.a.(1), imposed an affirmative duty that the, ***"Merger Committees shall compile, verify, certify and exchange (in electronic Excel format whenever possible) employment data for each pilot on their respective pre-merger seniority lists,"*** Accordingly, APA by and through its AAPSIC had a <u>duty to verify and certify</u> all LAA pilot employment/seniority information provided by American, but failed to do so on behalf of Meadows.

188.        In fact, APA's AAPSIC had ready access to an APA internal list showing all MDD pilots with their status dates, but the AAPSIC either knowingly or grossly negligently failed to exercise proper due diligence to cross-check employment/seniority data provided by American, against those APA MDD lists.

---

[5]        It must be noted to the extent Meadows employment data was listed in Joint Exhibit 0006A, it was not incorporated in the controlling document, the certified list, upon which the arbitrators relied. Additionally, that data was completely erroneous, showing and incorrect employee number, incorrect, seniority number (shows 6085, but should have been around 3900), and incorrect occupational seniority date. Further, despite Meadows raising these errors matter in correspondence to APA, AAPSIC, and the SLI panel back in March 2016, they were never corrected.

189.       There can be no rational explanation for such arbitrary and discriminatory treatment of pilot's seniority between and amongst the sub-category of LAA MDD disabled pilots, not to mention between the LUS disabled pilots (LTD > 5 years) whose relative seniority was protected and ALL were included on the final ISL. It seems as if the AAPSIC did not adequately represent[6] the seniority rights of LAA MDD pilots, if at all.

### The McCaskill Bond Act and Allegheny-Mohawk LLPs Required APA To Conduct SLI proceedings To Be Conducted in a Fair and Equitable Manner

190.       To be certain, The Memorandum of Understanding ("MOU") ¶ 10 and Seniority Integration Protocol Agreement ("SIPA") clearly provided that the Seniority List Integration ("SLI") proceedings are to be done in accordance with the McCaskill-Bond Statute. 49 U.S.C. §42112; which in turn incorporates Section 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"). (As published at 59 C.A.B. 45). The Allegheny-Mohawk LPPs, state that when a covered transaction (i.e., these SLI proceedings);

> *"results in the combination of crafts or classes that are subject to the Railway Labor Act, sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board ("CAB" or the "Board") in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers." Id. § 42112(a)."*

191.       Indeed, these Allegheny-Mohawk Labor Protective Provisions ("LPPs") **require that the carrier make provisions _"for the integration of seniority lists in a fair and equitable manner,"_**

---

[6]       In April 2014, the Allied Pilots Association secretly declared, and never noticed its members, that Meadows and other LTD/MDD are no longer considered members, and not entitled to any union benefits, and locked its disabled LTD/MDD pilots out of the electronic and physical union hall. Further, during and after the equity proceedings APA's counsel has asserted on numerous occasions that it does not represent Meadows or other similar situated disabled pilots, and thus, does not owe them a duty. Which was contradicted by Arbitrator Goldberg, held that APA ignored its duty and treated Meadows grievance arbitrarily, and awarded him full equity as if he was on the seniority list retroactive to the date he was removed.

FIRST AMENDED COMPLAINT

192.        However, the facts presented in Meadows Motion To Intervene showed the SLI

proceedings were clearly not fair and equitable because; i) APA had abandoned

representation of its LTD/MDD LAA pilots, and therefore, had not adequately represented

their seniority interests, ii) to date there has been egregious inequitable and disparate

treatment of seniority rights between and amongst the long term disabled pilots of LUS East,

LAA, and LUS in these proceedings, iii) and there is a myriad of pilot seniority and

employment data errors in the certified excel pilot seniority lists, particularly with respect to

LTD/MDD pilots, which APA and its AAPSIC refused to correct.

193.        Additionally, although unions and management were typically the parties in

Section 13 arbitrations, the CAB has also held that other employee groups and <u>individual</u>

<u>employees could be granted party status or allowed to otherwise participate.</u>

> See, e.g., Southern Emps. v. Republic/ALEA, 102 C.A.B. 616 (1983) (describing how
> seniority integration was negotiated by an "employee committee" established for
> that purpose without union involvement); Pan Am-TWA Route Exchange,
> Arbitration Award, 85 C.A.B. 2537 (1980) (noting that three individual engineers
> were parties to arbitration);  NAA I, 95 C.A.B. at 584 (denying dissenting group "full
> party status" but noting that they'd been given the opportunity to participate in the
> LPP arbitration).

194.        Thus, the CAB held that, as indicated by the language of the LPPs, unrepresented

employees still had rights to fair and equitable seniority integration and binding arbitration to

resolve integration disputes under the Allegheny-Mohawk LPPs, yet Meadows was denied

such rights, and his request to intervene on his own behalf were ignored.

195.        Most disturbingly, APA's AAPSIC and SLI Arbitral Board were put on formal

notice of these egregious errors, the disparate treatment of LAA MDD pilots, and the

AAPSIC's inadequate representation, via official correspondence, motions to intervene, and

expedited MOU system board grievances filed by Meadows, and other similarly LAA MDD

pilots. All such requests were blatantly ignored, and APA's AAPSIC failed to take action on Meadows behalf and correct these errors.

196.         Specifically, starting on March 1, 2016, Meadows sent a certified letter to APA's AAPSIC to express his concerns that they had failed to list his name and correct employment data, EE number, seniority number, DOH, and status, and that he treated disparately compared to other LAA MDD pilots, and was not *"pulled and plugged"* on the certified seniority list, as otherwise required by the Seniority Integration Protocol Agreement ("SIPA") ¶ 2.a.(1) protocol; which stated in part,

> 2. <u>Within 10 days of either the execution of this Protocol Agreement or the receipt from American of the information described in a. below, whichever is later, **the Merger Committees shall compile, verify, certify and exchange** (in electronic Excel format whenever possible) **employment data for each pilot on their respective pre-merger seniority lists, as follows,** subject to modification for accuracy.</u>

> a. The information certified and exchanged will include the following information to the extent such information is available and can be compiled/provided by American without undue burden or expense:

> <u>>Each pilot's name; employee number; seniority number; Date of hire; occupational seniority >date, if any, and any other date relevant to the pilot's placement on the pre-merger seniority list; date of birth; seat, aircraft, domicile, and information reflecting each pilot's availability to >engage in revenue flying (i.e., leave status,</u> instructor status, management pilot status, <u>>medical/disability status);</u> [Emphasis Added].

Further, SIPA, ¶ 2. a. (7) speaks directly to the seniority treatment of pilots such as Meadows who were terminated or removed from the list, and further states that;

> <u>>(7) Similar information for any pilot who has been terminated or otherwise >removed from the pre-merger seniority list, whose status is the subject of any >pending litigation or dispute.</u> [Emphasis Added].

197.         On March 6, 2016, APA's AAPSIC Committee Chairman, Mark Stephens, informed Meadows in writing that his seniority will be determined consistent with the APA C&B, stating in relevant part;

> >I received, via email, your letter dated **March 1, 2016** <u>regarding disputed seniority claims under the Seniority Integration Protocol Agreement.</u>

>If after the integrated seniority list is implemented, you are ultimately successful in your litigation/grievance regarding termination from American Airlines and/or you are able to regain FAA medical status that would allow your return to flying at American Airlines, **your position on the integrated seniority list will be determined consistent with** the legal ruling or settlement, **the APA constitution and bylaws, the current collective bargaining agreement,** any seniority integration dispute resolution procedure, and applicable union and company policy. [Emphasis Added].

### APA's And Its AAPSIC Failed Their Duty To Treat Disabled LAA Pilots Fairly and Equally in Violation of the Agreements and McCaskill Bond Act.

198.    It became clear that APA's AAPSIC was not treating all disabled Legacy AA pilots fairly and equally, and was simply kicking the can down the road; knowing that those MDD pilots who were excluded from the ISL, by its own rules, would in reality not have any dispute resolution remedy available to them.

199.    Since, the AAPSIC failed to correct Meadows' employment/seniority data errors, on March 7, 2016, he filed a "Motion to Intervene and Protect Lawrence M. Meadows Relative Position on the Integrated Seniority List" directly with the SLI arbitral board asking to stay the proceedings, correct the errors, and to treat him the same as all other MDD pilots, by *"pulling and plugging"* and protecting his relative position on the ISL.

200.    On March 17, 2016, after APA's AAPSIC failed to act on Meadows behalf, he filed a Request for Judicial Notice, to inform APA, AAPSIC, and the SLI arbitral panel of legal case precedent, which provided for individual employees to participate in seniority integration proceedings to ensure they were afforded *"fair and equitable treatment."*

201.    On March 21, 2016, after having been ignored by both APA's AAPSIC and the SLI arbitral board, Meadows submitted an MOU Expedited System Board of Adjustment Grievance for failure of American to uphold its obligations to conduct the proceedings in a *"fair and equitable manner"* in accordance with the MOU ¶ 10. To date the APA has failed to process this grievance, even though American has treated it as open and live.

202.        On March 26, 2016, Meadows sent APA's AAPSIC and the SLI arbitral board a

certified letter to inquire as to the status of pending Motion to Intervene, and expressed his

belief that the proceeding was fatally flawed and in violation of McCaskill Bond and the

Allegheny-Mohawk LPPs. He also filed a second Request for Judicial Notice to put the

arbitral board on Notice of his pending Expedited MOU System Board grievance

203.        To date, APA's AAPSIC have failed to act upon all of Meadows' certified

corresponded, Motions, Notices, and grievance, and failed to take any action whatsoever to

remedy the unfair and inequitable treatment of LAA disabled pilots in the SLI Proceedings.

### *SLI Decision and Award Contains Numerous Pilot Seniority and Employment Data Errors, Which APA Knew to Exist, But Refused to Correct, Causing LAA MDD Pilots To be Treated In An Arbitrary and Discriminatory Manner*

204.        On or around mid-September 2016, the panel issued its SLI Decision and Award

and final Integrated Seniority List ("ISL"). After Meadows carefully reviewed the 60-page

document, he was very troubled to learn that despite APA's AAPSIC Committee Chairman's

assurances, neither Meadows' name nor his correct employment/seniority data was never

included anywhere include in the AAPSIC's Certified Seniority List; and thus, was never

provided to the other committees and Arbitrators he otherwise represented, in direct violation

of Sec. 2.a.(7) of the protocol. Moreover, Meadows seniority and employment data was never

mentioned not published anywhere in the SLI Decision and Award  and final ISL.

205.        In fact, there is not even a generalized mention of LTD/MDD pilot Meadows nor

any of the 228 similarly situated MDD pilots, who all have pending grievances/litigation for

pre-merger seniority list removals or termination, and  who were supposed to be protected

under SIPA ¶ 2.a.(7); nor is there any discussion or process by which this category of pilots

will be treated with respect to being reinstated to their integrated relative positon on new

Integrated Seniority List ("ISL") if successful in their claims, much less an explicit reference of any such pilots by name or employee number in the new ISL.

206.        Once again on September 19, 2016, via certified mailing Meadows informed APA's AAPSIC Committee Chairman, that despite all of his previously filed concerns/complaints; the final SLI Decisions and Award was rife with numerous LTD/MDD pilot employee seniority/data errors related to Meadows and similarly situated LTD/MDD, 228 of whom lost seniority rights due to APA and its AAPSIC's disparate treatment.

207.        On September 23, 2016, APA's AAPSIC Committee Chairman replied, but refused to accept responsibility for, nor did he correct his and the AAPSIC failures. Seemingly unfazed by Meadows' allegations, he proceeded to simply reiterate his previous nebulous and hollow assurance that Meadows could utilize the Seniority Dispute Resolution procedure, which was only available to those whose names were on the new ISL.

208.        Furthermore, APA's the Seniority Dispute Resolution Procedure, Exhibit B only speaks to a procedure that can on be implemented by the Dispute Resolution Committee ("DRC") members or only by individual pilots whose name already appears on the ISL. Outrageously, that procedure seems to have no direct application for LTD/MDD pilots with disputed seniority claims pending grievances/litigation who were not *"pulled and plugged"* and not placed on the new ISL – leaving them and their careers all limbo.

209.        As a result of APA's and its AAPSIC failures Meadows and similarly situated LAA MDD pilots have been left *"remediless"* and without a forum to dispute their grievances, which is contrary to the congressional intent when it drafted the RLA. *Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

210.        The foregoing issues are specific Meadows and many other similarly situated

LAA LTD/MDD pilots on disability for greater than 5 years, but when considering that

similarly situated LUS pilots on disability greater than 5 years, did not lose seniority and

were included on the new ISL; APA's AAPSIC's failure to *"pull and plug"* all LAA MDD

pilots is even that much more egregious. Especially given the fact that **APA is the sole**

**certified bargaining agent for ALL pilots of the new American, all of whom were under**

**the same collective bargaining agreement on the snap shot date; and thus APA had a**

**duty to treat all former LAA and LUS East and West pilots fairly and equally.**

211.        Prior to serving his instant Complaint, Meadows was engaged in good faith

efforts to exhaust his administrative and internal union remedies to resolve his SLI claims;

via both an MOU Grievance which has remained open and pending, and also his Article VII

charges in the matter of *Meadows v. AAPSIC*, filed on December, 15, 2016, which were

pending a timely appeal to a neutral arbitrator at the time he served this Complaint. However,

once the APA President issued his Oct. 18. 2017 Constitutional Interpretation, which

declared Meadows as an inactive LTD/MDD pilot is no longer considered an APA member

in good standing, he was foreclosed from pursuing those remedies.

212.        In sum, without a place on the new Integrated Seniority List Meadows has been

deprived from resuming lifelong airline piloting career with American, as a direct result of

APA's and its AAPSIC failures.

### *APA's Sweetheart Seniority Side-deal For APA Insider and Similarly Situated LTD/MDD Pilot Joe Barkate ("The "Barkate Deal")*

213.        Prior to the above reference SLI Decision and Award, in June 2016, Meadows

Miami union representative, CA Ed Sicher, proffered a Resolution seeking to reinstate all

Meadows and all similarly situated MDD pilots back onto the pilot's seniority list, APA

R2016-30, which was adopted on 12/13/16 by the APA BOD by a vote of 19-3, and states in

relevant part;

> WHEREAS, the three separate contracts prior to the merger of US Air East, America West, and American Airlines treated disability retirements differently;
>
> **WHEREAS, the JCBA Supplement F. (1) 5. (d) and Section 11.D.1 adopted the most restrictive of the three, <u>the American Airlines contract, which has been subjectively reinterpreted by the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous disability</u>; and,**
>
> WHEREAS, the former U.S. Air East contract allowed disabled pilots to remain on the seniority list until they reach the federally mandatory retirement age for pilots; and,
>
> **<u>WHEREAS, the merging of the seniority lists is creating a disparate treatment amongst the individual pilot groups; and,</u>**
>
> **<u>WHEREAS, the most beneficial treatment of all of our disabled pilots is to allow them reinstatement from long-term disability in as expeditious and fair a manner as possible;</u>** and,
>
> **<u>WHEREAS, there has been some evidence indicating that the company has unfairly withheld reinstatement to long-term disabled pilots who have regained their Class A medicals from being reinstated if they were considered problematic employees; therefore,</u>**
>
> **BE IT RESOLVED, that the Negotiating Committee expeditiously engage the company in negotiations which seek to:**
>
> 1. Modify the language in the JCBA Sup F. (1) 5. (d) Disability Retirement and Section 11.D.1 so that it will not prevent a pilot from retaining and accruing seniority after a disability period of more than five (5) years commencing at the expiration of the pilot's paid sick leave and thus results in effectively removing the pilot from the seniority list;
>
> 2. Negotiate language which allows pilots with long term disabilities from being removed from the seniority list until they reach the federally mandated retirement age for pilots;
>
> **<u>3. Negotiate contractual language that provides for the immediate reinstatement and return to the Pilot System Seniority List of all pilots who are currently out sick or on disability and who have been removed from the seniority list as a result of the provisions previously contained in the respective contracts, and;</u>**
>
> 4. Prevent the further removal of pilots from the Pilot System Seniority List as a result of sickness or disability until they reach the mandatory pilot retirement age, and;
>
> **<u>5. Gather the names of the pilots from the three separate pilot groups that were medically retired due to long-term disability or disabilities and thus removed from their respective seniority lists and include them on the Seniority List Integration currently being negotiated.</u>** [Emphasis Added]. (Exhibit B).

214.        Clearly, in R2016-30 the overwhelming majority of the APA BOD, officially

admitted among other things that; 1) American Airlines had *"subjectively reinterpreted"* the

CBA to remove pilots on LTD > 5 years, 2) the seniority merger create "*disparate treatment amongst*" disabled (LTD/MDD) pilots of the three pilot groups , 3) that all disabled MDD pilots should be reinstated in an "*expeditious and fair*" manner, and 4) there was evidence that the Company  "*unfairly withheld reinstatement*" of some MDD pilots such as Meadows.

215.　　　　However, on October 16, 2019, the APA negotiating committee ignored its BOD directive in Resolution 2016-30, and instead negotiated Letter of Agreement ("LOA") Oct 2016 LOA, which only sought to partially eliminate American's pattern and practice of subjectively reinterpreting the CBA. In Sum, that LOA eliminated the unlawful practice of removing LTD pilots from the seniority list after 5 years, albeit ONLY prospectively. BUT, at it egregiously failed to accomplish the most important clauses of R2016-30 para. 3 and 5, and effectively abandoned the seniority rights of meadows and all LTD/MDD pilots.

216.　　　　To add insult to injury, as part and parcel of that Oct 2016 LOA discussions, a special side-deal, "*The Barkate Deal*" was made for long-time APA insider, and former APA Appeal Board Committee Member, Joe Barkate; who was similarly situated MDD pilot who was also removed from the seniority list just like Meadows.

217.　　　　Yet, Meadows was treated disparately as compared to Barkate, who unlike Meadows was guaranteed to be reinstatement, as was confirmed in an email from Meadows' Miami union representative, CA Ed Sicher, to similarly situated MDD pilot Kathy Emery;

　　　　-----Original Message-----
　　　　From: flysich <flysich@aol.com>
　　　　To: a.l.combs <a.l.combs@aol.com>
　　　　Sent: Wed, Oct 19, 2016 2:41 pm
　　　　Subject: Re: Request for Information

　　　　Kathy,

　　　　**I was informed that the Negotiating committee had been tasked by the President to get rid of the requirement to remove MDD pilots from the seniority list at the 5 year point.** This issue was first rejected by the company and then, in the end-run of the single FOS negotiations and in exchange (in part) for the "Mr. Rogers" keep the metal moving

FIRST AMENDED COMPLAINT

video by Dan Carey, the company finally agreed to this provision. **They also allowed one MDD pilot back on the seniority list (Barkay [Barakte]) and agreed to 3 other provisions.**

**However, the agreement not to remove MDD pilots would only take effect for those pilots who WILL BE removed, not for those who have already been removed, so the seniority list will remain in place as is.**

**Resolution 2016-30 has not been addressed, which would, if not amended, task the Negotiations Committee to reinstate those already removed.**


Regards,
Ed Sicher

218.          When Meadows asked his APA union representative, CA Sicher, as to why he

didn't also get the ***"The Barkate Deal"***, Sicher confirmed stated that the reason Meadows

didn't the same deal was because he sued the union, see conversation in relevant part;

> **LM:** I'm very concerned that once I produce my medical the Company will immediately yank my LTD and refuse to reinstate me. Then what, I can't sue or take any other legal action, except for G12-011. Which I've asked APA/Dan to move forward with since July. I'm now left hanging in the breeze with nothing to count on but APA. Sorry but their track record is an abysmal failure when it comes to LTD/MDD pilots like me.

> **LM:** Oh except for Barkate, you know the MDD pilot situated EXACTLY like me, but for the fact he hadn't even applied for a medical much less had one. Seriously, how do you justify that???

> **ED:** He hasn't sued the union

> **LM:** There you go Ed. Once again you've just admitted that APA is indeed treating me disparately simply because I sued the Union.

## CAUSES OF ACTION

## IV.   COUNT I: APA BREACHED DUTY OF FAIR REPRESENTATION
## Disparately Treated Meadows and Failed to Protect His Original Relative
## Position on the new Pilots' Integrated Seniority List
## (In Violation of RLA, 49 U.S.C. § 151 *et. seq.*)

219.          Plaintiff incorporates by reference the foregoing paragraphs, and also paragraphs

233 to 239 below, as id fully set forth herein.

220.        Plaintiff, Lawrence M. Meadows, is a both pilot employee of American Airlines;

and also a member of the craft or class of pilots, of which defendant APA is the exclusive

bargaining agent or "representative".

221.        *"The exclusive agent's statutory authority to represent all members of a*

*designated unit includes a statutory obligation to serve the interests of all members without*

*hostility or discrimination toward any, to exercise its discretion with complete good faith and*

*honesty, and to avoid arbitrary conduct."* Humphrey v. Moore, 375 U.S. 335, 55 LRRM

2031 (1964), and *"A breach of the statutory duty of fair representation occurs only when a*

*Union's conduct toward a member of the collective bargaining unit is arbitrary,*

*discriminatory, or in bad faith."* Vaca v. Sipes, 386 U.S. 171,190, 64 LRRM 2369, 2376

(1967).

222.        Additionally, APA's Constitution and Bylaws ("C&B") mandates that *"This*

*Constitution and Bylaws shall be the supreme law of APA."* C&B Article II. D. goes on the

state that one of the prime objectives of APA is, *"To determine and negotiate and to*

*continue to improve the rates of compensation, benefits, pensions, hours of employment and*

*working conditions, **and to maintain uniform principles of seniority and the perpetuation***

***thereof."***

223.        Here, APA breached its duty of fair representation, when it treated Meadows

seniority rights in an arbitrary, discriminatory and bad faith manner as compared to other

similarly situated long term disabled American Airlines, otherwise owed him under the RLA.

224.        On March 6, 2016, APA's AAPSIC Chairman, Mark Stephens, informed

Meadows that his position on the integrated seniority list would determine based upon

among other things, his grievances, APA's C&B and the current collective bargaining

agreement;

"**your position on the integrated seniority list will be determined consistent with** the legal ruling or settlement, **the APA constitution and bylaws**, the **current collective bargaining agreement**, any seniority integration dispute resolution procedure, and applicable union and company policy. [Emphasis Added]."

225.    On November 9, 2016, after learning that APA's AAPSIC failed to protect his

relative position on the Integrated seniority list, Meadows made a good faith attempt to

exhaust his internal union remedies related to his SLI seniority claim, by timely filing a

Seniority Dispute Resolution ("DRC") claim, even though he was technically excluded from

that procedure by virtue on not being included in the final ISL. Subsequently on January 8,

2017, APA's Dispute Resolution Committee denied Meadows Seniority DRC claim.

226.    However, on December 21, 2017, Meadows was still considered an Inactive LTD

member in good standing, based on which he had standing to also make a further good faith

effort to exhaust his other administrative internal union remedy of filing APA C&B, Article

VII Charges against APA's AAPSIC, *Meadows v. AAPSIC*. The APA AB failed to timely

render a decision within 60 days as mandated by the C&B; and finally did so (*albeit some 4

½ months later*), but only after Meadows demanded his hearing be scheduled. On May 4,

2017, the AB dismissed the *AAPSIC* charges via a written decision without a hearing.

227.    Thereafter, on May 15, 2017, Meadows timely appealed the AB decision of

*Meadows v. AAPSIC,* to a neutral arbitrator in accordance with the APA C&B Article VII.

That matter was pending an arbitral proceeding until 10/18/17. At which time Meadows was

suddenly foreclosed by the APA President's C&B Interpretation; which instantly changed

APA's policy, and had the effect of declaring that Meadows as an Inactive LTD was no

longer considered a member in good standing; which was a requirement to file Article VII

charges (*Meadows was in good standing at the time of fling*).  At that juncture, APA having

foreclosed Meadows, his administrative internal union remedies became futile.

228.        Therefore, as of 10/18/17, APA deliberately left Meadows without a remedy to

resolve his seniority claims resulting from his disparate treatment in the SLI proceedings;

which is contrary to the strong congressional interest in seeing that RLA employees are not

left *"remediless"* and without a forum to present their grievances. Cf. *Vaca v Sipes*, 386 U.S.

171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

229.        WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief to

compel Defendant APA to seek Meadows immediate reinstatement to the new American

Airlines Integrated Seniority Lists to his original relative position, and to reimburse him

value of full back pay and benefits with interest, as if he were never properly excluded; or if

unable, in lieu of reinstatement, full payment of all back pay/benefits and forward

pay/benefits lost as a result of APA's breach of duty of fair representation in an amount of no

less than $5.609M (to be re-calculated at trial and adjusted for the new JCBA). Additionally,

given APA's arbitrary, discriminatory and bad faith conduct Plaintiff also seeks punitive

damages and any other relief this Court deems just and proper.

## V.     COUNT II: APA BREACHED DUTY OF FAIR REPRESENTATION
### Failed to Enforce Meadows Rights and Prosecute His Timely Filed MOU Grievance Protesting Violation of His Seniority Rights under the Contingent Collective Bargaining Agreement ("MOU") During the SLI Proceedings (In Violation of RLA, 49 U.S.C. § 151 *et. seq.*)

230.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

231.        Plaintiff, Lawrence M. Meadows, is a both pilot employee of American Airlines;

and also a member of the craft or class of pilots, of which defendant APA is the exclusive

bargaining agent or "representative".

232.        Under the RLA, *"The exclusive agent's statutory authority to represent all*

*members of a designated unit includes a statutory obligation to serve the interests of all*

*members without hostility or discrimination toward any, to exercise its discretion with*

*complete good faith and honesty, and to avoid arbitrary conduct." Humphrey v. Moore*, 375

U.S. 335, 55 LRRM 2031 (1964), and *"A breach of the statutory duty of fair representation*

*occurs only when a Union's conduct toward a member of the collective bargaining unit is*

*arbitrary, discriminatory, or in bad faith." Vaca v. Sipes*, 386 U.S. 171,190, 64 LRRM 2369,

2376 (1967).

233.        The APA Constitution and Bylaws ("C&B") mandates that *"This Constitution*

*and Bylaws shall be the supreme law of APA."* C&B Article II. B. goes on the state that in

the prime objectives of APA is, ***"To protect the individual and collective rights of the***

***members of the APA*** *and to promote their professional interests,* ***including timely***

***prosecution of individual and collective grievances."***

234.    On March 21, 2016, after having been ignored by both APA's AAPSIC and the SLI

arbitral board, in accordance with procedure in the MOU Contingent Collective Bargaining

Agreement ¶ 10, Meadows submitted an Expedited System Board of Adjustment MOU

Grievance, protesting the failure of American to uphold its contractual obligations to conduct

the proceedings in a "fair and equitable manner" as it related to disabled pilots like Meadows.

235.        In May 2016, American Airline's counsel made a written demand, which wrongly

asserted that Meadows post-petition MOU Grievance somehow violated American's

Bankruptcy Courts Order, and insisted that he either withdraw or stay the grievance pending

an Appeal of the Bankruptcy Court's Order. Meadows responded, and refused to withdraw

said MOU Grievance, because it was based entirely on his right to preserve his disputed

seniority claims which are pending litigation, exactly as was provided for under the post-

petition Seniority Integration Protocol Agreement. Further, Meadows specifically asserted

that his MOU Grievance only related to American's *"post-petition obligation to provide my*

*correct employment data and status to the Merger Committees, in order to protect my*

*relative positon on the new integrated seniority list."*

236.      Meadows further informed American's counsel that, *"Based on all the foregoing,*

*I do not believe I am in violation of either the Plan or Judge Lane's Orders, and therefore*

*must respectfully decline your demand to withdraw or dismiss my Expedited SBOA [MOU]*

*Grievance. Additionally, I must insist that American move that grievance forward asap, as is*

*my right under the RLA and the CBA (i.e.; MOU)."* American's Counsel acquiesced, and

made no further demands for Meadows to withdraw or stay his MOU Grievance, leaving it

active and ripe for APA to prosecute before a RLA System Board of Adjustment.

237.      The collective bargaining agreement requires APA to schedule grievances within

24 months for a hearing before a RLA System Board of Adjustment, and the MOU required

it be heard by a System Board within 30 days of being scheduled.

238.      To date, some 25 months after filing his MOU Grievance with APA's System

Board Coordinator, both APA and its AAPSIC failed to process and schedule a hearing,

much less arbitrate his Grievance to a RLA System Board of adjustment, in violation of its

obligations under the CBA and the RLA. Thus, at this juncture prosecution is futile.

FIRST AMENDED COMPLAINT

239.        At this juncture, APA's arbitrary, discriminatory, and bad faith refusal to even

schedule this Grievance, makes it futile for Meadows to wait any longer the exhaust his

administrative grievance remedies, and accordingly this Court can now rule that APA has

breached duty of fair representation based on its failure to prosecute this Grievance, and

Meadows can sue APA solely. Just as was recently held in this circuit, during the breach of DFR

lawsuit case of similarly situated disabled MDD APA member, Kathy Emery, *Emery v. APA*

(FLSD, Case No. 16-80243-civ-KAM, Mar. 20, 2017, ECF 32), based on;

> *DelCostello v. Teamsters*, 462 U.S. 151, 164 (1983) (the exhaustion "rule works an
> unacceptable injustice when the union representing when a union representing the
> employee in a grievance/arbitration procedure acts in such a discriminatory,
> dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair
> representation. In such instance, an employee may bring suit against both the
> employer and the union, notwithstanding the outcome or finality of the grievance or
> arbitration proceeding")

240.        Further, APA by failing to prosecute Meadows MOU Grievance, has left

Meadows without any remedy to resolve his seniority claim; which is contrary to the strong

congressional interest in seeing that RLA employees are not left *"remediless"* and without a

forum to present their grievances. Cf. *Vaca v Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914,

17 L.Ed.2d 842 (1967).

241.        WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief

to compel Defendant APA to seek Meadows immediate reinstatement to the new American

Airlines Integrated Seniority Lists to his original relative position, and to reimburse him

value of full back pay/benefits with interest, as if he were never properly excluded; or in lieu

of reinstatement, full payment of all back pay/benefits and forward pay/benefits lost as a

result of APA's breach of duty of fair representation in an amount of no less than $5.609M

(to fully determined at trial and adjusted for the new JCBA pay rates).  Additionally, given

APA's arbitrary, discriminatory and bad faith conduct Plaintiff also seeks punitive damages

and any other relief this Court deems just and proper.

## VI.   COUNT III: APA BREACHED DUTY OF FAIR REPRESENTATION
APA Failed to Protect and Enforce Meadows Seniority Rights and Prosecute
DFW Base Grievance 12-012 Which Protested the Removal of and Failure to
Reinstate Meadows and Similarly Situated MDD Pilots to the Seniority List
(In Violation of RLA, 49 U.S.C. § 151 *et. seq.*)

242.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

243.        Plaintiff, Lawrence M. Meadows, is a both pilot employee of American Airlines;

and also a member of the craft or class of pilots, of which defendant APA is the exclusive

bargaining agent or "representative".

244.        Under the RLA, *"The exclusive agent's statutory authority to represent all*

*members of a designated unit includes a statutory obligation to serve the interests of all*

*members without hostility or discrimination toward any, to exercise its discretion with*

*complete good faith and honesty, and to avoid arbitrary conduct." Humphrey v. Moore*, 375

U.S. 335, 55 LRRM 2031 (1964), and *"A breach of the statutory duty of fair representation*

*occurs only when a Union's conduct toward a member of the collective bargaining unit is*

*arbitrary, discriminatory, or in bad faith." Vaca v. Sipes*, 386 U.S. 171,190, 64 LRRM 2369,

2376 (1967).

245.        Additionally, he APA Constitution and Bylaws ("C&B") mandates that *"This*

*Constitution and Bylaws shall be the supreme law of APA."* C&B Article II. B. goes on the

state that in the prime objectives of APA is, ***"To protect the individual and collective rights***

***of the members of the APA*** *and to promote their professional interests, **including timely***

***prosecution of individual and collective grievances."***

246.        On May 22, 2012, APA filed DFW Base Grievance 12-012, on which protested

the termination of pilots on LTD > 5 years, and failure to reinstate such pilots;

> "...protesting the Company's violation of Sections 11.D, Supplement F(1), and all other
> related sections of the Agreement as well as past practice, for failing to reinstate pilots to
> the Pilots' Seniority System List and for failing to provide pilots notice of termination
> prior to terminating employment status of pilots who have been on inactive status, unpaid
> sick, or disability for more than five years.

247.        On January 2, 2013, American Airlines during its bankruptcy proceedings filed

an Objection to Meadows' Motion to Lift Stay, wherein American asserted that Grievance

12-012 applied to Meadows, stating in relevant part;

> "The automatic stay should not, however, be modified to allow Meadows to initiate
> new, additional judicial proceedings to (i) determine his employment status, and (ii)
> determine which benefit plan applies to him (the "New Proceedings") **because the
> issues that would be raised in the New Proceedings may be disposed
> of**...**through the APA Grievance (as hereinafter defined) to which Meadows is
> currently party pursuant to American's collective bargaining agreement
> ("CBA") with the Allied Pilots Association ("APA")."** [Emphasis Added]; and,

> "...**the APA filed a grievance (DFW Domicile Grievance No. 12-012) (the
> "APA Grievance") on behalf of Meadows** and certain other DFW based pilots
> that had **been terminated because of the Five-Year Rule, asserting that they
> had not received adequate notice of their terminations.** The APA Grievance is
> pending. **Unless resolved in that process, it will be decided by a Board of
> Adjustment under the CBA** as required by the Railway Labor Act, 49 U.S.C. §
> 184." [Emphasis Added].

248.        To date, some 6 years after APA filed Grievance 12-012, on behalf of Meadows

and 240 other similarly situated MDD pilots, it has, handled it a perfunctory, arbitrary,

discriminatory, and bad-faith manner, by failed to process it and schedule a hearing, much

less arbitrate his Grievance to a RLA System Board of adjustment, in violation of APA's

obligations under the CBA and the RLA.

249.        At this juncture, due to APA's arbitrary, discriminatory, and bad faith refusal to

even schedule Grievance 12-012; in spite of the December 2015 sworn testimony of APA

Staff Attorney, Mark Meyers, that grievance 12-012 applies to all similarly situated MDD pilots; it is now futile for Meadows to wait any longer the exhaust his administrative grievance remedies. Accordingly, this Court can now rule that APA has breached duty of fair representation based on its failure to prosecute this Grievance, and Meadows can sue APA solely. Just as was recently held in this circuit, during the breach of DFR lawsuit case of similarly situated disabled MDD APA member, Kathy Emery, *Emery v. APA* (FLSD, Case No. 16-80243-civ-KAM, Mar. 20, 2017, ECF 32), based on;

> *DelCostello v. Teamsters*, 462 U.S. 151, 164 (1983) (the exhaustion "rule works an unacceptable injustice when the union representing when a union representing the employee in a grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such instance, an employee may bring suit against bot the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding")

250.     Moreover, APA by failing to prosecute Grievance 12-012, has left Meadows without any remedy to resolve his seniority claim; which is contrary to the strong congressional interest in seeing that RLA employees are not left *"remediless"* and without a forum to present their grievances. Cf. *Vaca v Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

251.     WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief to compel Defendant APA to seek Meadows immediate reinstatement to the new American Airlines Integrated Seniority Lists to his original relative position, and to reimburse him value of full back pay/benefits with interest, as if he were never properly excluded; or if unable, in lieu of reinstatement, full payment of all back pay/benefits and forward pay/ benefit lost as a result of APA's breach of duty of fair representation in an amount of no less than $5.609M (to be re-calculated at trial and adjusted for the new JCBA). Additionally,

given APA's arbitrary, discriminatory and bad faith conduct Plaintiff also seeks punitive damages and any other relief this Court deems just.

## VII.  COUNT IV: APA BREACH OF CONTRACT
### APA Materially Breached Its Contractual Obligations to Protect Meadows Individual and Collective Rights and In Particular His Right to Uniform Principles of Seniority and Perpetuation Thereof
#### (In Violation of APA Constitution and Bylaws Article II.D)

252.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

253.        The APA Constitution and Bylaws ("C&B"), Article 1 Section 4.A., states is relevant part; *"This Constitution and Bylaws shall be the supreme law of APA."*

254.        During the federal lawsuit of, *"Meadows v. APA and American Airlines"* (UDC, Case No. 2:14-cv-00115-DS),  the APA in its pleadings admitted that; 1) long term disabled MDD pilot Meadows is in fact a member of APA, and asserted 2) the *"The terms and conditions of Meadows' APA membership are governed by the APA Constitution and Bylaws.",* and 3) "As a condition of membership in the APA, Members of the Association shall accept and agree to abide by the Constitution and Bylaws of the APA . . . .", and 4) APA further asserted that the APA C&B is indeed a binding contract, stating, ***"[Meadows] does not challenge—nor could he—the long settled notion that the C&B is binding on him as a contract with the APA."***

255.        Additionally, during the federal LMRDA lawsuit of similarly situated MDD pilot, Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14cv-80518, Jan. 4, 2017), the honorable Judge Hurley held that similarly-situated MDD pilot Kathy Emery was indeed APA union member under the LMRDA, and entered a Ruling that the APA's AUP was unlawful, and amounted to an impermissible infringement of disabled MDD

member Emery's Free Speech Rights in violation of the LMRDA. Accordingly, that Court issued an Injunction ordering APA to treat disabled MDD APA member Emery as an Active APA member in good standing and immediately reinstate her to C&R.

256.     Furthermore, in April 2017, APA filed an answer in the case of *Emery v. APA* (FLSD, Case No. 9:16-cv-80243-KAM) and admitted MDD pilot, Kathy Emery, was indeed a member in good standing, and she is situated exactly as Meadows,

257.     For many years, the APA taken inconsistent positions as to the membership status of MDD pilots, in a disingenuous effort to deprive such members of their contractual and statutory rights. Regardless, it is now well settled that under the federal law of the LMRDA, that Meadows and similarly-situated MDD pilots are indeed members in good standing.

258.     Thus, the APA C&B is a binding contract, between APA and its Members. APA has several specific contractual obligations, and Meadows is a member who has specific contractual rights. APA failed to uphold several of those obligations, and accordingly breached its contract with Meadows.

259.     One of the self-stated prime objectives of APA C&B, Article II.B, is; ***"To protect the individual and collective rights of the members of the APA…",*** **and** Article II. D. more specifically states, ***", and to maintain uniform principles of seniority and the perpetuation thereof."***

260.     Here throughout Seniority List Integration ("SLI") arbitration process, which ran from 2013 through September 2016, APA violated its self-admitted contractual obligations under its own C&B, by failing to protect the individual seniority rights of disabled MDD pilot Meadows, as well as those collective rights for and other similar situated MDD pilots.

APA's breach of contract under its own Constitution and Bylaws resulted from APA's willful failure protect and enforce the collectively bargained contractual seniority rights of Meadows', or more specifically his right to have his seniority protected, by being "pulled and plugged" to protect his original relative position on the new Integrated Seniority List ("ISL"). Moreover, of the 239 MDD (as of 2016) pilots similarly situated to Meadows only a certain 11 MDD pilots had their seniority "pulled and plugged and protected on the ISL. Meanwhile, without any explanation or rationale the other 228 MDD pilots, including Meadows were arbitrarily excluded from the final published September 2016 Seniority List Integration Arbitration Award and its associated ISL.

261.         Also, as a result of APA's lack of fair representation and disparate treatment between and among Meadows and similarly situated disabled MDD pilots, APA has knowingly and willfully failed to uphold its contractual obligation *"...to maintain uniform principles of seniority and the perpetuation thereof."*

262.         Without his original relative pilot seniority number, Meadows is unable to resume his lifelong career as an American Airlines pilot, or alternatively be offered a reasonable accommodation to a non-flying job in the pilots bargaining unit at fully pensionable pilot pay. Therefore, Meadows has suffered substantial and devastating financial harm as the result of APA's material breaches of contract.

263.         Here the essential elements of a breach of contract are met; 1) APA C&B is a valid binding contract, 2) APA materially breached its contractual obligations otherwise owed Meadows, 3) Meadows was harmed by APA's breach, and 4) has suffered substantial damages.

264.        WHEREFORE, Meadows respectfully requests this honorable Court; hold

Defendant APA responsible for full value of Meadows' lost career earnings, lost travel

benefits, and pension contributions (plus investment return), in an amount of no less than

$5.609M (to be full determined at trial and adjusted for the new JCBA), from the date for its

breach through normal retirement age, plus any pre and post-judgment interest, as well as

appropriate true-up payment to mitigate and adverse tax consequences associated with a

lump sum award.   Additionally, given APA's arbitrary, discriminatory and bad faith conduct

Plaintiff also seeks punitive damages and any other relief this Court deems just.

## VIII.  COUNT V: APA BREACH OF CONTRACT
### APA Materially Breached Its Contractual Obligations To Protect Meadows Individual and Collective Rights, Including Timely Prosecution of His Individual and Collective Grievances
#### (In Violation of APA Constitution and Bylaws Article II.B)

265.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

266.        The APA Constitution and Bylaws ("C&B"), Article 1 Section 4.A., states is

relevant part; ***"This Constitution and Bylaws shall be the supreme law of APA."***

267.        During the federal lawsuit of, *"Meadows v. APA and American Airlines"* (UDC,

Case No. 2:14-cv-00115-DS), the APA in its pleadings admitted that; 1) long term disabled

MDD pilot Meadows is in fact a member of APA, and asserted 2) the *"The terms and*

*conditions of Meadows' APA membership are governed by the APA Constitution and*

*Bylaws."*, and 3) "As a condition of membership in the APA, Members of the Association

shall accept and agree to abide by the Constitution and Bylaws of the APA . . . .", and 4)

APA further asserted that the APA C&B is indeed a binding contract, stating, ***"[Meadows]***

*does not challenge—nor could he—the long settled notion that the C&B is binding on him*
*as a contract with the APA."*

268.    Additionally, during the federal LMRDA lawsuit of similarly situated MDD pilot
Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14cv-80518, Jan. 4,
2017), the honorable Judge Hurley held that similarly-situated MDD pilot Kathy Emery was
indeed APA union member under the LMRDA, and entered a Ruling that the APA's AUP
was unlawful, and amounted to an impermissible infringement of disabled MDD member
Emery's Free Speech Rights in violation of the LMRDA. Accordingly, that Court issued an
Injunction ordering APA to treat similarly situated disabled MDD APA member Emery as an
Active APA member in good standing.

269.    Furthermore, in April 2017, APA filed an answer in the case of *Emery v. APA*
(FLSD, Case No. 9:16-cv-80243-KAM) and admitted MDD pilot, Kathy Emery, was indeed
a member in good standing, and she is situated exactly as Meadows.

270.    For many years, the APA taken inconsistent positions as to the membership
status of MDD pilots, in a disingenuous effort to deprive such members of their contractual
and statutory rights. Regardless, it is now well settled under the federal law of the LMRDA,
Meadows and similarly-situated MDD pilots are indeed members in good standing.

271.    Thus, the APA C&B is a binding contract, between APA and its Members. Under
which, APA has several specific contractual obligations, and Meadows is a member who has
specific contractual rights. APA failed to uphold several of those obligations, and
accordingly breached its contract with Meadows.

272.    One of the self-stated prime objectives of APA C&B, Article II.B, is; *"To protect*
*the individual and collective rights of the members of the APA and to promote their*

FIRST AMENDED COMPLAINT

*professional interests, <u>including timely prosecution of individual and collective</u>*

*<u>grievances.</u>"*

273.    The 2015 AA-APA Pilots Joint Collective Bargaining Agreement ("JCBA"),

Section 23, D.4, provides that;

> "…the Company and the Association shall make every reasonable effort to submit grievances to the System Board on a timely basis. **To the extent possible, cases not scheduled to be heard by the System Board within two (2) years of filing, will be scheduled so as to be heard within twenty-eight (28) months of the original filing."**

274.    On May 22, 2012, the APA filed DFW Base Grievance, on the collective behalf

of all long term disabled pilots who are in an MDD ('Medical Disability Dropped From AA

Seniority List) status, that Grievance protests:

> "the Company's violation of Sections 11.D, Supplement F (1), and all other related sections of the Agreement as well as past practice, **for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."** [Emphasis Added].

275.    In December 2015, APA Staff Attorney, Mark Meyers, recently provided sworn

testimony stating that Grievance 12-012 applies to all MDD pilot's system-wide, which

would naturally include Meadows, and the 240 other similarly situated MDD pilots.

276.    Meadows is one of those MDD pilots who was purportedly *"administratively*

*terminated"* improperly removed from the seniority list without written notice his from Chief

Pilot supervisor, as is otherwise required under the pilots collective bargaining agreement.

277.    Now, almost six years since it filed Collective Grievance 12-012, APA has failed

to move it forward, to even a Company hearing with the Vice President of the Flight

Department, much less prosecute it before a RLA System Board of Adjustment, which is

well in excess of the collective bargaining agreement's requirement to have a such

grievances to be arbitrated by a RLA System Board of Adjustment within 28 months.

278.     Additionally, as further described in Count II above, on March 21, 2016, after

having been ignored by both APA's AAPSIC and the SLI arbitral board, and in accordance

with procedure in the MOU Contingent Collective Bargaining Agreement ¶ 10 and the

Allegheny-Mohawk LLP, Meadows also individually submitted an MOU Grievance

protesting the failure of American to uphold its contractual obligations to conduct the

proceedings in a *"fair and equitable manner"* as it related to Meadows and similarly situated

LTD/MDD pilots.

279.     To date, some 24 months after filing his MOU Grievance with APA's System

Board Coordinator, both APA and its AAPSIC have failed to respond to Meadows' certified

correspondence, and failed to process and schedule his grievance hearing, much less arbitrate

his Grievance before a RLA System Board of adjustment; which is now in excess of the 24-

month deadline to schedule such grievances as mandated in the collective bargaining

agreement.

280.     At this juncture, given  APA's bad faith failure to timely prosecute both

Collective DFW Base Grievance 12-012 and Meadows Individual MOU Grievance, it is

futile for Meadows to wait any longer the exhaust his administrative grievance remedies;

accordingly based on legal precedent in this circuits case of similarly situated MDD pilot

*Emery Id.*, this Court can now rule that APA has breached duty of fair representation based

solely on its failure to prosecute these grievances that would have otherwise restored

Meadows original relative pilot seniority number.

281.     Also, as a result of APA's breach of its duty of fair representation and disparate

treatment between and amongst Meadows and similarly situated disabled MDD pilots, APA

has knowingly and willfully failed to uphold its contractual obligation **"...to maintain**

**uniform principles of seniority and the perpetuation thereof."**

282.     Additionally, APA by failing to prosecute Meadows MOU Grievance has left

Meadows without any remedy to resolve his seniority claim; which is contrary to the strong

congressional interest in seeing that RLA employees are not left *"remediless"* and without a

forum to present their grievances. Cf. *Vaca v Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914,

17 L.Ed.2d 842 (1967).

283.     Without his original relative pilot seniority number, Meadows is unable to resume

his lifelong career as an American Airlines pilot, or alternatively be offered a reasonable

accommodation to a non-flying job in the pilots bargaining unit at fully pensionable pilot

pay; thereby Meadows has suffered substantial and devastating financial harm as the result of

APA's material breaches of contract.

284.     Here the essential elements of a breach of contract are met; 1) APA C&B is a

valid binding contract, 2) APA materially breached its contractual obligations otherwise

owed Meadows, 3) Meadows was harmed by APA's breach, and 4) has suffered substantial

damages.

285.     WHEREFORE, Meadows respectfully requests this honorable Court; hold

Defendant APA responsible for full value of Meadows' lost career earnings, lost travel

benefits, and pension contributions (plus investment return),  in an amount of no less than

$5.609M (to be full determined at trial and adjusted for the new JCBA), from the date for its

breach through normal retirement age, plus any pre and post-judgment interest, as well as

appropriate true-up payment to mitigate and adverse tax consequences associated with a

lump sum award.   Additionally, given APA's arbitrary, discriminatory and bad faith conduct

Plaintiff also seeks punitive damages and any other relief this Court deems just.

## IX.    COUNT VI: APA VIOLATION OF LMRDA
### APA Denied Meadows of his Union Member Bill of Rights
### Of Freedom of Speech and Assembly in the Union Hall
#### (In Violation of LMRDA, 29 U.S.C. §101(a) (2)

286.         Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

287.         The APA is defined as a labor organization under the Labor Management

Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §401 *et. seq.*

288.         Under the LMRDA, 29 U.S.C. Sec. 402, ¶ (o), a member and member in good

standing is synonymous and both are defined as follows;

> ***"Member" or "member in good standing"***, *when used in reference to a labor*
> *organization, includes **any person who has fulfilled the requirements for***
> ***membership in such organization**, and **who neither has voluntarily withdrawn***
> ***from membership nor has been expelled or suspended** from membership after*
> *appropriate proceedings consistent with lawful provisions of the constitution and*
> *bylaws of such organization.*

289.         LTD/MDD pilot Meadows joined APA in 1991, and has always have **fulfilled the**

**requirements for membership** (i.e.; initial qualification under C&B Art. III Sec. 1, and

payment of all dues and financial obligations to the association, up to the date of disability),

he has no dues or assessment owing in arrears, and he has **neither voluntarily withdrawn,**

**nor been expelled or suspended.** Thus, Meadows is indeed a ***"member in good standing"***

entitled to all **LMRDA "Union Member [Bill of] Rights"**, including but not limited to; 1)

**Freedom of Speech and Assembly**, 2) **Equal Rights** of Participation in union activities), 3)

**Protection of the Right To Sue**.

290.        Specifically, the LMRDA, 29 U.S.C. § 101(a)(2) mandates that Meadows as a

member in good standing is entitled to;

> **(2) FREEDOM OF SPEECH AND ASSEMBLY.--** Every member of any labor organization
> shall have the right to meet and assemble freely with other members; and to express any
> views, arguments, or opinions; and to express at meetings of the labor organization his views,
> upon candidates in an election of the labor organization or upon any business properly before
> the meeting, subject to the organization's established and reasonable rules pertaining to the
> conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a
> labor organization to adopt and enforce reasonable rules as to the responsibility of every
> member toward the organization as an institution and to his refraining from conduct that
> would interfere with its performance of its legal or contractual obligations.

291.        On March 27, 2014, APA LTD/MDD member, Meadow made a post on C&R,

that was highly critical of APAs leadership; and revealed *American's "pilot disability cost*

*savings"* scheme, facilitated through the use a fraudulent 3ʳᵈ party pilot disability claims

reviewer mutually selected by APA, and the resultant 84+ LTD pilots who had their

disability benefits wrongfully terminated. He went on to discuss in detail APA's

representational failures abandonment of those LTD/MDD pilots' disability benefits

termination claims and unlawful removals of from the seniority list. This became the most

viewed and actively discussed thread on C&R in the weeks that followed.

292.        On April 22, 2014, less than two hours after Meadows threatened to file an EEOC

charge of disability discrimination against APA; without notice and in violation of its own

policy, APA abruptly revoked of Meadows and all other disabled LTD and MDD pilots

access to the entire APA member website including C&R, depriving them their LMRDA

Union Member Bill of Rights.to Freedom of Speech and Assembly in the virtual union hall.

293.        Just prior locking-out its disabled members, an APA Special BOD meeting was

held with the National Officers, BOD Officers, and general counsel present.  During a secret

closed session of the meeting, the BOD took an informal vote (*in violation of APA policy,*

*votes and motions must be in open session*), based on wish they directed the Dallas Base

Chairman and APA Membership Committee Chair, to issue a directive that APA's MDD

pilots are no longer members, for the improper purpose of revoking their C&R access, which

stated in relevant part;

> "Per conversation with the BOD in the SBOD meeting on 4-22-14 **remove MDD pilot's access to the APA web site. These pilots are not members of APA,** are not on the seniority list **and do not have access to APA benefits**" [Emphasis Added].

294.     This action was later found to be an unlawful violation of the LMRDA rights of

similarly situated disabled MDD pilot, Kathy Emery, *Emery v. Allied Pilots Association*

(FLSD, Case No. 9:14cv-80518, Jan. 4, 2017); wherein, **Judge Hurley, opined that the**

**APA BOD who sought the directive to lock-out APA's disabled MDD pilots was** ***"likely***

***motivated by a desire to silence a group he viewed as combative and litigious."*** [Emphasis

Added].

295.     Thereafter, APA and its general counsel embarked on a disingenuous course of

conduct taking wildly inconsistent positions regarding Meadows and other similarly situated

LTD/MDD pilots' membership status, from forum to forum as it best suited its legal

arguments, in a bad faith effort to strip Meadows of his constitutional, contractual, and

statutory rights. (See SOF 130-173).

296.     Additionally, on July 14, 2017, APA Sec-Treasurer, Pam Torell was found guilty

and CENSURED under APA C&B Article VII charges for failing to uphold her constituently

duties by refusing to issues Meadows and similarly situated LTD/MDD membership cards

for 3 plus years from July 2013 thru Dec 2016; which had the effect of depriving those

disabled members of their right of Freedom of Speech and Assembly in the physical union

hall (*i.e.; no access to APA headquarters, no access to union meetings*).

297.    Under her predecessors, APA's long-standing past practice was to issue Meadows and similarly situated LTD/MDD pilots, Active APA Membership cards through Sep. 30, 2012, and based on which they enjoyed all rights, privileges and benefits of membership, including but not limited to C&R access, voting, committee membership, and attending all union meetings.

298.    APA's former and current President have issued Constitutional Interpretations for the improper purpose of depriving Meadows and similarly situated LTD/MDD pilots of their constitutional, contractual and statutory rights to which they are otherwise entitled as members in good standing.

299.    To the extent APA has made a bad faith effort to subjectively reinterpreted language of its C&B to imply or declare that Meadows and similarly situated LTD/MDD members were somehow not in good standing, and do not have full membership rights, is superseded by the LMRDA 'Union Member [Bill of] Rights" (29 U.S.C. §411, Sec. 101(b), which states;

> *"(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect."* [Emphasis Added].

300.    Just as was proven in the federal LMRDA suit of similarly situated APA LTD/MDD member, Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14-cv-80518, Jan. 4, 2017); that suit involved APA's refusal to issue her and similarly situated LTD/MDD pilots APA membership cards, and locking them all out of the virtual union hall, a member only website discussion forum, called Challenge and Reponses ("C&R") in violation of her LMRDA free speech rights.

301.     Wherein on the eve of the four-day trial APA suddenly issued her and all other similarly LTD/MDD pilots, including Meadows, Inactive APA Membership cards; but those cards are worthless, because APA has declared that Inactive LTD/MDD like Meadows are no longer members in good standing. Thus, those cards do not afford such members access to local domicile or BOD union meetings.

302.     Thereafter, the honorable Judge Hurley found that LTD/MDD pilot Emery was indeed APA union member entitled to rights under the LMRDA, and in particular in her case LMRDA Free Speech. Accordingly, on January 4, 2017, Judge Hurley entered a Ruling that the APA's C&R lock-out amounted to an impermissible infringement of APA LTD/MDD member *Emery's* Free Speech Rights in an unlawful violation of the LMRDA. Further, that **Court issued an Injunction ordering APA to treat disabled LTD/MDD APA member Kathy Emery as an Active APA member in good standing and immediately reinstate her access to C&R**.

303.     Thus, for purposes of APA membership, LTD/MDD pilot Meadows is situated exactly like Emery, and thus there is precedent in this circuit that supports the fact that he and other similarly situated LTD/MDD pilots must also be treated as member in good standing under the LMRDA, who is entitled to full Union Member Bill of Rights.

304.     Given, that standing policy violation, LTD/MDD members C&R access is tenuous at best, and can be suddenly revoked with yet another Presidential Constitutional Interpretation and/or a BOD vote which reserves the right to declare any unilateral Presidential action to be invalid at any time.

305.     In Sum, APA's has willfully engaged in a malicious, arbitrary, discriminatory and in bad-faith course of conduct, and has unlawfully taken wildly inconsistent positions with

respect to the membership status of its LTD/MDD, for the improper purpose of; 1) depriving them of their LMRDA right to Freedom of Speech and Assembly in the union hall. Including but not limited to, the APA BOD declaring LTD/MDD to be non-members and directing the APA President to unlawfully lock them out of the union's member only website discussion forum, C&R, 2) coupled with APA's Sec-Treasurer's refusal to issue LTD/MDD active membership cards. Which had the effect of depriving these pilots' access to both the virtual and physical union hall during the most crucial contract negotiations of their airline careers, during the merger of the US Airways and American Airlines which also involved the integration of the pilot seniority lists.

306.    Whereby, APA's discriminatory exclusion and bad faith treatment, severely prejudiced Meadows and all other LTD/MDD pilots, who as a result suffered the loss of constitutional, contractual, and statutory rights and union member union privileges/benefits, but worst of all Meadows and other LTD/MDD pilots were stripped of their valuable seniority rights, and restoration of the airline piloting careers.

307.    WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief and order APA it treat Meadows as an active APA member in good standing, issue him an active membership card, and that he be entitled to full LMRDA Union Member Bill of Rights 29 U.S.C. § 101(a); to include Freedom of Speech and assembly in the virtual and physical union hall, without limitation. Additionally, an award of punitive damages and any other relief that this Court deems just and proper.

## X.   COUNT VII: APA VIOLATION OF LMRDA
### APA Denied Meadows of his Union Member Bill of Rights
### Of Equal Participation and Privileges
#### (In Violation of LMRDA, 29 U.S.C. §101 (a)(1))

respect to the membership status of its LTD/MDD, for the improper purpose of; 1) depriving them of their LMRDA right to Freedom of Speech and Assembly in the union hall. Including but not limited to, the APA BOD declaring LTD/MDD to be non-members and directing the APA President to unlawfully lock them out of the union's member only website discussion forum, C&R, 2) coupled with APA's Sec-Treasurer's refusal to issue LTD/MDD active membership cards. Which had the effect of depriving these pilots access to both the virtual and physical union hall during the most crucial contract negotiations of their airline careers, during the merger of the US Airways and American Airlines which also involved the integration of the pilot seniority lists.

306.     Whereby, APA's discriminatory exclusion and bad faith treatment, severely prejudiced Meadows and all other LTD/MDD pilots, who as a result suffered the loss of constitutional, contractual, and statutory rights and union member union privileges/benefits, but worst of all Meadows and other LTD/MDD pilots were stripped of their valuable seniority rights, and restoration of the airline piloting careers.

307.     WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief and order APA it treat Meadows as an active APA member in good standing, issue him an active membership card, and that he be entitled to full LMRDA Union Member Bill of Rights 29 U.S.C. § 101(a); to include Freedom of Speech and assembly in the virtual and physical union hall, without limitation. Additionally, an award of punitive damages and any other relief that this Court deems just and proper.

## X.   COUNT VII: APA VIOLATION OF LMRDA
### APA Denied Meadows of his Union Member Bill of Rights
### Of Equal Participation and Privileges
#### (In Violation of LMRDA, 29 U.S.C. §101 (a)(1))

308.     Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

309.     The APA is defined as a labor organization under the Labor Management

Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §401 *et. seq.*

310.     Under the LMRDA, 29 U.S.C. Sec. 402, ¶ (o), a member and member in good

standing is synonymous and both are defined as follows;

> *"Member" or "member in good standing", when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization.* [Emphasis Added]'

311.     LTD/MDD pilot Meadows joined APA in 1991, and has always have **fulfilled the**

**requirements for membership** (i.e.; initial qualification under C&B Art. III Sec. 1, and

payment of all dues and financial obligations to the association, up to the date of disability),

he has no dues or assessment owing in arrears, and he has **neither voluntarily withdrawn,**

**nor been expelled or suspended.** Thus, Meadows is indeed a *"member in good standing"*

entitled to all **LMRDA "Union Member [Bill of] Rights"**, including but not limited to; 1)

**Freedom of Speech and Assembly,** 2) **Equal Rights** and Privileges in union activities), 3)

**Protection of the Right To Sue.**

312.     Specifically, the LMRDA, 29 U.S.C. § 101(a)(1) mandates that Meadows as a

member in good standing is entitled to;

> **SEC. 101. (a)(1) EQUAL RIGHTS.**-- Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

313.     As described in greater detail in Count VI above, APA's unlawfully treated Meadows similarly situated disabled pilots LTD/MDD as non-members and members not in good standing, refused to issue them membership cards, and locked them out of C&R.

314.     This action was later found to be an unlawful violation of the LMRDA rights of similarly situated disabled MDD pilot, Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14cv-80518, Jan. 4, 2017); wherein, **Judge Hurley, opined that the APA BOD who sought the directive to lock-out APA's disabled MDD pilots was** *"likely motivated by a desire to silence a group he viewed as combative and litigious."* [Emphasis Added].

315.     Thereafter, APA and its general counsel embarked on a disingenuous course of conduct taking wildly inconsistent positions regarding Meadows and other similarly situated LTD/MDD pilots, from forum to forum as it best suited its legal arguments, in a bad faith effort to strip Meadows of his constitutional, contractual, and statutory rights. (See SOF 130-173).

316.     On June 30, 2016, in apparent attempt to cover for APA's general counsel's misrepresentation to the UDC (*and pending Rule 11 and 60 motions*), on his last day in office APA Pres. Wilson, issued a Presidential Constitutional Interpretation of the APA C&B; and he reversed the April 2014 BOD directive that LTD/MDD were non-members, and suddenly declared that those LTD/MDD pilots are now Inactive APA Members (*who are still deprived them of their full LMRDA union member rights*). But, there is no such term as "Inactive" or "Active" member under the LMRDA, 29 U.S.C. § 401 ¶(o), under which the only type of member is a *"member in good standing."*

317.      On October, 18, 2017, immediately after Meadows asserted in his Motion that he

was still exhausting his administrative and internal union remedies in his Motion to Stay with

Court, APA's current President issued a Presidential Interpretation that declared that

Meadows and all Inactive APA Members (*to include all MDD pilots and pilots on LTD > 12*

*months*) are no longer considered members in good standing. This Presidential Interpretation

was obviously retaliatory, and done solely for the improper purpose of foreclosing the

Meadows from pursuing very same Article VII internal union remedies, that APAs former

general counsel previously argued he has to first exhaust. (SOF 169-171).

318.      Additionally, on July 14, 2017, APA Sec-Treasurer was found guilty and

CENSURED under APA C&B Article VII charges, for failing to uphold her constituently

duties by refusing to issue Meadows and similarly situated LTD/MDD membership cards for

3 plus years from July 2013 thru Dec 2016. Which had the effect of depriving those disabled

members of their right of Freedom of Speech and Assembly in the physical union hall (*i.e.;*

*no access to APA headquarters, no access to union meetings*).

319.      Under her predecessors, APA's long-standing past practice was to issue Meadows

and similarly situated LTD/MDD pilots, Active APA Membership cards through Sep. 30,

2012, and based on which they enjoyed all rights, privileges and benefits of membership,

including but not limited to C&R access, voting, committee membership, and attending all

union meetings.

320.      To the extent APA has made a bad faith effort to subjectively reinterpret the

language of its C&B to imply or declare that Meadows and similarly situated LTD/MDD

members were somehow not in good standing, and do not have full membership rights, is

superseded by the LMRDA 'Union Member [Bill of] Rights" (29 U.S.C. §411, Sec. 101(b), which states;

> **"(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect."** [Emphasis Added].

321.     Just as was proven in the federal LMRDA suit of similarly situated APA LTD/MDD member, Kathy Emery, *Emery v. Allied Pilots Association* (FLSD, Case No. 9:14-cv-80518, Jan. 4, 2017); that suit involved APA's refusal to issue her and similarly situated LTD/MDD pilots APA membership cards, and locking them all out of the virtual union hall, a member only website discussion forum, called Challenge and Reponses ("C&R") in violation of her LMRDA free speech rights.

322.     Wherein on the eve of the four-day trial APA suddenly issued all other similarly LTD/MDD pilots, including Meadows, Inactive APA Membership cards; but, those cards are worthless, because APA has declared that Inactive LTD/MDD like Meadows are no longer members in good standing. Thus, those cards do not afford such members access to local domicile or BOD union meetings.

323.     Thereafter, the honorable Judge Hurley found that LTD/MDD pilot *Emery* was indeed APA union member entitled to rights under the LMRDA, and in particular in her case LMRDA Free Speech.  Accordingly, on January 4, 2017, Judge Hurley entered a Ruling that the APA's C&R lock-out amounted to an impermissible infringement of APA LTD/MDD member *Emery's* Free Speech Rights in an unlawful violation of the LMRDA. Further, that **Court issued an Injunction ordering APA to treat disabled LTD/MDD APA member Kathy Emery as an Active APA member in good standing and immediately reinstate her access to C&R.**

324.    Thus, for purposes of APA membership, LTD/MDD pilot Meadows is situated exactly like Emery, and thus there is precedent in this circuit that supports the fact that he and other similarly situated LTD/MDD pilots must also be treated as member in good standing under the LMRDA, who is entitled to full Union Member Bill of Rights.

325.    In Sum, APA's has willfully engaged in a malicious, arbitrary, discriminatory and in bad-faith course of conduct, and has unlawfully taken wildly inconsistent positions with respect to the membership status of its LTD/MDD, for the improper purpose of depriving them of their LMRDA right to Equal Rights and Privileges in all union activities, including but not limited to; the right to nominate candidates, vote in elections, attend membership meetings and to participate in the deliberations and voting upon the business of such meetings, to be committee members, and to hold office.

326.    APA's unlawful acts of depriving Meadows and other similarly situated LTD/Members of Freedom of Speech and Assembly in the union hall Including but not limited to, the APA BOD declaring LTD/MDD to be non-members and directing the APA President to unlawfully lock them out of the union member only website discussion forum, C&R. coupled with APA's Sec-Treasurer's refusal to issue LTD/MDD active membership cards; had the effect of depriving these pilots access to both the virtual and physical union hall, and depriving them of their right to vote on working agreements and union representatives, during the most crucial contract negotiations of their airline careers, related to the merger of the US Airways and American Airlines which also involved the integration of the pilot seniority lists and negotiation of a new Joint CBA,

327.    Whereby, APA's discriminatory exclusion and bad faith treatment and deprivation of Equal Rights have severely prejudiced Meadows and all other LTD/MDD

<u>pilots and, who as a result suffered the loss of constitutional, contractual, and statutory rights</u>

<u>and union member union privileges/benefits, but worst of all Meadows and other LTD/MDD</u>

<u>pilots were stripped of their valuable seniority rights, and restoration of the airline piloting</u>

<u>careers.</u>

328.      WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief

and order APA it treat Meadows as an active APA member in good standing, issue him an

active membership card, and that he be entitled to full LMRDA, 29 U.S.C. § 101(a); Equal

Rights and privileges in ALL union activities; including but limited to, voting, holding office,

committee members, and attending union meetings, without limitation. Additionally, an

award of punitive damages and any other relief that this Court deems just and proper.

### XI.   COUNT VIII. APA VIOLATION OF LMRDA
### APA Denied Meadows of his Union Member Bill of Rights Of
### Protection of the Right to Sue Without Reprisal or Retaliation
### (In Violation of LMRDA, 29 U.S.C. §101 (a)(4))

329.      Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

330.      The APA is defined as a labor organization under the Labor Management

Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §401 *et. seq.*

331.      Under the LMRDA, 29 U.S.C. Sec. 402, ¶ (o), a member and member in good

standing is synonymous and both are defined as follows;

> ***"Member" or "member in good standing",*** *when used in reference to a labor organization, includes* ***any person who has fulfilled the requirements for membership in such organization,*** *and* ***who neither has voluntarily withdrawn from membership nor has been expelled or suspended*** *from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization. "* [Emphasis Added].

332.    LTD/MDD pilot Meadows joined APA in 1991, and has always have **fulfilled the requirements for membership** (i.e.; initial qualification under C&B Art. III Sec. 1, and payment of all dues and financial obligations to the association, up to the date of disability), he has no dues or assessment owing in arrears, and he has **neither voluntarily withdrawn, nor been expelled or suspended.** Thus, Meadows is indeed a *"member in good standing"* entitled to all **LMRDA "Union Member [Bill of] Rights"**, including but not limited to; 1) **Freedom of Speech and Assembly**, 2) **Equal Rights** and Privileges in union activities), 3) **Protection of the Right To Sue**.

333.    For all the reason cited in the preceding counts, for purposes of APA membership, LTD/MDD pilot Meadows is situated exactly like the LTD/MDD in *Emery Id.*, and thus there is precedent in this circuit that supports the fact that he and other similarly situated LTD/MDD pilots must also be treated as member in good standing under the LMRDA, 29 U.S.C. § 101(a), who is entitled to full Union Member Bill of Rights.

334.    Specifically, the LMRDA, 29 U.S.C. § 101(a)(4) mandates that Meadows as a member in god standing is entitled to a Protection of Right to Sue;

> **"(4) PROTECTION OF THE RIGHT TO SUE.**-- No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof:"

335.    On February. 4, 2012 Plaintiff timely filed company termination grievance #12-011 in accordance with Sec. 21 of the CBA, citing his improper discharge and removal from the seniority list in violation of the CBA; along with contributing factors of retaliation in

violation of his SOX-WB protections, and failure to offer a Reasonable Accommodation in violation of the American's with Disabilities Act (ADA).

336.    On July 10, 2013, APA confirmed in writing that it filed a Proof of Claim for Meadows grievance in American's bankruptcy proceedings, preserving all damages flowing from that grievance.

337.    Moreover, on December 7, 2012, APA specifically preserved Plaintiff's grievance #12-011, as one of the only 39 most meritorious, out of 270 open grievances; and excluded it from the as APA-AA Settlement Consideration and Bankruptcy Protections Agreement, and incorporated it by explicit reference into LOA 12-01 of the pilots' new 2015 Joint CBA ("JCBA").

338.    On June 6, 2013, after a VP of Flight hearing (2nd Step), American denied Plaintiff's grievance, re-asserting its decision under Sec. 11.D.1 of the 2003 CBA as the basis for his removal from the seniority list.

339.    In response, on June 28, 2013, APA's President, Keith Wilson notified American Airlines in writing that he was, *"protesting the Company's action of removing him from the seniority list and discharging him from American Airlines.",* and escalated Plaintiff's grievance to a Pre-Arbitration Conference ("PAC", 3rd step).

340.    The PAC was held on August 6, 2013. APA counsel submitted a settlement brief on Meadows' behalf, which offered global settlement in exchange for; 1) Reinstatement to the seniority list, 2) Restoration of his non-revenue travel benefits, and 3) Reasonable Accommodation within his bargaining unit, but the Company declined to settle.

341.    On August. 21, 2013, the PAC settlement was denied by American, so in accordance with his rights under the CBA and RLA, Meadows made a written request to

FIRST AMENDED COMPLAINT

APA, asking, *"I respectfully request the Association President appeal my grievance 12-011 to the System Board of Adjustment for a final review."* (RLA SBOA, 4th Step).

342.     On August 29, 2013, after over 18 months of filing, preserving, hearing, and appealing grievance #12-011, APA's President, Keith Wilson, wrote Meadows and stated he was refusing to arbitrate his grievance at System Board, because he suddenly believed that Meadows' grievance 12-011 did not raise any contractual violations (*which belied APA's prior actions*), and that Meadows had statutory claims (*under SOX and the ADA*) which he was already pursuing in the appropriate federal forums.

343.     On September 18, 2013, Plaintiff sent a certified letter to APA's President, asking he reconsider his decision to not appeal grievance 12-011 to a RLA system board, but said request was ignored.

344.     On information and belief, APA's last minute refusal to arbitrate his grievance #12-011, was done in retaliation by APA's President and Legal Director, due to the hostility and personal animus exhibited by certain APA Executive Officers; whom Meadows personally cross-examined, during the previous months (July 2013) APA Equity Distribution Arbitration hearing. Wherein, Meadows personally exposed APA's arbitrary, discriminatory, bad-faith treatment of Meadows and similarly situated long term disabled ("LTD") pilots, and medical disability dropped from AA ("MDD") which improperly deprived those pilots of their fair share of the $1B pilot equity distribution, shorting them of millions of dollars.

345.     As Meadows case moved forward it became evident that APA was the only unreasonable and unwillingly party that was in bad faith refusing to arbitrate Meadows grievance 12-011. By way of background, on 9/5/14, during American's bankruptcy proceedings, Judge Sean Lane issued and order stating that, "…Meadows shall be permitted to

arbitrate Grievance 12-011 before the System Board to the extent *permitted by applicable law*"; and subsequently on 9/14/14, American stated in another court pleading that it agreed to arbitrate Meadows' grievance 12-011, leaving APA as the only party refusing to move it forward.

346.     In January 2014, Meadows put APA on written notice to continue to preserve his grievance on its general proof of claim ("POC"), as it has valuable remedies (worth $5.609M) which flowed from it, and that he intended to pursue.

347.     Therefore, on February, 19, 2014, Meadows was left with no choice but to file suit against APA to enforce his individual statutory right under the RLA to compel arbitration of his grievance 12-012, which would provide valuable make whole remedies, worth $5.609M, and allow Meadows to resume his piloting career with American.

348.     **Immediately, thereafter in violation of Meadows LMRDA Protection of the Right to Sue his union, APA outrageously embarked on a willful, malicious and retaliatory course of conduct, and subjected Meadows to a litany of reprisals, including but not limited to;** 1) on 2/27/14 denied him access to APA Headquarters to pre-brief his grievance hearing with his Miami base representatives, 2) on 3/7/14 APA's Sec-Treasure, unilaterally amended APA's POC and removed Meadows' grievance without notice to him, 3) on 3/27/14 APA refused to process Meadows' petition for seniority reinstatement in violation of its policy, 4) on 4/17/14 APA's general counsel made surprise no-notice appearance in American's bankruptcy hearing on behalf of Meadows' adversary, American Airlines (*who filed a Claim Objection seeking to disallow Meadows' statutory claims,*) in amounted to a bad faith effort to help sabotage Meadows' statutory claims, 5) on 4/22/14 APA's BOD secretly issued a directive which declared LTD/MDD pilot Meadows was a

FIRST AMENDED COMPLAINT

non-member for the improper purpose of locking him out of the APA website and C&R, 6)

just over three months later, APA's general counsel misrepresented the inapposite to the Utah

District Court, asserting that because Meadows was a member (*in stark contradiction to BOD*

*directive*),  that the APA C&B was a binding contract on him, for the improper purpose of

defeating his RLA DFR claims, and forcing his LMRDA claims to first be exhausted via

internal union remedies (*APA Article VII charges*), 7) APA Sec-Treasure Pam Torell, refused

to issue Meadows an active membership card as he previously received from her

predecessors, 8) on 6/30/16 on his last day in office, APA Pres. CA Wilson issued a

Constitutional Interpretation declaring Meadows and similarly situated LTD/MDD pilots

were Inactive Members, 9) on 10/19/16  despite Meadows' long-standing written demands

for seniority reinstatement, APA made a special-side deal to reinstate similarly-situated

LTD/MDD pilot Joe Barkate, and told Meadows he didn't get the same deal because he had

sued the union, 10) on 3/2/17 while scheduled to attend the Article VII charges hearing for

*Meadows v. APA Sec-Treasurer Pam Torell*, APA refused him access to the union hall, 11)

on 10/6/17 Meadows served this instant DFR lawsuit upon APA, and then 12) on 10/18/17

Meadows filed a Motion to Stay these instant proceedings based in part on exhausting his

administrative internal remedies (*Article VII charges Meadows v. AAPSIC*); later that very

same day, the APA President issued yet another Constitutional Interpretation which declared

LTD/MDD pilot Meadows to be Inactive and no longer a member in good standing, for the

improper purpose of foreclosing from continuing to prosecute his pending Article VII

charges against APA Sec-Treasurer Torell and the AAPSIC.

349.       Despite APA's bad faith conduct, in the spring of 2017 Meadows made a good

faith effort to engage APA in settlement talks seeking waive his claims in exchange for APA

to agree to arbitrate grievances 12-011 and 12-012 before a RLA system board, but such efforts proved to be futile.

350.    **In Sum, APA willfully and in bad-faith outrageously embarked on a malicious and retaliatory course of conduct, and subjected Meadows to a litany of reprisals;** which were plainly retaliation for; 1) the filing of his Utah federal DFR lawsuit, 2) later amending that suit to include LMRDA claims, 3) threatening an EEOC ADA action, and 4) prosecuting three Article VII proceedings against two of APA's National officers and its National seniority committee.

351.    APA's reprisals, not only violated Meadows' constitutional (APA C&B), contractual (C&B and RLA), and statutory (LMRDA and ADA) rights, but more egregiously where intended to foreclose his grievance 12-011 (*valued at $5.609M*) in its entirety. APA literately deprived him of not only has grievance's contractual claims, but also his statutory SOX and ADA claims explicitly contained therein; which effectively left him *"remediless"* and without a forum to dispute his grievances, which is contrary to the congressional intent when it drafted the RLA. *Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

352.    Therefore, it is plain on its face that APA has egregiously violated Meadows' LMRDA Protection of the Right to Sue, 29 U.S.C. §101 (a)(4)), and that its reprisals and retaliatory acts were malicious, and severely prejudiced and harmed Meadows, and have destroyed his ability to obtain his valuable contractual and statutory make whole remedies to which he was otherwise entitled, and needed to resume his American Airlines piloting career.

353.    WHEREFORE, the Plaintiff respectfully seeks this Court order injunctive relief and; 1) issue a protective order requiring APA to cease and desist from any further reprisals

against Meadows, 2) to treat him as an active APA member in good standing, 3) issue him an active membership card, and 4) that he be entitled to full LMRDA Union Member Bill of Rights, 29 U.S.C. § 101(a), without limitation. Further, he must be allowed to continue to sue without any further reprisals. Additionally, an award compensatory damages equal to the value of Meadows abandoned grievance 12-011, and resultant lost career earnings/benefits in an amount of not less than $5.609M (to be fully determined at trial and adjusted for the new JCBA). Additionally, an award of punitive damages and any other relief that this Court deems just and proper.

## XII.   COUNT IX.  PAM TORELL BREACH OF FIDUCIARY DUTY
### As an Officer of APA, Pam Torell Breached her Fiduciary Responsibility By Unlawfully and Willfully Abstracting and Converting for the Use of Herself and Other Members, Meadows' Individual Grievance 12-011, Valued at $5.61M, and listed as Property on APA's Proof of Claim
#### (In Violation of LMRDA, 29 U.S.C. §501 (c) and APA C&B, Art. 10(c))

354.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

355.        The APA is defined as a labor organization under the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §401 *et. seq.*

356.        While serving as APA National Officer and serving as Secretary Treasurer, Pam Torell breached her Fiduciary Responsibility, by unilaterally amending APA's proof of claim, and stripping away Meadows individual Grievance 12-11 explicitly preserved and referenced therein, which was valued at $5.609M, without notice or authorization, in direct violation of APA's C&B Article 10, Paragraph C, and also the LMRDA 29 U.S.C 501.

357.        Pam Torell, as an APA National Officer serving as Secretary Treasurer, amongst her constitutional duties there also attaches a duty of Fiduciary Responsibility, as described in the C&B Article 10, Paragraph C, which states;

"**C. Fiduciary Responsibility: The National Officers**, BOD and Staff **who serve the Allied Pilots Association have a clear obligation to conduct all affairs of the Association in a forthright and honest manner. Each person should make necessary decisions using good judgment and ethical and moral considerations consistent with the Code of Ethics** stated in the APA Constitution and Bylaws (C&B), Appendix A. **All decisions of the National Officers, BOD, National Committee Members and Staff are to be made solely on the basis of a desire to promote the best interests of the Association and membership**" [Emphasis Added].

358.     Further, as an officer of a labor organization, Pam Torell also is bound by explicit

statutory duties, to include the Fiduciary Responsibility that arises under the Labor

Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501(a) which states;

"**Fiduciary Responsibility of Officers of Labor Organizations**
**SEC. 501. (a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members** as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, **to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, <u>to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization,</u> and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.** A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy." [Emphasis Added].

359.     Meadows individual company grievance #12-011, protested his purported

*"administrative termination"* and removal from American's pilot seniority list in violation of

the CBA, and also explicitly cites additional statutory bases of retaliation under the Sarbanes-

Oxley Whistleblower Act ("SOX"), and discrimination under the Americans with Disabilities

Act ("ADA"). Most importantly, it seeks valuable make whole remedies, to restore his

property rights of employment and seniority under the CBA to include reinstatement of pilot

seniority, full back pay and benefits with interest, reasonable accommodation of

reassignment to a nonflying position in the bargaining unit, and compensatory damages,

94

which has been valued at $5.609M (*under the old CBA, that amount is substantially higher under the new JCBA*) by an economic expert from Berkeley Research Group.

360.     In accordance with the former APA Sec-Treasurer's directive, APA preserved Meadows' Grievance 12-011 by direct reference, in APA's timely general proof of claim valued at $5.631B in American's bankruptcy proceedings; which was filed on behalf of APA and all its individual pilots' claims.

361.     Subsequently, in December 2012, APA entered a bankruptcy settlement agreement with American, which specifically excluded Grievance 12-011, and incorporated its ripe claims by explicit reference into the new CBA, in LOA 12-01.Even though APA abruptly abandoned this grievance after escalating it to the PAC, Meadows put APA on written notice of his intent to pursue it individually, and specifically asked APA continue to preserve it in its proof of claim as he intended to seek injunctive relief to enforce his individual statutory right to arbitration before a System Board of Adjustment under the RLA, 49 U.S.C. § 184.

362.     On February 19, 2014, Meadows' filed a lawsuit in the U.S. District Court, seeking to enforce his individual right to compel arbitration of his Grievance 12-011 in accordance with the RLA; because APA was refusing to arbitrate his claims before a RLA System Board, stating that he already had statutory remedies in pending in the appropriate forums (*EEOC ADA discrimination charge, and Dept. of Labor SOX ALJ proceeding*).

363.     Shortly thereafter, on March 7, 2014, in retaliation for filing his lawsuit, and without notice to Meadows, or authorization of the APA BOD, Sec-Treasurer Pam Torell, unilaterally amended APA's proof of claim and excluded claims related to grievance 12-011. As an initial matter Torell's action was extremely prejudicial to Meadows considering the

obvious career and economic damage it has caused him, while leaving him remediless. However, her exclusion of Grievance 12-011, also amounts to a blatant breach of her Fiduciary Responsibility under not only the C&B but also under the LMRDA.

364.     As stated above, Torell never provided notice to Meadows that she excluded his grievance 12-011 from the newly Amended APA Proof of Claim. He only learned about it when American, filed an Objection its bankruptcy proceedings, which sought to disallow his statutory claims in Grievance 12-011, which stated in relevant part;

> "**The Amended APA Claim amended the APA Claim to update the list of claims excluded from the settlement approved by the APA Order, and the updated list of Excluded Claims does not include Grievance 12-011.**"
> [Emphasis Added].

365.     Meadows, immediately sent emails and certified letters to the APA President, Torell, and the APA BOD demanding that APA re-amend its Proof of Claim and reinstate grievance 12-011, as it contained make whole remedies valued at $5.609M. APA never responded to Meadows request and took no action to re-amend its POC.

366.     Even more egregiously, on information and belief, on April 17, 2014, Pam Torell authorized and dispatched APA's General Counsel and bankruptcy Counsel to travel to New York to attend the U.S. Bankruptcy hearing regarding American's Objection to disallow the claims in Meadows Grievance 12-011; for the improper purpose of working hand-glove to bolster American's arguments to defeat all of Meadows pending claims. The APA never noticed its appearance to either the Court or Meadows. Further, APA asserted there were no contractual claims and never supported Meadows statutory claims. That was in fact a material misrepresentation to the Court, because a year prior APA submitted a detailed briefing to American in support of both Grievance 12011's contractual and statutory claims, and affirmed as much to Meadows in written correspondence.

FIRST AMENDED COMPLAINT

367.        Torell's above action violates LMRDA, 29 U.S.C.¶ 501(a), because she failed;

> **"to refrain from dealing with such organization as an adverse party or in behalf of an**
> **adverse party** [in this case on behalf American] **in any matter connected with his duties**
> [RLA and C&B fiduciary duty owed Meadows] **and from holding or acquiring any**
> **pecuniary or personal interest which conflicts with the interests of such organization**
> [to protect the individual and collective rights' of the members as per APA C&B],**"**

368.        There are no APA Board of Director ("BOD") minutes regarding this action, but

on information and belief Pam Torell's, action unlawfully abstracted and converted Meadows

grievance, as orchestrated in secret back room meetings (*with consent of APA BOD*) with

utter disregard for the C&B; and thus, was not done in a *"forthright and honest manner"* as

otherwise required under Article 10,¶ C.

369.        Moreover, it was outrageous for Pam Torell acting as APA Secretary Treasurer, to

unilaterally and secretly sign such a valuable instrument, without notice to the affected

parties. In so doing, she solely willfully and unlawfully stripped away a Meadows' individual

grievance 12-011, valued $5.6M without any special authorization, to include at least another

cosigner as required in APA's C&B.  In so doing, she essentially and converted of millions

of dollars of association property (*i.e.; the APA general proof of claim*), which included

Meadows individual grievance claim in violation of her constitutional and statutory fiduciary

duty, without approval by the APA BOD.

370.        This is particularly disturbing when considering, that under APA C&B Article I,

Section 8. Authorization of Monetary Obligations, provides that Pam Torell acting as APA

Secretary Treasurer, isn't allowed to unilaterally sign any instrument in excess of $5,000.00

on behalf of APA., which states in pertinent part;

> "All bills payable, notes, checks or other **negotiable instruments of APA shall be**
> **made in the name of the APA and shall be signed by one of the following four**
> **persons: APA President, APA Vice President, APA Secretary-Treasurer,** or APA

Director of Finance. Other than regularly occurring payroll checks, **all bills payable, notes, checks or other negotiable instruments of APA in excess of $5,000 shall require two of these signatures to lawfully authorize the payment. The Secretary Treasurer should be the second signatory on all checks over $5,000. ..., No officer, agent, or employee of the APA acting singly or jointly with others shall have the power to make any bills payable, notes, checks, drafts, warrants, or negotiable instruments of any description or nature or endorse the same in the name of the APA or contract or cause to be contracted any debt or liability in the name of or on behalf of the APA except as expressly** *prescribed* **and provided in this Constitution and Bylaws.** *(06/12/2004)"* [Emphasis Added].

371.     Additionally, Pam Torell further violated Article 10, ¶C, which stated that she as National Officer has a constitutional ethical and moral duty, and;

*"should make necessary decisions using good judgment and ethical and moral considerations consistent with the Code of Ethics stated in the APA Constitution and Bylaws (C&B), Appendix A. All decisions of the National Officers, BOD, National Committee Members and Staff are to be made solely on the basis of a desire to promote the best interests of the Association and membership."* [Emphasis Added].

372.     Pam Torell's action have blatantly stripped away Meadow's statutory and monetary claims against American valued at $5.609M, leaving him with no other viable option, other than to now sue her and the association for very same amount.  Thus, Pam Torell's act was gross breach of Fiduciary Responsibility which not only lacked *"good judgment"* but also "unethically" shifted the $5.609M economic burden from the Company and directly onto the Association, clearly making it, *"act contrary to the best interests of the APA as an institution or its membership as a whole."*, in violation of C&B Article VII, A.7.

373.     Finally, most problematic for Pam Torell, is that her unlawful act involved an egregious conflict of interest, because she would personally profit from her actions, in a brazen violation of the safeguards created for labor organizations, under the LMRDA, 29 U.S.C. § 501(c), which states;

"**Any person who** embezzles, steals, or unlawfully and **willfully abstracts or converts to**

98
FIRST AMENDED COMPLAINT

**his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer,** or by which he is employed, directly or indirectly, **shall be fined not more than $10,000 or imprisoned for not more than five years, or both."** [Emphasis Added].

374.       Here, Pam Torell, also in violation of the LMRDA, 29 U.S.C. § 501(c), has unlawfully and willfully abstracted or converted millions of dollars of association property and assets contained in APA's proof of claim, and more specifically, by excluding Meadows' Grievance 12-011 from it, thereby reduced the associations proof of claim's value by $5.609M. In effect, converting the value of Meadows grievance into additional equity for American Airlines bankruptcy estates, which into turn will ultimately be redistributed as additional creditor equity distributions, including 13.5% of it back to APA in the form of stock distributions. Thereby, effectively redistributing the individual equity of Meadows grievance, into the personal pockets of Pam Torell and the others.

375.       Thus, Pam Torell has not only unlawfully violated APA's C&B, Article VII. A.4., prohibition against, *"Misappropriating money or property of the Association"*, but she has also breached her Fiduciary Responsibility in violation of LMRDA, 29 U.S.C. § 501(c), by;

> *"**unlawfully and willfully abstracts[ing] or converts[ing] to his[her] own use, or the use of another** [all other association members], **any of the moneys, funds, securities, property, or other assets of a labor organization** [Meadows' grievance equity] **of which he is an officer."** [Emphasis Added].

376.       WHEREFORE, the Plaintiff respectfully seeks this Court award compensatory damages for the lost of value of Meadows grievance 12-011 in an amount of no less than $5.609M (to be determined at trial and adjusted for the new JCBA). Additionally, in accordance with the LMRDA, the Court is authorized by statute to fine Defendant Torell up to $10,000 and/or imprison her for up to five years. Further, given Defendant's willful and

bad faith conduct, Plaintiff also seeks punitive damages and any other relief this Court deems

just and proper.

## XIII.   COUNT X.  PAM TORELL BREACH OF FIDUCIARY DUTY
### As an Officer of APA, Pam Torell Breached her Fiduciary Responsibility By Unlawfully and Willfully Abstracting and Converting for the Use of Herself and APA The Equity Distribution True-up Funds
#### (In Violation of LMRDA, 29 U.S.C. §501 (a), (b), and (c); and APA C&B)

377.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

378.        The APA is defined as a labor organization under the Labor Management

Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §401 *et. seq.*

379.        The APA is the collective bargaining agent for the pilots of American Airlines.

380.        On November 29, 2011, American Airlines filed for Voluntary Chapter Eleven

Bankruptcy in the United States Bankruptcy Court Southern District of New York, Case No.

11-15463-SHL

381.        On October 21, 2013, the Bankruptcy Court entered an Order pursuant to Sections

1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy

Procedure Confirming Debtors' Fourth Amended Joint Chapter 11 Plan (ECF Nos. 10361

and 10367 (the "Confirmation Order").  The effective date of the Plan was December 9, 2013

(the "Effective Date").

382.        Under the Plan, the members of the unions and other workers of American

Airlines collectively, "Labor" are required to receive 30.8901% of distributions in the form

of stock of the reorganized debtors, made on account of the post-Effective Date Allowed

Claims.  The Allied Pilots Association (APA) members were required to receive 13.5% of

the stock distributions with an estimated value of approximately $1.2 billion.

383.      The first way the Plan was to distribute shares to the unions, including Allied

Pilots Association called for claims allowed as the Effective Date to receive mandatorily

Convertible Preferred Stock, a portion of which converted to New Common Stock on the

30th, 60th, and 90th day after the Effective Date with additional stock to be received on the

120th day,

384.      The unusual distribution to creditors over 120 days necessitated departure from

payment with dollars for payment in shares, with a conversion fixed by market price.

Payments were to be net of any expenses, including taxes of the disputed claim reserve, until

it could be determined there was a sufficient balance in the claim reserve to satisfy all

disputed claims.

385.      The second way in which the Plan distributes shares to the unions after the first

120 days was through "True-Ups" under Plan § 7.4.  Its purpose was to bring the account of

each claim holder in the Plan to correct balance when it is clear that there is more in the

reserve than needed to satisfy the remaining Disputed Claims.

386.      On December 15, 2015, the unions collectively, Allied Pilots Association,

Association of Professional Flight Attendants, and Transport Workers Union of America,

AFL-CIO's filed a Motion to Enforce Order Confirming Plan of Reorganization, which

mandates distributions on account of the American Labor Allocation, the Market-Based Old

Equity Allocation and to holders of Allowed Single-Dip General Unsecured Claims, be based

upon how such shares of New Common Stock would have been distributed in the first 120

days pursuant to § 7.4 of the Plan.

387.      In its motion, the Allied Pilots Association claimed that the reduction in

distributions to pay the disputed claim reserve tax liabilities resulted in Post-Effective Date

Allowed Claims receiving up to 9.7% fewer shares than the shares received by Effective

Date Allowed Claims in the first 120 days and claiming that in the three distributions to Post-

Effective Date Allowed Claims, the percentage withheld has been between 6.4% and 9.7%

and overall, Post-Effective Date distributions have been approximately 7.54% less.

388.  On December 23, 2016 and January 20, 2017 the Bankruptcy Court entered the

Memorandum of Decision and Gains Tax Order, respectively which provided that the

Debtors are required to make true-up payments to all holders of Disputed Claims that became

or become Allowed after the Effective Date of the Plan, including to the unions, such that all

holders of Disputed Claims that became or become Allowed after the Effective Date of the

Plan, will receive the same number of shares of New Common Stock as holders of Single

Dip General Unsecured Claims that were deemed Allowed as of the Effective Date of the

Plan.

389.  On or about August 31, 2017, in accordance with the Court Order and American's

Fourth Amended Joint Chapter Eleven Plan, the debtors Disbursing Agent, Garden City

Group (GCG) distributed shares of AAL stock to the labor unions for benefit of their

members including the Allied Pilots Association, through "True-Ups" pursuant to § 7.4 of

the Plan.  The distributions under § 7.4, was meant to ensured that the union members will

receive their corresponding percentage of New Commons Stock pursuant to the Plan.

390.  APA Sec-Treasurer Pam Torell always touts her commitment to *Truth and

Transparency"* in her official communiques to the APA membership. Here she has been

anything but truthful and transparent, to date, she has never disclosed to the membership,

APA's receipt of True-up shares, nor an accounting of those shares, and has withheld those

shares, and failed to distribute them to the rightful owners, (the individual APA members).

391.         Meadows has been denied the benefit and use of said true-up shares to which he is

entitled since August 2017, which he estimates to be worth $15,000.00 based on APA's

representations made in its bankruptcy court True-up Motion. Whereby, Pam Torell has

willfully and unlawfully abstracted and or converted the members true-up shares for benefit

of herself and certain others in violation of the LMRDA, 29 U.S.C. § 501(c).

392.         WHEREFORE, the Plaintiff respectfully seeks this Court award compensatory

damages in an amount to be determined at trial for his share of the Pilot's Equity Distribution

True-up of which he was unlawfully deprived, estimated to be approximately 15,000.00, plus

any pre-judgment and post-judgment interest. Additionally, in accordance with the LMRDA,

the Court is authorized by statute to fine Defendant Torell up to $10,000 and/or imprison her

for up to five years. Further, given Defendant's willful and bad faith conduct, Plaintiff also

seeks punitive damages and any other relief this Court deems just and proper.

## XIV.    PRAYER FOR RELIEF

393.         WHEREFORE, Plaintiff, Lawrence Meadows, prays for a judgment against the

Defendants for the relief as plead herein, to include compensatory damages for loss of airline

pilot career earnings in an amount of no less than $5.609M (to be fully determined at trial

and adjusted for new pilots' JCBA), punitive damages, emotional distress, pre-judgement and

post-judgement interest, expert witness fees, and for any such other injunctive or equitable

relief this Honorable Court deems just and proper. Additionally, in the event Meadows is

able to convert this into a class-action, then also award him all legal fees and costs.


Dated: this 19th day of March, 2018,                     Respectfully submitted,

Lawrence M. Meadows, Pro Se
1900 Sunset Harbour Dr., #2112
Miami Beach, FL 33139
Phone: 516-982-7718
Facsimile: 435-604-7850
lawrencemeadows@yahoo.com

FIRST AMENDED COMPLAINT

# EXHIBIT "A"

FIRST AMENDED COMPLAINT

# *Union Democracy Review*

No. 204        Published by the Association for Union Democracy

*Member Discussion Board closed off with No Explanation:*

## 233 Disabled Pilots Barred from Allied Pilots Association website

By Kurt Richwerger

Without explanation or warning, on April 22nd, 2014 the Allied Pilots Association (APA), the collective bargaining agent for all 10,000 American Airlines (AA) pilots, locked out 233 of its members - all of whom are medically disabled - from what is called the "challenge and response (C&R)" section of the APA website. C&R is a members-only discussion forum. The 233 pilots are all classified by the APA as "MDD" or medically disabled and dropped from the seniority list. AA policy is that after 5 years of disability members lose their seniority. This policy has been the subject of an ongoing dispute between the APA and its disabled pilots, and many pilots wish the APA to grieve the policy on grounds that it violates the CBA and the Americans with Disabilities Act (ADA). Regardless, MDDs have always been classified as members in good standing by the APA, but now have been prevented from entering what APA calls its "virtual union hall."

The lockout, according to some disabled pilots, is meant to prevent them from discussing the allegedly poor treatment of disabled pilots by the APA and by American Airlines (AA). According to one pilot, an active website discussion began with a member's posting of a press release regarding a March 2014 lawsuit against AA brought by Lawrence Meadows, one of the AA disabled pilots. The lawsuit, filed in federal court, accuses AA of violating the employee whistleblower protections of the Sarbanes Oxley Act by retaliating against Meadows and terminating him after Meadows informed AA of suspected fraud in its cost savings program scheme to terminate pilot disability payments funded by AA pension plans.

Disabled members began commenting and posting on C&R and told their own "horror stories," in the words of one disabled pilot, stories which did not paint the APA in a very favorable light.

Meanwhile in mid- April 2014 Meadows requested that APA represent him in a seniority reinstatement grievance hearing and APA refused; he responded to the APA legal department that he would file EEOC disability charges against APA and would advise others to do the same. Two hours later, he and all other 233 MDDs were locked out of the website.

Meadows' Sarbanes Oxley lawsuit provides some background and context for the above events. It alleges that AA targeted him in a fraudulent "cost-savings" initiative, as American faced the threat of bankruptcy and its pension obligations were badly underfunded.

The lawsuit alleges that in 2004 Meadows, at that time a 13-year APA member and pilot, became disabled and began receiving disability benefits as his application was approved by the AA Medical Director. In the 2004-07 period when he received benefits, Meadows attempted to get clearance to return to work twice, but was unable to obtain a required FAA medical recertification to fly for AA due to his condition. In fact, regular medical updates of his condition, required under the plan, found it worsening, reflected in AA records.

But despite his worsening condition, he was suddenly terminated from disability benefits in December 2007 -- not even told of this termination by AA - checks just stopped coming. Meadows appealed the loss of disability status to the AA's Pension Benefits Administration Committee (PBAC). PBAC had hired an outside party, "Western Medical Evaluators" (WME), to review such appeals. The WME review concluded that Meadows' claim be denied in 2008. But, Meadows learned from his 2010 ERISA lawsuit against AA that WME was not really a third party clinical source as required by the CBA, but rather a small worker's compensation claims processor that had a history of falsifying claims and records, and in fact WME was permanently shut down by the Texas State Insurance Board in 2010 for fraudulent practices. In discovery during his ERISA suit, WME could produce no medical records that they relied upon in conducting their peer review of Meadows' case.

Meadows' ERISA lawsuit also revealed the AA "cost savings program," which tracked some 84 disabled pilots including himself in a spreadsheet, and he was one of five designated for "cost savings." APA also challenged the PBAC review process in a 2009 lawsuit and the clinical review was moved to the Mayo Clinic.

continued on page 2...

| Inside Stories | | | |
|---|---|---|---|
| New book by Bill Barry | 3 | IAM election protest | 5 |
| NLRB win for carpenter | 3 | Where we stand | 5 |
| Oppression in the AMO | 4 | AFGE election | 6 |
| IBEW campaign | 5 | UBC free speech case | 8 |

June/July 2014



FIRST AMENDED COMPLAINT

# Disabled pilots continued from page 1...

The suit continues: after denial of benefits Meadows was placed on unpaid sick leave and told he had to return to full time pilot work by getting medical clearance. He applied again for the FAA clearance to return to work but was again denied due to his condition. But instead of returning to disability status, Meadows was kept on unpaid sick leave. The 2010 ERISA lawsuit meanwhile went to federal mediation and in the process Meadows revealed the use of WME and the existence of the fraudulent cost savings initiative to AA's corporate directors and AA's legal counsel, and told AA that his lawyers were intending to bring additional actions. Meadows was then told by AA he had exceeded AA's sick leave maximum of five years and threatened with termination – odd, because Meadows had already exceeded that policy by three and a half years and was never threatened with termination. The AA Reasonable Accommodation Policy requires that if a disabled pilot cannot obtain FAA clearance to fly an aircraft he may request a reasonable accommodation in another craft or class so Meadows requested an accommodation in one of AAs non flying pilot positions -- which would have kept him in the CBA , kept his seniority and eligibility for benefits, but he was refused. Meadows was terminated in 2011, after refusing to accept an accommodation outside of the CBA, which would have inferior status and benefits and prevented him from ever returning to work as a pilot.

The suit asks for relief in the form of a new assignment to a position in the bargaining unit with full wages commensurate with his seniority status and suggests three possible positions. It also asks for reinstatement of his benefit package, back pay and lost benefits. It also asks for a money sum for "intentional infliction of emotional distress" which the suit alleges has led to a significant exacerbation of Meadows' condition, and asks for attorney fees.

After Meadows' press release appeared on the C&R portion of the APA website, another disabled pilot, Kathy Emery, posted a document in which she alleges she was also the target of the AA cost savings plan. Like Meadows, her disability benefits were unex-pectedly discontinued, she had been receiving disability pay ments for several years and a doctor selected by AA provide updates to AA on her condition. But in Jan. 2007 she wa stripped of all disability benefits without notice, just around th time Meadows lost his benefits.

Emery describes in her posting that like Meadows, she exercise her right to appeal the loss of her disability to the AA PBAC an suffered the same fate -- WME denied her appeal. After he appeal was denied she was placed on unauthorized leave o absence and told to appear at a hearing. The hearing officer direct ed her to obtain a First Class Medical Clearance so she could g back to work. But soon after, she was told by the same AA Medical Director that had stopped her disability payments, that h would not give her such clearance but suggested she might b given a "reasonable accommodation" "stapling papers."

Like Meadows, Emery then filed an ERISA suit against AA in federal court in Florida. Her ERISA case unearthed the same fraudulent practices by WME that allegedly took place in Meadows case.

But Emery has issues with APA that Meadows did not. Emery and APA filed a grievance against AA in December 2007 but it was not settled and she is still awaiting an arbitration date. Emery was also entitled to disability benefits under the APA disability plan. So in 2003 she filed for benefits. No payments were received for five years. She filed another ERISA suit this time against the APA , and won a settlement of $48,000 from a federal court for the back years.

But there is even more to Emery's dispute with APA. Emery alleges she received far less than her fair share of the AA "Equity Distribution," which has become the basis for her EEOC complaint against APA. In the formation of the new American Airlines, AA pilots were given a 13.5 percent equity stake, as pilots became part owners of the new AA. Emery received an award estimated at $23,000, but similarly situated male pilots who had also been "terminated" received 5 to 6 times that amount. The reason: male pilots that had been "terminated" filed grievances that were given a presumption of likely success – thus they were held to be still on "active status." Emery alleges disparate treatment when her grievance was not given the same presumption, so she was not treated as "active" resulting in a much lower share of the equity. Emery also alleges in her complaint that the APA discriminated against other disabled pilots in the equity distribution.

Both Emery and Meadows are exploring ways to remove the website lockout.

**No. 204**                                           June/July 2014
Published by:
Association for Union Democracy
104 Montgomery Street
Brooklyn NY 11225
www.uniondemocracy.org
Phone (718) 564-1114
Email:info@uniondemocracy.org

Miriam Lazewatsky, Editor
Kurt Richwerger, Executive Director

**Subscription rates:** regular $30; institutions/foreign: $40; low income/student/retired: $15. (Additional contributions to AUD are tax deductible.)

Union Democracy Review aims to promote the principles and practices of internal union democracy in the North American labor movement. Toward this end, it makes its pages available for discussion.

FIRST AMENDED COMPLAINT

# EXHIBIT "B"

FIRST AMENDED COMPLAINT

*Disposition: Adopted 19-3-0-0 on 12/13/2016*

R2016 – 30 Rev 1       SOURCE:   MIA____
BOD MTG:
06/07-09/2016

| | |
|---|---|
| FOR | 19 |
| AGAINST | 3 |
| ABSTAIN | 0 |
| ABSENT | 0 |

Title:  Supplement F and Section 11.D.1. - Negotiating Committee Tasking_____

Presented by:   CA Ed Sicher_____   Seconded by:   CA Billyray Read_____

Policy Manual: _____   Cons. & Bylaws: _____

1      **WHEREAS,** the three separate contracts prior to the merger of US Air East, America West,

2   and American Airlines treated disability retirements differently; and,

3      **WHEREAS,** the JCBA Supplement F. (1) 5. (d) and Section 11.D.1 adopted the most

4   restrictive of the three, the American Airlines contract, which has been subjectively reinterpreted by

5   the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous

6   disability; and,

7      **WHEREAS,** the former U.S. Air East contract allowed disabled pilots to remain on the

8   seniority list until they reach the federally mandatory retirement age for pilots; and,

9      **WHEREAS,** the former America West contract effectively removed pilots from the seniority

10   list for retirement disabilities longer than eight (8) years without a provision to be reinstated in the

11   event that pilot should ever regain his or her Class A medical; and,

12      **WHEREAS,** the merging of the seniority lists is creating a disparate treatment amongst the

13   individual pilot groups; and,

14      **WHEREAS,** the most beneficial treatment of all of our disabled pilots is to allow them

15   reinstatement from long-term disability in as expeditious and fair a manner as possible; and,

16      **WHEREAS,** there has been some evidence indicating that the company has unfairly

17   withheld reinstatement to long-term disabled pilots who have regained their Class A medicals from

18   being reinstated if they were considered problematic employees; therefore.
    R2016-30 Rev 1                                                              1

19     **BE IT RESOLVED,** that the Negotiating Committee expeditiously engage the company in

20    in negotiations which seek to:

21        1.  Modify the language in the JCBA Sup F. (1) 5. (d) Disability Retirement and

22           Section 11.D.1 so that it will not prevent a pilot from retaining and accruing

23           seniority after a disability period of more than five (5) years commencing at the

24           expiration of the pilot's paid sick leave and thus results in effectively removing

25           the pilot from the seniority list;

26        2.  Negotiate language which allows pilots with long term disabilities from being

27           removed from the seniority list until they reach the federally mandated retirement

28           age for pilots;

29        3.  Negotiate contractual language that provides for the immediate reinstatement and

30           return to the Pilot System Seniority List of all pilots who are currently out sick or

31           on disability and who have been removed from the seniority list as a result of the

32           provisions previously contained in the respective contracts, and;

33        4.  Prevent the further removal of pilots from the Pilot System Seniority List as a

34           result of sickness or disability until they reach the mandatory pilot retirement age,

35           and;

36        5.  Gather the names of the pilots from the three separate pilot groups that were

37           medically retired due to long-term disability or disabilities and thus removed from

38           their respective seniority lists and include them on the Seniority List Integration

39           currently being negotiated.

R2016-30 Rev 1

2

FIRST AMENDED COMPLAINT



earth smart

FedEx carbon-neutral
envelope shipping

ORIGIN ID:PKCA   (516) 902-7718
LAWRENCE M MEADOWS

1900 PURDY AVE APT 2112

MIAMI BEACH, FL 33139
UNITED STATES US

TO CLERK OF COURT
WILKIE D FERGUSON U.S COURT
400 NORTH MIAMI AVE

MIAMI FL 33128
(305) 523-5100

SHIP DATE: 15OCT18
ACTWGT: 1.40 LB
CAD: 6997529/SSF01922

BILL      PARTY

REF:          DEPT:

**FedEx**
Express

**E**

TUE – 16 OCT 3:00P
STANDARD OVERNIGHT

TRK#
0200   8120 7962 8671

**XH MPBA**          33128
FL-US   MIA

# Envelope

RT **458**   1   E
15:00
FZ **457**          86 1
10.16

Align bottom of peel-and-stick airbill or pouch here.

**FedEx**
Express

Package
US Airbill

Fedex Tracking Number **8120 7962 8671**

Form 0200

**1  From**
Date 1/15/2018

Sender's Name  Lawrence M Muslow    Phone  5he 533-7712

Company  Case No 1:17-cv-22589-JLK

Address  1500 Bay Harbor Dr #2112

City  Miami Beach    State  FL    ZIP  33135

**2  Your Internal Billing Reference**

**3  To**
Recipient's Name  Clerk of Court    Phone  305 533-5100

Company  William D Ferguson US Courthouse

Address  400 North Miami Ave

City  Miami    State  FL    ZIP  33128

**4  Express Package Service**

Next Business Day
- FedEx First Overnight
- FedEx Priority Overnight
- ☑ FedEx Standard Overnight

2 or 3 Business Days
- FedEx 2Day A.M.
- FedEx 2Day
- FedEx Express Saver

**5  Packaging**
☑ FedEx Envelope    ☐ FedEx Pak    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6  Special Handling and Delivery Signature Options**
- ☐ Saturday Delivery
- ☐ No Signature Required
- ☑ Direct Signature
- ☐ Indirect Signature

Does this shipment contain dangerous goods?
- ☑ No
- ☐ Yes (Shipper's Declaration not required)
- ☐ Yes (As per attached Shipper's Declaration)
- ☐ Dry Ice
- ☐ Cargo Aircraft Only

**7  Payment  Bill to:**
☑ Sender    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Total Packages    Total Weight

644

8120 7962 8671