**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**LAWRENCE MEADOWS,**
    **Plaintiff,**

    **v.**

**ALLIED PILOTS ASSOCIATION,**
    **Defendant.**

**CASE NO. 1:17-cv-22589-EA**
**HONORABLE JUDGE ED ARTAU**
_____/



 FILED BY_____D.C.

JAN 28 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**PLAINTIFF'S REPLY IN SUPPORT OF AMENDED MOTION FOR EXTENSION**
**OF ALL CASE DEADLINES AND FOR A STAY OF PROCEEDINGS (ECF NO. 173)**

Plaintiff Lawrence Meadows respectfully files this Reply in support of his Amended

Motion for Extension of Time and for a Stay of Proceedings (ECF No. 173). Defendant Allied

Pilots Association's ("APA") Opposition (ECF No. 178) is a perfunctory attempt to sidestep the

consequences of its own misconduct. APA's arguments are defeated by new, dispositive evidence

confirming the necessity of modifying the case schedule. As established by the attached sworn

declaration of former APA President Ed Sicher (Exhibit 1), APA's post-2021 retaliatory conduct

is now a matter of record, rendering the current schedule and discovery limitations legally and

factually untenable.

**ARGUMENT**

APA's opposition brief rests on four flawed premises that are contradicted by the record:

(1) its discovery production is compliant; (2) its provision of false contact information for a key

witness was a harmless error; (3) pending motions are irrelevant; and (4) a new EEOC Right-to-

Sue letter has no bearing on this case. Each argument fails. The confluence of APA's escalating

1

discovery abuses, the slate of unresolved dispositive motions and objections, and case-altering new evidence constitutes the "exceptional circumstances" required for an extension.

## I. The EEOC Right-to-Sue Letter Confirms the Need to Expand the Case Scope.

APA's primary argument - that Plaintiff's EEOC Right-to-Sue letter is "entirely irrelevant" because an ADA claim has not yet been pleaded (ECF No. 178 at 4) - is a deliberate mischaracterization. The letter's significance is not its relevance to a claim that already exists, but the fact that it creates the procedural necessity and opportunity to amend the complaint to include new, timely claims of disability discrimination and retaliation arising from APA's 2025 conduct.

This development provides dispositive support for Plaintiff's pending Motion to Supplement Pleadings (ECF No. 129) and proves that the current 2021 temporal scope limitation is legally obsolete. It is impossible to prosecute these new claims, which are inextricably linked to the existing claims, without a corresponding extension of all case deadlines to permit discovery into these recent events.

## II. APA's Document Production Remains Defective and Prejudicial.

APA's claim that its production of over 33,000 individual, non-globally searchable PDF files complies with Fed. R. Civ. P. 34 is meritless. *See* ECF No. 178 at 1 - 2. A document dump of thousands of disconnected files is not a production "as they are kept in the usual course of business." *Id.* This was confirmed during the January 21, 2026 deposition of APA's own Rule 30(b)(6) witness, Mark Myers, who testified that he saves and organizes his own emails with searchable date and topic descriptors - a practice APA refused to follow in its production.

APA's defective production is not a technicality; it is a tactic designed to prejudice. It rendered Plaintiff unable to meaningfully prepare for Mr. Myers's deposition and continues to obstruct the truth-finding process. An extension is necessary to allow for a compliant production

and to permit Plaintiff to conduct discovery based on information that should have been provided months ago.

In sum, APA's discovery conduct is not just almost 2-months delinquent, it is woefully deficient, and functionally defective, amounting to a calculated campaign of obstruction designed to cause maximum prejudice. This conduct alone constitutes an exceptional circumstance warranting an extension and, eventually, sanctions.

**A. APA's Production is Deliberately Defective and Raises a Presumption of Spoliation.**

APA's claim that its production of thousands of individual, non-globally-searchable PDFs complies with Fed. R. Civ. P. 34 is meritless. It is a document dump designed to make meaningful review impossible. More egregiously, APA has engaged in clear spoliation or, at minimum, has made material misrepresentations to Plaintiff and the Court regarding the existence of Electronically Stored Information (ESI).

Specifically, APA's counsel, Joshua Shiffrin, unequivocally stated in a January 14, 2026 email that "APA does not possess any text messages or Telegram messages that were responsive to the document requests in this matter." (*See* **Exhibit 1**, Jan. 14, 2026 Shiffrin Email). He repeated this representation to Magistrate Judge Reid at the January 23 hearing, stating there are "no text messages." This is false. Plaintiff has located responsive text messages from currently serving APA officers, President Nick Silva, Secretary-Treasurer Pat Clark, Director of Representation James Clark, and APA Deputy Aeromedical Director Jeff Liesten. APA has been under a continuous duty to preserve this ESI since at least 2013. (*See* **Exhibit 2**, 2013 and 2020 Preservation Letters). APA's failure to produce any text messages, coupled with its counsel's false denials, creates a powerful inference of willful spoliation that must be explored through extended discovery.

Furthermore, APA has failed to produce ESI in native format with intact metadata. It has produced only four seniority lists in native format and zero emails. Providing a spreadsheet *summary* of metadata is not a substitute for producing the native files themselves and is a flagrant violation of standard discovery protocols.

**B. APA Engages in Discovery by Ambush.**

APA has weaponized the timing of its productions to cripple Plaintiff's deposition preparation.

1. **The Myers Deposition:** On January 21, 2026, APA produced its fourth tranche of documents and its privilege log at 9:05 a.m., five minutes *after* the scheduled start time for the Rule 30(b)(6) deposition of Mark Myers. This bad-faith tactic made it impossible to review the materials and question the deponent on them.

2. **The Barton Deposition:** On January 26, 2026, the evening before the deposition of its economic expert Matt Barton, APA produced its 6th tranche of documents responsive to Plaintiff's request. This eleventh-hour production deprived Plaintiff of any reasonable opportunity to prepare a meaningful examination.

This pattern is not accidental; it is a deliberate strategy to obstruct discovery and prevent a fair examination of witnesses. This conduct has caused irreparable harm and necessitates an extension to allow for proper review and potential re-deposition of witnesses.

**III. The Sworn Declaration of Former APA President Ed Sicher Establishes Overwhelming Good Cause and Exceptional Circumstances.**

Attached as **Exhibit 3** is the sworn Declaration of former APA President, Captain Edward Sicher. This declaration provides direct, firsthand evidence of APA's post-2021 misconduct and constitutes precisely the type of significant, case-altering evidence that creates "exceptional circumstances" under Rule 16(b)(4). Captain Sicher attests to, among other things:

- APA's active efforts to advance Plaintiff's Grievance 12-011 in 2024, proving APA's representation that the grievance was "closed" is false; and

- His hiring of outside counsel Sue Edwards, to represent Plaintiff individually in his ADA disability discrimination and retaliation lawsuit against American Airlines, for one month, until she was abruptly taken off his case a month later, because Palinitff refused to drop this instant lawsuit which was stayed at that time.

- The circumstances surrounding his refusal to sign a settlement that would extinguish Plaintiff's claims, which was immediately followed by his recall from the presidency.

A stay is required to allow the Court to rule on the pending Motion to Supplement (ECF No. 129) and Objection to the Magistrates Protective Order (ECF No. 138), and an extension is required to allow discovery into these highly relevant post-2021 events.

## IV. A Stay is Necessary to Resolve Foundational Issues of Counsel Disqualification and the Proper Scope of This Case.

Meaningful discovery cannot proceed while the fundamental contours of this case remain unresolved. The Magistrate Judge's summary denial of key discovery at the January 23 hearing confirms that a fair process is impossible while issues of attorney misconduct and the proper scope of the claims are pending. It is a violation of due process to force Plaintiff to complete discovery without knowing whether he is litigating against conflicted counsel who may be disqualified (pending Motions at ECF Nos. 109/110, 142, 148), or the proper temporal scope of his claims (pending Motion to Supplement, ECF No. 129, and Objections, ECF No. 149, 157, 161, 176).

Discovery must be stayed until these threshold matters are resolved.

### CONCLUSION

**WHEREFORE,** Plaintiff respectfully requests the Court grant his motion, immediately stay discovery proceedings until all pending dispositive motions and objections are adjudicated, and thereafter enter a new scheduling order with a 90-day extension of all deadlines.

Dated: January 28, 2026

Respectfully Submitted,

Lawrence M. Meadows, *Pro Se*
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

## CERTIFICATE OF SERVICE

I, Lawrence M. Meadows, Pro Se Plaintiff, hereby certify that on January 28, 2026, a true and correct copy of the foregoing was served via the Court's CM/ECF system, email, and U.S. Mail on all counsel of record.

**Lawrence M. Meadows**

## SERVICE LIST

**Capri Trigo, Esq.**
Gordon & Rees LLP
100 SE Second Street, Suite 3900
Miami, FL 33131
Email: ctrigo@gordonrees.com
*Lead Counsel for Defendant*

**John M. Pellettieri, Esq.**
**Grace Rybak, Esq.**
**Joshua B. Shiffrin, Esq.**
Bredhoff & Kaiser, P.L.L.C.
805 15th Street N.W., Suite 1000
Washington, D.C. 20005
Emails: jshiffrin@bredhoff.com;
jpellettieri@bredhoff.com;
grybak@bredhoff.com;
*Pro Hac Vice Counsel for Defendant*

## EXHIBIT  1

RE: [EXTERNAL] URGENT: Formal Demand to Correct Material Misstatements to the Court and Cure Deficient Document Production

From:  Joshua Shiffrin (jshiffrin@bredhoff.com)

To:  lawrencemeadows@yahoo.com; grybak@bredhoff.com

Cc:  ctrigo@grsm.com; ddymowski@grsm.com; ckekacs@bredhoff.com; jpellettieri@bredhoff.com; jnguyen@bredhoff.com

Date:  Wednesday, January 14, 2026 at 03:08 PM EST


Dear Mr. Meadows:

I write to respond to the discovery matters raised in your email below.

The issues you raise with respect to the manner of our document production were fully addressed by Magistrate Judge Reid at the January 7 hearing and in her January 13 order. Our document productions comply with her January 13 order, and we will not be re-producing any documents to you.

We are working with our vendor on the preparation of our privilege log, and we expect to provide it to you on January 21.

As part of the process of collecting documents, my firm conducted extensive custodian interviews of current APA custodians—i.e., individuals who are currently employed or hold a position with APA.  Those interviews included performing targeted searches on individuals' phones for text messages.  (No current APA custodian utilizes Telegram.)  We determined through that process that APA does not possess any text messages or Telegram messages that were responsive to the document requests in this matter during the relevant period.

Sincerely,

Joshua Shiffrin


**Disclaimer**

This electronic transmission is intended only for the addressee shown above. It may contain information that is privileged, confidential or otherwise protected from disclosure. Any review, dissemination or use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this electronic transmission in error, please delete the e-mail and notify us immediately by telephone or by reply e-mail. This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience.

## EXHIBIT  2

September 20th, 2013
Lawrence Meadows
777FO/MIA AA# 332713
PO Box 4344
Park City, UT 84060

Bennett Boggess
Director of Legal
Allied Pilots Association
O'Connell Building, Suite 500
14600 Trinity Blvd.
Fort Worth, TX

Via E-mail Certified Mail

**RE:    Preservation of Electronic Records of the Allied Pilots Association, Bennett Boggess (as an individual), Chuck Hairston (as an individual), Mark Meyers (as an individual), XXXXX Para Legal (as an individual), Linda Compton (as an individual), Mike Knoerr (as an individual), Keith Wilson (as an individual), Neil Roghair (as an individual), Scott Shankland (as an individual), Pam Torell (an individual), Mickey Mellerski (an individual), Mark Stephens (as an individual), David Quinlan (as an individual), Rusty McDaniel's(as an individual),  David Bates (as an individual), Lloyd Hill (as an individual), Tom Westbrook (as an individual), Bill Haug (as an individual), and Scott I ovine (as an individual), and James and Hoffman (APA's general counsel).**

Dear Mr. Bennett Boggess:

Based on information and belief, and continued investigation into the breach of duty of fair representation, breach of fiduciary duty, discrimination, retaliation, ADA violations, and potential conspiracy targeted at disabled pilot has led to the reasonable belief that certain electronic communications, and/or documents may exist which potentially implicate the above-referenced parties.

Furthermore, it is clear from the record that APA has failed to uphold it statutory and contractual duties, especially with respect to its disabled pilots.

We hereby put you on notice that we intend to seek discovery of all relevant electronic records, which may or may not include emails, IM's, text messages and other electronic media generated on "work" computers  and/or Allied Pilots Association's networks. Additionally, mirror-images of each parties relevant hard-drives will be sought. To the extent those communications are relevant, they will become discoverable, and we intend to seek to get it modified or overturned to allow us access to the necessary information.

Based on APA's recent conduct and inconsistencies with APA's verbal statements, written communications, and other evidence, we have reason to believe each of you may attempt to delete or destroy evidence pertaining to First Officer Meadows, and other similarly situated disabled pilots. This letter is intended to put each of you on notice of your duties not to destroy evidence, or in any way compromise our future ability to obtain discovery. On information and belief, each of you possess or control certain electronic records pertaining to this matter. As critical evidence in this matter exists in the form of electronic data contained on your personal and computers and in the computer networks of APA and James and Hoffman, and other affiliated entities this is a notice and demand that such evidence must be immediately preserved and retained by you personally and the affiliated entities until further written notice from the undersigned. This request is essential, as a paper printout of text contained in a computer file does not completely reflect all information contained within the electronic files, to include all metadata.

For purposes of this notice, "Electronic Data" shall include, but not be limited to, all text files (including word processing documents), spread sheets, text messages, IM's, e-mail files and information concerning e-mail (including logs of e-mail history and usage, header information and "deleted" files) e-mail attachments, internet history files and preferences, graphical image format ("GIF") files, data bases, calendar and scheduling information, computer system activity logs, and all file fragments and backup files containing Electronic Data.

Any attempt to destroy or alter data will be construed as an admission of guilt. Please contact me to discuss any issues set forth herein.

Sincerely,

Lawrence Meadows
777FO/MIA  AA# 332713

cc: APA President, Keith Wilson

or

February 11, 2020

First Officer Lawrence M. Meadows
MIA/FO/777/LTD/MDD
1900 Sunset Harbor Dr. 2112
Miami Beach, FL 33139
lawrencemeadows@yahoo.com
(516) 982-7718

**_Sent via Email and U.S. Certified Mail_**

Mark Myers, Esq., Director of Pilot Negotiations
Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Boulevard
Fort Worth, TX 76155

**Re: Your Litigation Hold and Duty To Preserve Evidence - Electronic Data**

Dear Mr. Myers,

Based on information and belief, and continued investigation into the breaches of fiduciary duty, discrimination, retaliation, violations of several federal statutes; it is reasonably believed that documents may exist which potentially implicate the above-referenced parties in a civil conspiracy targeted at APA's disabled pilots.

Furthermore, record evidence indicates that the above referenced parties have failed to uphold their duty to protect the individual and collective contractual and statutory duties rights of APA's disabled MDD pilots.

This has led to the reasonable belief that certain documents and/or communications, electronic or otherwise may exist which potentially implicate the above-referenced parties.

By operation of this certified litigation hold/electronic preservation letter, the above referenced parties are hereby on notice that you are under the threat of imminent litigation which has triggered a litigation hold and your duty to preserve evidence in both your business and personal capacities. To be certain, litigation hold letters such as this one, are issued in anticipation of litigation instructing recipients to preserve relevant documents and other information. The duty to preserve relevant information is triggered when litigation is "reasonably anticipated." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612-613 n. 7 (S.D. Tex. 2010). The test for "reasonable anticipation of litigation" varies by jurisdiction, but, in general, reasonable anticipation of litigation arises when a party knows there is a credible threat that it will become involved in litigation. *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 217 (S.D.N.Y. 2003).

We intend to seek discovery of any or all relevant records, documents, and communications, electronic or otherwise; which may or may not include emails, IM's, text messages and other electronic media generated on personal computers, and/or "work" computers, and/or on Allied Pilots Association's networks. Additionally, mirror-images of each parties relevant hard-drives will be sought.

1

To the extent any of those communications are privileged, they are still relevant, and will become discoverable; moreover, we intend to seek to have any privilege modified or overturned using the doctrine of *"crime-fraud exception"*, and will obtain an court orders necessary to allow us access to the necessary information.

Based on recent conduct and inconsistencies with relevant parties verbal statements, written communications, and other evidence to date, we have reason to believe each of you may attempt to delete or destroy evidence pertaining to First Officer Meadows, and any other similarly situated disabled MDD pilots.

This letter is also intended to put the above referenced parties on notice of your duties not to destroy evidence, or in any way compromise our future ability to obtain discovery. On information and belief, each of you possess or control certain electronic records pertaining to this matter. As critical evidence in this matter exists in the form of electronic data contained on your personal and computers and in the computer networks of APA, and other affiliated entities, this is a notice and demand that such evidence must be immediately preserved and retained by you personally and the affiliated entities until further written notice from the undersigned. This request is essential, as a paper printout of text contained in a computer file does not completely reflect all information contained within the electronic files, to include all metadata.

For purposes of this notice, "Electronic Data" shall include, but not be limited to, all text files (including word processing documents), spread sheets, text messages, IM's, e-mail files and information concerning e-mail (including logs of e-mail history and usage, header information and "deleted" files) e-mail attachments, internet history files and preferences, graphical image format ("GIF") files, data bases, calendar and scheduling information, computer system activity logs, and all file fragments and backup files containing Electronic Data.

Finally, you are hereby cautioned that any attempt to destroy or alter data will be construed as an admission of your guilt, and we will vigorously seek any and all appropriate remedies to the maximum extent permitted by law, to include spoliation sanctions, and up to default judgment.

Furthermore, under the threat of and during the pendency of this litigation, transfer of any personal or business assets, including but not limited to any and all real property, personal property, cash, investments, retirement plans, motor, vehicles, boats, planes, etc. will be deemed a Fraudulent Conveyance subject to the claw-back provisions of any judicial Charging Order.

 Please contact me to discuss any issues set forth herein.

Sincerely,

*L. M. Meadows*

Lawrence Meadows
First Officer American Airlines
MIA/FO/777/LTD/MDD
Founder, DisabledAirlinePilotsFoundaton.org

2

**EXHIBIT 3**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**LAWRENCE M. MEADOWS,**
  Plaintiff,

  v.

**ALLIED PILOTS ASSOCIATION, et al.,**
  Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**
_____/

### DECLARATION OF CAPTAIN EDWARD F. SICHER

I, Captain Edward F. Sicher, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am over the age of eighteen and all statements made herein are true and correct to the best of my knowledge.

2.     I am a veteran who served over 20-years as a U.S. Air Force Officer, am a decorated combat fighter pilot, who retired at the rank of Lt. Colonel, and was hired as a pilot for American Airlines in 1998, where I've worked for over 27 years, and am currently a B-777 Captain (CA) flying intentional routes.

3.     During my military career I was disabled and grounded from flying to due to being temporarily paralyzed as the result of a vaccine reaction during Desert Storm. My wife was pregnant with my first-born at the time and the Air Force threatened me with removal. Thus, I have experienced first-hand what it means to be a long-term disabled (LTD) pilot who has lost their flying career and suffered the associated difficulties and long fight to get medically re-certified and return to the cockpit. This is a primary reason why I am a staunch advocate for American Airline's LTD and MDD (Medical Disabled Dropped from AA seniority list) pilots.

4.        I devoted over a decade of my 27+ year career at American Airlines (AA) as a volunteer and elected representative at the American Airlines Pilots' union, the Allied Pilots Association (APA) which serves the 16000+ pilots of American Airlines, serving both at the Miami domicile and national level. Some of my many involvements in the pilot union include serving as the Miami (MIA) domicile Contract Compliance Chair (CH), as a MIA domicile Strike Preparedness Committee member, as an elected MIA domicile base representative (three times as the Miami Domicile Vice Chair (VC) and one time as the MIA Domicile Chair), at the national level as one of APA's Board of Directors (BOD), and finally as the elected President of the Allied Pilots Association 16000+ pilots where I had the privilege of representing the world's largest independent pilots' union at a unique time while we negotiated our most recent Contractual Bargaining Agreement (CBA).

5.        As President, and in keeping with my commitment to more aggressively represent our disabled pilots, I formed several ad hoc committees to advocate for them, as is my right as President to do. I also expanded our outreach programs to our over 800 disabled pilots who were then on disability. I also hired additional outside legal advisors specialized in this area to help us more forcefully and properly advocate for our disabled pilots. I also spoke directly to American Airline's CEO Robert Isom, Chief Strategist and founding member Steve Johnson, and Chief Legal Counsel, Lucretia Guia, specifically about this issue and Larry Meadows.

6.        In August 2023, as APA President, I obtained what was at that time the most lucrative pilots' collective barging agreement ever in the history of the airline-labor collective bargaining, adding an estimated additional $9.6 billion of contractual improvements over five years to our CBA to include amongst other things, industry leading pilot long-term disability (LTD) benefits.

2

7.      As an APA BOD member and National Officer, I routinely communicated union business via text message and signal (during contract negotiations) on my personal electronic devices, with other APA members, committeemen, officers, and attorneys.  I also primarily used my APA email hosted on APA servers, to which I was denied access after I left office.

8.      Based on my extensive and longstanding union experience listed above, and for the reasons stated below, I am considered to be one of the foremost subject matter experts (SME) on the AA-APA's most recent collective bargaining agreement (CBA), the arguments and positions at the table which resulted in the gains we made and the items we were denied, American Airline's pilot union representation, APA's governance, and American's disabled pilots' LTD benefits and MDD pilots grievances, and associated statutes of the Railway Labor Act (RLA), Labor Management Reporting and Disclosure Act (LMRDA), Americans' with Disabilities Act (ADA), and the National Mediation Board (NMB), all of which I had to know and navigate as President of the labor association during this critical time.

9.      On or around 2014 while serving my first term as MIA domicile's VC, I first met the Plaintiff, First Officer (FO) Lawrence Meadows, who was a disabled MIA pilot on LTD and MDD.  As FO Meadow's local union representative I was given responsibility for the LTD and MDD issue by then MIA CH CA Thomas Copeland. FO Meadows engaged in significant protected activity, as a whistleblower, and an outspoken advocate for his fellow LTD and MDD union brothers and sisters, who were openly critical of their representation by APA during 2007-2011 time period for reasons which I will explain.

10.     This was a particularly critical time for the MDD pilots due to the fact that AA had recently declared bankruptcy and was in the process of merging with US Air, leaving in doubt these pilots' positions on the new combined seniority list with the US Air Pilots and the America West Pilots,

if any position at all, should these pilots ever regain their medicals and be reinstated. It also left in question the status of the MDD pilots' many pending grievances such as DFW Domicile Grievance 20-012 (see attachments) over wrongful termination. Finally, it was also an increasingly unpopular topic to breach at the board table during the intensive merger negotiations as it increasingly appeared that APA had failed in achieving one of its most fundamental objectives and one which is sought by every labor union; the protection of it's members employment. It appeared that APA was complicit in allowing AA management to selectively choose which pilots it wanted to reinstate and which they did not (the company claiming that these pilots were "administratively removed"), while simultaneously allowing others to be reinstated. There was never any contractual provision for removal from employment for this reason nor was any proper notice given to these pilots.  It also appeared to me that all of the pilots who were being refused reinstatement, at least all of them that I could identify, were those pilots that chose to fight AA in court instead of accepting AA management's decisions regarding their status and benefits without question.  This disparate treatment appeared to be retaliation by the company and I was adamant that our union should be strongly advocating for each and every one of them.

11.      In 2016, while serving as the MIA VC, and in an effort to get our union more aligned with the objective of reinstating our MDD pilots, I proposed a Resolution (R2016-30; see attachments) which sought to more clearly define our official union policy towards these MDD pilots and expedite the grievances which had been filed seeking their reinstatement to the seniority list.  Although the legislation eventually passed, I was personally surprised at the push-back from APA's legal department. The only reason this legislation passed, after more than a year of deliberation by the BOD and objection by APA In-House Legal, was that President Dan Carey

had recently won the election for President of APA and summarily replaced the long-standing General Counsel of the union, Ed James from James and Hoffman, with Mr. George Buckley. Mr. Buckley had a fresh perspective and was willing to put the union on the right side of the issue. Also, at or about this time, long-serving Chief In-House Legal Counsel, Mr. Bennett Boggess, was replaced. Mr. Boggess had been the catalyst in allowing the company to pick and choose which pilots they chose to reinstate instead of advocating equally for all of them. Once he was gone progress towards getting APA to advocate for it's disabled members could begin

12.    In performing my due-diligence in preparing Resolution R2016-30 for debate, I talked via telephone with American Airline's Director of Flight Administration, Mr. Scott Hanson, on whether I could expect his support on reinstating the MDD pilots to the seniority list, and he replied "Absolutely not". When I inquired as to why he replied, "Because I have a business to run". It was then I realized that I was going to fight a mostly uphill battle in the next several years to make any progress at all on this issue.

13.    Also in researching this issue, I interviewed prior APA President Lloyd Hill, another MIA domicile member who served as national President from approximately 2008 until 2010. He and I discussed, amongst other issues, the hiring of an ERISA counsel in the 2008 to help APA fight this battle but then the union soon dismissed the counsel. When asked directly why this issue was abandoned Lloyd remarked that the union was in an increasingly precarious financial situation in the late 2000's and difficult decisions had to made concerning APA's expenses. For this reason he chose to concentrate APA's resources on those pilots still on the seniority list. Lloyd Hill, not coincidentally, was also the President who chose to reinstate Bennett Boggess as Chief In-House Legal counsel after he was fired in the mid-2000's.

14.     On May 14 2012, and before I took my seat on the APA BOD, APA filed a collective LTD

MDD Pilot seniority reinstatement grievance, DFW Domicile Grievance 12-012; "protesting the

Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the

Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System

List and for failing to provide pilots notice of termination prior to terminating employment status

of pilots who have been in inactive status, unpaid sick, or disability for more than five years."

(Grievance 12-012 is attached as an exhibit). This grievance was fortunately preserved through

the bankruptcy proceedings and still on the books when I started as a BOD member in 2014 (See

attachment preserving the grievance through the bankruptcy).  Unfortunately, American Airlines

did not want to hear the grievance and therefore, with APA's complicity, continually pushed

back on the hearing of the grievance for almost a decade. The union allowed the continual

dismissal of the hearing and arbitration of this grievance until I became President and put

additional resources and emphasis into the closure on this issue, rolling it into an expedited

Presidential Grievance (G2023-31). A copy of Grievance 12-012 and it Sicher Presidential

Expedited version 23-031 1 is attached hereto as **Exhibits A and B.**

15.     Of noticeable importance during the 2014-2016 timeframe when I was starting my elective

service to APA, was that the three pilot groups merging into the new American Airlines (Legacy

American Airlines pilots, US Air pilots, and America West pilots) were all being treated in

disparate manners in the forming of the new combined seniority list integration (SLI).  Legacy

AA Pilots were sometimes being denied reinstatement after 5-years off of the seniority list for an

LTD condition, US Air Pilots were allowed to retain their position on the merged seniority list

despite not possessing a current FAA medical until mandatory retirement age of 65, and America

West pilots were removed without any provision to regain their seniority after 8-years LTD.

6

16.     APA had chosen to lockout the MDD pilots from the social media and chat platforms of

the union at the time so getting the membership and other board members to hear all sides of the

story was increasingly difficult.  As the Miami VC with responsibility for the LTD/MDD issue

in MIA, I was Kathy Emery's representative in her objections to the unions lock-out of her ability

to access the social media platforms.  With the new General Counsel in place we soon reached

agreement on a settlement for Emery's lock out.  Unfortunately, the agreement, although getting

Kathy an undisclosed settlement, did not include the other LTD pilots who were likewise locked

out.  I did not consider this a victory. A copy of AUD Newsletter and *Emery* v. APA Court Order

and is attached hereto as **Exhibits C and D.**

17.     Also, of interest during the timeframe that I worked to get APA to change it's position on

the MDD pilots and was attempting to achieve passage of R2016-30, work was done behind the

scenes by APA Attorney Mark Meyers, Director of Negotiations, and unknown to those on the

Board of Directors such as myself. Myers solicited the legal opinion of an outside law firm,

Babbs-Denison.  This law firm issued a legal opinion letter justifying APA's abandonment of its

MDD pilots (Babbs-Dennison legal opinion letter attached).  However, this opinion was based

on the information that had been provided to them by Myers, and it was later discovered during

my representation of another MDD pilot, Wallace Preitz, that Babbs-Dennison was never

provided with the key piece of information being that APA had previously filed multiple

grievances on behalf of these pilots seeking their reinstatement and protesting their wrongful

termination, thus giving these pilots "rays of hope" that the union would advocate for them. I

believe that there is various case-law deliberating on this very issue and stating that by

establishing these "rays of hope", the union had, "by default", established a Duty of Fair

Representation (DFR), although I am no longer in possession of my electronic notes kept on APA

7

servers regarding this issue, I believe this letter, as flawed as it was, was used to justify the APA's

Legal Department abandonment of the representation of these MDD pilots. Furthermore, the

Babbs-Dennison legal opinion letter stated that although APA did not owe these pilots a duty of

fair representation (DFR), a duty would be in order if action or representation was taken on behalf

of any one of them, hence the importance of reporting the grievances that APA had filed when

soliciting Babbs-Dennison for an opinion. A copy of Babb-Dennison legal opinion is attached

hereto as **Exhibit E.**

18.     Immediately after receiving the Babbs-Dennison letter, APA legal switched from

obstructing my Resolution R2016-30, to reluctantly allowing its passage. On December 13,

2026, the APA Board of Directors ("BOD") voted in 19-3 to approve R2016-30 which stated in

part;

> "the three separate contracts prior to the merger of US Air East, America West, and American Airlines **treated disability retirements differently**…the American Airlines contract, which has been subjectively reinterpreted by the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous disability…**the merging of the seniority lists is creating a disparate treatment amongst the individual pilot groups**…the most beneficial treatment of all of our disabled pilots is **to allow them reinstatement from long-term disability in as expeditious and fair a manner as possible**… there has been some evidence indicating that the **company has unfairly withheld reinstatement to long-term disabled pilots** who have regained their Class A medicals from being reinstated if they were **considered problematic employees…**"… [Emphasis Added].

And further  created a BOD directive to the APA negotiating committee, which stated;

> ***BE IT RESOLVED, that the Negotiating Committee expeditiously engage the company in negotiations which seek to: 3. Negotiate contractual language that provides for the immediate reinstatement and return to the Pilot System Seniority List of all pilots who are currently out sick or on disability and who have been removed from the seniority list…*** [Emphasis Added].

A copy of APA BOD Resolution 2016-30 is attached hereto as **Exhibit F.**

8

19.     During the January 2020 investigation of the MDD issue (and before I was President of

the union but serving as the MIA domicile CH and BOD Member), the committee I chaired

interviewed two APA attorneys, Director of Negotiations Mark Myers, and APA Director of

Representation, James Clark, who both made material misstatements of the facts with respect

to the existence of the legal department's secret December 12, 2016, Babb-Denison legal

opinion letter obtained without knowledge or authorization from APA's Board of

Directors, which appeared to be used as justification of APA legal's prior abandonment of the

duty of representation of the over 240 MDD pilots; to include, improperly excluding them from

their full share payout of the $1.1B Equity Distribution, estimated to be approximately

$100,000.00 per MDD pilot, or $24M collectively. I informed then President Ferguson of these

attorney's ethical violations and recommended they be terminated due to ethics violations of

the APA Constitution and Bylaws (C&B"), but he declined, stating he "must safeguard the

best interests of APA", and instead abruptly disbanded the committee before it could issue its

findings. I therefore re-started the committee up as an ad-hoc committee immediately upon

my winning of the Presidential election, this time under a different name. See Deposition

transcript of Edward Sicher in; *Preitz v. APA* (Case No. 2:17-cv-01166-MSG, Doc 107-4, Jan

6, 2021) stating both Mr. Myers and Clark both lied about Babb-Denison letter).

20.     In or around April 2022, while serving as the Miami Domicile representative, I appointed

FO Meadows to the APA National Aeromedical Committee, Disabled Pilots Awareness Sub-

Committee (DPASC), to serve as the MIA Domicile Pilot LTD Coordinator to assist other

disabled pilots. The APA legal department pushed back on this appointment, arguing that FO

Meadows was not a "member in good standing" and was therefore ineligible to serve on a

national committee. This disagreement boiled out in my issuance of a Presidential

9

Interpretation on Sep 2, 2022, defining "members in good standing" (The APA President is the only union official allowed to interpret the Constitution and By-Laws at APA).

21.     The formal Constitutional Interpretation (see attachment) confirmed that inactive members, including MDD pilots, like FO Meadows, who had fulfilled all prior membership requirements, were "members in good standing." And could certainly serve on APA committees and in official APA capacities. A copy of that Presidential interpretation is attached hereto as **Exhibit G.**

22.     As a direct result of my Constitutional Interpretation FO Meadows, as a member in good standing, was able to serve as the MIA Domicile LTD Coordinator, where he sponsored and helped scores of disabled pilots.

23.     As APA President, I also took steps to address FO Meadows' long-pending individual and collective seniority reinstatement grievances. On March 13, 2023, at FO Meadows request, I converted the collective Grievance 12-012 into expedited Presidential Grievance 23-031. A copy of G-23-031 is previously attached as **Exhibit B.**

24.     I also created the National Dropped Reinstatement ad hoc Committee ("NDRC"), and around April 2023, I appointed First Officer ("FO") Thomas Rempfer as Chairman, to ensure that APA leaves "no pilot behind". The NDRC was tasked with finding avenues of reinstatement for those who have been dropped from the seniority list, by virtue of disability, merger, or other reason, not including retirement or discipline. This was intended to help obtain reinstatement of FO Meadows and other similarly situated MDD pilots. A copy of the NDRC power point presentation that FO Rempfer created in collaboration with MDD pilots FOs Meadows and Preitz is attached hereto as **Exhibit H.**

25.     During the AOA Spring BOD Meeting, FO Rempfer presented the NDRC PowerPoint to

the BOD, and APA Attorney Tricia Kennedy and Former APA BOD CA Thomas Westbrook

attempted to orchestrate a recall of MDD advocate FO Rempfer. A copy of FO Rempfer's

Memo For Record is attached hereto as **Exhibit I.**

26.     In early 2024, and due to the fact that it increasingly appeared that AA was unwilling to

reinstate Larry Meadows without a legal fight, I hired attorney Sue Edwards, Esq., to

personally represent FO Meadows in his individually filed ADA lawsuit against American

Airlines. The objective was to put a set of professional eyes on Meadow's filings as he had up

to then primarily been representing himself pro-se. Sue Edwards was trusted by the MDD pilots

and had recently achieved a win for APA in a prior lawsuit against the FAA for the wrongful

termination of one of our pilots for being improperly notified of a drug test. I felt that to truly

succeed in court he would need professional guidance. Victory in court would hopefully

persuade AA to drop its obstruction to reinstating our MDD pilots and result in the mutually

beneficial outcome to both our pilots and the company.  As President and the primary fiduciary

of the APA, the reason I gave to the Board of Directors and legal counsel for this expenditure

was that I had reached an agreement with Meadows that he would drop the lawsuits against

APA if the union put the bulk of its collective resources behind what was increasingly

becoming an individual fight. Meadows had originally agreed to this "quid pro quo", but when

it became clear to him that he would have to drop his claims against APA before he would

receive surety that his claims for reinstatement as a pilot against AA would succeed he reneged

and declined to drop his claims against APA.  When this occurred I directed Ms. Edwards to

terminate her representation of Meadows.

27.     Furthermore, on or about June 13, 2024, I directed the APA Director Of Grievances, Tricia
        Kennedy, to move FO Meadows' individual Grievance 12-011 forward and schedule it for an
        arbitration hearing. To my knowledge, that grievance was still open, active, and in the queue
        for a an arbitration hearing at least until I left office on October of 2024. Text messages
        between myself and Tom Remper attached hereto as **Exhibit J.**

28.     On or around late September 2024, I was presented with a proposed settlement agreement
        with American Airlines concerning Grievances 12-012 and 23-031. That proposal would have
        reinstated several other MDD pilots, some out on disability for much as 24-years, but explicitly
        excluded FO Meadows, despite the fact he was holding an FAA Airman's First Class Medical
        Certificate and working as current and qualified B-777 Captain and Instructor pilot in Boeings
        Miami Flight Training Center. I refused to sign because it was a "go-no-go decision point" to
        leave any pilot behind. I truly felt that to have continued the fight to this point and finally
        settle by letting the company decide who to reinstate and who to refuse would have left this
        issue unresolved, thus resulting in returning right back to where we started.

29.      In late 2024 and after an internal battle with my Board of Directors over the possible
        merger of our union with the Air Line Pilots Association (ALPA), a merger which I was
        adamantly against, I was removed from office by the Board of Directors. The Board of
        Directors was able to install another President they were allowed to choose due to the short
        remaining time left on my tenure. The replacement they chose, FO Nick Silva, had never served
        in a membership elected position and had very little experience, particularly dealing with APA
        grievances or its legal department. He had only served as a costing analyst on the negotiating
        committee. He summoned me down to APA to discuss the handoff from one President to the
        next. Despite the fact that there were hundreds of issues in play at the time, such as staff issues,

12

IT upgrades. problems with AA's Safety program and the FAA oversight of the airline, etc. etc. all Nick wanted to discuss was the issue of Larry Meadows. This was a huge surprise to me and indicative of how much pressure he was under by the APA legal department to fold on APA's advocacy for Meadows and the grievances I had filed as President. The question he dwelled on for most of the 45' he had scheduled for me was "Why wouldn't you approve the proposed MDD settlement by removing Larry Meadows?"

30.     I have since learned that on January 15, 2025, the new APA President FO Silva executed a settlement that finalized the exclusion of FO Meadows and falsely claimed that his individual Grievance 12-011, the very same grievance I had ordered to arbitration months earlier, was now being declared "closed since 2013." A copy of this January 15, 2025 Grievance 12-012/23-031 Settlement are attached hereto as **Exhibit K.**

31.     I have also been informed by FO Meadows that on or around May 1, 2025, the current APA President Nick Silva, terminated Meadows 34-years of APA membership via a letter, in response his request to speak during membership guest hour at the 2025 Spring Board of Directors Meeting,  A copy of this correspondence is attached hereto as **Exhibit L.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of January, 2026.

Captain Edward F. Sicher
MIA/777/International

## EXHIBIT A



**ALLIED PILOTS ASSOCIATION**

O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX 76155-2512  •  817.302.2272  •  www.alliedpilots.org

May 22, 2012

VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED # 7011 0470 0000 9113 1546

Captain John Hale
Vice President Flight
American Airlines, Inc.
P. O. Box 619617  MD851
DFW Airport, TX 75261-9617

     Re:    DFW Domicile Grievance No. 12-012

Dear Captain Hale:

     Pursuant to the May 1, 2003, Agreement ("Agreement"), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

     In accordance with Section 21.F.3 of the Agreement, I hereby elect to waive the Initial Hearing in this matter so that an Appeal Hearing can be held at the earliest possible date.

     In addition, we request that the Company send a copy of all hearing notices and decisions rendered in this case to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512.

                             Sincerely,

Captain Rusty McDaniels                  First Officer Russell Moore
Chairman - DFW                         Vice Chairman - DFW

cc:    Ms. Reagan Heine, AA Specialist HR Ops Support (via Shelley Handman)
       Captain Tom Kachmar, Grievance Coordinator – DFW
       First Officer Neil Roghair, Negotiating Committee Chairman
       Captain Frank McGill, Contract Compliance Committee Chairman
       APA Legal Department (JBB)

## EXHIBIT  B

**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines


O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX  76155-2512  •  817.302.2272  •  www.alliedpilots.org

March 13, 2023

VIA ELECTRONIC MAIL ONLY

Captain Russ Moore
Vice President – Flight Ops
American Airlines, Inc.
P. O. Box 619617 MD851
DFW Airport, TX 75261-9617

      Re:    Conversion of DFW Domicile Grievance No. 12-012 into Sicher Expedited
             Presidential Grievance No. 23-031

Dear Captain Moore:

      On May 22, 2012, the DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's violation of Sections 11.D, Supplement F(1), all other related sections of the Agreement, and past practice for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide notice prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. The Initial Hearing was waived, and the grievance is pending at the Vice President - Flight Appeal Hearing level.

      The APA hereby converts DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance No. 23-031. In accordance with Agreement Section 21.D.3., I hereby submit this grievance directly to the System Board of Adjustment. Moreover, I respectfully demand expedited arbitration of this grievance in accordance with Agreement Section 23.

      I request that the Company send a copy of all hearing notices and decisions relating to this grievance to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, Texas 76155-2512.

                        Sincerely,

                        Captain Edward F. Sicher
                        President

cc:    APA National Officers and Board of Directors
        Captain John Owens, Chair, APA Negotiating Committee
        Captain Jason Saxer, Chair, APA Contract Compliance Committee
        Captain Tracy Parrella, Chair, Grievance Resolution Committee Ad Hoc
        Captain BJ West, Member, Negotiating Committee
        APA Legal Department (TEK/GD/JK)
        Miranda Rosenthal, Esq., Managing Director Labor Relations (via Michelle Montgomery)
        Ms. Michelle Montgomery, Senior Manager Labor Relations

**EXHIBIT C**

# Union Democracy Review

No. 204        Published by the Association for Union Democracy

 *Member Discussion Board closed off with No Explanation:*

 ## 233 Disabled Pilots Barred from Allied Pilots Association website

By Kurt Richwerger

Without explanation or warning, on April 22nd, 2014 the Allied Pilots Association (APA), the collective bargaining agent for all 10,000 American Airlines (AA) pilots, locked out 233 of its members - all of whom are medically disabled - from what is called the "challenge and response (C&R)" section of the APA website. C&R is a members-only discussion forum. The 233 pilots are all classified by the APA as "MDD" or medically disabled and dropped from the seniority list. AA policy is that after 5 years of disability members lose their seniority. This policy has been the subject of an ongoing dispute between the APA and its disabled pilots, and many pilots wish the APA to grieve the policy on grounds that it violates the CBA and the Americans with Disabilities Act (ADA). Regardless, MDDs have always been classified as members in good standing by the APA, but now have been prevented from entering what APA calls its "virtual union hall."

The lockout, according to some disabled pilots, is meant to prevent them from discussing the allegedly poor treatment of disabled pilots by the APA and by American Airlines (AA). According to one pilot, an active website discussion began with a member's posting of a press release regarding a March 2014 lawsuit against AA brought by Lawrence Meadows, one of the AA disabled pilots. The lawsuit, filed in federal court, accuses AA of violating the employee whistleblower protections of the Sarbanes Oxley Act by retaliating against Meadows and terminating him after Meadows informed AA of suspected fraud in its cost savings program scheme to terminate pilot disability payments funded by AA pension plans.

Disabled members began commenting and posting on C&R and told their own "horror stories," in the words of one disabled pilot, stories which did not paint the APA in a very favorable light.

| Inside Stories | | | |
|---|---|---|---|
| New book by Bill Barry | 3 | IAM election protest | 5 |
| NLRB win for carpenter | 3 | Where we stand | 5 |
| Oppression in the AMO | 4 | AFGE election | 6 |
| IBEW campaign | 5 | UBC free speech case | 8 |

June/July 2014

Meanwhile in mid- April 2014 Meadows requested that APA represent him in a seniority reinstatement grievance hearing and APA refused; he responded to the APA legal department that he would file EEOC disability charges against APA and would advise others to do the same. Two hours later, he and all other 233 MDDs were locked out of the website.

Meadows' Sarbanes Oxley lawsuit provides some background and context for the above events. It alleges that AA targeted him in a fraudulent "cost-savings" initiative, as American faced the threat of bankruptcy and its pension obligations were badly underfunded.

The lawsuit alleges that in 2004 Meadows, at that time a 13-year APA member and pilot, became disabled and began receiving disability benefits as his application was approved by the AA Medical Director. In the 2004-07 period when he received benefits, Meadows attempted to get clearance to return to work twice, but was unable to obtain a required FAA medical recertification to fly for AA due to his condition. In fact, regular medical updates of his condition, required under the plan, found it worsening, reflected in AA records.

But despite his worsening condition, he was suddenly terminated from disability benefits in December 2007 – not even told of this termination by AA - checks just stopped coming. Meadows appealed the loss of disability status to the AA's Pension Benefits Administration Committee (PBAC). PBAC had hired an outside party, "Western Medical Evaluators" (WME), to review such appeals. The WME review concluded that Meadows' claim be denied in 2008. But, Meadows learned from his 2010 ERISA lawsuit against AA that WME was not really a third party clinical source as required by the CBA, but rather a small worker's compensation claims processor that had a history of falsifying claims and records, and in fact WME was permanently shut down by the Texas State Insurance Board in 2010 for fraudulent practices. In discovery during his ERISA suit, WME could produce no medical records that they relied upon in conducting their peer review of Meadows' case.

Meadows' ERISA lawsuit also revealed the AA "cost savings program," which tracked some 84 disabled pilots including himself in a spreadsheet, and he was one of five designated for "cost savings." APA also challenged the PBAC review process in a 2009 lawsuit and the clinical review was moved to the Mayo Clinic.

continued on page 2...



FIRST AMENDED COMPLAINT

# Disabled pilots <span>continued from page 1...</span>

The suit continues: after denial of benefits Meadows was placed on unpaid sick leave and told he had to return to full time pilot work by getting medical clearance. He applied again for the FAA clearance to return to work but was again denied due to his condition. But instead of returning to disability status, Meadows was kept on unpaid sick leave. The 2010 ERISA lawsuit meanwhile went to federal mediation and in the process Meadows revealed the use of WME and the existence of the fraudulent cost savings initiative to AA's corporate directors and AA's legal counsel, and told AA that his lawyers were intending to bring additional actions. Meadows was then told by AA he had exceeded AA's sick leave maximum of five years and threatened with termination – odd, because Meadows had already exceeded that policy by three and a half years and was never threatened with termination. The AA Reasonable Accommodation Policy requires that if a disabled pilot cannot obtain FAA clearance to fly an aircraft he may request a reasonable accommodation in another craft or class so Meadows requested an accommodation in one of AAs non flying pilot positions -- which would have kept him in the CBA , kept his seniority and eligibility for benefits, but he was refused. Meadows was terminated in 2011, after refusing to accept an accommodation outside of the CBA, which would have inferior status and benefits and prevented him from ever returning to work as a pilot.

The suit asks for relief in the form of a new assignment to a position in the bargaining unit with full wages commensurate with his seniority status and suggests three possible positions. It also asks for reinstatement of his benefit package, back pay and lost benefits. It also asks for a money sum for "intentional infliction of emotional distress" which the suit alleges has led to a significant exacerbation of Meadows' condition, and asks for attorney fees.

After Meadows' press release appeared on the C&R portion of the APA website, another disabled pilot, Kathy Emery, posted a document in which she alleges she was also the target of the AA cost savings plan. Like Meadows, her disability benefits were unex-

pectedly discontinued, she had been receiving disability pay ments for several years and a doctor selected by AA provide updates to AA on her condition. But in Jan. 2007 she was stripped of all disability benefits without notice, just around th time Meadows lost his benefits.

Emery describes in her posting that like Meadows, she exercise her right to appeal the loss of her disability to the AA PBAC an suffered the same fate -- WME denied her appeal. After he appeal was denied she was placed on unauthorized leave o absence and told to appear at a hearing. The hearing officer direct ed her to obtain a First Class Medical Clearance so she could go back to work. But soon after, she was told by the same AA Medical Director that had stopped her disability payments, that he would not give her such clearance but suggested she might be given a "reasonable accommodation" "stapling papers."

Like Meadows, Emery then filed an ERISA suit against AA in federal court in Florida. Her ERISA case unearthed the same fraudulent practices by WME that allegedly took place in Meadows case.

But Emery has issues with APA that Meadows did not. Emery and APA filed a grievance against AA in December 2007 but it was not settled and she is still awaiting an arbitration date. Emery was also entitled to disability benefits under the APA disability plan. So in 2003 she filed for benefits. No payments were received for five years. She filed another ERISA suit this time against the APA , and won a settlement of $48,000 from a federal court for the back years.

But there is even more to Emery's dispute with APA. Emery alleges she received far less than her fair share of the AA "Equity Distribution," which has become the basis for her EEOC complaint against APA. In the formation of the new American Airlines, AA pilots were given a 13.5 percent equity stake, as pilots became part owners of the new AA. Emery received an award estimated at $23,000, but similarly situated male pilots who had also been "terminated" received 5 to 6 times that amount. The reason: male pilots that had been "terminated" filed grievances that were given a presumption of likely success – thus they were held to be still on "active status." Emery alleges disparate treatment when her grievance was not given the same presumption, so she was not treated as "active" resulting in a much lower share of the equity. Emery also alleges in her complaint that the APA discriminated against other disabled pilots in the equity distribution.

Both Emery and Meadows are exploring ways to remove the website lockout.

**No. 204** — June/July 2014
Published by:
Association for Union Democracy
104 Montgomery Street
Brooklyn NY 11225
www.uniondemocracy.org
Phone (718) 564-1114
Email:info@uniondemocracy.org



Miriam Lazewatsky, Editor
Kurt Richwerger, Executive Director

**Subscription rates:** regular $30; institutions/foreign: $40; low income/student/retired: $15. (Additional contributions to AUD are tax deductible.)

Union Democracy Review aims to promote the principles and practices of internal union democracy in the North American labor movement. Toward this end, it makes its pages available for discussion.

## **EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  14-80518-CIV-HURLEY

KATHY E. EMERY,

       Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

       Defendant.

_____/

### ORDER CONTAINING FINDINGS OF
### OF FACT & CONCLUSIONS OF LAW

       Certain aspects of the employment relationship between American Airlines, a major commercial air carrier,  and its pilots form the background to this case.  The dispute at issue, however, involves  a policy promulgated by the pilots' union, the Allied Pilots Association.  The policy denies a minority of disabled pilots, who are inactive members of the union  and are referred to as  "MDD" (medically disabled dropped) pilots, access to "Challenge & Response," a website chat room maintained by the union.  For reasons that will be apparent, the Court concludes that the union's policy violates the union member's "bill of rights" contained in the Labor-Management Reporting and Disclosure Act,  29 U.S.C. § 411(a)(2).

       Based upon the testimony and evidence presented, the Court makes the following

### FINDINGS OF FACT

1.  American Airlines ("American" or "the airline") has approximately 15,000 pilots

1

a comment on C&R, the software listed the writer's name above the term "Member." However, when an MDD pilot posted an item on C&R, the software listed the writer's name above the term "Anonymous."

17. The status of MDD pilots within the APA was not resolved conclusively until June 30, 2016, when APA President Keith Wilson issued a written "presidential constitutional interpretation" indicating that MDD pilots are inactive members of the APA. Def. Ex. 16.

18. American declared bankruptcy in November 2011. Prior to this time, MDD pilots had begun to complain vigorously about the airline's imposition of unduly stringent reviews of their entitlement to disability benefits. Also, they often voiced the criticism that the APA was not taking sufficient steps to protect their benefits.

19. As a result of the airline's bankruptcy, a new collective bargaining agreement was negotiated between American and the APA. In exchange for various concessions, American granted a 13.5% equity share in the ownership of the airline to the members of the APA. Furthermore, the APA was given the authority to distribute the equity among its members. Suffice it to say this proved to be a major bone of contention between the APA and some MDD pilots who received lesser amounts than active pilots.

20. Tension between MDD pilots and the APA grew in the post-bankruptcy period. This is evidenced by posts on C&R. For example, Plaintiff Emery posted this comment on April 7, 2014:

> I am one of the pilots who was stripped of disability benefits when AA implemented the "disability nurse case management and cost savings program." Even though I was not on disability more than 5 years and still have sick time, I was also stripped on my seniority number and according to the APA terminated, (while awaiting

6

scheduling of my arbitration) which was submitted to the System Board by Loyd Hill [in] 2009. Anyone know what the average time to have an arbitration scheduled? . . . I still have not received any positive feed back from my January 23rd meeting with APA and my request to have APA form a disability committee make (sic) up of disabled pilots.

Steven Salmirs, a non-MDD pilot, posted this comment on April 22nd, 2014:

Don, Thanks for posting this and keeping it alive. It is something the membership needs to know about their union that when the time comes when they need help, the union will arbitrarily ignore you and actually work against you WITH management. Unheard of but there you are . . . I hope Larry is successful in his court cases.

On the same day, Larry Meadows, an MDD pilot, posted the following comment:

Don, I see you posted last week's news story that ran on April 15th about my SEC-Whistleblower Complaint under another thread. I don't know how you find all this stuff but thanks for posting it, and informing the membership. I'm going to repost it here (in-line text below), as that story directly related to this thread.

[Mr. Meadows reprinted the following assertions from his pending law suit.]

American knowingly failed to pay many of its pilots their otherwise rightful long-term disability benefits, which amounted to well over a 100 million dollars of obligations under its defined benefit pension plans. . . . American's Medical Department implemented the Nurse Case Management Pilot Disability Cost Savings scheme . . . . This scheme targeted the most costly pilot claimants by prematurely terminating their long-term disability benefits.

Ptf. Ex. 25.

21. The APA's board of directors held its spring meeting on April 22, 2014. By this time, American had emerged from two years in bankruptcy and had merged with U.S. Airlines. The APA was confronting a host of difficult issues including significant changes in the collective bargaining

agreement and the task of integrating the two airlines' seniority lists. Captain McDaniels explained,
"There had been major changes in our contract. Many of the changes were in dispute . . . and not
being implemented as we believed they were supposed to be implemented." Trial Tr. vol. 1, 146.
In the midst of these discussions, as the board was about to take a short recess, one member drew
the board's attention to recent comments posted by MDD pilots on C&R. In response, Captain
McDaniels reviewed the Acceptable Use Policy and pointed out that MDD pilots were not listed as
permitted users. He urged the board to enforce the policy as written. The board acceded to this
suggestion and directed Captain McDaniels, the chairman of the IT steering committee, to implement
the board's decision.

22. The APA's 2007 Acceptable Use Policy for Challenge & Response was intentionally
confirmed in April 2014 to exclude MDD pilots. While the Court finds that the board member who
raised the topic of the MDD pilots' postings was likely motivated by a desire to silence a group he
viewed as combative and litigious, his motivation cannot be ascribed to the board as a whole.
Rather, the Court finds the following testimony of Captain McDaniels to be credible and worthy of
belief. He explained,

> I looked up what the [Acceptable Use Policy] was to see what it said,
> and we quickly . . . saw . . . only active members, furloughs and
> retirees . . . are supposed to be on C&R. The board more or less – the
> concept was, okay, fine, this [Acceptable Use Policy] is not being
> enforced by the IT department, somebody go tell the IT department
> to fix the programming, and we are done and moving on. We have
> other things to talk about.
>
> I don't think we spent three to five minutes in casual conversation on
> it. From the board's standpoint, it never should have come up as a
> subject, it was an administrative programming glitch even to allow it

8

around the country to attend local union meetings, all lack the ease. spontaneity and scope of C&R.

While not designed to do so, the APA's policy of denying MDD pilots access to C&R acts to silence criticism of the union's management by a discreet minority of disabled members. Inasmuch as the evidence in the record fails to establish that the APA's policy can be justified under the second clause in § 101(a)(2), it is

**ORDERED and ADJUDGED**  the APA's policy of denying MDD pilots access to Challenge & Response constitutes in an impermissible infringement on Plaintiff's right to free speech guaranteed by LMRDA. Therefore, the Court, by separate order, will issue a mandatory injunction requiring the Defendant Allied Pilots Association to grant Plaintiff Kathy E. Emery access to Challenge & Response.

**DONE and SIGNED** in Chambers at West Palm Beach, Florida, this 4th day of January, 2017.

Daniel T. K. Hurley
United States District Judge

cc: Copies provided to both parties.

18

**EXHIBIT E**

# BAAB & DENISON, L.L.P.

G. William Baab*
Sanford R. Denison*

L. N. D. Wells, Jr.
(1914  2000)

ATTORNEYS
6301 GASTON AVE, STE 550
DALLAS, TEXAS 75214

*Board Certified
Labor and Employment Law
Texas Board of Legal Specialization

Tele: 214-637-0750 • Fax: 214-637-0730
denison@baabdenison.com

December 12, 2016

Mark R. Myers
Attorney
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Fort Worth, Texas 76155-2512

Re:     Duty of Fair Representation to Former Pilots Who Have Fallen off the Seniority List and
        Been Terminated by the Company Because of the Expiration of their Contractual
        Disability or Sick Leave

Dear Mark:

        This letter is in response to your request for our opinion as to whether APA owes a duty of fair
representation, and, if so, the nature and temporal extent of that duty, with regard to pilots who have
fallen off, or will fall off, the seniority list, and who thus have or will be terminated from their AA
employment, by operation of Section 11.D and Supplement F(1). §5(d).

        Specifically, you have advised that APA has a group of former pilots who have fallen off the
seniority list (and thus are no longer employees of AA and are no longer in the class or craft of
represented employees) as a result of the operation of two sections in the CBA: First, under Section 11.D,
a pilot is allowed to take a 3-year unpaid sick leave of absence (which can be extended to 5 years by
mutual agreement between APA and AA) at the expiration of which leave the pilot is automatically
dropped from the seniority list and terminated.  Second, under Supplement F(1), §5(d), until a recent
amendment which went into effect September 30, 2016, a pilot who was on long-term disability leave was
also automatically dropped from the seniority list and terminated at the expiration of 5 years of disability
leave. Under both provisions, the pilots are automatically dropped without the need for any formal
hearing. These two CBA sections have been in the CBA for decades and have never been contested by
APA.

        You have further advised that Supplement F(1), §5(d) was recently amended by a LOA signed
on October 19, 2016, as a result of which no additional pilots will be dropped from the seniority list under
Supplement F(1), §5(d) effective September 30, 2016. Thus, a pilot on disability leave who has already
hit the 5-year mark prior to September 30 will have fallen off the seniority list, but a pilot on disability
leave who hit, or will hit the 5-year mark on or after September 30 will no longer be dropped from the
seniority list and will retain AA employee status. Section 11.D. remains unchanged, such that a pilot who
is on sick leave - as opposed to disability leave - will still be dropped from the seniority list and
terminated at the expiration of the applicable 3 or 5 year period on which the pilot remained on sick leave.
You have advised that in the negotiations which led to the amendment of Supplement F(1), §5(d) that the
APA negotiating committee proposed that the elimination of the 5 year limitation on disability leave be
applied retroactively, such that pilots who have previously been dropped from the seniority list and
terminated by operation of that section would be reinstated. However, it was the Company's position that
it would only agree to elimination of the 5 year limitation on disability leave for pilots who have not

PREITZ003348

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 2

reached the 5 year mark as of September 30, 2016. Similarly, APA proposed in those negotiations that the
3 year limitation (or as may be applicable the extended 5 year limitation) on sick leave in Section 11.D.
also be eliminated. However, the Company would not agree to any modification of that provision, even
prospectively with regard to pilots who would hit their 3 or 5 year mark on sick leave on or after
September 30, 2016.

With regard to pilots who in the past have fallen off the seniority list and been terminated by AA
as a result of operation of either Section 11.D or Supplement F(1), §5(d), you have advised that former
pilots who subsequently regain their first class medical certificate are often reinstated to their AA
employment and to their relative position on the seniority list as if they had never been dropped. This is
an extra-contractual practice, which the Company reminds APA each time it occurs is on a no-cite, no-
precedent and case-by-case basis. You have advised that APA has always supported pilots seeking
return, but that the Company has not always agreed to bring them back. While there is no contractual
basis for APA to force or grieve the Company's decision, you have advised that the APA Board has
adopted resolutions which set forth APA policy with respect to former pilots who seek reinstatement by
AA and restoration of their seniority. Specifically, you have advised that the APA Board has passed
resolutions R3006-61 Rev.1, adopted on November 4, 2006, and R2014-07 Rev.1, adopted on March
2014, which set forth APA policy when a pilot who has regained his first class medical certificate, but
who has already fallen off the seniority list and been terminated as a result of the operation of either of
these two CBA provisions, petitions the APA for support of his request to AA for reinstatement to his or
her employment and original relative AA seniority number.

**Questions Presented:**

With regard to pilots who have already dropped off the seniority list and been terminated as a
result of the operation of Section 11.D. or Supplement F(1), §5(d), you have advised that a question has
arisen as to what duty, if any, is owed to those former pilots to advocate for their return, or to advocate on
their behalf with the Company on any issue.

A secondary question is whether, if no duty exists, does APA voluntarily assume a duty if it
makes promises to the pilots or makes efforts on their behalf to seek their return? Do these voluntary
actions expose APA to any DFR liability?

**Answers:**

To answer these questions one must begin by examining the case law with regard to whether a
union owes a duty of fair representation to former employees who were, but are no longer members of the
applicable bargaining unit, or to persons who are otherwise outside the bargaining unit. A union
obviously has a duty to represent former employees who were members of the bargaining unit with
respect to their rights which accrued under the contract prior to their termination, such as would be the
case with an employee discharged without just cause in violation of the CBA or an employee denied post-
termination some right or benefit accrued under the CBA. However, as discussed in section "I" below, the
law is settled that, in general, a union only owes a duty of fair representation to those currently employed
in the bargaining unit which the union is certified to represent.

**PREITZ003349**

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 3

This general rule, however, has two exceptions. First, as noted above, a union has a duty to represent former employees as to their previously accrued rights under the CBA. Second, as relevant here, a duty of fair representation can be imposed with regard to former employees when a union by its conduct assumes an obligation to represent those outside, or no longer employed within the bargaining unit, or undertakes functions beyond its duties as the exclusive representative of the bargaining unit. This exception is discussed in section "II" below.

In short, in answer to the questions presented, it is our opinion, based on this case law and the facts presented, that as a general proposition APA has no statutory duty to represent former pilots who have been dropped off the seniority list and terminated by AA by operation of Section 11.D. or Supplement F(1), §5(d) with respect to any issue other than contract rights which accrued prior to their termination. However, having said that, APA has arguably assumed a limited duty, beyond its statutory duty as certified bargaining agent, to represent such former pilots with regard to their efforts to seek reinstatement in accordance with APA policy as set forth in the two above referenced Board resolutions and its past practice of assisting such pilots in their extra-contractual efforts to secure reinstatement by AA upon their regaining their first class medical certification.

We do not believe however, that such assumed duty would include the requirement that APA *must actually negotiate* contractual reinstatement rights for such former pilots. Moreover, even assuming APA had a duty to *seek to negotiate* contractual reinstatement rights for such former employees (as distinct from any duty that APA actually negotiate such reinstatement rights), APA has already discharged that duty by proposing in negotiations the elimination of the temporal leave limitations on sick and disability leave of Section 11.D. and Supplement F(1), §5(d), and proposing that such elimination be applied retroactively to former pilots who have already been dropped from the seniority list.

The duty of fair representation does not mandate that a union obtain an employer's agreement to that to which the employer will not agree, only that in the conduct of negotiations the union take positions which are not arbitrary, capricious or in bad faith. See *Vaca v Sipes*, 386 U. S. 171, 190 (1967); *O'Neill v. ALPA*, 939 F.2d 1199, 1203, (5th Cir. 1991); and *McCall v. Southwest Airlines Co., et. al*, 661 F.Supp.2d 647, 654 (N.D.Tex. 2009).

Therefore, while APA's efforts to support and assist such former pilots, who are no longer members the bargaining unit and for whom there is this no statutory duty to represent, to obtain reinstatement may impose an assumed duty on APA, and thus the potential for DFR liability, such duty would be limited to acting in a manner which could not be construed as arbitrary, discriminatory, or in bad faith in relation to APA's actions in "representing" a former pilot who petitions APA for support and assistance in securing reinstatement of his or her AA employment and seniority. *Id*. In other words, APA could not refuse to assist or support a former pilot in his or her reinstatement efforts based on arbitrary, discriminatory, or bad faith factors or in the course of assisting or supporting such former pilot to secure reinstatement provide such assistance or support in an arbitrary, discriminatory or bad faith manner. This limited duty of support and assistance to former pilots with their efforts to secure reinstatement with the Company would not require that APA become an advocate on behalf of these former pilots with respect to any other matters beyond those which arose or which involve rights already accrued under the CBA prior to their terminations.

PREITZ003350

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 4

### I.  The Duty of Fair Representation, as a General Rule,  Does Not Extend to Those Who Are Not, Or Are No Longer, Members of the Bargaining Unit

As noted in our November 17, 2016 opinion memo regarding APA's duty of fair representation in the context of resolution of the issue of whether the Supp C narrowbody fence remained in effect, APA's duty of fair representation extends, as a general rule, only to those pilots who are current members of the bargaining unit. (*i.e.*, the craft or class of AA pilots on the current integrated seniority list).

In Bensel v. APA, et al., 387 F.3d 298, 312-15 (3rd Cir. 2004) the Third Circuit, citing Humphrey v. Moore, 375 U.S. 335 (1964), stated that "[a] union has the statutory duty to represent all members of the appropriate bargaining unit fairly [but that] [t]he scope of the duty … is commensurate with the scope of the union's statutory authority as the exclusive bargaining agent." Id. at 312. As such, the Court concluded that "[c]onversely, the union's statutory duty of fair representation does not extend to those persons who are not members of the pertinent bargaining unit." Id. On that basis, the Court went on to hold that until such time as APA was certified as the exclusive bargaining agent for the pilots of TWA-LCC it owed them no duty and that, therefore, APA's duty was "to protect the interests of American's pilots, for whom APA did have a statutory duty to fairly represent." Id. at 314. See *Barnes v. Air Line Pilots Ass'n*, 141 F. Supp. 3d 836, 844 (N.D. Ill. 2015) ("the DFR attaches only to those employees for whom the union serves as the exclusive bargaining representative.")

Accordingly, as analogous to whether APA has any duty to former APA pilots in general, with regard to retired employees, it has long been held that the duty of fair representation in contract negotiation and administration generally does not extend to retirees, who are once members of the bargaining unit prior to their retirement. The seminal case on this point is *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971). In *Allied*, the Court stated that "[s]ince retirees are not members of the bargaining unit, the bargaining agent [ *i.e.*, the union] is under no statutory duty to represent them in negotiations with the employer." *Id.* at 181 n. 20. Put another way: "A union's statutory duty of fair representation traditionally runs only to the members of its collective-bargaining unit, and is coextensive with its statutory authority to act as the exclusive representative for all the employees within the unit." *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n. 22 (1984); *see also In re UAL Corp.*, 468 F.3d 456, 459 (7th Cir. 2006) ("A union's duty to bargain collectively on behalf of the members of the bargaining unit that the union represents does not extend to retired workers, because they are not members of the unit.") and *Santiago v. United Air Lines, Inc.*, 2012 WL 3583057 (N.D. Ill. Aug. 17, 2012) (union had no duty to represent retired flight attendant regarding United's changes to its travel policy which allegedly benefited current employees at the expense of retirees).

Similarly, as a general rule, courts have held that, as with retirees, a union has no duty of fair representation with regard to managers, supervisors, nonemployees, or others who are outside the bargaining unit. *Karo v San Diego Symphony Orchestra Assn.*, 762 F.2d 819, 821 (9th Cir., 1985) ("If a union owes no duty of fair representation to retired employees of the bargaining unit it follows that no such duty would be owed to one who never was a member of the unit. Because the union owed no duty to Karo as a nonemployee of the bargaining unit, he lacks standing to sue for breach of such a duty.") *Cooper v. General Motors Corp.*, 651 F.2d 249, 250 (5th Cir. 1981) (union owes no duty to supervisors who were formerly members of bargaining unit).

PREITZ003351

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 5

### II. While it is the General Rule That a Union Owes No Duty of Fair Representation to Those Outside the Bargaining Unit, If a Union Voluntarily Undertakes the Representation of Those Outside the Bargaining Unit, the Duty of Fair Representation May Attach

However, if a union undertakes the representation of those outside the bargaining unit or takes on functions beyond its duties as the exclusive representative of the bargaining unit, along with the assumption of those functions and representation comes the obligation to carry out those functions and representation consistent with the duty of fair representation. *Barnes v. Air Line Pilots Ass'n*, 141 F. Supp. 3d 836, 844-45 (N.D. Ill. 2015); *Diaz v International Longshore and Warehouse Union Local 134*, 74 F.3d 1202, 1205 (9th. Cir, 2007).

In *Barnes* management pilots alleged that ALPA owed, and breached, a duty of fair representation to them with respect to collective bargaining negotiations with United in general and specifically on an issue of retro pay. While noting that "the DFR attaches only to those employees for whom a union serves as the exclusive bargaining representative", *Barnes*, 141 F. Supp. 3d at 844, based on record evidence that ALPA arguably led the management pilots to believe that ALPA was representing them by having negotiated specific contract provisions applicable to management pilots and by accepting dues and contract maintenance fees from the management pilots, the Court held that the issue of whether ALPA owed a duty of fair presentation to the management pilots could not be resolved on a Rule 12( c) motion to dismiss. Based on those facts the *Barnes* court concluded that "a reasonable observer could find that ALPA, through both omission and commission, conveyed to the management pilots that it was negotiating on their behalf and representing their interests in the retro pay allocation, even if it was not legally required to do so." *Id.* The *Barnes* court, as authority for its conclusion that a union, by its conduct assuming the representation of those who are not members of the bargaining unit and for whom the union had no statutory duty to represent, could nevertheless become subject to the to the DFR with respect to such assumed representation, cited the following authority:

> *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538 , 540 (7th Cir. 1997) ("Although a union has no duty to represent retirees, and retirees need not submit to union representation, retirees are free to make a union their agent if they so choose. And, of course, retiree benefits are a permissive subject of bargaining— a union may bargain for retirees if the employer agrees.").

> . . . .
> . . . *Rossetto*, 128 F.3d at 538 (holding that a DFR can attach to a union acting as the representative of retirees even though retired workers are not covered under the RLA). *Foust v. Int'l Bhd. of Elec. Workers*, 572 F.2d 710 , 717 (10th Cir. 1978) ("[h]aving undertaken to act affirmatively on behalf of [the plaintiff], the Union is precluded from escaping responsibility by asserting that" the plaintiff should not have "depend[ed] on" the union); *Nedd v United Mine Workers of Am.*, 556 F.2d 190 , 200 (3d Cir. 1977) ("While *Chemical Workers v. Pittsburgh Glass*[, 404 U.S. 157 , 92 S. Ct. 383 , 30 L. Ed. 2d 341 (1971),] held that future retiree benefits were not the subject of mandatory collective bargaining, it also recognized that such benefits were a permissive subject of bargaining. When the Union elects to undertake such bargaining, the union's duty of fair representation must apply. ... The Union need not have done so, and if it had not, the pensioners would have had a remedy against the employers for any delinquencies. But

PREITZ003352

## EXHIBIT F

*Disposition: Adopted 19-3-0-0 on 12/13/2016*

R2016 – 30 Rev 1          SOURCE:     MIA          FOR            19
BOD MTG:                                             AGAINST        3
06/07-09/2016                                        ABSTAIN        0
                                                     ABSENT         0

Title:   Supplement F and Section 11.D.1. - Negotiating Committee Tasking

Presented by:   CA Ed Sicher          Seconded by:   CA Billyray Read

Policy Manual: _____   Cons. & Bylaws: _____

1      **WHEREAS,** the three separate contracts prior to the merger of US Air East, America West,

2  and American Airlines treated disability retirements differently; and,

3      **WHEREAS,** the JCBA Supplement F. (1) 5. (d) and Section 11.D.1 adopted the most

4  restrictive of the three, the American Airlines contract, which has been subjectively reinterpreted by

5  the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous

6  disability; and,

7      **WHEREAS,** the former U.S. Air East contract allowed disabled pilots to remain on the

8  seniority list until they reach the federally mandatory retirement age for pilots; and,

9      **WHEREAS,** the former America West contract effectively removed pilots from the seniority

10  list for retirement disabilities longer than eight (8) years without a provision to be reinstated in the

11  event that pilot should ever regain his or her Class A medical; and,

12      **WHEREAS,** the merging of the seniority lists is creating a disparate treatment amongst the

13  individual pilot groups; and,

14      **WHEREAS,** the most beneficial treatment of all of our disabled pilots is to allow them

15  reinstatement from long-term disability in as expeditious and fair a manner as possible; and,

16      **WHEREAS,** there has been some evidence indicating that the company has unfairly

17  withheld reinstatement to long-term disabled pilots who have regained their Class A medicals from

18  being reinstated if they were considered problematic employees; therefore,

R2016-30 Rev 1                                                                    1

19   → **BE IT RESOLVED,** that the Negotiating Committee expeditiously engage the company in

20   in negotiations which seek to:

21       1.   Modify the language in the JCBA Sup F. (1) 5. (d) Disability Retirement and

22           Section 11.D.1 so that it will not prevent a pilot from retaining and accruing

23           seniority after a disability period of more than five (5) years commencing at the

24           expiration of the pilot's paid sick leave and thus results in effectively removing

25           the pilot from the seniority list;

26       2.   Negotiate language which allows pilots with long term disabilities from being

27           removed from the seniority list until they reach the federally mandated retirement

28           age for pilots;

29   → 3.   Negotiate contractual language that provides for the immediate reinstatement and

30           return to the Pilot System Seniority List of all pilots who are currently out sick or

31           on disability and who have been removed from the seniority list as a result of the

32           provisions previously contained in the respective contracts, and;

33       4.   Prevent the further removal of pilots from the Pilot System Seniority List as a

34           result of sickness or disability until they reach the mandatory pilot retirement age,

35           and;

36       5.   Gather the names of the pilots from the three separate pilot groups that were

37           medically retired due to long-term disability or disabilities and thus removed from

38           their respective seniority lists and include them on the Seniority List Integration

39           currently being negotiated.

**Meadows 015638**

# EXHIBIT G

**APA** ALLIED PILOTS ASSOCIATION
*Representing the pilots of American Airlines* 

O'Connell Building • 14600 Trinity Boulevard, Suite 500, Fort Worth, TX 76155-2512 • 817.302.2270 • www.alliedpilots.org

From:  CA Ed Sicher, APA President

Date:  September 2, 2022

Re:  Presidential Constitutional Interpretation, Inactive Member Standing

The Allied Pilots Association Constitution and Bylaws (C&B) gives the President the authority to "enforce" the C&B and issue "written interpretations" thereof.  *See* Article IV, Section 8.A.3. A question has arisen as to the standing afforded to Inactive Members.

## Article III.2.D

D.  Inactive Membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. Pilots in the following employment statuses shall be eligible for inactive membership: *(06/07/2006)*

1. Furlough
2. Medical or Personal Leave of Absence
3. Military Leave of Absence
4. Pilots not on active flying status with AA concurrently owing back dues. *(02/28/2008)*

Inactive Member. A member in good standing shall automatically be transferred to inactive membership status upon: *(02/25/99)*

1. Being furloughed by the Company.
2. Being on leave of absence from the Company thirty-six (36) months after the expiration of paid sick leave, or *(11/02/2018, R2018-45 Rev 2)*
3. Being in the United States military forces on continuous active duty in excess of sixty (60) months. *(02/28/2008)*
4. When that pilot is not on active flying status with AA and that pilot owes back dues, that pilot will remain on inactive membership status until he/she returns to work at AA. At that time, he/she will resume payment of back dues and will be returned to active membership. *(02/28/2008)*

## Article III.5.A

### Section 5. Membership Status

A. A member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association. The Secretary-Treasurer shall transfer a member from good to bad standing if such member shall be delinquent in either dues, assessments or other financial obligations due to the Association. A member will be placed in inactive



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500, Fort Worth, TX 76155-2512 • 817.302.2270 • www.alliedpilots.org

membership status by the APA Secretary-Treasurer when that member owes back dues and is not on active flying status. *(03/18/2011)*

## Interpretation

Prior to October 2017, Inactive Members who were members in good standing at the time that they became inactive retained their good standing while in Inactive Member status. Following an arbitration award in the matter of *Meadows v. Wilson*, in which the arbitrator found that Inactive Members have no standing, neither good or bad, a Presidential constitutional interpretation was issued adopting that same position. For the reasons set forth below, I hereby rescind that interpretation and issue the following interpretation:

Article III, Section 2.A of the Constitution & By-Laws provides that "[a] member in good standing shall automatically be transferred to inactive membership status upon the occurrence of one of the specifically identified events therein. Article III, Section 5.A of the Constitution & By-Laws provides that "[a] member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association."

Per Article III.2.A, only a member in good standing may be transferred to inactive membership status. As a result, at the time a member is transferred to inactive status, he or she must be in good standing. Article III.5.A provides that a member in good standing shall remain in good standing "as long as such member has paid current dues, assessments or other financial obligations due to the Association." Inactive Members do not receive compensation from American Airlines and thus do not have any ongoing dues, assessments or other financial obligations to the Association while they are in inactive status.

The C&B clearly provides that an Inactive Member must be a member in good standing at the time he/she becomes an Inactive Member. The C&B further provides that a member in good standing shall retain such standing as long as the member is current on all financial obligations to the Association. Because Inactive Members have no ongoing financial obligations to the Association while in such status, it is my interpretation that under the relevant provisions of the Constitution & By-Laws, Inactive Members, other than those who owed back dues at the time they went into inactive status, retain their good standing while in Inactive Member status.

This interpretation is solely intended to address the issue of standing of Inactive Members and does not bestow or vest any rights or privileges not already provide by the APA Constitution & By-Laws or APA benefit plans.



## ALLIED PILOTS ASSOCIATION

DROPPED REINSTATEMENT AD HOC
BRIEFING TO THE sBoD MAY 2023

# DRC MISSION STATEMENT HIGHLIGHTS…

**APA**

- Allied Pilots Association leaves "no pilot behind"… This committee is tasked with finding avenues of reinstatement for those who have been dropped from the seniority list, by virtue of disability, merger, or other reason, not including retirement or discipline.

- … examine possible avenues for reinstatement, helping to blunt the shortage of pilots we have available to employ, avoid future litigation of APA by its members, and eventually guide the reinstatement of members that have been dropped from the seniority list for reasons other than retirement or discipline.

- … not authorized to interview our in-house counsel…

- In Unity, CA Edward F. Sicher, President, Allied Pilots Association

- Currently, multiple pilots were left behind and await reinstatement
  - For over ten years, despite APA BoD's Resolution to fix it 7 years ago

# LOSS OF SENIORITY IAW THE JCBA

*APA*

## F. Loss of Seniority

### 1. Resignations, Retirement and Discharges

A pilot who resigns from the service of the Company, retires, or is discharged for just cause, shall forfeit all seniority as a pilot.

### 2. Failure to Return from Furlough

When a pilot who has been furloughed is offered, by written notice from the Company, the opportunity to return to duty as a pilot and such pilot elects, by written statement to the Company, not to return to such duty, or if a recalled pilot fails to comply with the requirements of Section 17.W. of this Agreement, his seniority right of preference in re-employment shall at that time terminate, and all his seniority as a pilot shall be forfeited.

### 3. Duration of Recall Rights

A pilot shall retain recall rights indefinitely until refused under 2. above.

### 4. Retention of Company Benefits

Upon return from furlough, a pilot shall receive all Company benefits accruing by reason of his previous active service.

# JCBA, SEC 13, items F of B, ON SENIORITY LOSS ==DOES NOT INCLUDE LTD/DISABILITY==



**B. Seniority Date**

Seniority shall begin to accrue from the date a pilot is first assigned to air line flying duty and shall continue to accrue during such period of duty except as provided in <u>Sections 11</u> and <u>12</u> of this Agreement.

**C. Retention of Seniority**

A pilot once having established seniority shall not lose such seniority except as provided in this Section, nor shall such pilot's relative position on the Pilots' System Seniority List be changed for any reason, including disciplinary action, except as provided in paragraph B. of this Section.

➡ Loss of seniority is "relative position" only under Sec 13.B/C, NOT TOTAL SENIORITY LOSS

4

# SEC 13 REFERS TO SEC 11 ON LEAVES



## D. Sickness or Injury Leaves

1.  When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty. A leave of absence for sickness or injury shall not commence until after a pilot has exhausted

JCBA Rev.1                                    SECTION 11 - 1                                    November 1, 2015

accrued sick leave credits in accordance with Section I0.C.8 of this Agreement. Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years. Length of service for pay purposes shall accrue during leaves granted because of injury on duty, and during the first ninety (90) days of any leave granted for sickness or injury sustained off duty.

2.  A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by seniority upon return to active flying duty.

# SUPP F(1)5(d) REQUIRED FIXING AS WELL

*APA*

(d) A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F only for a period of five (5) years commencing at the expiration of his paid sick leave. In the event such a pilot member recovers and returns to the Company as a pilot, during the five (5) year period in which he has not lost his seniority, his monthly disability pension shall cease. He will again become a participant in the Plan for the accrual of additional Basic and Variable Annuity benefits payable at Normal Retirement Date, subject to the eligibility provisions of the Plan. In the event such a pilot member works for the Company in a capacity other than as a pilot, his pilot benefits shall not be paid while he is employed in such a capacity. However, during such period he shall be eligible to participate in the pension programs applicable to his job category.

6

# FRESH SETS OF EYES ON AGREED UPON SOLUTIONS RELATED TO GRIEVANCE 12-012, NOW 23-031

**APA**

Re:     DFW Domicile Grievance No. 12-012

Dear Captain Hale:

Pursuant to the May 1, 2003, Agreement ("Agreement"), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

In accordance with Section 21.F.3 of the Agreement, I hereby elect to waive the Initial Hearing in this matter so that an Appeal Hearing can be held at the earliest possible date.

In addition, we request that the Company send a copy of all hearing notices and decisions rendered in this case to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512.

Sincerely,

Captain Rusty McDaniels
Chairman - DFW

First Officer Russell Moore
Vice Chairman - DFW



7

The Parties agree to the following amendment to the Collective Bargaining Agreement ("CBA") to effect this agreement:

Supplement F(1).5.d

A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F while disabled. In the event such a pilot member recovers and returns to the Company as a pilot, his monthly disability pension shall cease. He will again become a participant in the Plan for the accrual of additional Basic and Variable Annuity benefits payable at Normal Retirement Date, subject to the eligibility provisions of the Plan. In the event such a pilot member works for the Company in a capacity other than as a pilot, his pilot benefits shall not be paid while he is employed in such a capacity. However, during such period he shall be eligible to participate in the pension programs applicable to his job category.

The parties agree that this amendment is prospective only. That is, this amendment has no application to pilots whose employment terminated prior to the effective date of this Agreement. The effective date of this agreement shall be September 30, 2016.

Please indicate your concurrence with the foregoing by execution in the space provided below.

Sincerely,

Captain Kimball Stone
Vice President, Flight Operations
Flight
American Airlines, Inc.

Beth Holdren
Managing Director Labor Relations,

American Airlines, Inc.

# AA's JAMES ANDERSON DEPOSITION, JCBA SME & former AA Director of Crew Qualifications

**APA**

- Sec 21 - B. Investigation and Rights of Representation
- 1. ==A pilot shall not be disciplined or dismissed from service with the Company without an investigation and written notification== of such action, including the precise charge(s) and an explanation for any action taken. A pilot shall be provided with an opportunity to meet with that pilot's Flight Department supervisor prior to the rendering of the Company's decision with regard to discipline or dismissal.
- Sec 24 - I. Orders to be in Writing
- 1. ==All orders to pilots involving a change in status or leave of absence shall be stated in writing==… & 13.D requires notice as well!

- Pg 18, line 4 ?: Does 11d 5-year allow termination for disability? – "No"

9

# IN 2016 THE BOD'S AGREED TO FIX IT BOTH SUPP F(1)5D & SEC 11D RE THE 5-YEAR ISSUE

*APA*

- BE IT RESOLVED
- Modify the language in the JCBA
- Sup F. (1) 5. (d) Disability Retirement
- And Section 11.D.1… REF five (5) years
- Removing the pilot from the seniority list
- Negotiate language [PRECLUDING] pilots with long term disabilities from being removed from the seniority
- Negotiate contractual language … for the immediate reinstatement
- Prevent the further removal of pilots from the Pilot System Seniority List
- Gather the names of the pilots

*Disposition: Adopted 19-3-0-0 on 12/13/2016*

| R2016 – 30 Rev 1 | SOURCE: MIA | FOR | 19 |
| BOD MTG: | | AGAINST | 3 |
| 06/07-09/2016 | | ABSTAIN | 0 |
| | | ABSENT | 0 |

Title: Supplement F and Section 11.D.1. - Negotiating Committee Tasking

Presented by: CA Ed Sicher     Seconded by: CA Billyray Read

Policy Manual: _____ Cons. & Bylaws: _____

1    WHEREAS, the three separate contracts prior to the merger of US Air East, America West,
2  and American Airlines treated disability retirements differently; and,
3    WHEREAS, the JCBA Supplement F. (1) 5. (d) and Section 11.D.1 adopted the most
4  restrictive of the three, the American Airlines contract, which has been subjectively reinterpreted by
5  the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous
6  disability; and,
7    WHEREAS, the former U.S. Air East contract allowed disabled pilots to remain on the
8  seniority list until they reach the federally mandatory retirement age for pilots; and,
9    WHEREAS, the former America West contract effectively removed pilots from the seniority
10  list for retirement disabilities longer than eight (8) years without a provision to be reinstated in the
11  event that pilot should ever regain his or her Class A medical; and,
12    WHEREAS, the merging of the seniority lists is creating a disparate treatment amongst the
13  individual pilot groups; and,
14    WHEREAS, the most beneficial treatment of all of our disabled pilots is to allow them
15  reinstatement from long-term disability in as expeditious and fair a manner as possible; and,
16    WHEREAS, there has been some evidence indicating that the company has unfairly
17  withheld reinstatement to long-term disabled pilots who have regained their Class A medicals from
18  being reinstated if they were considered problematic employees; therefore,
R2016-30 Rev 1                                                                1

# NEW JCBA LANGUAGE SHOULD FIX IT
# Delete the 5-year language per BoD R2016-030

*APA*

- D. Sickness or Injury Leaves

- 1. When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his relative seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty. Leave of absence for sickness or injury shall not commence until after a pilot has exhausted accrued sick bank in accordance with Section 10.C.8 of this Agreement. Any loss of seniority is strictly governed by Sect. 13.F. Length of service for pay purposes shall accrue during leaves granted because of injury on duty, and during the first ninety (90) days of any leave granted for sickness or injury sustained off duty.

- 2. A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by relative seniority upon return to active flying duty.

11

# PREITZ v. APA "judgment for Allied [APA]"

APA

- "Long-running dispute over Allied's representation of pilots who were medically disqualified from flying"

- "American Airlines and Allied interpreted a provision of the applicable collective bargaining agreement as automatically terminating the employment of pilots, such as Plaintiff, who had been on disability leave for longer than five years, referring to such pilots "medically disabled dropped" ("MDD")"

- "Allied argues that MDD pilots were not members of its bargaining unit because they were automatically terminated…But Allied offers no documentation defining the scope of its bargaining unit during 2011 through 2016 and merely asserts that nonemployees were not members."

- "A factfinder could infer that terminated MDD pilots, including Plaintiff, were members of the bargaining unit."

12

# PREITZ v. APA, continued…

*APA*

- "Allied's present position that MDD pilots should have had their relative seniority restored upon returning"

- "… 2016, Allied and American Airlines agreed that disabled pilots would no longer be removed from the seniority list after being on leave for five years—essentially, that no new pilots would be designated MDD" – "prospective-only"

- "… 2016, Allied's Board of Directors passed a resolution to seek "the immediate reinstatement and return to the Pilot System Seniority List" of all MDD pilots"

- "Dallas grievance …advocated an interpretation of CBA § 11.D consistent with Plaintiff's view that MDD pilots did not automatically lose seniority."

13

# STATUS & SUGGESTED COURSES OF ACTION

*APA*

- THE PREITZ CASE WAS DECIDED IN APA'S FAVOR - COURT NOTED: "The Dallas grievance was never arbitrated. Instead, Allied and American Airlines repeatedly agreed to hold the Dallas grievance "in abeyance every sixty days"

- AND THAT 12-012 (Now 23-031) "advocated an interpretation of CBA § 11.D… that MDD pilots did not automatically lose seniority."

- WHILE APA'S ACTIONS WERE NOT A DFR VIOLATION…

- NOTHING BARS APA FROM BOARD DIRECTED JCBA FIXES

- E.G., NOTHING BARS APA FROM INSTITUTING BoD R2016-30

- I.E., REMOVE THE TIME LIMITS FROM 11.D & SUPP F(1)

14

# DANGLING CHADS...

**APA**

- NC PRIORITIES
  - SUPP F SHOULD BE FIXED TO MEMORIALIZE CAREY MEMO
  - IAW BoD Resolution, REMOVE 5-YEARS LANGUAGE IN SEC 11.D
  - IAW BoD Resolution, ENFORCE NOTIFICATION OF STATUS CHANGES
  - DEFINE RELATIVE SENIORITY IN SEC 13
  - UPHOLD APA C&B: "MAINTAIN UNIFORM PRINCIPLES OF SENIORITY"
  - TIMELY RESOLUTION OF GRIEVANCES PER APA C&Bs Art II.B., & JCBA sec 23.D.4, 2 year & 28-month grievance limits; plus, JCBA Sec 21.H.3 language: expedite all hearings, decisions and appeals"
- SUPPORT APA PRESIDENT & DROPPED REINSTATEMENT AD HOC COMM TO COMPLETE TASKS IN PRES GREIVANCE 12-012/23-031 & BoD R2016-30
- BL – JCBA, C&B's, seniority preservation principles support the above priorities

15

# NOTES & QUESTIONS

*APA*

- Note – APA BoD's meeting video reference on 3/5-year time issues:
- "20221102_SBOD_Recent Events Discussion - Early Afternoon"
- LTD vs Sec 11d discussion starting at time stamp 02:50 thru 14:00
- Summary: it's happened before and could happen again unless negotiated contract modifications occur IAW BoD R2016-030
- https://www.alliedpilots.org/Videos?VideoId=d39ed5bd1c1be6c25a

- ????????

16

**EXHIBIT H**

# EXHIBIT I

On Saturday, September 27, 2025, 2:00 PM, trempfer <trempfer@aol.com> wrote:
Fyi, my MFR below to Ed after the eavesdropping, and on the day of Kennedy reporting it to the board, and the subsequent first failed recall attempt, all interfering and overshadowing my planned briefing to the BoD on the MDD matters on that day.

Tom Rempfer
(520) 869-6590

-------- Original message --------
From: "Rempfer, Thomas" <trempfer@alliedpilots.org>
Date: 5/18/23 19:21 (GMT-05:00)
To: trempfer <trempfer@aol.com>
Subject: Fwd: MFR


Sent from my T-Mobile 5G Device
Get Outlook for Android

**From:** Rempfer, Thomas
**Sent:** Thursday, May 18, 2023 6:01:51 PM
**To:** President <president@alliedpilots.org>
**Subject: MFR**

Ed,

Regarding today's events, before I came into the boardroom, Chris Torres and Larry Cutler asked me to look at my phone, which I willingly allowed. They told me they were worried I had taken pictures in the back room when I went back there to get a soda when the board was in closed session. I didn't take it personally but found the encounter inappropriate, especially the demand to inspect someone's personal electronic device. Regardless, I was completely transparent with those officers and let them go through my phone. I was subsequently equally transparent with the board in an equally odd inquisition.

Once I heard from you with respect to someone eavesdropping on my dinner conversation with our dropped disabled pilot, and the related allegations regarding that conversation, it added to the uncomfortable working environment. I appreciated the heads up on that, and I again attempted to be fully transparent in the board meeting as I was with Torres and Cutler.

The main issue seemed to be if I said the APA would "withhold" the contract. I replied that I did not "recall," but I did promptly follow that up by frankly disclosing that I told the pilot about my hopes and the full pallet option possible resolutions, including my hope that the President could get it resolved directly with the company shy of arbitration. Feel free to call Tim Curren to verify -- 972-814-6509. Bottom line is, as I forthrightly told the board, I've discussed the full history of this case with all the MDD members. But I always speak my own opinions, and never speak for others, and I've specifically told that very thing to the MDD pilots, multiple times, which they will attest to.

When you look at an issue like this one, you come to the realization that there have been some extremely disappointing behaviors by our own Association, but also laudable events like the grievance, the resolution, and your advocacy for our MDD pilots. I also talked about that over dinner, but it sounds like that wasn't conveyed. If talking about the history, plus my hopes for resolution, and being overheard, becomes an issue it warrants counseling, which you did. I'll have better SA in the future. But any criticism also warrants a discussion of the root causes of the disappointment. Hopefully, I did that successfully, candidly, and professionally with the BoD.

Regarding that event, it sounds like my dinner discussion with the MDD pilot was only overheard by Ms. Kennedy and CA Westbrook, so there was no disclosure of any sensitive information publicly. While it was a public venue, it was not a public forum, and you know I don't discuss the matter in the online forums. No harm, no foul - lesson learned, especially about the nature of our own legal team. Whereas they listened into my dinner conversation, and then went straight to the BoD the next day, any professional in our Association could have introduced themselves and just as easily had said, 'hey, careful, you're talking too loud.'

Regardless of this odd chain of events, thank you for moving me over to the DRC to continue helping CA Coburn. If my involvement hinders the solution, you should remove me, not the BoD. But that doesn't course correct the observations about the cultural problems within our association, of which this appears to be a classic example. The idea that Association lawyers, of whom I'm disappointed with based on a deliberate review of their past conduct, but exceedingly professional about regarding that conclusion, can report to the BoD and it results in our union members being removed from their duties, this seems to be a more unhealthy dynamic then my treating an MDD pilot to dinner and discussing how I hope to help him correct a long standing injustice that the Association's legal department did not previously fix. In the lawyer's parlance, there appears to be a conflict of interest in this chain of events to have attorneys that have a bias on this matter, and a former BoD member who does as well, to be the impetus to remove a union officer that has developed the opposite bias based on a thorough study of the history.

To the extent these points assist you in advocating for me to continue advocating for our disabled pilots tomorrow, please by all means relay for me, unless you'd like me to be there myself as I was last December when the BoD tried to recall me previously. In both cases, as with our previous professions, when you're taking flak you know you're getting close to the target.

Sincerely,
Tom Rempfer
520-869-6590

Sent from my T-Mobile 5G Device
Get Outlook for Android

# EXHIBIT J

Messages - Tom Rempfer (+15208696590)                          +13053339534, annamaria717@yahoo.com, annamaria717@icloud.com

10/9/2025 5:13:40 AM

Tom Rempfer (+15208696590)

**Missed your call, Landing sim early, talk after**

10/10/2025 2:13:22 PM

Tom Rempfer (+15208696590)

June 14, 2024, assume the below text was from Ed to Larry, relayed
to me via text from Larry:

No. I have had it with you. I have done no to king but expend *time*,
money and resources despite the fact I have been left twisting in the
wind. I have been warned by APA legal that you would do just what
you are doing right now. Should have e listened to them a long time
ago. They were right all along. It is about the $$
I've held up multimillion dollar grievances for you. I've held up the
probable reinstatement of other pilots for you. I've cut across the
wishes of my own board to advocate and find outside counsel to
advocate for you. And at the end of the day you will give nothing to
help me make your case. It's over Larry. You're on your own. I'll drop
your grievance. You can make the case that APA isn't advocating for
you now. Treat the union as your enemy.
I've given official word to Sue and Jim to expend no more resources
on you. You are on your own now Larry. APA will slot your grievance
and that's all. Good luck

  Next was from me to Larry:

Only update is a fourteen or fifteen october grievance scheduling
request for 12-12. 12-11 still in the cue with over 50 other unresolved
grievances.

Next was from Larry to me:

In agreed to Additional 14-day on the condition we discuss...

"tAPA taking two actions on my behalf;

1) an immediate vigorous good faith effort for the APA President to
meet with AA CEO within the next 14-days, to negotiate and obtain
my reinstatement as an active line pilot at my relative seniority at
B777 CA pay, and

2),  also simultaneously immediately moving my individual Grievance
12-011 to a System Board on Presidential Expedited Basis in
accordance were CBA Sec 23, to be heard in the next available

Messages - Tom Rempfer (+15208696590)                    +13053339534, annamaria717@yahoo.com, annamaria717@icloud.com

arbitration slot with a pilot friendly arbitrator, using unconflicted outside counsel of my choice, with a System Board panel members picked by me or subject to my approval. The second step will put pressure on AA,"

 Sicher text to me was apparently on the same day he texted Larry on June 14, 2024

 We will slot his grievance 12-11 for hearing. That is all.

Conclusion, my testimony is actually irrelevant. You evidently received the same text info and commitment directly from Ed via text re 12-011 that you shared with me above. And evidently had the same commitment or expectation from your 14-day extension conference call. Plus I also gave you the same impression related to the October grievance scheduling, which indicated your grievance was in the cue, probably verifiable based on union records from that committee. Perhaps check with Tracy Parrella?

Bottom line, second hand info from your committee chairman is likely irrelevant compared to direct communications from your union President and the grievance resolution docket records. If you're grievance was closed how could it be in the queue?

Suggest you cnx my deposition and save that money since I've coordinated with legal as you suggested and they've relayed extensive restrictions on what I can testify about.

Flying tmrw morning.

                                   10/10/2025 5:53:00 PM


Tom Rempfer (+15208696590)

**Themselves**

# **EXHIBIT K**

# SETTLEMENT AGREEMENT

### Between

## AMERICAN AIRLINES, INC.

### and the

## ALLIED PILOTS ASSOCIATION

American Airlines, Inc., including its subsidiaries, affiliates, and parent companies, (collectively "American" or "Company"), and the Allied Pilots Association ("APA" or "Union") (collectively referred to as the "Parties"), mutually desire to settle and resolve Sicher Expedited Presidential Grievance 23-031 (converted from DFW Domicile Grievance No. 12-012). Accordingly, the Parties hereby agree to the following terms to compromise, settle, fully and finally resolve Sicher Expedited Presidential Grievance 23-031, including the underlying DFW Domicile Grievance No. 12-012, in its entirety, as follows:

WHEREAS, on May 22, 2012, the APA DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's alleged violation of the 2003 Collectively Bargained Agreement for failing to provide pilots notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five (5) years; and

WHEREAS, on March 13, 2023, the APA converted the DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance 23-031 (collectively with DFW Domicile Grievance No. 12-012, the "Presidential Grievance"). The Presidential Grievance continued to protest the Company's alleged violation of the Collectively Bargained Agreement for failing to provide pilot notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years; and

WHEREAS, in the Presidential Grievance the APA contended that the Company's failure to provide notice to pilots of their impending removal from the seniority list and separation from employment precluded those pilots from either attempting to return to service prior to being dropped from the seniority list and separated from their employment, and/or filing a grievance challenging the Company's decision to drop them from the seniority list and separate them from employment; and

WHEREAS, the remedy sought in the Presidential Grievance was an award ordering the Company to provide affected individuals with notice of their removal from the seniority list and separation from service thereby allowing them to then file a grievance challenging that action based upon the facts that existed at the time the original notice should have been given; and

WHEREAS, the Company contends the APA may not convert a domicile grievance into a presidential grievance and the APA disagrees with same;

WHEREAS, the Company contends the Presidential Grievance is without merit; and

WHEREAS, the Parties conducted a mediation on November 7, 2024, before a Neutral, and

through subsequent discussions, reached an agreement to resolve the Presidential Grievance; and

WHEREAS, the Parties desire to avoid further controversy and fully settle and compromise the Presidential Grievance, without any further proceedings.

NOW, THEREFORE, in exchange for the mutual considerations described herein, the sufficiency of which is hereby acknowledged, the Parties agree to fully resolve the Presidential Grievance, as follows:

1.  Although no specific pilots are referenced in the Presidential Grievance or the underlying Domicile Grievance, the Parties have identified the following four (4) individuals who were on inactive status, unpaid sick, or disability for more than five years, were removed from the pilot seniority list and separated from employment with the Company, and have represented that they have since obtained, or have filed paperwork to obtain, an FAA First Class Medical Certificate, and expressed a desire to be reinstated to employment as a pilot with the Company: Timothy Curren (354581), Dale Churovich (354629), Lawrence Meadows (332713), and Roger Wagner (318588) (collectively the "Identified Individuals").

2.  One of the Identified Individuals, however, Lawrence Meadows, was provided and received the notice attached as Exhibit A during his prior employment in advance of his removal from the seniority list and separation from employment in 2011, and the Parties agree that none of the other Identified Individuals received similar communications from the Company prior to their separation from employment. Following Mr. Meadows' removal from the seniority list and separation from employment, he filed two grievances challenging the Company's actions. The Company disputes that the notice given was required by the CBA while the APA contends that the notice was required and that the provided notice may not have been compliant in form. However, the APA has concluded that, under the totality of circumstances of this case, it is unlikely to prevail on its argument before the System Board, particularly in light of the fact that Mr. Meadows filed Grievance 12-011 and Grievance 13-064 challenging the Company's decision to separate him from employment at the time. Both grievance 12-011 and 13-064 were subsequently disposed of and closed after the APA declined to advance them in 2013 and 2014, respectively. As a result, Mr. Meadows is deemed not to be an Eligible Individual under this Agreement, and thus, he is not eligible for reinstatement under this Agreement.

3.  Based on the Parties' knowledge, Timothy Curren (354581), Dale Churovich (354629), and Roger Wagner (318588) (collectively "Eligible Individuals") did not receive notice prior to their removal from the seniority list and separation from employment and did not file a grievance challenging the Company's actions at the time. The Eligible Individuals may elect to utilize the process detailed below for possible reinstatement to the Pilot Seniority List and return to employment and active status at the Company, provided they satisfy the conditions detailed below.

4.  The Parties agree to offer a one-time opportunity to the Eligible Individuals to utilize the following process for possible reinstatement to the Pilot Seniority List and return to

employment with the Company (the "Process for Possible Reinstatement"). The Process for Possible Reinstatement must commence within thirty (30) days of the full execution of this Settlement Agreement. Each Eligible Individual may elect to pursue or may decline to pursue this one-time opportunity to pursue the Process for Possible Reinstatement as described below.

    a.    The APA will provide each Eligible Individual with the terms of the Process for Possible Reinstatement and advise them of their right to opt into pursuing reinstatement through the Process for Possible Reinstatement and that, regardless of whether they seek reinstatement, the Presidential Grievance will be withdrawn with prejudice pursuant to this Agreement. In the event an Eligible Individual does not timely and properly opt to pursue the Process for Possible Reinstatement, then the Eligible Individual will have waived his right to pursue the Process for Possible Reinstatement and will have elected not to return to employment with the Company and the APA will not advance any subsequent request for reinstatement, reemployment, or rehire on their behalf.

5.    Process for Possible Reinstatement. The Parties agree the following steps comprise the Process for Possible Reinstatement for the Eligible Individuals:

    a.    **Step 1**: In the event an Eligible Individual opts to pursue the Process for Possible Reinstatement, the Eligible Individual must send an email to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org) so indicating no later than thirty (30) consecutive calendar days after the date this Settlement Agreement is fully executed. The Eligible Individual must include a true and correct copy of his First Class Medical Certificate along with the email.

    b.    **Step 2**: Within 14 days of providing the Notice in Step 1, the Eligible Individual must execute a General Release (attached as Exhibit B) and email it to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org).

    c.    **Step 3**: The Eligible Individual shall submit to and successfully clear the standard pre-employment background checks for American pilots, including PRIA records review, submission to the Rap Back Program, fingerprinting, drug and alcohol testing, and any other standard, pre-employment requirement for New Hire American pilots.

    d.    **Step 4**: The Eligible Individual shall execute and submit a request to the FAA for a complete copy of their medical file (commonly referred to as a "Blue Ribbon File") to be released and sent to Natasha Narayan, MD, American's Corporate Medical Director. Dr. Narayan will review the Blue Ribbon File received from the FAA. Dr. Narayan shall have twenty (20) days to review the file upon receipt of same. In the event American's Corporate Medical Director concludes that the Blue Ribbon File is complete and accurate on its face, the Company will accept the determination rendered by the FAA in granting the medical certificate.

In the event American's Corporate Medical Director determines that the Blue Ribbon File indicates a need for further information or clarification in order for the Eligible Individual to continue on the Process for Possible Reinstatement, the Company will notify the Eligible Individual and APA in writing and identify the information/clarification needed. The criteria used in determining whether further information/clarification is necessary will be limited to: (a) suspected non-disclosure of material information; (b) evidence of non-compliance with an established treatment plan, (c) a prescribed treatment plan being inconsistent with a diagnosis or evaluation, or (d) clearance reports from a physician or specialist whose credentials are not consistent with the reported diagnosis. The Eligible Individual will then have the opportunity to provide additional information/clarification in response to the item(s) identified by the Medical Director.

Within ten (10) days of receipt of a response from the Eligible Individual, the Company will notify the Eligible Individual and APA in writing if additional information/clarification is needed and detail the basis for such determination. The Eligible Individual will be given an opportunity to withdraw their reinstatement request in writing to both the Company and the APA within ten (10) days of receipt of notification. If the Eligible Individual elects to withdraw their reinstatement request, then the Company will not take any further action. If the Eligible Individual does not withdraw his request for reinstatement or affirmatively confirms in writing his intention to continue with the reinstatement process under this Agreement, the Company shall copy the pilot on an email submission of Dr. Narayan's request for an FAA aeromedical general review at 9-AMC-GRCustomerSvc@faa.gov. An FAA request for information is not a denial. If the FAA denies the Eligible Individual's medical certificate, such Eligible Individual's reinstatement request shall be denied. If the FAA does not deny the Eligible Individual's medical certificate in response to the request for review, then the FAA determination on the medical certificate will be deemed final and binding with regard to reinstatement of the Eligible Individual.

If the Company seeks a general review of an Eligible Individual's medical certificate and the FAA confirms the medical certificate, the Eligible Individual will be entitled to be paid retroactive to the date the request for FAA general review was made at the hourly pay rate based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold. This period of retro pay will not be included in the 18-month guarantee provided in paragraph 6(b) below. In the event the FAA requests information directly from the Eligible Individual during the general review process, the period of time between when the request is made and when the Eligible Individual responds to the request will not be considered compensable in the event retroactive pay is required under this paragraph.

e.     **Step 5**: If an Eligible Individual successfully completes Steps 1 through 4, he will be reinstated to employment with the Company and placed on the Pilot Seniority list at the number representing approximately where he would have

been had he remained continuously employed by the Company ("relative seniority"). Reinstatement will begin effective with the commencement of training.

f.   **Step 6**: The Eligible Individual shall be assigned the first available training spot within three (3) months of the date reinstatement is approved, and will be given five (5) days' notice of same. The Eligible Individual will receive the standard AQP training course proffered to New Hire American pilots, inclusive of the standard remedial training offered to New Hire American pilots. Once the Eligible Individual successfully completes his training, he is considered an active employee and governed by the 2023 AA-APA Agreement and Company policies except as noted herein. In the event the Eligible Individual does not successfully complete training due to a training failure, he will not advance any further on the Process for Possible Reinstatement, and APA will not advance any subsequent request for reinstatement, reemployment, or rehire on his behalf.

6.   The following terms apply to each Eligible Individual who successfully completes the Process for Possible Reinstatement ("Reinstated Pilot"):

a.   Upon successful completion of training, each Reinstated Pilot shall be assigned as a First Officer on a narrow body aircraft until such time as the Reinstated Pilot has accomplished 1,000 hours of flight time as a narrowbody First Officer. After the completion of the required 1,000 hours of flight time, the Reinstated Pilot may exercise his seniority to bid for and be awarded whatever bid status his relative seniority can hold in the first vacancy bid award following completion. Prior to assigning the Reinstated Pilot a narrow body bid status, the Company shall confer with the Reinstated Pilot about his aircraft and base preferences and take such preferences into consideration when assigning the Reinstated Pilot a narrow body bid status.

b.   Compensation will commence once the Eligible Individual successfully completes Steps 1 through 4 above and timely reports for training as directed and described in this Settlement Agreement. Regardless of what seat and equipment is being flown, the Reinstated Pilot's hourly pay rate will be based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold for the first 18 months of his reinstatement. At the conclusion of the first 18 months, the Reinstated Pilot will assume the pay rate associated with whatever bid status the Reinstated Pilot holds at that time.

c.   Upon completion of training, the Reinstated Pilot's vacation bank and sick bank will reflect zero hours and will begin to accrue based upon the pilot's length of service in accordance with the 2023 Agreement. The Parties agree that the terms of LOA 18-001 do not apply to the Eligible Individuals. The Parties agree that the Reinstated Pilot's length of service will reflect the following upon timely reporting for training at the Training Academy:

Timothy Curren (354581) – updated Class Date 1/20/2016 – 9 years

Dale Churovich (354629) – updated Class Date 1/29/2017 – 8 years
Roger Wagner (318588) – updated Class Date 2/16/2020 – 5 years

7.   The Parties agree that the Eligible Individuals defined above cannot be changed, expanded, or modified in any way.

8.   The APA agrees to immediately withdraw with prejudice the Presidential Grievance and is resolved on a no citation and no precedence setting basis.

9.   This Agreement does not constitute an admission of any kind by the Company or the APA and is being entered into to avoid the expense and uncertainty of arbitrating the Presidential Grievance.

10.  The Parties agree that this Agreement constitutes the complete agreement between the Parties concerning the Presidential Grievance and that no other representations or promises have been made by the Parties in that regard.

11.  This Agreement may not be modified in any manner except in a writing signed by both Parties.

**ALLIED PILOTS ASSOCIATION**                **AMERICAN AIRLINES, INC.**

By: _____                By: _____
First Officer Nick Silva                         Maranda Rosenthal
President                                        Managing Director, Labor Relations/Flight
                                                 Assoc. General Counsel

Dated:  January 15, 2025                       Dated:  January 15 , 2025

# EXHIBIT L

**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines


O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

May 1, 2025

CA Lawrence Meadows
*Via Electronic Mail*

Dear Mr. Meadows,

It has been brought to my attention that you have requested to be included as a speaker during the Membership/Guest hour at the upcoming Spring Board of Directors meeting as a "member in good standing" of the Association.

As has been recently reaffirmed by the United States District Court for the Southern District of Florida, you were terminated from your employment as a pilot with American Airlines in 2011 pursuant to the terms of the Pilot Collective Bargaining Agreement. Following your termination by American, you were converted to Inactive Member status based on the fact that you were dropped from the seniority list, and thus terminated, due to having been out for more than five years due to a disability.

In 2018, you were able to obtain a first-class medical certificate and sought reinstatement to your position as a pilot with American Airlines. APA supported your request for reinstatement in accordance with its established protocols for seeking reinstatement for MDD pilots who regained their medical certificates. As you are aware, the decision to reinstate a pilot to employment is solely within the discretion of the Company and MDD pilots have no right to reinstatement. As you alleged in your recent lawsuit against the Company, American denied your request for reinstatement in 2019.

In light of the fact that you have not been employed by American Airlines as a flight deck crewmember since 2011 and then subsequently sought and were denied reinstatement by the Company after regaining your first class medical certificate, you are not qualified to retain any membership status in APA under Article III of our Constitution & Bylaws. Accordingly, you are not a member of APA, and you are thus not eligible to speak as a member during the membership hour of the upcoming Board of Directors meeting.

Respectfully,

First Officer Nick Silva
President, Allied Pilots Association