IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED BY _MP_ D.C.

FEB 18 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**LAWRENCE M. MEADOWS,**
Plaintiff,

v.

**ALLIED PILOTS ASSOCIATION, et al.,**
Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**
_____/

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER OF FEBRUARY 17, 2026 (ECF No. 204)

Pursuant to Federal Rule of Civil Procedure Rule 72(a), Plaintiff Lawrence Meadows respectfully objects to the Magistrate Judge's Order of February 17, 2026 (ECF No. 204), and its decision to quash the deposition of key fact witness Marjorie Powell and to deny Plaintiff's motions to compel the depositions of Nick Silva, Mark Myers, and James Clark. The Magistrate Judge's Order is clearly erroneous and contrary to law, as it ignores uncontroverted evidence and improperly shields wrongdoers from accountability.

### I. BACKGROUND

On February 10, 2026, the Magistrate Judge held a hearing on American Airlines' motion to quash the deposition of its former attorney, Marjorie Powell. In advance of that hearing, Plaintiff submitted to the Magistrate a detailed Memorandum of Law (**Exhibit 1**) and two sworn declarations from himself (**Exhibit 2**), and decorated military veteran Captain Brian Ostrom (**Exhibit 3**). These submissions established, with documentary proof, that Ms. Powell had engaged in a pattern of misconduct against other disabled pilots, and in Plaintiff's case personally fabricated

1

the pretextual "termination letter: that is the genesis of this DFR case The Magistrate Judge's order quashing the subpoena summarily ignores this entire factual record.

## II. ARGUMENT

### A. The Order Quashing the Powell Deposition is Clearly Erroneous and an Abuse of Discretion.

The Magistrate Judge's conclusion that deposing Ms. Powell was unwarranted is contrary to law and the facts on the record. The order is based on a flawed application of attorney-client privilege and ignores that Ms. Powell is a key fact witness who was listed on Plaintiff's initial disclosures.

1. **Ms. Powell is a Central Fact Witness, Not Merely an Attorney:** The declarations of Plaintiff and Captain Ostrom established that Ms. Powell personally drafted Plaintiff's pre-textual 2011 "termination letter" from non-supervisory administrator, Scott Hansen, that deliberately bypassed the collective bargaining agreement ("CBA")[1] to create a false basis for Plaintiff's removal form the seniority list and "administrative separation." Her testimony is not about privileged legal advice; it is about her direct, personal actions as a primary actor to interacted and negotiated with Plaintiff for fifteen months during the relevant time-frames in this lawsuit, involving  the events giving rise to this litigation. It is a clear error to shield a fact witness from a deposition simply because she is also an attorney.

2. **Powell is a Necessary Rebuttal Witness:** APA and American's counsel made Ms. Powell a central figure by introducing Plaintiff's 2015 voicemail to her, and subsequent cease and

---

[1]     Section 21 of the American Airlines Pilots' CBA mandates that a pilot can only be terminated by his Chief Pilot supervisor for "just cause", and only after full due process of initial notice, investigation, hearing and final notice, which didn't occur here.

desist letter from American's outside counsel Mark Roberston to portray him as harassing

They cannot use this communication as a sword and then use privilege as a shield to prevent

Plaintiff from questioning her under oath to establish the context of that communication.

Moreover, Mark Robertson, is now also a fact witness for his collusion with APA counsel

(evidenced by New Years Day emails between him and APA's counsel regarding a "time

sensitive matter regarding Larry Meadows') and his misrepresentations to the Magistrate

by submitting an erroneous unsigned subpoena in an attempt to discredit Plaintiff an

invalidate his otherwise proper service upon his client, Ms. Powell. In sum, denying

Plaintiff the right to rebut this character attack is a denial of due process.

## B. The Order Denying Reconsideration of the Silva, Myers, and Clark Depositions is Contrary to Law.

The Magistrate's refusal to permit these depositions is clearly erroneous and an abuse of discretion.

1. **The Court's Own Condition Was Met:** The Magistrate's prior order quashing Silva (ECF No. 193) was expressly conditioned on Plaintiff first deposing the expert, stating; "If Plaintiff wants more information regarding APA's rebuttal expert's report, then Plaintiff must ask those questions to the expert during the expert's deposition." Plaintiff complied. That deposition yielded new, direct evidence that President Silva personally signed the retention agreement as the "client" and that APA attorneys Myers and Clark provided the data and factual assumptions used in their expert's report. The Magistrate's refusal to reconsider in light of this new evidence, which directly satisfies the condition she herself set, is clearly erroneous and an abuse of discretion.

2. **The Ruling Ignores APA's "Discovery Ambush":** The Magistrate's denial of a continued deposition of APA's corporate designee, Mr. Myers, ignores the severe

prejudice caused by APA's tactic of producing thousands of pages of documents five minutes *after* the deposition was scheduled to begin. This rewards bad-faith litigation conduct and has caused the Plaintiff severe prejudice.

## CONCLUSION

The Magistrate Judge's Order (ECF No. 204) is clearly erroneous and contrary to law. It ignores uncontroverted evidence of misconduct, denies Plaintiff the right to depose key fact witnesses, and rewards Defendants' bad-faith discovery tactics. Plaintiff respectfully requests that the District Judge **set aside** the Magistrate's Order, **deny** the motion to quash the Powell subpoena, and **grant** Plaintiff's motion to permit the depositions of Silva, Myers, and Clark, as originally sought in Plaintiff's underlying legal memorandum (**Exhibit 1**).

Dated February 18, 2026.

Respectfully Submitted,

Lawrence M. Meadows, *Pro Se*
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

**Exhibits:**
1. Plaintiff's Memorandum of Law submitted Feb. 9, 2026
2. Declaration of Lawrence Meadows submitted Feb. 9, 2026
3. Declaration of Brian Ostrom submitted Feb. 9, 2026

## CERTIFICATE OF SERVICE

I, Lawrence M. Meadows, Pro Se Plaintiff, hereby certify that on February 18, 2026, a true and correct copy of the foregoing was served via the Court's CM/ECF system, email, and U.S. Mail on all counsel of record.

*Lawrence M. Meadows*

## SERVICE LIST

**Capri Trigo, Esq.**
Gordon & Rees LLP
100 SE Second Street, Suite 3900
Miami, FL 33131
Email: ctrigo@gordonrees.com
*Lead Counsel for Defendant*

**John M. Pellettieri, Esq.**
**Grace Rybak, Esq.**
**Joshua B. Shiffrin, Esq.**
Bredhoff & Kaiser, P.L.L.C.
805 15th Street N.W., Suite 1000
Washington, D.C. 20005
Emails: jshiffrin@bredhoff.com;
jpellettieri@bredhoff.com;
grybak@bredhoff.com;
*Pro Hac Vice Counsel for Defendant*

**EXHIBIT 1**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**LAWRENCE M. MEADOWS,**
    Plaintiff,

v.

**ALLIED PILOTS ASSOCIATION, et al.,**
    Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**
_____/

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
### DEPOSITION OF MARJORIE POWELL AND OTHER RELATED DISCOVERY

Plaintiff Lawrence Meadows submits this memorandum to demonstrate that the deposition of non-party witness Marjorie Powell, former counsel for American Airlines ("American"), is essential to this litigation and must be permitted to proceed. APA and American have sought to quash the deposition, claiming Ms. Powell lacks relevant knowledge. This argument fails not only because Ms. Powell is a direct, percipient witness to the central facts of this case, but also because her conduct is part of a broader pattern of bad-faith litigation tactics and collusion between APA and American's counsel that must be explored.

**I. Ms. Powell is a Necessary Witness to Foundational Events and a Pattern of Misconduct.**

Ms. Powell's testimony is directly relevant for two primary reasons. First, she is a key rebuttal witness. APA has made Ms. Powell a central figure in this litigation by introducing a voicemail Plaintiff left for her in 2015 to portray him in a false and threatening light. APA cannot use these communications as a sword and then shield Ms. Powell from being questioned

under oath about the context that provoked them - namely, her bad-faith conduct against Plaintiff and other pilots, including Captain Brian Ostrom.

Second, and more critically, Ms. Powell is a percipient witness to the collusive acts that form the basis of this DFR case. As detailed in the attached Declaration of Lawrence Meadows (attached herewith as **Exhibit A**), she personally drafted the pretextual 2011 "termination" letter that APA and American later used to extinguish Plaintiff's grievance rights. Captain Brian Ostrom's forthcoming declaration (to later be submitted as **Exhibit B**) will further establish Ms. Powell's pattern of fabricating documents and interfering with pilots' FAA medical certifications. Her conduct is not ancillary; it is foundational to proving pretext and bad faith.

## II. The Powell Deposition is Further Warranted by a Pattern of Collusion Between APA and American's Counsel.

The attempt to quash Ms. Powell's deposition cannot be viewed in a vacuum. It is part of a broader pattern of collusion between APA's counsel and American's counsel. Newly discovered evidence, obtained on Friday, February 6, 2026, reveals that on January 1 and 2, 2026 - a federal holiday weekend, just two days after Plaintiff served both entities with a joint EEOC charge American's lead outside counsel, Mark Robertson of O'Melveny & Myers, was engaged in "time sensitive" communications with APA's counsel, Joshua Shiffrin, regarding the assumptions for APA's *own* economic expert rebuttal report against Plaintiff. (See **Exhibit A,** Decl. of L. Meadows at ¶ 13; APA_000033963).

This evidence demonstrates that Mr. Robertson is not merely an advocate for a non-party; he is a fact witness to the very collusion and bad faith at the heart of this case. The active coordination between a union's counsel and management's counsel to strategize against a union member's damages claims destroys any claim of common interest privilege. It is untenable for Mr. Robertson to appear before this Court to shield one attorney-witness (Powell) while he

himself is implicated in improper, collusive conduct. This pattern of misconduct makes it imperative that Plaintiff be permitted to depose all attorneys involved, starting with Ms. Powell.

### III. The Court Should Reconsider Its Order Quashing the Depositions of Silva, Myers, and Clark.

Finally, Plaintiff asks the Court to reconsider its Order of February 5, 2026 (ECF No. 193) quashing the subpoena for APA President Nick Silva. That Order was based on the express premise that Plaintiff must first depose the expert. Plaintiff has now done so. That deposition yielded direct evidence—a consulting agreement personally signed by Mr. Silva and non-privileged emails from attorneys Mark Myers and James Clark—proving all three were personally involved in formulating APA's expert report. This new evidence satisfies the Court's prerequisite and establishes them as essential percipient witnesses.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests the Court deny the motion to quash the deposition of Marjorie Powell and reconsider its prior order to permit the depositions of Nick Silva, Mark Myers, and James Clark.

Respectfully Submitted,

_L. M. Meadows_

_____

Lawrence M. Meadows
*Plaintiff, Pro Se*

3

**EXHIBIT  2**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**LAWRENCE M. MEADOWS,**
　　Plaintiff,

　　v.

**ALLIED PILOTS ASSOCIATION, et al.,**
　　Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**
_____/

### DECLARATION OF LAWRENCE M. MEADOWS

I, Lawrence M. Meadows, declare as follows pursuant to 28 U.S.C. § 1746:

1.　　I am the Plaintiff in this matter and have direct, personal knowledge of the facts stated

herein. I submit this declaration in support of my opposition to the motion to quash the

deposition of Marjorie Powell and in support of my renewed request to depose other key

witnesses.

### Ms. Powell's Direct Involvement in My Purported Termination

2.　　In late July 2011, at an Eleventh Circuit-ordered mediation regarding my ERISA

disability benefits litigation, my attorney, in the presence of Marjorie Powell, put American

Airlines ("American") on notice of a fraudulent disability cost-savings scheme.

3.　　Approximately two weeks later, on August 5, 2011, I received a letter from Scott Hansen,

an American administrator, threatening that my employment would end. This letter was not from

my Chief Pilot - the only person with contractual authority to terminate me under the CBA - nor

was it copied to my union, the APA. It was a pretextual document designed to create the illusion

of a termination.

1

4.      I have personal knowledge, including from conversations with Mr. Hansen, that Marjorie Powell drafted or directed the drafting of this August 5, 2011 letter.

5.      This pretextual letter is the exact "notice" of termination that APA and American relied upon in their secret January 15, 2025 settlement agreement to extinguish my meritorious grievance rights and exclude me from reinstatement.

6.      Ms. Powell's direct knowledge of the creation and purpose of this letter is therefore not peripheral; it is foundational to proving that the basis for APA's adverse settlement was a pretext she personally helped create.

**A Pattern of Retaliation and APA's Misuse of Evidence**

7.      During a April 2015 mediation, I confronted Ms. Powell about her bad-faith conduct in the case of another disabled pilot, Captain Brian Ostrom, whose return to work she had obstructed after inducing a settlement. Ms. Powell became irate and walked out of the mediation. The following week, my own LTD benefits were abruptly and retaliatorily suspended.

8.      In response to this retaliation, I left Ms. Powell a voicemail demanding binding Rule 9019 arbitration in American's Bankruptcy Proceedings to resolve our dispute.

9.      In my recent deposition, counsel for APA introduced this decade-old voicemail to portray me in a false and threatening light. APA cannot use communications provoked by Ms. Powell's own misconduct as a sword against me, and then use her purported "discomfort" as a shield to prevent her deposition. Her testimony is essential for me to rebut the false narrative APA is constructing.

**Newly Discovered Evidence Warranting Further Depositions**

10.       On January 27, 2026, I deposed APA's economic expert, Matt Barton. In that deposition and the documents produced for it (the evening before on January 26), I obtained new evidence that was not before this Court when it previously quashed certain subpoenas.

11.       This evidence includes a consulting agreement for the expert report, which was **personally signed by APA President Nick Silva**, identifying him as the "client." (APA_000033905).  It also includes non-privileged emails showing that APA attorneys **Mark Myers** and **James Clark** were directly involved in providing the factual assumptions for the expert's report. (APA 000033872).

12.       This new evidence directly contradicts the Court's prior assumption that these individuals lacked percipient knowledge and establishes them as key witnesses to the creation of APA's damages theory against me.

13.       On Friday, February 6, 2026, while reviewing APA's document production, I discovered an email chain (bearing Bates number APA_000033963) between American's lead outside counsel, **Mark Robertson**, and APA's counsel, **Joshua Shiffrin**.

14.       These emails, dated January 1 and 2, 2026, show them coordinating on a "time sensitive matter regarding Larry Meadows" just two days after I served both parties with a joint EEOC charge. This is direct evidence of collusion between hostile adversaries. This conduct makes Mr. Robertson a fact witness and underscores the need to depose all.

     I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of February, 2026.

_L. M. Meadows_

_____
Lawrence M. Meadows

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE M. MEADOWS,
    Plaintiff,

    v.

ALLIED PILOTS ASSOCIATION, et al.,
    Defendants.

CASE NO. 17-cv-22589-EA
Honorable Judge Ed Artau
_____/

## DECLARATION OF CAPTAIN BRIAN OSTROM

I, Captain Brian Ostrom, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am over eighteen years of age, a resident of Maricopa County, Arizona, and am fully competent to make this declaration. The facts stated herein are based on my personal knowledge.

2. I am a retired Captain from American Airlines, Inc. ("American").

3. I am familiar with Marjory Powell from her former role as an in-house attorney for American. This familiarity is based on my direct personal experiences with Ms. Powell and my observations of her involvement in matters concerning other similarly situated disabled pilots.

### I. Background and Professional Experience

4. I am a graduate of the United States Naval Academy. I served as a commissioned Naval Officer and Naval Aviator in the United States Navy, attaining the rank of Lieutenant and flying the P-3B/C Orion and the F/A-18 Hornet.

5. I was employed by American Airlines for approximately thirty-three years. During my career, I held type ratings on the Boeing 737, 757, 767, 777, and 787 aircraft. I served as a Captain on the Boeing 737-800 and the Boeing 787 Dreamliner. I retired in good standing in February 2024.

6. My career at American included several notable roles. I was among the first pilots to introduce the Boeing 737-800 into the American Airlines fleet and conducted initial operational training, including touch-and-goes. I flew the inaugural American Airlines international flight from San Jose, California, to Paris, France. I was also part of the first group of pilots to introduce the Boeing 787 Dreamliner into the American Airlines fleet.

7. I was qualified and proficient to operate into all special-qualification airports served by American Airlines. Just prior to September 11, 2001, I was selected for the next Boeing 737 Check Airman training class.

8. In addition to my line-flying duties, I was selected for numerous high-profile and charitable missions. These included flying World War II veterans from the 80th anniversary of Pearl Harbor, flying for the Snowball Express charity for families of fallen service members, and flying the Los Angeles Rams to a playoff game during their Super Bowl-winning season.

9. From 2008 until my retirement, I served as a federally sworn Federal Flight Deck Officer (FFDO), a federal law-enforcement position authorized by the Department of Homeland Security.

**II. Personal Experience with American Airlines Legal and Medical Departments**

10. In July 2010, an intruder broke into my then-girlfriend's residence while I was present. I announced my law-enforcement status to encourage the intruder to depart, dialed 911, and retrieved my lawfully owned off-duty firearm for self-defense.

11. The intruder proceeded upstairs and physically assaulted me. I discharged my firearm to stop the threat. The Orange County Sheriff's Department investigated the incident. After reviewing all police reports and evidence, the Orange County District Attorney's Office concluded there was insufficient evidence to warrant the filing of criminal charges against me, and I was never arrested or charged. A true and correct copy of the December 8, 2010 letter from the Orange County District Attorney's Office is attached hereto as **Exhibit A**.

12. Shortly thereafter, my Chief Pilot at American, Greg Smith, contacted the lead homicide investigator on my case, Detective Daniel J. Salcedo. This contact was made at the direction of American's HR and legal departments. Detective Salcedo later confirmed the substance of this contact to me directly and in a sworn affidavit, stating that Mr. Smith initiated the communication and attempted to interfere in the active criminal investigation by:

   1. Offering to provide my confidential personnel and medical records to law enforcement

   2. Asserting that I had "anger issues" and was "medically unfit"; and

   3. Offering to provide additional information to assist in building a criminal case against me.

   A true and correct copy of Detective Salcedo's February 18, 2011 sworn affidavit is attached hereto as **Exhibit B**.

13. As stated in his affidavit (**Exhibit B**), Detective Salcedo attested that he declined Mr. Smith's offers, deeming the information improper and irrelevant to his self-defense investigation after consulting with the District Attorney.

14. Following this incident, American removed me from flight status and placed me on long-term disability. This action was taken without a precipitating medical examination, diagnosis, or any

determination by a qualified medical professional that I was unfit for duty. I remained on disability for approximately four and a half years.

15. To contest my improper removal from flight status, I pursued multiple actions against American, including filing charges with the Equal Employment Opportunity Commission, asserting claims under the Americans with Disabilities Act, and filing grievances through the Allied Pilots Association ("APA").

16. Upon information and belief, approximately five months before a required medical examination under Section 20 of the Collective Bargaining Agreement ("CBA"), agents or employees of American caused adverse medical diagnoses to be entered into my electronic pilot medical file. This was done even though I had not been evaluated or diagnosed with any such conditions by a physician. I became aware of these entries only after an American Airlines nurse with access to the system discovered and informed me of them.

17. Around 2015, my legal claims against American were resolved through a settlement agreement. The most critical and material term of that settlement was my full reinstatement to active flight status.

18. As a condition of my reinstatement, American's counsel, Marjory Powell (also known as Marjory Howell), required that my FAA First-Class Medical Certificate be sent directly to her in the legal department. This was after the FAA's Federal Air Surgeon had already evaluated my case and granted me a Special Issuance certificate, clearing me to fly. Ms. Powell's directive was contrary to the CBA, which required such certification be provided only to my Chief Pilot. This interference by the legal department delayed my return to duty by approximately sixty-one days.

19. After my claims were settled in exchange for my return to work, Ms. Powell caused a new letter to be sent to the FAA under the signature of American's interim Medical Director, Dr. Jeral Ahtone. This letter challenged the very Special Issuance medical certificate the FAA had just granted me. A true and correct copy of this April 2, 2015 letter is attached hereto as **Exhibit C**. This appeared to be a bad-faith tactic designed to honor the settlement in name only while simultaneously engineering a basis to prevent my return to active flight status. The letter misrepresented findings from my treating psychologist, Dr. Charles Green, prompting him to send a corrective letter to Dr. Ahtone and the FAA. A true and correct copy of Dr. Green's April 15, 2015 corrective letter is attached hereto as **Exhibit D**. The FAA did not revoke or rescind my Special Issuance.

20. Dr. Ahtone later confirmed to me, in a recorded conversation, that the letter to the FAA (**Exhibit C**) was drafted by and at the direction of American's legal counsel. His sworn deposition testimony in *Patterson v. American Airlines*, No. 1:17-cv-60533-JEM (S.D. Fla.), corroborates this. When asked if he had assistance writing the letter, Dr. Ahtone testified, "I had assistance with legal." When asked if that assistance was from "Margaret Howell" (an alias for Marjory Powell), counsel for American asserted attorney-client privilege and instructed Dr. Ahtone not to answer. A true and correct copy of the relevant excerpts from Dr. Ahtone's March 14, 2018 deposition is attached hereto as **Exhibit E**.

21. I filed a formal ethics complaint with American against my supervisor, Greg Smith, for his improper attempt to interfere in an active criminal investigation. The HR department refused to investigate, and to my knowledge, no disciplinary action was ever taken against Mr. Smith.

**III. Observed Pattern of Conduct and Relevance to Plaintiff Meadows**

22. Based on my direct personal experiences detailed above, I came to recognize a recurring pattern of conduct employed by American's legal and medical departments, in which Ms. Powell was often a central figure. The pattern I personally experienced and later observed in the cases of other pilots involved:

   1. Targeting pilots disfavored by management or the legal department;

   2. Manufacturing pretextual medical concerns or inserting adverse diagnoses into a pilot's file without a proper examination or basis;

   3. Using these pretextual medical issues to ground pilots and force them onto long-term disability;

   4. Creating procedural and bureaucratic hurdles to make it exceedingly difficult for pilots to disprove the unfounded medical allegations and regain FAA clearance; and

   5. Exploiting the pilot's disability status and the resulting financial and emotional distress as leverage in legal or contractual negotiations, often in concert with the APA.

23. After I was eventually reinstated, I volunteered with the APA's Disabled Pilots Assistance and Support Committee (DPASC), where I used my firsthand experience to assist other pilots facing similar systemic obstacles.

24. Based on my direct personal experiences, the actions taken against Plaintiff Lawrence Meadows, including the documented involvement of Ms. Powell, are consistent with and reflective of the same pattern of conduct that I personally experienced and observed being used against other pilots.

25. I am aware that Ms. Powell has represented to this Court that she does not recall her interactions with the APA regarding Mr. Meadows' grievances and has had no contact with him for over a decade. Contrary to these representations, and based on my direct experience, Ms. Powell

maintained a central and active operational role in disability and reinstatement matters affecting pilots during the relevant time periods.

26. I am also personally aware of Ms. Powell's involvement in matters concerning other disabled pilots, including but not limited to Lawrence Meadows and Colonel Patterson. In my experience, her involvement consistently demonstrated a pattern of actions adverse to disabled pilots seeking reinstatement. This included direct interference with FAA medical recertification processes and her participation in the drafting or direction of medical and regulatory correspondence designed to negatively impact a pilot's certification status, as evidenced by Dr. Ahtone's letter regarding my case (**Exhibit C**) and his deposition testimony regarding her involvement (**Exhibit E**).

27. Based on my direct experience with the individuals and processes at issue, I believe Ms. Powell possesses unique, firsthand knowledge of American's policies and practices toward disabled pilots and the specific facts underlying Plaintiff's claims in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 8th day of February, 2026.

Captain Brian Ostrom
American Airlines Ret.

**Index of Exhibits to the Declaration of Captain Brian Ostrom**

- **Exhibit A:** A true and correct copy of the December 8, 2010 letter from the Orange County District Attorney's Office, confirming its decision not to file criminal charges against Brian Ostrom.

- **Exhibit B:** A true and correct copy of the February 18, 2011 sworn affidavit of Detective Daniel J. Salcedo, describing an unsolicited call from American Airlines supervisor Greg Smith and his attempt to interfere in an active investigation.

- **Exhibit C:** A true and correct copy of the April 2, 2015 letter from Dr. Jeral Ahtone of American Airlines to the FAA, questioning Captain Ostrom's recently issued medical certificate.

- **Exhibit D:** A true and correct copy of the April 15, 2015 corrective letter from Dr. Charles B. Green to Dr. Jeral Ahtone and the FAA, clarifying misrepresentations made in Dr. Ahtone's letter (Exhibit C).

- **Exhibit E:** A true and correct copy of relevant excerpts from the March 14, 2018 deposition of Dr. Jeral Ahtone in *Patterson v. American Airlines*, where he testified that he received "assistance with legal" in drafting the letter to the FAA and was instructed not to identify the attorney involved.

# **EXHIBIT A**



OFFICE OF THE

# DISTRICT ATTORNEY

ORANGE COUNTY, CALIFORNIA
## TONY RACKAUCKAS, DISTRICT ATTORNEY

**JIM TANIZAKI**
SENIOR ASSISTANT D.A.
VERTICAL PROSECUTIONS/
VIOLENT CRIMES

**WILLIAM FECCIA**
SENIOR ASSISTANT D.A.
SPECIAL PROJECTS

**MARY ANNE McCAULEY**
SENIOR ASSISTANT D.A.
BRANCH COURT OPERATIONS

**JOSEPH D'AGOSTINO**
SENIOR ASSISTANT D.A.
GENERAL FELONIES/
ECONOMIC CRIMES

**MIKE MAJOR**
CHIEF
BUREAU OF INVESTIGATION

**LISA BOHAN - JOHNSTON**
DIRECTOR
ADMINISTRATIVE SERVICES

December 8, 2010

Orange County Sheriff's Department
Investigator Dan Salcedo
Homicide Unit

RE      Death of Dean Maldonado
        OCSO DR # 10-131789

Dear Investigator Salcedo:

After reviewing the police reports and all the information you provided to our office regarding the July 17, 2010 shooting that resulted in the death of Mr. Dean Maldonado, we are of the opinion that there is insufficient evidence to warrant the filing of criminal charges against the shooter, Brian Scott Ostrom, and to prove his guilt beyond any reasonable doubt.

Accordingly, the Office of the District Attorney is closing its inquiry into this matter. If you have any questions, please feel free to contact me at your convenience.

Sincerely,

Ebrahim Baytieh
Senior Deputy District Attorney
Homicide Unit

cc:     DA File

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

WEB PAGE: www.OrangeCountyDA.com

☒ MAIN OFFICE
401 CIVIC CENTER DR W.
P.O. BOX 808
SANTA ANA, CA 92701
(714) 834-3600

☐ NORTH OFFICE
1275 N. BERKELEY AVE.
FULLERTON, CA 92831
(714) 773-4480

☐ WEST OFFICE
8141 13TH STREET
WESTMINSTER, CA 92683
(714) 896-7261

☐ SOUTH OFFICE
30143 CROWN VALLEY PKWY.
LAGUNA NIGUEL, CA 92677
(949) 249-5028

☐ HARBOR OFFICE
4601 JAMBOREE RD.
NEWPORT BEACH, CA 92660
(949) 476-4650

☐ JUVENILE OFFICE
341 CITY DRIVE SOUTH
ORANGE, CA 92868
(714) 935-7624

☐ CENTRAL OFFICE
401 CIVIC CENTER DR. W
P.O. BOX 808
SANTA ANA, CA 92701
(714) 834-3952

# **EXHIBIT  B**

## AFFIDAVIT OF FACTS

I, <u>Daniel J. Salcedo</u>, the undersigned, being duly sworn, do herby swear, certify, and affirm that:

    (1) I am over the age of eighteen (18) and am a resident of the State of California. I have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.

    (2) I am a Homicide Investigator for the Orange County Sheriff-Coroner Department, located at 550 N. Flower Street, Santa Ana, CA 92703.

    (3) While I was investigating the shooting death of Dean Maldonado, I received an unsolicited call from Greg Smith.

    (4) I received the call from Greg Smith, while my investigation was still on-going.

    (5) Greg Smith identified himself as a Supervisor for American Airlines.

    (6) Greg Smith indicated that he was the immediate supervisor for Brian Ostrom.

    (7) Greg Smith declared, in part, Ostrom to be possibly unfit to adequately perform his job as an airline captain.

    (8) Greg Smith stated that Ostrom was removed from flight status for being medically unfit.

    (9) Greg Smith stated, in part, that Ostrom had "anger issues".

    (10) Greg Smith offered to share more employment and medical history on Ostrom.

    (11) Greg Smith invited me to meet with him at his American Airlines Los Angeles office.

    (12) Greg Smith informed me that he would provide "all the *intell*" that I would need to

SALCEDO AFFIDAVIT

help build a case against Ostrom.

(13)    I declined Greg Smith's invitation, after consulting with my District Attorney, because that information was irrelevant to the investigation.

(14)    I meet with Brian Ostrom on December 17th, 2010 at an Orange County Sheriff-Coroner's office to discuss the incident he had been involved in on July 17, 2010 and, during this meeting, informed him of these facts.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _18_ day of _February_____, 2011

_____   DANIEL  J.  SALCEDO
(TYPE OR PRINT NAME)

_____
(SIGNATURE)

STATE OF CALIFORNIA

COUNTY OF ORANGE

Subscribed and sworn to before me, this the _____ day of

_____, ____

_____see attached_____ Notary Public

My Commission Expires: ___10·25·12_____

Page 2 of 2

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____   _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

State of California

County of __ORANGE__

**C. ERGUETA**
COMM. # 1818513
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Oct. 25, 2012

**C. ERGUETA**
COMM. # 1818513
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Oct. 25, 2012

Place Notary Seal Above

Subscribed and sworn to (or affirmed) before me on this

18 day of February , 20 11 , by
  Date        Month                      Year

(1) Daniel J. Salcedo ,
              Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and

(2)_____ N/A _____,
              Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _____
              Signature of Notary Public

━━━━━━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━━━━━━

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: Affidavit of Facts

Document Date: 2-18-11          Number of Pages: 2

Signer(s) Other Than Named Above: _____

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# **EXHIBIT C**



VIA FEDERAL EXPRESS

April 2, 2015

James R. Fraser, M.D., Federal Air Surgeon
U.S. Department of Transportation
Office of Aerospace Medicine
Federal Aviation Administration
800 Independence Ave., S.W.
Washington, D.C.  20591
1-866-835-5322

Re:     Brian Scott Ostrom
        PI #:    2226244
        APP ID#:1999311441

Dear Dr. Fraser,

I am the Corporate Medical Director for American Airlines (AME #1319) and writing with respect to Captain Brian Scott Ostrom.

I recently received Captain Ostrom's Blue Ribbon Medical File (FOIA# 2015-004081CA) and have reviewed it, on behalf of American Airlines, in connection with the March 9, 2015, issuance of a First Class Medical Certificate to him.  In reviewing the file, I have some observations that I would like to respectfully submit for your review and consideration:

- As noted by Dr. Charles Chesanow in his memorandum to Nicholas Lomangino, M.D., dated November 7, 2014, there is disagreement between the conclusions of Dr. Anna Scherzer and other clinicians on Captain Ostrom's diagnosis.

- In March 2011, Dr. Scherzer conducted an Independent Psychiatric Evaluation and rendered the opinion that Captain Ostrom exhibits psychiatric signs and symptoms that potentially interfere with his ability to safely fulfill the functions of a commercial airline pilot and FFDO.  Further, her opinion is that Captain Ostrom's 2010 lethal use of a firearm, combined with his lack of psychological insight and diagnosis of Acute Trauma Reaction increase the risk of Captain Ostrom responding to ambivalent or threatening circumstances with the use of deadly force, placing him at an increased risk for an untoward event while functioning in a safety sensitive position.

- More recent medical opinions in the file disagree with Dr. Scherzer's conclusions. These more recent opinions indicate that Captain Ostrom has made significant progress while away from his job at American Airlines.

Occupational Health Services
4255 Amon Carter Blvd, MD 4100
Fort Worth, TX 76155
817 963 1200 Office
817 963 6378 Fax



Despite the generally favorable recent opinions, a letter dated February 7, 2014 by Charles Green, Ph.D. states , "Caution: It is my professional opinion that should this "Limbo" state continue, Captain Ostrom's emotional state will predictably deteriorate rapidly." (Emphasis is in the original). As noted in the July 9, 2014 memorandum from Dr. Chesanow to Roger Bisson, this statement "appears to confirm Captain Ostrom's disability status." Dr. Green's statement combined with his opinion that Captain Ostrom's difficulties were caused by an "occupational problem," (4/15/14 report) and Susan L. Simmons' (M.S.) conclusion (December 8, 2011) that Captain Ostrom never suffered from PTSD, but that "his frustration, anxiety, and stress were all related to issues involving American Airlines' management staff," raise the concern of how Ostrom's "occupational problem" with American Airlines might affect, if at all, Captain Ostrom's ability to perform his duties safely upon return to the work environment at American Airlines.

I'm raising these issues only to ensure that I have done what I reasonably can to ensure the safety of our passengers, employees, and Captain Ostrom himself. Obviously, American Airlines will rely upon and defer to the judgment of the FAA in this matter.

I understand that the FAA has 60 days from the time of issuance to review or modify medical certificates and/or to request additional information. To the extent there are any such modifications or requests for information, please let me know. If I do not receive such notice from you within the prescribed time period, by May 9, 2015, I will proceed with our process to return Captain Ostrom to active duty status.

Thank you in advance for your attention to this matter, and feel free to contact me if you have any questions.

Sincerely,

Jeral Ahtone, M.D.
Corporate Medical Director
Occupational Health Services
American Airlines

cc:    Captain Brian Ostrom

# **EXHIBIT D**

CHARLES B. GREEN, PH.D.
Practice of Clinical Psychology
NPI# 1770691446    LIC# PSY4442
19582 Beach Blvd., Ste. 207
Huntington Beach, CA 92648
Telephone: (714)378-2428      Fax: (714)964-6919

April 15, 2015

American Airlines, Occupational Health Services
4255 Amon Carter Blvd.
Fort Worth, Texas 76155

Attn: Jeral Ahtone, M.D.,  Corporate Medical Director, Occupational Health Services

Re: Ostrom, Scott Brian, Captain,   PI # 2226244
      APP ID#: 1999311441, and the letter sent to you by one James R. Fraser, M.D.,
      Federal Air Surgeon Surgeon, dated 4-2-15

Dear Dr. Ahtone:

After reviewing the above-indicated letter (supra), I feel compelled to correct the record
as it relates to my assertion related to Captain Ostrom's "occupational problem".  Let me
be very clear, it is and has been all along my clinical opinion/judgment that Captain
Ostrom's "occupational problem" clearly stems from his not being permitted not only to
return to his job as qualified pilot with TSA clearance regarding the carrying of a weapon
but the repeated efforts by American Airlines to allow and/or consider alternative "Test
Based Analysis" of his personality confirming no contraindications why he should not be
reinstated as a pilot timely.

Finally, Captain Ostrom has not only continued his treatment with me but has carried
out an alternative constructive avocation to help him keep hoping and moving while still
awaiting his rightful reinstatement as a Pilot.

Finally it is hoped that this will clarify any misinterpretation of "occupational problem"
other then that of a most remarkable but positive healthy effort on Captain Ostrom's part
to keep up the fight to regain his rightful status as a qualified Pilot.

Sincerely,

Charles B Green, Ph.D.

cc: Pt. Chart
      James R Fraser, M.D., Federal Air Surgeon; and Dr. Keith Martin, Fax:303-341-4803

# **EXHIBIT E**

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF FLORIDA
2            FORT LAUDERDALE DIVISION
                              §
3    RODNEY SCOTT PATTERSON,   §
                              §
4            Plaintiff,        §       CASE NO.:
                              §
5    Vs.                       §    1:17-cv-60533-JEM
                              §
6    AMERICAN AIRLINES, INC.,  §
     a Delaware Corporation,   §
7                              §
             Defendant.        §
8
9
     ****************************************************
10
                    ORAL DEPOSITION OF
11
                 JERAL L. AHTONE, MD
12
                   March 14th, 2018
13
     ****************************************************
14
15            ORAL DEPOSITION OF JERAL L. AHTONE, MD,
16   produced as a witness at the instance of the
17   Plaintiff, and duly sworn, was taken in the
18   above-styled and numbered cause on the 14th of
19   March, 2018, from 9:53 a.m. to 3:05 p.m., before
20   Daniel J. Skur, Notary Public and Certified
21   Shorthand Reporter in and for the State of Texas,
22   reported by stenographic means, at the offices of
23   Veritext Legal Services, 300 Throckmorton Street,
24   Suite 1600, Fort Worth, Texas, pursuant to the
25   Federal Rules of Civil Procedure.

Page 2

1               A P P E A R A N C E S

2    FOR PLAINTIFF:

3         William R. Amlong, Esq.

4         (Via Teleconference)

5         Amlong & Amlong, PA

6         500 Northeast Fourth Street

7         Second Floor

8         Fort Lauderdale, Florida 33301

9         P 954.462.1983 | F 954.463.5008

10        wramlong@theamlongfirm.com

11

12   FOR DEFENDANT:

13        Cameron Cloar-Zavaleta, Esq.

14        American Airlines, Inc.

15        4333 Amon Carter Boulevard

16        MD5675

17        Fort Worth, Texas 76155

18        P 817.963.5213

19        cameron.cloar@aa.com

20

21

22   ALSO PRESENT:

23        Noel Pace, Esq., Via Teleconference

24        Mr. Rodney Scott Patterson, Via Teleconference

25

1   correct?

2              MR. CLOAR-ZAVALETA:  Object to the form.

3       A.    No, I'm unable to determine that.

4   That's not enough information to give someone a

5   career-ending diagnosis.

6   BY MR. AMLONG:

7       Q.    Dr. Ahtone, have you, as the corporate

8   medical director of American Airlines, ever written

9   to the Federal Air Surgeon seeking a modification

10  of a pilot's first-class medical certificate?

11      A.    No.

12      Q.    Have you ever written to the Federal Air

13  Surgeon concerning Captain Brian Scott Ostrom?

14             MR. CLOAR-ZAVALETA:  Object to the form.

15      A.    Yes, I have written to him regarding

16  that pilot.

17  BY MR. AMLONG:

18      Q.    Seeking to have his first-class medical

19  certificate altered, correct?

20      A.    No, not that I recall.

21      Q.    Why did you write to the Federal Air

22  Surgeon about Captain Ostrom?

23             MR. CLOAR-ZAVALETA:  Object to the form.

24      A.    Can I just talk to Cameron one sec?

25             THE WITNESS:  Can meet with me for one

Page 62

1    sec?

2              MR. CLOAR-ZAVALETA:  No, that's okay.

3              THE WITNESS:  Okay.  This is -- I

4    haven't been given permission to talk about this.

5              MR. CLOAR-ZAVALETA:  It's okay.  Object

6    to the form.

7         A.    Okay.  The letter was written to him to

8    ask the flight surgeon to make sure that -- that

9    Mr. Ostrom had disclosed all of the things that he

10   had done in the past in regards to evaluations or

11   acts, activities, or whatever.

12   BY MR. AMLONG:

13        Q.    Did the Federal Air Surgeon take any

14   adverse action towards Captain Ostrom?

15        A.    Not --

16             MR. CLOAR-ZAVALETA:  Object to the form.

17        A.    Not to my knowledge.

18   BY MR. AMLONG:

19        Q.    Did you personally write the letter to

20   Dr. Frazer?

21             MR. CLOAR-ZAVALETA:  Object to the form.

22        A.    I had assistance with legal.

23   BY MR. AMLONG:

24        Q.    Margaret Howell?

25             MR. CLOAR-ZAVALETA:  So, again, this

Page 63

1    is -- I'm going to object on privilege.  Instruct

2    the witness not to answer.

3    BY MR. AMLONG:

4         Q.    Is Captain Ostrom still flying?

5               MR. CLOAR-ZAVALETA:  Object to the form.

6         A.    To my knowledge, he is.

7    BY MR. AMLONG:

8         Q.    Did you ever discuss First Officer

9    Patterson with Dr. Tordella?

10        A.    Yes.  I believe he called me.

11        Q.    And what -- what did Dr. Tordella say to

12   you, and how did you respond to him?

13              MR. CLOAR-ZAVALETA:  Object to the form.

14        A.    I don't remember the exact conversation.

15   It was a short conversation, but I do not remember

16   the details of the conversation other than that he

17   called me.  I wouldn't have remembered that if you

18   hadn't brought it up.

19   BY MR. AMLONG:

20        Q.    And this is Joseph R. Tordella, correct?

21        A.    Yes.  I just know him as "Joe."

22        Q.    And he's an AME?

23        A.    Yes.

24        Q.    Was he suggesting that First Officer

25   Patterson should be put back into the air?