UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE MEADOWS,

      Plaintiff,                            CASE NO. 1:17-CV-22589-EA

v.

ALLIED PILOTS ASSOCIATION, et al.

      Defendants.

_____/

**DECLARATION OF MARK MYERS**

I, Mark Myers, hereby declare and state as follows:

1. I am a resident of Texas. I am over the age of 18. This declaration is based on my personal knowledge of the facts described herein.

2. I am an attorney licensed in the state of Texas. I am also licensed in the states of California and Washington.

3. Since 2008, I have been employed as an attorney at the Allied Pilots Association (APA).

4. APA is a labor organization that has been the certified collective bargaining representative for pilots at American Airlines (American) since 1963. APA is headquartered in Fort Worth, Texas.

5. APA represents a bargaining unit composed of over 16,000 pilots employed by American.

6. Since June 2017, I have had the title of Director of Negotiations at APA. Prior to becoming the Director of Negotiations, I served as a staff attorney at APA.

7. During my tenure at APA, I have provided legal advice and representation with respect to contract negotiations and grievances (including arbitrations) between APA and American Airlines.

I have also provided legal advice to APA's Officers, Board of Directors, committees, and departments on a variety of matters.

8.    Through my experience at APA, I am knowledgeable about, among other things, APA's governance, APA's Constitution and Bylaws, APA's agreements with American Airlines, APA's practices with respect to grievances and arbitration, American's 2011 bankruptcy, and American's merger with US Airways in December 2013.

9.    As an attorney at APA, I am also familiar with Plaintiff Lawrence Meadows and his efforts to be reinstated as a pilot at American after his employment at American was terminated and he dropped from the American pilot seniority list in 2011. I have communicated with Mr. Meadows many times regarding those efforts.

10.   As an attorney at APA, I have access to files and records maintained by APA in the ordinary course of business.

### APA's Governance

11.   APA's governing document is its Constitution and Bylaws, which are amended periodically. A true and correct copy of the version of the Constitution and Bylaws that was in effect as of October 16, 2018, is attached as **Exhibit 1**. The dates that are included at the end of many of the provisions in the Constitution and Bylaws indicate when those provisions were last amended.

12.   Pilots at American are assigned to ten different geographical "bases" or "domiciles," corresponding to major hubs for the airline.

13.   Under Articles V and VI of the Constitution and Bylaws, APA's governance structure is similarly organized by domicile. Each domicile has two elected domicile representatives, a chair and vice chair. Each APA member's domicile coincides with his or her base assignment as a pilot at American. Combined, the domicile chairs and vice chairs compose APA's Board of Directors.

**APA's Collective Bargaining Relationship with American**

14.  APA and American have negotiated a series of collective-bargaining agreements (CBAs) that set out the terms and conditions of employment for pilots at American.

15.  In 2003, APA and American executed a CBA, which was in effect until January 1, 2013, when it was superseded by a new CBA. The January 1, 2013, CBA was periodically amended, and after the merger between American Airlines and U.S. Airways, the CBA was amended on January 30, 2015, to become the Joint Collective Bargaining Agreement.

16.  A true and correct copy of excerpts of the 2003 CBA is attached as **Exhibit 2.**

**Plaintiff Lawrence Meadows**

17.  According to APA's membership records, Mr. Meadows first became a member of APA in 1991.

18.  According to documents reviewed and information known to me, Mr. Meadows' employment was terminated, or alternatively, he was "administratively separated," from American in October 2011.

19.  Mr. Meadows was based in Miami at the time of his termination.

**Sick and Disability Leave under the American-APA CBA**

20.  All positions within the bargaining unit represented by APA at American are pilot positions.

21.  A pilot must possess a Federal Aviation Administration (FAA) Medical Certificate issued by an FAA authorized Aviation Medical Examiner to fly a commercial aircraft, including for American. It is APA's understanding, that American requires its pilots to obtain a First Class Medical Certificate when seeking an FAA medical certificate from an AME.

22. It is APA's understanding that every pilot position at American covered by the CBA between APA and American requires a pilot to have an FAA Medical Certificate because each pilot position covered by the CBA includes the duties of flying commercial aircraft.

23. Under the 2003 CBA, as well as under all successor CBAs, all flying at American has had to be performed by pilots whose names appeared on the American Airlines pilot seniority list, subject to certain limited exceptions.

24. If a pilot at American loses their FAA Medical Certificate, or is unable to operate under their unexpired medical certificate, or is unable to renew their medical certificate, that pilot is unable to operate and fly a commercial aircraft. A pilot in that position may take paid sick leave, unpaid sick leave, or disability leave, depending on their personal circumstances, pursuant to the terms of the CBA, until they regain their certification.

25. Section 11.D of the 2003 CBA stated that while a pilot retains and accrues seniority while on unpaid leave for sickness or injury, a "leave of absence for sickness or injury . . . may not exceed a total continuous period of five (5) years."

26. Supplement F(1)5(d) of the 2003 CBA stated that "[a] pilot shall retain and continue to accrue his seniority for the purposes of [retirement benefit calculations] only for a period of five (5) years commencing at the expiration of his paid sick leave."

27. APA and American have both taken the position over the years that these provisions permitted American to administratively separate, or terminate, the pilot who had been on unpaid sick or disability leave for more than five years as a function of the CBA and remove that pilot from the seniority list. Similar provisions appeared in predecessor CBAs as well.

28. **Exhibit 3** is a true and correct copy of a resolution passed by the APA Board of Directors in 2006. The resolution states in part that "a pilot who has been on MDSB status longer than five

4

years is removed from the AA seniority list [in accordance with] section 11.D.1 of the CBA," and "reinstating the lost seniority number of a pilot who has been on the MDSB list for more than five years would require an exception to section 11D.1 of the CBA." "MDSB" is a status code which stands for medical disability.

29. **Exhibit 4** is a true and correct copy of a resolution passed by the APA Board of Directors in 2014. It states in part that "a pilot who has been on MDSB status longer than five years is removed from the AA seniority list in accordance with Supplement F(1).5(d) of the CBA" and "reinstating the lost seniority number of a pilot who has been on the MDSB list for more than five years would require an exception to Supplement F(1).5(d) of the CBA which must be agreed upon by both the Company and APA."

30. **Exhibit 5** is a true and correct copy of a letter to Lawrence Meadows that is dated November 18, 2011, from Bennett Boggess. At the time, Mr. Boggess was an attorney in the APA legal department in the role of Director of Representation. That letter states in part that "pursuant to Section 11.D.1 of the CBA, a leave of absence for sickness or injury may not exceed five (5) years." The letter goes on to explain that American's decision to end Mr. Meadows' employment in October 2011 was permitted under this provision.

31. APA has internally referred to pilots terminated and removed from the seniority list by American after five years of unpaid sick or disability leave as Medical Disability Dropped (MDD) pilots. MDD is an internal APA status code.

32. As stated in Exhibits 4 and 5, if an MDD pilot regains their FAA Medical Certificate, APA can request, and has often requested, that American reinstate that pilot and return them to the seniority list at their prior relative seniority position.

5

33. American and APA have a shared understanding that the decision whether to reinstate a pilot who has regained their required FAA Medical Certificate is entirely within American's discretion.

34. It has been APA's practice since at least 2008 to only formally request reinstatement on behalf of pilots who had regained their FAA First Class Medical Certificates.

35. In October 2016, APA successfully negotiated a letter of agreement that eliminated the limit under Supplement F(1) of the CBA that permitted American to administratively separate and remove pilots from the seniority list after they had been on disability leave for five years. **Exhibit 6** is a true and correct copy of the October 2016 letter of agreement.

36. Over the years, a number of MDD pilots who regained their FAA First Class Medical Certificate have been reinstated to their position and placed on the seniority list; each pilot was reinstated by American on a case-by-case basis at American's discretion.

### Grievances 12-011 and 13-064

37. Under the 2003 CBA and subsequent CBAs, individual pilots or APA could file grievances asserting that American violated its contractual obligations under the CBA.

38. The procedure for resolving grievances under the 2003 CBA involved the following steps: (1) American made a decision on the grievance after an initial hearing (this step can be waived); (2) if American denied the grievance at the initial level, or if the initial level was waived,, the grievant could appeal to the Vice President of Flight at American for a decision; (3) if American denied the grievance after an appeal hearing, APA could advance the grievance to a pre-arbitration conference; (4) if the grievance could not be resolved in a pre-arbitration conference, APA could advance the grievance to arbitration before the System Board of Adjustment.

39. APA has the discretion to decide whether to advance a grievance to the pre-arbitration conference, and, ultimately, to arbitration.

40. On February 4, 2012, Plaintiff filed an individual grievance, Grievance 12-011, asserting that his "discharge" from American and removal from the pilot seniority list violated the Americans with Disability Act and the Sarbanes-Oxley Act.

41. APA advanced Grievance 12-011 through the pre-arbitration conference.

42. **Exhibit 7** is a true and correct copy of an email thread from August 2013 that included Mr. Meadows, as well as then-APA attorney Chuck Hairston. The thread included an email from a representative of American to Mr. Hairston explaining that the grievance could not be resolved at the pre-arbitration conference step.

43. **Exhibit 8** is a true and correct copy of a letter sent on August 29, 2013, by then-APA President Keith Wilson to Mr. Meadows explaining that APA determined not to advance Grievance 12-011 to arbitration before the System Board of Adjustment. At that point, APA considered Grievance 12-011 to be closed.

44. American filed for Chapter 11 bankruptcy in November 2011 in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-15453-SHL.

45. On March 7, 2014, APA filed an amended proof of claim in the American bankruptcy, a true and correct copy of which is attached as **Exhibit 9.**

46. The amended proof of claim had attached to it, as Exhibit A, a November 2012 letter of agreement between American and APA. That letter of agreement included a list of 37 grievances that the parties had agreed as of November 2012 had not been resolved as a part of a global settlement and would be preserved under APA's proof of claim (the "Excluded Claims"). That list, which was prepared as of November 2012, included Grievance 12-011.

47. The amended proof of claim filed in March 2014 stated that it "amends only the Excluded Claims," and had attached to it, as Exhibit B, an "updated list of Excluded Claims." Exhibit B was entitled "APA Legal Active Grievances as of 2/28/14," and it listed only 20 grievances, which were a subset of the grievances identified in Exhibit A. Grievance 12-011 was not included on the March 2014 list in Exhibit B.

48. **Exhibit 10** is a true and correct copy of a letter that Mr. Meadows sent to President Wilson, copied to the APA Legal Department, regarding APA's amended proof of claim on or around March 25, 2014.

49. In 2013, Plaintiff filed another individual grievance (Grievance 13-064) asserting that American violated the 2003 CBA by terminating him and removing him from the pilot seniority list after five years of disability leave.

50. **Exhibit 11** is a true and correct copy of a letter American sent to Mr. Meadows on March 26, 2014, copies to the APA Legal Department, informing Mr. Meadows American had denied his grievance because Plaintiff's removal from the seniority list complied with the CBA.

51. **Exhibit 12** is a true and correct copy of a letter sent to Mr. Meadows by President Wilson on April 23, 2014, informing Plaintiff that APA had decided not to advance Grievance 13-064 to a pre-arbitration conference.

### Grievance Processing

52. Even as to grievances that APA has decided that it will arbitrate, it is not unusual at APA for a grievance to take years to be scheduled for arbitration.

53. APA does not fully control when a grievance will be arbitrated. Per the CBA, APA and American must mutually agree to schedule a grievance for arbitration.

8

54. In any given year between 2012 and 2021, APA had an average of approximately 155 open grievances that had been filed on behalf of American pilots at different points during the year. That number does not take into account hundreds of grievances that had been filed on behalf of former US Airways pilots prior to the American Airlines and US Airways merger, and that APA inherited when it became the certified representative of those pilots in September 2014.

55. Between 2012 and 2021, APA and American scheduled for arbitration an average of approximately 11 grievances per year. In 2013 through 2015, when American was emerging from bankruptcy and its merger with U.S. Airways, the number of grievances scheduled for arbitration per year ranged from about four to six.

### Seniority List Integration

56. In 2013, while it was in bankruptcy, American agreed to merge with U.S. Airways.

57. In connection with that merger, the two airlines and the two unions representing the pilots at the airlines (APA and the U.S. Airline Pilots Association) entered into a Memorandum of Understanding (MOU) that addressed, among other things, steps the parties would take toward merging the pilot seniority lists from the two airlines. A true and correct copy of the MOU is attached as **Exhibit 13.**

58. Pursuant to a Seniority Integration Protocol Agreement ("Protocol Agreement") between the parties to the MOU, an arbitration process took place before an arbitration panel to determine the integrated seniority list. As part of that process, committees that represented the interests of the legacy pilot groups at American and US Airways exchanged seniority list information and developed integration proposals based on that information, which the committees presented to the arbitration panel. The arbitration panel, in turn, issued an award that included an integrated seniority list.

59. Per the terms of the Protocol Agreement, APA remained neutral during the arbitration process. I was responsible for facilitating the seniority integration arbitration process and communicating with the merger committees on behalf of APA.

60. **Exhibit 14** is a true and correct copy of a letter that Mr. Meadows sent APA and American on March 21, 2016, that purported to commence a grievance challenging the seniority list integration process pursuant to provisions in the MOU.

61. American and APA shared the position that individuals were not entitled to initiate grievances under the dispute resolution procedures of the MOU. APA explained that position to several pilots in writing, including Wally Preitz.

62. For that reason, APA did not initiate arbitration of a grievance under the MOU in response to Plaintiff's letter.

63. On September 6, 2016, the arbitration panel established under the Protocol Agreement issued its final award, which included the integrated seniority list.

### 2013 Equity Distribution Process

64. In 2013, APA received a large amount of equity (*i.e.*, stock) in American in connection with the settlement of its claims in American's bankruptcy proceedings.

65. APA established a committee to determine how to distribute the equity amongst pilots. I provided legal advice to the committee. The committee established a formula and methodology for the distribution of equity to pilots. The APA Board of Directors approved the equity eligibility and allocation methodology and process in April 2013. The approved eligibility and allocation methodology and equity distribution process was published to the pilot group.

66. Within the approved process, the committee also established an expedited arbitral dispute resolution procedure for pilots to raise challenges to APA's distribution formula, methodology, and

allocation determinations. Pursuant to the established process, any challenges had to be submitted to APA by May 20, 2013, to be heard at the arbitration. Pursuant to both the established process and Article III, Section 7.F. of the APA Constitution and Bylaws, pilots were required to file challenges in order to be preserve a challenge for arbitration or litigation. Challenges, if not resolved prior to arbitration between the challenger and APA, were ultimately heard and resolved in an arbitration before Arbitrator Stephen Goldberg, a member of the National Academy of Arbitrators.

67.  Mr. Meadows was one of several pilots who submitted challenges and participated in that arbitration. Plaintiff was successful with respect to his challenge, and, as a result, he received a larger equity distribution than he was originally accorded by the committee.

**Membership Status**

68.  Prior to 2016, there had been internal debate within APA about the membership status of MDD pilots who could potentially regain their FAA Medical Certificate (and thus be eligible to fly) and seek reinstatement from American.

69.  Under APA's Constitution and Bylaws, APA's president has the authority to issue written interpretations of the Constitutional and Bylaws.

70.  **Exhibit 15** is a constitutional interpretation issued by President Wilson on June 30, 2016, that found that MDD pilots were inactive members of APA.

71.  On September 27, 2016, an arbitration hearing was held before Arbitrator Edward Valverde regarding internal union disciplinary charges that Mr. Meadows had filed against President Wilson. The records pertaining to that arbitration are maintained on the members-only portion of APA's website.

72.  **Exhibit 16** is a true and correct copy of an excerpt of the transcript of the September 2016 arbitration proceeding before Arbitrator Valverde.

11

73. **Exhibit 17** is a true and correct copy of an excerpt of the post-hearing brief that Mr. Meadows submitted to Arbitrator Valverde.

74. **Exhibit 18** is a true and correct copy of the award that Arbitrator Valverde issued on January 10, 2017, in which he found that Mr. Meadows was an inactive member of APA under the Constitution and Bylaws.

75. **Exhibit 19** is a true and correct copy of an email that Mr. Meadows sent to me and others on February 25, 2017, in which he threatened to file a federal lawsuit seeking to overturn the Valverde Award. To my knowledge, Mr. Meadows never filed any such lawsuit.

76. **Exhibit 20** is a true and correct copy of a letter that then-APA President Dan Carey sent to Mr. Meadows on October 18, 2017, confirming Arbitrator Valverde's interpretation of the Constitution and Bylaws with respect to MDD pilots.

77. Under the Constitution and Bylaws, dues for APA members are assessed as a percentage of contractual pay received from American. As a result, APA members who are on unpaid leaves of absence and MDD pilots do not pay dues to APA.

78. APA maintains a password-protected website with several components. One component of APA's website is an electronic forum in which authorized users can post messages and read messages posted by others. For many years, that forum was called "Challenge and Response."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 31, 2026

Mark Myers

12

# EXHIBIT 1

# for Myers Declaration

# CONSTITUTION AND BYLAWS



HOME OFFICE
14600 Trinity Blvd., Suite 500
Ft. Worth, TX  76155-2512
(817) 302-2272

Ratified and Approved by
Allied Pilots Association Membership
November 26, 1963

Amendment #85
Effective: August 19, 2018

APA_000002211

## CHANGES MADE TO THE CONSTITUTION AND BYLAWS SINCE LAST AMENDMENT

| ARTICLE / SECTION | PAGE NUMBER | ACTION | CONTENT | RESOLUTION NUMBER | RESOLUTION ADOPTED |
|---|---|---|---|---|---|
| IV.8.C.2 | 15 | Insert new language | Requires restrictions placed on viewing books and records of the Association to be reported to the BOD, with the reason for the restriction. | R2018-20 Rev 1 | 5/7/2018 |
| | | | | | |

This Constitution and Bylaws, Amendment #85, is effective August 19, 2018.

Certified by:  ____/s/_____    Date:  _August 19, 2018_____
               CA Pam Torell, Secretary-Treasurer

APA Seal



i

APA_000002212

## PREAMBLE

This Constitution and Bylaws of the Allied Pilots Association is hereinafter set forth to provide the mechanism whereby the collective and individual rights of the pilots in the APA are safeguarded through a formula for sound leadership and, at the same time, retention of control of the APA by the membership.

## AMENDMENT DATES

| | | |
|---|---|---|
| September 23, 1964 | January 26, 1995 | |
| March 16, 1966 | June 29, 1995 | February 28, 2008 |
| April 22, 1970 | October 22, 1995 | February 12, 2009 |
| May 1, 1972 | January 24, 1996 | May 28, 2009 |
| October 18, 1974 | January 31, 1998 | January 1, 2010 |
| October 31, 1975 | May 17, 1998 | January 3, 2010 |
| April 20, 1979 | June 1, 1998 | December 25, 2010 |
| October 3, 1979 | August 7, 1998 | June 26, 2011 |
| March 20, 1981 | October 14, 1998 | March 7, 2012 |
| April 28, 1981 | February 25, 1999 | June 16, 2012 |
| September 13, 1982 | October 31, 1999 | March 8, 2013 |
| March 22, 1983 | January 22, 2000 | April 27, 2013 |
| March 19, 1987 | May 4, 2000 | June 27, 2013 |
| September 18, 1987 | July 21, 2000 | October 11, 2013 |
| December 4, 1987 | September 29, 2000 | November 20, 2013 |
| March 17, 1989 | February 16, 2001 | April 24, 2014 |
| April 5, 1989 | May 20, 2001 | August 2, 2014 |
| September 20, 1989 | July 13, 2001* | December 26, 2014 |
| March 20, 1990 | March 19, 2002 | September 15, 2016 |
| February 27, 1991 | May 18, 2002 | December 14, 2016 |
| March 26, 1991 | November 8, 2002 | March 23, 2017 |
| July 3, 1991 | April 16, 2003 | August 19, 2018 |
| September 24, 1991 | May 18, 2003 | |
| January 23, 1992 | November 20, 2003 | |
| April 24, 1992 | February 7, 2004 | |
| July 1, 1992 | June 12, 2004 | |
| July 24, 1992 | November 18, 2004 | |
| December 29, 1992 | February 12, 2005 | |
| February 7, 1993 | May 6, 2005 | |
| June 16, 1993 | July 26, 2005 | |
| October 26, 1993 | November 2, 2005 | |
| March 27, 1994 | June 7, 2006 | |
| June 9, 1994 | May 11, 2007 | |
| | November 9, 2007 | |

*Rewrite – effective immediately

ii

APA_000002213

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................................... 1
ARTICLE I         GENERAL ........................................................................................................... 2
    SECTION 1.      NAME ............................................................................................................. 2
    SECTION 2.      HOME OFFICE LOCATION ............................................................................. 2
    SECTION 3.      DURATION ..................................................................................................... 2
    SECTION 4.      GOVERNMENT ............................................................................................... 2
    SECTION 5.      GOVERNING BODIES ...................................................................................... 3
    SECTION 6.      PARLIAMENTARY LAW AND RULES OF ORDER ............................................. 3
    SECTION 7.      FISCAL YEAR ................................................................................................. 3
    SECTION 8.      AUTHORIZATION OF MONETARY OBLIGATIONS ............................................ 3
    SECTION 9.      SEAL .............................................................................................................. 4
    SECTION 10.     SENIORITY DEFENSE FUND ........................................................................... 4
ARTICLE II        OBJECTIVES AND RIGHTS OF APA ................................................................ 4
ARTICLE III       MEMBERSHIP .................................................................................................... 6
    SECTION 1.      QUALIFICATIONS ........................................................................................... 6
    SECTION 2.      CLASSES OF MEMBERSHIP ............................................................................ 6
    SECTION 3.      APPLICATION AND APPROVAL FOR MEMBERSHIP .......................................... 7
    SECTION 4.      MEMBERSHIP CREDENTIALS .......................................................................... 7
    SECTION 5.      MEMBERSHIP STATUS .................................................................................... 8
    SECTION 6.      DUES ............................................................................................................. 8
    SECTION 7.      MEMBERSHIP RIGHTS AND OBLIGATIONS ................................................... 10
ARTICLE IV        NATIONAL OFFICERS ...................................................................................... 11
    SECTION 1.      OFFICERS DEFINED ...................................................................................... 11
    SECTION 2.      ELIGIBILITY ................................................................................................. 11
    SECTION 3.      SALARY ....................................................................................................... 11
    SECTION 4.      NOMINATIONS FOR NATIONAL OFFICE ........................................................ 11
    SECTION 5.      NATIONAL OFFICE ELECTION PROCEDURES ................................................ 12
    SECTION 6.      ELECTION APPEALS ..................................................................................... 13
    SECTION 7.      TERMS OF NATIONAL OFFICE AND VACANCIES ........................................... 13
    SECTION 8.      DUTIES OF NATIONAL OFFICERS .................................................................. 14
    SECTION 9.      RECALL OF OFFICERS .................................................................................. 15
ARTICLE V         BOARD OF DIRECTORS .................................................................................. 15
    SECTION 1.      AUTHORITY OF THE BOARD ........................................................................ 15
    SECTION 2.      REPRESENTATION ........................................................................................ 16
    SECTION 3.      MEETINGS ................................................................................................... 16
    SECTION 4.      VOTING ....................................................................................................... 16
    SECTION 5.      QUORUM ..................................................................................................... 17
ARTICLE VI        DOMICILES ...................................................................................................... 17
    SECTION 1.      OFFICERS DEFINED ...................................................................................... 17
    SECTION 2.      ELIGIBILITY ................................................................................................. 17
    SECTION 3.      DOMICILE NOMINATIONS AND ELECTIONS ................................................. 17
    SECTION 4.      SCHEDULE OF DOMICILE ELECTIONS, TERMS OF OFFICE, AND VACANCIES ... 19
    SECTION 5.      ELECTION APPEALS ..................................................................................... 20
    SECTION 6.      DUTIES OF DOMICILE OFFICERS .................................................................. 20
    SECTION 7.      RECALL OF DOMICILE OFFICERS ................................................................. 20
ARTICLE VII       HEARING AND DISCIPLINARY PROCEDURES .............................................. 20
ARTICLE VIII      EXPENSES ........................................................................................................ 24
ARTICLE IX        BONDING AND INDEMNIFICATION ............................................................... 24
    SECTION 1.      BONDING ..................................................................................................... 24
    SECTION 2.      INDEMNIFICATION ....................................................................................... 24
ARTICLE X         CONFLICTS OF INTEREST .............................................................................. 25
ARTICLE XI        COMMITTEES .................................................................................................. 27
ARTICLE XII       NEGOTIATIONS AND AGREEMENTS ............................................................. 28
ARTICLE XIII      AMENDMENTS ................................................................................................ 29
APPENDIX A ................................................................................................................................... 31
APPENDIX (B1) .............................................................................................................................. 33
APPENDIX (B2) .............................................................................................................................. 34
INDEX ........................................................................................................................................... 35

APA_000002214

## ARTICLE I   GENERAL

### Section 1.   Name

The name of the organization shall be the ALLIED PILOTS ASSOCIATION.  Whenever the term "APA" is used, it shall refer to and mean the ALLIED PILOTS ASSOCIATION.

### Section 2.   Home Office Location

The general office and headquarters of the APA shall be at 14600 Trinity Boulevard, Suite 500, Ft. Worth, Texas 76155-2512. *(10/14/98)*  The headquarters may be changed by action of the Board of Directors in accordance with the applicable provisions of this Constitution and Bylaws.  *(On 4/22/70 location changed from New York, New York to Arlington, Texas; on 9/22/87 moved from Arlington, Texas to Grand Prairie, Texas; on November 9, 1998 moved from Grand Prairie, Texas to Fort Worth, Texas.)*

### Section 3.   Duration

A.   The duration of the APA shall be perpetual, or until it is dissolved as provided for in the Constitution and Bylaws.  In the event of dissolution of the APA, the officers of the Association shall act as agents for the membership and dispose of all of the physical assets of the APA by suitable means.  All of the liquid assets shall then be prorated to the active members on record in good standing of the APA at the time of such dissolution in proportion to the monies then being paid by such members, less any indebtedness; provided that any amounts that may be paid to the APA for insurance or other benefits shall be dealt with separately and prorated only to those members who contributed to such funds, and in proportion to their individual contributions.

B.   APA may also be dissolved through an affiliation or merger pursuant to a representation vote conducted by the National Mediation Board under the Railway Labor Act or pursuant to Article XII, Section D.   Until such time as the NMB requires an election or the Board of Directors decides affirmatively through a two-thirds (2/3) vote to pursue an affiliation or merger, APA money or property may not be used to encourage or facilitate such affiliation or merger.  *(02/07/2004)*

### Section 4.   Government

A.   This Constitution and Bylaws shall be the supreme law of APA.  This Constitution and Bylaws establishes APA as a two-tiered labor organization consisting of domiciles and a national union. As set forth in, and only insofar as consistent with, this Constitution and Bylaws, the National Officers direct the day-to-day affairs of APA subject to review and direction by the Board of Directors, which has the authority to alter, amend and add to this Constitution and Bylaws. As such, the Board of Directors has the legal authority of a constitutional convention as a result of the authority set forth in Article XIII.  *(09/15/2010)*

B.   The Board of Directors shall approve a Policy Manual for the Allied Pilots Association which will provide the mechanism whereby the collective and individual rights of the pilots in the APA are safeguarded through a formula for sound leadership and, at the same time, retention of control of the APA by the membership.  All Association officers, committee members, agents, and employees are obligated to be aware of, understand, and conduct themselves consistent with the policies contained therein.  The policies contained therein apply to the Board of Directors, even when the Board is in

APA_000002215

session. The Board of Directors does have the authority to alter the Policy Manual at any time or to deviate from the Policy Manual according to the following standards:

1.   The Board may vote, by simple majority, to take an action (or actions) that either explicitly or implicitly deviate(s) from the Policy Manual. *(6/07/2006)*
2.   The Board may vote, by a two-thirds (2/3) majority, to make a permanent change to the Policy Manual. *(06/07/2006)*

At any time the Board takes either of the above actions, the membership will be informed within 24 hours using the APA Information Hotline. Such notice will describe the nature of the change or the deviation. Further, the specific substance of the change or deviation will be made electronically available within seven (7) days. *(09/29/2000*

## Section 5.   Governing Bodies

The governmental powers of the APA shall be vested in the Board of Directors and the National Officers in accordance with the laws provided herein. The final control of the APA shall be vested in the membership.

## Section 6.   Parliamentary Law and Rules of Order

All questions on parliamentary law and rules of order which are not provided for in the Constitution and Bylaws or Policy Manual shall be decided according to the principles set forth in the current *Robert's Rules of Order*. *(06/12/2004)*

## Section 7.   Fiscal Year

The fiscal year of the Association shall be from July 1 to the following June 30.

## Section 8.   Authorization of Monetary Obligations

All bills payable, notes, checks or other negotiable instruments of APA shall be made in the name of the APA and shall be signed by one of the following four persons: APA President, APA Vice President, APA Secretary-Treasurer, or APA Director of Finance. Other than regularly occurring payroll checks, all bills payable, notes, checks or other negotiable instruments of APA in excess of $5,000 shall require two of these signatures to lawfully authorize the payment. The Secretary-Treasurer should be the second signatory on all checks over $5,000. Under normal circumstances, the President may delegate his check signing responsibilities to the Director of Finance. The President shall be provided each month a summary of non-recurring checks issued in amounts greater than $5,000. The President, Secretary-Treasurer, or APA Director of Finance may each, from time to time, transfer such sums of money to administrative accounts, including payroll accounts, petty cash accounts, and such other accounts as may be necessary to meet administrative and current obligations of the Association, and the President and Secretary-Treasurer may each designate a surrogate, who shall be bonded in an amount consistent with the amount of funds over which he may have control, to sign checks for and draw upon such administrative accounts. No officer, agent, or employee of the APA acting singly or jointly with others shall have the power to make any bills payable, notes, checks, drafts, warrants, or negotiable instruments of any description or nature or endorse the same in the name of the APA or contract or cause to be contracted any debt or liability in the name of or on behalf of the APA except as expressly prescribed and provided in this Constitution and Bylaws. *(06/12/2004)*

APA_000002216

**Section 9.      Seal**

The official Seal of the Allied Pilots Association shall be:   *(02/06/98)*



The official Logo of the Allied Pilots Association shall be: *(02/06/98)*



**Section 10.     Seniority Defense Fund**

The Trust Agreement of the Allied Pilots Association Seniority Defense Fund shall not be under the legal control of the Allied Pilots Association as of the Irrevocability Date that is set forth and defined in the Trust Agreement.  If the Fund is still in existence on the Irrevocability Date, the Directors of that Fund shall have exclusive authority over those funds pursuant to the terms of the Trust Agreement. *(02/28/2008)*

**ARTICLE II      OBJECTIVES AND RIGHTS OF APA**

A.      To operate a non-profit employee-representing association, a labor union. *(03/29/2002)*

B.      To protect the individual and collective rights of the members of the APA and to promote their professional interests, including timely prosecution of individual and collective grievances.

C.      To establish and to exercise the right of collective bargaining for the purpose of making and maintaining employment agreements covering rates of pay, rules, and working conditions for the members of the APA and to settle promptly disputes and grievances which may arise between such members and their employer. APA maintains the right to resolve institutional

APA_000002217

and individual grievances in its sole discretion as the collective bargaining representative of the pilots. *(11/20/2003)*

D.    To determine and negotiate and to continue to improve the rates of compensation, benefits, pensions, hours of employment and working conditions, and to maintain uniform principles of seniority and the perpetuation thereof.

E.    To achieve full retroactivity and full pensionability for all improvements in pay from the amendable date of the previous agreement through the date of signing of a new agreement.

F.    To sponsor and support the passage of legislation and appropriate regulations affecting membership and the industry which may be beneficial to the profession or to the industry.

G.    To safeguard with ceaseless vigilance, the safety of scheduled air transportation in recognition of the high degree of public trust, confidence and responsibility placed on the members. *(10/31/99)*

H.    To further scheduling with safety in any practical manner. *(10/31/99)*

I.    To disseminate information in any manner to enhance the professional status of the membership and to ensure a fully informed membership.  A fundamental principle of APA's ability to effectively represent the interests of its membership is protecting APA's right to communicate with the membership without restriction or outside approvals.  Therefore, no APA officer, committee member or staff employee shall agree to or participate in a communications "blackout" or other restriction of the flow of information from APA to the membership including proposals presented by APA or management during negotiations.

J.    To levy dues and assessments upon the membership with which to provide the funds necessary to carry on the business and objectives of the Association.

K.    To purchase, hold, acquire, lease, mortgage, and convey real estate and personal property of every kind, nature, and description, in any state, the District of Columbia, and any territory or possession of the United States, for the convenient conduct and execution of the Association's business, including the purchasing, leasing, and maintaining of equipment, buildings, and improvements which may be necessary, directly or indirectly, in connection with any of the business and objects of the Association.

L.    To maintain Mutual Aid Plans. *(01/04/87)*

M.    To exchange views and information with other U.S. and international pilot organizations and to cooperate on issues where a mutual benefit is possible, such as safety, collective bargaining, legislative and regulatory matters. *(09/29/2000)*

N.    To do any and all other acts consistent with and in furtherance of the objectives and purposes set forth in this Constitution and Bylaws, including the establishment of such legal entities as necessary to carry out the legitimate objectives and purposes of the Association. *(10/14/98)*

APA_000002218

## ARTICLE III   MEMBERSHIP

### Section 1.   Qualifications

A.   Any person of lawful age and of good moral character who is qualified as a flight deck operating crew member with American Airlines, Inc., who is accruing seniority, furloughed, or on a leave of absence, except for pilots who are employed by American Airlines in a management position for which total compensation is not defined by the collective bargaining agreement; shall be eligible for membership in the APA as hereinafter provided. *(02/28/2008)*

B.   No one except honorary members shall be permitted a membership who is not a holder of a certificate or license required for a flight deck operating crew member's position on an American Airlines' operation. *(06/07/2006)*

C.   No one shall be admitted for membership who has willfully acted as a strikebreaker pilot, or scab pilot, or who has secured or attempted to secure employment rights as a scab pilot during any duly authorized pilot strike. *(09/24/91)*

### Section 2.   Classes of Membership

A.   Apprentice membership shall be assigned to a probationary flight deck operating crew member upon application and approval by his Domicile Chairman.  Apprentice membership shall terminate upon completion of such member's probationary period. *(02/25/99)*

B.   Active membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. *(02/25/99)*

C.   Inactive Membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval.  Pilots in the following employment statuses shall be eligible for inactive membership: *(06/07/2006)*

1.   Furlough
2.   Medical or Personal Leave of Absence
3.   Military Leave of Absence
4.   Pilots not on active flying status with AA concurrently owing back dues. *(02/28/2008)*

Inactive Member.  A member in good standing shall automatically be transferred to inactive membership status upon: *(02/25/99)*

1.   Being furloughed by the Company.
2.   Being on leave of absence from the Company twelve (12) months after the expiration of paid sick leave, or *(02/07/2004)*
3.   Being in the United States military forces on continuous active duty in excess of sixty (60) months. *(02/28/2008)*
4.   When that pilot is not on active flying status with AA and that pilot owes back dues, that pilot will remain on inactive membership status until he/she returns to work at AA.  At that time,

APA_000002219

he/she will resume payment of back dues and will be returned to active membership. *(02/28/2008)*

D.     Honorary membership may be conferred upon any individual by action of the Board of Directors.

## Section 3.     Application and Approval for Membership

A.     All applications for membership shall be on a standard form provided by the Secretary-Treasurer. *(11/20/2013)*

B.     Applicants for membership shall be investigated by the Membership Committee.  *(06/07/2006)*

C.     Following investigation, each application for membership shall be sent to the respective Chairman and Vice Chairman of the Domicile, which has jurisdiction over the application.  The application for membership shall be approved by the members of the Domicile which has jurisdiction over the application. Such approval shall either take place by membership vote at the next regularly convened Domicile meeting or, at the discretion of the Domicile Chair, via email from the respective Domicile Chair.  In the event the next Domicile meeting is more than 45 days from the date of application or if a vote was not conducted within 45 days of the date of application, the approval shall take place via email from the respective Domicile Chair.  When approval is conducted via email, the email shall be sent to the email address on file at APA for Domicile members eligible to vote and shall present the application(s) and solicit objections. Upon receipt of the email, Domicile members eligible to vote will have 14 days to respond to the Domicile Chair objecting to an application.  An objection, which is sent to the Secretary-Treasurer, Domicile Chair, and Domicile Vice-Chair must state the reason(s) the member feels a particular applicant should be denied membership.  Upon receipt of an objection, the Domicile Chair or Vice-Chair shall confirm that the email was sent by a Domicile member who is eligible to vote.  Applications which do not receive any objections during the 14 days will be considered approved by the membership.  Applications which receive an objection during the 14 days will be presented and voted on at a regularly scheduled domicile meeting.  An applicant for membership must receive an approval of the majority of those present at the meeting in order to be admitted into membership. *(11/20/2013)*

D.     If an application is not approved by a majority of the membership, the applicant must wait for a period of six (6) months before reapplying for membership.

E.     All former members of APA, regardless of whether they voluntarily resigned their membership or were expelled from membership, shall not be accepted into active or inactive membership unless they follow all the procedures outlined in this Section. *(06/07/2006)*

## Section 4.     Membership Credentials

Every active member of the APA in good standing shall receive a membership card.  The card shall contain thereon the name of the member, and such additional information as may be deemed appropriate and shall be signed by the Secretary-Treasurer of the APA and shall bear the APA seal.  Honorary members, apprentice members, retired members, and inactive members shall receive special membership cards which shall contain thereon the name of the member, and such additional information as may be appropriate and shall be signed by the Secretary-Treasurer and bear the APA seal.

APA_000002220

**Section 5.        Membership Status**

A.     A member who accepts a management position for American Airlines for which total compensation is not defined by the collective bargaining agreement will become a nonmember upon assuming that management position. All current Executive Members, as of the 100 day abeyance period of this Constitution and Bylaws amendment (06/07/2008), shall become non members. *(02/28/2008)*

B.     Except as provided in A above, a member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association.  The Secretary-Treasurer shall transfer a member from good to bad standing if such member shall be delinquent in either dues, assessments or other financial obligations due to the Association.  A member will be placed in inactive membership status by the APA Secretary-Treasurer when that member owes back dues and is not on active flying status. *(03/18/2011)*

C.     Only members in good standing shall have the right to vote on matters brought before the membership.  The number of members in good standing of a domicile shall be determined at the time of the commencement of the meeting. *(02/25/99)*

D.     A member shall be returned to good standing upon the payment of all back dues, assessments, and penalties owing.  Any reinstated member may be required to satisfy medical underwriting standards and pay costs associated with reinstatement to any APA benefits program. *(03/27/94)*

E.     When a member is in bad standing for six (6) consecutive months the Secretary-Treasurer shall notify such member that unless he pays or makes arrangements to pay all back dues, assessments, and penalties within thirty (30) days he shall be automatically expelled.

F.     The Secretary-Treasurer shall keep an account for all members in good standing, members in bad standing, non-members, retired members, inactive members, etc.  When an inactive member returns to active line flying his account will be reactivated and all new dues and assessments will be charged from the day of his return to line flying. *(02/28/2008)*

G.     Any pilot desiring to terminate his or her membership with the Association must provide notification of such intent in writing by certified mail to the Secretary-Treasurer of the Association. *(05/18/2002)*

**Section 6.      Dues**

A.     A member's obligation for dues and assessments shall commence as of the date of the member's eligibility for active membership.  Active members shall be required to pay dues by employer dues check-off.  Members shall pay dues at the rate of one percent (1%) on current monthly income.  Dues at the rate in effect at the time any such payments are received by the member shall be collected on all contractual pay, including Variable Compensation, cash bonuses, and cash profit sharing.  An exception to this will be all non-cash compensation. *(10/23/97)*

B.     It shall be the duty of the Board of Directors to conduct an annual review of the dues structure of the Association, to determine if the dues structure should be revised.  The meeting at which this annual review occurs, or any Board meeting at which a dues revision occurs, shall be considered an APA convention. *(02/28/2008)*

APA_000002221

C.      Dues and assessments not paid on the established due date shall be subject to a ten percent (10%) penalty. Any member who does not pay dues, assessments, and penalties shall be placed in bad standing. *(06/09/94)*

D.      Initiation fees and dues will be collected by the Secretary-Treasurer and a record of each member's dues payment history will be maintained.

     1.      Initiation fees and dues for pilots hired by the Company:

         a.      A probationary pilot who applies for membership will not begin paying dues until he or she becomes an active member; however:

             (1)      A probationary pilot who applies for membership during the first ninety (90) days after his or her date of employment will not pay an initiation fee;

             (2)      A probationary pilot who applies for membership after the first ninety (90) days after his or her date of employment will pay a $25.00 initiation fee.

         b.      A pilot who applies for membership after completing a probationary period shall pay a $25.00 initiation fee and begin paying dues as soon as his or her membership application is approved. He or she shall also be required to pay back dues to the date that he or she became eligible to be an active member plus a ten percent (10%) penalty.

     2.      Initiation fees and dues for pilots who become an employee of the Company as a result of an acquisition and Eagle Flow Through pilots:

         a.      A pilot who applies for membership within ninety (90) days of the date that APA becomes his or her collective bargaining representative will not pay an initiation fee. Dues commence upon approval of the membership application.

         b.      A pilot who applies for membership more than ninety (90) days after the date that APA becomes his or her collective bargaining representative shall pay a $25.00 initiation fee; however, an Eagle Flow Through pilot who had been an APA member in the past is not required to pay an initiation fee. Back dues will be collected from the date APA becomes his or her collective bargaining representative plus a ten percent (10%) penalty.

     3.      In any other circumstance in which a pilot becomes employed by the Company other than those listed in E.1 and E.2 above, APA's Board of Directors shall determine whether the initiation fee should be charged and when the dues obligations shall commence.

     4.      Dues are an obligation of the members of the Association. The Board of Directors must approve any waiver of initiation fees, penalties and or back dues and this will be reported in the official minutes of the Board of Director's meeting. *(02/28/2008) (Paragraphs E.1 & E.2 replaced and E.3 & E.4 added 01/22/2000)*

E.      Starting the earlier of six (6) months prior to the date set forth as an Early Reopener or, in the absence of an Early Reopener, *(02/07/2004)* the Amendable date of a current Basic Collective Bargaining

APA_000002222

Agreement, all APA members covered by that agreement shall pay an additional one-half percent (1/2%) dues for expenses directly related to obtaining such agreement. These additional dues shall be accounted for separately, shall be used for expenses incurred after the effective date of additional one-half percent (1/2%) dues, and shall be used only for expenses specifically related to negotiations for that specific Basic Agreement that are above and beyond the normal level of recurring expenses. The APA Board of Directors shall be provided a detailed accounting of receipts and expenditures of the additional dues at each Board meeting, and the Board shall have final authority to decide whether such expenditures should be paid from the additional dues or from the Association's regular dues.

F.      The collection of one-half percent (1/2%) additional dues from the respective members shall cease after a new Basic Collective Bargaining Agreement is ratified and all related arbitrations and other litigation resulting from negotiating the new Basic Collective Bargaining Agreement have been concluded and all such expenses have been paid, or sooner if approved by the Board of Directors. All remaining funds from the additional dues shall be refunded and/or rebated to the respective members as soon as practicable, according to a formula approved by the Board of Directors. *(10/26/93)*

G.      In the event of a bankruptcy by the Company or its parent, and in the event that the one-half percent (½%) dues provided for in Section 6 G. is not being charged at the time of the bankruptcy, all APA members shall pay an additional one-half percent (½%) dues for the expenses related to the bankruptcy proceeding and any related negotiations beginning with the first day of the next pay period following the date of the bankruptcy filing. The APA Board of Directors shall have final authority to decide which expenses are attributable to the bankruptcy and related negotiations and which expenses shall be paid from the Association's regular dues. Moreover, the Board of Directors shall decide when the collection of this one-half percent (1/2%) shall cease and, in the event that more than sufficient funds have been collected to cover the expenses related to a bankruptcy proceeding and the related negotiations, the Board of Directors shall have the discretion to decide the timing and manner in which these funds shall be refunded or rebated to the respective members. *(05/18/2003)*

H.      Assessments may be levied on all members to provide for extraordinary expenses, contingencies, and reserves, provided such assessments are first approved by a two-thirds (2/3) vote of the Board of Directors and ratified by a majority vote of the members voting in a membership vote on the question.

## Section 7.     Membership Rights and Obligations

A.      A member in good standing is entitled to participate actively in all APA activities and is entitled to all of the rights, privileges, and benefits of membership in the APA.

B.      Apprentice and inactive members shall enjoy all the benefits of active membership except the privileges of voting, holding elected office, and participation in Association sponsored programs where specific requirements prohibit such participation. *(10/18/74)*

C.      A member in bad standing shall not have the right to vote, hold office, nor participate in any of the privileges or benefits of active membership, provided, however, that a member's continued participation in an Association-sponsored benefit program shall not be terminated as a result of bad standing membership. *(11/09/2007)*

APA_000002223

D.      Voting on matters presented at a domicile meeting shall be restricted to active members in good standing currently occupying a bid status at that domicile. *(02/07/93)*

E.      Members of the Association shall accept and agree to abide by the Constitution and Bylaws of the APA as they are in force or as they may be amended, changed, or modified in accordance with the provisions of this Constitution and Bylaws.

F.      In the event that the Association has discretion to distribute a lump sum payment ("Lump Sum Payment"), which shall be defined by the Board in the Lump Sum Dispute Resolution Procedure, any pilot or group of pilots who wishes to challenge the distribution shall be required to exhaust the Lump Sum Dispute Resolution Procedure. No pilot or group of pilots may take legal action against the Association with respect to any matter that could be addressed in the Lump Sum Dispute Resolution Procedure unless this particular Procedure has been invoked and exhausted by the pilot or group of pilots. *(11/28/12)*

## ARTICLE IV    NATIONAL OFFICERS

**Section 1.    Officers Defined**

The National Officers shall be the President, Vice President, and Secretary-Treasurer.

**Section 2.    Eligibility**

Only active members in good standing shall be eligible for nomination and election to National office. A National Officer who retires during a term of office shall vacate that office automatically upon retirement. Any National Officer who is ordered to Active Duty service in the United States military in excess of 90 consecutive days or more than 120 days in any twelve month period will be required to resign his/her office and the vacancy filled in accordance with Article IV, Section 7. *(06/12/2004)*

**Section 3.    Salary**

The salary of the President, Vice President, and Secretary-Treasurer shall be as determined by the Board of Directors.

**Section 4.    Nominations for National Office**

A.      Any active member in good standing shall be eligible to hold any national office. *(09/24/91)*

B.      No more than six (6) months prior to the date of the National Officer Election, the Secretary-Treasurer shall establish a schedule for the upcoming election. The notice of nomination and election, which shall include an election schedule and examples of the electronic nomination submission form, the electronic statement of willingness to serve, and the electronic Conflict of Interest Disclosure Form contained in Appendix (B1) of this Constitution, shall be posted on the Association website, mailed to the address of record and e-mailed to the e-mail address of record of each member in good standing. *(10/11/2013, 06/07/2016)*

C.      Any active member in good standing may submit him or herself or any other active member in good standing for nomination for the office of President, Vice President, or Secretary-Treasurer.

APA_000002224

Submissions shall be made using the on-line nomination form as indicated in the election notice. Submissions for nomination must be received by the deadline published in the election notice, and will be posted to the APA website upon receipt. All persons submitted for nomination shall be immediately notified via mail, phone, and email, and shall have 7 days from the closing of the submission period to execute a statement, in a form provided by the Secretary-Treasurer, that he or she will serve if elected. The person must also execute the Conflict of Interest Disclosure Form C&B Appendix (B1). These acceptance forms shall be posted on the Association website in such a manner as to allow a member to execute them electronically. A member submitted for nomination may withdraw from consideration for nomination at any time prior to the date voting commences by notifying the Secretary-Treasurer by facsimile; certified mail, return receipt requested; or e-mail as indicated in the acceptance forms. *(06/07/2016)*

D.      The Secretary-Treasurer shall cause to be distributed to each active member in good standing a list of persons willing to be considered for nomination. Each member may vote for one (1) person for each office from the list of names provided by the Secretary-Treasurer. An independent disinterested third party shall be responsible for the counting of the nomination ballots. *(02/16/2001)*

E.      The three (3) persons who receive the most votes at each domicile for each office shall be considered nominated, and the Secretary-Treasurer shall include their names on the official ballot in alphabetical order. In the event of a tie for the third place, the tied candidates shall be included on the ballot. *(01/23/92)* If nominated, a member may withdraw his or her nomination at any time prior to the date election voting commences by notifying the Secretary-Treasurer by facsimile; certified mail, return receipt requested; or e-mail as indicated in the election notice. *(06/07/2016)*

**Section 5.      National Office Election Procedures**

A.      Subject to the supervision of the Secretary-Treasurer, the independent disinterested third party designated pursuant to Section 4.D. shall also be responsible for the distribution, collection, and counting of the election ballots. The official ballot shall be distributed to all members no less than twenty-one (21) days prior to the date of the vote count. *(05/03/2005)*

B.      The most current Status 1 List shall be used to determine the eligibility of a member to vote in the election. *(06/16/93)*

C.      Each ballot and each vote on the ballot cast by an active member in good standing shall be counted provided that the independent third party is able to determine the intention of the voter with sufficient accuracy. Blank ballots and write-in votes shall not be counted. Decisions on whether or how to count a particular ballot or ballots shall be resolved conclusively by the independent third party. *(01/23/92)*

D.      Each candidate is permitted to have an observer at each phase of the election process, subject to the independent third party's policies. The candidate and any active member in good standing designated by the candidate shall be eligible to act as an observer. *(02/16/2001)*

E.      The candidate who receives the majority of votes cast for each office shall be deemed elected to that office. The determination of a majority shall be made with respect to each office following the vote count. *(01/23/92)*

APA_000002225

F.    In the event that no candidate receives a majority of votes cast for a particular office, the Secretary-Treasurer shall cause a runoff election to be concluded within sixty (60) days of the prior vote count. The ballot in the runoff election shall be limited to the two (2) candidates who received the greatest number of votes.  In the event of a tie in a runoff election, one (1) candidate shall be eliminated by the drawing of lots. *(01/23/92)*

## Section 6.    Election Appeals

The Article VII Appeal Board shall also serve as the Association's internal election appeal body.  The Appeal Board shall consider all complaints, protests, or appeal concerning APA elections received via certified mail, return receipt requested, in writing from any member in good standing provided they have been received by the Appeal Board, in care of the APA Legal Department, postmarked within ten (10) business days after the later of the completion of the election or the run-off election. Receipt at the APA Legal Department constitutes receipt by the Appeal Board.  Complaints may not be filed prior to the conclusion of an election.  The Appeal Board shall issue its written decision as soon as practicable within sixty (60) days from receipt of a written complaint and the election complaint, the Appeal Board decision, and any subsequent decision by the Department of Labor shall be matters of public record available to members of the Association.  The Appeal Board shall issue its written finding or decision as soon as practicable within sixty (60) days of receipt of a written protest, complaint, or appeal. *(02/26/2005)*

## Section 7.    Terms of National Office and Vacancies

A.    Effective with the election of the National Officers for the term beginning July 2001, the term of office for the President, Vice President, and Secretary-Treasurer shall be three (3) years and shall commence on the first day of July, and continue for three (3) years or until he or she is re-elected or a successor has been elected and assumes office in accordance with this Constitution and Bylaws. *(09/29/2000)*

B.    If the results of a runoff election are announced after the first day of July in an election year, the person elected shall assume office immediately.  No person may serve more than two (2) consecutive terms (not including partial terms) in the same National Officer position (i.e., President, Vice President, Secretary-Treasurer) after July 1, 1994.  Terms served before July 1, 1994 shall not be considered part of the two (2) consecutive term limit. *(02/07/2004)*

C.    In the event of a vacancy in the office of the President, and if the unexpired term is twelve (12) months or less, the Board of Directors, by majority on a one director, one vote basis, shall elect a President.  If the unexpired term is more than twelve (12) months, the Board of Directors, by majority on a one director, one vote basis, shall elect a President pro tem to serve until an election can be held to fill the vacancy. *(02/12/2009)*

D.    In the event of a vacancy in the office of Vice President, and if the unexpired term is twelve (12) months or less, the Board of Directors, by majority on a one director, one vote basis, shall elect a Vice President.  If the unexpired term is more than twelve (12) months the Board of Directors, by majority on a one director, one vote basis, shall elect a Vice President pro tem to serve until an election can be held to fill the vacancy. *(02/12/2009)*

E.    In the event of a vacancy in the office of Secretary-Treasurer and if the unexpired term is twelve (12) months or less, the Board of Directors, by majority on a one director, one vote basis, shall elect a

APA_000002226

Secretary Treasurer.  If the unexpired term is more than twelve (12) months, the Board of Directors shall, by majority on a one director, one vote basis, elect a Secretary-Treasurer pro tem to serve until an election can be held to fill the vacancy. *(02/12/2009)*

**Section 8.      Duties of National Officers**

A.      President

The President shall conduct the affairs of APA consistent with this Constitution and Bylaws and with the policy and directives set by the Board of Directors. While the President's actions are subject to review by the Board of Directors, the President's actions shall be presumed valid unless the Board of Directors elects to review and disapprove a particular action taken by the President. Such review and disapproval, however, may be taken at any time, and the President shall have the responsibility of keeping the Board of Directors informed about actions taken by him pursuant to this Article IV, Section 8. *(09/15/2010)*

1.      The President shall notify the national and domicile officers of all regular and special meetings of the Board. The President shall appoint and remove, employ and discharge, and fix the compensation of all employees and agents of the APA other than its officers. The President shall have the authority to direct the day-to-day affairs of APA. The employees and agents of APA, and Committee members other than those serving on the Financial Audit Committee and Appeal Board, shall report to the President. *(09/15/2010)*

2.      The President shall sign all notes, checks, drafts or other orders for the payment of money duly drawn by the Secretary-Treasurer consistent with his fiduciary duty under federal law to approve only appropriate and authorized expenditures. The President shall sign any agreement entered into between APA and a third party and, in general, carry out all other duties necessary to the conduct of APA.  The President shall issue an annual report to the membership. *(09/15/2010)*

3.      The President shall enforce the APA Constitution and Bylaws, and he may issue, as necessary, written interpretations of the Constitutional and Bylaws. *(09/15/2010)*

B.      Vice President

The Vice President shall assist the President in the discharge of all duties. He shall also preside when called upon by the President and at times when the President may be temporarily unable to discharge his duties.  In case of removal, resignation, or death of the President, the Vice President shall perform the duties of the President until such time that the APA Board of Directors can meet to fulfill the vacancy procedures as outlined in Section 7 of this Article. *(02/12/2009)*

C.       Secretary-Treasurer

1.      The Secretary-Treasurer shall take charge of all books and effects of the Association.  He shall keep a record of all proceedings at all regular and special meetings of the Board of Directors.  He shall keep a record of all officers and special appointees and maintain all Conflict of Interest Disclosure Statements (C&B Appendix B1) and Agenda Disclosure Statements (C&B Appendix B2).  He shall assist the President in preparing an Annual Report to the members of the Association.  He shall be custodian of the Association Seal and affix the

APA_000002227

seal when required. He shall affix his signature to all membership cards. He shall cause to be kept the Association membership records so as to show at all times the number of members under each classification, their names alphabetically arranged, their respective places of residence, their post office addresses, and the time at which each person became a member of the Association or changed his membership status. A member may inspect his records or account any time at his request during normal business hours. *(02/16/2001)*

2. The books and records of the Secretary-Treasurer shall be accessible at APA Headquarters *(05/09/2018)* to any member or group of members in good standing in accordance with Federal law. Any restriction placed upon the viewing of these records will be reported to the BOD within a reasonable time and will include the reason for such restriction. *(05/09/2018)* He shall be responsible for all funds of the Association, receiving all dues, fees, and special assessments assessed the Association as a group. He shall keep an accurate record of all expenditures and receipts of the Association. He shall keep an individual record of all dues and assessment of each member. He shall prepare and submit under his signature all reports required under law. He shall present his books at the end of each fiscal year for audit by a certified auditor. He or his successor will present this audit, together with a current accounting of APA funds, at the next following Board of Directors meeting. *(06/12/2004)*

**Section 9.    Recall of Officers**

A.    The President, Vice President, or Secretary-Treasurer may be recalled and removed from office by action of the membership as follows:

1. A two-thirds (2/3) majority of the Board of Directors, on a one Director one vote basis (secret ballot), may cause a recall ballot to be sent to the membership on a National Officer. If a simple majority (50% plus one) of the members voting in a recall ballot (not including apprentice members) vote for a recall, that National Officer shall be recalled and removed from office. *(02/28/2008)*

2. Thirty percent (30%) of the active membership in good standing (not including apprentice members) may petition the Secretary-Treasurer and cause a recall ballot be taken on any National Officer. If a majority of the members voting on a recall ballot vote in favor of a recall, that National Officer shall be recalled and removed. *(04/24/2014)*

## ARTICLE V    BOARD OF DIRECTORS

**Section 1.    Authority of the Board**

A.    The Board of Directors is the supreme policy making authority within APA, and it has the authority to review and disapprove actions taken by the National Officers; however, absent a specific vote disapproving an action taken by a National Officer, the action shall be presumed valid. *(09/15/2010)*

B.    Members of the Board of Directors are both officers of their domiciles and members of the Board of Directors with the authority set forth in Article XIII to alter, amend or add to this Constitution and Bylaws. *(09/15/2010)*

APA_000002228

**Section 2.        Representation**

A.      The Board of Directors shall consist of the Chairman and Vice Chairman from each domicile, where a majority of pilots' bid status are awarded solely on the basis of seniority alone and are open to all pilots on the AA seniority list, except that domiciles having one hundred (100) or less members shall have one (1) representative (Chairman). *(07/21/2000)*

B.      Domiciles not meeting the criteria of A.1. above, shall be represented by the geographically closest APA domicile, in existence as of June 1, 2000. *(07/21/2000)*

C.      Pilots assigned to a Home Base, as defined in the 2012 AA/APA CBA Section 18, shall be represented by the geographically closest APA domicile in existence at the time of opening of the Home Base. *(06/27/2013)*

D.      Members of a base represented by geographically closest APA domicile have the right to run for elective office in the base that represents them. *(07/21/2000)*

**Section 3.        Meetings**

The Board of Directors shall convene for the transaction of business at least twice a year on a date and at a location determined by the President.  Special meetings of the Board of Directors may be called by the President or will be called within fourteen (14) days upon the written request of thirty percent (30%) of the Board of Directors.

In addition, a majority of the BOD may call and determine the inclusive dates, location and agenda of a special BOD meeting by making notice of such in writing to the national office. There shall be no restrictions as to lead time if requested by the BOD. There is no requirement for a National Officer to be in attendance at a special BOD meeting if that attendance is not desired by the BOD. This by no means precludes attendance under normal circumstances. *(01/17/2013)*

There shall be no restrictions on business conducted at any meeting of the Board of Directors, provided, however, that no business shall be acted upon without:

A.      Ten (10) days notice of the agenda in writing to all members of the Board prior to such meeting; or

B.      Approval of seventy-five percent (75%) of the Board of Directors.

**Section 4.        Voting**

A.      All issues shall be decided by a majority vote of the Board of Directors except as may otherwise be provided in this Constitution and Bylaws.

B.      Each member of the Board shall be entitled to vote fifty percent (50%) of the active members in good standing at his domicile provided that the representative from a domicile having one hundred (100) or less members shall be entitled to one (1) vote for each active member in good standing at his domicile. Fractional votes will be counted.

APA_000002229

C.    At a meeting of the Board of Directors, in the absence of a Domicile Chairman or Vice Chairman, a duly designated (not proxy) representative (DDR) from such domicile possessing authorization from the absent Chairman or Vice Chairman shall have and exercise all rights and privileges as a member of the Board of Directors at such meeting.  An exception to this paragraph can occur when a newly elected Officer who has not yet taken Office is serving as DDR while the incumbent Officer remains in attendance. *(02/16/2001)*

D.    Proxy voting will be allowed at all duly-convened Board meetings within the APA provided that: *(03/26/91)*

    1.    Proxies are in writing.
    2.    Proxies may not be given when the duly elected officer or duly designated representative is personally present.  *(10/03/79)*
    3.    Proxies may not be used in any vote by secret ballot.

## Section 5.    Quorum

The quorum of the Board of Directors at all meetings, whether Special or Regular, shall be a majority of the Domicile Chairmen and Vice Chairmen or their Duly Designated Representatives (DDR), not proxy, from such domicile possessing authorization from the absent Chairman or Vice Chairman. *(09/29/2000)*

## ARTICLE VI    DOMICILES

## Section 1.    Officers Defined

The Domicile Officers shall be Chairman and Vice Chairman.

## Section 2.    Eligibility

Only active members in good standing shall be eligible for nomination and election to Domicile office.  A Domicile Officer who retires during a term of office shall vacate that office automatically upon retirement. A Domicile Officer may hold office only at his/her domicile. Any Domicile Officer who is ordered to Active Duty service in the United States military in excess of 90 consecutive days or more than 120 days in any twelve month period will be required to resign his/her office and the vacancy filled in accordance with Article VI, Section 4.  *(06/12/2004)*

## Section 3.    Domicile Nominations and Elections

A.    At least seventy-five (75) days prior to the dates established in Section 4.A. of this Article VI, the Secretary-Treasurer shall post on the Association website, mail to the address of record and e-mail to the e-mail address of record of each member in good standing of the domicile a notice of nomination and election. *(10/11/2013)* The notice of nomination and election shall include an election schedule and examples of the electronic nomination submission form, the electronic statement of willingness to serve, and the electronic Conflict of Interest Disclosure Form contained in Appendix (B1) of this Constitution nomination ballot. *(06/07/2013)*

APA_000002230

B.      Any active member in good standing at the domicile may submit him or herself or any other active member in good standing at the domicile for nomination for the office of Domicile Chairman or Domicile Vice Chairman. Submissions shall be made using the on-line nomination form as indicated in the election notice. Submissions for nomination must be received by the deadline published in the election notice, and will be posted to the APA website upon receipt. All persons submitted for nomination shall be immediately notified via mail, phone, and email, and shall have 7 days from the closing of the submission period to execute a statement, in a form provided by the Secretary-Treasurer, that he or she will serve if elected. The person must also execute the Conflict of Interest Disclosure Form C&B Appendix (B1). These acceptance forms shall be posted on the Association website in such a manner as to allow a member to execute them electronically. A member submitted for nomination may withdraw from consideration for nomination at any time prior to the date voting commences by notifying the Secretary-Treasurer by facsimile; certified mail, return receipt requested; or e-mail as indicated in the acceptance forms. *(06/07/2016)*

C.      The Secretary-Treasurer shall cause to be distributed to each active member in good standing at the domicile a list of persons willing to be considered for nomination. Each member may vote for one (1) person for each office from the list of names provided by the Secretary-Treasurer. The most current Status 1 List shall be used to determine the eligibility of a member to vote in the election. *(06/16/93)*

D.      Subject to the supervision of the Secretary-Treasurer, the independent disinterested third party designated pursuant to Article IV, Section 4.D. shall also be responsible for the administration of nominations and elections. The official ballot shall be made available to all members no less than twenty-one (21) days prior to the respective dates of the vote count. *(02/28/2008)*

E.      The three (3) persons who receive the most votes for each office shall be considered nominated, and the independent third party shall forward their names to the Secretary-Treasurer. Subject to the Secretary-Treasurer's supervision, the ballots will then be made available by the independent third party for election of candidates. In the event of a tie for the third place, the tied candidates shall be included on the ballot. *(02/16/2001)* If nominated, a member may withdraw his or her nomination at any time prior to the date election voting commences by notifying the Secretary-Treasurer by facsimile; certified mail, return receipt requested; or e-mail as indicated in the election notice. *(06/07/2016)*

F.      The candidate who receives the majority of the votes cast for each office shall be deemed elected to that office. The determination of a majority shall be made with respect to each office following the vote count. *(02/07/93)*

G.      In the event that no candidate receives a majority of votes cast for a particular office, the Secretary-Treasurer shall cause a run-off election to be concluded within sixty (60) days of the prior vote count. The ballot in the run-off election shall be limited to the two (2) candidates who received the greatest number of votes. In the event of a tie in a run-off election, one (1) candidate shall be eliminated by the drawing of lots. *(02/07/93)*

H.      In the event of a tie for a particular office, the Secretary-Treasurer shall cause a run-off election to be concluded within sixty (60) days of the prior vote count. The ballot in the run-off election shall be limited to the candidates who tied for a particular office. In the event of a tie in a run-off election, a candidate(s) shall be eliminated by the drawing of lots. *(07/24/92)*

APA_000002231

I.     Each candidate is permitted to have an observer at every phase of the election process, subject to the independent third party's policies.  The candidate and any active member in good standing of the domicile designated by the candidate shall be eligible to act as observer. *(02/16/2001)*

J.     Each ballot and each vote on the ballot cast by an active member in good standing of the domicile shall be counted, provided the independent third party is able to determine the intention of the voter with reasonable accuracy.  Blank ballots and write-in votes shall not be counted.  Decisions on whether or how to count a particular ballot or ballots shall be resolved conclusively by the independent third party. *(02/16/2001)*

K.     Challenges to the conduct of the election and complaints about how ballots were counted shall be resolved pursuant to the procedure set forth in Section 6. *(07/24/92)*

**Section 4.     Schedule of Domicile Elections, Terms of Office, and Vacancies**

A.     The term of office of the Domicile Chairman and Vice Chairman shall be for a period of twenty-four (24) months.  Domiciles shall be divided into four (4) categories, and the division shall be published in the APA Policy Manual.  Terms of office will begin according to the following dates and shall continue until the last day of the twenty-fourth month thereafter. *(04/16/2003)*

1.     Category A:  The first day of November in even-numbered years.
2.     Category B:  The first day of May in odd-numbered years.
3.     Category C:  The first day of May in even-numbered years.
4.     Category D:  The first day of November in odd-numbered years. *(05/18/2002)*

B.     No person may serve more than four (4) consecutive terms (not including partial terms) as a member of APA's Board of Directors after November 1, 1992.  Terms served before November 1, 1992 shall not be considered part of the four- (4) year consecutive term limit. In order to ensure the Board of Directors always remains fully constituted, a Duly Designated Representative will be appointed to temporarily fill a vacant seat on the Board of Directors until such time as the appropriate election process is concluded.  If the vacancy is created as a result of a resigning or retiring Domicile Officer, the resigning or retiring Domicile Officer will appoint the Duly Designated Representative prior to resigning or retiring.  If the vacancy is created by other means, or if the resigning or retiring Domicile Officer fails to appoint a Duly Designated Representative, the remaining Domicile Officer will appoint the Duly Designated Representative.  If there is no other Domicile Officer to make the appointment, the President will appoint a pilot from the domicile to be the Duly Designated Representative. *(02/25/99)*

C.     In the event of a vacancy in the office of Domicile Chairman or Vice Chairman, if the unexpired term is more than six (6) months, an election shall be held to fill the vacancy utilizing the procedures specified in Section 4 of this Article VI.  If the unexpired term is six (6) months or less, an election shall be held at a domicile meeting provided that a notice is mailed to each domicile member at least twenty (20) days prior to the election informing the member of the date, time, and place of the election and a listing of the office or offices to be filled. *(04/24/92)*

D.     When a Domicile loses eligibility for a Vice Chairman because the number of active members in good standing at the Domicile fall below the number required by Article V, Section 1.A. of the Constitution and Bylaws, the following will apply: *(05/11/2007)*

APA_000002232

Effective with the date that the status falls below that required, the Secretary-Treasurer shall notify the Chairman and Vice Chairman of the affected Domicile that the Domicile has become ineligible for a Vice Chairman representative until such time as the active members in good standing increases to the required number. If the active membership increases to the required number, the Vice Chairman will be reinstated for the remainder of the elected term. If the elected term is expired, there will be an election according to Article VI, Section 4. *(06/12/2004)*

**Section 5.        Election Appeals**

The Article VII Appeal Board shall also serve as the Association's internal election appeal body. The Appeal Board shall consider all complaints, protests, or appeal concerning APA elections received via certified mail, return receipt requested, in writing from any member in good standing provided they have been received by the Appeal Board, in care of the APA Legal Department, postmarked within ten (10) business days after the later of the completion of the election or the run-off election. Receipt at the APA Legal Department constitutes receipt by the Appeal Board. Complaints may not be filed prior to the conclusion of an election. The Appeal Board shall issue its written decision as soon as practicable within sixty (60) days from receipt of a written complaint and the election complaint, the Appeal Board decision, and any subsequent decision by the Department of Labor shall be matters of public record available to members of the Association. The Appeal Board shall issue its written finding or decision as soon as practicable within sixty (60) days of receipt of a written protest, complaint, or appeal. *(02/26/2005)*

**Section 6.        Duties of Domicile Officers**

A.        *Chairman.*  It shall be the duty of the Chairman to call and preside at all meetings of the domicile, to preserve order during its deliberations; to appoint all committees not otherwise ordered by the domicile; to authorize expenditure of the domicile's governing funds; to enforce the Constitution and Bylaws; to supervise the activities of the domicile; to supply the Board of Directors with any information it may desire and to carry out all directives from the Board of Directors.

B.        *Vice Chairman.*  The Vice Chairman shall perform the duties of the Chairman in the absence of that officer and in case of the removal, resignation, or death of that officer until an election is held in accordance with Article VI, Section 4. He shall also preside when called upon by the Chairman and at times when the Chairman may be temporarily unable to discharge his duties. The Vice Chairman shall assist the Chairman at all times in the discharge of all duties.

**Section 7.        Recall of Domicile Officers**

Thirty percent (30%) of the active membership in good standing of the domicile (not including apprentice members) may petition the Secretary-Treasurer and cause a recall ballot to be taken on a Domicile Officer of the domicile. If a majority of the members of the domicile voting on a recall ballot vote in favor of a recall, that Domicile Officer shall be recalled and removed. *(04/24/2014)*

**ARTICLE VII        HEARING AND DISCIPLINARY PROCEDURES**

A.        Any member is subject to disciplinary action, including but not limited to fines, placing a member in bad standing, suspension, or expulsion for any of the acts listed below. Charges filed under this Article for the purpose of resolving or pursuing intra-union political disputes shall not be actionable under this Article. *(09/23/2009)*

APA_000002233

1. Willfully acting as a strike-breaker (scab) pilot during any duly authorized pilot strike, as determined by the striking authority;

2. Willful violation of this Constitution and Bylaws;

3. Willful neglect in paying dues, assessments, or fines levied by the Association;

4. Misappropriating money or property of the Association;

5. Willful violation of a pilot's working agreement;

6. Initiating and/or prosecuting charges under this article in bad faith (for example, malicious or frivolous charges) against another APA member;

7. Any act contrary to the best interests of the APA as an institution or its membership as a whole.

8. Any act motivated by malice or political animus that exposes another member to company discipline, up to and including termination. *(09/23/2009)*

B.   **Charges**

All charges shall be preferred in writing by submitting the charges to the APA Secretary-Treasurer by certified mail, return receipt requested. The charges shall be specific as to the alleged acts that constitute the basis for the charges with citations to the particular provision of the Constitution and Bylaws that have been violated. The accused member shall be supplied with a copy of the charges, by certified mail, return receipt requested, at his or her last known address. The Secretary-Treasurer is charged with distribution of the charges to the Domicile Officers and the Appeal Board.

1. Charges may be brought under this Article by any member in good standing against any other member. *(09/23/2009)*

2. Except for charges filed in accordance with Section A.1 and A.8. of this Article, charges must be filed within one (1) year after the alleged offense. Charges under Section A.1 may be applied retroactively to conduct which occurred prior to becoming an APA member. Absent extreme mitigating circumstances, expulsion is mandatory for a violation of Section A.1. Charges filed in accordance with Section A.8. of this Article must be filed within one (1) year, or one (1) year from the issuance of the Arbitrator's award in the related grievance, if applicable. The Appeal Board shall delay the hearing of charges filed under A.8. of this Section until the issuance of the Arbitrator's award in the related grievance, if applicable. *(09/23/2009)*

3. Article VII proceedings shall be scheduled and conducted so as to minimize the cost to the Association and its membership. All mailed notices and written submissions, including decisions and appeals shall be sent by certified mail, return receipt requested, to the Secretary-Treasurer, who is charged with expeditious distribution of the submissions to the relevant parties and to the Appeal Board in the event they have not been served with the documents

APA_000002234

pursuant to the provisions of this Article VII.  In the event that a party refuses to accept a certified mailing, he or she shall be deemed on notice of the contents of the document.

C.    **Domicile Hearing**

1.    Unless otherwise provided for in this Article VII, the charges shall be considered by the accused member's Domicile Officers in the first instance.  The Domicile Officers are first charged with determining whether the charges as submitted set forth a claim cognizable under this Article VII.   If the Domicile Officers determine that the charges state a cognizable claim, the Domicile Officers shall hold a hearing, if either the accused or the accuser requests one, or at their discretion, if neither party requests a hearing.   No hearing shall be convened unless the accused and the accuser have been given written notice at least twenty (20) days before the hearing.  In the event that one of the Domicile Officers recuses him or herself, the remaining Domicile Officer shall act alone. *(09/23/2009)*

2.    In the event of a hearing, both the accused member and the accuser shall have the right to be represented by a member in good standing.  If the accuser or the accused fails to appear at a scheduled hearing, he or she shall be deemed to have waived his or her right to an appeal from the decision of the Domicile Officers, unless the Appeal Board finds that good cause is shown for the failure to appear at the hearing.

3.    At the Domicile Hearing, a court reporter will be present and will record a transcript of the hearing and swear the witnesses.  This cost will be borne by the Association.  Both the accused and the accuser shall be provided with a copy of the transcript at the Association's expense. *(09/23/2009)*

4.    A decision on the charges will be published within the later of thirty (30) days after the hearing or thirty (30) days after receipt of the transcript.  The decision shall be in writing and sent by certified mail, return receipt requested, to the Secretary-Treasurer. *(09/23/2009)*

D.    **Appeal Board**

1.    An Appeal Board shall be established to hear or review cases referred to it in accordance with this Constitution and Bylaws.  This Appeal Board shall comprise three (3) regular and two (2) alternate members in good standing, appointed by the Board of Directors.

2.    The term of office for such members shall be for two (2) years or until their successors have been selected. Appeal Board members who are currently hearing or reviewing a case, and whose terms will soon or may have already expired, will continue to serve for the purpose of concluding any pending matters before them. The Appeal Board Chair shall be the final authority in determining caseload staffing and necessity, as well as satisfactory caseload conclusion for any Appeal Board member who falls within this paragraph. *(12/14/2016)*

3.    Either the accused or the accuser may appeal the decision of the Domicile Officer(s) to the Appeal Board. An appeal of the decision by the Domicile Officer(s) must be made within thirty (30) days after receipt by the accused or the accuser of the decision of the Domicile Officer(s).

APA_000002235

4.    Should the accused or the accuser be a Domicile Officer, then such charges shall be considered by the Appeal Board in the first instance.  When accused members from more than one domicile are charged with substantially the same offense, such charges shall be considered by the Appeal Board in the first instance.  Such charges should be filed in writing with the Secretary Treasurer. *(09/23/2009)*

5.    The President shall have the authority, in consultation with General Counsel, to enforce the Terms and Conditions of the Acceptable Use Policy ("AUP") established for the APA Web site and its subparts ("System") on behalf of the Association by removing postings, and/or suspending or revoking a member's access in whole or in part to the System for a period no longer than fourteen (14) business days.  A member's right of access to the System or any subpart(s) shall not be revoked or suspended unless the President, in consultation with General Counsel, determines that such action is necessary for APA to comply with its legal or contractual obligations or to protect the integrity of the System. The President shall promptly provide the member, by e-mail or otherwise, with specific reasons for such actions.  In the event that the President removes a member's posting, the member may contest such action by filing an appeal with the Appeal Board, subject to the procedures specified in VII.D.  In the event that the President restricts a member's access to the System, this restriction shall be subject to mandatory review by the Appeal Board via the procedures specified in VII.D. for Article VII proceedings.  This review shall be conducted and a decision rendered by the Appeal Board within the fourteen (14) business days specified above.  In the event that the Appeal Board determines that a member's access has been restricted for cause, the Appeal Board shall determine the ultimate duration and the extent of the restriction.  The Appeal Board's decision may be appealed to the Neutral Arbitrator in accordance with the procedures set forth in VII.E. *(09/23/2009)*

6.    When the Appeal Board holds a formal hearing, both the accused and accuser shall have the right to be represented by a member in good standing.

7.    The Appeal Board may decide that the charges as set forth by the accuser fail to state a cognizable claim.  The Appeal Board will then dismiss the claim, via a written opinion.  If the Appeal Board determines that the charges state a cognizable claim, the Appeal Board shall hold a hearing, if either the accused or the accuser requests one, or at its discretion, if neither party requests a hearing. *(09/23/2009)*

8.    Unless otherwise provided, the Appeal Board shall give thirty (30) days notice of all hearings. A court reporter shall record, transcribe the hearing and swear the witnesses.

9.    The Appeal Board shall issue its decision no later than sixty (60) days from the date that the Appeal Board obtains jurisdiction over the case, either by appeal or by assuming or obtaining original jurisdiction.  In the event of a hearing, the sixty (60) days shall run from the date of receipt of the transcript.  The decision shall be in writing and sent by certified mail, return receipt requested, to the parties and to the Secretary-Treasurer.

10.   The fees and expenses of the Appeal Board shall be the responsibility of APA, unless the Appeal Board determines that a party to the proceeding has repeatedly acted in bad faith in the prosecution or the defense of the charges, in which case the Appeal Board shall have the authority to impose some or all of the costs and fees associated with the Article VII proceeding on the offending party.

APA_000002236

E. **Neutral Arbitrator**

    1.    Appeals of decisions made by the Appeal Board may be submitted to a Neutral Arbitrator by filing a written appeal to the Secretary-Treasurer within thirty (30) days of receipt of the decision by the Appeal Board. In the event of an appeal all sanctions, penalties, or fines imposed by the Appeal Board shall be stayed, pending the Arbitrator's award. *(09/23/2009)*

    2.    The Neutral Arbitrator shall be rotated among a list of approved neutrals.  The list of neutrals shall consist of a pool of three to five arbitrators familiar with, and experienced in, matters involving union affairs.  The Appeal Board, in consultation with APA Legal, shall compile this list every five (5) years.  The list of neutrals must be approved via majority vote of the Board of Directors. *(09/23/2009; amended 6/21/2011)*

    3.    The Arbitrator shall hold a hearing as soon as practicable.  A court reporter shall be present at the hearing in order to swear witnesses and record a transcript. Both the accused and the accuser have the right to be represented at this hearing by a member in good standing.  The Association shall provide the Arbitrator will all materials from prior hearings, as well as an electronic copy of past Article VII filings, transcripts, and awards. *(09/23/2009)*

    4.    The fees and expenses associated with the arbitration shall be the responsibility of the Association, unless the Arbitrator determines that a party to the proceeding has acted in bad faith in the prosecution or defense of these charges, in which case the Arbitrator shall have the authority to impose some or all of the costs and fees associated with the Article VII proceedings on the offending party. *(09/23/2009)*

## ARTICLE VIII    EXPENSES

Normal expenses incurred by any officer, representative, or member while on APA business shall be reimbursed by the APA, provided, however, that authorization from the President or his designated representative is first obtained.  Allowable expenses shall include transportation, lodging, verified flight pay lost, meal expenses, and incidentals, conforming with the expense policy of the APA as set forth by the Board of Directors.

## ARTICLE IX    BONDING AND INDEMNIFICATION

**Section 1.    Bonding**

All officers of the Association shall be bonded in amounts not less than those provided for and required by appropriate Federal statute.

**Section 2.    Indemnification**

The Allied Pilots Association shall indemnify and hold harmless, to the extent permitted by law, the members of the Board of Directors, National Officers, committees, and staff as well as other members authorized by the Association to act on its behalf, against all liabilities, costs and expenses, including attorneys fees actually and reasonably incurred by him or her, in connection with any threatened, pending, or completed legal action or judicial or administrative proceeding to which he or she may be a party, or may be

APA_000002237

threatened to be made a party, by reason of his or her actions or omissions within the scope of his or her authorized duties on behalf of the Association, except with regard to any matters as to which he or she shall be adjudged in such action or proceeding to be liable for gross negligence, willful misconduct, or criminal conduct in connection therewith.  It is the expressed intent of the Association that the indemnity provided for in this Section is an indemnity extended by the Association, as indemnitor, to indemnify and protect those being indemnified from the consequences of their own negligence.  The Association may provide such indemnification through the purchase of insurance, or any other means, as the Association deems appropriate.  The Association reserves the right to select counsel in connection with any action, actual or threatened, for any person who is provided indemnification pursuant to this provision.  With respect to the benefit programs maintained by the Association, the Association shall maintain adequate bonding and liability insurance coverage for the Association and those authorized to act on its behalf in amounts either required by law or deemed appropriate by the Association.  *(09/12/2000)*

## ARTICLE X   CONFLICTS OF INTEREST

A.   Summary: The purpose of this statement is to assist the Allied Pilots Association and all of its related operations in identifying, disclosing, and resolving real and potential conflicts of interest.

B.   Scope: The following statement applies to all members of the Association and its elected National and Domicile Officers, National Committee Members, and Staff, all of whom shall hereafter be referred to as "the National Officers, Board of Directors (BOD), National Committee Members, and Staff."

C.   Fiduciary Responsibility: The National Officers, BOD and Staff who serve the Allied Pilots Association have a clear obligation to conduct all affairs of the Association in a forthright and honest manner.  Each person should make necessary decisions using good judgment and ethical and moral considerations consistent with the Code of Ethics stated in the APA Constitution and Bylaws (C&B), Appendix A.  All decisions of the National Officers, BOD, National Committee Members and Staff are to be made solely on the basis of a desire to promote the best interests of the Association and membership.

D.   Statement:  The National Officers, BOD, National Committee Members and Staff agree in their dealings with the Association to place the welfare of the Association and membership above personal interests, business interests, interests of family members, or others who may be personally involved in substantial affairs affecting the Association's basic functions.

E.   Specific Disclosure:  The National Officers, BOD, National Committee Members and Staff shall disclose by submitting a Conflict of Interest Disclosure Form set forth in C&B Appendix B (1) which fully discloses the precise nature of their interest or involvement when participating in any transactions for the Association which another party to the transaction includes:

1.   Himself or herself; or

2.   A member of the family (spouse, parents, brothers, sisters, children, and any other immediate relatives); or

3.   An organization with which the member of the National Officers, BOD, National Committee Members and Staff or his family, is affiliated.

APA_000002238

Disclosure of said interest shall be made within five (5) business days of the first knowledge of the potential transaction.

F.   General Disclosure: The National Officers, BOD, National Committee Members and Staff shall disclose by submitting a Conflict of Interest Disclosure Form set forth in C&B Appendix B (1) disclosing all relationships and business affiliations which may now, or in the future, potentially conflict with the interest of the Association or bring personal gain to them, their family, or their business.   While it is not practical to list all situations that might lead to a conflict of interest, disclosure of said relationship or affiliation must be made if any member of the National Officers, BOD, National Committee Members and Staff or members of their family:

1.   Is an officer, director, partner, employee, or agent of an organization with which the Association has business dealings; or

2.   Is either the actual or beneficial owner of more than one percent of the voting stock or controlling interest of an organization with which the Association has business dealings; or

3.   Is a consultant for such an organization; or

4.   Has any other direct or indirect dealings with an individual or organization from which he or she materially benefited (e.g., through the receipt directly or indirectly of cash, gifts, or other property).

5.   Accepts commissions, a share of profits or other payments, loans (other than with established banking or financial institutions at prevailing market rates), services, preferential treatment, entertainment or travel, or gifts from any individual or organization doing or seeking to do business with APA valued at greater than $100 retail.

6.   Buys, sells or leases, whether directly or indirectly, through another company, firm or individual, any kind of property, facilities, or equipment from or to APA.

G.   Reporting of Disclosures: All disclosures by Staff will be handled by the Association Secretary-Treasurer and will be held in confidence, except when the Association's best interests would be served by bringing the information to the attention of the National Officers and BOD.  All disclosures of the National Officers, BOD and National Committee Members shall be handled by the Secretary-Treasurer and maintained in a file, which can be inspected by any member of the Association.

H.   Restraint of Participation: The National Officers, BOD, National Committee Members and Staff who have a conflict of interest, real or potential, in any manner shall refrain from participating in the execution of any agreement, contract or verbal binding of the Association and shall refrain from voting on such matters.  National Officers shall execute an Agenda Disclosure Statement found in C&B Appendix B2 prior to any agenda item that represents a real or potential conflict of interest.

I.   Determination of Possible Conflict of Interest: Any individual who is uncertain about a conflict of interest in any manner shall disclose such possible conflict top the appropriate reporting individual, as noted above, using the Conflict of Interest Disclosure Form found in C&B Appendix B1, noting the potential conflict and any other information which the individual feels would assist APA Legal in determining if a conflict of interest exists.   The Secretary-Treasurer shall notify APA Legal immediately of all disclosures.  After the Disclosure Form has been executed, the individual shall be

APA_000002239

entitled to act as though no conflict of interest exists unless APA Legal notifies him or her otherwise in writing.

J.      When to Disclose Conflicts of Interest: Each member shall execute a Conflict of Interest Disclosure Form as set forth in C&B Appendix B1 in order to qualify as a candidate for National Officer, Domicile Officer or when nominated for any national committee and before assuming any duties of that office or committee. Staff members shall execute a Conflict of Interest Disclosure Form as set forth in C&B Appendix B1 when applying for employment. The form shall be maintained by the Secretary-Treasurer for the entire term of office/employment and will be destroyed upon completion of term in office or termination of employment with the Association. If a potential conflict of interest arises subsequent to the submission of the original form, the National Officers, BOD, National Committee Member or Staff member shall complete a Conflict of Interest Form as set forth in C&B Appendix B1 within five (5) business days of becoming aware of the conflict.

K.      Failure to Disclose: Each National Officer, BOD, National Committee Member and Staff member who executes a Disclosure Form recognizes that such filing is a requirement for continued affiliation or employment with the Association, and further, that a knowing failure to disclosure a potential conflict of interest could result in Article VII proceedings or discipline / termination of the employee and become subject to appropriate legal action to recover/return any item obtained in conflict with this policy.

## ARTICLE XI    COMMITTEES

A.      The President, subject to the advice and consent of the Board of Directors, shall appoint members to the standing committees established by the Board of Directors, except for standing committees that the Board of Directors has reserved the right to elect. The committee member appointed by the President shall be made from a list of members in good standing, submitted by current members of the Board of Directors. *(05/23/2005)*

B.      Each committee member appointed by the President shall submit a Conflict of Interest Disclosure Form (C&B Appendix B1) to the Secretary-Treasurer and be subject to a vote of approval by the Board of Directors at the next regular Board meeting following the appointment. A simple majority vote shall be required for approval or rejection. The President may appoint ad hoc committees as necessary to handle special projects. These ad hoc committees shall not be standing committees, shall remain in effect for not longer than one (1) year, shall be appointed from a list of members in good standing, submitted by current members of the Board, shall submit a Conflict of Interest Disclosure Form (C&B Appendix B1) to the Secretary-Treasurer and shall be subject to Board approval and recall. *(05/23/2005)*

C.      The term in office for standing and ad hoc committee members, except those standing committees that the Board of Directors has reserved the right to elect, will expire with each election of the Association's President. *(05/23/2005)*

D.      The President, as appointing authority, has the power to remove or replace any committee member, except for the committees that the Board of Directors has reserved the right to elect. *(05/23/2005)*

E.      Any member appointed or elected to any committee shall submit a Conflict of Interest Disclosure Form (C&B Appendix B1) to the Secretary-Treasurer prior to Board approval. Any member

APA_000002240

appointed or elected to any committee shall be subject to recall with or without cause by the Board of Directors.  A simple majority vote of the Board of Directors shall constitute a recall. *(05/23/2005)*

## ARTICLE XII    NEGOTIATIONS AND AGREEMENTS

A.   During negotiations having the purpose, intent, or effect of amending, modifying, or extending the Collective Bargaining Agreement, at least two (2) elected members of the APA Negotiating Committee shall be present at all meetings with any member of the Company's Negotiating Committee.   This policy shall be adhered to without exception by the National Officers and Negotiating Committee at all times.   At the first joint session of any negotiation or mediation or super-mediation, the President of the APA or the Chairman of the APA Negotiating Committee shall notify management's negotiating committee and the National Mediation Board representative, if applicable of this policy, and that there can be no exceptions to it for any reason. *(09/29/2000)*

B.   No National Officer, Board member or Committee member shall conduct conferences or negotiations having the purpose, intent or effect of amending, modifying or extending the collective bargaining agreement, with any party, without full disclosure of the existence of such conferences or negotiations to the Board of Directors and membership. If conferences or negotiations are to be held and the subject matter is of a confidential competitive nature, then the Board of Directors and membership shall be so notified. *(09/29/2000)*

C.   Conferences or negotiations shall not be initiated or carried on or concluded in the name of the Association by any member or any group of members thereof to make or establish basic collective bargaining agreement or other agreements without the prior approval of the President or the Board of Directors. *(01/23/92)*

D.   Basic collective bargaining agreements and agreements of affiliation or merger with other labor organizations shall be submitted to the Board of Directors for review.  After reviewing the agreement, the Board of Directors shall vote to approve or reject the agreement.  Only agreements approved by the Board of Directors by a majority vote, both one-man, one-vote and roll call vote shall be forwarded to the affected membership for a ratification vote. *(06/04/98)*

E.   The Board of Directors shall determine the date the ratification ballots will be distributed to all active affected members in good standing.  Active members in good standing may vote for or against ratification of the agreement and shall return their ballots postmarked not later than fourteen (14) days following the date of ballot distribution.  In order to bind the Association, the agreement shall be ratified by a majority vote of the participating members.  The membership shall be notified immediately of the results. *(01/23/92)*

F.   In order to bind the Association, amendments to the basic collective bargaining agreements relative to pay, benefits or work rules, scope, successorship, and any agreements involving seniority list integration shall be ratified by the Board of Directors. *(02/16/2001)*

G.   No agreement shall become effective until it bears the signature of the President of the Association or other Association Officers authorized to sign by the Board of Directors. (01/23/92)

H.   Nothing in this Article XII shall prohibit APA from accepting a proffer of binding arbitration under the provisions of the Railway Labor Act.  Acceptance of a proffer of binding arbitration must be

APA_000002241

approved in advance by the Board of Directors by a majority vote, both one-man, one-vote and roll call vote. (3/7/2012)

## ARTICLE XIII     AMENDMENTS

A.      The Constitution and Bylaws may be altered, amended, or added to by an affirmative two-thirds (2/3) vote of the Board of Directors.

B.      Any alteration, amendment, or addition to the Constitution and Bylaws shall not become effective after the two-thirds (2/3) affirmation referred to above, for one hundred (100) days after the completed vote has transpired.

If, during such one hundred (100) day abeyance period, thirty percent (30%) of the active membership petitions the Secretary-Treasurer requesting a referendum of the subject alteration, amendment, or addition, the Secretary-Treasurer shall circulate such a referendum ballot to the active membership.  The ballot shall contain the proposal to be voted on and shall state a reasonable deadline for the return of the ballots.  *(09/23/64)*

C.      Amendments to Election or Recall Procedures for National and Domicile Officers passed by an affirmative vote of a two thirds (2/3) majority of the Board of Directors will be subject to approval by the membership by way of a referendum ballot.

D.      The Board of Directors may also, at their discretion, direct other amendments to the Constitution and Bylaws be sent to members in good standing for approval by referendum by a two thirds (2/3) vote of the Board. *(04/24/2014)*
    1.      The Secretary-Treasurer shall, within thirty (30) days, circulate such ballots to the active membership. The ballot shall contain the proposition to be voted on and shall state a reasonable deadline for the return of the ballots. *(04/24/2014)*
    2.      An affirmative vote of a majority of the active members casting ballots shall be required for passage of the referendum.  Upon approval, the 100 day abeyance period from Article XIII B. shall be waived and the amendment will become effective immediately or on the date stated in the amendment in question. *(04/24/2014)*

E.      The Constitution and Bylaws may also be altered, amended, or added to in the following manner:

    1.      Thirty percent (30%) of the active members in good standing may petition the Secretary-Treasurer requesting a referendum ballot for altering, amending, or adding to the Constitution and Bylaws.  All such petitions must bear a signature date no earlier than one hundred and twenty (120) days prior to submission to the Secretary-Treasurer.  The Secretary-Treasurer shall, within thirty (30) days, circulate such ballots to the active membership.  The ballot shall contain the proposition to be voted on and shall state a reasonable deadline for the return of the ballots. *(10/31/75)*

    2.      Any referendum petitions submitted to the Secretary-Treasurer by virtue of this Section 4 shall contain the petitioner's name printed in block letters, his signature, seniority number, domicile, and date of that signature. *(10/31/75)*

APA_000002242

3.      An affirmative vote of two-thirds of the active members casting ballots shall be required for passage of the referendum ballot. *(04/23/14)*

APA_000002243

# APPENDIX A
# CODE OF ETHICS
*(02/16/2001)*

<<<<<<<<<<<<<<<<◇>>>>>>>>>>>>>>

## APA's NATIONAL OFFICERS, DOMICILE OFFICERS, STAFF, CONSULTANTS AND NATIONAL COMMITTEES

I will faithfully discharge the duty I owe the Association, which makes possible my way of life.

I will respect other officers, committee members, and employees of the Association remembering that respect does not entail subservience.

I will do all within my powers to discharge my duties efficiently and in a manner that will not cause unnecessary delays or expense.

I will faithfully adhere to the policies, directives, and resolutions of the Board of Directors.

I will realize that as a representative of the Association, I will at all times keep my personal appearance and conduct above reproach.

I will direct any criticism or proposed changes to the proper authorities within the Association.

I will hold the Association's business secrets in confidence, and will take care that they are not improperly revealed.

In dealing with others I will expect efficient performance, yet I will overlook small discrepancies and refrain from unnecessary and destructive criticism.

I will conduct my affairs with the Association in such a manner as to bring credit to the Association and to myself.

I will conduct my affairs with the Association and its members in accordance with the rules laid down in the Constitution and Bylaws of the Association and the interpretations promulgated there from.

I shall refrain from taking advantage of the confidence reposed in me by my fellow members. If I am called upon to represent the Association in any dispute, I will do so to the best of my ability, fairly and fearlessly, relying on the influence and power of the Association to protect me.

I will regard myself as a debtor to the Association and will dedicate myself to its advancement.

I will not publish articles, give interviews, or permit my name to be used in any manner likely to bring discredit to the Association.

I will continue to keep abreast of labor developments so that my skill and judgment, which heavily depend on such knowledge, may be of the highest order.

I will endeavor to my utmost to faithfully fulfill the obligations of the Allied Pilots Association Code of Ethics.

Ethics are not learned by teaching; they are inculcated by example and by experience. To a man of honor, ethics come as naturally as good table manners.

<<<<<<<<<<<<<<<◇>>>>>>>>>>>>>>

APA_000002244

There are many rights guaranteed by the United States Government through the Labor Department and other government agencies.  The <u>Labor Management Reporting and Disclosure Act of 1989, As Amended</u> provides a wealth of information regarding your fundamental rights as a union member.  To obtain a copy of this Act, you may write to:

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC  20210

or you can request it by telephone.  Offices are located in many major cities throughout the United States and are listed under United States Government, Labor Department, and Office of Labor-Management Standards. *(09/20/89)*

APA_000002245

**APPENDIX (B1)**
**Conflict of Interest Disclosure Form**
*(12/18/2013)*

**TO:    Allied Pilots Association Secretary-Treasurer**

*I have received and read the Conflict of Interest statement as set forth in Article X, Section D of the Constitution and Bylaws and to the best of my knowledge and information, I am in compliance with the provision except as specifically set forth below.  If my status should ever change, I will advise the Secretary-Treasurer and complete an additional Disclosure Form within five (5) business days.* **(Check one)**

☐      *I have no conflict of interest as set forth in Article X, F. of the Constitution and Bylaws.*

☐      *I am involved in a potential or actual conflict of interest as defined in Article X, F. of the Constitution and Bylaws as set forth below:*

Signature_____ Employee Number_____

Printed Name_____ Date_____

**ALLIED PILOTS ASSOCIATION CONSTITUTION AND BYLAWS (Effective. 3/23/2017)**      **Page 33**

APA_000002246

## APPENDIX (B2)
*(12/18/2013)*

### Agenda Disclosure Statement

| LAST NAME, FIRST NAME, MIDDLE INITIAL | DOMICILE OR OFFICE |
|---|---|
| | |
| **AGENDA ITEM NUMBER** | **DATE** |
| | |

This form is for any National Officer, Domicile Officer, Duly Designated Representative (DDR), or Proxy (Officer) who has a real or potential conflict of interest with an agenda item.

Each Officer MUST ABSTAIN from voting on a measure that inures to his special private gain. (C&B Article X, E.1.)

Each Officer is also prohibited from knowingly voting on a measure that inures to the special gain of a member of the family (spouse, parents, brothers, sisters, children, and any other immediate relatives). (C&B Article X, E.2.)

Each Officer is also prohibited from knowing by voting on a measure that inures to the special gain of an organization of which he is affiliated. (C&B Article X, E3)

In any of the above cases, you should disclose the conflict prior to the announcement of the agenda item. The conflict of interest must be disclosed by completing this form and submitting it to the Secretary-Treasurer for inclusion in the meeting minutes. (C&B Article X, G.)

APA_000002247

# INDEX

Agenda Disclosure Statement, 35

AMENDMENT DATES, ii

Application and Approval for Active Membership, 8

ARTICLE I - - GENERAL, 3

ARTICLE II  OBJECTIVES AND RIGHTS OF APA, 5

ARTICLE III - - MEMBERSHIP, 7

ARTICLE IV   NATIONAL OFFICERS, 12

ARTICLE V  BOARD OF DIRECTORS, 16

ARTICLE VII  HEARING AND DISCIPLINARY PROCEDURES, 22

Board of Directors, 16

Classes of Membership, 7

CODE OF ETHICS, 32

Conflict of Interest Disclosure Form, 34

Domicile Nominations and Elections, 18

Dues, 9

Duration, 3

Duties of Domicile Officers, 21

Election Appeals, 14, 21

Eligibility, 12

Executive Officers, 25

Fiscal Year, 4

Home Office Location, 3

Lump Sum Dispute Resolution Procedure, 12

Lump Sum Payment, 12

Meetings, 17

Membership Credentials, 8

Membership Rights and Obligations, 11

Membership Status, 9

Name, 3

National Office Election Procedures, 13

Nominations for National Office, 12

OBJECTIVES AND RIGHTS OF APA, 5

Obligations of Members, 12

Officers Defined, 12

Parliamentary Law and Rules of Order, 4

PREAMBLE, ii

President, 15

Qualifications, 7

Schedule of Domicile Elections, Terms of Office, and Vacancies, 20

Secretary-Treasurer, 15

Terms of National Office and Vacancies, 14

Vice President, 15

APA_000002248

# EXHIBIT 2

# for Myers Declaration

# AGREEMENT

between

# AMERICAN AIRLINES, INC

and

# THE AIRLINE PILOTS

in the service of

# AMERICAN AIRLINES, INC.

as represented by the

# ALLIED PILOTS ASSOCIATION

## EFFECTIVE: MAY 1, 2003

APA_000000001

# Table of Contents
## Sections

Note: Single vertical line in the table of Contents indicates the Section, Supplement or Letter was not contained in the printed Agreement dated May 5, 1997.

Single vertical line in the body of this Agreement indicates a change from the printed agreement dated May 5, 1997.

| Section | Subject | Page |
|---|---|---|
| 1 | RECOGNITION AND SCOPE | 1-1 |
| 2 | DEFINITIONS | 2-1 |
| 3 | PAY | 3-1 |
| 4 | MINIMUM GUARANTEES | 4-1 |
| 5 | PAY AND CREDIT PILOT RELIEVED OF FLYING DUTIES | 5-1 |
| 6 | MISCELLANEOUS FLYING | 6-1 |
| 7 | EXPENSES AWAY FROM BASE | 7-1 |
| 8 | MOVING EXPENSES | 8-1 |
| 9 | VACATIONS | 9-1 |
| 10 | SICK LEAVE | 10-1 |
| 11 | LEAVES OF ABSENCE | 11-1 |
| 12 | SUPERVISORY PILOTS, CHECK AIRMEN & TULE | 12-1 |
| 13 | SENIORITY | 13-1 |
| 14 | PROBATION PERIOD | 14-1 |
| 15 | HOURS OF SERVICE | 15-1 |
| 16 | CERTIFICATES AND RATINGS | 16-1 |
| 17 | FILLING VACANCIES, DISPLACEMENTS, REINSTATEMENTS, FURLOUGHS, AND RECALLS | 17-1 |
| 18 | TRIP SELECTIONS | 18-1 |
| 19 | TRIP TRADE WITH OPEN TIME SYSTEM | 19-1 |
| 20 | PHYSICAL EXAMINATIONS | 20-1 |
| 21 | DISCIPLINE, GRIEVANCES, HEARINGS, AND APPEALS | 21-1 |
| 22 | PRE- ARBITRATION CONFERENCE | 22-1 |
| 23 | SYSTEM BOARD OF ADJUSTMENT | 23-1 |
| 24 | GENERAL | 24-1 |
| 25 | AGENCY SHOP AND DUES CHECKOFF | 25-1 |
| 26 | AMENDMENTS TO AGREEMENT,EFFECT ON PRIOR AGREEMENTS, AND DURATION | 26-1 |

APA_000000002

# Table of Contents
## Supplements

| Supplement | Subject | Page |
|---|---|---|

| A | PAY GUIDE | A-1 |
| B | JOB SECURITY FOR PILOTS HIRED PRIOR TO NOVEMBER 1, 1983 | B-1 |
| C | ANNUAL INCENTIVE PROGRAM | C-1 |
| D | EQUITY AGREEMENT | D-1 |
| E | MAC AGREEMENT | E-1 |
| F (1) | RETIREMENT BENEFIT PLAN | F-7 |
| F (2) | RBP ADMINISTRATIVE CHANGES | 11-7 |
| F (3) | RBP MODIFICATIONS | F-9 |
| F (4) | PENSION PLAN AMENDMENTS | F-11 |
| F (5) | NON-QUALIFIED PENSION PLAN ALTERNATIVES | F-13 |
| G (1) | COMMUTER POLICY | G-1 |
| G (2) | COMMUTER POLICY ENHANCEMENT | G-3 |
| H (1) | CRAF OPERATIONS CLARIFICATION | H-1 |
| H (2) | CRAF OPERATIONS ORIGINAL | H-2 |
| I | INTERNATIONAL AGREEMENT | I-1 |
| J (1) | BRAKE RELEASE AGREEMENT | J-1 |
| J (2) | BRAKE RELEASE (BLOCK TO BLOCK) | J-2 |
| J (3) | BRAKE RELEASE (GRIEVANCE WITHDRAW | J-4 |
| J (4) | BRAKE RELEASE (GATE DELAY PAY) | J-5 |
| K (1) | MEDICAL PLAN FOR PILOTS | K-1 |
| K (2) | DENTAL PLAN FOR PILOTS | K-2 |
| K (3) | MEDICAL AND DENTAL INSURANCE PROGRAMS FOR PILOTS | K-3 |
| L | DRUG AND ALCOHOL TESTING | L-1 |
| M | OVERTIME FLYING | M-1 |
| N (1) | CPA PAYOUT PROVISIONS | N-1 |
| N (2) | CPA PAYOUT CLARIFICATION | N-2 |
| O | TEMPORARY SUPERVISORY FLIGHT TRAINING POSITIONS | O-1 |
| P | INTERNATIONAL CREW BASES | P-1 |
| Q | INTERNATIONAL CREW USE SEATS | Q-1 |
| R | ALASKA AIRLINES CODESHARE | R-1 |
| S | JOINT SCHEDULING COMMITTEE | S-1 |
| T | TERMS OF BANKRUPTCY PROTECTION | T-1 |
| U (1) | LOS ANGELES SUPPLEMENTAL FLYING | U-1 |
| U (2) | LOS ANGELES SUPPLEMENTAL FLYING ADDENDUM | U-5 |
| U (3) | LAX SUPPLEMENTAL FLYING AMENDMENTS | U-6 |
| V | CREW COMPLEMENT | V-1 |
| W | AMERICAN AIRLINES EMPLOYMENT OPPORTUNITIES AND FURLOUGH PROTECTION | W-1 |
| X (1) | PROFIT SHARING | X-1 |
| X (2) | PROFIT SHARING PRE-TAX CHART | X-3 |
| X (3) | PROFIT SHARING ELIGIBLE EARNINGS | X-4 |
| Y | TRAINING POLICIES | Y-1 |
| Z | TERRORISM, SABOTAGE AND HOSTAGE BENEFITS | Z-1 |
| AA | RESERVE REST | AA-1 |
| BB | FATIGUE POLICY | BB-1 |
| CC | TWA INTEGRATION | CC-1 |

APA_000000003

# Table of Contents
## Letters

| Letter | Subject | Page |
|---|---|---|
| A | TELEPHONIC RECORDING SYSTEM | A-1 |
| B | CODESHARING EXAMPLES | B-1 |
| C (1) | ACARS | C-1 |
| C (2) | FLIGHT DATA RECORDERS | C-2 |
| C (3) | ACARS UPDATE | C-3 |
| D | CENTRAL CREW TRACKING | D-1 |
| E | PAPER TRIP SELECTION | E-1 |
| F | VOLUNTARY MUTUAL BID STATUS EXCHANGE IMPLEMENTATION | F-1 |
| G | MAJOR MEDICAL EXPENSE BENEFITS | G-1 |
| H | TRIP REMOVAL REQUIRED AS A RESULT OF REASSIGNMENT | H-1 |
| I | SATELLITE CREW BASED SUPPORT | I-1 |
| J | TRAINING PROHIBIT DAYS | J-1 |
| K | UNIFORM COMMITTEE | K-1 |
| L | LAYOVERS INVOLVING A CHANGE OF AIRPORT AT OTHER THAN CO-TERMINALS | L-1 |
| M | AIRPORT PARKING PERMITS | M-1 |
| N | CAPTAIN'S RECOMMENDATION RE: HOTELS DURING OFF SCHEDULE OPERATIONS | N-1 |
| O | INTERNATIONAL OFFICER POSITION | O-1 |
| P | TRAINING EXPENSES | P-1 |
| Q | ACCOMODATION OF OTHER AIRLINE JUMP SEAT RIDERS IN THE CABIN | Q-1 |
| R | CREW MEALS | R-1 |
| S | SUPPLEMENTAL TRAINING | S-1 |
| T | RECALL DEFERRAL | T-1 |
| U | WEIGHTED AVERAGE COST OF CAPITAL | U-1 |
| V | CREW REST FACILITIES | V-1 |
| W | TRAINING CANCELLATION | W-1 |
| X | ELECTRONIC NOTIFICATION OF TRAINING | X-1 |
| Y | PASSES FOR DIRECTOR OF SAFETY, TRAINING | Y-1 |
| Z | MAINTENANCE PRIOR TO TAKEOFF | Z-1 |
| AA | AFFILIATION OF AMR CORPORATION | AA-1 |
| BB | VACATION SCHEDULED DURING AN IOD | BB-1 |
| CC (1) | SERVICE CREDIT FOR FURLOUGHED PILOTS | CC-1 |
| CC (2) | FURLOUGH LENGHT OF SERVICE | CC-2 |
| DD | B737-600 AND B737-700 AIRCRAFT | DD-1 |
| EE | DISTRIBUTION OF GRIEVANCE DOCUMENTS | EE-1 |
| FF | PROCESS FOR REACHING JETS FOR JOBS PROTOCOLS AT COMMUTER CARRIERS | FF-1 |
| GG | PROCESSING OF REMOVALS FROM PRIOR REMOVAL SEQUENCES | GG-1 |
| HH (1) | DISPLACEMENT FLYING WHILE ON UNION LEAVE | HH-1 |
| HH (2) | FLYING WHILE ON UNION LEAVE | HH-2 |
| II | PU IF NEEDED | II-1 |
| JJ (1) | SCOPE: COMMUTER CODESHARE | JJ-1 |
| JJ (2) | SCOPE: REMOVING AA CODE FROM OA FLIGHTS | JJ-2 |

APA_000000004

# Table of Contents
## Letters

| Letter | Subject | Page |
|--------|---------|------|
| JJ (3) | SCOPE: ROUTE PROFITABILITY ANALYSIS | JJ-4 |
| JJ (4) | SCOPE: EXCESS BAGGAGE | JJ-13 |
| JJ (5) | SCOPE: BASELINE CORRECTION | JJ-14 |
| JJ (6) | SCOPE: TSA ATR EXCEPTION | JJ-15 |
| KK | PILOT LONG TERM DISABILITY | KK-1 |
| LL (1) | TWA TRANSITION AGREEMENT | LL-1 |
| LL (2) | PROHIBITING THE LEVERAGE OF TWA-LCC | LL-10 |
| LL (3) | MODIFICATION OF TWA TRANS AGREEMENT | LL-12 |
| LL (4) | TWA JOB PROTECTION | LL-13 |
| MM | CAPTAIN FLYING AS FO FOR EXPERIENCE PRIOR TO CAPTAIN OE | MM-1 |
| NN | ANTICIPATED MISCONNECT | NN-1 |
| OO | MASTER SHUFFLE | OO-1 |
| PP | SUPP WITH IMPLEMENTATION | PP-1 |
| QQ | SUMMARY OF UPDATES | QQ-1 |
| RR | REFORMATTING OF CONTRACT | RR-1 |
| SS | AGREEMENT ON CRJ-700 AIRCRAFT | SS-1 |
| TT | FURLOUGH STAND IN STEAD | TT-1 |
| UU | PILOT EXHAUSTING SICK LEAVE BANK | UU-1 |
| VV | COMMUTER AIR CARRIERS | VV-1 |
| WW | CPA FILL UP PAYOUT OPTION | WW-1 |

APA_000000005

# Table of Contents
## Numbered Letters (2004)

LOA 04-01  S8T-S80 Similar Aircraft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-01
LOA 04-02  Moving Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-02
LOA 04-03  Utilizing S80 Domestic Flight Crews for
Flying to Nassau, Bahamas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-03
LOA 04-04  AA Hub Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-04
LOA 04-05  Excess Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-05
LOA 04-06  Vacation Bank to CPA Conversion Days . . . . . . . . . . . . . . . . . . . 04-06
LOA 04-07  International Baseline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-07
LOA 04-08  Pilot Seniority List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-08
LOA 04-09  Sept 2004 ORD F100-D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-09
LOA 04-10  RAPs Awarded or Assigned to International
Reserve Pilots Outside DOTC . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-10
LOA 04-11  National Officers and PU if Needed . . . . . . . . . . . . . . . . . . . . . . . 04-11
LOA 04-12  FMLA Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-12
LOA 04-13  Chatauqua Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04-13
LOA 04-14  Effective Dates of Supplements and Letters . . . . . . . . . . . . . . . . 04-14

## Numbered Letters (2005)

LOA 05-01  Establishment of FOQA Program . . . . . . . . . . . . . . . . . . . . . . . . 05-01
LOA 05-02  Paid Union Leave (PU) Administration . . . . . . . . . . . . . . . . . . . . . 05-02
LOA 05-03  APA Staff Pass Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 05-03
LOA 05-04  wide body Body Aircraft Cockpit Crew Rest Seats . . . . . . . . . . . . 05-04
LOA 05-05  Scope Exception - Corporate Airlines
BNA-TRI and BNA-ATL Flight . . . . . . . . . . . . . . . . . . . . . . . . . . . 05-05
LOA 05-06  Contract Clarifications and Corrections
to the May 1, 2003 Pilot Agreement . . . . . . . . . . . . . . . . . . . . . . . 05-06
LOA 05-07  Military Flights to Guantanamo Bay . . . . . . . . . . . . . . . . . . . . . . . 05-07
LOA 05-08  International Hours of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . 05-08
LOA 05-09  Enhanced CPA Payout Provisions . . . . . . . . . . . . . . . . . . . . . . . . 05-09
LOA 05-10  Military Charter Flying . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 05-10
LOA 05-11  Utilizing S80 D for Flying to NAS . . . . . . . . . . . . . . . . . . . . . . . . 05-11
LOA 05-12  MIA Excess Baggage Agreement . . . . . . . . . . . . . . . . . . . . . . . . 05-12

## Numbered Letters (2006)

LOA 06-01  Supplement "L" Clarifications and Technical Corrections . . . . . . . . . . . . 06-01
LOA 06-02  Greated Time To Date (GTD) Credit for Training Program
Of five (5) days or Less . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 06-02
LOA 06-03  Supplement CC System Board of Adjustment . . . . . . . . . . . . . . . . . . . . 06-03
LOA 06-04  (not Assigned)

APA_000000006

LOA 05-06  Utilizing S80 Domestic Flight Crews
           For Flying to Nassau, Bahamas................................06-05

# Numbered Letters (2007)

LOA 07-01  RE: TUL Supervisory Flying
LOA 07-02  RE: TUL Vacation Scheduling

APA_000000007

# Table of Contents
# Other Side Letters

QUESTIONS AND ANSWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Q&A-1
INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . INDEX- 1

APA_000000008

# AGREEMENT
## between
## AMERICAN AIRLINES, INC.
### and
## THE AIR LINE PILOTS
### in the service of
## AMERICAN AIRLINES, INC.
### as represented by the
## ALLIED PILOTS ASSOCIATION
## Effective:  May 1, 2003

THIS AGREEMENT is made  and entered into in accordance with  the provisions of the Railway Labor Act, as amende d, by and  between AMERICAN AIRLINES, INC., he reinafter known a s the "Company", and the air line pilots in the service of AMERICAN AIRLINES INC. as represented by the ALLIED PILOTS ASSOCIATION, hereinafter known as the "Association".

In making this  Agreement  the  parties  hereto recognize that co mpliance with the terms of   the Agreement and the development of a spirit of cooperation is essential for mutual benefit and for the intent and purpose of this Agreement.

It is hereby mutually agreed:

APA_000000009

## SECTION 1

## RECOGNITION AND SCOPE

### A. Recognition

The Allied Pilots Asso ciation has shown satisfactory  proof to the  <u>Company</u> that it rep resents more than a majority of  the airline pilots of the  <u>Company</u>, and further, has been ce rtified by the National Mediation Board.

### B. Definitions

1. Affiliate

    The term "Affiliate" refers to (a) any entity that Controls the Company or any entity that the Company Controls, and/or (b) any other corporate subsidiary, parent, or entity Controlled by or that Controls any entity referred to in (a) above.

2. Agreement

    The term "Agreement" means this collective bargaining agreement between the Association and the Company and all supplements and letters of agreement between the Association and the Company.

3. Air Carrier

    The term "Air Carrier" means any common carrier by air.

4. Commuter Air Carrier

    The term "Commuter Air Carrier" refers to any Air Carrier utilizing only (a) aircraft that are certificated in the United States and Europe with a maximum passenger capacity of 50 passenger seats or fewer and (b) aircraft that are not certificated in any country with a maximum gross takeoff weight of more than 64,500 pounds. If an aircraft type operated by an Air Carrier otherwise meeting the conditions in the preceding sentence is recertified with a maximum passenger capacity of greater than 50 passenger seats, the Air Carrier operating said aircraft shall remain a Commuter Air Carrier so long as it operates said aircraft with no more than 50 passenger seats.

5. Company

    The term "Company" shall refer to American Airlines, Inc.

6. Comprehensive Marketing Agreement

    The term "Comprehensive Marketing Agreement" means an arrangement between the Company or an Affiliate and a Domestic New Entrant Air Carrier that is not a Commuter Air Carrier that contains at least the following elements:

    a. AAdvantage or any other Company frequent flyer program;

    b. joint marketing arrangements (other than AAdvantage type arrangements); and,

    c. the lease or transfer of gates from the Company or a U.S. Affiliate to the Domestic New Entrant Carrier.

7. Control

    The term "Control" shall have the same meaning as the term had in Arbitrator Stephen Goldberg's decision in the Canadian Arbitration Case No. 12-93 (April 25, 1994).

8. Domestic Air Carrier

    The term "Domestic Air Carrier" refers to any Air Carrier that is a citizen of the United States within the meaning of 49 U.S.C. § 40102(a)(15), as that statute defines citizenship on the effective date of this Agreement.

9. Domestic Commuter Air Carrier

    The term "Domestic Commuter Air Carrier" refers to any Commuter Air Carrier that is a citizen of the United States within the meaning of 49 U.S.C. § 40102(a)(15), as that statute defines citizenship on the effective date of this Agreement.

APA_000000010

10. Domestic New Entrant Air Carrier

The term "Domestic New Entrant Air Carrier" means a Domestic Air Carrier that has entered the passenger air transportation market since deregulation, either initially or through ceasing operations and then re-entering the market.

11. Fixed Base Operator Flying

The term "Fixed Base Operator Flying" means flying activities in aircraft having a maximum passenger capacity of 30 seats and a maximum payload capacity of 7,500 pounds.

12. Foreign Carrier

The term "Foreign Carrier" means an Air Carrier other than a Domestic Air Carrier.

13. International Flying

The term "International Flying" means scheduled flying by the Company that includes a scheduled landing or departure outside the 48 contiguous states. This definition is solely for the purposes of the exception for International Codesharing and the conditions on that exception in Section 1.J.

14. Major Foreign Carrier

The term "Major Foreign Carrier" means a Foreign Carrier that has had more than $1 billion US, or its equivalent, in annual revenues during its most recent fiscal year.

15. Successor

The term "Successor" shall include, without limitation, any assignee, purchaser, transferee, administrator, receiver, executor, and/or trustee of the Company or of all or substantially all of the equity securities and/or assets of the Company.

16. Successorship Transaction

The term "Successorship Transaction" means any transaction, whether single step or multi-step, that provides for, results in, or creates a Successor.

17. Transborder Flying

The term "Transborder Flying" means flying scheduled by the Company on US-Canada transborder routes.

18. WACC

The term "WACC" refers to AMR Corporation's weighted average cost of capital as described in the letter agreement between the Association and the Company dated May 1, 2003.

## C. SCOPE

1. General.

All flying performed by or on behalf of the Company or an Affiliate shall be performed by pilots on the American Airlines Pilots Seniority List in accordance with the terms and conditions of this Agreement, except as expressly permitted in provisions D.- K. below.

    a. Company Flying. Such flying shall include without limitation all passenger flying, cargo or freight flying, and ferry flying, whether scheduled or unscheduled, revenue or non-revenue:

        (1) performed on aircraft owned and operated by or on behalf of the Company or an Affiliate, leased to and operated by or on behalf of the Company or an Affiliate, or operated by the Company or an Affiliate, or

        (2) conducted by any other Air Carrier which the Company has permitted to utilize the Company's present or future designator code, trade name or aircraft paint scheme for the other Air Carrier's flight operations except as expressly permitted in Section 1 D - K below, and provided that the portion of this provision referring to trade names will apply only to Company trade names used to describe the Company's flight operations and not trade names such as "AAdvantage."

    b. Prohibited Transactions.

APA_000000011

Neither the Company nor an Affiliate shall, without the Association's prior written consent, enter into any transaction, agreement, or arrangement, except as expressly permitted in Section 1.D.- K. below, that permits or provides for:

(1) any form of contracting out or subcontracting out of any Company flying covered by subsection C.1., or any wetleasing from an entity or any chartering of such flying from an entity; or

(2) a Comprehensive Marketing Agreement with a Domestic New Entrant Carrier.

(3) Nothing in this provision C.1.b. shall be construed to permit any other transaction that would violate this provision C.1.

2. Training.

All flight training of American Airlines pilots in Company aircraft shall be performed by American Airlines pilots.

3. Interline Agreements

Nothing in this Section 1 shall be construed to limit the Company or an Affiliate's ability to enter into interline agreements with other Air Carriers.

4. Frequent Flyer Programs.

Nothing in this Section 1 shall be construed to limit the Company or an Affiliate's ability to enter into agreements or arrangements with other Air Carriers involving frequent flyer miles, promotions, awards or other frequent flyer arrangements that are not part of a Comprehensive Marketing Agreement.

5. Captions.

The captions to provisions in this Section 1 are not substantive and should not be considered in construing the meaning of any provision, provided that the Company and the Association do not intend thereby to create an implication as to other captions in this Agreement.

## D. Scope Exception: Commuter Air Carriers

1. Commuter Air Carriers and Section 1 Limitations.

The Company or an Affiliate may create, acquire, maintain an equity position in, enter into franchise type agreements with, and/or codeshare with a Commuter Air Carrier, and flying by any such Commuter Air Carrier shall not be subject to the limitations of Section C.1 above, so long as any such Commuter Air Carrier operates in accordance with the limitations set forth in this Section 1.D.

2. American Eagle, Inc. and Executive Airlines, Inc.

American Eagle, Inc. and Executive Airlines, Inc. may operate, in the aggregate, no more than 43 ATR 72 aircraft or other turbo prop aircraft certificated in the United States and Europe for a maximum passenger capacity of between 51 and 70 seats, without losing their status as Commuter Air Carriers.

3. Purpose; Intent of the Parties.

a. Primary Purpose.

The primary purpose of a Commuter Air Carrier is either to provide passenger and/or cargo revenue feed to Company flights and/or to enhance the Company's overall market presence.

b. Role of Commuter Air Carriers in Company's Development.

The parties recognize that Commuter Air Carriers have played a role in the development of the Company as the world's premier airline. Additionally, the Company and the Association acknowledge that the passenger feed provided to the Company's domestic and international system strengthens the Company, thereby providing enhanced career opportunities to American Airlines pilots.

c. Markets in Which the Company Cannot Earn an Adequate Return on Invested Capital

APA_000000012

The Company will operate American Airlines service in markets where such service can earn an adequate return on invested capital. This provision will not require the Company to operate a particular service, but instead, if the Company could operate a service and earn an adequate return on invested capital, the Company may not place or maintain the Company code on such service by a Commuter Air Carrier. Notwithstanding this prohibition, if the Company orders additional aircraft to fly such a route, the Company may place or maintain its code on the route or frequency during the time between order and delivery of the additional aircraft. Similarly, if the Company is procuring an airport slot, gate and/or other route authority to fly such a route, the Company may place or maintain its code on the route or frequency during the time required to procure such a slot and/or authority.

d. Parties to Meet in the Event of Problems.

It is not the intent of either the Company or the Association to limit the expansion of Commuter Air Carriers in developing new markets. If at any time it is determined that these provisions are impeding the ability of Commuter Air Carriers to fulfill their primary role in support of the Company's system, the parties agree to promptly meet and discuss appropriate modifications to this Agreement.

4. Cockpit Crewmember Floor.

In the event that the number of cockpit crewmembers employed by the Company on the American Airlines Pilots Seniority List goes below 7300, the parties agree that the commuter exception contained in this Section D. shall be terminable at the option of APA following a 90-day period to provide an opportunity for discussion. If APA elects to require termination of the commuter exception, the Company shall thereafter have a reasonable time to complete the disposition of the operations covered by this Section D. during which period the parties shall meet in good faith and discuss the issues related to such termination. Pilots added to the American Airlines Pilots Seniority List by way of seniority merger shall not count in calculating the number of cockpit crewmembers for purposes of this section 4.

5. Limitations on Commuter Carriers.

a. Aircraft Limit.

Beginning with the six month period starting 7/1/03, for each six month period, the total number of aircraft operated under this Section D. may not exceed a limit, based on Narrowbody aircraft operated during that period as provided in c. below. Aircraft shall be counted toward that limit as provided in d. below.

b. Counting Narrowbody Aircraft.

Effective each January 1 and July 1, the total number of aircraft that are being operated by the Company in a single aisle seating configuration ("Narrowbody Aircraft") that are "in service," as that term is defined in SUPPLEMENT CC Section 1.K., shall be tallied for purposes of determining the applicable limit on the number of aircraft operated pursuant to this Section D. For the purpose of this tally of Narrowbody Aircraft, the "total number of aircraft" being operated by the Company for the six month period shall be the straight average of the number of aircraft in service at the Company on the fifteenth calendar day of each of the previous six months. If any six-month tally involves a fractional aircraft unit, the fractional unit will be rounded down if less than .5, and otherwise rounded up.

(1) Force Majeure.

In the event that the Company's planned aircraft deliveries do not take place as scheduled due to conditions beyond the Company's control, then for 12 months from the scheduled delivery date, so long as the scheduled deliveries remain firm orders to be delivered as soon as circumstances permit, the aircraft shall be counted as though they had been timely delivered.

If the Company is unable to operate Company aircraft due to conditions beyond the Company's control, then the Company may count such aircraft as in operation for purposes of b.(1) above for three months from the date such aircraft go out of operation, or such longer period as necessary, not to exceed fifteen months, if the Company is taking all practicable steps to restore operations, including by repairing or replacing the affected aircraft.

APA_000000013

"Conditions beyond the Company's control" shall include, but not be limited to, the following: (1) an act of God, (2) a strike by any other Company employee group or by the employees of a Commuter Air Carrier operating pursuant to Section 1.D., (3) a national emergency, (4) involuntary revocation of the Company's operating certificate(s), (5) grounding of a substantial number of the Company's aircraft, (6) a reduction in the Company's operation resulting from a decrease in available fuel supply caused by either governmental action or by commercial suppliers being unable to meet the Company's demands, (7) the unavailability of aircraft scheduled for delivery.

c. Determining the Maximum Number of Aircraft that Commuter Carriers May Operate.

The maximum average number of aircraft that may be operated under this Section D. during a six-month period is the number of Narrowbody Aircraft multiplied by 110%.

d. Counting Commuter Carrier Aircraft

(1) Two Counts.

Effective each January 1 and July 1, aircraft operated pursuant to this Section D. for the previous six month period shall be counted toward the aircraft limit in c above as a straight average of the number of aircraft in operation on the fifteenth calendar day of each of the previous six months.

Commuter Air Carriers that are Affiliates or that have more than 50% of their RPMs attributable to passengers flying on the Company code shall be counted on a 1 for 1 basis, with fractional units rounded as at the mainline.

Aircraft at Commuter Air Carriers that are not Affiliates and that have 50% or fewer of their RPMs attributable to flying on the Company's code shall be counted toward the aircraft limit as provided in d. (2) below.

(2) Counting Aircraft at Commuter Carriers With 50% or Fewer RPMs on the Company's Code.

At Commuter Air Carriers that are not Affiliates and that have 50% or fewer of their RPMs attributable to passengers flying on the Company's code, aircraft shall be counted in one of two ways, depending on whether or not the Commuter Air Carrier operates a portion of its flights as American Connection (or similarly dedicated operation).

If such Commuter Air Carrier does not operate a portion of its flights as American Connection (or similarly dedicated operation), monthly RPMs flown on the Company's code as a proportion of total monthly RPMs at each such carrier shall be multiplied by the average number of aircraft in operation at that carrier during that month. Fractional units shall be rounded to the nearest hundredth.

Thus, for example, if one third of the monthly RPMs at such a Commuter Air Carrier are attributable to passengers flying on the Company code, then one third of that Commuter Air Carrier's fleet shall be counted toward the overall limit for Commuter Air Carrier aircraft for that month.

If, on the other hand, the Commuter Air Carrier operates a portion of its flights as American Connection or similarly dedicated operation, the aircraft in the dedicated portion of the operation shall be counted on a 1 for 1 basis. If aircraft operated by such a Commuter Air Carrier outside the dedicated portion of the operation carry passengers on the Company code, then:

(a) The aircraft in the dedicated portion shall be counted on a 1 for 1 basis; and

(b) The aircraft in the non-dedicated portion shall be counted in the same manner as aircraft at Commuter Carriers without a dedicated operation, excluding the dedicated portion of the operation from the calculation; and

(c) The number of aircraft in (a) and (b) shall be added together.

Thus, for example, if a Commuter Air Carrier operates 10 aircraft in a dedicated portion of its operations, operates another 10 aircraft in a nondedicated portion of its operations, and if 1/10 of the monthly RPMs in the non-dedicated portion of its operations are attributable to passengers flying on the Company code, then 11

SECTION 1-5

aircraft count toward the overall limit for Commuter Air Carrier aircraft for that month.

e. Penalty for Excess Commuter Carrier Operations.

If, for any six month period, the total number of aircraft operated under this Section D., counted as provided in d. above, exceeds the number permitted under provision c. above, then the number of aircraft that Commuter Air Carriers would otherwise have been permitted to operate during the subsequent six month period shall be reduced by twice the number of such excess aircraft. Moreover, during that subsequent six month period, the Company shall be required to stay within the aircraft limit as calculated on the first day of each month in the period for the previous months in the period. If the Company does not comply during any month of this subsequent six-month period, the Association shall have all available remedies. Nothing herein limits the right of either party to bring a grievance on an expedited basis before the System Board about any dispute regarding compliance with Section 1.D. at any time.

f. Limitations on Aircraft Types in Commuter Air Carriers' Fleets.

No aircraft type in the Company's fleet, or inactive aircraft type previously in the Company's fleet and still under the Company's control, and no orders or options for a Company aircraft type shall be transferred to or operated by a Commuter Air Carrier operated under this Section D.

g. Limits on Certain Non-Stop Flying

Beginning with the calendar quarter starting July 1, 2003, and for each calendar quarter thereafter, Commuter Air Carriers majority owned by AMR Corp. or by an Affiliate shall operate no more than 1% of the total combined scheduled block hours for such Commuter Carriers and the Company in nonstop scheduled service between any of the following airports, without the consent of the Association: DFW, ORD, MIA, JFK, SFO, LAX, LGA, STL and SJU. If the number of departures scheduled by the Company at any other airport exceeds an average of 70 per day over a 12 month period, the Company shall meet with the Association to discuss adding such airport to this list.

No other Commuter Air Carrier operated under this Section 1.D. shall operate nonstop scheduled service between any of the following airports without the consent of the Association: DFW, ORD, MIA, JFK, SFO, LAX, LGA, STL and SJU, except that if Executive Airlines ceases to be a Commuter Carrier that is majority owned by AMR Corp. or an Affiliate, then while Executive Airlines is such a Commuter Carrier, three daily nonstop scheduled roundtrips between SJU and MIA shall not be subject to the restriction in this paragraph. BNA shall be added to the list of restricted airports whenever the Company schedules 40 or more daily departures from BNA. If the number of departures scheduled by the Company at any other airport exceeds an average of 70 per day over a 12 month period, the Company shall meet with the Association to discuss adding such airport to this list.

Section 1.D.5.g amended see Letter VV

h. Hub or Major Airport Departures.

Beginning with the calendar quarter starting July 1, 2003, and for each calendar quarter thereafter, 85% of departures by turbo-jet aircraft at Commuter Air Carriers majority owned by AMR Corp. or by an Affiliate shall be into or out of the following major airports: DFW, ORD, MIA, SJU, SFO, LAX, LGA, STL, and JFK. Other Commuter Air Carriers shall carry passengers on behalf of the Company only into or out of the following airports: DFW, ORD, MIA, SJU, SFO, LAX, LGA, STL and JFK. Departures utilizing commuter slots at slot controlled airports other than those listed above (e.g., DCA) and departures from airports limited to commuter departures by other governmental or aircraft operational restrictions (e.g., SAF), shall not be covered by this provision h.

Section 1.D.5.h amended see Letter VV

6. Preference in Hiring.

If pilots of the Company are on furlough, such pilots shall be given preference in the filling of vacancies on Commuter Air Carriers that are Affiliates.  The Company shall also attempt to secure preference for such pilots for vacancies occurring at Commuter Air Carriers in which the Company or an Affiliate owns a minority equity interest and at independently owned

APA_000000015

Commuter Air Carriers that have franchise-type agreements or other codesharing relationships with the Company or an Affiliate.

7. Information Sharing.

    a. Review of Changes to Commuter Air Carrier Flying.

    The Association shall identify individuals to work with the Company's schedule planning department to review contemplated changes in flying by Commuter Air Carriers on routes where passengers will be carried on behalf of the Company. The Association agrees to treat the information provided by the Company pursuant to this provision as confidential.

    b. Quarterly Data Review.

    On a quarterly basis beginning September 1, 1997, the Company shall review with the Association data that reflects the results of any decisions to substitute flying by Commuter Air Carriers operated under this Section 1.D. for the Company's flying and shall review routes, if any, operated by Commuter Air Carriers on behalf of the Company that could be flown by the Company and earn an adequate return on invested capital. The Company shall also procure and share with the Association the data necessary to verify the limits set forth in this Section D.

    c. New Codesharing/Ownership Arrangements.

    The Company shall discuss with the Association any plans to enter into new codesharing or ownership arrangements with any Commuter Air Carrier prior to the implementation of such arrangements.

8. Foreign Commuter Air Carrier.

A Commuter Air Carrier that engages in flying only between points outside the United States, its territories or possessions shall not be subject to the limitations set forth in Section D.4.-7.

9. Prohibition on Training.

Neither the Company nor an Affiliate shall provide flight training to any pilot on the seniority list of any Commuter Air Carrier that operates under Section 1.D. on any aircraft type owned or operated by the Company.

## E. Scope Exception: Fixed Based Operators

The Association recognizes the Company's desire to engage in fixed base operations. Where such operations include Fixed Base Operator Flying, the Association agrees that the provisions of Section 1.C. above shall not apply to such flying as long as it does not supplant the Company's flying and is not utilized in airline service which is offered for sale to the general public through such devices as the Official Airline Guide and airline industry computerized reservations systems.

## F. Scope Exception: Hawaiian Inter-Island

The Company may place its current or future designator code on flights operating wholly within the Hawaiian Islands provided that the Air Carrier (or its parent) upon which the code is placed is not an Affiliate (other than a Commuter Air Carrier) of the Company, or categorized as a "Group III" Air Carrier by the U.S. Department of Transportation. Further, if the Air Carrier upon which the code is placed also operates between Hawaii and the U.S. mainland, and if the Company drops frequencies existing as of December 1996 between the contiguous 48 states and Hawaii, the Association shall have the right to withdraw its consent to this provision.

## G. Scope Exception: Air Freight Feed Operations

Notwithstanding Section 1.C. above, it is agreed that the Company shall have the right to contract for Air Freight Feed Operations as defined in SECTION 2, below, or to operate such feeders by means of a subsidiary, affiliate, or a division of the Company, or both. If the Company contracts for such operation, and if any American Airlines pilots are on furlough during the performance of such operation, the Company will recall that number of pilots which equals the minimum number of pilots who would be required to perform the operation if the Company, utilizing the same type of aircraft as are actually utilized on the date of commencement of each such operation, performed the operation itself under the terms of this Agreement. The recall of

APA_000000016

furloughed p ilots shall p roceed in the  ma nner  stated in th is  Agreement.  In th e event  the Company operates any such Air Freight Feed Operation itself, the rules of this Agreement shall apply.

## H. Scope Exception: Domestic Air Carriers Other Than Commuter Carriers

The Company may place its current or future designator code, and/or any designator code that the Company directly or indirectly controls, on a Domestic Air Carrier that is not a Commuter Air Carrier as specified below:

1.  The Company shall notify the Association at least 30 days in advance of beginning to codeshare with a Domestic Air Carrier that is not a Commuter Air Carrier.

2.  The Company and the Association will discuss the proposed domestic codesharing agreement for a period of 30 days after the notice in order to reach an agreement that will allow the implementation of the codeshare agreement. The parties do not intend these discussions to encompass subjects unrelated to the implementation of the codesharing agreement.

3.  The parties will engage a mediator/interest-arbitrator to facilitate their discussions. The mediator/arbitrator will be selected by agreement from a list of interest arbitrators knowledgeable about Scope provisions in pilot collective bargaining agreements. If the parties have not reached agreement within the 30 day period, the mediator/arbitrator will resolve the outstanding issues by issuing an award within 10 days after the conclusion of the 30 days period. Any domestic codesharing agreement that the Company enters into before the issuance of the award, or the reaching of an agreement, shall not require the Company to place its code, or any code that it directly or indirectly controls, on flying by the Domestic Air Carrier.

4.  In forming the award, the arbitrator will utilize the terms of the then-existing domestic codeshare agreements among domestic air carriers and the provisions of then-existing collective bargaining agreements for pilots at United, Delta, Northwest, Continental and USAirways airlines that are relevant to domestic codesharing. The Arbitrator will apply those agreements to establish an industry standard domestic codeshare agreement for the period of that agreement that is fair to the pilots.

5.  The subjects to be considered by the parties and submitted to the arbitrator, if agreement cannot be reached, shall include, but not be limited to:

    a.  Procedures for reciprocal codesharing;

    b.  Terms of codesharing on flights between and from the Company's and the Domestic Air Carrier's hubs and focus cities;

    c.  Conditions for codesharing on flying in overlapping markets;

    d.  Conditions for blocked space arrangements;

    e.  Code sharing on International Flying;

    f.  Codesharing on regional jet flying by the Domestic Air Carrier's associated regional airlines and commuter carriers, if any;

    g.  Block hour limitations;

    h.  Joint marketing limitations;

    i.  Adequate protections for existing AA flying;

    j.  The mutual benefits to the Company and the American Airlines pilots.

6.  The interest arbitration will be pursuant to the Railway Labor Act.

7.  The interest arbitrator will retain jurisdiction to resolve questions and disputes about the implementation of his award.

8.  Section 1.C.1.b. (2), concerning Comprehensive Marketing Agreements, shall no longer be effective upon the implementation of a domestic codesharing agreement under this Section pursuant to either an arbitrator's award or agreement with the Association.

APA_000000017

## I.  Scope Exception: Transborder

The Company may place its current or future designator code on flights by Canadian Air Carriers as set forth below:

1.  Codesharing to Third Countries.

    Codesharing agreements allowing Canadian Air Carriers to carry the Company's code between Canada and a third country must meet the following conditions:

    a.  Opportunities to Earn WACC.

        The Company shall always deploy its own aircraft on any international route for which it can obtain authority, so long as that route will earn a return on invested capital at least equal to WACC. The Company shall not use Canadian Air Carriers' flights to third countries as a substitute for opportunities to operate its own international flights from U.S. gateways, provided such Company flights will earn a return on invested capital at least equal to WACC.

    b.  Review of Third Country Traffic Flows.

        On September 1, 1997 and every six months thereafter, the Company shall review with the Association the flows of international passengers traveling to third countries on the Company's code on Canadian Air Carriers' flights and on Canadian Air Carriers' codes on the Company's flights. This review shall identify any incremental international operations that meet the criteria in provision 1.a. above. It shall include an evaluation of the size of aircraft and frequency of operations potentially available for the Company. This review shall also assure that the Company is accruing benefits from the traffic carried on its code on Canadian Air Carriers' flights.

    c.  Review of Traffic Flows Exceeding Certain Numbers of Passengers on Company Code.

        If, for any period of six consecutive months, Canadian Air Carriers carry more than an average of 50 passengers per flight per day on the Company's code or more than an average of 500 passengers per flight per week on the Company's code, the Company and the Association shall promptly conduct a review as described in 1.b. above to determine whether any opportunity exists to carry that traffic from a U.S. gateway on a Company flight that will earn a return on invested capital at least equal to WACC, assuming that the Company can obtain authority for the operation. Nothing in these provisions 1.a.- c. shall be construed to require the Company to operate a particular route or routes.

    d.  Maximizing Use of Canadian Air Carriers' Codes.

        The Company shall attempt to maximize Canadian Air Carrier codesharing on the Company's flights to third country destinations.

2.  Ability to Reopen.

    In the event of a change in regulation, law, or industry practice with respect to codesharing, either party retains the right to reopen on this issue of codesharing with a Canadian Air Carrier.

## J.  Scope Exception: Other International Codesharing

The Company may place or maintain its current or future designator code on flights by Foreign Carriers under the following conditions:

1.  General Principles

    a.  Importance of International Codesharing.

        The Company and the Association agree that codesharing with Foreign Carriers has become an important element of international competition and that it is in the Company's interest to enter into codesharing agreements with such carriers when those agreements strengthen the Company's international and domestic route networks.

    b.  Purpose of Codesharing.

        The purpose of codesharing is to provide feed to the Company's route system and/or establish, maintain, or acquire market presence.

APA_000000018

2. Other Airline Codes on Company Flights.

The Association endorses the maximum use of other airline codes on Company flights. In negotiating codesharing agreements with Foreign Carriers, the Company shall attempt to maximize opportunities to use its own aircraft and personnel.

3. Baseline for International Flying.

A Baseline for International Flying shall be calculated for each year as described below:

a. Effective January 1, 2003, the Baseline for International Flying shall be ___ [the January 1, 2003 International Baseline under the May 1997 Agreement minus the number of block hours that were "double counted" since 1997, (to be determined but not to exceed 18,000 block hours) plus total scheduled block hours in 2002 of Transborder Flying as defined in the May 1997 Agreement].

b. International Baseline for January 1, 2004 and Beyond.

Effective January 1, 2004, and each January 1 thereafter, the International Baseline for that year shall be calculated as follows:

(1) The International Baseline for the previous year shall be adjusted upward by the total block hours of International Flying scheduled by the Company during that year in excess of the previous year's International Baseline. Thus, for example, if the January 1, 2003 International Baseline is $x$ and the total block hours for International Flying scheduled during 2003 is $x + 1000$, then the January 1, 2004 International Baseline shall be $x + 1000$.

(2) The International Baseline for the previous year shall carry forward and remain the same if the amount of block hours scheduled by the Company during the previous 12 month period for International Flying is less than or equal to the International Baseline for that year.

4. International Flying Below 90% and/or 80% of the Baseline in 2003 and Beyond.

On January 1, 2004 and on January 1 of each year thereafter, the International Baseline as calculated on the preceding January 1 shall be compared to the total block hours of International Flying scheduled by the Company during the preceding 12 months.

a. If the Company's scheduled International Flying is below 90% of the previous year's International Baseline, the Company shall have until the succeeding January 1 to cure that deficiency by increasing total scheduled block hours of International Flying to the level that would have met that 90% threshold. If the Company's scheduled International Flying during that additional 12 months does not increase to this required level, then the Association's concurrence shall be required for the Company to enter into new international codesharing agreements whether to place the Company's code on a Foreign Carrier's flights or to carry a Foreign Carrier's code on a Company flight.

b. If the Company's scheduled International Flying is below 80% of the previous year's International Baseline, the Company shall have until the succeeding January 1 to cure that deficiency by increasing total block hours back to the level that would have been required to meet that 80% threshold. If the Company's scheduled International Flying during that additional 12 months does not increase to this required level, then the Association's concurrence shall be required for renewal or continuation of all codesharing agreements whether to place the Company's code on a Foreign Carrier's flights or to carry a Foreign Carrier's code on a Company flight, with the exception of those specifically listed below:

Qantas (on AA 10/23/89; by AA 11/15/94)

British Midland (11/1/93)

Gulf Air (transatlantic 7/1/94; UK-Middle East 1/1/94)

5. Opportunities to Earn Adequate Return on Invested Capital.

a. General.

The Association and the Company agree that the Company shall continue to seek international route authority and pursue all opportunities for deploying its aircraft assets on international routes where it will earn an adequate return on invested capital.

APA_000000019

b. Review of International Codeshare Traffic.

On May 1, 2003 and every six months thereafter, the Company shall review with the Association the flows of international codeshare passengers traveling on the Company's code on Foreign Carrier flights and on Foreign Carrier codes on the Company's flights. This review shall identify any incremental international operations that meet the criteria in provision 5.a. above. It shall include an evaluation of the size of aircraft and frequency of operations potentially available for the Company. This review shall also assure that the Company is accruing benefits from the traffic carried on its code on Foreign Carrier flights.

c. No Codesharing on Routes That Could Earn Adequate Return on Invested Capital.

The Company shall not, without the Association's consent, place or maintain its code on any international route or frequency operated by a Foreign Carrier, on which the Company could earn an adequate return on invested capital. This analysis shall be performed using the same method to analyze route profitability that AMR then uses internally for route planning. Notwithstanding this prohibition, if the Company orders additional aircraft to fly such an international route, the Company may place or maintain its code on the route or frequency during the time between order and delivery of the additional aircraft. Similarly, if the Company is procuring an airport slot, gate and/or other route authority to fly such a route, the Company may place or maintain its code on the route or frequency during the time required to procure such a slot and/or authority. Nothing in this provision 5 shall be construed to require the Company to operate a particular route or routes.

6. Cabotage.

If any Foreign Carrier obtains the right to transport local passenger or cargo traffic between airports within the United States or its territories, the Company shall not allow its code to be used on flights carrying such traffic and shall not carry that Foreign Carrier's code on flights between airports within the United States or its territories.

7. Leaving Company Code in a Market.

The Company shall not reduce flying in a market and subsequently maintain or place its code on Foreign Carrier service in that market without the Association's concurrence unless:

a. the reduction is temporary, based on seasonality, and such flying will be reinstated; or

b. all of the following three conditions are met:

(1) the Foreign Carrier is a Major Foreign Carrier; and

(2) the route/flight failed to earn an adequate return on invested capital over the preceding three months or, if the flying has not continued for three months, then over such shorter period as the flying has actually continued; and

(3) either there will be no decrease in the Company's total international block hours, as measured on the next January 1 for the preceding calendar year, or there will be a proportionate decrease in international block hours flown by the Company and the codeshare partner on routes codeshared with that partner. (In calculating the proportionate decrease in block hours, such block hours shall be rounded to the nearest number that will enable each carrier to reduce its flying in increments of at least one daily round trip). Examples of such decreases are contained in Letter B.

8. Prior Documentation.

Prior to any reduction under provision 7 above, the Company shall provide to the Association the information and, if necessary, the documents necessary to demonstrate compliance with that provision.

9. Initiating Codesharing with a Major Foreign Carrier.

Notwithstanding provisions J.5.c and J.7. above, the Company may rationalize flying as part of entering into an initial codesharing agreement with a Major Foreign Carrier even though such rationalization involves withdrawing from a market and maintaining or placing the Company's code on the service of the Major Foreign Carrier in that market, or placing the Company code on a flight of a Major Foreign Carrier that could earn an adequate return on invested capital, provided that the following conditions are fulfilled:

SECTION 1-11

APA_000000020

a.  As a result of the new codesharing agreement, block hours operated by the Company on routes involved in the codesharing agreement decrease by no more than 10% or by the block hours attributable to one round trip on a route (nonstop flying between any two airports) involved in the codesharing agreement, whichever is greater; and

b.  either there will be no decrease in the Company's total international block hours, as measured on the next January 1 for the preceding calendar year, or there will be a proportionate decrease in international block hours flown by the Company and the new codeshare partner on routes codeshared with that partner as specified in 7.b.(3) above.

c.  Provisions J.5.c. and J.7. shall apply to any subsequent change in service on the codeshared routes. In addition, if the Company withdraws from a route involved in the initial codesharing agreement, and such withdrawal causes block hours operated by the Company on routes involved in the codesharing agreement to drop below the level that would earlier have violated a. above, the Association and the Company shall review the remaining routes on which the Major Foreign Carrier is codesharing. If such review reveals that any route could earn an adequate return on invested capital, the Association shall have the right to require the Company to withdraw its code from one such route for each route from which the Company has withdrawn.

10. Withdrawal from a Codesharing Agreement.

Where the Company is required by this Agreement to withdraw from an agreement with a codesharing partner, such withdrawal shall take place at the earliest possible date that does not cause the Company to incur a financial penalty that is material in the context of the codesharing agreement with the Foreign Carrier.

## K. Equity Ownership Of Foreign Carriers

A Foreign Carrier in which the Company or an Affiliate has an equity investment of more than 15% and with whom the Company codeshares shall be a "Foreign Partner." The Company may have a Foreign Partner only under the following conditions:

1.  When a Foreign Carrier becomes a Foreign Partner, the parties shall establish a "Company Baseline" for that Foreign Partner as follows:

a.  International flights by the Foreign Partner to or from any point in the U.S. that carry the Company code (or that a new codesharing agreement contemplates will carry the Company code) shall be "Covered Flights."

b.  The Company's total scheduled block hours for the previous 12 month period in all markets (city pairs) in which there is a Covered Flight shall be the "Company Baseline."

2.  Twelve months after a Foreign Carrier becomes a Foreign Partner and annually thereafter, the Foreign Carrier's total scheduled block hours attributable to Covered Flights for that twelve months shall be compared to the Foreign Carrier's previous year's total scheduled block hours attributable to Covered Flights. The Company's total scheduled block hours in markets in which the Foreign Partner operates a Covered Flight shall also be compared to the Company's previous year's total scheduled block hours in those markets.

a.  If the above comparison in any year shows that the Foreign Partner's block hours on Covered Flights have increased, the Company's international block hours shall have increased that year at least the same number of block hours.

b.  If the above comparison in any year shows that the Company's block hours in markets in which the Foreign Partner performs Covered Flights have decreased, then the Foreign Partner's block hours on Covered Flights shall have decreased that year or the Company's international block hours shall have increased at least the same number of block hours.

c.  If the above comparison in any year shows that the Company's block hours in markets in which the Foreign Partner performs Covered Flights have decreased and the Foreign Partner's block hours on Covered Flights have increased, then the Company's international block hours shall have increased in the same year by the amount of the Company's decrease combined with the amount of the Foreign Partner's increase. For example, if the Company's block hours decrease by 100 hours and the Foreign Partner's block hours increase by 100 hours, the Company's international block hours in that year shall have increased by 200 hours.

APA_000000021

d. If the above provisions 2.a., b. or c are violated, the Company shall have the ensuing year to bring itself into compliance. If, at the conclusion of the ensuing year, the Company is still not in compliance, then the Company shall withdraw the Company code from sufficient Covered Flights to bring the Company into compliance.

e. If the comparison in any year shows a decrease in the Company's block hours such that the total is less than the Company Baseline, then the Foreign Partner's block hours on Covered Flights shall not increase until a subsequent year's comparison shows that the Company's block hours are again equal to or greater than the Company's baseline.

## L. Successorship

1. Agreement Binding on Successor.

The Agreement shall be binding upon any Successor. The Company shall not bring a single step or multi-step Successorship Transaction to final conclusion unless the Successor agrees, in writing, to recognize the Association as the representative of pilots on the American Airlines Pilots Seniority List consistent with the Railway Labor Act, to employ the pilots on the American Airlines Pilots Seniority List in accordance with the provisions of this Agreement, and to assume and be bound by this Agreement.

2. Seniority List Merger.

If the Successor is an Air Carrier or an affiliate of an Air Carrier, the Company shall, at the option of the Association, require the Successor to agree to integrate the pre-transaction pilot seniority lists of the Company and the Successor in a fair and equitable manner within 12 months of the Successorship transaction pursuant to Sections 3. and 13. of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"). The requirement of this provision does not apply to the Company's acquisition of all or part of another Air Carrier in a transaction which includes the acquisition of aircraft and pilots.

## M. Opportunity To Make Competing Proposal

In the event that any person or entity proposes a transaction which would result in a change of control or potential change of control of the Company or its parent, as those terms are used in AMR's 1988 Long-Term Incentive Plan, whether through a single or multi-step transaction, and the Company determines to pursue or facilitate the proposal, the Company, if consistent with the fiduciary duties of its Board of Directors, shall provide the Association with

1. advance written notice before acting favorably on such proposal; and

2. an opportunity to make a competing proposal.

## N. Other Labor Protective Provisions In Substantial Asset Sale

In the event that, within any 12 month period, the Company transfers (by sale, lease, or other transaction) or otherwise disposes of aircraft, slots, or route authorities ("Aircraft-Related Assets") which, net of Aircraft-Related Asset purchases or acquisitions during the same 12 month period, constitute 20% or more of the value of the Aircraft-Related Assets of the Company to an entity or to a group of entities acting in concert that is an Air Carrier or that will operate as an Air Carrier following its acquisition of the transferred Aircraft-Related Assets (any such entity or group, the "Transferee"; any such transaction, a "Substantial Aircraft-Related Asset Sale"):

1. the Company shall require the Transferee to proffer employment to pilots from the American Airlines Pilots Seniority List in strict seniority order (the "Transferring Pilots"). The number of Transferring Pilots shall be no fewer than the average monthly pilot staffing over the prior 12

SECTION 1-13

APA_000000022

months for the Aircraft-Related Assets transferred to the Transferee in connection with the Substantial Aircraft-Related Asset Sale; and

2. the Company shall not finally conclude a transaction under this subsection unless the Transferee agrees to integrate the Transferring Pilots into the Transferee's pilot seniority list pursuant to Sections 3. and 13. of the Allegheny-Mohawk LPPs.

## O. Remedies

1. The Company and the Association agree to arbitrate any grievance filed by the other party alleging a violation of this Section 1 on an expedited basis directly before the System Board of Adjustment sitting with a neutral arbitrator. The arbitrator shall be a member of the National Academy of Arbitrators and experienced in airline industry disputes. The burden of proof will be determined by the arbitrator. The provisions of the Railway Labor Act shall apply to the resolution of any dispute regarding this Section 1.

2. The parties agree that, in addition to any other rights and remedies available under law and this Agreement, an arbitration award under this Section 1 shall be enforceable by equitable remedies, including injunctions and specific performance against the Company, AMR Corp., and/or an Affiliate of the Company. The Company and Association agree that in a court proceeding to enforce an arbitration award under this Section 1, the rights and obligations are equitable in nature, that there are no adequate remedies at law for the enforcement of such rights and obligations, and that the Association and the Company's pilots are irreparably injured by the violation of this Section 1.

APA_000000023

# SECTION 2

## DEFINITIONS

### A.  Air Freight Feed Operation

A freight operation conducted with non-turbojet aircraft whose primary purpose is to "feed" the Company's aircraft and which is flown with active or furloughed pilots of the Company or under contract.

### B.  Calendar Month

"Calendar month", as used herein, shall mean the period from the first day of, to and including the last day of each calendar month of the year, except that for pilot scheduling and pay purposes January, February and March will each be considered a thirty (30) day month through the addition of January 31 and March 1 to the month of February. Leap year will make February a thirty-one (31) day month.

The Company may, at its option and prior to the annual vacation bidding for a given year, declare that up to any other four (4) months containing thirty-one (31) calendar days be deemed thirty (30) day contractual months by taking the first or last day of each such month and adding it to each or all of the other thirty (30) calendar day months.

### C.  Captain

"Captain" means a pilot who is in command of the aircraft and is responsible for the manipulation of, or who manipulates the flight controls of an aircraft while under way, including take off and landing of such aircraft, and who is properly qualified to serve as, and holds a current airman's certificate authorizing service as a Captain and who holds a Captain bid status.

### D.  Changeover pairings / prior removal sequence

Pairings on the next month allocation for trip sequences originating in the current contractual month. They may be longer or shorter which show a commitment for that particular month. Pay protection for any changes are limited to the current month's flying.

### E.  Classification date

A pilot's Classification Date is assigned concurrent with such pilots' occupational date and shall continue to accrue during such period of duty except as provided in Sections 11, 12, and 17 of this Agreement. Classification seniority is used to determine pay level and the timing of advancement to succeeding pay levels.

### F.  Company date

In most cases it is the same as your date of hire since it is based on continuous service with AMR. A current AMR employee hired as an AA pilot will retain his/her original Company date. It is adjusted due to furloughs and leaves of absence as provided for in Sections 11 and 17.

### G.  Co-terminals as used in this Agreement shall mean:

1.  Kennedy/Newark/LaGuardia

2.  Midway/O'Hare

3.  Dallas/Fort Worth International Airport/Love Field

4.  Washington/Dulles International

5.  Tampa/St. Petersburg

6.  Miami/Fort Lauderdale

The above shall become and remain in effect when crew bases are maintained in the respective cities.

APA_000000024

## H. Contractual Month

"Contractual month" as used herein, shall mean the period of time, for pilot scheduling and pay purposes, during which allocated flying and the associated trip selections shall be effective, when the thirty (30) day provision of Section 2.B. (Calendar Month) is utilized.

## I. Credited Projection (PROJ)

A pilot's total time for the month, including fly through time credited at the beginning of the month, the greater of scheduled or actual for flying already performed, scheduled time for flying yet to be performed, credits as provided in Section 15 Hours of Service (E.- minimum pay and credit for an on duty period, F. - minimum pay and credit for time away from base, and G.- minimum and average pay and credit for an on duty period), and credit for scheduled flight time when relieved of flying duties as provided in Section 5, [trips missed due to paid sick leave, a training program of more than five (5) days, vacation, jury duty, and Association leave] and credited time for any credit/no pay removals (for example, unpaid sick). Credited Projection (PROJ) is used in conjunction with Scheduled Projection (SPROJ) to determine a regularly scheduled pilot's legality in accordance with SECTION 15 Hours of Service.

## J. Crew Tracking Trip Sequence(s)

Any pairing or repairing of a trip or trip sequence by Crew Tracking, or any flying that is not planned in advance to permit inclusion in a pilot's monthly trip selection, shall be called a "Crew Tracking Sequence".

## K. Date of hire

The first day as an AA pilot. This date does not change for furloughs or leaves of absence.

## L. Day Flying

"Day flying" shall include all flying between the hours of 0600 and 2259 pilot's Home Base Time (HBT).

## M. Diversion

When a crew makes an unscheduled or scheduled landing at a destination other than planned, generally due to operational reasons such as (weather, mechanical, pick-up passengers, passenger emergency).

## N. Domicile

A common location where a group of pilots are based.

## O. Duty day

A calendar day (0000-2400) in which any duty is performed for the company including sign-in and debrief.

## P. Duty period

The elapsed time between sign-in time and release time;

1. Sign-in time – shall not be less than one hour prior to scheduled or rescheduled departure time for a pilot flying the first flight of a duty period or thirty (30) minutes prior for a pilot deadheading.

2. Release time – shall apply to all scheduled flying and deadheading and shall be fifteen (15) minutes after the scheduled or actual block in time, whichever is later. (30 minutes for International trip sequence).

3. Deadheading to and from training does not require a thirty (30) minute sign-in or a fifteen (15) minute debrief.

APA_000000025

## Q. First Officer

"First Officer" means a pilot who is second in command of the aircraft and any part of whose duty is to assist or relieve the Captain in the manipulation of the flight controls of the aircraft while under way, including takeoff and landing of such aircraft, and who is properly qualified to serve as, and holds a current airman's certificate authorizing service as a First Officer and who holds a First Officer bid status. On any international flight requiring more than a two (2) pilot cockpit crew, the First Officer(s) shall also be required to possess an ATPC and a type rating on the equipment flown.

## R. Flight Time

1. Actual – that period of time beginning when an aircraft first moves from the ramp blocks for the purpose of flight and ending when the aircraft comes to a stop at the ramp for the purpose of loading or unloading at either intermediate stops or final destination.

2. Scheduled - the time published publicly by the Company from flight departure to flight arrival of the flight.

## S. Fly-through

Time resulting from a trip or trip sequence which spans two contractual months and refers to the flight time including P&C for which a pilot is credited in the succeeding contractual month.

## T. Furlough

"Furlough" means the removal of a pilot from active duty as a pilot with the Company without prejudice, due to a reduction in force, or the period of time during which such pilot is not in the active employ of the Company as a pilot due to such reduction in force.

## U. Greater Time to Date (GTD)

A running accumulation of a pilot's credited hours to date, including time credited for a crew schedule error affecting a reserve pilot (as provided in Section 18.D.2.), but not including credit for future flying, relief from future flying, or reserve proficiency displacement flying (as provided in18.G.2.). Greater Time to Date (GTD) includes all time credited to date. Greater Time to Date (GTD) is used to determine reserve variances and assignments (as provided in Section 18.

## V. International Officer

"International Officer" means a pilot who is assigned to international flights and who holds, in addition to a First Officer qualification, an ATPC and a type rating on the equipment flown, and whose duties as specified by the Company and as directed by the pilot in command, include the assistance or relief of the Captain or First Officer.

## W. Last trip of the month

The last active scheduled trip sequence in a pilot's contractual month, other than make up, regardless of when it was added to the pilot's schedule.

## X. Management pilot

A pilot who occupies a management position in the Flight Department.

## Y. Midnight cutoff

When a change in a contractual month occurs en route, pay and credit for the time flown before midnight shall be paid and credited to the month in which the pilot involved originated the flight. Midnight shall be determined on the basis of local time at the point of last takeoff.

APA_000000026

## Z. Misconnect

Misconnect means that a particular segment, including deadhead, of a pilot's sequence operates sufficiently late into a station so as to cause such pilot to miss the next segment of such pilot's sequence. [See Q&A #105, #106]

## AA. Night Flying

"Night flying" shall include all flying between the hours of 2300 and 0559 pilot's HBT.

## BB. Occupational date

Generally occupational seniority shall begin to accrue from the date a pilot is first scheduled to complete initial new hire training with the Company and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement. Occupational seniority is used for determining placement on the Pilot System Seniority list and for bidding purposes. Any references to seniority in this Agreement are to Occupational Seniority, unless otherwise specified.

## CC. Pay or Compensation

"Pay" or "compensation", for purposes of this Agreement, means longevity, hourly, gross weight, mileage and, if applicable, international override pay.

## DD. Pay Projection (PPROJ)

A pilot's total paid time for the month based on fly through time applied to the Credited Projection (PROJ) at the beginning of the month, the greater of scheduled or actual for flying already performed, scheduled time for flying yet to be performed, credits as provided in SECTION 15 Hours of Service (E. - minimum pay and credit for an on duty period, F. - minimum pay and credit for time away from base, and G. - minimum and average pay and credit for an on duty period), for scheduled time when relieved of flying duties as provided in Section 5, [trips missed due to paid sick leave, a training program of more than five (5) days, vacation, jury duty, and Association leave], and for any pay/no credit applications [for example, trips missed due to a training program of five (5) days or less as provided in Section 6.D.1.a.]. Pay adjustments will be made at the end of the month for training pay (Section 6.D.), minimum guarantee (SECTION 4), apportionment pay (Section 6.C.2.), CPA fill up (Section 15.A.6.a.), CPA spill back (Section 15.A.6.b.) and CPA pay out.

## EE. Pilot

"Pilot" shall include and mean Captain, First Officer, and International Officer.

## FF. Proficiency Displacement

A qualified pilot about to lose a qualification may request to displace another pilot for proficiency flying. The displaced pilot, once removed from the trip, is no longer obligated for such trip. The displacing pilot assumes the obligation to cover the displaced pilot's trip. (See Q&A #28)

## GG. Reassignment

A pilot who is legal in all respects for such pilot's next regularly scheduled flight/sequence, but is assigned by the Company to perform other flying instead of such regular flight/sequence. The pilot shall be paid for whichever of the two (2) flights/sequences produces the higher pay.

## HH. Recurrent training

Training and any associated proficiency check(s) for a category in which the pilot is qualified and is for the purpose of retaining qualification before becoming non-current.

## II. Reschedule

A pilot shall be deemed rescheduled if, (1) following a cancellation, the pilot flies or is deadheaded on the first available flight to base or flies or is deadheaded to pick up the next leg

APA_000000027

of the pilot's original flight sequence; or (2) following a misconnect or illegality, the pilot flies or is deadheaded on the first available flight to b ase. The "first available flight to b ase" is the flight that arrives at the base the earliest. This flight may be direct or indirect.

## JJ.  Requalification training

Training (ground and/or flight) and any associated proficiency check(s) for a category for which the pilot was qualified but is no longer currently qualified.

## KK.  Satellite Base

A sat ellite base is a station where pilots domiciled at a ce rtain crew base as spe cified herein, may be sched uled to origina te and terminate trip sequ ences. All satellite trip selections mu st contain only sequences which are scheduled to originate and terminate at the same sa tellite for the entire contractual month, unless accepted below. The following satellites shall become and remain in effect when crew bases are maintained in the respective cities:

| Crew Bases | Satellites |
|---|---|
|  | Ontario (ONT) / Santa Ana (SNA) / |
| Los Angeles | Long Beach (LGB) |
| San Francisco | Oakland (OAK)/San Jose (SJC) |
| Washington | Baltimore (BWI) |
| Tampa/St. Petersburg | Sarasota (SRQ) |
| Miami/Fort Lauderdale | West Palm Beach (PBI) |

Any Los Ange les based r eserve p ilot who o riginates and terminates a trip se quence at a L os Angeles satellite will have the off duty periods immediately preceding and immediately following such trip sequence extended by one hour (1:00) each.

In a ny contractual month up to thirty-five percent (3 5%) of the to tal trip selections for the satellites of L ong Bea ch (L GB), Santa Ana (SNA), Ontario (ONT), Baltimore (BWI), and We st Palm Beach (PBI), only, may, at the Company's option, be constructed subject to the following exceptions:

1.  or Long Beach (LGB), one (1) trip sequence for each trip selection may originate and terminate at Santa Ana (SNA), or one (1) trip sequence for each trip selection may originate and terminate at Ontario (ONT), or one (1) trip sequence for each trip selection may originate and terminate at Los Angeles (LAX).

2.  or Ontario (ONT), one (1) trip sequence for each trip selection may originate and terminate at Santa Ana (SNA), or one (1) trip sequence for each trip selection may originate and terminate at Long Beach (LGB), or one (1) trip sequence for each trip selection may originate and terminate at Los Angeles (LAX).

3.  or Santa Ana (SNA), one (1) trip sequence for each trip selection may originate and terminate at Long Beach (LGB), or one (1) trip sequence for each trip selection may originate and terminate at Ontario (ONT), or one (1) trip sequence for each trip selection may originate and terminate at Los Angeles (LAX).

4.  for Baltimore (BWI), one (1) trip sequence for each trip selection may originate and terminate at Washington (DCA).

5.  for West Palm Beach, (PBI), one (1) trip sequence for each trip selection may originate and terminate at Fort Lauderdale (FLL), or one (1) trip sequence for each trip selection may originate and terminate at Miami (MIA).

## LL.  Schedule

"Schedule" means the operating schedule used by the Company in its operations.

## MM. Scheduled Projection (SPROJ)

A pilot's total sche duled time for the month, ba sed on the pilot's trip se lection a ward after adjustment for fly through time. Scheduled Projection (SPROJ) includes credits as provided in

APA_000000028

<u>SECTION 15</u> Hours of Service (E. - minimum pay and credit for an on duty period, F. - minimum pay and credit for time away from base, and G. - minimum and average pay and credit for an on duty period), and credit for scheduled time when relieved of flying duties as provided in <u>Section 5</u> [trips missed due to paid sick leave, a training program of more than five (5) days, vacation, jury duty, and Association leave]. Scheduled Projection (SPROJ) is adjusted only for underfly on a leg by leg (block to block) basis, an assignment or reassignment (domestic: at base or away from base; international: at base only), an award or assignment of open flying at base (through make-up, reserve, VJA or trip trading with open time), trip trading (with another pilot or with open time), an uncredited removal from all or part of a scheduled trip sequence which results in less time than was originally scheduled (for example, a cancellation). Scheduled Projection (SPROJ) is used in conjunction with Credited Projection (PROJ) to determine a regularly scheduled pilot's legality in accordance with <u>SECTION 15</u> Hours of Service.

## NN.  Scheduled Trip or Trip Sequence

A "scheduled trip or trip sequence" is a published pairing of flying and/or dead heading, consisting of two or more flight segments, which originates and terminates at a crew base.

## OO.  Service

"Service" means the period of time assigned to active duty as a flight deck operating crewmember or supervisor with the Company.

## PP.  Sick if needed

A reserve pilot who is sick may call and so notify the Company. The pilot will not be charged sick leave until such pilot is assigned to fly. At the time the pilot is needed to fly (by assignment – not by proffer) such pilot will be so notified and will be placed on sick leave effective that date. At the beginning of each subsequent month of reserve, the pilot will convert back to a sick-if-needed status.

## QQ.  Stand in stead displacement

A senior pilot can proffer to stand instead of a junior pilot being displaced from their respective bid status. In doing so, the senior pilot will be awarded a job from his/her bid preference list using the seniority number of the pilot who is most junior in such bid status at that point in the process. Once in the new bid status, pilots will use their own seniority number. The pilot is subject to a lock-in per <u>Section 17L.</u>

## RR.  Supervisory displacement

When a crewmember is replaced on a whole or partial sequence by a Supervisory Pilot. Crewmember is paid schedule for displacement plus greater of schedule/actual time flown. If crewmember is scheduled to deadhead on displaced leg, the greater of scheduled or actual is paid.

## SS.  Supervisory Pilot

Any pilot listed on the American Airlines Pilot Seniority List who is serving in a managerial or instructional capacity and has not been awarded a monthly trip selection, except that a pilot may be utilized as a temporary supervisory pilot under the provisions of <u>SUPPLEMENT O</u>, or may be appointed to a supervisory position during the course of the month.

## TT.  Trip Selection

"Trip selection" means any monthly regular, relief, secondary or reserve flying assignment.

## UU.  Trip selection denial

When a <u>Captain</u> or First Officer cannot be awarded a trip selection of choice due to minimum experience requirements. Such pilot will be awarded another selection, in accordance with that

APA_000000029

pilot's seniority and choice, and will be pay prote cted for the trip selection that such pilot could have held.

## VV.  32 hour legality

FAR legality where an interna tional crewmem ber of a two man unaugmented crew cannot be scheduled to fly over 32 hours in a seven day period.

FAR legality where a crewmember must be given a period of 24 hours free from all duty within a 7 calendar day perio d.  This relief of duty may be given in the form of a ca  lendar day off, a 24 hour period commencing at any time during the day and terminating 24 ho urs later (including a period free from all d uty of 2 4 ho urs or more contained wit hin a seque nce), or by moving a reserve's movable duty free period in accordance with Section 15.D.2.c

APA_000000030

# SECTION 11

## LEAVES OF ABSENCE

### A. General

When the requirements of the Company will permit, a pilot may be granted a leave of absence. When such leave is granted , a pilot shall retain and continue to accrue seniority, provided that such pilot maintains at all times his required certificate or rating s. If such pil ot shall permit his required certificate or ratings to lapse, he sha ll retain his seniority accrued at the time of su ch lapse. Length of service for lo ngevity pay or sala ry purposes shall not accrue during leaves of absence, except leaves granted in the interest of the Company, leaves to permit attendance as representatives of the pilots at conferences with the Company, leaves granted due to sickness or injury, for duty with the military services of the United States, or for service with the Association.

### B. Personal Leaves of Absence

1. A pilot during the normal vacation selection period may submit a request for a leave of absence in conjunction with such vacation preference that shall not exceed a period of thirty (30) consecutive days.

2. The Company shall consider up to thirty (30) individual requests for leaves per calendar year, not including leaves related to maternity, but will not be required to consider more than nine (9) such leaves during any one (1) period of time on a system-wide basis.

3. The Company will respond, in writing, within a reasonable time as to whether or not the pilot's request for a leave can be honored.  Such requests will be honored in order of system seniority subject to availability of replacements in equipment and category at the base.

4. If the Company grants a leave, it may be canceled no later than thirty (30) days prior to the effective date of the leave or his vacation whichever occurs first, except that in cases of emergency, it may be canceled in less than thirty (30) days.

   If the pilot desires to cancel his request for leave, he shall notify the Company as soon as possible, but in no event later than thirty (30) days prior to the effective date of leave or his vacation, whichever occurs first.

5. The Company may, operational requirements permitting, consider the request for pilot's leave of absence in excess of the numbers stated above.

6. In the event of a furlough, the Company will notify all pilots that it will consider all requests for Leaves of Absence in order to mitigate the number of furloughs.

7. A pilot on leave shall not, without prior written permission of the Company, engage in aviation employment, and in no case shall engage in employment, the nature of which may bring discredit upon the Company.

### C. Bid Status During Leaves

1. Any pilot granted a leave of absence shall have the same bid status upon return to active flying duty.

2. A pilot who, upon return, is unable to hold the bid status held at the commencement of the leave will be placed in a lateral or lower bid status in accordance with that pilot's displacement preference list.

3. Reinstatement rights of any pilot on a leave of absence shall not be exercised while such pilot is on such leave of absence.

### D. Sickness or Injury Leaves

1. When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty.  A leave of absence for sickness or injury shall not commence until after a pilot has exhausted

APA_000000062

accrued sick leave credits provided under Section I0 of this Agreement. Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years. Length of service for pay purposes shall accrue during leaves granted because of injury on duty, and during the first ninety (90) days of any leave granted for sickness or injury sustained off duty.

2. A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by seniority upon return to active flying duty.

## E. Military Service Leaves

1. A pilot ordered to, or who volunteers for, active duty with the military services of the United States in time of war shall be granted a leave of absence for the period of such duty and for ninety (90) days thereafter, during which time his seniority and length of service for pay purposes shall accrue.

2. A pilot who volunteers and is accepted for active duty with the military services of the United States in time of peace shall be granted a leave of absence for the period of such duty, but not to exceed a cumulative total of five (5) years, during which time his seniority and length of service for pay purposes shall accrue.

3. A pilot returning from any military leave of absence shall be permitted to return to that pilot's former bid status upon return to active flying duty.

4. A pilot who, upon return, is unable to hold the bid status held at the commencement of the leave will be placed in a lateral or lower bid status in accordance with that pilot's displacement preference list.

5. Notice And Verification

   a. Pilots must provide the Company with reasonable notice of all military leaves which conflict with their American Airlines work schedule, unless the giving of such notice is precluded by military necessity or, under all of the relevant circumstances, the giving of such notice is otherwise impossible or unreasonable.

      (1) Notice of military leave shall be submitted to the Company before trip selection bids close for the following month, unless precluded by one of the exceptions above.

      (2) Late notice and notice of change shall be submitted to the Company by the deadline date specified on the bid sheet header pages.

6. Verification of military duty will not normally be required by the Company.

   When the Company does require verification, within a reasonable period of time the pilot must provide documentation substantiating the military duty in question. [See Q&A #140]

7. Vacation

   a. A pilot may reschedule current fiscal year vacation days/hours to cover military duty provided the Company is given reasonable notice (i.e., notice must be given by the earlier of [1] the first of the month preceding the month in which the vacation is scheduled, or [2] the first of the month preceding the month in which the vacation is rescheduled). The rescheduled vacation must be taken within the current vacation fiscal year.

      (1) The vacation being rescheduled must match, to the extent possible, the number of days of military leave; and

      (2) The vacation must be taken in blocks as originally scheduled or, if the vacation was not originally split, it may be split in accordance with the provisions of this Agreement.

   Examples of rescheduling vacation for military leave:

| Military Duty Dates | Scheduled VC | Rescheduled VC |
|---|---|---|
| Aug. 10 - 16 (7 days) | Jan. AB | Jan. AB to Aug. AB |
| | Jan. AB & Mar. A | Mar. A to Aug. B |

SECTION 11-2

APA_000000063

|  | Jan. ABC | Jan. C to Aug. B |
|---|---|---|
| Aug. 10 - 21 (12 days) | Jan. AB | Jan. AB to Aug. BC |
|  | Jan. AB & Mar. A | Jan. AB to Aug. BC |
|  | Jan. ABC | Jan. AB or BC to Aug. BC |

b.  A pilot may use personal vacation days (PVD's) to cover military duty provided the total number of PVD's used, whether for military duty or not, is in compliance with the provisions of this Agreement. The pilot's vacation bank will be increased by the number of PVD's used times the daily conversion rate.

c.  For a military leave involving four (4) or more entire contractual months, current fiscal year vacation and vacation accrued but not yet credited will be paid at the beginning of such leave, unless the pilot requests not to be paid for such vacation. In no case may a pilot defer vacation into the next vacation fiscal year.

d.  A pilot who has vacation days remaining but no hours in the vacation bank may still move vacation days to coincide with military duty.

8.  Guarantee

a.  A pilot's guarantee will not be reduced for any military leave which does not result in the pilot's removal from a trip sequence or removal from days of reserve availability.

b.  Except as provided for in c.(4) and (5) below, a reserve pilot's guarantee will be reduced if the original military request is submitted after trip selection bids close for the following month or is changed and results in an increase in unavailability due to reserve available days missed. In this case, the reserve pilot's guarantee will be reduced by the amount of the additional unavailability.  [See Q&A #7, #8]

c.  The guarantee of a pilot who is removed from a trip sequence or from days of reserve availability will not be reduced provided:  [See Q&A #6, #7, #8, #77, #140]

(1)  The pilot has submitted to the Company the military leave request before trip selection bids close for the following month, and

(2)  The pilot's entire military leave request for a given month is to cover consecutive days of military duty, and as a result the pilot is not removed from more than four (4) days of trips missed or more than four (4) days of reserve availability, and

(3)  The pilot, if regularly scheduled, is available for make up flying, during the normal hours for the coverage of open time, on all days except those days on which the pilot is (1) scheduled to fly, (2) on a preplanned duty free period or (3) on military leave, provided the pilot does not refuse all proffers of make up flying on such days, or

(4)  The pilot, if reserve, who then changes the original military request which complied with paragraphs (1) and (2) above, increases the days of reserve unavailability but, at the same time, moves DFPs such that they cover the increased unavailable days. If the pilot is unable or chooses not to cover the increased unavailable days, the reserve pilot's guarantee will be reduced by one-nineteenth (1/19th) for each day of increased reserve availability missed. In such case, remaining DFPs may be moved to alleviate any potential illegalities, or

(5)  The pilot, if reserve, submits a late military request, or the original military request resulted in more than four (4) days of reserve unavailability, moves DFPs such that they cover all unavailable days. If the pilot is unable or chooses not to cover all unavailable days, the reserve pilot's guarantee will be reduced by one-nineteenth (1/19th) for each day of reserve availability missed. In such case, remaining DFPs may be moved to alleviate any potential illegalities.

d.  For absences due to military leave (removal from a trip sequence or removal from days of reserve availability) other than those provided in c. above, the guarantee of a reserve or regularly scheduled pilot will be reduced for each day of absence due to such leave in accordance with Section 5.D.  A regularly scheduled pilot who has complied with the Notice and Verification provisions in 5. above will be eligible to make up the time lost. (See Q&A #7)

SECTION 11-3

APA_000000064

9. Crediting

Absences due to military leave (removal from a trip sequence or removal from days of reserve availability) not in compliance with the Notice and Verification provisions above will be credited, unpaid. A regularly scheduled pilot who has complied with Notice and Verification provisions above will be eligible to make up the time lost.

10. Bid Status Following Military Duty.

a. For a leave which does not exceed three (3) entire contractual months, upon the pilot's return to active flying duty with the Company, reinstatement will normally be to the same bid status the pilot held before the leave.

(1) A pilot with a different bid status pending at the time a military leave begins will assume the new bid status at the end of the leave if the effective date of the new bid status coincides with or is before the end of the leave.

(2) For a pilot being withheld from a bid status at the beginning of a military leave, the Company may continue to withhold the pilot in accordance with the AA/APA Basic Agreement and the pilot will assume the same bid status held before the leave, or the pilot may be awarded the withheld bid status. In all cases, the period of the leave will be included in determining the maximum duration of a pilot's withholding, as provided in the AA/APA Basic Agreement.

(3) During such leave, a pilot's bid and displacement preferences will be processed. Thus, the pilot may be awarded a different bid status during the military leave. At the end of the leave, a pilot will assume the bid status held before the leave, or be awarded the new bid status, depending on the effective date of the new status.

(4) A pilot's lock-in and deferral of upgrade will continue to run during such a leave.

b. During a military leave involving four (4) or more entire contractual months, a pilot's bid and displacement preferences will not be processed. Upon the pilot's return to active flying duty with the Company, the pilot will assume a bid status in accordance with the following:

(1) A pilot returning from a leave who does not have a lock-in should, if possible, give the Company a minimum of forty-five (45) days notice of the bid status to which the pilot is entitled by seniority including reinstatement or entitlement rights. Any lock-in incurred will be in accordance with this Agreement.

(2) A pilot's lock in will run during the leave.

(3) If a pilot's lock-in has not been fulfilled, when the pilot returns to active flying duty with the Company, the pilot will assume the bid status to which the lock-in applies.

(4) A pilot returning from a leave who does not have a lock-in will assume a bid status to which the pilot is entitled by seniority, and any lock-in incurred will be in accordance with the AA/APA Basic Agreement.

(5) Deferral of upgrade will continue to run during such a leave, if the deferral began before the leave. If the deferral did not begin before the leave, the pilot may elect to begin the deferral following the leave.

(6) In order to assure that a pilot has the requisite experience for the bid status awarded following a leave, the Company may require training and flying at the same base and in the same equipment but in a different category than the bid status awarded. In such case, the pilot will be paid as if withheld from the bid status which is awarded.

(7) A pilot returning from a leave will be returned to payroll the earlier of such pilot's actual training start date or thirty (30) days from the date the pilot notifies the Company of his availability for training. In no case shall a pilot be returned to payroll earlier than such pilot's actual date of availability for training.

11. General

a. A pilot's probation period will be extended on a day for day basis for military absences exceeding sixty two (62) days.

b. A current and qualified pilot who will be available on the first day of the next contractual month will be eligible to bid for a trip selection.

SECTION 11-4

   c. A pilot may be withheld from a bid status at the end of a leave, provided such withholding is in accordance with the terms of this Agreement.

   d. If a military leave begins in one month and extends into the following month, it will be treated under the provisions of this agreement as if it ended in the same month in which it began.

   e. Nothing in this Section shall supersede, nullify or diminish any federal or state law that establishes a right or benefit which is more beneficial to, or is in addition to, a right or benefit provided for a pilot in this Section.

## F. Duty with the Association

A pilot covere d by t his Ag reement, who is prov iding se rvice for t he Association on a full time basis, shall be granted a leave of absence for the duration of such tour of duty provided that the number of pilots on such leaves shall not at any time exceed three (3) in number. A pilot, who is granted any such leave of absence, shall continue to accrue seniority and length of service for pay pu rposes. Such a p ilot will cont inue to participate in the Pilot Re tirement Plan and the Company Grou p Insurance Plan, subject to pr ovisions and re gulations of said Plans. The Association shall reimburse the Company for the cost thereof. A pilot returning to active service with the Company, from a full time tour of duty with the Association, shall assume a bid status to which entitled by seniority. In lieu of a full time leave of absence, such pilot may elect to remain on the Company's payroll, in which case the Association will reimburse th e Company f or a ll items such as salary, pensions, insurance, sick time and vacations.

## G. Physical Fitness

Any dispute arising under this Section concerning physical fitness of any pilot shall be settled in accordance with the provisions of Section 20 of this Agreement.

## H. Furlough While On Leave

Pilots on leave of absence whose seniority is such that they would have been furloughed had they not b een on leave of absence shall be pr omptly notified that their righ ts under the Agreement have been changed to those of furloughed pilots. If there is a subsequent expansion in se rvice, such pilots, if seniority warra nts, shall a gain revert to leave of absence st atus with accompanying rights, and shall be so notified.

SECTION 11-5

APA_000000066

# SECTION 13

## SENIORITY

### A. Service with Company

Seniority as a pilot shall be based upon the length of service as a flight deck operating crew member with the Company except as otherwise provided in Sections 11 and 12 of this Agreement.

### B. Seniority Date

Seniority shall begin to accrue from the date a pilot is first assigned to air line flying duty and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement.

### C. Retention of Seniority

A pilot once having established seniority shall not lose such seniority except as provided in this Section, nor shall such pilot's relative position on the Pilots' System Seniority List be changed for any reason, including disciplinary action, except as provided in paragraph B. of this Section.

### D. Basic Seniority Rule

Seniority shall govern all pilots in case of promotion, demotion, their retention in case of reduction in force, their recall from furlough, their assignment or reassignment due to expansion or reduction in force or schedules, and their choice of vacancies, provided that the pilot is sufficiently qualified for the conduct of the operation to which he is to be assigned. In the event a pilot is considered not to be sufficiently qualified, the Company shall promptly furnish such pilot written reasons therefore. This paragraph shall apply, provided that certain other rules in this Agreement stipulating specific methods and procedures of applying system seniority shall govern such application of system seniority only to the extent of the specific provisions of such rules.

### E. Failure to Qualify in Turn

When a junior pilot is promoted over a senior pilot, by reason of the failure of the latter to qualify in his turn, the senior pilot shall continue to retain his position on the Pilots' System Seniority List.

### F. Loss of Seniority

1. Resignations, Retirement and Discharges

   A pilot who resigns from the service of the Company, retires, or is discharged for just cause, shall forfeit all seniority as a pilot.

2. Failure to Return from Furlough

   When a pilot who has been furloughed is offered, by written notice from the Company, the opportunity to return to duty as a pilot and such pilot elects, by written statement to the Company, not to return to such duty, or if a recalled pilot fails to comply with the requirements of Section 17.W. of this Agreement, his seniority right of preference in re-employment shall at that time terminate, and all his seniority as a pilot shall be forfeited.

3. Duration of Recall Rights

   A pilot shall retain recall rights indefinitely until refused under 2. above.

4. Retention of Company Benefits

   Upon return from furlough, a pilot shall receive all Company benefits accruing by reason of his previous active service.

APA_000000081

## G. System Seniority List

1. Seniority List Supplied by Company

   The Company shall make available to each pilot, within thirty (30) days after July 1st of each year, a Pilots' System Seniority List, effective July 1, which contains the names of all pilots arranged in the order of system seniority, whether active or inactive, and the seniority date of each pilot.  Such list shall also reflect each pilot's normal retirement date.

2. Protests

   a. A pilot shall be permitted a period of thirty (30) days after any posting of the Pilots' System Seniority List, each year, in which to protest to the Company any omission or incorrect posting affecting his seniority.

   b. A pilot on leave or away from his base station at the time of posting of the list shall have a period of thirty (30) days from the date of his return to his base station during which to file such protest.

   c. Any incorrect posting or any other discrepancy which went unprotested on the annual list in which it first appeared shall not be protested on any subsequent annual posting except that typographical and clerical errors may be corrected at any time.

APA_000000082

# SECTION 21

## DISCIPLINE, GRIEVANCES, HEARINGS, AND APPEALS

### A. Discipline

In recognition of the mutual interest by the Association and the Company to assure that the very highest stand ards of pilot co nduct and perfo rmance are maintained,  and ackno wledging the Company's  obligation to  timely   investigate  allegations of miscondu  ct while bala  ncing the Association's obligatio n to fairly repr  esent  the pilots, th e Co mpany and th e Asso ciation ha ve reached the  following unde rstanding rega rding  the  Company's d isciplinary pro gram for  pilots and the Association's rights of representation.

1.  Disciplinary Program

    a.  It is understood and agreed that the Company will have the right to maintain and administer a disciplinary program for pilots and that the Company may in the future revise, modify, rename, or otherwise change its disciplinary program, solely at its discretion, provided prior written notification is given to the Association and such changes are not in violation of the provisions of the Agreement.

    b.  It is understood and agreed that the Company's disciplinary program will not contain any procedure or step which will require a pilot to waive the contractual right to grieve an action taken by the Company, as provided under the Agreement. The parties recognize that the initial discussion, as defined in 21.A.1.g below, with an employee does not constitute discipline or a step in the disciplinary procedure.

    c.  In response to the Association's expressed concerns relative to the disciplinary letters in pilots' files, the Company agrees that disciplinary letters or advisories issued to pilots under the provisions of the disciplinary program will be removed from the affected pilots' files not later than two (2) years following the date of issue.

    d.  It is understood and agreed that discussion records, which are currently referred to as CR-1 entries, would be entered in and will be maintained as a permanent part of a pilot's Company personnel file; however, no advisory or disciplinary letter will refer to any adverse CR-1 entries in the discussion record entry which was made more than two (2) years prior to the issuance of said advisory or disciplinary letter.

    e.  In accordance with Section 24.B of the AA/APA Agreement, the Company will notify a pilot each time an entry is made on the pilot's discussion record and the discussion record will be available for inspection by the pilot during business hours.  Further, in response to any discussion record entry, a pilot may provide a written rebuttal which will be attached and become a part of the discussion record.

    f.  The purpose of any Company discipline is to correct a pilot's behavior and/or performance.

    g.  The Company will not normally impose discipline upon any pilot until a step process effort has been made to correct a pilot's behavior and/or performance. An entry in the discussion record (currently a CR-1 entry) of a non-disciplinary verbal advisory will include a record of the pilot meeting and specific information concerning the behavior or performance in question, but not such detail as would constitute a written advisory. The Pilot or the Association may, at either's option, provide a written response, rebuttal or addendum. The discussion record and the pilot's or the Association's response, rebuttal, or addendum can be referred to for no more than two (2) years from the date of the issuance of said discussion record.

    h.  The following steps will constitute the disciplinary program for pilots:

        (1) The first step will be a written advisory which will include specific information concerning the behavior or performance in question, any corroborating evidence, and a record of the pilot meeting. The pilot or the Association may, at either's option, provide a written response, rebuttal or addendum.  The written advisory and the pilot's or the Association's response, rebuttal, or addendum will be considered part of the first step, which will reside in the personnel file or record for no more than two (2) years.

APA_000000132

(2) The second step will be a Letter of Discipline which will include specific information concerning the behavior or performance in question, any corroborating evidence, and a record of the pilot meeting.  The Company may proceed to the second step should the pilot have another occurrence documented under A.1.h.(1) of this Section during the time in which a first step written advisory as described in A.1.h.(1) is still in the personnel file or record.  The Company may consider and implement other forms of corrective action. The pilot or the Association may, at either's option, provide written response, rebuttal or addendum to the Company's file or record.

    (a) The parties recognize that there are certain serious infractions that may result in termination or other discipline without prior steps.

    (b) The Company will weigh the positive attributes of the pilot's employment history when considering whether or not a pilot should be disciplined, suspended, or terminated.

i. The Company will maintain no more than one discussion record in a pilot's personnel file and will maintain no more than one (1) personnel file or record for any pilot that can be used for disciplinary purposes.  A pilot will be advised immediately if any material, notation, entry, or otherwise is placed in or removed from such personnel file or record. Such file or record will be available for inspection by the pilot at the pilot's domicile during normal business hours.  At the pilot's request, an Association representative may be present and be permitted to view the pilot's file.

j. Nothing in this Section shall be construed as requiring or otherwise forcing the Company to impose discipline upon a pilot at any time.

## B. Investigation and Rights of Representation

1. A pilot shall not be disciplined or dismissed from service with the Company without an investigation and written notification of such action, including the precise charge(s) and an explanation for any action taken. A pilot shall be provided with an opportunity to meet with that pilot's Flight Department supervisor prior to the rendering of the Company's decision with regard to discipline or dismissal.

2. A pilot shall be entitled to Association representation, or the pilot may elect to be represented by another Company employee of the pilot's choice, at any meeting with the Company for the purpose of (1) investigating a matter which may result in discipline or dismissal, or (2) at which a written statement may be required, or (3) of sufficient importance for the Company to have a witness or more than one supervisor present.  In any case, if a pilot does not wish to have Association representation, the Association reserves the right to have an observer present and the Company has an affirmative obligation to inform the Association in a timely manner about such meeting.

3. The Company will advise the pilot that s/he is entitled to Association representation at the time the investigative meeting/hearing is scheduled.

4. Prior to any investigation, the Company will notify the pilot and the Association of the purpose of the investigation, and make available relevant documentation including the specific charges and statements. The Company may in cases involving harassment allegations require employees of the Company to sign non-retaliatory confidentiality statements prior to reviewing statements.  Further, the Company may redact names and other personal identifiers at the preliminary investigative proceeding.  It is understood that should the matter proceed to the System Board, the Company will provide the Association such statements without redactions.

5. Investigations will be conducted expeditiously.

6. Meetings or investigations will be scheduled at mutually convenient times to the extent possible. The parties recognize that this provision may not be utilized to frustrate the process of conducting timely and appropriate investigations or meetings. If no mutually agreeable time can be established, the meeting will be established between 10:00 am and 3:00 pm local time; however, meetings will not be scheduled during a pilot's DFP. Once scheduled, the hearing should commence within 15 minutes of schedule and proceed as expeditiously as possible. In the event either party is unwilling or unable to commence the meeting within 15 minutes of the scheduled start time, the meeting will be rescheduled, unless mutually agreed

APA_000000133

otherwise. The pilot will not be paid for any meeting that is rescheduled due to either the pilot's or the Association's delay.

7. Only those participants appropriate and necessary for the conduct of the investigation will be present. Only one (1) Chief Pilot/Company supervisor/Company representative will conduct and oversee any pilot meeting.  Only that Chief Pilot/Company supervisor/Company representative will be designated to ask questions or direct any question to be asked of any pilot during the meeting.  At no time will there be more than two (2) Chief Pilots/Company supervisors/Company representatives present during any meeting. This will not prevent either the Company or the Association from having an observer present for note taking or training. Nothing in this paragraph will preclude the Company or the Association from having those deemed necessary to the investigation present, but in no case will there be more than one (1) witness to the incident or event or one (1) expert witness present at the same time during any pilot meeting or hearing.

8. The parties agree that participants in investigations shall be free to discharge their duties in an independent manner, without fear that their individual relations with the Company, the employees of the Company, or the Association, may be affected in any manner by any action taken by them in their capacity as a participant.

9. Investigations involving TUL pilots will be conducted by their pilot supervisor, in the appropriate location. If necessary, the Company will provide the pilot Company business travel to and from that meeting.

10. The subject pilot(s) will be paid for investigative hearings at the rate of :15 minutes flight pay (no credit) for each hour or fraction thereof required.

11. Following the conclusion of the investigation at each level, the Company will provide a written statement to the pilot and to the Association outlining the results of the investigation. If the pilot and/or the Association elect(s) to provide a position statement, it will become a permanent part of the record.

## C. Corporate Security Interviews

Interviews  conducted by the Co  rporate  Security  Department may  not  result in discip line  or discharge of a pilot.  The Association will be  notified and may h ave a representative attend the investigation  as an  observer.  Pilots will b  e  entitled to  Associatio n rep resentation at  su ch interviews, where the pilot is the person being investigated.

## D. Grievances

1. Discipline and Discharge Grievances
    a. A pilot may protest the Company's action(s) imposing discipline or dismissal by filing a grievance and a request for a hearing of the matter in writing within thirty (30) days of the pilot's receipt of the written notification of such action.  The grievance shall be addressed to the pilot's Flight Department supervisor, with a copy provided to the Vice President-Flight and the President of the Association or his/her designee.

    b.  A pilot may be held out of service with pay by the Company, pending an investigation, hearing, appeal, or Substance Abuse Professional evaluation after a confirmed positive breath alcohol test, provided that if the pilot is charged with insubordination, criminal charges or verified positive drug test results, the pilot may be held out of service without pay.  If, in the case of criminal charges or verified positive drug tests, the charges are subsequently not pursued or proven, s/he will be returned to duty without a loss of seniority, shall be paid for any time or earnings lost which the pilot would have received but for the withhold from service, and the Company shall ensure that all personnel and other records so reflect that fact.

2. Contractual Grievances
    a. Any pilot, or group of pilots, covered by this Agreement having a grievance concerning any action by the Company, shall be entitled to the same rights and privileges as provided for in this Agreement and may protest the Company's action(s) by filing a grievance within the following time limits:

        (1) Ninety (90) days from the date of the occurrence being grieved by an individual; or

APA_000000134

  (2) One hundred eighty (180) days from the date of the occurrence being grieved by the President of the Association as a Presidential grievance, or by a Domicile Chairman as a Base grievance.

  (3) The President of the Association, with respect to Presidential grievances, may waive both the Chief Pilot Initial and the Vice-President Appeal grievance levels and proceed either to the Pre-Arbitration Conference, as described in Section 22 of this Agreement, or pursuant to Section 21.D.3, to the System Board of Adjustment, as described in Section 23 of this Agreement.

 b. The Company shall have the right to file a grievance concerning any action by the Association or any matter involving the application or interpretation of this Agreement within the time limits set forth in Section D.2.a.(2) above. Company grievances shall proceed immediately to the Pre-Arbitration Conference as set forth in Section 22.

 c. The time limits set forth in this provision shall begin to run from the point of the occurrence or, if the party did not know about the occurrence, the earlier of the date when the party knew or should have known about the occurrence.

3. Expedited Grievances: A party submitting a Presidential or Company grievance may, upon written request at the time of submission, demand an expedited arbitration of such grievance and may proceed directly to the System Board of Adjustment, as described in Section 23.

## E. Grievance Hearing Guidelines

1. In recognition of the mutual interest by the Association and the Company to assure that grievances are timely processed and acknowledging that communications and the exchange of documents supporting the party's specific positions at the earliest opportunity promotes quicker resolution at the lowest grievance level, the Company and the Association have reached the following understanding regarding grievance hearings.

2. Prior to an Initial or Appeal hearing, a grievant or the Association shall be given the necessary time, not exceeding twenty (20) days, in which to secure the presence of witnesses and prepare for the hearing. The grievant shall have the right to be represented by a Company employee of the grievant's choice, or by the grievant's Association representative(s). In any case that a grievant does not wish to have Association representation, the Association reserves the right to have an observer present and the Company has an affirmative obligation to inform the Association in a timely manner about such hearing. However, if the grievant did not receive the notifcation of the hearing in time to have had the twenty (20) days required above, if requested, the hearing will be rescheduled to provide the required twenty (20) days.

3. Prior to an Initial or Appeal hearing, the parties shall exchange documents supporting their respective positions including (a) for discipline/discharge grievances, documents to support the discipline issued, statements and the grievant's personnel file; and (b) for contractual grievances, documents that support the party's position.

4. Should any pilot(s) or the Association elect to do so, submissions will become a part of the investigation document, specifically those emanating from the initial hearing, and in response to any Company investigation disclosure.

## F. Chief Pilot Initial Grievance Hearing

1. The Initial hearing shall be held by the grievant's Base Chief Pilot, or his designated representative within forty-five (45) days following the receipt of the grievant's written grievance and request for that hearing. In the event that a grievance is not scheduled within

APA_000000135

the 45 day time frame, it shall be deemed to be denied and the grievant shall have the right to proceed to the next step in the grievance process.

2. For those pilots based at the Maintenance and Engineering Center at Tulsa, Oklahoma, the hearing shall be held by the pilot's supervisor at the appropriate location.

3. The Initial hearing may be waived at the grievant's option, and the grievance will proceed to the Appeal hearing level with the Vice President-Flight in accordance with the procedures of this Section.

4. Within thirty (30) days following the Initial hearing, the Company shall render its decision, in writing, and shall furnish the grievant, and APA Legal, a copy of the decision. The Company will provide the specific reason(s) for the decision. In the event that a decision is not rendered within the thirty (30) day time frame, then the grievance shall be deemed to be denied and the grievant shall have the right to proceed to the next step of the grievance process.

## G. Vice-President Appeal Grievance Hearing

1. A decision by the Company in the Initial hearing which is unsatisfactory to the grievant may be appealed to the Vice President-Flight. The written appeal request must be signed by the grievant and filed by the grievant, or his Association representative, within thirty (30) days following receipt of the Company's decision by the President of the Association or his/her designee.

2. The Vice President-Flight, or his designated representative, shall hold the appeal hearing within forty-five (45) days after the receipt of the grievant's written request. In the event that a hearing is not scheduled within the forty-five (45) day time frame, it shall be deemed to be denied and the President of the Association shall have the right to proceed to the next step in the grievance process.

3. The Appeal documentation shall include the results of the Initial Hearing, including any position statement filed by the grievant or the Association. If a decision by the Chief Pilot has not been issued at the time the appeal is filed, the absence of the Chief Pilot's decision should be noted on the appeal notification. The Appeal documentation may be filed at or before the Appeal hearing.

4. The Vice President-Flight, or his designated representative, shall consider all pertinent information, render his decision, in writing, and shall furnish the grievant, and the President of the Association or his/her designee, with a copy of the decision within thirty (30) days after the close of the grievance hearing. The Vice-President-Flight or his designee will provide the specific reason(s) for the decision, citing factual findings and where applicable any contractual reference or past practice supporting the decision. In the event that a decision is not rendered within the thirty (30) day time frame, then the grievance shall be deemed to be denied and the President of the Association shall have the right to proceed to the next step in the grievance process.

5. After the appeal provisions of this Section have been exhausted, the President of the Association shall have the right to appeal either to the Pre-Arbitration Conference, as described in Section 22 of this Agreement, or pursuant to section 21.D.3, to the System Board of Adjustment, as described in Section 23 of this Agreement. Appeal to either the Pre-Arbitration Conference or the System Board must be made within thirty (30) days from the date of the receipt by the President of the Association or his/her designee of the appeal decision of the Vice President-Flight. The written appeal request must be filed by the Association to the Company with a copy to the System Board Coordinator.

## H. General

1. All decisions not appealed within the time limits described herein are final and binding as to the grievant but without precedent unless otherwise agreed.

2. The rights afforded in Sections 21, 22, and 23 are extended to probation pilots for contractual grievances, but not for discipline and discharge grievances.

3. Time limits for hearings, decisions and appeals, established in this Section shall be considered as maximum periods. Every effort will be made to expedite all hearings,

APA_000000136

decisions and appeals.  In cases where extenuating circumstances dictate, the time limits may be extended by mutual agreement, provided that the agreement to extend is in writing and is for a specified time period.

4.  A stenographic report may be taken at an investigation or hearing, with the cost to be divided equally by both parties to the dispute.  In the event it is not mutually agreed that a stenographic report be taken, the party requesting the report shall be responsible for its cost. If the other party subsequently requests a copy of that report, it shall be provided upon receipt of that party's payment of one-half the report's cost.

5.  The filing of all grievances, notices, decisions and appeals provided for in Sections 21, 22 and 23 of this Agreement and all required copies thereof shall be accomplished by hand delivery with receipt or by deposit in U.S. mail, postage prepaid, certified mail to the last known address of the party to whom the notice is being given, or by other delivery means that provide a receipt.

SECTION 21-6

APA_000000137

# SECTION 22

## PRE-ARBITRATION CONFERENCE

### A. Establishment

The Association and the Company desire to implement a method of grievance resolution that will afford the parties an opportunity to resolve pending grievances prior to arbitration proceedings before the System Board of Adjustment. The parties agree that grievances may use fully be evaluated at a Pre-Arbitration Conference ("PAC") to determine if there can be a satisfactory resolution by negotiation or mediation. The parties further desire to use the PAC as a procedure to discuss their respective positions and identify and agree on the issue(s) of genuine disagreement. To this end, the parties agree to act in good faith at the PAC to discuss settlement and exchange relevant documents.

### B. Participants

The parties shall select a minimum of two (2), but no more than five (5) representatives to serve as participants in the PAC. The Association and the Company shall each appoint a principal spokesperson for the PAC.

### C. Jurisdiction

1. The PAC shall have jurisdiction over disputes growing out of grievances or out of interpretation or application of any of the terms of this Agreement. The jurisdiction of the PAC shall not extend to proposed changes in hours of employment, rates of compensation, or working conditions covered by this Agreement.

2. The settlement of grievances resulting from the PAC shall be documented in writing, shall be final and binding on the parties, and shall constitute a precedent, unless the Association and the Company agree otherwise. All cases not resolved at the PAC will be so documented and may be submitted to the System Board of Adjustment.

### D. Responsibility

All grievances must be submitted for a PAC prior to a hearing by the System Board of Adjustment unless otherwise provided under this Agreement. Unless mutually agreed, a grievance will only be heard at one (1) PAC.

1. The PAC will review each grievance before it to determine if there is a resolution to the grievance which is mutually acceptable to both parties; and,
   a. Resolve the grievance in a manner mutually acceptable to both parties, or
   b. Forward the grievance for scheduling at a Mediation Panel, or
   c. Determine that the grievance cannot be resolved and submit the grievance to hearing by the System Board of Adjustment.

The grievant shall be notified of the PAC result, but need not be personally present during any PAC, Mediation Panel, or System Board of Adjustment.

2. The Company will provide the Association at the PAC with its position regarding any grievance scheduled for that PAC including its factual findings, and where applicable, any contractual reference or assertion of past practice supporting its position.

3. The Association and the Company will exchange any pertinent and relevant documents at least five business days prior to the PAC, including: (a) for discipline/discharge grievances, documents to support the discipline issued, statements and the grievant's personnel file; and (b) for contractual grievances, documents that support the party's position.

### E. Scheduling of Pre-Arbitration Conferences

1. The Association and the Company shall mutually agree to schedule and convene a PAC in the following months: January, April, July, and October. The parties further agree that the

APA_000000138

location of the PAC shall be at either the headquarters of the Association or the Company, or at an alternate site mutually agreed upon by the parties.

2. Thirty (30) days prior to a PAC, the Association and the Company will exchange a list of its outstanding grievances that it plans to address at the next PAC.  The Company may only submit one grievance to each PAC unless otherwise agreed upon by the Association.

3. In the event that the Association and Company are unable to resolve a grievance at the PAC, then they may mutually seek the participation of a Mediator to sit as a member of a Mediation Panel.

4. All cases referred to the Mediation Panel must be scheduled for consideration by the Mediation Panel within thirty (30) days of the date the referral is made at the PAC.

5. In the event that the Association and the Company are unable to resolve a grievance at the PAC and the parties do not mutually seek the participation of a Mediator, the grievance may be appealed to the System Board of Adjustment, as described in Section 23, within thirty (30) days from the date the grievance was discussed at the PAC.

## F. Mediation Panel

1. The Mediation Panel shall consist of an equal number of Association and Company representatives, not exceeding three (3) representatives for each party, and a Mediator.

2. The Association and the Company shall select a Mediator from a mutually agreed to list of potential Mediators, and the Mediator shall serve until removed upon the request of either party.  The Association and the Company will equally share the fee and expenses for the Mediator selected.

3. Upon the request of either the Association or the Company, the list of Mediators will be reviewed annually for additions or deletions.

4. The representatives of the parties shall, no later than five (5) business days prior to the scheduled date of the Mediator's participation in a Mediation Panel, present the Mediator with a brief written statement containing the issue(s) in dispute, and the arguments in support of their position.  If the statement is not provided in written form, it may be provided orally at the beginning of the Mediation Panel.  However, oral statements shall not exceed thirty (30) minutes in duration.

5. Proceedings before the Mediator will be informal in nature, shall last no more than one-half (½) day per grievance, unless otherwise agreed by the parties, and the rules of evidence will not apply.

6. No record of a Mediation Panel will be made except by mutual agreement between the Association and the Company.  Any written material that is presented to the Mediator will be returned to the party presenting that material at the termination of the Mediation Panel.

7. The Mediator will have the authority to meet separately with either the Association or the Company during the Mediation Panel proceedings.

8. The Mediation Panel will not have the authority to compel a resolution of the grievance.

9. If the Mediation Panel has been unable to resolve the grievance, the Mediator will immediately provide the parties with an oral advisory decision, unless the Association and the Company mutually agree that no advisory decision will be provided.  When rendering an oral advisory decision, the Mediator will state the grounds for the advisory decision.

10. In the event that either the Association or the Company does not agree to the Mediator's advisory decision, the grievance may be submitted for hearing to the System Board of Adjustment upon notice from the President of the Association or in the case of the Company, the Vice President-Flight, to the System Board Administrator within ten (10) days after consideration by the Mediation Panel.  Failure to give timely notice will constitute withdrawal of the grievance.

11. No Mediator participating in the consideration of a grievance during a Mediation Panel may serve as a member of the System Board with respect to that grievance.  During the System

APA_000000139

Board proceeding on such grievance, no reference shall be made to the discussion of the parties, the comments, observations or advisory ruling of the Mediator, or to the fact that the grievance had been submitted to and was not settled by a Mediation Panel.

12. All cases proceeding to the System Board of Adjustment must be scheduled for hearing as provided in Section 23.

## G. General

Time limits established in this Section shall be considered as maximum periods. Every effort will be made to expedite all hearings, decisions and appeals. In cases where extenuating circumstances dictate, the time limits may be extended by mutual agreement, provided that the agreement to extend is in writing and is for a specified time period.

SECTION 22-3

APA_000000140

## SECTION 23

## SYSTEM BOARD OF ADJUSTMENT

### A. Establishment

In complian ce with the Railway La bor Act, as amended, the parties establish the American Airlines System Board of Adjustme nt for the pu rpose of adju sting and de ciding dispu tes which may arise under the terms of this Agreement and which are properly submitted to it. The System Board o f Adjustment may be constitut ed as either a Four Memb er Bo ard or a Five Member Board. All grievances pro perly submitted to the Board will be hea rd by a Fou r Member Board, unless th e Presiden t of the Association, or in th e case of a Comp any grievance, the Vice-President Flight, elects to proceed directly to a Five Member Board.

### B. Membership

1. A Four Member System Board shall consist of four (4) members, two (2) of whom shall be selected and appointed by the President of the Association, and two (2) by the Company. A Five Member System Board shall consist of five (5) members, two (2) of whom shall be selected and appointed by the President of the Association, two (2) by the Company, and a neutral Arbitrator. For a Five Member System Board, the parties shall select an Arbitrator by mutual agreement, as provided for in this Section, to serve as that Board's Chairman with respect to any case or cases scheduled before that System Board. In some cases, by agreement between the Association and the Company, each party shall appoint only one (1) member each to serve on the System Board with an Arbitrator.

2. The Association shall provide a System Board Coordinator who will determine the availability of the Arbitrators, coordinate their selection, and schedule arbitrations by the procedures contained in sections C. and D. of this Section. The System Board Coordinator shall be the contact point for all communications with Arbitrators, except when System Boards are in session. The System Board Coordinator shall coordinate the various dockets, meetings, and so forth, necessary to administer the System Board. The System Board Coordinator shall not be a participant in any capacity in any hearing, appeal, PAC, Mediation Panel, or System Board of Adjustment, except as may be necessary to testify as to the System Board Coordinator's duties.

### C. Selection of Arbitrator

1. The Association and the Company shall, by mutual agreement, establish a list of Arbitrators to serve as the neutral member of the Five Member System Board. Arbitrators will be categorized as suitable for Disciplinary/Discharge hearings, and/or Contractual Dispute hearings. There shall be a minimum number of ten (10) Arbitrators on each list with the understanding that an Arbitrator can be on both lists.

2. Either the Association or the Company, by written notice to the other, may at any time and without cause, remove any of the named Arbitrators. The Arbitrator so removed shall complete any pending matters in accordance with the Basic Working Agreement. If future arbitration dates have been reserved with the removed Arbitrator pursuant to the Agreement, the System Board Coordinator shall cancel those future dates, and the party requesting the removal of said Arbitrator will be responsible for any cancellation fees that may be incurred as a result of the cancellation of future dates. Upon the removal of any Arbitrator, the System Board Coordinator shall contact the remaining Arbitrators, pursuant to Section 23.C.4 below, to obtain additional dates. The removed Arbitrator will be replaced in accordance with C. 1. above during the parties' annual review of the Arbitrators list.

3. Upon request of either the Association or the Company, the list of acceptable Arbitrators will be reviewed annually for additions or deletions.

### D. Scheduling of Arbitrations

1. The scheduling of Four Member System Board arbitrations shall be as follows:

   a. The System Board Coordinator will contact the parties, coordinate and schedule the System Board hearing, and notify all parties of the time, date and location. The

APA_000000141

Association and the Company agree that the location of System Boards shall be at either the headquarters of the Association or Company, or at an alternate site mutually agreed upon.

2. The scheduling of Five Member System Board arbitrations shall be as follows:

   a. The System Board Coordinator will contact the Arbitrators on the agreed to list to determine scheduling availability for the next annual arbitration dates.

   b. Upon receipt of all Arbitrator's annual available dates, the System Board Coordinator shall provide to the Association and the Company a list of the Arbitrators' annual availability, and the Association and the Company shall attempt to mutually agree upon Arbitrators and annual arbitration dates from the list prepared by the System Board Coordinator. Once the Company and the Association agree upon Arbitrators and annual arbitration dates, the System Board Coordinator will contact the Arbitrators and confirm the arbitration dates.

   c. If a need arises for additional arbitration dates, then the System Board Coordinator will contact the Arbitrators on the agreed to list to determine availability and provide the parties a list of available Arbitrators and dates. The parties shall then attempt to mutually agree upon an Arbitrator and arbitration date from the list prepared by the System Board Coordinator.

   d. The System Board Coordinator will schedule the System Board hearing and notify all parties of the time, date and location. The Association and the Company agree that the location of System Boards shall be at either the headquarters of the Association or Company, or at an alternate site mutually agreed upon.

3. The President of the Association (submitting a Presidential grievance) or the Company Vice President-Flight may submit a grievance to the System Board and, upon written request at the time of submission, demand an expedited arbitration of such grievance. The scheduling of expedited arbitrations shall be as follows:

   a. The grieving party (the Company or the Association) may elect to either (1) substitute the expedited grievance in the place of any of its other scheduled grievances, provided that the Arbitrator is suitable to hear the expedited grievance as provided in Section 23.C.1, or (2) schedule an additional arbitration in accordance with 23.D.2.c. above. The parties shall select an Arbitrator who can schedule, hear, and render a decision within one hundred twenty (120) days following the submission of the dispute to the System Board. In cases where extenuating circumstances dictate, the one hundred twenty (120) day limit may be extended by mutual agreement, provided that the agreement to extend is in writing and is for a specified time period not to exceed an additional thirty (30) days.

   b. If additional arbitration dates have been requested pursuant to 23.D.2.c above and if within seven (7) calendar days after the parties' receipt of the System Board Coordinator's list, the parties cannot mutually agree upon an Arbitrator, then the parties shall attempt to agree upon an Arbitrator that is not on the standing list.

   c. If the parties cannot mutually agree upon an Arbitrator under 23.D.2.c and 23.D.3.b that is not on the standing list within fifteen (15) calendar days, then either party may proceed to the National Mediation Board to obtain a list of not less than seven (7) additional Arbitrators. The parties shall attempt to select a mutually agreeable Arbitrator from the National Mediation Board list, and if the parties fail to do so within fifteen (15) calendar days after receipt of the National Mediation Board's list of Arbitrators, then they shall proceed to select an Arbitrator by the alternating strike method within the following seven (7) calendar days.

## E. Jurisdiction

The System Board shall have jurisdiction over disputes between any employee covered under this Agreement or between the Association and the Company growing out of grievances, or out of the interpretation or application of any of the terms of this Agreement. The jurisdiction of the System Board shall not extend to proposed changes in hours of employment, rates of compensation, or working conditions covered by this Agreement.

SECTION 23-2

APA_000000142

### F. Submission of Disputes

All petitions properly referred to the System Board for hearing shall be served upon the Company and the Association, with a copy to the System Board Coordinator, including all papers and exhibits in connection therewith. The System Board Coordinator shall promptly docket the case. Each case submitted shall include a System Board Petition containing:

1. Question or questions at issue;

2. Statement of facts;

3. Position of their party or parties; and

4. Specific reasons for their positions.

When possible, joint submissions should be made. Upon the moving party's submission to the System Board, the non-moving party shall either join in the moving party's submission or it must provide its separate submission to the moving party, with a copy to the System Board Coordinator, no later than fourteen (14) days after receipt of the moving party's submission to the System Board. The non-moving party must submit a separate submission during this period; otherwise the arbitrator, in the case of a Five Member System Board, or the System Board members, in the case of a Four Member System Board, will be notified of the non-moving party's failure to submit and of the importance of a timely submission to the System Board.

### G. Representation

1. Both the Association and the Company may permit employees covered by this Agreement to be represented at Board hearings by such person(s) as they may choose and designate. In any case, if a pilot does not wish to have Association representation, the Association reserves the right to have a representative participate in the Board hearings. Evidence may be presented either orally or in writing or both.

2. The Board acting as a whole, or the Arbitrator, or the Association or Company representative(s) may summon witnesses or documents that are requested by the parties to the dispute. This Section 23 shall not restrict any additional rights granted under applicable law.

3. No later than fourteen (14) days prior to the date set for the hearing, the parties must exchange all documents that they intend to enter in support of their respective positions and make available, in writing, the names of all witnesses they intend to summon. Nothing herein shall require the representative(s) of either party to present the aforementioned documents, or summon the aforementioned witnesses, during the course of the hearing. Representatives of either party shall not be restricted from entering documents or summoning witnesses that become known subsequent to the fourteen (14) day exchange, provided timely notice is given to the opposing party. To the extent a party fails to disclose a document(s) or witness(es) pursuant to the above and seeks to introduce the evidence as direct or rebuttal evidence during the course of the hearing, the arbitrator, in the case of a Five Member System Board, or the System Board members, in the case of a Four Member System Board, may take such action as appropriate to ensure that: (a) the other party is not prejudiced by the late disclosure of the document(s) or witness(es); (b) the proceedings are not unduly delayed; or (c) additional expense is not incurred.

4. The number of witnesses summoned at any one time shall not be greater than the number which can be spared from the operations without interference with the services of the Company.

### H. Majority Decision is Final

All decisions of the Board shall be made by majority vote. Decisions of the Board in all cases properly referred to it shall be final and binding upon the parties. In the case of a Four Member System Board, the Board's decision shall be deemed final after at least three (3) concurring board members agree that no further Executive Board session(s) are appropriate and after the three (3) concurring board members have signed the final decision. In the case of a Five Member System Board, the Board's decision shall be deemed final after the Arbitrator and two (2) concurring board members agree that no further Executive Board session(s) are appropriate

APA_000000143

and a fter t he  Arbitrator and  th e two   (2)  concurring  board members  have signed the   final decision.

## I.  Deadlock

If a deadlock occurs in a case properly submitted to a Four Member System Board, it shall be the duty of the  Board to endeavor to  reach a d ecision.  I n the  event that the  deadlock cannot be resolved or if a majority is not reached, then the grieving party (the Association or the Company) shall have the right to appeal to the Five Member System Board of Adjustment within thirty (30) days from the date the case is declared deadlocked.  Failure to give timely notice will constitute withdrawal of the grievance.

## J.  Rights and Privileges of the Parties

Nothing h erein sha ll be construed to limit, rest rict, or ab ridge the rights or p rivileges accorded either  to the  employees, the   Association,  or th e Comp any, or th   eir d uly accredited representatives, under the provisions of th e Railway Labor Act, as a mended, and the failure to decide a dispute under the procedure established herein shall not, therefore, serve to foreclose any subsequent rights which such law may afford or wh ich may be established by the Nation al Mediation Board by orders issued under such law with respect to disputes which are not decided under the procedure established herein.

## K.  Records

Unless otherwise agreed by the parties, a stenographic report of the hearings will be taken.  The Board shall maintain a complete record of all matters submitted to it for its consideration, and all findings made by it.

## L.  Expenses

1.  The Association and the Company shall equally share the expenses incurred by the Arbitrator except as otherwise set forth in this section.

2.  Each of the parties shall equally share the expenses incurred by the court reporter in preparing the transcript of the hearing.

3.  Each of the parties shall equally share expenses incurred to secure meeting rooms to hear arbitrations at locations other than at the headquarters of the Association or the Company.

4.  Each of the parties will assume the compensation, travel expense, and other expenses of the Board members selected by the respective parties.

5.  Board members who are employees of the Company shall be granted necessary leaves of absence for performance of their duties as Board members.  So far as space is available, Board members who are employees of the Company shall receive free transportation over the lines of the Company from the point of duty or assignment to the point at which they must appear as Board members and return, to the extent permitted by law.

## M.  Expenses - Witnesses

Each of the pa rties will assume the compe nsation, travel expenses, and other expenses of the witnesses  called by th e re spective p arty.   So far  as  space  is available and in accord with Company policy and/or past practice, witnesses who are employees of the Company or former employees who  are  gr ievants  in the  case   of discharge proceedings   shall receive   free transportation over the lines of the Company from the point of duty or assignment to the point at which they must appear as witnesses and return, to the extent permitted by law.

## N.  Freedom to Discharge Duties

It is u nderstood that each and every Board member shall be f ree to d ischarge their duty(ies) in an inde pendent man ner, with out fea r that th eir in dividual rela tions with t he Comp any,  or the employees of the Company, may be affected in any manner by any action taken by them in their capacity as a Board member.

SECTION 23-4

APA_000000144

### SUPPLEMENT F (1)

James G. Sovich
President
Allied Pilots Association
P. O. Box 5524
Arlington, Texas 76005-5524

Dear Captain Sovich:

The Company has made and will make the following revisions to the Pilot Retirement Benefit Plan:

1.  Fixed Income Benefits

    For pilots retiring on or after April 1, 1977, the Fixed Income Benefit formula will be replaced by the following:

    (a) 1.25% of the pilot's final salary times years and completed months of service less one year for all years from the date of hire as a flight deck operating crewmember. Where a pilot has participated in another defined benefit plan of the Company and has a pension benefit payable from the other defined benefit plan, the years and completed months of participation under the other defined benefit plan will be excluded from service under the Pilot Retirement Benefit Plan for purposes of benefits produced by the final average salary formula.

    (b) Final average salary will be equal to one fifth (1/5) of the sum of the pilot's earnings in the sixty (60) consecutive months in the last 120 months preceding the pilot's Normal, Early or Disability Retirement Date (whichever is applicable) which produces the highest amount. For this purpose, earnings during any calendar year will be considered to be earned equally during each month in the year. Earnings received by a retiring pilot after his retirement date, such as his final month's pay or accrued vacation pay, may be used in conjunction with his earnings in the immediately preceding sixty (60) months of the calculation of his final average salary.  If the retiring pilot's final months' pay exceeds a month's pay at the beginning of the sixty (60) month period, it will be included in the calculation of his final average salary in place of the month's pay at the beginning of the sixty (60) month period.  If the retiring pilot received accrued vacation pay for thirty (30) days or more and such pay for thirty (30) days exceeds a month's pay at the beginning of the sixty (60) month period, the vacation pay for each thirty (30) days will be included in the calculation of his final average salary in place of a month's at the beginning of the sixty (60) month period.  If the vacation pay for any remaining days under thirty (30), exceeds the pay for a comparable period of a thirty (30) day month at the beginning of the sixty (60) month period, such pay will be included in the calculation of his final average in place of the comparable period of a thirty (30) day month at the beginning of the sixty (60) month period. To the extent a retiring pilot received accrued vacation pay after his retirement, it will first be used to complete his last partial month of flying.  The balance of his accrued vacation time may then be used in substitution for full or partial months of wages at the beginning of his sixty (60) month period.  [See Q&A #40]

    (c) Effective for all pilots retiring on or after April 1, 1991 a minimum annual benefit equal to the following amount will be payable if such amount is greater than the benefit produced in (a) above: $1,500.00 times the number of years and completed months of service as an active pilot employee, less one year. Service as an active pilot employee will be calculated as Credited Service (less one year) less periods of disability and other non-active status as identified in Paragraph 8 of Supplement F(1).

    (d) The benefit produced in (a) or (c) above will be payable at Normal Retirement Date.  If the benefit is to commence on an Early Retirement Date, it will be actuarially reduced.

2.  Disability Retirement Minimum

APA_000000189

(a) For a pilot who accepts disability retirement on or after April 1, 1977, the provisions of the Plan will remain the same, except the average monthly salary used in the computation of the monthly benefit will be based on the higher of:

(i) the average monthly salary that the pilot received during the twelve (12) months prior to the exhaustion of his paid sick leave and/or vacation time, or

(ii) the average monthly salary during the pilot's highest paid calendar year out of his last five calendar years prior to the exhaustion of his paid sick leave and/or vacation time.

(b) The Fixed Income Benefit which will be payable to the pilot at Normal Retirement Date, who is on disability retirement and is still on the Pilot Seniority List as of April 1, 1977, or later, in accordance with Supplement F, will be determined under Section 1, above, based on his final average salary to his Disability Retirement Date and years and completed months of service, less one (1) year. Included in such service will be the period between the pilot's Disability Retirement Date and his Normal Retirement Date.

3. (a) Survivor benefit payable upon death of pilot who has attained at least age 50 and for whom benefit payments have not begun on an Early or Normal Retirement basis.

This benefit in the Plan is modified as follows:

(i) Upon the death of a pilot employee who has attained at least age 50 and for whom benefit payments have not begun on an Early or Normal Retirement basis, a survivor's benefit shall be payable to the pilot employee's legal spouse of at least one year on his date of death. In the event there is no legal spouse surviving the deceased pilot employee, the survivor's benefit shall revert to the lump sum payable from both the Fixed and Variable portions of the Plan as if death had occurred prior to age 50.

(ii) The survivor's benefit under the Fixed Income Benefit portion of the Plan shall equal 50% of the benefit determined under Section 1 where the final average salary is determined as of the death of the pilot and years and completed months of service less than one year. Included in such service will be the period between the pilot's date of death and his Normal Retirement Date. Such benefit shall become payable to the surviving spouse effective with the first day of the month coincident with or next following the pilot's death.

(iii) The survivor's benefit payable under the Variable Annuity portion of the Plan to the surviving spouse shall continue to be equal to what the pilot would have received had he retired early at death and had elected a 2/3 joint annuitant option.

(a) Survivor benefit payable upon death of a pilot who has not attained age 50

(i) The Fixed Income Plan is modified to include for the pilot who is vested the qualified pre-retirement survivor annuity required by the Retirement Equity Act as an optional alternative to the current death benefit (i.e., payment of the Basic Accumulation).

(ii) The Variable Income Plan is modified to vest immediately the Company Units and pay a participant's entire account balance to a surviving spouse (or to an alternate beneficiary with the spouse's consent).

4. Effective September 1, 1979 the designated beneficiary of a pilot employee or pilot receiving a disability pension or a pilot on an unpaid sick leave of absence who dies after attaining age 50 without a surviving legal spouse of at least one year as of his date of death, shall receive, at Company expense, an amount of Term Life Insurance equal to 150% of the pilot employee's Basic Life Insurance coverage. The designated beneficiary shall be the beneficiary of record under the Pilot Retirement Plan unless the pilot employee has designated a specific beneficiary for this benefit on Form C-438. Any other agreement to the

APA_000000190

contrary, the designated beneficiary for this benefit shall not be eligible for the Spouse's Survivor Benefit of Supplement F and the Pilot Retirement Benefit Plan.

5. Disability Retirement

(a) An illness and/or injury which has been verified through qualified medical authority and which prevents a pilot from acting as a cockpit crewmember in the service of the Company shall constitute a medical disability and shall make such pilot eligible for benefits according to the provisions set forth in this Supplement. The benefits shall commence ninety (90) days after the onset of the disability or related disability or on the expiration of paid sick leave and/or vacation, whichever occurs later; provided that there has been and continues to be qualified medical care consistent with the nature of the illness or injury. Disability pension benefits are not payable to furloughed pilots, whether furlough date occurs prior to or during a period of disability. [See Q&A #39]

(b) The verification of a disability as it relates to this Supplement shall be established by the Corporate Medical Director through claim procedures set up by the Company and the Allied Pilots Association. Once established, the disability, when appropriate, may be subject to verification every ninety (90) days.

(c) For purposes of the Supplement, a disability will cease to exist whenever health is restored so as not to prevent a pilot from acting as a cockpit crewmember in the service of the Company; whenever verification of a disability can no longer be established; or whenever appropriate medical care is wantonly disregarded. It is recognized by the Association and the Company that there shall be exclusions which are not entitled to disability benefits; these are: fear of flying syndrome, unless there is a pre-eminent psychiatric diagnosis; chemical dependency showing no progress toward recovery after two years.

(d) A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F only for a period of five (5) years commencing at the expiration of his paid sick leave. In the event such a pilot member recovers and returns to the Company as a pilot, during the five (5) year period in which he has not lost his seniority, his monthly disability pension shall cease. He will again become a participant in the Plan for the accrual of additional Basic and Variable Annuity benefits payable at Normal Retirement Date, subject to the eligibility provisions of the Plan. In the event such a pilot member works for the Company in a capacity other than as a pilot, his pilot benefits shall not be paid while he is employed in such a capacity. However, during such period he shall be eligible to participate in the pension programs applicable to his job category.

(e) At Normal Retirement Date such monthly disability pension shall cease. The pilot member shall then receive the monthly Basic and Variable Annuity pension (including that provided by his optional contribution still remaining in the Variable Annuity Trust) which had been accrued under the Basic Annuity portion of the Plan and contributed for under the Variable Annuity portion of the Plan up to the date of the exhaustion of his sick pay, to be payable at Normal Retirement Date.

(f) In the event the actuarially reduced benefits for an early retirement under the Plan exceed the monthly disability pension which would otherwise be payable to such a pilot member, he may elect to receive such benefits and still be considered a disability retirement. A pilot employee who was a member of the Pilot Plan as it existed on the day before the effective date of the signing of the Agreement pertaining to current negotiations shall not lose any accrued rights as a result of these amendments.

(g) Furthermore, effective April 1, 1973, in lieu of extending the Pilot Retirement Benefit Plan death benefit for a pilot member who dies after his 50th birthday to a pilot member who had not attained age 50, the Company, at its expense, will provide such active pilot member with an amount of Term Life Insurance equal to 150% of his Basic Life Insurance coverage under the Group Insurance Plan. Such additional coverage shall cease as of the active pilot member's 50th birthday. In the event such active pilot member becomes disabled and is placed on a sick leave of absence, and/or retires on a disability pension, the additional

APA_000000191

coverage as well as his Basic Life Insurance coverage under the Group Insurance Plan will be continued, at Company expense, up to his 50th birthday.

Optional Life Insurance Plan may be continued by the disabled pilot member, at his expense, up to his 50th birthday.  At his 50th birthday, all such coverage shall cease.  The pilot member shall then be considered a retired employee for purposes of the Group Insurance Plan and will be covered under the Retired Employee Life Insurance schedule.  In the event a pilot member is totally and permanently disabled in the sense that he is completely unable to perform any and every duty pertaining to any occupation or employment for remuneration or profit, his additional coverage will continue as long as he is so disabled. Unless otherwise indicated by the pilot member, the beneficiary of record under the Pilot Retirement Plan shall be the beneficiary of record for this additional coverage.

(h) Any disputes arising as to the clinical validity of a claim or as to the continuation of disability defects, once commenced, shall be referred to a mutually agreed-to clinical source,  whose findings regarding the nature and extent of the condition shall be final and binding upon the parties.  The cost involved in such proceeding shall be equally shared by the Association and the Company.

(i) Effective November 1, 1979, for a pilot diagnosed as chemically dependent on or after November 1, 1979:

(i)   A pilot shall be entitled to a lifetime maximum of up to twenty-four (24) months of payments from the point in time he is diagnosed chemically dependent but not beyond his Normal Retirement Date.

(ii)  The payments shall be a combination of accrued sick time and/or disability pension payments.

(iii) The twenty-four (24) months of payments are not necessarily consecutive. They may be broken for periods if the pilot returns to active status, or does not apply for disability pension payments. However, they are cumulative.

(iv) The twenty-four (24) months of payments shall be extended to pay the pilot any accrued sick time he may have remaining at the end of the twenty-four (24) months of payments.

(v)  Any accrued vacation pay shall not be counted in the twenty- four (24) months of payments.

(vi) If, at the end of the twenty-four (24) months of payments, the pilot has not shown progress toward recovery as determined by the Corporate Medical Director, all disability pension payments terminate.  If the pilot is showing progress toward recovery, as determined by the Corporate Medical Director, he shall continue to receive disability pension payments until he is returned to active flying status.  Any disputes with a pilot's physician arising as to a pilot's recovery or showing progress toward recovery under this sub-paragraph (vi), shall be referred to a mutually agreed-to clinical source, whose findings regarding the nature and extent of the condition of the cockpit crewmember shall be final and binding upon the parties.  The cost involved in such proceeding shall be equally shared by the Association and the Company.

(j) A pilot diagnosed as chemically dependent after August 20, 1982 shall be entitled to the greater of:

(i)   a lifetime maximum of eighteen (18) months of combined sick time and disability pension payments including not more than twelve (12) months of disability pension payments; or

(ii)  the balance of accrued sick time payments.

The eighteen (18) months of payments under (i) above are not necessarily consecutive. They may be broken for periods when the pilot returns to active status or does not apply for disability pension payments.  However, they are cumulative.

Any accrued vacation pay shall not be counted in the eighteen (18) months of payments under (i) above.

APA_000000192

6. Variable Annuity

   (a) Effective January 1, 1973, the actuarial interest assumption shall be 6% interest per annum.  Pilots retired prior to January 1, 1973 will have their variable benefits converted to the new 6% interest assumption as of January 1, 1973.

   (b) Effective January 1, 1990, Company Contributions to the Variable Income Plan of the Pilot Retirement Benefit Program will be eleven percent (11%) of compensation earned on or after January 1, 1990 for all pilot employees.

7. Maximum/Minimum Disability Retirement

   (a) Effective November 1, 1979, a pilot member of the Pilot Retirement Benefit Plan who accepts disability retirement on or after November 1, 1979, because he is medically unable to continue as a pilot, shall be eligible for a monthly disability pension equal to 55% of his average monthly salary.  The maximum monthly payment shall be $4,700.

   (b) Effective January 1, 1992, the maximum monthly payment in a. above is increased to $6,000.  Such maximum monthly payment is applicable to those currently receiving disability retirement benefits and those who qualify for such benefits in the future.

8. As provided in the Pilot Retirement Benefit Plan, on and after April 1, 1977, Credited Service shall not include any period of unpaid leave of absence or furlough after that date except for the following:

   (a) an emergency leave of absence generated by the strike of another organized group which causes the Company to suspend operation; credited service shall not be granted for a period of suspension of operations caused only by pilot employees in connection with the strike of another organized group;

   (b) a leave of absence at Company request to avoid the furlough of other pilot employees;

   (c) an approved disability whether disability benefit is paid or unpaid; or unpaid sick leave of absence which has been requested by the pilot and approved by the Corporate Medical Director;

   (d) with respect to the Spouse's Survivor Benefit, the period from the pilot employee's date of death to his Normal Retirement Date;

   (e) with respect to the Fixed Income Benefit payable at Normal Retirement Date to a pilot on disability retirement the period from the pilot's Disability Retirement Date to his Normal Retirement Date;

   (f) a leave of absence for Association business for which period the Association reimburses the Company for the cost of the Pilot Retirement Benefit Plan;

   (g) a military leave of absence after the pilot employee has become a member of the Plan.

   Neither the Company nor the Association shall modify or change the above during the period of this collective bargaining agreement and the next subsequent collective bargaining agreement.

9. Effective September 1, 1979, in the computation of a pilot employee's Final Average Compensation for his highest 60 consecutive months out of his last 120 months, the period and applicable wages, if any, from items 8(a), 8(b) and 8(c) above, which would normally fall in such 60 month period shall be excluded.  The Final Average Compensation shall be based on wages for such reduced 60 month period, e.g., 58 months. For example, if wages for the 58 month period amounted to $300,000, the Final Average Monthly Salary would be $5,172.41.  However, in the computation of his Fixed Income Benefit, such period shall continue to be included in his Credited Service.

10. For purposes of the Disability Retirement Benefit, in the computation of a pilot employee's average monthly compensation during either the 12 consecutive months next preceding the date of expiration of his paid sick leave, vacation, or both, or the highest calendar year out of the five consecutive years preceding the date of expiration of his paid sick leave, vacation, or both, whichever produces the highest average, the period and applicable wages, if any, from

APA_000000193

items 8(a), 8(b) and 8(c) above, which would normally fall in such 12 month period shall be excluded. The average monthly compensation shall be based on wages for such reduced 12 month period, e.g., ten months. For example, if wages for the 10 month period amounted to $60,000, the average monthly compensation would be $6,000. However, in the computation of his Fixed Income Benefit, such period shall continue to be included in his Credited Service.

11. Lump Sum Option under the Fixed Income Plan

For all pilots retiring after January 1, 1989, the Company will reinstate the lump sum option under the Fixed Income Plan of the Pilot Retirement Benefit program as it existed on January 1, 1989, modified only to comply with Internal Revenue Service requirements in order to maintain the continued qualification of the plan.

The above may only be changed or modified as required by the Internal Revenue Service to maintain the qualification of the Plan under the Internal Revenue Code or the Department of Labor under the Employee Retirement Income Security Act of 1974.

The Company will provide all necessary data and will cooperate fully with the Connell Company to produce pilot statements by March 31st of each year.

Very truly yours,


/signed/
J. G. Allen
Vice President
Employee Relations


Agreed:


/signed/
J. G. Sovich
President
ALLIED PILOTS ASSOCIATION

APA_000000194

# EXHIBIT 3
# for Myers Declaration

*Disposition:  Passed as amended 18-0-0-0 on 11/04/2006*

R2006 – 61  Rev.1          DOMICILE:   DCA          FOR          18
BOD MTG:  09/17-09/22/2006                          AGAINST          0
CBOD MTG:  11/02-11/04/2006                         ABSTAIN          0
                                                    ABSENT          0

Title:  Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five Years

Presented by:  CA Gary Boettcher          Seconded by:   FO Richard Girard

Policy Manual: _____          Cons. & Bylaws: _____

WHEREAS, a pilot who has been on MDSB status longer than five years is removed from the AA seniority list IAW section 11D.1 of the CBA; and

WHEREAS, the company requires a letter from the APA President affirming the reinstatement of pilot's seniority number for a pilot who was removed from the AA seniority list IAW section 11D.1 of the CBA and has subsequently regained their FAA medical certificate,

WHEREAS, reinstating the lost seniority number of a pilot who has been on the MDSB list for more than five years would require an exception to section 11D.1 of the CBA;

THEREFORE BE IT RESOLVED, as soon as practicable, the President shall inform the APA Board of Directors, in writing, of the circumstance underlying the request of the pilot who has petitioned the APA for a reinstatement of their original relative AA seniority number.  The President shall state whether the petitioning pilot was/is an APA member in good standing.  The BOD shall then have seven days to consider each case and must advise the President of any noted objections, in writing, within the seven day period of their objection(s).  Absent any written objection(s) from individual Domicile Officers, the President shall then have the authority to sign a letter authorizing reinstatement of said pilot's seniority number.

BE IT FURTHER RESOLVED, if the President chooses not to reinstate a pilot's seniority number for any reason, or there is a Board Member objection, the said pilot shall have the

R2006-61 Rev.1.doc          1

opportunity to directly petition the APA Board of Directors for seniority number reinstatement.  The

BOD shall retain final decision authority in each seniority number restoration case.

# EXHIBIT 4

# for Myers Declaration

Defendant Exhibit
Exhibit No.: 37
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

1

*Disposition: Passed 12-4-0-0 on March 20, 2014*

| | | | |
|---|---|---|---|
| R2014- 07 Rev. 1 | DOMICILE: DFW | FOR | 12 |
| BOD MTG: | | AGAINST | 4 |
| 02/10-14/2014 | | ABSTAIN | 0 |
| | | ABSENT | 0 |

Title: <u>Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five Years</u>

Presented by: <u>FO Russ Moore</u>          Seconded by: <u>CA Steve Roach</u>

Policy Manual: <u>1.22 (added)</u>          Cons. & Bylaws: _____

**WHEREAS**, a pilot who has been on MDSB status longer than five years is removed from the AA seniority list in accordance with Supplement F(1).5(d) of the CBA; and

**WHEREAS**, reinstating the lost seniority number of a pilot who has been on the MDSB list for more than five years would require an exception to Supplement F(1).5(d) of the CBA which must be agreed upon by both the Company and APA; and,

**WHEREAS**, a condition precedent to the Company's consideration of a contractual exception, APA must support the reinstatement of a pilot's seniority number for a pilot who was removed from the AA seniority list in accordance with Supplement F(1).5(d) of the CBA and has subsequently regained his/her FAA medical certificate; therefore,

**BE IT RESOLVED,** the APA Policy Manual be amended to include:

.      **1.22      Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five Years**

**A. As soon as practicable, the President shall inform the A PA Board of Directors, in writing, of the circumstance underlying the request of the pilot who petitioned APA for support of reinstatement of their original relative AA seniority number of a pilot wishing to return to the seniority list after greater than five years on MDSB. The President shall state whether the petitioning pilot was/is an APA member in good**

R2014-07

**2**

standing. The Board members shall then have seven days to consider each case and must . advise the President of any noted objections, in writing, within the seven . day period of their objection(s). Absent any written objection(s) from an individual Board Member, the President shall then have the authority to sign a letter authorizing reinstatement of said pilot's seniority number.

B.  If the President chooses not to agree to reinstate a pilot's seniority number for any reason, or there is a Board Member objection, the said pilot shall have the opportunity to directly petition the APA Board of Directors for seniority number reinstatement. The BOD shall retain final . decision authority in each seniority number restoration case by majority vote.

*(Tailor to fit.)*

# EXHIBIT 5

# for Myers Declaration

Ex 6

**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX  76155-2512  •  817.302.2272  •  www.alliedpilots.org

November 18, 2011

Defendant Exhibit
Exhibit No.: **6**
Name: **Meadows, L.**
Date: **1/13/2026**
ESQUIRE

VIA CERTIFIED MAIL / RETURN RECEIPT
REQUESTED #7008 3230 0000 8494 0484

First Officer Lawrence M. Meadows
P. O.  Box 4344
Park City, UT  84060-4344

     Re:    Medical Disability Reinstatement

Dear First Officer Meadows:

     This confirms receipt of your email dated November 8, 2011, to Captain Scott Iovine, APA MIA Domicile Chairman (Encl. #1). In your electronic message, you requested APA's assistance with respect to your "termination" by the Company. Your correspondence has been forwarded to me for response.

     In preparation for this response, I reviewed several pieces of your previous correspondence, the majority of which was directed to the Company with a courtesy copy to APA. I have also discussed your case with your domicile representatives, members of the APA Benefits Department and staff from APA Legal.

     It is my understanding that you received pilot long-term disability (LTD) benefits from approximately May 2004 through December 2007, at which time Dr. Thomas Bettes, AMR Corporate Medical, terminated your benefits.  You then appealed that decision to the American Airlines Pension Benefit Administration Committee (PBAC).  I have confirmed that prior to submitting your appeal, you received direct assistance from both the APA Benefits Department and Dr. Keith Martin, of Virtual Flight Surgeons, now known as Aviation Medicine Advisory Service (AMAS).  Dr. Martin reviewed your denial letter and recommended that you obtain a formal psychiatric evaluation in addition to submitting complete medical records from your nurse psychologist.  Dr. Martin then reviewed your formal psychiatric evaluation and additional records prior to you submitting them to the PBAC. As you know, APA contracts with AMAS to provide consultation services and aeromedical advice to APA members at no charge to the individual pilot.

     Unfortunately, the PBAC denied your appeal in June 2008. In October 2008, APA retained outside counsel in Oakland, California to assist APA in aggressively reviewing individual pilot LTD cases. Outside counsel assisted APA with pending appeals, and in cases where the PBAC had already denied a pilot's appeal, such as yours, outside counsel also reviewed the case for possible litigation. With your permission, your case was sent to outside counsel in February 2009. After a review, outside counsel, along with APA Benefits and Legal, your domicile representatives and the APA Secretary-Treasurer held a telephone conference with you on August 12, 2009, to discuss your case. Although the general opinion was that your case

APA_000014251

*First Officer Lawrence Meadows*
*November 18, 2011*
*Page 2*

was not very strong for litigation, referrals were provided to you for competent lawyers near your home and where you were based.

We are aware you retained a lawyer and pursued litigation. Regrettably, we understand your case was dismissed on summary judgment. In response to your previous request for reimbursement of your individual litigation costs to date, as well as your request to fund and pursue your case through the appellate process, APA must respectfully decline your requests. This decision comes only after careful consultation with APA Leadership, APA Benefits and APA Legal Departments, as well as consultation with our outside legal and ERISA experts.

In response to your concerns regarding APA's future action in addressing your "termination," (again Encl. #1), let me clarify that the Company did not "terminate" you; rather, your employer is seeking to exercise administrative procedures contained in the Collective Bargaining Agreement ("CBA"). Specifically, pursuant to Section 11.D.1 of the CBA, a leave of absence for sickness or injury may not exceed five (5) years. Because you have been out on medical disability and/or on a Sick Leave of Absence since 2004, you exceeded the five (5) year limit. The Company now asserts they had no choice but to drop you from the seniority list as prescribed by the CBA. This is presumably what Scott Hansen, Company Director Flight Administration, was trying to explain in his letter to you dated August 5, 2011 (Encl. #2). Being administratively dropped from the seniority list differs from being involuntarily terminated, which is considered a "permanent separation." Among other distinctions, should you obtain your First Class Medical Certificate in the future, you may request to return to active status if approved by both the Company and APA. Certainly, should you obtain your First Class Medical Certificate and wish to return to the seniority list in the future, APA will assist you in the process of requesting your return to the seniority list.

As to your reference to a violation of the Sarbanes-Oxley Act (your "SOX whistle-blower" case), while APA is your exclusive representative with respect to the bargaining agreement under the Railway Labor Act, we are not in a position to represent you individually in your allegations and filing of this particular complaint.

Should you have an issue that is grievable under the CBA, we are very willing to assist you with that matter. Specifically, if you are able to return to active flight status in the future, please contact APA Legal for assistance in that process.

Sincerely,

J/Bennett Boggess
Director of Representation

Enclosures (2)

cc:   Captain David Bates, APA President
      Captain Scott Iovine, APA MIA Chairman

APA_000014252

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Tuesday, November 08, 2011 8:44 PM
**To:** Iovine, Scott; MIA-Chair; Rivera, Ivan - Sec; MIA-Vice; President; Vice President; SECRETARY-TREASURER; APA Legal Bennett Boggess; Myers, Mark
**Cc:** Philip Layfield
**Subject:** Awaiting your response: Termination in Violation of SOX Whistler Blower Protetcion

Scott,

It's been three days since my last request for APA's assistance, and for the union to exercises their duty to represent me as a member in good standing; with respect to the company's unlawful termination of me in violation of my SOX Whistle-blower pprotection. I know you guys are all busy and all trying to negotiate a contract, but that seems highly unlikely; when APA appears to be unwilling and/or unable to defend their members under the current contract.

**So I will ask you once again, "Scott as my union base representative, what is the APA going to do for me with this respect to my termination, and how will you invoke the alternative dispute resolution on my behalf. I need an immediate answer, from you and APA Legal; and respectfully demand you take swift and appropriate action on my behalf.**

Fraternally,
Lawrence Meadows
777FO MIA

Enclosure #1

APA_000014253

# AmericanAirlines®

August 5, 2011

Via CERTIFIED MAIL

Lawrence Meadows
P.O. Box 4344
Park City, UT 84060-4344

Dear Mr. Meadows:

I am responding to the letter you sent to Dr. Bettes on June 22, 2011 about returning to duty as a pilot. As you know, to begin the process of returning to work as a pilot you must obtain a First Class Medical Clearance Certificate from the FAA and send it to AA Medical. If necessary, your AME can advise you on options and procedures for obtaining a special issuance. If you would like an AA Medical physician to assist you in the FAA clearance process, please contact Lead Program Nurse Marcia Reekie at 817-931-4260.

A second option available to you, if you are not able to obtain the required FAA Medical Certificate, or if you simply wish to return to work in a position other than pilot, is to work with the Company to identify a reasonable accommodation. Although you have not requested a reasonable accommodation, you should be aware that one or more may be available to you. To learn more about this option, please visit the Reasonable Accommodation Policy on JetNet. There you will find instructions for how to begin the process, or you may simply contact me and I will initiate it for you. If I have not heard back from you within 10 days of the date of this letter, I will contact you to discuss reasonable accommodation with you.

Our payroll history shows that you have been on a Sick Leave of Absence since April 19, 2004. Your collective bargaining agreement and company policy limit SLOAs for pilots to a total period of three years and up to a maximum of five years with approval, and requires administrative separation from employment when that limit is exceeded. Although you have already exceeded the time limit, as an additional accommodation, to give you time to obtain your FAA clearance and/or to work with us to identify a possible reasonable accommodation option for returning to work, we will continue you in SLOA status through October 7, 2011. If you are unable to return to work at the end of this extended leave of absence, with or without a reasonable accommodation, your employment with the company will end.

Please contact me if I can be of assistance or there is any other issue you would like to discuss. We wish you the best whatever your decision.

Sincerely,

Scott Hansen
Director, Flight Administration
817-967-5291

cc:    Personnel File
       Robert Raleigh



Enclosure #2

APA_000014254

# EXHIBIT 6

# for Myers Declaration


American Airlines

October 19, 2016

Captain Dan Carey
President
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Ft. Worth, TX 76155-2512

Re:  Elimination of limitations on retention and accrual of seniority for disabled pilots

Dear Captain Carey:

This will confirm the agreement between American Airlines, Inc. ("Company") and the Allied Pilots Association ("Association") (collectively the "Parties") regarding the elimination of the five (5) and eight (8) year limitations on the retention and accrual of seniority for LAA and LUS West pilots who have a medical disability as defined in Supplement F(1).5.a.  The parties agree that these  pilots (LAA and LUS) will continue to retain and accrue seniority while disabled.

The Parties agree to the following amendment to the Collective Bargaining Agreement ("CBA") to effect this agreement:

Supplement F(1).5.d

A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F while disabled. In the event such a pilot member recovers and returns to the Company as a pilot, his monthly disability pension shall cease.  He will again become a participant in the Plan for the accrual of additional Basic and Variable Annuity benefits payable at Normal Retirement Date, subject to the eligibility provisions of the Plan.  In the event such a pilot member works for the Company in a capacity other than as a pilot, his pilot benefits shall not be paid while he is employed in such a capacity. However, during such period he shall be eligible to participate in the pension programs applicable to his job category.

The parties agree that this amendment is prospective only.  That is, this amendment has no application to pilots whose employment terminated prior to the effective date of this Agreement.  The effective date of this agreement shall be September 30, 2016.

Please indicate your concurrence with the foregoing by execution in the space provided below.

Sincerely,

_Kimball R Stone_

Captain Kimball Stone
Vice President, Flight Operations
Flight
American Airlines, Inc.

_Beth Holdren_

Beth Holdren
Managing Director Labor Relations,

American Airlines, Inc.



PREITZ_001966  **Meadows 041465**

# EXHIBIT 7
# for Myers Declaration

**From:** Lawrence Meadows <lawrencemeadows@yahoo.com>
**Sent:** Wed, 21 Aug 2013 05:44:16 +0000 (GMT)
**To:** "Hairston, Charles R." <chairston@alliedpilots.org>; "APA MIA Thomas Copeland" <copelandthomas@hotmail.com>; IVANMAD <IVANMAD@aol.com>
**Subject:** Grievance 12-011: Lawrence Meadows SB Request

Chuck,
21, 2013

Thanks for the update, I had hoped for better news. However, for all the same reasons I requested APA proceed to a PAC, I certainly want APA to now move the matter forward to the System Board. I don't want to belabor my previous points, wanted to briefly restate three of the most important reasons why it should go to a SB.

First , and most importantly, as mentioned previously, I would be severely prejudiced in the bankruptcy claims resolution process if my grievance is now deemed to be finally denied. My grievance was preserved as part of the APA Settlement Agreement, and is an integral part of my damages on my personal proof of claim. If it is denied it will adversely affect the final monetary value of my claim.

Second, I was in fact not simply terminated under Sec 11.D., because I exceeded five years on disability/sick leave. The company left me on the list for almost three years after my five year point, and didn't even threaten to terminate my employment until just two weeks after I engaged in protected SOX-WB activity. That matter is pending a Dept. of Labor ALJ hearing, which is currently stayed as a result American's bankruptcy.

Third, if my grievance is resolved favorably it would benefit each and every pilot at APA, and especially the disabled pilots, and particularly those affected under pending DFW Domicile Grievance 12-012. Moreover, during Equity Dispute Merit's Hearing testimony, Membership Committee Chairman, and DFW Base Chair, Capt. Rusty McDaniels, and who filed 12-012 on behalf of his domicile, admitted that he would like to see APA have discussions about, and its negotiators look at eliminating Sec 11.D. just as United had done with the similar max-sick leave provision in its pilots CBA. There is no reason our disabled pilots shouldn't enjoy the same security and protections afforded to their peers at UAL and SW; specifically, to allow them retain their position on the seniority list until such time that they can medically qualify to return to the cockpit, or until retirement age.

APA has the opportunity to resolve this Sec 11.D. issue to the benefit of all its members, right here and right now. Furthermore , if APA BOD Officer, Capt. McDaniel's is sincere about protecting the his members under 12-012, which I believe his testimony clearly showed, then APA can use my grievance as the vehicle to effectuate immediate relief to all similarly situated disabled/sick pilots. Regardless of whether not Sec 11. D. violates the ADA or not, it is simply amounts a punitive rule that places an arbitrary and discriminatory time constraint on a sick pilots career expectations/progression. This is a no cost item, and imposes no undue hardship on the company, and no there is no justifiable reason as to why it should not be eliminated.

Therefore, I respectfully request the Association President appeal my grievance 12-011 to the System Board of Adjustment for a final review.

Fraternally,

Larry Meadows
777FO/MIA AA#332713

---

**From:** "Hairston, Charles R." <chairston@alliedpilots.org>
**To:** "Meadows, Lawrence M." <lawrencemeadows@yahoo.com>
**Sent:** Tuesday, August 20, 2013 8:13 AM
**Subject:** FW: Lawrence Meadows

Larry —

See below. We'll be reviewing your case internally and I will let you know the decision on the System Board.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187

THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

---

**From:** Cohen, T C [mailto:T.C.Cohen@aa.com]
**Sent:** Tuesday, August 20, 2013 9:12 AM
**To:** Hairston, Charles R.
**Cc:** Yu, K helen; Newgren, Denny
**Subject:** Lawrence Meadows
**Importance:** High

APA_000014098

Chuck,

I wanted to get back with you on the proposal offered at PAC for Meadows.  At this time the Company cannot meet the terms requested by Mr. Meadows.

If you have any questions please let me know.

TC

American Airlines

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. As such, this message is privileged and confidential. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

APA_000014099

# EXHIBIT 8

# for Myers Declaration



Defendant Exhibit
Exhibit No.: 18
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building   •   14600 Trinity Boulevard, Suite 500   •   Fort Worth, TX  76155-2512   •   817.302.2272   •   www.alliedpilots.org

August 29, 2013

Recieved Sep 5, 2013
Via U.S. MAIL

First Officer Lawrence Meadows
P. O. Box 4344
Park City, UT 84060-4344

Re:    Grievance 12-011

Dear First Officer Meadows:

I am writing in reference to Grievance Number 12-011, which you filed on February 4, 2012. By way of background, your grievance was first heard by the Vice-President - Flight's designee on April 25, 2013. Your grievance was denied by the Vice President – Flight's designee by letter dated June 6, 2013. On June 28, 2013, at your request I submitted your grievance to the Pre-Arbitration Conference. Your grievance was discussed at the Pre-Arbitration Conference held August 6, 2013, but was not resolved. You subsequently requested that I consider your grievance for submission to the System Board of Adjustment.

I have considered your request and have decided not to submit your grievance to the System Board of Adjustment. Your grievance is based on federal statutory claims, and it is my understanding that you are already pursuing those claims in the appropriate federal forums. Under those circumstances, submission of your grievance to the System Board of Adjustment would not be appropriate.

Sincerely,

Captain Keith C. Wilson
President

cc:    APA Legal Department (CRH)

Meadows 023299

# EXHIBIT 9

# for Myers Declaration

GCG Number: 7654080

Modified B 10 (GCG) (12-11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor (Check Only One):**    **Case No.**

- ■ American Airlines, Inc. — (11-15464)
- ☐ AMR Corporation — (11-15463)
- ☐ AMR Eagle Holding Corporation — (11-15465)
- ☐ American Airlines Realty (NYC) Holdings, Inc. (11-15462)
- ☐ Americas Ground Services, Inc. — (11-15466)
- ☐ PMA Investment Subsidiary, Inc. — (11-15467)
- ☐ SC Investment, Inc. — (11-15468)
- ☐ American Eagle Airlines, Inc. — (11-15469)
- ☐ Executive Airlines, Inc. — (11-15470)
- ☐ Executive Ground Services, Inc. — (11-15471)
- ☐ Eagle Aviation Services, Inc. — (11-15472)
- ☐ Admirals Club, Inc. — (11-15473)
- ☐ Business Express Airlines, Inc — (11-15474)
- ☐ Reno Air, Inc — (11-15475)
- ☐ AA Real Estate Holding GP LLC — (11-15476)
- ☐ AA Real Estate Holding L.P. — (11-15477)
- ☐ American Airlines Marketing Services LLC — (11-15478)
- ☐ American Airlines Vacations LLC — (11-15479)
- ☐ American Aviation Supply LLC — (11-15480)
- ☐ American Airlines IP Licensing Holding, LLC — (11-15481)

**Your Claim is Scheduled As Follows:**

*[stamp:]* THE GARDEN CITY GROUP INC. MAR ~ 7 2014

FILED - 13866

USBC - SDNY

AMR CORPORATION, ET AL.

11-15463 (SHL)

NOTE: Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503 (other than a claim under 11 U.S.C. § 503(b)(9), which is subject to a separate bar date of February 13, 2012).

**Name of Creditor (the person or other entity to whom the Debtor owes money or property):** Allied Pilots Association

**Name and address where notices should be sent:**
ALLIED PILOTS ASSOCIATION
C/O JOSHUA R TAYLOR
1330 CONNECTICUT AVE NW
WASHINGTON   DC   20036
US

Telephone number: 202 429 3000
E-mail: jrtaylor@steptoe.com

**Name and address where payment should be sent (if different from above):**

Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, TX 76155-2512

Telephone number: 817.302.2272
E-mail: jrtaylor@steptoe.com

■ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:**

8331 (see attached)

*(if known)*

Filed on: July 13, 2012

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

1. **Amount of Claim as of Date Case Filed (November 29, 2011):** $ See attached
(See instruction #1)

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. **Basis for Claim:** See attached
(See instruction #2)

3. **Last four digits of any number by which creditor identifies Debtor:** _____
(See instruction #3)

3a. **Debtor may have scheduled account as:** _____
(See instruction #3a)

3b. **Uniform Claim Identifier (optional):** _____
(See instruction #3b)

4. **Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:**  ☐ Real Estate  ☐ Equipment  ☐ Other

Describe: _____

Value of Property: $ _____

Annual Interest Rate _____ %  ☐ Fixed or ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:** $ _____

Basis for perfection: _____

Amount of Secured Claim: $ _____

Amount Unsecured: $ _____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount. (See instruction #5)

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the Debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

**Amount entitled to priority:** $ _____

Control Number: 9273297819

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

6. **Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**Meadows 019910**

Modified B 10 (GCG) (12-11)

7. **Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #7, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain: _____

8. **Signature:** (See instruction #8)
Check the appropriate box.

■ I am the creditor     ☐ I am the creditor's authorized agent     ☐ I am the trustee, or the Debtor, or their     ☐ I am a guarantor, surety, indorser, or other
                              (Attach copy of power of attorney, if any.)     authorized agent. (See Bankruptcy Rule 3004.)     codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: *Pam Torell*
Title: *APA Secretary - Treasurer*
Company: Allied Pilots Association

*Pam Torell*   03.04.14

(Signature)   (Date)

Address and telephone number (if different from notice address above):
14600 Trinity Boulevard, Suite 500
Fort Worth, TX 76155-2512

Telephone number: 817.302.2272     e-mail:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

### INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the Debtor, exceptions to these general rules may apply. The attorneys for the Debtors and their Court-appointed claims agent, GCG, Inc. ("GCG"), are not authorized to provide, and are not providing, you with any legal advice.*

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: **IF BY FIRST CLASS MAIL:** AMR Corporation, et al., c/o GCG, P.O. Box 9852, Dublin, Ohio 43017-5752. **IF BY HAND DELIVERY OR OVERNIGHT MAIL:** AMR Corporation, et al., c/o GCG, 5151 Blazer Parkway, Suite A, Dublin, Ohio 43017. **ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR EMAIL WILL NOT BE ACCEPTED.**

### THE GENERAL AND GOVERNMENTAL BAR DATES IS JULY 16, 2012 AT 5:00 P.M. (PREVAILING EASTERN TIME)

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on November 29, 2011 (the "Commencement Date"). You should select the Debtor against which you are asserting your claim.

**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR.**

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid e-mail address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the Court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing (using the exchange rate, if applicable, as of the Commencement Date.) Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the Debtor's account or other number used by the creditor to identify the Debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the Debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a):**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes Courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

Meadows 019911

Modified B 10 (GCG) (12-11)

## DEFINITIONS

**Debtor**
A Debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity to whom the Debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. § 101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the Debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the Debtor on the date of the bankruptcy filing. The creditor must file the form with GCG as described in the instructions above and in the Bar Date Notice.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the Debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a Debtor or may be obtained through a Court proceeding. In some states, a Court judgment is a lien. A claim also may be secured if the creditor owes the Debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social security, individual's tax identification, or financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

## INFORMATION

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from GCG, please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to GCG.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official Court documentation or communications from the Debtor. These entities do not represent the Bankruptcy Court or the Debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the Bankruptcy Court.

**Meadows 019912**

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| AMR CORPORATION, *et. al.*, | Case No. 11-15463 (SHL) |
| Debtors. | Jointly Administered |

## ATTACHMENT TO AMENDED PROOF OF CLAIM SUBMITTED BY ALLIED PILOTS ASSOCIATION ON ITS OWN BEHALF AND ON BEHALF OF ITS INDIVIDUAL MEMBERS

The Allied Pilots Association ("APA") is the exclusive collective bargaining representative of the pilots employed by American Airlines, Inc. ("American" or "Debtor"). This Amended Proof of Claim is made and submitted on behalf of the APA itself, as well as each individual member pilot.

### BACKGROUND

APA is an unincorporated association and labor union. It is the certified collective bargaining representative, under the Railway Labor Act, for airline pilots employed by American Airlines. On July 13, 2012, APA filed, on its own behalf and on behalf of its individual members, Proof of Claim #8331 against Debtor (the "Original Proof of Claim"). In the Original Proof of Claim, APA asserted claims, among others, on behalf of itself and its member pilots, for (i) claims related to the freeze of the pension plan, (ii) claims related to scope changes, (iii) claims related to Other Changes to Rates of Pay, Rules and Working Conditions and (iv) claims related to grievances involving APA and/or its member pilots that arise from conduct or breaches of the 2003-2008 CBA (including the Supplemental Agreements), other separate agreements between APA and American or violations of the RLA's status quo provisions which occurred prior to the petition date, including certain listed litigation claims.

1

Meadows 019913

On November 16, 2012, APA and Debtor entered into a Letter of Agreement providing for, among other things, the settlement of claims of APA, on behalf of itself or the pilots represented by APA, against Debtor. The "APA Settlement Consideration fully, finally and completely extinguishes any and all claims, interest, causes or demands (including any and all pending grievances, excluding those grievances identified on Exhibit 1)."[1] Section 1 of the Letter of Agreement also provided that the settlement did "not encompass or extinguish the following claims related to these specific grievances or lawsuits: American Airlines, Inc. v. Allied Pilots Ass'n, No. 4:12-cv-00083-Y (N.D. Tex.); Canada v. American Airlines, Inc., et al., No. 3:09:0127 (M.D. Tenn.), Case No. 10-6131 (6th Cir.); Furland v. American Airlines, Inc., ARB Case Nos. 09-102, 10-130, ALJ Case No. 2008-AIR-011; American Airlines, Inc. v. Administrative Review Board, Department of Labor, Case No. 11-14419-C (11th Cir.); and pending discipline grievances" (collectively, with the grievances identified on Exhibit 1 to the Settlement Letter, the "Excluded Claims").

This settlement was implemented in the Debtors' Second Amended Joint Chapter 11 Plan, dated June 5, 2013 (ECF No. 8590) (the "Plan"), as approved by the Court in its Order dated October 21, 2013. In particular, under Section 1.41 of the Plan, "the APA Claim shall not include the claims and grievances or lawsuits (i) set forth in Sections 1, 3, and/or Exhibit 1 of the Bankruptcy Settlement Letter of Agreement" and these claims "if Allowed, shall be classified and treated [under the Plan] in accordance with any such allowance."

This amended Proof of Claim amends only the Excluded Claims, and does not, in any way, amend or modify any other claims of the Original Proof of Claim. Set forth below and attached hereto, as Exhibit B is an updated list of Excluded Claims. Except as noted on Exhibit

---

[1] A copy of the Settlement Letter, including Exhibit 1, is attached hereto as Exhibit A.

Meadows 019914

B, each Excluded Claim is for a currently unliquidated amount estimated to be no less than the figure listed on Exhibit B. These estimates are without prejudice to APA's right to assert at any time that the amounts owed are greater than the amounts set forth in this amended Proof of Claim. As further investigations warrant, APA expressly reserves the right to assert that all or a portion of the amounts listed on Exhibit B constitute a post-petition claim.

A. *Captain Theodore Furland. Furland v. American Airlines, inc.. ARB Case Nos. 09-102, 10-130, ALJ Case No. 2008-AiR-OII (ARB July 27, 2011) (grievance for improper retaliation for safety whistleblowing):*

On July 27, 2011, the Department of Labor ("DOL") determined that American Airlines, Inc. ("American") violated Captain Theodore Furland's right under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21") to engage in protected whistleblowing activity by reporting air safety violations without suffering retaliation. *See Furland v. American Airlines, Inc.,* ARB Case Nos. 09-102, 10-I30, AL.1 Case No. 2008-AIR-011 (ARB July 27, 2011) ("Merits Decision"). Accordingly, the DOL awarded Furland $915.64 plus interest in damages, $38,711.25 in attorney's fees for work before the Administrative Law Judge, and an additional $21,192.75 in attorney's fees for work before the Administrative Review Board ("ARB") ("Fee Decision"). *See id.* at 4 (damages, interest, and fees for AU work); *Furland v. American Airlines, Inc.,* ARB Case No. 09-102, 10-I30, ALJ Case No. 2008-AIR-OII, slip op. at 5 (ARB Oct. 21, 2011) (fees for ARB work).

American has paid Furland the $915.64 in damages, but has failed to pay him interest on those damages or the $59,904 in attorney fees that the DOL has awarded. Instead, on September 23, 2011, American petitioned the United States Court of Appeals for the Eleventh Circuit for review of the DOL's decisions. *See American Airlines, Inc. v. Administrative Review Board,*

3

Meadows 019915

*Department of Labor*, Case No. 11-14419-C (11th Cir.). Prior to the bankruptcy petition, Furland intervened in those appellate proceedings. *American Airlines, Inc. v. Administrative Review Board, Department of Labor*, Case No. 11-14419-C (11th Cir. Nov. 11, 2011). American notified the Eleventh Circuit on February 17, 2012, of the bankruptcy proceedings, and the court stayed the appeal on March 14, 2012, prior to briefing by any party or argument.

The case arose when Furland's supervisor warned him in May 2007 that, in the company's view, Furland had recently used "excessive" sick leave, even though company did not dispute that Furland was truly sick when he had taken leave. Nonetheless, Furland's supervisor warned him to "come to work" throughout the summer because American needed all its pilots. In June 2007, Furland became sick with food poisoning while piloting a flight, and he reported that he would be unable to continue the scheduled sequence. Furland's condition resolved itself overnight, and he returned to work the next day. Nonetheless, American responded by docking Furland's pay, ostensibly because he failed to produce a doctor's note substantiating his food poisoning. Yet, American had demanded such documentation only after-the-fact, making that demand impossible to fulfill.

In these circumstances, the DOL determined that Furland's sick report and his subsequent protest of American's documentation requirements were protected by AIR 21, and American violated that statute by docking his pay. It also rejected American's contention that Furland had not "incurred" legal fees paid by his union (with the expectation of reimbursement upon award). All of these determinations were well supported by established precedent.

B. *Captain William R. Canada, Jr., William R. Canada, Jr. v. American Airlines, Inc. Fixed Income Plan of the Pilot Retirement Benefit Program and American Airlines, Inc, Case No. 10-6131 (6th Cir.):*

4

Meadows 019916

William R. Canada, Jr., brought suit to obtain certain pension benefits denied him by American Airlines Inc. and the Pilot Retirement Benefit Program ("Plan"), a defined benefit pension plan for pilots employed by American. American sponsors and administers the Plan. At all relevant times, the normal retirement age under that Plan has been age 60. Until December 2007, federal law mandated that pilots could not continue to serve as pilots after age 60. In December 2007, however, Congress passed the Fair Treatment of Experienced Pilots Act, 49 U.S.C. § 44729, which allowed pilots to continue to fly until age 65.

Canada has been employed as a pilot with American since 1989 and has participated in the Plan since he completed his probationary period. In 1994, five years after Canada began to accrue benefits under the Plan, American added a "suspension-of-benefits" provision, which allowed the Plan to suspend the benefits of a pilot who worked or returned to work after age 60 during the period of his or her post-60 employment.

In 2008, following the change in federal law that increased the mandatory retirement age, American took the position that the retirement benefits of pilots continuing to serve as pilots after age 60 would be permanently suspended during the period of post-60 pilot employment, with no actuarial adjustment to the benefits paid on actual retirement to compensate for the delay in receipt of benefits after normal retirement age or the shorter period retirees could actuarially be expected to receive retirement benefits.

Canada turned 60 on February 14, 2008, and, based on the new statutory mandate, continued to serve as a pilot at American. On March 11, 2008, American and the Plan issued Canada a notice of the permanent suspension of his benefits during his continuing pilot employment. All other American pilots flying after age 60 received identical notices.

**Meadows 019917**

Canada brought suit against American and the Plan in February 2009, *William R. Canada Jr. v. American Airlines, Inc. Pilot Retirement Benefit Program* and *American Airlines Inc.*, Case No. 09-cv-0127 (M.D. Tenn.), claiming that (1) the application of the 1994 suspension of benefits provision to him constituted a cutback of the benefits he had accrued prior to the addition of the provision, in violation of the anti-cutback rule under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1054(g); (2) the application of the suspension provision without a subsequent-actuarial adjustment constituted a prohibited forfeiture of benefits in violation of ERISA's anti-forfeiture rule, 29 U.S.C. § 1053(a); and (3) in interpreting the Plan to make the suspension provision applicable to Canada and others, American breached its fiduciary duties to the Plan and its participants because its real motivation for doing so was the significant savings it would enjoy on its required contributions to the Plan (estimated by American itself to be $374 million), in violation of Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Canada estimates his personal claims to be worth $ 260,500. The aggregate value of the claims of other pilots who participate in the Plan and are affected by the same issues Canada raises in his lawsuit and of the APA is $698 million. The district court rendered summary judgment in favor of American and the Plan on August 10, 2010, and Canada timely appealed to the United States Court of Appeals for the Sixth Circuit (Case No.1 0-6131). The case has been fully briefed and had not yet been scheduled for oral argument at the time that American filed its bankruptcy petition and stayed the proceedings. The parties stipulated to extend the bankruptcy stay to the Plan, and the bankruptcy court so ordered. *See AMR Corp. v. William R. Canada, Jr.*, Chapter 11 Case No. 11-15436, Adv. Proc. Case No. 12-01203, Adv. Proc. ECF No. 30 (Bankr. S.D.N.Y. May 11, 2012).

    1. *Supporting Documentation*

Meadows 019918

The claims asserted herein arise under filings made with respect to the pre-petition grievances. Because the Debtors are already in possession of these documents and the voluminous nature of these documents copies are not submitted herewith, but shall be made available upon request by the Court or any other interested party.

2. *Attorneys' Fees and Expenses.*

Claimant reserves all rights it has to seek and recover any attorneys' fees and/or expenses to which it is entitled. Neither the filing of this proof of claim nor the lack of an explicit reservation of APA's or a pilot's right to recover attorneys' fees and/or expenses with respect to one or more of the claims listed herein shall be deemed a waiver of such rights.

3. *Priority and Administrative Expenses.*

Claimant demands priority to the fullest extent permitted by agreement, by applicable law, including, but not limited to, 11 U.S.C. § 507 and pursuant to Bankruptcy Court orders, including orders approving motions to pay pre-petition wages and other compensation, including, without limitation the Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing (i) Payment of Prepetition Wages, Salaries, and Other Compensation and Benefits, (ii) Maintenance of Employee Benefits Programs and Payment of Related Administrative Obligations, and (iii) Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor all Fund Transfer Requests [Dkt. No. 52].

Claimant expressly reserves the right to seek the allowance and payment of certain amounts as administrative expenses. In addition, Claimant expressly reserves its right to file a request for administrative expense priority under 11 U.S.C. § 503(b) for any part or all of the claims set forth in this Proof of Claim or which are due and payable after the bankruptcy petition date.

7

**Meadows 019919**

4. *Amendments*

APA reserves its right to amend or supplement this proof of claim, including any contingent or unliquidated claim set forth herein. APA expressly reserves the right to amend and supplement this Proof of Claim and to file additional claims against American for any reason, including amendment to incorporate additional claims for additional amounts due, including attorneys' fees, and to seek the allowance and payment of certain amounts as administrative expenses. APA reserves the right to amend or supplement this proof of claim to assert additional legal grounds and/or bases for the claims and amounts set forth herein.

At the time of the filing of this Proof of Claim, APA is without sufficient knowledge or information to determine whether additional potential claims arising out of the business relationship discussed herein against American exists. In the event that APA becomes aware of such information and to the extent that such claims exist, APA files this Proof of Claim to preserve its rights with respect to such claims, including APA' right to assert such claims in the bankruptcy proceedings. APA further reserves the right to file additional claims related to the business relationship referenced herein, including but not limited to any other claims related to the 2003-2008 CBA and any separate agreements, including but not limited to Supplemental Agreements, which comprise the Green Book and/or the Pilot Benefit Plan. To the extent such additional claims exist, the amounts of such claims are currently unliquidated. Nothing herein is intended to, or should be construed as, an admission that any and all such claims do not have administrative priority.

5. *Grievance and Arbitration*

APA, on behalf of itself and each of the pilots it represents, reserves the right to establish the liability and amounts set forth in this proof of claim pursuant to the grievance and system

8

Meadows 019920

board of adjustment/retirement system board arbitration provisions of the 2003-2008 CBA and/or as set forth in the RLA.

6. *Reservation of Rights*

In addition to the foregoing, Claimant expressly reserves all other rights, remedies, interests, priorities, protections, claims, counterclaims, defenses, setoffs, and recoupments, including, without limitation, claims against the Debtors under Sections 503, 507, 510, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and the common law.

The filing of this Proof of Claim is not (i) an election of remedy; (ii) waiver of jury trial rights; (iii) a waiver or limitation of any right, interest, or cause of action held by Claimant; (iv) a waiver or release of the rights of Claimant against any person, entity, or property; (v) a waiver of any past, present, or future defaults or events of default; (vi) consent to jurisdiction of this Court or any other body for any matter unless specifically stipulated herein. Claimant further reserves any and all rights against parties other than the Debtor based on the foregoing facts and circumstances.

This proof of claim shall not constitute or be construed as a waiver of the right to withdraw the reference with respect to the subject matter of the claims contained herein or any objection or other proceeding commenced with respect thereto or any other proceedings involving Claimant. This proof of claim shall not constitute an admission that any claims set forth herein are not entitled to administrative or other priority, or an admission that any claims set forth herein are required to be filed at this time pursuant to the Bar Date Order. To the extent that any Debtor entity other than American Airlines, Inc. is determined to be an obligor with respect to the foregoing claims, this proof of claim filed shall be deemed filed against such entity as an additional obligor with respect to such claim.

9

**Meadows 019921**

# EXHIBIT A

**Meadows 019922**

# AmericanAirlines

November 16, 2012

Keith Wilson
President
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Ft. Worth, TX  76155-2512

Subject: Settlement Consideration and Bankruptcy Protections

Dear President Wilson:

The Tentative Agreement dated November 16, 2012 reached between American Airlines, Inc. ("Company") and the Allied Pilots Association ("APA") in connection with the Company's Chapter 11 Restructuring was agreed to in furtherance of the Company's effort to restructure its capital structure and operations, and in consideration of the terms of the Tentative Agreement and this Letter of Agreement. This Letter of Agreement will be binding on any Chapter 11 trustee that may be appointed in the Company's present bankruptcy cases, *In re AMR Corporation, et al.*, Chapter 11 Case No. 11-15463(SHL) (hereinafter "Bankruptcy Cases"), or other entity operating with the equivalent authority of a Chapter 11 trustee.

The Company and APA agree as follows:

1. **Settlement Consideration.** In full and complete satisfaction of any and all claims APA has or might arguably have, on behalf of itself or the pilots represented by APA, pursuant to the Railway Labor Act ("RLA") or under or with respect to the abrogated collective bargaining agreement between the Company and APA or the existing pilot terms and conditions of employment ("Green Book"), against the Debtors (or any of them) in the Bankruptcy Cases, and subject to the approval of the Bankruptcy Court, APA will receive under a plan or plans of reorganization of the Debtors equity in the reorganized entity (the "APA Settlement Consideration") equal to 13.5% of such equity issued to the holders of allowed prepetition unsecured claims (including APA) against the Debtors (including any equity issued with respect to other unions) (collectively the "Unsecured Claims"). The APA Settlement Consideration fully, finally, and completely extinguishes any and all claims, interests, causes or demands (including any and all pending grievances, excluding those grievances identified in Exhibit 1) that APA has or might arguably have, on behalf of itself or the pilots represented by APA, pursuant to the RLA and the terms of the abrogated CBA

1

Meadows 019923

and/or the Green Book, against the Debtors arising prior to the Effective Date of this Letter of Agreement as defined below. The APA Settlement Consideration will not be diluted by any subsequent events other than: (1) equity consideration given to holders of interests in another entity in the event of a merger or consolidation as provided below; (2) an equity offering approved by the Bankruptcy Court in conjunction with confirmation of a plan of reorganization; (3) equity consideration granted to management in connection with incentive plans approved by the Bankruptcy Court; and (4) any post-emergence equity issuance.

Notwithstanding anything in the preceding paragraph to the contrary, the APA Settlement Consideration will not encompass or extinguish the following claims related to these specific grievances or lawsuits: *American Airlines, Inc. v. Allied Pilots Ass'n*, No. 4:12-cv-00083-Y (N.D. Tex); and *Canada v. American Airlines, Inc., et al.*, No. 3:09:0127 (M.D. Tenn.), Case No. 10-6131 (6th Cir.); *Furland v. American Airlines, Inc.*, ARB Case Nos. 09-102, 10-130, ALJ Case No. 2008-AIR-011; *American Airlines, Inc. v. Administrative Review Board, Department of Labor*, Case No. 11-14419-C (11th Cir.); and pending discipline grievances.

Subject to the foregoing, in the event of a reorganization plan for the Debtors that provides for the consolidation of the Debtors with a third party, the APA Settlement Consideration shall be equal to 13.5% of the total consideration distributed with respect to the Unsecured Claims, and shall be issued contemporaneously with the consideration distributed under the plan with respect to the other Unsecured Claims.

The APA Settlement Consideration will confer upon APA all statutory rights to vote on any plan or plans of reorganization presented by the Company or any other entity. In the event that the APA Settlement Consideration has not yet been actually issued, it will be estimated for voting purposes as if APA held allowed unsecured claims in an amount that would entitle it to the APA Settlement Consideration. Neither the APA Settlement Consideration nor any rights under this Letter of Agreement may be assigned or transferred (including the granting of any participation) prior to the effective date of a Bankruptcy Court confirmed Plan of Reorganization, except with the express written consent of the Company exercised in its sole discretion.

2. **Effective date.** This Letter of Agreement shall not become effective until the last-occurring of these events (the "Effective Date"):

    (1)    The Tentative Agreement is ratified by the pilot membership pursuant to procedures determined by the APA Board of Directors;

2

Meadows 019924

(2)     The Tentative Agreement and this Letter of Agreement are approved by a final order of the United States Bankruptcy Court for the Southern District of New York which order has not been stayed.

It is expressly understood and agreed that if the Effective Date does not occur, all of the terms contained in this Letter of Agreement are inapplicable and will be of no force or effect. Upon the occurrence of the Effective Date, but prior to the approval of any Plan of Reorganization in these cases, this Letter of Agreement shall constitute a binding and enforceable post-petition agreement between APA and the Company.

3. **Administrative claim for fees and expenses.** APA shall have an allowed administrative expense claim as of the Effective Date in an amount sufficient to reimburse APA for all reasonable fees and expenses (including attorneys and experts) incurred by APA in the Bankruptcy Cases in connection with the negotiation and/or litigation related to the Tentative Agreement, this Letter of Agreement, and Plan of Reorganization (including APA's opposition to the Company's Motion pursuant to 11 U.S.C. 1113) not to exceed $5 million. In addition, on the Effective Date, APA shall have an allowed administrative expense claim in the amount of up to $5 million for the reasonable fees and expenses of APA's investment banker (Lazard) incurred by APA in the Bankruptcy Cases in connection with the negotiation and/or litigation related to the Tentative Agreement, this Letter of Agreement, and Plan of Reorganization (including APA's opposition to the Company's Motion pursuant to 11 U.S.C. 1113). The fees and expenses payable hereunder shall not include fees or expenses incurred in connection with the pursuit of any third party purchaser of the Debtors or a merger partner (including but not limited to US Airways).

4. **Withholding.** The APA Settlement Consideration will be subject to applicable governmental withholding and reporting requirements. Any amounts so withheld will be treated for all purposes as having been paid to and received by the applicable recipient. In the case of a non-cash payment, the withholding agent may withhold an appropriate portion of the property and sell the withheld property on the recipient's behalf to generate the cash necessary to satisfy and pay the withholding. To the extent any non-cash payment is withheld, the withholding agent will hold such property in an escrow account until the property is timely sold, at the direction of APA. The escrow account will permit APA to vote any equity amount. In the event, or to the extent, that the APA Settlement Consideration has been allocated as of the effective date of a Bankruptcy Court confirmed Plan of Reorganization to the pilots represented by APA (such that it is capable of being distributed to the pilots within a reasonable time), the Company will be the withholding agent (with the cooperation of APA). To the extent that it

3

Meadows 019925

has not been so allocated, APA will be the withholding agent (and the Company will assist in the processing of any applicable payroll returns, deposits and the like).

Any withholding obligations will not impact or reduce APA's statutory rights to vote on any plan or plans of reorganization presented by the Company or any other entity as described above in Paragraph 1.

5. **Indemnification**. The Company will indemnify and hold harmless APA and its current or former (a) members, (b) officers, (c) directors, (d) committee members, (e) employees, (f) advisors, (g) attorneys, (h) accountants, (i) investment bankers, (j) consultants, (k) agents, (l) actuaries, (m) financial advisors, (n) professionals, (o) agents and (p) other representatives (each an "Indemnitee") from fifty percent of any liability, loss, damages, fines, penalties, taxes, expenses and costs (not including any income or excise taxes or similar amounts imposed by any governmental agency) relating to, concerning or resulting from any and all third party claims, lawsuits or administrative charges of any sort whatsoever, including fifty percent of the reasonable attorney's fees and costs, arising in connection with matters relating to, concerning or connected to the negotiation or establishment of (x) the Tentative Agreement and this Letter of Agreement, (y) any amendment of any benefit plan or program concerning pilots or other participants in such plan made pursuant to or as a result of the Tentative Agreement and this Letter of Agreement, and (z) any other document or agreement forming part of the Tentative Agreement and this Letter of Agreement. This fifty-percent sharing arrangement will exist until APA's financial exposure reaches $5 million. Any exposure exceeding $5 million will be the responsibility of the Company.

Such indemnification and hold harmless obligation will not apply to: (1) any claim, lawsuit or administrative charge resulting from the willful or intentional conduct of any Indemnitee; (2) any claim, lawsuit or administrative charge asserting that APA violated its By-Laws or other organizational requirements by entering into the Tentative Agreement and this Letter of Agreement; (3) any claim, lawsuit or administrative charge resulting from any statement made by any Indemnitee that incorrectly describes the Tentative Agreement or Letter of Agreement or the modifications made thereby; (4) any claim, lawsuit or administrative charge related to allocation among American pilots represented by APA of any claim or any proceeds or distribution received in connection with the APA Settlement Consideration; or (5) any claim, lawsuit or administrative charge related to any disposition by APA or pilots represented by APA to third parties of the APA Settlement Consideration or any proceeds or distribution received in connection therewith.

4

**Meadows 019926**

An Indemnitee seeking to be indemnified and held harmless pursuant to this paragraph must provide to the Company written notice within seven business days of the Indemnitee learning of the claim, lawsuit or administrative charge as to which the Indemnitee seeks to be indemnified and held harmless. The Company will have the right to conduct the defense of such matter with counsel of the Company's choosing and enter into a settlement of such matter. The Company will give reasonable consideration to the wishes of the Indemnitee in connection with the matters described in the foregoing sentence.

6. **Exculpation.** The Company agrees that it will not propose or support any Plan of Reorganization that does not contain an exculpation or release provision for APA and each of its current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives at least as favorable as any exculpation or release provisions provided for the Company's officers, directors, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives.

7. **Bankruptcy protection.** From the date of this Letter of Agreement until a date three years from the date of this Letter of Agreement, the Debtors will not file or support any motion ("Motion") pursuant to 11 U.S.C. Sections 1113, 1113(e), or any other relevant provision of the Bankruptcy Code, seeking rejection or modification of, or relief or interim relief from, the Tentative Agreement or this Letter of Agreement and the finalized documents implementing the Tentative Agreement or this Letter of Agreement. The Debtors will actively oppose any such Motion if filed by another party.

Notwithstanding the foregoing, the Debtors reserve the right to file or support any Motion if there is a material deterioration in the Company's financial condition or financial prospects, whether because of general economic conditions or otherwise. All requirements and provisions of Section 1113 will also remain applicable to any such Motion. APA reserves its right to object to such Motion and nothing in this Letter of Agreement shall be construed as an agreement by APA to such modifications or relief.

8. **Court approval.** With the full and active support of APA, the Company will file and prosecute a motion for approval and assumption of the Tentative Agreement and this Letter of Agreement under Sections 363 and 1113 of the Bankruptcy Code and any other applicable sections thereto if the condition set forth in Paragraph 2(1) is satisfied. Both the motion and the proposed order attached thereto (the "363 Order") shall be in form and substance reasonably acceptable to APA. Both the Company and APA will use their reasonable best

5

**Meadows 019927**

efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Tentative Agreement, including this Letter of Agreement, and to seek entry of the 363 Order. Immediately upon entering into the Tentative Agreement, APA will file a motion to stay each of its appeals arising from the Bankruptcy Court proceedings, including its appeal of the dismissal of its Adversary Proceeding regarding the application of Section 1113 to amendable collective bargaining agreements, (appeal No. 1:12-cv-04376 (LAK)) (the "Adversary Proceeding Appeal"), its appeal of the Bankruptcy Court's August 15 Section 1113 decision (appeal No. 1:12-cv-07468 (CM)(GWG)) (the "Initial Section 1113 appeal"), the appeal from the Bankruptcy Court's September 5, 2012 Order granting the Company's Renewed Section 1113 motion (appeal No. 1:12-cv-07647 (CM)) (the "Renewed Section 1113 Appeal"), and its appeal from the Bankruptcy Court's decision granting in part the Motion in Limine filed by American in connection with its Renewed Section 1113 Motion (appeal No. 1:12-cv-07648 (CM)) (the "Motion in Limine appeal"). Upon the occurrence of the Effective Date, APA agrees to take all steps necessary to withdraw and dismiss immediately each and every appeal filed by APA related to the Bankruptcy Cases.

9. **Damages.** Other than the APA Settlement Consideration and the claims reserved in Section 1 above, APA shall not have any claims as a result of the Company's requests for relief under Section 1113 of the Bankruptcy Code or the parties' entry into the Tentative Agreement or this Letter of Agreement.

Very truly yours,

*Laura Einspanier*

Laura A. Einspanier
Vice President, Employee Relations

Agreed:

_____

Keith Wilson
President
Allied Pilots Association

6

**Meadows 019928**

## Exhibit 1
## Grievances excluded from the settlement

| Grievance No | Date Filed | Grievant |
|---|---|---|
| 06-003 | 01/05/06 | Hunter Presidential |
| 07-009 | 02/12/07 | Hunter Presidential |
| 07-028 | 06/14/07 | Haug, William |
| 07-048 | 08/08/07 | Mock, James |
| 07-066 | 11/05/07 | Murphy, Robert |
| 07-082 | 12/10/07 | Emery, Kathy |
| 08-005 | 02/20/08 | Hill Presidential |
| 08-021 | 04/07/08 | Hass, Mark |
| 08-066 | 07/21/08 | Tierney, Michael |
| 08-102 | 10/08/08 | Smith, Sidney |
| 09-002 | 01/21/09 | Reinford, Philip |
| 09-006 | 03/04/09 | Decker, Richard |
| 09-016 | 03/27/09 | Weiland, Ronald |
| 09-036 | 07/17/09 | Balcom, Robert |
| 10-026 | 04/27/10 | Clark, John J |
| 10-077 | 10/13/10 | Minkin, Ronald |
| 10-087 | 12/21/10 | Smith, Carl |
| 11-019 | 04/12/11 | Bowling, Phillip |
| 11-031 | 05/11/11 | Torres, Felix |
| 11-033 | 05/23/11 | Conlon, Steven |
| 11-054 | 08/18/11 | LGA Domicile |
| 11-065 | 10/24/11 | Gordon, Michael |
| 11-066 | 11/02/11 | Bates Presidential |
| 11-067 | 11/18/11 | Sheehan III, James |
| 11-084 | 11/29/11 | AICA |
| 12-009 | 01/27/12 | Thompson Jr, Glen |
| 12-011 | 02/04/12 | Meadows, Lawrence |
| 12-012 | 05/22/12 | DFW Domicile |
| 12-010 | 02/01/12 | Maher, Sylvan |
| 12-016 | 03/09/12 | Thompson, Lawrence |
| 12-023 | 04/09/12 | Salameh, Elias |
| 12-030 | 05/16/12 | Pollenz, Alan |
| 12-034 | 06/12/12 | Piper, William |
| *12-111 | 10/26/12 | Gary, William |
| *12-113 | 10/26/12 | Jackson, Carl |
| *12-114 | 10/26/12 | Bacon, Stephen |
| 10-042 - EXPEDIT | 06/24/11 | Hill Presidential |

*PEH Grievances: the Company reserves the right to challenge as non-disciplinary and not subject to grievance process.

7

**Meadows 019929**

# EXHIBIT B

Meadows 019930

EXHIBIT B

APA LEGAL ACTIVE GRIEVANCES
as of 2/28/14

| File # | Grievant | Level | Base | Section / Summary | Description | Value | Affected Pilots |
|---|---|---|---|---|---|---|---|
| P-35-09 (06-003) | Hunter Presidential ATC/RFD (Formerly ORD Base Grievance 04-030 file by CA Ron Hunt and CA Jim Condes) | SYS | | Supp. J | Grievance filed as ORD Base grievance on 1/5/06 protesting the Company's failure to pay pilots RFD pay for ATC take-off delays. | $250,000.00 | Any and all pilots who were not paid for ATC take-off delays in accordance with Arbitrator Goldberg's award. |
| 07-009 | Hunter Presidential | Appeal | | Letter I | Presidential grievance filed 2/12/07 protesting the Company's failure to properly provide satellite crew base support. | $0.00 | Any and all pilot who utilized satellite crew bases not in compliance with the CBA. |
| P-18-08 (07-066) | Murphy, Robert C. (165484) | SYS | LAX | Termination | Grievance filed 11/5/07 protesting the Company's wrongful termination of Grievant for the reasons set forth in Captain Bob | $680,000.00 | FO Robert C. Murphy 1410 Pueblo Dr Boulder City, NV 89005-3207 |

B-1

Meadows 019931

| File # | Grievant | Level | Base | Section / Summary | Description | Value | Affected Pilots |
|---|---|---|---|---|---|---|---|
| | | | | | Bush's Letter of Termination dated 10/18/07 | | |
| P-06-09 (07-082) | Emery, FO Kathy E. (354954) | SYS | MIA | 10, 11, 21, Supp. F | Grievance filed 12/11/07 protesting the Company improperly removing Grievant from medical disability, improperly placing her on "unauthorized" leave of absence, failing to place her on proper pay status of PW while investigating her, and violating §21 in her investigation. | $615,700.00 | FO Kathy E. Emery 1050 NE 91st St Miami, FL 33138-3451 |
| P-34-08 (08-005) | Hill Presidential | SYS | | Discipline 21 | Grievance filed 2/20/08, protesting the Company's action in sending disciplinary letters to pilots alleging they exceeded their D1 travel pass allotment in 2007, and for reducing those pilots' D1 travel pass allotment for 2008. | $0.00 | See Attachment #1-B to Original Proof of Claim for identified pilots. Also includes any other pilots receiving disciplinary letters alleging they exceeded the D1 travel pass allotment in 2007, and for reducing those pilots' D1 travel pass allotment for 2008. |
| 08-066 | Tierney, CA Michael (129884) | Appeal | MIA | 10, 11, 21, Supp F | Grievance filed 7/18/08 protesting the Company's improper removal of Grievant from medical disability. | $12,000.00 | CA Michael Tierney 333 N Ocean Blvd, Apt 1210 Deerfield Beach, FL 33441 |

B-2

Meadows 019932

| File # | Grievant | Level | Base | Section / Summary | Description | Value | Affected Pilots |
|---|---|---|---|---|---|---|---|
| P-05-09 (08-102) | Smith, CA Sid R. (168524) | SYS | LAX | Discipline 21 | Grievance filed 10/3/08 protesting the discipline imposed on Grievant by CA Bob Bush in a Written Advisory dated 9/8/08. | $7,179.00 | CA Sid R. Smith 11215 Rolling Hills Way Valley Center, CA 92082 |
| P-07-10 (10-042) Expedited | Hill Presidential | SYS | | §1.D.6. | Expedited grievance filed 6/24/10 protesting Company's failure to give proper preference in the filling of vacancies on Commuter Air Carriers that are affiliates of AA. | $104,700.00 | Robert T. Papp 670 Rock Road Pine Grove, PA 17963 And any other pilot(s) who was not given proper preference in the filling of vacancies on Commuter Air Carriers that are affiliates of AA from 12/25/09 to the present. |
| 11-019 | Bowling, CA Phillip W. (009619) | Initial | LAX | 6.D, Ltr. W | Grievance filed 4/12/11 protesting the Company's failure to pay Grievant for Sequence 15796 on 2/18/11 after removing him from said sequence for recurrent training, which was subsequently cancelled. | $2,750.00 | CA Phillip W. Bowling 3180 Falcon Dr Carlsbad, CA 92008-1128 |
| P-11-11 (11-031) | Torres, FO Felix G. (195280) | SYS | LGA | Termination | Grievance filed 5/11/11 protesting the Company's action in terminating grievant for the reasons cited by Captain Scott Meade in his letter dated 5/9/11. | $250,000.00 | FO Felix G. Torres Cond.Lagomar Apt PH-D Carolina, PR 00979 |
| 11-033 | Conlon, FO Steven M. (183635) | Initial | LAX | 18, 19 - SEP | Grievance filed 5/23/11 protesting Company's failure to properly award Grievant a May, 2011 SEP bid. | $1,500.00 | FO Steven M. Conlon 12488 Kingspine Ave San Diego, CA 92131-2286 |

B-3

Meadows 019933

| File # | Grievant | Level | Base | Section / Summary | Description | Value | Affected Pilots |
|--------|----------|-------|------|-------------------|-------------|-------|-----------------|
| 11-054 | LGA Base - Oberski & Cummings | Appeal | LGA | 11, Supp F(1) | Grievance filed 8/18/11 protesting the Company's failure to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. | $323,000.00 | FO Rodney Charlson P.O. Box 6776 Thousand Oaks. CA 91359-6776 And any other LGA-based pilot(s) who was not provided notice of termination prior to terminating employment status of the pilot who had been on inactive status, unpaid sick, or disability for more than five years. |
| 11-065 | Gordon, CA Michael A. (018135) | Appeal | MIA | Discipline | Grievance filed 10/24/11 protesting the Company's action in imposing discipline on Grievant by Captain Bob Raleigh for the reasons cited in his Letter of Discipline dated 10/20/11. | $0.00 | CA Michael A. Gordon 3318 Harness Cir Lake Worth, FL 33449-8026 |
| 11-066 | Bates Presidential  Consolidated into this Grievance: Condes 10-056 | Appeal | | 21, ASAP MOU | Grievance filed 11/2/11 protesting the Company's action in requiring P2 reports and rescinding exemptions for ASAP filings. | $0.00 | CA James C. Condes 1116 Lahinch CT. Dyer, IN 46311-1285 And any other pilot(s) who was required to file a P2 report and whose exemption for an ASAP filing was rescinded. |

B-4

Meadows 019934

| File # | Grievant | Level | Base | Section / Summary | Description | Value | Affected Pilots |
|---|---|---|---|---|---|---|---|
| P-03-12 (11-067) | Sheehan, III, CA James E. (052349) | SYS | MIA | Termination | Grievance filed 11/18/11 protesting the Company's action in terminating the Grievant for the reasons cited by CA Scott Meade, Director of Flight - LGA, in his letter dated 10/28/2011. | $113,123.00 | CA James E. Sheehan, III 169 Mason Street, Unit 4-C Greenwich, CT 06830 |
| 11-084 | American Independent Cockpit Alliance, Inc. (AICA) | Appeal | | 1 - Scope | Grievance filed directly by American Independent Cockpit Alliance, Inc. (AICA) on 11/15/11, protesting the Company's failure to secure flying slots / positions to those pilots on the Current American Airlines Pilot Seniority List and allowing pilots other than these to operate aircraft and bid on the positions. | $95,000.00 | Outside counsel |
| 12-012 | DFW Base - McDaniels & Moore | Appeal | DFW | 11.D, Supp F(1) | Grievance filed 5/22/12 protesting the Company's failure to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. | $245,000.00 | Andrea B. Twitchell 896 West Safari Drive Tucson, AZ 85704-2857 And any other DFW-based pilot(s) who was not reinstated to the Pilots' Seniority System List or was not provided notice of termination prior to terminating employment status of the pilot who had been on inactive status, unpaid sick, or disability for more than five years. |

B-5

Meadows 019935

| File # | Grievant | Level | Base | Section / Summary | Description | Value | Affected Pilots |
|---|---|---|---|---|---|---|---|
| 12-111 | Gary, Bill | SYS | DCA | Discipline | Grievance filed on 10/26/12, protesting the unjust discipline imposed on Grievant in connection with the PEH entry provided on 10/26/12. | Remove PEH Entry | CA Bill Gary, APA HQ, 14600 Trinity Blvd., Suite 500, Ft. Worth, TX 76155 |
| 12-113 | Jackson, Carl | SYS | DCA | Discipline | Grievance filed on 10/26/12, protesting the unjust discipline imposed on him and in connection with the PEH entry provided in October 2012. | Remove PEH Entry | CA Carl Jackson, P.O. Box 523, Berryville, VA 22611 |
| 12-114 | Bacon, Stephen | SYS | BOS | Discipline | Grievance filed on 10/26/12, protesting the Company's unjust discipline on Grievant in connection with the PEH entry dated 10/2/12. | Remove PEH Entry | APA HQ, 14600 Trinity Blvd., Suite 500, Ft. Worth, TX 76155 |

B-6

Meadows 019936

# EXHIBIT 10
# for Myers Declaration

Lawrence M. Meadows                                                    25Mar14
777FO/MIA AA# 332713
PO Box 4344
Park City, UT 84060


Captain Keith Wilson,
President, Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512

**Via E-mail and Certified Mail:**

**RE: Unauthorized Exclusion of Grievance 12-011 from APA's Amended**


Dear Captain Wilson,

I am writing to express my outrage and disbelief, based on my discovery last Friday, that APA has unilaterally excluded my grievance #12-011 and all the claims and remedies that flow from it, from its recently Amended Proof of Claim, dated March 7, 2014. I relied upon APA's preservation of my claims, and assurances that it supported my SOX claim. Now APA pulled the rug out from underneath me, and has severely prejudice my ability to be made whole for my contractual and statutory claims under the RLA, ADA, and SOX Acts, as explicitly outlined in grievance #12-011. Frankly, I am dumbfounded at APA's action, as there can be but only two explanations; either "administrative oversight", or worse yet, retaliation.

As you should be aware, prior to the above action by APA, on Feb. 19, 2014, I had timely filed a DFR suit against APA. Wherein I sought to compel arbitration based on recent case law, which prohibits RLA unions from acting as "gatekeeper"; and unilaterally deciding as to whether or not an individual "employee" gets to exercise his otherwise absolute individual statutory right to a System Board. I filed that action, to further preserve all of my contractual and statutory claims that flowed from it, and also all claims which flow from pending grievance #13-064. I filed that DFR action relying upon the fact that APA had already preserved grievance #12-011, as was shown in Exhibit 1 of APA's Settlement Consideration and Bankruptcy Protections agreement (Attachment 1).

Whether or not APA now supports my position is irrelevant. The fact is they had previously supported grievance 12-011, and accordingly timely preserved it, continuing to process it through a PAC, for over 13 month after the bar date. I detrimentally rely on APA's prior preservation, and now have unilaterally had all of my claims stripped away without due process, cause or notice. The one thing is clear, APA stripped my claims, just after two weeks of filing my DFR suit, which smacks of retaliation. Thus, APA has

APA_000014138

deprived me the opportunity to otherwise preserve those claims on my personal proof of claim prior to the bar date.

Additionally, I sent an email, on Jan. 17, 2014 to APA Staff Attorney, Chuck Hairston, wherein I stated; "*Chuck ,I understand that 12-011 is closed, but I still have legal remedies that flow from it. Therefore, I want to ensure that to the extent APA's originally filed POC preserved that grievance and the actions which flow from it; that if APA does in fact amend its POC by the 24th, that my grievance 12-011 remains included in it to protect my ability to pursue any other legal remedies associated with it.*" (Attachment 2). Chuck Hairston's email response was that my grievance was "*closed and had no value associated with it.*" Which oddly is the exact same phrase I heard when I was at AA Headquarters on Feb. 28th, when discussed my cases at length at, during sit down meetings with AA's CFO, General Counsel, and Senior Attorney. This is disconcerting to me and, raises the specter that AA Legal has been talking with APA Legal, about extinguishing all of my claims related to 12-011. Especially considering that just one week after those meetings APA excluded my grievance from its amended proof of claim.

Moreover, in your Aug. 29, 2013 letter to me, you stated; " *I have considered your request and have decided not to submit your grievance to the System Board of Adjustment. Your Grievance is based on federal statutory claims, and it is my understanding that you are already pursuing those claims n the appropriate federal forums.*" (Attachment 3). As you are aware, my statutory SOX and ADA claims were explicitly cited and detailed in grievance 12-011, dated Feb. 4, 2014. (Attachment 4), and I was actively pursuing those claims. My former attorney relied on such, as he has recently declared that he reasonably believed, the proofs of claim filed by APA on behalf of its pilots, to include myself, identified the nature of and preserved all my claims by the July 16, 2012 bar date.

Furthermore, <u>prior to and during my Exec. VP of FLT, Grievance Appeal of #12-011, Chuck Hairston explicitly stated that APA would get behind me and represent me only on my SOX claim.</u> Now it seems APA has failed to follow-thru and reneged on that promise.

My expectation is that either via resolution of my pending grievances before a System Board Sole Neutral, SOX ALJ Complaint, or EEOC Charges, that I will ultimately be made whole with back pay and benefits, reinstatement to the seniority list, and accommodation within the bargain unit. I will not stop fighting until I get there. Regardless, as much as I'm frustrated with how APA has abandoned and mistreated me, I'm not looking to inflict financial harm upon my fellow APA members or my Association.

American has now filed an Objection to my proof of claim asserting that my SOX and EEOC Claims are no longer preserved as part of grievance 12-011, because APA has now excluded 12-011 from its March 7th, 2014 amended proof of claim. (11-15463-shl, Doc 11840, ¶ 27.) Therefore, respectfully demand that APA correct this egregious error, and immediately re-amend its recently amended proof of claim, to ensure that my

2

grievance #12-011 is fully preserved, along with #13-064, and advise Judge Lane of this *"administrative oversight."*, which constitutes "excusable neglect". Otherwise, I am at risk of losing all of my claims; depending on the outcome of my April 17th hearing on AA's Objection to my personal proof of claims, and Judge Lanes ruling.

In closing, I truly hope APA does the right thing, and resolves this amicably. What I am asking for cost APA nothing, and in fact mitigates its risk. Otherwise, the burden of my claims will be shifted from AA onto APA. Leaving me with no choice to file an action personally against you, Bennett, and Chuck Hairston, and the Association, for at least $5.6M. Which is the net present the valuation of my career, as calculated by my Economist from Berkley Research Group, assuming I had been accommodated in the bargain unit when I was terminated in Nov. 2011. (Attachment 5). Additionally I never received any notice from APA its recent actions, and need to be immediately provide with a copy of APA's amended proof of claim.

Please advise if APA intends to comply with my demand NLT 5:00 pm, Thursday, March 27, 2014, so I know how to address APA's position/actions in my Response due to be filed with Judge Lane's Court.

Sincerely,

Lawrence Meadows
777FO/MIA AA# 332713


cc: APA Staff Attorney, Chuck Hairston, APA Dir Legal, Bennett Boggess

3

APA_000014140

# EXHIBIT 11
# for Myers Declaration

**Captain John Hale**
Vice President Flight
Chief Pilot

# American Airlines

RECEIVED

MAR **2 8** 2014

APA LEGAL DEPT.

March 26, 2014

Mr. Lawrence Meadows
P. O. Box 4344
Park City, UT  84060

Re: APA Grievance No. 13-064

Dear Sir,

I held a hearing on the above listed grievance on February 27, 2014 regarding your removal from the AA pilot's seniority list due to a sick leave of absence of over 3 years as provided in Sec. 11.D.1 of the Collective Bargaining Agreement.

After reviewing the information you presented during that hearing, I have determined that your removal from the American Airline pilot's seniority list was in compliance with Sec. 11.D.1 of the Collective Bargaining Agreement.

Therefore, your grievance is denied.

Sincerely,

Captain John Hale


cc:  APA Legal
     Employee Relations


P O Box 619617. MD 851
DFW Airport, TX 75261-9617
817 967 5050 Office
817 967 5888 Fax
john.hale@aa.com



APA_000032191

# EXHIBIT 12

# for Myers Declaration

**ALLIED PILOTS ASSOCIATION**

*Representing the pilots of American Airlines*

O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX  76155-2512  •  817.302.2272  •  www.alliedpilots.org

April 23, 2014

First Officer Lawrence Meadows
P. O. Box 4344
Park City, UT 84060-4344

      Re:    Grievance 13-064

Dear First Officer Meadows:

      I am writing in reference to grievance number 13-064, which you filed on October 31, 2013.  By way of background, your grievance was first heard by the Vice-President – Flight on February 27, 2014.  Your grievance was denied by the Vice President – Flight by letter dated March 26, 2014.  On April 2, 2014, you requested that your grievance be submitted to the Pre-Arbitration Conference (PAC).

      I have considered your request and have decided not to submit your grievance to the PAC.  The claims in your grievance are contrary to the plain language of Supplement F(1) of the collective bargaining agreement.  Under those circumstances, submission of your grievance to the PAC would not be appropriate.

                            Sincerely,

                            Captain Keith C. Wilson
                            President

cc:    APA Legal Department (CRH)

APA_000032200

# EXHIBIT 13

# for Myers Declaration

## MEMORANDUM OF UNDERSTANDING

## REGARDING

## CONTINGENT COLLECTIVE BARGAINING AGREEMENT

Pursuant to this Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement (this "Memorandum"), US Airways, Inc. and any successor (collectively, "US Airways"), American Airlines, Inc. ("American"), Allied Pilots Association ("APA"), and US Airline Pilots Association ("USAPA", and with US Airways, American, and APA, the "Parties"), hereby agree as follows:

1. US Airways and APA agreed to a Conditional Labor And Plan Of Reorganization Agreement executed April 13, 2012 and as amended from time-to-time (the "CLA"). Upon the Memorandum Approval Date (as defined in Paragraph 18), this Memorandum shall supersede and replace the CLA. This Memorandum provides a process for reaching:

    (a) a Merger Transition Agreement (the "MTA") between APA and an entity ("New American Airlines") formed in connection with a plan of reorganization ("POR") for such of those AMR Corporation-related debtors required to effectuate a combination of American and US Airways (the "Merger"). The MTA shall consist of the collective bargaining agreement between American and APA approved on December 19, 2012 by the Bankruptcy Court in In Re AMR Corporation, et al., jointly administered Ch. 11 Case No. 11-15463 (SHL) (the "2012 CBA"), as amended pursuant to the provisions of this Memorandum;

    (b) a Joint CBA (the "JCBA") to apply to a merged workforce composed of pilots employed by American and US Airways.

2. The negotiation and interest arbitration processes provided in this Memorandum will be binding and apply to all Parties as of the Memorandum Approval Date. The results of the negotiation and interest arbitration processes will be binding and apply to all Parties as provided herein. Notwithstanding the foregoing, any changes made to the MTA prior to the implementation of the JCBA will apply with equal force to all pilots.

3. Beginning on the effective date of the POR (the "Effective Date"), pilots employed by US Airways shall be paid in accordance with the provisions of the MTA that are generally applicable to pilots employed by New American Airlines. The eligibility of US Airways pilots for a defined contribution plan accrual shall commence on the Effective Date, and US Airways' contribution to the retirement plan beginning on the Effective Date shall be calculated by multiplying an eligible pilot's eligible compensation under the applicable retirement plan by the percentage contribution made by New American Airlines to its pilots' defined contribution retirement plan.

4. It is the intent of the Parties that, as of the Effective Date, the terms and conditions of employment for pilots employed by New American Airlines and US Airways will be set by the MTA (as defined in Paragraph 1(a)) and in accordance with the process specified herein. The Parties further understand,

1

APA_000011591

however, that it will take some period of time for those terms to be implemented. Accordingly, except for those terms specifically identified in Paragraph 3, the Parties agree that each term of the MTA shall be applicable to all US Airways pilots at the earliest practicable time for each such term, and such terms, when applicable, shall govern and displace any conflicting or wholly or partially inconsistent provision of the former US Airways pilot agreements or the *status quo* arising thereunder. Once the MTA has been fully implemented, it shall fully displace and render a nullity any prior collective bargaining agreements applicable to US Airways pilots and any *status quo* arising thereunder.

5. US Airways, and its successors, if any, shall continue to recognize and treat with USAPA as the representative of the pilots employed by US Airways until another representative for the pilot craft or class is certified by the National Mediation Board (the "NMB"). Subject to the provisions of Paragraph 27, negotiations to convert this Memorandum and the MTA into the JCBA and any implementation or other interim agreement, if any, shall be conducted with USAPA and APA jointly, until such time as one union is certified by the NMB to be the collective bargaining representative of the combined pilot craft or class. At that time, the duly-certified representative shall have exclusive authority to negotiate on behalf of the pilots with respect to the JCBA. It is the Parties' intention that the JCBA shall replace any and all prior collective bargaining agreements for USAPA; however, for APA, the JCBA shall be an amendment to the MTA.

6. During the period US Airways is obligated to bargain with USAPA, it will provide information requested by duly authorized representatives of USAPA's Negotiating Advisory and Merger Committees that is reasonably related to the Merger, subject to the execution of standard confidentiality agreements by USAPA and/or affected individuals upon US Airways' request. US Airways will similarly provide such information on such conditions to APA. Notwithstanding the foregoing, US Airways shall continue to supply information pursuant to Attachment M of the Basic East Agreement in matters unrelated to the Merger.

7. US Airways shall reimburse USAPA for expenses incurred after May 1, 2012, as well as for all flight pay loss, incurred in developing and carrying out the functions specified in this Memorandum. The reimbursement provided to USAPA pursuant to the preceding provisions shall not be more than $1.5 million. In addition, New American Airlines and US Airways shall reimburse the merger representatives involved in the seniority integration process in an aggregate not to exceed $4 million. However, any such reimbursement shall not include expenses or flight pay loss associated with litigation against US Airways, American, New American Airlines, or their affiliates, related entities or successor(s), if any, or with respect to the current seniority dispute at issue in the United States District Court for the District of Arizona or to influence the representation choices of their employees or affect their organization rights under Section 2, Ninth of the Railway Labor Act. The reimbursement for expenses related to seniority list integration shall be made no later than 30 days after presentation of an integrated seniority list to US Airways and New American Airlines that complies with the provisions of Paragraph 10, including the obligation to produce an integrated seniority list within the time limitations in Paragraph 10 unless such failure is caused by the airline(s). Reimbursement for expenses, other than for seniority list integration, shall be made no later than 30 days after submission of an invoice in a suitable form so long as USAPA or APA have submitted the invoice within 45 days of the later of the date when the expense was incurred or the date when APA's Board of Directors approves this Memorandum, or USAPA's membership ratifies this Memorandum, as applicable. All expenses for flight pay loss shall be paid directly by the airlines and USAPA and APA shall provide supporting information to support the flight pay loss claim. US Airways and New American Airlines shall also make positive space transportation available to members of USAPA's

2

APA_000011592

Merger and Negotiating Advisory Committees, and similar APA committee members, when engaged in activities related to seniority list integration and contract negotiations.

8. The protections in this Paragraph begin on the Effective Date and last until the earlier of eighteen (18) months after US Airways and the New American Airlines obtain a single operating certificate, or the date on which a JCBA and integrated seniority list are in effect. From the Effective Date until the effective date of the JCBA, the terms and conditions of employment of the New American Airlines and US Airways pilots shall be governed by the MTA.

a. The New American Airlines pilots and US Airways pilots will perform work in accordance with the MTA, including flying and training, and neither airline will interchange pilots between their operations. Neither New American Airlines nor US Airways may utilize in its flight operations or flight training operations a pilot employed by the other airline, except : (i) for pilots hired from one airline by the other pursuant to Paragraphs 8(i) and 8(j); (ii) as may be needed to comply with conditions prescribed by the Federal Aviation Administration for the purpose of transition to, and eventual operation under, a single operating certificate; or (iii) to train pilots who will make up the initial cadre of check airmen for a new fleet type. APA and USAPA, as applicable, shall support the efforts of US Airways and New American Airlines to obtain regulatory approval for the Merger and issuance of the single operating certificate.

b. Except for the circumstances described in paragraph (a) above, no pilot of New American Airlines or US Airways will fly as a crewmember on an aircraft in the Fleet of the other airline. The "Fleet" of each airline shall be defined to include all aircraft in the service of or stored by the airline, or on order or option by the airline, on the Memorandum Approval Date. A list of all aircraft in the respective Fleets of American and US Airways as of the Memorandum Approval Date is included as Attachment A. All orders, options, and anticipated returns set forth in the airlines' fleet plans as of the Memorandum Approval Date are included as Attachment B.

c. In the event that American/New American Airlines or US Airways acquires aircraft not listed in Attachments A or B as a replacement for an existing aircraft, that aircraft shall be designated as American Airlines or US Airways based upon the aircraft being replaced. For purpose of this section, "replacement" means that the newly acquired aircraft can be matched, on a one-to-one basis, to an aircraft that has left or will leave the service of the airline within six (6) months before or after the new aircraft enters service.

d. With respect to new aircraft not listed on Attachments A or B and not assigned under Paragraph 8(c) above, the pilots of each airline will operate any of their respective unique aircraft types. As to all other aircraft, the following procedure will be applied: the airline will provide notice to APA and USAPA, if applicable, of its intent to acquire any such aircraft not less than 270 days prior to such aircraft entering service, and will inform the organization(s), to the extent known, of the type, model and number of such aircraft, the type of engines on them, their ETOPS capability, if any, and the extent to which such aircraft will be used as replacements for other aircraft then or previously operated. The representative(s) of the New American Airlines and US Airways pilots will promptly determine which pilot group will operate such aircraft or will implement binding arbitration, if necessary, to determine the allocation of such flying; the pilot representative(s) shall notify the airlines of the results of this process no later than thirty (30) days after receiving notice from the airlines. If the airlines do not agree with the position of the labor representative(s), the dispute will be resolved pursuant to final and binding interest arbitration with a decision issued no later than 120 days prior to the date when the aircraft is scheduled to be placed in service. The standard to be applied by the arbitrator will be the fair and equitable allocation of flying between the two pilot groups giving

3

APA_000011593

due consideration to the airline business plans. Nothing in this Paragraph will delay or prevent the planned implementation of such aircraft into revenue service.

e. The total number of aircraft block hours scheduled to be flown by mainline US Airways East pilots (excluding Group I aircraft) during any rolling 12-month look-back period shall be no less than 664,426. The total number of aircraft block hours scheduled to be flown by mainline US Airways West pilots during any rolling 12-month look-back period shall be no less than 436,850. The number of widebody positions, either maintained or pay protected, for US Airways pilots shall be no less than 291 US Airways widebody captain positions and 475 US Airways widebody first officer positions. A pay-protected pilot under this Paragraph 8(e) shall not be eligible for additional pay protection under Paragraph 12(a). In the event a pilot is eligible for pay protection under both Paragraphs 8(a) and 12(a), such pilot shall be entitled to whichever pay protection produces the higher pay and shall also fulfill one of the minimum number of widebody positions required herein.

f. The total number of aircraft block hours scheduled to be flown by mainline New American Airlines pilots (excluding Group I) in any rolling twelve month look back period shall be no less than 1,995,663 hours.

g. Commencing when the total number of US Airways aircraft in Equipment Group I equals 31, subsequent Group I aircraft shall be delivered on a ratio of two (2) Group I aircraft to New American Airlines for every one (1) Group I aircraft to US Airways.

h. For purposes of this Paragraph 8, block hours scheduled to be flown for a given month shall be determined by reference to an airline's flight schedule as published for sale 30 days prior to the first day of the month. US Airways shall furnish the block hour data to USAPA, if applicable, and APA no later than 30 days prior to the first day of each month.

i. New American Airlines will not hire new pilots if pilots at US Airways are on furlough unless the most junior pilot on the American Airlines Pilots' System Seniority List has been offered a position at the New American Airlines.

Effective when the most junior pilot on the American Airlines Pilots' System Seniority List has been offered a position at New American Airlines, future positions at New American Airlines will be offered to furloughed US Airways pilots to the extent consistent with the terms of the April 9, 2010 Opinion and Award in FLO-0108 and September 14, 2011 Preferential Hiring Agreement entered into pursuant to that Award. Prior to making offers under this provision, US Airways, New American Airlines and the pilot representative(s) shall agree to the order in which any such offers shall be made to US Airways pilots. A furloughed US Airways pilot who declines a position as a New American Airlines pilot retains the right to be offered a position in a future New American Airlines new-hire class and also retains the right to be recalled to, or otherwise offered a position with, US Airways.

A US Airways pilot who accepts a position at New American Airlines:

(1) will be treated as junior to all pilots who are on the American Airlines Pilots' System Seniority List on the Effective Date, but pilots on the US Airways seniority list employed by New American Airlines under this provision will be ranked among themselves in the order of their acceptance of positions with New American Airlines, and

(2) will be considered an employee of New American Airlines during the period prior to the expiration of the protections in this Paragraph 8 and be subject to the MTA, and

4

APA_000011594

(3) will retain, accrue and be entitled to use his/her combined longevity at both airlines for all purposes, including but not limited to, pay (excluding furlough pay, which will be calculated based on time at New American Airlines only), benefits, vacation accrual, and eligibility towards retirement contributions and health and welfare participation, and

(4) cannot return to US Airways for up to eighteen (18) months from the date of employment as a pilot for New American Airlines, and

(5) will retain his/her position on the US Airways seniority list, and

(6) will not be required to serve a probation period as a pilot for New American Airlines, and

(7) will not receive furlough pay from US Airways with respect to the period of service as a pilot for New American Airlines, and

(8) will be subject to any applicable background checks and employment requirements for New American Airlines pilots returning from furlough.

j. US Airways will not hire new pilots if pilots at New American Airlines are on furlough unless the most junior US Airways pilot has been offered recall or another position with US Airways and all New American Airlines pilots on furlough have been offered a position at US Airways.

Effective when the most junior US Airways pilot has been offered recall or another position with US Airways, future positions at US Airways will be offered to furloughed New American Airlines in seniority order. A furloughed New American Airlines pilot who declines a position as an US Airways pilot retains the right to be offered a position in a future US Airways new-hire class and also retains the right to be recalled to New American Airlines in accordance with his/her American Airlines seniority.

A New American Airlines pilot who accepts a position at US Airways:

(1) will be treated as junior to all pilots who are on the US Airways seniority list on the Effective Date, but pilots on the American Airlines Pilots' System Seniority List employed by US Airways under this provision will be ranked among themselves in seniority order, and

(2) will be considered an employee of US Airways during the period prior to the expiration of the protections in this Paragraph 8 and be subject to the terms and conditions set forth in the MTA (as provided in Paragraphs 3-4 of this Memorandum), and

(3) will retain, accrue and be entitled to use his/her combined longevity at both airlines for all purposes, including but not limited to, pay (excluding furlough pay, which will be calculated based on time at New American Airlines only), benefits, vacation accrual, and eligibility towards retirement contributions and health and welfare participation, and

(4) cannot return to New American Airlines for up to eighteen (18) months from the date of employment as a pilot for US Airways, and

(5) will retain his/her position on the American Airlines Pilots' System Seniority List, and

(6) will not be required to serve a probation period as a pilot for US Airways, and

(7) will not receive furlough pay from New American Airlines with respect to the period of service as a pilot for US Airways, and

5

APA_000011595

(8)  will be subject to any applicable background checks and employment requirements for US Airways pilots returning from furlough.

k.  No pilot base other than St. Louis shall be closed prior to October 1, 2013.

l.  Neither New American Airlines nor US Airways will establish TDY positions at a pilot domicile of the other airline.

m.  All Shuttle flying between DCA, LGA and BOS shall be performed by US Airways pilots.

n.  All existing flying between PHX and Hawaii shall be performed by US Airways pilots.

o.  All Trans-Pacific (Asia) flying shall be performed by pilots on the American Airlines Pilots' System Seniority List.

p.  All of the provisions of this Paragraph 8 shall be subject to Paragraph 21.

9.  Nothing herein shall prevent placement of the "US" code on flights operated by American or New American Airlines (or by any other airline when displaying the "AA" code), or placement of the "AA" code on flights operated by US Airways (or by any other airline when displaying the "US" code), immediately upon the Effective Date, and it is expressly agreed that US Airways and American or New American Airlines may do so.  Subject to the provisions of this Memorandum, immediately upon the Effective Date, US Airways and New American Airlines or their successors (if any) may move forward with obtaining and utilizing a single operating certificate, and otherwise combining the operations of the two carriers, except for those measures that are dependent upon implementation of an integrated seniority list.

10.  a.  A seniority integration process consistent with McCaskill-Bond shall begin as soon as possible after the Effective Date.  If, on the date ninety (90) days following the Effective Date, direct negotiations have failed to result in a merged seniority list acceptable to the pilots at both airlines, a panel of three neutral arbitrators will be designated within fifteen (15) days to resolve the dispute, pursuant to the authority and requirements of McCaskill-Bond.  That arbitration proceeding will commence no later than 60 days after the designation of the arbitrators, or as soon thereafter as practicable given the availability of the designated arbitrators, provided that it is understood that, in no event, shall the seniority integration arbitration proceeding commence prior to final approval of the JCBA pursuant to the deadlines and procedures in Paragraph 27 below.  The panel of arbitrators will render its award within six (6) months of the commencement of the arbitration, and in any event not later than 24 months after the Effective Date.

b.  The panel of arbitrators may not render an award unless it complies with all of the following criteria:  (i) the list does not require any active pilot to displace any other active pilot from the latter's position; (ii) furloughed pilots may not bump/displace active pilots; (iii) except as set forth in Paragraphs 12 and 13 below, the list does not require that pilots be compensated for flying not performed (e.g., differential pay for a position not actually flown); (iv) the list allows pilots who, at the time of implementation of an integrated seniority list, are in the process of completing or who have completed initial qualification training for a new category (e.g., A320 Captain or 757 First Officer), or who have successfully bid such a position but have not been trained because of conditions beyond their control (such as a company freeze), to be assigned to the positions for which they have been trained or successfully bid, regardless of their relative standing on the integrated seniority list; and (v) it does not contain conditions and restrictions that materially increase costs associated with training or company paid move as specified in the JCBA.

6

APA_000011596

c. The integrated seniority list resulting from the McCaskill-Bond process shall be final and binding on APA and USAPA (and/or the certified bargaining representative of the combined pilot group), the company(ies) and its(their) successors (if any), and all of the pilots of American/New American Airlines and US Airways.

d. During the McCaskill-Bond process, including any arbitration proceeding, US Airways, American or New American Airlines, or their successors (if any), shall remain neutral regarding the order in which pilots are placed on the integrated seniority list, but such neutrality shall not prevent said carriers from insuring that the award complies with the criteria in Paragraph 10(b)(i)-(v).

e. The obligations contained in this Paragraph shall be specifically enforceable on an expedited basis before a System Board of Adjustment in accordance with Paragraph 20, provided that the obligations imposed by McCaskill-Bond may be enforced in a court of competent jurisdiction.

f. A Seniority Integration Protocol Agreement ("Protocol Agreement") consistent with McCaskill-Bond and this Paragraph 10 will be agreed upon within 30 days of the Effective Date. The Protocol Agreement will set forth the process and protocol for conducting negotiations and arbitration, if applicable, and will include a methodology for allocating the reimbursement provided for in Paragraph 7. The company(ies) will be parties to the arbitration, if any, in accordance with McCaskill-Bond. The company(ies) shall provide information requested by the merger representatives for use in the arbitration, if any, in accordance with requirements of McCaskill-Bond, provided that the information is relevant to the issues involved in the arbitration, and the requests are reasonable and do not impose undue burden or expense, and so long as the merger representatives agree to appropriate confidentiality terms.

g. This Memorandum is not a waiver of any argument that participants may make in the seniority integration process. Nor do the provisions of this Memorandum constitute an admission as to the appropriate allocation of flying following the expiration of the protections in Paragraph 8 of this Memorandum, or the manner in which the respective pre-merger carriers would have operated in the absence of a merger, or the job entitlements or equities that arguably underlie the construction of an integrated seniority list, or for any other purpose. This Memorandum may be offered into evidence or shown to a mediator as background information and to describe the actual operations of the separate carriers prior to expiration of the protections in Paragraph 8 of this Memorandum.

h. US Airways agrees that neither this Memorandum nor the JCBA shall provide a basis for changing the seniority lists currently in effect at US Airways other than through the process set forth in this Paragraph 10.

i. Nothing in this Paragraph 10 shall modify the decision of the arbitration panel in Letter of Agreement 12-05 of the 2012 CBA.

11. a. During the term of the MTA, US Airways shall not furlough any pilots who have established and maintain seniority on the US Airways mainline system as of the Effective Date. USAPA will

7

APA_000011597

provide, by name, East Pilot "X" and West Pilot "Y" who will be the most junior US Airways pilots afforded this furlough protection. US Airways shall not furlough any such pilot in anticipation of the transaction that results in the formation of New American Airlines or of the operationally merged carrier consisting of New American Airlines and US Airways. The parties intend that this furlough protection will be part of the status quo during contract negotiations pursuant to Section 6 of the Railway Labor Act for a successor agreement to the JCBA.

b. New American Airlines shall not furlough any pilots during the term of the MTA whose names appear on the American Airlines' Pilots System Seniority List as of the Effective Date and who are not: (i) on furlough as of the Effective Date; (ii) junior to the least senior active pilot on the Effective Date. This protection includes American Eagle pilots with American Airlines seniority numbers when they flow up and become active employees at New American Airlines and who are senior to the most junior active pilot on the Effective Date. The parties intend that this furlough protection will be part of the status quo during contract negotiations pursuant to Section 6 of the Railway Labor Act for a successor agreement to the JCBA.

c. This Paragraph 11 is subject to Paragraph 21.

12. a. Any US Airways pilot as of the Effective Date who is thereafter involuntarily displaced to a lower paying position shall be pay protected. The pay protections of this Paragraph shall continue unchanged if the affected pilot(s) suffer(s) multiple displacements, but shall end whenever such pilot(s) can hold the position from which the pilot was originally displaced or an equivalent or greater pay position. USAPA will provide, by name, East Pilot "X" and West Pilot "Y" who will be the most junior US Airways pilots afforded this pay protection. The final version of this pay protection provision, including its duration, will be substantively the same as in the MTA.

b. If any currently-active New American Airlines pilot is involuntarily displaced to a Group I aircraft, the pilot's hourly pay rate shall not be reduced. This pay protection shall terminate if and when the involuntarily-displaced pilot can hold a position at the same or higher pay rate.

If any currently-active New American Airlines pilot is displaced from his bid position to another bid position within his base, or to a bid position at a different base, that pilot will be pay protected against a pay rate reduction unless:

1. That pilot could have been awarded a displacement within his base to a bid position of equal or greater pay, but elected a displacement to a lower paying bid position. (A lateral displacement (International / Domestic, and vice versa) is considered a displacement of equal pay); or

2. No bid position of equal or greater pay was available at his current base, and that pilot elected not to be awarded a displacement at a new base to a bid position which would have provided that pilot equal or greater pay when compared to the bid position displaced from. (A lateral displacement to a different base (International / Domestic, and vice versa) is considered a displacement of equal pay).

8

APA_000011598

This pay protection shall terminate if and when the displaced pilot could return or advance to a position in any base at the same or higher pay rate from which the pilot was initially displaced.

The value and treatment of this pay protection shall be governed by Paragraph 24.

13. Commencing on the date of single operating certificate for US Airways and New American Airlines or their successors (if any), all pilots, who have established and maintain seniority on the US Airways mainline system and who are eligible for furlough protection pursuant to Paragraph 11 above, will be paid in accordance with the Group I pay rates as set forth in Paragraph 22 when flying a Group I aircraft except for the following pay protection: a Group I captain shall be paid at Group III first officer pay rates unless the captain can hold a Group III first officer or higher-paying position; a Group I first officer shall be paid at Group II first officer pay rates unless the first officer can hold a Group II first officer or higher-paying position.

14. USAPA agrees to waive all change of control provisions, including, but not limited to, Section 1.D in the East collective bargaining agreement, LPPs, daily minimum utilization, and minimum fleet requirements in the East and West collective bargaining agreements and in the Transition Agreement conditioned upon the occurrence of the Effective Date.

15. US Airways agrees that it will comply with the East and West CBAs and the Transition Agreement until the Effective Date.

16. US Airways shall provide a bridge of Short Term Disability ("STD") coverage for thirty-six (36) months for eligible former America West pilots who remain employed by US Airways and have not forfeited their seniority rights as of the Effective Date. This STD coverage shall begin at the time the eligible former America West pilots are covered by New American Airlines' long-term disability plan. Eligibility for this coverage shall be determined according to the terms of the America West STD plan; the coverage shall contain, at a minimum, the plan design features in Appendix B of the current America West collective bargaining agreement except that the Maximum Benefit Duration shall be up to 90 days of a disability.

17. Any US Airways pilot with a sick leave balance in excess of 1000 hours as of the Effective Date shall be allowed to use the sick leave for illness or injury in excess of 1000 hours until the pilot's sick leave balance is reduced to 1000 hours or less. For US Airways pilots with a sick leave balance in excess of 1000 hours, their sick leave accruals on or after the Effective Date will be treated the same as American Airlines pilots under the MTA.

18.    a. This Memorandum shall become effective (the "Memorandum Approval Date") upon the date when all of the following have occurred: (i) approval by APA's Board of Directors; (ii) approval by US Airways' Board of Directors; and (iii) approval by AMR Corporation's Board of Directors. If all of these approvals do not occur, this Memorandum shall be null and void in its entirety and as to all Parties.

    b. This Memorandum shall become applicable to USAPA upon the later of (i) the

9

APA_000011599

Memorandum Approval Date; and (ii) USAPA's Board of Pilot Representatives' recommending that USAPA's membership ratify this Memorandum and USAPA's membership's subsequent ratification of this Memorandum.  USAPA will inform the Parties whether its Board of Pilot Representatives has agreed to recommend that its membership ratify the MTA on or before January 4, 2013.  If recommended, the ratification vote of USAPA's membership shall be completed no earlier than approval of the Merger by AMR Corporation's Board of Directors and no later than 60 days after such approval (if any).  If such recommendation and ratification do not timely occur, this Memorandum shall be of no force or effect as to USAPA but shall remain in full force and effect as to the other parties.

c. For purposes of clarity, this Memorandum shall be null and void in its entirety and as to all Parties if the Merger is not consummated.

d. This Memorandum will only apply to this Merger, and will apply to this Merger regardless of its corporate structure.  This Memorandum shall not affect or have any applicability to American's stand-alone plan or any merger or transaction other than this Merger.

e. If this Memorandum or the MTA is deemed to be unenforceable or nullified, in whole or in part, for any reason after the Effective Date, USAPA and APA agree that the terms and conditions of employment for the pilots employed by US Airways and New American Airlines will be as provided in the 2012 CBA as modified by the process in Paragraph 24 of this Memorandum.

19.  It is the intent of the Parties that, notwithstanding anything to the contrary in this Memorandum, Paragraphs 8, 9, 18(e), and the results obtained through the process identified in Paragraph 24, shall remain in effect after the Effective Date even if this Memorandum is subsequently deemed to be unenforceable or nullified for any reason, and that these provisions are severable from the other terms of this Memorandum.  The parties shall meet and confer within fifteen (15) days after this provision is triggered to agree upon replacement protections for the provisions held to be unenforceable or nullified, and provided further that if replacement protections are not agreed upon by the Parties within thirty (30) days thereafter, either party may submit the dispute to binding arbitration on an expedited basis in accordance with the procedure described in Paragraph 20 of this Memorandum.  The interest arbitrator shall be charged with constructing alternatives having the same economic value as, and operating effects comparable to, the unenforceable or nullified MOU provisions they are replacing.

20.  Except as expressly provided otherwise in this Memorandum, any dispute over the interpretation or application of this Memorandum shall be resolved in accordance with this provision.  Any such dispute shall be arbitrated on an expedited basis directly before a specially-created one-person System Board of Adjustment consisting of arbitrator Richard Bloch or Ira Jaffe, whoever shall be available to hear the dispute earliest.  If Arbitrator Bloch or Jaffe declines to serve in this capacity or is not available to resolve the dispute, another neutral arbitrator shall be selected.  The dispute shall be heard no later than thirty (30) days following the submission to the System Board (subject to the availability of the arbitrator), and shall be decided no later than thirty (30) days following the first day of the hearing, unless otherwise agreed to in writing.

21. The provisions described in Paragraphs 8 and 11 shall not apply in circumstances where the Company's non-compliance is caused in substantial part by Conditions Beyond The Company's Control.  "Conditions Beyond The Company's Control" shall include, but not be limited to, the

10

following: (1) an act of God; (2) a strike by any other company employee group or the employees of a Commuter Air Carrier operating pursuant to an authorized codeshare arrangement with the company; (3) a national emergency; (4) involuntary revocation of the company's operating certificate(s); (5) grounding of a substantial number of the company's aircraft; (6) a reduction in the company's operation resulting from a decrease in available fuel supply caused by either governmental action or by commercial suppliers being unable to meet the company's demands; and (7) the unavailability of aircraft scheduled for delivery.

22.    Pilot hourly pay rates shall be in accordance with the 2012 CBA Section 3 and Supplement A.

23. Section 9 of the 2012 CBA shall be modified as follows:  (1) vacation accrual and value (i.e., how accrual translates to days off) shall be computed in accordance with the existing program for US Airways (West) pilots; and (2) New American Airlines minimum monthly vacation obligation will be 5.0% of the awarded vacations for the year (i.e., total accrued vacations less floated vacations), or 2.75% of the total accrued vacation, whichever is lower.

24.    a. APA is entitled to modifications to the 2012 CBA valued at an average of $87 million/year over six years.

     b. APA will provide its list of proposed modifications, and corresponding valuations with underlying documentation and modeling, within twenty-one (21) days of APA's Board of Directors' approval of this Memorandum.  APA, American, and US Airways will negotiate with respect to the means by which the modifications identified in Paragraph 24(a) will be achieved and the appropriate valuation of each APA proposed modification.  To the extent the parties are unable to reach an agreement as to the appropriate modifications and valuations, US Airways and American shall offer final and binding interest arbitration, and the APA shall accept such proffer, to resolve the dispute. Richard Bloch shall serve as the arbitrator.  If Arbitrator Bloch declines to serve in this capacity or is not available to resolve the parties' dispute, the parties shall select another arbitrator.  The arbitration decision on any contested modifications or valuation issues shall be issued no later than 60 days after APA provides its list of proposed modifications and corresponding valuations with underlying documentation and modeling; provided, however, that the arbitrator shall not have jurisdiction to modify any of the provisions of Paragraph 25 of this Memorandum.  In resolving contested valuation issues, the arbitrator will take into consideration economic cost and, where warranted, balance sheet liability.  For example, with regard to an item such as retiree medical benefits, balance sheet liability will be considered in addition to economic cost.

     c. APA agrees that Supplement X regarding profit sharing is hereby eliminated from the 2012 CBA, and that profit sharing shall not be part of APA's proposed modifications referred to in this Paragraph.

     d. The pay protection described in Paragraph 12 shall be valued at $12 million for each year of protection, and shall count against the total value of the modifications provided for in Paragraph 24(a).

     e. Flights over sixteen (16) hours will be manned with two (2) Captains and two (2) First Officers.

11

APA_000011601

25. Section 1 (Recognition and Scope) of the MTA shall be the 2012 CBA as modified in a. through f. below.

    a. The maximum number of commuter aircraft as a percentage of the Mainline Narrow-Body Fleet shall not exceed 75%.

    b. The maximum number of large regional commuter aircraft as a percentage of the Mainline Narrow-Body Fleet shall not exceed 30% through 2014, 35% in 2015 and 40% thereafter.

    c. Codeshare modified to accommodate full AA/US codesharing plus 15% codesharing with domestic air carriers, both exclusive of AS and HA carve outs.

    d. Existing CRJ900s and E175s fleet in operation at US grandfathered from 76 seat limitation.

    e. Accommodate US Shuttle as provided in CLA.

f. Baseline for international flying set to number of international block hours scheduled during the previous 12 months by AA/US combined.

26. APA shall file a single carrier petition with the NMB as soon as practicable after the Effective Date, when APA determines that the facts support the legal requirements for the filing of a petition but in no event later than four months after the Effective Date. If and when the NMB makes a single-carrier finding, the single carrier acknowledged by the NMB and the certified representative shall be governed by this Memorandum.

27. If and when the NMB makes a single-carrier finding, the organization certified to represent the pilots of the single carrier, the single carrier acknowledged by the NMB and the certified organization shall promptly engage or re-engage in negotiations to achieve a JCBA to be applicable to the carrier that will be the product of the Merger. In the event that such negotiations are not completed within 30 days of the NMB's certification, New American Airlines will offer final and binding interest arbitration under Section 7 of the RLA, and the organization will accept such proffer, to resolve once and for all the terms of the JCBA. The arbitration decision shall be issued no later than 60 days after the close of the 30-day negotiation period. A panel of three arbitrators led by Richard Bloch shall serve as the arbitrators for this process. If Arbitrator Bloch declines to serve in this capacity or is unable to resolve the parties' dispute, the parties shall select another arbitrator. The arbitrator's jurisdiction and award will be limited to fashioning provisions which are consistent with the terms of the MTA, including provisions which implement the terms of the MTA or facilitate the integration of pilots under the terms of the MTA. The arbitrator's award specifically shall adhere to the economic terms of the MTA and shall not change the MTA's Scope terms (Paragraph 25 of this Memorandum) or the modifications generated through the process set forth in Paragraph 24 of this Memorandum.

28. US Airways and USAPA agree to be bound and abide by the arbitration decision contemplated by Letter of Agreement 12-05 of the 2012 CBA. Nothing in the MTA shall modify the decision of the arbitration panel thereunder.

29. Attachment C summarizes the timelines prescribed by this Memorandum for the creation of the MTA, JCBA, and integrated seniority list and shall not prevent the Parties from developing the JCBA earlier.

12

APA_000011602

30.  This Memorandum is ultimately subject to approval by the Bankruptcy Court in In Re AMR Corporation, et al., jointly administered Ch. 11 Case No. 11-15463 (SHL) in connection with the Merger.

**APA:**

ALLIED PILOTS ASSOCIATION

By: _____
Name: _____KEITH C. WILSON_____
Title:_____PRESIDENT_____

**USAPA:**

US AIRLINE PILOTS ASSOCIATION

By: _____
Name:_____
Title:_____

**American:**

AMERICAN AIRLINES, INC.

By: _____
Name:_____
Title:_____

**US Airways:**

US AIRWAYS, INC.

By: _____
Name:_____
Title:_____

13

APA_000011603

30.  This Memorandum is ultimately subject to approval by the Bankruptcy Court in In Re AMR Corporation, et al., jointly administered Ch. 11 Case No. 11-15463 (SHL) in connection with the Merger.

<u>**APA:**</u>

ALLIED PILOTS ASSOCIATION

By: _____

Name:_____

Title:_____

<u>**USAPA:**</u>

US AIRLINE PILOTS ASSOCIATION

By: _____

Name:  GARY HUMMEL

Title:  PRESIDENT

<u>**American:**</u>

AMERICAN AIRLINES, INC.

By: _____

Name:_____

Title:_____

<u>**US Airways:**</u>

US AIRWAYS, INC.

By: _____

Name:_____

Title:_____

13

APA_000011604

30.  This Memorandum is ultimately subject to approval by the Bankruptcy Court in In Re AMR Corporation, et al., jointly administered Ch. 11 Case No. 11-15463 (SHL) in connection with the Merger.

**APA:**

ALLIED PILOTS ASSOCIATION


By: _____
Name: _____
Title: _____

**USAPA:**

US AIRLINE PILOTS ASSOCIATION


By: _____
Name: _____
Title: _____

**American:**

AMERICAN AIRLINES, INC.

By: _____
Name: _____DENISE LYNN_____
Title: _____SVP, People_____

**US Airways:**

US AIRWAYS, INC.


By: _____
Name: _____
Title: _____

13

APA_000011605

30. This Memorandum is ultimately subject to approval by the Bankruptcy Court in In Re AMR Corporation, et al., jointly administered Ch. 11 Case No. 11-15463 (SHL) in connection with the Merger.

**APA:**

ALLIED PILOTS ASSOCIATION

By: _____
Name: _____
Title: _____

**USAPA:**

US AIRLINE PILOTS ASSOCIATION

By: _____
Name: _____
Title: _____

**American:**

AMERICAN AIRLINES, INC.

By: _____
Name: _____
Title: _____

**US Airways:**

US AIRWAYS, INC.

By: _____
Name: _____ J. Scott Kirby _____
Title: _____ President _____

13

APA_000011606

## ATTACHMENT A

A list of all aircraft in the service of or stored by American Airlines, Inc., and US Airways, Inc. as of the Memorandum Approval Date will be provided to APA and USAPA within two days after the Memorandum Approval Date and be made a part of this Memorandum.

14

APA_000011607

## ATTACHMENT B

A list of all aircraft orders, options, and anticipated returns set forth in the fleet plans of American Airlines, Inc. and US Airways, Inc. as of the Memorandum Approval Date will be provided to APA and USAPA within two days after the Memorandum Approval Date and be made a part of this Memorandum.

15

APA_000011608

**ATTACHMENT C**

| COMMENCE JCBA PRE MERGER POR | MOU Execution | Board Approval<br>-AMR<br>-US Airways<br>-APA → 21 Days For List of Valuation Modifications<br>-USAPA→ Recommendation Decision by 01/04/13;<br>If Recommended, Membership Ratification Vote Completed Between AMR Board Approval Of Merger and 60 Days Thereafter | 60 Days<br>From APA list<br>Of Valuation Modifications<br><br>Agreement Reached On Valuation<br>- Or -<br>Conclusion Of Interest Arbitration | = MTA<br>By agreement<br>- Or -<br>Arbitrator's Decision |
|---|---|---|---|---|

JCBA NEGOTIATIONS →

| ON AND AFTER MERGER POR | POR | 4 months | At NMB Discretion, But Projected 6-8 Months From Petition | 30 days | 60 days | = JCBA |
|---|---|---|---|---|---|---|
| | MTA in effect For APA and USAPA If USAPA Ratifies or MTA In Effect For APA and USAPA Under Status Quo JCBA Negotiations Begin | APA Petition For Single Carrier Status | NMB Single Carrier Finding | * JCBA Negotiation Complete -Or- If Not Complete → | JCBA Interest Arbitration Before Panel of 3 Arbitrators | |

* JCBA negotiations shall begin as soon as practicable after the POR and may be completed anytime between the POR and the deadline of 30 days past NMB Single Carrier finding.

| ON AND AFTER MERGER POR | POR | 30 days | 90 days From POR | 15 Days | 60 Days But Not Before JCBA Effective | 6 Months and No Later Than 24 Months After POR | Integrated = Seniority List |
|---|---|---|---|---|---|---|---|
| | Seniority Integration Process Begins | APA and USAPA Seniority Integration Protocol Agreement | Direct Negotiations Between APA and USAPA | Panel of 3 Arbitrators Designated | Integrated Seniority List Arbitration Commences | Arbitration Panel Renders Award | |

APA_000011609

# EXHIBIT 14
# for Myers Declaration

Defendant Exhibit

Exhibit No.: 26
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

March 21, 2016

Lawrence M. Meadows
MIA/FO/777/MDSB
AA# 332713
PO Box 4344
Park City, UT 84060

**Via E-mail and Certified Mail:**

American Airlines, Inc.
Ms. Helen Yu - System Board Coordinator
Employee Relations
4333 Amon Carter Boulevard
Fort Worth, TX 76155

Allied Pilots Association
c/o Mallory Gloria - System Board Coordinator
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512

**RE: Individual Submission Of Grievance To Expedited System Board Of Adjustment In Accordance With MOU ¶¶ 10.f and 20, To Dispute American Airlines Failure To Uphold Its Obligations Under The MOU ¶ 10., And The Resultant Violation Of Seniority Rights Of Lawrence M. Meadows And Similarly Situated Pilots On Long Term Disability.**

Dear Ms. Yu and Ms. Gloria,

Lawrence M. Meadows, hereby submits this Grievance, in accordance with the Memorandum of Understanding Regarding The Contingent Collective Bargaining Agreement ("MOU") ¶¶ 10.e and 20., as executed on January 15, 2013. He does so on the basis that American Airline's Seniority List Integration Proceedings are inconsistent with the McCaskill-Bond Statute, and therefore violate the MOU ¶10.a, and f.

FACTS

1.      The Memorandum of Understanding ("MOU") ¶ 10.a, requires, "*A seniority integration process consistent with McCaskill-Bond.*"49 U.S.C. §42112.

1

**Meadows 017055**

2.        The McCaskill-Bond Statute in turn incorporates Sections 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"). (As published at 59 C.A.B. 45).

3.        The Allegheny-Mohawk LPPs, state that when a covered transaction (i.e., American Airline's Seniority List Integration proceedings);

> "results in the combination of crafts or classes that are subject to the Railway Labor Act, sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board ("CAB" or the "Board") in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers." Id. § 42112(a).

4.        In short, these Allegheny-Mohawk Labor Protective Provisions ("LPPs") require that the carrier make provisions *"for the integration of seniority lists in a fair and equitable manner,"*

5.        However, for several reasons, the Seniority List Integration Proceedings are clearly inconsistent with the McCaskill-Bond Statute, and thus not fair and equitable because; 1) American has inconsistently treated the seniority rights between and amongst the long term disabled pilots of LUS East, LAA, and LUS West pilots in these proceedings, and done so in a unfair and inequitable manner, 2) American, has failed to compile and provide complete and accurate LAA pilot seniority and employment information, particularly with respect to long term disabled and terminated pilots who were "removed" from pre-merger seniority list, 3) The APA and Board of Arbitrators have ignored disabled pilots requests to correct known pilot seniority and employment data errors, and 4) The Allied Pilots Association ("APA") has abandoned representation of disabled LAA pilots, as such they were not provided adequate representation (if any) in the Seniority List Integration proceedings.

6.        Additionally, although unions and management were typically the parties in Section 13 arbitrations, the CAB has also held that other employee groups and underline individual employees could be granted party status or allowed to otherwise participate.

2

**Meadows 017056**

*See, e.g., Southern Emps. v. Republic/ALEA*, 102 C.A.B. 616 (1983) (describing how seniority integration was negotiated by an "employee committee" established for that purpose without union involvement); *Pan Am-TWA Route Exchange, Arbitration Award*, 85 C.A.B. 2537 (1980) (noting that three individual engineers were parties to arbitration); *NAA I*, 95 C.A.B. at 584 (denying dissenting group "full party status" but noting that they'd been given the opportunity to participate in the LPP arbitration).

7.       Thus, the CAB held as indicated by the language of the Allegheny-Mohawk LPPs,

that unrepresented employees still had rights to fair and equitable seniority integration and

participation in binding arbitration to resolve seniority integration disputes.

## CONCLUSON

Based on all the foregoing facts, American Airlines has clearly violated ¶¶ 10.a, and f. of the

MOU, and failed to uphold its obligations thereunder. Additionally, in such event the MOU ¶10.e;

provides for enforcement of those obligation, stating that;

> "e. The obligations contained in this Paragraph [MOU ¶ 10.] shall be specifically
> enforceable on an expedited basis before a System Board of Adjustment in
> accordance with Paragraph 20, provided that the obligations imposed by McCaskill-
> Bond may be enforced in a court of competent jurisdiction."

Furthermore, the MOU ¶ 20., provides for resolution of this dispute on an expedited basis before a

System Board consisting of a sole neutral within 30 days, and states;

> "20. Except as expressly provided otherwise in this Memorandum, any dispute over
> the interpretation or application of this Memorandum shall be resolved in accordance
> with this provision. Any such dispute shall be arbitrated on an expedited basis directly
> before a specially-created one-person System Board of Adjustment consisting of
> arbitrator Richard Bloch or Ira Jaffe, whoever shall be available to hear the dispute
> earliest. If Arbitrator Bloch or Jaffe declines to serve in this capacity or is not available
> to resolve the dispute, another neutral arbitrator shall be selected. The dispute shall
> be heard no later than thirty (30) days following the submission to the System Board
> (subject to the availability of the arbitrator), and shall be decided no later than thirty
> (30) days following the first day of the hearing, unless otherwise agreed to in writing."

In closing, the APA has declared that Meadows is not a member, and explicitly denied him

of his right of representation, and further asserted it owes him no duty.  Regardless, Meadows has

standing, and is an interested party, pursuant to the MOU ¶ 10.c., which states that the integrated

seniority list "*shall be final and binding on…all of the pilots* of the American/New American

3

Meadows 017057

*Airlines. "* Unless, this grievance is adjusted Meadows and other similar situated pilot's relative positon on the integrated seniority list will not be protected, and they will suffer irreparable harm and a manifest injustice. Therefore, Meadows is left with no choice, but to exercise his individual right, to ensure this grievance is handled and adjusted by an expedited System Board of Adjustment as provided for under the MOU ¶ 20.  Finally, please consider this document as Meadows individual grievance and request to the System Board Coordinator to submit this dispute to a special expedited SBOA, and contact the other parties, to coordinate, schedule, and subsequently notify all parties of the date, time and location of such proceeding.

Respectfully Submitted,

Lawrence M. Meadows
First Officer, American Airlines

CC: Keith Wilson, Pres. APA; Gary Hummel, Pres. USAPA, Denise Lynn, AAL SVP People; Scott Kirby, Pres. US Airways; Ira Jaffe, Esq; Richard Bloch, Esq.

4

**Meadows 017058**

# EXHIBIT 15

# for Myers Declaration



## ALLIED PILOTS ASSOCIATION

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

FROM:  CA Keith C. Wilson, APA President

DATE:  June 30, 2016

RE:     **PRESIDENTIAL CONSTITUTIONAL INTERPRETATION**

---

The Allied Pilots Association ("APA" or "Association") Constitution and Bylaws ("C&B") states "The President shall enforce the APA Constitution and Bylaws, and he may issue, as necessary, written interpretations of the Constitutional and Bylaws. (09/15/2010)" (C&B, Article IV, Section 8.A.3.)

RELEVANT C&B SECTIONS AT ISSUE:  **ARTICLE III - MEMBERSHIP**

### Section 1. Qualifications

A.  Any person of lawful age and of good moral character who is qualified as a flight deck operating crew member with American Airlines, Inc., who is accruing seniority, furloughed, or on a leave of absence, except for pilots who are employed by American Airlines in a management position for which total compensation is not defined by the collective bargaining agreement; shall be eligible for membership in the APA as hereinafter provided. (02/28/2008)

### Section 2. Classes of Membership

...

B.  Active membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. (02/25/99)

C.  Inactive Membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. Pilots in the following employment statuses shall be eligible for inactive membership: (06/07/2006)

1. Furlough
2. Medical or Personal Leave of Absence
3. Military Leave of Absence
4. Pilots not on active flying status with AA concurrently owing back dues. (02/28/2008)

Inactive Member. A member in good standing shall automatically be transferred to inactive membership status upon: (02/25/99)

1. Being furloughed by the Company.
2. Being on leave of absence from the Company twelve (12) months after the expiration of paid sick leave, or (02/07/2004)
3. Being in the United States military forces on continuous active duty in excess of sixty (60) months. (02/28/2008)
4. When that pilot is not on active flying status with AA and that pilot owes back dues, that pilot will remain on inactive membership status until he/she returns to work at AA. At that time, he/she will resume payment of back dues and will be returned to active membership. (02/28/2008)

1



**ALLIED PILOTS ASSOCIATION**

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

**Section 5. Membership Status**

...

F.  The Secretary-Treasurer shall keep an account for all members in good standing, members in bad standing, non-members, retired members, inactive members, etc. When an inactive member returns to active line flying his account will be reactivated and all new dues and assessments will be charged from the day of his return to line flying. *(02/28/2008)*

FINDINGS:  Under Sections 11.D and Supplement F(1) of the Collective Bargaining Agreement ("CBA"), pilots who are on a leave of absence on account of sickness or injury for more than five years no longer retain or accrue seniority.

Under Article III, Section 2(C), an active member in good standing is "automatically ... transferred to inactive membership status upon ... [b]eing on leave of absence from the Company twelve (12) months after the expiration of paid sick leave."

The C&B does not expressly address whether a member who has become inactive due to a twelve-month leave of absence on account of sickness or injury continues to retain his or her inactive membership after his employment terminates on account of Section 11.D or Supplement F(1)'s five-year cap on leaves of absences for sickness or injury.

Under BOD Resolution R2006-61 Rev 1 (2006), BOD Resolution R2014-07 Rev 1 (2014), and APA Policy Manual 1.22, pilots who lost their seniority on account of Section 11.D or Supplement F(1) and later regain their FAA medical certificate may petition APA to support the pilot's reinstatement to active pilot employment. APA's past practice, absent unusual circumstances, has been to support pilots' efforts at reinstatement upon demonstration that they have regained their FAA medical certificate. A pilot reinstated to employment under this process does not have to reapply for APA membership. On the contrary, under Article III, Section 5(F), upon reinstatement to employment, the pilot's status automatically returns to Active membership. Consistent with Article III, Section 2 of the C&B, it must be inferred, therefore, that prior to the automatic conversion to active membership status, the pilot must have been in inactive membership status.

**INTERPRETATION:  A pilot who has become an inactive member on account of C&B Article III, Section 2(C) and later loses his or her seniority under Section 11.D or Supplement F(1) of the CBA retains his or her status as an inactive APA member until such time as the pilot returns to active pilot employment under the procedures described above, or the pilot's APA status changes for some other reason, e.g., a voluntary resignation from APA or the exercise of retirement rights.**

**This interpretation does not bestow or vest any rights or privileges not already provided by the APA C&B or APA benefits plans.**

2

# EXHIBIT 16
# for Myers Declaration

Evidentiary Hearing, Vol. 1                          9/27/2016

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

In the Matter in          §
Arbitration Between:      § Case No. 01-16-0001-4118
                          §
LAWRENCE MEADOWS,         § Violation of Constitution
    Accuser,              § and Bylaws
                          §
AND                       §
                          §
                          § Before:
CAPTAIN KEITH WILSON,     § Edward B. Valverde
    Accused.              §


------------------------------------

EVIDENTIARY HEARING

VOLUME 1

SEPTEMBER 27, 2016

------------------------------------


        BE IT REMEMBERED that on September 27, 2016,

from 11:16 a.m. to 4:51 p.m., I, Angela L. Mancuso, a

Certified Shorthand Reporter in and for the State of

Texas, appeared at Regus Conference Center,

13727 Noel Road, Tower II, Suite 200, Dallas, Texas, in

the City of Dallas, County of Dallas, State of Texas,

whereupon the following proceedings were had:

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Evidentiary Hearing, Vol. 1                              9/27/2016

2

A P P E A R A N C E S

THE ARBITRATOR:

    MR. EDWARD B. VALVERDE
    Valverde Arbitration Services, Inc.
    P.O. Box 17564
    Fort Worth, Texas  76102
    (817) 480-6140
    valverdearbitration@gmail.com

THE ACCUSER:

    MR. LAWRENCE M. MEADOWS
    P.O. Box 4344
    Park City, Utah  84060
    (516) 982-7718
    lawrencemeadows@yahoo.com

THE ACCUSED:

    CAPTAIN KEITH WILSON
    Allied Pilots Association
    14600 Trinity Boulevard
    Suite 500
    Fort Worth, Texas  76155
    (817) 302-2170
    kcw1985@verizon.net


ALSO PRESENT:

    Captain Ed Sicher, Allied Pilots Association
    Miami Vice Chairman - DDR
    (954) 224-6908
    flysich@aol.co

    Captain Rusty McDaniels, Allied Pilots Association
    IT Steering Committee Chairman
    Membership Committee
    (817) 832-0909
    rustymcdaniels@gmail.com

    Mr. J. Bennett Boggess, Allied Pilots Association
    Executive Administrator
    Director of Representation
    (817) 302-2170
    bboggess@alliedpilots.org

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Evidentiary Hearing, Vol. 1                    9/27/2016

3

TABLE OF CONTENTS

                                                      PAGE

Accuser's Opening Statement by Mr. Meadows.......  65
Accused's Opening Statement by Captain Wilson....  403

MASTER WITNESS LIST
CHRONOLOGICAL ORDER

VOLUME 1

CAPTAIN RUSTY McDANIELS
Direct Examination by Mr. Meadows................  85

VOLUME 2

CAPTAIN RUSTY McDANIELS
Direct Examination (Cont.) by Mr. Meadows........  222
Cross-Examination by Captain Wilson..............  259
Redirect Examination by Mr. Meadows..............  274

CAPTAIN KEITH WILSON
Direct Examination by Mr. Meadows................  285

BENNETT BOGGESS
Direct Examination by Mr. Meadows................  377

MASTER EXHIBIT LIST
VOLUMES 1-2

ARBITRATOR EXHIBITS
NUMBER/DESCRIPTION

Arbitrator Exhibit 1
    9/16/16 letter from Steven Hoffman to
    Arbitrator Valverde

Arbitrator Exhibit 2
    6/30/16 Presidential Constitutional Interpretation

MEADOWS EXHIBITS
NUMBER/DESCRIPTION

Meadows Exhibit 1
    APA Constitution and Bylaws

Meadows Exhibit 2
    APA Policy Manual

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Evidentiary Hearing, Vol. 1                          9/27/2016

4

Meadows Exhibit 3
     2013 collective bargaining agreement

Meadows Exhibit 4
     2015 joint collective bargaining agreement

Meadows Exhibit 5
     2012 and 2013 APA and Subsidiaries Consolidated
     Financial Statements (With Independent Auditors'
     Reporter Thereon)

Meadows Exhibit 6
     APA Non-Members list

Meadows Exhibit 7
     Meadows Member Detail Information and Member
     Profile as of 7/23/15

Meadows Exhibit 8
     Meadows Member Update and Activity Profile
     as of 8/20/15

Meadows Exhibit 9
     APA Membership Reports and APA Status Codes

Meadows Exhibit 10
     Your APA Group Term Life & Voluntary Accidental
     Death & Dismemberment Insurance Plan

Meadows Exhibit 11
     AMAS - Welcome APA Members!

Meadows Exhibit 12
     Meadows APA membership card

Meadows Exhibit 13
     Meadows is an "Employee" & "Pilot Employee" of
     American Airlines
     He Has A 25 Year Continuing Employment Relationship
     with exhibits

Meadows Exhibit 14
     2/1/04 American Airlines, Inc.
     Pilot Long Term Disability Plan

Meadows Exhibit 15
     Decision and Award
     Equity distribution arbitration

5

Meadows Exhibit 16
     12/31/14 A Plan Benefit Statement

Meadows Exhibit 17
     11/18/11 letter from Bennett Boggess to
     Lawrence Meadows

Meadows Exhibit 18
     Decision and Award
     Cockpit Crewmember Floor, Hill Presidential

Meadows Exhibit 19
     R2014-07 Rev. 1, R2006-61 Rev. 1

Meadows Exhibit 20
     APA System Board/Grievance Report
     2014 Winter Board of Directors Meeting

Meadows Exhibit 21
     Rod Charlson Member Detail Information
     July 2015 Bid Award Review

Meadows Exhibit 22
     9/20/13 letter from Lawrence Meadows to
     CA Keith Wilson

Meadows Exhibit 23
     CR Post 3/27/14

Meadows Exhibit 24
     4/22/14 e-mail thread

Meadows Exhibit 25
     Union Democracy Review
     233 Disabled Pilots Barred from Allied Pilots
     Association website

Meadows Exhibit 26
     7/21/14 MIA Domicile Meeting Reminder

Meadows Exhibit 27
     Opinion and Award
     Annable vs. Todd Wissing

Meadows Exhibit 28
     APA appeal board decision
     Sproc vs. APA National Officers and Board of
     Directors

6

Meadows Exhibit 29
    Decision and Award
    Sproc vs. Allied Pilots Association Officers

Meadows Exhibit 30
    Section 2.04 of APA Policy Manual

Meadows Exhibit 31
    Defendant Allied Pilots Association's Reply Brief

Meadows Exhibit 32
    4/6/15 letter from Lawrence Meadows to Pam Torell

Meadows Exhibit 33
    4/14/15 letter from Lawrence Meadows to Pam Torell

Meadows Exhibit 34
    Tom Westbrook's C&R post

Meadows Exhibit 35
    R2015-10

Meadows Exhibit 36
    5/4/15 letter from Lawrence Meadows to
    Thomas Westbrook

Meadows Exhibit 37
    5/4/15 letter from Lawrence Meadows to Pam Torell

Meadows Exhibit 38
    Order Granting Plaintiff's Motion to Amend and
    Defendants' Motions to Dismiss

Meadows Exhibit 39
    5/5/15 letter from Charles Hepp to Lawrence Meadows

Meadows Exhibit 40
    5/8/15 letter from Keith Wilson to Chuck Hepp

Meadows Exhibit 41
    5/11/15 letter from Lawrence Meadows to
    Charles Hepp

Meadows Exhibit 42
    5/12/15 letter from Charles Hepp to
    Lawrence Meadows

Meadows Exhibit 43
    5/14/15 letter from Charles Hepp to Lawrence
    Meadows and Keith Wilson

Evidentiary Hearing, Vol. 1                          9/27/2016

7

Meadows Exhibit 44
    5/19/15 letter from Charles Hepp, Lisa Heller,
    Katie Fletcher to Lawrence Meadows

Meadows Exhibit 45
    5/29/15 letter from Charles Hepp, Lisa Heller,
    Katie Fletcher to Lawrence Meadows

Meadows Exhibit 46
    6/3/15 letter from Charles Hepp to
    Lawrence Meadows

Meadows Exhibit 47
    6/10/15 letter from Lawrence Meadows to Charles
    Hepp, Lisa Heller, Katie Fletcher

Meadows Exhibit 48
    6/10/15 letter from Lawrence Meadows to Pam Torell

Meadows Exhibit 49
    6/12/15 letter from Charles Hepp to Lawrence
    Meadows, Keith Wilson

Meadows Exhibit 50
    6/17/15 letter from Pam Torell to Lawrence Meadows

Meadows Exhibit 51
    6/22/15 letter from Steven Hoffman to
    Lawrence Meadows

Meadows Exhibit 52
    6/25/15 letter from Steven Hoffman, Edgar James to
    Charles Hepp, Lisa Heller, Katie Fletcher

Meadows Exhibit 53
    6/26/15 letter from Charles Hepp to Lawrence
    Meadows

Meadows Exhibit 54
    6/29/15 letter from Charles Hepp to Keith Wilson,
    Lawrence Meadows

Meadows Exhibit 55
    7/13/15 letter from Charles Hepp to Rusty McDaniels

Meadows Exhibit 56
    7/14/15 letter from Lawrence Meadows to Charles
    Hepp

Evidentiary Hearing, Vol. 1                              9/27/2016

8

Meadows Exhibit 57
     Printout from Office of Labor-Management Standards

Meadows Exhibit 58
     4/25/13 position paper of Lawrence Meadows

Meadows Exhibit 59
     5/12/15 letter from Lawrence Meadows to FAA

Meadows Exhibit 60
     7/14/15 letter from Lawrence Meadows to Charles
     Hepp

Meadows Exhibit 61
     7/15/15 letter from Keith Wilson to Charles
     Hepp

Meadows Exhibit 62
     Article VII/Policy Manual - Appeal Board
     Recommendations Overview - Winter Board Meeting
     2009

Meadows Exhibit 63
     7/28/15 letter from Lawrence Meadows to Steve
     Hoffman

Meadows Exhibit 64
     Plaintiff's Notice of Request for Judicial Notice

Meadows Exhibit 65
     7/30/15 letter from Lawrence Meadows to Steve
     Hoffman

Meadows Exhibit 66
     7/30/15 letter from Lawrence Meadows to Charles
     Hepp, Katie Fletcher, Lisa Heller

Meadows Exhibit 67
     8/3/15 letter from Lawrence Meadows to Pam Torell

Meadows Exhibit 68
     8/14/15 letter from Charles Hepp to Lawrence
     Meadows, Keith Wilson

Meadows Exhibit 69
     Defendant Allied Pilots Association's Privilege Log

Meadows Exhibit 70
     3/31/14 e-mail thread

Evidentiary Hearing, Vol. 1                           9/27/2016

9

Meadows Exhibit 71
     Declaration of Keith Wilson

Meadows Exhibit 72
     Declaration of Arthur McDaniels

Meadows Exhibit 73
      Declaration of Arthur McDaniels

Meadows Exhibit 74
     APA Status Codes

Meadows Exhibit 75
     5/22/12 letter from Rusty McDaniels, Russell Moore
     to John Hale

Meadows Exhibit 76
     Debtors' Limited Objection to Motion of Lawrence
     Meadows for Relief from Automatic Stay

REPORTER'S NOTES:

     Exhibits retained by arbitrator.
     Exhibit copies are not attached to transcript.

     Quotation marks are used for clarity and do
     not necessarily reflect a direct quote.

**STRYKER REPORTING SERVICES**                 **(817) 494-0700**

# EXHIBIT 17
# for Myers Declaration

# <u>VERIFIED CLOSING BRIEF OF LAWRENCE M. MEADOWS</u>

## <u>In the APA Article VII matter of *Meadows v. Wilson*</u><br><u>AAA Case No. 01-16-0001-4118)</u>

Before The Honorable Arbitrator Edward B. Valverde<br>American Arbitration Association

<u>**Submitted By:**</u>

**FO Lawrence M. Meadows, Pro Se**<br>MIA/FO/777/MDSB<br>PO Box 4344<br>Park City, UT 84060<br>Cell: 516-982-7718<br>Fax: 435-604-7850<br>Email: <u>lawrencemeadows@yahoo.com</u>

**December 6th, 2016**

Verified Closing Brief<br>Page **0** of **51**

**TABLE OF CONTENTS**

1.  **PREFACE** …………………………………………………..…………… 3

2.  **INTRODUCTION** ……………………………………...….…………… 4

3.  **STATEMENT OF FACTS**

    A.  **Background Facts** …………………………………..…………… 6

    B.  **Events Leading to C&R Lockout** …………………..………………… 16

    C.  **Post C&R Lock-Out Procedural History** ………………………………… 23

D.  **ARGUMENT**

    A.  **APA's Challenge and Response ("C&R" ) Electronic Message Forum Constitutes A Virtual Union Hall Protected Under LMRDA Union Member Bill Of Rights…………………………………………………..………… 28**

    B.  **APA C&B Is The Supreme Law of the Union, But Its Subordinate To And Cannot Preclude Rights Under The LMRDA………………………………...………….. 30**

    C.  **APA C&B In Turn Provides For An APA Policy Manual Which In Turn Provides For A Members Only Website And Electronic Communications Forum Challenge & Response…………………………………………………………… 31**

    D.  **MDD Pilots Are APA Members In Good Standing Who Are Entitled To All Rights, Privileges And Benefits Of APA Membership Including C&R Access….. 32**

    E.  **APA's Long-standing Past-practice Has Been To Treat MDD Pilots As Active Members Granting Them C&R Access Since Its Inception Some 20 Years Ago. ..33**

    F.  **Arguendo Even If Meadows Is An Inactive Member, He Is Still Entitled To C&R Access………………………………………………………………… 34 ..**

    G.  **Meadows Made C&R Posts That Were Highly Critical of APA' Leadership And Highlighted Its Representational Failures And Disparate Treatment With Respect To Disabled Members Benefits and Seniority Rights………………...……… 35**

**H. On April 22, 2014 APA Held a Secret Closed Session Special BOD Meeting Allegedly For Purposes Of Issuing A BOD "Directive" Declaring MDD Pilots Were Not Members For Purposes Of Directing The APA President To Revoke Long-Standing C&R Access Of All Disabled MDD Pilots…………………………… 37**

**I. APA Appeal Board Has Previously Held That The AUP Is Never Enforced And Cannot Be Selectively Enforced As Was Done Here Against Only Disabled MDD Members………………………………………………………………………… 40**

**J. Bottom-line To The Extent The APA President Has Authority To Enforce The AUP, He Can Only Do So In Accordance With The Due Process Requirements Mandated In The APA C&B Article VII Sec. D.5…………………….…………… 41**

**K. APA AND Keith Wilson Have Taken Wildly Inconsistent Positons Regarding Meadows Membership Status From Forum To Forum As It Suited Its Needs.… 44**

**E. <u>CONCLUSION</u>……..…….…………….…………………….…………… 47**

**F. <u>VERIFICATION</u>………………………………………………………… 49**

**G. <u>CERTIFCIATE OF SERVICE</u>…………………………...……………….. 50**

APA, which while extreme is in the best interest of the association, and necessary to send a strong message and ensure that no other APA Officer behaves in such an unlawful manner at the expense of the membership ever again.

Submitted on this 6th day of December, 2016;                    Respectfully,

Lawrence M. Meadows, Pro Se
PO Box 4344
Park City, UT 84060
Cell: 516-982-7718
Email: lawerencemeadows@yahoo.com

**<u>VERIFICATION</u>**

I, Lawrence M. Meadows, declare as follows;

I am on the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. With respect to the causes of action alleged by me, the same is true by my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of Texas that the foregoing is true and correct.

Date: Decemeber 6, 2016;

_____

Lawrence M. Meadows, Pro Se

# EXHIBIT 18

# for Myers Declaration

# BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration<br><br>between<br><br>**Lawrence M. Meadows,**<br>               **Accuser**<br>and<br><br>**Captain Keith Wilson,**<br>               **Accused** | **AAA Case No: 01-16-0001-4118**<br><br>    **Grievance: Violation of**<br>    **Constitution &**<br>             **Bylaws**<br><br>BEFORE:<br>Edward B. Valverde, Esq. – Arbitrator |

APPEARANCES:

    For the grievant:  Captain Ed Sicher, Representative of the Accuser; Lawrence M. Meadows, Accuser

    For the Accused Keith Wilson, Accused

| | |
|---|---|
| Place of Hearing: | Dallas, TX. |
| Dates of Hearing: | September 27 & 28, 2016 |
| Date Hearing Closed: | December 30, 2016[1] |
| Date of Award: | January 10, 2017 |
| | |
| Award: | Grievance denied. |

### Award Summary

    Accuser did not establish by preponderant evidence that the Accused violated Article VII by ordering that inactive members (specifically Medical Disability Dropped) be denied access to Challenge & Response.

*Edward B. Valverde*

Edward B. Valverde, Esq.-Arbitrator

---

[1] The record was closed on upon arbitrator's receipt of the Accused and Accuser's briefs and supporting documents and extended to December 30, 2016 to all for the receipt of post-brief correspondence.  References to the transcripts of the two hearings will be as follows: AB hearing as (AB Tr. __); arbitration hearing as (Arb. Tr.___); and exhibits will be identified by party and exhibit number e.g., (Meadow's Exhibits as (M. Ex. __) and Wilson's Exhibits as (W Ex.__).

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

**Organizational Structure**

The Allied Pilots Association (APA) is a labor organization that is the exclusive collective bargaining representative of the pilots and co-pilots of American Airlines. For purposes of self-governance, APA established a Constitution & Bylaws (C&B) that sets forth, *inter alia*, its organizational structure. The organization is two-tiered, consisting of domiciles (local chapters) and a national union. There are three national officers elected by the membership: a President, Vice President and Secretary-Treasurer. Each domicile elects a Chairman and Vice Chairman. The Board of Directors (BoD) is the governing body of the organization. The BoD membership consists of the Chairman and Vice Chairman from each domicile within the organization. Thus, these domicile officers also serve as members of the BoD.

### RELEVANT CONSTITUTIONAL PROVISIONS

**ARTICLE I – GENERAL –**

**\*\*\***

**Section 4. Government:**
A. This Constitution and Bylaws shall be the supreme law of APA. This Constitution and by laws establishes APA as a two-tiered labor organization consisting of domiciles and a national union. As Set forth in, and only insofar as consistent with, this Constitution and Bylaws, the National Officers direct the day-to-day affairs of APA subject to review and direction by the Board of Directors, which has the authority to alter, amend and add to this Constitution and Bylaws**…**

B. The Board of Directors shall approve a *Policy Manual* for the Allied Pilots Association which will provide the mechanism whereby the collective and individual rights of the pilots in the APA are safeguarded through a formula for sound leadership and, at the same time, retention of control of the APA by the membership. All Association officers, committee members, agents, and employees are obligated to be aware of, understand, and conduct themselves consistent with the policies contained therein. The policies contained therein apply to the Board of Directors, even when the Board is in session. The Board of Directors does have the authority to alter the Policy Manual at any time or to deviate from the Policy Manual according the following standards:

1. The Board may vote, by simple majority, to take an action (or actions) that either explicitly or implicitly deviate(s) from the Policy Manual. *(06/07/2006)*
2. The Board may vote, by a two-thirds (2/3) majority, to make a permanent change to the Policy Manual. *(06/07/2006)*

At any time the Board takes either of the above actions, the membership will be informed

2

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

within 24 hours using the APA Information Hotline.  Such notice will describe the nature of the change or the deviation.  Further, the specific substance of the change or deviation will be made electronically available within seven (7) days.  *(09/29/2000)*

### Section 5.  Governing Bodies

The governmental powers of the APA shall be vested in the Board of Directors and the National Officers in accordance with the laws provided herein.  The final control of the APA shall be vested in the membership.

### Section 6.  Parliamentary Law and Rules of Order

All questions on parliamentary law and rules of order which are not provided for in the Constitution and Bylaws or Policy Manual shall be decided according to the principles set forth in the current Robert's Rules of Order.  *(06/12/2004)*

\*\*\*

## ARTICLE II – OBJECTIVES AND RIGHTS OF APA

\*\*\*

I.  To disseminate information in any manner to enhance the professional status of the membership and to ensure a fully informed membership.  A fundamental principle of APA's ability to effectively represent the interests of its membership is protecting APA's right to communicate with the membership without restriction or outside approvals.  Therefore, no APA officer, committee member or staff employee shall agree to or participate in a communications "blackout" or other restriction of the flow of information from APA to the membership including proposals presented by APA or management during negotiations.

J.  To Levy dues and assessments upon the membership with which to provide the funds necessary to carry on the business and objectives of the Association.

\*\*\*

## ARTICLE III – MEMBERSHIP –

### Section 1. Qualifications

A.  Any person of lawful age and of good moral character who is qualified as a flight deck operating crew member with American Airlines, Inc., who is accruing seniority, furloughed, or on a leave of absence, except for pilots who are employed by American Airlines in a management position for which total compensation is not defined by the collective bargaining agreement, shall be eligible for membership in the APA as hereinafter provided. *(02/28/2008)*

\*\*\*

### Section 2.  Classes of Membership

\*\*\*

B.   Active membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. *(02/25/99)*

C.   *Inactive Membership* shall be assigned to flight deck operating crew members

3

(including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. Pilots in the following employment statuses shall be eligible for inactive membership: *(06/07/2006)* [Italics and Bold added.]

    1. Furlough
    2. ***Medical or Personal Leave of Absence*** [Italics and Bold added.]
    3. Military Leave of Absence
    4. Pilots not on active flying status with AA concurrently owing back dues. *(02/28/2008)*

*Inactive Member*. A member in good standing shall automatically be transferred to inactive membership status upon: *(02/25/99)*[Italics added.]

    1. Being furloughed by the Company.
    2. ***Being on leave of absence from the Company twelve (12) months after the expiration of paid sick leave***, or *(02/07/2004)* [Italics and Bold added.]
    3. Being in the United States military forces on continuous active duty in excess of sixty (60) months. *(02/28/2008)*
    4. When that pilot is not on active flying status with AA and that pilot owes back dues, that pilot will remain on inactive membership status until he/she returns to work at AA. At that time, he/she will resume payment of back dues and will be returned to active membership.

\*\*\*

### Section 5. Membership Status

1. B. Except as provided in A above, ***a member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association***. The Secretary-Treasurer shall transfer a member from good to bad standing if such member shall be delinquent in either dues, assessments or other financial obligations due to the Association. A member will be placed in inactive membership status by the APA Secretary-Treasurer when that member owes back dues and is not on active flying status. *(03/18/2011)* [Italics and Bold added.]

C. ***Only members in good standing shall have the right to vote*** on matters brought before the membership….*(02/25/99)* [Italics and Bold added.]

F. The Secretary-Treasurer shall keep an account for all members in good standing, members in bad standing, non-members, inactive members, etc. When an inactive member returns to active line flying his account will be reactivated and all new dues and assessments will be charged from the day of his return to ling flying.

\*\*\*

### Section 6. Dues

A. *A member's obligation for dues and assessments shall commence as of the date of the member's eligibility for active membership*. ***Active members*** *shall be required to pay dues by employer dues check-off*. Members shall pay dues at the rate of one percent (1%) on current monthly income. Dues at the rate in effect at the time any such payments are received by the member shall be collected on all contractual pay, including Variable Compensations, cash bonuses, and cash profit sharing. An exception to this will be all

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

non-cash compensation. *(10/23/97)* [Italics and Bold added.]

**Section 7.  Membership Rights and Obligations**
A.  *A member in good standing is entitled to participate actively in all APA activities and is entitled to all of the rights, privileges, and benefits of membership in the APA.*

B.  Apprentice and **inactive members** ***shall enjoy all the benefits of active membership except the privileges of voting, holding elected office, and participation in Association sponsored programs where specific requirements prohibit such participation****. (10/18/74)* [Italics and Bold added.]
\*\*\*
D.  *Voting on matters presented at a domicile meeting shall be restricted to active members in good standing currently occupying a bid status at that domicile*.  *(02/07/93)* [Italics added.]

**ARTICLE IV NATIONAL OFFICERS**

**Section 8.  Duties of National Officers**
A. President
The President shall conduct the affairs of APA consistent with this Constitution and Bylaws and with the policy and directives set by the Board of directors.  While the President's actions are subject to review by the Board of Directors, the President's actions shall be presumed valid unless the Board of Directors elects to review and disapprove a particular action taken by the President.  …
\*\*\*
3.  The President shall enforce the APA Constitution and Bylaws, and *he may issue, as necessary, written interpretations* of the Constitutional and Bylaws. *(09/15/2010)*[Italics added.]
\*\*\*

**ARTICLE V   BOARD OF DIRECTORS**
**Section 1.  Authority of the Board**
A.      The Board of Directors is the supreme policy making authority within APA, and it has the authority to review and disapprove actions taken by the National Officers; however, absent a specific vote disapproving an action taken by a National Officer, the action shall be presumed valid.  *(09/15/2010)*
\*\*\*

**ARTICLE VII – HEARING AND DISCIPLINARY PROCEDURES**

A. Any member is subject to disciplinary action, including but not limited to fines, placing a member in bad standing, suspension, or expulsion for any of the acts listed below.  *Charges filed under this Article for the purpose of resolving or pursuing intra-union political disputes shall not be actionable under this Article. (09/23/2009)* [Italics added.]

      1.  Willfully acting as a strike-breaker (scab) pilot during any duly authorized pilot strike, as determined by the striking authority;

2. Willful violation of this Constitution and Bylaws;

3. Willful neglect in paying dues, assessments, or fines levied by the Association;

4. Misappropriating money or property of the Association;

5. Willful violation of a pilot's working agreement;

6. Initiating and/or prosecuting charges under this article in bad faith (for example, malicious or frivolous charges) against another APA member;

7. Any act contrary to the best interests of the APA as an institution or its membership as a whole.

8. Any act motivated by malice or political animus that exposes another member to company discipline, up to and including termination. *(09/23/2009)*

B. Charges

All charges shall be preferred in writing by submitting the charges to the APA Secretary-Treasurer by certified mail, return receipt requested…

1. ***Charges may be brought under this Article by any member in good standing*** against any other member. *(09/23/2009)* [Bold and Italics added.]

\*\*\*

D. **Appeal Board**

1. An Appeal Board shall be established to hear or review cases referred to it in accordance with this Constitution and Bylaws. This Appeal Board shall comprise three (3) regular and two (2) alternate members *in good standing*, appointed by the Board of directors.

2. The term of office for such members shall be for two (2) years or until their successors have been selected.

\*\*\*

4. Should the accused or the accuser be a Domicile Officer, then such charges shall be considered by the Appeal Board in the first instance. When accused members from more than one domicile are charged with substantially the same offense, such charges shall be considered by the Appeal Board in the first instance. Such charges should be filed in writing with the Secretary Treasurer. *(09/23/2009)*

5. The President shall have the authority, in consultation with General Counsel, to enforce the Terms and Conditions of the Acceptable Use Policy ("AUP") established for the APA Web site and its subparts ("System") on behalf of the Association by removing postings, and/or suspending or revoking a member's access in whole or in part to the System for a period no longer than fourteen (14) business days. A member's right of access to the System or any subpart(s) shall not be revoked or suspended unless the President, in consultation with General Counsel, determines that such action is necessary for APA to comply with its legal or contractual obligations or to protect the integrity of the System. The President shall promptly provide the member, by e-mail or otherwise, with specific reasons for such actions. In the event that the President removes a member's posting, the member may contest such action by filing an appeal with the Appeal Board, subject to the procedures specified in VII.D. In the event that the President restricts a member's access to the System, this restriction shall be

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

subject to mandatory review by the Appeal Board via the procedures specified in VII.D. for Article VII proceedings. This review shall be conducted and a decision rendered by the Appeal Board within the fourteen (14) business days specified above. In the event that the Appeal Board determines that a member's access has been restricted for cause, the Appeal Board shall determine the ultimate duration and the extent of the restriction. The Appeal Board's decision may be appealed to the Neutral Arbitrator in accordance with the procedures set forth in VII.E. *(09/23/09)*

6. When the Appeal Board holds a formal hearing, both the accused and accuser shall have the right to be represented by a member in good standing.

7. The Appeal Board *may* decide that the charges as set forth by the accuser fail to state a cognizable claim. The Appeal Board will then dismiss the claim, via a written opinion. *If the Appeal Board determines that the charges state a cognizable claim, the Appeal Board shall hold a hearing, if either the accused or the accuser requests one, or at its discretion, if neither party request a hearing. (09/23/2009)* [Italics in text added.]

8. Unless otherwise provided, the Appeal Board shall give thirty (30) days notice of all hearings. *A court reporter shall record, transcribe the hearing and swear the witnesses.* [Italics to text added.]

9. The Appeal Board shall issue its decision no later than sixty (60) days from the date that the Appeal Board obtains jurisdiction over the case, either by appeal or by assuming or obtaining original jurisdiction. In the event of a hearing, the sixty (60) days shall run from the date of receipt of the transcript. The decision shall be in writing and sent by certified mail, return receipt requested, to the parties and to the Secretary-Treasurer.

E. **Neutral Arbitrator**

1. *Appeals of decisions made by the Appeal Board may be submitted to a Neutral Arbitrator* by filing a written appeal to the Secretary-Treasurer within thirty (30) days of receipt of the decision by the Appeal Board. In the event of an appeal all sanctions, penalties, or fines imposed by the Appeal Board shall be stayed, pending the Arbitrator's award *(09/23/2009)* [Italics added.]

2. The Neutral Arbitrator shall be rotated among a list of approved neutrals. The list of neutrals shall consist of a pool of three to five arbitrators familiar with, and experienced in, matters involving union affairs. The Appeal Board, in consultation with APA Legal, shall compile this list every five (5) years. The list of neutrals must be approved via majority vote of the Board of Directors. *(09/23/2009; amended 6/21/2011)*

3. *The arbitrator shall hold a hearing as soon as practicable. A court reporter shall be present at the hearing in order to swear witnesses and record a transcript.* Both the accused and the accuser have the right to be represented at this hearing by a member in good standing. The Association shall provide the Arbitrator will (sic) all materials from prior hearings, as well as an electronic copy of past Article VII filings, transcripts, and awards. (09/23/2009) [Italics added.]

4. The fees and expenses associated with the arbitration shall be the responsibility of the Association, *unless the Arbitrator determines that a party to the proceeding*

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

*has acted in bad faith in the prosecution or defense of these charges, in which case the Arbitrator shall have the authority to impose some or all of the costs and fees associated with the Article VII proceedings on the offending party. (09/23/2009)* [Italics added.]

**Article X – Conflicts of Interest**

A.  Summary:  The purpose of this statement is to assist the Allied Pilots Association and all of its related operations in identifying, disclosing, and resolving real and potential conflicts of interest.
***
G.  Reporting of Disclosures:  All disclosures by staff will be handled by the Association Secretary-Treasurer and will be held in confidence, except when the Association's best interests would be served by bringing the information to the attention of the National Officers and BOD.  All disclosures of the National Officers, BOD and National Committee Members shall be handled by the Secretary-Treasurer and maintained in a file, which can be inspected by any members of the Associations.
I.  Determination of Possible Conflict of Interest:  Any individual who is uncertain about a conflict of interest in any manner shall disclose such possible conflict to the appropriate reporting individual, as noted above, using the Conflict of Interest Disclosure Form found in the C&B Appendix BI, noting the potential conflict and any other information which the individual feels would assist APA Legal in determining if a conflict of interest exists. The Secretary-Treasurer shall notify APA Legal immediately of all disclosures.  After the Disclosure Form has been executed, the individual shall be entitled to act as though no conflict of interest exists unless APA Legal notifies him or her otherwise in writing.

**Article XIII – Amendments**
A.  The Constitution and Bylaws may be altered, amended, or added to by an affirmative two-thirds (2/3) vote of the Board of Directors.
 ***
E. The Constitution and Bylaws may also be altered, amended, or added to in the following manner:

> 1.  Thirty percent (30%) of the active members in good standing may petition the Secretary-Treasurer requesting a referendum ballot for altering, amending, or adding to the Constitution and Bylaws…. *(10/31/75)*

**RELEVANT POLICY PROVISIONS**

2.04 Communications/Electronic
***
B. APA will maintain and support a website and an electronic forum system to be called Challenge & Response that will continue to support the free and democratic discussion of issues between members of the Association.  The APA Board of Directors will approve an Acceptable Use Policy (AUP) applicable to those who wish to have access to the APA website. *(10/27/2009)*

8

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

## FACTUAL BACKGROUND

Meadows was employed as a pilot by American Airlines (AA) on or about October 1991.  About June 2004 he became disabled and began receiving disability benefits shortly thereafter. On or about December, 2007 his disability benefits were terminated.  Meadows appealed his termination of disability benefits to the American Airlines Pension Benefits Administration Committee ("PBAC") where they were again denied by American Airlines' third party disability claims evaluator, Western Medical Evaluators ("WME") on or about June 2008.  He then filed an individual ERISA disability lawsuit against AA in an attempt to get his disability benefits reinstated and later filed a Sarbanes-Oxley Whistleblower (SOX-WB) complaint highlighting alleged fraud by WME and AA.  On or about September 14, 2011 Meadows submitted his disability claims to the new reviewer, the Mayo Clinic, for evaluation of his condition.  The Mayo Clinic verified the continuous existence of his disabling condition and on about October 1, 2011, he submitted a new disability benefit claim to AA. On or about December, 2011 AA approved Meadows' the claim, his disability benefit payments were reinstated and he continues to receive disability benefits to date.  On or about November 2011, AA removed FO Meadows from the pilot seniority list.[2]

**MDDs**

The Association maintains internal codes for pilots who are or have been employed by AA.  One of those codes is "Medical Disability Dropped" or 'MDD' that is used to identify a pilot who has been on unpaid sick leave, long-term disability, or a combination of both for more than five years.  Under the terms of collective bargaining agreement, individuals on unpaid sick leave and/or long-term disability for more than five years are dropped from the seniority list.  (W Ex. 12) Once a pilot is no longer on the seniority list, that individual is considered no longer employed by AA.  During all times relevant to this case, Meadows has been designated as an MDD.

---

[2] According to the U.S. Bankruptcy Court, Southern District of New York, Meadows' employment from AA was terminated in October 2011.  (See, AMR Corporation, et al, Case No. 11-15463(SHL), at p. 13 (4/14/2016))

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

**CHALLENGE & RESPONSE**

The Association maintains an unmonitored electronic discussion board forum for pilot-to-pilot discussions called Challenge & Response ("C&R"). As part of the Association website, use of C&R is governed by the APA Acceptable Use Policy ("AUP"). (See Exhibit 5, APA Policy Manual 2.04(B)).

**ACCEPTABLE USE POLICY**

Since about 2005 the Association has had an Acceptable Use Policy (AUP) to guide the membership in its use of the Association's Internet services. An attempt at revising the AUP was made at the BoD meeting in July 2007. The proposal at that meeting included the following:

1. All use of C&R is restricted exclusively to Apprentice, Active, and Inactive members in good standing, in addition to members who were Active or inactive members when they retired. All use of C&R by Executive and Honorary members is prohibited. (W Ex. 4)

While this proposed change would have expanded the class of members that would have access and use to this web service, it did not pass. Instead, the BoD referred the matter to the Association General Counsel for review. Thereafter, in November 2007 the BoD reviewed and approved changes to the Association's AUP. It defined "User" as a person with lawful access to the Association's Internet services. Access to services that are password-protected was restricted exclusively to members of the Association and those individuals to whom it had expressly granted access to those services. Regarding C&R and other unmoderated member electronic forums, authorization to participate in these forums was restricted exclusively to *active, retired, and furloughed members*. (W Ex. 5) Thus, the BoD made a conscious, unequivocal decision to limit access to C&R to these three classes of members to the exclusion of all others. In February 2009 the AUP was again revised, but that revision did not change those who were authorized to have access to C&R and those who did not. (W Ex. 6) Thus, since November 2007, the AUP has limited the authorized users of C&R (i.e., members specifically authorized) to active, retired and furloughed members.

On or about March 27, 2014 Meadows, an MDD and inactive member, posted a brief description of the history of his disability claims and the litigation he

10

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

had pending against AA and the Association on C&R.  On or about April 22, 2014, pilots in the MDD status were no longer able to access and use C&R.

The BoD was in closed session on April 22, 2014.  At some point during the meeting, a board member raised a question about MDDs having access to C&R. During that discussion it was determined that MDDs were not authorized users of C&R and (President) Wilson was instructed by the BoD to terminate their access to C&R.  Shortly thereafter, MDDs were no longer able to access and post on C&R pursuant to instructions issued by Wilson.  On April 6, 2015 Meadows filed charges against Wilson, who was President of the Association during in 2014.[3]

**Charges**

1st CHARGE: "The APA President violated C&B Article VII.D.5 by failing to promptly notify myself, and all other disabled pilots, including MDD members, by email or otherwise, with specific reasons as to why he unilaterally revoked our access to C&R."

2nd CHARGE: "The APA President also violated C&B Article VII.D.5, by exceeding the scope of his authority, by locking out myself and all other disabled MDD members from C&R for a period longer than the 14 business days allowed."

3rd CHARGE: "The APA President also violated C&B Article VII.D.5, by failing to ensure the Appeal Board conduct a *Mandatory Review* of his unilateral action of restricting all MDD members' access to C&R, and further, failing to ensure the Appeal Board render a decision on that restriction within the 14 day period specified in Article VII.D.5."

4th CHARGE: "As a result of all the above violations, the APA President also violated C&B Article VII.A.7 by committing an '*act contrary to the best interests of the APA as an institution or its membership as a whole*.'"

5th CHARGE: "As a result of the above violations the APA President willfully violated C&B Article VII.A.2 by committing numerous '*Willful violation[s] of this [the APA] Constitution and Bylaws.*'"

6th CHARGE: "Finally the APA President has failed to enforce the APA Constitution

---

[3] The record contains substantially more evidence on what happened at the meeting and how the Internet technology staff was notified and instructed to restrict any MDD's access to C&R; and that it took some time before those instructions were properly executed.  However, those facts do not alter the substance of the summary herein.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

and Bylaws in violation of C&B Article IV, Section 8.A.3: specifically he failed to enforce Article III, Section 4, which requires the APA Secretary Treasurer issue Membership cards to active members in good standing, or Special Membership Cards to inactive members. My certified requests for a membership card have been ignored."[4]

**Parties' Arguments**

**Accuser[5]**

Accuser argues he is a member in good standing that has the right of access to C&R. Notwithstanding the fact that he is and continues to be a MDD pilot, he and other MDDs had access to C&R and it was not until he posted his comments on March 27, 2014 which were critical of the Association that Wilson retaliated against him by blocking his and all other MDD's access to C&R. Because he had never before been denied access to C&R prior to April 22, 2014, Accuser argues there existed an established "past practice" that allowed MDD's access to C&R notwithstanding the existence of restrictions in the AUP that clearly limited membership access to C&R. Also, reliance on the AUP to exclude MDDs from access to C&R should not be permitted for the AUP has been found to be unenforceable as a disciplinary tool, based on arbitrator Wolitz's award of *Annable v. Wissing* that found the AUP unenforceable. Accordingly, Accuser requests that he be found to be a member in good standing; that he and all other MDDs be provided access to C&R; and that Wilson be found guilty and disciplined as requested.

**Accused**

Accuser contends that he committed no violations of the C&B when he followed BoD instructions to restrict MDDs access to C&R for they are not authorized users of that Internet service as stated in the Policy Manual. Accordingly, he requests the charges be dismissed in their entirety.

**DISCUSSION**

The party pursuing charges has the initial burden of proof. In this case, that

---

[4] Charge no. 6 will not be specifically addressed in this award for the parties have specifically scheduled another arbitration hearing to address the issues raised in that charge.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

responsibility belongs to the Accuser who is contending that the Accused has violated provisions of the C&B. Before addressing the charges there are two preliminary matters that require discussion: the Accuser's membership status and whether the charges state a cognizable charge. The primary issue – whether the Accused violated the C&B - will be discussed thereafter.

## PRELIMINARY MATTERS

**Accuser's Membership Status[6]**

The arbitrator finds the Accuser's membership to be limited to that of an inactive member. At hearing and in brief, the Accuser asserts he should be found to be a member in good standing; and he sought to develop witness testimony and present documentary evidence on this issue. This was objected to at hearing for the parties knew another arbitration had been scheduled to address this matter fully. Because the Accuser was provided wide latitude at hearing, some testimonial evidence was developed at hearing on this matter, though much of it was given as opinion. Here, the arbitrator's discussion of the Accuser's membership status is guided by the provisions in the C&B as applied to undisputed facts. As a starting point, the arbitrator interprets the various provisions in the C&B in a manner that makes the provisions compatible with each other and not in a manner where one provision contradicts another provision.

The record reveals that Accuser became a member sometime after his employment with AA. In 2004 Accuser was placed on medical leave of absence status. According to the provisions in the C&B, Accuser automatically was transferred from active membership to inactive membership after being on leave of absence from AA twelve (12) months after the expiration of paid sick leave. (Art. III, Sec. 2.C) It is

---

[5] This award will not address Accuser's allegation that Wilson's enforcing the AUP against MDDs violates LMRDA's Union Member Bill of Rights, a matter that is appropriate for another forum.

[6] The arbitrator is aware that the Appeal Board deferred on this issue and treated Meadows as a member in good standing in order to address the allegations raised by the charges. (See, AB, fn. 1, p. 1) Further, it appears that the matter of Meadows' membership status is to be fully addressed in a subsequent arbitration involving the issuance of membership cards. Accordingly, Accuser's membership status will be addressed only to the extent necessary to resolve the issues in this case.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

undisputed that Accuser has not returned to work since then, so at best, he has continued to maintain the status of 'inactive member.'[7]

There is no dispute that during the time Meadows was an active member he was a member in good standing. However, was his "good standing" affected when he became an inactive member? The arbitrator finds that once he became an inactive member this also changed his "member in good standing" status for the following reasons.

According to membership status provisions of the C&B a member in good standing retains that status as long as he/she is current on his dues, assessments or other financial obligations due the Association. (Art. III, Sec. 5.B.). Dues and assessments are to be paid through employer dues check-off. (Art. III, Sec. 6.A). Since Meadows has not been receiving wages from the employer since about 2004, he has not paid any dues, at least not through dues check-off; and the C&B does not provide for payment of dues in any other manner.

The Secretary-Treasurer has the responsibility to maintain an account for all members and their respective statuses, (e.g., members in good standing, members in bad standing, non-members, retired members, inactive members, etc.) (Art. III, Sec. 5.F.). That these various kinds of statuses are identified in the C&B indicates that each status is different from the other.

Only members in good standing have the right to vote on matters before the membership. (Art. III, Sec. 5.C.). Only members in good standing are entitled to participate actively in all APA activities and are entitled to all of the rights, privileges, and benefits of membership. (Art. III, Sec. 7.A Finally, only members in good standing can run for national office. (Art. IV, Sec. 2.). While the C&B provides inactive members some of these benefits (that are not specifically identified), the C&B specifically states inactive members do not enjoy the privileges of voting, holding elected office, and cannot participate in Association sponsored programs where specific requirements prohibit such participation. (Art. III, Sec. 7.B.). This provision in the C&B has been in existence since 1974. Thus, inactive members cannot vote, cannot hold elective office and cannot participate in programs where they are specifically prohibited from participation. This

_____

[7] This finding is consistent with the constitutional interpretation provided by Captain Wilson. (Arb. Ex. 2)

14

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

language is clear and unambiguous. And inactive members do not pay dues. The arbitrator concludes that since an inactive member cannot do these things that all members in good standing can do, an active member's "good standing" status fundamentally changes when he/she becomes an inactive member. Accordingly, the arbitrator finds that when Meadows became an inactive member, he lost his good standing status within the Association.

**Accuser's Membership Arguments Rejected**

The Accuser relies upon a variety of arguments to assert he is a member in good standing. Those arguments are summarily rejected. However, one of those arguments merits further discussion. Specifically, Meadows asserts that an Appeal Board (AB) ruling that one of its appointed members was a member in good standing should also apply to him. That argument is rejected for the AB decision relied upon has no authoritative value.

In the AB decision *Sproc v. APA National Officers (Sproc)*, the AB ruled that AB member Joe Barkate, who apparently was also an inactive member and an MDD pilot at the time, was considered to be a member in good standing and was properly serving on the Appeal Board. That AB decision (which dealt specifically with whether national officers had violated the C&B by maintaining mediation discussions secret) was appealed to this arbitrator who issued an award based on the charges that Sproc filed.[8] This arbitrator did not rely on the underlying AB decision in any respect due to Sproc's challenges to the composition of the AB panel. It was concluded that Sproc should have raised these issues regarding the composition of the AB to the Secretary-Treasurer for submission to APA legal for consideration in accord with the C&B requirements. (See, Art. X.I). Because the AB award in *Sproc* was not relied upon or adopted by this arbitrator in his award, there is no authoritative value in relying

---

[8] The issue of Barkate's standing to serve as a member of the AB was not part of the charge, but was raised as an objection to his serving in that position at that hearing. Thus, it was a ruling by the AB panel not related to any of the charges that were the basis for the hearing. Because the arbitrator did not rely upon the AB decision, that decision nor any rulings made therein have any authoritative value for they have neither been sustained nor adopted thereafter.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

upon the AB *Sproc* decision, especially when one is attempting to rely on a ruling from a body whose composition was challenged and therefore substantively compromised. If an accuser wants to rely on AB rulings or decisions, they should be decisions that were not challenged (i.e., not appealed to an arbitrator and thus, final and binding on the parties) or they must be an AB decision that was adopted and/or relied upon by the arbitrator on appeal. Neither of those is the situation with the AB *Sproc* decision. Further, neither the AB decision nor a ruling contained therein, is binding on an arbitrator. (See, *Linn/Smith and Bates, et. al*., AAA 71 200 00258 91, (Arbitrator J.D. Dunn, March 28, 1992). Accordingly, Accuser's reliance on the AB *Sproc* decision is misplaced and rejected.

**CHARGES ARE WITHOUT MERIT**

The arbitrator finds the charges should be dismissed for a variety of reasons. While any one of the reasons is sufficient to dismiss this matter, they will be discussed below to provide the Accuser as full an understanding for why the charges are being dismissed.

**No Jurisdiction to File Charges**

The C&B specifically states that only a member in good standing can file a charge against any other member. (Art. VII, B.1.) Here, the arbitrator has made a preliminary finding that Meadows, an inactive member, does not enjoy 'member in good standing' status. Thus, he technically does not have the authority to file charges against a member. However, Captain Wilson did not argue this position (although the Accuser sought a finding on the membership issue). Further, this record reveals there is an ongoing dispute regarding the status of inactive members/MDD pilots. It is abundantly clear to the arbitrator that the Association has chosen to provide Accuser this forum and the fullest latitude to voice his various charges against the Association.[9] Accordingly, additional matters and the charges will be addressed below.

---

[9] Because the AB chose to treat Meadows as a member in good standing it treated this matter as one covered under Art. VII, D.5 and made findings on every charge. This latter point will be discussed further below.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

**No Jurisdiction - Charges are Political**

Article VII states that, "Charges filed under this Article for the purpose of resolving or pursuing intra-union political disputes shall not be actionable under this Article." The BoD adopted this language on September 23, 2009. However, since the Eisler award in 1991 arbitrators have recognized that Article VII charges cannot be used to pursue a political agenda. In *Hoffler v. Mayhew and Handrick*, (July 29, 1991), Arbitrator Eisler set forth what C&B charges are about, specifically setting forth the parameters of these proceedings. In addition to identifying proceedings under Article VII as an internal dispute resolution procedure built into the C&B to hear cases concerning prohibited acts specified in the C&B, he also delineated that these proceedings are not a substitute for political action, i.e., *"They do not and may not supplant the democratic political process of the Association. They only enforce Association interests, as opposed to individual interests, absent a clearly stated contrary intention in the Constitution and Bylaws to do otherwise."* (*Hoffler v. Mayhew and Handrick*, AAA No. 71 300 00096 91, (Eisler) (1991), p.33)

In the present matter, one need only look to the remedial relief Accuser requests in this proceeding to conclude he seeks to supplant the democratic political process of the Association (i.e., the ballot box) through the arbitral process and this award. Specifically, Accuser seeks, among other matters, a ruling that MDD pilots are "members in good standing entitled to all rights and privileges of APA membership to include access" [to C&R] and "to immediately restore all MDD members C&R access." (See, Accuser's Closing Brief, p. 47) Clearly, the Accuser seeks to acquire active member status (that would necessarily include access to C&R) when the current C&B provides him (a member on medical leave of absence over five years) inactive member status with its defined limitations, including the inability to vote on membership matters. The only way the relief sought by Accuser can be achieved is through political action that results in changes to the C&B. To acquire said changes would require convincing the BoD to alter, amend or add to the C&B (Art. I, Sec. 4 A) or for the membership to do the same (Art. XIII, E).[10]

_____

[10] The BoD also has the authority to permit other classes of members (e.g., MDDs) access to C&R through a change in policy that the C&B permits. (Art. I, Sec. 4 B)

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

Under the C&B, the arbitrator's role is limited to conducting hearings on disciplinary matters to determine whether or not discipline is warranted and to decide the appropriate relief, if any. In doing so, the arbitrator is guided by the provisions in the C&B and is required to interpret and apply the C&B to the matters before him/her. As Article VII prohibits its use to resolve or pursue intra-union political disputes, so too is the arbitrator prohibited from engaging in political action by imposition of remedial relief that effectively accomplishes the same. As a consequence, this arbitrator cannot provide the substantive relief Accuser seeks. For this reason, the arbitrator has no jurisdiction to address, much less, resolve this intra-union political dispute.

However, Accuser also charges Wilson with specific allegations that are asserted to be violations of the C&B; does request that the violations be found; and that appropriate discipline be issued. These matters will be addressed below.

**No Constitutional Misconduct**

The arbitrator finds that the provisions of Art. VII, D.5 do not apply to this case for Meadows is an inactive member of the Association who was never authorized to have access to C&R. Art. VII, D.5 applies to situations where an authorized user-member is affected by presidential action. First, these provisions apply to a situation where the President of the Association takes action to enforce the AUP by removing postings, and/or suspending or revoking a member's access in whole or in part to the "System" for a period no longer than fourteen (14) business days. The System referred to in Art. VII, D is the Association's website of which C&R (to which AUP applies) is a part. While Art. VII, D.5 merely uses the term 'member' without specification, it can only reasonably be interpreted to apply to members of the Association who are authorized users. Of course, the C&B does not identify who these individuals are but Art. III, Sec. 7.B. states that inactive members can be excluded from participation in some of the Association sponsored programs where so prohibited. So, the question is, who is allowed to have access to C&R? Here, the evidence is undisputed that the Policy Manual (PM) identifies active, retired and furloughed members as the only ones authorized to use C&R.[11]

---

[11] This award does not address whether the BoD should amend the AUP policy to provide MDDs or anyone else access to C&R for that is a political question left for the BoD to address.

18

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

The Accuser is correct when he argues that there are other classifications of inactive members (i.e. those on furloughs) that are allowed access. The reason for this is that furloughed members are specifically included.[12] One might argue that this is discriminatory against MDDs who are inactive members as are those on furlough. But whether the existing policy discriminates or not is not the issue. The issue is whether the BoD has acted within its constitutional authority when it restricted access to C&R and whether Wilson, as President, acted within his constitutional authority when he enforced their directive. The arbitrator finds that both acted within their prescribed authorities. Thus, since MDDs were never authorized to have access to C&R, excluding them through actions taken in April 2014 was not a denial of a member's right to access C&R, it was enforcing the limitations (exclusions) that had long since been established (i.e., since 2007). Consequently, since MDDs were never authorized users of C&R their denial of access was never a deprivation of a right that a MDD member had. Stated somewhat differently, when Meadows was denied access to C&R, he did not lose a right that he had under the AUP policy or the C&B. Consequently, the action taken by Wilson to deny MDDs access to C&R did not amount to a suspension or revocation of a right MDDs had within the meaning of Art. VII, D.5. Thus, that constitutional provision does not apply to Meadows' case.

Second, Meadows' posting on C&R remains and was never removed. Wilson's undisputed testimony was that Meadows' posting on C&R was never removed and continues to be posted to the present time.

Third, since MDDs never were authorized to use C&R, Wilson's enforcement of the AUP did not require that he limit the restriction against MDDs to only 14 days. Fourth, since MDDs' restriction from access to C&R did not amount to a restriction of a right they had, President Wilson was not required to consult General Counsel before taking said action. Fifth, President Wilson was not required to notify MDDs in any manner, that they were being restricted access from C&R, a right they never had. Sixth, whether exclusion of MDD's from C&R is an act contrary to the best interests of the

---

[12] While the record contains testimony as to why furloughed members are authorized to use C&R, the undisputed fact is that the BoD, since at least 2007 has provided furloughed members access to C&R to the exclusion of other inactive member classifications including MDDs.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

APA as an institution or its membership as a whole is a matter of opinion; and based on the fact that the BoD decided to restrict MDDs from access to C&R in 2007, that opinion has been in the minority.  The fact that the Association has provided Accuser this forum, i.e., to utilize the AB and arbitration process to address his concerns does not otherwise grant him a right under Art. VII, D.5.  MDDs shall continue to be denied access to C&R pursuant to current policy.

**No Past Practice**

Accuser asserts there existed a past practice where the Association allowed MDD pilots access to C&R.  He asserts that he had had access and use of C&R and that C&R had been used as a communications tool by MDDs.  The Accused did not challenge these assertions.  Instead, he denied having any knowledge of whether this was the case.  Specifically, Wilson testified that C&R is a public union bulletin board used by the membership for ventilating issues.  It is not a source for factual information, nor is it the source by which the Association provides the membership information.  As a result he does not use or monitor its use by the membership.   Thus, he could neither admit nor deny that MDDs had long had access to C&R.  Nor did the Accuser elicit any testimony that the BoD knew that MDDs had access to C&R or that MDDs had never been denied access as Accuser asserts.  Notwithstanding any direct challenges to Meadows' assertion regarding his and other MDDs' access to C&R, the arbitrator finds there does not exist any past practice regarding who did or did not have access to C&R for the following reasons.

Past practice is a term of art in labor law.  It is used in workplace situations where collective bargaining exists.  Generally, it comes up in situations where the parties to a collective bargaining relationship have done things in a certain way that is contrary to the provisions of the collective bargaining agreement.  Sec. 2.20 of the *Common Law of the Workplace,* (2nd Edition, p. 89) defines "past practice" as "{A] pattern of prior conduct consistently undertaken in recurring situations so as to evolve into an understanding of the parties that the conduct is the appropriate course of action."  It arises as a dynamic of a collective bargaining relationship in response to traditions, customs, and unique circumstances of a workplace.  Arbitrator Mittenthal analyzed a group of factors that are generally applied by arbitrators in determining whether workplace activity qualifies as a

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

past practice:

(1) Clarity and consistency of the pattern of conduct,

(2) Longevity and repetition of the activity,

(3) Acceptability of the pattern, and

(4) Mutual acknowledgment of the pattern by the parties.

(See Mittenthal, Richard, *Past Practice and the Administration of Collective Bargaining Agreements*, 59 Mich. L. Rev. 1017 (1961))  For a past practice to be binding on both parties, it must be (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both parties. (*How Arbitration Works* (7th Edition), Chapter 12-4).

Applying the above definitions to the facts in this case, the arbitrator finds the Accuser's use of this term here is misplaced, for the relationship between the Accuser and the Association is not that of employer-employee or employer-union, but that of union-union member.  A collective bargaining agreement and a constitution and bylaws do establish contractual relations between the parties to that relationship but those contracts are not the same.  A CBA is an agreement negotiated between a union and employer; a constitution and by-laws is unilaterally created by the labor organization to aid it in managing the affairs of the organization.  There are no conditions of employment in the C&B because no employment relationship exists, but it does provide benefits to its membership.  These observations aside, the evidence fails to establish two critical elements necessary to establish a past practice; i.e., there is no evidence that the BoD ever acknowledged in any fashion, that MDDs had access to C&R and that it accepted or acquiesced on this breach of policy.  In fact the BoD's conduct establishes that it had no knowledge that some inactive members (MDDs) had access to C&R, for the evidence is clear there was no formal discussion of MDD access to C&R.  It merely came up, was discussed and once it was concluded that MDDs were never authorized users, the BoD instructed President Wilson to take appropriate action to have their access removed.[13]

---

[13] Accuser sought to develop testimony and submitted documentary evidence on the events at the BoD meeting.  While such details are generally relevant, in the present matter where the C&B and PM are relatively clear, the substantive question is whether the BoD and Wilson had the authority to act as they did, not what their underlying motivations were.

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

Quite simply, the record contains no evidence that the BoD knew or acknowledged that MDDs had access to C&R prior to the events in April 2014. A binding past practice must arise out of mutuality of agreement; it cannot arise out of a unilateral mistake. Here, the Association's unilateral mistake was its apparent failure to monitor C&R to determine whether there were any unauthorized users. But, MDDs' (or any other members) unauthorized use of C&R does not make a past practice. Accordingly, Accuser's argument of a past practice is rejected.

**AUP is Enforceable – Application of Annable v. Wissing**

Accuser also argues the AUP cannot and should not be used to deny MDDs access to C&R for the AUP has been found to be unenforceable. He argues that the *Annable v. Wissing* (AAA No. 71 300 00050 04 (Wolitz) (2005)) arbitration decision has already found the AUP to be unenforceable and that this arbitrator should recognize and honor that ruling in this case. The arbitrator disagrees for the Accuser has misunderstood the finding in that award.

In that case Arbitrator Wolitz dealt with the issue of whether Wissing violated the AUP when he posted a Soundoff communication (that had been prepared by Annable) on C&R, without Annable's permission and whether this conduct fell within the category of an Article VII breach. Wolitz's finding that the Acceptable Use Policy was unenforceable as to a member's breach of the AUP in postings on C&R was based on the fact that members regularly violated the AUP when using C&R without disciplinary action taken against them. To use a Wissing's alleged violation of the AUP when using C&R, where violations of AUP were commonplace, would be selective and thereby discriminatory. To quote from the award, "*We find that a person cannot be found guilty of violating a policy which the promulgating organization itself has acknowledged is routinely violated and not enforced. An organization cannot selectively enforce a policy against one individual even if it imposes no penalty. We find that even if [Wissing] had violated the Acceptable Use Policy when he posted a Soundoff communication on a public union (electronic) bulletin board without permission, this would not fall into the category of an Article VII breach...*" (Ibid., p. 27).

Here, the issue is not whether a member violated the AUP through a posting on C&R but whether he/she was authorized to have access to C&R. Clearly, the Wolitz award

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

did not address the issue of whether Annable or Wissing were authorized to access and use C&R for that was not an issue in that case.  Whether Meadows is authorized to have access to C&R is the issue here.  Simply stated, it is not the content of the posting, but whether there was authorization to post in the first place that is at issue in this case.  Accordingly, the *Annable v. Wissing* award has no direct application to the issues in this case.  Thus, Meadows' use of the Wolitz award to argue Wilson could not enforce the PM provisions (i.e., AUP) to preclude MDD's access to C&R is misplaced.[14]  Accordingly, the BoD's instructions to Wilson to enforce the AUP to deny unauthorized users (MDDs) access to C&R and Wilson's actions to accomplish that instruction was permissible under the C&B, and cannot be a violation thereof.

## CONCLUSION

The arbitrator finds for the reasons stated above, that the Accuser's charges should be dismissed in their entirety.  The Accuser's efforts to challenge AA and the Association to expand the rights of medically disabled pilots are notable, but his issues with the Association are substantively political.  As such, they are not appropriate for charges under Art. VII and/or this forum.  Further, the C&B permits the BoD and President to engage in the conduct complained of herein (restricting MDDs' access to C&R).

Also notable is the Association's willingness to allow Accuser to use this forum to address his concerns for and on behalf of MDDs.  However, Captain Wilson had the constitutional duty to follow directives he received as president of the Association from the BoD; and the arbitrator has the duty to apply the provisions of the C&B to the credible and relevant facts.  Clearly, President Wilson's actions were consistent with the authority provided to him by the C&B.  Finally, since 1974 the C&B has given the BoD the authority to restrict members' access to Association sponsored programs and since 2007 the PM has excluded MDDs as a class of members from access to C&R.  Accordingly, the arbitrator issues the following award.

---

[14] This award should not be understood as a rejection of the Wolitz award or its findings. That case is merely distinguishable from the present matter.

23

AAA Case No. 01-16-0001-4118 (Lawrence M. Meadows v. Captain Keith Wilson)

**AWARD**

The arbitrator finds, for the reasons stated above, that this matter be dismissed in its entirety. Also, because the Association provided the Accuser access and use of this forum to address his concerns, it will be charged the full costs of these proceedings.

Date of Award: January 10, 2017

_Edward B. Valverde_
Edward B. Valverde, Esq.-Arbitrator

24

# EXHIBIT 19

# for Myers Declaration

Exhibit No.: **35**
Name: Meadows, L.       **1**
Date: 1/13/2026
ESQUIRE

**From:** Lawrence Meadows <lawrencemeadows@yahoo.com>
**Sent:** Sat, 25 Feb 2017 17:31:46 +0000 (GMT)
**To:** AAA Mary Jara <AAAMaryJara@adr.org>
**Cc:** "Wilson - Sec, Keith" <kcw1985@verizon.net>; SECRETARY-TREASURER <secretary-treasurer@alliedpilots.org>; President <president@alliedpilots.org>; "Buckley, George" <gbuckley@alliedpilots.org>; "Clark, James (Jim)" <jclark@alliedpilots.org>; Edward Valverde <e.b.valverde@sbcglobal.net>; APA MIA Vice-Chair Ed Sicher <flysich@aol.com>; Biilyray Read <billyray2@bellsouth.net>; CA Dan Carey <careycargo@gmail.com>; "Myers, Mark" <mmyers@alliedpilots.org>
**Bcc:** "a.l.combs@aol.com" <a.l.combs@aol.com>; "aa737drvr@aol.com" <aa737drvr@aol.com>
**Subject:** Re: Meadows v. Wilson (AAA Case No. 011600014118) - Arbitrator's Response

Ms . Jara,

Please advise Arbitrator Valverde that he has failed to provide conflict disclosures as required under AAA rules and requested. It is outrageous that he refuses the correct his obvious errors of fact and law, and refused to correct his error of exceeding his jurisdiction and authority by improperly assessing me fees. His behavior is that of a corrupt Arbitrator.

Please advise him that we will be sending discipline complaints to AAA and seeking to overturn in Federal Court. His service is an embarrassment for the AAA.

Sincerely,
Lawrence M. Meadows
516-982-7718
Sent from my iPhone

On Feb 25, 2017, at 9:55 AM, AAA Mary Jara <AAAMaryJara@adr.org> wrote:

Dear Mr. Meadows,

The American Arbitration Association acknowledges receipt of your 2nd Motion for Reconsideration on February 22, 2017.

The arbitrator has advised that he considers this matter closed and will take no further action on this case. The AAA has no authority to vacate the decisions of the arbitrator. The arbitrator would also not have the authority to vacate this award as this matter is closed and he no longer has jurisdiction. Such authority generally lies with the courts unless the parties' agreement provides for some type of appellate proceeding within the arbitration. You also request that the AAA provide a disclosure of all of Judge Valverde's prior and ongoing business dealings with APA. Any disclosures communicated to the AAA by the arbitrator were provided to the parties during the administration of this case. Therefore, the AAA is unable to proceed with your request and we will continue to consider this arbitration closed.

Respectfully,
Mary Jara

<imagead460f.PNG> **AAA Mary Jara**
**Manager of ADR Services**

American Arbitration Association
Employment
T: 866 440 1796  F: 855 267 4082  E: AAAMaryJara@adr.org
13727 Noel Road, Suite 700, Dallas, TX 75240
www.adr.org

**2**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Wednesday, February 22, 2017 8:24 PM
**To:** Myers, Mark; AAA Mary Jara
**Cc:** Wilson - Sec, Keith; SECRETARY-TREASURER; President; Buckley, George; Clark, James (Jim); Edward Valverde; APA MIA Vice-Chair Ed Sicher; Biilyray Read; CA Dan Carey
**Subject:** Re: Meadows v. Wilson (AAA Case No. 011600014118) - Arbitrator's Response

Ms. Jara,

Please disregard my previous email which had an incorrect attachment, and now find attached herewith my response to Mr. Meyer's email, which is also my 2nd motion for reconsideration.

Sincerely,
Lawrence Meadows

On Tuesday, February 21, 2017 3:58 PM, "Myers, Mark" <mmyers@alliedpilots.org> wrote:

Dear Ms. Jara,
I have been asked to respond on behalf of APA. Although APA was not a party in the *Meadows v. Wilson* arbitration, Mr. Meadows' recent email alleges Arbitrator Valverde has a conflict of interest which may have influenced him to "rule in APA's favor." As noted, APA was not a party in this arbitration. APA is not aware of any conflict of interest or ongoing business relationship between APA and Arbitrator Valverde. Arbitrator Valverde has sat as a neutral arbitrator in APA-related proceedings on at least three occasions (two cases under APA's C&B Article VII – *Sproc v. National Officers/Board of Directors* and *Meadows v. Wilson* – and one Agency Fee arbitration in 2011). In each instance, the appointment of Arbitrator Valverde was coordinated through AAA. Mr. Meadows does not specify any details about the nature of the financial conflict; however, APA does not believe that an arbitrator has an inherent conflict of interest because the arbitrator has heard cases in the past or may hear cases in the future with the same party or parties. It does not appear from his email that Mr. Meadows alleges a conflict of interest between Arbitrator Valverde and Keith Wilson, who was the party in this arbitration.

It is APA's further understanding that Arbitrator Valverde has issued a final ruling in this case. APA will process and pay the January 26, 2017, invoice for $1,500 sent to Mr. Meadows. Though AAA may need to internally process Mr. Meadows' conflict of interest charge according to its own policies and procedures, APA is not requiring any further action.

Mark R. Myers
Attorney
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Fort Worth, Texas 76155-2512
817.302.2170; 817.302.2181 (direct)
800.323.1470, ext. 2170
817.302.2187 (Fax)
mmyers@alliedpilots.org

Begin forwarded message:
**From:** AAA Mary Jara <AAAMaryJara@adr.org>

**Date:** February 13, 2017 at 11:30:35 AM CST
**To:** Lawrence Meadows <lawrencemeadows@yahoo.com>, 'Keith Wilson' <kcw1985@verizon.net>, Edward Valverde <e.b.valverde@sbcglobal.net>
**Cc:** CA Dan Carey <careycargo@gmail.com>, APA MIA Vice-Chair Ed Sicher <flysich@aol.com>, Biilyray Read <billyray2@bellsouth.net>, "Robert Sproc - Sec" <sprocco@aol.com>, George Buckley <gbuckley@alliedpilots.org>, "Clark James (Jim)" <jclark@alliedpilots.org>
**Subject: RE: Meadows v. Wilson (AAA Case No. 011600014118) - Arbitrator's Response**
Good Afternoon:

At this time we ask Mr. Wilson to provide comments by February 21, 2017.

Thanks,
Mary

<image003.png>

**AAA Mary Jara**
**Manager of ADR Services**

American Arbitration Association
Employment
T: 866 440 1796  F: 855 267 4082  E: AAAMaryJara@adr.org
13727 Noel Road, Suite 700, Dallas, TX 75240
www.adr.org

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Thursday, February 09, 2017 5:25 PM
**To:** AAA Mary Jara; 'Keith Wilson'; Edward Valverde
**Cc:** CA Dan Carey; APA MIA Vice-Chair Ed Sicher; Biilyray Read; Robert Sproc - Sec; George Buckley; Clark James (Jim)
**Subject:** Re: Meadows v. Wilson (AAA Case No. 011600014118) - Arbitrator's Response

Ms. Jara,

We disagree with Arbitrator Valverde's revised ruling, and find it troublesome on many grounds. Accordingly, we are evaluating our options for appealing it and/or overturning it in federal court. In particular, it is plainly erroneous on its face with respect to Meadows' standing; as it contradicts the prior arbitral precedent of Arbitrator Woltiz in *Annable v Wissing*, which defined a member in good standing, which in turn the APA AB in *Sproc* applied to inactive disabled pilot Joe Barkate, declaring that despite his inactive disability status he remained a member in good standing. Additionally, it contradicts the record evidence consisting of the sworn testimony of CA Wilson and APA accounting of Meadows membership dues, which clearly showed that Meadows was a member in good standing, who did not owe any finical obligations to the association, and was never in bad standing. Indeed, APA's practice and C&B policy is to treat disabled members in an inactive membership status to remain as members in good standing. Now APA Secretary-Treasurer is relying upon this flawed decision, in a bad faith attempt to deny Meadows the previously docketed Article VII proceedings of *Meadows v. Torell*, which the AB directed would hear and decide the membership and standing issue carved out of the *Wilson* proceeding.

Secondly, it is inappropriate to assess Meadows costs for a reconsideration initiated by the Arbitrator himself, which was solely based on Meadows' notice of a very recent and relevant federal court ruling involving the C&R lock-out. Moreover, there was no finding of bad faith, nor could there have been, further the C&B Art. VII.E.4 plainly states;

*"The fees and expenses associated with the arbitration shall be the responsibility of the Association, unless the Arbitrator determines that a party to the proceeding has acted in bad faith in the prosecution or defense of these charges, in which case the Arbitrator shall have the authority to impose some or all of the costs and fees associated with the Article VII proceedings on the offending party."*

Thus, in the absence of bad faith Arbitrator Valverde had no authority to assess costs upon Meadows, and accordingly he refuses to pay any costs that have been inappropriately assessed him, and demands that such costs *"shall be the responsibility of the association"*, as provided in the C&B.

Finally, the APA Appeal Board has recently provided Meadows with new found information that Arbitrator Valverde has had an ongoing business relationship with APA outside of and in addition to hearing Article VII proceedings, which he otherwise failed to disclose. This is especially troubling, as it gives rise to the appearance of a financial incentive to rule in APA's favor. Therefore, please provide, a disclosure of all of Arbitrator Valverde's prior and ongoing business dealings with APA.

Sincerely,
Lawrence M. Meadows
MIA/FO/777/MDSB

On Wednesday, February 1, 2017 9:34 AM, AAA Mary Jara <AAAMaryJara@adr.org> wrote:

Dear Parties,

By direction of the arbitrator, attached please find the duly executed Response to Accuser's Request to Reconsider Award in the above-captioned matter.

If you have any questions, please contact the undersigned.

Sincerely,
Mary

<image004.png> **AAA Mary Jara**
**Manager of ADR Services**

American Arbitration Association
Employment
T: 866 440 1796  F: 855 267 4082  E: AAAMaryJara@adr.org
13727 Noel Road, Suite 700, Dallas, TX 75240
www.adr.org

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

5

5

# EXHIBIT 20
# for Myers Declaration

# ALLIED PILOTS ASSOCIATION
### Representing the pilots of American Airlines

O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX  76155-2512  •  817.302.2272  •  www.alliedpilots.org

October 18, 2017

Defendant Exhibit
Exhibit No.: 36
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

**VIA FIRST CLASS MAIL AND EMAIL**

Lawrence M. Meadows
P.O. Box 4344
Park City, UT 84060
lawrencemeadows@yahoo.com

Dear Mr. Meadows,

I received your requests to appeal the Appeal Board decisions to an arbitrator in both *Meadows v. AAPSIC* and *Meadows v. Torell*. For the reasons stated below, the Allied Pilots Association ("APA" or "Association") is not forwarding your requests to an arbitrator.

In *Meadows v. AAPSIC*, the Appeal Board found your charges failed to state a cognizable claim. In *Meadows v. Torell*, the Appeal Board issued a written decision. Both of these cases were filed prior to the arbitration award being issued in *Meadows v. Wilson*.

The arbitrator award in *Meadows v. Wilson* confirmed that you are an Inactive Member of APA and that Inactive Members are not "members in good standing" as that term is defined in APA's Constitution and Bylaws ("C&B") and "[t]hus, [Meadows] technically does not have the authority to file charges against a member."[1] The arbitrator found that "an active member's 'good standing' status fundamentally changes when he/she becomes an inactive member" and that an inactive member loses good standing status with the Association.[2] Under the decision, Inactive APA Members do not have standing to file charges under Article VII.[3]

The Association's C&B states "The President shall enforce the APA Constitution and Bylaws, and he may issue, as necessary, written interpretations of the Constitutional and Bylaws. *(09/15/2010)"* (C&B, Article IV, Section 8.A.3.). As President of the Association, I confirm the interpretation of Inactive Member as defined and applied in the January 10, 2017, arbitration decision. Because you do not have standing to file a charge under Article VII of the C&B, there is no basis to forward your requests for appeal to an arbitrator.

Sincerely,

CA Dan Carey
President

---

[1] *Meadows v. Wilson*, Valverde Decision and Award dated January 10, 2017, page 16. Confirmed in *Meadows v. Wilson* "Response to Accuser's request to Reconsider Award" (Valverde Decision, dated January 26, 2017).
[2] Valverde Decision, January 10, 2017, page15.
[3] Valverde Decision, January 10, 2017, pages 13-16.

**Meadows 008542**

cc:     CA Pam Torell
        AAPSIC Committee Members

Meadows 008543