UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE MEADOWS,

     Plaintiff,

v.

ALLIED PILOTS ASSOCIATION, *et al.*

     Defendants.

_____/

CASE NO. 1:17-CV-22589-EA

**DECLARATION OF JOSHUA B. SHIFFRIN**

I, JOSHUA B. SHIFFRIN, hereby declare and state as follows:

1.     I am a resident of Maryland. I am over the age of 18. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am an attorney at Bredhoff & Kaiser, PLLC. I am lead counsel to Allied Pilots Association ("APA") in the above-captioned litigation.

3.     **Exhibit 1** are true and correct excerpts from the transcript of the deposition of Plaintiff Lawrence "Larry" Meadows, taken on January 13, 2026.

4.     The following are true and correct copies of exhibits that were introduced at the deposition of Mr. Meadows, with citations to the pages in the deposition transcript where Plaintiff authenticated those documents:

     a.  **DX2** is a letter dated August 5, 2011, sent from Scott Hansen, the Director of Flight Administration at American Airline (American) to Plaintiff. Ex. 1, at 33.

     b.  **DX3** is a letter dated September 2, 2011, sent from Mr. Hansen to Plaintiff. Ex. 1, at 34.

1

c.  **DX4** is an email chain between Scott Hansen and Plaintiff, dating from October 7, 2011, to November 4, 2011. Ex. 1, at 37.

d.  **DX13** is a copy of Grievance 12-011, as submitted by Plaintiff on February 4, 2012. Ex. 1, at 101.

e.  **DX14** is letter dated June 6, 2013, sent from Captain Bart Roberts, the Director of Flight at American to Plaintiff. Ex. 1, at 102-03.

f.  **DX15** is a position statement submitted by Plaintiff on or about August 6, 2013. The exhibits that were originally attached to this document have been omitted for the Court's convenience. Ex. 1, at 103-04.

g.  **DX19** is a copy of Grievance 13-064, as submitted by Plaintiff on October 31, 2013. Ex. 1, at 125.

h.  **DX20** is an email chain between Plaintiff and staff attorneys at APA, dating from January 17, 2014, to January 20, 2014. Ex. 1, at 136.

i.  **DX21** is a copy of Grievance 12-012, as submitted by Captain Rusty McDaniels and First Officer Russell Moore on May 22, 2012. Ex. 1, at 150.

j.  **DX28** is a claim submitted by Plaintiff to the Dispute Resolution Committee pursuant to the seniority list integration award on or about November 9, 2016. Ex. 1, at 191-92.

k.  **DX29** is an email sent by the Dispute Resolution Committee to Plaintiff on January 9, 2017. Ex. 1, at 193-94.

l.  **DX30** is a letter to Plaintiff from the Dispute Resolution Committee that was attached to DX29. Ex. 1, at 195.

m. **DX32** is an email sent from Plaintiff toattorneys at APA on June 30, 2017. Ex. 1, at 199.

n. **DX33** is a demand by Plaintiff to file internal disciplinary charges against members of the American Airlines Pilots Seniority Integration Committee (AAPSIC), submitted on or about December 19, 2016. Ex. 1, at 202-03.

o. **DX38** is a letter sent from Plaintiff to the President of APA, Captain Keith Wilson, on or about March 20, 2014. Ex. 1, at 244-45.

p. **DX39** is a motion to amend the APA policy manual, which was passed by the APA Board of Directors on March 20, 2014. Ex. 1, at 245-46.

q. **DX40** is an email exchange between Plaintiff and Charles Hairston, a staff attorney at  APA, which occurred on March 31, 2014. Ex. 1, at 246-47.

r. **DX42** are excerpts of a hearing transcript from the bankruptcy proceedings in the U.S. Bankruptcy Court for the Southern District of New York, documenting a hearing that took place on April 17, 2014 before Judge Sean Lane, as part of the American bankruptcy proceedings. Ex. 1, at 256-60.

s. **DX43** is an email exchange between Plaintiff and Mr. Hairston, which occurred between April 15, 2014 and April 22, 2014. Ex. 1, at 265-66.

t. **DX45** is an email sent by the APA Communications Chairman to Plaintiff on January 13, 2017. Ex. 1, at 267, 281.

u. **DX46** is a letter sent by Plaintiff to President of APA Captain Dan Carey on or about December 10, 2018. Ex. 1, at 293-94.

v. **DX57** is a letter sent to Plaintiff by Mark W. Robertson, a legal representative for American, on or about December 10, 2019, including attachments thereto. Ex. 1, at 325.

5. Exhibits 2-4 are true and correct excerpts from the three-part transcript of the deposition of deposition of Mark Myers, taken on January 21 and 22, 2026. **Exhibit 2** is excerpts from Day One, Volume 1 of the transcript. **Exhibit 3** is excerpts from Day One, Volume 2 of the transcript. And **Exhibit 4** is excerpts from Day Two of the transcript.

6. **Exhibit 5** is true and correct excerpts from the transcript of the deposition of Dan Carey, taken on March 4, 2026:

7. The following are true and correct copies of an exhibit that wwas introduced at the deposition of Dan Carey, with citations to the pages in the deposition transcript where Captain Carey authenticated the document:

a. **CX31** is an email sent by then-President  Carey to Kimball Stone at American on April 8, 2019, with attachments. Ex. 5, at 19-20.

8. The following are true and correct copies of documents that were produced by Plaintiff as part of discovery in this case:

a. **Exhibit 6** is an email sent by Wally Preitz to Plaintiff on September 19, 2016, including an attachment.

b. **Exhibit 7** is a letter that was sent by Mr. Robertson to Plaintiff on or about May 19, 2016, including an attachment.

9. The following are true and correct copies of declarations that were submitted by APA officials in previous litigation involving Plaintiff. Most of the exhibits to these depositions have been omitted for the Court's convenience:

a. **Exhibit 8** is a true and correct copy of a sworn declaration from Captain Keith Wilson, which is publicly available as ECF No. 93-3 in *Emery v. APA*, Case No. 9:14-cv-80518 (S.D. Fla., June 10, 2016), including exhibits 6 and 8 thereto. Other exhibits have been omitted for the Court's convenience.

b. **Exhibit 9** is a true and correct copy of a sworn declaration from Arthur "Rusty" McDaniels, which is publicly available as ECF No. 93-4 in *Emery v. APA*, Case No. 9:14-cv-80518 (S.D. Fla., June 10, 2016). The exhibits to this declaration have been omitted for the Court's convenience.

c. **Exhibit 10** is a true and correct copy of a sworn declaration from J. Bennett Boggess, which was submitted as part of an arbitration involving Plaintiff's challenge the distribution of equity to APA-represented pilots as part of the American bankruptcy proceedings, including exhibit 1 thereto.

10. The following are true and correct copies of filing in related lawsuits that are cited in Defendant's Statement of Material Facts, for the Court's convenience:

a. **Exhibit 11** is the Amended Complaint, ECF No. 21-1, in *Meadows v. APA*, Case No. 2:14-cv-115 (D. Utah, July 2, 2014).

b. **Exhibit 12** is an Order Granting Plaintiff's Motion to Amend and Defendants' Motion to Dismiss, ECF No. 35, in the same case, *Meadows v. APA*, Case No. 2:14-cv-115 (D. Utah, Nov. 3, 2014).

c. **Exhibit 13** is the Final Judgment, ECF No. 160, in *Emery v. APA*, Case No. 14-cv-80518 (S.D. Fla. Jan. 11, 2017).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 1, 2025

Joshua B. Shiffrin

# EXHIBIT 1
# for Shiffrin Declaration

## Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

LAWRENCE MEADOWS,

     Plaintiff,

-vs-             CASE NO. 1:17-CV-22589-EA

ALLIED PILOTS ASSOCIATION, et al.,

     Defendants.

VIDEOTAPED DEPOSITION OF

LAWRENCE MEADOWS

NONCONFIDENTIAL PORTIONS

Tuesday, January 13, 2026

9:35 a.m.

Gordon Rees Scully Mansukhani, LLP

100 Southeast 2nd Street, Suite 3900

Miami, Florida 33131

Jose Patino

Digital Reporter

Notary Commission No.  HH 604222

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff, Lawrence Meadows:

     LAWRENCE MEADOWS, PRO SE
     1900 Sunset Harbour Drive, Unit #2112
     Miami Beach, Florida 33139
     516-982-7718
     lawrencemeadows@yahoo.com

On behalf of the Defendant, Allied Pilots Association:

     JOSHUA B. SHIFFRIN, ESQ.
     GRACE RYBAK, ESQ.
     BREDHOFF & KAISER, PLLC
     805 15th Street NW, Suite 1000
     Washington, D.C. 20005
     202-842-2600
     jshiffrin@bredhoff.com

Also Present:

     David Cardenas, Videographer
     Javier Ordonez, Videographer
     Edison Mayorga,  Videographer
     Mark Myers, Client Representative, APA
     Ann Maria Marino, Wife to Mr. Meadows

## Page 3

INDEX TO EXAMINATION

| EXAMINATION | PAGE |
|---|---|
| Direct Examination by Mr. Shiffrin | 8 |
| Cross-Examination by Mr. Meadows | 349 |
| Redirect Examination by Mr. Shiffrin | 356 |

Confidential Portions Excerpted

Page 82, Line 9 - Page 101, Line 12

INDEX OF EXHIBITS

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | SOX Complaint | 22 |
| Exhibit 2 | August 5 Hansen Letter | 33 |
| Exhibit 3 | September 2 Hansen Letter | 34 |
| Exhibit 4 | November 4, 2011 Hansen email | 37 |
| Exhibit 5 | Februbary 10, 2013 Meadows email | 46 |
| Exhibit 6 | November 18, 2011 Boggess letter | 49 |
| Exhibit 7 | Damages Report | 54 |
| Exhibit 8 | RA requests to APA | 62 |
| Exhibit 9 | CCI Consulting Agreement | 68 |
| Exhibit 10 | Atlas subpoena | 71 |
| Exhibit 11 | Resume | 79 |
| Exhibit 12 | Tax return (confidential) | 82 |
| Exhibit 13 | Grievance 12-011 | 101 |
| Exhibit 14 | June 6 Grievance 12-011 | 102 |
| Exhibit 15 | PAC Brief | 103 |

## Page 4

INDEX OF EXHIBITS (Cont'd)

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | CBA Excerpt Sec 23 | 113 |
| Exhibit 17 | Goldberg Arbitration transcript | 117 |
| Exhibit 18 | APA August 29 2013 Wilson Letter | 122 |
| Exhibit 19 | Grievance 13-064 | 125 |
| Exhibit 20 | Hairston No Further Action | 136 |
| Exhibit 21 | Grievance 12-012 | 150 |
| Exhibit 22 | CBA Excerpt Section 11, etc | 155 |
| Exhibit 23 | Meadows email to Stephens | 176 |
| Exhibit 24 | March 2016 Stephens email | 177 |
| Exhibit 25 | Seniority Integration Protocol Agreement (SIPA) | 182 |
| Exhibit 26 | MOU Grievance | 188 |
| Exhibit 27 | M. Stephens email chain Meadows-008655 | 189 |
| Exhibit 28 | Dispute Resolution Claim | 191 |
| Exhibit 29 | Email | 193 |
| Exhibit 30 | Attachment | 195 |
| Exhibit 31 | Email with J. Clark re: SOX | 196 |
| Exhibit 32 | Email with J. Clark | 199 |
| Exhibit 33 | Article VII against AAPSIC | 202 |
| Exhibit 34 | First Amended Complaint | 209 |
| Exhibit 35 | Arbitrator threat email | 213 |
| Exhibit 36 | Carey interpretation | 216 |
| Exhibit 37 | Torell Appeal Board ruling | 241 |



Page 5

INDEX OF EXHIBITS (Cont'd)

| DEFENDANT'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 38 | Reinstatement request | 244 |
| Exhibit 39 | Resolution 2014-070 | 245 |
| Exhibit 40 | Hairston Exchange | 246 |
| Exhibit 41 | June 17-19 2014 minutes | 251 |
| Exhibit 42 | Transcript of Steve Hoffman | 257 |
| Exhibit 43 | EEOC threat email | 265 |
| Exhibit 44 | Email trial decision | 267 |
| Exhibit 45 | Carey restoration to C&R | 267 |
| Exhibit 46 | Carey reinstatement email | 293 |
| Exhibit 47 | Carey Rollout email | 294 |
| Exhibit 48 | Carey reinstatement letter | 294 |
| Exhibit 49 | Voicemail | 299 |
| Exhibit 50 | Voicemail Follow-up | 303 |
| Exhibit 51 | Hatfield Voicemail Follow-up | 307 |
| Exhibit 52 | Silber email re:  No Reinstatement by voicemail | 308 |
| Exhibit 53 | Hoffman email Alt has informed you | 311 |
| Exhibit 54 | Carey text exchange | 314 |
| Exhibit 55 | First cease and desist | 318 |
| Exhibit 56 | Second cease and desist | 321 |
| Exhibit 57 | RA request | 325 |
| Exhibit 58 | Boggess RA Response | 344 |
| Exhibit 59 | Timeline | 344 |

Page 6

INDEX OF EXHIBITS (Cont'd)

| DEFENDANT'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 60 | Disposition | 346 |

(Exhibits 1 through 60 were retained.)

Page 7

(The proceedings commenced at 9:35 a.m.)

THE VIDEOGRAPHER:  Good morning.  We are on the record for the video deposition of Lawrence Meadows taken in the matter of Lawrence Meadows v. Allied Pilots Association, et al.

Today is January 13, 2026, and the time is 9:35 a.m.  This deposition is being conducted at 100 Southeast 2nd Street in Miami, Florida.

The court reporter is Jose Patino, and the videographer is Javier Ordonez.

Will counsel please introduce themselves, after which the court reporter will swear in the witness?

MR. SHIFFRIN:  Joshua Shiffrin on behalf of Allied Pilots Association.  With me is Grace Rybak on behalf of Allied Pilots Association, and we have with us the client representative, Mark Myers.

MR. MEADOWS:  Lawrence Meadows, Plaintiff, on behalf of myself, pro se.

MR. SHIFFRIN:  Who else is in the room?

MR. MEADOWS:  This is my wife, Ann Marie Marino, and she's here for emotional support.  Do you have an objection to that?

MR. SHIFFRIN:  No.

MR. MEADOWS:  Okay.  Thank you.

Page 8

THE REPORTER:  Okay.  Good morning, everyone.  My name is Jose Patino, Florida Notary and Digital Reporter on behalf of Esquire Deposition Solutions.

Pursuant to the general laws of the State of Florida, I will be capturing the verbatim record of today's proceeding using electronic audio equipment, a computer, and specialized recording software, which is not a form of stenography.

The witness is presently located in Miami, Florida, and has confirmed their identity with a driver's license issued by the Florida Department of Motor Vehicles.

Counsel for the witness has confirmed and can verify the stated witness is the person testifying in this proceeding.

Hearing no objection, this shall constitute agreement and stipulation of such, and I will now swear in the witness.

LAWRENCE MEADOWS
having been first duly sworn, testified as follows:

DIRECT EXAMINATION
BY MR. SHIFFRIN:

Q.  Mr. Meadows, have you ever been deposed before?

A.  Yes, sir.



Page 13

able to finish my questions.

A. Okay. But if you ask me a question, if you ask -- I'm going to ask to answer fully and honestly to the best of my knowledge.

Q. That's why I need to finish answering -- asking my question before you answer.

A. Okay.

Q. What attorneys have you communicated with about this matter?

A. Several. One's dead. Two are in jail. Reina Smith, Philip Layfield (phonetic).

Q. About this matter?

A. Jill Rona (phonetic). Well, they've advised me over the years. Two of them are my longtime attorneys, but they're both in jail now, unfortunately. And Lycium, John Clark.

Q. Who did you talk to about -- which attorneys did you talk to you about preparation for this --

A. No, I prepped myself. I mean, I -- I get legal advice about the rules and stuff and make sure I'm within my grounds.

Q. So you've retained a lawyer to give you legal advice?

A. I have not retained a lawyer, no.

Q. Okay. Your -- are your communications with

Page 14

the lawyers you mentioned privileged?

A. Yes.

Q. So they are your lawyers?

A. All my legal strategy, mental impressions, and conversations with counsel are privileged, yes.

Q. Which lawyers have you had privileged conversations with about this matter?

A. All the ones I just mentioned to you.

Q. Which one most recently?

A. Lycium.

Q. Okay. Do you understand that you're under oath?

A. Yes, sir.

Q. Okay. And as I said, there's a court reporter and videographer is here to record what you have to say to them.

A. That's my understanding.

Q. Okay.

A. I see two video cameras, and we're on audio, I assume? And is it stenographically transcribed also?

Q. It's digitally transcribed.

A. Okay.

Q. Now, if I ask a question and you don't understand it --

A. Oh, by the way. Go ahead. I'm sorry.

Page 15

Q. Please, Mr. Meadows, we've got a long day today. I need to be able to ask my questions, okay? And I will give you all the opportunity you need to answer my questions. Understand? Do you understand?

A. Yes, sir.

Q. Okay. If I ask a question and you don't understand it, please tell me, and I'll rephrase my question. Does that make sense?

A. Mm-hmm.

Q. Is that a yes?

A. Yes, sir.

Q. For the sake of the record that we're creating, I need you to give a verbal yes or no answer.

A. Okay.

Q. And if you don't tell me that you don't understand a question, I'm going to presume that you did understand it. Does that make sense?

A. Yes.

Q. Okay. I expect to go seven hours on the record today. If you need a break, let me know. Okay?

A. Yes.

Q. Okay. And you understand you'll have an opportunity to review the transcript and make sure it was accurately transcribed?

A. Yes. And I'd like to assert a standing

Page 16

objection that I reserve all rights to object under federal rules for the entire proceeding, and I will do so, and also errata the back end.

Q. What does that mean?

A. Means I reserve my right to object to -- you don't want me making talking objections, so I'm going to reserve my right up front to object to anything that's in violation of federal rules for foundation, relevance, vague and ambiguous, privileged and so on.

Q. Typically, what occurs in a deposition is at the time a question's asked, someone, the lawyer representing the witness will say objection to form, and that's it. And that preserves your objection.

A. I understand, but you just told me you didn't want me to object. So I'm confused because I'd like to object.

Q. I'm going to clear up that confusion for you right now as we speak.

A. Okay.

Q. You can make an -- what's called an -- you can say objection to form, and that's all you need to say, and your objection. Whatever your objection is, is preserved, and if there's a point later in this case where the deposition's being introduced at trial, you can explain what that objection was. But what's not



Page 17

permissible is to make a speech about what the objection is, understand?

A. I totally understand.

Q. Okay. So if you have an objection to a question, please say it at the time that the question's being asked. That would give me an opportunity to rephrase my question. Does that make sense?

A. And I will ask you to rephrase if I don't understand. If I think it's compound --

Q. And if anything's objectionable --

A. Objection to form.

Q. -- make the objection at the time of the question.

A. Okay.

Q. Okay. Mr. Meadows, I understand you attended two years of law school?

A. Yes.

Q. When was that?

A. 1988 through '89, St. Louis University.

Q. Why did you not finish?

A. The Air Force transferred me. They were paying. I was transferred to Germany after my -- tail end of my second year.

Q. Why didn't you resume your studies?

A. I don't think you really want me to get into

Page 18

that. Pretty little opinion of the legal field and the ethics involved, and I just decided it wasn't for me.

Q. When did you first become a commercial airline pilot?

A. I was hired by American Airlines in October 1991.

Q. Had you had any jobs with other carriers before American?

A. I was in the military prior to the US Air Force for six years.

Q. And when was the last time you flew a plane for American Airlines?

A. Probably late 2003.

Q. And why did you stop flying for American Airlines?

A. Just my medical condition.

Q. And at that time, did you lose your FAA First Class Medical Certificate?

A. No, I did not lose it, but I had to -- as an airman, I have a duty to report fitness or lack of fitness for duty. And I was unfit for duty because of the medication I was taking.

Q. Tell me how you came to no longer have a first class medical license?

A. It just expired.

Page 19

Q. And when was that?

A. I'm not sure exactly. Because I think when I held my medical, they ran for -- I can't remember. I think one year is a first -- six months is a first class, two years is a second class, and default to the third class. So I might have held it for the two years before it fully expired.

Q. You may have held a medical license, but not a first class medical license?

A. Yeah. The way it used to work, first class medical would default to a second class and then default to a third class for a period of two years. I don't think that's that way anymore. But so I just let my -- I was advised by APA's air medical examiners AMES, Aviation Medical Examination Service, to let it lapse and not get an affirmative denial. Later, I was advised by APA to get a denial, which really made it difficult to get re-qualified.

Q. I understand. So in -- let me make sure -- first of all, just for the sake of the record, could you explain what a FAA medical license is?

A. As a pilot, I hold -- I guess it's equivalent PhD in flying, hold an airline transfer pilot certificate. There's various levels of pilot licenses, commercial instrument, and so on. But you cannot

Page 20

exercise the privileges of any of those -- it would be like having a driver's license for your car, but you can't drive your car unless you have a medical certificate that's current. So as a pilot, you have to have a FA current medical certificate, which allows you to exercise the privileges of your pilot's license. The pilot's license never expires, the FA medical does.

Q. Okay. And so you -- and let me just make sure the record's clear on this. When you flew for American Airlines, you always had a first class medical license?

A. Yes.

Q. Okay. And after you ceased flying for American, your license went from being first class to second class to third class to the point it expired?

A. Yes, until such time. I couldn't reapply because I was on -- I was taking unapproved medication.

Q. Understood. What caused you to -- what was the medical condition at the time in 2003 that led to you not having a medical license?

A. Again, I'm just going to object. I mean, I don't want to have to do this throughout the proceeding, but when you ask about my medical condition and stuff, I expect that stuff to remain confidential in the transcript. I'd like the line of questioning and my answers be reflected as such.



Page 21

Q. Well, and just --

A. Because we have a -- I have a protective order. Let me -- let me -- I'm talking. I have a protective order that's reciprocal, and all my financial and medical information is to be protected. So when you're -- I -- I'm an open book. There's nothing the FAA doesn't know about my medical condition, but I just want to protect it from public record. That's all.

Q. Understood. I'll say this. First of all, we can mark any portion of this as confidential, and we'll take care of that.

A. Okay.

Q. I -- I don't understand -- that question can't be confidential because you disclosed that fact in public filings in your whistleblower complaint, so --

A. I may have, but in this matter, anything related to my financial and medical condition is protected.

Q. Unless it's already been disclosed publicly.

A. I don't -- I'm not sure exactly what's been disclosed publically.

Q. Okay. Well, do you want me to show you?

A. Yeah. You could pull out all the documents. Because I mean, there's thousands of documents that you're aware. I don't remember a lot of those, so.

Page 22

MR. SHIFFRIN: Yeah. We'll mark this as Exhibit 1 to this deposition.

(Defendant's Exhibit 1 was marked for identification.)

BY MR. SHIFFRIN:

Q. Mr. Meadows, can you identify what Exhibit 1 is?

A. Well, I'll have to read it for a minute. Hold on. This looks like the complaint -- it looks like -- filed with federal court. POL. I can't remember.

Q. Well --

A. It's a complaint for the violation of whistleblower protection of the Sarbanes-Oxley Act. Okay. I see Judge Romero. This was filed in the Department of Labor in 2013.

Q. This was filed on your behalf, correct?

A. When you say on my behalf?

Q. This is filed by lawyers on your behalf?

A. Yeah. Initially, it was filed by the Rona Law Firm.

Q. As you -- on your behalf --

A. Yes.

Q. -- correct? You're the complainant --

A. Complainant.

Q. -- in this action, correct? And if you look

Page 23

at Paragraph 22 of the complaint that's on Page 4, it refers to your diagnosis of depression; is that correct?

A. Yes.

Q. Okay. And this is a document that was public -- excuse me, that was filed in a public document.

A. Yeah, it was filed 2014, 11 years ago. Sorry, I'm just getting refreshed now by reviewing it.

Q. You can set that aside. When was it that you regained --

A. You want me to set it aside?

Q. You can set it aside.

A. Okay.

Q. When was it that you regained your first class medical license?

A. I'm trying to tell you the exact date, but I want to say around November 23, 2018.

Q. Okay. And --

A. I kind of remember because it was assigned personally by the Federal Air Surgeons, like the Surgeon General.

Q. Of the FAA?

A. Yeah. It took a congressional inquiry to get it.

Q. Was it made retroactive to July?

A. Yes. I -- I -- well, without seeing a special

Page 24

authorization letter, I can't say with specificity, but the examination for the base -- yeah, I remember now. My examination and submission for the medical was in July. By the time they approved it, it was literally expiring within a month. I had to go right back and get it reissued. So it was a very late issuance, but it was based on that examination in July. Yes.

Q. So the effective date --

A. I think it would be effective July, retroactively.

Q. But you got it in November of --

A. Yeah. Yeah. But I didn't know until November.

Q. I understand. So then when you get it renewed, you get it renewed in July? Every six months?

A. Yeah.

Q. And so just so we're clear, between the period that you -- when -- what was the period of time that you did not have a first class medical license?

A. I can't say with specificity, but I'm going to say sometime when I got sick. In 2003, I think it began to lapse. It expired, I -- we'll say sometime mid to late 2004 and then it was unexpired I remember -- yeah. I -- I remember that the time when they took away my disability benefits in a cost savings scheme in 2008, I



Page 33

marked as Exhibit 2.

(Defendant's Exhibit 2 was marked for identification.)

THE WITNESS: Okay.

BY MR. SHIFFRIN:

Q. This is -- you recognize this as a letter from Scott Hansen to you on August 5, 2011?

A. I'm sorry, this?

Q. You've seen this before?

A. Yes.

Q. And in this letter, looking at the last paragraph of it, first of all, Mr. Hansen says to you, it says: Our payroll history shows that you have been on sick leave of absence since April 19, 2004. Do you see that?

A. Yes.

Q. And then he says: Your collective bargaining agreement and company policy limits SLOAs for pilots to a total period of three years and up to a maximum of five years with approval and requires administrative separation from employment when that time limit has exceeded. Do you see that?

A. I see it.

Q. Okay. And it continues and says: Although you have already exceeded the time limit, as an

Page 34

additional accommodation to give you time to obtain your FAA clearance and/or to work with us to identify a possible reasonable accommodation option for returning to work, we will continue you in SLOA status through October 7, 2011. Do you see that?

A. I see it.

Q. Then he says: If you are unable to return to work at the end of this extended leave of absence, with or without a reasonable accommodation, your employment with the company will end. Do you see that?

A. I see it.

Q. And, in fact, your employment in the company did end in 2011?

A. It did not end in 2011.

MR. SHIFFRIN: Okay. Let's take a look then at the next exhibit. We'll mark it as Exhibit 3.

(Defendant's Exhibit 3 was marked for identification.)

THE WITNESS: And I'm going to say Scott Hansen is not my chief pilot superior. That letter has no weight. And it's not even copied to the union. Okay. And it doesn't say I was administratively separated. There's no such term administrative separation in the contract, nor is any letter to me from my chief pilot superior.

Page 35

BY MR. SHIFFRIN:

Q. I'll mark -- I'm showing you what's been marked as Exhibit 3. Exhibit 3 is a letter to you dated September 2, 2011 from Scott Hansen. Do you see that?

A. What date is this?

Q. September 2, 2011. You see that?

A. Yeah, I see it.

Q. And in this letter, you see at the bottom of Page 1, there's in bold language, check airman. Do you see that?

A. You have to give me a minute to read it. Okay.

Q. And in this letter, Mr. Hansen discusses a request that you had made for a reasonable accommodation to be a check airman, is that right?

A. Yes.

Q. And he denies that request, is that fair to say?

A. He has no authority to deny a request. He's not my chief pilot supervisor Miami base. And American's managers are on the record that the only person who has the authority to terminate a pilot or give them accommodation is the chief pilot superior, but what would you like to ask me in this question?

Q. Authority or not, what he says to you is

Page 36

American Airlines is not going to accommodate you by making you a check airman --

A. Well --

Q. -- is that fair to say?

A. -- he says that, but it's contrary to the contract. The contract provides for accommodation for check airmen.

Q. I'm just asking what he says.

A. Yeah, but it's meaningless. He's not -- he has no authority over me.

Q. Okay. That's your position?

A. No, it's American Airlines' position.

Q. Okay. But as far as this letter goes --

A. If you'd like to, I'll reference you to the deposition testimony of the man that said that.

Q. If I ask a question for that, I'll let you know.

A. Okay.

Q. All I'm asking right now is in this letter, it says American Airlines is not accommodating your request.

A. He unlawfully refused my request for accommodation in the -- yes. And APA did not participate in the interactive process.

MR. SHIFFRIN: Okay. And then let me show you



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

Page 37

what's been marked as Exhibit 4.

(Defendant's Exhibit 4 was marked for identification.)

THE WITNESS:  Can I keep these?

MR. SHIFFRIN:  Yes.

THE WITNESS:  Thank you.

BY MR. SHIFFRIN:

Q.  Exhibit 4 is a email from you to Mr. Hansen dated November 4, 2011.  Do you see that?

A.  Yes.

Q.  Okay.  And it -- it's an email chain.  Do you see that, if you flip forward, there's emails going back between you and Mr. Hansen back --

A.  Hold on a second.  So what part is -- do you -- do you want me to speak to the whole thing or certain portion?

Q.  No, I'm going to -- I'll direct you to the -- there's an email -- if you look at the first page, an email from Mr. Hansen to you dated November 4, 2011 that begins about halfway down the page.  Do you see that?  I'll direct you to that email, if you want to take your time to read it, you may.

A.  First page?

Q.  If you look at the first page, it continues onto the second page.

Page 38

A.  Okay.  Let me read it.  Okay.  Just tell me what you want to ask and I'll read the section, unless you want to read the entire thing.

Q.  No, I don't.  About -- about two thirds of the way down in the first paragraph on the second page, Mr. Hansen says:  As of October 21, 2011, you remain in the bargaining unit.  Thus, you were removed from the pilot seniority list and administratively separated from the company as we had advised in advance.  Do you see that?

A.  I see that.

Q.  Okay.  So at least as of November 4, 2011, you had been removed from the pilot seniority list?

A.  No.

Q.  What's your basis for saying that?

A.  I have HI-3s all the way through the following year and I was still on the seniority list.

Q.  But at least as of that date, American --

A.  First of all --

Q.  -- American Airlines communicated to you that you were removed from the pilots --

A.  My chief pilot superior did not communicate that to me.

Q.  Who is Scott Hansen?

A.  Scott Hansen is a flight administrator.  He has no authority over pilots.

Page 39

Q.  Is he a manager at American Airlines?

A.  He's a manager.  He's an administrator.

Q.  Okay.  And he also communicated to you that you had been administratively separated from the company.

A.  There's no such phrase as administrative separation.  And I -- no, I've never -- he claims I was administratively separated back in -- standby.  I think October 20 something.  I can't find -- October 21st.  I never received any letter from American Airlines about my termination or separation or whatever you're going to call it.  The contract provides that I must have initial notice, an investigation, and a hearing, and final notice with my chief pilot superior.  I had none of that.  I never got a letter from Scott Hansen.  This was precipitated by me calling him, saying, what's going on with my accommodation?  He goes, oh, by the way, we separated you two weeks ago.

Q.  Well, you looked at the letters that said he was going -- that this was going to happen, right?

A.  No.  It -- it -- what he said is going to happen, the contract does not provide for.

Q.  So I understand, but at least from American Airlines' perspective --

A.  From Scott Hansen's perspective -- American

Page 40

Airlines, because --

Q.  But you understood, at least as of February 2013, that you had been terminated from American Airlines?

A.  I felt like I was constructively terminated, but American Airlines has treated me at times as an employee, nonemployee, as I speak to you today.  I am on a payroll.  And the whole basis for the alleged administrative separation was four years of unauthorized sick leave or unpaid sick leave.  There's no sick leave in my record now.  That's been eviscerated by the PBAC warden.  2013 is a change of circumstance.  So the basis for which I was moved was unpaid sick leave, which I've never been on.  If you look at my pension statements, as I sit here talking today, I'm accruing pension credit of service under the pilot retirement benefit program, and that can only happen if you're an employee and a participant of the plan.

So I'll make really clear that I am an employee, as I speak today.  I'm on the payroll.  I receive pilot W-2 employee wages, taxable, full active pilot benefits package, medical, dental, life insurance, under the 2004 pilot long term disability plan authorized in a letter KK of the collective bargaining -- collectively bargaining benefits, I'm defined as a



Page 81

A. Dent Dents Paintless Dent Removal, Incorporated (phonetic).

Q. Do you still have that?

A. No.

Q. When did you cease to have that?

A. I closed it in 2001 or two, maybe. I -- I don't recall.

Q. Did you do any work for any type of aviation company between 2011 and 2018?

A. I didn't hold an FA medical certificate.

Q. That wasn't my question.

A. No.

Q. Okay. What real estate -- and looking at -- I'm looking now at the second page of the resume, and I see that it says, and I appreciate this was prepared a number of years ago, but January 2008 to the present, that you're the new property management for properties in Utah?

A. Yes.

Q. Is that still something that you do?

A. Yes.

Q. How much time does that take up a month?

A. Not much. I have someone that works for me.

Q. How much time?

A. I don't know. I don't track my time. I don't

Page 82

pay myself hourly, so I don't know how much time.

Q. Can you give me an estimate?

A. No.

Q. A number of hours per week?

A. It's not like that. I have an employee that manages all of my property related activities, maintenance and guests, and so on, so phone calls counting.

Page 101

(The testimony on Page 82, Line 9 through Page 101, Line 12 was marked confidential, excerpted, and bound separately.)

BY MR. SHIFFRIN:

Q. I'm -- we're on the same page of anything that's confidential.

A. I got you, yeah, feel free. Just let me know.

Q. Okay. Exhibit 13, do you recognize this as what came to be known as grievance 12-011?

A. Yeah. This one version. I think there's two version. I think I sent one to my chief pilot, one to John Hill, but. The same thing. One has a banner on it.

Q. Okay. But the substance of this is grievance 12-011?

A. Yes.

Q. And you wrote this yourself?

A. Yeah, because APA wouldn't write it for me.

Page 102

Q. Okay. And this was an individual grievance?

A. Yes.

Q. Not a base grievance?

A. Individual.

Q. And what's the difference between an individual and a base grievance?

A. Individual grievance, it is filed on behalf of the individual. A collective grievance is filed on behalf of the entire base, but if it's precedential, we'll fire the entire system.

Q. And grievance 12-011 was denied by the company, right?

A. It was never fully heard. The company's exact wording was remove the seniority list in accordance with 11(d)(1) from Chief Roberts.

MR. SHIFFRIN: And I'll -- just so we're on the same page, I'll show you what we'll mark as Exhibit 14.

(Defendant's Exhibit 14 was marked for identification.)

THE WITNESS: Can put the phone down, please.

MS. RYBAK: I'm sorry.

BY MR. SHIFFRIN:

Q. You just referred to it, the substance of American Airlines' denial of your grievance, is this



Page 103

what you -- is Exhibit 14 what you were referring to?

A.   Yeah.  That's got a errata on it.  E7111k1, but I'm pretty certain he means E1.

Q.   And then --

A.   And I want to point out, it says I was moved on the seniority list, nothing more.  It doesn't say I was terminated or administratively separated.

Q.   Okay.  You covered that, right?

A.   Yes.

Q.   And it was submitted -- after that, the grievance was submitted to what's known as the PAC, is that right?

A.   Pre-arbitration conference.

Q.   And you submitted a brief in support of the grievance at that conference, correct?

A.   I don't know if I did or Chuck Hairston did or I wrote it and he submitted it.

MR. SHIFFRIN:  Okay.  Let me show you what we'll mark as Exhibit 15.

(Defendant's Exhibit 15 was marked for identification.)

BY MR. SHIFFRIN:

Q.   Do you recognize Exhibit 15 as a brief that you prepared?

A.   Apparently.

Page 104

Q.   This was in support of your grievance 12-011?

A.   Yeah.

Q.   Okay.

A.   If I recall, I think Chuck Hairston refused to file anything on my behalf, and I did it myself.

Q.   Okay.  And --

A.   I think I gave this to him to submit.

Q.   And he submitted it, is that right?

A.   I would hope so.  I don't -- I have no evidence of this -- him submitting it to the panel.

Q.   In any event, flipping to Page 2 of Exhibit 15, you see there's a paragraph that reads:  Meadows is entitled to reinstatement to the AA pilot system seniority list.  Do you see that?

A.   Yes.

Q.   That reflects that you were, first of all, not on the pilot seniority --

A.   No, it doesn't reflect that.  It reflects I was administratively dropped as James Anderson testified in the Cathy Emory litigation.  He said that we were administratively dropped, and we're always reinstated to the original relative position even though the contract provides that after five years, you ceased to retain a crew, only your relative seniority.  But historically, everyone's always been reinstated to where they belong.

Page 105

So I never considered myself permanently moved, just dropped.

Q.   Okay.  Well, when you wrote this, you were asking for reinstatement?

A.   Yeah, reinstatement my original relative position.

Q.   Okay.  And you also understood when you wrote this that section 11(d) contained a rule that after five years, pilots would be dropped in the seniority list, correct?

A.   No, I did not understand that.  That -- that's not what it says.  It says you cease to retain or accrue your relative seniority.  It doesn't say you're dropped from the seniority list.  There's nothing in the contract that says that.

Q.   Okay.  Looking at where it says third under that first bullet point.

A.   Yeah.

Q.   It refers to the five year maximum sick leave policy contained in 11(d).

A.   That's what the company asserts exists, but there's no such thing.  But go ahead.

Q.   Not just the company, APA considers --

A.   Well, APA is in bed with American on that issue for sure.

Page 106

Q.   So APA and American have the same position on that issue?

A.   Their practice is not in that position, but go ahead.  They filed three collective grievances refuting that part of the contract.

Q.   We'll talk about that --

A.   They filed three collective grievances that refute that very section.  So it's disingenuous to say APA supports it because they didn't.

Q.   Okay.

A.   They changed their position later.

Q.   Well, in the November 2011 letter that we looked at, that was the position of APA, correct?  That there's a five year rule in the CBA?

A.   Which letter?

Q.   One of the prior exhibits, Exhibit 6.

A.   Okay.  So Scott Hansen -- the Bennett Boggess letter?

Q.   Yes.

A.   Yeah, well --

Q.   We looked at it together, right?

A.   Yeah, the guy's -- he's -- on one hand, he's telling me I'm not terminated, yet, later they say, I am.  And prior to this, they filed a grievance for a guy just like me.  So -- and Bennett Boggess isn't credible.



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
123–126

Page 123

from the president of APA at the time, Captain Keith Wilson, on August 29, 2013.  Do you see that?

A.  Mm-hmm.

Q.  Okay.  And in the second paragraph, he writes: I've considered your request and decided not to submit your grievance to the system board of adjustment.  Do you see that?

A.  I see that.

Q.  And it goes on to say:  Your grievance is based on federal statutory claims, and it's my understanding that you're already pursuing those claims in the appropriate federal forums.  Do you see that?

A.  Yes.

Q.  And it was true that your grievance is based on federal statutory claims, correct?

A.  No, in part.  Partially.  It was based on a no notice of termination in lieu of my chief pilot superior.  And Keith Wilson just left that out.

Q.  Okay.  But that's not what you describe in your submission to the PAC, correct?

A.  I don't -- show me-- if you're going to reference me to a document that's 15 years old, show it to me, please.

Q.  Take a look at Exhibit 15 again.

A.  Okay.  Go ahead.

Page 124

Q.  Tell me where in Exhibit 15 it references no notice.

A.  This isn't the grievance.

Q.  It says your brief describing why American should grant --

A.  Yeah, but that's not the dispositive grievance.  So I -- I don't know what you want out of there.  What do you want?

Q.  I want to know where it says no notice.

A.  It says in the grievance.

Q.  Okay.  But --

A.  The pack isn't decided on the brief, it's decided on the grievance.  Go ahead.

Q.  Okay.  I'm asking where --

A.  Then I'm going to refer you back to the grievance, whichever exhibit that is, and tell you what it says in the first statement.

Q.  I'm going to ask you one more time.  Do not interrupt me.  And if you have a difficulty to do it, we're going to adjourn this and set it for another day.

A.  If you want to -- if you want to take the risk and adjourn this, go ahead.  I'm happy to just answer every question.  I'm here for the duration of seven hours.

Q.  And I expect you to let me speak.

Page 125

A.  I will state, if you adjourn this, I'm not coming back for a second time, so I -- I would just advise you to make the maximum use of your time today, please.  I'm willing to do whatever you need.

MR. SHIFFRIN:  Let me show you what's marked as exhibit -- what we'll mark as Exhibit 19.

(Defendant's Exhibit 19 was marked for identification.)

BY MR. SHIFFRIN:

Q.  You submitted another grievance in 2013, a grievance 1364, correct?

A.  Yes.

Q.  And that was the first time that you contended that APA violated the CBA -- excuse me, that American violated the CBA with respect to your dropping the administrative (indiscernible)?

A.  No, I wouldn't say it's the first time.  The second time.  It's more -- more specific.

Q.  This is the first time that you contended that they violated section 13, is that right?

A.  I think it was implied in grievance 12-011.  They took me off the seniority list with no notice and termination.  So it is -- it was in violation of section 13.  The only basis for removal under section 13, again, the four reasons, retirement, discharge for just cause,

Page 126

resignation, failure to return furlough, none of which occurred for me, but go ahead.

Q.  Okay.  We looked.  You say it's implied, but you don't actually use the word section 13 in --

A.  I was a layman.  I was -- I was deprived of representation.  What I didn't know when I asked for grievance 12-011, that AP had already secretly abandoned representation from Mark Myers and the team because he didn't want to prosecute a risk claim.  So we weren't really being represented.  That was the problem.

Q.  Mr. Meadows, if you cannot answer the question --

A.  I answered the question.

Q.  No, that wasn't answered.

A.  You're talking over me.  Let me finish.  You're going to ask questions.  I'll answer them.  I'm allowed to answer fully.  If you don't like the answer, you can strike it.

Q.  Well, I'd like you to, if you're -- in answering fully, you need to provide an answer to the question.

A.  Okay.

Q.  The word section 13 don't show up in grievance --

A.  Rephrase your question.



Page 127

Q.  The words section 13 don't show up in section -- in grievance 12-011.

A.  Let me look at it. Where's 12-011?  What exhibit number?  Just give me the number, and I'll find it.

MS. RYBAK:  13.

THE WITNESS:  13.  I see 13 at the top of the page.  Yes.  Exhibit 13.  So, no, section 13 does not appear in that.  Again, I was writing this as a layman. I didn't know I have to recite chapter, verse, and I've been told you don't have to, so anyway.  The union filed it properly would have been cited properly.

BY MR. SHIFFRIN:

Q.  And I understand one of your contentions in this lawsuit is that the decision by Captain Wilson to not submit grievance 12-011 to a system board was in retaliation in part.

A.  Yeah.

Q.  When you say in part, what do you mean?

A.  I think there's a lot of reasons.

Q.  What are the reasons?

A.  I think APA, I wasn't aware of at the time, but they made an institutional decision to abandoned representation of the entire MDD group.  Not really the MDD group, but he had them to -- but anyone who had the

Page 128

benefits terminated during the American Airlines corporate medical pilot discipline cost savings reports, which was facilitated by a fraudulent third party reviewer initially hired by AP and American, yes.

Q.  So that was one of the reasons you believe that Mr. -- assuming that Captain Wilson decided not to advance your grievance to the system board?

A.  One reason.  There was -- there was a huge financial motive not to do it.

Q.  Which is what?

A.  Because if my grievance 12-011, which was telegraphed [sic] by Arbitrator Goldberg, was heard and prevailed, or if grievance 12-012 was heard and prevailed, it could result in a precedential a ruling that all the MDD pilots would be reinstated fully retroactive list, which means they're all entitled to equity.  And APA improperly deprived 240 pilots like me of equity, on average, about 100,000 each or $20 million, with 12 years of prejudgment interest at 12 percent, ES&P rate, about $34 million, not to mention the 84 pilots like me who lost our disability benefits. I've received about $2.3 million in disability benefits. I can show you 80 some pilots who have not.  So union's on the hook for about $35 million in deprived equity, improperly deprived equity, go to proceedings, and about

Page 129

$170 million in disability payments, which should have been paid.  And some of these pilots, friends of mine, have committed suicide over this issue.  And Mark Myers is tasked with representing them in the cost savings scheme.  It's a very serious matter.

Q.  Mr. Meadows, you're referring to a process that equity distribution process entered in 2013.

A.  Yes.

Q.  Okay.  And that process is long over, correct?

A.  It's part of this lawsuit.

Q.  Well, you don't have a claim related to it.

A.  I don't have a claim because I want it.  I'm the only one that wanted it, but everyone like me should have been paid their equity.  I received --

Q.  Mr. Meadows --

A.  I'm speaking.  I received four silos of a $138,000.  I can tell you right now --

Q.  Mr. Meadows, there's not a question pending.

A.  Well, I'm -- I'm answering.

Q.  No, you're not answering the question.

A.  I'm answering the question.

Q.  What question are you answering.

A.  Ask your question.

Q.  Thank you.

A.  Go ahead.

Page 130

Q.  Mr. Meadows, you prevailed in the Goldberg arbitration because you had a grievance pending, correct?

A.  No.

Q.  That's what Mr. Goldberg said.

A.  That's not what he said.

Q.  He said that because you had grievance 12-011 pending, you should be treated like other --

A.  That's not what he said.

Q.  Let's take a look at the Goldberg order.

A.  That's not what he said.  I could explain to you if you like.

Q.  No, I'm not -- it's not a question.

A.  Okay.

Q.  Well, in any event, we'll -- we'll leave it alone for right now.

A.  I could tell you what he said.

Q.  Do you represent in this -- this lawsuit is brought only on your own behalf, correct?

A.  For now.

Q.  For -- you think that you -- you're going to amend the lawsuit to add other plaintiffs?

A.  I'm not.

Q.  Who is?

A.  Some people might.



Page 135

Q.   Well, what miss -- what APA told you was that in 2013, was that a grievance had been closed, correct?

A.   That wasn't true.

Q.   That's what they told you, correct?

A.   Well, Judge Lane says it was preserved in 2021 and that Citure opened it and moved into arbitration in January 13, 2024.

Q.   But as of 2013, it was closed?

A.   I never saw any evidence that it was closed.

Q.   Well, you were told that it was closed.

A.   By who?

Q.   Well, first of all, you had been told by Captain Wilson that it was not being submitted to a system board.  We just looked at that, right?

A.   Yeah, but that was erroneous because --

Q.   That's what he told you, right?

A.   I don't -- show me the letter where he says that.

Q.   We just looked at the letter.

A.   Okay.

Q.   We just looked at Exhibit 19?

A.   But it wasn't closed.

Q.   He said it was not being forwarded to a system --

A.   Well, American Airlines said they would

Page 136

arbitrate it contingent on mutual agreement, meaning the Utah litigation, so it wasn't closed.  And in fact, APA tried to settle it in 2017 and it was preserved in 2020 by Judge Lane in bankruptcy court.  And it was opened and moved into an arbitration, order to prosecute it in June of 2024.  So no, it was not closed.  You may want to argue this --

MR. SHIFFRIN:  Take a look at Exhibit 20.

(Defendant's Exhibit 20 was marked for identification.)

BY MR. SHIFFRIN:

Q.   And let's take a look, first of all, at the paragraph.  This is -- you see this is an email chain between you and Chuck Hairston?

A.   Yeah.

Q.   Okay.  And first of all, let's look at the email in the middle of the first page, which is dated January 17, 2014 and that's from you to Chuck Hairston, Tom Copeland, and Ivan Rivera.  Do you see that?

A.   Yes, I see it.

Q.   .  Okay.  And you wrote the first sentence of that reads, in the first clause, it says, I understand that 12-011 is closed.  You wrote those words.

A.   I understand that Keith Wilson said it was closed.  I disagree and so much so, I filed a lawsuit.

Page 137

Q.   So when I asked you if Keith Wilson said it was closed, why didn't you say yes?

A.   I didn't see the letter.  So, yeah.

Q.   I showed you the letter.

A.   So Keith -- if Keith Wilson said it was closed, I don't agree it was closed.

Q.   Okay.

A.   If he said it was closed, I'll agree with that.

Q.   Okay.  So it was as of January 17, 2014, it was closed?

A.   I disagree it was closed.

Q.   Well, you said it was closed.

A.   Temporarily, but I brought a lawsuit.  And it -- the results speak for themselves.  It was never really closed.

Q.   As of this time, it was closed?

A.   They -- they refused to take it to the system board.

Q.   As of this time, you said it was closed?

A.   That's the way they treated it.

Q.   That's the way -- these are your words, correct?

A.   But -- but I -- I just said I -- you -- you're -- you're taking it out of context.  Is -- but I still

Page 138

have remedies that flow from it.  I can still compel arbitration of it.  It still was open.  And, and matter of fact, despite the Utah court ruling, Judge Lane order that it shall be permitted to arbitrated in 2014 and American is agreed to arbitrate contingent on AP -- the only lynchpin why it didn't get arbitrated was America -- APA.

Q.   Because APA considers it closed?

A.   No, APA considers it -- they don't -- they want to retaliate and don't represent me.  That's what the problem was.

Q.   Because APA considered it closed?

A.   No.  APA considered me not to be a member of the bargaining --

Q.   And Judge Lane didn't order that to be arbitrated.  He said it could be arbitrated to the extent permitted by law.  That was his order.

A.   His order was it shall be permitted to be arbitrated, and American Airlines agreed to arbitrate it, so I would disagree with you.

Q.   And APA didn't because it was closed?

A.   I don't know why APA didn't.  I think APA did it for retaliation and for financial motive.

Q.   And you knew before -- and actually, let's take a look at this whole exchange.  And what you --



Page 147

A.   Well, he doesn't know what he's talking about.

Q.   But that was APA's position?

A.   That was his position.

Q.   So you knew, though, that APA wasn't going to preserve it in it's --

A.   I did not know that.  No.

Q.   Well, that's what you had asked --

A.   No -- yeah, I found out they removed the proof of claim without notice to me in a hearing, I think, in March or April.  And Judge Lane was skeptical and said, it looks like APA has removed your grievance or proof of claim, or so it would seem, but he still treated it as a live grievance.  He didn't treat it as removed, but he knew that I submitted the economic report to protect it.

Q.   You say without notice.  But you asked APA before they submitted the proof of claim, and the answer that you received was APA believed the grievance is closed and had no value associated with it, right?

A.   There's a difference between APA saying it's closed and it having value in the bankruptcy.  I'm sorry.  You're conflating preservation in the bankruptcy with closing it and refusing to take it to the system board.  Its' two separate --

Q.   But you asked, and that was the answer that APA gave you?

Page 148

A.   That was his position, not mine.

Q.   But you knew --

A.   I do not agree -- no, I did not know that.

Q.   Okay.

A.   I did not know it was not preserved.  If you're trying to tell me closed equals not preserved, I would disagree strenuously.

Q.   Well, no, he didn't just say close.  He also said no value associated with it at this point, right?

A.   Well, that's been borne out to be absolutely false.

Q.   Well, that's what he said.

A.   Well, he's a liar.  He's fired.

Q.   But he's -- that's what -- everyone's a liar --

A.   Do you understand he's the one that hired the fraudulent medical reviewer with American Airlines?

Q.   Mr. --

A.   Well, we'll talk about that later.

Q.   Okay.  Now, you contended as far back as 2014 that the reason that APA didn't advance your case to a system board was due to retaliation under the LMRDA?

A.   I think we just asked and answered, but we just went over this.  That was part of it.

Q.   I'm asking now in 2014, do you believe that?

Page 149

A.   Rephrase the question, please.

Q.   In 2014, you believed that one of the reasons that APA did not advance your grievance to the system board was due to retaliation?

A.   Which grievance?

Q.   Grievance 12-011?

A.   I think retaliation was a large part of it, but not the only part.

Q.   And that was your position as of March of 2013?

A.   It's always been my position.

Q.   Okay.  And at the time in March of 2014, you had pending a case against APA in Utah and related to grievance 12-011, correct?

A.   What date?

Q.   In -- as of March of 2014?

A.   Do you know the date it was filed?

Q.   February 2014.

A.   Yeah, pending.

Q.   So you had it pending.  And in July of 2014, you amended that complaint in that case to add an LMRDA count, correct?

A.   Yes.

Q.   Okay.  But you didn't add a retaliation count at that time -- claim at that time, did you?

Page 150

A.   I think the only one was the speech claim.

Q.   Why didn't you add a retaliation count?

A.   I don't know if I was smart enough, to be honest.  I should have, but it didn't matter.  They continue to retaliate to present day in that issue.

Q.   Let's switch gears.  I take it you're familiar with grievance 12-012?

A.   Yes.

MR. SHIFFRIN:  Let's take a look at that together.

THE REPORTER:  This would be Exhibit 21?

MR. SHIFFRIN:  Yes.

(Defendant's Exhibit 21 was marked for identification.)

BY MR. SHIFFRIN:

Q.   Do you recognize Exhibit 21 is grievance 12-012?

A.   Yes, I do.

Q.   Okay.  And this was filed -- this agreement filed by Captain Rusty McDaniels and First Officer Russell Knorr.  Do you see that?

A.   That's what it says.  Yes.

Q.   And they were the APA officers for the DFW base at the time?

A.   Yes.  I guess.  Yeah, apparently.



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
151–154

Page 151

Q.   And it's described as a DFW domicile grievance number 12-012?

A.   Yes.

Q.   Okay.  And it's a domicile grievance, correct?

A.   Correct.  Yeah.

Q.   In other words, a base grievance?

A.   Collective grievance.

Q.   A base grievance?

A.   It's called a collective grievance.

Q.   Well, it doesn't say base -- collective grievance.

A.   It is a collective grievance, but go ahead.

Q.   Okay.  And the issues that it raised are, one, failing to reinstate pilots to the pilot seniority system list.  Do you see that?

A.   Yes.

Q.   And two, for failing to provide pilots notice of termination prior to termination, terminating employee status.  And pilots have been in -- on inactive status on paid sick or disability for more than five years.  Do you see that?

A.   Yes.

Q.   And you contend that had this grievance been arbitrated, you would have benefited from it?

A.   Yes.

Page 152

Q.   Why?

A.   Because it would have resulted in the reinstating pilots.  I didn't get proper notice.

Q.   What do you mean what it would have resulted in --

A.   They're protesting the past practice of failing to reinstate pilots to the seniority list.  And also protesting the violation of the collective bargaining agreement for failing to provide notice and for termination, removal, in violation of the collective argument agreement or the agreements.

Q.   Well, I don't see this last part there.

A.   We don't -- well --

Q.   Where does it say that they protest people --

A.   It speaks for itself.  So what's the question?

Q.   Well --

A.   I'm not here to interpret your grievance.  Just ask me a question.

Q.   I -- well, you contend in this case that if 12-012 would have been arbitrated, it would have benefited you?

A.   Absolutely.

Q.   Okay.  Do you believe it would have led to your reinstatement?

A.   Yes.

Page 153

Q.   Even though -- at the time in 2012?  At what point?

A.   Yes.

Q.   Without a seniority -- without a medical certificate?

A.   Do you see anything that requires a medical certificate on that grievance?

Q.   So your position is that --

A.   Shouldn't say medically qualified pilots because we never should have been removed from the list at all.

Q.   And that's your -- your contention is that 12-012 protests your removal from the list at all?

A.   That's what Bennett Boggess said.

Q.   Where does he say that?

A.   In all the emails between him and Susan Twitchill (phonetic), the name recipient for this grievance.

Q.   You're aware that he -- he has a declaration about the meaning of 12-012?

A.   If you're referring to the perjury's declaration that Mark Myers mars attached to his declaration, yes, it's perjurious.  And we can bring in Susan Twitchill and she'll testify to that effect.  I have the grievances.  It says it was to -- intended to

Page 154

seek her senior restatement and others like her and American Airlines subsequently said that grievance applied -- was filed on behalf of me and others like me in Dallas, and resolve my employment status.

Q.   At what point in time?  After you got your medical back?

A.   No.  It never -- it was never conditioned on that.

Q.   So your contention is that you never should have been removed from the seniority list in the first place?

A.   Absolutely not.

Q.   And that 12-012 grieves that?

A.   It says it right there.

Q.   Where?

A.   It says right there, it says failing to provide notice.  I was never given notice.

Q.   Well, notice is one thing.  Notice doesn't mean that you can't be removed.  It means that you need notice before being removed?

A.   Pilots should not have been removed according to the contract.  There's nothing in the contract that provides removal on the basis of disability or sickness.

Q.   Section 11(d).

A.   It does not say that.  If you'd like to pull



Page 155

it out, why don't you pull out section 11(d) and read it to me because it does not say that.  You're misinterpreting the contract.

Q.   Let's take a look back.

A.   Yeah.  You might as well pull out section 13 because we're going to need both.

MR. SHIFFRIN:  Yeah.  Do you know what exhibit this was?

MS. RYBAK:  22.

MR. SHIFFRIN:  Pull out Exhibit 22.

MS. RYBAK:  No, we haven't.

MR. SHIFFRIN:  Sorry.  We're marking what's Exhibit 22.

(Defendant's Exhibit 22 was marked for identification.)

BY MR. SHIFFRIN:

Q.   This is another excerpt of the CBA?

A.   Okay.  The previous contract excerpt, that was on section 21 and 3, is that correct?

Q.   23.

A.   Okay.

Q.   So if we look in Exhibit 22 to the page that's labeled APA Bates stamp 62, which is section 11.

A.   Okay.

Q.   We'll look together at section (d)(1).

Page 156

A.   What version of the contract is this?  What year?

Q.   2003.

A.   Okay.

Q.   This is the one that -- and you'll agree that 2003 was in effect --

A.   Yeah, that would be the operable.  I mean, the language stated largely the same, but I agree.

Q.   Okay.  So then looking at the top of the page, which labeled section 11-2 or APA 63, it says, such leaves of absence for sickness or injury may not exceed a total continuous period of three years unless it ended by mutual consent from the company in the association, in which case, it may not exceed a total continuous period of five years.  Do you see that?

A.   Yes.

Q.   And American and APA have common ground?  That that means after a pilot's been on a period of sick leave -- excuse me, unpaid sick leave or disability for five years, that he or she may be dropped from the seniority list and administratively terminated, correct?

A.   No, that's not correct.

Q.   That's not the position of APA and American?

A.   That's not what they say in three collective grievances, no.  They protested.  No notice, termination

Page 157

--

Q.   And you're saying that 12-012 is one of those grievances?

A.   Well, I -- I mean, if you're go to -- section -- I know you want to ask me questions.  I don't -- I don't want to speak out of turn here, but Section 11(d)(1), the first sentence says, a pilot shall retain and accrue his seniority respective of whether he's not -- to maintain medical -- retention and accrual is not the same as losing seniority.  You'd have to refer to section 13.  I believe it's section 13(b), but retention only has to do with your relative position, not your total seniority, which would be a loss.

Q.   And then that same section says that a period of sick leave may not last for more to five years, correct?

A.   May not last.  For what purpose?

Q.   May not exceed a total continuous period of five years.

A.   In which case, you would slide backwards list and cease to retain it for your relative position.  But in practice, American's never done.  They've always reinstated everybody to their original relative position.  Even if they've been out 20 plus years.

Q.   In any event, APA and American have had the

Page 158

same understanding on that?

A.   I don't think so because there's three grievances that say otherwise.  And Mark Myers filed one of 1154.

Q.   And one of those grievances would been 12-012?

A.   Yeah.

Q.   Okay.  Where does it say otherwise?

A.   It says failing restate policy -- because -- so the implication is they were terminated and removed in violation agreements without notice.

Q.   So they -- I see that it reads the notice, but where does it say that no one can ever be removed?

A.   Well, why would you file a grievance?  The whole grievance -- the purpose of grievance filing, people are removed from the list and allegedly terminated in violation of the contract and is seeking to reinstate the ones who were removed and wanted to come back.  But it -- and that was the past practice.

Q.   The past practice was to return people to the list after they --

A.   Every single person except for Lawrence Meadows.

Q.   After they got their medical?

A.   Yeah, but I think reading this thing and Arbitrator Goldberg said the same thing, that it was



Page 159

never conditioned on the medical -- she never should have been removed. Medical qualifications are required to stay in the seniority list. That's just a subjective interpretation by American Airlines.

Q. The past practice, though, had only been to return people to a seniority list after they regain their medical?

A. I would say that in December 13th, 2016, the governing body of the APA, the board of directors passed Resolution 2016-30 and they said that pilots like me removed -- were removed due to subjective reinterpretation of section 11(d)(1). The company subjectively reinterpreted it. The union aggressively defended it until they rolled over and capitulate because they realized that if these grievance were resolved favorably, it would cost them the equity. That's the problem.

Q. Mr. Meadows, we'll get to 1630, but the past practice has always been --

A. To reinstate every single pilot who's removed from the list to the original relative position.

Q. After they regain their medical certificate, correct?

A. That's never been put in writing. As a matter of fact, there's other resolutions for seniority

Page 160

reinstatement, I think Resolution 2014 and 2007-dash-whatever, they're not conditioned on medical certification. I would disagree to the medical certification requirement. That's kind of been treated that way, but it's not a requirement in the contract because the removal is extra contractual.

Q. It's treated that way by both American Airlines and APA?

A. By American.

Q. How about APA?

A. APA's been all over the map in this thing. They changed their position after the equity --

Q. Well, APA's told you that it wouldn't seek to reinstate you to the list until you got your medical.

A. Yeah. I got the medical. They still wouldn't reinstatement me.

Q. They sought your reinstatement.

A. No, they didn't.

Q. You don't think they sought your reinstatement?

A. No, not really.

Q. Not really?

A. Yes.

Q. Didn't Dan --

A. We can get to that later.

Page 161

Q. Didn't Dan Carey send multiple communications to --

A. No, Dan Carey never sent a return of work letter like the other 55 pilots had sent the VP of flight. He sent an informal email.

Q. And then there was another letter that went out.

A. There was not an official return to work letter.

Q. You asked for one from Mark Myers, and he provided you the one that was sent, right?

A. That was not the official return to work letter that was sent for every other pilot.

Q. Why do you --

A. I have been treated disparately compared to every single pilot at American Airlines in the MDD status.

Q. What's your evidence of that?

A. I have every single return work letter for every one of those pilots returned, and I don't have a letter like that.

Q. What's the difference?

A. Big difference. I don't know. Difference in the letters that were sent. It is substantial.

Q. Tell me --

Page 162

A. It's signed by the president, signed by the VP of flight. Is countersigned. Is a formal letter. And when Dan Carey sought my reinstatement, he called me the day after Christmas and told me he spoke to Kimball Stone personally, sent Kimball Stone, like, an informal email, and came back and said, you're going to have your training date by mid January. Kimball agreed to bring me back the day after Christmas, he demand I give him a base and crew position on the spot. I was shocked. But the -- in the end, the communication with him, the VP of flight, was very informal, whereas the other pilots, it was very formal.

Q. Let's take a look at it together so that we actually have the facts in front of us.

A. Okay.

Q. You'd agree with me that in order to be reinstated, American would have to agree to reinstate you, correct?

A. I do not agree. Dan Carey and Ed Citure both told me APA owns the seniority list. I disagree.

Q. The company's position has been always that they own the seniority list, correct?

A. No.

Q. You don't believe the company believes it owns the seniority list?



Page 163

A.   No.  I believe APA believes it owned the seniority list.

Q.   Based on what?

A.   Based on the searches of Dan Carey and Ed Citure.  Union owns the list.  All unions own seniority lists, but Carey and Citure both serve that.

Q.   Let's actually -- I know we're jumping around and we'll get to this.  Let's stay on the exhibit that you have in front of you with the CBA, which is Exhibit 22.

A.   Okay.  Section 11?

Q.   Let's go to section 15.

A.   Okay.  That's in the back?

Q.   I'm sorry.

A.   I have two sections -- okay.  I got section 13.  Do you have multiple contracts in the same exhibit?  Is that what you got going on here?

Q.   Multiple sections of the same contract.

A.   Well --

Q.   It's an excerpt.

A.   I have -- is that what you're looking for?

Q.   Yes.  Thank you.

A.   It was stuck to mine.

Q.   Okay.

A.   I was wondering why it had a separate CBA.

Page 164

Q.   Understand?

A.   Makes sense.

Q.   Looking at section 13(g), this is on page -- section 13-2.  It says, seniority list applied by the company.  The company shall make available to each pilot within 30 days of July 1st of each year a pilot system seniority list, effective July 1st, which contains the names of all pilots arranged in the order of system seniority that are active or inactive and the seniority date of each pilot.  So it's the company that owns the seniority list, correct?

A.   It does not say that.

Q.   I didn't -- those words I read are not accurate?

A.   It does not say the company owns -- it says the -- and James Anderson says he administered it.

Q.   Okay.  And you think that APA can add or remove people from the seniority list?

A.   I think they control the list.  They own it.

Q.   What does that mean?

A.   They own it.  I think if AP wanted to get me back, I'd be back.

Q.   Who decides who's on it?

A.   Well, you get hired by American Airlines as a condition, and you get on the seniority list.

Page 165

Q.   Okay.  And APA can't hire people to be on the list?

A.   They can't hire people, but they -- they keep people on the list.  They decide who stays on the list, who goes back on it.  And they -- no, no one's ever really removed from the list or administratively dropped, okay?  And it's just a paper chase exercise.  It's designed to keep the three XP clear and not encumbered by a bunch of disabled pilots.

Q.   American removed you from the list, right?  We looked at all those documents.  They said we are removing you from the list.

A.   They say I was administratively dropped.

Q.   Okay.  And they did that, right?  It wasn't APA who did that?

A.   I don't know.  I don't really know.  It was kind of a black hole.

Q.   What American said --

A.   Depends who you're talking to.

Q.   And looking at section 13(a), it says, seniority as a pilot shall be based on the length of service as a flight deck operating crew members with the company except as otherwise provided in section 11 and section 12 of this agreement.

A.   I agree with that.

Page 166

Q.   Okay.  And so section 11 -- so we looked at that.  It contained a five year --

A.   Okay.  Yeah.  Well, section 11, you're going to talk about section 11.  I'm going to refer you section 11(d)(1) back to section 12(c).

Q.   12(c)?

A.   Yeah.  A pilot, once having established seniority, shall not lose such seniority except as provided in this section.  The only chance for loss of seniority is Paragraph F, none of which occurred to me.

Q.   Yeah, but section A says that as an exception to everything in section 11 -- section 11 and section 12, right?

A.   No.

Q.   You don't read those words?

A.   No, I don't.

Q.   Okay.  And -- but in any event, you made this argument about section 13 in your grievance 1364.

A.   Yes.

Q.   Okay.  And APA didn't advance that to a system board?

A.   No.

Q.   And you sued APA over its decision not to do so in your Utah case, right?

A.   For 1364?  I'm not sure.  I can't remember.



Page 167

Did I?

Q. You don't remember if there was two grievances at issue in this case?

A. That's like 12 years ago.

Q. So whatever that case says?

A. Well, I -- whatever it says, it says, but I don't remember. I really don't.

Q. Okay.

A. That's like ancient history.

Q. Let's get back to --

A. I've had multiple grievance. I have 12-011. I think there's a 14 something, 1364. And the only reason I was -- I was filing these grievances to get a voice with the VP of flight because --

Q. There's not a question pending, sir.

A. Well, okay. You want -- you were asking. But I -- I don't -- I really don't recall. I know 12-011 was part of the lawsuit.

Q. And -- okay. If you -- you -- one of your claims in this case is that APA has failed to arbitrate 12-012, correct?

A. Yes.

Q. So if you could go before an arbitrator on grievance 12-012, what would you argue?

A. You're asking my legal strategy. Ask me a

Page 168

fact.

Q. No, I'm asking --

A. I'm not obligating you my legal arguments. I object.

Q. Again, it's going to be your burden in this case to show that you would prevail --

A. My pleadings will speak for themselves. What would you like --

Q. Well, this is -- this is my opportunity --

A. No, it's not your opportunity to litigate the case. You have to ask me fact questions.

Q. Well, it's my opportunity to conduct -- it is a fact question.

A. What's the fact?

Q. As a fact question is what are the facts that would show that you would prevail?

A. Calling for speculation. I object to that, too.

Q. You still have to answer.

A. Okay. It was speculation. I think the facts are clear. The contract does not provide for administrative separation in any shape or form, only for discharge for just cause, which isn't the case for me. The contract does not provide for total loss of seniority for sick leave, only for ceasing to retain or

Page 169

accrue seniority, which relates to your relative seniority as referenced in section 13(c). That's clear. The loss of seniority can only occur in four instances, resignation, discharge for just cause, which didn't occur here. If it did, I would have been given due process under section 21 of initial notice investigation hearing and final notice of chief pilot superior, which didn't happen here.

Retirement, furlough -- interestingly, in the secret settlement where they carved me out, one of the guys retired. He un-retired, and they bring him back. So that's pretty specious, so -- but --

Q. I'm asking -- okay. Mr. Meadows, and those are all reasons that you believe are contained in grievance 12-012?

A. 12-012 is clear. It protests the no notice rule of termination because the company never had authority to remove a terminated pilot, medical or not off the seniority list. And they've testified that we were only administratively dropped. We're never really removed. It's just a bookkeeping exercise the seniority is clean until pilots get their medical and get returned to active services. And that's by the testimony of James Anderson, Senior Principal of Flight. And you can look it up. I've submitted it in my opposition to my

Page 170

motion to dismiss. It's in the record.

Q. But your testimony is, everything you just said is part of grievance 12-012?

A. I believe 12-012, it speaks on its face.

Q. So whatever 12-012 says --

A. And American Airlines admitted in federal court it applies to me. It will resolve my employment status. And it never -- and also, they asserted that it shall -- shall be arbitrated to the railway system board, but it was secretly de-scheduled and mediated with the attorney the union hired for me against my adversarial attorneys from American in a very dirty backroom deal that the board of directors didn't sign off on. Go ahead.

Q. This is probably an appropriate time for a lunch break, I would say. How do you feel about that?

A. I want to keep going, but how long -- how long --

Q. Well, let me look at the other people who are also here working.

A. I'll go consensus in the room. Yeah.

Q. Would you like a lunch now or do you want to keep going? Whatever? Sorry.

THE REPORTER: Whenever counsel finds it appropriate, I'm okay with it. I'll accommodate.



Page 171

MR. SHIFFRIN: I bet you this is an appropriate time. Let's take a lunch break.

THE WITNESS: How long can we have?

MR. SHIFFRIN: How long do you want?

THE WITNESS: An hour? I'll stay as late as you like. I'd like to go to Casa Tua.

MR. SHIFFRIN: I just -- we're trying to get home tonight, so I was going to suggest --

THE WITNESS: Do you have a flight tonight?

MR. SHIFFRIN: Yes.

THE WITNESS: Okay.

MR. SHIFFRIN: I'm going to suggest 45 minutes.

THE WITNESS: That's fine.

MR. SHIFFRIN: Okay. There's sandwiches downstairs. Off the record. Sorry.

THE VIDEOGRAPHER: The time is 12:38 p.m. We're going off the record.

(Recess from 12:38 p.m. to 1:37 p.m.)

THE VIDEOGRAPHER: The time is now 1:37 p.m. We're back on the record.

MR. MEADOWS: I don't have the stack of exhibits.

MR. SHIFFRIN: Did you take them with you? Here. I'm sorry. Well, also, the court reporter will

Page 172

have a set and can append a set to the deposition transcript.

THE WITNESS: Okay. I think I organized here. Okay. I think these are mine. Whatever. I wrote my line right there.

MR. SHIFFRIN: All right. That will be your set.

BY MR. SHIFFRIN:

Q. Mr. Meadows, we just took a lunch break.

A. Yes.

Q. On that lunch break, did you discuss your testimony with anyone?

A. No. I enjoyed my nice Italian lunch at Casa Patelo (phonetic).

Q. Excellent choice.

A. You've been there?

Q. Yes.

A. Okay.

Q. So we're going to talk -- there's claims in your case related to the seniority integration process that took place between 2013 and 2016, is that right?

A. Yes.

Q. Okay. And so we have common ground. There was a merger that occurred between American Airlines and US Airways in that time period?

Page 173

A. Yes.

Q. Okay. And in connection with that merger, the pilot seniority list at United -- excuse me. In connection with that merger, the pilot seniority list between American Airlines and the one at US Airways were merged together?

A. Yes.

Q. And pilots care a great deal about their placement on the seniority list?

A. Seniority is everything. Pilot's kryptonite.

Q. Why do you say that?

A. It controls every aspect of your life, where you live, what equipment you fly, what trips you get, what days off you. Its' absolutely 100 percent controlling. Most valuable thing to a pilot. It's not portable. Can't take it with you when you go.

Q. And some of those aspects that you just described also then determine your compensation, is that right?

A. Yes.

Q. Okay. And so when airlines merge the integration of the seniority list is fair to say it's a big deal?

A. Yes.

Q. Okay. And there's often a process of

Page 174

arbitration that takes place in which different committees represent the interests of the different pilot groups that are being merged together, is that right?

A. Yes.

Q. Okay. And that's what occurred in the -- at American Airlines when the merger between The US Airways and American --

A. Yeah. Fully integrated. So those proceedings occurred between 2014 and '16 when we decided to.

Q. Yes. And there was an arbitration panel with three arbitrators who issued a integrated seniority list?

A. I believe so.

Q. Okay. And leading up to that process, there were actually -- so in participating in that arbitration process, there were three committees. Do you recall that?

A. I recall the AASPIC.

Q. Say that again.

A. AASPIC, American Airlines Seniority -- I think.

Q. Yeah. So there was on behalf -- there was a committee that represented the interests of, I'll call the legacy American pilots. Does that make sense?



Page 191

legal or any officer of APA that ever said they were refusing to prosecute it.  I just took it as a refusal because they ignored it.

Q.   And then I think you filed a complaint with the -- what was called the dispute resolution committee?

A.   Correct.  That was what I was speaking to earlier, the US Airways.

Q.   Right.  And that complaint was denied in January of 2017, correct?

A.   What was the date on that complaint versus the grievance?

Q.   The date on the grievance was March 21st.

A.   Yeah.  What was the date of the dispute resolution thing?

Q.   I'll show you.

A.   Okay.  Okay.

(Defendant's Exhibit 28 was marked for identification.)

BY MR. SHIFFRIN:

Q.   I've just handed you Exhibit 29.  Is this the dispute resolution claim that you had submitted?

A.   I think these are US Airways guys I was writing to.

THE REPORTER:  For the record, this is Exhibit 28.

Page 192

MR. SHIFFRIN:  Oh, thank you.

MS. RYBAK:  Yes.  Sorry.

MR. SHIFFRIN:  Exhibit -- we'll mark this as Exhibit 28.

THE WITNESS:  This is 28?  Sure.

BY MR. SHIFFRIN:

Q.   Yeah.

A.   Thank you.  Okay.  So you want to read it first?

Q.   I'm asking you to confirm that this was the claim that you submitted to the -- this resolution committee?

A.   It was signed by me, so yes, I --

Q.   Okay.  And you submitted this on November 9, 2016?

A.   Yes.

Q.   And at that point, the seniority integration list award had already been published and finalized by the arbitration panel?

A.   I don't know what date was that.

Q.   In September of 2016.

A.   Assumes facts not in evidence.  Unless you show me something, I'll object.

Q.   Okay.  Let's take a look at Paragraph 24 of Exhibit 28, which reads, on or around mid September

Page 193

2016, I carefully reviewed the 60 page final SLI decision and award.  Do you see that?

A.   Paragraph 28?

Q.   Excuse me.  No, it's Exhibit 28, Paragraph 24.  Is that -- and that -- does that refresh your recollection that the seniority award was published in September 2016?

A.   I said it, so.  I don't recall it, but I -- those are my words, so I said it.

Q.   Okay.  And the dispute resolution committee denied your claim, correct?

A.   I don't know.  Is there a denial?

Q.   I'll -- we'll show that to you next.

MS. RYBAK:  What's the exhibit number?

THE REPORTER:  The last one was Exhibit 28.  So this will be 29.

(Defendant's Exhibit 29 was marked for identification.)

BY MR. SHIFFRIN:

Q.   I'm showing you what's Exhibit 29.  Well, which is the -- I'll show you the attachment in a minute, but do you see Exhibit 29 is an email to you from is ISL claim dated Monday, 9th of January of 2017?

A.   Yes.

Q.   Okay.  And that's the date that you received a

Page 194

response from the SP resolution committee?

A.   Apparently.  Okay.  It says see my resolution of claim.  So this -- is that not what this is?  This says -- Exhibit 28 is my dispute resolution claim.

Q.   Right.

A.   I'm asking them to review my dispute resolution complaint brief in exhibits.  So I'm assuming there's a different document than this.

Q.   Well, this, I'll say that -- well, this -- well we'll look -- Exhibit 29, just so we clear, is an email chain, right?

A.   Yeah.  It was referencing a resolution complaint with exhibits, which 28 is not.

Q.   The first exhibit in -- the first email references that, and then there's a response to that email on December 1, 2016 that says, your submission received, right?

A.   So I'm asking you, are they talking about this submission or another submission?

Q.   I don't know.

A.   This doesn't sound like the same thing.

Q.   I don't know, sir.

A.   Well, I don't think it is.

Q.   It's your emails.  Okay.

A.   Yeah, they're my emails, but there -- there's



Page 195

a gap.  There's something missing.

Q.  Well, Exhibit 28 is what is produced by you.

A.  I understand.  There's another submission between 28 and 29, I believe.

Q.  Okay.  In any event, they deny your submission, correct?

A.  What it says.

(Defendant's Exhibit 30 was marked for identification.)

BY MR. SHIFFRIN:

Q.  Okay.  And I will show you Exhibit 30, which is the actual denial, is that right?

A.  Was this sent to me?

Q.  This would have been the attachment, I believe, to Exhibit 29.

A.  There's no -- no indication that's where it came from.

Q.  Okay.  You don't agree that you're -- I mean, you allege in your complaint, I believe --

A.  -- I don't know.  You're asking me to attest to a document that has no connection to this document.

Q.  Fair enough.

A.  So I can't say that.

Q.  Okay.  But set the documents aside, you agree that the DRC denied your claim?

Page 196

A.  I believe they denied it.  Otherwise, I wouldn't have been prosecuting MOU grievance.  And I also brought charges through the Article 7 process and the same thing.

Q.  Okay.  Let's -- you understood, though, that your -- the statute of limitations on any claims that you wanted to raise about the seniority integration process ran from the denial of the DRC claim on January 9?

A.  No, I believe that they never prosecuted the grievance in this -- the MOU grievance, I believe, has never been heard, never been denied, and is still open.

Q.  Let's take a look at -- I'll show you -- this will be Exhibit?

MS. RYBAK:  31.

MR. SHIFFRIN:  31.

THE WITNESS:  There's no evidence that the MOU grievance was ever addressed by APA.  It was never denied.

(Defendant's Exhibit 31 was marked for identification.)

BY MR. SHIFFRIN:

Q.  Aside from your words saying that it was --

A.  It was never -- there's no denial letter.

Q.  Right.

Page 197

A.  It was not denied.  There's no -- there's no evidence of a denial.

Q.  Except for your --

A.  No -- that -- your -- your -- no, you're not going to put words in my mouth.  Not my -- my testimony is APA never acknowledged the receipt of that grievance even though they were asked to.  They never gave me any response to it whatsoever, much less a decision or a denial.  American Airlines strenuously objected to it and, and forcibly demand that I withdraw, which I did not.  I refused.  And this is a lot of emails that you probably have between me and Mark Robertson.  You probably produce them because you -- that grievance is treated as hot and active by Mark Roberts.  He was very threatened by it.

Q.  Well, he told you to remove -- withdraw it because they had -- were -- obtained an injunction against you filing grievances.

A.  Correct.  No, he did not.  That's what he said in his letter, pre petition, but that's a pre petition he demanded.  Do you understand the different between pre petition and post petition?  So that grievance -- no, I'm speaking.  That grievance -- the grievance was filed after the actually had nothing to do with the bankruptcy claims.

Page 198

Q.  Mr. Robertson said --

A.  I don't care what Mr. Robertson said.

Q.  You have to let --

A.  I object.  Hearsay.

Q.  Mr. Meadows, you have to let me speak.

A.  Well, you -- I'm not going to let you put words into the record.  They're from someone else and not you and not directly --

Q.  We can look at the letter -- we can look at the letter together.  Let's look at Exhibit 31 together.  I'm going to direct you to the second page of it.

A.  Exhibit 31?

Q.  Yes.

A.  Okay.

Q.  And you'll see it's an email chain between you -- the first email is an email from you to Dan Carey dated July 28.  But what I want you to look at is an email on the prior page from you to Jim Clarke.  Do you see that on July 27, 2017?

A.  July 27, the one in the bottom?

Q.  Yeah.  Hold on.  Apologize.  One second.  This is not the right document.  Let me -- you can set 31 aside.  It's my fault.

A.  Okay.  Go ahead.

Q.  One second.



Page 199

A. So yeah.  This is in relation to --

Q. There's no question pending, sir.

A. I'm glad you brought that up, though.

MR. SHIFFRIN:  We'll mark Exhibit 32.  Exhibit 31 will remain Exhibit 31.

MS. RYBAK:  Thank you.

MR. SHIFFRIN:  This is Exhibit 32.

(Defendant's Exhibit 32 was marked for identification.)

BY MR. SHIFFRIN:

Q. Do you see Exhibit 32 is an email that you sent to Jim Clark and George Buckley on June 30, 2017.  Do you see that?

A. Yes, I do.

Q. And at the time, George Buckley was the general counsel of APA, is that right?

A. Yeah.  It was before he was forced out by Jim Clark.  Yes.

Q. By -- okay.  And Jim Clarke is an attorney who does work for APA?

A. He doesn't work for APA, no.

Q. He's not an -- is he the attorney for APA?

A. He's a contractor for APA who does legal work for APA.  Yes.

Q. Okay.  And in your email to Jim Clarke, you

Page 200

wrote, first one -- I'm looking now at the second paragraph of this email that you sent.  You wrote, as mentioned -- as I mentioned, main concern is that I have a looming SLIDFR claim deadline.  Do you see what I'm referring to?

A. Yep.

Q. For which I exhausted internal remedies via an ISLDDRC complaint.  Do you see that?

A. Yep.

Q. And which we looked at together, right?

A. Yes.

Q. Which was denied by the committee on 1/8/17.  Do you see that?

A. Yes.

Q. We looked at that together, right?

A. Yes.

Q. And so you wrote so my six month DFRSOL is 7/8/17.  Do you see that?

A. Yeah.

Q. And SOL refers to statute limitations, correct?

A. Yes.

Q. And you were asking Jim Clarke whether APA would enter into a tolling agreement for your DFR plan?

A. Right.

Page 201

Q. Okay.  And you did not file your complaint by 7/8/17, did you?

A. Didn't need to.

Q. Why?

A. Because I was still exhausting internal remedies through the Article 7 process.  And APA went through great pains in the Utah litigation to deprive me of my federal rights under the LMRD and forced me into Article 7 process, even though at the time, I wasn't aware that there's jurisprudence in the body of law of the APA appeals board that the system were -- or the appeals board cannot decide federal laws of the land.  But I had been pursuing charges under Article 7 related to the SLI, which they refused to hear.  And I filed an appeal.  And that was pending until they changed my membership status and said I was no longer member in good standing, could prosecute that.  And that occurred in October of '17 and I brought this lawsuit right after that.

Q. You're referring to charges that you filed against the AAPSIC members individually?

A. Yes.

Q. Okay.  And that would have been filed under the Article 7 procedures under the APA constitution?

A. Yes, it was.

Page 202

Q. And by the time you filed it, the list had already been published, right?

A. I don't recall.

Q. Okay.  I'll show you --

A. There wasn't resolution on the MOU grievance.  Everything was just hanging, so.

Q. Well, you -- whether there was or wasn't, your email said APA had refused to process it, right?

A. Process what?

Q. Your MOU agreement?

A. They never said they refused to process.  They just ignored it.

Q. You lied in your email?

A. I didn't lie.  They -- they -- my -- my statement, they refused it, they ignored it, and they ignored it and didn't respond to me.  They never gave me a definitive response.  So you could deem that a denial or whatever you want to call it.  But they didn't respond, and they owed me a response.  They never confirmed receipt.  However, American Airlines did, Helen, you did, and Mark Robertson did.

(Defendant's Exhibit 33 was marked for identification.)

BY MR. SHIFFRIN:

Q. Mark -- so Exhibit 33, this is the charge,



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
203–206

Page 203

your demand to file Article 7 charges against absent members, correct?

A.  This is 33 we're looking at now?

Q.  Yes.

A.  Okay.

Q.  That's what it is.  This is your -- these are your charges against the absent members?

A.  I'm looking.  Yes.

Q.  And this was -- you submitted this document December 19, 2016, correct?

A.  That's what it states.

Q.  Might have been two months after this seniority list has been published, correct?

A.  Yes.

Q.  And you were not on that seniority list when it was published in September 2016?

A.  Again, I don't see the list and I can't attest to whether I was on or off it.  I don't see it.

Q.  And the relief that you sought on -- looking at Page 5 is the AAPSIC members should be held to account for failure to comply with their duties, correct?

A.  Which charge number?

Q.  I'm looking under -- on -- under relief sought on Page 5 of your document.

Page 204

A.  Yeah.  I believe they violated it, constitutional bylaws.

Q.  And had you succeeded in that, this would not have put you on the seniority list, correct?

A.  It would have been the first step.

Q.  How could the appeals board, an internal board within APA have added you to the seniority list?

A.  Well, at the time, I didn't know.  But at the time, APA, as former general counsel, James Hoffman misrepresented to the federal judge I had to exhaust remedies through Article 7 before I could sue them in federal court.  So I couldn't sue in the Railway Labor Act for DFR until exhausted my appeal board charges.  And that's what I was told by James M. Hoffman.  And that's why the (indiscernible) claim was so delayed in this case because I had to spend three years spinning my wheels in a futile process in Article 7, and the same thing here.  In an abundance of caution, I continued to Article 7 until I fully exhausted.  I never got to fully exhausted because their way of dealing with me, and that was to strip away my membership rights as a member of good standing and stop that process.

Q.  You didn't seek in the relief under this Article 7 charges to be put on the seniority list, correct?

Page 205

A.  I couldn't because it's an administrative remedy, and it's the first step to -- going to -- the next step to ADFR claim.  You're familiar with the concept of exacting administrative remedies, correct?

Q.  Well, I'll ask the questions.

A.  Okay.  Well, that's what I'm explaining to you.

Q.  You have claims in your case in which you contend that you should be treated as an active member of APA in good standing, is that right?

A.  Which part of the case?

Q.  If you have counts -- I believe they're six and seven.

A.  The complaint speaks for itself.  Unless you put it in front of me.  I'm not going to assert anything unless I see it.

Q.  You don't recall what this -- what you've alleged in your amended complaint?

A.  Do I recall 311 paragraphs over 110 pages verbatim?  No.

Q.  You don't recall what claims you made in this case?

A.  I have a general idea of the claims.  Yes.

Q.  And among the claims is that APA violated the LMRDA, correct?

Page 206

A.  In many ways, yes.

Q.  And one of the ways that you claim that they violated the LMRDA is by not affording you full rights as an active member in good standing of APA?

A.  There's a whole passage on how APA widely inconsistent positions members as it suits their needs from tribunal to tribunal or forum to forum from being a member, active member of good standing to an inactive member of good standing to being an inactive member of no standing, to being not a member, to being locked out, to being -- come full circle, being declared a member, a good -- inactive member in good standing, appointed to a national committee, only have my membership stripped away by the committee.

Q.  So the answer is yes?

A.  Which answer?  What question?  What point in time?  I have memberships all over the map.  I've been a member in good standing to an inactive member to non member as a member of good standing repeatedly.

Q.  What you've sued for is to be treated as a --

A.  Yeah, because the union --

Q.  You got to let me finish, sir.

A.  Okay.

Q.  Let me finish.

A.  Ask the question.



Page 211

it's of no force and effect under federal law.  And you're familiar with Robert's rules that governs APA in the hierarchy of laws that go federal, state corporate charter, and constitution of bylaws.  And the constitution of bylaws is meaningless under the federal law.  So no matter what the APCB says, it cannot trump the federal statute of the LMRDA Railway Labor Act.  And that's in jurisprudence.  And I think in Annabell versus Wissing and the two other cases in APA that say that.  So I would strenuously object that inactive is a red herring, so continue your question.

Q.  I actually didn't ask the question.  So Mr. Meadows, you -- I take it from Paragraph 316, you took issue with the presidential interpretation that president -- well, let me just finish my question, sir.  President Wilson --

A.  I thought you were going to ask me something, I took issue with it.

Q.  I haven't said anything yet.  You have to wait until I finish my question.  Okay.  I'll start over.  I take it that you take issue with the interpretation that President Wilson made in June of 2016, finding that MDD pilots were inactive members of ADA.  That's a yes or no question.

A.  Yes.  And that was -- that interpretation was

Page 212

left on Keith Wilson's desk for Dan Carey's last day in office, clearly to cover up his tracks for something.  I don't know why, but --

Q.  And then you had in connection with Article 7 charges that you filed against President Wilson, you had an opportunity to litigate the question of whether you're an active or inactive member before Arbitrator Valderdi, correct?

A.  Mm-hmm.

Q.  And you put on evidence before Arbitrator Valderdi, correct?

A.  Correct.

Q.  And you made arguments to Arbitrator Valderdi?

A.  What I learned later was Arbitrator Valderdi did not have authority to determine the LMRDA claim.

Q.  Well, and he -- and he didn't determine the questioning as a matter of LMRDA, right?

A.  Of the constitutional bylaws only.

Q.  Okay.  He made a determination, Arbitrator Valderdi made a determination that you were an inactive member under the terms of the APA constitution and bylaws, right?

A.  That's what he said.

Q.  Okay.  In his award?

A.  Again, that award has been -- it's trumped by

Page 213

the LMRDA and it's trumped by the subsequent constitutional determination [sic].

Q.  Okay.  And you threatened to sue to overturn the Valderdi award, correct?

A.  Did I?

Q.  Let's take a look.

A.  Did I threaten or did I sue?

(Defendant's Exhibit 35 was marked for identification.)

BY MR. SHIFFRIN:

Q.  I'll show you what's marked as Exhibit 35.  Exhibit 35 is an email that you sent on Saturday, February 25, 2017 to an email address as AAA Mary Jari, J-A-R-I, that was cc'd to a number of people, including Keith Wilson, secretary and treasurer at Allied Pilots, president of Allied Pilots, George Buckley, Jim Clarke, including Edward Valderdi.  Do you see that?

A.  Yeah, I do.

Q.  Okay.  And you wrote, Ms. Jari, please advise Arbitrator Valderdi that he has failed to provide conflict disclosures as required under AAA rules as -- and requested.  Do you see where I'm reading?

A.  Yes, I do.

Q.  And then you wrote, it is outrageous that he refuses to correct his obvious errors of fact and law

Page 214

and refused to correct his error of exceeding his jurisdiction and authority by imposed -- by improperly assessing the fees.  Do you see that?

A.  Yes.

Q.  You wrote, his behavior is that of a corrupt arbitrator, right?

A.  Yeah.

Q.  Those were your words?

A.  Yeah, it was, because he was -- he was working for APA and other jobs.  He's conflicted.

Q.  Okay.  And then you wrote, please advise him that we will be sending disciplined complaints that AAA is seeking to overturn in federal court.  Do you see that?

A.  Mm-hmm.

Q.  Okay.  And you wrote that, right?

A.  Mm-hmm.

Q.  Did you send disciplinary complaints to AAA?

A.  I don't think I did.

Q.  Okay.

A.  I'm not sure.  I don't remember, but another pilot had informed me of all his outside work with APA getting paid to collect dues from non members.  And he was conflicted.  He should never heard of this matter.

Q.  But ultimately, you never --



Page 215

A.   Was a former national officer, by the way, that gave me that information, so I wasn't aware of.

Q.   But you never filed a lawsuit to overturn his award?

A.   I didn't need to.  I brought this lawsuit because, again, he was -- he was dabbling in federal law ruling related to my membership in LMRDA.  And he -- I think -- and I think he's the one that talked about the hierarchy of laws, if I remember correctly, he's the one that said that the CNB in Article 7 cannot adjudicate labor laws of the land, yet, that's exactly what he tried to do.

Q.   Well, he -- whatever his rulings are, they speak for themselves, right?

A.   But they're -- they're relevant.  They've been overruled by the Emory case.

Q.   Well, the Emory case didn't opine on whether MDD pilots were full members, did it?

A.   It said she is a member in good standing, but, yeah.

Q.   No, it doesn't say that.

A.   Okay.  Well, this would be the first case we'll get to decide that question of law in this case because it's pretty clear.  But go ahead.

Q.   And now, President Carey issued a presidential

Page 216

interpretation that told you --

A.   Yet another one.

Q.   Can I just finish my questions?

A.   Yes.

Q.   President Carey issued a residential interpretation in October of 2017, is that right?

A.   Is that the third or second interpretation?  I lost track.

(Defendant's Exhibit 36 was marked for identification.)

MR. SHIFFRIN:  I'm showing what's Exhibit 36.

THE WITNESS:  That's the one written by Mark Myers?

BY MR. SHIFFRIN:

Q.   Well, it's signed by Dan Carey --

A.   Written by Mark Myers.  Go ahead.

Q.   And in this interpretation, this is a presidential interpretation.  It's dated October 18, 2017, assigned by Dan Carey.  It has a Meadows Bates number.  Do you see that?

A.   I see it.

Q.   Okay.  And in this presidential interpretation, he cites to the Valderdi award, correct?

A.   Correct.

Q.   Okay.  And that was the basis for his

Page 217

interpretation?

A.   Yeah.  The award has no (indiscernible) value, correct.

Q.   Okay.  But he made an interpretation that was consistent with that award.

A.   He did.

Q.   Okay.  And was this award retaliatory?  Excuse me.  Was this decision retaliatory?

A.   Well, according to Rob Sprock, it was corrupt.  But regardless, it's been overturned.  I'm not as is superceded by a subsequent -- yet another constitution revision of membership, believe it or not.

Q.   You allege in your complaint that this interpretation was retaliatory, and I'm trying to understand.

A.   Yeah, I believe it was.  Well, I -- the purpose of this interpretation was to strip away my good standing status and cease my Article 7 charges against the seniority committee.  That was the whole purpose.

Q.   But it was already --

A.   Let me -- let me finish my answer.  So after the union lied to the federal judge in Utah and said I had to exhaust internal remedies under Article 7, which didn't exist for the RDA, I spent years doing that.  And as an abundance of caution, I felt like I had to exhaust

Page 218

my remedies, probably filling another DFR claim for the MOU grievance.  I filed those.  And when union didn't like where it was going and the people were going to get put under oath in the AAPSIC, they change my membership status because you have to member standing to prosecute those charges.  So I no longer have a right.  And that's why the -- one of the reasons why this lawsuit was brought was this letter.

Q.   What's your evidence that was the reason why Dan Carey wrote this?

A.   Talk to Dan Carey.

Q.   Happy to do so.  But in general, Dan Carey was supportive of your efforts to return --

A.   Flying.

Q.   -- at American, right?

A.   Personally, yes.

Q.   Right.  And he wrote letters in support of you to, first of all, the FAA?

A.   I don't know.  I think he may have.

Q.   Okay.  And also to American Airlines?

A.   I don't know if he wrote letters.

Q.   Let's take a look at your complaint again.  I don't recall --

A.   And I will say I was largely supported by the last three presidents of the union, but that's not the



Page 235

to forgive me. I forgot half the shit I wrote. So I have pretty good recall, but there's a lot there.

Q. All right.

A. But if you want me to find it, I think I can try to find it for you.

Q. Somewhere in your production.

A. It's in the production, but --

Q. Okay.

A. It's in there for sure. It's in the -- it's broken down by the SLI, so somewhere in there.

Q. Okay. You say it's broken down by the SLI, what do you mean?

A. I think you asked -- whatever RFP you asked, I -- I don't -- you asked, but you are -- you -- I think you did.

Q. Okay.

A. But I put subfolders in there, so it shouldn't be hard to find.

Q. I understand what you're saying. I want to talk about your Count A, retaliation count. We talked -- we began talking about the activity. I want to turn to what the acts are that you alleged to be retaliatory. You can look at Exhibit 34, the amended complaint.

A. What paragraph?

Q. Well, I haven't referred to a paragraph yet.

Page 236

But I understand that one of the things that you allege was retaliation was President Wilson dropping -- excuse me. Let me rephrase that. One of the things that you alleged to have been done for retaliatory reasons was President Wilson refusing to take grievance 12-011 to a system board, right?

A. That was the beginning of it, yes.

Q. Okay. And I think we talked about all the reasons why you believed that to have been retaliatory.

A. I don't remember what -- you mean I stated them?

Q. Today on the record.

A. I think so. I don't know.

Q. And then looking at Paragraph 348 --

A. All the reason -- I don't know. I gave you the best reason I could come up off my recollection.

Q. Okay. Paragraph 348 lists a number of acts that you alleged to have been retaliatory, is that right?

A. The laundry list of -- yes.

Q. There's a litany of reprisals, I think you said.

A. Okay.

Q. I want to go through that.

A. All right.

Page 237

Q. The first one is that on February 27 2014, you were denied access to APA headquarters to brief -- pre brief a grievance hearing with your Miami base reps.

A. Yes.

Q. Can you tell me what happened there?

A. I showed up to go into headquarters and the -- Thomas Copeland, Ivan Rivera to brief grievance 12-011 and I was stopped in the -- he wouldn't let me the building that -- to stand out in the parking lot. Like, forgive me, as an asshole. Union member standing out in the cold in the parking lot because Bennett Boggess wouldn't let me the building because he just learned in PACR, I filed the DFR lawsuit.

Q. Okay. Who stopped you?

A. I don't know. The receptionist or whatever. Bennett Boggess had a standing order. I wasn't allowed in the building.

Q. How do you -- what's your evidence that Bennett Boggess had a standing order?

A. Because I was told that by Alison, the girl at the front desk.

Q. Alison is the receptionist --

A. And that -- that went on years later. I mean, when I was doing an Article 7 charge one day, I --

Q. Well --

Page 238

A. I'm just saying I spoke to Dan Carey in Israel, they locked me out of the building. Go ahead.

Q. Were you able to gain access on February 27, 2014?

A. No.

Q. Okay. What was that retaliation for?

A. It was -- I literally filed the DFR laws the day before, some sort of thing.

Q. Okay. What relief are you seeking with respect to that conduct?

A. It's just a -- it's -- it's a chain of reprisals. And ever since I've been suing the union, it's one thing after another.

Q. So no particular relief as to that?

A. There's relief in the back. Yeah.

Q. As to -- as to be denied access. What's -- what relief are you seeking?

A. I think the access is kind of incorporated into the membership count, Count 6, I believe it is.

Q. Okay.

A. So I would like to be a member in good standing and have access to the union hall, yes. But that's just a litany of things that happened. And that's just the first one that came to mind.

Q. Okay. Then --



Page 239

A.  Keep in mind, this is written seven years ago. There's a lot more now.

Q.  Well, this is the amended complaint that we have in front of it.

A.  I know, but there's a lot more, and there's a supplemental pleading, and they'll be probably amended complaint again.

Q.  Well, that's up to Judge Artale, right?

A.  It is.

Q.  Okay.  And if Judge Artale rules it's part of the case, it's part of the case.  And if he rules it's not, it's not.  Right?

A.  Right.  That will be a new lawsuit.

Q.  Okay.  And then on March 7, 2014, APA's secretary treasurer unilaterally amended APA's POC that refers to proof of income claim and remove Meadows' grievance without notice to him.  Do you see that?

A.  Correct.

Q.  And we talked about the documents that showed that --

A.  We talked around that, and I learned about it during the bankruptcy court hearing in April.

Q.  Okay.  But you -- you had -- you had communications with Chuck Hairston where he had told you that it wouldn't be included, correct?

Page 240

A.  No, he never said it wasn't going to be preserved.  He said it was going to be preserved.  He said it was closed.

Q.  He said it was closed and APA assigned it no value, correct?

A.  He didn't say he was not preserving it.

Q.  He said it was closed and had no value, correct?

A.  He did not say he was not preserving.  It was still preserved in the bankruptcy after that.

Q.  Okay.  You asked whether it be preserved, and his response to that question was it is closed and has no value, correct?

A.  That's what he said, but I don't agree with that.  And it -- it had to have value because it was subject to a DFR lawsuit.  How can you say it has no value if I'm availing to criminal arbitration, so.

Q.  And what's your evidence that -- the secretary treasurer, that would have been Pam Torrel?

A.  Yes.

Q.  What's your evidence that she unilaterally amended the proof of claim?

A.  She signed it.

Q.  Okay.  But do you have any evidence that she amended it?

Page 241

A.  She said she amended.  She -- it's her signature on it.  No.  I -- I queried her.  I -- I had an Article 7 charge, ask a lot of questions, and she ran out of the room, started crying because she's basically -- she's fiduciary for the union, and she's falsifying tax returns for the union, essentially, and I accused her of that and she ran out.

Q.  And that Article 7 panel found that she was not the one to have prepared the proof of claim, right?

A.  I don't remember that ruling.  They -- I -- they censured her, and they demanded that they issued us membership cards.  That was the only good thing that came out of the Article 7 process.

Q.  As inactive members, correct?

A.  Yes.  And she -- they also ruled that I'd always paid all my dues, never in arrears.

MR. SHIFFRIN:  I'm showing you what's been marked as Exhibit 37.

(Defendant's Exhibit 37 was marked for identification.)

BY MR. SHIFFRIN:

Q.  Exhibit 37 dated July 14, 2017 reads, Allied Pilots Association Appeal Board ruling NRE Article 7, charges First Officer Lawrence Meadows versus APA Secretary Treasurer captain Pam Torrel.

Page 242

A.  This is the decision?

Q.  This is the decision in the -- with respect to your charges again Torrel, right?

A.  Yes.

Q.  And on Page 13 of the document, which is Page 11 below, you see Page 13 at the top, looking at the second full paragraph.

A.  Page 13?

Q.  Well, if you look at Page 13 at the top, it's --

A.  Oh.

Q.  It reads in the middle of the paragraph, the signature on the proof of claim is purely ministerial.  Katherine Torrel did not fill out the proof of claim nor did she decide individually or in her capacity as secretary as APA secretary treasurer, what was to be included in the proof of claim.  Those decisions were made by the APA BOD, meaning board of directors during the course of the AA bankruptcy.  Do you see that?

A.  Yeah, but I don't know how they concluded that because there's no testimony that effect.

Q.  But do you have any evidence to contradict that?

A.  Nor does APA.  There's no evidence submitted in those proceedings that would prove that.



Page 243

Q.   Do you have evidence to contradict that?

A.   Not yet.

Q.   And ultimately, grievance 12-011 was preserved in the bankruptcy process?

A.   Yes.  Which is kind of interesting because it allegedly had zero value, yet it was preserved, and APA forfeited a certain amount of money to do that.

Q.   And there was -- at the time that the proof of claim was amended in 2016 -- what's that?

A.   March of '14.

Q.   I take that back.  You're right.  When the -- when the APA proof of claim was amended in March of 2014, a number of grievances were dropped from the proof of claim, correct?

A.   I'm not sure.  I think it was culled, but that -- yeah, there was -- my grievance was one of the many on settlement agreement 1201 and along the way, I think several either were resolved or dropped off.  But in the end, only two survived, 12-011 and 12-012.

Q.   But between the original amended -- between the original proof of claim and the one that was submitted in March of 2014, a number of other grievances were also --

A.   I haven't looked at that document.

Q.   Okay.

Page 244

A.   But I would probably agree with that.

Q.   Then the next thing listed -- we're going to go back to the complaint.  Back to that paragraph.  That was 348, number three, on March 27, 2014, APA refused to process Meadows' petition for seniority reinstatement.

A.   I'm sorry.  Which paragraph?

Q.   Paragraph 348.

A.   Okay.

Q.   This is your third point in it?

A.   Okay.

Q.   On March 27, 2014, APA refused to process Meadows' petition for seniority reinstatement in violation of its policy.  Do you see that?

A.   Yes.

Q.   Okay.  And you had made a request to APA to seek your reinstatement to the seniority list, correct?

A.   Oh, yeah.  That was based on resolution 2014.07, or something like that.

Q.   Well, let's take a look at that resolution.

A.   Okay.

Q.   Sorry.  Actually, let's -- since you have -- let me show you what's marked as Exhibit 38.

A.   Okay.

(Defendant's Exhibit 38 was marked for identification.)

Page 245

BY MR. SHIFFRIN:

Q.   And was this -- was this -- the request -- is looking at Exhibit 38.  Is this the request that you had made in March 2014 that's referred to in Paragraph 348?

A.   Yeah, resolution -- okay.  I was right.  Is in 2014-7, rev one, but it's actually incorporated the policy manual Paragraph 1.22.  Yes.

MR. SHIFFRIN:  Okay.  And let me show you now Exhibit 39, resolution.

THE WITNESS:  Okay.

(Defendant's Exhibit 39 was marked for identification.)

BY MR. SHIFFRIN:

Q.   And you'll see the third whereas clause, we're looking at Exhibit 39.  Top of it reads, position past 12/4/00 on March 20, 2014.  Do you see that?

A.   Yeah.

Q.   The third whereas clause reads, whereas a condition precedent to the company's consideration of contractual exception, APA must support the reinstatement of a pilot seniority number for a pilot was removed from the -- a senior a list in accordance with supplement F1.5d of the CBA and has subsequently regained his or her FAA medical certificate.  Do you see that?

Page 246

A.   Yes.

Q.   Okay.  And so when APA refused to process you request for a statement because you had not, as of March 20, 2014, regained your first class medical --

A.   I would disagree.  Whereas clauses aren't finding.  And in the policy manual, which is controlling, it doesn't state you have to have a medical certificate on PM 122.

Q.   That's the reason that APA gave you, right?

A.   You mean Bennett Boggess?

Q.   Yes.

A.   I don't remember, but I think he said that. But again, it's not a requirement in the policy manual.

MR. SHIFFRIN:  Yeah.  Actually pull this one. Let me show you what's been marked as Exhibit 40.

(Defendant's Exhibit 40 was marked for identification.)

THE WITNESS:  Okay.

BY MR. SHIFFRIN:

Q.   Exhibit 40 is an email chain between you and Charles Hairston.  Do you see that?

A.   Dated 31, March, '24?

Q.   Yeah.

A.   2014?  Yes.

Q.   And so the first email, looking down the page



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
247–250

Page 247

from Charles Hairston to you, it says, Captain Wilson, APA's president, has forwarded your statement, requesting made for a response.  As you know, both APA and AA have to sign off on their main statement of a pilot to the seniority list.  And that's a true fact, right?

A.  Say again.

Q.  It's a true fact that both APA and AA have to sign off on the statement of a pilot to the seniority list?

A.  I don't know if it's a true fact.  That's what Chuck Hairston says, but he's not credible in my opinion.

Q.  Okay.  Item number one on the checklist is a current medical certificate.  Do you see that?  That's what he wrote to you, right?

A.  Yeah, but that's not what the resolution says.

Q.  And he says, unless something has changed since your last appeal hearing, you don't have a medical certificate, right?

A.  That's true.

Q.  Okay.  And you wrote back to him to say, no, I do not have a medical, but don't believe I should need one simply to be reinstated to the list, right?

A.  Yes, that's okay because that's what the

Page 248

resolution says.

Q.  And then looking down at the second paragraph, you wrote, the requirement for an FAA medical is extraneous.  Do you see that?

A.  Yes.

Q.  And then you said, I believe they should reconsider and revise resolution 201407 rev one, right?

A.  Mm-hmm.

Q.  And that's because as written in 247 -- 201407 required FA medical certification, right?

A.  Yeah.  It's discriminatory, I would agree with that.

Q.  Okay.  And APA never revised 201407, right?

A.  Well, the final language of policy, excludes the requirements for the medical certificate and the -- and the final language and to be resolved in the grievance doesn't have a requirement of the medical certificate so the whereas clause is irrelevant.

Q.  The whereas clause refers --

A.  Yeah, I know.  They're not binding.

Q.  And that was the reason --

A.  You know that as a lawyer.  But anyway, yeah.  So the final language in the policy never required.  And that was my position.  I don't need a medical.  And the resolution said it required medical.  I asserted that.

Page 249

Boggess threatened me.  I said, listen, if you don't do this, I'm going to file a NISO (phoenetic) charge and direct alternate -- file it within two hours, or 20 minutes, actually, I think he went to the board of directors, went closed, they took a secret vote, and declared us not to be members and locked us out of the union hall just like that.

Q.  I'm not sure what question you're responding to?

A.  Well, that's the answer.

Q.  You -- we covered that.

MS. RYBAK:  Okay.  Just this.

MR. SHIFFRIN:  Okay.

BY MR. SHIFFRIN:

Q.  You understood at the time that the company would not reinstate somebody without a first class medical to the seniority list, right?

A.  No, I didn't understand that because that's not what grievance 12-012 said, and that's what Bennett Boggess and Chuck Hairston would mislead people like me to believe.  And Dan Carey said it wasn't a requirement.

Q.  You're not aware of anybody being added to the seniority list who doesn't have a first class medical?

A.  I'm aware of people who remained on the seniority list for more than five years that did not

Page 250

have a first medical.  Many.

Q.  Are you aware of anyone who was reinstated to the seniority list without a first class medical?

A.  Not sure.  I don't have that -- access to that information.  Ask the question.

Q.  Are you aware of anybody?

A.  I don't have access to the information.  I cannot answer that with specificity.

Q.  You're aware that the APA board made a motion --

A.  Actually, I take that back.  Joe Barcati (phonetic) was guaranteed reinstatement without a medical.

Q.  He returned to the seniority list without a medical?

A.  I'm not sure, but there was a special deal for him.

Q.  Probably the best person to ask about that would be Joe Barcati?

A.  Yeah.

Q.  Whatever his testimony on that would be --

A.  He's been deposed.

Q.  We can rely on that deposition?

A.  I don't know.  I didn't do it.

MR. SHIFFRIN:  Let me show you what we've



Page 255

under what rules -- when a rule -- under what rule you think you just walk in any courtroom and make argument as a lawyer.

Q.  I think --

A.  Provide a notice of appearance.

Q.  I think as a creditor --

A.  It's highly prejudicial to me.  I -- because I was on the docket arguing my claims, and they showed up with no notice appearance.  Yeah.  I think it was highly prejudicial.

Q.  Did -- but you -- you contend that under the bankruptcy rules of the bankruptcy court you're entitled to --

A.  I had a high power bankruptcy attorney and he thought it was highly irregular.

Q.  Okay.  But was there a rule that he said it was violating?

A.  He just thought it was highly irregular and very prejudicial.

Q.  Do you think there was a rule violated?

A.  I'm not a bankruptcy attorney.  I don't know the rules.

Q.  Well, you allege that this is an act of retaliation.  So I'm asking you what rule --

A.  Yeah, I believe there was an act of

Page 256

retaliation.  He had no business being there other than to destroy my -- the whole point was it wasn't about they were American alone was panicked because I had a hearing with the Department of Labor, Administrative Law Judge, Judge Romero, and I had a bench trial set for June 4, 2014 and I was issued 60 days of discovery.  And I subpoenaed Doug -- Doug Parker, Harpe, Scott Hansen, and John Hale, the VP of flight.  And they were all subpoenaed.  And they -- Judge Lane could not stop that proceeding.  They were panicked.

Q.  You're not responding to the --

A.  Well, APA went in there to help American stop the Sarbanes-Oxley proceeding.

Q.  Let me show you an excerpt of a --

A.  I have the transcript.  I know what it says.

Q.  So you know what it says?

A.  Yeah, I know what it says, but tell me if want to ask a question.

Q.  I'm going to direct you to --

A.  This is where James -- Steve Hoffman lies that they don't support the Sarbanes-Oxley claim and contradicts the letters from Chuck Hairston saying --

Q.  There's no question pending, sir.

A.  Okay.

(Defendant's Exhibit 42 was marked for

Page 257

identification.)

BY MR. SHIFFRIN:

Q.  On Page 71, let me see.  Looking at -- looking at page -- what's labeled Page 70 to 71 in the document.

A.  Okay.

Q.  At the top, it says Page 70.  You see that --

A.  What line?

Q.  -- transcript of Mr. Hoffman's remark starting at Line 7 on Page 70.

A.  Yes.

Q.  Okay.  And what he first describes is that grievance 12-011 alleges a violation of the ADA and a violation of Sarbanes-Oxley and that neither of these are within the jurisdiction of an arbitrator to decide.  Do you see that?

A.  Mm-hmm.

Q.  And that's consistent with the position that APA had already communicated to you in 2013, right?

A.  I don't recall if he communicated, but I know Hoffman said right here.

Q.  So that's consistent with what Mr. Wilson said was the reason that they were not taking the case to assist the board, right?

A.  James Hoffman got fired for that and other things.

Page 258

Q.  It's consistent with that, right?

A.  Well, consistent with their failure to represent me properly in accordance to the law, and Dan Carey fired him on day one.

Q.  The answer is yes?

A.  The answer is yes, Dan Carey fired James Hoffman on day one for misrepresentations in that matter and others at cost on their ANL (phonetic) policy.

Q.  Now, and then he goes on, on Page 71, Line 3, he says, "We are not taking any position today on whether Mr. Meadows's various claims are timely or not.  We're not taking any position on whether his Sarbanes-Oxley claim is a good claim or disability act claim is a good claim.  Those are for the Department of Labor on the one hand, before the EOC on the other hand."

Do you see that?

A.  Yeah.  And he lied, because Chuck Hairston -- there's a letter from Chuck Hairston that says he supports the Sarbanes-Oxley claim and the grievance.

Q.  In the context of the grievance, right?

A.  He said he supported the grievance.  So contradicting AP's own in-house counsel.

Q.  What he's saying here to the judge is that we're not telling you, Your Honor, whether you should



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
259–262

Page 259

grant American's motion to deny your --

A. The whole problem was they were alleging the Sarbanes-Oxley complaint wasn't timely preserved, which is part of 12-011 explicitly. And APA was supposed to preserve it. They failed to preserve my claim and I lost my Sarbanes-Oxley trial because of APA's failure to preserve.

Q. And you're saying they were taking that position, not -- it was American that was taking that position, right? That it was not timely preserved?

A. Yeah. And it was due to APA's failure and preserved because they were responsible to preserve my claims.

Q. And what Mr. Hoffman said to the judge was that APA's taking no position on whether those claims were timely or not, right?

A. Well, actually, Chuck Hairston took the position they were. So when -- I wouldn't say AP, Steve Hoffman took the position more timely, but Chuck Hairston took the position they were timely and Clarke agreed.

Q. So Mr. Hoffman didn't show up to speak on behalf of American because he didn't take the position that American --

A. He came to defeat my claim. He helped

Page 260

American defeat my claim. He had no business in that court. There was no other matter he was speaking to other than me. He was there. He was -- he was in the gallery. He was -- he was in the back. He wasn't an attorney of record. Whatever. It speaks for itself. But he had no business being there other than to hurt me.

Q. Well, his words do speak for themselves. We have agreement on that?

A. Yeah. He was there for one purpose, to improperly help American deprive my claim, was untimely, when APA had the obligation to preserve it.

Q. Do you think that if he wanted to help American and help defeat your claims as being untimely, he would have taken the position that your claims are untimely?

A. He -- it's the same effect. He -- basically, he lied to Judge Lane. He, APA, did, in fact, support the Sarbanes-Oxley claim. It's the matter of an email from Chuck Hairston, as a matter of substantial grievance brief that I wrote that Chuck Hairston approved and submitted on my behalf to the VP of flight. And I tried to bring that up and Judge Lane said I'm not trying to -- the union is right here to tell me what -- what they're saying. They were lying.

Page 261

Q. Ultimately, you did submit that email to the Court, right?

A. I believe I did.

Q. Okay. But as far as whether your claims are timely, and APA didn't take any position on that with Judge Lane?

A. They subverted it.

Q. Okay. Well, the words here --

A. Regardless, the end result was the same. They helped American subverted it as untimely, and they were the ones that failed to --

Q. Despite the words that are on the page?

A. Yeah. But at the end, APA only hurt themselves because now they got to pay the back pay for it.

Q. Okay. Let's take a look at number five under Paragraph 348. The APA board secretly issued a directive, was declared LTV --

A. Okay. We're back here.

Q. Pilot Meadows was a non member for the improper purpose of locking him out of the APA website and CNR.

A. Yes.

Q. So my question is, that directive wasn't just about you. It was about all MDD pilots, right?

Page 262

A. My name was mentioned.

Q. And what's the directive then you're referring to?

A. The directive was they were in closed session and took a vote, which is unlawful under Robert's rules, but they did. They took a vote and deemed us not to be members anymore just like that.

Q. Where was your name mentioned?

A. Huh?

Q. Where was your name mentioned?

A. In closed session.

Q. How do you know?

A. I know.

Q. How do you know?

A. Because several board members told me.

Q. Who?

A. I don't recall exactly. Probably the Miami reps. Probably the DC reps.

Q. Okay. And the directive, though, was not to lock Larry Meadows out, but to lock out all MDD pilots?

A. It was because of me.

Q. And the question --

A. Because of the threat -- I threatened to file an EOC charge on behalf of myself and all MDD pilots if they didn't reinstate us based on policy 91122 and



Page 263

Bennett Boggess retaliated by going to the board, going closed, and locking us out of the website immediately. Like I -- I don't -- it says in the complaint. It's either two hours or 20 minutes. It's a very short time frame.

Q. Okay. The directive, though, wasn't directed just at you. It was directed at a larger group, right?

A. It was triggered by me, and it was directed to the entire group, yes.

Q. Okay.

A. But not only that, they didn't just lock out 240 MDD pilots, they locked out 950 disabled pilots total. So 700 pilots who were disabled weren't MDD were collateral damage, so it was totally --

Q. And you -- you allege that was retaliation for a threat you had made to file something with the EOC?

A. Yes.

Q. When did you make that threat?

A. When they refused to reinstate me based on resolution of 2427 (phonetic). I called Bennett Boggess and talked to him about it, and that's -- I told him that.

Q. Okay.

A. It's in the complaint. I think I recounted in there.

Page 264

MR. SHIFFRIN: Is this what we had looked at?

MS. RYBAK: Yes, 64, Exhibit 40.

MR. SHIFFRIN: So if you could pull up Exhibit 40.

THE WITNESS: Do I have it?

MR. SHIFFRIN: Yes.

THE WITNESS: Okay. 41. 38. I have this here, but do you have -- can you show it to me.

MR. SHIFFRIN: Yeah, I'll show it to you. My -- let me take that -- the version. I'll obviously hand this back to you.

THE WITNESS: Yeah, of course.

BY MR. SHIFFRIN:

Q. Looking at the second paragraph, this -- was this the --

A. Didn't we just read this?

Q. Yes.

A. Okay.

Q. This was -- looking at the last sentence of the second paragraph, refers to an EOC charge.

A. Yeah.

Q. Is that -- is this the threat you're referring to?

A. No.

Q. Okay. What was the threat you're referring

Page 265

to?

A. This precipitated it. Actually verbally threatened Bennett Boggess to file an EOC charge if he didn't follow the policy manual.

Q. Okay.

A. And it's in the complaint somewhere. I'm -- I'm looking for it.

Q. And it's your allegation that in response to that threat, APA took the action of locking out 240 MDD pilots and 970 disable pilots?

A. About 950 in total and 240 which were MDD.

(Defendant's Exhibit 43 was marked for identification.)

BY MR. SHIFFRIN:

Q. Okay. Let me show you what we've marked as Exhibit 43. This is an email chain between you and Chuck Hairston on April 22, April 2014. Looking in the middle of the page reads, this is an email from you to Chuck Hairston that same day. The middle paragraph reads, just to be clear, if APA is absolutely refusing to process my petition on the basis of medical disability, and please advise Bennett that myself and any other similarly situated pilots will be filing EEOC charges on that matter. Do you see that?

A. Yeah. I think I just spoke to Bennett Boggess

Page 266

prior to this email.

Q. So this was the threat that you're referring to?

A. Yes.

Q. Okay.

A. Again, this is in the amended complaint starting in Paragraph 116, Paragraph 118, I sent an email to APA's legal director of threatening filed discrimination charge unless APA reinstated.

Q. And you'd agree that the circumstances around the removal of MDD pilots from, well, CNR was fully litigated in the Emory action?

A. I agree it was an impermissible infringement of free speech in violation of LMRDA and was not fully litigated. It was only litigated for her.

Q. Well, what the Court found there was -- what do you mean it was only litigated for her?

A. As an individual claim. It didn't affect the whole pilot group. It was only for her.

Q. Okay.

A. They got an injunction ordering a treater as a member in good standing reinstate her only.

Q. Well, the injunction didn't say a treater member in good standing.

A. It said she had to be treated the same as a



Page 267

member in good standing or something to that effect. I'm not -- I'm paraphrasing.

Q. Whatever the order says --

A. But it did, and she got reinstated. And I went to Dan Carey, and I said, hey, I want to get reinstated, too. And he said, it's not a class action. I said well, I talked to AUT, and they've offered to file on my behalf, and we're going to rubber stamp it. And he eventually put us back on it in five days.

MR. SHIFFRIN: Let's take a look at this together. Going to show you what's marked as Exhibit 44.

(Defendant's Exhibit 44 and Exhibit 45 were marked for identification.)

BY MR. SHIFFRIN:

Q. Do you recognize this?

A. 159, yes. Is this the one that's got my name on it?

Q. Decision in the Emory case.

A. Yes. Okay.

Q. Going to the last page, the very last page at the back of it, what the judge ordered was that the APA's policy of denying MDD pilots access to challenge and response constitutes an impermissible infringement on plaintiff's right to free speech guaranteed by LMRDA.

Page 268

Do you see that?

A. Yes.

Q. So it doesn't say anything about her being a full member of APA, right?

A. The injunction does. This is the ruling. There's an associated injunction. I think it said she has to treated at the same -- at -- I don't think it says she is a member in good standing. Said she has to be treated the same as a member in good standing. And eventually, APA admitted in her motion to dismiss proceeding in or subsequent DRF that she was a member in good standing.

Q. We'll take a look at this. We'll take a look at that later, but whatever it says, it says, right?

A. Yeah, and Mark Weiner should be aware of this. Pretty accessible.

Q. And you're aware that the Court found that there was no impermissible discriminatory animus for APA deciding to exclude MDD pilots from challenging response?

A. Where does he say that?

Q. Paragraph 31. That's on Page 11.

A. It's a find of fact or a finding of law?

Q. Finding of fact.

A. Paragraph 31?

Page 269

Q. Yeah.

A. So what do you -- what do you -- what's the question?

Q. He -- Judge Hurley found in this case that the APA's explanations for why it excluded MDD pilots from challenge and response was not offered to mask an impermissible discriminatory animus, correct?

A. In this case, but he hasn't heard all the facts.

Q. Okay.

A. And in Paragraph 22, he says that he finds that the one board member raised a topic, i.e., Rusty McDaniels, was likely motivated by a desire to silence a group he views as most combatable litigious.

Q. Okay.

A. His motivation can't be described as the board as a whole, but he cites opposed made by me and Kathy Emory.

Q. So despite that finding in '22, he ultimately found that there was no discriminatory --

A. He found as a violation of the LMRDA.

Q. Okay. But not because of the discriminatory animus?

A. Not against Kathy Emory.

Q. No, not in general.

Page 270

A. She was the one that made the threat. I made the threat.

Q. Right.

A. I precipitated the CMR lockout to threat Bennett Boggess. That triggered it.

Q. And he had those facts in front of him, correct?

A. No, he did not.

Q. Why not?

A. Because it wasn't -- that was not Kathy Emory's case. She's only arguing about her loss of free speech. She didn't argue she has a discriminatory animus.

Q. Well, then, why did the judge make the finding that it was not a discriminatory animus?

A. I wasn't part of the case. It's got nothing to do with my phone call to Bennett Boggess and my email threatening to file the EOC charge. It has nothing to do with it. It's all due to the simple purpose. We were locked out.

Q. Okay. So the Emory case has nothing to do with this case?

A. Those facts -- the incident is identical. The facts are similar, the same parties, but that, you know, you can't -- it's not one in the same, it's different.



Page 271

I'm the one that triggered the lockout.

Q.   Okay.  After --

A.   And that's why I fought it so hard.  Because I felt guilty that all these pilots suffered because of the dispute between me and Boggess.  He punished 950 disabled pilots to hurt me.

Q.   After the Emory case was resolved, you regain access to the --

A.   Not easily.  It took a lot of legal threats.

Q.   Okay.  Did --

A.   (Crosstalk) I got pro hoc -- I got pro bono consult from civil -- public citizen.  They agreed to file a class action in my name, and I went to Dan Carey with that, and they were landed and finally put us back on a week or so later.

Q.   Okay.  By January 13, 2017 --

A.   Yeah, that's from Dan Carey.  Communication, you have access.  You know all this.

Q.   You had access as of January 13, 2017, right?

A.   Yeah.  Three years after we were locked out.  And then we were locked out during the JCBA negotiation, during the ISL one of the most critical phases of any American pilot's career.

Q.   What damages do you claim in that?

A.   Excluded from the ISL.  No voice in the union

Page 272

hall.  No voice in union meeting.  Kathy went to the union meetings.  Was thrown out because she didn't have an ID card.  We were ostracized from the union.

Q.   What financial loss did you suffer?

A.   Well, the report speaks for itself.  During those years?

Q.   How does the loss of employment from American Airlines relate to not being on CNR?

A.   Because we would have been on the seniority list.  If -- if we had a voice and were actively involved in the JCBA and the -- any ISL conversations when they were happening, we probably would have been on the list.

Q.   But you were able to communicate with the committee that was handling the seniority --

A.   It was corrupt.  Those guys didn't care about us.  Mark Stephens was on the equity -- he -- he was part and parcel the reason all the MDD pilots were excluded from the equity.

Q.   How would posting on CNR changed your --

A.   Changes everything.  You kidding me?  CNR is a weapon.  It's a powerful weapon.  I've -- I've caused political change and upheaval in that union with CNR.  I've forced some of the strongest union officers out of their positions.  I've helped get union presence

Page 273

elected.  I won and lost elections for some very, very powerful people.  I made very powerful enemies.  CNR is extremely valuable.  It is free speech at it's finest.

Q.   How would it have related to the seniority list, though?

A.   Totally because we could have had a very, very -- a platform to exhibit or to exert influence and pressure on the people that needed it to make the decision to make sure we weren't discarded because the east pilots and west pilots were on the ISL even if they're out more than five years.

Q.   The people making those decisions were the AAPSIC?

A.   The board of directors.

Q.   That was the AAPSIC?

A.   No, the board of directors.  The board of directors could have exerted more influence.

Q.   You understand that under the --

A.   I know how it worked.  And I know the AAPSIC, but the -- the whole thing was just designed to insulate APA from DFR.

Q.   You understand that --

A.   I understand it fully, but I'm --

Q.   Let me finish my sentence so we understand --

A.   Okay.

Page 274

Q.   -- for the record.

A.   I'm getting upset because this harmed a lot of people.

Q.   I'm trying to understand how.  Okay.  So by --

A.   Ruined their careers.

Q.   Under the seniority integration protocol agreement that we looked at earlier, APA was mutual with respect to the seniority integration, correct?

A.   Allegedly.

Q.   Okay.  And AAPSIC was the entity within APA that was representing --

A.   AAPSIC was APA, its' Mark Stephens.

Q.   Can I just finish my sentence?

A.   Yes.

Q.   Because otherwise, we're not going to have a transcript and we're going to be back here doing this again.

A.   No, we're not.  We're not coming back, so let's get it done today.

Q.   Okay.  AAPSIC was the committee that was charged with making decisions with respect to how the interests of American pilots would be represented in the seniority pilots list, right?

A.   Yeah.

Q.   And he made those -- one of his



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
275–278

Page 275

responsibilities was to make those decisions in accordance with that seniority integration protocol agreement, right?

A. Allegedly.

Q. Okay. And you had access to Mark Stephens, right?

A. Which was having access to the wall.

Q. Okay. But you --

A. What I needed access to was the entire membership to turn the entire membership against Mark Stephens and the board and the committee to bring the pressure to bear to show that the guys that really were here first, the legacy pilots were getting screwed in the process by their own committee men, when honestly, the most support we had as an MDD group came from the east and west pilots, not from the legacy officers.

Q. Okay.

A. So the -- our voice was stripped away in the most critical time during the ISL and JCBA. So I -- I would --

Q. So what you would have done --

A. If I had access to -- let me finish. If I had accessed to CNR, I'm almost certain we would have been on the integrated list.

Q. And that's because what you would have done is

Page 276

advocate for Mark Stephens to violate the terms of the protocol agreement and add you to the seniority list?

A. No, we would have advocated for -- for us to be treated fairly. Like the board -- the board recognized the failure in Resolution 26-30 and tried to cure it.

Q. But even -- even if you are not on the seniority list as of the snapshot date, you would have advocated for Mark Stephens to add you to the certified seniority list?

A. Not Mark Stephens, I would have advocated for the thing to be done fairly and equitably, and it was not.

Q. Okay.

A. But the legacy of American disabled pilots were treated desperately by APA board of director's own admission, had we been able to make that public and swing the hearts and minds of the membership and the leadership of the union, I could have been on seniority list in 2016. And when I got my medical in 2018, we wouldn't be here today. I'd be -- I'd be flying.

Q. Because there would have been pressure on Mark Stephens to --

A. There'd be pressure.

Q. You got to let me finish, sir.

Page 277

A. I was still talking. There'd be pressure on the entire organization and --

Q. Okay. Now it's my turn --

A. Let me finish. My effectiveness using CNR and the effects of others like me has been borne out time and time again. It's cost people elections. It's won people elections.

Q. You said that.

A. Yeah. And it's very valuable.

Q. Now, can I ask a question now?

A. The power -- no. The power of speech. You cannot discount it. It's probably the most -- of this whole lawsuit -- one thing in this lawsuit is the fact that the MDD in all -- equal say and access and privileges in this union, not -- it's not even about dollars. It's about rights.

Q. Okay.

A. Which results in career --

Q. Mr. Meadows, you're far field from any question --

A. I know I am, but I'm making a strong point because.

Q. This is not an opportunity to make a point. This is --

A. You asked a question --

Page 278

Q. -- the time for me to ask me questions and for you to answer?

A. Continue. Thank you.

Q. I'm going to ask the question. You're not going to interrupt me. I'm going to --

A. I'm not going to interrupt you. Please just go.

Q. Please listen carefully and just answer the question that's being asked.

A. Yes.

Q. So the way that you would have used CNR to get on the seniority list in 2016, just so we're clear, because we looked at the seniority integration procedures together before, you would have advocated for Mark Stephens to add you to the AAPSIC certified list even though you were not --

A. Mark --

Q. -- I'm not done with my question, sir.

A. Okay. You're putting words in my mouth. That's not what I said.

Q. I didn't say any words from you. I'm asking the question. Do not interrupt me again. Mr. Meadows --

A. I'm here and I'm listening.

Q. Please continue listening until I tell you



Page 279

it's time to respond.  Understand?

A.  Yes.

Q.  Mr. Meadows, the way you would have used CNR, if I understand your testimony, to get put on the AAPSIC certified seniority list in 2016 would have been to use it to put pressure on Mark Stephens and the rest of the AAPSIC committee to add you to that list despite the terms of the seniority integration protocol agreement that says the only people that should be on the certified seniority list are people who are on the seniority list of the company as of December 9, 2013.

A.  That's a mischaracterization because I -- my belief is Mark Stephens didn't have the will and the power, nor did the committee, but it would take a much broader action and outreach and outcry.  The entire membership in the leadership that could contain things and -- because it was really a very disparate treatment of the legacy pilots.  The pilots that have been there the entire time were the ones that got harmed and treated the worst.

Q.  How could that have been done consistent with the terms of the protocol agreement?

A.  It could have been done through the MOU grievances.  There could have been -- there could have been multiple MOU grievances filed.  It could have been

Page 280

grieved on behalf of the group.  There could have been a collective grievance for MOU, but the union had no desire.

Q.  Okay.  But the protocol agreement says what it says.

A.  It says what it says.

Q.  Okay.  And it says that the only people that should be on the certified list for those that were on the company's seniority list as of December 9, 2013, right?

A.  Yes.

Q.  Okay.  And so it would have meant violating that part of the protocol agreement --

A.  I don't agree because the facts in the record show that we were still on the list.  We were just administratively dropped.  We were never really -- we were never removed.  We were never terminated.  Bennett Boggess, by his own letter, says I was never terminated.  James Anderson, by his own testimony, says we were not terminated.  We were not administratively terminated.  Administratively dropped.

Q.  You were dropped from the seniority list.  Okay.

A.  Which is different than being terminated.  And it was administrative only.  It wasn't a permanent loss

Page 281

of seniority.  And that's American -- you can argue with American's own managers.  That's what they say.  The union twisted us all around because they realized what exposure they have in the equity.

Q.  As of the date you filed the amended complaint, you had access to challenge and response, is that right?

A.  I don't know.

Q.  As of October 16, 2018?

A.  I think I was reinstated in -- sometime in 2017.

Q.  You just looked at that, right?

A.  Yeah.  I don't know what the date is.

Q.  January 2017, you were reinstated?

A.  Yes.

Q.  So you had access as of the time you filed the amended complaint?

A.  Yeah.  When the ISL was done and gone.

Q.  Okay.  So what remedy are you seeking with respect to challenge and response?

A.  Well, challenge and response doesn't exist anymore.  There's a live forum form.  Apparently, it's been shut down, and I guess it's been reactivated.  So I think every member should have access to the live forum.

Q.  But what access -- well, certainly, it's up to

Page 282

APA whether or not to have a forum for it's members, right?

A.  I would disagree.  I think -- I think that post Covid, in the modern era of Zoom, union membership has been waning.  Participation in base meetings waning.  It was standing room only in union meetings in the nineties.  And I think doing things virtually is the future.  And I think it's an absolute necessity to maintain a vigorous and vibrant union membership, so I think it's extremely important.

Q.  But it's not required by law, right?

A.  Precedence -- I don't think they can take it away.  It's part -- like I explained to you earlier, we don't have a fixed location, one union office.  So I think the live forum or the virtual union hall is our union hall, and that's where the majority of membership come in.

Q.  What relief are you seeking in this lawsuit with respect to --

A.  Which claim?

Q.  -- an online forum?

A.  Well, I'm -- I'm seeking relief of full membership rights, including full access to the virtual and physical union hall, rights to vote, rights to run for national office.



Page 283

Q. Okay.

A. And whatever right every other member has.

Q. Let's go back to Paragraph 348 of the amended complaint.

A. Okay.

Q. And this --we're at number 6, is on Page 92.

A. This is -- Page 92. Hold on.

Q. Page 92 at the top of the amended complaint.

A. I'm getting there. Okay. Go ahead.

Q. It reads, "Just over three months later, APA's general counsel misrepresented the in opposite to the Utah District Court asserting that, because Meadows was a member of the (indiscernible) the DOD directive, that the APA CMB was a binding contract for the improper purpose of defeating his RLA DFR claims, enforcing his LMRDA claims to first be exhausted via internal -- internal union remedies."

Do you see that?

A. Yes.

Q. Okay. And that refers to the position that APA took in the Utah District Court litigation --

A. After --

Q. I'm not done with my question.

A. I thought you were.

Q. Okay. That -- that it took in the Utah

Page 284

District Court litigation on its motion to dismiss?

A. What was the question?

Q. This would help everybody greatly if you didn't interrupt me.

A. I'm not interrupting. You're wearing me out. So what was the question? We have to take a break, but go ahead.

Q. Just over -- the question is -- number six here refers to the positions that APA took in the Utah District Court litigation in its motion to dismiss.

A. Right.

Q. Okay. And you're aware that on a motion to dismiss, the facts alleged in the complaint are taken to be true?

A. Right.

Q. Okay. And that's what APA's position was, right?

A. Mm-hmm.

Q. Okay. Let's move on to number seven. APA --

A. So Is there a question there?

Q. I'm asking my question. I -- we're moving on.

A. What was the question? You didn't ask the question.

Q. I did. APA secretary treasurer of Pam Torrel --

Page 285

A. What was the question in number six?

Q. You'll have the transcript. You'll read it then.

A. I want to know the question now so I can answer it correctly. So I -- I did not -- I'll object and strike -- move to strike because there's a non-answer. I want to know what the question is so I can answer clearly.

Q. I asked you what APA's position was, and you agreed with me what APA's position was. And you -- I asked you --

A. After APA deemed me a non-member, they deemed me a member to enforce the CBA against me as a binding contract in adverse terms.

Q. Mr. Meadows, there's not a question pending.

A. That was my answer.

Q. APA secretary treasurer, Pam Torrel, refused to issue an active membership card as you had received from it's predecessor, right? That's -- do you see where I'm reading on number 7?

A. Yes.

Q. And that's because APA's position at the time was that you're an inactive member, right?

A. No. Their position was we were not a member.

Q. Okay. And then Mr. Wilson made an

Page 286

interpretation that you were not a non member. You were an inactive member, correct?

A. In good standing.

Q. He -- that's what he found, is that you're an inactive member in good standing?

A. Yes.

Q. Okay. And then Arbitrator Valderdi issued an award on that. We covered that, right?

A. Which has been superseded by a subsequent CBA interpretation.

Q. All my question was that he issued an award, right? Okay.

A. Superseded, yes.

Q. And so the refusal to issue an active membership card was consistent with the view that you were not -- you're not entitled to one because you're not an active member, correct?

A. I would disagree.

Q. Why?

A. Because under LMRDA, there's only one type of membership, members in good standing.

Q. Okay.

A. And to the extent the constitution calls for terms that are inconsistent with the LMRDA, inactive -- inactive, not party of the LMRDA, they're void and of no



Page 291

Q. You believe this all occurred in 2016?

A. This occurred between September, October 2016, and then when Barcati finally got his medical, they kind of reneged for a while because they -- they didn't want to bring me back. And that was in January of '19 through May of '19. Barcati came back May of '19.

Q. So Barcati was never put back on the seniority list without a medical, right?

A. He wasn't put on the seniority list with the medical.

Q. He wasn't put on without a medical?

A. He wasn't put on the list with one.

Q. That's not my question, sir. My question is, was he put on the seniority list --

A. He was promised -- he was guaranteed returned to the list once he got his medical, and he's guaranteed he would -- he wouldn't -- would not not be reinstated.

Q. Was he put on the list without a medical?

A. To my knowledge, no.

Q. Okay. Did you ever talked to Joe Barcati about any of this?

A. At length.

Q. What did he tell you?

A. It's been a long time. I haven't talked to him like three or four years.

Page 292

Q. Tell me what he told you.

A. Pretty much what I told you. He was -- he was actually a pariah. The company had investigated him. Thought he was gaming the system. They accused him sick leave abuse. He's under investigation. And the company was very hostile to him, more so than me, even. And they tried to -- they were almost threatening to terminate him, and despite all that, he managed to get back because the union went above and beyond. And my only explanation can be is because he was a union insider and committee man, all the favored.

Q. On that -- the union made numerous requests for your reinstatement to you, right?

A. Allegedly.

Q. Well --

A. As I told you, Dan Carey's requests were not formal requests that the other pilots got.

Q. We'll take a look at those documents together.

A. And if you don't have them, you should compare my letters to the RTW letters for all the other MDD pilots. Mine are -- mine's different than everyone else's.

Q. And that's because there was never an agreement to bring you back, right?

A. What agreement?

Page 293

Q. There was never an agreement between APA and American to bring you back to the list?

A. Dan Carey said there was. He says I would have a training date the second week of January.

Q. And he told you --

A. She was there. He called me the day after Christmas and said, what base, what aircraft you want? I need to know right now. I'm meet Kimball Stone in a half hour.

Q. Okay. And then he told you --

A. Then he called me back and said, you're coming back to training.

Q. Sir --

A. I'm answering the question.

Q. I didn't ask the question.

A. Well, that was -- that was part of my answer.

Q. So you have to wait until I ask the question.

A. Well, you have to --

Q. You have to let him finish.

A. Okay.

Q. You have to let me finish.

A. Go ahead. Ask the question, Josh.

MR. SHIFFRIN: Exhibit 46.

(Defendant's Exhibit 46 was marked for identification.)

Page 294

BY MR. SHIFFRIN:

Q. First of all, so this was December 10, 2018.

A. Yes.

Q. This is the first time that you requested to Captain Carey to make a request to the company to return you to the list, correct?

A. Exactly. Yes.

Q. Okay. And then Dan Carey followed up with that by doing just that, right?

MS. RYBAK: You want his request from American?

MR. SHIFFRIN: No.

MS. RYBAK: Okay.

BY MR. SHIFFRIN:

Q. And at the same time around that, you made your own request to American for -- to be returned to work, right?

A. Yeah, I did both.

MR. SHIFFRIN: Okay. Exhibit 47.

(Defendant's Exhibit 47 and Exhibit 48 were marked for identification.)

BY MR. SHIFFRIN:

Q. Exhibit 47 is a email from President Carey to Kimball Stone and Tim Hamel dated Wednesday, 26, December, 2018. Do you see that?



Page 319

Q. Yes.

A. By the way, there's no text messages in your production. Why is that?

Q. I'll be asking the questions, sir.

A. Yeah.

Q. Directing you to what's labeled Page 5 of 14, Meadows 008576.

A. Which page?

Q. Page 5?

A. Give me a Bates number, please.

Q. Meadows 008576.

A. Okay.

Q. Okay. And there's a message from you to Dan. It says: Dan, thanks for the prompt response letting me know the company is refusing to reinstate me.

Do you see that?

A. February of 2019 is what I told you.

Q. Okay. So this was when you learned the company was refusing to reinstate you?

A. I just told you Lucretia Guia, her statement -- that's all I ever heard. No one's ever told me that.

Q. Okay. But you heard that from Dan Carey?

A. I never heard it from the company.

Q. You never heard directly from the company?

Page 320

A. Nor has APA -- APA has nothing in writing. There's not a single stitch of paper that says my return is denied.

Q. Okay. But Dan Carey communicated to you that the company was refusing to reinstate you, verbally?

A. He said -- he said what I told you. And I'll restate the question. It's asked and answered and I object on that basis, but Dan Carey said -- because he sent -- he literally sent Jim Clark across the street immediately, in 15 minutes, got a phone call back, and I was told that Lucretia Guia said she's not providing a written denial of any sort, and she's not going to reinstate me under any circumstances whatsoever. And that was relayed immediately back to me by Dan Carey when Jim Clark came back across the street.

Q. Okay.

A. It took like less than a half hour.

Q. Understood. And in 2019, you received several cease and desist letters from American's outside counsel, Mark Robertson, telling you to stop contacting American about seeking reinstatement, correct?

A. I don't know. Show me.

Q. Okay. Let's take a look at it.

A. He would always assert that I was violating the bankruptcy injunction.

Page 321

(Defendant's Exhibit 56 was marked for identification.)

BY MR. SHIFFRIN:

Q. I'll show you what's marked as Exhibit 56. This is an email from Mark Robertson to you on Thursday, April 4th, 2019.

Do you see that?

A. Say again?

Q. This is an email from Mark Robertson to you dated Thursday, April 4th, 2019.

Do you see that?

A. Yes, I do.

Q. Okay. We're looking at Exhibit 56. And the last sentence of his email says -- oh, actually, I'll read a little bit further out.

In addition, American has informed you that you have sent communications to various American employees inquiring about returning to work. As you have acknowledged in several court filings, American terminated your employment and removed you from the pilot seniority list in 2011. There is no return to work process for terminated employees.

Do you see that?

A. Yeah, that's not true. There is a process for return to work.

Page 322

Q. And then he says: American asked me to respond on its behalf because, in the past, when American employees have conveyed position or information with which you disagreed, you have responded with inappropriate or threatening communications and also sued one employee in her individual capacity simply for performing her job.

Do you see that?

A. The only communication was to Marjorie Powell, which you just brought up, and the only lawsuit was against her.

Q. Okay. American requests that you cease further communications with its employees requesting a return to work.

A. The problem was this letter is in violate -- Judge Lane's order said I cannot communicate with American's employees regarding my termination, removal seniority list. He said, but if and when I get -- medically, has no problem with me contacting American about my reinstatement.

Q. Okay.

A. No, that's important because he is disregarding Judge Lane's actual bench ruling --

Q. Mr. --

A. -- and transcript, so no --



Page 323

Q. I haven't asked a question about --

A. Well, I'm giving you the answer.

Q. I'm not sure what you're disagreeing with.

A. Well, I disagree with your point of this letter, because this is Mark Robertson, but he is erroneously saying I can't contact employees regarding my reinstatement when Judge Lane issued an order saying I can.

Q. Mr. Robertson is, whatever else he believes, he's making requests that you cease further communications with --

A. Well, I disagree with the request because that's what Judge Lane ordered.

Q. In fact, he made a second request to you as well, right, to cease communication?

A. I don't know, he's hade many requests. He wants to hide behind a bankruptcy injunction all the time.

Q. There's no reference to the bankruptcy injunction in this letter.

A. He does it all the time.

Q. But in the letter, in Exhibit 56, there's no reference to bankruptcy injunction?

A. Yeah, but his position is that my termination removal allegedly -- my purported termination removal

Page 324

allegedly happened prior to the bankruptcy, its pre-petition, and its discharge, and it can't be contested. Yet every other MDD pilot who was administratively discharged or separated from the CR list can get back.

So -- but Judge Lane specifically said I could contact American regarding my reinstatement when I got my medical.

Q. Okay. But there's no reference to a bankruptcy --

A. Well, if you believe it, try out the order, but I'm giving you the facts. You want to take stuff out of context to make me look bad, feel free, but I'll rebut it as I feel needed.

Q. I want to make sure the record is clear --

A. The record is clear.

Q. I want to finish my sentence. Are you ready?

A. Are you?

Q. I'm ready to speak if you're ready to listen and not interrupt me.

A. I'm listening.

Q. Exhibit 57 -- excuse me.

Exhibit 56 contains no reference to a bankruptcy injunction order, right?

A. Not that letter.

Page 325

MR. SHIFFRIN: Okay. Thank you.

(Defendant's Exhibit 57 was marked for identification.)

BY MR. SHIFFRIN:

Q. Exhibit 57, this is another letter to you from -- exhibit 57 is a letter to you from Mark Robertson dated December 10th, 2019.

Do you see that?

A. Mm-hmm.

Q. Okay. And he writes to you to say: I write on behalf of American Airlines. American has informed me that you continue to write directly to American employees about returning to work despite multiple requests that you cease such communications, including a December 5th, 2019 email from you to Jeffrey Price attached below. As you know, I informed you on April 4, 2019, and again on July 10th, 2019, that American has no return to work process for terminated employees, and accordingly, I requested on American's behalf that you cease further communications with its employees seeking to return to work. To reiterate, consistent with my two prior emails to that effect, American again asks that you cease further communications with any of its employees requesting return to work.

Do you see that?

Page 326

A. Yeah, I see it, so what's your point -- question? Question?

Q. Yeah. My question is, why do you think American is going to return you to work?

A. Why?

Q. Yeah.

A. Because they're obligated to under the law.

Q. What law?

A. All laws.

Q. All the laws?

A. Yeah. I mean, what -- I mean, I'm being treated differently than every other employee.

So are you going to let me ask my question, or you going to keep -- start over.

Q. I'm listening to you, sir.

A. No, you're not.

Q. I am.

A. We can start over when you're ready.

Q. You said all the laws. That was your answer?

A. No, it's not my answer.

Q. What's your answer then?

A. Re-ask the question, please.

Q. What makes you think that an American is going to return you to work?

A. I think they have to return me to work. If



Page 327

the union would do their job and represent me, they could get me returned to work.

Q. So the union has made requests to return you to work?

A. Yeah. The union also promised they wouldn't sign a CBA without my return and they missed that opportunity.

Q. We'll talk about that. But the union made requests to return you to work, correct?

A. Allegedly.

Q. Well, not allegedly. We looked at them, right?

A. Yeah, but they're not the same requests that every other -- every other MDD pilot had different requests. My requests were unique, put it that way.

Q. You had more requests than other pilots?

A. I had no formal request that the other pilots got.

Q. Okay. And you left a voicemail for an American Airlines employee that American Airlines considers threatening, correct?

A. That's what you state.

Q. Well, that's what American Airlines stated, right?

A. If it was threatening, I think they would have

Page 328

taken action.

Q. Well, they took action by writing you a letter and saying it was threatening and telling you not to communicate with her anymore, correct?

A. Yeah, but that's not what Judge Lane said. I have a right to communicate regarding my reinstatement.

Q. That was what they said, right?

A. And there's a path -- it's a lie.

There is a path to reinstatement for a terminated at MDD pilot. To the extent an MDD pilot is considered terminated, they have all been reinstated except for me.

Q. And then APA's -- excuse me, American's lawyer wrote to you and said, please stop communicating with our employees, correct, asking for a return to work, right?

A. Yeah, but I was -- that was in response to the letter I wrote to the Miami Chief Pilot Jeff Price at the insistence of BR, my Miami domicile representative who asked me to write Jeff Price --

Q. And one of the reasons --

A. -- it was a friend of his.

Q. And one of the reasons why he told you not to communicate with anyone at American about reinstatement anymore was because you had responded with inappropriate

Page 329

or threatening communications and had also sued an employee for doing her job, right?

A. He's referencing the Marjorie Powell letter, the only time.

Q. Okay.

A. And APA's own domicile representative said it was, in his opinion, was not a threatening communication. He listened to it.

Q. Okay. Well --

A. You can take it on paper all you want, but if you want to play the recording, then you could really decide. You can play it in a jury trial, I guess, if you want.

Q. Yeah, I'm sure we'll do that, but the opinion that probably matters isn't Billy Ray's opinion, but the opinion of --

A. Well, I was acting on advice of my domicile representative who said the --

Q. But the opinion of American Airlines, correct? The opinion of whether or not the voicemail was threatening really is -- what matters is American Airlines who has the power to bring you back or not?

A. I object to relevance. I think you're just looking for reasons not to dodge your obligations under the Railway Labor Act, the LMRD, breach of contract. Go

Page 330

ahead.

Q. The opinion that matters is not that of Billy Ray Reed, but that of American Airlines, with respect to the nature of that voicemail, correct?

A. I disagree. I think he's my union representative and he didn't think it was threatening and he was willing to go to bat for me and fight for me.

Q. Okay. And he did that?

A. To the best of my knowledge. He was a good advocate. Ed Citure was a good advocate.

Q. Dan Carey?

A. I believe Dan Carey was a good advocate too, but I think their hands are tied because APA, as an institution, has got a huge tension between the legal department and their past abandonment reputation and representational failures, and it ties the hands of the officers and has been in tension ever since 2011 that the -- it's just a conflicted institution.

And unfortunately, it's for pilots to protect pilots, but it's run by lawyers to protect the assets and the jobs of the staff at APA.

Q. What more should APA have done to get you reinstated?

A. Withheld signed the CBA, as they promised, and they could have got me back.



Page 339

Q.  Okay.  Retract your answer, sir.  I don't know what that means, but you have done it.

A.  Well, I'd like to be re-asked that question because I wasn't done.

Q.  What do you have to say?

A.  Ask the question again.

Q.  Let me ask a different question.

A.  No, I want to go back to that question.

Q.  You understand --

A.  I want to get the correct answer on the record.

Q.  You understand that the board of directors has the authority to approve or disapprove of agreements with the company, correct?

A.  That wasn't the question.

Q.  I'm asking you a different question.

A.  I want to -- I want to be asked the previous question --

Q.  I don't --

A.  -- get the correct answer on the record --

Q.  -- (crosstalk), so I'm asking you a different question.

You understand that the board of directors has the authority to approve or disapprove contracts that are negotiated with the company, correct?

Page 340

A.  It's got nothing to do with whether the president signs it or not, but yes.

Q.  Okay.  And you understand that the president can't refuse to sign an agreement that's been approved by the board of directors, correct?

A.  Actually, he can.

Q.  Based on what authority?

A.  Well, a real union president protects every job and every seniority member.

Q.  So it's your position that an APA president could, over the instructions of his board, refuse to sign the collective bargaining agreement?

A.  Yeah.  Dan Carey told me he would not sign any CBA that didn't include the return of any hostages, including me, and resolve all grievances, which, historically, was always done until Keith Wilson.

And there was a big point of contention in the '23 contract that Ed Citure signed a contract without doing the same thing.  And all agreements were resolved and there was a split in the board 50/50 and the Miami reps wouldn't vote for the contract for that reason alone.

Q.  Dan Carey didn't sign a contract that didn't call for your --

A.  Dan Carey didn't get the opportunity to sign a

Page 341

contract.  One was not negotiated while he was in office.

Q.  The Bob Denison letter, do you know what I'm referring to?

A.  Yes.

Q.  How did you get it?

A.  I got it in the mail.

Q.  From whom?

A.  I don't know.  It was someone that he paid.  He seems to feel sorry for me because he keeps sending me stuff in the mail.  It's like the secret settlement and the Bob Denison, but I got it.

Q.  There was no --

A.  In an unmarked envelope.

Q.  Okay.  So you don't know if the person who sent it to you had authority to send it to you?

A.  No.

Q.  Okay.  Let's go -- sorry.

Let's go back to Paragraph 348 of the amended complaint.

A.  Okay.

Q.  You allege that, as an act of retaliation against you, you were denied access to APA headquarters on the second day of the Article VII hearings regarding your charges against Pam Terrell?

Page 342

A.  Yeah.  I had to call Dan Carey in Israel to get access to the building.

Q.  And you got access to the building that day?

A.  After Dan Carey called him from Israel.

Q.  Okay.

A.  How ridiculous is that?  I'm prosecuting charges.  They forced me in Federal Court, out of Federal Court, out of my LMRDA claims, say I have to exhaust my administrative remedies, and I can't get in the building to exhaust my administrative remedies?  I mean, how egregious is that?

Q.  You got in the building, though, right?

A.  After the president ordered them to let me in.

Q.  Who denied --

A.  You know why they wouldn't let me in?

Q.  Who denied you access?

A.  Allison.  You know why?  There's still a standing directive from Bennett Boggess that I was not allowed in the building, even though he was no longer there.

Q.  What did Allison say to you?

A.  She said, you can't come in the building, there's a standing directive, you're not allowed in the building.

Q.  And then you were allowed in the building?



LAWRENCE MEADOWS
MEADOWS vs ALLIED PILOTS

January 13, 2026
343–346

Page 343

A. No, I had to go call Dan. I had to outside and waste an hour calling Dan Carey in Israel, and he called me back and he fixed it and told them to let me in, and then -- the Appeals Board couldn't even get me in the building. The Appeals Board chairman tried to get me in the building, they wouldn't let me in.

MR. SHIFFRIN: I think I'm about done, sir. I'm going to take a 10-minute break, consult with my colleagues, and see if I have any more questions.

THE WITNESS: Okay. I want to have some rebuttal when we get done, so just, I probably need a little bit of time for that.

MR. SHIFFRIN: What do you mean by rebuttal?

THE WITNESS: There's a few things I want to correct on the record or restate on the record. It's my right.

THE VIDEOGRAPHER: The time is 4:46 p.m. We're going off the record.

(Recess from 4:46 p.m. to 4:59 p.m.)

THE VIDEOGRAPHER: The time is 4:59 p.m. We're back on the record.

BY MR. SHIFFRIN:

Q. Mr. Meadows, I have just a few more questions.

A. Okay.

Q. Let's take a look at -- yeah.

Page 344

(Defendant's Exhibit 58 was marked for identification.)

BY MR. SHIFFRIN:

Q. Let me show you Exhibit 58. You'll see that Exhibit 58 is a letter from you to Bennett Boggess at APA who, at the time, was the APA Directive Legal, dated September 27, 2013.

Do you see that?

A. Yes.

Q. Okay. And you can take time to review this, but I believe in this letter you are asking for APA's assistance in getting a reasonable accommodation from American Airlines; is that right?

A. Yes.

Q. Okay. And Mr. Boggess responded to this letter?

A. I don't see a response.

Q. Okay. I'm going to show you a response.

A. I don't know if this is the first letter or not, but it was verbal. I had other communications.

(Defendant's Exhibit 59 was marked for identification.)

BY MR. SHIFFRIN:

Q. Mr. Boggess sent you a response on October 4th, 2013. This is what is marked as Exhibit 59.

Page 345

Do you see that?

A. Yep.

Q. And Mr. Boggess said in his response to you that, this response to your letter dated September 27th, 2013 regarding your American Airlines employment application and request for a reasonable accommodation, APA has no role to play in employment applications or requests for accommodation of the type you seek from American Airlines.

Do you see that?

A. Yep.

Q. Okay. So you knew that, as of October 4th, 2013, that APA's position was that it had no role to play in helping seek a reasonable accommodation for you, correct?

A. What's the question?

Q. No, that was my question.

A. I knew Bennett Boggess believed that, but I know, under federal law, APA is a covered entity and they have a role to play in the interactive process and, in fact, are obligated to -- let me finish.

And I would strenuously disagree with Bennett Boggess because the mechanics, the TWU have an accommodation review board, it meets bimonthly, and re-accommodates mechanics, but the union has no such --

Page 346

the APA has no such thing.

So I think Mr. Boggess is shirking his duties, his statutory obligation to the ADA, but yes, I see what he says, but I don't agree with it. And that will be decided in the next ADA lawsuit, I suppose, but go ahead.

Q. Okay. And --

MR. SHIFFRIN: I'll grab that one.

MS. RYBAK: Okay.

MR. SHIFFRIN: I think we're fine. Don't worry about it.

MS. RYBAK: Oh, we -- we may have already done that.

MR. SHIFFRIN: Yeah.

MS. RYBAK: It's because it's Exhibit 8.

MR. SHIFFRIN: Okay.

MS. RYBAK: So you covered it. Okay. 24.

MR. SHIFFRIN: I think this is -- it's fine.

(Defendant's Exhibit 60 was marked for identification.)

MS. RYBAK: 60.

(Sotto voce discussion.)

BY MR. SHIFFRIN:

Q. Okay. Let me show you what's been marked as Exhibit 60.



# EXHIBIT DX2

# for Shiffrin Declaration

# AmericanAirlines®

Ex2 ¹

August 5, 2011

Defendant Exhibit
Exhibit No.: **2**
Name: **Meadows, L.**
Date: **1/13/2026**
ESQUIRE

Via CERTIFIED MAIL

Lawrence Meadows
P.O. Box 4344
Park City, UT 84060-4344

Dear Mr. Meadows:

I am responding to the letter you sent to Dr. Bettes on June 22, 2011 about returning to duty as a pilot. As you know, to begin the process of returning to work as a pilot you must obtain a First Class Medical Clearance Certificate from the FAA and send it to AA Medical. If necessary, your AME can advise you on options and procedures for obtaining a special issuance. If you would like an AA Medical physician to assist you in the FAA clearance process, please contact Lead Program Nurse Marcia Reekie at 817-931-4260.

A second option available to you, if you are not able to obtain the required FAA Medical Certificate, or if you simply wish to return to work in a position other than pilot, is to work with the Company to identify a reasonable accommodation. Although you have not requested a reasonable accommodation, you should be aware that one or more may be available to you. To learn more about this option, please visit the Reasonable Accommodation Policy on JetNet. There you will find instructions for how to begin the process, or you may simply contact me and I will initiate it for you. If I have not heard back from you within 10 days of the date of this letter, I will contact you to discuss reasonable accommodation with you.

Our payroll history shows that you have been on a Sick Leave of Absence since April 19, 2004. Your collective bargaining agreement and company policy limit SLOAs for pilots to a total period of three years and up to a maximum of five years with approval, and requires administrative separation from employment when that limit is exceeded. Although you have already exceeded the time limit, as an additional accommodation, to give you time to obtain your FAA clearance and/or to work with us to identify a possible reasonable accommodation option for returning to work, we will continue you in SLOA status through October 7, 2011. If you are unable to return to work at the end of this extended leave of absence, with or without a reasonable accommodation, your employment with the company will end.

Please contact me if I can be of assistance or there is any other issue you would like to discuss. We wish you the best whatever your decision.

Sincerely,

Scott Hansen
Director, Flight Administration
817-967-5291

cc:   Personnel File
     Robert Raleigh



# EXHIBIT DX3

# for Shiffrin Declaration

# AmericanAirlines®



Ex 3

September 2, 2011

Sent Via FedEx

First Officer Lawrence Meadows
515 Woodside Ave.
Park City, UT  84060
516-982-7718

> Defendant Exhibit
> Exhibit No.:  3
> Name: Meadows, L.
> Date: 1/13/2026
> ●ESQUIRE

Dear Mr. Meadows,

This will follow up on our recent discussions, as well as your recent written communications.  I've appreciated the opportunity to speak with you.

As you will recall, we discussed American's protocol on providing reasonable accommodations.  As an aside, I did note in your correspondence your concern that it would be inappropriate for you to entertain potential reasonable accommodations because your long-term disability claim is in dispute. You included materials regarding the Americans with Disabilities Act upon which you based your concern.

While I appreciate the time that you must have spent in compiling your materials, the Company's approach remains simple: American is committed to the ADA's fundamental goal of helping employees get back to work when a medical impairment somehow impacts their ability to perform their job.  At American, we look at what an employee can and cannot do, and essential functions and qualifications of positions.  If a reasonable accommodation will allow an employee to return to work, we pursue that. I have not heard of anything that would make it "unlawful" for American to offer and for you to accept a reasonable accommodation in your situation.

Let me address your present status.  In our discussion, you confirmed that you do not hold a FAA Medical Certificate, which prevents your return to the pilot position, and of course, restricts you from flight duty. But we did discuss your options to seek a vacant position other than pilot.  I had promised to check on a few questions that you posed.  In addition to researching those questions, and in light of our lengthy discussions, I thought it may be helpful to summarize some points.

As you know, positions in Flight are subject to complex requirements.  For example, the company must comply with provisions in the collective bargaining agreement and FAA regulations.  Of course, these obligations have an impact on the analysis of reasonable accommodations.

Based on our bargaining agreement obligations, as we discussed, American is unable to simply assign you to do non-pilot work while keeping you employed as a pilot.  That would violate the collective bargaining agreement, and thus would not be a reasonable accommodation.  But, as we also discussed, you may voluntarily choose to seek vacant positions, whether inside or outside of the bargaining unit.  Of course, to the extent that any position is subject to a collective bargaining agreement, we must comply with the terms of the contract.  This includes contractual obligations on filling such vacancies.  With that in mind, let me address in more detail inquiries for vacancies.

**Check Airman**

You indicated your interest in a Check Airman position. I have researched that, and unfortunately, we cannot consider you for a Check Airman position as a reasonable accommodation.  Both X-type and L-



Meadows 013463

type Check Airman are required to be currently qualified to fly, as a matter of Company policy, under the terms of the collective bargaining agreement, and under our FAA-approved training program. Indeed, L-type Check Airmen must periodically rotate to fly the line. Because the absence of an FAA medical certificate prevents you from flying, you would not be able to satisfy this essential part of the job and it cannot be available as a reasonable accommodation.

## Other Vacant Positions

I would also urge you to examine other vacant positions. These may include, for example, management or support staff positions, or a Simulator Pilot Instructor position. These alternate positions must be reviewed on their own terms – rates of pay and types of benefits for these positions will be different from the pilot position.

Should you be selected for and accept a position outside of the bargaining unit, you would be removed from the pilot seniority list. Obviously, leaving the bargaining unit is a personal choice for any employee. Many bargaining unit employees do not wish to leave the union to take a non-union position for myriad reasons. Because you indicated in one of your emails that this is a concern for you, let me ask you to confirm: Are you willing to consider and accept, if offered, any positions outside of the bargaining unit?

## The Careers Page of Jetnet

If you are interested in leaving the union to take a non-union position, let me refresh your memory on the tools available. As you may know, American posts its vacant non-union positions on Jetnet. Employees are able to directly view online any vacant position to determine whether they are qualified for, and interested in, that position. Employees then have the ability to respond directly to the posting to be considered for selection. For these non-union positions, selections are merit-based, and managers select the most qualified candidate.

To access this tool, log into Jetnet, and click on the "Careers" tab. On the Careers landing page, look for the "Internal Careers" heading, with the link for "Find a Job." Click on that link, and the system will list all current vacancies. You may also use the tools in the Find a Job system to search vacancies by certain parameters. If positions interest you, you have the opportunity to apply for them via this tool.

I would suggest that you test your access to the Careers page of Jetnet. If you do not have access to that, please contact me immediately, because that is a technical issue that I can make sure is corrected. I would also suggest that we schedule a time in the next few days so that you and I may discuss open positions; assistance with the application process; assistance with your resume; or any other questions or concerns you may have. If you have particular dates and times that are open for you, please advise.

Sincerely,

Scott Hansen
Director, Flight Administration
American Airlines
817-967-5291

Meadows 013464

# EXHIBIT DX4
# for Shiffrin Declaration

Ex 4

| | |
|---|---|
| Subject: | Re: Your E-mail of 7Oct11 |
| From: | Lawrence Meadows (lawrencemeadows@yahoo.com) |
| To: | Scott.Hansen@aa.com; |
| Cc: | john.hale@aa.com; philip@pjllawfirm.com; |
| Date: | Friday, November 4, 2011 1:21 PM |

Defendant Exhibit

Exhibit No.: **4**

Name: **Meadows, L.**

Date: **1/13/2026**

ESQUIRE

Scott,

I'll try to contact you later, as I'm in trial most of day awaiting a ruling on my damages and fees in the bank litigation.

First, to be frank, I am extremely disappointed; and find it very disconcerting that American has chosen to violate my SOX Whistle Blower protection, and terminate me in violation of Federal Law. Please give me a formal termination letter so I can forward to the DOL as per their recent request.

Second, absent confirmation that Capt Hale wil not meet with me, I'll take that as his refusal to do so. Regardless, I the Corporate Ethics Policy is clear that he is required as my supervisor to intimate an investigation with Corporate Security, based on my request. Furthermore, as an Executive Officer I shouldnt need to remind him that he has a fiduciary duty to do so  If he is unwilling to do so please let me know before COB today. Otherwise, I will proceed with contacting AA General Counsel, and Corporate Security.

This is most unfortunate for all involved, nothing good can come of it.
Regardless, I thank you once again for your assistance throughout this matter

Sincerely,
Lawrence Meadows


Sent from my iPhone

On Nov 4, 2011, at 8:18 AM, "Hansen, Scott" <Scott.Hansen@aa.com> wrote:

Dear Larry,

Thank you for your e-mail of October 31.  In it, you posed five questions.  I appreciate the opportunity to respond to your concerns.

Your first question sought clarification of your employment status and seniority number.  As you'll recall from my letter of August 5, 2011, you had exceeded the time limit for a Sick Leave of Absence under the terms of the collective bargaining agreement.  Nonetheless, as an additional accommodation, to give you time to obtain your FAA clearance and/or to work with us to identify an alternative accommodation, American agreed to continue your SLOA status through October 7, 2011.  As you'll recall from our subsequent discussions, as well as my letter of September 2, 2011, you confirmed that you did not hold a FAA Medical Certificate, which prevented your return to the pilot position; as well as placement into a Check Airman position.  In that September 2 letter, I urged you to use your remaining time

**Meadows 013575**

on leave to examine other vacant positions – including a specific position within the TWU – even though these positions would require you to leave the pilot bargaining unit. I also took that opportunity to refresh you on how to use tools on Jetnet to see comprehensive lists of vacant positions across the company. In light of the fact that October 7 was approaching, I also asked you to contact me for assistance in applying for any vacant position in which you were interested. By October 7, 2011, you and the Company appeared to have exhausted any opportunities for your return to work into the pilot bargaining unit. And – as noted above – you had indicated that you did not wish to leave the bargaining unit, and you had not sought positions outside of the pilot bargaining unit. In an effort to ensure that you had the opportunity to fully reflect on this personal decision, and apply for vacant positions if you had changed your mind, American notified you that we would continue your SLOA to October 21, 2011. I also noted that upon the expiration of your leave, the only alternative available if you were still in the bargaining unit was administrative separation from the company. As of October 21, 2011, you remained in the bargaining unit, thus, you were removed from the pilot seniority list and administratively separated from the company, as we had advised in advance. The APA is your exclusive representative with respect to the bargaining agreement under the Railway Labor Act. If you dispute the effect under the terms of the bargaining agreement of your removal from the seniority list and separation, I suggest that you seek your union's assistance with invoking the alternative dispute resolution process under the bargaining agreement.

Your second question sought a new passcode for Jetnet, in order to search for alternate positions. As you had confirmed to me previously, during your employment with American, you did not wish to leave the pilot bargaining unit for alternate positions. If, in the future, you elect to change your mind, you would have access to all positions open to external (non-employee) job applicants via AA.com, without need for access to Jetnet.

Your third question sought an "expense voucher." You indicate that you wanted the voucher to seek reimbursement under Supplement F(5)(h) of the collective bargaining agreement. I understand from previous communications with you that the cost that you incurred refers to your personal election to seek medical consultation with the Mayo Clinic. I have reviewed Supplement F(5)(h), which states: "Any disputes arising as to the clinical validity of a claim or as to the continuation of disability defects, once commenced, shall be referred to a mutually agreed-to clinical source, whose findings regarding the nature and extent of the condition shall be final and binding upon the parties. The cost involved in such proceeding shall be equally shared by the Association and the Company." The language of Supplement F(5)(h) does not apply to your situation. As noted above in response to your first question, the APA is your bargaining representative, and I suggest that you consult with your union regarding any additional question surrounding the contents of Supplement F(5)(h).

Your fourth concern appears to be an email from Dr. Anzalone referring to an LTD claim. Although you don't pose a specific question, I can confirm my understanding that American has received your LTD claim, and I understand that it is being processed according to standard protocol.

Your fifth question sought a meeting with Captain Hale. As I noted in response to your first question, the collective bargaining agreement includes a comprehensive dispute resolution process. To the extent that a Captain Hale is a part of that process, I again urge you to explore your grievance

**Meadows 013576**

rights with the APA.

Larry, I trust that this responds to your five questions. I wish you well in your future endeavors.

Sincerely,

Scott Hansen
817-967-5291

---

**From:** Lawrence Meadows [mailto:lawrencemeadows  yahoo.com]
**Sent:** Monday, October 31, 2011 4:19 PM
**To:** Hansen, Scott
**Cc:** Hale, John
**Subject:** Re: Your E-mail of 7Oct11

**Sent via e-mail and certified mail:**

Hello Scott,

In your letter of 7Oct11, you said American would extend my employment to 21Oct11, but I have not received  any other correspondence with respect to my employment since then. You also encouraged me to continue looking in Jetnet for other job listings. However, when I attempted to Login this weekend I was locked out, I don't know if that was intentional or some sort of error. Please follow-up on that, and the other issues outlined below.

**1. What is the company's current position on my empbyment status and seniority number?**

**2. I need to get a new passcode for Jetnet**, if I am to continue to be able to actively search for a job that could possibly serve as a reasonable accommodations.

**3. Please send an expense voucher.** So I can apply for reimbursement of the cost of the Mayo Clinic's proper clinical review, and verification of my existing medical    disability; which I was    forced to pay for at my own expense, since the company failed to ever provide a clinical review from a legitimate clinical authority/source  as required under Supp-F 5(h).

**4. I received a letter last week from MIA base Dr. Anzalone**, stating he received " Notice of [my] intent to file a claim for flight disability." I found this rather confusing, since it's been over one    month since I submitted a full disability claim package in a 31 Tab 3" binder, consisting of almost 300 pages of claim forms and supporting documents directly yo your office. So, it seems he may    not have part or all of that package. If that is that case please ensure he gets a copy of my complete package as submitted. I hate to be cynical, but I don't know why the base doctor is even    involved at this juncture; I feel like I'm getting the run-around in the disability
 claim process. I submitted my claim with you a HDQ FLT Admin, because the  MIA Chief refuses to communicate    with me, and MIA base FLT Admin deferred everything to HDQ. So it seems that my file should have gone directly to Dr. Bettes at AA Medical HDQ, but instead it's going backwards down    to the base level.
     Please follow-up on that and advise me on the status of my disability claim and what else if anything the company could possibly need. This is

Meadows 013577

getting frustrating, but I guess it shouldn't    surprise me when dealing with AA Medical. Ironically,  the Chief of Aerospace Medicine said that AA Medical is the most dysfunctional medical department he's ever dealt with – and he deals    with a lot of corporations and medical facilities around the world.

5.  Finally, It is imperative I get a meeting with Captain Hale as my ultimate superior ASAP; since my base supervisor, MIA Chief Capt. Raleigh refuses to help me.

I want to report, and advise Capt. Hale of specific issues, with respect to threatened termination of my employment. Especially, as it relates to the fraudulent scheme iimplemented/conducted by specific individuals and departments. Specifically, but not limited to Dr Bettes, and Nurse Spoon of AA Medical; Deborah Jameson, and Charlotte Teklitz of the    PBAC, and Marjorie Powell of the Legal Department. Based on information and belief, these individuals committed fraudulent acts that have stripped many of his subordinate pilots of their of    their rightful disability and medical benefits, as well as their employment. They have systematically engaged in a on-going conspiracy that has fraudulently understated pension funding liabilities,    and overstated corporate  earnings in violation of the Sarbanes-Oxley Act. Thereby, ruining the careers, and lives of many the pilots under his command, in the name of "cost savings." Capt.    Hale has a moral, and legal obligation to ensure his subordinates federal employment rights are not violated; and as VP of FLT, and officer of the company he has fiduciary, and ethical obligation    to  report these individuals, and their activities to Corporate Security for a full investigation. I'm requesting he initiate said investigation of the behalf of myself and similarly wronged  pilots. I    don't want to go over his head, and break the chain of command, but if I must then I will. I feel I owe that much to him, to avoid the flight department from being implicated in this  matter.

Scott I believe you tried to help me to the best of your ability within the constraints of your position with the company; and I'd also like to believe that Captain Hale is on my side as well. However, if I'm forced to go to Corporate Security without him, I fear he will be implicated in this entire mess. If he continues to sit on sidelines, and remains silent, it will smack of complicity.  So please make your best effort to convey to Captain Hale that I do want his involvement, and request his intervention in this matter. I really don't want to go any further down this road taking irreversible actions without his knowledge, but will do so absent further direction from him. This is a serious matter, and I can say with certainty, that the culpable individuals will lose their employment with the company, and could be criminally liable for violations of numerous federal statutes. It's only a matter of time before this situation is squarely at the feet of Mr Arpey, and the Board of Directors, and that will not bode well for all those involved. Sooner or later American Airlines will have to rectify this matter, and conduct itself as a publicly held Fortune 100 company – either voluntarily or forcibly.

Sincerely,

Lawrence Meadows

Meadows 013578

777FO MIA

From: "Hansen, Scott" <Scott.Hansen___aa.com>
To: Lawrence Meadows <lawrencemeadows___yahoo.com>
Sent: Friday, October 7, 2011 9:26 AM
Subject:

Dear Larry,

This will follow up on our recent correspondence and discussions.

You'll recall that in my letter of August 5, 2011, I noted that the leave of absence provided under the terms of your collective bargaining agreement had expired, but that as a clerical error, you were not administratively separated. Accordingly, I advised that American would extend your leave by an additional 60 days, to October 7, 2011, to allow you and the Company to continue to identify and discuss any potential reasonable accommodations that would allow you to return to work.

Over the course of the last two months, both you and the company have been able to examine alternative job opportunities and potential reasonable accommodations. Of course, you do not hold a First Class Medical certificate from the FAA, which is a requirement to work as an active pilot. Nonetheless, you and I examined alternative positions within your bargaining unit to determine whether you may return to work in such a position. Specifically, we examined Check Airmen jobs, to determine whether you were qualified for that position, and could perform the essential job functions, with or without reasonable accommodation. Unfortunately, as I shared in a recent letter, the check airman positions require a candidate to be an active pilot, qualified to fly. Thus, you lacked a basic qualification for that position. Although we have also communicated about your ability to seek alternative, vacant positions outside of the bargaining unit – as an example, a position as a Simulator Tech Instructor, which falls within the TWU bargaining unit – you have confirmed to me that you do not wish to leave the pilot bargaining unit, and American certainly acknowledges that personal election.

I appreciated the opportunity to explore these options with you, and I respect the choices that you have made. Nonetheless, I do want to ensure that you understand the significance of your decision not to seek positions outside of the pilot bargaining unit. It appears that we have exhausted any opportunities for your return to work into your bargaining unit, with or without reasonable accommodation. Accordingly, based upon the expiration of your leave of absence, the only alternative available should you remain in the bargaining unit is to administratively separate from the company. Although you have advised me that you do not wish to leave the bargaining unit, in an effort to ensure that you have the opportunity to reflect upon that election, American has agreed to extend your leave for two weeks, to October 21, 2011, should you wish to apply for vacant positions outside of the pilot bargaining unit. In past correspondence, I reminded you of the tools available to apply for open positions via Jetnet. I also offered to schedule time during which you and I may

**Meadows 013579**

Case 1:17-cv-22589-EA   Document 238-3   Entered on FLSD Docket 04/01/2026   Page 62 of 324

discuss open positions; assistance with the application process; assistance with your resume; or any other questions or concerns you may have. Of course, I remain available to discuss those items.

On unrelated items, I also wanted to take this opportunity to address two additional concerns that you've posed recently. First, you have inquired whether the pay code PW (Paid Withheld from Service) would apply to your time out of work. That code is used when a pilot has a contractual right to full paid status during an investigation conducted by the airline surrounding the pilot's conduct. Accordingly, the PW code would not apply to your time.

Second, you have posed a question regarding your travel privileges during your time away. Generally, company policy for all pilots on disability is that if you are unable to come to work when scheduled, you are unable to travel. Travel is not considered a benefit or right, nor is it included inside of the collective bargaining agreement. Rather, travel is deemed a "privilege" and the company reserves the right to modify its guidelines with or without notice. Pilots who wish an exception to the policy of no non-revenue travel while on disability may seek an exception from their chief pilot, the VP of Flight, or his designee. All exceptions to the general policy must be pre-approved prior to the actual travel date. A complete description of company policy and traveling while absent from work can be found in the Trip Book on Jetnet.

Sincerely,

Scott Hansen
817-967-5291

NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

Meadows 013580

# EXHIBIT DX6

# for Shiffrin Declaration

*Ex 6*

# ALLIED PILOTS ASSOCIATION
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

November 18, 2011

Defendant Exhibit
Exhibit No.: **6**
Name: **Meadows, L.**
Date: **1/13/2026**
ⒺESQUIRE

VIA CERTIFIED MAIL / RETURN RECEIPT
REQUESTED #7008 3230 0000 8494 0484

First Officer Lawrence M. Meadows
P. O. Box 4344
Park City, UT  84060-4344

     Re:    Medical Disability Reinstatement

Dear First Officer Meadows:

     This confirms receipt of your email dated November 8, 2011, to Captain Scott Iovine, APA MIA Domicile Chairman (Encl. #1). In your electronic message, you requested APA's assistance with respect to your "termination" by the Company. Your correspondence has been forwarded to me for response.

     In preparation for this response, I reviewed several pieces of your previous correspondence, the majority of which was directed to the Company with a courtesy copy to APA. I have also discussed your case with your domicile representatives, members of the APA Benefits Department and staff from APA Legal.

     It is my understanding that you received pilot long-term disability (LTD) benefits from approximately May 2004 through December 2007, at which time Dr. Thomas Bettes, AMR Corporate Medical, terminated your benefits. You then appealed that decision to the American Airlines Pension Benefit Administration Committee (PBAC). I have confirmed that prior to submitting your appeal, you received direct assistance from both the APA Benefits Department and Dr. Keith Martin, of Virtual Flight Surgeons, now known as Aviation Medicine Advisory Service (AMAS). Dr. Martin reviewed your denial letter and recommended that you obtain a formal psychiatric evaluation in addition to submitting complete medical records from your nurse psychologist. Dr. Martin then reviewed your formal psychiatric evaluation and additional records prior to you submitting them to the PBAC. As you know, APA contracts with AMAS to provide consultation services and aeromedical advice to APA members at no charge to the individual pilot.

     Unfortunately, the PBAC denied your appeal in June 2008. In October 2008, APA retained outside counsel in Oakland, California to assist APA in aggressively reviewing individual pilot LTD cases. Outside counsel assisted APA with pending appeals, and in cases where the PBAC had already denied a pilot's appeal, such as yours, outside counsel also reviewed the case for possible litigation. With your permission, your case was sent to outside counsel in February 2009. After a review, outside counsel, along with APA Benefits and Legal, your domicile representatives and the APA Secretary-Treasurer held a telephone conference with you on August 12, 2009, to discuss your case. Although the general opinion was that your case

*First Officer Lawrence Meadows*
*November 18, 2011*
*Page 2*

was not very strong for litigation, referrals were provided to you for competent lawyers near your home and where you were based.

We are aware you retained a lawyer and pursued litigation. Regrettably, we understand your case was dismissed on summary judgment. In response to your previous request for reimbursement of your individual litigation costs to date, as well as your request to fund and pursue your case through the appellate process, APA must respectfully decline your requests. This decision comes only after careful consultation with APA Leadership, APA Benefits and APA Legal Departments, as well as consultation with our outside legal and ERISA experts.

In response to your concerns regarding APA's future action in addressing your "termination," (again Encl. #1), let me clarify that the Company did not "terminate" you; rather, your employer is seeking to exercise administrative procedures contained in the Collective Bargaining Agreement ("CBA"). Specifically, pursuant to Section 11.D.1 of the CBA, a leave of absence for sickness or injury may not exceed five (5) years. Because you have been out on medical disability and/or on a Sick Leave of Absence since 2004, you exceeded the five (5) year limit. The Company now asserts they had no choice but to drop you from the seniority list as prescribed by the CBA. This is presumably what Scott Hansen, Company Director Flight Administration, was trying to explain in his letter to you dated August 5, 2011 (Encl. #2). Being administratively dropped from the seniority list differs from being involuntarily terminated, which is considered a "permanent separation." Among other distinctions, should you obtain your First Class Medical Certificate in the future, you may request to return to active status if approved by both the Company and APA. Certainly, should you obtain your First Class Medical Certificate and wish to return to the seniority list in the future, APA will assist you in the process of requesting your return to the seniority list.

As to your reference to a violation of the Sarbanes-Oxley Act (your "SOX whistle-blower" case), while APA is your exclusive representative with respect to the bargaining agreement under the Railway Labor Act, we are not in a position to represent you individually in your allegations and filing of this particular complaint.

Should you have an issue that is grievable under the CBA, we are very willing to assist you with that matter. Specifically, if you are able to return to active flight status in the future, please contact APA Legal for assistance in that process.

Sincerely,

J. Bennett Boggess
Director of Representation

Enclosures (2)

cc:     Captain David Bates, APA President
        Captain Scott Iovine, APA MIA Chairman

APA_000014252

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Tuesday, November 08, 2011 8:44 PM
**To:** Iovine, Scott; MIA-Chair; Rivera, Ivan - Sec; MIA-Vice; President; Vice President; SECRETARY-TREASURER; APA Legal Bennett Boggess; Myers, Mark
**Cc:** Philip Layfield
**Subject:** Awaiting your response: Termination in Violation of SOX Whistler Blower Protetcion

Scott,

It's been three days since my last request for APA's assistance, and for the union to exercises their duty to represent me as a member in good standing; with respect to the company's unlawful termination of me in violation of my SOX Whistle-blower pprotection. I know you guys are all busy and all trying to negotiate a contract, but that seems highly unlikely; when APA appears to be unwilling and/or unable to defend their members under the current contract.

**So I will ask you once again, "Scott as my union base representative, what is the APA going to do for me with this respect to my termination, and how will you invoke the alternative dispute resolution on my behalf. I need an immediate answer, from you and APA Legal; and respectfully demand you take swift and appropriate action on my behalf.**

Fraternally,
Lawrence Meadows
777FO MIA

Enclosure #1

APA_000014253

# AmericanAirlines®

August 5, 2011

Via CERTIFIED MAIL

Lawrence Meadows
P.O. Box 4344
Park City, UT 84060-4344

Dear Mr. Meadows:

I am responding to the letter you sent to Dr. Bettes on June 22, 2011 about returning to duty as a pilot. As you know, to begin the process of returning to work as a pilot you must obtain a First Class Medical Clearance Certificate from the FAA and send it to AA Medical. If necessary, your AME can advise you on options and procedures for obtaining a special issuance. If you would like an AA Medical physician to assist you in the FAA clearance process, please contact Lead Program Nurse Marcia Reekie at 817-931-4260.

A second option available to you, if you are not able to obtain the required FAA Medical Certificate, or if you simply wish to return to work in a position other than pilot, is to work with the Company to identify a reasonable accommodation. Although you have not requested a reasonable accommodation, you should be aware that one or more may be available to you. To learn more about this option, please visit the Reasonable Accommodation Policy on JetNet. There you will find instructions for how to begin the process, or you may simply contact me and I will initiate it for you. If I have not heard back from you within 10 days of the date of this letter, I will contact you to discuss reasonable accommodation with you.

Our payroll history shows that you have been on a Sick Leave of Absence since April 19, 2004. Your collective bargaining agreement and company policy limit SLOAs for pilots to a total period of three years and up to a maximum of five years with approval, and requires administrative separation from employment when that limit is exceeded. Although you have already exceeded the time limit, as an additional accommodation, to give you time to obtain your FAA clearance and/or to work with us to identify a possible reasonable accommodation option for returning to work, we will continue you in SLOA status through October 7, 2011. If you are unable to return to work at the end of this extended leave of absence, with or without a reasonable accommodation, your employment with the company will end.

Please contact me if I can be of assistance or there is any other issue you would like to discuss. We wish you the best whatever your decision.

Sincerely,

Scott Hansen
Director, Flight Administration
817-967-5291

cc:     Personnel File
        Robert Raleigh



Enclosure #2

APA_000014254

# EXHIBIT DX13
# for Shiffrin Declaration

**1**

**Lawrence Meadows /AA#332713**
**Po Box 4344**
**Park City, UT 84060**

4Feb12



Defendant Exhibit
Exhibit No.: 13
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

**Captain John Hale**
**VP of FLT**
**AA Flight Academy**
**Po Box 619617**
**Dallas/Fort Worth Airport, TX 75261-9617**

**Sent via e-mail and certified mail:**

Dear Captain Hale,

I'm writing to grieve the improper assertions and actions, made via e-mail by Scott Hansen, Director HQD Flight Administration with respect to my employment status, seniority, and discharge. For the record I have never been contacted by, nor received any formal notice from my supervisor MIA Chief Pilot Raleigh, with respect to any of the above. Keep in mind I have a disability that affords me rights and protections under the American with Disabilities Act (ADA). Moreover, on 6Dec11 the company acknowledged such when they re-approved my Pilot Long Term Disability benefits.

In Blatant violation of the ADA, I was unilaterally removed me from the pilot seniority list, and discharged from American Airlines, not by my supervisor, but instead by the Mr. Hansen; who also denied me additional sick leave as a reasonable accommodation. Notwithstanding the fact that the "EEOC Enforcement guidance on the ADA and Psychiatric Disabilities, Para. 29", clearly states the _"No-Leave" policies_ (such as the company's 5 years max sick leave rule) are _strictly prohibited._ Instead, I should have been granted additional leave as a reasonable accommodation, as long as necessary to meet the medical requirements of my job. In the interim the company is required to keep my same job, and position (i.e., seniority) open, until I'm able to return to work.

Furthermore, I protected then, as I am now as a Federal Whistle Blower. Yet Mr. Hansen, acting in a non-supervisory capacity asserted that he revoked my seniority and discharged me from the company; which constitutes a blatant violation of my rights and protections under federal law:

**Sarbanes–Oxley Section 1107: Criminal penalties for retaliation against whistleblowers:**
_"Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense, shall be fined under this title, imprisoned not more than 10 years, or both."_

Therefore as provided under Section 21 of the Pilots CBA, Section Please consider this my formal request for grievance on the above matter.

Sincerely,

_L. M. Meadows_

Lawrence Meadows/ 777FO MIA
Page 1 of 1

# EXHIBIT DX14

# for Shiffrin Declaration

**1**

# American Airlines

Defendant Exhibit
Exhibit No.: 14
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

June 6, 2013

Larry Meadows
1900 Sunset Harbor Dr. 2112
Miami Beach, FL 33139

Re: Grievance 12-011

Dear Larry,

I held an appeal hearing for the above listed grievance on April 25, 2013 during which you protested your removal from the AA pilot seniority list as a result of being on continuous sick leave of absence for more than 3 year as specified in the Collective Bargaining Agreement.

You did not provide new information at the hearing that would compel me to change the decision to remove you from the seniority list as provided by the Collective Bargaining Agreement, Sec. 11-1, K. 1. Therefore, your grievance is denied.

Sincerely,

Captain Bart Roberts
Director of Flight

CC: APA Legal
   Bob Raleigh, Director of Flight - MIA

P.O. Box 619617
DFW Airport, TX 75261-9617

# EXHIBIT DX15
# for Shiffrin Declaration

Defendant Exhibit
Exhibit No.: 15
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

## FO LAWRENCE MEADOWS PAC POSITION STATEMENT - GRIEVANCE #12-011

Chief Roberts denial of Meadows grievance makes no sense. Meadows did not protest his removal from the seniority list under Sec 11-1, K.1, but instead grieved his improper discharge and removal from the seniority list based on American's violations of the ADA, and retaliation in violation of SOX-Whistleblower Act. Further, AA had waived any right it had under sec 11.D.

## SUMMARY OF FACTS

- On Dec 26, 2007 Meadows disability benefits were terminated by the AA Corp. Medical Director, who asserted Meadows was no longer disabled under the Program; and he changed Meadows status to USLOA, but failed to offer a reasonable accommodation.
- As of May 17, 2009 Meadows was on combined Disability/SLOA for 5 years, but AA did not terminate him in accordance with Sec 11.D.
- On Jun 15, 2011, Meadows made a certified request for a Sec 20 Physical Exam and RTW clearance, but the Corporate Medical director ignored said request.
- On Jul18, 2011, Meadows engaged in protected SOX-whistleblower activity, and reported AA Medical's *"Pilot Disability Nurse Case Management Cost Savings"* scheme.
- On Aug 5, 2011, American threatened to terminate Meadows unless he obtained an FAA medical certification and RTW as a pilot, or alternatively, permanently resign his pilot seniority number and take a position outside the flight department.
- Meadows made multiple requests for a reasonable accommodation within his bargaining unit, but AA refused to grant one, and refused to acknowledge he even had a disability.
- On Sep 14, 2011, Meadows was evaluated by the Mayo Clinic, who verified Meadows had a newly diagnosed disabling illness, as defined under the LTD plan.
- On Oct 1, 2011, based on his status as an *Active Pilot Employee* on the *System Seniority List*, who was on an *Authorized Leave* and received *Compensation* in 2011; Meadows was eligible to apply for, and was ultimately approved for LTD benefits under the new Plan on Dec 13, 2011, based on a newly diagnosed condition.
- On 11/4/11 AA terminated Meadows and removed him from the seniority list, despite Meadows pending LTD claim, and SOX WB protection. Ostensibly, this was done under Sec 11.D, but AA had already failed exercise that right for almost 3 years prior.
- On Feb 12, 2012, Meadows filed termination grievance #12-011.
- On Aug 1, 2013, The PBAC approved Meadows appeal for retroactive disability benefits and reinstatement of Credited Service under the new LTD plan from 3/25/08 - 12/13/11.

## RELIEF OFFERED

1. Mutual release of all past, present, and pending contractual, statutory, or legal claims.
2. Waiver of any monetary claims for back pay in PW status, past medical expense reimbursement, lost interest on any previously unpaid benefits, and any legal fees.

Meadows 013867

## REMEDIES SOUGHT

      **I.   REINSTATEMENT TO THE SENIORITY LIST**
      **II.  REINSTATEMENT OF NON-REV TRAVEL BENEFITS**
      **III. REASONABLE ACCOMODATION WITHIN THE BARGAINING UNIT**

## MEADOWS POSITION

**I.  Meadows is entitled to reinstatement to the AA Pilot System Seniority List;**

First, AA did not timely exercise its rights under section the CBA Sec 11.D, and is now legally barred from doing so by the doctrines of waiver, estoppel and laches.

Second, Sec 11.D has been modified by the longstanding past-practice for almost 50 years prior to bankruptcy, wherein APA and AA previously reinstated to the seniority list pilots who were on LTD in excess of five years, but subsequently became qualified for their pilot job.

Third, the 5 year maximum sick leave policy contained in Sec 11.D, is unlawful as it violates the ADA's strict prohibition against similar "No-Leave" polices. Furthermore, American is currently under a EEOC Systemic Investigation for its failures to reasonably accommodate its employees, similar to what United Airlines was recently subjected to. More importantly, in Dec 2012, just a three months after a stunning reversal and the groundbreaking ruling in *EEOC v. United Airlines (No. 11-1774, 7th Cir. Sept. 7,2012)* (Exhibit 1), United Airlines eliminated its 6 year maximum sick leave policy in the Pilot's 2012 CBA (Exhibit 2). Thereby, effectively reasonably accommodating UAL pilots with additional medical leave; by allowing them to remain on the seniority list, until they are medically qualified and return to work, or until they retire. There is no reason why disabled AA pilots shouldn't also similarly enjoy the same protections as required under the ADA.

**II. Meadows is entitled reinstatement of his non-rev travel privileges;**

First, up to the date of his removal from the seniority list Meadows previously enjoyed Non-Revenue travel benefits, as originally approved by AA's Corporate Medical Director (Exhibit 3), and granted in blanket authorization letter by his Chief Pilot (Exhibit 4). Additionally, the MIA Chief Pilot allowed Meadows to retain these privileges, despite the Corporate Medical Director's subsequent, unsubstantiated and discriminatory recommendation in June 2008, to *"restrict his Non-Rev travel (even though there is no strict medical reason to do so), then consider some disciplinary action...."* (Exhibit 5).

Second, now that Meadows is once again receiving benefits under the LTD plan there is no legitimate reason, for Meadows not to be allowed the use of his travel benefits. Moreover, Meadows treating doctor recently provided a medical evaluation to the AA, wherein she stated; *"I do not believe his condition would be adversely impacted by airline travel. There are no impairments or limitations that would prevent Mr. Meadows from airline travel, and there would not be a medical reason to restrict him from such travel."*

**III. Meadows is entitled to a Reasonable Accommodation in his bargaining unit;**

**Meadows 013868**

Significantly, just two months ago on May 28th, 2013, the U.S. Supreme Court, denied United Airlines petition for review, and let stand the 7th Circuit's *En Banc* decision in *EEOC v. United (7th Cir. Sep 7, 2012)*; which held that, "*The ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified...or another option, such as providing an accommodation which allows the employee to remain in his or her current position.*" Furthermore, the Obama administration, on behalf of the EEOC and in the interest of public policy, also urged the justices to let the Chicago based appellate panel's ruling stand (Exhibit 6).

Second, EEOC Enforcement Guidance Under the ADA (915:002, Para.39) defines a "Qualified individual" with a disability, as one who can perform *"essential job functions"* with or without a reasonable accommodation. Meadows meets all of AA's published Essential Job Functions of Pilot (Exhibit 7). Meadows can perform all of an AA Pilot's Essential Job Functions, but simply cannot hold an FAA 1st Class Medical certificate; which is not listed as an Essential Job Function, because it only relates to professional licensure. There are at least three jobs within the bargain unit, which an LTD pilot such as Meadows, could perform without an FAA medical certificate; to include Flt Ops Technical, Base Chief Pilot, or X-Type Check Airman (simulator only).

Third, Meadows can be easily be reasonably accommodated within the bargaining unit in the position of X-Type Check Airman (simulator only) based on both a contractual and statutory basis; 1) The CBA Sec 12.B.10., provides that a Check Airman placed on disabled status, will be given the choice of remaining as a Check Airman, and that the company has the ability to address special situations on an ad hoc basis (Exhibit 8), 2) FAA regulation 61.23(b)(7), provides that a medical certificate is not required when serving as a Check Airman and administering a practical test or proficiency check for an airman certificate or rating, or authorization conducted in a simulator or flight training device (Exhibit 9), and 3) Under EEOC reasonable accommodation practices, which include job restructuring or job sharing, AA could modify an X-type's annual Line Rotation requirement to fly 73 hours under CBA 12.B.9.d.(1), by allowing Meadow to exchange his flight hours for another Check Airman's simulator hours.

## CONCLUSION

Meadows is thankful AA has finally approved his 2nd PBAC claim for retroactive disability benefits, and reinstatement of his Credited Service; and would now like to give the company the opportunity to resolve all outstanding matters amicably - once and for all. Further, Meadows desires to put this unpleasant mess behind him, and utilize his specialized skills and education to work as a productive asset for the company; until such time that he can obtain FAA medical certification to achieve his ultimate goal to return as a line pilot for American Airlines.

**Respectfully Submitted, on this 6th day of August, 2013, by FO Lawrence Meadows;**

*L. M. Meadows*

Page 3 of 3

**Meadows 013869**

# EXHIBIT DX19

# for Shiffrin Declaration

Defendant's Exhibit
Exhibit No.: 19
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

October 31, 2013

Lawrence M. Meadows
777FO/MIA  AA# 332713
P.O. Box 4344
Park City, UT 84060

Captain John Hale
Executive Vice President of Flight
American Airlines
Po Box 619617,  Flight Academy MD-823
DFW Airport, TX 75261-9617

**Sent via certified mail and e-mail:**

**Re: Meadows Grievance 13-064, for Contractual Violation of CBA Sec. 13**

Dear Captain Hale,

I hereby timely submit this contractual grievance in accordance with Section 21.D.2, based on the Companies' flawed contractual interpretations and positions adopted in defense of its August 20, 2013 PAC Denial of my previous Grievance #12-011. I have had an RLA expert review AA-APA  Collective Bargaining Agreement (CBA), who has advised that  Company has and continues to systematically abrogate the contractual seniority rights of myself and other similarly situated sick/disabled pilots in violation of the CBA Section 13. These violations are indirectly effectuated thorough the  misapplication and subjective  reinterpretation of the terms of CBA Section 11.D.1; in an effort to improperly impose an unspecified requirement to administratively the  terminate employment, and remove from the seniority list, pilots who are continuously sick and/or disabled in excess of five (5) years[1].

This contractual violation is based on the following reasons;

First and Foremost, CBA **Section 13**  ***"Seniority",***  is the controlling Section as it relates to pilot seniority issues. Further, the  language of **Section 13.C.** ***"Retention of Seniority"***, explicitly dictates that,  "***a pilot once having established seniority, shall not lose such seniority except as provided in this Section[13]."***

Second and more importantly,  **Section 13.F.** ***"Loss of Seniority";*** only allows for forfeiture of pilot seniority under the four distinct circumstances for,  *"A pilot who resigns from service of the company, retires, or is discharged for just cause...,* or fails *"to return to duty as a*

---

[1]    *Government employment statutes, such as the Americans with Disabilities Act (ADA) supersede any contractual language in a CBA.  Further, the ADA prohibits employers  from entering into collective bargaining agreements that discriminate against individuals protected by the ADA. To the extent that  such employment laws are not explicitly referenced in the language of the bargaining agreement itself, the legislative history of the ADA shows that Congress considered the unique problems created by collective bargaining agreements, and intended that the provisions of an agreement be dovetailed with the duty of reasonable accommodation under the ADA. Thus, the Company's application of a five year maximum sick leave policy as described in Section 11.D.1 is unlawful and violates the American with Disabilities Act strict prohibition of No-Leave Policies. The Company is in fact required to provide a disabled pilot as much additional medical leave necessary, as a form reasonable accommodation.*

**Meadows 009537**

*pilot* " from a furlough recall. None of those circumstances apply to me personally; as I never resigned, retired, been discharged for cause, nor was I ever furloughed. Therefore, the Company has no contractual basis whatsoever to remove me from the seniority list, much less administratively terminate my employment.

Third, **Section 13.C.** *"Retention of Seniority"*, goes on to state *"nor shall such pilots relative position on the Pilots' System Seniority List be changed for any reason...except as provided in paragraph B. of this Section [13]."* Additionally, **Section13.B. "Seniority Date"** also states that a pilot, *"shall continue to accrue [seniority] during such period of duty except as otherwise provided in Section 11..."* .

Fourth and finally, **Section 11.D.1** *"Sickness and Injury Leaves",* does not explicitly provide for the administrative termination of a sick/disabled pilot, nor the forfeiture of such pilot's seniority by removing them from the Pilot System Seniority List.   This Section only speaks to the fact that, *"a pilot shall be allowed to retain and continue to accrue"* his relative seniority during sick leaves of absence, which do not exceed total continuous period of five (5) years. Nothing more.

In Sum, it is clear that the plain contractual language of both the 2003 or 2013 CBA does not in any way provide for the administrative termination or removal from the seniority list of sick/disabled pilots.  At most, the "seniority" related language of Section 11.D.1, when properly considered in conjunction with the controlling language in Section 13, <u>can only be construed to impose the condition that pilots who are sick/disabled in excess of five years, only cease to accrue their relative seniority - not lose it</u>.  In other words, the contract merely provides that such sick/disabled pilots only lose the incremental amount of relative seniority commensurate with the amount of time they are absent in excess of five years, but there is no contractual provision that requires the complete and total forfeiture of their pilot system seniority.

Based on all the foregoing, I seek reinstatement to the same relative position on the Pilot System Seniority List as if I had never been removed, and the continued accrual of such relative seniority until such time that I either retire, resign or am terminated for just cause.

Respectfully Submitted,

Lawrence M. Meadows

cc: Bennett Boggess, Dir. APA Legal; Ivan Rivera, APA MIA Chair; Thomas Copland, APA MIA Vice-chair

**Meadows 009538**

# EXHIBIT DX20
# for Shiffrin Declaration



**1**

Defendant Exhibit

Exhibit No.: **20**

Name: **Meadows, L.**

Date: **1/13/2026**

ESQUIRE

**From:**   "Hairston, Charles R." <chairston@alliedpilots.org>

**Sent:**   Mon, 20 Jan 2014 15:16:30 +0000 (GMT)

**To:**   "Meadows, Lawrence M." <lawrencemeadows@yahoo.com>; "Copeland, Thomas J."<copelandthomas@hotmail.com>; "Rivera, Ivan - Sec" <ivanmad@aol.com>

**Subject:** RE: POC, Grievance Hearing Date, BOD Meeting

Larry –

APA will be taking no further action to support Grievance No. 12-011, which is closed and has no value associated with it at this point.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187
THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

---

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Friday, January 17, 2014 5:33 PM
**To:** Hairston, Charles R.; Copeland, Thomas J.; Rivera, Ivan - Sec
**Subject:** Re: POC, Grievance Hearing Date, BOD Meeting

Chuck,

I understand that 12-011 is closed, but I still have legal remedies that flow from it. Therefore, I want to ensure that to the extent APA's originally filed POC preserved that grievance and the actions which flow from it;  that if APA does in fact amend its POC by the 24th, that my grievance #12-011 remains included in it to protect my ability to pursue any other legal remedies associated with it.

Additionally, I will have to respectfully disagree with APA's position in regards to my status, because I believe I am still a member of the bargaining unit and owed a duty. Hence, the reason why I filed #13-064 for abrogation of my seniority and termination in violation of Sec.13 of the CBA. If as you contend that I have no rights under the CBA, then why is it that the company has agreed to hear my current my grievance; which is only a right to which members of the bargaining unit are entitled to under the CBA. Thus, I dispute APA's  ignoring its duty to me.

As to the hearing I want to be clear that I could attend on Jan 16th due to a personal issue, and that I did not elect not to proceed, but simply requested to reschedule it. To be clear I do want my grievance heard, and exercise my right to attend and be represented by a pilot of my choice at the hearing.

Thanks,
Larry

On Friday, January 17, 2014 2:56 PM, "Hairston, Charles R." <chairston@alliedpilots.org> wrote:
Larry –

As you know, Grievance No. 12-011 was not advanced to the System Board and has been closed. Your most recent grievance, No. 13-064, is pending appeal hearing. You are free to pursue whatever remedies you wish during that hearing.  As we have discussed, APA does not represent you since you are no longer a member of the bargaining unit.

**2**

As far as scheduling, you elected not to proceed with the hearing on the previously scheduled date of January 16, 2013. It is my understanding that Tom and Ivan are waiting for schedules to come out on the 18th to see whether February is workable from their end.  We will let you know what the schedule looks like.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187
THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION.  IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Friday, January 17, 2014 3:27 PM
**To:** Hairston, Charles R.; Copeland, Thomas J.; Rivera, Ivan - Sec
**Subject:** POC, Grievance Hearing Date, BOD Meeting

Hello Chuck,

I just wanted to follow-up with you on a few items;

1.  It is my understanding that the SDNY issued an order that all claims arising under the rejection of executory contracts (CBA) must be filed by Jan 24th, and that APA is amending/updating its umbrella Proof of Claim. I just want to be sure that my legal remedies under my previously preserved grievance #12-011  continue to be preserved, and  that the contractual and legal remedies under my pending grievance #13-064 are also fully preserved. Please let me know what action APA is taking related to preservation all of my grievance claims against AA related to my termination and removal form the seniority list, which arose under the CBA pre-commencement.

2.  Any word on scheduling for my grievance? I understand Feb. is bad for Thomas, but just want to let you know that I can be available anytime in Feb.or March, and would like to re-schedule at the earliest date possible that works for everyone involved.

3.  Finally, I saw brief blurb in the APA news digest that yesterday Bennett had briefed the BOD on the LTD 5 year rule, and the possibility of an extension or reinstatement to the seniority list. Could you elaborate more on that matter, and let me know what it means as it relates to me and my current grievance.

Thanks,
Larry

# EXHIBIT DX21
# for Shiffrin Declaration

# ALLIED PILOTS ASSOCIATION

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

May 22, 2012

Defendant Exhibit
Exhibit No.: 21
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED # 7011 0470 0000 9113 1546

Captain John Hale
Vice President Flight
American Airlines, Inc.
P. O. Box 619617  MD851
DFW Airport, TX 75261-9617

      Re:    DFW Domicile Grievance No. 12-012

Dear Captain Hale:

      Pursuant to the May 1, 2003, Agreement ("Agreement"), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

      In accordance with Section 21.F.3 of the Agreement, I hereby elect to waive the Initial Hearing in this matter so that an Appeal Hearing can be held at the earliest possible date.

      In addition, we request that the Company send a copy of all hearing notices and decisions rendered in this case to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512.

Sincerely,

Captain Rusty McDaniels
Chairman - DFW

First Officer Russell Moore
Vice Chairman - DFW

cc:    Ms. Reagan Heine, AA Specialist HR Ops Support (via Shelley Handman)
       Captain Tom Kachmar, Grievance Coordinator – DFW
       First Officer Neil Roghair, Negotiating Committee Chairman
       Captain Frank McGill, Contract Compliance Committee Chairman
       APA Legal Department (JBB)

Meadows 023216

# EXHIBIT DX28

# for Shiffrin Declaration

Lawrence M. Meadows
MIA/FO/777/MDSB AA# 332713
PO Box 4344
Park City, UT 84060

November 9, 2016



Defendant Exhibit
Exhibit No.: 28
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

**Sent via E-mail and Fed-Ex #8023-5704-7416**

ISL CLAIM DISPUTE RESOLUTION COMMITTEE
Captain B. Kelly Ison, Dispute Resolution Committee Member
Captain Russ Payne, Dispute Resolution Committee Member
Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512
ISLclaim@alliedpilots.org

**RE: SLI DISPUTE RESOLUTION CLAIM OF LAWRENCE MEADOWS**

Dear Captains Ison and Payne,

### *Initial Matter – Recusal of AAPSIC Committee Chair*

I am a disabled Legacy American Airlines ("LAA") pilot, who has been treated in an arbitrary and discriminatory manner by my very own AAPSIC as compared to other similarly situated disabled LAA and LUS pilots. Specifically, the AAPSIC failed to *"pull and plug"* and protect my relative seniority as it did for other similarly situated pilots. Unfortunately, for reasons outlined below, I must respectfully request that either or both of you use your authority as DRC Members under Exhibit B, and submit and process my SLI Dispute Resolution Claim, as Captain Mark Stephens is conflicted.

Captain Stephens is supposedly representing LAA pilot's seniority interest in the SLI Dispute Resolution Process, but has proven incapable of doing so in this matter, as he has animus and a deep-seated bias against all LAA disabled pilots. In 2013, while serving on the equity distribution committee, he made unsupported and conclusory sworn statements in an effort to deprive disabled LAA pilots of their rightful equity payouts. In fact, Arbitrator Stephen Goldberg, determined the APA Equity Distribution Committee, in which CA Stephens played an integral role, had ignored its duty to me and other similarly situated disabled pilots, and treated us arbitrarily; and as a result ordered that APA award me a full share equity payout from all four Silos, and that all other LAA disabled pilots be awarded payouts for Silo 3. During the SLI proceedings, CA Stephens, once again exhibited the same animus and prejudicial bias against myself and similarly situated LAA disabled pilots, and refused to correct known employment data errors, and arbitrary and discriminatory seniority treatment of certain disabled pilots. Additionally, he also engaged in ex part communications with APA's counsel, in an effort to end-run inquires and claims made by myself and similarly situated disabled LAA pilots in an attempt to shut-down all communications between AAPSIC members and disabled pilots. Moreover, the supposedly "independent" AAPSIC

1

Meadows 017448

and its designated counsel, Allison, Slutsky, and Kennedy, who were supposed to be advocating for the seniority rights of all LAA pilots in the SLI, outrageously took and adverse position against me in U.S. District Court, in an effort to help American Airlines defeat my seniority claims against the Company. Finally, CA Stephens, gave me a hollow reassurance that I would be able to resolve any claims related to, *"your position on the integrated seniority list will be determined consistent with the legal ruling or settlement, the APA constitution and bylaws, the current collective bargaining agreement, <u>any seniority integration dispute resolution procedure ...".</u>* Which, turns out to be a disingenuous response, as Exhibit B clearly states that, *"Phase 1 of this dispute resolution process, the DRC shall consider claims concerning the interpretation or application of the ISL Award <u>submitted by DRC members or by any pilot whose name appears on the ISL</u> on his or her own behalf or on behalf of a group of similarly-situated pilots."*

Therefore, because the AAPSIC arbitrarily excluded my name from the ISL, I have no dispute resolution remedy available to me individually, and will be left remediless unless you two submit by dispute directly as objective, unbiased DRC members, using the authority afforded you in Exhibit B.

### *Background Facts*

1.      I am a LAA pilot who was hired in 1991 and hold the following four-part bid status, MIA/FO/777/MDSB. I am currently receiving pilot long term disability benefits for more than five years, and the Company purportedly removed *"dropped"* from the pre-merger LAA pilot seniority list on 10/24/2011 in apparent retaliation for engaging in protected whistleblower activity; which action I timely protested via grievances and litigation which were pending during the pendency of the SLI proceedings, and still are. APA currently lists myself and other similarly situated LAA pilots who have been on disability for greater than 5 years, in a status of Medical Disability Dropped from AA seniority list ("MDD").

2.      There were some 238 disabled LAA pilots in "MDD" status, during the SLI snap-shot date December, 9, 2016. Myself and most of these pilots receive disability payments in the form of W-2 employee wages subject to tax-withholding, along with Active *"Pilot Employee"* Medical, Dental, Vision, Life Insurance, and Pension benefits, under the terms of the LAA 2004 Pilot Long Term Disability Plan. In which the Plan terms define these pilots as *"Inactive Pilots" "Employees" and "Pilot Employees".* (Exhibit 1).

3.      Accordingly, the AAPSIC treated many (at least 11) of these LAA MDD disabled pilots as *"Inactive Pilot"*[1] *"Employees"*, and *"pulled and plugged"* them, thereby preserving their original relative positon on the AAPSIC certified seniority list submitted to the Arbitral Board. (Exhibit 2).

---

[1]      At least the treatment of these MDD pilots is consistent with Arbitrator Fishgold's 7,300 cockpit Crewmember Floor Arbitration decision, as upheld by the U.S. District Court of D.C.; which held that pilots on medical disability while *"on inactive status"* were counted as being on the pilot seniority list; because they are still considered employees and cockpit crewmembers, and in particular, *"those on medical disability receive streams of income, retain seniority rights to return, and are carried on APA's membership data base."* Moreover, these pilots are laos defined as both *"Employees* and *"Pilot Employees"* under terms of 2004 LAA Pilot LTD Plan.

2

**Meadows 017449**

4.     Predictably, these MDD pilots who received favorable treatment relative to me, included very senior Captains, and none of them had outstanding individual grievances or litigation pending against the company. Meanwhile, most (approximately 227) MDD pilots including myself, who had pending litigation were not protected in accordance with the SIPA, and were not pulled and plugged and did not have their relative seniority protected on the certified list.

5.     Based on the treatment of other similarly situated MDD pilots, I should have been treated as an "Inactive Pilot" and "pulled and plugged" at seniority number 4102 on the AAPSIX certified list immediately junior to my new-hire class mate, Jon Scruggs, EE332721 who was placed at seniority number 4101. (Exhibit 3).

6.     In late February 2016, I first learned that the AAPSIC failed to include me on the certified seniority list, but did include me on SLI Joint Exhibit 0006A *AAPSIC Certified List*[2], on a scabbed on sheet separate from the seniority list entitled "TAG", which incorrectly showed me holding seniority 6085, along with errors on all my relevant employment data. (Exhibit 4).

7.     To the extent CA Stephens alleges he merely blindly accepted relied on that erroneous data that was provided by American, then he should have "pulled and plugged" me at number 6085. But his argument doesn't hold water, because the Seniority Integration Protocol Agreement ("SIPA") ¶ 2.a.(1), imposed an affirmative duty upon the, *"Merger Committees shall compile, verify, certify and exchange (in electronic Excel format whenever possible) employment data for each pilot on their respective pre-merger seniority lists,"* Thus, he had a duty to verify the information from American, which if he had done

8.     In fact, CA Stephens had ready access to an APA internal list showing all MDD pilots with their status dates (Exhibit 5), but he and the AAPSIC either knowingly or negligently failed to exercise proper due diligence to cross-check those APA MDD lists, to verify the pilot seniority and employment data provided by American.

9.     There can be no explanation for such arbitrary and discriminatory treatment of pilot's seniority within the sub-category of LAA MDD disabled pilots, not to mention between LUS disabled pilots (>5 years) whose relative seniority was protected and all were included on the final ISL. It seems as if the AAPSIC did not adequately represent[3] the seniority rights of LAA MDD pilots, if at all.

---

[2]   It must be noted to the extent my data was provided in Joint Exhibit 0006A, it was not on the certified number, seniority number (shows 6085, but should have been around 3900), and occupational seniority date. Further, despite me raising this matter in correspondence to APA, AAPSIC, and the SLI panel back in March 2016, and it was never corrected.

[3]   In April 2014, the Allied Pilots Association declared that Meadows and other long term disabled pilots areno longer considered members, and not entitled to any union benefits, and locked its disabled pilots out of the electronic and physical union hall. Further, during and after the equity proceedings APA's counsel has asserted on numerous occasions that it does not represent Meadows or other similar situated disabled pilots, and thus, does not owe them a duty.

**Meadows 017450**

## *McCaskill Bond Act and Allegheny-Mohawk LLPs Require*
## *The SLI proceedings To Be Conducted in a Fair and Equitable Manner*

10.      To be certain, The Memorandum of Understanding ("MOU") ¶ 10 and Seniority Integration Protocol Agreement ("SIPA") clearly provide that these SLI proceedings are to be done in accordance with the McCaskill-Bond Statute. 49 U.S.C. §42112; which in turn incorporates Section 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"). (As published at 59 C.A.B. 45). The Allegheny-Mohawk LPPs, state that when a covered transaction (i.e., these SLI proceedings);

> *"results in the combination of crafts or classes that are subject to the Railway Labor Act, sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board ("CAB" or the "Board") in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers." Id. § 42112(a)."*

11.      Indeed, these Allegheny-Mohawk Labor Protective Provisions ("LPPs") require that the carrier make provisions *"for the integration of seniority lists in a fair and equitable manner,"*

12.      However, based on the facts presented in Meadows recently filed Motion To Intervene, these proceedings are clearly not fair and equitable because; i) APA has abandoned representation of its long term disabled LAA pilots, and therefore, has not adequately represented their seniority interests, ii) to date there has been egregious inequitable and disparate treatment of seniority rights between and amongst the long term disabled pilots of LUS East, LAA, and LUS in these proceedings, iii) and there is a myriad of pilot seniority and employment data errors in the certified excel pilot seniority lists, particularly with respect to long term disabled pilots.

13.      Additionally, although unions and management were typically the parties in Section 13 arbitrations, the CAB has also held that other employee groups and individual employees could be granted party status or allowed to otherwise participate.

> *See, e.g., Southern Emps. v. Republic/ALEA,* 102 C.A.B. 616 (1983) (describing how seniority integration was negotiated by an "employee committee" established for that purpose without union involvement); *Pan Am-TWA Route Exchange, Arbitration Award,* 85 C.A.B. 2537 (1980) (noting that three individual engineers were parties to arbitration); *NAA I,* 95 C.A.B. at 584 (denying dissenting group "full party status" but noting that they'd been given the opportunity to participate in the LPP arbitration).

14.      Thus, the CAB held that, as indicated by the language of the LPPs, unrepresented employees still had rights to fair and equitable seniority integration and binding arbitration to resolve integration disputes under the Allegheny-Mohawk LPPs

15.      Most disturbingly, the AAPSIC and SLI Arbitral Board were put on formal notice of these egregious errors, disparate treatment of LAA MDD, and the AAPSIC's inadequate representation, via official correspondence, motions to intervene, and expedited system board grievances filed by myself, and other similarly LAA MDD pilots. Sadly, all such

4

**Meadows 017451**

requests were blatantly ignored, and the AAPSIC and SLI board failed to correct these errors.

16.       Specifically, starting on March 1, 2016, I sent a certified letter to the AAPSIC to express my concerns that they had failed to list my name and correct employment data, EE number, seniority number, DOH, and status, and that I was not "pulled and plugged" on the certified seniority list (Exhibit 6), as otherwise required by the Seniority Integration Protocol Agreement ("SIPA") ¶ 2.a.(1) protocol; which stated in part,

2. Within 10 days of either the execution of this Protocol Agreement or the receipt from American of the information described in a. below, whichever is later, the Merger Committees shall compile, verify, certify and exchange (in electronic Excel format whenever possible) employment data for each pilot on their respective pre-merger seniority lists, as follows, subject to modification for accuracy.

a. The information certified and exchanged will include the following information to the extent such information is available and can be compiled/provided by American without undue burden or expense:

(1)    Each pilot's name; employee number; seniority number; Date of hire; occupational seniority date, if any, and any other date relevant to the pilot's placement on the pre-merger seniority list; date of birth; seat, aircraft, domicile, and information reflecting each pilot's availability to engage in revenue flying (i.e., leave status, instructor status, management pilot status, medical/disability status); [Emphasis Added].

Further, SIPA, ¶ 2. a. (7) speaks directly to the seniority treatment of pilots such as myself, and further states that;

(7) Similar information for any pilot who has been terminated or otherwise removed from the pre-merger seniority list, whose status is the subject of any pending litigation or dispute. [Emphasis Added].

17.       On March 6, 2016, CA Stephens of the AAPSIC responded and asserted;

>I received, via email, your letter dated March 1, 2016 regarding disputed seniority claims under the Seniority Integration Protocol Agreement.

>Your name is not included on the AAPSIC's proposed integrated seniority list because you were not on the American Airlines Pilots system seniority list as of the stipulated snapshot date, 12/9/2013.

>Your name was included with the certified list AAPSIC provi    ded to the parties and arbitrators under the Seniority Integration Protocol, on a list identifying pilots known to be disputing their termination from American Airlines and/or removal from the seniority list, in accordance with Section 2.a.(7) of the Proto    col.

>If after the integrated seniority list is implemented, you are ultimately successful in your litigation/grievance regarding termination from American Airlines and/or you are able to regain FAA medical status that would allow your return to flying at American Airlines, your position on the integrated seniority list will be determined consistent with the legal ruling or settlement, the APA constitution and bylaws, the current collective bargaining agreement, any seniority integration dispute resolution    procedure, and applicable union and company policy.     (Exhibit 7).

### *The AAPSIC, Arbitral Board, APA, and American Failed Their Duty To Treat Disabled LAA Pilots Fairly and Equally in Violation of the Agreements and McCaskill Bond Act.*

18.       It became clear that the AAPSIC was not treating all Legacy MDD pilots fairly and equally, and was simply kicking the can down the road, knowing that MDD pilot excluded from the ISL would in reality having no dispute resolution remedy available to them

19.       Since, the AAPSIC failed to correct the errors, on March 7, 2016, I filed a Motion to Intervene And Protect Lawrence M. Meadows Relative Position on the Integrated Seniority List directly with the SLI arbitral board asking to stay the proceedings, correct the errors,

5

Meadows 017452

and to treat me the same as all other MDD pilots, by pulling and plugging me on the list. (Exhibit 8). Further, on March 9, 2016I filed a supplemental argument. (Exhibit 9).

20.      On March 17, 2016, since the AAPSIC failed to act on my behalf, I filed a Request For Judicial Notice, to inform the arbitral board of legal case precedent for individual employees to participate in seniority integration proceedings to ensure "fair and equitable treatment." (Exhibit 10).

21.      On March 21, 2016, after having been ignored by the arbitral board, submitted an Expedited System Board of Adjustment Grievance for failure of American to uphold its obligations to conduct the proceedings in a "fair and equitable manner" in accordance with the MOU ¶ 10. To date the Company, APA and AAPSIC have refused to process this grievance. (Exhibit 11).

22.      On March 26, 2016, sent the arbitral board a certified letter to inquire as to the status of pending Motion to Intervene (Exhibit 12), I expressed my belief that the proceeding was fatally flawed and in violation of McCaskill Bond and the Allegheny-Mohawk LPPs. I also filed a second Request For Judicial Notice to put the arbitral board on Notice of my pending expedited system board grievance. (Exhibit 13).

23.      To date, arbitral board callously ignored all of my certified corresponded, Motions, Notices, and grievance, and took no action to remedy the unfair and inequitable treatment of LAA disabled pilots in the SLI Proceedings. Nor did the APA, APSIC, or American Airlines respond or take any action to correct its failures.

### *The SLI Decision and Award Contains Numerous Pilot Seniority and Employment data Errors, and Treated LAA MDD Pilots In An Arbitrary and Discriminatory Manner*

24.      On or around mid-September 2016, I carefully reviewed the 60 page final SLI Decision and Award and Exhibits, I was very troubled to learn that despite CA Stephens assurances, my name and correct employment data was not include in the AAPSIC Certified Seniority List, and thus was never provided to the other committees and Arbitrators he otherwise represented, in violation of Sec. 2.a.(7) of the protocol. Moreover, my seniority and employment data was never published anywhere the final SLI Decision and Award documents.

25.      In fact there is not even a generalized mention of myself and or any other similarly situated MDD pilots who have pending grievances/litigation for pre-merger seniority list removals or termination who were supposed to be protected under SIPA ¶ 2.a.(7), nor is there any discussion or process by which this category of pilots will be treated with respect to being reinstated to their integrated relative positon on new Integrated Seniority List ("ISL") if successful in their claims; much less an explicit reference of any such pilots by name or employee number in the new ISL.

**Meadows 017453**

26.    Once again on September 19, 2016, I informed CA Stephens and the AAPSIC via certified mail, that despite all of my previously filed concerns/complaints, the final SLI Decisions and Award was rife with numerous disabled pilot employee seniority and data errors, and gross disparate treatments of some 228 LAA MDD pilots. (Exhibit 14).

27.    On September 23, 2016, CA Stephens responded, and refused to accept responsibility for and correct his and the AAPSIC failures. Seemingly unfazed by m allegations, he proceeded to simply reiterate his previous nebulous and hollow assurance that I could utilize the Seniority Dispute Resolution procedure. (Exhibit 15).

28.    Furthermore, Exhibit B, the Seniority Dispute Resolution Procedure, only speaks to a procedure that can on be implemented by the Dispute Resolution Committee members ("DRC") or only by individual pilots whose name already appears on the ISL. Outrageously, that procedure seems to have no application for MDD pilots with disputed seniority claims pending grievances/litigation who were not *"pulled and plugged"* and not placed on the ISL – leaving them all in limbo.

29.    If that's the case myself and similarly situated MDD pilots would be left *"remediless"* and without a forum to dispute their grievances, which is contrary to the congressional intent when it drafted the RLA. *Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

### *Conclusion*

In sum, I find it very troubling that none of the LAA MDD or pilots with known individual disputed seniority claims, like myself listed on the SLI Joint Exhibit 0006A *AAPSIC Certified List* were not protected on the new ISL; while many other LAA MDD pilots (apparently those who did not file a grievance or lawsuit) were in fact treated as "Inactive Pilots", and *"pulled and plugged"* protecting their correct relative positon on the on new ISL. There can be no reasonable explanation for such arbitrary and discriminatory treatment within the same category of LAA MDD pilots, as to why a chosen few are protected on the ISL, while many others seniority rights were abandoned. To be certain, APA Staff Attorney Mark Meyers, declared in sworn testimony that all MDD pilots system wide to include myself, Kathy Emery, Wallace Preitz, and all other 239 MDD pilots also are covered by pending APA grievance 12-012; which protests violations of 11.D.1 to include, removal of disabled pilots from the seniority list without notice, and failure to reinstate MDD pilots who later become requalified medically. The foregoing issues are specific to LAA MDD pilots on disability for greater than 5 years, but when considering that LUS pilots on greater than 5 years remained on the new ISL, the failure to *"pull and plug"* all LAA MDD pilots is even that much more egregious, especially given the fact that APA is the sole certified bargaining agent for all pilots of the new American, and as such now has a duty to treat all former LUS, LAW, and LAA pilots fairly and equally. This is a serious matter that places the careers of most MDD pilot's careers in jeopardy, and raises serious questions that require immediate answers by you and the AAPSIC.

7

Meadows 017454

Sadly, this is an epic fail on behalf of both arbitral board, the AAPSIC, the APA and the Company, especially to the extent that it appears the AAPSIC acted outside the scope of its authority and failed to comply with the MOU, SIPA, and specifically the McCaskill Bond Act and Allegheny-Mohawk LLP's (not to mention the RLA and ADA), by failing to represent all MDD pilots adequately and fairly (if at all), and not allowing them to alternatively protect their rights via individual representation. Bottom-line, the AAPSIC and in turn the arbitral board, most certainly failed to treat all MDDs equally. In fact, AAPSIC knowingly and maliciously failed its duty to treat all 239 disabled LAA MDD pilots in a fair and equitable manner.

Therefore, based on all the foregoing, I respectfully request that DRC members CA's Ison and Payne notify all 239 similarly situated LAA MDD pilots, and submit a Phase 1 claim on behalf of that group of adversely affected pilots. Hopefully, the DRC can timely resolve this matter before otherwise allowing this matter to spiral out of control into a costly class action necessary to protect seniority rights of the protected class of pilots with a history of disability. However, I would prefer resolve this matter amicably, and forgo filing any litigation.

Respectfully Submitted on this 9[h] Day of November 2016,

*L. M. Meadows*

Lawrence M. Meadows

CC: CA Mark Stephens, CA Dan Carey, CA Billy Read, CA Ed Sicher, CA Copeland

8

Meadows 017455

# EXHIBIT DX29
# for Shiffrin Declaration

**1**

Defendant Exhibit
Exhibit No.: 29
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

| | |
|---|---|
| **From:** | ISLclaim <ISLclaim@alliedpilots.org> |
| **Sent:** | Mon, 9 Jan 2017 06:01:12 +0000 (GMT) |
| **To:** | "Meadows, Lawrence M." <lawrencemeadows@yahoo.com> |
| **Cc:** | ISLclaim <ISLclaim@alliedpilots.org> |
| **Subject:** | RE: SLI Dispute Resolution Complaint |
| **Attachments:** | Meadows 332713 DRC Response.pdf |

The DRC's response to your submission is attached.

**From:** ISLclaim
**Sent:** Thursday, December 01, 2016 5:58 PM
**To:** Meadows, Lawrence M.
**Cc:** ISLclaim
**Subject:** RE: SLI Dispute Resolution Complaint

First Officer Meadows,

Your submission to the DRC was received.  The DRC will respond to your submission no later than January 8, 2017.

Thank you.

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Wednesday, November 09, 2016 10:50 PM
**To:** ISLclaim <ISLclaim@alliedpilots.org>; Payne, Russ <russ.payne@me.com>; Ison, Kelly <bkison@gmail.com>
**Cc:** Carey, Daniel (cnt) <careycargo@gmail.com>; Stephens - Sec, Mark <apa@mcstephens.net>; Read, William L. <Billyray2@bellsouth.net>; Sicher, Edward F. <flysich@aol.com>; Copeland, Thomas J. <copelandthomas@hotmail.com>
**Subject:** SLI Dispute Resolution Complaint

Dear Captains Ison and Payne,

Please find my SLI Dispute Resolution Complaint, Brief, and Exhibits attached herewith.

Sincerely,
Lawrence Meadows

# EXHIBIT DX30
# for Shiffrin Declaration

Defendant Exhibit
Exhibit No.: 30
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

Re:     DRC Claim-Meadows-332713

Mr. Meadows

Your DRC Claim has been forwarded to the DRC. Under the Dispute Resolution Procedure (Exhibit B to the SLI Arbitration Award), the DRC representatives are responsible for determining whether the DRC has jurisdiction over the claim and, if so, whether there is merit to the claim.

Under the applicable agreements and the SLI Award, the DRC's jurisdiction under the Dispute Resolution Procedure extends only to "claims concerning the interpretation or application of the ISL Award consistent with paragraph 14 of the Protocol Agreement." The DRC does not have jurisdiction over requests to reconsider or change the terms of the SLI Award, which is final and binding pursuant to Paragraph 10.c. of the January 2013 Memorandum of Understanding (MOU) among the carriers, APA and USAPA; and Paragraph 15 of the Seniority Integration Protocol Agreement that governed the SLI Arbitration.

Although you were not included on the final integrated list and technically not eligible to invoke the DRC process, the DRC representatives discussed and considered your claim. The DRC has concluded that your claim falls outside of the scope of the Dispute Resolution Procedure and the DRC does not have jurisdiction over your DRC Claim. Specifically, you are challenging your exclusion from the final ISL. Pursuant to the governing Seniority Protocol Agreement, the integration was based on seniority data from the Company. AA did not include you on the LAA seniority list as of the snapshot date, 12/9/13. Based on the Company data, the AAPSIC did identify you on its certified list as a pilot who the Company had identified as disputing removal from the AA seniority list. The Arbitrators were thus on notice as to your status. When and if you attain the appropriate qualifications and return to flying at AA, you may be reinstated to the appropriate place on the ISL in accordance with the Arbitrators' Final Award and AA/APA policy and procedure. If that process is not satisfactory, you will have whatever remedies are available based on the actions of the Company and APA at that time.

/s/ FO Tom Duncan-LAA DRC Representative Alternate
/s/ CA Russ Payne- LUS(W) DRC Representative
/s/ FO Kelly Ison- LUS(E) DRC Representative

APA_000014923

# EXHIBIT DX32
# for Shiffrin Declaration

Defendant Exhibit

Exhibit No.: 32
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

| | |
|---|---|
| **From:** | Lawrence Meadows <lawrencemeadows@yahoo.com> |
| **Sent:** | Fri, 30 Jun 2017 18:34:02 +0000 (GMT) |
| **To:** | Jim Clark <jclark@alliedpilots.org>; George Buckley<gbuckley@alliedpilots.org> |
| **Cc:** | CA Dan Carey <careycargo@gmail.com>; Biilyray Read<billyray2@bellsouth.net>; APA MIA Vice-Chair Ed Sicher <flysich@aol.com> |
| **Subject:** | Todays Conversation Re 12-011, and Tolling Agreement |
| **Attachments:** | Tolling Agreement.DOCX |

Jim,

I appreciate your efforts on deciding to go to the Company on G12-011. As I said, as long as were making progress the last thing I want to do is being perceived as antagonistic, or adversarial towards APA by fling any additional legal claims; especially given the good faith efforts of yourself, Mr. Buckley, Dan, BR, and Ed on my behalf.

As I mentioned main concern is that I have a looming SLI DFR claim deadline, for which I exhausted y internal remedies via an ISL DRC Complaint, which was denied y the committee on 1/8/17; so my 6 month DFR SOL is 7/8/17. Anyway, as I suggested I would willing to sign a tolling agreement for a few (3-6) months where by myself and APA would mutually agree to toll the 6 month SOL for my potential SLI DFR claim, but with the caveat that APA would preserve its defenses. American had approached me with a similar agreement to toll my EEOC claims during settlement discussions. I have attached it for your review, but I would be willing to use it as a template and agree to similar terms.

Thanks again for your assiatance on moving my matter forward.

Have Happy 4th Weekend,

Larry

APA_000014896

# EXHIBIT DX33

# for Shiffrin Declaration

1

Lawrence M. Meadows
MIA/FO/777/MDSB
PO Box 4344
Park City, UT 84060
516-982-7718
lawrencemeadows@yahoo.com

December 19, 2016



Defendant Exhibit
Exhibit No.: 33
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

**Via Certified Mail Return Receipt Requested and E-mail**

**Accuseds:**
CA Mark Stephens, AAPSIC Chairman
FO David Durham, AAPSIC Member
CA Bruce Case, AAPSIC Member
CA Budd Beaman, AAPSIC Member
CA Steve Iverson, AAPSIC Member
FO Timothy Daudelin, AAPSIC Member
CA Mark O'Grady, AAPSIC Member
FO Thomas Duncan, AAPSIC Member
CA Andrew Engelke, AAPSIC Member

c/o CA Pam Torell, APA Secretary - Treasurer
Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512

**RE:  Demand to File Article VII Charges Against All AAPSIC Members Individually**

Dear CA Torell,

I write to you in your official capacity as APA Secretary Treasurer, and as a member in good standing. In accordance with APA Constitution and Bylaws ("C&B") Article VII, I hereby timely prefer charges against all members of the American Airlines Pilots Seniority Integration Committee ("AAPSIC") in their individual capacity, specifically I am charging CA Mark Stephens, FO David Durham, CA Bruce Case, CA Budd Beaman, CA Steve Iverson, FO Timothy Daudelin, CA Mark O'Grady, FO Thomas Duncan, and CA Andrew Engelke, for their unlawful acts committed during the Seniority List Integration ("SLI") proceedings and implementation of the Integrated Seniority List ("ISL") Decision and Award in willful violations of the APA Constitution and Bylaws ("C&B"). For purposes of simplicity going forward I will collectively refer to all of individual accuseds as the AAPSIC members.

**OVERVIEW**
Page 1 of 6

Generally, under the C&B Article VII, the AAPSIC member's unlawful actions directly and indirectly constitute, not only a *"Willful violation of this Constitution and Bylaws"* in violation of Article VII.A.2, and also an *"act contrary to the best interests of the APA as an institution or its membership as a whole.",* in violation of C&B Article VII, A.7. As described in further detail below, their actions have been severely prejudicial not only to myself, but to all other similarly situated disabled pilots, including all 228 Medical Disability Dropped ("MDD") members who were treated separately, had their seniority rights abrogated, and were discriminatorily excluded from the ISL, and as a result caused potentially millions of DFR exposure, which is extremely damaging to the financial interest of the association and its membership as a whole.

Specifically, I am charging the AAPSIC members for their unlawful acts committed while working on the SLI proceedings in violation of the C&B which resulted in the abrogation of seniority of most MDD pilots, to include; 1) Art. II D., for their failure *"To determine and negotiate… to maintain uniform principles of seniority and the perpetuation thereof.",* 2) Art. I. Section 6, which provides, *"All questions on parliamentary law and rules of order which are not provided for in the Constitution and Bylaws or Policy Manual shall be decided according to the principles set forth in the current Robert's Rules of Order."* For their failure to their follow Robert's Rules principal of the ranking of laws, and specifically that the statutory laws of the Railway Labor Act ("RLA"), McCaskill-Bond Act and Allegheny Mohawk Labor Protective Provisions (LPPs) are superior to and not precluded by the C&B., which required pilots to be treated equally and fairly, and to be provided adequate representation or allowed individual representation, 3) Art II C., *"…to settle promptly disputes and grievances which may arise between such members and their employer.",* for failure to process my Expedited System Board of Adjustment Grievance

## SUMMARY OF FACTS

### *Meadows' Employment-Disability-Termination-Grievance History*

1.  Meadows graduated cum laude with a degree in Aeronautical Engineering from Embry-Riddle Aeronautical University in April 1985, where he also received his commission as an Air Force Officer through Air Force ROTC.

2.  Thereafter he served his country honorably, as a military pilot in the U.S. Air Force, until he was hired as a pilot by American Airlines in October 1991.

3.  In June 2004, Meadows began suffering from a debilitating illness, and American's Corporate Medical Director approved him for pilot long term disability benefits, payable form American's pilot pension plan.

**3**

4.      On December 27, 2007, American's Corporate Medical Director abruptly terminated Meadows disability benefits without cause or notice, despite reports showing no improvement in his medical condition; in fact, AA's records showed it worsening.

5.      In Meadows appealed his benefits termination to American's PBAC, who sent his claim to fraudulent claims reviewer Western Medical Evaluators, who denied his claim.

6.      APA had mutually agreed to selection WME, despite it being an administrative billing service, in violation the CBA, Supp. F.(5)(h) which required all disability claim disputes to be referred a *"clinical-source"*, and also failed to discover WME's fraudulent history.

7.      One month after reviewing and denying Meadows' and four other pilot's disability claims WME was shut down by the Texas Insurance Board, and its principals were indicted for felony medical claim fraud, and American canceled WME's contract.

8.      In July 2010, Meadows filed an ERISA lawsuit protesting the PBAC's denial, which was based on the purportedly" independent", but in fact fraudulent WME doctor's reports.

9.      On July 18, 2011, during an 11th Circuit mediation of his ERISA disability Case, Meadows' engaged in protected reporting activity, and informed American of his intent bring additional claims related to securities fraud, based on the *"cost savings"* scheme.

10.      On August 5, 2011, just two weeks after engaging in protected SOX-whistleblower activity, American sent Meadows a letter threatening to terminate his employment within 60 days, unless he obtained an FAA medical or resigned his seniority and took a job outside the flight department.

11.      On September 12, 2011, Meadows filed an OSHA-SOX whistleblower complaint.

12.      On September 14, 2011, Meadows was re-evaluated by the Mayo Clinic who verified the existence of his continuing disability.

13.      Using the Mayo's evaluation reports, Meadows successfully re-applied for disability benefits with American Airlines.

14.      Between August and October 2011, Meadows protested his threatened termination, and made multiple requests for a Reasonable Accommodation of reassignment to a non-flying job in the pilot's bargaining unit, but American refused to provide one.

15.      On October, 24, 2011, despite the lack of a termination cause, investigation, not or notice letter from his chief pilot superior, American purportedly removed Meadows from the pilot seniority list and terminated his employment.

16.    On December, 13, 2011, American approved Meadows' second claim for benefits, payable as W-2 wages, albeit under the 2004 American Airlines, Inc. Pilot Long Term Disability Plan, the terms of which now define Meadows as an "Employee" and "Pilot Employee."

17.    On February 4, 2012, Meadows filed company termination Grievance #12-011; asserting he was improperly removed from the pilot seniority list and discharged form employment in violation of Sec. 21 of the CBA., and explicitly citing contributing factors of retaliation under SOX, and discrimination under the ADA.

## CHARGES

to include; 1) Art. II D., for their failure *"To determine and negotiate… to maintain uniform principles of seniority and the perpetuation thereof."*, 2) Art. I. Section 6, which provides, *"All questions on parliamentary law and rules of order which are not provided for in the Constitution and Bylaws or Policy Manual shall be decided according to the principles set forth in the current Robert's Rules of Order."* For their failure to their follow Robert's Rules principal of the ranking of laws, and specifically that the statutory laws of the McCaskill-Bond Act and Allegheny Mohawk Protective Provisions are superior to and not precluded by the C&B., which required pilots to be treated equally and failry,,3) Art II C., *"…to settle promptly disputes and grievances which may arise between such members and their employer."*, for failure to process my Expedited System Board of Adjustment Grievance

**1st CHARGE;** The AAPSIC members abrogated the seniority rights of most LAA MDD pilots, by treating them disparately between and amongst LAA disabled MDD pilots, and also as compared to disabled LUS pilots, and in so doing willfully violated Article II D., which mandates that one of the prime objectives of APA is to, *"To determine and negotiate… to maintain uniform principles of seniority and the perpetuation thereof.*

**2nd CHARGE;** The AAPSIC members failed process and handle in the usual and customary manner, Meadows' Expedited System Board of Adjustment SLI grievance as mandated by the Memorandum of Understanding (MOU) ¶¶10.e and 20. Thereby, the AAPSIC members in turn willfully violated APA's objective in Art. II C., which required them *"to settle promptly disputes and grievances which may arise between such members and their employer."*

**3rd CHARGE;** The AAPSIC members failed to follow APA's parliamentary law of Roberts Rules of Order as mandated by C&B Art. I Sec.6, specifically by ignoring Roberts Rules' doctrine of ranking of laws, and failing to comply with the statutory laws of the McCaskill-Bond Act and Allegheny-Mohawk LPP's, which are superior to and

preclude the C&B.  More specifically they violated the Allegheny-Mohawk LLPs requirement to treat all LAA MDD disabled pilots *"equally and fairy"*, and failed to provide adequate representation, to MDD pilots or to allow MDD pilots to represent themselves individually, and thereby willfully violated C&B Art. I Sec. 6.

**4th CHARGE;** as a result of all the above willful C&B violations the AAPSIC members also violated C&B Article VII.A.2., by committing *"Willful violation[s] of this [the APA] Constitution and Bylaws."*, and should therefore be found guilty of Article VII charges on this basis.

**5th CHARGE;** as a result of all the above willful C&B violations, the AASPIC members also violated C&B Article VII.A.7., by committing an, *"act[s] contrary to the best interests of the APA as an institution or its membership as a whole"*, and should therefore also be found guilty of Article VII charges on this basis.

## RELIEF SOUGHT

Based on all the foregoing each and every AAPSIC member should be held to account for failure to comply with their duties in accordance with the supreme law of the union - the APA C&B, and resultant violations of Article VII thereunder, and as outlined in the charge list above.

**Therefore,** given that the all AAPSIC members are from various Domiciles and all serve on an APA National Committee, and that their commission of egregious acts adversely impacts each and every member of the association, a Domicile Hearing would not be an appropriate forum. Thus, FO Meadows respectfully requests that here in the first instance, that the Appeal Board should conduct a single formal hearing of the individual Article VII Charges filed against each of AAPSIC members. Finally, the Appeal Board should impose upon the AAPSIC members whatever disciplinary action, fines, and sanctions as it may deem appropriate.

I hereby certify that all the foregoing to be true and correct to the best of my personal knowledge.

Fraternally Submitted on this 21st day of December 2016;

*L. M. Meadows*

Lawrence M. Meadows
MIA/FO/777/MDSB

**6**

cc via e-mail: CA Dan Carey, CA William Read, CA Ed Sicher, George Buckley

# EXHIBIT DX38
# for Shiffrin Declaration

Defendant Exhibit

Exhibit No.: **38**

Name: **Meadows, L.**

Date: **1/13/2026**

ⒺESQUIRE

Ex 38

**From:** FO Lawrence M. Meadows
Po Box 4344
Park City, UT 84060

20Mar14

### *** Lawrence Meadows Petition For Reinstatement to the Pilot System Seniority List***

**To:**   Captain Keith Wilson
President, Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Boulevard
Fort Worth, TX 76155-2512 USA

**Sent via Certified mail and E-mail**

Dear Captain Wilson,

First let me say I am pleased to learn that just yesterday the APA BOD passed resolution 2014-07 Rev.1. Which is a big step in ensuring that our pilots enjoy the same career expectations as their industry peers at UAL and SWA. The resolution, states in part, *" **BE IT RESOLVED**, the APA Policy Manual be amended to include: **1.22 Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five years, A. As soon as practicable, the President shall inform the APA Board of Directors, in writing, of the circumstance underlying the request of a pilot who petitioned APA for support of reinstatement of their original relative AA seniority number of a pilot wishing to return to the seniority list aftewr greater than five years on MDSB."*

I am an APA member in good standing , who was removed from the seniority list after being on MDSB  for greater than five years. Just  prior to my removal,  my 3XP, as of 11/1/2011 showed that my new hire classmate Captain Dan Land, was immediately above  my original position on the list. (Attached herewith). Captain Land is currently occupies seniority number 4153 on the pilot system seniority list. (See 3XP excerpt as of  3/2/14 below).

| 716 | 4153 | DW | LAND | | CA | 767 | MIA | I | 332726 | 2833 | 2027 |
|-----|------|----|------|-|----|-----|-----|---|--------|------|------|

Thus, my pilot seniority number should currently be 4154. Accordingly, I hereby formally petition you, as the President of Association, for reinstatement to the original relative seniority to which I am entitled. Your consideration is greatly appreciated.

Fraternally,

*L. M. Meadows*

Lawrence Meadows
FO/777/MIA   AA#332713

cc: MIA Chair, Ivan Rivera; MIA Vice-Chair, Thomas Copeland

**Meadows 008409**

# EXHIBIT DX39

# for Shiffrin Declaration

Defendant Exhibit
Exhibit No.: 39
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

1

*Disposition: Passed 12-4-0-0 on March 20, 2014*

| | | | |
|---|---|---|---|
| R2014- 07 Rev. 1 | DOMICILE: DFW | FOR | 12 |
| BOD MTG: | | AGAINST | 4 |
| 02/10-14/2014 | | ABSTAIN | 0 |
| | | ABSENT | 0 |

Title: <u>Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five Years</u>

Presented by: <u>FO Russ Moore</u>          Seconded by:          <u>CA Steve Roach</u>

Policy Manual: <u>1.22 (added)</u>          Cons. & Bylaws:          _____

**WHEREAS,** a pilot who has been on MDSB status longer than five years is removed from the AA seniority list in accordance with Supplement F(1).5(d) of the CBA; and

**WHEREAS,** reinstating the lost seniority number of a pilot who has been on the MDSB list for more than five years would require an exception to Supplement F(1).5(d) of the CBA which must be agreed upon by both the Company and APA; and,

**WHEREAS,** a condition precedent to the Company's consideration of a contractual exception, APA must support the reinstatement of a pilot's seniority number for a pilot who was removed from the AA seniority list in accordance with Supplement F(1).5(d) of the CBA and has subsequently regained his/her FAA medical certificate; therefore,

**BE IT RESOLVED,** the APA Policy Manual be amended to include:

**1.22    Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five Years**

**A. As soon as practicable, the President shall inform the A PA Board of Directors, in writing, of the circumstance underlying the request of the pilot who petitioned APA for support of reinstatement of their original relative AA seniority number of a pilot wishing to return to the seniority list after greater than five years on MDSB. The President shall state whether the petitioning pilot was/is an APA member in good**

R2014-07

**2**

standing. The Board members shall then have seven days to consider each case and must . advise the President of any noted objections, in writing, within the seven . day period of their objection(s). Absent any written objection(s) from an individual Board Member, the President shall then have the authority to sign a letter authorizing reinstatement of said pilot's seniority number.

B. If the President chooses not to agree to reinstate a pilot's seniority number for any reason, or there is a Board Member objection, the said pilot shall have the opportunity to directly petition the APA Board of Directors for seniority number reinstatement. The BOD shall retain final . decision authority in each seniority number restoration case by majority vote.

*(Tailor to fit.)*

# EXHIBIT DX40
# for Shiffrin Declaration



Exhibit No.: 40
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

| | |
|---|---|
| **From:** | Lawrence Meadows <lawrencemeadows@yahoo.com> |
| **Sent:** | Mon, 31 Mar 2014 20:32:51 +0000 (GMT) |
| **To:** | "Hairston, Charles R." <chairston@alliedpilots.org> |
| **Subject:** | Re: RESPONSE TO REINSTATEMENT REQUEST |

Chuck,

No I do not have a medical, but don't believe I should need one to simply be reinstated to the list. As there is no medical requirement to maintain a seniority number on a piece of paper. I'm not unable to seek an actively flying position as of yet, but intend to get a special issuance after I've completed a HIMS psychiatric case study, for pilots like myself. Its going to take some time, but I'm determined to get there.

Please pass the following to President Wilson and the BOD;
The requirement for an FAA Medical, is extraneous. I believe they should reconsider and revise Resolution 2014-07 Rev.1. To otherwise base reinstatement on a pilots FAA medical certification, is essentially discriminating against such pilots based on their medical disability, and therefore unlawful under the ADA. As you know, I firmly believe our disabled pilots should occupy their place on the list, until such time that they become medically recertified, die,or retire. I prefer to work with APA on this, before escalating this to an EEOC charge.

Thanks,
Larry

On Monday, March 31, 2014 2:07 PM, "Hairston, Charles R." <chairston@alliedpilots.org> wrote:
Larry:

CA Wilson, APA President, has forwarded your reinstatement request to me for response. As you know, both APA and AA have to sign off on the reinstatement of a pilot to the seniority list. Item number one on the checklist is a current medical certificate. Unless something has changed since your last appeal hearing, you don't have a medical certificate. If I am incorrect let me know.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187

THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

APA_000014212

# EXHIBIT DX42
# for Shiffrin Declaration

Page 1

Defendant Exhibit
Exhibit No.: 42
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 11-15463(SHL)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

AMR CORPORATION,

        Reorganized Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York

                April 17, 2014

                11:14 AM

BEFORE:

HON SEAN H. LANE

U.S. BANKRUPTCY JUDGE

Page 2

Hearing re:  Doc. #11800 Hearing re: Marcelline Mesidors

Request for Payment of Administrative Expenses of Chapter 11

(Filed As ECF #38 in Case No. 11-15464)

Hearing re:  Doc. #11840 Objection of Debtors Pursuant to 11

U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to Proof of Claim

Nos. 13478, 13788, and 13865 Filed By Lawrence M. Meadows

filed by Stephen A. Youngman on behalf of AMR Corporation

Hearing re:  Doc. #11833 Motion to Authorize/Motion for an

Order Pursuant to Section 107(b) of the Bankruptcy Code and

Bankruptcy Rule 9018 Authorizing the Filing of a Redacted

Copy of the Declaration of Piper A. Brock in Support of the

Response of NCC Charlie Company and Verizon Capital Corp. to

Debtors TIA Claim Objections

Hearing re:  Doc. #11727 (146th) Motion for Omnibus

Objection to Claim(s)/Debtors 146th Omnibus Objection to

Claims (No Liability Claims)

Hearing re:  Doc. #11728 (147th) Motion for Omnibus

Objection to Claim(s)/Debtors 147th Omnibus Objection to

Claims (No Liability Claims)

Hearing re:  Doc. #11826 (148th) Motion for Omnibus

Page 3

Objection to Claim(s)/Debtors 148th Omnibus Objection to Claims (Satisfied Claims) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Hearing re:  Doc. #11827 (149th) Motion for Omnibus Objection to Claim(s)/Debtors 149th Omnibus Objection to Claims (Reclassified and Wrong Debtor Claims to be Allowed) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Hearing re:  Doc. #11828 (150th) Motion for Omnibus Objection to Claim(s)/Debtors 15t0h Omnibus Objection to Claims (Claims Resolved Pursuant to the Plan) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Hearing re:  Doc. #11829 (151st) Motion for Omnibus Objection to Claim(s)/Debtors 151st Omnibus Objection to Claim (No Liability Claims) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Transcribed by:  Dawn South

Page 4

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP

    Attorney for the Reorganized Debtor

    200 Crescent Court, Suite 300

    Dallas, TX 75201-6950

BY:  STEPHEN A. YOUNGMAN, ESQ.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

    Attorney for the Post-Effective Date Creditors

    Committee

    155 North Wacker Drive

    Suite 2700

    Chicago, IL 60606

BY:  JOHN K. LYONS, ESQ.

SHERMAN, CITRON & KARASIK, P.C.

    Attorney for Ms. Mesidor

    70 E. 55th Street

    New York, NY 10158-0125

BY:  HOWARD KARASIK, ESQ.

Page 5

DEBEVOIS & PLIMPTON LLP

    Special Aircraft Counsel to the Reorganized Debtors

    919 Third Avenue

    New York, NY 10022

BY:   JASMINE BALL, ESQ.

VADENBERG & FELIU LLP

    Attorney for Lawrence Meadows

    60 East 42nd Street

    New York, NY 10165

BY:   VINCENT J. ROLDAN, ESQ.

JAMES & HOFFMAN, P.C.

    Attorney for Allied Pilots Association

    1130 Connecticut Avenue, NW

    Suite 950

    Washington, DC 20036-3904

BY:   STEVEN K. HOFFMAN, ESQ.

Page 6

STEPTOE & JOHNSON LLP

Attorney for Allied Pilots Association

1330 Connecticut Avenue, NY

Washington, DC 20036


BY: JOSHUA R. TAYLOR, ESQ.

Page 7

P R O C E E D I N G S

THE COURT:  All right, that concludes matters in China Natural Gas and so we can move on to AMR Corporation, the 43rd omnibus hearing in that case.

I don't know if anybody can tell me what the record is this courthouse for a number of omnibus hearings. I suspect we're not even close, but if we ever get close I trust you'll let me know.

MR. YOUNGMAN:  I hope we don't be the record holder of that, Your Honor.

Stephen Youngman for AMR Corporation and the reorganized debtors.

THE COURT:  Good morning.  Let me get appearances from anybody else.

MR. LYONS:  Yes, Your Honor, John Lyons on behalf of the post-effective date creditors' committee.

MR. KARASIK:  Howard Karasik, counsel to Ms. Mesidor, one of the claimants.

MS. BALL:  Jasmine Ball, special aircraft counsel to the reorganized debtors.

MR. ROLDAN:  Good morning, Your Honor, Vincent Roldan from Vandenberg & Feliu, counsel to Lawrence Meadows, and with me in the courthouse is Mr. Meadows and Mr. Meadows' wife.

THE COURT:  All right.

Page 8

MR. HOFFMAN: Steven Hoffman for the Allied Pilots Association.

MR. TAYLOR: And Joshua Taylor, also for the Allied Pilots Association.

THE COURT: All right, good to have you all here this morning.

So I see we have on the agenda two contested matters listed, a couple -- one uncontested matter, and then a number of omnibus objections to claims, I think two of which are on a returning engagement from a prior hearing and several others that we have not seen before.

So I assume it makes sense to go right down the agenda, but I defer to counsel.

MR. KARASIK: Agreed, Your Honor.

The first matter is the Marcelline Mesidor's request for payment of an administrative expense.

THE COURT: All right.

MR. YOUNGMAN: It's her motion, I think it's probably appropriate for her counsel to proceed.

THE COURT: All right, so let me hear from Ms. Mesidor's counsel. And you can feel free to use that microphone, stay right where you are, or the podium. Your option.

MR. KARASIK: Yes. Ms. Mesidor filed a proof of claim in the --

Page 69

stakeholders, and you know, that bar date and the claims

register that existed as of the time of the bar date was one

of the predicates that led to a series of economic decisions

that all stakeholders made in crafting this plan, which had

a series of very complicated, you know, value distribution

mechanics in the plan as Your Honor is aware.  And, you

know, the danger of not upholding the integrity of the

Court's bar date orders is some of those expectations is

that the allocation of value may be defeated.

Now this claim, you know, under the broad scheme

of things is fairly, you know, de minimis, but again, it's a

claim that is now being asserted in a multiple of ten times

the original asserted amount containing claims that, you

know, no reasonable interpretation could be contained within

the long-term disability benefits description of the claim

as originally filed.

So the committee is very supportive of the

debtor's position in objecting to Mr. Meadows' claim and

believes that his claim should be expunged.

THE COURT:  All right.

MR. HOFFMAN:  May I respond, Your Honor?

THE COURT:  Anybody else?  I see somebody here

from the APA, I don't know if they are going to weigh in or

not, and then Mr. Youngman I'll hear from you obviously.

MR. HOFFMAN:  No, I hope actually to say something

Page 70

helpful, and if that --

THE COURT:  I'm also in favor of something helpful.

MR. HOFFMAN:  -- doesn't seem to be happening tell me sit down and I will.

THE COURT:  All right.

MR. HOFFMAN:  Your father's idea is correct.  The purpose of a grievance is to challenge an alleged violation of the contract.

The grievance here, and it's attached to Mr. Meadows' response to the objection as Exhibit N, is different in that it alleges two things.  It alleges a violation of the Americans With Disabilities Act and it alleges a violation of Sarbanes-Oxley.  Neither of these are within the jurisdiction of an arbitrator to decide.

Now the APA included that grievance among the list of 37 that were accepted from an overall settlement on the equity side, the grievance moved through the process, through -- up to the pre-arbitration conference in which the parties make one final attempt to resolve grievances and decide which go to the arbitration, which don't.

Unfortunately no resolution was possible, at which point the APA decided, and in August of 2013 when it decided, informed Mr. Meadows that it would not be taking this grievance to arbitration because it did not allege a

Page 71

violation that the arbitrator would have any jurisdiction over.  At that point the process ended.

We are not taking any position today on whether Mr. Meadows' various claims are timely or not, we're not taking any position on whether his Sarbanes-Oxley claim is a good claim or his disabilities act claim is a good claim.  Those are in -- before the Department of Labor on the one hand and before the EEOC on the other.

The APA, to my knowledge as of now, is not involved in either of these cases.  But I just wanted to clarify for you because the grievance -- the notion of this as a grievance is something that's off the usual road, as we recognize.

THE COURT:  All right.  I appreciate that.  Thank you.

MR. ROLDAN:  Your Honor, may I address that?

THE COURT:  All right.  I'm going circle around and I will get back to you.  You'll obviously have a chance to respond to anything that anybody says in this second round.

So, Mr. Youngman, anything you want to add?

MR. YOUNGMAN:  I'd like to talk about the status of the Eleventh Circuit decision.

It is true that there is a Rule 60(b) motion pending by Mr. Meadows.  As we indicated in our papers we

Page 72

expect that the district judge -- Middle District of Florida

is going to rule on that soon, she so indicated --

THE COURT:  Actually that's a good question.  So

the 60(b) is in the district court, not in the Court of

Appeals.

MR. YOUNGMAN:  That's correct.

THE COURT:  All right.

MR. YOUNGMAN:  And she indicated in docket entries

which we annexed as Exhibit A to our reply that she doesn't

anticipate granting it, but would do so soon.

THE COURT:  Well --

MR. YOUNGMAN:  In any event --

THE COURT:  -- but before you get into the merits

of that and just to save us all some time is it doesn't

sound like there's any detriment if I'm going to take it

under advisement any way to wait at least a certain amount

of time in which point my experience with the federal courts

is they try to address those things fairly quickly and it's

unlikely to linger.

But is there any problem with me doing that,

meaning giving you a little bit of time to get -- to get

done with?  Obviously not an infinite amount of time.

MR. YOUNGMAN:  Yes, there is a problem, but

there's also a solution.  I'm going back to the SOX action,

and this is going to address two points.  One that the

company was participating in the SOX litigation.

The SOX matter was originally filed as an investigation and the Department of Labor/OSHA did its investigation like EEOC does, they do an investigation, and that is accepted from the operation of the automatic stay while they do that investigation.

Department of Labor/OSHA investigated and they determined there was no cause --

THE COURT:  Right.

MR. YOUNGMAN:  -- I'm going paraphrase the words. There was nothing for them to do.

Then Mr. Meadows started pursuing that in his individual capacity suing individual rights, and annexed as Exhibit J to Mr. Meadows' response is my letter to his then counsel of April 8, 2013 saying, you are violating the automatic stay because you are now pursuing us in an individual capacity on account of prepetition actions.  The matter was stayed.

The administrative law judge -- not -- he has a charge and he believes his charge is to adjudicate matters, and we believe that one, this claim has been discharged because there was no timely proof of claim filed, and we have asked Mr. Meadows and the administrative law judge not to be going forward on that Utah -- I'll just call it the SOX action, everyone else does -- not to be going forward on

that until this judge can make a -- sorry -- unless this

Court can make a determination as to whether this claim has

been discharged or not.

If the administrative law judge feels compelled to

go forward and Mr. Meadows has declined to agree to put a

stay on that proceeding until this court rules, so we're

spending money, time, and time of officers of the company.

THE COURT:  Well what are you doing in that case

now?

MR. YOUNGMAN:  Not being defaulted.  We filed an

answer, Mr. Meadows wants to take discovery, and --

THE COURT:  All right.

MR. YOUNGMAN:  -- all of which would be

unnecessary depending if -- if this Court were to rule --

THE COURT:  Right.

MR. YOUNGMAN:  -- that those claims were

discharged.  So not a problem --

THE COURT:  And that SOX action, we're using that

term loosely I guess, because the original one is something

that somebody can bring and then it's -- it's accepted from

the automatic stay as they look into allegations about

safety, and then you said he pursued in his individual

capacity.  Exactly what do you mean by that?  How does that

work?

MR. YOUNGMAN:  The Department of Labor department

Page 75

determined that they had no grounds to go forward on this.

They said there's nothing here that gave Mr. Meadows a time

to pursue a claim in his individual capacity, but --

THE COURT:  Right, but where does that claim go?

I know if the EEOC does that then the claim goes to federal

court.  If the Department of Labor does that where does the

claim go?

MR. YOUNGMAN:  It's an appeal proceeding before

the administrative law judge.

THE COURT:  All right.

MR. YOUNGMAN:  And I believe that's pending in

Utah.

THE COURT:  All right.

MR. YOUNGMAN:  But right now we're spending money

and time that probably is unnecessary and a request that the

parties stay pending this Court's determination has been not

taken.

THE COURT:  Okay.

MR. YOUNGMAN:  I want to just leave with one more

point and that is the debtor knew that Mr. Meadows was or

could be asserting claims.  I think the Second Circuit has

addressed that issue in the Midland Co. Generation case, and

where they say this is at 419 Fed.3d at page 131.  "Even if

debtors potentially knew of liability does that absolve a

claimant from filing a proof of claim?"  The Second Circuit

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 11-15463(SHL)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

AMR CORPORATION,

          Reorganized Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


                    U.S. Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    April 17, 2014

                    11:14 AM


B E F O R E :

HON SEAN H. LANE

U.S. BANKRUPTCY JUDGE

Page 2

Hearing re:   Doc. #11800 Hearing re: Marcelline Mesidors

Request for Payment of Administrative Expenses of Chapter 11

(Filed As ECF #38 in Case No. 11-15464)

Hearing re:   Doc. #11840 Objection of Debtors Pursuant to 11

U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to Proof of Claim

Nos. 13478, 13788, and 13865 Filed By Lawrence M. Meadows

filed by Stephen A. Youngman on behalf of AMR Corporation

Hearing re:   Doc. #11833 Motion to Authorize/Motion for an

Order Pursuant to Section 107(b) of the Bankruptcy Code and

Bankruptcy Rule 9018 Authorizing the Filing of a Redacted

Copy of the Declaration of Piper A. Brock in Support of the

Response of NCC Charlie Company and Verizon Capital Corp. to

Debtors TIA Claim Objections

Hearing re:   Doc. #11727 (146th) Motion for Omnibus

Objection to Claim(s)/Debtors 146th Omnibus Objection to

Claims (No Liability Claims)

Hearing re:   Doc. #11728 (147th) Motion for Omnibus

Objection to Claim(s)/Debtors 147th Omnibus Objection to

Claims (No Liability Claims)

Hearing re:   Doc. #11826 (148th) Motion for Omnibus

Page 3

Objection to Claim(s)/Debtors 148th Omnibus Objection to Claims (Satisfied Claims) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Hearing re:  Doc. #11827 (149th) Motion for Omnibus Objection to Claim(s)/Debtors 149th Omnibus Objection to Claims (Reclassified and Wrong Debtor Claims to be Allowed) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Hearing re:  Doc. #11828 (150th) Motion for Omnibus Objection to Claim(s)/Debtors 15t0h Omnibus Objection to Claims (Claims Resolved Pursuant to the Plan) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Hearing re:  Doc. #11829 (151st) Motion for Omnibus Objection to Claim(s)/Debtors 151st Omnibus Objection to Claim (No Liability Claims) with hearing to be held on 4/17/2014 at 11:00 AM at Courtroom 701 (SHL) Responses due by 4/10/2014

Transcribed by:  Dawn South

Page 4

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP

    Attorney for the Reorganized Debtor

    200 Crescent Court, Suite 300

    Dallas, TX 75201-6950


BY:  STEPHEN A. YOUNGMAN, ESQ.


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

    Attorney for the Post-Effective Date Creditors

    Committee

    155 North Wacker Drive

    Suite 2700

    Chicago, IL 60606


BY:  JOHN K. LYONS, ESQ.


SHERMAN, CITRON & KARASIK, P.C.

    Attorney for Ms. Mesidor

    70 E. 55th Street

    New York, NY 10158-0125


BY:  HOWARD KARASIK, ESQ.

DEBEVOIS & PLIMPTON LLP

Special Aircraft Counsel to the Reorganized Debtors

919 Third Avenue

New York, NY 10022

BY:   JASMINE BALL, ESQ.

VADENBERG & FELIU LLP

Attorney for Lawrence Meadows

60 East 42nd Street

New York, NY 10165

BY:   VINCENT J. ROLDAN, ESQ.

JAMES & HOFFMAN, P.C.

Attorney for Allied Pilots Association

1130 Connecticut Avenue, NW

Suite 950

Washington, DC 20036-3904

BY:   STEVEN K. HOFFMAN, ESQ.

# EXHIBIT DX43
# for Shiffrin Declaration

Defendant Exhibit

Exhibit No.: 43
Name: Meadows, L.
Date: 1/13/2026

ESQUIRE

**From:**     u=Hairston; Charles R./O=ALLIEDPILOTS/OU=HQ/CN=RECIPIENTS/CN=CHAIRSTON
**Sent:**      Tue, 22 Apr 2014 18:56:33 +0000 (GMT)
**To:**         "Meadows, Lawrence M." <lawrencemeadows@yahoo.com>
**Subject:**  RE: Exec. VP of Flt. Denial Grievance 13-064

I am in all June.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187

THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

---

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Tuesday, April 22, 2014 1:55 PM
**To:** Hairston, Charles R.
**Subject:** Re: Exec. VP of Flt. Denial Grievance 13-064

Chuck,

Yes, and upon receipt of that letter I spoke at length Bennett on the phone, and have detailed verbatim notes of the conversation. He told me that if I wasn't reinstated, that I would be the first one that wasn't. He assured me that it would be extremely unlikely that AA would deny such request if I had obtained my medical, as they hadn't done so previously. However, since the BK that has been borne out to be not true.

Just to be clear, if APA is absolutely refusing to process my petition on the basis of medical disability, then please advise Bennett, that myself and many other similarly situated pilots will be filing EEOC charges on that matter. I truly prefer to avoid such action, but unless I hear otherwise I will do so on Wednesday morning.

I don't believe my representative is available late May, so it may have to be in early June. I will get back to you once I get confirmation from him. Are there any date sin June that don't work for you?

Thank,
Laryy

On Tuesday, April 22, 2014 12:39 PM, "Hairston, Charles R." <chairston@alliedpilots.org> wrote:
Larry –

I understand what you want, but the protocol is what it is. The BOD will not entertain your request for reinstatement until you get a medical.

I also want to clarify one point in your e-mail below. I believe you are referring to the attached letter that Bennett sent to you November 18, 2011. I do not see where Bennett promised that APA would support your reinstatement. If and when you get a medical and apply for reinstatement, APA will determine whether it wants to support your reinstatement, and not before.

As far as your appeal hearing for 14-026 goes, I am in arbitration on the 15th. I could do it the 22nd or 29th. Let me know if one of those dates will work.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187

THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

---

**From:** Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
**Sent:** Tuesday, April 22, 2014 9:53 AM
**To:** Hairston, Charles R.
**Subject:** Re: Exec. VP of Flt. Denial Grievance 13-064

APA_000014259

Chuck,

Ok, but I believe the whole point of this is petition is whether or not APA itself supports my reinstatement. Therefore, I'm going to make one more request that, ask President Wilson and the BOD to duly consider my petition and provide me a formal decision.

You need to understand that I'm at the point where I need to invest a lot of time and money over the next 1-2 years with a HIMS certified psychiatrist, to participate in a special program, which is seeking to approve the medication I am currently taking. What I don't want is to find out that after I finally obtain FAA medical certification, that AA will terminate my disability benefits, but refuse to return me to the list.
Thus, I need the certainty that APA will support my reinstatement to the list just as Bennett has previously promised me via certified letter.

Also, as to scheduling 14-026, my personal representative can't make the 8th, but can do the 15th, are you available on that date?

Larry

.

On Tuesday, April 22, 2014 7:41 AM, "Hairston, Charles R." <chairston@alliedpilots.org> wrote:
Not you specifically. The Company will not reinstate someone who does not have a medical.

Charles R. Hairston
Attorney / Election Administrator
Allied Pilots Association
14600 Trinity Boulevard
Suite 500
Fort Worth, Texas 76155-2512
Telephone: (817) 302-2178
Facsimile: (817) 302-2187

THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

——Original Message——
From: Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
Sent: Monday, April 21, 2014 10:09 PM
To: Hairston, Charles R.
Subject: Re: Exec. VP of Flt. Denial Grievance 13-064

The Company will agree to reinstatement of me specifically?
Or are you referring to any pilot who can't hold a medical.

Sent from my iPhone

> On Apr 21, 2014, at 7:12 PM, "Hairston, Charles R." <chairston@alliedpilots.org> wrote:
>
> Larry -
>
> I can't be more clear. The BOD will not entertain a request for reinstatement from a pilot who has fallen off the seniority list until the pilot obtains a medical. I know you don't like that answer, but that is the BOD position. Please also understand that even if the BOD did consider a request from a pilot without a medical, and even if the BOD supported the request and the President sent it to the Company, the Company has made clear they will not agree to reinstatement. Bottom line: you need a medical to start the reinstatement process.
>
> Chuck
>
> _____
> From: Lawrence Meadows [lawrencemeadows@yahoo.com]
> Sent: Monday, April 21, 2014 6:02 PM
> To: Hairston, Charles R.
> Subject: Re: Exec. VP of Flt. Denial Grievance 13-064
>
> Chuck,
>
> It is my right to have my petition fully considered.
> Once again if my petition is being denied please provide the objections and reasons for doing so.
> If APA is refusing to provide due process of process my seniority petition please so advise.
>

APA_000014260

> I'm working in good faith here, and trying to avoid filing an EEOC charge on this issue, but it seems APA is intent on discriminating against its members with medical disabilities.Holding an FAA medical certificate is not a requirement for a sick/injured or disable pilot to remain on the AA seniority list.
>
> Larry
>
>
> Sent from my iPhone
>
> On Apr 21, 2014, at 1:29 PM, "Hairston, Charles R." <chairston@alliedpilots.org<mailto:chairston@alliedpilots.org>> wrote:
>
> Larry –
>
> Your understanding of the resolution does not match APA's.  In order to get before the BOD, you need to have a medical.  If you review the "whereas" section that should be clear.  Bottom line: until you get a medical, we cannot process your request.
>
> Charles R. Hairston
> Attorney / Election Administrator
> Allied Pilots Association
> 14600 Trinity Boulevard
> Suite 500
> Fort Worth, Texas 76155-2512
> Telephone: (817) 302-2178
> Facsimile: (817) 302-2187
>
> THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION.  IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.
>
> From: Lawrence Meadows [mailto:lawrencemeadows@yahoo.com]
> Sent: Monday, April 21, 2014 2:14 PM
> To: Hairston, Charles R.; Copeland, Thomas J.; Rivera, Ivan - Sec
> Subject: Re: Exec. VP of Flt. Denial Grievance 13-064
>
> Chuck,
>
> 1.  Grievance 14-026:
> Once again I'll have to disagree with you as far as APA's duty to represent me during my grievance hearing, as you know I am an APA member in good standing who  receives a collectively bargained  disability benefit negotiated under the CBA. Regardless, if APA continues to refuse to represent me then, I will be left with no choice but to do so myself, with a perosnal pilot representative of my own choosing. I have a call into Thomas to see if he can make it on the 8th as my personal pilot representative. So I will get back to you once I confirm his availability.
>
> 2.   Seniority Petition:
> With respect to my seniority petition, the email you previously sent did not contain any direct response from Captain Wilson or the BOD, nor any reasons for a denial. However,  R-2014-7 Rev.1  specifically states; "The President shall state whether the petitioning pilot was/is an APA member in good standing. The Board members shall then have seven days to consider each case and must advise the President of any noted objections, in writing, within the seven day period of their objection(s).  If the President chooses not to agree to reinstate a pilot's seniority number for any reason, or there is a Board Member objection, the said pilot shall have the opportunity to directly petition the APA Board of Directors for seniority number reinstatement."
> As a member in good standing, I am entitled have my petition fully considered by the BOD, and be provided with any BOD objections noted, or reasons for  denial by President Wilson. Therefore, I request a formal written decision as to whether or not my petition was fully considered IAW R-2014-7 Rev.1, and whether it was approved, or be provided any objections or reasons as to why it wasn't approved.
>
> Thanks,
> Larry
>
>
>
>
>
>
>
> On Sunday, April 20, 2014 7:38 PM, "Hairston, Charles R." <chairston@alliedpilots.org<mailto:chairston@alliedpilots.org>> wrote:
> Larry -
>
> For your appeal hearing, I could do it on the 8th.  Confirm that works for you and I'll lock it in.  Again, I will be attending on behalf of APA, not you.  APA does not represent you.
>
> For your reinstatement request, the response you received from me on March 31 was CA Wilson's response.  We cannot do anything with your request until you have a valid medical.
>
> Chuck
> _____
> From: Lawrence Meadows
> [lawrencemeadows@yahoo.com<mailto:lawrencemeadows@yahoo.com>]

APA_000014261

> Sent: Friday, April 18, 2014 10:45 AM
> To: Hairston, Charles R.; Copeland, Thomas J.; Rivera, Ivan - Sec
> Subject: Re: Exec. VP of Flt. Denial Grievance 13-064
>
> Chuck,
>
> I want to address the following two issues;
> 1.      Grievance 14-026: During yesterdays hearing Judge Lane postponed ruling on AA's Objection to my POC, for 30-45 days, pending the district court decision on my pending Rule 60(b) Motion to set aside AA's ERISA judgment, based misrepresentations and on fraud upon the court. He also asked if I would agree to stay the SOX matter during that period of time, so my scheduled depositions have been postponed accordingly.
> Therefore, I will now immediate availability to attend a VP of Flt hearing on my current grievance 14-026, and want to schedule it as soon as possible. I'm available on the 1st,8th or 15th of May.
>
> 2.      Seniority Petition: It's been 19 days since President Wilson received my seniority petition under BOD R2014-07 Rev.1, my understanding is that the BOD ha sonly 7 days to consider and decide such petition. Please advise what APA's final decision is on that matter.
>
> Thanks,
> Larry
>
>
> On Tuesday, April 15, 2014 5:27 PM, Lawrence Meadows <lawrencemeadows@yahoo.com<mailto:lawrencemeadows@yahoo.com>> wrote:
> Thanks Chuck.
>
> I'm pretty busy now, I'm appearing before Judge Lane this Thursday in
> NY, and the SOX matter is heating up. I'm deposing Hale and Hansen
> next week. Then were supposed to depose Arpey and Parker shortly
> thereafter. So I can't do it immediately, but likely sometime in
> early-mid may. Let me know what dates in May work for you Thomas and
> Ivan
>
> Larry
>
> On Tuesday, April 15, 2014 2:34 PM, "Hairston, Charles R." <chairston@alliedpilots.org<mailto:chairston@alliedpilots.org>> wrote:
> Larry –
>
> No decision has been made on whether to submit your grievance to the PAC. A decision will be made NLT the 25th.
>
> As far as scheduling an appeal hearing, appeals are on Thursdays at 1200 and 1300. I believe there is one already booked for 1300 on the 24th, but aside from that I believe the schedule is open. Let me know when you want to do it.
>
> Charles R. Hairston
> Attorney / Election Administrator
> Allied Pilots Association
> 14600 Trinity Boulevard
> Suite 500
> Fort Worth, Texas 76155-2512
> Telephone: (817) 302-2178
> Facsimile: (817) 302-2187
>
> THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU BELIEVE YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.
>
> From: Lawrence Meadows
> [mailto:lawrencemeadows@yahoo.com<mailto:lawrencemeadows@yahoo.com>]
> Sent: Tuesday, April 15, 2014 12:54 PM
> To: Hairston, Charles R.
> Subject: Fw: Exec. VP of Flt. Denial Grievance 13-064
>
> Chuck,
>
> I wanted to follow-up on two issues. First, is APA going to appeal my grievance 13-064 to a PAC. Second, I want to schedule my pedning grievance 14-026 for a VP of FLT appeal hearing.
>
> Thank you,
> Larry
>
> On Wednesday, April 2, 2014 5:47 PM, Lawrence Meadows
<lawrencemeadows@yahoo.com<mailto:lawrencemeadows@yahoo.com><mailto:lawrencemeadows@yahoo.com<mailto:lawrencemeadows@
wrote:
>
> Chuck,
>

APA_000014262

> Please see attached  letter from Capt. Hale denying my grievance
> #13-064. Please consider this my formal request the Association President escalate this to a Pre-Arbitration Conference As provided in Sec. 21.
>
> Thank you,
> Larry Meadows
>
>
>
>
>

< ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ >

APA_000014263

# EXHIBIT DX45

# for Shiffrin Declaration

Defendant Exhibit
Exhibit No.: 45
Name: Meadows, L.
Date: 1/13/2026
ESQUIRE

**1**

**Subject:** Your Access to C&R

**From:** Communications Chairman (comm.chair@alliedpilots.org)

**To:** lawrencemeadows@yahoo.com;

**Date:** Friday, January 13, 2017 4:36 PM



## Your Access to C&R

Today, January 13, 2017, APA President Dan Carey directed that all inactive APA members with an APA status of MDD (Medical Disability Dropped) be granted access to Challenge and Response (C&R). You may access C&R under the Quick Links section of the AlliedPilots.org homepage.

# EXHIBIT DX46

# for Shiffrin Declaration

Ex 46   1

Defendant Exhibit
Exhibit No.: **46**
Name: **Meadows, L.**
Date: **1/13/2026**
ESQUIRE

December 10, 2018

First Officer Lawrence M. Meadows
1900 Sunset Harbour Dr. #2112
Miami Beach, FL 33139

**Sent via Email and FedEx# 8120-7957-5906**

Captain Dan Carey, President
Allied Pilots Association
14600 Trinity Blvd.
O'Connell Bldg. - Suite 500
Fort Worth, TX 76155

**Re: Request for Immediate Seniority Reinstatement and Return to Duty**

Dear CA Carey,

After two plus long years, I'm very pleased to inform you that the FAA Federal Air Surgeon has finally issued me an Airman's 1st Class Medical Certificate. (Enclosed Herewith). In accordance with your past assurances and longstanding past-practice, please consider this my formal request for immediate and unconditional reinstatement to my original relative position on the American Airlines Pilots' Seniority List, Return-To-Work ("RTW") clearance, and training date, exactly as has been done for all other similarly-situated MDD pilots.

I know you're very busy, especially with Sec. 6 looming but would appreciate your prompt attention and expeditious handling of this matter. Should you have any questions or need any additional information, don't hesitate to contact me. Finally, I express my sincerest gratitude to you and CAs Read and Sicher for standing behind me all these years and look forward to flying the line with you gentlemen once again. I'm truly elated to finally be able to resume my career as an American Airlines pilot. Thank you in advance for your efforts and support.

Fraternally,

Lawrence "Larry" M. Meadows
MIA/FO/777/LTD/MDD
AA# 332713

Cc: CAs Billyray Read, Ed Sicher, Dave Rintel

Encl: FAA 1st Class Medical

# EXHIBIT DX57
# for Shiffrin Declaration

Defendant Exhibit
Exhibit No.: 5 4
Name: Meadows, L
Date: 1/13/2026
ESQUIRE



**O'Melveny**

O'Melveny & Myers LLP          T: +1 212 326 2000                    File Number:
Times Square Tower             F: +1 212 326 2061
7 Times Square                 omm.com
New York, NY 10036-6537

December 10, 2019                                          **Mark W. Robertson**
                                                          D: +1 212 326 4329
                                                          mrobertson@omm.com

**VIA E-MAIL AND U.S. MAIL**

Lawrence M. Meadows
P.O. Box 4344
Park City, UT 84060
lawrencemeadows@yahoo.com

Re:     ***Cease and Desist Communications with American Airlines, Inc. Employees***

Dear Mr. Meadows:

I write on behalf of American Airlines, Inc. ("American").  American has informed me that you continue to write directly to American employees about returning to work despite multiple requests that you cease such communications—including in a December 5, 2019 e-mail from you to Jeffrey Price, attached below.

As you know, I informed you on April 4, 2019 and again on July 10, 2019 that American has no return-to-work process for terminated employees, and, accordingly, I requested on American's behalf that you cease further communications with its employees seeking to return to work. (*See* Attachment B.)

To reiterate, and consistent with my two prior emails to that effect, American again asks that you cease further communications with any of its employees requesting a return to work.

Sincerely,

*/s/ Mark W. Robertson*

Mark W. Robertson
of O'MELVENY & MYERS LLP

Attachments

Century City · Los Angeles · Newport Beach · New York · San Francisco · Silicon Valley · Washington, DC
Beijing · Brussels · Hong Kong · London · Seoul · Shanghai · Singapore · Tokyo

**Meadows 000022**

## ATTACHMENT A

**From:** Lawrence Meadows <lawrencemeadows@yahoo.com>
**Date:** December 5, 2019 at 10:28:24 PM EST
**To:** Jeffrey Price <jeffrey.price@aa.com>
**Cc:** Billyray Read <wread@alliedpilots.org>, Dave Rintel <grinch6@gmail.com>
**Subject: Follow-up on RTW Request date July 24, 2019**
**Reply-To:** Lawrence Meadows <lawrencemeadows@yahoo.com>

Dear CA Price,

As you may recall, four months ago I sent you a certified letter/email, requesting a Return-TO-Work ("RTW") medical clearance, training date, and return to active line pilot service, in accordance with the collectively bargained Agreements and past-practice. You promptly replied, and informed me that you forwarded my request to HR and Legal and were standing by for a response.

To date, it has been one year since I submitted my FAA First Class medical certificate to the Company's ARC and requested a RTW. Yet, nobody from Company has ever responded to, much less approved or denied my RTW request.

During that same time-frame I am personally aware of at least five other similarly-situated formerly disabled pilots (including another fellow MIA based pilot) who have been given an RTW clearance and returned to active line pilot status. All of whom, just like me, were disabled for more than five years (some for more than 10 years) and purportedly administratively terminated and removed from the seniority list.

There can be no rational explanation for such disparate treatment of myself. Especially considering, that out of all those disabled pilots recently reinstated, I am the only one who was current and qualified as a B-777 Captain. Moreover, on information and belief, certain individuals in HR/Legal are retaliating against me.

Therefore, I respectfully request that you as my Chief Pilot supervisor, insist that the Company treat me equally and fairly, just like all the other similarly-situated pilots; and immediately be grant my request for RTW and training date.

My hope remains that this matter can be resolved amicably, but time is of the essence. Please let me know when I can expect the Company to approve my RTW request, or if they are refusing to do so. Either way, I would appreciate a response by the close of business.

Sincerely,

Lawrence M. Meadows
MIA/FO/777/LTD
AA# 332713

**Meadows 000023**

## Attachment B

**From:** Robertson, Mark
**Sent:** Wednesday, July 10, 2019 11:57 AM
**To:** 'Lawrence Meadows' <lawrencemeadows@yahoo.com>
**Subject:** Communications with American

Mr. Meadows,

I write on behalf of American Airlines, Inc.. American has informed me that you continue to write directly to its employees inquiring about returning to work. As I explained in my below email of April 4, 2019, and as you have acknowledged in several court filings, American terminated your employment and removed you from the pilot seniority list in 2011. There is no return-to-work process for terminated employees.

Accordingly, American, consistent with my below email, again requests that you cease further communications with its employees seeking a return to work.

Thank you.

Mark Robertson

---

**From:** Robertson, Mark
**Sent:** Thursday, April 4, 2019 4:07 PM
**To:** 'Lawrence Meadows' <lawrencemeadows@yahoo.com>
**Subject:** RE: Meet & Confer Re: 9th Cir. COA Case No. 18-16204

Mr. Meadows,

I apologize for my delayed response. This came in over the weekend when I was traveling, and then I got tied up this week.

As to issues you raise below regarding American's filing in the Ninth Circuit, American disagrees in all respects. American's position is that everything in its filing is accurate and that all record excerpts it cited are appropriately before the Ninth Circuit.

As to your settlement proposal, American rejects it.

In addition, American has informed me that you have sent communications to various American employees inquiring about returning to work. As you have acknowledged in several court filings, American terminated your employment and removed you from the pilot seniority list in 2011. There is no return-to-work process for terminated employees.

**Meadows 000024**

American asked me to respond on its behalf because, in the past when American employees have conveyed position or information with which you disagreed, you have responded with inappropriate or threatening communications and also sued one employee in her individual capacity simply for performing her job.

American requests that you cease further communications with its employees requesting a return to work.

Thank you.

Mark Robertson

---

**From:** Lawrence Meadows <lawrencemeadows@yahoo.com>
**Sent:** Saturday, March 30, 2019 10:46 AM
**To:** Robertson, Mark <mrobertson@omm.com>
**Subject:** Re: Meet & Confer Re: 9th Cir. COA Case No. 18-16204

Mark,

Sorry for the delayed response, I was occupied with the 2nd Circuit Argument, and traveling yesterday. Anyway, I will seek to strike the following:

All record excerpts from AMR's bankruptcy proceedings and any and all Argument that stems from them, which are inextricable intertwined in your Answer Brief.

Additionally, there are several mischaracterizations and material misstatements of fact in your introduction; including but not limited to falsely claiming the EEOC investigation was in no way related to me, when in fact my 2012 charges of disability discrimination and those of other pilots were specifically reassigned to and investigated by the very same Phoenix EEOC investigator leading the systemic investigation of American.

Moreover, you also misstate that I am terminated, which is belied your client's own internal records and collectively bargained "Agreements"; all of which plainly define and show me as a "pilot employee", who at all relevant times has continuously been on an "Authorized Leave of Absence" of disability leave approved by American's Corporate Medical Director, receiving compensation in the form of W-2 employee wages subject to federal tax withholding, Active Pilot Employee Medical Benefits, and annual accrual of Pension Credited Service.

Furthermore, contrary to your mischaracterization, No court has ever ruled my litigation or pleadings to be frivolous as you otherwise misstate. Indeed, just yesterday one of my pleadings which you have collectively referred to as

Meadows 000025

"frivolous", resulted in the U.S. Bankruptcy Court granting my Motion to Enforce your client's improper premature manipulating its claims register in violation of the bankruptcy Courts' prior Order and explicit term of the Consent Decree.

In sum, your pleading contains numerous documents and associated arguments that are beyond the orginal record in violation of the rules, along with several improper mischaracterizations and material  misstatements of fact.

However, I would be willing to agree to temporarily stay the proceedings , so as to allow you the opportunity to withdraw your offending pleadings, and to promptly cure and properly refile them. Otherwise, I will vigorously object to all matters beyond the record and said misstatements.

Finally, last week I proffered a reasonable no-cost settlement proposal to you along with counsel for AMR and the EEOC, but now over  one week later I have heard nothing back.  Its disappointing that your client appears to want to continue to conduct itself unlawfully and engage in scorched earth tactics, as opposed to amicably resolving this matter for the mutual benefit of ALL parties.

Regardless, I'll remain committed to my proposed no-cost resolution until next week. Thereafter, I will pursue other remedies and file appropriate pleadings/complaints in the 9th Circuit and elsewhere.

Lawrence Meadows

516-982-7718

Sent from my iPhone

On Mar 27, 2019, at 12:39 PM, Robertson, Mark <mrobertson@omm.com> wrote:

Can you let us know what you are seeking to strike from American's motion.

**O'Melveny**
**Mark W. Robertson**
mrobertson@omm.com
O: +1-212-326-4329
M: +1-718-916-6904

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY  10036
Website | LinkedIn | Twitter | Bio

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the*

Meadows 000026

*intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

On Mar 27, 2019, at 12:28 PM, Lawrence Meadows <lawrencemeadows@yahoo.com> wrote:

Gentleman,

I wrting to  confer with both of you for the purpose of filing a Motion(s) to Strike both your pleadings or portions therein, as it relates to your improper use of materials and issues from matters beyond the record in the underlying  U.S District Court Of Arizona Case that is the Only subject matter on appeal before the 9th Circuit COA.

Please advise if you support or oppose such Motion as soon as possible. Feel free to call me if you have any questions or would like to discuss further.

Sincerely,
Lawrence M. Meadows
516-982-7718

Sent from Yahoo Mail for iPhone

Meadows 000027

# EXHIBIT 2

# for Shiffrin Declaration

## Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

LAWRENCE MEADOWS,

Plaintiff,

vs

ALLIED PILOTS ASSOCIATION, et al ,

Defendants

CASE NO  1:17-cv-22589-EA

HONORABLE JUDGE ED ARTAU

_____

ORAL AND VIDEOTAPED DEPOSITION

MARK MYERS, INDIVIDUALLY AND AS CORPORATE

REPRESENTATIVE FOR ALLIED PILOTS ASSOCIATION

JANUARY 21, 2026

VOLUME 1

(REPORTED REMOTELY)

_____

ORAL AND VIDEOTAPED DEPOSITION, VOLUME 1, OF MARK MYERS, INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE FOR ALLIED PILOTS ASSOCIATION, produced as a witness at the instance of the Plaintiff and duly sworn remotely, was taken in the above-styled and -numbered cause on the 21st day of January, 2026, from 9:42 a m  to 3:55 p m , before Amber Collins, Certified Shorthand Reporter in and for the State of

## Page 2

Texas, reported stenographically by a Texas certified machine shorthand reporter at witness location, in Arlington, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 3

APPEARING REMOTELY

PRO SE PLAINTIFF:
Mr. Lawrence M. Meadows
1900 Sunset Harbour Drive
#2112
Miami Beach, Florida 33139
T: (516) 982-7718
Email: lawrencemeadows@yahoo.com

FOR DEFENDANTS:

Mr. Joshua B. Shiffrin
MS. Grace Rybak
BREDHOFF & KAISER, P.L.L.C.
805 15th Street N.W., Suite 1000
Washington, D.C. 20005
T: (202) 842-2600
Email: jshiffrin@bredhoff.com

ALSO PRESENT:
Videographer Brian Primavera
Captain Brian Ostron

REPORTER'S NOTE

Uh-huh = Yes - Affirmative response
Huh-uh = No - Negative response
Quotation marks are used for clarity and do not necessarily indicate a direct quote.
Ellipses are used only to show that an answer has trailed off and not been interrupted.  Names not spelled on record may be spelled phonetically.

## Page 4

INDEX

PAGE

Appearances                         3
Exhibit Index                    5 - 7
MARK MYERS, INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE FOR ALLIED PILOTS ASSOCIATION

Examination by MR  MEADOWS                    9

Agreement Re Confidential Proceedings      77 - 79

Confidential Portion           79/15 - 81/1

Changes and Signature                268
Court Reporter's Certificate         270

Page 5

PLAINTIFF'S EXHIBITS

| EXHIBIT | DESCRIPTION | IDENTIFIED/MARKED |
|---|---|---|
| 1 | 2003 Collective Bargaining Agreement [Meadows 051828 - 051830] | 46 |
| 2 | Business Listing for Western Medical [Retained by Counsel] | 53 |
| 3 | Plaintiff's Motion and Memorandum for Rule 60(b) Relief to Set Aside Order and Final Summary Judgment and Based on Newfound Evidence, Fraud and Misrepresentation; or Alternatively using the Courts Inherent Powers Under Rule 60(d) [Meadows 024819 - 024925] | 56 |
| 4 | Letter KK - February 1, 2024 [Meadows 052217 - 052218] | 72 |
| 5 | American Airlines, Inc Pilot Long-Term Disability Plan dated February 1st, 2004 [Meadows 024070 - 024097] | 73 |
| 7 | August 11, 2008 Letter from Captain Bob Raleigh [Meadows 013355] | 86 |
| 8 | Section 11, Leaves of Absence [Meadows 051889 - 051893] | 92 |
| 9 | Section 13, Seniority [Meadows 051908 - 051909] | 94 |
| 10 | Certified Letter from APA Director of Representation, Bennett Boggess, dated November 18th, 2011 [Meadows 009624 - 009628] | 116 |

Page 6

PLAINTIFF'S EXHIBITS (cont )

| EXHIBIT | DESCRIPTION | IDENTIFIED/MARKED |
|---|---|---|
| 11 | Oral Deposition Testimony of James Anderson dated October 17th, 2016 [Meadows 029695 - 029745] | 119 |
| 12 | August 5, 2011 Letter from Scott from Scott Hansen [Meadows 013421] | 133 |
| 13 | Section 12, Supervisory Pilots, Check Airmen & Tule [Meadows 051894 - 051907] | 142 |
| 14 | Grievance 12-011 [Meadows 023532] | 156 |
| 15 | June 6, 2013 Letter from Captain Bart Roberts | 165 |
| 16 | June 25, 2013 Pension Profile [Meadows 023813 - 023815] | 168 |
| 17 | September 12, 2013 Pension Profile | 171 |
| 18 | March 3, 2011 Letter from Grace Mora [Meadows 024993 - 024997] | 176 |
| 19 | "APA Announces Hiring ERISA Disability Litigator to Assist with Ongoing Denials of Pilot Disability Claims by American Management" [Meadows 052352 - 052354] | 181 |
| 20 | APA Flight Line [Meadows 027303 - 027307] | 193 |

Page 7

PLAINTIFF'S EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | IDENTIFIED/MARKED |
|---|---|---|
| 21 | June 9, 2011 Demand Letter | 201 |
| 22 | June 19, 2008 Email from Thomas Bettes [Meadows 013350] | 207 |
| 23 | July 14th, 2017 Allied Pilots Appeal Board Ruling [Meadows 008027 - 008044] | 231 |
| 24 | April 22, 2014 Email from Rusty McDaniels [Meadows 003210] | 244 |
| 25 | Article: Union Democracy Review Published by the Association for Union Democracy [Meadows 052450 - 052451] | 255 |

Page 8

PROCEEDINGS

(JANUARY 21, 2026)

THE VIDEOGRAPHER:  We are on the record at 9:42.  Today is Wednesday, January 21st, 2026.  This is the videotaped deposition of Mark Myers.  It's being taken in the matter of Lawrence Meadows verse Allied Pilots Association, et al.  It's filed in the United States District Court, Southern Division of Florida, Miami Division, Civil Action No. 1:17-cv-22589-EA.

Will counsel please state their appearances and any agreements for the record.

MR. MEADOWS:  Lawrence Meadows, Plaintiff proceeding pro se.  With me assisting is Captain Brian Ostron.  He'll be observing and logging exhibits.

MR. SHIFFRIN:  Joshua Shiffrin, counsel for Allied Pilots Association.  With me is my associate, Grace Rybak.

THE VIDEOGRAPHER:  Will our court reporter please swear in our witness.

(Witness sworn.)

MR. MEADOWS:  Okay.  You guys ready?

Page 105

sure what you've -- when you say the word "you," I want to understand in what capacity you're asking.

MR. MEADOWS: Yes. We're talking about 30(b)(6). I haven't veered off that.

Q. (By Mr. Meadows) Please answer the question.

A. Can you restate.

MR. MEADOWS: Will you restate the question, please.

Oh, okay.

Court reporter, Amber, can you restate the question. Amber.

(Previous question read back.)

COURT REPORTER: There's a lot of talking over each other.

MR. MEADOWS: Okay. Let me restate the question.

Q. (By Mr. Meadows) Is it APA's position that Lawrence Meadows is terminated and currently dropped in the seniority list in accordance with Section 11.D.1?

A. APA's position is that you were removed from the seniority list and separated from the company pursuant to the Section 11.D.1. and/or Supplement F1.

Page 106

Q. Okay. And does it say administrative separation anywhere in this document?

A. No.

Q. Thank you.

Do you find Bennett Boggess to be a credible individual?

A. I have not found him to be incredible or uncredible. Sometimes his -- was very incredible. But uncredible? I have not talked to him in a very long time, but I had no reason to doubt his credibility.

Q. Okay. So we're going to go back to the disability claim.

A. And that was in my personal capacity, not as a Section 30(b) -- you know, sorry. Because we are going back --

Q. I'm trying -- so we're back to -- what is the --

MR. MEADOWS: What exhibit is the letter from the chief pilot in 2008 -- that one right there?

Exhibit 7.

Q. (By Mr. Meadows) It's Exhibit 7. We're back to this.

It says I'm on an unapproved leave of

Page 107

absence. Yes or no?

A. Yes.

Q. And if I'm on unapproved leave of absence, and I was not paid from December 26th, 2007 until February of 2012, would I be eligible for disability benefits under the plan based on what we looked at earlier?

MR. SHIFFRIN: Objection. Calls for legal analysis.

Q. (By Mr. Meadows) Under -- under the plain and unambiguous language of the 2004 LTD Plan, can an individual on unapproved leave who is not on the payroll be eligible for these benefits?

MR. SHIFFRIN: Objection. Calls for a legal analysis. I'm going to instruct him --

MR. MEADOWS: I'm asking the plain and unambiguous language of the plan.

MR. SHIFFRIN: I've instructed the witness not to answer.

MR. MEADOWS: He can answer. It's not privileged.

Q. (By Mr. Meadows) Mr. Myers --

MR. SHIFFRIN: Mr. Meadows, you've asked. I've instructed him not to answer.

MR. MEADOWS: On what basis?

Page 108

MR. SHIFFRIN: It calls for a legal analysis.

MR. MEADOWS: What basis?

Give me the timestamp, please.

What basis? Give me a basis for your objection.

MR. SHIFFRIN: Mr. Meadows, I've given you a basis for my objection.

MR. MEADOWS: No, you have not. State your objection for the record, please.

MR. SHIFFRIN: It's been stated.

MR. MEADOWS: Amber, restate his objection, please.

MR. SHIFFRIN: It calls for a legal analysis.

MR. MEADOWS: It does not.

MR. SHIFFRIN: Okay.

MR. MEADOWS: Let me restate the question.

Q. (By Mr. Meadows) Based on the plain and unambiguous language of Section 4, paragraph A, page 5 of the 2003 LTD plan, can a pilot on an unauthorized leave be eligible for benefits?

MR. SHIFFRIN: Mr. Meadows, that's the same question. You didn't restate it.

Page 121

Agreement?"

"A:  Collective Bargaining Agreement, yes."

Q.  So you would agree that Mr. Anderson testifies that he was in charge of administering the CBA for the pilot agreement?

A.  Yes.

Q.  Okay.

A.  On behalf of American Airlines.

Q.  On behalf of American Airlines.  The company, the employer.

Okay.  Read lines 5 to 10.  Page 13, lines 5 to 10.

A.  "Q:  Can a pilot be disciplined or discharged from employment with the company without an investigation and written notice to the pilot of his discharge?"

And then it says:

"MR. BERG:  Objection.  Vague and ambiguous.  Calls for speculation."

"A:  Not according to the language."

MR. SHIFFRIN:  Objection.  Misleading as it's a very incomplete portion of his testimony.

Q.  (By Mr. Meadows)  Read -- starting at page 17, line 24, read through page 18, line four.

Page 122

A.  Sorry.  On line 24 of page 17?

Q.  Yes.

A.  I'm assuming that the page right above 18 is 17, but I don't see the page number.

Q.  There's 17.

A.  Thank you.

Q.  There you go.  I'm sorry.  I'll do it for you.

A.  24, Q by Ms. Emery:

"Do you see anything in 11D that leads you to believe that a pilot is terminated after five years after disability?"

"MR. BERG:  Objection.  Calls for speculation."

"A:  No."

Q.  So the employer --

MR. SHIFFRIN:  Same objection.

Q.  (By Mr. Meadows)  American Airlines, the employer, doesn't believe a pilot is terminated under 11D, but the union does?

MR. SHIFFRIN:  Objection to the form.

Q.  (By Mr. Meadows)  Is that the APA's position?

A.  Are you asking me in my 30(b)(6)?

Page 123

Q.  I'm asking as an individual.

A.  As an individual?

Q.  Yeah.

A.  I can't answer for what Mr. Anderson was testifying to or whether or not he understood the use of the word "terminated", or using it differently, or the prior questions leading to that.

As an individual, a pilot who has been out longer than five years under Section 11D or Supplement F, F1, at the time, that's been changed.

It's not inconsistent for the company to administratively separate or terminate their employment after they go beyond five years.

Q.  But he says you're not terminated.

MR. SHIFFRIN:  Objection to form.

Q.  (By Mr. Meadows)  Mr. Anderson says you're not terminated after five years.

MR. SHIFFRIN:  Objection to form.

Q.  (By Mr. Meadows)  Let's continue.

We're on page 18.  Read lines 16 to 23 only.

A.  Line 16 starts at:

"A:  The longstanding past practice that has been accepted by the company and the Association that a pilot is

Page 124

removed from the seniority list at the expiration of five years on disability, that predated me when they started doing the seniority list in 2001, and it continues to this day."

"QUESTION:  Is that" --

Or Q.  I'm sorry.

"Q is that a permanent termination of the pilot?"

"A:  Not necessarily."

MR. SHIFFRIN:  Again, objection that this is an incomplete statement of what this document contains.

MR. MEADOWS:  Okay.

Q.  (By Mr. Meadows)  Page --

MR. SHIFFRIN:  Again, same objection.

A.  Line 11:

"Q:  Okay.  But if a pilot is determined not to be disabled by the company and is seeking reinstatement to go back to work, are you familiar with any situation where a pilot could be terminated for anything other than cause?"

31 (Pages 121 to 124)

Page 213

disciplinary action.

Q. (By Mr. Meadows) If you saw this letter as my union attorney, would you recommend action against the company?

MR. SHIFFRIN: Objection to form. Calls for speculation.

A. If in 2008, I saw this letter in my capacity, I was helping you as we -- you know, as we have been for several years, this would have played a factor into how we engaged with the company. It -- it -- this on its face would not have impacted, you know, the actions or the company's actions under Section 11D or Supplement F1. I mean, the five-year thing is a five-year thing. It's not --

Q. (By Mr. Meadows) What if this were based on fraud?

If the company's actions to remove me were based on fraud knowing I'm disabled? Removed from the list knowing I'm disabled and terminated me knowing I'm disabled.

MR. SHIFFRIN: Objection to -- objection to the form.

A. If -- if I can clarify that. Are you -- are you asking me that if the company had approved

Page 214

your disability based on fraud, kept you on disability for more than five years based on fraud, that Section F1 would not have applied to you, or are you asking that if there was fraud going on in the background and you were still on long-term sick or unpaid sick and disability for more than five years, would that have changed the application of 11D or Supp F1?

Q. (By Mr. Meadows) Possibly both.

Let me ask you this question: Is the company committing fraud now by paying me disability benefits despite me holding a First Class medical for the last eight years?

MR. SHIFFRIN: Objection. Calls for a legal conclusion.

A. I can't answer that question.

Q. (By Mr. Meadows) Are you familiar with the Sarbanes-Oxley Act?

A. I think -- I think it's silly they're paying you and not bringing you back, but that's a company decision.

Q. Well, I don't know if it's silly.

A. I don't know how else to put it. They're paying you disability. And you have a First Class, and they haven't brought you back. And, I'm sorry,

Page 215

Josh. APA has made multiple efforts to bring you back and the company is saying no. Do I think that's silly? Absolutely. I think that's silly.

Q. Have you ever watched the Sopranos?

A. No. Actually, I haven't.

Q. Never have?

A. No.

Q. Never seen the Italian guy sitting in the parking lot -- in lounge chairs getting paid full pay to not work?

MR. SHIFFRIN: Objection.

A. That's not you, Larry. I don't think you're scamming the system.

Q. (By Mr. Meadows) No. The company is scamming their own system.

MR. SHIFFRIN: Objection. Let's focus on the question.

Q. (By Mr. Meadows) All right. My question: In the 2019 time frame --

A. Yes.

Q. Actually, I got my medical in December of '18. And shortly thereafter, are you aware that there's like several pilots, four or five, that got their medicals right behind me in February to April of 2019?

Page 216

A. There were four or five. A few before, a few after, but yes. Yeah, I'm aware that there were other pilots --

Q. A few names that would refresh your memory. Joe Barkate, Pete Laporae, Bill Rulander.

A. Those names all sound familiar.

Q. Yeah. So what they told me, they got their medicals and they're upset because the company decided they didn't want to bring me back, so they didn't bring anyone back. And their benefits were terminated immediately. They were unpaid. I was getting paid, but they were unpaid. And you went to them in April. And all three of them told me the same thing. You called and said, Listen, the company is not bringing you back. They're not going to reinstate your disability benefits. And do you recall telling them that you're not going to file a grievance seeking reinstatement or disability benefits?

MR. SHIFFRIN: Objection to form.

A. I do not recall specific conversations or whether the conversation was the same with all of those pilots. I have talked to pilots before who have sought reinstatement and reemployment because they have dropped off earlier under Section 11D or

54 (Pages 213 to 216)

# EXHIBIT 3

# for Shiffrin Declaration

## Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

LAWRENCE MEADOWS,

  Plaintiff,

   v

ALLIED PILOTS ASSOCIATION, et al ,

  Defendants

CASE

NO  1:17-cv-22589-EA

HONORABLE JUDGE ED ARTAU

--------------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

MARK MYERS,

PART 2

JANUARY 21, 2026

--------------------------------------------

REMOTE ORAL/VIDEOTAPED DEPOSITION OF MARK MYERS, PART 2, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 21st of January, 2026, from 4:00 p m  to 5:38 p m , via videoconference in Arlington, Texas, before Miriam Feigenson, CSR in and for the State of Texas, reported by oral/stenographic means, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto

## Page 2

A P P E A R A N C E S

(ALL APPEARED REMOTELY)

FOR THE PLAINTIFF:

Lawrence M. Meadows, (Pro Se)
1900 Sunset Harbour Drive, Suite 2112
Miami Beach, Florida 33139
516-982-7718
Lawrencemeadows@yahoo.com

FOR THE DEFENDANT:

Joshua B. Shiffrin (Pro Hac)
Grace Rybak
Bredhoff & Kaiser, P.L.L.C.
805 15th Street Northwest, Suite 1000
Washington, D.C. 20005
202-842-2600
Jshiffrin@bredhoff.com

ALSO PRESENT:

The Videographer - Brian Primavera
Observer - Captain Brian Ostron

## Page 3

INDEX (Part 2)

| | |
|---|---|
| Appearances | 2 |
| MARK MYERS | |
| Continued Examination by Mr. Meadows | 4 |
| Signature and Changes | 84 |
| Reporter's Certificate | 86 |

EXHIBITS

| No. | DESCRIPTION | PAGE |
|---|---|---|
| 27 | Email | 15 |
| 28 | Email | 19 |
| 29 | Debtors Limited Objection to Motion of Lawrence Meadows | 22 |
| 30 | Order | 32 |
| 31 | Email | 46 |
| 32 | Letter | 49 |
| 33 | Text Messages | 65 |

## Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are back on the record at 4 o'clock

MR  MEADOWS:  So we are back on the record?

THE VIDEOGRAPHER:  Yes

MARK MYERS, having been previously sworn, testified as follows:

E X A M I N A T I O N (Continued)

Q   (BY MR  MEADOWS) Okay  So we were on Emery, so I'm looking for a better copy of your deposition also  Let's find it

(Sotto voce discussion )

MR  MEADOWS:  Okay  Back on the record, Plaintiff's Exhibit 26 is the oral deposition of Mark Myers, taken December 11th, 2015  And Bates Number Meadows 029150  And, Mr  Myers, you would agree this is your -- you can see the court docketing on top, Case 17-cv-01166-MSG 59 dated April 24th, '29 [sic] in the Preitz litigation  You recall this was submitted and the -- Preitz was taken in the Emery litigation in 2015  Do you remember?

A   I don't remember that it was submitted in that Preitz litigation  I do remember that I was deposed in the Emery litigation back in 2015

MR  MEADOWS:  Yeah, I reference you to the first page, you notice it's double Bates stamped Preitz versus --

Page 5

Preitz 000209?

THE WITNESS: I see that

Q (BY MR MEADOWS) Yeah, so -- but just to be clear, it came from Emery So how many times have you been deposed as an APA attorney?

A Including today?

Q Yes

A Twice

Q That's it? Really?

MR SHIFFRIN: Objection

Q (BY MR MEADOWS) How many times have you been deposed in your life?

A Twice

Q Wow

A Including today

Q Really?

THE VIDEOGRAPHER: Lawrence, can you grab your microphone again for me?

MR MEADOWS: Oh I'm sorry

THE VIDEOGRAPHER: No, you're fine

MR MEADOWS: And what's the new court reporter's name, ma'am?

THE VIDEOGRAPHER: It says Miriam

THE REPORTER: Miriam

MR MEADOWS: Can you hear me okay now?

Page 6

THE REPORTER: Yes

Q (BY MR MEADOWS) Okay I forgot where I was Okay So I'll just scroll to the relevant sections So I think there's a line of questioning related to Grievance 12-012 So would you agree that on Page 27 this relates to -- it says two grievances filed related to -- actually line 13, it says there's two grievances related to Section 11 D and Sup F Do you know which grievance she's referring to?

MR SHIFFRIN: Objection to the form of the question

A And is this page 27 of the grievance? I didn't see the page number

Q (BY MR MEADOWS) It's page 27

A Yes Okay Thank you

Q And she's -- hasn't stated the actual grievance She's asking: Did APA file a grievance related with the company's failure to notify pilots that are about to fall off the list?

A I see that question

MR SHIFFRIN: Yeah Just be clear What question are we referring -- okay Sorry

Q (BY MR MEADOWS) Yeah I get it Okay So what grievances do you think she's referring to here?

MR SHIFFRIN: Objection; calls for speculation

A She's referring to grievances related to the

Page 7

company's failure to notify pilots that they're about to fall off the list

Q Do you have DFW Grievance 12-012 and La Guardia Grievance 1154?

MR SHIFFRIN: Objection; calls for speculation I don't know how he can answer what Kathy Emery was thinking when she asked the question

A I answered in that case that there were two grievances

Q (BY MR MEADOWS) Yes

A And I suspect that at that time those were the two grievances I was thinking of

Q All right Yeah, that -- and that's what they were I just -- I think it's vague and I want you to be comfortable before we go into the questioning I'm looking -- so I can't believe the number of grievances not in there Let's see the exhibits, if I can find that

A I don't think this is the entirety of the deposition

Q It's not It's a piece --

A Sorry to interject

Q You're right

A -- there seems to be a lot of pages missing

Q That's why it's confusing (Talking to self) I think there's a full one in there Hold on

It's going to be difficult to me to ask you questions

Page 8

if specificities are not in there. Let's try this one.

Okay. Do you recall testifying about grievance 12-012 in that litigation?

A. Yes.

Q. Okay. And starting on Page 27, line 23, actually 20. Just read from line 20 on that page down to line five on Page 28, please.

A. Okay. I can only see Page 28 right now.

MR. SHIFFRIN: Can you start with the question he was being asked on Page 27?

MR. MEADOWS: Well, sure.

A. So line 23 is my -- line 20 is my answer. So if we start with the question -- you wanted line 23?

Q. Line 18. You can go ahead start with line 18.

A. What are the two grieve -- on -- on -- whose behalf were the two grievances filed -- where, yeah, were the two grievances filed?

Well, they were both base grievances, so in that sense they were on behalf of any affected base pilot.

So if APA prevails on a base grievance is that only applicable to the Dallas base if they prevail on a grievance? That was the second question.

I'm going to ask you to scroll down if you want me to continue to read.

Answer: It depends on what the issue is. I mean, if

MARK MYERS January 21, 2026

Page 9

it's a base-specific issue, then, yes, it's specific to that base  These two issues were -- were systemic system-wide and so arguably they would -- they would apply system-wide

Q  Okay  So I think it's understood that we're, at least, we're speaking about a grievance 12-012 and the other one as you go down 1154, which is really irrelevant, but you agree that those answers are about 12-012 in part?

MR  SHIFFRIN: Objection to the form of the question

A  In part -- in part, yes

Q  (BY MR  MEADOWS) Okay  And you said they were systemic, meaning system-wide and applied to all adversely affected pilots -- or affected pilots?

MR  SHIFFRIN: Objection; misstates the testimony that he just read

Q  (BY MR  MEADOWS) What do you mean by systemic?

A  So 12-012 was filed, basically, for two different reasons  One, during the bankruptcy, the company took a hard-line position and wasn't going to return anybody to the seniority list of pilots who had fallen off because of Section 11(d) or Supplement F and subsequently regained their first-class medical certificates and then sought reinstatement and reemployment to the company

Prior to the bankruptcy, we followed -- APA followed a process  When those pilots came to us we engaged the company

Page 10

and the majority were returned

Again, in -- during the bankruptcy, if a pilot who had previously been administratively separated or terminated under Section 11(d)or Supplement F1, when they regained their first-class medical certificate and sought reinstatement during the bankruptcy, the company had taken a position that we ain't doing it for anybody

And so there was a concern here that they have changed their practice by not even handling it on a case-by-case basis, which was accepted prior as every -- every case was accept -- you know, handled on a case-by-case basis  But to categorically state that they weren't even going to consider, we felt that that was a change in the practice and the process from prior years

And so one of the reasons for 12-012 was to improve the process for reinstatement, so once a pilot did get their first class medical back, that we had an established process to follow with the company not just internally -- we've always had an internal process, but with the company to seek that pilot's reappointment and reinstatement

The second issue was focused around notice because we had a pilot who had their first class at the five-year mark, had engaged with the company already for -- to return and come off of their unpaid sick leave  And the company went ahead and terminated that pilot, administratively separated them under

Page 11

Section 11(d) at the five-year mark even though the pilot had had the first class

So those were the two primary issues that were around when these grievances were filed  We wanted to improve the process and we wanted to improve the notice of pre-separation, because those two issues were systemic in a sense because it would have applied across the contract, across the pilot group  My expectation, you know, expectation, hope, whatever you want to call it, is that if we were to resolve this base grievance, the company would then apply it system-wide

Q  You mean across the whole country?

A  Yeah

Q  Nationwide?

A  Across the system, right  I mean --

Q  So anywhere?

A  All bases

Q  All bases

A  Across the company

Q  It would be Precedential?

A  I don't want to equate American Airlines to the country

Q  Okay

A  But, yes  So that is what I meant by --

Q  Okay

A  -- they were systemic  And so arguably, if we had a

Page 12

favorable resolution, that we would be able to convince the company that they should do it this way for everybody across all bases

Q  So should it have resulted in a reinstatement of the pilots that it adversely affected?

MR  SHIFFRIN: Objection

Q  (BY MR  MEADOWS) Should Grievance 12-012, if resolved favorably, result in reinstatement of pilots for holding medicals and not reinstated?

MR  SHIFFRIN: Objection

A  12-012 was not seeking reinstatement across the board  Can you ask that again? I'm not sure if I under -- you asked it two different ways --

Q  (BY MR  MEADOWS) If 12 -- if grievance 12-012 was resolved favorably --

A  Uh-huh

Q  -- would it have resulted in reinstatement of any pilots sitting out with a first-class medical seeking reinstatement, would it have reinstated them?

A  No

Q  You sure?

A  Yes  Not -- not necessarily  I mean, because 12-012 was not seeking reinstatement of all MDD pilots  It was, specifically, tailored to look at the notice and the process, but it was not --

3 (Pages 9 to 12)

MARK MYERS January 21, 2026

Page 13

Q   Was it filed on behalf of any pilots?

A   The -- yes   Well, the reason it came up in DFW is during bankruptcy there was a pilot who had regained her first-class medical and the company had refused to reinstate her

Q   So the purpose of the agreement was intended to reinstate her?

A   The -- that was, hopefully, going to be one of the outcomes, yes

Q   Okay

A   But -- but you -- you said any pilot reinstatement, and I can't --

Q   Well, you're familiar with Bennett Boggess --

MR  SHIFFRIN: Can you please let Mr  Myers finish?

MR  MEADOWS: I thought he was done

MR  SHIFFRIN: He wasn't done  Go ahead

Q   (BY MR  MEADOWS) Mr  Myers, you --

A   I was saying that there was that one affected pilot who had her first-class when this was filed and, hopefully, it would have resulted in her reinstatement, but the grievance was not seeking reinstatement of all MDD pilots  So you've asked the question a couple different ways, so I just want to make sure --

Q   Was that pilot speaking to --

Page 14

MR  SHIFFRIN:  Again, you have to let him finish

A   I just wanted to make sure that we understood there are two -- a couple of different issues here

Q   (BY MR  MEADOWS) Okay   Was that grievance filed on behalf of Susan Twitchell and seeking her reinstatement?

THE REPORTER:  Can you repeat -- can you repeat that question please and slower?  Thank you

Q   (By Mr  Meadows) Was that grievance filed on behalf of Susan Twitchell and seeking her reinstatement to the seniority list?

A   Susan Twitchell was a known pilot, who at the time -- yes

Q   Was it --

A   It was filed on behalf of DFW pilots, but Susan Twitchell -- Susan Twitchell was an affected pilot, yes

Q   And was it seeking reinstatement of any other pilots?

A   Not that I recall

Q   Are you aware it was filed on behalf of myself as well?

MR  SHIFFRIN:  Objection

A   I was not aware that it was filed on your behalf as well   You were not a DFW-based grievance or a base pilot, and I am uncertain that you were included when this was filed

Q   (BY MR  MEADOWS) Are you aware that I was based at

Page 15

DFW at certain periods of time in my career?

A   In 2012?

Q   Maybe?  I was off the seniority list

A   You were off the seniority list  I don't know if you were based anywhere, but at the time that this was filed, I -- I don't think you were a DFW-based grievance -- or pilot  Sorry  I don't doubt that you may have been based out of DFW at some point during your career

Q   Okay

THE REPORTER:  Mr  Meadows, if you can slow down your questions, that way I can get everything in  Thank you

MR  MEADOWS:  Of course  Thank you

Q   (BY MR  MEADOWS) Okay   This is Meadows Plaintiff's Exhibit 027, Bates number Meadows 048759  This is an email dated May 14th, 2012, from Bennett Boggess, Director of Representation, to First Officer Susan Twitchell  And do you want to read me that email from after FO Twitchell to -- to Thanks Bennett?

(Exhibit 27 is marked )

A   FO Twitchell, we had your file marked for follow up today as we are on the deadline for an individual to file a contractual grievance  Captain Hale's denial of your request for reinstatement to APA president Captain Bates was dated 14 February '12

Previously we had discussed filing a DFW domicile

Page 16

grievance, which would cover you and any other similarly situated pilot denied reinstatement  If we pursue that course, the filing deadline is 180 days from the date of Captain Hale's denial  Please advise if you still desire to pursue the DFW-base grievance route rather than -- rather the individual contractual grievance strategy  Please feel free to call with questions or to discuss, but I would request an email from you for my file as well

Q   So would you agree that the director representative of APA, Bennett Boggess, who you previously testified you deemed to be credible represented that that grievance would cover Susan Twitchell, individually, and any other similarly situated pilot denied reinstatement?

MR  SHIFFRIN:  Objection to the form

A   I see that it was Susan Twitchell and any other similarly situated that's at the DFW -- as a DFW domicile grievance

Q   (BY MR  MEADOWS) Okay   And let's look at Meadows Bates number 048758  And that's a response from FO Susan Twitchell to Bennett Boggess dated May 14th at 3 p m   Can you read that?

A   Please let this note -- this is -- Hi Bennett  I'm sorry  May 14, 3 p m   Right?  Is that what you're saying?

Q   Yes

A   Hi Bennett  Please let this note serve as your

MARK MYERS January 21, 2026

Page 17

confirmation that I would like to file a DFW domicile grievance regarding Captain Hale's denial of my request for reinstatement to the seniority list   Thanks for your help, Susan

Q   So she agreed to have him go and file on her behalf instead of an individual grievance, a domicile grievance, which would seek the reinstatement of her and others similarly situated as represented by Bennett Boggess?

MR  SHIFFRIN: Objection to the form

A   It appears that she's agreeing to that route, yes

Q   (By Mr  Meadows) Okay   She agreed and are you aware that that grievance was subsequently filed?

A   Yes

Q   I believe there's a follow-up email   And this is Meadows Bates 048762   Email from Kathy Schroeder   And who is Kathy Schroeder?

A   She is a paralegal at APA

Q   Okay   So it looks like she's sending on behalf of Bennett Boggess   She's says, greetings -- so you can read that to me if you want

MR  SHIFFRIN: Before you do that, Mr  Meadows, is this a different exhibit? How do you want to handle these? You've -- you're now gone through several communications

MR  MEADOWS: Oh, yeah   Let's call it Plaintiff's -- I'm sorry -- Miriam? I'm sorry   Plaintiff's Exhibit 28, email from Rusty McDaniels to -- I'm sorry   This

Page 18

is confusing there

MR  SHIFFRIN: I believe it's an email to Mr  McDaniels

MR  MEADOWS: It's to Mr  McDaniels and I'm trying to see who it's from   It's copied to Bennett Boggess

MR  SHIFFRIN: It's from Kathy Schroeder

MR  MEADOWS: It's from Kathy Schroeder to Rusty McDaniels cc'd to Bennett Boggess, Susan Twitchell   It's highlighted

And just read that out for me   And this is Bates Number -- Miriam -- Meadows 048762

THE REPORTER: The -- we saw an email before   Was that another exhibit?

MR  SHIFFRIN: That was another exhibit   This one is Plaintiff's Number 29

THE REPORTER: Okay

MR  SHIFFRIN: So -- okay

THE REPORTER: Okay   Well, we can go through it after, all the exhibits

MR  SHIFFRIN: Before we lose total track of this, you -- I think that you -- so you'd like to make this 29 and then the prior Exhibit 28?

MR  MEADOWS: 28, yeah

MR  SHIFFRIN: Do you want to just go back and note that for the record what it was? Do you want to scroll

Page 19

back and just note the Bates number for 28?

MS  RYBACK: You had introduced the document as 27, so did you want --

MR  MEADOWS: Oh, that -- the previous one was 27?

MR  SHIFFRIN: I think you've done three emails and 27 was one   28 was -- we've not yet identified, and 29 is what you just said

MS  RYBACK: There were two emails

MR  MEADOWS: There were two -- 27 was actually two emails, so this will be 28   So --

MR  SHIFFRIN: Okay

MR  MEADOWS: The -- the previous declaration was Exhibit 27 was correct, Miriam   But let's declare this one Plaintiffs 29 -- or 28   And it's Bates number 048762

(Exhibit 28 is marked )

THE REPORTER: Okay   And then in the beginning of the depo there was a deposition that -- that was read out   Was that an exhibit you wanted to label? It was a transcript   Sorry   It was a transcript

MR  SHIFFRIN: Did we not label that one, Brian?

THE REPORTER: Maybe you did with the previous reporter   I'm just noting

MR  MEADOWS: I thought we did

THE REPORTER: Okay

Page 20

MR  MEADOWS: Myers depo, yeah   That was 26

MR  SHIFFRIN: Yeah, we did

MR  MEADOWS: That was -- that was declared part of your -- are we -- are you good, Miriam? I see a thumbs up   Okay   Okay   Thank you

Q   (BY MR  MEADOWS) All right   So I lost track   Did you read this to me?

A   Not yet

Q   Okay   Please read it to me

A   Just the substance?

Q   Yeah, the greetings   Read the greetings

A   Greeting   Attached is a copy of the DFW domicile grievance that we filed today   If you have any questions, please let us know

Q   So we can agree that as represented by Bennett Boggess, he encouraged Susan Twitchell to convert to an individual domicile to get additional filing deadline to obtain a reinstatement of her and others similarly situated in Dallas and this confirms that it was filed --

MR  SHIFFRIN: Objection to the form

Q   (BY MR  MEADOWS) -- on this date

A   I'm not sure if I agree with everything you just said   I don't think she converted an individual grievance to a domicile grievance   But I agree that 12-012 was filed on or about May 22nd of 2012

Page 21

Q   I agree with that -- to clarify, she sought an individual grievance   It was suggested that she file a domicile grievance to get additional filing deadline and that's what happened   Yes or no?

A   I don't know if that's what happened, but, yes, that is filed on May 12

Q   Understood   Okay   So grievance 12-012 is filed   And I think we talked with -- do you believe that grievance applies to me?

MR SHIFFRIN:  Objection to the form

A   I -- in my personal capacity?

Q   (BY MR  MEADOWS) Yeah, yeah

A   You were not at DFW at the time   You were not on the seniority list at the time   You did not have your first-class medical   And you had not sought reinstatement after you had gotten your first reinstate -- your first-class medical at that time   So at that -- no, I -- I don't think that that would have applied to you, that grievance

Q   (BY MR  MEADOWS) So is American Airlines wrong about that?

MR SHIFFRIN:  Objection

A   I can't speak for American Airlines

Q   (BY MR  MEADOWS) Okay   I'd like to introduce Plaintiff's Exhibit 29 starting at Bates number Meadows 023283   It's the Debtors Limited Objection to Motion of Lawrence

Page 22

Meadows for Relief of the Automatic Stay   And it's bankruptcy document 5926, filed January 2nd, 2013 in American Airline's bankruptcy proceeding

(Exhibit 29 is marked )

Q   (BY MR  MEADOWS) I would like you to read paragraph three, please, on Bates number Page 023284

A   Paragraph three:  The automatic stay should not, however, be modified to allow Meadows to initiate new, additional judicial proceedings to, one, determine his employment status and, two, determine which benefit plan applies to him and (following that is the -- the new proceedings)   Because the issues that would be raised in the new proceedings may be disposed of either through the 11th Circuit's determination and the appeal or through the APA grievance (as hereinafter defined) to which Meadows is currently party pursuant to American's collective bargaining agreement (CBA with the allied pilots association) APA

Q   Okay   So --

A   You want me to read the -- oh, I'm sorry   Thus, it is premature to modify the stay to allow the commencement of the new proceedings during the pendency of the appeal and the APA grievance

Q   So American Airlines is admitting in that paragraph they're not a party to the American Airlines collective agreement, correct?

Page 23

MR  SHIFFRIN:  Objection; misstates that paragraph

Q   (BY MR  MEADOWS) Okay   Does American Airlines state that Meadows is a party to the CBA?

MR  SHIFFRIN:  It doesn't state that

MR  MEADOWS:  What does it state?

MR  SHIFFRIN:  It states that you're a party --

MR  MEADOWS:  You're not the witness, sir   I'll object to that

MR  SHIFFRIN:  (Overtalk)

A   I cannot testify as to what the company's state of mind was as they wrote it, but it states:  Through the APA grievance to which Meadows is currently party pursuant to American's collective bargaining agreement with the APA

Q   (BY MR  MEADOWS) Okay   Do you believe I was a member of the bargaining unit at this point in time on January 1st -- or January 2nd, 2013?

A   Member of APA or --

Q   Was I a member of the collective bargaining unit on January 2nd, 2013?

A   In my personal capacity?

Q   What American Airlines says   Does American Airlines say I'm a member of the collective bargaining agreement as of January 2nd?

A   I don't believe that that's what this says, that

Page 24

you're a member of the bargaining unit.

Q.  Does it say I'm a party of CBA?

A.  It --

Q.  Meadows is currently party of CBA.  Yes or no?

MR. SHIFFRIN:  It doesn't say that.

A.  It doesn't say that.  It says it's currently party pursuant -- it says:  To which Meadows is currently party pursuant to America's collective bargaining agreement with the APA.

I'm unable to answer questions that --

Q   (By Mr. Meadows) Okay.

A.  -- are trying to give you an insight of what American Airline's --

Q.  Let's move forward into the document.  Go ahead and read paragraph seven starting on the first line.

A.  All right.  I'm not able to see the entire paragraph on the screen.  Are you going to scroll or do you want to shrink it a little so I can see the whole thing?  I'd rather not look over your shoulder?

Q.  (Overtalk.)  Do you want to look over there?

A.  Okay.  Looking at the larger screen, I still don't see all of paragraph seven.

Q.  It will -- it ends on Page 3.  I could bring it up --

A.  Okay.

Q.  -- to here and I'll scroll up when you're ready.

Page 45

the Mr Rogers video

Q Yeah, that's the -- that's the colloquial thing amongst the pilot group, believe it or not So let me show you that

A You want me to watch the video? Is that what you're --

Q I would not like -- no, I'm not going to play the video I promise you You've never heard that expression, that Mr Rogers keep the metal moving video?

A Related to Dan Carey

Q Yes?

A Of Dan Carey?

Q Yes

A No Sorry Not that I recall

Q Okay

A If I had heard it in passing at APA, I don't recall the name Now I'm curious though I want to see Dan Carey as Mr Rogers

Q It's kind of one and the same It's the second disability "jihad " They have all those crazy phrases All right We'll do --

MR MEADOWS: And how many hours are we on the record as of right now, Brian?

THE VIDEOGRAPHER: Five hours and 30 minutes

MR MEADOWS: Okay Does anyone need a break?

Page 46

THE WITNESS: It's almost 5 o'clock Do you want to take a break at 5:00 and we can figure out how much more time we can be here?

MR MEADOWS: We can be here until 6:00, but I was planning on stopping earlier

MR SHIFFRIN: Okay

THE WITNESS: I do not need a break

MR MEADOWS: Anyone need a bathroom break? You good? Okay All right Okay

Q (By Mr Meadows) All right Okay It says Plaintiff's number -- Plaintiff's Exhibit 31, Bates stamped -- standby, that one is not Bates stamped Oh, wait a second Here it is Bates stamped Meadows 010806 And this is an email from Captain Ed Sicher to AL Combs (phonetic), which is Kathy Emery, believe it or not, dated October 19th, 2016 for a request for information And you mind reading that letter to me?

(Exhibit 31 is marked )

MR SHIFFRIN: Are we asking now about a topic?

MR MEADOWS: This is related to -- we're kind of on -- it's related to Kathy Emery It's related to grievance handling And related to collective bargaining agreement letter -- it's really related to a letter of agreement October 2016, which we just discussed previously And I can -- I can pull that one up

Page 47

MR SHIFFRIN: That's not a topic that's identified as --

MR MEADOWS: I can ask him in his official capacity then

Q (BY MR MEADOWS) Can you please read this email?

A Yes Now, you said it was related to my testimony and Kathy Emery or Kathy Emery --

Q No this happened --

A -- my testimony

Q Yeah, I understand So in your individual capacity

A Just read the body or the entire thing?

Q You can read just the body after Kathy

A All right I was -- I was informed that the negotiating committee had been tasked by the president to get rid of the requirement to remove MDD pilots from the seniority list at the five-year point This issue was first rejected by the company and then, in the end -- in the end run of the single FOS, F-O-S, negotiations and in exchange, parenthetical, and part for the Mr Rogers keep the metal moving video by Dan Carey, the company finally agreed to this provision They also allowed one MDD pilot back on the seniority list (Barkay, B-A-R-K-A-Y) and agreed to three other provisions However, the agreement not to remove MDD pilots would only take effect for those pilots who will be removed, not for those who have already been removed, so the seniority list will remain in

Page 48

place as is Resolution 2016-30 has not been addressed, which would, if not amended, task the negotiations committee to reinstate those already removed I will be in session all day and have an -- have a FA -- capital FA -- function tonight I'll try and call this evening if I get back at a reasonable hour Otherwise early tomorrow morning may be okay I have attached the seniority list Regards, Ed Sicher

Q Two points of clarification Barkay should be Barkate, B-A-R-K-A-T-E

MR SHIFFRIN: Objection I don't -- you could -- it's an email from Ed Sicher

MR MEADOWS: Okay

MR SHIFFRIN: If you want to ask him why he --

Q (BY MR MEADOWS) Mr Myers, are you aware he was referring to Joe Barkate in that letter?

A I can't say for certain, but I would expect he's referring to Joe Barkate, yes

Q Okay Well, we'll show that in a minute And you also would agree FA stands for APA Family Awareness Function, capital FA?

A It -- it could He also could have been going to a flight attendant function over APFA But family awareness, flight attendant, I cannot offer an opinion as to what FA stands for

MR SHIFFRIN: Calls for speculation

MARK MYERS January 21, 2026

Page 49

Q   (BY MR MEADOWS) Okay  All right  Let's go to the letter  Plaintiff's Exhibit 32, Bates stamped Meadows 041465, dated October 19, 2016  It's a letter from the VP of Flight, Kimball Stone, and Beth Holdren, American's Managing Director of Labor Relations, addressed to APA President Captain Dan Carey  Do you agree?

(Exhibit 32 is marked )

A   Yes

Q   (BY MR MEADOWS) And we discussed this, this is the letter we referred to as the seniority list October 2016 LOA, which is, basically, title -- read the title for me, please?

A   It's re: Elimination of Limitations on Retention and Accrual of Seniority for Disabled Pilots

Q   And I believe your testimony was going down to the last paragraph you just -- not the last sentence, but the paragraph right -- the three sentence paragraph right above  Can you read that paragraph?

A   Just for clarification, is there a second page here? There should be a second page with a Dan Carey's signature, which is -- makes it an official letter of agreement  But I don't think we're disputing that this is an actual letter of agreement

Q   Do you recognize this as the October 2016 LOA?

A   Yes, I do

Q   Okay  I believe it's in his CBA if we want to do

Page 50

that, but, yeah

A   The -- the changes have been made in the CBA, the letter may not be in the CBA, but -- because we made the changes to -- in the current CBA  We just changed the language as a result of this LOA  Does that make sense?

Q   Yes, sir  Question, on the 2023 CBA, are letters hyperlinked now?

A   They should be  Depends on which --

Q   You're saying this is -- language is built into the CBA?

A   This language is built into the CB -- the -- the Sup F1 5(d) was amended by this letter of agreement  That amendment has been incorporated --

Q   Understood

A   -- into the CBA  The JCBA, it wouldn't have been yet, but this version, it is incorporated  But, yeah

Q   So just read that paragraph where it says parties agree

A   Parties agree that this amendment is prospective only  That is this amendment has no application to pilots whose employment terminated prior to the effective date of this agreement  The effective date of this agreement shall be September 30th, 2016

Q   And do you know why it's prospective only?

A   The company refused to make it retroactive

Page 51

Q   And do you know why they refused to make it retroactive?

A   The -- well, the negotiating committee -- this wasn't the only thing they were trying to get, right?  I mean, they had been tasked, or the board had shown interest and introduced the resolution prior to this LOA  It wasn't voted on until December  But the negotiating committee went ahead based on that direction and the president's encouragement to go ahead and negotiate for all those things prior to that resolution

So APA was seeking the elimination of the five-year rule in Supplement F1  The elimination of the five-year rule in Section 11(d), reinstatement or to have this apply prospectively and retroactively, meaning all those who had fallen off the seniority list who were still under the age of 65 to be reinstated to the seniority list  The negotiating committee was only able to achieve the goal of changing Supplement F1 5(d), and there were several different factors or reasons why the company explained, but one of them stated at the table was that there were current pilots who had fallen off the seniority list who they did not want to reinstate

Q   Would those be the policy team to be, quote unquote, problematic employees?

A   I think they were talking about you, Larry

Q   Yeah, and Kathy Emery?

A   I don't know about Kathy, but I imagine it's a big

Page 52

list

Q   So you think this letter is the Larry Meadows carve-out list?

A   No  This letter -- this letter was a huge gain for APA to get rid of the five-year mark out of a Supplement F1 5(d)

Q   Okay  Were you aware that as part of this letter Joe Barkate got a guarantee of return?

A   I am not aware --

MR SHIFFRIN: Objection; misstates the letter

A   -- I am not aware of that  It is not part of the letter  And I disagree with that

Q   Okay  I'll show you something in a second

A   Okay

Q   So are you aware that Dan Carey made a special deal with the company to guarantee the return of Joe Barkate that if and when he got his medical, he would absolutely get to come back and his disability benefits would not stop?

MR SHIFFRIN: Objection -- objection to the form of the question

Q   (BY MR MEADOWS) I'm asking if you're aware of that deal?

A   I'm aware that in 2016 the APA engaged the company for his company return, but because Joe did not get his first-class, no agreement was reached

MARK MYERS January 21, 2026

Page 53

Q   Okay

A   So to the extent you're using the secret whatcha-call-it deal --

Q   Okay   The Barkate-sweetheart deal

A   There was no Barkate-sweetheart deal

Q   Was Barkate a union insider?

MR  SHIFFRIN: Objection --

A   I don't know what that means --

MR  SHIFFRIN: Objection to the form of that question

A   -- a union insider

Q   (BY MR  MEADOWS) Was Joe Barkate on the negotiating committee?

A   Not at the time, no

Q   But he was on the negotiating committee at one time?

A   Yeah, probably early 2000s

Q   Yes   Was Joe Barkate --

A   20, 25 years ago now, 20 years ago now

Q   Was Joe Barkate on the appeals board prior to this?

A   Yes, he was

Q   Okay   So safe to say he -- he was a national committeeman?

A   He had been on national committees, negotiating committees, appeals board

Q   Okay   And do you think there's any other pilots

Page 54

besides me they wanted to keep out?

A   I am unable to answer that one way or the other

Q   Why would you mention my name?

A   Well, because I believe at the table the company, specifically, said Larry Meadows to the negotiating chair at the time that you were negotiating this, they did not want to make it retroactive because they did not want to and were not going to bring you back

Q   And who said that?

A   Members of the American Airlines negotiating team was negotiating this letter of agreement

Q   Lucretia Guia?

A   I don't know who

Q   You don't know who   Were you there?

A   No

Q   Okay   I thought you were there   I'm sorry

A   No, but the negotiating committee chair was negotiating committee chair when I became the negotiating director   And as we continued efforts to reach the -- the guideline or the goals of the board be reviewed the LOA from 2016 and the circumstances surrounding the negotiation of that LOA

Q   Are you aware that I did a very professional -- professionally written white paper to the VP of flight asking for this very change in the contract?

Page 55

MR  SHIFFRIN: Objection to the form of the question

Q   (BY MR  MEADOWS) Are you aware I did a white paper seeking to eliminate the five-year rule and making so pilots get treated the same as they did at Southwest, United, Us Air East, all the other major airline's, pilots on disability remained on the list until they returned to work or age of retirement age?

MR  SHIFFRIN: Objection to the form of the question

A   I -- if I was aware that you did a white paper, I don't recall it today

Q   (BY MR  MEADOWS) Okay   All right   So you feel like Joe Barkate may have been treated better than me?

MR  SHIFFRIN: Objection; misstates his testimony

A   I can't say whether Joe Barkate was treated better than you   I can say that when Joe Barkate regained his first-class medical in 2019 that the APA followed its internal process and engaged with the company and the company agreed at that time to reinstate him and reemploy him

Q   (By Mr  Meadows) Okay

A   They did not do that for you in 2019, so to that extent, did they treat him better, yes

Q   When you say "they," who are you referring to?

Page 56

A   The company   Sorry

Q   So --

A   The company reinstated Joe Barkate in 2019   They did not reinstate you

Q   Yeah, let's get back to -- so in May of 2019

A   Yeah

Q   I think going to 2019, I was the first one that got a medical and behind me there were several, Joe Barkate, Bill Rualander, Pete Lepore, and a few others that got their medical certificates and they were also denied return, initially?

A   I don't know the order of events on who had a medical first or not   You had yours in 2018 not 2019

Q   December '18, yeah

A   So if -- if the others were 2019 then, yes, you would have gotten yours first

Q   Okay   And do you know why at that -- going into May of 2019 all of us were held out of service, and you had called several and said you're not coming back   Look for a job elsewhere

MR  SHIFFRIN: To be clear, we're asking Mr  Myers questions in his personal capacity now?

MR  MEADOWS: Yes   I guess that would be, yes

A   I do not recall telling any of the pilots to look for a job elsewhere

Q   (BY MR  MEADOWS) Did you call Joe Barkate and tell

# EXHIBIT 4

# for Shiffrin Declaration

## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE MEADOWS *
  Plaintiff, *
                    *
v                   * CASE NO
                    * 1:17-cv-22589-EA
ALLIED PILOTS ASSOCIATION, *
ET AL ,             * HONORABLE JUDGE
  Defendants        * ED ARTAU

*******************************************

ORAL AND VIDEO DEPOSITION OF

MARK MYERS, INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE
FOR
ALLIED PILOTS ASSOCIATION

JANUARY 22, 2026

VOLUME 3

*******************************************

ORAL AND VIDEO DEPOSITION OF MARK MYERS, INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE FOR ALLIED PILOTS ASSOCIATION, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 22nd day of January, 2026, from 9:32 a m to 3:27 p m , before Amy Massey, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Spark Coworking, 1000 Ballpark Way, in the City of Arlington, County of Tarrant, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto

## Page 2

APPEARANCES

FOR THE PLAINTIFF, LAWRENCE MEADOWS:
  MR LAWRENCE MEADOWS
  Pro Se
  1900 Sunset Harbour Drive
  Number 2112
  Miami Beach, Florida 33139
  516-982-7718
  lawrencemeadows@yahoo com

FOR THE DEFENDANT, ALLIED PILOTS ASSOCIATION, ET AL:
  MR JOSHUA B SHIFFRIN
  Bredhoff & Kaiser, P L L C
  805 15th Street N W
  Suite 1000
  Washington, D C 20005
  202-842-2600
  jshiffrin@bredhoff com

Also Present:
  Mr Brian Primavera, Videographer
  Elite Video Productions
  214-747-1952
  info@elitevideoproductions com

  Captain Brian Ostrom

## Page 3

INDEX

                                        PAGE

Appearances                               2
Stipulations                              1

MARK MYERS, INDIVIDUALLY AND AS CORPORATE
REPRESENTATIVE FOR ALLIED PILOTS ASSOCIATION

Direct Examination by Mr Meadows          7

Signature and Changes                   269

Reporter's Certificate                  271

REPORTER'S NOTE: Quotation marks used are for the ease of reader and may not indicate an actual quote

## Page 4

EXHIBIT INDEX

DEPOSITION   DESCRIPTION              PAGE
EXHIBIT                           IDENTIFIED

NUMBER 27   Email Chain Between Bennett    107
            Boggess and FO Susan
            Twitchell Regarding Request
            to Return to Pilot System
            Seniority

NUMBER 29   Debtors' Limited Objection     119
            to Motion of Lawrence
            Meadows for Relief from
            Automatic Stay

NUMBER 34   2003 AA APA CBA, Sections 21,   44
            23, and 24
            Discipline, Grievances,
            Hearings, and Appeals

NUMBER 35   Grievance 12-12                 51

NUMBER 36   Proposed 2017 Proposed Arbitration 66
            Agreement for Grievance 12-011

NUMBER 37   Order Authorizing the           31
            Stipulation and Agreed
            Order for Proof of Claim
            Filed by The Allied Pilots
            Association

NUMBER 38   National Mediation Board        95
            Representation Manual
            Revised Text Effective
            March 25, 2013

NUMBER 39   Declaration of J Bennett        95
            Boggess

NUMBER 40   Allied Pilots Association proof  113
            of Claim Submitted by Allied
            Pilots Association On Its
            Own Behalf and On Behalf of
            Its Individual Members

NUMBER 41   Amended Declaration of Mark     122
            Myers In Wallace T Preitz v
            Allied Pilots Association

1 (Pages 1 to 4)

Electronically signed by Amy Massey (401-010-081-3772)                    afef0e26-0b33-4a4d-a49d-8d12a33ee313

MARK MYERS January 22, 2026

## Page 5

EXHIBIT INDEX CONTINUED

DEPOSITION   DESCRIPTION              PAGE
EXHIBIT                       IDENTIFIED

NUMBER 43   Individual Submission of      143
Grievance to the Expedited
System Board of Adjustment
in Accordance with the MOU,
Paragraphs 10 f and 20,
To Dispute American Airlines
Failure to Uphold Its
Obligations Under The MOU,
Paragraph 10 and Resultant
Violation of Seniority Rights
of Lawrence M Meadows and
Similarly Situated Pilots on
Long-Term Disability

NUMBER 44   Disposition: Adopted        150
19-3-0-0 on 12/13/2016
Supplement F and
Section 11 D 1

NUMBER 45   Baab & Denison, L L P ,     180
Letter to Mark R Myers
Regarding Duty of Fair
Representation to Former
Pilots

NUMBER 46   APA Reinstatement of        194
Disabled Dropped
Investigative (REDDI)
Ad Hoc Committee

NUMBER 47   Email from Lawrence         211
Meadows to APA President
Dan Carey on
March 11th, 2019

NUMBER 48   APA Constitution and        219
Bylaws Amendment #81
Effective: August 2, 2014

NUMBER 49   American Airlines, Inc      242
Pilot Retirement Benefit
Program Summary Plan
Description

## Page 6

EXHIBIT INDEX CONTINUED

DEPOSITION   DESCRIPTION              PAGE
EXHIBIT                       IDENTIFIED

NUMBER 50   12/31/2021 A Plan Benefit     235
Statement, American Airlines,
Inc , Pilot Retirement
Benefit Program
Prepared for: Lawrence Meadows

NUMBER 51   American Airlines, Inc        252
Pilot Retirement Benefit
Program Summary Plan
Description

NUMBER 52   Email Between Lloyd Hill and   254
Chuck Hairston Regarding
Larry Meadows About
Eradicating APA Legal

NUMBER 53   Email Between Jim Clark and    259
Lawrence Meadows Regarding
Agreement

NUMBER 54   Joint Collective Bargaining    47
Agreement (JCBA)
Effective: January 30, 2015

NUMBER 55   Allied Pilots Association      83
Equity Distribution Arbitration

NUMBER 56   Declaration of J Bennett      105
Boggess

NUMBER 57   Certified Letter from         148
American Airlines to
Lawrence Meadows Regarding
the MOU dated
May 25, 2016

NUMBER 58   Handwritten Notes of REDDI     207
Committee Chairman Captain
Ed Sicher, Documented in the
Matter of Preitz versus APA
Doc 107-91,
Filed October 1st, 2021

## Page 7

(Exhibits marked by Plaintiff prior to deposition.)

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record at the 9:32.  Today is Thursday, January 22nd, 2026.  This is the videotaped deposition of Mark Myers.  It's being taken in the matter of Lawrence Meadows versus Allied Pilots Association, et al, filed in the United States District Court, Southern District of Florida, Miami Division, Civil Action Number 1:17-cv-22589-EA.

Will counsel please state their appearances and any agreement for the record.

MR. MEADOWS:  Lawrence Meadows, plaintiff, proceeding pro se.  With me is my observer and exhibit logger, Captain Brian Ostrom.

MR. SHIFFRIN:  Joshua Shiffrin, counsel for the Allied Pilots Association.

THE VIDEOGRAPHER:  Will the court reporter please swear in our witness.

MARK MYERS, having been first duly sworn, testified as follows:

MR. MEADOWS:  Okay.  We're on the record.  Before we begin questioning, I need to make three points for the record.

First, regarding document production:  APA's

## Page 8

production, due December 1st, 2025, remains seven weeks delinquent and woefully deficient.  Yesterday at 9:05 a.m., five minutes after the scheduled start of deposition, APA served its fourth tranche of documents, including evidence of targeted retaliation which we will address.  This production, like previous ones, is not globally keyword searchable and not organized according to Rule 34.  To date, no text messages have been produced.  Furthermore, a privilege log was provided yesterday, to which I have not had a reasonable opportunity to review.  This is an unacceptable, prejudicial, and obstructionist tactic.  I am proceeding under protest and reserve all rights to recall Mr. Myers in both his individual 30(b)(6) capacities, at APA's expense, to question him regarding the late-produced documents and any questions or documents improperly withheld on the unreviewed privilege log.

Second, regarding deposition time:  This deposition was noticed for two full seven-hour days.  Yesterday we completed approximately six and a half hours.  Counsel has expressed a desire to leave early today.  Let the record reflect I intend to use the full time allotted under the notice.  Any attempt to prematurely conclude this deposition will be treated as an improper obstruction tactic and presented to Judge -- or Magistrate Judge Lissette Reid tomorrow at 10:00 a.m.

Electronically signed by Amy Massey (401-010-081-3772)                    afef0e26-0b33-4a4d-a49d-8d12a33ee313

MARK MYERS January 22, 2026

Page 53

Q   I would like --

A   -- the page that--

Q   This -- this is -- this is a representative example   I'd like you to read the body of this email   Just read -- starting from "Re" -- "Re" down to "Sincerely," please read --

A   Okay

Q   -- that portion

MR  SHIFFRIN:  Objection to the form of the question

Q   (BY MR  MEADOWS)  I'll make it bigger for you

A   Thank you   And this particular one, can you show the date just so we know which --

Q   Yes

A   -- of these many pages I'm reading from?

Q   Yes

A   April 11th, 2017   "Re" -- you know, R-e, colon, "DFW Domicile Grievance Number 12-012 (Reinstatement after five years)   Dear Michelle, The above-referenced grievance is to be scheduled for an appeal hearing with Captain Stone   By mutual agreement, it is requested that the time limitations be placed in abeyance for an additional 60 days for this grievance in order that the Appeal Hearing may be arranged   Thank you for your cooperation in this matter   If you have any questions or

Page 54

need additional information, please call me."

Q.  Okay.

A.  "Sincerely, Kathy Schroeder."

Q.  Okay.  So in the subject line -- I believe your testimony yesterday was that this grievance was for purposes of procedural changes to the notice process.

MR. SHIFFRIN:  Objection, misstates his testimony.

A.  I think it was a little bit more extensive than that, but that was one of the purposes, is to improve the process for pilots who had regained their first class medical certificate and were now seeking reinstatement and reemployment -- reinstatement to the seniority list and reemployment by American Airlines.

That was one of the reasons because they had in -- during the bankruptcy categorically not agreed to bring anybody back.

And then the second prong was to improve pre-administrative separation or pre-termination notice.

So, yes, those two prongs.

Q.  (BY MR. MEADOWS)  Okay.  So this letter says it was a reinstatement after five years.  Did you testify that it was not for reinstatement yesterday?

A.  No, I did not --

MR. SHIFFRIN:  Objection.

Page 55

THE WITNESS:  I'm sorry.

MR. SHIFFRIN:  Objection, misstates his testimony.

A.  I did not testify to that yesterday.  I testified that this grievance was not seeking to reinstate all MDD pilots.

Q.  (BY MR. MEADOWS)  Was it intended to reinstate Susan Twitchell and similarly situated pilots in DFW?

MR. SHIFFRIN:  Objection, asked and answered yesterday.

A.  As mentioned yesterday, it was intended to address pilots who had already regained their first class medical and the Company had categorically started denying their return.

Q.  (BY MR. MEADOWS)  Okay.

THE REPORTER:  And the Company what?

THE WITNESS:  Categorically started to deny their return.

Q.  (BY MR. MEADOWS)  Okay.  We'll get back to that later.

Okay.  How long was this grievance in abeyance for?

A.  Well, the grievance itself was -- and, again, I don't know -- if you're using the term "abeyance" in the letter, because I -- I don't want to give the impression

Page 56

that there was no work being done on the grievance.  But the time limitations were placed in abeyance in order to preserve any timeliness issues.

Q.  Understood.

A.  We didn't want to violate any of the time restrictions that were in the contract.

The grievance was filed in 2012, and it was recently resolved in 2025 after being converted to a presidential.  So it was an open grievance for approximately 12 or 13 years.

Q.  And what was the pur- -- I think you read it, but what was the purpose of these abeyance letters?  Why was it put in abeyance?

A.  It was in order to preserve any time limitations, appeal hearings, submissions to the PAC, submission to the System Board.  There are time requirements enabled to advance those, and so these letters are to preserve and not waive those time limitations.

Q.  Okay.  Can you just read the second sentence starting with "By mutual agreement" only?

A.  "By mutual agreement, it is requested that the time limitations be placed in abeyance for an additional 60 days for this grievance in order for the appeal hearing may be granted" (sic) -- or "arranged."

Be nice if it was granted.

14 (Pages 53 to 56)

Electronically signed by Amy Massey (401-010-081-3772)                                    afef0e26-0b33-4a4d-a49d-8d12a33ee313

MARK MYERS January 22, 2026

Page 57

Q. Right. So --

A. "May be arranged."

Q. So you would agree that it was -- these abeyance letters were designed because we were waiting for the VP of Flight to hear the grievance --

MR. SHIFFRIN: Objection, form.

Q. (BY MR. MEADOWS) -- for an appeal hearing?

We were waiting for the vice president of the Flight department to schedule an appeal hearing --

MR. SHIFFRIN: Objection to the --

Q. (BY MR. MEADOWS) -- for that grievance?

MR. SHIFFRIN: -- form of the question.

A. I would disagree that it was necessarily that we were always waiting on the vice president of American Airlines, you know, VP of Flight, to schedule the hearing. It was so that the appeal hearing could be arranged.

Q. (BY MR. MEADOWS) But that's what every letter says. Would you agree that every letter says "be placed in abeyance for an additional 60 days for this grievance in order that an Appeal Hearing may be arranged"; yes or no.

MR. SHIFFRIN: Objection.

A. I would have to look at every single letter. You're only --

Q. (BY MR. MEADOWS) Okay.

Page 58

A. -- showing me one.

Q. Okay.

A. If you'd like to go through all of them, but I would expect that each of those pages would say something the same or similar.

Q. Okay. I would agree to that.

So the first page, Bates 009634, who were the signers of that grievance?

A. Captain Rusty McDaniels. He was the chair of the DFW domicile or DFW base. And then First Officer Russ Moore, who was the vice chair of the DFW domicile or DFW base. They were the chair and the vice chair at the time that this grievance was filed.

Q. Do you know what time frame Russ Moore became the vice president of the Flight department?

A. He retired a couple of years ago. He was in there three or four years. I would probably say around 2016, '17 time frame. I don't recall offhand.

Q. Would you agree that it was probably -- it was actually in the vicinity of 2022 to '23?

A. Was it that late?

Q. Yes.

A. Wow. Times flies -- or doesn't fly.

Q. I guess -- so the question is, you do agree that, at some junction after these letters after 2017, that

Page 59

vice pres- -- Ru- -- First Officer Russell Moore became the Vice President of the American Airlines Flight department?

A. Yes. There were intermediate steps in there when he left, being DFW, and had other management positions over there and then became the Vice President of Flight. I agree with that.

Q. And in that role, that's, I guess, the -- he's an executive officer of the corporation American Airlines, correct, in that role?

MR. SHIFFRIN: Objection, calls for speculation.

A. I -- I don't know if American classifies him as one of the executive officers, but I certainly would look at him as senior management, yes.

Q. (BY MR. MEADOWS) Okay. Have you ever looked at the American Airlines website, the chain of command that used to be on JetNet? I would show him as the lowest-level executive, the 15th one.

A. Okay. Great.

Q. Okay. I was just curious if you --

A. But, no, I do not have access to --

Q. I was curious --

MR. SHIFFRIN: Objection.

Q. (BY MR. MEADOWS) -- if you had seen that

Page 60

MR. SHIFFRIN: Objection.

Q. (BY MR. MEADOWS) Okay. So Russell Moore was Vice President of Flight, and this grievance was awaiting a VP of Flight hearing. Do you think it's irregular that the gentleman who wrote the grievance got on the other side of the table had the -- had the authority to schedule but it wasn't scheduled for a VP of Flight hearing ever?

MR. SHIFFRIN: Objection.

A. Certainly unusual that a base grievance signed by the vice chair ended up being the vice president. Yeah, that is certainly --

Q. (BY MR. MEADOWS) Yeah.

A. -- unusual.

Q. Agreed.

I -- because he certainly could have scheduled it if he wanted to; would you agree?

MR. SHIFFRIN: Objection.

A. The Company could have reached out and said, "We'd like to schedule this one," I suppose, yes.

Q. (BY MR. MEADOWS) And I believe you said it was approximately a 13-year delay. Do you consider 13 years to be timely?

A. Again, every case is case-by-case depending on the timing, depending on the factors that are going into it. 13 years is on the long end. Absolutely.

15 (Pages 57 to 60)

Electronically signed by Amy Massey (401-010-081-3772)                                     afef0e26-0b33-4a4d-a49d-8d12a33ee313

MARK MYERS January 22, 2026

Page 61

Q. Okay.

A. I -- I -- nobody would consider that as being quick. But there was a lot going on in between, and a lot of the issues that were addressed here actually were getting resolved through other avenues as well.

Q. Would you consider this a high-priority item of pilots who do not have a seniority number to try and return to work --

MR. SHIFFRIN: Objection.

Q. (BY MR. MEADOWS) -- to be -- be resolved more quickly than 13 years?

MR. SHIFFRIN: Objection to the form --

A. I can't speak --

MR. SHIFFRIN: -- of the question.

Sorry. Just --

THE WITNESS: Yeah.

MR. SHIFFRIN: -- Mark, for --

THE WITNESS: I'm sorry, I will wait.

MR. SHIFFRIN: -- for the benefit of everybody, let me make objections.

I object to the form of the question.

Thank you.

You can answer.

A. I cannot speak to as what other -- what pilots that I do not know personally, haven't spoken with, think

Page 62

about this grievance

Q. (BY MR MEADOWS) How many -- are you aware of how many pilots retired or died in that 13-year period?

A No

Q Would you agree it was many?

MR SHIFFRIN: Objection to the form of the question

A I don't know how many pilots with American Airlines or nationwide or worldwide or if we're just talking about the MDD pilots -- I -- I -- I can't answer that question

Q (BY MR MEADOWS) Would you agree that the MDD list circa 2014 is approximately 240 pilots, plus or -- plus or minus a few?

MR SHIFFRIN: Objection

A Roughly Probably in the low 200s, yes

Q (BY MR MEADOWS) And where do you believe it is today?

A It's probably well below 100 Maybe 60, 70, or even 50

Q I think last I checked -- would you agree 67's the correct number for the recent time frame?

A No, I can't --

MR SHIFFRIN: Objection

A No, I can't --

Page 63

Q. (BY MR. MEADOWS) Okay.

A. -- agree with that because I just don't recall.

Q. So it would be fair to say that approximately 150-plus pilots were no longer in the MDD status?

MR. SHIFFRIN: Objection.

A. They are no longer MDD status because they may have now since retired, reached age 65. They may have returned to flying status and no longer MDD. And, as you mentioned, there may have been some who have passed away.

Q. (BY MR. MEADOWS) Okay. So based on the discovery in the Preitz litigation, it was shown that 52 such pilots -- 55 pilots sought reinstatement, 52 were reinstated. I think two, Emery and Twitchell, signed settlements waiving their right to return. I was not returned. And, thereafter, there's approximately three more pilots that have been reinstated.

So to the best of my knowledge, there's about 55 pilots that have been reinstated. So it's fair to say that a large number of these pilots retired or died, correct?

MR. SHIFFRIN: Objection to the form of the question.

A. I can't say a large number died. I would expect a large -- it wouldn't surprise me if a large number hit the age 65.

Page 64

Q (BY MR MEADOWS) Do you know how many committed suicide in that time frame due to inability to resume their career?

MR SHIFFRIN: Objection to the form of the question

A I am unable to say how many people or how many pilots committed suicide during that time, nor am I even going to speculate or can I answer the question that it was because they were unable to resume their career

Q (BY MR MEADOWS) Do you have knowledge of the number of pilots that commit suicide at APA on an annual basis?

MR SHIFFRIN: Objection to the form of the question

A I do not I don't know that number offhand I can't answer that either, one way or the other

Q (BY MR MEADOWS) Have you ever been briefed on the number of suicides at APA?

MR SHIFFRIN: Objection to the form of that question

A I have -- I have been in briefings that -- from Air Medical that talk about suicide and pilot suicide, yes

Q (BY MR MEADOWS) Would it shock you in one year there was 11 pilot suicides?

16 (Pages 61 to 64)

Electronically signed by Amy Massey (401-010-081-3772)

afef0e26-0b33-4a4d-a49d-8d12a33ee313

Page 109

MR. SHIFFRIN: Objection to the form of the question.

A. I believe you misstated his declaration.

Q. (BY MR. MEADOWS) How did I misstate his declaration?

A. His declaration said that the grievance, by it -- is not seeking reinstatement of all pilots who had been administratively separated as a result of Section 11 or Section -- or Supplement F(1) simply because they were separated.

Q. Okay.

A. And I paraphrase that. That wasn't an exact quote. I can read it, if you'd like.

Q. So I think your testimony yesterday was it was not seeking the reinstatement of any pilots; is that true?

MR. SHIFFRIN: Objection, misstates his testimony from yesterday.

A. I said it was --

Q. (BY MR. MEADOWS) Yesterday you testified that grievance was not to seek reinstatement, but to change procedural notice of procedures.

A. Those were the two --

MR. SHIFFRIN: Objection.

A. Those were the two primary purposes, that's right.

Page 110

Q. (BY MR. MEADOWS) So when you say -- do you believe that grievance is seeking reinstatement of MDD pilots -- certain MDD pilots or not?

MR. SHIFFRIN: Objection.

A. The grievance was dealing with addressing the categorical denial of the company saying, "We're not bringing any MDD pilots back." By resolution, it was going to benefit and possibly bring back pilots who had their first class medical who had previously been denied.

Q. (BY MR. MEADOWS) Does that grievance state that a pilot must have their first class medical to seek reinstatement?

A. No. But that is the process that has been around for decades.

Q. The grievance does not state a condition of precedent of a first class medical, does it not?

MR. SHIFFRIN: Objection to the --

Q. (BY MR. MEADOWS) Let me rephrase --

MR. SHIFFRIN: -- form.

Q. (BY MR. MEADOWS) -- the question.

Yes or no: Does Grievance 12-12 explicitly state a condition precedent of FAA medical certification to seek reinstatement?

MR. SHIFFRIN: Objection to the form of the question.

Page 111

A. Not that I recall, but if you want to bring it up --

Q. (BY MR. MEADOWS) I'll be happy --

A. -- I can double-check.

Q. Of course, I'll pull it up for you.

And we're going to go back to abeyance document, which is Plaintiff's Exhibit 35. And you can read the part of the grievance where it says what it's protesting.

Actually read -- read the whole "Pursuant to" that's -- the middle paragraph.

A. Yeah. "Pursuant to" -- the middle paragraph? Or you want me --

Q. Well, the top -- top --

A. Okay.

Q. -- top paragraph on the -- on the screen.

A. "Pursuant to the May 1st, 2003, Agreement ('Agreement'), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Section 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' System Seniority List" -- I'm sorry, I said that

Page 112

backwards, "Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on an inactive status, unpaid sick, or disability for more than five years "

Q So do you see anywhere in that grievance where it's a condition precedent for a pilot to have an FAA medical certificate prior to seeking reinstatement --

A That is --

Q -- yes or no?

MR SHIFFRIN: Objection to the form of the question

A No, that is not in this paragraph

Q (BY MR MEADOWS) Okay So when you're qualifying it that it's not -- when you -- when you make the statement that an FAA medical is required, that is not consistent with the language of the -- the plain and unambiguous language of Grievance 12-12, correct?

MR SHIFFRIN: Objection

A I disagree

Q (BY MR MEADOWS) You disagree that the grievance doesn't say what it says?

A It mentions past practice, and the past practice, as is the current practice, is that if a pilot had fallen off the seniority list as a result of Section 11 D or

28 (Pages 109 to 112)

Electronically signed by Amy Massey (401-010-081-3772)                                                      afef0e26-0b33-4a4d-a49d-8d12a33ee313

MARK MYERS January 22, 2026

Page 225

a medical certificate, his career is put on indefinite hold, and do you think 13 years is too long for a career to be put on hold?

MR. SHIFFRIN: Objection to the form of the question.

A. I think --

MR. SHIFFRIN: And, again, are you asking him in his personal capacity or on behalf of APA?

MR. MEADOWS: Both.

MR. SHIFFRIN: Well, which one do you want to ask first, then?

MR. MEADOWS: Individual, then corporate.

A. Individual?

Q. (BY MR. MEADOWS) Yes.

A. I think, again, we want to get every pilot back as expeditiously as possible. As soon as a pilot regains -- in -- in the scenario you asked about, as soon as the pilot regains their first class medical, we want to expeditiously get that request across the street. And if we run up against any resistance from the Company, the we want to take a look at what opportunities or -- or different avenues we could tackle that problem with.

Q. Do you think --

A. The -- whether or not a grievance is timely filed after 13 years, there was a lot going on in those 13 years

Page 226

and a lot of efforts to satisfy the issues, in particular of 12-12, including the elimination of the five years under Supplement F(1), multiple engagements to get MDD pilots back with or without a -- a medical, although formally and through the internal process it only occurs after.

There were a lot of the issues that were being addressed in 12-12 that were being resolved anyway -- or not "anyway," but as a result of efforts by APA, including the notice. The notice is now in the contract, the six- -- six-month notice before somebody drops off of 11.D. The Company started doing that after we filed the grievance. So that was very good -- that was good to see that we were making headway on some of these items.

Q. Okay.

A. So as we went through on any particular grievance, you also have to evaluate what's going on, the bargaining environment, the -- the industry environment, the relationships, and whether or not we're resolving some of the issues or concerns through other avenues.

Q. Okay. So, again, my question: Do you think 13 years is too long for a pilot to be held out of service and not be able to resume his career as a pilot due to a grievance pending for 13 years?

Page 227

MR SHIFFRIN: Objection to the form of the question

A I can't ans- --

MR SHIFFRIN: Calls for speculation

A I can't answer that question I believe it's too speculative, based on the way you phrased it

Q (BY MR MEADOWS) If you were disbarred but not guilty of the charges alleged against you and it took 13 years to regain your law license, would you be happy with that delay?

A I --

MR SHIFFRIN: Objection to the form of the question

A If I --

Q (BY MR MEADOWS) Knowing -- knowing that you -- you met all the essential job functions and qualifications of an attorney and there was no professional licensure issues underlying, would you be happy to have to wait 13 years to get the determination?

A I don't think --

MR SHIFFRIN: Objection to the form of the question Calls for speculation

A I don't think that's analogous in the sense that if we're talking about you, you did not have your first class medical until 2019 You haven't had it for

Page 228

13 years.

Do I think that a pilot who has regained their first class and APA has -- is supporting their reinstatement like APA is supporting you that you should be back? Absolutely. I think one day is too long, Larry.

Q. (BY MR. MEADOWS) Okay. So in railway labor world, R- -- RLA, railway labor world, who has the exclusive jurisdiction to adjudicate minor disputes?

MR. SHIFFRIN: Objection, calls for a legal conclusion.

A. Under the RLA, there are major disputes and minor disputes. Minor disputes usually go to a system board of adjustment or through the collective bargaining agreement grievance and arbitration route.

Q. (BY MR. MEADOWS) Okay.

A. So that would -- we -- you know, we talked about that earlier today, filing a grievance, getting it resolved at any different level, or ultimately going to an arbitration.

Q. But a railway labor arbitrator, he's an arbitrator, but he's effectively -- wouldn't you agree that a railway labor arbitrator is essentially a judge for railway labor employees? He decides career-impacting issues?

MR. SHIFFRIN: Objection to the form of the

57 (Pages 225 to 228)

Electronically signed by Amy Massey (401-010-081-3772)                    afef0e26-0b33-4a4d-a49d-8d12a33ee313

MARK MYERS January 22, 2026

Page 229

question.

A. From a layman's perspective, if I was explaining what an arbitrator did, I might use the term "judge" to help somebody understand. But an arbitrator is not a judge.

Q. (BY MR. MEADOWS) Okay. But the decision by the arbitrator in a railway labor tribunal, a system board of adjustment, is final and binding, correct?

A. Yes.

Q. Okay.

A. Unless there are grounds to take it to federal court.

Q. And do you consider yourself as an APA attorney to be well versed in the Railway Labor Act and labor law in general?

A. In general, yes.

Q. Okay. Are you familiar with the concept that a termination grievance of an employee -- a union employee is considered the form -- a form of capital punishment?

MR. SHIFFRIN: Objection to the form of the question.

A. No, I -- I would not use --

Q. (BY MR. MEADOWS) You have not read the case law -- have -- have you -- have you read case law -- or have you read the case law that says a termination

Page 230

grievance is the equivalent of capital punishment --

MR. SHIFFRIN: Objec- --

Q. (BY MR. MEADOWS) -- for a union employee?

MR. SHIFFRIN: Objection to the form of the question.

A. If I have, I don't recall the analogy of termination and death.

Q. (BY MR. MEADOWS) Okay. So if an individual was accused of murder, do you think it's timely for him to get -- to wait trial -- for a trial for 13 years?.

MR. SHIFFRIN: Objection, calls for speculation.

A. I am not a criminal law expert. There are speedy trial -- both constitutional and statutory speedy trial provisions that would dictate when --

Q. (BY MR. MEADOWS) Okay. And --

A. -- a case has to be heard.

Q. Okay. In your individual capacity, in your personal opinion, if you were wrongly accused of murder and you know you're wrongly accused, would you like it to be heard and tried in 28 months or 13 years?

MR. SHIFFRIN: Objection to the form of that question. It calls for an opinion from a non-expert.

A. I would rather have it dismissed tomorrow.

Q. (BY MR. MEADOWS) Exactly. Thank you. I think

Page 231

I've made my point in that.

Okay. Let's go to Article II, D. Can you read that one for me?

A. "To determine and negotiate and to continue to improve the rates of compensation, benefits, pensions, hours of employment and working conditions, and to maintain uniform principles of seniority and the perpetuation thereof."

Q. So you would agree, in part, that Article II, D, one of the objectives is to -- quote, to maintain uniform principles of seniority and the perpetuation thereof, unquote?

A. Yes. That's -- that's what it says, and that --

Q. Okay.

A. -- was one of APA's missions.

Q. Do you think it's uniform for some MDD pilots to be returned -- or most -- do you think it's uniform for most MDD pilots to be returned but not all?

MR. SHIFFRIN: Objection to the form of the question.

A. Do I think it's uniform? Do I think it's -- I -- I don't think this is an absolute provision. There are principles of seniority throughout the contract, besides just, you know, that a lot of contractual terms are based on seniority.

Page 232

So I -- I look at that uniform principles of seniority -- you have to look at it also within the contract. Section 11.D and Supplement F(1) before it was amended unfortunately had people dropping off the seniority list after five years. We were able to change the one. We're still working on the other.

And so that -- that is within the collective bargaining agreement that allows that seniority to be lost and that pilot to be no longer employed by American Airlines.

I don't -- I don't know if I can answer that any --

Q. (BY MR. MEADOWS) Okay.

A. -- differently.

Q. All right. You've obviously interacted with hundreds, if not thousands, of pilots over the course of your career at APA, correct?

A. I -- hundreds, sure. I don't know about thousands. There's --

Q. If I told you to state in one word the most important thing to pilots, what would you say it is?

MR. SHIFFRIN: Objection, calls -- that -- objection to the form of the question.

A. It depends on the pilot you ask, right? But if you're -- but seniority is a big factor for each pilot,

58 (Pages 229 to 232)

Electronically signed by Amy Massey (401-010-081-3772)                                                    afef0e26-0b33-4a4d-a49d-8d12a33ee313

Page 233

where they are.  It drives what they can bid, both their bid status and their monthly schedules.

Some pilots are -- the first word coming out of their mouth is going to be "scope," some "seniority," some "quality of life," some "money."  We -- we hear it all, and that's what makes negotiating very challenging to make sure we get the right guidance from the board in establishing bargaining priorities.

Q.  (BY MR. MEADOWS)  So you mentioned some people want time off.  Many pilots want the most money.  What does it take to get those two things?

MR. SHIFFRIN:  Objection to the form of the question.

Q.  (BY MR. MEADOWS)  What's the one thing that you need to get the most money and the most time off?

A.  A contract that pays everybody $1 million whether they fly or not.

Q.  It doesn't exist.

Under the terms of the existing bargaining agreement, would you agree that seniority -- have you ever seen the article that seniority is the pilot's kryptonite?

MR. SHIFFRIN:  Objection to the form of the question.

A.  I've heard that phrase.

Q.  (BY MR. MEADOWS)  Okay.

Page 234

A.  It is -- it is both great for them and it can kill them, right, because you -- it's not transferable to other airlines.  It will -- and -- but it is -- does drive your bid status, and it drives your monthly schedule.

Q.  That -- because that's the problem.  So if you left APA tomorrow and went to a major law firm, would you expect to start as a bottom-level associate?

A.  Well --

MR. SHIFFRIN:  Objection, calls for speculation.

A.  -- I don't have -- you know, I've been at APA 18 years, so I don't know if a law firm is going to bring me in as a partner with no book of business.

Q.  (BY MR. MEADOWS)  Okay.  Yeah.  True.

Okay.  But the point --

A.  That'd be nice, right?  Yeah.

But -- but I understand your point. Attorneys can laterally transfer from one place to another.  Airline pilots do not.  They start over at the seniority list if they're going to move airlines.

Q.  So you would agree that pilot professionals -- airline pilot professions, unlike lawyers, doctors, attorneys, they can't transfer laterally to another company in a position commensurate with their pay and seniority?  For a pilot, if you start over at the

Page 235

airline -- you -- you mentioned transferability.  You also had the word "portability."  Seniority is not portable?

A.  Right.

Q.  Okay.

A.  I think the move in --

MR. SHIFFRIN:  Objection to the form of the question.

A.  If you move in a management position, in which case it's not an issue.  But I -- I think --

Q.  (BY MR. MEADOWS)  Okay.

A.  -- I think we understand each other here.

Q.  Okay.  Yeah.  Exactly.  Seniority is the end-all, be-all for pilots.

MR. SHIFFRIN:  Objection to the statement.

Q.  (BY MR. MEADOWS)  Do you agree that seniority is the end-all, be-all for pilots?

A.  As I testified earlier, every pilot may say it differently.

Q.  Okay.  Thank you.

I'd like to introduce Plaintiff Exhibit 50. This is the pension statement of Plaintiff Lawrence Meadows, dated 2019, from American Airlines.

MR. SHIFFRIN:  Are we still on Topic 14?

MR. MEADOWS:  Yes.  This is one of the document -- governing documents in the grievance.

Page 236

MR  SHIFFRIN:  That -- your pension statement is --

MR  MEADOWS:  Yes, it is

MR  SHIFFRIN:  -- a governing document?

MR  MEADOWS:  It's related to the program, and we'll get to that next   This is the foundation for my program question

I stand corrected   This is actually Plaintiff's Exhibit 50, but it's a 2021 pension statement And let me move my screen sharing dialogue again

Q   (BY MR  MEADOWS)  Okay  All right

A   Can you show a Bates number?

Q   I'm getting there   Plaintiff's Exhibit 50, the document is entitled December 31st, 2021, A Plan Benefit Statement, American Airlines, Inc , Pilot Retirement Benefit Program Prepared for Lawrence M  Meadows, Employee Number 332713

This is the last pension statement because Fidelity Investments took over   So this is the last-known data in this format   It runs from Bates Meadows 023868 to Meadows 023871

Have you seen one of these statements before?  We -- I showed you one yesterday   Have you seen this before that?

A   I have not seen -- I'm not familiar with this

Electronically signed by Amy Massey (401-010-081-3772)          afef0e26-0b33-4a4d-a49d-8d12a33ee313

# EXHIBIT 5

# for Shiffrin Declaration

**[Tape 1]**

Joshua Beauvais (00:00:01):

All right, counsel, are we ready to go on the record? Yes. All right. I'll put this on then. We are now on the record. Today is March 4th, 2026. The time is currently 9:30 AM. This is the videotaped deposition of Daniel Carey taken in the matter of Lawrence Meadows versus Allied Pilots Association. Case number 17CV22589 in the United States District Court, Southern District of Florida, Miami. Court reporter is Sabrina Beauvais. I am the legal video specialist, Joshua Beauvais. Both lists Southwest Florida Reporting. Will the attorneys please state their appearances for the record?

Lawrence Meadows (00:00:42):

Yeah, Lawrence Meadows, plaintiff pro se. Josh, sorry. With my, is my wife, uh, Anne Marino as observer. I also have, uh, Brian Ostrom observing his exhibit larger.

Joshua Shiffrin (00:00:54):

Where is Brian?

Lawrence Meadows (00:00:54):

He's remote. He's on his own.

Joshua Shiffrin (00:00:58):

Okay. Joshua Schiffrin, counsel for defendant Allied Pilots Association with me is my client representative.

Joshua Beauvais (00:01:05):

And will the court reporter please swear in the witness?

Sabrina Beauvais (00:01:08):

Yes, sir. Sir, if I could ask you to please raise your right hand and place you on the road. Do you solemnly swear or affirm that the testimony you're about to give in this matter will be the truth, the whole truth, and nothing but the truth?

Joshua Beauvais (00:01:18):

Yes.

Sabrina Beauvais (00:01:19):

Thank you.

Lawrence Meadows (00:01:22):

You ready to begin?

Joshua Beauvais (00:01:23):

Yes, sir.

1

Lawrence Meadows ([00:01:23](#)):

Okay. Dan, I've done you a long time, but as a matter of professional courtesy and respect, I'm referr to you as Captain Carrie through proceeding. Is that okay? All right, for the record, it's my understanding Captain Carrie is appearing today as a unrepresented non-party, and Mr. Shifford is appearing solely as counsel for defendant Allied Police Association. Accordingly, while counsel may make objections to form, I will expect the witness to answer and any instructions not to answer must be limited to specific privilege held by the Allied Pilot Association. Do you agree, Mr. Schiffer?

Joshua Shiffrin ([00:01:53](#)):

No.

Lawrence Meadows ([00:01:54](#)):

You do not agree?

Joshua Shiffrin ([00:01:54](#)):

I don't agree to you instructing me as to how I conduct myself. He's

Lawrence Meadows ([00:01:59](#)):

My witness, and you are not representing Mr. Carry, correct?

Joshua Shiffrin ([00:02:02](#)):

I'm not representing her.

Lawrence Meadows ([00:02:03](#)):

Okay. So I'm going to ask you, please, if you do object to state the basis of objection only, do not engage in talking objections. We have a lot of questions to get through. I'd like to get it done as expeditiously as possible.

Joshua Shiffrin ([00:02:14](#)):

I'll take it under advisement. I have questions for Mr. Perry as well.

Lawrence Meadows ([00:02:19](#)):

Okay. Good morning, Captain Carey. Uh, please state your name and full name and address for the record.

Daniel Carey ([00:02:26](#)):

Uh, Daniel Carey. 1953 Westie Street, Naples, Florida.

Lawrence Meadows ([00:02:32](#)):

Okay. And where do you reside normally?

Daniel Carey ([00:02:35](#)):

At, uh, Naples, Florida.

Lawrence Meadows (00:02:37):

And you asked me to serve you in, uh, New York, correct?

Daniel Carey (00:02:41):

At the time, I was in New York, yes.

Lawrence Meadows (00:02:42):

Okay. Have you ever resided in Gulf Breeze, Florida?

Daniel Carey (00:02:47):

No, sir.

Lawrence Meadows (00:02:49):

Are you aware that ABA represented that your residence was in Gulf Breeze, your initial disclosures?

Daniel Carey (00:02:53):

Uh, no, I was not.

Lawrence Meadows (00:02:54):

Okay. You served as the president of Allied Pilot Association from, I believe, July 1st, 2016 to June 30th, 2019, correct?

Daniel Carey (00:03:04):

That's correct.

Lawrence Meadows (00:03:06):

Prior to that, you were union represent- uh, based in New York?

Daniel Carey (00:03:10):

Uh, in, uh, from 1993 to 1998, yes.

Lawrence Meadows (00:03:17):

Uh, were you domiciled chairman and vice chairman? Vice Chairman

Joshua Shiffrin (00:03:19):

Domicel. Objection to form of the question. No, no leading questions, sir.

3

\*        \*        \*

Lawrence Meadows (01:35:27):

Okay. Dan, how many years do you know me?

Daniel Carey (01:35:30):

Over 30.

Lawrence Meadows (01:35:31):

How many communications have we had in the course of your presidency?

Daniel Carey (01:35:35):

I'm sorry?

Lawrence Meadows (01:35:35):

During the course of your presentation, how many times have we communicated?

Daniel Carey (01:35:38):

Hundreds.

Lawrence Meadows (01:35:39):

Hundreds, right? And it's fair to say we have a personal, special relationship, and I think I've ... It's fair to say I, I've tried to help you as much as possible and you've helped me as much as possible.

**[Tape 2]**

Daniel Carey (00:26:49):

I had, I had, I had conversations with management on, uh, occasion where we always asked for reinstatement of pilots who were, uh, who were not reinstated. As long as he, as long as the pilot had a medical, I went aggressively, uh, anytime I had the opportunity with senior management, I, I'd keep a, I'd keep a list of pilots I thought, uh, that you deserved, uh, reinstatement and, uh, we'd try to get them reinstated.

Lawrence Meadows (00:27:19):

And did you do that for me?

Daniel Carey (00:27:21):

Absolutely.

Lawrence Meadows (00:27:22):

And did you have the authority to do it on your own? Did you need permission of the board of directors to do it?

Daniel Carey (00:27:29):

As the APA president, you always have the ability to, um, improve the pay working conditions, uh, of the, of the membership. Now, um, in individual cases, the APA president, there's already a resolution that the APA is trying to aggressively fix this problem, so the APA president has the authority to bring the pilot, to attempt to bring a pilot back. The company has the ultimate authority whether the group, the pilot goes back on the seniority list or not.

\*     \*     \*

Lawrence Meadows (00:32:03):

Actually, I have notes. It did. Yeah. You told me and then we waited and nothing happened and we proceeded from there.

Daniel Carey (00:32:11):

No, I had a conversation with Kimball Stone, but that was not the conversation.

Lawrence Meadows (00:32:14):

What was the conversation?

Daniel Carey (00:32:15):

Conversation, Kimball Stone said that the, he said that you were, you were on disability LTD under the AMR Corporation, and first of all, he has no responsibility to bring you back because the AMR corporation is bankrupt and we're now the AAL corporation. So anybody who comes back is at the company's discretion and he said that, um, uh, the company has a, um, a, a trust and, uh, a, uh, a, um, a professional commitment to the traveling public and they get to pick and choose who they put in the cockpit of American Airlines Airplanes and that, uh, that he was not gonna reinstate.

Lawrence Meadows (00:32:57):

He never relayed that to me. I

Daniel Carey (00:32:58):

Absolutely did.

Lawrence Meadows (00:32:59):

He did not. Do you, do you have an email? Did you send me an email?

Daniel Carey (00:33:02):

Absolutely didn't represent that to you.

6

\*     \*     \*

Lawrence Meadows (00:49:47):

The question was, in that time, after I gave you my FAA medical certificate in December of 18, shortly thereafter, four other pilots, MDD pilots, obtainer medicals, their disability benefits were suspended and they were seeking reinstatement. They were held out of service because of me. It was a company who didn't want to return me and those four pilots behind me were also held up, and that included Joe Barkate, Pete Lapore, Dan Chau and Bill.

Daniel Carey (00:50:13):

So I- Objection to the

Joshua Shiffrin (00:50:14):

Form of the question.

Daniel Carey (00:50:15):

I wouldn't, I wouldn't agree that they were held, withheld because of you. I, I would state that American Management was reviewing each case individually. Um-

Lawrence Meadows (00:50:29):

Are you aware that in April of 19, Mark Meyers called all five of the policy, including myself, and he told those four that the company was not gonna return them, they may as well seek employment elsewhere and APAs refusing to file a grievance to reinstate their disability benefits?

Joshua Shiffrin (00:50:47):

Objection, lacks foundation. Yeah,

Daniel Carey (00:50:49):

I, I, I don't, wouldn't recall that.

Lawrence Meadows (00:50:51):

Are you aware Mr. Myers called me and said, even though I was still receiving disability benefits, unlike the other four, he said that the company's not gonna reinstate you, APA is not gonna file a grievance for your reinstatement, you might as well seek employment elsewhere, have a nice day.

Daniel Carey (00:51:07):

Objection, lack of- I was not privy to that

Lawrence Meadows (00:51:10):

Conversation. Okay. So, let me show you, uh, Exhibit 19. So, is it, is it true though that in that May 19 timeframe you managed to secure to return- I don't

Daniel Carey (00:51:25):

Get to, uh, uh- I'll,

Lawrence Meadows (00:51:26):

I'll get to it right there. Is it true that you secured a return of those four other pilots in May of 19? I

Daniel Carey (00:51:33):

Had recommended their return, uh, as I always would, to a medical qualifying pilot to the company and the company that decides whether they come back or not.

Lawrence Meadows (00:51:41):

Okay. And you, you were able to get them back, but not me?

Daniel Carey (00:51:44):

The company decided to take those pilots back.

\*      \*      \*

Lawrence Meadows (00:55:26):

And there's a reason why there's not a letter, one of the used for me despite me being in the queue before all these guys?

Joshua Shiffrin (00:55:32):

Objection to the form of the question.

Daniel Carey (00:55:34):

The only, uh, the only thing I can, uh, the only thing I can say to answer that question is I made the, uh, the request to Captain Stone, and Captain Stone stated, as I stated earlier, that American Airlines reserves the right to put in the cockpit who they feel they deem, uh, safe and airworthy. And Captain Stone, uh, he, he said to me they can continue paying Larry, I'll, we'll continue paying Larry Meadows disability, but we, we're not gonna put him back in the cockpit.

Lawrence Meadows (00:56:06):

Can he give you a reason why?

Daniel Carey (00:56:08):

He, he gave, that was the reason, that they don't have to. They can continue paying Larry Meadows disability, they have a responsibility to traveling public, and they're not gonna put you back in the doctor.

9

*       *       *

Lawrence Meadows (01:07:15):

So your belief that the, the, the one time APA could have gotten me back or should have tried to get it back was a contract ratification?

Daniel Carey (01:07:21):

I don't believe that APA has the, had the ability to, has the ability to put anybody back on the seniority list. Again, as we, as I stated earlier, that's up to the company. Uh, the company has to agree just because, you know, APA asked for, uh, one of our req- uh, requests was, uh, having offered Super Bowl, uh, or premium paid for Super Bowl. We didn't get it. Uh, you know, those are things that we put in negotiations, uh, that, you know, we don't attain everything. So the, the ultimate, uh, uh, gatekeeper for putting a, a pilot on the seniority list, returning from LTT, MTT is, is management.

10

\*       \*       \*

Lawrence Meadows (01:22:12):

So, while you were president in 2016, were you re- aware in 2015 years prior that Judge Shaw Lane ordered by grievance 1211 shall be arbitrated and American Airlines agreed to arbitrate it so long as APA would agree to proceed?

Joshua Shiffrin (01:22:32):

Objection, misstates the documents in several different ways. I'm sorry, what? Misstates the documents in several different ways.

Daniel Carey (01:22:40):

And so again, <laugh> we had over 700 grievances and the timeline of the ... We don't have contractual language on timeline at this time, on timeline of the grievances. So grievances were heard at, essentially at the company's pleasure. Sometimes we wouldn't have a grievance here a grievance for five years, or in the case when I took over a president's, we had grievances that were lying on there for 11

Lawrence Meadows (01:23:01):

Years. I'm asking you, a- as you're aware, I was aggressively pursuing and seek arbitration of both these grievances, did APA's attorneys ever inform you that the Banksy Court ordered that I shall be permitted to arbitrate 12-11, that American Airlines subsequently agreed to arbitrate 12-11 contingent on mutual agreement being APA? Yes or no? No.

Joshua Shiffrin (01:23:20):
<laugh> Captain Carey-

Lawrence Meadows (01:23:22):
Answer

Joshua Shiffrin (01:23:22):

The question. You may not. Answer questions about conversations that you had with APA's attorneys while you were

Daniel Carey (01:23:27):

Present. I understand that. Yeah. And I, I actually, I can't answer the question. Do,

Lawrence Meadows (01:23:31):

So you, your testimony is you have no personal knowledge that there was court orders allowing me to move forward with my grievance and the only linchpin was APA?

Daniel Carey (01:23:38):

Objection. My personal knowledge is that we moved forward with all of the over 700 grievances that were on the table when I took over as APA president in 2016. Okay.

11

Lawrence Meadows (01:23:52):

So you're telling me you have no knowledge that APA was the only party refusing to arbitrate agreement was 12-11 that the company was willing to arbitrate it contingent on agreement of APA?

Joshua Shiffrin (01:24:02):

Objection, misstates the testimony and misstates

Lawrence Meadows (01:24:04):

What you're referring to. Okay. All right. Do you recall in the spring, shortly thereafter, in the spring, while you were in office, in the spring of 2017, my Miami-Bays representative at the time Captain Ed Sitcher came to you and asked you to advance grievance 12-11 to arbitration?

Daniel Carey (01:24:27):

Captain Ed Sitcher, I don't recall that, and all of our grievances were scheduled to be advanced, uh, to arbitration. And as I stated earlier, the company has to agree to sit down and arbitrate them, and, uh, and we were always trying to clear the table of those 700 plus grievances since I came into office in 2016.

12

**[Tape 3]**

Lawrence Meadows (00:07:58):

So you're telling me you don't understand that AP discharged all's claims against American with the exception of grievance 12, 11 and 12, 12, that's not what that paragraph says?

Joshua Shiffrin (00:08:06):

Objection, calls for legal conclusion and misstates the document.

Lawrence Meadows (00:08:09):

Okay. Well, given that both these grievances were reviable throughout your term as president, why did your administration fail to take either one to Assistant Board of Adjustment?

Joshua Shiffrin (00:08:19):

Objection, lack of foundation.

Daniel Carey (00:08:21):

We never, uh, we don't control the timeline, as I stated earlier on what goes, uh, before the System Board of Adjustment. The company does that. APA, um, legal and the negotiating committee constantly try to resolve outstanding grievances. As I said again earlier, when I became APA president in 2016, we had over 700 outstanding grievances. I think some of them went back 11 years from four different airlines and, uh, and they were, they were pursued, uh, uh, through the process at APA and, uh, the roadblock is, always had been in my career and may still be, uh, the, uh, the process under, under, under the Railway Labor Act. The company has no obligation to, to give you the time to, to hear these arguments.

13

\*       \*       \*

Lawrence Meadows ([00:29:47](#)):

That's a good point. So the majority of communication between you and I were on your personal carry cargo account. Sometimes on APA present.alipost.org, but why would you communicate on your personal mail account to certain people as a reason?

Daniel Carey ([00:30:03](#)):

Well, I considered you a personal friend. Of

Lawrence Meadows ([00:30:04](#)):

Course. Me too.

14

\*        \*        \*

Joshua Shiffrin (01:02:13):

Is it fair to say that you spent most of the time as a line private?

Daniel Carey (01:02:17):

Yes.

Joshua Shiffrin (01:02:17):

What is a line pilot?

Daniel Carey (01:02:19):

A line pilot, uh, is a, does a journeyman work in our profession at an airline pilot. Uh, we bid a monthly schedule and, uh, I spent, uh, most of my career, uh, all but 20 months of my career in the international division based in New York, JFK, LaGuardia. So, uh, I would, uh, fly my schedule.

Joshua Shiffrin (01:02:40):

And when you say you bid a monthly schedule, what does that mean? Uh,

Daniel Carey (01:02:43):

We, uh, the company posts, um, a bid sheet for the following month's schedules, a roster, and, uh, we, we pick the trips, uh, that we, we love to fly, and, uh, we're awarded the trips commensurate our seniority in the union.

Joshua Shiffrin (01:02:56):

And so, uh, if someone has higher seniority than you, you can't, they'll beat you out for something that you might want?

Daniel Carey (01:03:04):

Correct.

Joshua Shiffrin (01:03:04):

Okay. And you don't control that?

Daniel Carey (01:03:06):

Correct.

15

\*       \*       \*

Joshua Shiffrin (01:15:02):

Let me put this in more concrete terms. Um, are you familiar with something I'll refer to as the five-year rule?

Daniel Carey (01:15:08):

Yeah.

Joshua Shiffrin (01:15:08):

Okay. And what was the five-year

Daniel Carey (01:15:09):

Rule? So the, the five-year rule had been around forever. Um, I've been in the airline industry my whole life. My father, uh, flew for TWA from 1945 until 1975. The five-year rule was industry standard at the legacy carriers, American, TWA, United. And, uh, if you went on disability, and keep in mind, I was hired in 1984, and the mandatory retirement age then was age 60, and the statistics showed that 30% of pilots who were hired did not retire at age 60. They would lose their medical, go out on disability, and retire before 60.

Joshua Shiffrin (01:15:47):

And so, before this, uh, LOA, and was in, um, October 2016, Carrier Exhibit 10, uh, what was the status of the five-year rule at American Airlines?

Daniel Carey (01:15:59):

It was in place.

Joshua Shiffrin (01:16:01):

It was on pla- in place under the collective bargaining agreement? Yeah. And that was American's understanding?

Daniel Carey (01:16:05):

Yes.

Joshua Shiffrin (01:16:06):

And APA's understanding?

Daniel Carey (01:16:07):

Yes. Now, yeah.

Joshua Shiffrin (01:16:09):

Um, and then what did this LOA do to change that?

16

Daniel Carey ([01:16:13](#)):

It, it gave the ability for pilots who were, um, uh, medically unqualified and outside of the five years to come back at, um, and, and have the ability to requalify and go back to work.

Joshua Shiffrin ([01:16:31](#)):

And do, if a pilot, uh, regains his or her, uh, FAA first class medical certificate, does he or she have a right to return to the airline?

Daniel Carey ([01:16:42](#)):

No. If the company was clear that they would review each case from the multiple corporations, uh, before, you know, this letter was agreed upon and they would decide who they thought was fit and eligible to come back to work.

Joshua Shiffrin ([01:17:01](#)):

And would APA have the unilateral ability to put anybody back on the seniority list?

Daniel Carey ([01:17:07](#)):

No. We attempted to obtain that and were unsuccessful.

Joshua Shiffrin ([01:17:14](#)):

Um, in negotiating for the LOA, uh, did, did you try to get the company to agree to retroactively bring people, bring back people had already been let go? Yes. Okay. You personally did that?

Daniel Carey ([01:17:31](#)):

We did.

Joshua Shiffrin ([01:17:32](#)):

Um, and what was the company's response?

Daniel Carey ([01:17:34](#)):

They would not agree to that. They, they agreed that they would review it in a case by case, uh, basis. Okay.

Joshua Shiffrin ([01:17:40](#)):

Um, and then, then you signed the letter on the list? It

Daniel Carey ([01:17:44](#)):

... I signed the letter. It was a, it was a, it was a, a major improvement that helped, uh, dozens of pilots at the time and, and hundreds in the future.

17

\*　　　\*　　　\*

Joshua Shiffrin (01:21:37):

Um, now, you had testified about efforts that you had made to secure Mr. Meadows reinstatement to the airline?

Daniel Carey (01:21:44):

Yes.

Joshua Shiffrin (01:21:44):

Just generally speaking, how would you describe what those efforts consisted of?

Daniel Carey (01:21:48):

Um, I had, there were a few pilots. We had one who was, uh, uh, out for tax reasons, uh, but I'd had a few names that I'd keep in my pocket and, uh, when I'd meet with VP of flight, Kimball Stone, we had a protocol where afterwards we would have a sidebar conversation, the company, uh, you know, may have something coming up, uh, that they wanted us to know about. You know, for example, they were starting a cadet program to bring in cadet pilots. Uh, and whenever we had those light conversations, I would always try to take advantage of them while <laugh> they were in a light mood to, uh, try to, you know, get, get something, uh, accomplished for our membership.

Joshua Shiffrin (01:22:37):

And Mr. Meadows was among those pilots?

Daniel Carey (01:22:39):

Yes.

Joshua Shiffrin (01:22:40):

Okay. We, I think we had looked at letters that, uh, a letter that you had sent to Kimball Stone regarding Mr. Meadows taking his reinstatement?

Daniel Carey (01:22:47):

Yes. And I had, you know, I had, I had several conversations with him.

Joshua Shiffrin (01:22:50):

Okay. And were those efforts to get Mr. Meadows back to work any different than you had for other pilots in this similar situation?

Daniel Carey (01:22:58):

No. I had a, I had a pilot who was out for 10 years because he had, uh, pleaded no contest to any income tax violation and had, uh, uh, lost his ability to, uh, hi- his security badge for 10 years, which is a federal law, and, uh, we got him back.

Joshua Shiffrin (01:23:17):

Let me show you what I'll mark as Exhibit 31. Okay. Um, you'll see the first page of Exhibit 31 is an email from Bridget Blake- mm-hmm. ... sent on Monday, April 28th, 2019. Do you see that?

Daniel Carey (01:23:38):
Yes.

Joshua Shiffrin (01:23:38):
And you were in office at that time?

Daniel Carey (01:23:39):
Correct.

Joshua Shiffrin (01:23:40):
And who was Bridget Blake at the time?

Daniel Carey (01:23:42):
Uh, she was one of the executive, uh, assistants in, at Allied Pilots Association.

Joshua Shiffrin (01:23:46):
Okay. And she would assist you with your affairs as president? Yes. Okay. And it was sent to Kimball Stone. Do you see that?

Daniel Carey (01:23:53):
Yes.

Joshua Shiffrin (01:23:53):
Okay. And it's CC'd to, uh, Mark Myers and president at alliedpilots.org?

Daniel Carey (01:23:58):
Yes.

Joshua Shiffrin (01:23:58):
And pa- president alliedpilots.org at that time, that would've been you?

Daniel Carey (01:24:02):
Yes.

Joshua Shiffrin (01:24:02):
Okay. And you see attached to it a number of letters?

19

Daniel Carey (01:24:06):

Yes.

Joshua Shiffrin (01:24:07):

Um, and these letters are, is it fair to say they're similar in form?

Daniel Carey (01:24:11):

Mm-hmm.

Joshua Shiffrin (01:24:12):

Okay. What are these letters? Uh,

Daniel Carey (01:24:14):

They're, um, they're, they're pleased, essentially. <laugh> Uh, they're pleased to please consider this person for reinstatement.

Joshua Shiffrin (01:24:25):

Okay. And the company decided to reinstate some of the people that you, uh, had asked for, is that fair to say?

Daniel Carey (01:24:31):

Yes.

Joshua Shiffrin (01:24:32):

But not Mr. Meadows?

Daniel Carey (01:24:33):

Yes.

Joshua Shiffrin (01:24:34):

Okay. Um, and you had testified about, uh, a member named Joe Barkate. Do you recall that testimony?

Joshua Beauvais (01:24:49):

I do.

Joshua Shiffrin (01:24:50):

Okay. Um, and can you describe for me what efforts you had made on, um, Mr. Barkate's behalf for him to return?

Daniel Carey (01:24:59):

The same efforts as anyone else. Whenever I had the ability to, uh, talk to Captain Stone, I would bring up the names of people who had recently, uh, contacted APA and informed us that they were at or near requi- requalifying medically with their FAA First Class Amber certificate.

Joshua Shiffrin (01:25:19):

Okay. Was there anything different about what you did for, for, uh, Joe Barkate and what you did for Larry Meadows?

Daniel Carey (01:25:24):

Uh, no. In fact, Joe Barkate was worried that if he got his medical certificate back, he wouldn't, um, they may or may not take him back and he wanted a guarantee in writing and I told him the company doesn't do that.

Joshua Shiffrin (01:25:39):

Do you have an understanding of when, uh, Mr. Barkate actually returned to client?

Daniel Carey (01:25:43):

No. Okay. Um,

Joshua Shiffrin (01:25:45):

Let me show you, uh, you, do you recall giving a testimony in the Wally Preitz matter?

Joshua Beauvais (01:25:51):

Yes.

Joshua Shiffrin (01:25:51):

Okay. I'm gonna, I'm gonna show you, you do not have to read this. I'm gonna direct you to a certain page and here's the transcript, but I have for you a copy-

Lawrence Meadows (01:25:59):

Do you introduce this as an exhibit? Uh,

Joshua Shiffrin (01:26:00):

We can do that. We'll make this Exhibit 32.

Lawrence Meadows (01:26:03):

Otherwise, you can't use it. <laugh>

Joshua Shiffrin (01:26:05):

Sure. Um, the date of your, your testimony in the Wally Preitz matter was Tuesday, March 9th, 2021. Do you see that?

21

Joshua Beauvais (01:26:16):

Yes.

Joshua Shiffrin (01:26:17):

So that would've been, uh, a little bit less than two years after you last left office, right? Right. Um, and here we are about five years since then, right? Okay. Yes. Um, and let me direct you to page ... If you go to page 19 of the document overall, and then look within it to pages 71 to 74. I'll let you read those and let me know when you're finished.

Daniel Carey (01:26:41):

19.

Joshua Shiffrin (01:27:43):

Okay.

Daniel Carey (01:27:45):

Okay.

Joshua Shiffrin (01:27:45):

Um, does that refresh your recollection about the communications you had with American Airlines regarding Joe Barkate?

Joshua Beauvais (01:27:51):

Yes.

Joshua Shiffrin (01:27:52):

So, um, let me ask you again. I mean, h- how was your contact with American Airlines about Joe Barkate initiated?

Daniel Carey (01:28:01):

Um. So, um, Joe Barkate had contacted me, uh, in reference to getting his medical back. I believe he was working at a manager at a restaurant or something in the local metroplex area, and I explained to him what was going on, and, um, and I would put out fielders on it.

Joshua Shiffrin (01:28:25):

And that's what you

Daniel Carey (01:28:26):

Did? Yes.

Joshua Shiffrin (01:28:27):

Okay. And then you spoke to, uh, Captain Kimball Stone?

22

Daniel Carey (01:28:30):

Yes.

Joshua Shiffrin (01:28:30):

And he's the management in American-

Daniel Carey (01:28:32):

V- VP of Flight.

Joshua Shiffrin (01:28:32):

He was at the time?

Daniel Carey (01:28:33):

Yes.

Joshua Shiffrin (01:28:34):

Okay. And what was Captain Stone's response?

Daniel Carey (01:28:36):

Captain Stone's response was, you know, "We'll readdress it when he has his medical back."

Joshua Shiffrin (01:28:41):

Okay.

Daniel Carey (01:28:41):

Which was his, always his response. And,

Joshua Shiffrin (01:28:44):

Uh, looking at page 74, was that the same thing that he had said with respect to the Larry Meadows?

Daniel Carey (01:28:49):

Yes. Okay.

Joshua Shiffrin (01:28:51):

Um, so was there any special deal to re- return Joe Barkate to service before he had his medical?

Joshua Beauvais (01:28:58):

No.

23

# EXHIBIT CX31
# for Shiffrin Declaration

| From: | "Blake, Bridget" <bblake@alliedpilots.org> |
|---|---|
| Sent: | Mon, 8 Apr 2019 20:10:33 +0000 (GMT) |
| To: | "kimball.stone@aa.com" <kimball.stone@aa.com> |
| Cc: | "Myers, Mark" <mmyers@alliedpilots.org>; President<president@alliedpilots.org> |
| Subject: | Letters Confirming Requests For Reinstatement |
| Attachments: | Ruhlander - Pres. Reinstatement Letter.pdf;Morris - Pres. Reinstatement Letter.pdf;Meadows - Pres. Reinstatement Letter.pdf;Burchard - Pres. Reinstatement Letter.pdf |

CA Stone,

On behalf of CA Daniel Carey, please find the attached letters pertaining to the reinstatement for the following pilots:
Ronald L. Morris
Lawrence Meadows
William Ruhlander
Robert A. Burchard

Thank you,

Bridget Blake
Executive Assistant
Allied Pilots Association
o. 817-302-2116
f. 817-302-2119

APA_000024146



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:  Reinstatement of William G. Ruhlander, #153451

Dear Captain Stone:

William ("Bill") Ruhlander, #153451, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Bill regained his First Class Medical Certificate, a copy of which is attached. APA initially notified the Company of Bill's request on or about February 21, 2019.

This letter is to confirm the Association's desire to restore Bill Ruhlander's seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

Confidential

APA_000024147

UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

## MEDICAL CERTIFICATE FIRST CLASS

This certifies that *(Full name and address):*

WILLIAM GENE RUHLANDER
2008 Hillcrest Court
Mckinney TX 75070 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| 10/24/1958 | 69 | 188 | BROWN | GREEN | M |

has met the medical standards prescribed in part 67, Federal Aviation Regulations, for this class of Medical Certificate.

**Limitations**

Must wear corrective lenses, possess glasses for near/intermediate vision. Not valid for any class after 8/31/2019.

**Examiner**

| Date of Examination | Examiner's Designation No. |
|---|---|
| 02/19/2019 | 000016812 |

Signature

Typed Name
PETER J LAMBROU , MD

AIRMAN'S SIGNATURE

Applicant ID: 1996543862     Control No.: 200008562806

FAA Form 8500-9   (3-12) Supersedes Previous Edition     NSN: 6052-00-879-7002

Confidential

APA_000024148



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:     Reinstatement of Ronald L. Morris, #041811

Dear Captain Stone:

Ronald L. Morris, #041811, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Ron regained his First Class Medical Certificate, a copy of which is attached. APA notified the Company of Ron's request on or about February 20, 2019.

This letter is to confirm the Association's desire to restore Ron Morris' seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

Confidential

APA_000024149



UNITED STATES OF AMERICA
**Department of Transportation**
Federal Aviation Administration

## MEDICAL CERTIFICATE FIRST CLASS

This certifies that *(Full name and address):*

RONALD L MORRIS
2419 harbor Blvd #12
Ventura CA 93001 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| 11/07/1956 | 73 | 165 | GRAY | HAZEL | M |

has met the medical standards prescribed in part 67, Federal Aviation Regulations, for this class of Medical Certificate.

**Limitations**

Must wear corrective lenses. possess glasses for near/intermediate vision

| Date of Examination | Examiner's Designation No. |
|---|---|
| 02/15/2019 | 000010574 |

**Examiner**

Signature

Typed Name
WILLIAM SCOTT Jr. DO

**AIRMAN'S SIGNATURE**

Applicant ID: 1996489898    Control No.: 2000084978G2

FAA Form 8500-9   (5-12) Supersedes Previous Edition    NSN: 0052-00-670-7002

---

CONDITIONS OF ISSUE

The holder of this certificate must:

• Have it in his or her personal possession at all times while exercising privileges of an airman certificate. (14CFR § 61.3)
• Understand that the issuance of a medical certificate by an Aviation Medical Examiner may be reversed by the FAA within 60 days. (14CFR § 67.407)
• Comply with validity standards specified for first-, second-, and third-class medical certificates. (14CFR § 61.23)
• Comply with any statement of functional, operational, and/or time limitation issued as a condition of certification. (14CFR § 67.401)
• Comply with the standards relating to prohibitions on operation during medical deficiency. (14CFR §§ 61.53, 63.19, and 65.49)

For International Operations Only: Some holders may be affected by certain international medical standards. Consult the U.S. Aeronautical Information Publication for U.S. differences with ICAO Annex 1 medical standards.

---



**AEROSPACE MEDICAL CERTIFICATION DIVISION, AAM - 300**
FAA Civil Aerospace Medical Institute
Mike Monroney Aeronautical Center
P.O Box 26080
Oklahoma City, OK 73125-9914

RONALD L MORRIS
2419 harbor Blvd #12
Ventura CA 93001 USA

Dear Airman:

Above is your new medical certificate. It supersedes any previous one you may have been issued.

To validate this certificate, it is necessary that you sign it in the space provided (Airman's Signature).

This certificate must be in your possession at all times while exercising your pilot privileges.

Creation: Friday February 15 2019

Confidential

APA_000024150



## ALLIED PILOTS ASSOCIATION
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:     Reinstatement of Lawrence M. Meadows, #332713

Dear Captain Stone:

Lawrence ("Larry") Meadows, #332713, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Larry regained his First Class Medical Certificate, a copy of which was provided to the Company initially by Larry in his first email to the AA Absence and Return Center, dated December 10, 2018, and by me in my December 26, 2018, email (my email attached).

This letter is to confirm the Association's desire to restore Lawrence Meadows' seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

APA_000024151

| | |
|---|---|
| **From:** | Hamel, Timothy |
| **To:** | Myers, Mark |
| **Subject:** | FW: Return to seniority list |
| **Date:** | Wednesday, December 26, 2018 2:00:37 PM |
| **Attachments:** | image001.png |

FYI, it was delivered.

**FO Tim Hamel**
**Vice President**

 ALLIED PILOTS ASSOCIATION

14600 Trinity Blvd. Suite 500
Fort Worth. Texas 76155
Office: 817-302-2115
Cell:    602-369-6585
Fax:    817-302-2119

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

**From:** President <president@alliedpilots.org>
**Date:** Wednesday, December 26, 2018 at 1:16 PM
**To:** "Kimball.Stone@aa.com" <Kimball.Stone@aa.com>, "Hamel, Timothy" <thamel@alliedpilots.org>
**Subject:** Return to seniority list

Kimball,

Lawrence Meadows, #332713, is currently on long-term disability (LTD). He was removed from the AA pilot system seniority list in approximately December 2011 pursuant to the Collective Bargaining Agreement. Meadows recently regained his First Class Medical Certificate (see attached) and is seeking reinstatement of his relative seniority number. Meadows forwarded a separate request with a copy of his First Class Medical Certificate to the AA Absence and Return Center on December 10, 2018. APA requests that Meadows be reinstated to the seniority list.

Thanks,

Dan

Sent from my iPhone

APA_000024152



UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

**MEDICAL CERTIFICATE FIRST CLASS**

This certifies that *(Full name and address):*

LAWRENCE MICHAEL MEADOWS
1900 Sunset Harbour Drive Apt 2112
Miami Beach FL 33139 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| | | | BLACK | BROWN | M |

Has met the medical standards prescribed in part 67, Federal Aviation Regulations for the class of Medical Certificate.

Not valid for any class after

*Limitations*

*Examiner*

Signature *Michael A. Berry, MD*

Typed Name
MICHAEL A. BERRY, MD

AIRMAN'S SIGNATURE

FAA Form 8500-9

CONDITIONS OF ISSUE

The holder of this certificate must:

- Have it in his or her personal possession or otherwise while exercising privileges of an airman certificate. (14CFR § 61.3)
- Understand that the issuance of a medical certificate by an Aviation Medical Examiner may be reversed by the FAA within 60 days. (14CFR § 67.407)
- Comply with validity standards specified for first-, second-, and third-class medical certificates. (14CFR § 61.23)
- Comply with any statement of functional, operational, and/or time limitation issued as a condition of certification. (14CFR § 67.401)
- Comply with the standards relating to prohibitions on operation during medical deficiency. (14CFR §§ 61.53, 61.19, and 91.49)

For International Operations Only: Some holders may be affected by certain international medical standards. Consult the U.S. Aeronautical Information Publication for U.S. differences with ICAO Annex 1 medical standards.



AEROSPACE MEDICAL CERTIFICATION DIVISION, AAM - 300
FAA Civil Aerospace Medical Institute
Mike Monroney Aeronautical Center
P.O Box 26080
Oklahoma City, OK 73125-9914

LAWRENCE MICHAEL MEADOWS
1900 Sunset Harbour Drive Apt 2112
Miami Beach FL 33139 USA

Dear Airman:

Above is your new medical certificate. It supersedes any previous one you may have been issued.

To validate this certificate, it is necessary that you sign it in the space provided (Airman's Signature).

This certificate must be in your possession at all times while exercising your pilot privileges.

APA_000024153



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:   Reinstatement of Robert A. Burchard, #519151

Dear Captain Stone:

Robert A. Burchard, #519151, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Robert regained his First Class Medical Certificate, a copy of which is attached. APA initially notified the Company of Robert's request on or about January 23, 2019.

This letter is to confirm the Association's desire to restore Robert's seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

Confidential

APA_000024154

UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

### MEDICAL CERTIFICATE FIRST CLASS

This certifies that (Full name and address):

ROBERT Alan BURCHARD
366/Clough Road
Stamford VT 05352 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| 00/00/1965 | 6/9 | 246 | BROWN | BLUE | M |

has met the medical standards prescribed in part 67, Federal Aviation Regulations, for this class of Medical Certificate.

**Limitations:** Must wear corrective lenses.

**Date of Examination:** 06/08/2019

**Examiner's Designation No.:** 000099999

**Examiner Signature:** 

**Typed Name:** LANCE D REYNOLDS, MD

**AIRMAN'S SIGNATURE**

Account ID: 190631345   Control No.: 200003556567

FAA Form 8500-9

# EXHIBIT 6

# for Shiffrin Declaration

**From:** wally <wallypreitz@yahoo.com>
**Sent:** Mon, 19 Sep 2016 14:48:31 +0000 (GMT)
**To:** Lawrence Meadows <lawrencemeadows@yahoo.com>; Alvin Combs <a.l.combs@aol.com>
**Subject:** SI
**Attachments:** 2016-04-18 APA AA SI response to Preitz 001.pdf;2016-4-4 Preitz Exp Sys Brd of Adj Grievance SI.pdf

Kathy and Laryy

Attached is the AA/APA response (dated 2016-4-18) to my SI grievance (dated 2016-4-4, also attached).  The last paragraph of the 4/18 letter, from Wilson and Holdren, states:

"The parties did agree in the Protocol Agreement that any claim a pilot affected by the integrated seniority list may have regarding  the award issued by the SLI arbitrators would be referred to the post -award dispute resolution process for review..."

That pretty much sums up that the dispute resolution process is our venue for a dispute.

Wally



American Airlines

April 18, 2016

VIA EMAIL AND CERTIFIED MAIL

Wallace T. Preitz, II
120 Suffield Court
Chalfont, PA 18914
wallypreitz@yahoo.com

Dear Mr. Preitz:

      We have received your letter requesting to file a grievance under Paragraph 20 of the Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement ("MOU") between and among American Airlines, Inc. (American), US Airways, Inc. (US Airways), the Allied Pilots Association (APA), and the US Airline Pilots Association (USAPA). Your request raises issues relating to the ongoing process to integrate the seniority lists of American and US Airways, in which the record has closed and the parties have submitted their final positions to the arbitrators for decision; that process's compliance with the McCaskill-Bond statute; and, specifically, whether your name and information was provided to the arbitrators under Section 2(a)(7) of the parties' Seniority Integration Protocol Agreement.

      As you know, three seniority integration committees — the East Pilots Seniority Integration Committee, the West Pilots' Merger Committee, and the AA Pilots Seniority Integration Committee (AAPSIC) — are participating in the seniority list integration (SLI) process, each representing its respective existing seniority list and the pilots on each of those lists (US Airways East list, US Airways West list, and American list). We note you already raised the issue of your personal status with the AAPSIC chair and that he responded to you and informed you that AAPSIC would comply with your request. AAPSIC then provided your name and information to the parties and the arbitrators in the SLI process, consistent with the governing Protocol Agreement. I am attaching these communications, which demonstrate that AAPSIC has complied with your request and provided the remedy you seek in your letter.

      The MOU dispute resolution process contained in Paragraph 20 did not create and was never intended by the parties to create an avenue for pilots to lodge collateral attacks on the SLI process itself, or to have an arbitrator rule on the contours of federal statutes.

      The parties did agree in the Protocol Agreement that any claim a pilot affected by the integrated seniority list may have regarding the award issued by the SLI arbitrators would be referred to the post-award dispute resolution process for review. Information about that process will be published when the award is issued.

4333 Amon Carter Blvd., MD 5235
Fort Worth, TX 76155



Wallace T. Preitz, II
April 18, 2016
Page 2

Sincerely,

*[signature]*

Beth Holdren
Managing Director Labor Relations, Flight
American Airlines, Inc.

*[signature]*

Keith Wilson
President
Allied Pilots Association

Enclosures

March 3, 2016

Wallace T. Preitz II
120 Suffield Court
Chalfont, PA 18914
215-796-2499
FO/A300/LGA
AA Employee # 354721

CA Mark Stephens, AAPSIC Chairman
Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512

Via Certified Mail and Email:
apa@mcstephens.net

**RE: Seniority Integration Protocol Agreement (SIPA) and the status of pilots with pending litigation or dispute.**

Dear Captain Stephens,

It's probably best that I refresh your memory concerning my employment status with American Airlines (AA). After serving seven years in the U.S. Air Force I was hired by AA in 1992. In late 1996 I developed medical issues, but with the help of the APA and the Aviation Medical Advisory Service (AMAS) I was able to obtain FAA waivers from 1998 through 2001. During that period I flew uninterrupted except for an initial treatment period of four weeks in 1997. In 2001 the FAA ceased to follow my medical condition. In 2005 I experienced a worsening of my condition and was approved for AA Long Term Disability (LTD). I remained on LTD from August 2005 till November 2007 when American Medical unexpectedly terminated my benefits without cause. The APA under; Lloyd Hill, Tom Westbrook, Bill Haug and APA Legal realized there was a systematic assault on disabled pilots. Collectively they developed a plan to defend the weakest members of the APA members, the disabled. I worked closely with the APA in their choice to hire Dan Feinberg in 2008 but later was informed the APA would not provide legal support for individual claim; therefore we would need to pursue individual ERISA actions. My ERISA case was filed in 2011, stayed due to AA's bankruptcy filing in 2011, and the stay was lifted/remanded to the district courts in late 2013. The case remains open as of today. The case seeks among other things the reinstatement of both LTD benefits and seniority.

As a member of the Equity Distribution committee you may recall that Arbitrator Stephen Goldberg ruled that the APA owed a duty of fair representation to disabled pilots out greater than

five years who had been removed from the seniority list. Additionally the arbitrator ruled that a pending ERISA lawsuit would be treated the same as a grievance in that it had the potential to result in the restoration of LTD benefits and seniority, and that the power of the court to award such a remedy is unquestioned.

Over the past several years I've become aware of multiple pilots who were removed from the seniority list after five years but who have now returned to active flying. This is in concert with the long past practice of returning pilots to active flying status. Could you please confirm or deny that this past practice will continue once the seniority integration is complete. What is the mechanism to return a disabled pilot to the seniority list and active flying, specifically a pilot who is not on the integrated seniority list but regains their FAA Class I Medical Certificate after the integration is complete? I'm sure you realize how critical this question is.

After reviewing the "Seniority Integration Protocol Agreement" I realize my information should be included in the AAPSIC certified seniority list (file "Copy of JE 006 – AAPSIC Certified List 20131209(20150610)"). However I just discovered that my information and many other disabled pilot's information was noticeably absent.

Section 2 of the "Seniority Integration Protocol Agreement" (SIPA) states:

> 2. Within 10 days of either the execution of this Protocol Agreement or the receipt from American of the information described in a. below, whichever is later, the Merger Committees shall compile, verify, certify and exchange (*in electronic Excel format whenever possible*) employment data for each pilot on their respective pre-merger seniority lists, as follows, *subject to modification for accuracy*. (Emphasis added)

Section 2. a. (1), (2) and (7) states;

> a. The information certified and exchanged will include the following information to the extent such information is available and can be compiled/provided by American without undue burden or expense:

> (1) Each pilot's name; employee number; seniority number; date of hire; occupational seniority date, if any, and any other date relevant to the pilot's placement on the premerger seniority list; date of birth; seat, aircraft, Each pilot's name; employee number; seniority number; date of hire; occupational seniority date, if any, and any other date relevant to the pilot's placement on the premerger seniority list; date of birth; seat, aircraft, domicile, and information reflecting each pilot's availability to engage in revenue flying (i.e., leave status, instructor status, management pilot status, medical/disability status);

(2) For each pilot, the start and end date of any furlough, period of disability, or leave of absence, or any intervening period of service with the pre-merger carrier other than as a flight deck crew member; an explanation for the furlough, period of disability, leave of absence, or period of service other than as a flight deck crew member; and an explanation of the effect, if any, of the furlough, period of disability, leave of absence, or period of service other than as a flight deck crew member on the pilot's seniority, longevity, compensation domicile, and information reflecting each pilot's availability to engage in revenue flying (i.e., leave status, instructor status, management pilot status, medical/disability status);

(7) *Similar information for any pilot who has been terminated or otherwise removed from the pre-merger seniority list, whose status is the subject of any pending litigation or dispute.* (Emphasis added)

I understand time is short, the March 21, 2016 post hearing brief submission deadline is approaching. I respectfully request that the APA and the AA Pilots Seniority Integration Committee (AAPSIC) review the appropriate documents and provide me with confirmation that my pertinent information was compiled, certified and exchanged with the proper committees. If not I request that the APA and the AAPSIC do so immediately, in accordance with SIPA, and provide me with confirmation. Additionally please answer my question posed in paragraph three. I need to ensure that my seniority position is protected on the integrated seniority list. Seniority is everything, I sincerely thank you for helping protect mine.

Sincerely,

Wallace T. Preitz II

CC: AAPSIC, Western Merger Committee, EPSIC, CA Keith Wilson, CA Michael Burr, CA Scott Heckenberger, Mark Myers

April 4, 2016

Wallace T. Preitz II
LGA/FO/A300
AA# 354721
120 Suffield Court
Chalfont, PA 18914
215-796-2499

**Via E-mail and Certified Mail:**

American Airlines, Inc.
Ms. Helen Yu - System Board Coordinator
Employee Relations
4333 Amon Carter Boulevard
Fort Worth, TX 76155

Allied Pilots Association
c/o Mallory Gloria - System Board Coordinator
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512

**RE: Submission of Grievance To Expedited System Board Of Adjustment In Accordance With Memorandum of Understanding (MOU) ¶¶ 10.f and 20, To Dispute American Airlines Failure to Uphold Its Obligations Under The MOU ¶ 10 and the Seniority Integration Protocol Agreement (SIPA) and any applicable provisions of the Collective Bargaining Agreement (CBA) and past practice.**

Dear Ms. Yu and Ms. Gloria,

Wallace Preitz, hereby submits this Grievance, in accordance with the Memorandum of Understanding Regarding The Contingent Collective Bargaining Agreement ("MOU") ¶¶ 10.e and 20., as executed on January 15, 2013, the Seniority Integration Protocol Agreement (SIPA) signed and dated September 4, 2014, and any other applicable provisions of the Collective Bargaining Agreement (CBA) between American Airlines, Inc. and the pilots in the service of the company as represented by the Allied Pilot's Association. Preitz files this grievance on the basis that American Airline's Seniority List Integration Proceedings appear to be inconsistent with the McCaskill-Bond Statute, and therefore violate the MOU ¶10.a, and f, the SIPA and other related terms of the CBA, including Sections 11, 13, Supp F1, 21, and any other applicable provisions of the CBA and past practice.

**FACTS**
1. The Memorandum of Understanding ("MOU") ¶ 10.a, requires, *"A seniority integration process consistent with McCaskill-Bond."* 49 U.S.C. §42112.

1

2. The McCaskill-Bond Statute in turn incorporates Sections 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"). (As published at 59 C.A.B. 45).

3. The Allegheny-Mohawk LPPs, state that when a covered transaction (i.e., American Airline's Seniority List Integration proceedings);

*"results in the combination of crafts or classes that are subject to the Railway Labor Act, sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board ("CAB" or the "Board") in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers." Id. § 42112(a).*

4. In short, these Allegheny-Mohawk Labor Protective Provisions ("LPPs") require that the carrier make provisions *"for the integration of seniority lists in a fair and equitable manner,"*

5. However, for several reasons, the Seniority List Integration Proceedings are clearly inconsistent with the McCaskill-Bond Statute, and thus not fair and equitable because; 1) American has treated the seniority rights between and amongst the terminated, separated and/or long term disabled pilots of LUS East, LAA, and LUS West pilots in these proceedings, in a unfair and inequitable manner, 2) American, has failed to compile and provide complete and accurate LAA pilot seniority and employment information, particularly with respect to long term disabled and/or terminated pilots who were "removed" from pre-merger seniority list, 3) The APA has ignored or failed to respond to disabled and terminated pilots requests for clarification and/or to compile, verify and exchange known pilot seniority and employment data information in accordance with the SIPA, and 4) The Allied Pilots Association ("APA") has abandoned representation of disabled LAA pilots, as such they were not provided adequate representation, if any, in the Seniority List Integration proceedings.

6. According to the McCaskill-Bond Statute the interests of unionized employee groups are represented by their union. As indicated by the language of the Allegheny-Mohawk Labor Protective Provisions (LPPs), unrepresented employees still have rights to fair and equitable seniority integration and binding arbitration to resolve integration disputes. Additionally the Allegheny-Mohawk LPPs create an obligation for management to provide for integration of seniority lists in a fair and equitable manner. This includes all pilot employees having disputes with the company including those who were *involuntarily* terminated, separated, or retired from the company for any reason including on the basis of disability or a history of disability.

See, e.g. Southern Emps. V. Republic/ALEA, 102 CAB 616 (1983) (Describing how seniority integration was negotiated by an "employee committee" established for that purpose without union involvement); Pan Am-TWA Route Exchange, Arbitration Award, 85 C.A.B. 2537 (1980) (noting that three engineers were parties to arbitration); NAAI, 95 C.A.B. at 584 (denying dissenting group "full party status" but noting that they'd been given the opportunity to participate in the LPP arbitration).

2

7. APA's documents to the arbitrators imply they owe no duty of fair representation to disabled pilots out greater than five years. Arbitrator Goldberg, during APA Equity Distribution challenges, ruled a duty of fair representation is owed such pilots. Before, during and after the Equity Distribution challenges the APA has taken conflicting positions concerning the duty of fair representation of their disabled pilots out greater than five years.

8. AA Pilots Seniority Integration Committee (AASPIC) stated that my information was not included in the certified list provided to the parties and arbitrators under Section 2.a(7) of the Seniority Integration Protocol. The AASPIC stated my name was not provided because the APA and American Airlines failed to do so. The AASPIC stated that they *would provide* the parties and arbitrators my pertinent information and I requested that the AASPIC provide documentation that this exchange of information occurred, to date I've received no verification and only radio silence by all parties.

9. Therefore this group of disabled pilots has no choice but to participate on their own behalf according to the provisions of the LLPs. It's my opinion that AA and the APA maybe acting in bad faith and/or unfair representation.


## CONCLUSON

Based on the foregoing facts, American Airlines has violated ¶¶ 10.a, and f. of the MOU, and failed to uphold its obligations thereunder. Additionally, in such event the MOU ¶10.e; provides for enforcement of those obligation, stating that;

> "e. The obligations contained in this Paragraph [MOU ¶ 10.] shall be specifically enforceable on an expedited basis before a System Board of Adjustment in accordance with Paragraph 20, provided that the obligations imposed by McCaskill-Bond may be enforced in a court of competent jurisdiction."

Additionally, the MOU ¶ 20., provides for resolution of disputes on an expedited basis before a System Board consisting of a sole neutral within 30 days, and states;

*"20. Except as expressly provided otherwise in this Memorandum, any dispute over the interpretation or application of this Memorandum shall be resolved in accordance with this provision. Any such dispute shall be arbitrated on an expedited basis directly before a specially-created one-person System Board of Adjustment consisting of arbitrator Richard Bloch or Ira Jaffe, whoever shall be available to hear the dispute earliest. If Arbitrator Bloch or Jaffe declines to serve in this capacity or is not available to resolve the dispute, another neutral arbitrator shall be selected. The dispute shall be heard no later than thirty (30) days following the submission to the System Board (subject to the availability of the arbitrator), and shall be decided no later than thirty (30) days following the first day of the hearing, unless otherwise agreed to in writing."*

Unless this grievance is adjusted Preitz' and other similarly situated pilots' relative position on the New American Airlines integrated seniority list may not be protected, and they will suffer irreparable harm and manifest injustice.

WHEREFORE, Preitz respectfully requests that this grievance be scheduled by the System Board Coordinator for an expedited System Board of Adjustment as provided for under the MOU ¶ 20. Furthermore, Preitz requests that **formal notice** of the proceedings be provided to <u>all</u> other similarly situated pilots (pilots terminated, released, separated and/or involuntarily retired for any reason, including on the basis of disability or a history of disability). This includes but is not limited to pilots designated by the Allied Pilots Association as Terminated Pending Grievance ("TAG") and Medical Disability Dropped ("MDD").

Respectfully submitted:

Wallace T. Preitz II
First Officer, American Airlines

CC: Keith Wilson, Pres. APA; Ira Jaffe, Esq; Richard Bloch, Esq: Capt. Kimball Stone; Capt. Michael Burr, Capt. Scott Heckenberger, Scott Kirby Pres. AA

# EXHIBIT 7
# for Shiffrin Declaration

# O'MELVENY & MYERS LLP

| | **Times Square Tower** | |
|---|---|---|
| BEIJING | **7 Times Square** | SAN FRANCISCO |
| BRUSSELS | **New York, New York 10036-6524** | SEOUL |
| CENTURY CITY | | SHANGHAI |
| HONG KONG | TELEPHONE (212) 326-2000 | SILICON VALLEY |
| LONDON | FACSIMILE (212) 326-2061 | SINGAPORE |
| LOS ANGELES | www.omm.com | TOKYO |
| NEWPORT BEACH | | WASHINGTON, D.C. |

May 19, 2016

WRITER'S DIRECT DIAL
(212) 326-4329

**VIA E-MAIL AND U.S. MAIL**

WRITER'S E-MAIL ADDRESS
mrobertson@omm.com

Lawrence M. Meadows
203 North LaSalle Street, Suite 2100
Chicago, IL 60601

Dear Mr. Meadows:

On behalf of American Airlines, Inc. ("American"), I write in response to the March 21, 2016 grievance that you purported to file under Paragraph 20 of the Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement ("MOU") between and among American, US Airways, Inc. ("US Airways"), the Allied Pilots Association, and the US Airline Pilots Association. In that purported grievance, you contend that American violated Paragraph 10 of the MOU in connection with the proceedings to integrate the seniority lists of the pilots of American and US Airways.

As you are aware, in its May 16, 2016 Order in *In re: AMR Corporation*, Case No. 11-15463 (SHL) (Bankr. SDNY), the United States Bankruptcy Court for the Southern District of New York (the "Court") granted the motion of AMR Corporation and its related debtors, including American (collectively, the "Debtors"), and issued an order enjoining you from commencing or continuing any action against American with respect to any alleged conduct or claims that occurred or arose before the commencement of the Debtors' chapter 11 case on November 29, 2011 (the "Order"). By way of example only, this includes any and all claims arising from your termination of employment with American and your removal from the pilot seniority list. Thus, in accordance with the Order, you must withdraw your purported grievance or request that it be stayed unless and until you are successful in your appeal of the Court's September 5, 2014 order.

Sincerely,

Mark W. Robertson
of O'MELVENY & MYERS LLP

**Meadows 014778**

O'MELVENY & MYERS LLP

May 19, 2016 - Page 2

Enclosure

cc:    Ira F. Jaffe, Esq.
       Dana E. Eischen, Esq.
       M. David Vaughn, Esq.
       Mallory Gloria (System Board Coordinator, Allied Pilots Association)
       Jeffrey Freund, Esq.
       Wesley Kennedy, Esq.
       William R. Wilder, Esq.
       Edgar James, Esq.
       Robert A. Siegel, Esq.

Meadows 014779

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x
                                             :
In re                                        :        Chapter 11 Case No.
                                             :
AMR CORPORATION, *et al.*,                   :        11-15463 (SHL)
                                             :
                           Debtors.          :        (Jointly Administered)
                                             :
————————————————————————x

### ORDER PURSUANT TO SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE ENFORCING THE PLAN AND THE CONFIRMATION ORDER AGAINST LAWRENCE M. MEADOWS

Based upon the July 13, 2015 motion, the September 18, 2015 reply, the September 23, 2015 hearing, and the September 30, 2015 correspondence submitted following the hearing (collectively, the "**Motion**"), of AMR Corporation and its related debtors, as debtors and reorganized debtors, including American Airlines, Inc. ("**American**") (collectively, the "**Debtors**"), pursuant to the Plan, the Confirmation Order, and sections 524 and 1141 of the Bankruptcy Code, seeking entry of an order (i) finding that Meadows violated the Plan and the Confirmation Order by commencing or continuing the following actions identified in the Motion and supporting papers:  Grievance Nos. 13-064 and 14-026 (the "**Grievances**"); Charge No. EWB15606 filed with the Federal Aviation Administration; Charge Nos. 540-2012-03194, 540-2013-01436, and 440-2015-05648 filed with the Equal Employment Opportunity Commission; April 30, 2015 complaint and August 3, 2015 amended complaint in *Meadows v. American Airlines, Inc.*, Case No. 1:15-cv-03899 (N.D. Ill.) as to American (the "**Illinois Action**"); May 4, 2015 Motion with the Administrative Law Judge presiding over his September 12, 2011 Sarbanes-Oxley complaint, Case No. 2013-SOX-00016, requesting that this matter be re-listed for a hearing ("**SOX Proceeding**"); May 12, 2015 AIR21 Complaint ("**AIR21 Action**"); and June 25, 2015 SOX whistleblower complaint ("**Whistleblower Action**") (collectively, the

Meadows 014780

"**Enjoined Actions**"); (ii) enjoining Meadows from seeking any other relief against the Debtors

or commencing or continuing any other actions based on any alleged conduct or claims that

occurred or arose before the Commencement Date; (iii) directing Meadows to dismiss or stay the

Enjoined Actions that are currently pending, as well as any other actions currently pending that

are based on any alleged conduct or claims that occurred or arose before the Commencement

Date, unless and until he is successful in his pending appeal of this Court's September 5, 2014

Order Disallowing Meadows' Late-Filed Amendments; (iv) directing Meadows to communicate

concerning his litigation (to the extent any such communications are necessary following entry

of this order) exclusively with American's outside legal counsel for such matters; and

(v) granting the Debtors such other and further relief as is just, all as more fully described in the

Motion. And the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and

proper notice of the Motion having been provided, and it appearing that no other or further notice

need be provided; and a hearing having been held to consider the relief requested in the Motion

(the "**Hearing**"); and upon the record of the Hearing and all of the proceedings had before the

Court; and the Court, pursuant to its April 14, 2016 Memorandum of Decision [ECF No. 12717],

having found and determined that Meadows violated the Plan and the Confirmation Order by

commencing and continuing the Enjoined Actions, and the Court having further found and

determined that the relief sought in the Motion is in the best interests of the Debtors, creditors,

and all parties in interest, and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and having considered Meadows' objection and response to

**Meadows 014781**

the Debtors' modified proposed order [ECF No. 12726]; and after due deliberation and sufficient

cause appearing therefore, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that Meadows is directed, within seven days of entry of this Order, to

dismiss/withdraw any Enjoined Actions that remain pending, including the Grievances, the

Illinois Action as to American, SOX Proceeding, AIR21 Action, and the Whistleblower Action,

or alternatively to request that these matters be stayed unless and until Meadows is successful in

his appeal of this Court's September 5, 2014 Order Disallowing Meadows' Late-Filed

Amendments; and it is further

ORDERED that Meadows make no further filings in the Enjoined Actions, other

than those required to dismiss/withdraw or stay the Enjoined Actions, unless and until he is

successful in his appeal of this Court's September 5, 2014 Order Disallowing Meadows' Late-

Filed Amendments; and it is further

ORDERED that Meadows is directed, within seven days of entry of this Order, to

dismiss/withdraw any other actions/grievances currently pending that are based on any alleged

conduct or claims that occurred or arose before the Commencement Date, including without

limitation his termination from American and his removal from the pilot seniority list, or

alternatively to request that such matters be stayed unless and until Meadows is successful in his

appeal of this Court's September 5, 2014 Order Disallowing Meadows' Late-Filed Amendments;

and it is further

ORDERED that Meadows is enjoined from seeking any other relief against the

Debtors based on any alleged conduct or claims that occurred or arose before the

3

Meadows 014782

Commencement Date, including without limitation his termination from American and his removal from the pilot seniority list; and it is further

ORDERED that Meadows is directed to communicate only with designated outside legal counsel for American regarding any of his pending litigation matters, including the Enjoined Actions, and is prohibited from further communications with American's employees regarding any of these matters; and it is further

ORDERED that this Order does not prohibit Meadows from pursuing Appeal No. 15-4139 in the United States Court of Appeals for the Tenth Circuit as it relates to Grievance No. 12-011, but it does prohibit Meadows from pursuing that appeal as it relates to Grievance No. 13-064; and it is further

ORDERED that this Order does not prohibit Meadows from pursuing his appeal of this Court's September 5, 2014 Order Disallowing Meadows' Late-Filed Amendments; and it is further

ORDERED that this Order does not prohibit Meadows from contacting American to the extent he is permitted to do so in connection with his prior employment, nor does it limit his conduct in his position as founder of the Disabled Pilots Foundation or in any other similar organization; and it is further

ORDERED that the objections of Meadows [ECF No. 12726] are overruled as without merit and unsupported based on the record before this Court and the Court's April 14, 2016 Memorandum of Decision [ECF No. 12717]. None of Meadows' arguments change the fact that he is not entitled to pursue litigation against the Debtors for conduct occurring pre-petition, with the notable exceptions specified above and any appeal of this Order, in light of the expungement of his claims against the Debtors; and it is further

4

**Meadows 014783**

ORDERED that Debtors are entitled to seek sanctions, to be determined by the

Court, if Meadows does not comply with this Order, the Plan, and the Confirmation Order; and it

is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:  New York, New York
       May 16, 2016

*/s/ Sean H. Lane*               
United States Bankruptcy Judge

Meadows 014784

# EXHIBIT 8
# for Shiffrin Declaration

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-80518-CIV-RYSKAMP/HOPKINS**

KATHY E. EMERY,

     Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

     Defendant.

_____/

**DECLARATION OF KEITH WILSON**

I, Keith Wilson, do hereby depose and state as follows:

1. I am currently employed by American Airlines, Inc. (**American**) as an airline pilot. I first joined the carrier in 1985 and I am currently a Captain on the Boeing 737.

2. Since 1986, I have also been a member of the Allied Pilots Association (**APA**), the certified collective-bargaining representative for the approximately 15,000 pilots employed by American.

3. I am currently the APA President and have been since August 2012.

4. I make this declaration on personal knowledge and in support of the APA's motion for summary judgment in the above-captioned case.

**APA's Collective-Bargaining Agreement and Governing Documents**

5. The terms and conditions of pilot employment at American are governed by a collective bargaining agreement between APA and American (**CBA**).

6. Section 1(C)(1) of the 2003 CBA—the pertinent agreement for the purposes of this litigation—limits "[a]ll flying performed by or on behalf of the Company or an Affiliate" to

"pilots on the American Airlines Pilots Seniority List … ," subject to certain exceptions. I attach as Exhibit 1 a copy of Section 1 of the 2003 CBA.

7. Section 11(D)(1) provides that a "leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years." I attach as Exhibit 2 a copy of Section 11 of the CBA. Once a pilot reaches five years of disability leave (assuming APA and American extended the period from three to five years), the pilot no longer retains or accrues seniority. *Id.* And once such a pilot drops off the seniority list by operation of Section 11(D)(1), his or her employment terminates under Section 1(C)(1).

8. APA refers to these pilots—those who have dropped off the seniority list as a result of a disability leave of five or more years—as Medical Disability Dropped (**MDD**) pilots. This term, MDD, is simply a shorthand developed by APA for internal purposes to refer to the group of pilots affected by the operation of Section 11(D)(1).

9. The APA's associational affairs are governed by a Constitution and Bylaws (**C&B**). I attach the current C&B as Exhibit 3.

10. Under the C&B, the President conducts the Association's affairs consistent with "the policy and directives set by the Board of Directors. While the President's actions are subject to review by the Board of Directors, the President's actions shall be presumed valid unless the Board of Directors elects to review and disapprove a particular action taken by the President." C&B, Art. IV, § 8(A).

11. The APA Board of Directors is the Association's supreme policy making body. It is made up of 22 Directors, one Chairman and one Vice Chairman elected from each of the APA's

eleven domiciles, pilot bases at major airports from which American operates in the United States.

12. The C&B establishes several categories of membership in APA: apprentice, active, inactive, and honorary membership. C&B, Art. III, § 2.

13. It also establishes the qualifications for membership: "Any person of lawful age and of good moral character who is qualified as a flight deck operating crew member with American Airlines, Inc., who is accruing seniority, furloughed, or on a leave of absence … shall be eligible for membership in the APA as hereinafter provided." C&B, Art. III, § 1(A).

14. And it provides: "Active membership shall be assigned to flight deck operating crew members … who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval." C&B, Art. III, § 2(B).

15. It also provides: "A member in good standing shall automatically be transferred to inactive membership status upon … [b]eing on leave of absence from the Company twelve (12) months after the expiration of paid sick leave … ." C&B, Art. III, § 2(C).

16. The APA maintains a password-protected website. The website has a number of subparts, described in greater detail below, including Challenge & Response (**C&R**), a calendar of events, *Flightline*, a member lookup page, and Sound Off.

17. C&R is an electronic forum, like a chat room, in which authorized users can post messages and read messages others have posted.

18. The C&B directs that the APA website and its subparts shall be governed by an Acceptable Use Policy (**AUP**). C&B, Art. VII(D)(5).

19. APA officers, committee members, agents, and employees are also governed by the APA Policy Manual, a compendium of operating rules established by the APA Board of Directors. I attach excerpts from the Policy Manual, Revision #161 (June 25, 2015), as Exhibit 4.

20. Section 2.04 of the Policy Manual provides "APA will maintain and support a website and an electronic forum system to be called Challenge & Response that will continue to support the free and democratic discussion of issues between members of the Association. The APA Board of Directors will approve an Acceptable Use Policy (AUP) applicable to those who wish to have access to the APA website."

21. Unlike C&R and other unmoderated member electronic forums, the main portion of APA's members-only website is open "exclusively to members of APA," without regard to membership type. Exhibit 6 at 43 (APA 290).

22. The APA Board of Directors enacted the current version of the AUP at a Board meeting on November 7, 2007. The issue came before the Board after Captain Bacon, then Chair of the Boston Domicile, proposed an amendment on July 27, 2007, to the then-existing AUP. I attach as Exhibit 5 a copy of Captain Bacon's proposal, R2007-38.

23. R2007-38 did not pass but was referred to General Counsel for review and report to the Board at its fall 2007 meeting in November. Had R2007-38 passed, it would have restricted all use of C&R "exclusively to Apprentice, Active, and Inactive members in good standing, in addition to members who were Active or Inactive members when they retired." Exhibit 5 at 8 (APA 242).

24. On November 7, 2007, General Counsel recommended proposed changes to the AUP. I attach as Exhibit 6 excerpts from the minutes of the Fall November 4–9, 2007, Board

meeting. Captain Bacon moved to accept the revised AUP as presented by General Counsel, and the motion passed 16-2-0-0.

25. Under the terms of the AUP enacted on November 7, 2007, "Authorization to participate in the Forums is restricted <u>exclusively</u> to active, retired, and furloughed APA members." *Id.* at 44 (APA 291). The AUP defines the "Forums" as "Challenge & Response and other unmoderated member electronic forums." *Id.*

### Challenge & Response

26. On March 28, 2014, I received an email from Carl Jackson, then-Vice Chairman of the DCA domicile in Washington, DC, requesting a brief from the Legal Department on legal proceedings initiated by Lawrence Meadows against the APA and described in a post he had made to Challenge & Response (**C&R**), the online forum for certain APA members.

27. I forwarded the email that day to APA in-house counsel. Because Captain Jackson was seeking legal advice, not my view on the matter, I did so without reading the C&R post itself.

28. I do not generally go on C&R or read posts to that forum. I believe I have been on C&R approximately twice in my career as an American pilot, each time to seek information relating to the Super 80 fleet.

29. To gain access to C&R, an authorized user must first pass a webpage, which reads, in pertinent part: "the APA leadership DOES NOT monitor or police forum content and any information posted should not be treated as fact or as representing the positions or directions of the union." I attach as Exhibit 7 that webpage.

30. On April 22, 2014, the Board held a meeting, which I attended as APA President.

31. At that meeting, the topic of authorized access to C&R came up. I do not remember who raised the topic. But I do remember the substance of the conversation.

32. The conversation began after the Board received the briefing from the in-house Legal Department Captain Jackson had requested. In response, a Board member (I do not remember specifically which one) asked whether MDD pilots were authorized users under the AUP entitled in the first instance to have access to C&R.

33. Another Board member then consulted the AUP, which restricted authorized use of C&R to active, retired, and furloughed pilots. Because MDD pilots fit none of those categories, the Board member noted that the AUP did not authorize MDD pilots to have access to C&R.

34. The majority of the Board members present at the time then agreed that APA should enforce the AUP and prevent unauthorized users from having access to C&R. Because the AUP represented existing APA policy, the Board did not take a vote on the matter, nor was it required to do so.

35. The entire Board discussion on this topic took a few minutes at most. The April 22, 2014, Board meeting lasted about four and a half hours in total.

36. Rusty McDaniels, who was then both a Board member and the IT Steering Committee Chairman, sent an email during the meeting at 3:47 pm, copying me and directing two staff members in the APA IT Department to discontinue MDD pilots' unauthorized access to C&R. I attach as Exhibit 8 a copy of that email.

37. Initially, the IT Department carried out Captain McDaniels's instructions by removing MDD pilots' access to the entire password-protected APA website, including C&R and all other components of the website.

38. A few days later, on April 25, 2014, I asked the IT Department to restore MDD pilots' access to the password-protected APA member website, but to retain the restriction against their unauthorized use of C&R. I did so because, on further consideration of the AUP, I believed

that document permitted MDD pilots to access the main portion of the APA password-protected website, but not C&R.

39. The IT Department complied with my request and later that day, April 25, restored MDD pilots' access to the non-C&R portions of the members' only website.

40. Over the next several weeks, my staff and I conducted a full review of the access the AUP permits by different groups of pilots to C&R and other components of the website. My goal was to ensure the broadest access possible, consistent with Board directives. For example, I wanted to ensure that those in need of access to information on the APA website about their benefits had that access.

41. That review concluded on or around May 16, 2014, and resulted in a list of status codes for which access to C&R should and should not be authorized. I attach that list as Exhibit 9 (APA 375–78). My staff and I determined, as a result of our review of the AUP and Board Directives, that pilots falling within the highlighted codes were not authorized users and not entitled to access C&R, whereas pilots falling within the non-highlighted codes were authorized users and entitled to access C&R. (The document contains one typographical error. Expelled members, XAP, should have been highlighted as a group of pilots not authorized to access C&R.)

42. I also attach a chart prepared around the same time, Exhibit 10 (APA 379), which shows the rights of pilots in each status code to access the password-protected portions of the website other than C&R, to access C&R, and to vote.

43. As a result of that review, MDD pilots continued to have access to all portions of the APA password-protected website except C&R. In particular, on May 16, I confirmed my earlier decision on April 25 to permit MDD pilots access to, among other pages, the APA password-

protected pages on benefits, committees, domiciles, Board Information, Calendar of Events, Contract Resources, Financials (APA), *Flightline* Magazine, a link to the Department of Labor's website on the Labor–Management Reporting and Disclosure Act of 1959, Member Lookup, SoundOff, and Videos.

44. SoundOff is an on-line feedback system allowing any pilot to send messages that are delivered to every APA Officer, or their staff, and each member of the APA Board of Directors, all of whom receive digests each morning of the messages submitted to SoundOff. I attach as Exhibit 11 a copy of the SoundOff webpage.

45. Member Lookup permits pilots to obtain contact information about other APA members who have consented to make their contact information available within APA. This webpage also contains a feature that permits users to look up contact information for all pilots associated with each domicile.

46. The only forum within APA's password-protected website to which MDD pilots have not had access since April 22, 2014, is C&R.

47. As reflected in Exhibits 9 and 10, my staff and I concluded in May 2014 that pilots on disability for more than one year but less than five years—referred to by APA as Medical Disability Inactive (**MDI**) members—should have their access to all portions of the APA website, including C&R. I rendered that decision pursuant to my authority as President to conduct the day-to-day affairs of the Association. My goal was to provide as broad access to the APA website as possible. I apprised the Board of my decision, and it has not reviewed or disapproved that decision.

48. I reached this decision based on the differences in contractual rights between MDD and MDI pilots.

49. By operation of CBA Sections 11(D)(1) and 1(C)(1), MDD pilots do not have a place on the pilot seniority list and are no longer employees of American. Neither do they have a contractual right to return to active pilot employment in the event they overcome their disability and qualify for medical clearance. They can return to active pilot employment only if they first obtain the required Medical Certificate from an Aviation Medical Examiner (**AME**) approved by the Federal Aviation Administration (**FAA**) and if both American and APA agree that the pilot should return to active pilot employment.

50. By contrast, MDI pilots retain their seniority numbers, are current employees of American, and have a contractual right to return to active pilot duty (including bidding on lines of flying) as soon as their disability or illness clears up and they obtain the requisite medical certificate.

51. The decisions that the Board and I made in April and May 2014 to enforce the terms of the AUP and to rationalize access to the APA password-protected website had nothing to do with Kathy Emery specifically. Neither were those decisions based, in any way, on whether any pilot had sued the APA. On the contrary, the decisions treated alike all MDD pilots (approximately 233 in total)—only two of whom have sued the APA. The decisions also treated alike all MDI pilots (approximately 166 in total)—none of whom have sued the APA. As discussed above, the bases for my decisions in April and May 2014 were the plain language of the AUP and the differences in CBA rights between MDD and MDI pilots.

**Miami Domicile Meeting**

52. On July 28, 2014, I attended a meeting of APA's Miami Domicile. I had been invited by the Miami leadership, Chairman Ivan Rivera and Vice Chairman Thomas Copeland, to attend the meeting. Other invited guests included Secretary-Treasurer Pam Torell, Seniority Integration

Committee member Mark Stephens, Negotiating Committee member Dave Brown, Government Affairs committee member Bob Coffman, and Negotiating Committee member Brian Smith.

53. The meeting began around 10:00 am and ended a few minutes before 3:30 pm.

54. At some point after lunch, I became aware that Kathy Emery had entered the meeting. Because Ms. Emery had filed suit against APA in or around June 2014, I advised Chairman Rivera that we should be careful not to say anything publicly we would not want on the record in that lawsuit.

55. Toward the end of the meeting, after the presentations of the invited guests and the reports from the Miami leadership, there was a question and answer period.

56. As domicile Chairman, Captain Rivera had the authority to recognize pilots to speak. He recognized Ms. Emery to speak twice during that period. Between those two instances, I believe at least one other pilot was recognized to speak.

57. The second time Ms. Emery was recognized to speak, I believe she asked questions about why she had lost access to C&R. I answered, in effect, that she did not qualify for access to C&R.

58. Shortly after her questions were answered, a pilot in attendance moved to adjourn the meeting, the motion was seconded, and it passed unanimously. The meeting then adjourned.

59. I left after the meeting adjourned and did not speak with Ms. Emery after the meeting that day or since until my deposition in this case on August 19, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Cpt. Keith Wilson

Date:   March 8, 2016

# Exhibit 6

## Notice to all APA Members from the Secretary-Treasurer

Listed below are the changes to your Policy Manual and Constitution and Bylaws during the Fall Nov. 4-9, 2007 Board of Directors Meeting. If you have questions, concerns or objections after reviewing these minutes, I recommend you first contact your local domicile representatives and get their views.

You also have rights outlined in the APA Constitution, Article II. Copies of the APA Constitution and Bylaws and the APA Policy Manual may be obtained from the Secretary-Treasurer. You may also access the Constitution and Bylaws on the APA Web site at http://www.alliedpilots.org/Members/Data/Documents/constitution.pdf; the Policy Manual at http://www.alliedpilots.org/Members/Data/Documents/polman.pdf.



                          CA Bill Haug
                          Secretary-Treasurer

Fall 2007 Board Meeting                          1

**APA 248**

## CHANGES TO THE CONSTITUTION & BYLAWS
### As Approved at the Fall Board of Directors Meeting
### Nov. 4-9, 2007 Session

| SECTION | ACTION | CONTENT | RESOLUTION NO. |
|---|---|---|---|
| Article III 7.C. | Amended | BRAB Duties | R2007-49,  Rev. 1 |
| Article IV 8.A. | Deleted | BRAB Duties | R2007-49,  Rev. 1 |
| Article V 3.D. | Deleted | BRAB Duties | R2007-49,  Rev. 1 |

Effective date of these changes: <u>February 17, 2008, Revision #67</u>

## CHANGES TO THE POLICY MANUAL
### As Approved at the Fall Board of Directors Meeting
### Nov. 4-9, 2007 Session

| SECTION | ACTION | CONTENT | RESOLUTION NO. |
|---|---|---|---|
| 4.01 B.9. | Amended | Communications Committee Size | R2007-57, Rev. 1 |
| 4.01 B.10 | Deletion/ Addition | Contract Education Committee Contract Compliance Committee | R2007-35, Rev. 3 |
| 4.01 B. 29 | Amended | Strike Preparedness Committee Structure | R2007-55 |
| 4.11 | Addition | Contract Compliance Committee | R2007-35, Rev. 3 |
| 5.01 A. | Addition | Capital Budget | R2007-39 |
| 5.01 B. | Amendment | Capital Budget – Assets Defined | R2007-39 |
| 7.03 B. | Amendment | Membership Drive Initiative | R2007-42, Rev. 2 |

Effective date of these changes: <u>Nov. 9, 2007, Revision #126</u>

Fall 2007 Board Meeting                    2

**APA 249**

# TABLE OF CONTENTS

CHANGES TO THE CONSTITUTION & BYLAWS ................................................................. ...........2

CHANGES TO THE POLICY MANUAL ................................................................. ...................2

TABLE OF CONTENTS ................................................................. ..................................3

MONDAY, NOVEMBER 5, 2007 ................................................................. .....................5

   ROLL CALL................................................................. ....................5
   PRESIDENT'S REPORT ................................................................. ...............7
   VICE PRESIDENT'S REPORT ................................................................. .............8
   SECRETARY-TREASURER'S REPORT ................................................................. 9
   FINANCIAL REPORT................................................................. ...............11
   KPMG................................................................. ........................13
   EXECUTIVE ADMINISTRATOR'S REPORT ............................................................. 14
   PENSION COMMITTEE ................................................................. ..............15
   FAC REPORT ................................................................. ..................15
   FAC ELECTION ................................................................. .................16
   JUMPSEAT COMMITTEE................................................................. ............17
   IT STEERING COMMITTEE ................................................................. ..........18
   PROFESSIONAL STANDARDS ................................................................. ........22
   HOTEL COMMITTEE ................................................................. ..............24

TUESDAY, NOVEMBER 6, 2007 ................................................................. ..................27

   STEERING COMMITTEE ................................................................. ............27
   LEGISLATIVE AFFAIRS ................................................................. ...........27
   SCOPE................................................................. ......................27
   INTERNATIONAL ALLIANCE COMMITTEE ................................................................. 28
   COMMUNICATIONS COMMITTEE REPORT ............................................................. 28
   COMMUNICATIONS COMMITTEE CHAIRMAN ELECTION ............................................. 29
   NEGOTIATING COMMITTEE ................................................................. .........29
   NEGOTIATING COMMITTEE NOMINATIONS – PRELIMINARY ROUND ............................... 29
   MEMBERSHIP COMMITTEE ................................................................. .........29
   SCHOLARSHIP FUND ................................................................. ............31
   TASC................................................................. .......................31
   SPC ................................................................. .......................33
   ACTION TAKEN ON RESOLUTIONS................................................................. ....38

WEDNESDAY, NOVEMBER 7, 2007 ................................................................. .............40

   CONTRACT EDUCATION COMMITTEE ................................................................. 40
   TRAINING COMMITTEE................................................................. ...........41
   AEROMEDICAL ................................................................. ...............41
   SAFETY ................................................................. ....................42
   SECURITY................................................................. ...................42
   GENERAL COUNSEL ................................................................. ...........43
   SYSTEM BOARD/LEGAL ................................................................. .........45

THURSDAY, NOVEMBER 8, 2007 ................................................................. ..............46

   CHECK AIRMAN COMMITTEE ................................................................. .......46
   SAFETY AWARD COMMITTEE ELECTION ............................................................. 46
   NEGOTIATING COMMITTEE ELECTION ............................................................. 46
   US/EU AD HOC COMMITTEE................................................................. .......47
   AD HOC COMMITTEE REVIEW ................................................................. ......47
   SCOPE ELECTION ................................................................. .............48
   BENEFITS................................................................. ..................49
   APPEAL BOARD ................................................................. .............57
   BRAB ................................................................. ....................58

**APA 250**

ACTION TAKEN ON RESOLUTIONS ......................................................................................59

**FRIDAY, NOVEMBER 9, 2007** ...................................................................... ............................**60**
    IT STEERING COMMITTEE ...................................................................... ..................60
    COMMITTEE APPOINTMENTS.......................................................... .............63
    ACTION TAKEN ON RESOLUTIONS.................................................. ....64

**RESOLUTIONS** ...................................................................... ...........................................**66**

**APA MEMBERS IN ATTENDANCE** .............................................................. ......................**92**

**APA NON MEMBERS** .............................................................. ...................................**93**

Fall 2007 Board Meeting         4

**APA 251**

## WEDNESDAY, NOVEMBER 7, 2007

**MEETING CALLED TO ORDER (0905)**

**MOTION to meet in Executive Session:**  A motion was made to meet in Executive Session with the Board, DDRs and National Officers in attendance. The motion passed without objection from those present.

MAKER:      Bacon         SECOND:      Bergtholdt
PRESENT:    McClellan, Hunt, Conlon, Karn, Leone, Mellerski, Young, Raynor (DDR-Lackovic), Schafer (DDR-Mayer), Plummer, Dillard, Bacon, Flor, Gabel, Wilson, Boettcher, Bergtholdt, Epperson
ABSENT:     -0-

**CONTRACT EDUCATION COMMITTEE**
Committee Chairman FO Glenn Schafer

Committee Personnel:
FO Glenn Schafer - Chairman
FO Matthew Field
FO Mike Horn
CA Bob Coffman

Projects:
- Kit Bag Contract
- Know Your Contract
- Contractual Changes in the 2003 Contract

Completed 9/13/2007:

Know Your Contract

Since Oct. 2001
- Approximately 1,700 pilots have retired
- We currently have almost 2,600 pilots furloughed

Since Oct. 2001
- We have roughly 4,300 fewer pilots flying today then we did in September 2001
- Approximately 30 percent fewer pilots in 2006 than in 2000 and 2001.

Since Oct. 2001
- In 2000 American Airlines flew 2,600,000 block hours.
- In 2006 American Airlines flew 2,490,000 block hours.

Fall 2007 Board Meeting                    40

**APA 287**

**GENERAL COUNSEL**

Mr. Steve Hoffman, Esq. detailed the status of several arbitrations and lawsuits involving APA. Mr. Hoffman then reviewed the recommended proposed changes to the Acceptable Use Policy "AUP" for the use of the "members only" portion of the APA Web site. *The Board had referred R2007-38, Acceptable Use Policy, to the General Counsel for review on 07/27/2007.*

**MOTION to accept AUP.** A motion was made to accept the revised AUP as presented by General Counsel and implement it. The motion passed 16-2-0-0.

MAKER:     Bacon          SECOND:     Mayer (*Note:  CA Mayer left the room after seconding the motion and CA Schafer voted in the affirmative as his DDR.*

FOR:       McClellan, Conlon, Karn, Leone, Mellerski, Young, Lackovic, Schafer (DDR-Mayer), Plummer, Dillard, Bacon, Flor, Gabel, Wilson, Bergtholdt, Epperson
AGAINST:   Hunt, Boettcher
ABSTAIN:   -0-
ABSENT:    -0-

The approved AUP is as follows:

**TERMS AND CONDITIONS OF USE:**

All use of the "members only" portion of the Allied Pilots Association ("APA") Internet Services and its subparts ("Services") is subject to the following Terms and Conditions of Use adopted by the APA Board of Directors under the authority provided to the Board by the APA Constitution and Bylaws. The General Terms and Conditions set forth below apply to all aspects of the Services. Specific Terms and Conditions applicable to particular subparts of the Services are also set forth below.

In what follows, the term "User" means you as a person with lawful access to the Services.

General Terms and Conditions

*Members Only:* Access to Services that are password-protected is restricted exclusively to members of APA and those individuals whom APA has expressly granted access to the Services (e.g., APA staff and consultants). Use of Services by Executive Members of APA is restricted exclusively to use for their own *personal* non-management purposes (e.g., review/update their own personal APA records). Executive Members are prohibited from redistributing or communicating any information obtained from any Services to which they have been provided access. Other personnel from American Airlines or any other airline are expressly prohibited from accessing any of the Services or the information contained on the Services for any reason.

*Password Protection and Accountability*: Each User is responsible for any and all Services activities occurring under their account. Each User is also obligated to take reasonable precautions to secure his/her password against dissemination to others without lawful access to the Services. If a User learns that his/her password has come into possession of one

**APA 290**

without lawful access to the Services, the User must promptly inform the APA so that the APA can secure the Services against unlawful access.

*Impersonation*: A User will not impersonate any other person or entity while using the Services and will not assist anyone without lawful access to the Services in accessing or using those Services.

*Services Disruption*: A User will not disrupt the flow of communications to or from or adversely affect the performance or availability of the Services to other Users. Each User will take reasonable precautions to avoid the transmission of computer viruses to the Services.

*Availability and Changes to Terms*: These terms and conditions will be continuously available from a link on at least the central pages of the APA Web site and may be amended by the APA Board of Directors. Notice of all changes will be distributed by e-mail to all authorized Users for whom APA has e-mail addresses on file.

Specific Terms and Conditions of Use for Subparts

*Challenge & Response/Membership Forums*

The following specific Terms and Conditions of Use apply to Challenge & Response and other unmoderated member electronic forums ("Forums").

*Members Only*: Authorization to participate in the Forums is restricted <u>exclusively</u> to active, retired, and furloughed APA members. Executive Members are specifically prohibited from participating, accessing, or using Forum contents in any manner.

*Restrictions on Content*: Users will not upload, post, or otherwise publish on the Forums any content that

1.  Contains any personally threatening, unlawfully harassing, obscene, sexually explicit, pornographic or other unlawful content;
2.  Violates copyright or intellectual property laws. Upon receipt of a proper notice of copyright infringement, in order to avoid institutional liability under the copyright laws, APA is required to remove or block access to any copyrighted material posted by a User. Also to avoid such liability, APA may suspend or terminate a repeat infringer's access to the Forums in appropriate circumstances consistent with the APA Constitution and Bylaws.
3.  Contains any unsolicited advertisements or promotional materials, junk mail, mass or duplicate communications, chain letters, pyramid schemes, or any form of commercial solicitation.

*Disclaimer: APA does not endorse or in any way vouch for the accuracy, completeness, truthfulness, or reliability of any content of any kind posted on the Forums. Posts to the Forums do not necessarily constitute or reflect the views of APA, and the posts are not approved by APA. Members, not the APA, are exclusively responsible for the contents of their posts to the Forums. The statements, views and opinions in posts to the Forums are entirely those of the individual members and not the APA.*

**APA 291**

# Exhibit 8

| | |
|---|---|
| **From:** | Rusty McDaniels <rustymcdaniels@gmail.com> |
| **Sent:** | Tuesday, April 22, 2014 3:47 PM |
| **To:** | Duff, Andrea; Thompson, Russ |
| **Cc:** | President; Vice President; SECRETARY-TREASURER; West, Jim E. |
| **Subject:** | MDD Pilots |

Per conversation with the BOD in the SBOD meeting on 4-22-14 remove MDD pilot's access to the APA web site.

These pilots are not members of APA, are not on the seniority list and do not have access to APA benefits.

*Captain Rusty McDaniels*
*IT Steering Committee Chairman*
*817-832-0909 Cell*
*RustyMcDaniels@Gmail.Com*

APA

APA 380

# EXHIBIT 9

# for Shiffrin Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-80518-CIV-RYSKAMP/HOPKINS

KATHY E. EMERY,

     Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

     Defendant.

_____/

**DECLARATION OF ARTHUR McDANIELS**

I, Arthur ("Rusty") McDaniels, do hereby depose and state as follows:

1. I am currently employed by American Airlines, Inc. (**American** or **Company**) as an airline pilot. Specifically, I am a Captain on the MD-80.

2. Since 1989, I have also been a member of the Allied Pilots Association (**APA**), the certified collective-bargaining representative for the pilots employed by American.

3. I have served on several APA committees. In particular, I have served on APA's Membership Committee since 2001 and was the Chair of that committee from May 2003 until May 2010. I have also served on APA's Information Technology (**IT**) Steering Committee since early spring of 2014.

4. I also served as a member of the APA Board of Directors from May 2010 through April 2014 as the Chairman of the Dallas-Ft. Worth (**DFW**) domicile, which represents pilots based out of that airport.

5. I make this declaration on personal knowledge and in support of the APA's motion for summary judgment in the above-captioned case.

**APA Membership Profiles and Internal Status Codes**

6. APA maintains an internal database to track information about pilots employed by American. The database contains information about each pilot's APA Status, AA Status, and seniority number, along with many other pieces of information.

7. The APA Status code is a three-letter designation created and assigned by APA to reflect certain information about each pilot at any given time. In or around 2003, as chairman of the Membership Committee, I worked with the APA IT department to create additional status codes for APA's internal use to capture with a single code aspects of a pilot's status of particular interest to the Association.

8. The AA Status code, in contrast, is a designation created and assigned by the Company for its own purposes. The APA and AA Status codes do not always correspond to one another, because the Association and Company each track different pieces of information of interest to the Association and the Company, respectively.

9. I attach as Exhibit 1 a copy of the complete list of the APA codes as of January 2013.

10. The database can be searched for an individual pilot's information and the results of that search can be produced in a report called a "Member Profile."

11. I attach as Exhibit 2 Kathy Emery's "Member Profile" as of August 20, 2015.

12. The code Terminated Awaiting Grievance (**TAG**) is APA's code for pilots who (1) have been terminated for cause as a result of the disciplinary process in Section 21 of the collective-bargaining agreement between APA and American (**CBA**), and (2) have filed a grievance with American seeking reinstatement to pilot employment. To have TAG status, a pilot must either have a pending grievance that would result in his or her reinstatement to pilot employment, if the pilot were to prevail.

2

13. Medical Disability Dropped (**MDD**) is APA's code for a pilot who no longer holds a place on the American Airlines Pilot Seniority list as a result of the operation of Section 11(D)(1) of the CBA, which provides that a pilot no longer retains or accrues seniority once he or she has been on a leave of absence from the Company for five years, due to disability, injury, or illness.

14. The data in the APA membership database is populated in several ways. First, the APA Membership Committee, working with APA's IT staff, enters data about each pilot when first hired by American and again when the pilot joins (or decides not to join) APA. That initial decision is reflected in the "Member Type" field. "Member Type," therefore, does not generally reflect changes in a members' status, such as his retirement or inactive status; rather, it reflects the pilot's initial decision to join APA as a member or not to do so.

15. The APA Membership Committee, working with the IT staff, also updates APA membership profiles based on changes in a pilot's status with the Company. APA receives Status 1 Reports from the Company each month, which show any changes since the prior month in a pilot's bid status. The bid status includes a pilot's base (*i.e.*, airport or region), position (generally, Captain or First Officer), equipment (the type of aircraft for which a pilot is qualified and rated to fly, such as a Boeing 727 or MD-80), division (domestic or international), and other relevant information, like whether a pilot is currently on leave, such as military or disability leave.

16. Occasionally, data for a pilot is missing from the Status 1 Report. When that happens, the APA Membership Committee typically investigates to see why data is missing, and I have done so from time to time.

17. Our first step in those investigations is to look up the pilot in Sabre. Sabre is a computer system, also known as the Flight Operating System, American uses for flight operations. It tracks information about flight crews, schedules, and aircraft movements. Because the Status 1 Reports show snapshots of a pilot's status once a month, whereas the data in Sabre show all activity in a month, a query to Sabre is usually sufficient to resolve questions about a "missing" pilot's status.

18. Occasionally, though, a pilot's status depends on something beyond monthly activity reflected in Sabre. For example, as noted above, a pilot who has been on disability leave for more than five years loses his place on the seniority list. Sabre does not automatically track that information; someone in American's Human Resources department must enter it manually. For that reason, there can be a delay between the time that a pilot reaches five years of disability leave and the time that information is reflected in American's computer systems.

19. Each year, managers in American's Flight Administration department work with the APA Membership Committee to review the seniority list and update it, effective July 1. While I was the Chair of the Membership Committee from 2003 through 2010, I did this task on behalf of APA in coordination with Scott Hansen and Jim Anderson on behalf of the Company. During this process, the Company and I reviewed each pilot who was on disability leave to determine their dates of disability. If a pilot had been on disability for more than five years, American would assign the pilot an AA Status of MDSB and APA would assign the pilot an APA status of MDD. That pilot would then be removed from the seniority list administratively and by operation of the CBA. In other words, even if American and APA did not notice that a pilot reached his or her fifth year of disability leave in the month he or

4

she did so, we would usually do so in our annual review of the seniority list effective July each year.

20. I know of no way that a pilot who has been removed from the seniority list by operation of Section 11(D)(1) and, thus, designated MDD by APA, can later be terminated by American for cause. That is, once a pilot is designated MDD, he or she cannot be designated as TAG as far as I know.

**Emery's MDD Status**

21. In 2013, I reviewed a summary of Emery's Status 1 Reports and her APA Status, MDD. Based on that review, I prepared and submitted a declaration on behalf of APA in the equity distribution arbitration, *In re Distribution of Equity by the Allied Pilots Association*, before Arbitrator Goldberg. I attach my July 2013 declaration here as Exhibit 3.

22. In support of my declaration, I submitted an exhibit, attached here as Exhibit 4, summarizing Kathy Emery's Status 1 Reports.

23. According to the Status 1 Reports, since at least February 2003, Emery has not had a status with American that would permit her to bid a line of flying. And the Status 1 Reports also show that began a disability leave (AA Status MDSB) in or around November 2003. The Status 1 Reports, beginning September 2007, no longer show her in a disability leave status; they reflect no status from September 2007 through November 2008; and then they again show her on an unpaid sick leave of absence from December 2008 through September 2009 (AA Status USLOA). After September 2009, no Status 1 Reports exist for Kathy Emery. Based on my familiarity with those reports and AA status codes, I conclude that, at least by September 2009, Emery was no longer a pilot employed by American.

5

24. That conclusion is consistent with Emery's Membership Profile, which shows her APA Status as "MDD," a status APA assigned as of September 5, 2009.

25. The date of Emery's APA Status does not mean that Emery first fell off the seniority list on September 5, 2009. Rather, it means that on September 5, 2009, APA changed Emery's status to "MDD," likely because that was when Emery was no longer listed as on disability leave on American's Status 1 Reports.

26. I do not know exactly when Emery reached five years of disability leave. But I do know, based on her Status 1 Reports, that as of 2013—the year of the equity distribution arbitration—she had been on disability leave from American for at least five years and was thus correctly designated "MDD" by APA.

27. Emery has had access to her APA Member Profile through the APA website since 2009 and could see her MDD status at any time. Before the equity proceedings in 2013, Emery never raised any questions to the APA Membership Committee about her MDD status, nor did she so much as suggest that she disagreed with APA's determination that she had been properly designated as MDD.

**DFW Domicile Grievance**

28. On May 22, 2012, I submitted a grievance on behalf of all pilots at the DFW Domicile. That grievance, captioned DFW Domicile Grievance No. 12-012, asserted two challenges. I attach a copy of that grievance as Exhibit 5.

29. First, it challenged American's then-recent practice of categorically refusing to reinstate any pilot who had been on disability for five years or more, had overcome his or her disability, had obtained a First Class Medical Certificate from an Aviation Medical Examiner authorized by the Federal Aviation Administration, and sought to return to active pilot

employment. Although American has no obligation under the CBA to reinstate such formerly disabled pilots who had been dropped from the seniority list by operation of Section 11(D)(1), its pre-bankruptcy practice was to meet with representatives from APA and discuss each case individually. Before American filed for bankruptcy in November 2011, those discussions led to reinstatement for the overwhelming majority of formerly disabled pilots who had obtained an FAA medical certificate and were willing and able to return to work. Once it filed for bankruptcy in November 2011, however, American changed its practice and refused even to sit down with APA representatives to discuss the prospects of reinstatement for any individual pilot who had overcome his or her disability, obtained an appropriate medical certificate, and sought reinstatement. The DFW Domicile Grievance challenged that blanket refusal to engage in individualized discussions.

30. Second, it challenged American's then-prevailing practice of not providing notice to disabled pilots before they reached the five-year anniversary of their disability leave. This aspect of the grievance sought to fix the situation where, although a pilot could timely obtain a First Class Medical Certificate before reaching five years of disability leave, American would automatically drop him or her from the seniority list by operation of Section 11(D)(1) and he or she would have no right to return to pilot employment but would, in its absolute discretion choose—or not choose—to reinstate him or her.

**Challenge & Response**

31. On April 22, 2014, I attended a meeting of the APA Board of Directors. At the time, I was a member of the Board—the DFW Chairman. I was also Chair of the IT Steering Committee.

32. At that meeting, the topic of authorized access to C&R came up. I do not remember who raised the topic. But I do remember the substance of the conversation.

7

33. The conversation began after the Board received a briefing from APA's in-house Legal Department. A Board member (I do not remember specifically which one) asked whether MDD pilots were authorized to access Challenge & Response (**C&R**), a portion of the password-protected APA website, like a chat room, in which pilots can post messages to one another. Authorized access to C&R is governed by the Acceptable Use Policy (**AUP**), a document established and approved by the APA Board of Directors.

34. I consulted the AUP, which restricted authorized use of C&R to active, retired, and furloughed pilots. Because MDD pilots fit none of those categories, I noted that the AUP did not authorize MDD pilots to have access to C&R.

35. The majority of the Board members present at the time then agreed that APA should enforce the AUP and prevent unauthorized users from having access to C&R. Because the AUP represented existing APA policy, the Board did not take a vote on the matter, nor was it required to do so.

36. The entire Board discussion on this topic took a few minutes at most. The April 22, 2014, Board meeting lasted about four and a half hours in total.

37. As a Board member and the Chair of APA's IT Steering Committee, I then sent an email during the meeting at 3:47 pm, directing two staff members in the APA IT Department to discontinue MDD pilots' unauthorized access to C&R. I attach as Exhibit 6 a copy of that email. Although my email referred only to MDD's, my intent was to communicate to the IT staff that it should enforce the terms of the AUP.

38. I understand that in the weeks following the April 22, 2014, Board meeting, APA President Keith Wilson and his staff conducted a full review of the AUP to determine which groups of pilots were authorized to access C&R and other portions of the website.

I declare under penalty of perjury that the foregoing is true and correct.

Arthur "Rusty" McDaniels

Date: November 19, 2015

# EXHIBIT 10
# for Shiffrin Declaration

ALLIED PILOTS ASSOCIATION
EQUITY DISPUTE RESOLUTION PROCEDURE

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| EQUITY DISPUTE RESOLUTION ) | ARBITRATOR |
| ) | STEPHEN GOLDBERG |
| ) | |
| _____ ) | |

## DECLARATION OF J. BENNETT BOGGESS

I, J. BENNETT BOGGESS, under penalty of perjury, declare the following

to be true and correct based on my personal knowledge and information from my

experience and/or the business records of the Allied Pilots Association (the

"Association" or "APA") within my custody and control.

1.      "I am employed by the APA as the Director of Representation and as

the APA Executive Administrator. As Director of Representation, I direct the APA

Legal Department and am a practicing attorney. I have been employed by the

Association for approximately 20 years. I have a Bachelor of Arts degree from the

University of Florida, a Juris Doctor degree from the University of Memphis and

have been admitted to practice law in the states of Texas, Tennessee and Florida.

2.      I am familiar with the American Airlines (AA) - APA Collective

Bargaining Agreement, including Section 21 (Discipline, Grievances, Hearings, and

Appeals) and Section 11.D. (Leaves of Absence). In my experience at APA, I have

represented hundreds of pilots in both contractual and discipline grievances. I have

been personally assigned to several termination discipline cases and am generally

familiar with all of the current termination cases. I am also familiar with the

1

APA_000019983

operations and administration of the Association and the various APA internal status codes used by the Association to classify current, former and retired AA pilots.

3. APA has created a series of three-letter status codes to reflect each pilot's APA status at any given time. I understand a list of these codes has been introduced as APA Exhibit 53. I have reviewed Exhibit 53 and it appears to be an accurate list of the APA internal status codes.[1] These status codes, which were created entirely by APA and are used only internally, were designed for the purpose of being able to capture the key aspects of a pilot's status with one three-letter code, which is why there are so many of them.

4. Medical Disability Dropped, or MDD, is APA's code for a pilot who has been on unpaid sick leave, long-term disability, or a combination of both, for more than five years and has therefore been dropped from the seniority list as a function of CBA provisions, including Section 11.D. and Supplement F(1).

5. It is first important to explain that, by operation of Section 11.D. and Supplement F(1) of the CBA, which have been introduced as APA Exhibits 5, 9, 10, and 32, pilots who have been on an unpaid leave of absence, long-term disability, or a combination of both, for more than five years are dropped from the Pilots' System Seniority List. Those pilots are no longer employed by American, are no longer subject to the CBA, and can only be returned to active status and the seniority list if American and APA are able to agree to reinstate the pilot to the seniority list.

---

[1] The codes used by APA are not a result of the CBA or agreement with the Company. The codes and their use are purely internal to APA and used for APA administrative purposes.

APA_000019984

6.       Terminated Awaiting Grievance, or TAG, is APA's code for pilots who (1) have been terminated for cause as a result of the disciplinary process in Section 21 of the CBA, and (2) are pursuing reinstatement.[2]  While a pilot is on TAG status, he or she has access to certain APA benefits, including the ability to enroll in emergency medical benefits.

7.       The APA Legal Department maintains a list of TAG pilots.  APA Legal maintains the list because APA Legal is given notice of and is aware of pilot terminations and is involved in pilot disciplinary actions.  The TAG list is updated periodically.  When APA Legal adds or deletes a pilot on the TAG list, APA Legal then forwards the pilot's name to APA membership to make appropriate changes in the APA membership/pilot database.

8.       Attached as Exhibit 1 to this Declaration is a list of TAG pilots as of November 9, 2012.  This list was the last formally updated list in 2012.  There are 11 pilots on the November 9, 2012, list.  One of the pilots listed was reinstated to active status and the pilot seniority list as a result of favorable arbitration prior to January 1, 2013, and was therefore an active pilot on January 1, 2013.  Another pilot was reinstated to active status and to the pilot seniority list after January 1, 2013.  Both of these pilots have been removed from the TAG list.  On the other hand, the current TAG list includes three additional pilots who were recently terminated, therefore they did not appear on the November 9, 2012, list.  All of these three pilots were active pilots on January 1, 2013, but are now listed by APA as TAG.

---

[2] To have TAG status, a pilot must have been terminated for cause and be seeking reinstatement through recognized remedies.

3

APA_000019985

9.      The list of TAG pilots used by the Equity Distribution Committee (EDC) was not created for the EDC or for purposes of the equity distribution.  The names of TAG pilots were given to the EDC upon request.  No additional names were reviewed for inclusion or exclusion.  Simply put, the names of those pilots on TAG were given to the EDC.

10.     I understand that two former pilots, Kathy Emery and Wallace Preitz, have filed challenges in the equity dispute resolution process asserting they are or should be considered TAG.  Neither Kathy Emery nor Wallace Preitz are on the TAG list, nor have they ever been on the TAG list or been considered TAG.  Pilots who drop off the seniority list as a result of Section 11.D. or Supplement F of the CBA are not terminated for cause and therefore are not included as TAG pilots.

11.     I am familiar with the Dallas-Fort Worth base grievance filed May 22, 2012 ("Dallas Base Grievance"), introduced as APA Exhibit 56.  I am the attorney assigned to that grievance.  The Dallas Base Grievance seeks to accomplish two objectives: (1) to require advance notice from the Company for a pilot about to fall off of the seniority list pursuant to Section 11 and Supplement F, so they understand the urgency of trying to reclaim their First Class Medical certification, if possible; and (2) to improve the process for reinstatement of pilots who have their First Class Medical certification and are ready to return to active status.  The grievance is not seeking to reinstate all pilots who have dropped off the seniority list by function of Section 11 or Supplement F simply because they dropped off the seniority list.  Pilots who may be positively affected by the Dallas Base Grievance are not considered to be TAG."

4

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: 18 Jul '13

J. Bennett Boggess

5

APA_000019987

## PILOTS ON TAG STATUS

| EMP # | NAME | STATUS | | NOTES | LEVEL | RULES OF CONDUCT |
|---|---|---|---|---|---|---|
| 027070 | Reinford, Philip | TAG | MBR | | | |
| 041321 | Minkin, Ronald | TAG | MBR | | | |
| 052349 | Sheehan, James | TAG | MBR | | | |
| 165484 | Murphy, Robert | TAG | MBR | | | |
| 195280 | Torres, Felix | TAG | MBR | | | |
| 318744 | Thompson, Glen | TAG | MBR | | | |
| 332461 | Bogacki, Martin | TAG | MBR | | | |
| 332562 | Maher, Sylvan | TAG | MBR | | | |
| 374350 | Smith, Carl | TAG | MBR | | | |
| 089790 | Balcom, Robert | TAG | MBR | | | |
| 052505 | Decker, Richard | TAG | MBR | | | |

**ALLIED PILOTS ASSOCIATION - CONFIDENTIAL**

APA_000019988

Exhibit 1 to Boggess Declaration

# EXHIBIT 11
# for Shiffrin Declaration

Lawrence M. Meadows
P.O. Box 4344
Park City, UT 84060
Phone: 516-982-7718
Facsimile: 435-604-7850
lawrencemeadows@yahoo.com
PRO SE

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **LAWRENCE M. MEADOWS,** | |
| Plaintiff, | |
| | **Case No. 2:14-cv-00115** |
| v. | **Magistrate Judge Evelyn J. Furse** |
| **ALLIED PILOTS** ASSOCIATION, | **FIRST AMENDED** |
| a Texas Labor Association, and | **VERIFIED COMPLAINT** |
| **AMERICAN AIRLINES, INC.,** | |
| a Delaware Corporation, . | **JURY TRAIL DEMANDED** |
| Defendants. | |

**COMES NOW**, the Plaintiff, Lawrence M. Meadows, who hereby, files the following

First Amended Complaint to sue Defendant's and states as follows:

## I. JURISDICTION AND VENUE

1.      Plaintiff's claims are filed pursuant to 28 U.S.C. § 1331 and § 1337(a) in that this suit seeks to enforce the Railway Labor Act ("RLA"), an Act of Congress regulating Commerce. Venue is proper under 28 U.S.C. § 1391 in that defendants have either substantial contacts, or, with respect to the Allied Pilots Association has members in the state of Utah; and the Meadows resides in the state of Utah and is subject to personal jurisdiction.

## II. PARTIES

2.      Plaintiff, Lawrence M. Meadows resides in Utah, is a member of defendant Allied Pilots Association, and a pilot *"employee"* of defendant American Airlines, Inc., as defined under U.S.C 45 §151- Fifth. Railway Labor Act.

3.      Defendant, Allied Pilots Association (hereinafter "APA" or "Union"), is a labor organization, and an unincorporated association headquartered in Texas, with members in Utah, and the "representative" of the pilots of American Airlines, Inc., as defined under 1 Sixth of the RLA, 45 U.S.C. § 151.Sixth. APA is also a "labor organization " as defined by the Labor-Management Disclosure Reporting Act (LMRDA), 29 U.S.C. 402.

4.      Defendant, American Airlines, Inc (hereinafter "American Airlines", "American" or "Company"), is a foreign corporation with substantial business contacts in Utah and every other state in the United States, and is an air "carrier" under RLA § 1 First, (45 U.S.C. §151). As such, American Airlines is a required party under Rule 19(a), Fed. R. Civ. P., as it is mutually responsible for establishment of a System Board of Adjustment under the authority of RLA Section 204, (45 U.S.C. § 184).

VERIFIED COMPLAINT

## III.   STATEMENT OF FACTS

5.        Plaintiff, Lawrence M. Meadows brings this hybrid action against his former employer, American Airlines, Inc, and his representative the Allied Pilots Association, for violations of his rights pursuant to the Railway Labor Act, 45 U.S.C. § 151 et seq.

6.        The Railway Labor Act was originally enacted un 1926 to govern labor-employment relations is the rail industry, and was designed to, among other things, "provide for the prompt an orderly  settlement of all disputes growing of grievance or out of the interpretation or application of collective bargaining Agreements [CBA]."

7.        Unlike other industries where the right to arbitrate grievances is established in the collective bargaining agreement, the source for grievance arbitration in the railroad and airline industries is statutory, pursuant to the Railway Labor Act (RLA) Section 3, (45 U.S.C. §153) which addresses the railroad industry, and RLA Section 204, (45 USC §184) covers the airline industry. The primary difference between the two sections relates to the structure of the arbitral panels. Despite the fact that Section 201 specifically provides that Section 3 does not apply to air carriers, many aspects of railroad arbitration have been applied to the airlines.

8.        Meadows' alleges that; 1) his *"carrier"*, American Airlines terminated him without cause, and removed him from the Pilot System Seniority List in violation of the Collective Bargaining Agreement (CBA);  2)  That both Defendant's are denying Meadows of his individual statutory right to have his grievance claims arbitrated before System Board of Adjustment under RLA  Sec. 204 (§184.);   3) That his *"representative"*, the Allied Pilots Association (APA), breached its  duty of  fair representation of Meadows, wherein it processed his grievance in a perfunctory manner, and also exhibited

3
VERIFIED COMPLAINT

animus and hostility toward Meadows, when it subsequently refused to arbitrate his company termination grievance claim before a System Board of Adjustment and denied Meadows his rights and privileges as an APA member; and 4) That APA has locked out Meadows and other disabled pilot members, from the APA's virtual union hall, violating their Union Member Bill of Rights under the LMRDA, 29 U.S.C. 411.

## Employment History

9. Meadows, graduated cum laude from Embry-Riddle Aeronautical University in 1985, with a B.S. Degree in Aeronautical Engineering. Upon graduation, he became a commissioned officer in the U.S. Air Force, and served on active duty as a military pilot flying T-37, T-38, and C-9A aircraft, until he was honorably discharged in 1991.

10. Meadows was hired by as a pilot employee by American Airlines in Oct. 1991, where flew DC-10, B-727, MD-11, and B-777 aircraft.

11. Immediately after his date of hire, Meadows became a member in good standing of his pilots' union, the APA, and as a member of the craft or class of pilots employed by American, APA owes him a Duty of Fair Representation under the Railway Labor Act.

12. Meadows believes he is still an APA member in good standing, but starting in June 2013 during the pendency of his first grievance, APA's counsel began to assert that Meadows was in fact not a member, and therefore not owed a duty by APA.

## Disability History

13. Starting in June 2004, Meadows suffered from a debilitating illness, which prevents him from obtaining the needed FAA medical certification to perform his duties as a pilot.

14. Therefore, American Airlines Corporate Medical Director approved Meadows for the pilot long term disability benefits, as provided under the CBA, which were funded by the Company's *"Pilot Retirement Benefit Program" ("Program")*.

15. Regardless, to date Meadows continuously has remained a *"Participant"* under the terms of the *"Program"*, and was entitled to receive, and accrue full pension Credited Service; based his uninterrupted service in an eligible statuses of either, *"Active Pilot Employee"* on the *"Pilot System Seniority List"*, *"Unpaid Sick Leave of Absence (USLOA)"* as approved by the Corporate Medical Director, or on a Disability benefit defined under the *"Program"*.

16. On December 26, 2007, AA's Corporate Medical Director, without cause or notice, abruptly terminated Meadows's then existing disability benefits under the old pension funded "Program"; and unilaterally placed him in an approved "USLOA" status.

17. Meadows timely filed an Administrative Appeal to American Airlines Pension Benefits Administration Committee (PBAC), who reviewed and denied his disability claim through third party disability claims evaluator, Western Medical Evaluators (WME) on June 8, 2008.

18. Supplement-F of the pilot's CBA, Supp-F required that all disability claim disputes be referred to a *"Clinical-source"*; but AA and APA violated this clause of the CBA, because WME was nothing more than an administrative medical billing service.

19. After two years of waiting, and APA's failure to resolve his disability dispute, Meadows timely filed an individual ERISA disability lawsuit against American Airlines in U.S. District Court, of the Florida Southern District (FLSD).

VERIFIED COMPLAINT

20. On March 23, 2011, the Meadows was allowed to conduct special court ordered depositions of AA's Chief Nurse, and Senior Budget Analyst.

21. Based on those depositions, and AA's last minute, untimely production of documents; the Meadows, discovered the existence of secret *"Pilot Disability Nurse Case Management Cost Savings"* reports; which were used by American Airline's Medical Department to fraudulently deny and/or terminate rightful pilot disability benefits based on cost saving alone.

22. These reports showed that 421 pilots were receiving disability benefits; and that during December 2007 Meadows was one of 84 pilots being tracked and targeted for cost savings.

23. The very next day On March 24, 2011, before all the evidence was in the record, FLSD Court abruptly entered Final Summary Judgment order in favor of AA.

24. Shortly thereafter, Meadows also discovered that AA's third party disability claims reviewer, WME used in furtherance of AA's *"Pilot Disability Nurse Case Management Cost Savings"* scheme, was shut down for felony medical claim fraud.

25. WME was not a *"Clinical-source"* as required under Supp-F(1) of the CBA, but instead was a tiny 6 employee medical billing service that was rife with fraud and procedural irregularities; "WME's" corporate medical director medical license had been revoked by the Texas Medical Board, it's office manager was a convicted felon, and it's principals fabricated and forged doctors evaluation reports.

26. Eventually WME was shuttered, and its principals charged and convicted with multiple counts of felony medical claim fraud, and forced to pay fines and restitution.

27.     Just recently Meadows discovered documents that show American Airlines terminated WME's contract on August 8, 2008, within one day of its principles being indicted for felony medical claim fraud.

28.     American Airlines or APA never subsequently offered Meadows a proper claim re-review by the WME's replacement, the Mayo Clinic.

29.     In mutually selecting WME, a medical billing service, both American Airlines and APA violated the CBA, by failing to provide its disabled pilots a full and fair review of their disability claims by a "Clinical-source" as required by the CBA Supplement-F(1)

30.     American Airlines and APA also breached their fiduciary to duty by failing to exercise proper due diligence, when mutually selecting WME, which was in fact a procedurally flawed and fraudulent disability claims reviewer.

31.     APA also funded its own pilot long term disability (LTD) plans, and as such had a mutually beneficial financial interest in selecting a flawed reviewer to facilitate AA's pilot disability costs savings scheme.

32.     Both AA's and APA's LTD plans had similar definition of disability. Therefore, every pilot that was denied LTD benefits by AA, was also likely to have their APA LTD benefits terminated for the same reason, saving APA money.

33.     In April 2011, Meadows timely filed a Notice of Appeal with the 11th Circuit Court of Appeals, and a Rule 59 with the FLSD based the newfound evidence, but the FLSD denied said motion, due to lack of jurisdiction.

34.     Just a couple of days after Meadows exposed that American Airlines was a conflicted fiduciary; which was attempting to aide with the gross underfunding of its pension plans, by implementing the secret *"Pilot Disability Nurse Case Management*

7
VERIFIED COMPLAINT

*Cost Savings"* scheme, facilitated through a fraudulent claims reviewer. American Airlines retaliated, and attempted to punish Meadows, by falsifying meet and confer certifications in order to file untimely and unmeritorious costs and attorney's fee motions totaling $52,680.20.

35.     Subsequently, Meadows filed a Rule 11 motion; and the FLSD Court struck American Airlines pleadings, and denied its cost and attorney's fee motions as moot.

36.     In June 2011, based on his ERISA disability suit denial, and American Airlines steadfast refusal to acknowledge his disabling condition; Meadows, mailed a certified request to American Airlines Corporate Medical Director, requesting Fitness For Duty Exam and issuance of Return to Work (RTW) clearance, as per Sec. 20 of the CBA.

37.     The Corporate Medical director never responded, and ignored said request.

**Meadows Engaged in Protected Sarbanes-Oxley Whistleblower (SOX-WB) Activity**

38.     Based on American Airlines pilot disability cost savings scheme, implemented through the use of WME, Meadows reasonably believed American Airlines was intentionally underfunding pilot's rightful disability pension funding obligations, which thereby artificially inflated its corporate earnings reported on their financial statements. Which for publically traded company, amounted securities fraud in violation of the Sarbanes-Oxley (SOX) Act.

39.     On July 18, 2011, based on his reasonable belief of SOX fraud, Meadows engaged in protected whistleblower activity, and reported the fraudulent cost savings scheme to American Airline's managers and counsel; and eventually, on Sep. 12, 2011, he filed a formal SOX-Whistleblower (SOX-WB) Complaint with OSHA.

40.     In March 2013, the Department of Labor (DOL), assigned t his case to an Administrative Law Judge, who issued a Pre-Hearing and Scheduling Order, and setting the matter for trial.

41.     The SOX-WB retaliation matter is currently stayed, pending decision on due American's bankruptcy claim objection, and DOL Administrative Law Judge assigned to that matter has continued the SOX trial to December 8, 2014.

### Meadows's Termination - Removal from Seniority List - 2nd Disability Claim

42.     On August 5, 2013, merely two weeks after Meadows engaged in protected SOX- WB; American Airlines sent a certified letter threatening to terminate his employment; and refused to acknowledge existence of his disabling condition, and denied his requests for a Reasonable Accommodation. Two months thereafter, American Airlines ultimately terminated him without cause.

43.     On September 14, 2011, to defend against the threat of termination, Meadows at his own expense underwent a clinical examination at AA's then new disability claims reviewer, the Mayo Clinic, who verified the continuous existence of his disabling illness.

44.     During that time-frame Meadows remained on the American Airlines' *"Pilot System Seniority List"*, and was considered an *"Active Pilot Employee"* on an *"Authorized Leave of Absence"*, who received compensation from the Company. As such he met eligibility criteria for disability benefits under the new *"PLTD Plan"*.

45.     On October 1, 2011, using Mayo's evaluation, Meadows submitted a renewed disability benefits claim under the *"PLTD Plan"*. Which American Airlines subsequently approved, albeit with benefit payments commencing on Dec. 13, 2011; thereby denying him of four years of retroactive payments.

46.     On November 4, 2011, in complete disregard of the Meadows's SOX-WB protections, and his pending disability benefits claim; American Airlines administratively terminated Meadows's employment, removed him from the *"Pilot System Seniority List"* in violation of the Sec. 13 of the CBA, and revoked Meadows's lifetime non-revenue travel benefits.

47.     Despite American Airlines and APA's contentions that Meadows was terminated; he is currently still on the Company's payroll, receiving his pilot disability benefits in the form of W-2 employee wages subject to Federal Income Tax withholding. As such he is considered both an *"Employee"* and *"Pilot Employee"* as defined under the terms of the *"PLTD Plan"* I.d

### Meadows Files his 1st Company Termination Grievance #12-011

48.     On November 7, 2011 Meadows made written requests to his APA base representative to invoke alternative dispute resolution process, and file a grievance for his improper discharge and removal from the seniority list, but APA ignored said request

49.     After APA's failure to act on his behalf, on February 4, 2012 Meadows was forced to individually his first a company termination grievance #12-011. (Exhibit 1). pursuant to Sec. 21 of the CBA, citing his improper discharge and removal from the seniority list in violation of the CBA without notice or cause. Meadows also cited additional statutory basis and motivating factors of retaliation for engaging in SOX-WB activity, and discrimination under American's with Disabilities Act (ADA).

50.     Sec.21.B of the CBA clearly shows that Pilots can only be terminated for just cause, and specifically provides that;

> *"A pilot shall not be disciplined or dismissed from service with the Company without an investigation and written notification of such action, including the precise charge(s) and an explanation for any action taken."*

51. Yet, Meadows never received neither an investigation nor written notification or precise reason as to why he was terminated, and removed from the pilot seniority list in direct violation of CBA Sec. 21..

52. On July 10, 2012, APA filed a Proof of Claim for Meadows grievance in American's bankruptcy proceedings, thereby, preserving all damages flowing from that grievance. including the CBA, SOX and ADA claims.

53. Further, on December 7, 2012, APA specifically preserved Meadows's grievance #12-011, as one of the only 36 most meritorious, out of approximately 270 open grievances; as listed in exhibit 1 of the APA-AA Settlement Consideration and Bankruptcy Protections agreement.

54. APA staff attorney, Chuck Hairston was assigned to process Meadows' grievance, and attend the hearing; but bluntly told Meadows he was not representing his interests, but instead attending the hearing only to represent the interests of APA.

55. Meadows was also forced to draft his own grievance brief, which is normally the duty of the APA Legal Department. Meadows brief included arguments relating to violations of the CBA Sec 20 & 21, and also supported his SOX and ADA claims.

56. Further, the day before his grievance hearing, Mr. Hairston told Meadows that APA would not go anywhere near the issues in his brief related to the fraudulent disability claims reviewer (Western Medical Evaluator's) piece, which violated the CBA Supp-F(1) and Sec. 20 Physical Examinations; or the ADA reasonable accommodation piece.

57. However, Mr. Hairston confirmed that APA can support the SOX piece of Meadows' his grievance brief, and that as matter of equity he should be made whole.

So APA clearly believed the SOX claim was arbitrable.

58.     On April 25, 2013. Meadows's discharge grievance #12-011 was first heard directly as appeal grievance (2nd step) by the Vice President of the Flight Department. APA's counsel only made cursory opening and closing remarks, and insisted Meadows argue his brief himself.  Rendering, APA's presence at the hearing purely perfunctory.

59.     Previously unknown to Meadows until just recently  was the fact that Mr. Hairston , was the very  same APA staff attorney who responsible for mutually selecting fraudulent disability claims reviewer WME.  The very same company whose fraud Meadows reported  in his SOX-WB Complaint, which ultimately led to his discharge from the company.

60.     Thus, APA breached its duty to Meadows  by processing his grievance using counsel who had  a direct conflict of interest in the outcome of Meadows' grievance.

61.     On June 6, 2013,  American Airlines denied Meadows's  grievance #12-011.

62.     In response, on June 28, 2013,  APA's President, Keith Wilson notified American Airlines  in writing that he was, *"protesting the Company's action of removing him from the seniority list and discharging him from American Airlines."* , and escalated Meadows' grievance to a Pre-Arbitration Conference (PAC) (3rd step).

63.     The PAC was held on August 6, 2013. Once again APA counsel acted in a perfunctory fashion, and required Meadows to draft and submit his own settlement brief.

64.     Meadows brief offered a global settlement in exchange for,  three no cost items; 1) Reinstatement to the seniority list, 2) Restoration of his non-revenue travel benefits, and 3) Reasonable accommodation to another position within his bargaining unit, but the Company declined to settle.

65.     On August 21, 2013 after the PAC declined settlement; Meadows made a written request to APA, asking, *"I respectfully request the Association President appeal my grievance 12-011 to the System Board of Adjustment for a final review."*

66.     On August 29, 2013, after over 18 months of preserving, and processing grievance #12-011 to the 3rd step of a PAC; APA President, Keith Wilson wrote Meadows, and made an 11th hour refusal to arbitrate his grievance at System Board. Despite having previously preserved it as a meritorious CBA claim in the bankruptcy.

67.     APA was simply going through the motions, and processing Meadows grievance in a perfunctory fashion.. APA took minimal effort, refused to draft briefs, and simply attending the hearings sitting silent like stuffed suits, and made no legal arguments on behalf of Meadows.

68.     On September 18, 2013, Meadows via certified wrote APA's President, stating, *"I respectfully ask you to reconsider your decision and appeal my grievance to a System Board before the 30 day deadline to do so expires on tomorrow."*

69.     Meadows followed up via email and telephone, but the APA President never responded. Leaving Meadows Grievance being deemed finally denied.

70.     Now, Meadows only option to resolve grievance #12-011, is to seek a district court issue an order to compel arbitration before a RLA System Board of Adjustment, and both AA and APA are already on notice of Meadows request to submit his grievance for such arbitration.

### APA's No-Notice Elimination of Meadows Grievance from its Proof of Claim

71.     Meadows took extra efforts to ensure that his valuable CBA, SOX-WB, and ADA claims contained in grievance 12-011 continued to be preserved. These claims

provide for make whole remedies including back pay/benefits, reinstatement/reasonable accommodation, and forward pay/benefits, are valued at $5.069M , as calculated by Meadows economic expert.

72.    Prior to filing this complaint, on January 17, 2014 Meadows put APA on written notice that he still had valuable legal remedies that flowed from grievance #12-011 (i.e.; this hybrid complaint), and requested APA continue to preserve that grievance as listed in APA's original Proof of Claim (POC) filing in American's bankruptcy proceedings.

73.    On February 28, 2014,  Meadows met with a senior AA Attorney, Marjorie Powell.  Who told him that AA intended file an Objection to all of Meadows claims , and that AA was  "informed"  that APA was no longer preserving Meadows grievance in its POC.

74.    On March 7, 2014, APA amended its Proof of Claim in American's bankruptcy proceedings without notice to any members, and unilaterally eliminated Meadows' grievance #12-011,  in spite of Meadows prior requests to continue to preserve it.

75.    One week later, on March 14, 2014 , American filed an Objection to Meadows claim in its bankruptcy proceedings, and only after reading it did Meadows  discover a footnote that mentioned APA eliminated his  grievance #12-011 from its POC.

76.    Meadows was shocked, and immediately wrote letters to APA's President, Board of Directors, Secretary Treasurer, and Legal Director demanding an answer as to why APA had eliminated his grievance without his knowledge, and requested that APA re-amend its POC.

77.    Meadows even called APA's bankruptcy counsel, Joshua Taylor, who was directly responsible for  processing/filing APA's Proof of Claims.

78.     Despite Meadows numerous requests, APA took no action to re-amend its POC, by adding back grievance #12-011.

79.     On April 17, 2014, the U.S. Bankruptcy Court of the SDNY heard argument on American's Objection to Meadows' personal and union POC's.

80.     During that hearing American admitted that while Meadows' grievance #12-011 had alluded to statutory issues SOX-WB and ADA, but that they believed it was based purely on violations of the contract, since it was submitted pursuant to Sec. 21 of the CBA.

81.     American's attorneys also stated they weren't objecting determination of the grievance with respect to terms of the CBA itself, and admitted to the court that the grievance #12-011, *"will run its process under the union and collective bargaining agreement processes -- outside of this court."*

82.     Additionally, American's attorneys specifically requested the bankruptcy court enter a order which stated in part;

> *"Meadows <u>shall be permitted to arbitrate Grievance 12-011 before the System Board to</u> the extent that such arbitration is limited in scope to claims involving the interpretation of the CBA and provides remedies, if any and if appropriate, that are customary under the grievance procedures created by the RLA..."*

83.     APA's General counsel Steve Hoffman, and APA's bankruptcy counsel Joshua Taylor made an unnoticed appearance at the hearing, with making any prior submissions to the court, and without Meadows knowledge, request or consent.

84.     Outrageously, just prior to the conclusion of American's April 17, 2014 bankruptcy claim objection hearing, without being called upon, Mr. Hoffman abruptly stood up and made oral arguments completely contrary to Meadows position, and in so doing bolstered AA's arguments,

VERIFIED COMPLAINT

85. APA's taking of an adversarial position against Meadows in these proceeding further highlighted APA's animus and outright hostility toward Meadows, in blatant defiance of the Duty of Fair representation which APA otherwise owed him.

### APA's Arbitrary Treatment of Meadows' Equity Distribution

86. On information and belief APA's last minute refusal to arbitrate his grievance #12-011, was done in retaliation by APA's President and Legal Director, due to the hostility and personal animus exhibited by certain APA Executive Officers; whom Meadows personally cross-examined, during the previous months Equity Distribution Arbitration hearing. Wherein, Meadows exposed APA's arbitrary and discriminatory treatment of its disabled pilots, and shorting them of millions of dollars.

87. As part of the AA-APA Bankruptcy Settlement Agreement, APA was charged with distributing approximately $1B in equity to each of its 8,400 members or roughly over $100,000 per pilot.(i.e.; the "Equity Distribution")

88. APA's Equity Distribution Committee (EDC) created Eligibility and Distribution Methodology rules; under which Meadows was clearly entitled to a full payout from all four equity silos, in an amount of about $130,000, based on pilots of similar seniority.

89. However, in Meadows's case the EDC did not follow its own distribution rules, and instead said it *"looked at the totality of the situation..."*; and manually "adjusted" Meadows status, and giving him only a partial payout from just two of the four silos, which amounted to only $35,459.96.

90. APA's EDC website also contained data errors incorrectly showing Meadows only had 17.5 years of Pension Credited Service, as opposed to correct amount of 20

VERIFIED COMPLAINT

years. Which not only significantly reduced his equity payout, but also reduced his annual pension annuity by $4, 265.72/yr.

91.　　　Meadows filed a formal APA Equity Distribution Challenge, which was heard by Arbitrator Stephen Goldberg on July 13, 2013; where amongst other things he argued that APA refused to correct data errors related to his status and years of pension credited service, and ignored his full eligibility status. Arbitrator Goldberg directed APA to correct all data errors and notify the affected pilots, and specifically FO Meadows.

92.　　　During these proceedings APA general counsel asserted that Meadows and other disabled pilots were not members, and that APA owed them know duty.

93.　　　On July 30, 2013, APA filed its closing brief and stated, *"American recently undertook a review of the data it had provided to APA and made certain adjustments as a result. On July 23, 2013 APA notified all pilots whose data had been updated."* However, APA never informed,　nor contacted Meadows regarding his data error dispute.

94.　　　On August 8, 2013 Meadows sought assistance from the APA Benefits Coordinator

to follow-up with American to ensure he received the full adjustment of Credited Service.

95.　　　However, nine days later,　APA's Benefits Coordinator, advised him,　*"A-Plan [Pension] statements will be mailed <u>sometime first quarter of next year.</u>　If you are not retiring before then, I would suggest you wait until you receive that statement to see if they have given you updated credited service."*

96.　　　Had Meadows waited until the 1st quarter of 2014, he would have lost any benefit of his Credited Service adjustment for purposes of receiving a full equity payout.

97.     Meadows then took it upon himself to contact American Airlines, and successfully obtained adjustment to his Credited Service; of which he gave formal notice to APA and the Arbitrator of the adjustment, and requested recalculation of his equity payout.

98.     Shortly thereafter, APA staff attorney Mark Meyers, filed a formal Response to the Arbitrator, which it posted on a public website; attaching Meadows's confidential emails between himself and APA's counsel, which contained his personal financial and medical data. I

99.     In that Response, APA also made an untimely attempt to reargue to the Arbitrator why Meadows should only receive a partial equity payout of two silos, instead of all four.

100.     On September 16, 2013, Meadows demanded APA withdraw his confidential emails contained within its pleading from the website, and APA subsequently did so.

101.     APA as a labor organization, is a covered entity under Title I of the ADA, 42 U.S.C. § 12111, and accordingly APA also owes its members a duty under the ADA, to include not discriminating in pay, profit sharing (equity distribution), benefits, and of reasonable accommodations.

102.     APA's disabled pilot suffered discrimination on the basis of their disability, because APA's Equity Distribution Committee admitted they did consider APA's duty under the ADA, when formulating equity allocation and distribution methodologies.

103.     On September 27, 2013, Meadows sent a renewed request to APA as his bargaining agent, seeking help to secure him a reasonable accommodation within his

VERIFIED COMPLAINT

bargaining unit, as previously requested throughout the grievance process. However, APA refused to get involved, and instead allowed the Company to *"direct-deal"* with Meadows' in violation of its duty under the ADA..

104. On October 4, 2013, APA legal director, Bennett Boggess, responded in a letter and stated, *"APA has no role to play in requests for accommodation of the type you seek."* despite APA' being converted entity under the ADA.

105. Further, while Meadows's grievance was still pending, Arbitrator Stephen Goldberg's Decision and Award on the APA Equity Dispute held that, *"it is arbitrary for APA to treat pilots who have a TAG* [Terminated Awaiting Grievance] *Grievance as sufficiently likely to be successful..., while treating differently pilots who have a non-TAG grievance that challenges an administrative termination."*, and further that, *"APA ignores the fact that it is advocating for FO Meadows..."*, and *"Nor is there record evidence that a grievance seeking reinstatement to active duty is more likely to be successful than a grievance seeking reinstatement to the seniority list."* (Exhibit 2).

106. Arbitrator Goldberg, ruled that, *"FO Meadows Challenge is sustained and APA will be directed to make him eligible for a full share distribution from all four silos."* *I.d.* Which amounted to $130,892; over $100k more than APA had improperly calculated.

107. The only other pilots whom Arbitrator Goldberg only awarded extra equity payouts were another 200 similarly, situated disabled pilots, because he found that they too were also treated arbitrarily by APA.

### Meadows's files his 2nd Company Termination Grievance #13-064

108.     On October 11, 2013, Meadows asked his APA base representative to a file a second grievance (eventually #13-064) on behalf of himself and all similar situated pilots at the based on the Company's violations of CBA Sec. 13 & 11. (Exhibit 3).

109.     By October, 31, 2013, APA had ignored Meadows request. So, he individually filed this second grievance #13-064, as an appeal directly to American's Exec V.P. of Flight.

110.     In this grievance Meadows explicitly reasserted that the Company was abrogating his pilot seniority and administratively terminated him in violation the Sec. 13 and 11 of the CBA, as explained in further detail below.

111.     First and Foremost, **CBA Section 13 *"Seniority"*,** is the controlling Section as it relates directly to pilot seniority issues. Further, the language of **Section 13.C. *"Retention of Seniority"*,** explicitly dictates that, "***a pilot once having established seniority, shall not lose such seniority** except as provided in this Section[13]."*

112.     Second and more importantly, **Section 13.F. *"Loss of Seniority"*;** only allows for forfeiture of pilot seniority under the four distinct circumstances for, *"A pilot who (1) resigns from service of the company, (2) retires, or is (3) discharged for just cause...,* or (4) fails *"to return to duty as a pilot "* from a furlough recall.

113.     None of those circumstances apply to Meadows personally; as he never resigned, retired, been discharged for cause, nor was he ever furloughed. Therefore, the Company had no contractual basis whatsoever to remove Meadows the seniority list, much less administratively terminate his employment.

VERIFIED COMPLAINT

114. Third, **Section 13.C.** *"Retention of Seniority"*, goes on to state *"nor shall such pilots* **relative position** *on the Pilots' System Seniority List be changed for any reason...except as provided in paragraph B. of this Section [13]."*

115. *Fourth,* **Section13.B. "Seniority Date"** goes on to state that a pilot, *"shall continue to accrue [seniority] during such period of duty except as otherwise provided in Section 11..."* .

116. Fifth and finally, **Section 11.D.1** *"Sickness and Injury Leaves",* does not in any way explicitly provide for the administrative termination of a sick/disabled pilot, nor the forfeiture of such pilot's seniority by removing them from the Pilot System Seniority List. This Section only speaks to the fact that, *"a pilot shall be allowed to retain and continue to accrue"* his relative seniority during sick leaves of absence, which do not exceed total continuous period of five (5) years. Nothing more.

117. On December 13, 2013 the Company sent a certified mailing, acknowledging Meadows new grievance, and directing him to contact APA to schedule a hearing.

118. That same day APA staff attorney, Mr. Chuck Hairston contacted Meadows to schedule a hearing for the second grievance now designated #13-064, but explicitly told Meadows that he is not a member, that APA does not represent him, and APA owes him no duty.

119. Further, Mr. Hairston said he would attend the hearing, but only to represent APA's own interests.

120. Since APA abandoned his representation, Meadows was again forced to draft his own brief for grievance #13-064, and argue it without any support.

121.     On February 27, 2014, grievance #13-064 was initially heard as an appeal grievance (step 2). APA's attorney and two base representatives attended the hearing, but at the start of the hearing, they admitted they were not representing Meadows in an official capacity, and would be taking no role in support of his grievance.

122.     Subsequently, On March 23, 2014 the V.P. of Flight issued a written denial of grievance #13-064.

123.     Once again on April 2, 2014, Meadows requested the APA President to appeal his second grievance to a PAC, but said request for resolution was denied on April 23, 2014.

124.     Now, Meadows only option to resolve grievance #13-064 is for a district court to compel arbitration before a RLA System Board of Adjustment, and both AA and APA are already on notice of Meadows request to submit his grievance for such arbitration.

### **APA Has Filed And is Arbitrating Grievances For Other Pilots with Similar Claims**

125.     American Airlines assigns status code of "MDSB" (Medical Disability Benefits) to pilots like Meadows who are receiving pilot long term disability benefits.

126.     After five years on MDSB, American has removed certain pilots from the pilot seniority list. APA then assigns those pilots an internal member status code of "MDD" (Medical Disability Dropped by AA).

127.     This removal or dropping from the seniority list in violation of Sec 11.D.1 of the CBA, is one of the key issues raised in both of Meadows grievances. APA has also identified this as a problem and filed two pilot domicile base grievances over the very same issue.

128.     One of the key Objective noted in APA's Constitution and Bylaws Article II.D., is to, " *maintain uniform principles of seniority and perpetuation thereof.*"

VERIFIED COMPLAINT

129.     On August 18, 2011, APA's New York (LGA) Base Representatives filed grievance #11-054, on behalf of all LGA Domicile Based pilots. Which protested the Company's failure to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. It was submitted to System Board on 8/21/13, and is currently scheduled for arbitration.

130.     On May 22, 2012, APA Dallas (DFW) Base Chairman, Capt. Rusty McDaniels, and DFW Vice Chairman Russell Moore, filed DFW Domicile Grievance #12-012, which is currently pending an appeal hearing, and protests in part;

> *"Pursuant to the May 1, 2003, Agreement between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned <u>hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."</u>*

### APA's Refusal to Process Meadows Petition for Seniority Number Reinstatement

131.     On March 20, 2014, in response to the problem of MDSB pilots who were dropped from the seniority list, the APA Board of Director recently took action to provide a solution, and added the following amendment to its policy manual;

> *"1.22  Reinstatement of Pilot's Seniority Number for Those on MDSB Greater Than Five Years*
> *A.     <u>As soon as practicable, the President shall inform the APA Board of Directors, in writing, of the circumstance underlying the request of the pilot who petitioned APA for support of reinstatement of their original relative AA seniority number of a pilot wishing to return to the seniority list after greater than five years on MDSB.</u> The President shall state whether the petitioning pilot was/is an APA member in good standing. The Board members shall then have seven days to consider each case and must advise the President of any noted objections, in writing, within the seven day period of their objection(s). Absent any written objection(s) from an individual Board member, the President shall then have the authority to sign a letter authorizing reinstatement of said pilot's seniority number.*

23
VERIFIED COMPLAINT

*B. If the President chooses not to agree to reinstate a pilot's seniority number for any reason, or there is a Board member objection, the said pilot shall have the opportunity to directly petition the APA Board of Directors for seniority number reinstatement. The BOD shall retain final decision authority in each seniority number restoration case by majority vote. (03/20/2014)"*

132.    That very same day, in accordance with the newly amended APA Policy Manual Section 1.22.A, Meadows submitted a certified written demand letter to then APA President; wherein, he petitioned for reinstatement of his original relative AA seniority number on the AA pilot system seniority list.

133.    The APA President never processed Meadows' petition for seniority reinstatement within the required seven days.

134.    Meadows engaged in numerous correspondence with APA Legal, and eventually resubmitted his petition directly to the APA Board of Directors, but APA still refused to process Meadows petition for seniority reinstatement.

135.    On April 22, 2014, Meadows sent an email to APA Legal, and stated;

"Just to be clear, if APA is absolutely refusing to process my petition on the basis of medical disability, then please advise Bennett [APA Legal Director] that myself and many other similarly situated pilots will be filing EEOC charges on that matter. I truly prefer to avoid such action, but unless I hear otherwise I will do so on Wednesday morning."

### APA Locks Out Its Disabled Pilot Members From The "Virtual Union Hall"

136.    Less than two hours after Meadows threatened to file an EEOC charge against APA, he found he was completely locked out of the APA member website, including "C&R" (Challenge and Response) which is an electronic message board that serves as APA's electronic "virtual union hall".

137.    Every time Meadows re-attempted to login to the APA website he began to received error messages which said he was an unauthorized user.

24
VERIFIED COMPLAINT

138.     Meadows immediately contacted the APA webmaster to troubleshoot his inability to login to the APA website. He was shocked when the IT manager informed him that it was not an error, but instead an "executive decision" designed to lockout all disabled pilots from APA's website, because they were deemed to not be members.

139.     Meadows learned that this "lockout" was in retaliation for his threat of an EEOC charge, and numerous website postings that were critical of APA and its leaders.

140.     Meadows was told by his base representative, that the lockout was done solely at the direction of APA's President Keith Wilson, and Legal Director Bennett Boggess; without any knowledge of the APA Board of Directors, who happened to be in session that week.

141.     APA was apparently trying to suppress numerous and active postings which discussed American's and APA's failures and discriminatory treatment of its disabled pilot members, as it related to the pilot disability cost savings scheme, and fraudulent disability claims reviewer.

142.     APA's lockout of its disabled members was in direct violation of the Labor-Management Reporting and Disclosure Act (LMRDA), which guarantees union members rights of freedom of speech and assembly and equal participation in the union hall.

143.     The Association for Union Democracy (AUD), found APA's lockout of disabled pilots to be outrageous. The AUD was so highly offended that it assigned an attorney to investigate the matter, and also published a two page article in its bi-monthly newsletter the "Union Democracy Review" that was critical of APA actions. (Exhibit 4).

## IV.   COUNT I
### Compel Arbitration of Grievances to System Board of Adjustment
### As provided by the Railway Labor Act, 45 U.S.C. § 153, §184
### (As to AA and APA)

144.     Meadows incorporates by reference the foregoing paragraphs as fully set forth herein.

145.     The Meadows currently receives a collectively bargained disability welfare benefit under the *"PLTD"* Plan, negotiated under the CBA, whose benefits are paid as W-2 Employee wages. Further he is defined as both an *"Employee"* and *"Pilot Employee"* under the terms of the *"PLTD Plan"*. *I.d.*

146.     As such, Meadows, Lawrence M. Meadows is an both employee of the defendant air carrier, American Airlines; and also member of the craft or class of Pilots which his defendant Union represents.

147.     Meadows is also individually a party to the CBA, as defined in its Preface;

> *"THIS AGREEMENT is made and entered into in accordance with the provisions of the Railway Labor Act, as amended, by and between AMERICAN AIRLINES, INC., herein after known as the "Company", and the air line pilots in the service of AMERICAN AIRLINES INC. as represented by the ALLIED PILOTS ASSOCIATION, hereinafter known as the "Association" .In making this Agreement the parties hereto recognize that compliance with the terms of the Agreement and the development of a spirit of cooperation is essential for mutual benefit and for the intent and purpose of this Agreement."*

148.     CBA, Section 23.G Jurisdiction, provides that;

> *"The System Board shall have jurisdiction over disputes between any employee covered under this Agreement or between the Association and the Company growing out grievances, or out of the interpretation or application of any of the terms of this Agreement."*

149.     According to the CBA, Meadows is a party, and an employee whose disputes between the Company shall be subject to jurisdiction of a System Board. Thereby, affording him a contractual right to arbitration of his grievances before a System Board.

150.     The Railway Labor act also provides Meadows an individual statutory right to arbitration of his grievances before a System Board. Unlike other industries where the

right to arbitrate grievances is established in the collective bargaining agreement, <u>the source for grievance arbitration in the railroad and airline industries is statutory</u>. (Emphasis added). Section 3 of the Railway Labor Act (45 USC §153) addresses the railroad industry, and Section 204 (45 USC §184) covers the airline industry.

151. The primary difference between the two sections relates to the structure of the arbitral panels. Despite the fact that RLA Section 201 (45 U.S.C. §181) specifically provides that Section 3 does not apply to air carriers, many aspects of railroad arbitration have since been applied by the Federal Courts to the airlines.

152. Meadows filed grievance claims protesting his improper discharge and removal from the seniority list, which are considered a *"minor dispute"* under the Railway Labor Act, 45 U.S.C. § 151 et seq.; as it is a grievance which flows from the interpretation and application of the collective bargaining agreement (CBA).

153. The RLA, provides that all *"minor disputes"* arising between an employee and a air carrier under Section 3 (45 U.S.C. §153), be handled in usual manner under Section 204 (45 U.S.C. §184). and arbitrated to System Board of Adjustment under the Railway Labor Act.

154. The distinction between major and *"minor disputes"* is significant. While federal courts have broad powers to intervene in some major disputes, *"minor disputes"* require interpretation of a CBA, must be resolved through arbitration in a grievance proceeding or before a System Board of Adjustment. See 45 U.S.C. § 184. See. *Caparo v. United Parcel Service Co.*, 993 F.2d 328, 331(3d Cir. 1993), which recognized, *"the RLA reflects a clear decision by Congress that minor disputes should be arbitrated, and not litigated."* See also. *Assoc. of Flight Attendants, AFL-CIO v. USAir, Inc.*, 960 F.2d 345, 347 (3d

VERIFIED COMPLAINT

Cir.1992) *("Congress placed great emphasis on negotiation and voluntary settlement rather than judicial resolution of labor disputes under the RLA.")*.

155. Additionally, the RLA also reflects a strong congressional interest in seeing that employees are not left *"remediless"* and without a forum to present their grievances. Cf. *Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

156. Further, the Eleventh Circuit has also expressly recognized, that 45 U.S.C. § 184 establishes the individual statutory right of an air industry employee to compel arbitration before the adjustment board established by his union and employer. (Emphasis added). See *Pyles v. United Airlines, Inc.* 79 F.3d 1046 (11th Cir. 1996); wherein the court explained in a footnote why it *"believed"* that airline employees have a statutory right to pursue claims before a board of adjustment without union assistance. *See id.* at 1052, n. 9.

157. APA itself has previously argued in federal court on behalf of other members , *"that 45 U.S.C. § 184 establishes the individual right of an air industry employee to compel arbitration before the adjustment board established by his union and employer."* (Emphasis added), contending that the Eleventh Circuit has expressly recognized this right in *Pyles supra.. See Whitaker and Allied Pilots Association, Plaintiffs-Appellants, v. American Airlines, Inc.* (11th Cir. Mar, 2002).

158. As such, Meadows enjoys an absolute individual statutory right to arbitrate his grievances, under the RLA Part I, Section 3 (45 U.S.C. §153), which courts have extended to RLA Part II, Section 204 (45 U.S.C. §184). (Emphasis added).

159. *"While agreement is not compulsory, the steps required under the RLA are. In the event that either party refuses to follow the plain mandate of Congress, and breached the duty which Congress has impose upon it."* Injunctive Relief, is required to *"vindicate the processes of the Railway Labor Act"*, *Brotherhood Railroad Trainmen v. Chicago River & Indiana R.R Company* 353U.S (1957). at page 4177 Sect. at page 641, *"without*

*which the act would be a nullity." American v. ALPA,* 1969F Supp. 777. (1958) (Emphasis Added).

160. Additionally, during the SOX-WB proceedings, on February 25, 2014, American sent correspondence to the Administrative Law Judge, and asserted that to the extent, *" that [Meadows] administrative termination was the retaliatory act he seeks to redress in the present proceedings...that contractual issue should be determined authoritatively before the adjudication of the SOX claim...",* and therefore American would, *" in the meantime perhaps be suggesting the appropriateness of deferral to arbitration...."*

161. Shortly thereafter, during its bankruptcy proceedings in April 2014, American admitted that Meadows grievance should move forward to arbitration, and specifically requested the court enter an order stating in part;

> *"Meadows shall be permitted to arbitrate Grievance 12-011 before the System Board to the extent that such arbitration is limited in scope to claims involving the interpretation of the CBA and provides remedies, if any and if appropriate, that are customary under the grievance procedures created by the RLA..."*

162. However, in its recently filed 12(b)6 Motion to Dismiss the Plaintiff's original complaint, American, has taken an inapposite position, as to whether Meadows shall now be permitted to arbitrate grievance 12-011.

163. Unless American Airlines and APA's breaches of duty are rectified, the Meadows will continue to suffer substantial damages stemming from his lost rights under the RLA; including but not limited the loss of his right to have his grievance arbitrated, which can provide "make whole" remedies of back pay and benefits, reinstatement to the pilot seniority list, or forward pay and benefits in lieu of reinstatement.

164.     Finally, the federal court in *Capraro v. United Parcel Service Co.* 993 F.2d 328 (3rd Cir. 1993), held that, "*if an air carrier [or representative] refuses to participate in a Board of Adjustment proceeding, by refusing to hear an employee's individual claim, **that employee is entitled to a judicial order compelling arbitration.**"* (Emphasis added).

165.     Accordingly, the **Meadows respectfully seeks this Court to compel both Defendants to submit Meadows's grievances to the American/APA System Board of Adjustment (SBA) for an arbitration hearing and final and binding resolution by a neutral arbitrator.**

166.     Resolution by the neutral, rather than majority vote by the SBA, is required given American Airlines unethical and fraudulent treatment related to Meadows disability and termination, coupled with APA's animus and hostility.

167.     Finally, given APA's hostility, Meadows respectfully request this Court also requires APA to provide Meadows with a third party representation at APA's expense.

## V.   COUNT II:
### Breach of Duty of Fair Representation
### (As to APA)

168.     Meadows incorporates by reference the foregoing paragraphs as fully set forth herein.

169.     The Meadows currently receives a collectively bargained disability welfare benefit under the *"PLTD Plan"*, negotiated under the CBA, whose benefits are paid as W-2 Employee wages. Further he is defined as both an *"Employee"* and *"Pilot Employee"* under the terms of the *"PLTD Plan". I.d.*

170.     As such the Meadows, Lawrence M. Meadows is an both "employee" of the defendant air carrier, American Airlines, and also member of the  defendant union representative , the Allied Pilots Association (APA).

171.     Unlike other industries where the right to arbitrate grievances is established in the collective bargaining agreement, <u>the source for grievance arbitration in the railroad and airline industries is statutory</u>. (Emphasis added).  Section 3 of the Railway Labor Act (45 USC §153) addresses the railroad industry, and Section 204 (45 USC §184) covers the airline industry. The primary difference between the two sections relates to the structure of the arbitral panels. Despite the fact that RLA Section 201 (45 U.S.C. §181) specifically provides that Section 3 does not apply to air carriers, many aspects of railroad arbitration have since been applied by the Federal Courts to the airlines.

172.     Meadows filed a grievance claims protesting his improper discharge and removal from the seniority list, which  is considered a minor dispute under the Railway Labor Act, 45 U.S.C. § 151 et seq.;  as it is a grievance which flows from the interpretation or application of the collective bargaining agreement (CBA).

173.     The  RLA, provides that all minor disputes arising between an employee and a air carrier  under Section 3 (§153), be handled in usual manner under Section 204 ( §184). and arbitrated to System Board of Adjustment under the Railway Labor Act.

174.     The distinction between major and minor disputes is significant. While federal courts have broad powers to intervene in some major disputes, minor disputes must be resolved through arbitration in a grievance proceeding or before a System Board of Adjustment. See 45 U.S.C. § 184. See. *Caparo v. United Parcel Service Co.*, 993 F.2d 328, 331(3d Cir. 1993), which recognized, "*the RLA reflects a clear decision by Congress*

31
VERIFIED COMPLAINT

*that minor disputes should be arbitrated, and not litigated." See also. Assoc. of Flight Attendants, AFL-CIO v. USAir, Inc.*, 960 F.2d 345, 347 (3d Cir.1992) *("Congress placed great emphasis on negotiation and voluntary settlement rather than judicial resolution of labor disputes under the RLA.").*

175.	Additionally, the RLA also reflects a strong congressional interest in seeing that employees are not left *"remediless"* and without a forum to present their grievances. Cf. *Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

176.	Further, the Eleventh Circuit has also expressly recognized, that 45 U.S.C. § 184 establishes the individual statutory right of an air industry employee to compel arbitration before the adjustment board established by his union and employer. (Emphasis added). See *Pyles v. United Airlines, Inc.* 79 F.3d 1046 (11th Cir. 1996); wherein the court explained in a footnote why it *"believed"* that airline employees have a statutory right to pursue claims before a board of adjustment without union assistance. *See I.d.* 1052, n. 9.

177.	APA itself has previously argued in federal court on behalf of other members , *"that 45 U.S.C. § 184 establishes the individual right of an air industry employee to compel arbitration before the adjustment board established by his union and employer."* (Emphasis added), contending that the Eleventh Circuit has expressly recognized this right in *Pyles supra.. See Whitaker and Allied Pilots Association, Plaintiffs-Appellants, v. American Airlines, Inc.* (11th Cir. Mar, 2002).

178.	As such, Meadows enjoys an absolute individual right to arbitrate a grievance, under the RLA Part I Section 3, §153, which courts have extended to part II, §184; which his union, APA, is on record as supporting such in *Whitaker I.d.*(Emphasis added).

179.     Further, while Meadows's grievance was still pending, Arbitrator Stephen

Goldberg's Decision and Award on the APA Equity Dispute held that, *"it is arbitrary*

*for APA to treat pilots who have a TAG* [Terminated Awaiting Grievance] *Grievance as*

*sufficiently likely to be successful…, while treating differently pilots [Meadows] who*

*have a non-TAG grievance that challenges an administrative termination.",* and further

that, *"APA ignores the fact that it is advocating for FO Meadows…",* and. *"Nor is there*

*record evidence that a grievance seeking reinstatement to active duty is more likely to be*

*successful than a grievance seeking reinstatement to the seniority list." I.d.*

180.     Ever since, certain individuals of APA have demonstrated an animus and

hostility towards Meadows, and APA's counsel has explicitly and repeatedly stated it

does not represent or owe the Meadows any duty.

181.     APA has unclean hands, and has ignored Meadows rights and privileges as a

member, in violation of the APA Constitution and Bylaws and APA Policy Manual.

182.     APA has acted in arbitrary, discriminatory and bad faith manner, denying

Meadows is a member, and ignoring its duty of fair representation, treating his equity

distribution arbitrarily, by refusing to represent Meadows during his grievance hearings

while filing/representing grievances for others on the same issue, depriving him of his

statutory right to arbitrate his grievance before a System Board, refusing to process his

petition for seniority reinstatement, and locking him out of the APA members website.

183.     Additionally, the APA staff attorney, Mr. Chuck Hairston, who handled

Meadows' grievance was also responsible for mutually selecting fraudulent disability

claims reviewer WME on behalf of APA. The same reviewer that terminated Meadows

disability benefits. Mr. Hairston had direct conflict of interest in the outcome of

Meadows' grievance. See *Automobile Workers, Local 600*, 225 NLRB 1299, 93 LRRM 1233 (1976), *"A potential conflict of interest between grievant and their Union representatives does not constitute a breach of the duty <u>unless</u> the representative has a personal stake in the outcome that is contrary to the grievant's interest."*

184. APA simply went through the motions and processed Meadows's grievances in a perfunctory manner, by failing to draft his grievance brief, and appearing at his grievances hearings, while explicitly refusing to argue on his behalf.

185. APA, is a covered entity under the ADA, but ignored its statutory duties under it; by refusing to assist with Meadows written requests for a reasonable accommodation, treating equity distribution of disabled pilots arbitrarily, and locking its disabled pilots out of the "virtual" union hall.

186. Unless APA's breaches of their duty are rectified, the Meadows will continue to suffer substantial damages stemming from his lost rights to under the RLA , including but not limited the loss if his right to have his grievance arbitrated, which can provide "make whole" remedies of back pay and benefits, reinstatement to the pilot seniority list, or forward pay and benefits in lieu of reinstatement.

187. *"While agreement is not compulsory, the steps required under the RLA are. In the event that either party refuses to follow the plain mandate of Congress, and breached the duty which Congress has impose upon it. Injunctive Relief, is required to "vindicate the processes of the Railway Labor Act",* Brotherhood Railroad Trainmen v. Chicago River & Indiana R.R Company* 353U.S (1957). at page 4177S.Ct. at page 641), *"without which the act would be a nullity." American v. ALPA,* 1969F Supp. 777. (1958) (Emphasis added.)

188.    Finally, the federal court in *Capraro v. United Parcel Service Co.* 993 F.2d 328 (3rd Cir. 1993), held that, *"if an air carrier* [or representative] *refuses to participate in a Board of Adjustment proceeding, by refusing to hear an employee's individual claim, that employee is entitled to a judicial order compelling arbitration."* (Emphasis added).

189.    Accordingly, the **Meadows respectfully seeks this Court to compel both Defendants to submit Meadows's grievances to the American/APA System Board of Adjustment (SBA) for a hearing and final and binding resolution by a neutral arbitrator.**

190.    Resolution by the neutral, rather than majority vote by the SBA, is required given American Airlines unethical and fraudulent treatment related to Meadows' disability and termination, coupled with APA's animus, hostility, and arbitrary treatment.

191.    Finally, given APA's hostility, Meadows respectfully request this Court also requires APA to provide Meadows with a third party representation at APA's expense.

### VII.   COUNT  III
### Labor-Management Reporting and Disclosure ACT (LMRDA )
### Civil Enforcement of Union Member Bill of Rights, 29 U.S.C. 411-412
### (As to APA)

192.    Meadows incorporates by reference the foregoing paragraphs as fully set forth herein.

193.    APA classifies Meadows member status as "MDD", which is defined as Medical disability Dropped from AA, which APA documents show as members in good standing.

194.    APA is a labor organization as defined under the Labor-Management Reporting and Disclosure Act of 1959, as amended ("LMRDA"), 29 U.S.C. 402

VERIFIED COMPLAINT

195.     Without explanation or warning, on April 22nd, 2014 the Allied Pilots Association (APA), the collective bargaining agent for all 10,000 American Airlines (AA) pilots, locked out 233 of its members - all of whom are medically disabled - from what is called the "challenge and response (C&R)" section of the APA website. C&R is a members-only discussion forum.

196.     The 233 pilots are all classified by the APA as "MDD" or medically disabled and dropped from the seniority list. AA policy is that after 5 years of disability members lose their seniority. This policy has been the subject of an ongoing dispute between the APA and its disabled pilots, and many pilots have insisted the APA to grieve the policy on grounds that it violates the CBA and the Americans with Disabilities Act (ADA).

197.     MDD's have always been classified as members in good standing by the APA, but they now have been prevented from entering what APA calls its "virtual union hall."

198.     Title I of the LMRDA; Bill of Rights Of Members of Labor Organizations, 29 U.S.C. 411, SEC. 101; provides among other things that every member of a labor organization shall have equal rights and privileges to participate in union activities, freedom of speech and assembly in the union hall, and protection of the right to sue.

199.     Title I of the LMRDA; Bill of Rights Of Members of Labor Organizations, 29 U.S.C. 412, SEC. 102. Civil Enforcement; provides, Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

200.     Accordingly, the Meadows respectfully seeks this Court to issue an injunction directing APA to immediately provide Meadows and all other similarly situated

VERIFIED COMPLAINT

disabled pilot members full access to the APA members website, including the member only discussion forum "C&R" (Challenge and Response).

## VI.  PRAYER FOR RELIEF

WHEREFORE, Meadows, Lawrence Meadows, prays for a judgment against the Defendants for the injunctive relief as plead herein, legal costs, and for such other equitable relief as this Honorable Court deems just and proper.

Dated: this 22nd day of July, 2014           Respectfully submitted,

Lawrence M. Meadows PRO SE
Po Box 4344
Park City, UT 84060
Telephone: (516) 982-7718
Facsimile: (435) 604-7850
lawrencemeadows@yahoo.com

VERIFIED COMPLAINT

## VERIFICATION

I, Lawrence M. Meadows, declare as follows:

I am on the Meadows in the above-entitled action. I have read the foregoing complaint and know the contents thereof. With respect to the causes of action alleged by me, the same is true by my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of Utah that the foregoing is true and correct.

Date: July 22, 2014,     _____

Lawrence M. Meadows

VERIFIED COMPLAINT

## Certificate of Service

**I hereby certify,** that a true and correct copy of the foregoing was served by U.S. Mail on July 22, 2014 on all counsel or parties of record on the Service List below.

_____
Signature of Filer

## SERVICE LIST

### Allied Pilots Association

**Arthur F. Sandack**
8 E BROADWAY STE 411
SALT LAKE CITY, UT 84111
(801)595-1300
Email: asandack@msn.com

**Steven K. Hoffman**
JAMES & HOFFMAN PC
1130 CONNECTICUT AVE NW STE 950
WASHINGTON, DC 20036
(202)496-0500
Email: skhoffman@jamhoff.com

### American Airlines, Inc.

**James M. Barrett**
OGLETREE DEAKINS NASH SMOAK & STEWART PC
222 SW COLUMBIA ST STE 1500
PORTLAND, OR 97201
(503)552-2140
Email: james.barrett@ogletreedeakins.com

**Kathleen E. Kubis**
OGLETREE DEAKINS NASH SMOAK & STEWART PC
191 PEACHTREE ST NE STE 4800
ATLANTA, GA 30303
(404)881-1300
Email: kathleen.kubis@ogletreedeakins.com

**Todd C. Duffield**
OGLETREE DEAKINS NASH SMOAK & STEWART PC
191 PEACHTREE ST NE STE 4800
ATLANTA, GA 30303
(404)881-1300
Email: todd.duffield@ogletreedeakins.com

VERIFIED COMPLAINT

# EXHIBIT 12

# for Shiffrin Declaration

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| Lawrence M. Meadows, | ) | |
| | | Case No. 2:14CV00115DS |
| Plaintiff, | ) | |
| | | |
| vs. | ) | ORDER GRANTING PLAINTIFF'S MOTION TO AMEND AND |
| | | DEFENDANTS' MOTIONS TO |
| Allied Pilots Association, et al. | ) | DISMISS |
| | | |
| Defendants. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Before the Court is Plaintiff's Motion to File a First Amended Complaint (#21). Also before the Court is Defendant Allied Pilots Association's ("the Union") Motion to Dismiss Plaintiff's amended complaint (#23). Plaintiff filed a response in opposition (#26), to which the Union replied (#32). Also before the Court is Defendant American Airlines' ("American") Motion to Dismiss Plaintiff's amended complaint (#24). Plaintiff filed a response in opposition (#25), to which American replied (#31).[1]

## I. BACKGROUND

Plaintiff was hired as a pilot by American years ago, and became a member of the Union immediately after he was hired (#21, ¶¶ 10, 11). Plaintiff worked for American until he suffered from a debilitating illness that left him unable to perform his pilot duties (#21, ¶ 13). American approved Plaintiff for long term disability benefits shortly after (#21, ¶ 14).

American later sent Plaintiff a letter informing him that he had exhausted his Sick Leave of Absence time allotted under his Collective Bargaining Agreement ("CBA") (#23, Ex. C). The

---

[1] Also before the Court are the Union's Motion to Dismiss (#6) and American's Motion to Dismiss (#8) Plaintiff's original complaint. Both of these motions are rendered moot in light of today's decision.

letter also informed Plaintiff that he needed to either obtain the necessary medical approval to return to work as a pilot or identify a reasonable accommodation option for returning to work in a different capacity. Id. American extended Plaintiff's Sick Leave of Absence an additional two months to give him time to make a decision. Id.

Once Plaintiff's Sick Leave of Absence expired, American removed Plaintiff from the Pilot System Seniority List ("Seniority List") (#21, ¶ 46). Plaintiff challenged his removal and filed a grievance against American (#21, ¶¶ 48-49). The Union assigned a staff attorney, Charles Hairston ("Hairston"), to assist Plaintiff during his appeal hearing (#21, ¶ 54). American, however, denied Plaintiff's grievance at the hearing (#21, ¶ 61).

The Union president later advanced Plaintiff's grievance to a Pre-Arbitration Conference, but American declined to settle (#21, ¶¶ 62, 64-65). Plaintiff asked the Union to advance his grievance to arbitration before the System Board of Adjustment ("System Board"), but the Union president declined Plaintiff's request (#21, ¶¶ 65-66). The Union president explained that he would not pursue Plaintiff's grievance because it was based on federal statutory claims, and Plaintiff was already pursuing those claims before the appropriate federal agencies (#23, Ex. E).

In response, Plaintiff filed a second grievance and alleged that American violated the CBA when it removed him from the Seniority List (#21, ¶ 109). American, however, denied Plaintiff's second grievance at an appeals hearing (#21, ¶¶ 121-122). Plaintiff asked the Union president to appeal his second grievance to a Pre-Arbitration Conference, but the Union president denied the request (#21, ¶ 123). The Union president explained that he would not pursue Plaintiff's second grievance because it was contrary to the language of the CBA (#23, Ex. I). Subsequently, Plaintiff filed a complaint (#1) with this Court attempting to compel the Union and American to participate in arbitration regarding Plaintiff's grievances.

## II. ANALYSIS

### A. Plaintiff's Motion to File First Amended Complaint

Plaintiff requests leave to file a First Amended Complaint, which adds several new factual allegations and a Labor-Management Reporting and Disclosure Act ("LMRDA") claim against the Union. A party may amend its pleading once as a matter of course within twenty-one days of service of a 12(b) motion. FED. R. CIV. P. 15(a)(1)(B). Plaintiff filed his motion within the Rule 15(a)(1)(B) deadline, and neither the Union nor American opposed Plaintiff's motion. Therefore, Plaintiff's motion is granted.

### B. The Union's Motion to Dismiss

Plaintiff's amended complaint alleges that (1) Plaintiff has a right to compel arbitration, (2) the Union breached its duty of fair representation, and (3) the Union violated the LMRDA. The Union moves to dismiss those claims under FED. R. CIV. P. 12(b)(6).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Plausibility, in the context of a motion to dismiss, means that a plaintiff has pleaded facts which allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Consequently, the Court will analyze each of Plaintiff's allegations in light of the pleaded facts to determine whether they are plausible.

#### 1. Plaintiff's Right to Compel Arbitration

Plaintiff alleges he has a contractual right to compel arbitration of his grievances under the CBA. Plaintiff is incorrect. It is well settled that the relationship existing between a union and its members is contractual and that the constitution, charter, by-laws and regulations, if any, constitute a binding contract. James v. Int'l Bhd. of Locomotive Eng'rs, 302 F.3d 1139,

1146 (10th Cir. 2002). Courts, in turn, must enforce the constitution, charter, by-laws and regulations so long as they are free from illegality or invalidity. See Adams v. Int'l Bhd.of Boilermakers, 262 F.2d 835, 839 (10th Cir. 1958).

Neither the Union's Constitution and Bylaws ("Constitution") nor the CBA gives Plaintiff a contractual right to appeal his grievances before the System Board; instead, those documents accord that right to the Union president. Under the CBA, the Union President has "the right to appeal [grievances] either to the Pre-Arbitration Conference . . . or . . . to the System Board of Adjustment." See #23, Ex. B, § 21(G)(5). The Union's Constitution also gives the Union "the right to resolve institutional and individual grievances in its sole discretion as the collective bargaining representative of the pilots." (#23, Ex. A, Art. II(C)). Thus, the Union's Constitution and CBA grant the Union President, not Plaintiff, the right to appeal Plaintiff's grievances.

Additionally, Plaintiff has not shown, and the Court has not found, anything that suggests that the Union's Constitution or CBA is illegal or invalid. Therefore, the Court rejects Plaintiff's allegation that he has a contractual right to arbitrate his grievances.[2]

Plaintiff also alleges that he has a statutory right under the Railway Labor Act to arbitrate his grievances. Plaintiff's argument, however, is unpersuasive. Plaintiff relies primarily on dicta from the Eleventh and Third Circuit Courts (#21, ¶¶ 156, 164), but fails to give any explanation or analysis as to why this Court should follow these dicta in its decision. Therefore, the Court rejects Plaintiff's allegation that he has a statutory right to arbitrate his grievances.

---

[2] At this point, Plaintiff alleges that he never intended to waive his right to appeal when he became a union member. This argument, however, is unpersuasive because it is a conclusory statement and lacks any supporting facts or analysis.

*2. The Union's Duty of Fair Representation*

Plaintiff alleges that the Union breached its duty of fair representation. A union breaches its duty of fair representation if its actions during negotiations with an employer are "arbitrary, discriminatory, or in bad faith." Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1357 (10th Cir. 1994). A union may also breach its duty of fair representation if its actions are perfunctory. See Vaca v. Sipes, 386 U.S. 171, 191 (1967). When determining whether a union breached its duty of fair representation, courts are highly deferential toward the union and recognize the "wide latitude that negotiators need for the effective performance of their bargaining responsibilities." Considine, 43 F.3d at 1357. However, even if a union breaches its duty of fair representation, a plaintiff must show that that the breach seriously undermined the grievance proceedings. Hinkley v. Roadway Express, Inc., 249 F. App'x 13, 17 (10th Cir. 2007).

*a. Arbitrary Actions*

Plaintiff asserts that the Union acted arbitrarily when it assigned him 'conflicted counsel,' declined to advance his grievances to arbitration, refused to argue his federal claims at his appeal, refused to draft his briefs, and refused to represent him during the appeal of his second grievance (#21, ¶¶ 56-58, 60, 118-120, 123). Plaintiff is incorrect. A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational. Considine, 43 F.3d at 1357. Under this standard, the Union's actions in the present case are not arbitrary.

The Union's decision to assign Hairston as Plaintiff's counsel was not arbitrary because Hairston did not have a conflict of interest, as Plaintiff suggests. A conflict of interest exists when a division of loyalties affects counsel's performance. Mickens v. Taylor, 535 U.S.

5

162, 171, 122 S.Ct. 1237, 1243 (2002). This conflict must actually affect a client's representation; it cannot be a mere theoretical division of loyalties. Id.

Plaintiff asserts that Hairston had a conflict of interest because he helped select the disability claims reviewer that rejected an administrative appeal that Plaintiff filed years before. Plaintiff's first grievance, however, did not address that administrative appeal; instead, it addressed Plaintiff's removal from the Seniority List (#21, ¶¶ 48-49). Furthermore, the facts do not suggest that Hairston had divided loyalties, or would receive some sort of benefit if Plaintiff were removed from the Seniority List. Plaintiff's allegation, therefore, is merely theoretical and fails to show that the Union acted irrationally when it assigned Hairston to assist Plaintiff.

The Union's refusal to advance Plaintiff's first grievance to arbitration was also not arbitrary because the System Board did not have jurisdiction over Plaintiff's first grievance. The CBA states that the System Board has jurisdiction over "disputes . . . growing out of grievances, or out of the interpretation or application of any of the terms of this Agreement." (#23, Ex. B, § 23(E)). The CBA also states that a grievance must be either a contractual grievance, or a discipline and discharge grievance (#23, Ex. B, § 21(D)). Plaintiff's first grievance, which consisted of federal statutory claims, did not fall under the System Board jurisdiction because it did not dispute the interpretation or application of the CBA, and was not a contractual, or a discipline and discharge grievance. Therefore, the Union's refusal to advance Plaintiff's first grievance to the System Board was not irrational.

The Union's refusal to advance Plaintiff's second grievance to the System Board was also not arbitrary because the Union did not believe Plaintiff's grievance had any merit under the CBA. Plaintiff's second grievance asserted that American violated the CBA when it removed him from the Seniority List (#21, ¶ 110). The CBA, however, expressly allows

American to remove a pilot from the Seniority List if the pilot exhausts his or her sick leave of absence (#23, Ex. B, § 11(D)(1); Ex. B, Supplement F(1)(5)(d)). Plaintiff had exceeded the sick leave of absence time permitted under the CBA (#21, ¶ 13, ¶ 46; #23, Ex. C). Thus, when American removed Plaintiff from the Seniority List, it acted within the confines of the CBA. The Union realized this when it processed Plaintiff's second grievance, and notified Plaintiff (#23, Ex. I). Consequently, the Union's refusal to advance Plaintiff's second grievance to arbitration was not arbitrary.

Plaintiff finally contends that the Union acted arbitrarily when it refused to draft Plaintiff's briefs, argue Plaintiff's federal claims, and represent Plaintiff during the appeal of his second grievance. However, these statements are conclusory and fail to show the Court how the Union acted arbitrarily. Therefore, the Court rejects Plaintiff's allegation that the Union acted arbitrarily in the present case.

*b. Discriminatory Actions*

Plaintiff alleges that the Union's actions were discriminatory because the Union refused to arbitrate his second grievance when it advanced a similar grievance to arbitration (#21, ¶¶ 129-30). Plaintiff's argument, however, does not have merit. A union's discriminatory conduct violates its duty of fair representation only if it is 'invidious.' Considine, 43 F.3d at 1357. Plaintiff, however, does not allege nor show the Court how the Union's actions were 'invidious.'

Furthermore, the grievance identified in Plaintiff's amended complaint is not similar to Plaintiff's second grievance. The grievance identified in Plaintiff's amended complaint asserts that American failed to give adequate notice to several disabled pilots before they were removed from the Seniority List (#21, ¶¶ 129-30). Plaintiff's second grievance is quite different;

7

it contends that pilots who are sick or disabled longer than five years should cease to accrue seniority, but not be removed from the Seniority List (#21, Ex. 3).

Plaintiff fails to plausibly allege that the Union's actions were discriminatory. The Court, therefore, rejects Plaintiff's allegation.

### c. Actions Made in Bad Faith

Plaintiff alleges that the Union's actions were made in bad faith. Plaintiff's allegation is without merit. "Bad faith requires a showing of fraud, or deceitful or dishonest action." Considine, 43 F.3d at 1357. Additionally, when alleging fraud, Plaintiff must state with particularity the circumstances constituting the fraud. FED. R. CIV. P. 9(b). Plaintiff fails to meet these requirements because his allegation is a mere conclusory statement. Therefore, the Court rejects Plaintiff's allegation.

### d. Perfunctory Actions

Plaintiff alleges that the Union's actions were perfunctory. However, Plaintiff fails to show the Court that the Union acted in a perfunctory manner. For the Union to act in a perfunctory fashion, it needs to act without concern or solicitude, or give a claim only cursory attention. Hinkley, 249 F. App'x at 17. In the present case, the Union devoted several resources to assist Plaintiff: it assigned him counsel, analyzed his grievances, processed his grievances, arranged his appeals, and spoke during his first appeal. The Union also wrote letters to Plaintiff explaining why it would not advance his grievances to arbitration (#23, Ex. E; Ex. I). While the Union certainly could have done more to assist Plaintiff, the facts do not suggest that the Union only gave his grievances cursory attention. Therefore, the Court rejects Plaintiff's allegation

### e. The Union's Alleged Breach of Duty

Even if the Court were to hold that the Union breached its duty of fair representation, Plaintiff's allegations still fail because Plaintiff fails to show the Court that

Union's alleged breach seriously undermined his grievance proceedings. Hinkley, 249 F. App'x at 17. According to the facts before the Court, Plaintiff's first grievance was outside the jurisdiction of the System Board, and his second grievance was not supported by the CBA. Thus, even if the Union were to advance Plaintiff's grievances to the System Board, the result would be the same: Plaintiff's grievances would fail or be rejected. Therefore, the Court holds that the Union's alleged breach did not seriously undermine Plaintiff's grievance proceedings.

### 3. Plaintiff's LMRDA Claim

Plaintiff finally alleges that the Union violated the LMRDA because it denied 233 medically disabled pilots access to its members-only discussion forum (#21, ¶ 195). Plaintiff's claim, however, is not timely. Federal law allows a union to require a member "to exhaust reasonable hearing procedures . . . before instituting legal or administrative proceedings against [the union] or any officer thereof." 29 U.S.C. § 411(a)(4). The Union's Constitution requires a member who has been restricted access to the Union's website to obtain a mandatory review prior to filing suit (#23, Ex. A, Art. VII(D)(5)). Plaintiff has not shown that he has exhausted this union remedy. He also does not contend that this procedure is unreasonable. Therefore, the Court holds that Plaintiff must exhaust his union remedies before filing his LMRDA claim.

### C. American's Motion to Dismiss

American contends that Plaintiff fails to state a plausible claim against it. The Court agrees. In his amended complaint, Plaintiff alleges that American breached its duty when Plaintiff was unable to arbitrate his grievances (#21, pp. 25-30). However, Plaintiff's allegation is a conclusory statement. Furthermore, the facts suggest that American fulfilled its obligations under the CBA. Id. Therefore, the Court grants American's motion to dismiss.

9

## III. CONCLUSION

Accordingly, it is **HEREBY ORDERED** that Plaintiff's Motion to File First Amended Complaint (#21) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant American Airlines' Motion to Dismiss Plaintiff's First Amended Complaint (#24) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Allied Pilot Association's Motion to Dismiss Plaintiff's First Amended Complaint (#23) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant American Airlines' Motion to Dismiss (#8) and Defendant Allied Pilot Association's Motion to Dismiss (#6) are **DENIED** as moot.

DATED this 3rd day of November, 2014.

BY THE COURT:

_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

# EXHIBIT 13

# for Shiffrin Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-80518-CIV-HURLEY

KATHY E. EMERY,

     Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

     Defendant.

_____/

## FINAL JUDGMENT

The Court previously entered an order on Defendant's motion for summary judgment finding that Plaintiff had failed to established a breach of the duty of fair representation as alleged in Count One and, therefore, Defendant was entitled to summary judgment on this claim. [DE 138]. That order is incorporated by reference into this final judgment. Thereafter, following a bench trial on Count Two-A, the Court entered an order finding that Defendant violated Plaintiff's right of free speech by preventing her from posting comments on Challenge & Response, the union's website chat room. [DE 159]. The latter order is also incorporated by reference into this final judgment. Finally, the Court has concluded that Plaintiff's claim, as alleged in Count Two-B, that Defendant violated her right of free speech by preventing her from speaking at a union meeting is moot and should be dismissed with prejudice. Accordingly it is

1

**ORDERED and ADJUDGED:**

1. Plaintiff Kathy E. Emery shall take a recover nothing on Count One, the claim for breach of the duty of fair representation, and the Defendant Allied Pilots Association shall go hence without day on this claim.

2. Plaintiff Kathy E. Emery, having prevailed on Count Two-A, by establishing that Defendant Allied Pilots Association violated the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2), is granted the following mandatory injunctive relief:

    (A)    Defendant Allied Pilots Association forthwith shall permit Plaintiff Kathy E. Emery complete access to "Challenge & Response," the union's website chat room on the same terms and conditions as exist today for all active members of the APA;

    (B)    Defendant Allied Pilots Association, within ten days of the entry of this final judgment, shall provide a copy of the Court's order of January 4, 2017 to each member of the APA's board of directors;

    (C)    In the event Defendant Allied Pilots Association elects to terminate Challenge & Response prior to January 11, 2018, (the possibility of which was discussed by APA officials at trial), Defendant shall continue to grant Plaintiff Kathy E. Emery unfettered access to Challenge & Response until January 11, 2018. Plaintiff's access and usage shall be the same as exists today for all active members of the APA. Furthermore, Plaintiff's postings and comments shall be able to viewed by all members of the Allied Pilots Association by the same means and terms as exist today.

2

3. Defendant Allied Pilots Association shall file a notice of compliance within ten days of the entry of the entry of this judgment indicating that it has complied with items 2(A) and 2(B) above.

4. Plaintiff Kathy E. Emery's claim, Count Two-B, that the Defendant Allied Pilots Association violated her right of free speech by preventing her from speaking at a union meeting is moot and, therefore, is dismissed with prejudice.

5. The Court retains jurisdiction over the parties to enforce all provisions of this final judgment and, if appropriate, to award costs and attorney's fees.

6. The Clerk shall close this case.

**DONE and SIGNED** in Chambers at West Palm Beach, Florida, this 11th day of January, 2017.

Daniel T. K. Hurley
United States District Judge

cc: Copies provided to the parties.

3