UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE MEADOWS,

    Plaintiff,                              **CASE NO. 1:17-CV-22589-EA**

v.

ALLIED PILOTS ASSOCIATION, *et al.*

    Defendants.

_____/

### SUPPLEMENTAL DECLARATION OF JOSHUA B. SHIFFRIN

I, JOSHUA B. SHIFFRIN, hereby declare and state as follows:

1.    I am a resident of Maryland. I am over the age of 18. If called as a witness, I could and would testify competently to the matters set forth below.

2.    **Exhibit 5A** is a compilation of excerpts from the certified transcript of the deposition of Dan Carey, taken on March 4, 2026. This exhibit replaces the compilation of rough transcript excerpts that was submitted as Exhibit 5 to my original declaration, *see* ECF No. 238-3, at 177, in support of APA's Statement of Material Facts, *see* ECF No. 238. The excerpts in Exhibit 5A encompass all of the material that was included in Exhibit 5.

3.    **CX31**, which was also attached as an exhibit to my prior declaration, *see* ECF. No. 238-3, at 201, is an email sent by then-APA President Carey to Kimball Stone at American on April 8, 2019, with attachments. *See* Ex. 5A, at 350-52 (authenticating the exhibit).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 4, 2025

Joshua B. Shiffrin

# EXHIBIT 5A
# for Supp. Shiffrin
# Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE MEADOWS,

       Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

       Defendant.

**CERTIFIED TRANSCRIPT**

CASE:  1:17-cv-22589

# VIDEO DEPOSITION OF DANIEL F. CAREY

## VOLUME 1 OF 2

DATE TAKEN:    Wednesday, March 4, 2026

TIME TAKEN:    9:30 a.m. to 12:40 p.m.

PLACE TAKEN:   Hyatt House Naples
1345 Fifth Avenue South
Gathering Room 4
Naples, Florida  34102

TAKEN BY:      Plaintiff, Lawrence Meadows

REPORTED BY:   Sabrina C. Beauvais, CCR, FPR, CLR
Certified Stenographic Court Reporter

 **Southwest Florida Reporting Services, Inc.**

Deposition Suites in Naples, Fort Myers and Port Charlotte
Post Office Box 9161, Naples, Florida 34101    (239) 778-7303
www.SouthwestFloridaReporting.com
*"Every word.  Every time."*



A P P E A R A N C E S


On Behalf of the Plaintiff, Lawrence Meadows:

          LAWRENCE M. MEADOWS, PRO SE
          1900 Sunset Harbour Drive
          Suite 2112
          Miami Beach, Florida  33139
          (516) 982-7718
          lawrencemeadows@yahoo.com


On Behalf of the Defendant, Allied Pilots Association:

          JOSHUA B. SHIFFRIN, ESQUIRE
          Bredhoff & Kaiser, PLLC
          815 15th Street Northwest
          Suite 1000
          Washington, D.C.  20005
          (202) 842-2600
          jshiffrin@bredhoff.com

          JIM CLARK, ESQUIRE
          Allied Pilots Association
          14600 Trinity Boulevard
          Suite 500
          Fort Worth, Texas  76155
          (817) 302-2284
          jclark@alliedpilots.org


Also present:

          ANN MARINO

          BRIAN OSTROM (Via Zoom Video Communications)




                    *  *  *  *  *

I N D E X

                                                        PAGE

Video Deposition of DANIEL F. CAREY

                    VOLUME 1 OF 2

Direct Examination by Mr. Meadows..................  12

                    VOLUME 2 OF 2

Continued Direct Examination by Mr. Meadows........  235

Cross-Examination by Mr. Shiffrin..................  332

Redirect Examination by Mr. Meadows................  360

Court Reporter's Certifications....................  389

* * * * *

PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1. | PBAC Disposition 11/30/19 (Bates Meadows 24926 to 24928) | 20 |
| 2. | Correspondence from Hunton & Williams to Carrie J. Feit, Esquire, dated March 3, 2011 (Bates Meadows 24993 to 24997) | 25 |
| 3. | American Airlines Pilot Disability Supplement F(1) (Bates Meadows 19807 to 19822) | 34 |
| 4. | E-mail transmission from APA Leadership to natoff@alliedpilots.org | 39 |
| 5. | APA Flightline, January 2010 (Bates Meadows 27303 to 27307) | 42 |
| 6. | Plaintiff's Reply in Support of Amended Motion for Extension of All Case Deadlines and for a Stay of Proceedings, e-filed January 29, 2026 | 48 |
| 7. | Allied Pilots Association Equity Distribution Arbitration, Decision and Award, dated October 15, 2013 (Bates Meadows 23578 to 23651) | 60 |
| 8. | E-mail transmission from Lloyd Hill to Charles Hairston, dated February 11, 2017 (Bates APA 32473 to 32475) | 93 |
| 9. | Correspondence from Allied Pilots Association to Lawrence M. Meadows, dated November 18, 2011 (Bates Meadows 9624 to 9628) | 75 |

PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 10. | Correspondence from American Airlines to Dan Carey, dated October 19, 2016 | 116 |
| 11. | E-mail transmission from Ed Sicher to Kathy Combs, dated October 19, 2016 (Bates Meadows 10806) | 120 |
| 12. | Allied Pilots Association Board of Directors Resolution R2016-30 Rev. 1, Adopted December 13, 2016 (Bates Meadows 15637 to 15638) | 122 |
| 13. | Text message chain from Ed Sicher to Larry Meadows, dated March 24, 2017 | 133 |
| 14. | E-mail transmission from William Read to Robert Baker, dated August 14, 2019 (Bates APA 32467 to 32468) | 136 |
| 15. | Correspondence from Lawrence M. Meadows to Daniel Carey, dated December 10, 2018 (Bates Meadows 8552) | 142 |
| 16. | Correspondence from Allied Pilots Association to Kimball Stone, dated April 8, 2019 (Bates Meadows 8569 to 8571) | 143 |
| 17. | E-mail transmission from Lawrence Meadows to Dan Carey, dated March 11, 2019 (Bates Meadows 8560 to 8562) | 150 |
| 18. | E-mail transmission from William Read to Lawrence Meadows, dated March 6, 2019 (Bates Meadows 12539) | 153 |

PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 19. | Correspondence from Kimball Stone to Allied Pilots Association, dated September 3, 2019 (Bates APA 7153 to 7160) | 163 |
| 20. | Text message from Dan Carey to Lawrence Meadows, dated March 29, 2018 (Bates Meadows 8572 to 8585) | 176 |
| 21. | Lawrence Meadows Grievance 12-011, dated February 4, 2012 (Bates Meadows 23532) | 189 |
| 22. | Correspondence from Allied Pilots Association to John Hale, dated May 22, 2012 (Bates Meadows 23534 to 23563) | 235 |
| 23. | Debtors' Limited Objection to Motion of Lawrence Meadows for Relief From Automatic Stay, e-filed January 2, 2013 (Bates Meadows 23564 to 23577) | 238 |
| 24. | Order Pursuant to 11 U.S.C. Section 502(b) and Fed. R. Bankr. P. 3007 Disallowing and Expunging Proof of Claim Nos. 13478, 13788 and 13865, filed by Lawrence M. Meadows, e-filed September 5, 2014 (Bates Meadows 23679 to 23680) | 241 |
| 25. | Defendant American Airlines' Reply to Plaintiff's Opposition to the Motion to Dismiss Plaintiff's First Amended Complaint, e-filed September 16, 2014 (Bates Meadows 23681 to 23685) | 244 |

PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 26. | Unexecuted agreement dated October 2017 (Bates Meadows 11899 to 11902) | 249 |
| 27. | Order Authorizing the Stipulation and Agreed Order for Proof of Claim Filed by The Allied Pilots Association, e-filed November 8, 2021 (Bates Meadows 23696 to 23698) | 263 |
| 28. | Correspondence from Allied Pilots Association to Russ Moore, dated March 13, 2003 (Bates Meadows 23699) | 276 |
| 29. | Appellee's Unopposed Motion to Supplement the Appellate Record, e-filed October 6, 2025 (Bates Meadows 23708 to 23724) | 278 |
| 30. | Supplemental Declaration of Mark Myers, e-filed February 18, 2026 | 303 |

* * * * *

DEFENDANT'S EXHIBITS

NUMBER                      DESCRIPTION                      PAGE

31.    E-mail transmission from Bridget           350
       Blake to Kimball Stone and others,
       dated April 8, 2019 (Bates APA
       24146 to 24154)


32.    Deposition of Daniel F. Carey,             354
       taken on March 9, 2021


33.    Allied Pilots Association Board            358
       of Directors Resolution R2006-61
       Rev. 1, Adopted November 4, 2006
       (Bates Meadows 15631 to 15632)



                    *  *  *  *  *

* * * * *

P R O C E E D I N G S

* * * * *

THE VIDEOGRAPHER:  Counsel, are we ready to go on the record?

MR. MEADOWS:  Yes.

THE VIDEOGRAPHER:  All right.  I will read us on.

We are now on the record.  Today is March 4th, 2026.  The time is currently 9:30 a.m.

This is the videotaped deposition of Daniel Carey taken in the matter of Lawrence Meadows versus Allied Pilots Association, Case Number is 17-cv-22589, in the United States District Court, Southern District of Florida, Miami.

The court reporter is Sabrina Beauvais.  I am the legal video specialist, Joshua Beauvais, both with Southwest Florida Reporting.

Will the attorneys please state their appearances for the record.

MR. MEADOWS:  Yeah.  Lawrence Meadows, Plaintiff, pro se.  With --

MR. SHIFFRIN:  Josh -- I'm sorry.

MR. MEADOWS:  -- me is my wife, Ann Marino, as observer.  I also have Brian Ostrom observing as

the exhibit logger.

MR. SHIFFRIN:  Where is Brian?

MR. MEADOWS:  He is remote.  He is on Zoom.

MR. SHIFFRIN:  Okay.  Joshua Shiffrin, counsel for Defendant, Allied Pilots Association.

With me is my client representative, Jim Clark.

THE VIDEOGRAPHER:  And will the court reporter please swear in the witness?

THE COURT REPORTER:  Yes, sir.

Sir, if I could ask you to please raise your right hand, I will place you under oath.

THE WITNESS:  (Complies.)

THE COURT REPORTER:  Do you solemnly swear or affirm that the testimony you are about to give in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.

MR. MEADOWS:  Ready to begin?

THE COURT REPORTER:  Yes, sir.

MR. MEADOWS:  Okay.  Dan, I've known you a long time, but as a matter of professional courtesy and respect, I'm going to refer to you as Captain Carey throughout the proceedings.  Is that okay?

THE WITNESS:  (Nodding head.)

MR. MEADOWS:  For the record, it is my understanding that Captain Carey is appearing today as an unrepresented, nonparty, and Mr. Shiffrin is appearing solely as counsel for Defendant, Allied Pilots Association.

Accordingly, while counsel may make objections to form, I will expect the witness to answer, and any instructions not to answer must be limited to a specific privilege held by the Allied Pilots Association.

Do you agree, Mr. Shiffrin?

MR. SHIFFRIN:  No.

MR. MEADOWS:  You do not agree?

MR. SHIFFRIN:  I don't agree to you instructing me as to how I can conduct myself in this deposition.

MR. MEADOWS:  Well, he is  my witness, and you are not representing Mr. Carry.  Correct?

MR. SHIFFRIN:  I am not representing Mr. Carry.

MR. MEADOWS:  Okay.  So I would ask you, please, if you do object, to state the basis of the objection only, do not engage in talking objections.

We have a lot of questions to get through and I would like to get it done as expeditiously as possible.

MR. SHIFFRIN:  I will take it under advisement.

MR. MEADOWS:  Okay.

MR. SHIFFRIN:  I have questions for Mr. Carry as well.

MR. MEADOWS:  Okay.

THEREUPON,

DANIEL CAREY,

called as a Witness, after having been first duly sworn, was examined and testified upon his oath as follows:

DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Okay.  Good morning, Captain Carey.  Please state your name and -- full name and address for the record.

A.    Daniel Carey, 1953 Mustique Street, Naples, Florida.

Q.    Okay.  And where do you reside, normally?

A.    At Naples, Florida.

Q.    But you asked me to serve you in New York. Correct?

A.    At the time I was in New York, yes.

Q.    Okay.  Have you ever resided in Gulf Breeze, Florida?

A.    No, sir.

Q.    Oh, you weren't -- you didn't represent that your residence was in Gulf Breeze in your initial disclosures?

A.    No, I was not.

Q.    Okay.  You served as the president of Allied Pilots Association from, I believe, July 1st, 2016, to June 30th, 2019.  Correct?

A.    That's correct.

Q.    Prior to that, you were a union representative based in New York?

A.    In -- from 1993 to 1998, yes.

Q.    And you are a domicile chairman and a vice chairman of both.  Right?

A.    Vice chairman domicile --

MR. SHIFFRIN:  Objection to form of the question.

No -- no leading questions, sir.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Any other positions you've held in the union thereafter?

A.    I was on various committees.  I was base

administrator at the LaGuardia domicile.  I was on the negotiating committee from '97 to late '98.  I was on government affairs from '99 until 2001.  I served on and off on the LaGuardia base administration committee.

MR. SHIFFRIN:  Can we pause for a minute?

I'm sorry, Dan.

I'm not -- I'm waiting for the host to allow me into the Zoom.

THE COURT REPORTER:  Can we go off the record a moment?

THE VIDEOGRAPHER:  Yes.  That's what I was going to ask.

We are going off the record.  The time is 9:33 a.m.

(Whereupon, there was a brief pause in the proceedings.)

MR. MEADOWS:  Captain Carey, you can continue --

THE VIDEOGRAPHER:  I'm sorry, Counsel.

We are back on the record.  The time is 9:35 a.m.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Captain Carey, please continue.  I think you were talking about your experience in the APA.

A.      I served on -- as a volunteer, a base administrator for the LaGuardia domicile in 2000s, on and off, taking care of base hearings and general business for the domicile chair.

Q.      Okay.  So, it is fair to say that you are a subject matter expert in the governance of APA, and the collective bargaining agreements, and the CMV, and representational matters regarding the members of APA?

MR. SHIFFRIN:  Objection to the form of the question.  And Mr. Carey -- Captain Carey is not here as an expert witness in any respect.  He was not noticed as an expert witness or identified as an expert witness so --

MR. MEADOWS:  Okay.  Thank you.

MR. SHIFFRIN:  I -- I am in the middle of --

MR. MEADOWS:  Thank you for your objection, Mr. Shiffrin.

MR. SHIFFRIN:  -- speaking.  I -- I am going to preserve it for the record that you -- if you proceed to lead him.

Please wait until I finish, Mr. Meadows.

He is not here as an expert witness.  He cannot be here to provide opinion testimony.  He can provide fact testimony, and that is the limit of his testimony today.

medical professional, so --

Q.    I'm asking your personal opinion.

MR. SHIFFRIN:  Objection to asking him his personal opinion.

THE WITNESS:  Neither is Lloyd Hill.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Okay.  Dan, how many years have you known me?

A.    Over 30.

Q.    How many communications have we had during the course of your presidency?

A.    I'm sorry?

Q.    During the course of your presidency, how many times have we communicated?

A.    Hundreds.

Q.    Hundreds.  Right?

A.    (Nodding head.)

Q.    And it's fair to say we have a personal and professional relationship?  And I think I've -- it's fair to say I have tried to help you as much as possible, and you've helped me as much as possible --

MR. SHIFFRIN:  Objection to the form of the --

MR. MEADOWS:  -- through the course of your

MR. SHIFFRIN:  Objection to the form of the question.

THE WITNESS:  I -- I don't believe -- I don't -- the union -- your union representative's opinion is -- is not the -- the directorship of APA.  I mean, we have a resolution stating that they are going to aggressively pursue that, the negotiating the committee.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.     But did they ever seek reinstatement in the contract?

A.     I had -- I had -- I had conversations with management on occasion where we always asked for reinstatement of pilots who were -- who were not reinstated.  As long as the -- as long as the pilot had a medical, I went aggressively any time I had the opportunity with senior management.  I'd -- I'd keep a -- I'd keep a list of pilots I thought that deserved reinstatement, and we tried to get them reinstated.

Q.     And did you do that for me?

A.     Absolutely.

Q.     And did you have the authority to do it on your own or did you need permission of the board of directors to do it?

A.      As the APA president, you always have the ability to improve the pay and working conditions of -- of the membership.

Now, in individual cases, the APA president -- and there is already a resolution that the APA is trying to aggressively fix this problem.  So the APA president has the authority to bring a pilot -- to attempt to bring a pilot back.  The company has the ultimate authority whether to -- if the pilot goes back on the seniority list or not.

Q.      Okay.  Do you feel like you need the full support of the board of directors to do so?

A.      To -- to make a proposal to management to bring back a pilot?

Q.      Yes.

A.      Absolutely not.

Q.      Okay.

(Whereupon, Carey Deposition Exhibit Number 15 was marked for identification as of this date.)

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.      All right.  Let's move on to Carey Exhibit Number 15, please.  Let me know when you have it open.

A.      (Complies.)

I would probably be back in training sometime in mid to late January.

A.    Huh-huh.

Q.    Do you recall that?

A.    No, that did not occur.

Q.    Are you sure?

A.    Positive.

Q.    Actually, I have notes.  It did.

A.    Well --

Q.    You told me.  And then we waited, and nothing happened, and we proceeded from there.

A.    No.  I had a conversation with Kimball Stone and that was not the conversation.

Q.    What was the conversation?

A.    The conversation -- Kimball Stone said that the -- said that you were -- you were on disability LTD under the AMR corporation and, first of all, he has no responsibility to bring you back because the AMR corporation is bankrupt and we're now AAL corporation. So, anybody who comes back is at the company's discretion.  And he said that the company has a -- a-- a trust and a -- a -- a professional commitment to the traveling public, and they get to pick and choose who they put in the cockpit of American Airlines airplanes and that -- that he was not going to reinstate you.

Q.      You never relayed that to me.

A.      I absolutely did.

Q.      You did not.  You --

A.      Yes, I did.

Q.      -- do you have an e-mail?  Did you send me an e-mail?

A.      I absolutely did represent that to you.

Q.      Okay.  All right.  We'll move on.

So, thereafter, I believe I asked you to try to give me a formal denial or seek reinstatement and you sent Mr. Clark across the street, on or around the beginning of February of 2019, to speak with Lucretia Guia.  Do you recall that?

A.      I never sent Mr. Clark across the street for any specific reason.  If Mr. Clark had a time to speak with Lucretia Guia, the company's counsel.  Mr. Clark was always -- had several agenda items to pursue and -- and your issue was of always brought up whenever I had contact with senior management.

Q.      Do you recall calling me and telling me that Mr. Clark spoke to Ms. Guia and she would refused to provide anything in writing, but she said that she would not return me to the seniority list --

A.      Yeah, it's --

Q.      -- under any circumstances whatsoever?

anything.

The -- the RLA process goes through the -- the grievance and arbitration.  And after that, a possible legal remedy.  And it takes years, so --

Q.    Okay.  All right.  So, shortly thereafter, Captain Carey, in May of 2019, that your term was nearing an end and you were running for re-election, at that point there was at least four other MDD pilots who received their medical certificates shortly after me, including, but not limited to, Joe Barkate, Pete Lepore, L-E-P-O-R-E, and Bill Ruhlander, R-H-U-L-A-N-D-E-R [sic], and Dan Shaw; isn't that right?

MR. SHIFFRIN:  Objection to the form of the question.

THE WITNESS:  So, I -- your date was -- the date you read was --

MR. MEADOWS:  Oh, May 19th.

THE WITNESS:  May --

MR. MEADOWS:  May 2019.

THE WITNESS:  May 2019.  Okay.  So, and -- what is the question?

MR. MEADOWS:  The question was:  In that time -- after I gave you my FAA medical certificate in December of '18 --

THE WITNESS:  Yeah.

MR. MEADOWS:  -- shortly thereafter, four other pilots, MDD pilots, attained their medicals, their disability benefits were suspended, and they were seeking reinstatement, and they were held out of service because of me, because the company didn't want to return me and those four pilots behind me who were also held up, and that included Joe Barkate, Pete Lepore, Dan Shaw and Bill Ruhlander.  Do you recall that?

MR. SHIFFRIN:  Objection to --

THE WITNESS:  So I --

MR. SHIFFRIN:  -- the form of the question.

THE WITNESS:  -- I wouldn't -- I wouldn't agree that it they were held -- withheld because of you.  I -- I would state that American management was reviewing each case individually.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    But are you aware that, in April of '19, Mark Myers called all five of the pilots, including myself, and he told those four that the company was not going to return them, they may as well seek employment elsewhere, and APA is refusing to file a grievance to reinstate your disability benefits?

MR. SHIFFRIN:  Objection; it lacks

foundation.

THE WITNESS:  Yeah.  I -- I don't -- wouldn't recall that.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Are you aware that Mr. Myers called me and said, even though I was still receiving disability benefits, unlike the other four, he said that the company is not going to reinstate you, the APA is not going to file a grievance for your reinstatement, you might as well seek employment elsewhere, have a nice day?

MR. SHIFFRIN:  Objection; lack of predicate.

THE WITNESS:  I was not privy to that conversation.

(Whereupon, Carey Deposition Exhibit Number 19 was marked for identification as of this date.)

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Okay.  So, let me show you Exhibit 19.

So, is it -- is it true, though, that, in that May '19 time frame, you managed to secure a return --

A.    How do I get to --

Q.    Oh, I will get it to it.  I will fix it.
(Adjusting screen share.)

Is it true that you secured the return of those four other pilots in May of '19?

A.    I had recommended their return, as I always would, to medically qualified pilots of the company, and the company decides whether they come back or not.

Q.    Okay.  And you -- you were able to get them back, but not me?

A.    The company decided to take those pilots back.

Q.    Did you trade me for those four pilots?

A.    (Laughs.)  Absolutely not.

Q.    Did you try to get me returned in the same time frame as those four pilots?

A.    You know I did.  Every time I had a chance to get anybody back --

Q.    Okay.

A.    -- I took a swing at it.

Q.    Okay.  Let's take Exhibit 19.  Let me know when you are up.  Do you see that?

A.    I have -- I have a letter of September 3rd, 2019.  Is that --

Q.    Right.

A.    Yeah.

here is one here, for example.  Look at the -- can you see this one, dated May 29th, 2019?  (Adjusting screen share.)

A.    Ah, yes, I do.

Q.    And would you read -- so that is a return to work letter for Captain Bill Ruhlander, or William Ruhlander?

A.    Yeah.  I -- I don't recall Captain Ruhlander.  You know, I recognize the letter.

Q.    But that letter is countersigned -- so, all of these return to work letters are countersigned by both the VP of flight and you.  Correct?  Or the vice -- the president of the union.  Correct?

A.    Yes --

MR. SHIFFRIN:  Objection to the form of the question.

THE WITNESS:  -- they are.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    And there is a reason why there is not a letter -- one of these for me, despite me being in the queue before all of these guys?

MR. SHIFFRIN:  Objection to the form of the question.

THE WITNESS:  The only -- the only thing I

can -- the only thing I can say to answer that question is, I made the -- the request to Captain Stone, and Captain Stone stated, as I stated earlier, that American Airlines reserves the right to put in the cockpit who they feel they deem safe and airworthy.

And Captain Stone, you know, he said to me they can continue paying Larry -- we'll continue paying Larry Meadows' disability, but we -- we're not going to put him back in the cockpit.  He told me that.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS

Q.    Did he give you a reason why?

A.    He -- he did -- that was the reason, that they don't have to.  They can continue paying Larry Meadows' disability.  And they have a responsibility to the traveling public, and they are not going to put you back in the cockpit.

Q.    Okay.

A.    And I told you that.

Q.    Earlier, you said he made a distinction about AMR, Inc., versus AAL, Inc.  But weren't all of these other pilots removed from the seniority list during the bankruptcy and prior to the bankruptcy --

position, and I cleared [sic] it earlier -- I declared it earlier in questioning in this deposition, that the time to resolve grievances is in Section 6.  That -- that is the time to do it.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.      So, you believe that the -- the one time APA could have gotten me back, or should have tried to get me back, was the contract ratification?

A.      I don't believe that APA has the -- had the ability to -- has the ability to put anybody back on the seniority list.  Again, as we -- as I stated earlier, that is up to the company.  The company has to agree.

Just because, you know, the APA asked for one of our re -- requests was having off for a Super Bowl, or premium pay for the Super Bowl, we didn't get it.  And those are things that we put in negotiations that -- you know, we don't attain everything.

So, the ultimate gatekeeper for putting a -- a pilot on the seniority list returning from LDD/MDD is -- is management.

Q.      But your testimony was that you believed that all grievances should be resolved at contract ratification --

A.      Your best opportunity is to resolve the

A.      "Defendant American Airlines' Reply to Plaintiff's Opposition to the Motion to Dismiss Plaintiff's First Amended Complaint."

Q.      Now, it starts in Meadows Bates 023681.

I'm going to scroll down to -- two pages. (Adjusting screen share.)  And this is Meadows Bates 23683.

Now, can you just read the highlighted paragraph there, please?

A.      (Reviewing document.)

Q.      Read it out loud.

A.      Yeah.  Hang -- hang on a minute.

Q.      Okay.

A.      "American has informed Meadows and the APA that it will comply with any agreement of the parties to submit the grievances to a system board hearing or, if no agreement can be reached between Meadows and the APA, with any order of this court."

Q.      So, while you were president in 2016, were you aware, in 2015 and the years prior, that Judge Sean Lane ordered my grievance, 12-011, shall be arbitrated and American Airlines agreed to arbitrate it so long as the APA would agree to proceed?

MR. SHIFFRIN:  Objection; misstates the document in several different ways.

THE COURT REPORTER:  I'm sorry.  What?

MR. SHIFFRIN:  It misstates the document in several different ways.

THE WITNESS:  So, again, we had over 700 grievances.  And the timeline of the -- we don't have contractual language on the time line of -- at this time, on time line of grievances.  So grievances were heard at -- essentially, at the company's pleasure.  Sometimes we wouldn't have a grievance -- hear a grievance for five years.  Wherein the case when I took as president, we had grievances that were lying there for 11 years.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.     I was asking you:  As you were aggressively pursuing to seek arbitration of both of these grievances, did APA's attorneys ever inform you that the bankruptcy court ordered that I shall be permitted to arbitrate 12-011, that American Airlines subsequently agreed to arbitrate 12-011, contingent on a mutual agreement with the APA?  Yes or no?

MR. SHIFFRIN:  No.  Captain Carey, you may not --

MR. MEADOWS:  Answer the question, please, Mr. Carey.

MR. SHIFFRIN:  -- answer questions about conversations that you had with APA's attorneys while you were present --

THE WITNESS:  I understand that, yeah.  And I -- I actually -- I can't answer the question.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    So, your testimony is you have no personal knowledge that there were court orders allowing me to move forward with my grievance, and the only lynchpin was APA?

MR. SHIFFRIN:  Objection; misstates --

THE WITNESS:  My personal knowledge is that we moved forward with all of the over 700 grievances that were on the table when I took over as APA president in 2016.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Okay.  So, you are telling me you have no knowledge that APA was the only party refusing to arbitrate Grievance 12-011, that the company was willing to arbitrate it, contingent on agreement with APA?

MR. SHIFFRIN:  Objection; misstates the testimony and misstates the document you are referring to.

THE WITNESS:  Yeah, I don't know.  I can't tell you that.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    All right.  Do you recall, in the spring -- shortly thereafter, in the spr -- while you were in office, in the spring of 2017, my Miami base representative at the time, Captain Ed Sicher, came to you and asked you to advance Grievance 12-011 to arbitration?

A.    Captain Ed Sicher, I don't recall that.  And all of our grievances were scheduled to be advanced to arbitration.  And, as I stated earlier, the company has to agree to sit down and arbitrate them.  And -- and we were always trying to clear the table of those 700-plus grievances since I came to office in 2016.

Q.    Okay.  I'll -- I'll refresh your memory in a minute.

So, according to Captain Ed Sicher's e-mail to me, you delegated that task to APA's legal department, specifically Jim Clark and Mark Myers.

Do you not recall that?

A.    Grievances are always handled by APA legal and the negotiating committee.  That's the complete normal process of business.

THE WITNESS:  Regardless of APA's objection, I can't comment on it because I'm not a lawyer, and I'm not a bankruptcy lawyer, and I would -- I have no idea what this means in -- in a -- in a court of law.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.      But your testimony earlier, you're familiar with collective bargaining, you're familiar with reading language of agreements.  Correct?

A.      But I can't cherry-pick one paragraph out of this, you know, judge's order and -- and -- and pretend to make a --

Q.      Okay.

A.      -- judgment on it.

Q.      Okay.  So, you are telling me you don't understand that APA discharged all its claims against American with the exception of Grievance 12-011 and 12-012, that's not what that paragraph says?

MR. SHIFFRIN:  Objection; calls for --

THE WITNESS:  I answered it already.

MR. SHIFFRIN:  -- a legal conclusion and misstates the document.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Okay.  Well, given that both these grievances were viable throughout your term as president, why did your administration fail to take either one to a system board of adjustment?

MR. SHIFFRIN:  Objection; lack of foundation.

THE WITNESS:  We never -- we don't control the time line, as I stated earlier, and what goes before the system board of adjustment.  The company does that.  And APA legal and the negotiating committee constantly try to resolve outstanding grievances.

As I said, again, earlier, when I became APA president in 2016, we had over 700 outstanding grievances.  I think some of them went back 11 years from four different airlines.  And -- and they were -- they were pursued through the process of APA.  And the roadblock is, and always had been in my career and may still be, the process under -- under -- under the Railway Labor Act.  The company has no obligation to -- to give you the time to -- to hear these arguments.

CONTINUED DIRECT EXAMINATION

BY MR. MEADOWS:

Q.    Okay.  You are familiar with the APA C&B.

your personal computers and telephones?

A.      So I have separated myself from the previous phone carrier when I left APA in 2019.  And -- and so any -- any computers I had, I would not have any longer either, so --

Q.      So, all the mess -- text messages and e-mails between you and I over the years, you -- you are no longer in possession of?

A.      I wouldn't -- I wouldn't think so.

Q.      Okay.

A.      Yeah.  Any e-mails that were through the APA server, APA would have.  But I -- I rarely did personal e-mails on -- on company business -- or I tried not to.  I am not saying I never did, but I -- I tried to avoid it.

Q.      That is a good point.  So, the majority of communications between you and I were on your personal Carey Cargo account, sometimes on APA president at Allied Pilots Association, but why would you communicate on your personal e-mail account to certain people?

A.      Well, I --

Q.      Is there a reason?

A.      -- I considered you a personal friend.

Q.      Of course.  Me, too.

So, are you aware that many officers of APA

THE WITNESS:  Thank you.

MR. SHIFFRIN:  I will start and try to be as expeditious as I can be so that we can get out of here.

(2:54 p.m.)

CROSS-EXAMINATION

BY MR. SHIFFRIN:

Q.     Captain Carey, remind me, when was it that you were first hired by American Airlines?

A.     I was hired in November 1984.

Q.     Okay.  And when was it that you retired?

A.     April 2025.

Q.     Is it fair to say that you spent most of the time as a line pilot?

A.     Yes.

Q.     What is a line pilot?

A.     Well, a line pilot is a -- does the journeyman work in our profession as an airline pilot. So we bid a monthly schedule.  And I spent most of my career, all but 20 months of my career, in the international division, based in New York, JFK/LaGuardia.  So, I would fly my schedule.

Q.     And when you said you bid a monthly schedule, what does that mean?

A.     Oh, the company posts a bid sheet for the

following month's schedule.  It's a roster.  And we -- we pick the trips that we would love to fly.  And we are awarded the trips commensurate on our seniority in the union.

Q.    And so, if someone has higher seniority than you, you can't -- they will beat you out for something that you might want?

A.    Correct.

Q.    Okay.  And you don't control that?

A.    Correct.

Q.    Okay.  Are you familiar with per diem payments?

A.    Yes.

Q.    What are those?

A.    Per diem is a contractual negotiated payment.  So, for example, when I was a new hire, if you leave the New York base or whatever base you are based out of at noon, and you return at noon three days later, you would get 72 hours' of $1 an hour or $2 an hour -- whatever the negotiated rate is in the CBA.

Q.    What is the purpose of those per diem payments?

A.    It was to -- to provide yourself with food, laundry, dry cleaning, while you were away from base.

Q.    If you don't fly a trip, do you get per diem

A.     Well, this agreement gave the ability for dozens, maybe a hundred pilots, to -- to come back to work, and -- and hundreds of others in the future, to have hope and the ability to come back to work.

And -- and our pitch to the management was, you know, I mentioned it earlier in the deposition, that, okay, somebody -- somebody who went out years ago because they lost a hand in a car accident, well, now they have the ability to -- to come back when they can medically prove that they're -- they can get a disability waiver from the FAA that they're capable to do their job.

Q.     And let me put this in more concrete terms. Are you familiar with something I will refer to as the five-year rule?

A.     Yeah.

Q.     Okay.  And what was the five-year rule?

A.     So, the five-year rule had been around forever.  I've been in the airline industry my whole life.  My father flew for TWA from 1945 until 1975.  The five-year rule was industry standard at the legacy carriers, American, TWA, United.

And if you went on disability -- and keep in mind, I was hired in 1984, and the mandatory retirement age then was age 60.  And the statistics showed that 30

percent of pilots who were hired did not retire at age 60.  They would lose their medical, go out on disability, and retire before 60.

Q.    And so, before this LOA, it was in October of 2016, Carey Exhibit 10, what was the status of the five-year rule at American Airlines?

A.    It was in place.

Q.    It was in place under the collective bargaining agreement?

A.    Yeah.

Q.    And that was American's understanding?

A.    Yes.

Q.    And APA's understanding?

A.    Yes.  Now -- yeah.

Q.    And then, what did this LOA do to change that?

A.    It -- it gave the ability for pilots who were medically unqualified and outside of the five years to come back at -- and -- and have the ability to requalify and go back to work.

Q.    And do -- if a pilot regains his or her FAA First Class Medical Certificate, does he or she have a right to return to the airlines?

A.    No.  If -- the company was clear that they would review each case from the multiple corporations

that -- before, you know, this letter was agree upon, and they would decide who they thought was fit and eligible to come back to work.

Q.    And would APA have the unilateral ability to put anybody back on the seniority list?

A.    No.  We attempted to attain that, and we weren't successful.

Q.    In negotiating for the LOA, did -- did you try to get the company to agree to retroactively bringing people -- bring back people that had already been let go and were --

A.    Yes.

Q.    Okay.  And you personally did that?

A.    We did.

Q.    And what was the company's response?

A.    They would not agree to that.  They -- they -- that they would review it on a case-by-case basis.

Q.    Okay.  And then you signed the letter, nonetheless?

A.    I signed the letter.  It was a -- it was a -- it was a major improvement that helped dozens of pilots at the time, and hundreds in the future.

Q.    Okay.  And I am going direct you to Carey Exhibit 12.  This is Resolution 16 -- 2016-30.  And let me know when you have that in front of you.

context of Resolution 16-30, did you seek, from the company, an agreement to immediate reinstatement and return to the pilot system seniority list of all pilots who are currently out sick or on disability?

A.     Yes.

Q.     Okay.  On behalf of APA?

A.     Yes.  Any time I had the opportunity to meet with the VP of flight, I would -- I would bring this up.

Q.     Okay.  And, again, what was the company's response when you did that?

A.     We'll -- we'll address it in negotiations.

Q.     Now, you had testified about efforts that you had made to secure Mr. Meadows' reinstatement to the airline?

A.     Yes.

Q.     Just, generally speaking, how would you describe what those efforts consisted of?

A.     I had -- there were a few pilots.  We had one who was out for tax reasons.  But I would have a few names that I would keep in my pocket.  And when I would meet with the VP of flight, Kimball Stone, we had a protocol where, afterwards, we would have a sidebar conversation.

The company, you know, may have something coming up that they wanted us to know about.  For

example, they were starting a cadet program to bring in cadet pilots.  And whenever we had those light conversations, I would always try to take advantage of them while they were in a light mood to try to -- you know, to try to get something accomplished for our membership.

Q.    And Mr. Meadows was among those pilots?

A.    Yes.

Q.    Okay.  And we had -- I think we had looked at letters that -- a letter that you had sent to Kimball Stone regarding Mr. Meadows' seeking his reinstatement?

A.    Yes.  And I had you -- I had -- I had several conversations with him.

Q.    Okay.  And were those efforts to get Mr. Meadows back to work any different than you had for other pilots in this similar situation?

A.    No.  I had a -- I had a pilot who was out for ten years because he had pleaded no contest to an income tax violation and had lost his ability to -- his security benefits for ten years, which is a federal law, and we got him back.

(Whereupon, Carey Deposition Exhibit Number 31 was marked for identification as of this date.)

CONTINUED CROSS-EXAMINATION

BY MR. SHIFFRIN:

Q.     Let me show you what I will mark as Exhibit 31.

A.     Okay.

Q.     Do you see the first page of Exhibit 31 is an e-mail from Bridget Blake --

A.     Mm-hmm.

Q.     -- that was sent on Monday, April 20 -- 8th, 2019.  Do you see that?

A.     Yes.

Q.     And you were in office at that time?

A.     Correct.

Q.     And who was Bridget Blake at that time?

A.     She was one of the executive assistants at Allied Pilots Association.

Q.     And she would assist you with your affairs, as president?

A.     Yes.

Q.     Okay.  And it was sent to Kimball Stone.  Do you see that?

A.     Yes.

Q.     Okay.  And a cc to Mark Myers and president@alliedpilots.org?

A.     Yes.

Q.     And president@alliedpilots.org, at that

Case 1:17-cv-22589-EA   Document 244-1   Entered on FLSD Docket 04/06/2026   Page 46 of 62

Page    352

time, that would have been you?

A.    Yes.

Q.    Okay.  And do you see attached to it a number of letters?

A.    Yes.

Q.    And these letters are kind of similar in form?

A.    Mm-hmm.

Q.    Okay.  What are these letters?

A.    They are -- they're pleas, essentially.  They are pleas to please consider this person for reinstatement.

Q.    Okay.  And the company decided to reinstate some of the people that you had asked for.  Is that fair to say?

A.    Yes.

Q.    But not Mr. Meadows?

A.    Yes.

Q.    Okay.  And you had testified about a member named Joe Barkate.  Do you recall that testimony?

A.    I do.

Q.    Okay.  And can you describe for me what efforts you had made on Mr. Barkate's behalf for him to return?

A.    The same efforts as anyone else.  Whenever I

SouthwestFloridaReporting.com
(239) 778-7303

had the ability to talk to Captain Stone, I would bring up the names of people who had recently contacted APA and informed us that they were at or near requal -- requalifying medically with their FAA First Class Airman Certificate.

Q.    Okay.  Was there anything different about what you did for Joe Barkate than what you did for Larry Meadows?

A.    No.  In fact, Joe Barkate was worried that, if he got his medical certificate back, he wouldn't -- they may or may not take him back, and he wanted a guarantee in writing.  And I told him the company doesn't do that.

Q.    Do you have an understanding of when Mr. Barkate actually returned to flying?

A.    No.

Q.    Okay.  Let me show you -- you -- do you recall giving testimony in the Wally Preitz matter?

A.    Yes.

Q.    Okay.  I'm going to -- I'm going to show you -- and you do not have to read this.  I'm going to direct you to a certain page.  Here is the transcript. But I have for you copies --

MR. MEADOWS:  Are you going to introduce this as an exhibit?

MR. SHIFFRIN:  Oh, we can do that.  We'll make this Exhibit 32.

MR. MEADOWS:  Otherwise you can't use it.

(Whereupon, Carey Deposition Exhibit Number 32 was marked for identification as of this date.)

CONTINUED CROSS-EXAMINATION

BY MR. SHIFFRIN:

Q.     The -- the date of your -- your testimony in the Walley Preitz matter was Tuesday, March 9th, 2021.

Do you see that?

A.     Yes.

Q.     So, that would have been a little bit less that two years after you last -- you left office. Right?

A.     Right.

Q.     And here we are -- well, five years since then.  Right?

A.     Yes.

Q.     And, let me direct you to page -- if you go to Page 19 of the document overall, and then look within it to Pages 71 to 74, I will let you read those.  And let me know when you are finished.

A.     19.  (Reviewing Exhibit 32.)  Okay.

Q.     Does that refresh your recollection about

the communications you had with American Airlines regarding Joe Barkate?

A.      Yes.

Q.      So, let me ask you, again -- I mean, how was your contact with American Airlines about Joe Barkate initiated?

A.      So, Joe Barkate had contacted me in reference to getting his medical back.  I believe he was working -- you know, managing a restaurant or something in the local metroplex area.  And I -- I explained to him what was going on, and I would put out feelers on it.

Q.      And that's what you did?

A.      Yes.

Q.      Okay.  And then you spoke to Captain Kimball Stone?

A.      Yes.

Q.      And he's the management in American --

A.      The VP of flight --

Q.      He was at that time?

A.      Yes.

Q.      Okay.  And what was Captain Stone's response?

A.      Captain Stone's response was, you know, we'll readdress it when he has his medical back.

Q.     Okay.

A.     Which was his -- always his response. (Laughs.)

Q.     And, looking at Page 74, is that the same thing that he had said with respect to -- to Larry Meadows?

A.     Yes.

Q.     Okay.  But was there any special deal to return Joe Barkate to service before he had his medical?

A.     No.

Q.     All right.  Was -- did you treat Mr. Meadows differently at all because he had sued APA?

A.     No.

Q.     As far as you are aware, did anyone at APA treat Mr. Meadows differently because he had sued APA?

A.     Oh, maybe Tom Westbrook.

Q.     Okay.  And Tom Westbrook, you described him as having a role on the board?

A.     Yes.

Q.     And so, in -- in the context of him having a role on the board, he would have the ability to vote on matters that were before the board?

A.     Yes.

Q.     And he would be something like one of 20 votes?

A.    Yes.

Q.    Did he have any other control over APA's administration?

A.    No.

Q.    Okay.  Did he -- did he set policy for APA?

A.    No.

Q.    Did he set policy with respect to Larry Meadows in any way?

A.    No.

Q.    Okay.  And I think what you were communicating before is that, when there is 20 members on the APA board, there's a lot of different opinions?

A.    Yes.

Q.    Okay.  And how does the -- how does the board then take action when -- amongst 20 people?

A.    Well, they -- they debate it.  Each member gets a chance to speak, present their issues, and then they will either vote on it or -- or pass it on to a proper -- a proper committee.

MR. SHIFFRIN:  Captain, if you'll give us just two minutes, I think we may be done.

THE VIDEOGRAPHER:  Would you like to go off the record?

MR. SHIFFRIN:  Yeah, why don't we do that.

THE VIDEOGRAPHER:  We are going off the

# EXHIBIT CX31
# for Supp. Shiffrin
# Declaration

| | |
|---|---|
| **From:** | "Blake, Bridget" <bblake@alliedpilots.org> |
| **Sent:** | Mon, 8 Apr 2019 20:10:33 +0000 (GMT) |
| **To:** | "kimball.stone@aa.com" <kimball.stone@aa.com> |
| **Cc:** | "Myers, Mark" <mmyers@alliedpilots.org>; President<president@alliedpilots.org> |
| **Subject:** | Letters Confirming Requests For Reinstatement |
| **Attachments:** | Ruhlander - Pres. Reinstatement Letter.pdf;Morris - Pres. Reinstatement Letter.pdf;Meadows - Pres. Reinstatement Letter.pdf;Burchard - Pres. Reinstatement Letter.pdf |

---

CA Stone,

On behalf of CA Daniel Carey, please find the attached letters pertaining to the reinstatement for the following pilots:
Ronald L. Morris
Lawrence Meadows
William Ruhlander
Robert A. Burchard

Thank you,

Bridget Blake
Executive Assistant
Allied Pilots Association
o. 817-302-2116
f. 817-302-2119

APA_000024146



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines



O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:    Reinstatement of William G. Ruhlander, #153451

Dear Captain Stone:

    William ("Bill") Ruhlander, #153451, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Bill regained his First Class Medical Certificate, a copy of which is attached. APA initially notified the Company of Bill's request on or about February 21, 2019.

    This letter is to confirm the Association's desire to restore Bill Ruhlander's seniority and return him to flying status as an Active Pilot at American Airlines.

    Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

Confidential

APA_000024147

UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

## MEDICAL CERTIFICATE FIRST CLASS

This certifies that *(Full name and address):*
WILLIAM GENE RUHLANDER
2008 Hillcrest Court
Mckinney TX 75070 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| 10/24/1958 | 69 | 188 | BROWN | GREEN | M |

has met the medical standards prescribed in part 67, Federal Aviation Regulations, for this class of Medical Certificate.

**Limitations:** Must wear corrective lenses, possess glasses for near/intermediate vision. Not valid for any class after 8/31/2019.

**Examiner:**

Date of Examination 02/19/2019

Examiner's Designation No. 000008832

Signature

Typed Name
PETER J LAMBROU , MD

AIRMAN'S SIGNATURE

Applicant ID: 1996543862    Control No.: 200008562806

FAA Form 8500-9   (3-12) Supersedes Previous Edition    NSN: 0052-00-879-7002

Confidential

APA_000024148

 

# ALLIED PILOTS ASSOCIATION
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:     Reinstatement of Ronald L. Morris, #041811

Dear Captain Stone:

Ronald L. Morris, #041811, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Ron regained his First Class Medical Certificate, a copy of which is attached. APA notified the Company of Ron's request on or about February 20, 2019.

This letter is to confirm the Association's desire to restore Ron Morris' seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

Confidential

APA_000024149



UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

## MEDICAL CERTIFICATE FIRST CLASS

This certifies that *(Full name and address):*

RONALD L MORRIS
2419 harbor Blvd #12
Ventura CA 93001 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| 11/07/1956 | 73 | 165 | GRAY | HAZEL | M |

has met the medical standards prescribed in part 67, Federal Aviation Regulations, for this class of Medical Certificate.

**Limitations**

Must wear corrective lenses. possess glasses for near/intermediate vision.

**Examiner**

Date of Examination
02/15/2019

Examiner's Designation No.
000010574

Signature

Typed Name
WILLIAM SCOTT Jr. DO

**AIRMAN'S SIGNATURE**

Applicant ID   1996489898        Control No.: 20000849786?

FAA Form 8500-9   (1 12) Supersedes Previous Edition

CONDITIONS OF ISSUE

The holder of this certificate must:

• Have it in his or her personal possession at all times while exercising privileges of an airman certificate. (14CFR § 61.3)
• Understand that the issuance of a medical certificate by an Aviation Medical Examiner may be reversed by the FAA within 60 days. (14CFR § 67.407)
• Comply with validity standards specified for first-, second-, and third-class medical certificates. (14CFR § 61.23)
• Comply with any statement of functional, operational, and/or time limitation issued as a condition of certification. (14CFR § 67.401)
• Comply with the standards relating to prohibitions on operation during medical deficiency. (14CFR §§ 61.53, 63.19, and 65.49)

For International Operations Only. Some holders may be affected by certain international medical standards. Consult the U.S. Aeronautical Information Publication for U.S. differences with ICAO Annex 1 medical standards.



AEROSPACE MEDICAL CERTIFICATION DIVISION, AAM - 300
FAA Civil Aerospace Medical Institute
Mike Monroney Aeronautical Center
P.O Box 26080
Oklahoma City, OK 73125-9914

RONALD L MORRIS
2419 harbor Blvd #12
Ventura CA 93001 USA

Dear Airman:

Above is your new medical certificate. It supersedes any previous one you may have been issued.

To validate this certificate, it is necessary that you sign it in the space provided (Airman's Signature).

This certificate must be in your possession at all times while exercising your pilot privileges.

Creatation: Friday February 15 2019

Confidential

APA_000024150



**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:     Reinstatement of Lawrence M. Meadows, #332713

Dear Captain Stone:

Lawrence ("Larry") Meadows, #332713, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Larry regained his First Class Medical Certificate, a copy of which was provided to the Company initially by Larry in his first email to the AA Absence and Return Center, dated December 10, 2018, and by me in my December 26, 2018, email (my email attached).

This letter is to confirm the Association's desire to restore Lawrence Meadows' seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

APA_000024151

| | |
|---|---|
| **From:** | Hamel, Timothy |
| **To:** | Myers, Mark |
| **Subject:** | FW: Return to seniority list |
| **Date:** | Wednesday, December 26, 2018 2:00:37 PM |
| **Attachments:** | image001.png |

FYI, it was delivered.

**FO Tim Hamel**
**Vice President**

 **ALLIED PILOTS ASSOCIATION**

14600 Trinity Blvd. Suite 500
Fort Worth, Texas 76155
Office: 817-302-2115
Cell:    602-369-6585
Fax:    817-302-2119

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

**From:** President <president@alliedpilots.org>
**Date:** Wednesday, December 26, 2018 at 1:16 PM
**To:** "Kimball.Stone@aa.com" <Kimball.Stone@aa.com>, "Hamel, Timothy" <thamel@alliedpilots.org>
**Subject:** Return to seniority list

Kimball,

Lawrence Meadows, #332713, is currently on long-term disability (LTD). He was removed from the AA pilot system seniority list in approximately December 2011 pursuant to the Collective Bargaining Agreement. Meadows recently regained his First Class Medical Certificate (see attached) and is seeking reinstatement of his relative seniority number. Meadows forwarded a separate request with a copy of his First Class Medical Certificate to the AA Absence and Return Center on December 10, 2018. APA requests that Meadows be reinstated to the seniority list.

Thanks,

Dan

Sent from my iPhone

APA_000024152



UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

## MEDICAL CERTIFICATE FIRST CLASS

This certifies that *(Full name and address):*

LAWRENCE MICHAEL MEADOWS
1900 Sunset Harbour Drive  Apt 2112
Miami Beach  FL  33139  USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| | 5'7 | 175 | BLACK | BROWN | M |

Has met the medical standards prescribed in part 67, Federal Aviation Regulations, for the class of Medical Certificate.

Not valid for any class after  08/31/2019.

**Limitations**

| Date of Examination | Examiner's Designation No. |
|---|---|
| 02/10/2018 | |

Signature  *Michael A. Berry, MD*

Typed Name
MICHAEL A. BERRY MD

AIRMAN'S SIGNATURE

FAA Form 8500-9

### CONDITIONS OF ISSUE

The holder of this certificate must:

- Have it in his or her personal possession or at offices while exercising privileges of an airman certificate. (14CFR §61.3)
- Understand that the issuance of a medical certificate by an Aviation Medical Examiner may be reversed by the FAA within 60 days. (14CFR §67.407)
- Comply with validity standards specified for first-, second-, and third-class medical certificates. (14CFR §61.23)
- Comply with any statement of functional, operational, and/or time limitation required as a condition of certification. (14CFR §67.401)
- Comply with the standards relating to prohibitions on operation during medical deficiency. (14CFR §§ 61.53, 61.19, and 91.49)

For International Operations Only: Some holders may be affected by certain international medical standards. Consult the U.S. Aeronautical Information Publication for U.S. differences with ICAO Annex 1 medical standards.



AEROSPACE MEDICAL CERTIFICATION DIVISION, AAM - 300
FAA Civil Aerospace Medical Institute
Mike Monroney Aeronautical Center
P.O Box 26080
Oklahoma City,  OK  73125-9914

LAWRENCE MICHAEL MEADOWS
1900 Sunset Harbour Drive  Apt 2112
Miami Beach  FL  33139  USA

Dear Airman:

Above is your new medical certificate. It supersedes any previous one you may have been issued.

To validate this certificate, it is necessary that you sign it in the space provided (Airman's Signature).

This certificate must be in your possession at all times while exercising your pilot privileges.

APA_000024153



## ALLIED PILOTS ASSOCIATION
Representing the pilots of American Airlines



O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org



April 8, 2019

Captain Kimball Stone
Vice President – Flight
American Airlines, Inc.
P.O. Box 619617  MD851
DFW Airport, TX 75261-9617

RE:    Reinstatement of Robert A. Burchard, #519151

Dear Captain Stone:

Robert A. Burchard, #519151, is seeking reinstatement to the seniority list with his relative seniority number following long-term disability ("LTD"). He was on LTD for more than five years and was dropped from the seniority list. Robert regained his First Class Medical Certificate, a copy of which is attached. APA initially notified the Company of Robert's request on or about January 23, 2019.

This letter is to confirm the Association's desire to restore Robert's seniority and return him to flying status as an Active Pilot at American Airlines.

Thank you for your quick attention to this matter.

Sincerely,

Captain Daniel F. Carey
President

Enclosure

Confidential

APA_000024154

UNITED STATES OF AMERICA
Department of Transportation
Federal Aviation Administration

## MEDICAL CERTIFICATE FIRST CLASS

This certifies that *(Full name and address):*

ROBERT Alan BURCHARD
366 Clough Road
Stamford VT 05352 USA

| Date of Birth | Height | Weight | Hair | Eyes | Sex |
|---|---|---|---|---|---|
| 01/17/1965 | 69 | 346 | BROWN | BLUE | M |

has met the medical standards prescribed in part 67, Federal Aviation Regulations, for this class of Medical Certificate.

**Limitations:** Must wear corrective lenses.

Date of Examination: 01/08/2019

Examiner's Designation No.: 0100499

Examiner Signature:

Typed Name: LANCE D REYNOLDS , MD

AIRMAN'S SIGNATURE

Applicant ID: 190631345    Control No.: 300003566587

FAA Form 8500-9

Confidential

APA_000024155