UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**LAWRENCE MEADOWS,**

      Plaintiff,                                  **CASE NO. 1:17-CV-22589-EA**

**v.**

**ALLIED PILOTS ASSOCIATION,** *et al.*

      Defendants.

_____/

**DEFENDANT'S <u>CORRECTED</u> STATEMENT OF MATERIAL FACTS[1]**

---

[1] In addition to this Statement of Material Facts required by S.D. Fla. Rule 56.1, this Court's scheduling order requires the parties to "also file a Joint Statement of Undisputed Facts." ECF No. 177 at 4. APA contacted Plaintiff on March 24, 2026, to request his position on the facts set forth below. Plaintiff responded that it would not be "feasible" or "appropriate" for him to review the proposed facts. APA is therefore unable to file a Joint Statement of Undisputed Facts.

## I.      The Collective Bargaining Agreement (CBA)

1.      Defendant Allied Pilots Association (APA) is a labor organization that has been the certified collective-bargaining representative for pilots at American Airlines (American) since 1963. Myers Decl. ¶ 4.

2.      APA represents a bargaining unit composed of over 16,000 pilots at American. Myers Decl. ¶ 5.

3.      All positions within the bargaining unit represented by APA at American are pilot positions. Myers Decl. ¶ 20, Ex. 1 (Constitution and Bylaws) Art. III § 1.A.

4.      A pilot must possess a Federal Aviation Administration (FAA) Medical Certificate to fly a commercial aircraft, including for American. Myers Decl. ¶ 21; *see* DX2[2]; DX3, at 1, 2.

5.      It is APA's understanding that every pilot position at American covered by the CBA between APA and American requires a pilot to have an FAA Medical Certificate because each pilot position covered by the CBA includes the duties of flying commercial aircraft. Myers Decl. ¶ 22.

6.      APA and American have negotiated a series of collective-bargaining agreements (CBAs) to set the terms and conditions of employment for pilots at American. Myers Decl. ¶ 14.

7.      APA and American have periodically renegotiated the CBA, including in 2003. Myers Decl. ¶¶ 14-16, Ex. 2 (2003 CBA).

8.      The 2003 CBA and all other relevant versions of the CBA contained rules that govern how pilots at American accrue and retain seniority. Myers Dec. ¶ 23, 2003 CBA §§ 11, 13, & Supp. F(1).

---

[2] Documents with the prefix "DX" or "CX" are appended to the Declaration of Joshua B. Shiffrin, as are excerpted transcripts from the depositions of Plaintiff, Mark Myers, and Dan Carey.

1

9.      Seniority determines many aspects of a pilot's working conditions and quality of life, including what aircraft they fly, what positions they hold, and their schedules, which consequently impacts their compensation. Meadows Dep. Tr. 173; Myers Day 2 Dep. Tr. 232-33; Carey Dep. Tr. ~~15~~332-33[3]; Stephens Decl. ¶ 6.

10.     The 2003 CBA and all other relevant versions of the CBA provided that American was responsible for maintaining a pilot seniority list that listed the American-employed pilots in order of seniority. 2003 CBA § 13.G; *see also* Carey Dep. Tr. ~~10~~184 ("I don't believe that APA . . . has the ability to put anybody back on the seniority list. . . . [T]hat i~~'~~s up to the company").

11.     Under the 2003 CBA and all other relevant versions of the CBA, all flying at American had to be performed by pilots whose names appeared on the pilot seniority list, subject to certain exceptions inapplicable to this case. 2003 CBA § 1.C.1; Myers Decl. ¶ 23.

12.     If a pilot at American loses their FAA Medical Certificate, is unable to operate under their unexpired medical certificate, or is unable to renew their medical certificate, that pilot is unable to operate and fly a commercial aircraft. A pilot in that position may take paid sick leave, unpaid sick leave, or disability leave, depending on their personal circumstances, pursuant to the terms of the CBA, until they regain their certification. Myers Decl. ¶ 24.

---

[3] Dan Carey's deposition occurred on March 4, 2026. The court reporter, due to health issues, ~~has was~~ ~~been~~ unable to produce a certified transcript by April 1, 2026, so APA submitted a rough transcript with its original Statement of Material Facts. *See* ECF No. 238. ~~All citations are, accordingly, to a computer-generated rough transcript based on the video of the deposition. APA will provide an updated statement of material fact when the certified transcript becomes available. The portions of the video cited herein are also available upon request.~~As indicated in that document, this Corrected Statement of Material Facts includes citations to an updated, certified transcript of the Carey Deposition. Those updated citations are the only substantive change to the document.

13.     The 2003 CBA contained provisions that permitted American to terminate pilots who had been on unpaid sick or disability leave for five years or longer. 2003 CBA § 11.D.1.; 2003 CBA Supp. F(1)5(d).

14.     Section 11.D of the 2003 CBA stated that while a pilot would retain and accrue seniority while on leave for sickness or injury, a "leave of absence for sickness or injury . . . may not exceed a total continuous period of five (5) years." 2003 CBA § 11.D.1.

15.     Another section of the 2003 CBA stated that "[a] pilot shall retain and continue to accrue his seniority for the purposes of [retirement benefit calculations] only for a period of five (5) years commencing at the expiration of his paid sick leave." 2003 CBA Supp. F(1)5(d).

16.     American and APA had a shared understanding, which both APA and American communicated to Plaintiff as early as 2011, that these provisions permitted American to terminate a pilot's employment and remove the pilot from the seniority after the pilot had been on unpaid sick or disability leave for more than five years. DX2; Myers Decl. ¶ 27, Exs. 3, 4, 5 (at 2); Myers Day 1 (Vol. 1) Dep. Tr. 105, 123; *see also* Carey Dep. Tr. ~~163~~343-44.

17.     APA internally referred to pilots terminated and removed from the seniority list by American after five years of unpaid sick or disability leave as Medical Disability Dropped (MDD) pilots. Myers Decl. ¶ 31; Boggess Decl.[4] ¶¶ 3-4.

18.     APA communicated to Plaintiff in fall 2011 that if an MDD pilot regained their FAA First Class Medical Certificate, APA could request that American reinstate that pilot and return them to the seniority list at their prior relative seniority position. Myers Decl. ¶ 32, Ex. 5 at 2.

---

[4] Declarations from APA Officials Keith Wilson, Arthur McDaniels, and J. Bennett Boggess, originally submitted in other proceedings, are appended to the Declaration of Joshua B. Shiffrin.

19.     There is no contractual right to reinstatement once a pilot has been terminated after being out for more than five years. The decision whether to reinstate a pilot who has regained their FAA First Class Medical Certificate ultimately falls within American's sole discretion. Myers Decl. ¶ 33, Ex. 4; Stone Decl. ¶ 5; Carey Dep. Tr. ~~6~~145, 1648, ~~10~~184.

## II.     Plaintiff Lawrence Meadows

20.     Plaintiff Lawrence Meadows started working as a pilot at American and became a member of APA in 1991. Meadows Dep. Tr. 18; Myers Decl. ¶ 17.

21.     Plaintiff stopped flying for American in or around 2003 due to a disability and began a long period of unpaid sick and/or disability leave. Meadows Dep. Tr. 18; DX2.

22.     Plaintiff's FAA First Class Medical Certificate expired in or around 2004. Meadows Dep. Tr. 24.

23.     Plaintiff did not regain his FAA First Class Medical Certificate until November or December 2018. Meadows Dep. Tr. 23; DX46.

24.     On August 5, 2011, Scott Hansen—the Director of Flight Administration at American—wrote to Plaintiff to inform him that, per the 2003 CBA and company policy, and because Plaintiff had been on a sick leave of absence for more than five years, his employment at American would end unless he either (a) regained his FAA First Class Medical Certificate and returned to his pilot position, or (b) "work[ed] with the Company" to identify a reasonable accommodation to return to work in a non-pilot position. DX2; *see also* DX3; DX4 at 5.

25.     On October 7, 2011, Scott Hansen wrote to Plaintiff to confirm that Plaintiff and American had been unable to identify a reasonable accommodation, in part because Plaintiff declined to pursue non-pilot positions outside the APA bargaining unit. DX4 at 5; *see also* DX3.

26. On November 4, 2011, Scott Hansen informed Plaintiff that he had been "removed from the pilot seniority list and administratively separated from" American as of October 21, 2011. DX4 at 2.

27. Since his termination, Plaintiff has not been an employee of American. *Meadows v. Am. Airlines*, No. 24-CV-20518, 2024 WL 5248006, at \*8, \*13 (S.D. Fla. Oct. 22, 2024) (holding that judicial and collateral estoppel bar Plaintiff from arguing otherwise); *In re AMR Corp.*, No. 11-15463 (SHL), 2016 WL 1559294, at \*6 (Bankr. S.D.N.Y. Apr. 14, 2016), *aff'd*, 764 F. App'x 88 (2d Cir. 2019) (noting that "three neutral decision makers have determined that Mr. Meadows was terminated" and invoking judicial estoppel to preclude his arguing otherwise).

28. In November 2011, APA informed Plaintiff in writing that American's termination of Plaintiff and removal of Plaintiff from the pilot seniority list were consistent with the 2003 CBA and that APA would be available to assist Plaintiff with requesting his reinstatement if he were to regain his FAA First Class Medical Certificate. Myers Decl. Ex. 5 at 2.

## III. Grievance 12-011

29. The 2003 CBA permitted pilots or APA to file grievances asserting that American violated its contractual obligations under the CBA. 2003 CBA § 21.D.2.

30. The 2003 CBA created a procedure for resolving grievances that involved the following steps: (1) American made a decision on the grievance after an initial hearing; (2) if American denied the grievance, the grievant could appeal to American for a decision after an appeal hearing; (3) if American denied the grievance after an appeal hearing, APA could advance the grievance to a pre-arbitration conference; (4) if the grievance could not be resolved in a pre-arbitration conference, APA could advance the grievance to arbitration before the System Board of Adjustment. 2003 CBA §§ 21-23.

31.     On or about February 4, 2012, Plaintiff filed an individual grievance (Grievance 12-011) asserting that his "discharge" from American and removal from the pilot seniority list was a "[b]latant violation" of the Americans with Disability Act and the Sarbanes-Oxley Act. DX13; *see also* DX15 at 1 (describing statutory basis for Grievance 12-011).

32.     On or about June 6, 2013, American denied Plaintiff's appeal of Grievance 12-011 after a hearing. DX14.

33.     On or about August 20, 2013, APA and American did not resolve Grievance 12-011 at a pre-arbitration conference. Myers Decl. ¶ 42, Ex. 7.

34.     On or about August 29, 2013, APA President Keith Wilson informed Plaintiff that APA would not advance Grievance 12-011 to arbitration before the System Board of Adjustment, explaining that advancing the grievance to arbitration would be inappropriate because it was "based on federal statutory claims." Myers Decl. ¶ 43, Ex. 8.

35.     On January 17, 2014, counsel for APA informed Plaintiff that Grievance 12-011 "has been closed"; Plaintiff responded, "I understand that 12-011 is closed." DX20 at 1.

36.     In February 2014, Plaintiff sued APA in the U.S. District Court for the District of Utah, alleging, among other things, that (1) APA's decision not to advance Grievance 12-011 to the System Board of Adjustment violated his statutory right to arbitrate grievances, and (2) APA violated its duty of fair representation under the Railway Labor Act by failing to advance Grievance 12-011 to arbitration. *See Meadows v. APA*, No. 2:14-CV-00115-DS, 2015 WL 13650044, at *1 (D. Utah Apr. 27, 2015), *aff'd*, 822 F. App'x 653 (10th Cir. 2020).

37.     In March 2014, Plaintiff told APA that he believed APA's decision not to advance Grievance 12-011 to arbitration was retaliatory. Myers Decl. Ex. 10; *see* Meadows Dep. Tr. 149.

38.     On July 22, 2014, Plaintiff filed an amended complaint in the Utah litigation. Shiffrin Decl. Ex. 11 (Amended Complaint); Ex. 12, at 10 (granting motion to amend).

39.     Both issues described in SMF ¶ 36 were fully briefed in connection with APA's motion to dismiss, and the court granted APA's motion, holding that (1) Plaintiff did not have an individual right to arbitration of his grievances, and (2) APA did not violate its duty of fair representation when it did not submit Grievance 12-011 to arbitration. Shiffrin Decl. Ex. 12 (Utah Order), at 3-9; *see also Meadows v. APA*, 2015 WL 13650044, at *1.

**IV.     Grievance 13-064**

40.     In 2013, Plaintiff filed an individual grievance (Grievance 13-064) asserting that American violated the 2003 CBA by terminating him and removing him from the pilot seniority list after five years of disability leave. DX19; *see Meadows v. APA*, 2015 WL 13650044, at *1.

41.     American denied the grievance after a hearing, concluding that Plaintiff's removal from the seniority list complied with the CBA. Myers Decl. Ex. 11.

42.     On April 23, 2014, APA President Keith Wilson informed Plaintiff that APA had decided not to advance Grievance 13-064 to a pre-arbitration conference, explaining that the claims in the grievance were "contrary to the plain language" of the CBA and therefore submission to a pre-arbitration conference "would not be appropriate." Myers Decl. Ex. 12.

43.     In his lawsuit in the U.S. District Court for the District of Utah, Plaintiff asserted a claim that APA had violated its duty of fair representation by failing to advance Grievance 13-064. Shiffrin Decl. Ex. 11 (Am. Compl.) ¶¶ 144-91; *see id.* Ex. 12 (Order), at 2, 6-7.

44.     The district court in Utah dismissed the claim, concluding that "the CBA . . . expressly allows American to remove a pilot from the Seniority List if the pilot exhausts his or her sick leave of absence," and "[t]hus, when American removed Plaintiff from the Seniority List, it

acted within the confines of the CBA." Shiffrin Decl. Ex. 12 (Order), at 6-7; *see Meadows v. APA*, 2015 WL 13650044, at *1 (concluding that Grievance 13-064 was "not supported by the CBA").

**V.      Grievance 12-012**

45.      Pilots at American are assigned to ten different geographical "bases" or "domiciles," corresponding to major hubs for the airline. Myers Decl. ¶ 12.

46.      APA's governance structure is similarly organized by domicile. Myers Decl. ¶ 13.

47.      Each domicile has a chair and vice chair, and each APA member is assigned to a domicile that coincides with his or her employment assignment from American. Myers Decl. ¶ 13.

48.      On May 22, 2012, the Chairman and Vice Chairman of APA's Dallas/Fort Worth (DFW) base filed a grievance "on behalf of all DFW-based pilots." DX21.

49.      Grievance 12-012 was a "base grievance," *see* 2003 CBA § 21.D.2.a(2); Meadows Dep. Tr. 151, which meant that it was not filed by an individual pilot but rather by an APA base representative on behalf of affected pilots at the representative's base—for example "DFW-based pilots." DX21; *see* Myers Day 1 (Vol. 2) Dep. Tr. 8, 14.

50.      When APA prevails in a base grievance, relief is awarded to all similarly situated pilots at the base on whose behalf it was filed. Myers Day 1 (Vol. 2) Dep. Tr. 15-16.

51.      If APA prevails in a base grievance, it can try to convince American to apply the resolution to similarly situated pilots across all bases. Myers Day 1 (Vol. 2) Dep. Tr. 11-12.

52.      Plaintiff was not a DFW-based pilot at the time of his termination in 2011. Myers Decl. 19; *see* Myers Day 1 (Vol. 2) Dep Tr. 21.

53.      Grievance 12-012 asserted that American violated the CBA by (1) "failing to reinstate pilots" to the pilot seniority list, and (2) "failing to provide pilots notice of termination

prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years." DX21.

54.    Grievance 12-012 was intended to challenge (1) American's practice of terminating pilots who had been on unpaid sick or disability leave for five years without first providing adequate notice, and (2) American's then-recent practice of categorically refusing to reinstate pilots who had been terminated after five years of unpaid sick or disability leave but who had regained their FAA First Class Medical Certificate and thereafter sought reemployment with American. Myers Day 1 (Vol. 2) Dep. Tr. 9-11; Myers Day 2 Dep. Tr. 54-55; McDaniels Decl. ¶¶ 28-30.

55.    Grievance 12-012 did not seek reinstatement of all pilots who had been terminated after being on unpaid sick or disability leave for five years. Myers Day 1 (Vol. 2) Dep. Tr. 13; Myers Day 2 Dep. Tr. 55, 109; Boggess Decl. ¶ 11.

56.    If successful, Grievance 12-012 would not have resulted in the blanket reinstatement of all MDD pilots, let alone an MDD pilot who still lacked an FAA First Class Medical Certificate. Myers Day 1 (Vol. 2) Dept. Tr. 12, 21; Myers Day 2 Dep. Tr. 110.

57.    As of the filing of the Amended Complaint in this case in October 2018, APA had not advanced Grievance 12-012 to arbitration. Myers Day 2 Dep. Tr. 55-56.

58.    It is not unusual at APA for a grievance to take years to get to arbitration. Myers Decl. ¶ 52.

59.    Between 2012 and 2021, APA had on average approximately 155 grievances in any given year that were filed on behalf of American pilots. It also inherited hundreds of open grievances filed on behalf of former US Airways pilots prior to the merger between US Airways and American, which became APA's responsibility when it became the certified bargaining representative for those pilots in September 2014. Myers Decl. ¶ 54.

60.     When Captain Dan Carey came into office as APA's president in July 2016, there were approximately 700 pending grievances, some up to 11 years old. Carey Dep. Tr. ~~11~~246, ~~13~~271.

61.     APA needs American's agreement to schedule grievances for arbitration, and between 2012 and 2021, APA and American scheduled for arbitration an average of approximately 11 grievances per year. Myers Decl. ¶¶ 53, 55; Carey Dep. Tr. ~~11~~246, 248~~, 12~~.

62.     Between the filing of Grievance 12-012 in 2012 and the filing of Plaintiff's Amended Complaint in 2018, APA addressed many of the concerns raised by Grievance 12-012 through other avenues. Myers Day 2 Dep. Tr. 61, 225-26.

63.     After Grievance 12-012 was filed, APA persuaded American to give notice to pilots before they were terminated and dropped from the seniority list after being on unpaid sick or disability leave for five years. Myers Day 2 Dep. Tr. 226.

64.     After Grievance 12-012 was filed, American ceased its blanket refusal to reinstate MDD pilots who had regained their FAA First Class Medical Certificate and resumed considering reinstatement requests on a case-by-case basis. *See* Myers Decl. ¶ 36; Myers Day 2 Dep. Tr. 226; Carey Dep. Tr. 164~~7-8~~, ~~17~~344-45.

65.     In 2016, APA negotiated a Letter of Agreement with American to amend Supp. F(1) of the CBA such that pilots on disability leave would no longer be terminated and removed from the seniority list after five years. Myers Decl. Ex. 6; *see* Myers Day 2 Dep. Tr. 225-26.

66.     APA's representatives sought to make that change retroactive, but American would only agree to the change if the change was prospective. Myers Day 1 (Vol. 2) Dep. Tr. 50-54; Carey Dep. Tr. ~~17~~345.

10

67.     Several MDD pilots who regained their FAA First Class Medical Certificate have been reinstated to their position and placed on the seniority list on a case-by-case basis at American's discretion. Myers Decl. ¶ 36; Myers Day 1 (Vol. 1) Dep. Tr. 216; Myers Day 2 Dep. Tr. 226; Carey Dep. Tr. 161-64.7-8.

68.     Joe Barkate was a pilot who was terminated after he had been on unpaid sick or disability leave for five years or longer. Myers Day 1 (Vol. 2) Dep. Tr. 47-48.

69.     Mr. Barkate was reinstated at American in 2019 at his prior relative seniority position, but only after he had regained his FAA Medical Certificate. Myers Day 1 (Vol. 2) Dep. Tr. 55-56; *see* Carey Dep. Tr. 23355.

70.     Then-APA president Dan Carey requested that American reinstate Mr. Barkate in the same manner he made the request for Plaintiff and other pilots. Carey Dep. Tr. 352-5620-21, 23.

## VI.     Seniority List Integration

71.     In November 2011, American filed for Chapter 11 bankruptcy. Myers Decl. ¶ 44.

72.     In 2013, while it was in bankruptcy, American agreed to merge with U.S. Airways. Myers Decl. ¶ 56.

73.     In connection with that merger, the two airlines and the two unions representing the pilots at the airlines (APA and the U.S. Airline Pilots Association) entered into a Memorandum of Understanding (MOU) that addressed, among other things, steps the parties would take toward merging the pilot seniority lists from the two airlines. Myers Decl. ¶ 57, Ex. 13 (MOU).

74.     Section 10 of the MOU provided that "[a] seniority integration process consistent with McCaskill-Bond shall begin as soon as possible after" the effective date of the MOU and the parties would enter into a "Seniority Integration Protocol Agreement" that would "set forth the

process and protocol for conducting negotiations and arbitration," MOU ¶¶ 10(a), (f), and Section 20 provided that any dispute "over the interpretation or application" of the MOU "shall be arbitrated on an expedited basis directly before a specially-created one-person System Board of Adjustment" and "shall be heard no later than thirty (30) days following the submission to the System Board" and "shall be decided no later than thirty (30) days following the first day of the hearing, unless otherwise agreed to in writing." MOU ¶ 20.

75.     On September 24, 2014, the parties entered into a Seniority Integration Protocol Agreement that established a process for integrating the pilot seniority lists. Stephens Decl. Ex. A (Protocol Agreement).

76.     The process called for merger committees established by APA and U.S. Airline Pilots Association to compile and exchange certified seniority lists containing data "for each pilot on their respective pre-merger seniority lists." Protocol Agreement ¶ 2.

77.     The Seniority Integration Protocol Agreement provided that "the certified seniority lists will reflect the status quo of the . . . seniority lists in effect at the carriers on December 9, 2013." Protocol Agreement ¶ 2(b).

78.     The Seniority Integration Protocol Agreement also required the merger committees to compile and exchange lists of pilots "who ha[ve] been terminated or otherwise removed from the pre-merger seniority list, whose status is the subject of any pending litigation or dispute." Protocol Agreement ¶ 2.a.7.

79.     The Seniority Integration Protocol Agreement provided for the creation of a three-member "Arbitration Board" that would "have the authority to establish a fair and equitable integrated seniority list." Protocol Agreement ¶¶ 6-7.

80.     APA established a merger committee called the American Airlines Pilot Seniority Integration Committee (AAPSIC). Stephens Decl. ¶ 10.

81.     AAPSIC requested and received employment data from American that it used to create a certified pilot seniority list that it submitted pursuant to the Seniority Integration Protocol Agreement. Stephens Decl. ¶¶ 18-19, 23-24.

82.     Plaintiff was not included in AAPSIC's certified seniority list because he was not included in the data that AAPSIC received from American as to pilots on the American pilot seniority list on or around December 9, 2013, but he was included in a separate list of pilots who were challenging their separation from American. Stephens Decl. ¶ 25; *see id.* ¶¶ 16-23.

83.     On March 1, 2016, Plaintiff wrote to Mark Stephens, the chairman of AAPSIC, to complain about his omission from the list, and on March 6, 2016, Mr. Stephens responded that (1) Plaintiff was absent from the list because he was not on American's seniority list as of December 9, 2013, and (2) Plaintiff's name was included on a separate list identifying pilots known to be disputing their termination or removal from the seniority list. Stephens Decl. ¶ 27, Ex. G.

84.     On or about March 21, 2016, Plaintiff sent a letter to APA and American that purported to commence a grievance challenging the seniority list integration process pursuant to provisions in the MOU. Myers Decl. Ex. 14 (MOU Grievance).

85.     Plaintiff asserted that under Paragraph 20 of the MOU, he was entitled to an expedited process that required arbitration before a System Board of Adjustment within 30 days of submission. Myers Decl. Ex. 14 at 3-4.

86.     American sent a letter to Plaintiff saying that it considered the MOU Grievance that Plaintiff purported to file to be a breach of an injunction that had been entered in bankruptcy court

13

enjoining Plaintiff from commencing or continuing any grievance arising from his termination from American or removal from the pilot seniority list. Shiffrin Decl. Ex. 7.

87.     APA did not initiate arbitration in response to Plaintiff's letter. Myers Decl. ¶ 62.

88.     In a joint letter sent to another pilot—which was shared with Plaintiff—APA and American took the position that individual pilots did not have a right to file a grievance under the MOU arbitration provisions, stating that "the MOU dispute resolution process in Paragraph 20 did not create and was never intended by the parties to create an avenue for pilots to lodge collateral attacks on the [seniority list integration] process itself, or to have an arbitrator rule on the contours of federal statutes." Shiffrin Decl. Ex. 6, at 1, 2.

89.     The integrated seniority list was finalized by the Arbitration Board on September 6, 2016. Stephens Decl. ¶ 26; Myers Decl. ¶ 63.

90.     On September 19, 2016, Plaintiff sent an email to Mark Stephens stating that "APA Legal refused to submit" his grievance that he sought to file under the MOU to the System Board of Adjustment. Stephens Decl. ¶ 27, Ex. H at 2.

91.     On or about November 9, 2016, Plaintiff submitted a claim to the Dispute Resolution Committee established by the Arbitration Board for purposes of resolving disputes regarding the interpretation or application of the integrated seniority list award. DX28.

92.     The Dispute Resolution Committee informed Plaintiff on January 9, 2017, that it had declined to pursue Plaintiff's complaint. DX29; DX30.

93.     On December 19, 2016, Plaintiff filed internal union charges against individual members of APA's merger committee (AAPSIC). DX33.

94.     For relief, those internal union charges sought that AAPSIC members "be held to account for failure to comply with their duties" under the APA Constitution and Bylaws, including

14

"whatever disciplinary action, fines, and sanctions" the Appeal Board should deem appropriate. DX33 at 5.

95.     In June 2017, Plaintiff sent an email to APA stating that he had a deadline of July 8, 2017, to file a federal lawsuit asserting a duty-of-fair representation claim pertaining to the seniority list integration process. DX32.

## VII.    Request for Reinstatement

96.    After APA adopted a resolution in 2014 addressing the process by which an MDD pilot could ask APA to petition American for reinstatement, Plaintiff wrote to APA to request reinstatement to the seniority list. DX38; *see* DX39.

97.    An APA representative wrote back to Plaintiff informing him that APA would not consider forwarding his request to American until he regained an FAA First Class Medical Certificate, as required by the 2014 resolution. DX40; *see* DX39.

98.    On or about December 10, 2018, Plaintiff informed APA President Dan Carey that he had regained his FAA First Class Medical Certificate, and he requested "immediate and unconditional reinstatement" to his "original relative position" on the seniority list. DX46.

99.    On December 26, 2018, President Carey emailed American requesting that Plaintiff be reinstated to his relative position on the seniority list. Stone Decl. ¶ 4, Ex. 1.

100.    A few months later, on or about April 8, 2019, President Carey sent a letter to American, again requesting that American return Plaintiff to flying status and restore Plaintiff to the seniority list. Stone Decl. ¶ 4, Ex. 2.

101.    The April 8, 2019, letter was part of a batch of four nearly identical letters sent by President Carey to American on behalf of pilots who had been terminated under the five-year rule and subsequently re-obtained their FAA First Class Medical Certificate. *See* CX31.

102.    American received and considered President Carey's requests but declined to reinstate Plaintiff to the seniority list or return him to flying status. Stone Decl. ¶¶ 4, 5; Carey Dep. Tr. 1699 (recounting statement that "American Airlines reserves the right to put in the cockpit who they feel they deem safe and airworthy . . . . [W]e'll continue paying Larry Meadows' disability, but we—, we're not gonna going to put him back in the cockpit.").

103.     On or about April 4, 2019, July 10, 2019, and December 10, 2019, a legal representative from American wrote to Plaintiff demanding that he cease and desist communicating with American employees seeking to return to work. DX57.

## VIII.   APA Constitution and Bylaws

104.     APA's associational affairs are governed by its Constitution and Bylaws. Myers Decl. ¶ 11, Ex. 1 (Constitution and Bylaws)

105.     At all times relevant to this matter, the Constitution and Bylaws articulated criteria for membership in APA and established several categories of membership in APA: apprentice, active, inactive, and honorary. Constitution and Bylaws Art. III §§ 1-2.

106.     The Constitution and Bylaws provide that "[a] member in good standing is entitled to participate actively in all APA activities and is entitled to all of the rights, privileges, and benefits of membership in the APA." Constitution and Bylaws Art. III § 7.A.

107.     The Constitution and Bylaws provide that "inactive members shall enjoy all of the benefits of active membership except the privileges of voting, holding elected office, and participation in Association sponsored programs where specific requirements prohibit such participation." Constitution and Bylaws Art. III § 7.B.

108.     "Active Membership" applies to "flight deck operating crew members" who meet certain other qualifications, Constitution and Bylaws Art. III § 2.B, and pilots who do not actively fly for American, such as pilots on "[m]edical or [p]ersonal [l]eave of [a]bsence," are eligible for inactive membership, Constitution and Bylaws Art. III § 2.C.

109.     An active "member in good standing shall automatically be transferred to inactive membership status upon … [b]eing on leave of absence form the Company twelve (12) months after the expiration of paid sick leave." Constitution and Bylaws Art. III § 2.C.

17

110.     Dues for APA members are assessed as a percentage of contractual pay received from American; thus pilots on unpaid leaves of absence do not pay dues to APA. Constitution and Bylaws Art. III § 6.A; Myers Decl. ¶ 77.

111.     Prior to 2016, there had been internal debate within APA about the membership status of MDD pilots who could potentially regain their FAA Medical Certificate (and thus be eligible to fly) and seek reinstatement from American. Myers Decl. ¶ 68.

112.     APA's president has the authority to "issue, as necessary, written interpretations of the Constitutional and Bylaws," Constitution and Bylaws Art. IV § 8.A.3, which are binding unless disapproved by the Board of Directors, Constitution and Bylaws Art. V § 1.A.

113.     On June 30, 2016, APA President Keith Wilson issued a binding constitutional interpretation, stating that, under the Constitution and Bylaws, a pilot who "loses his or her seniority under Section 11.D or Supplement F(1) of the CBA," *i.e.*, an MDD pilot, "retains his or her status as an inactive APA member until such time as the pilot returns to active pilot employment." Myers Decl. Ex. 15.

114.     On January 10, 2017, after Plaintiff had filed internal union charges against President Wilson, an arbitrator issued an award (the Valverde Award) determining that Plaintiff was an inactive member of APA under the Constitution and Bylaws. Myers Decl. Ex. 18 (Valverde Award) at 14.

115.     The arbitrator further concluded that an inactive member of APA cannot be a member in "good standing" and therefore Plaintiff lost his "good standing" status when he became an inactive member. Valverde Award at 16.

116.     These issues were fully litigated in the arbitration proceedings. Meadows Dep. Tr. 212.

18

117. During those proceedings, Plaintiff submitted evidence, presented witnesses, and submitted a post-hearing brief. Meadows Dep. Tr. 212; Myers Decl. ¶ 71, Exs. 16, 17.

118. Plaintiff threatened to file a federal lawsuit seeking to overturn the Valverde Award but never did so. Myers Decl. ¶ 75, Ex. 19; Meadows Dep. Tr. 215.

119. On October 18, 2017, APA President Carey sent Plaintiff a letter confirming the arbitrator's finding that inactive members are not members in good standing. Myers Decl. Ex. 20.

## IX. Challenge & Response

120. APA maintains a password-protected website with several components. Myers Decl. ¶ 78; Wilson Decl. ¶ 16.

121. One part of APA's website is an electronic forum where authorized users can post and read messages posted by others. During the relevant period that forum was called Challenge & Response (or "C&R"). Myers Decl. ¶ 78; Wilson Decl. ¶¶ 16, 17; McDaniels Decl. ¶ 33.

122. Prior to 2014, the use of Challenge & Response was governed by an Acceptable Use Policy that limited access to Challenge & Response to certain classes of membership, which did not include inactive members. Wilson Decl. ¶¶ 20, 25; McDaniels Decl. ¶¶ 33, 34.

123. Prior to April 2014, that policy was not enforced, and inactive members, including MDD pilots, had access to Challenge & Response. Wilson Decl. ¶¶ 32-34, 36.

124. At 1:55 PM on April 22, 2014, Plaintiff emailed an APA lawyer and stated that: "Just to be clear, if APA is absolutely refusing to process my petition on the basis of medical disability, then please advise Bennett [Boggess], that myself and many other similarly situated pilots will be filing EEOC charges on that matter." DX43.

125. At a meeting on or about April 22, 2014, the APA Board of Directors decided to enforce the Acceptable Use Policy and revoke access to Challenge & Response by inactive pilots,

19

including MDD pilots. Wilson Decl. ¶¶ 32-34, Ex. 6; McDaniels Decl. ¶ 35. That decision was made sometime before 3:47 PM, when an email was sent instructing members of the IT team to remove MDD's access. Wilson Decl. ¶ 36, Ex. 8.

126.    As a result of the Board's decision on April 22, 2014, more than 200 MDD pilots, and more than 900 pilots total, lost their access to Challenge & Response. Meadows Dep. Tr. 263.

127.    An MDD pilot named Kathy Emery subsequently sued APA regarding the Challenge & Response restrictions and prevailed. *Emery v. Allied Pilots Ass'n*, 227 F. Supp. 3d 1292 (S.D. Fla. 2017) (Hurley, J.).

128.    In January 2017, the court in the *Emery* case found that, while APA's justifications for enforcing the restrictions in the Acceptable Use Policy "were not offered to mask an impermissible discriminatory animus," 227 F. Supp. 3d at 1299, APA's "policy of denying MDD pilots access to Challenge & Response constitutes . . . an impermissible infringement on [Plaintiff Emery]'s right to free speech guaranteed by [the] LMRDA," *id.* at 1302.

129.    The court ordered that APA grant Ms. Emery "complete access to 'Challenge & Response,' the union's website chat room on the same terms and conditions as exist today for all active members of the APA." Shiffrin Dec. Ex. 13 (Final Judgment), at 2.

130.    On January 13, 2017, APA restored access to Challenge & Response for all MDD pilots—including Plaintiff—and consequently Plaintiff had access as of the filing of his Amended Complaint. Meadows Dep. Tr. 271; DX45.

131.    On January 13, 2017, APA President Dan Carey informed Plaintiff that his access to Challenge & Response had been restored, along with all the MDD pilots. DX45.

20

## X.    Additional Retaliation Allegations

132.    In November 2012, American and APA negotiated a Letter of Agreement that included a list of 37 grievances that they agreed were not resolved as of that date and would be preserved under APA's proof of claim in the bankruptcy proceedings. Myers Decl. Ex. 9 at Ex. A.

133.    On January 17, 2014, Plaintiff emailed APA that it was his understanding that APA would be amending its proof of claim in the American bankruptcy, and he asked if his remedies under Grievance 12-011 would be preserved under APA's proof of claim. DX20 at 2.

134.    On January 20, 2014, an APA attorney wrote back to Plaintiff and stated that "APA will be taking no further action to support Grievance No. 12-011, which is closed and has no value associated with it at this point." DX20 at 1.

135.    On March 7, 2014, APA filed an amended proof of claim in the American bankruptcy. Myers Decl. Ex. 9. That document included a list of "APA Legal Active Grievances as of 2/28/14," and did not include Grievance 12-011. Myers Decl. Ex. 9 at Ex. B.

136.    On or around April 17, 2014, APA's then-general counsel Steven Hoffman, appeared at a hearing during the American bankruptcy and explained that (1) APA had informed Plaintiff that it would not be advancing Grievance 12-011 to arbitration because it did not assert a contractual violation and instead asserted statutory claims that were not within the jurisdiction of the System Board arbitration panel, and (2) APA was taking no position on the timeliness or validity of the statutory claims asserted in Grievance 12-011. DX42 at 8, 69-71.

137.    On March 2, 2017, Plaintiff was temporarily denied access to APA's headquarters and was let into the building after he called then-President Dan Carey. Meadows Dep. Tr. 341-43.

21

138.     Plaintiff considered Dan Carey, who was president of APA ~~between~~ from July 2016 ~~and~~ to June 30, 2019, to be a friend and strong supporter. Carey Dep. Tr. 11~~3~~34, ~~14~~296; Meadows Dep. Tr. 218.

Dated: April 6~~1~~, 2026

Respectfully submitted,

*/s/ Andrew Dymowski*
Andrew Dymowski, Esq.
Florida Bar No.1058209
Capri Trigo, Esq.
Florida Bar No. 28564
GORDON REES SCULLY MANSUKHANI
Miami Tower
100 S.E. Second Street, Suite 3900
Miami, Florida 33131
Telephone: (305) 428-5309
Email: ctrigo@grsm.com

*/s/ Joshua B. Shiffrin*
Joshua B. Shiffrin*
John M. Pellettieri*
Lane Shadgett*
BREDHOFF & KAISER PLLC
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Email: jshiffrin@bredhoff.com
Email: jpellettieri@bredhoff.com
Email: lshadgett@bredhoff.com
*Admitted *Pro Hac Vice*

*Counsel for Defendant Allied Pilots Association*

23