# EXHIBIT A

## TO MEADOWS DECLARATION

## Exhibit A:
## Pending Dispositive & Procedurally Critical Matters On April 15, 2026

| ECF No. | Date Filed | Title / Description | Key Issue / Impact on MSJ |
|---|---|---|---|
| **Pending Motions** | | | |
| 109 / 110 | 10/21/2025 | Motion to Disqualify Counsel (Criminal Witness Tampering) | **Fitness of Counsel:** Challenges counsel's standing due to alleged criminal witness tampering. |
| 129 | 11/03/2025 | Motion to Supplement Pleadings (2018-2025 Facts) | **Scope of Case:** Seeks to add post-2021 claims; precludes SJ on a stale record. |
| 142 | 11/19/2025 | Second Motion to Disqualify Counsel (Sue Edwards Conflict) | **Fitness of Counsel:** Alleges an unwaivable conflict created by representing Plaintiff's former attorney. |
| 148 | 11/26/2025 | Motion to Correct Record & for Sanctions (re: Pellettieri) | **Integrity of Record:** Alleges counsel made material misrepresentations to secure the Protective Order. |
| 155 | 12/09/2025 | Motion for Evidentiary Hearing (on Disqualification) | **Fitness of Counsel:** Unresolved request for hearing on counsel's alleged misconduct. |
| 167 | 01/13/2026 | Notice of Supplemental Authority (New EEOC Charges) | **Scope of Case:** Notifies court of case-altering events that render the current schedule untenable. |
| 173 | 01/14/2026 | Amended Motion for Extension of All Case Deadlines & Stay | **Judicial Management:** Direct request to halt proceedings to resolve foundational issues. |
| 183 | 01/30/2026 | Motion for Leave to File Supplemental Evidence (Sicher Decl.) | **Integrity of Record:** Seeks to formally add the Sicher declaration to support multiple pending motions. |
| 186 | 02/02/2026 | Notice of Conventional Filing (Witness Tampering Recordings) | **Fitness of Counsel:** Documents submission of audio evidence requested by the Magistrate, pending for 2+ months. |
| 187 | 02/03/2026 | First Motion for Sanctions (Spoliation - Sicher) | **Integrity of Record:** Alleges bad-faith destruction of former president's laptop & data. |

1

| ECF No. | Date Filed | Title / Description | Key Issue / Impact on MSJ |
|---|---|---|---|
| 205 | 02/17/2026 | Emergency Motion to Vacate Protective Order (Fraud on Court) | **Integrity of Record:** Seeks to undo Protective Order procured by counsel's material misrepresentations. |
| 213 | 03/02/2026 | Emergency Motion to Stay All Deadlines | **Judicial Management:** Asks to halt MSJ process pending resolution of motion logjam. |
| 223 | 03/12/2026 | Second Motion for Sanctions (Spoliation - Carey) | **Integrity of Record:** Alleges destruction of data from another former president, Dan Carey. |
| 224 | 03/12/2026 | Motion to Transfer Venue (from E.D.N.Y.) | **Scope of Case:** Seeks to consolidate post-2021 claims, making MSJ on stale record premature. |
| **Pending Objections** | | | |
| 149 | 11/26/2025 | Objections to Protective Order (ECF No. 138)    (1st Obj.) | **Scope/Discovery:** Challenges order limiting temporal scope & quashing 8 key witness subpoenas. |
| 159 | 12/23/2025 | Objections re: Denial of Discovery Relief (2nd Obj.) | **Discovery:** Documents APA's production delays and failure to provide searchable discovery. |
| 162 | 12/29/2025 | Objections to Sua Sponte Order re: Depo Date (3rd Obj.) | **Discovery:** Challenges prejudicial scheduling of the critical 30(b)(6) deposition. |
| 176 | 01/15/2026 | Objections re: Constructive Denial of Relief (4th Obj.) | **Discovery:** Documents ongoing discovery abuses and lack of judicial remedy. |
| 208 | 02/18/2026 | Objections re: Denial of Re-Deposition    (5th Obj.) | **Discovery:** Challenges denial of remedy for "discovery ambush" before Myers deposition. |
| 232 | 03/23/2026 | Sixth Objection re: Order Granting Excess Pages    (6th Obj.) | **Prejudice:** Challenges one-sided ruling granting APA excess pages without reciprocal relief. |
| 246 | 04/07/2026 | Seventh Objection re: Order Denying Extension (7th Obj.) | **Prejudice:** Challenges biased denial of extension of time to respond to a 716 page MSJ filing. |

2

# EXHIBIT B

## TO MEADOWS DECLARATION

# Case No. 25-10297-DD

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT



FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

APR 01 2026

David J. Smith
Clerk

**Lawrence Meadows**

*Plaintiff-Appellant*

v.

**American Airlines, Inc.**

*Defendant-Appellee*

**Appeal from the United States District Court
for the Southern District of Florida**

**Case No. 1:24-cv-20518-DPG**

---

### APPELLANT'S REPLY BRIEF

---

Dated: March 30th, 2026

Lawrence M. Meadows
1900 Sunset Harbour Dr., 2112
Miami Beach, FL33139
Phone: 516-982-7718
lawrencemeadows@yahoo.com
**Pro Se Appellant**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Appellant, Lawrence M. Meadows ("Meadows"), pursuant to Eleventh Circuit Rule 26.1-1, submits this Certificate of Interested Persons and Corporate Disclosure Statement. The following parties have an interest in the outcome of this case or appeal:

1. American Airlines, Inc. (Appellee);

2. American Airlines Group Inc. (corporate parent of Appellee);

3. DellaBetta, Matthew M. (Appellee's counsel);

4. Gayles, Hon. Darrin P. (United States District Judge);

5. Goodman, Hon. Jonathan (United States Magistrate Judge);

6. Kolaya, Timothy A. (Appellee's counsel);

7. Meadows, Lawrence (pro se Appellant);

8. O'Melveny & Myers LLP (Appellee's counsel's firm);

9. Robertson, Mark W. (Appellee's counsel);

10. Stumphauzer Kolaya Nadler & Sloman, PLLC (Appellee's counsel's firm);

11. Stumphauzer, Ryan K. (Appellee's counsel);

12. Wood, Kelly S. (Appellee's counsel); and

13. Zarrow, Jason (Appellee's counsel).

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned

certifies that he is a natural person and not a corporation.


Lawrence M. Meadows
*Pro Se* Appellant

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT................................................................... C1

TABLE OF CONTENTS................................................................ i

TABLE OF AUTHORITIES............................................................. iii

ARGUMENT............................................................................ 1

I. INTRODUCTION: AMERICAN'S DEFENSES COLLAPSE UNDER THE WEIGHT OF ITS FRAUD ON THIS COURT.................................... 1

II. AMERICAN PERPETRATED A FRAUD ON THIS COURT BY PROFFERING A SETTLEMENT AGREEMENT PREDICATED ON A DEMONSTRABLY FALSE PRETEXT............................................. 3

A. American Knowingly Misrepresented the Status of Grievance 12-011............. 4

B. American Mischaracterized Grievance 12-012 to Create a False Distinction.... 5

III. AMERICAN'S FRAUD IS IRREFUTABLE PROOF OF PRETEXT, AND ITS SUBSTANTIVE DEFENSES FAIL AS A MATTER OF LAW AND EQUITY................................................................................... 6

A. The Doctrine of Unclean Hands Bars American's Reliance on Estoppel......... 6

B. The Settlement Agreement Is a New, Discrete Act of Retaliation That Renders Appellant's Claims Timely and Establishes a Viable ADA Claim.................... 8

C. American's Reliance on *Stanley* Is Eviscerated by its Own Discriminatory Actions......................................................................................... 9

D. Appellant's ADA Claims Are Not Preempted by the Railway Labor Act...... 10

CONCLUSION.......................................................................... 12

CERTIFICATE OF COMPLIANCE.................................................... 14

CERTFICATE OF SERVICE....................................................................... 16

## TABLE OF AUTHORITIES

### Cases

*Batuyong v. Gates*, 337 F. App'x 451 (6th Cir. 2009).................................. 10

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)........................... 3

*Brown v. Illinois Central R.R. Co.*, 254 F.3d 654 (7th Cir. 2001).................... 11

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994)............................... 11

*In re AMR Corp.*, 2022 WL 1556398, at *1.............................................. 4

*Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276 (11th Cir. 2005)... 11

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)........................... 8

*New Hampshire v. Maine*, 532 U.S. 742 (2001)......................................... 7

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945)... 8

*Pyles v. United Air Lines, Inc.*, 79 F.3d 1046 (11th Cir. 1996)..................... 11

*Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978)............................ 3

*Stanley v. City of Sanford*, 83 F.4th 1333 (11th Cir. 2023)................... 1, 3, 9, 10

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997)................................................................................ 9

*Williams v. Montgomery*, 742 F.2d 586 (11th Cir. 1984).............................. 9

### Statutes

42 U.S.C. § 12111(8) Americans with Disabilities Act ("ADA").................... 10

45 U.S.C. §151 et. seq. Railway Labor Act ("RLA")................................ 10

### Rules

## ARGUMENT

## I. INTRODUCTION: AMERICAN'S DEFENSES COLLAPSE UNDER THE WEIGHT OF ITS FRAUD ON THIS COURT

Appellee American Airlines, Inc. ("American") asks this Court to affirm a dismissal predicated on procedural defenses - estoppel, timeliness, and a flawed misapplication of *Stanley v. City of Sanford*, 83 F.4th 1333 (11th Cir. 2023). These arguments are a smokescreen designed to obscure the merits of its discriminatory and retaliatory refusal to reinstate formerly disabled Appellant Lawrence Meadows - now a fully qualified individual who meets all essential job functions of an American Airlines pilot – who was targeted for engaging in protected activity. This strategy of obstruction, however, has now crossed into sanctionable misconduct before this very Court.

At its own request, American moved to supplement the record with a settlement agreement it claims justifies its actions (ECF No. 30). This Court granted the motion, making the agreement part of the appellate record (ECF No. 40). That agreement is a confession of pretext. It is predicated on a material and demonstrably false statement: that Appellant's individual reinstatement "Grievance 12-011" seeking reinstatement was "disposed of and closed ... in 2013." (Appellant's Supplemental Appendix ["ASA"] at 2, ¶ 2).[1] As this brief will demonstrate, record

---

[1]   All citations to the Appellant's Appendix filed with the opening brief are designated as "(AA, Vol. [I, II, or III], Tab [##], at [p. ##])," referencing the

1

evidence - including prior federal court orders to which American was a party and which were explicitly cited in Appellant's Opening Brief - proves this is a fabrication.

American's fraud is the ultimate proof of pretext.

It shows American had to invent a reason to exclude Appellant from the return-to-work process ("RTW") it offered to the other formerly disabled MDD[2] pilots who were "Identified Individuals" in the settlement agreement - proving its true motive was retaliatory. This misconduct eviscerates American's procedural defenses. A party that comes to Court with unclean hands cannot seek refuge in equitable doctrines like estoppel.

---

district court ECF docket number used as the tab and the page number from that specific district court pleading. Citations to the separately filed Appellant's Supplemental Appendix are designated as "(ASA at [p. #])."

[2] MDD ("Medically Disability Dropped from AA Seniority List") is the classification for pilots administratively dropped from the seniority list for exceeding five years on disability, which the pilots' union, the APA, protested was a violation of the American pilots' collective bargaining agreement ("CBA') and past practice. The "Identified Individuals" in the settlement agreement were all MDD pilots. (ASA at 2, ¶ 1). Of the 55 MDD pilots who obtained FAA medical certification and sought reinstatement, only three were denied: Appellant, Kathy Emery, and Susan Twitchell. All three had sued American and their union, the APA, and filed EEOC charges. Emery and Twitchell took settlements waiving reemployment rights, leaving Appellant as the only MDD pilot denied reinstatement. (AA, Vol. I, Doc 22, at p. 6, n.2).

The fraudulent settlement agreement itself is a new, discrete act of retaliation, rendering Appellant's claims timely and viable. And American's reinstatement of other MDD pilots proves its reliance on *Stanley* is disingenuous. For these reasons, the district court's judgment must be reversed.

## II. AMERICAN PERPETRATED A FRAUD ON THIS COURT BY PROFFERING A SETTLEMENT AGREEMENT PREDICATED ON A DEMONSTRABLY FALSE PRETEXT

An attorney's duty of candor to the tribunal is paramount.

By filing its Motion to Supplement, American's counsel certified that its factual contentions had evidentiary support after a reasonable inquiry. Fed. R. Civ. P. 11(b)(3). American's failure to adhere to this basic standard is spectacular. Such conduct amounts to a fraud on the court, which is "distinguished by the fact that it is a wrong against the institutions set up to protect and safeguard the public." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978).[3] By proffering a settlement agreement predicated on a demonstrably false statement of fact, American has engaged in precisely such a scheme.

This conduct is not merely sanctionable; it provides this Court with dispositive, record-based evidence that American's stated rationale for its actions was pretextual.

---

[3]   Decisions of the former Fifth Circuit handed down prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

3

## A. American Knowingly Misrepresented the Status of Grievance 12-011.

The settlement agreement states the reason for Appellant's exclusion is that his **individual reinstament "Grievance 12-011" was "disposed of and closed...in 2013..."** (ASA at 2, ¶ 2). This is false, and the record proves it.

**First,** on September 5, 2014 - a year after the Appellant's individual reinstament grievance 12-011was supposedly "closed" - the Honorable Judge Sean H. Lane of the U.S. Bankruptcy Court for the Southern District of New York ordered that, notwithstanding any injunction, **"Meadows shall be permitted to arbitrate Grievance 12-011..."** (AA, Vol. II, Tab 76, Ex. D, at p. 22).

**Second,** on November 8, 2021, Judge Lane issued a subsequent order stating: **"The Stipulation does not affect Grievance No. 12-011 (02/04/12 Meadows, Lawrence) ...** and the parties retain their respective legal positions on the validity and status of those grievances." (AA, Vol. II, Tab 76, Ex. E, at p. 25).

**Third,** the record reflects that Appellant's **Grievance 12-011 specifically alleged that American, in response to Appellant's disability, had engaged in "improper assertions and actions" related to his "employment status, seniority, and discharge" in violation of the CBA and the ADA.** (*In re AMR Corp.*, 2022 WL 1556398, at *1, cited in AA, Vol. II, Tab 76, at p. 9). Furthermore, in a 2022 proceeding related to the bankruptcy, American's own counsel confirmed on the record that **"the process of fully litigating Grievance 12-011 ... is unaffected by**

4

debtors' objection...[and] is on a separate track." (*Id.*, cited in AA, Vol. II, Tab 76, at p. 11).

Appellant's Opening Brief put American on direct notice of this history. (Op. Br. at 11-12, 14, 16, 38-39, n.8). For counsel to then proffer a document claiming the opposite is not an innocent mistake. It is an intentional misrepresentation.

**B. American Mischaracterized Grievance 12-012 to Create a False Distinction.**

American's motion to supplement focused exclusively on the **collective, class-action style reinstatement Grievance 12-012**, arguing Appellant was different from the reinstated pilots because he received a "notice of termination" and they did not. (ECF No. 30 at 2). This argument is defective for two reasons.

**First,** American deliberately ignores the dual nature of Grievance 12-012, which not only protested the company's violation of the CBA and past practice not only for **"failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years"**, but also for **"failing to reinstate pilots to the Pilots' Seniority System List."** (AA, Vol. I, Doc 67, Ex. 5). The grievance was always about seeking reinstatement of MDD pilots like Appellant, a fact American now conveniently omits.

**Second,** the settlement agreement itself concedes the sole initial notice Appellant received from a non-supervisory administrator "may not have been

5

compliant in form." (ASA at 2, ¶ 2). The record shows why: it was not issued by Appellant's supervisor, his Miami Base Chief Pilot (the only individual with authority to terminate a pilot), and failed to provide him the "just cause" due process rights of initial notice, investigation, hearing and final written notice guaranteed by Section 21 of the CBA. (AA, Vol. I, Doc 67, ¶ 31). American's attempt to build a wall between Appellant and the other pilots is based on a "non-compliant" notice they admit was likely invalid.

## III. AMERICAN'S FRAUD IS IRREFUTABLE PROOF OF PRETEXT, AND ITS SUBSTANTIVE DEFENSES FAIL AS A MATTER OF LAW AND EQUITY

### A. The Doctrine of Unclean Hands Bars American's Reliance on Estoppel.

American's primary defense is that Appellant is judicially estopped from pursuing his claims because a prior court deemed him "terminated." (Appellee Br. at 19-25). This argument fails on the facts, misrepresents the prior court's ruling, and is barred by American's own misconduct.

**First,** American's factual premise is flawed. Notwithstanding the "terminated" label, Appellant has, since 2011, continuously received collectively bargained long-term disability benefits, under American's Pilot Long Term Disability Plan and Retirement Benefit Plan, in the form of taxable "Pilot Employee" W-2 wages, a full "Active Pilot Employee" benefits package, and continuous uninterrupted accrual of pension "Credited Service." (AA, Vol. I, Doc 67, ¶¶ 41-47,

6

Exs. 7-15). As detailed in Appellant's Opening Brief, the governing collectively bargained plan documents for these benefits define participants as "Employees" and provide that participation ceases upon "Resignation or Discharge." (Op. Br. at 42-43). American's attempt to use a single word taken out of context to erase Appellant's substantive and ongoing employment relationship is disingenuous; under the plain and unambiguous  terms of these plans, Appellant remains a "Participant" and an "Employee."

**Second,** American misrepresents the bankruptcy court's holding. While Judge Lane did use the term "terminated," he immediately qualified it by holding that Appellant's status did not extinguish his right to be reinstated. As the record reflects, Judge Lane stated: "[G]iven your status, whether it's an administrative separation or a termination, you're somebody who has it sounds like has a right to seek a position if you get [FAA] medical clearance…" (AA, Vol. I, Doc 67, Ex. G at 66:22-67:4) (emphasis added). American's estoppel argument conveniently ignores this crucial context, which recognizes the very "changed circumstance" – obtaining an FAA medical certificate – that gives rise to this ADA claim.

Finally, even if American's argument were not so factually and legally flawed, the equitable doctrine of judicial estoppel is unavailable to a party who has acted in bad faith. Judicial estoppel is an equitable doctrine whose purpose is to "protect the integrity of the judicial process." *New Hampshire v. Maine,* 532 U.S. 742, 749-50

(2001). It is not a technical trap for the unwary. Here, American seeks to benefit from this equitable doctrine while simultaneously perpetrating a fraud on this very Court. The overriding doctrine of unclean hands dictates that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

American's blatant and documented misrepresentation to this Court regarding the status of Appellant's Grievance 12-011 constitutes precisely the type of inequitable conduct that bars equitable relief. American cannot defraud this Court with one hand while asking for the equitable protection of estoppel with the other.

## B. The Settlement Agreement Is a New, Discrete Act of Retaliation That Renders Appellant's Claims Timely and Establishes a Viable ADA Claim

American argues that Appellant's claims are time-barred and that he fails to state a viable claim for post-termination retaliation. (Appellee Br. at 28-38). This is wrong. The 2025 settlement agreement, which reinstated three similarly situated formerly long term disabled MDD pilots but excluded Appellant based on a fraudulent pretext, is a **new and discrete act of discrimination and retaliation**. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (each discrete discriminatory act starts a new clock).

Moreover, the ADA's anti-retaliation provision protects former employees from post-employment adverse actions. This Court has long recognized that a former employee states a viable claim for retaliation when an employer's post-employment

8

actions - such as providing a negative reference, a refusal to hire or rehire, or, as here, blacklisting an individual from a reinstatement process - harm the former employee's prospects.

> In *Williams v. Montgomery*, this Court held that **"a former employee may bring a suit against his former employer for acts of retaliation ... for exercising his Title VII rights."** 742 F.2d 586, 588 (11th Cir. 1984). **This framework applies with equal force to the ADA.** *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). [Emphasis Added].

American's 2025 refusal to reinstate Appellant, predicated on a fraudulent settlement, is a classic example of post-termination retaliation against a former employee for engaging in protected activity (filing whistleblower complaints involving American's pilot disability cost savings scheme, EEOC charges of ADA discrimination and retaliation, and federal lawsuits). It is a new, actionable wrong, and Appellant's claims are therefore timely and viable.

## C. American's Reliance on *Stanley* Is Eviscerated by its Own Discriminatory Actions.

American's argument that Appellant is not a "qualified individual" under the ADA rests on its flawed analogy to the retiree plaintiff in *Stanley*. (Appellee Br. at 33-38). This fails for two dispositive reasons.

**First,** unlike the plaintiff in *Stanley* who "neither held nor desired to hold an employment position," Appellant has consistently and actively sought reinstatement through American's RTW process. The very existence of his individual Grievance

12-011, a grievance alleging both CBA and ADA violations, is protected activity and undeniable proof that Appellant "desires" employment. 42 U.S.C. § 12111(8) American's with Disabilities Act ("ADA"); *see also Batuyong v. Gates*, 337 F. App'x 451, 456 (6th Cir. 2009) (**grievances can be Title VII protected activity if they are related to employment discrimination**). [Empasis added].

**Second**, American's argument is fatally contradicted by its own actions. By creating a reinstatement process for the other "Identified Individuals" who were similarly "on inactive status, unpaid sick, or disability for more than five years, were removed from the pilot seniority list and separated from employment with the Company," before American's bankruptcy pre-petition date, (ASA at 2, ¶ 1); American judicially admitted that a return-to-work path existed and that these individuals were qualified candidates, and not barred by the bankruptcy injunction.

American's argument that Appellant - who was equally qualified and actively seeking reinstatement - is somehow disqualified is legally incoherent. The only material distinction between Appellant and the reinstated pilots is that Appellant engaged in protected activity by filing EEOC charges and federal lawsuits against American and its pilots' union, the APA. (Op. Br. at 6, n.2). Proving American's reliance on *Stanley* was disingenuous.

**D. Appellant's ADA Claims Are Not Preempted by the Railway Labor Act.**

10

American argues that Appellant's claims are preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §151 et. seq., because they require interpretation of the CBA. (Appellee Br. at 40-42). This argument misapprehends the controlling law. The Supreme Court in *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994), established that while claims that are "substantially dependent" on an analysis of a CBA are preempted, claims that allege violations of independent federal statutory rights are not. Id. at 266.

This Circuit, applying *Hawaiian*, has been clear that preemption is a narrow exception. Citing *Pyles v. United Air Lines, Inc.*, 79 F.3d 1046 (11th Cir. 1996), American argues for preemption but omits the Eleventh Circuit's crucial caution: "The fact that reference to a CBA may be required, particularly where factual issues are involved, is insufficient of itself to preempt...; only where interpretation of a CBA is required will the claim be preempted." *Id.* at 1050 (citation omitted).

Appellant's claims fall squarely into the non-preempted category. He alleges disparate treatment and retaliation in violation of the ADA - rights that are created by federal statute, not by the CBA. Here, the CBA and the grievances are referenced not to interpret disputed contractual rights, but as factual evidence of American's discriminatory conduct, its pretextual reasoning, and its retaliatory motive. As the Seventh Circuit clarified in *Brown v. Illinois Central R.R. Co.*, a disparate treatment or retaliation claim is not preempted where the CBA is merely consulted for context.

11

254 F.3d 654, 668 (7th Cir. 2001). Because Appellant's claims are not "substantially dependent" on interpreting the CBA, they are not preempted. See *Hawaiian Airlines*, 512 U.S. at 266.

In sum, this Court has long held that a plaintiff can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Here, **American's explanation for excluding Appellant - that his individual "grievance 12-011" was "disposed of and closed ... in 2013" - is not merely "unworthy of credence"; it is a proven falsehood based on the appellate record.**

The pretext is manifest.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court reverse the district court's judgment of dismissal and remand this case for proceedings on the merits.

Respectfully submitted,

Dated: March 30, 2026

**Lawrence M. Meadows**
*Pro Se* Appellant
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Eleventh Circuit Rule 27-4, I hereby certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because this document contains 2,723 words, excluding the parts of the motion exempted by Rule 32(f). This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated this 30th day of March 2026,

Lawrence M. Meadows
*Pro Se* Appellant
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

## CERTIFICATE OF SERVICE

**I, Lawrence M. Meadows, Pro Se Appellant, hereby certify,** that on March 30, 2026, a true and correct copy of the foregoing was filed via Federal Express with the Eleventh Circuit Clerk, and also served via Federal Express upon counsel of record in the Service List below.

Signature of Filer

## SERVICE LIST

**Mark W. Robertson**
O'Melveny & Myers, LLP
1301 Avenue of the Americas Suite 1700
New York, NY 10019
212-326-4329
Email: mrobertson@omm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kelly S. Wood**
O'Melveny & Myers, LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
949-823-6900
Email: kwood@omm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Zarrow**
O'Melveny & Myers, LLP
400 S HOPE ST FL 19

LOS ANGELES, CA 90071
Firm: 213-430-6000
jzarrow@omm.com
*ATTORNEY TO BE NOTICED*

**Ryan K. Stumphauzer**
**Matthew M. DellaBetta**
**Timothy A. Kolaya**
Stumphauzer, Kolaya, Nadler & Sloman, PLLC
One Biscayne Tower
2 South Biscayne Boulevard
Ste 1600
Miami, FL 33131
305-614-1413
Email: mdellabetta@sknlaw.com
*ATTORNEY TO BE NOTICED*

**Counsel for Appellee - American Airlines. Inc.**



ORIGIN ID:MPBA   (516) 982-7718
LAWRENCE MEADOWS

1900 SUNSET HARBOUR DR 2112

MIAMI BEACH, FL 33139
UNITED STATES US

TO  US COURT OF APPEALS 11TH CIR.
ATTN: CLERK OF COURT
56 FORSYTH STREET NORTHWEST

ATLANTA GA 30303
(404) 335-8100         REF:

SHIP DATE: 30MAR26
ACTWGT: 0.95 LB
CAD: 6570517/ROSA2710



FedEx
Express

E

**Envelope**

TRK#
0201  8701 3445 6058

WED — 01 APR 10:30A
MORNING 2DAY

P cycle me.

SP QFEA

30303
GA–US   ATL



529-2008

# EXHIBIT  C

## TO MEADOWS DECLARATION

# No. 25-10297-DD

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

**LAWRENCE MEADOWS,**
**Plaintiff-Appellant,**

v.

**AMERICAN AIRLINES, INC.,**
**Defendant-Appellee.**

**Appeal from the U.S. District Court**
**for the Southern District of Florida**
**Hon. Darrin P. Gayles**
**No. 1:24-cv-20518-DPG**

## APPELLANT'S MOTION FOR SANCTIONS AGAINST APPELLEE AND ITS COUNSEL PURSUANT TO FED. R. CIV. P. 11, FED. R. APP. P. 46, 28 U.S.C. § 1927, AND THE COURT'S INHERENT AUTHORITY

**Lawrence M. Meadows**
*Pro Se* Appellant
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant, Lawrence M. Meadows ("Meadows"), pursuant to Eleventh Circuit Rule 26.1-1, submits this Certificate of Interested Persons and Corporate Disclosure Statement. The following parties have an interest in the outcome of this case or appeal:

1. American Airlines, Inc. (Appellee);

2. American Airlines Group Inc. (corporate parent of Appellee);

3. DellaBetta, Matthew M. (Appellee's counsel);

4. Gayles, Hon. Darrin P. (United States District Judge);

5. Goodman, Hon. Jonathan (United States Magistrate Judge);

6. Kolaya, Timothy A. (Appellee's counsel);

7. Meadows, Lawrence (pro se Appellant);

8. O'Melveny & Myers LLP (Appellee's counsel's firm);

9. Robertson, Mark W. (Appellee's counsel);

10. Stumphauzer Kolaya Nadler & Sloman, PLLC (Appellee's counsel's firm);

11. Stumphauzer, Ryan K. (Appellee's counsel);

12. Wood, Kelly S. (Appellee's counsel); and

13. Zarrow, Jason (Appellee's counsel).

1Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned certifies that he is a natural person and not a corporation.

Lawrence M. Meadows
*Pro Se* Appellant

## APPELLANT'S MOTION FOR SANCTIONS AGAINST APPELLEE AND ITS COUNSEL PURSUANT TO FED. R. CIV. P. 11, FED. R. APP. P. 46, 28 U.S.C. § 1927, AND THE COURT'S INHERENT AUTHORITY

### PRELIMINARY STATEMENT

Plaintiff-Appellant Lawrence M. Meadows, proceeding *pro se*, respectfully moves for an order imposing sanctions on Defendant-Appellee American Airlines, Inc. ("American") and its counsel of record, Mark W. Roberston, Kelly S. Wood, and Jason Zarrow, of O'Melveny & Myers LLP; and Ryan K. Stumphauzer, Timothy A. Kolaya, and Matthew M. Dellabetta of Stumphauzer Kolaya Nadler & Sloman, PLLC, for conduct violating Federal Rule of Civil Procedure 11, as made applicable by Federal Rule of Appellate Procedure 46, as well as 28 U.S.C. § 1927 and this Court's inherent authority to sanction bad-faith litigation conduct.

Counsel for American has perpetrated a fraud on this Court by filing a motion to supplement the record (ECF No. 30) that contained a material and demonstrably false statement of fact.

### FACTUAL BACKGROUND

1.      On October 6, 2025, counsel for American filed a "Motion to Supplement the Record on Appeal" (ECF No. 30), which this Court granted on March 16, 2026 (ECF No. 40). The motion's central purpose was to introduce a 2025 Settlement Agreement to explain why Appellant was excluded from a reinstatement process.

1

2.      Specifically, the Settlement Agreement paragraph 2. states as the express pretext for excluding Appellant that his **individual grievance, "Grievance 12-011", was "disposed of and closed…in 2013."** A true and correct copy of the Settlement Agreement is attached as **Exhibit A.**

3.      This representation is demonstrably false and is directly contradicted by multiple judicial records to which American and its counsel were parties, all of which are part of the record on appeal.

4.      **The 2014 Order:** On September 5, 2014 - *after* the grievance was supposedly "closed" - the Honorable Judge Sean H. Lane of the U.S. Bankruptcy Court for the Southern District of New York **issued an order stating that Appellant "shall be permitted to arbitrate Grievance 12-011."** (AA, Vol. II, Tab 76-2, Ex. D, at p. 22). A true and correct copy of the 2014 Order is attached hereto as **Exhibit B.**

5.      **The 2021 Order:** On November 8, 2021, Judge Lane issued a subsequent order stating: **"The Stipulation does not affect Grievance No. 12-011 (02/04/12 Meadows, Lawrence)…** and the parties retain their respective legal positions on the validity and status of those grievances." (AA, Vol. II, Tab 76-2, Ex. E, at p. 25, ¶ 3). A true and correct copy of the 2021 Order is attached hereto as **Exhibit C.**

2

6. **The 2022 Admission:** The record further reflects that Grievance 12-011 specifically alleged that American, in response to Appellant's disability, had engaged in "improper assertions and actions" related to his "employment status, seniority, and discharge" in violation of the CBA and the ADA. (*In re AMR Corp.*, 2022 WL 1556398, at *1, cited in AA, Vol. II, Tab 76, at p. 9). Furthermore, in a 2022 proceeding related to the bankruptcy, American's own counsel confirmed on the record that **"the process of fully litigating Grievance 12-011 ... is unaffected by debtors' objection...[and] is on a separate track."** (*Id.*, cited in AA, Vol. II, Tab 76, at p. 11).

7. **The 2024 Corroboration:** Finally, these judicial records and admissions are corroborated by the sworn declaration of former APA President, Captain Edward Sicher, submitted on January 28, 2026, in the parallel litigation of *Meadows v. Allied Pilots Ass'n*. (S.D. Fla., No. 17-cv-22589-EA, ECF No. 180-3, ¶¶ 27, 30). **Captain Sicher attests that he directed Grievance 12-011 to be moved forward for arbitration in June 2024, and that it was still active awaiting an arbitration hearing as of October 7, 2024.** A true and correct copy of Captain Sicher's declaration is attached as **Exhibit D.**

8. American's counsel, particularly Mark W. Robertson, was deeply involved in these proceedings. The representation to this Court that Appellant

3

Meadows Grievance 12-011 was "disposed of closed…in 2013", was therefore made either with knowledge of its falsity or with a reckless disregard for the truth that falls far below the standard of "reasonable inquiry" required by Rule 11.

## ARGUMENT

By submitting a filing containing a material falsehood, American's counsel has violated multiple rules of professional conduct.

I. **Violation of Rule 11.**

Federal Rule of Civil Procedure 11(b)(3), made applicable to this Court by Fed. R. App. P. 46, requires an attorney to certify that factual contentions in a filing have evidentiary support after a reasonable inquiry. Counsel's representation was directly contradicted by multiple orders and admissions on their own client's litigation dockets, which were also part of the record in this very case. This conduct is sanctionable.

II. **Violation of 28 U.S.C. § 1927.**

By submitting a document with a false pretext, counsel has "unreasonably and vexatiously" multiplied these proceedings, forcing Appellant to expend significant resources to refute a fabricated justification.

III. **Fraud on the Court.**

4

This conduct is not a mere mistake but rises to the level of a fraud on the court - a "fraud that is directed to the judicial machinery itself." *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Counsel sought to have a false statement formally entered into the appellate record to gain an unfair litigation advantage, thereby subverting the integrity of the appellate process.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that the Court enter an order imposing sanctions on Appellee American Airlines, Inc. and its counsel, and granting any other relief this Court deems just and proper.

Respectfully submitted,

Dated: March 25, 2026

Lawrence M. Meadows
*Pro Se* Appellant
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

5

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Eleventh Circuit Rule 27-4, I hereby certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because this document contains  words, excluding the parts of the motion exempted by Rule 32(f). This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated this 25th day of March 2026,

_Lawrence M. Meadows_
*Pro Se* Appellant
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

6

## CERTIFICATE OF SERVICE

**I, Lawrence M. Meadows, Pro Se Appellant, hereby certify,** that on

March 25, 2026, a true and correct copy of the foregoing was served via Email and

Federal Express upon all counsel of record at the addresses listed on the Service

List below, pursuant to Fed. R. Civ. P. 11(c)(2).

Signature of Filer

## SERVICE LIST

**Mark W. Robertson**
O'Melveny & Myers, LLP
1301 Avenue of the Americas Suite 1700
New York, NY 10019
212-326-4329
Email: mrobertson@omm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kelly S. Wood**
O'Melveny & Myers, LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
949-823-6900
Email: kwood@omm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Zarrow**
O'Melveny & Myers, LLP
400 S HOPE ST FL 19

7

LOS ANGELES, CA 90071
Firm: 213-430-6000
jzarrow@omm.com
*ATTORNEY TO BE NOTICED*

**Ryan K. Stumphauzer**
**Matthew M. DellaBetta**
**Timothy Kolaya**
Stumphauzer, Kolaya, Nadler & Sloman, PLLC
One Biscayne Tower
2 South Biscayne Boulevard
Ste 1600
Miami, FL 33131
305-614-1413
Email: mdellabetta@sknlaw.com
*ATTORNEY TO BE NOTICED*

**Counsel for Appellee - American Airlines. Inc.**

**Exhibits:**

**A.** Settlement Agreement (from ECF No. 30-1)
**B.** Bankruptcy Court Order dated September 5, 2014
**C.** Bankruptcy Court Order dated November 8, 2021
**D.** Declaration of Edward Sicher (ECF 180-3, *Meadows v. APA*

9

## EXHIBIT A

# SETTLEMENT AGREEMENT

## Between

## AMERICAN AIRLINES, INC.

### and the

## ALLIED PILOTS ASSOCIATION

American Airlines, Inc., including its subsidiaries, affiliates, and parent companies, (collectively "American" or "Company"), and the Allied Pilots Association ("APA" or "Union") (collectively referred to as the "Parties"), mutually desire to settle and resolve Sicher Expedited Presidential Grievance 23-031 (converted from DFW Domicile Grievance No. 12-012). Accordingly, the Parties hereby agree to the following terms to compromise, settle, fully and finally resolve Sicher Expedited Presidential Grievance 23-031, including the underlying DFW Domicile Grievance No. 12-012, in its entirety, as follows:

WHEREAS, on May 22, 2012, the APA DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's alleged violation of the 2003 Collectively Bargained Agreement for failing to provide pilots notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five (5) years; and

WHEREAS, on March 13, 2023, the APA converted the DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance 23-031 (collectively with DFW Domicile Grievance No. 12-012, the "Presidential Grievance"). The Presidential Grievance continued to protest the Company's alleged violation of the Collectively Bargained Agreement for failing to provide pilot notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years; and

WHEREAS, in the Presidential Grievance the APA contended that the Company's failure to provide notice to pilots of their impending removal from the seniority list and separation from employment precluded those pilots from either attempting to return to service prior to being dropped from the seniority list and separated from their employment, and/or filing a grievance challenging the Company's decision to drop them from the seniority list and separate them from employment; and

WHEREAS, the remedy sought in the Presidential Grievance was an award ordering the Company to provide affected individuals with notice of their removal from the seniority list and separation from service thereby allowing them to then file a grievance challenging that action based upon the facts that existed at the time the original notice should have been given; and

WHEREAS, the Company contends the APA may not convert a domicile grievance into a presidential grievance and the APA disagrees with same;

WHEREAS, the Company contends the Presidential Grievance is without merit; and

WHEREAS, the Parties conducted a mediation on November 7, 2024, before a Neutral, and

Settlement Agreement                                                    Page 1 of 6

through subsequent discussions, reached an agreement to resolve the Presidential Grievance; and

WHEREAS, the Parties desire to avoid further controversy and fully settle and compromise the Presidential Grievance, without any further proceedings.

NOW, THEREFORE, in exchange for the mutual considerations described herein, the sufficiency of which is hereby acknowledged, the Parties agree to fully resolve the Presidential Grievance, as follows:

1. Although no specific pilots are referenced in the Presidential Grievance or the underlying Domicile Grievance, the Parties have identified the following four (4) individuals who were on inactive status, unpaid sick, or disability for more than five years, were removed from the pilot seniority list and separated from employment with the Company, and have represented that they have since obtained, or have filed paperwork to obtain, an FAA First Class Medical Certificate, and expressed a desire to be reinstated to employment as a pilot with the Company: Timothy Curren (354581), Dale Churovich (354629), Lawrence Meadows (332713), and Roger Wagner (318588) (collectively the "Identified Individuals").

2. One of the Identified Individuals, however, Lawrence Meadows, was provided and received the notice attached as Exhibit A during his prior employment in advance of his removal from the seniority list and separation from employment in 2011, and the Parties agree that none of the other Identified Individuals received similar communications from the Company prior to their separation from employment. Following Mr. Meadows' removal from the seniority list and separation from employment, he filed two grievances challenging the Company's actions. The Company disputes that the notice given was required by the CBA while the APA contends that the notice was required and that the provided notice may not have been compliant in form. However, the APA has concluded that, under the totality of circumstances of this case, it is unlikely to prevail on its argument before the System Board, particularly in light of the fact that Mr. Meadows filed Grievance 12-011 and Grievance 13-064 challenging the Company's decision to separate him from employment at the time. Both grievance 12-011 and 13-064 were subsequently disposed of and closed after the APA declined to advance them in 2013 and 2014, respectively. As a result, Mr. Meadows is deemed not to be an Eligible Individual under this Agreement, and thus, he is not eligible for reinstatement under this Agreement.

3. Based on the Parties' knowledge, Timothy Curren (354581), Dale Churovich (354629), and Roger Wagner (318588) (collectively "Eligible Individuals") did not receive notice prior to their removal from the seniority list and separation from employment and did not file a grievance challenging the Company's actions at the time. The Eligible Individuals may elect to utilize the process detailed below for possible reinstatement to the Pilot Seniority List and return to employment and active status at the Company, provided they satisfy the conditions detailed below.

4. The Parties agree to offer a one-time opportunity to the Eligible Individuals to utilize the following process for possible reinstatement to the Pilot Seniority List and return to

Settlement Agreement                                                                                  Page 2 of 6

employment with the Company (the "Process for Possible Reinstatement"). The Process for Possible Reinstatement must commence within thirty (30) days of the full execution of this Settlement Agreement. Each Eligible Individual may elect to pursue or may decline to pursue this one-time opportunity to pursue the Process for Possible Reinstatement as described below.

a.   The APA will provide each Eligible Individual with the terms of the Process for Possible Reinstatement and advise them of their right to opt into pursuing reinstatement through the Process for Possible Reinstatement and that, regardless of whether they seek reinstatement, the Presidential Grievance will be withdrawn with prejudice pursuant to this Agreement. In the event an Eligible Individual does not timely and properly opt to pursue the Process for Possible Reinstatement, then the Eligible Individual will have waived his right to pursue the Process for Possible Reinstatement and will have elected not to return to employment with the Company and the APA will not advance any subsequent request for reinstatement, reemployment, or rehire on their behalf.

5.   Process for Possible Reinstatement. The Parties agree the following steps comprise the Process for Possible Reinstatement for the Eligible Individuals:

a.   **Step 1:** In the event an Eligible Individual opts to pursue the Process for Possible Reinstatement, the Eligible Individual must send an email to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org) so indicating no later than thirty (30) consecutive calendar days after the date this Settlement Agreement is fully executed. The Eligible Individual must include a true and correct copy of his First Class Medical Certificate along with the email.

b.   **Step 2:** Within 14 days of providing the Notice in Step 1, the Eligible Individual must execute a General Release (attached as Exhibit B) and email it to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org).

c.   **Step 3:** The Eligible Individual shall submit to and successfully clear the standard pre-employment background checks for American pilots, including PRIA records review, submission to the Rap Back Program, fingerprinting, drug and alcohol testing, and any other standard, pre-employment requirement for New Hire American pilots.

d.   **Step 4:** The Eligible Individual shall execute and submit a request to the FAA for a complete copy of their medical file (commonly referred to as a "Blue Ribbon File") to be released and sent to Natasha Narayan, MD, American's Corporate Medical Director. Dr. Narayan will review the Blue Ribbon File received from the FAA. Dr. Narayan shall have twenty (20) days to review the file upon receipt of same. In the event American's Corporate Medical Director concludes that the Blue Ribbon File is complete and accurate on its face, the Company will accept the determination rendered by the FAA in granting the medical certificate.

In the event American's Corporate Medical Director determines that the Blue Ribbon File indicates a need for further information or clarification in order for the Eligible Individual to continue on the Process for Possible Reinstatement, the Company will notify the Eligible Individual and APA in writing and identify the information/clarification needed. The criteria used in determining whether further information/clarification is necessary will be limited to: (a) suspected non-disclosure of material information; (b) evidence of non-compliance with an established treatment plan, (c) a prescribed treatment plan being inconsistent with a diagnosis or evaluation, or (d) clearance reports from a physician or specialist whose credentials are not consistent with the reported diagnosis. The Eligible Individual will then have the opportunity to provide additional information/clarification in response to the item(s) identified by the Medical Director.

Within ten (10) days of receipt of a response from the Eligible Individual, the Company will notify the Eligible Individual and APA in writing if additional information/clarification is needed and detail the basis for such determination. The Eligible Individual will be given an opportunity to withdraw their reinstatement request in writing to both the Company and the APA within ten (10) days of receipt of notification. If the Eligible Individual elects to withdraw their reinstatement request, then the Company will not take any further action. If the Eligible Individual does not withdraw his request for reinstatement or affirmatively confirms in writing his intention to continue with the reinstatement process under this Agreement, the Company shall copy the pilot on an email submission of Dr. Narayan's request for an FAA aeromedical general review at 9-AMC-GRCustomerSvc@faa.gov. An FAA request for information is not a denial. If the FAA denies the Eligible Individual's medical certificate, such Eligible Individual's reinstatement request shall be denied. If the FAA does not deny the Eligible Individual's medical certificate in response to the request for review, then the FAA determination on the medical certificate will be deemed final and binding with regard to reinstatement of the Eligible Individual.

If the Company seeks a general review of an Eligible Individual's medical certificate and the FAA confirms the medical certificate, the Eligible Individual will be entitled to be paid retroactive to the date the request for FAA general review was made at the hourly pay rate based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold. This period of retro pay will not be included in the 18-month guarantee provided in paragraph 6(b) below. In the event the FAA requests information directly from the Eligible Individual during the general review process, the period of time between when the request is made and when the Eligible Individual responds to the request will not be considered compensable in the event retroactive pay is required under this paragraph.

e. **Step 5:** If an Eligible Individual successfully completes Steps 1 through 4, he will be reinstated to employment with the Company and placed on the Pilot Seniority list at the number representing approximately where he would have

been had he remained continuously employed by the Company ("relative seniority"). Reinstatement will begin effective with the commencement of training.

f.  **Step 6**: The Eligible Individual shall be assigned the first available training spot within three (3) months of the date reinstatement is approved, and will be given five (5) days' notice of same. The Eligible Individual will receive the standard AQP training course proffered to New Hire American pilots, inclusive of the standard remedial training offered to New Hire American pilots. Once the Eligible Individual successfully completes his training, he is considered an active employee and governed by the 2023 AA-APA Agreement and Company policies except as noted herein. In the event the Eligible Individual does not successfully complete training due to a training failure, he will not advance any further on the Process for Possible Reinstatement, and APA will not advance any subsequent request for reinstatement, reemployment, or rehire on his behalf.

6.  The following terms apply to each Eligible Individual who successfully completes the Process for Possible Reinstatement ("Reinstated Pilot"):

a.  Upon successful completion of training, each Reinstated Pilot shall be assigned as a First Officer on a narrow body aircraft until such time as the Reinstated Pilot has accomplished 1,000 hours of flight time as a narrowbody First Officer. After the completion of the required 1,000 hours of flight time, the Reinstated Pilot may exercise his seniority to bid for and be awarded whatever bid status his relative seniority can hold in the first vacancy bid award following completion. Prior to assigning the Reinstated Pilot a narrow body bid status, the Company shall confer with the Reinstated Pilot about his aircraft and base preferences and take such preferences into consideration when assigning the Reinstated Pilot a narrow body bid status.

b.  Compensation will commence once the Eligible Individual successfully completes Steps 1 through 4 above and timely reports for training as directed and described in this Settlement Agreement. Regardless of what seat and equipment is being flown, the Reinstated Pilot's hourly pay rate will be based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold for the first 18 months of his reinstatement. At the conclusion of the first 18 months, the Reinstated Pilot will assume the pay rate associated with whatever bid status the Reinstated Pilot holds at that time.

c.  Upon completion of training, the Reinstated Pilot's vacation bank and sick bank will reflect zero hours and will begin to accrue based upon the pilot's length of service in accordance with the 2023 Agreement. The Parties agree that the terms of LOA 18-001 do not apply to the Eligible Individuals. The Parties agree that the Reinstated Pilot's length of service will reflect the following upon timely reporting for training at the Training Academy:

Timothy Curren (354581) – updated Class Date 1/20/2016 – 9 years

Dale Churovich (354629) – updated Class Date 1/29/2017 – 8 years
Roger Wagner (318588) – updated Class Date 2/16/2020 – 5 years

7.  The Parties agree that the Eligible Individuals defined above cannot be changed, expanded, or modified in any way.

8.  The APA agrees to immediately withdraw with prejudice the Presidential Grievance and is resolved on a no citation and no precedence setting basis.

9.  This Agreement does not constitute an admission of any kind by the Company or the APA and is being entered into to avoid the expense and uncertainty of arbitrating the Presidential Grievance.

10.  The Parties agree that this Agreement constitutes the complete agreement between the Parties concerning the Presidential Grievance and that no other representations or promises have been made by the Parties in that regard.

11.  This Agreement may not be modified in any manner except in a writing signed by both Parties.

**ALLIED PILOTS ASSOCIATION**

By: _____
First Officer Nick Silva
President

Dated: January 15, 2025

**AMERICAN AIRLINES, INC.**

By: _____
Maranda Rosenthal
Managing Director, Labor Relations/Flight
Assoc. General Counsel

Dated: January 15, 2025

## EXHIBIT  B

Case 15463osh20D6cD2258DoFiled09/05/14 Entered09/05/19 dske3c8905/2a04 Deage 9t of
USCA11 Case: 25-10297      Document:(3562507e8)e Filed: 06/27/2025      Page: 114 of 248

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                               :

In re                              :            **Chapter 11 Case No.**
                                 :

**AMR CORPORATION,** *et al.,*          :            **11-15463 (SHL)**
                                 :

             **Debtors.**        :            **(Jointly Administered)**
                                 :

---------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007 DISALLOWING AND EXPUNGING PROOF OF CLAIM NOS. 13478, 13788, AND 13865 FILED BY LAWRENCE M. MEADOWS

    1.    Upon the Objection, dated March 17, 2014 (the "**Objection**"),[1] of AMR Corporation and its related debtors, as debtors and reorganized debtors (collectively, the "**Debtors**"), pursuant to section 502(b) of title 11 of the United States Code and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure, seeking to disallow and expunge Proof of Claim Nos. 13478, 13788, and 13865 filed by Lawrence M. Meadows, all as more fully described in the Objection; and the Court having jurisdiction to consider the Objection and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Objection and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Objection having been provided, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Objection (the "**Hearing**"); and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the

---
[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

Objection is in the best interests of the Debtors, creditors, and all parties in interest, and that the legal and factual bases set forth in the Objection establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Objection is granted as provided herein; and it is further

ORDERED that Proof of Claim Nos. 13478, 13788, and 13865 are disallowed and expunged in their entirety; and it is further

ORDERED that, notwithstanding the foregoing, Meadows shall be permitted to arbitrate Grievance 12-011 before the System Board to the extent that such arbitration is limited in scope to claims involving the interpretation of the CBA and provides remedies, if any and if appropriate, that are customary under the grievance procedures created by the RLA *permitted by applicable law*; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
September 5, 2014

/s/ *Sean H. Lane*
United States Bankruptcy Judge

2

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————x
                              :

In re                          :       **Chapter 11**

AMR CORPORATION, *et al.*,     :       **Case No. 11-15463 (SHL)**

           **Reorganized Debtor.**    :       **(Jointly Administered)**
                              :

——————————————————————x

### ORDER AUTHORIZING THE STIPULATION AND AGREED ORDER FOR PROOF OF CLAIM FILED BY THE ALLIED PILOTS ASSOCIATION

Upon the Stipulation and Agreed Order dated September 30, 2021, (Dkt No. 13364)[1] of

AMR Corporation as the reorganized debtor (the "**Reorganized Debtor**" or "**American**") and

the Allied Pilots Association (the "**APA**" and, together with American, the "**Parties**"), for entry

of an agreed order resolving the Amended Claim, all as described more fully in the Stipulation;

and this Court having jurisdiction to consider the Stipulation and the relief requested under 28

U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated

January 31, 2012 (Preska, C.J.); and consideration of the Stipulation and the requested relief

being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the

Bankruptcy Court under 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Stipulation having been provided, and it appearing that no other or further notice need be

provided; and a hearing having been held to consider the relief requested in the Stipulation

(the "**Hearing**"); and upon the record of the Hearing and the proceedings had before the

Bankruptcy Court; and the Bankruptcy Court having overruled any objections for the reasons

---

[1] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Stipulation.

stated on the record of the Hearing; and the Bankruptcy Court having found and determined that the relief sought in the Stipulation is in the best interests of the Reorganized Debtor, creditors, and all parties in interest, and that the legal and factual bases in the Stipulation establish just cause for the relief granted; and after due deliberation and sufficient cause appearing, it is ordered that:

1.      The Stipulation shall become effective on the date that it is "So Ordered" by the Bankruptcy Court and shall inure to the benefit of the Parties and their respective successors.

2.      The Amended Claim will be allowed in the amount of $625,000.

3.      Except for the right to receive a distribution for allowance of the Amended Claim set forth in paragraph 2 above pursuant to the Stipulation and the Plan, the APA fully, finally, and forever releases, relinquishes, and discharges the Debtors, their principals, officers, directors, agents, assigns, administrators, and representatives, from all rights, claims, demands, damages of any kind, and causes of action of every nature, whether known or unknown, asserted or unasserted, arising from or relating to the Amended Claim. The Stipulation does not affect Grievance No. 12-011 (02/04/12 Meadows, Lawrence) and Grievance No. 12-012 (05/22/12 DFW Domicile) identified on Exhibit 1 to the Letter of Agreement, and the parties retain their respective legal positions on the validity and status of those grievances.

4.      Nothing in the Stipulation shall be construed as an admission of liability or constitute, imply, or evidence the validity of any claim, allegation, objection, defense, asserted right or remedy at law or equity, raised, or that could be raised, by any party in connection with the Amended Claim.

5.      The Stipulation may not be modified, amended, or vacated other than by a signed writing executed by the Parties. The Stipulation contains all of the terms agreed upon by the

Parties regarding the subject of the Stipulation. Any prior agreements, promises, negotiations, or representations, either oral or written, relating to the subject of the Stipulation that are not set forth or referred to in the Stipulation are of no force or effect.

6.   Each person who executes the Stipulation on behalf of a Party represents that he or she is duly authorized to execute the Stipulation on behalf of that Party.

7.   The Stipulation may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Evidence of execution of the Stipulation may be exchanged by electronic transmission of a scanned copy of the signature pages or by exchange of an originally signed document, each of which shall be fully binding on the Party as a signed original.

8.   The claims agent in the Debtors' chapter 11 cases is authorized to adjust the claims register in accordance with the Stipulation.

9.   The Bankruptcy Court shall retain jurisdiction to interpret, implement, and enforce the provisions of the Stipulation.

**APPROVED AND SO ORDERED**
this 8th day of November 2021

**BY THE COURT:**

*/s/ Sean H. Lane*
Honorable Sean H. Lane
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE M. MEADOWS,
    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION, et al.,
    Defendants.

CASE NO. 17-cv-22589-EA
Honorable Judge Ed Artau

_____/

## DECLARATION OF CAPTAIN EDWARD F. SICHER

I, Captain Edward F. Sicher, declare as follows pursuant to 28 U.S.C. § 1746:

1.    I am over the age of eighteen and all statements made herein are true and correct to the best of my knowledge.

2.    I am a veteran who served over 20-years as a U.S. Air Force Officer, am a decorated combat fighter pilot, who retired at the rank of Lt. Colonel, and was hired as a pilot for American Airlines in 1998, where I've worked for over 27 years, and am currently a B-777 Captain (CA) flying intentional routes.

3.    During my military career I was disabled and grounded from flying to due to being temporarily paralyzed as the result of a vaccine reaction during Desert Storm. My wife was pregnant with my first-born at the time and the Air Force threatened me with removal. Thus, I have experienced first-hand what it means to be a long-term disabled (LTD) pilot who has lost their flying career and suffered the associated difficulties and long fight to get medically re-certified and return to the cockpit. This is a primary reason why I am a staunch advocate for American Airline's LTD and MDD (Medical Disabled Dropped from AA seniority list) pilots.

1

4.     I devoted over a decade of my 27+ year career at American Airlines (AA) as a volunteer and elected representative at the American Airlines Pilots' union, the Allied Pilots Association (APA) which serves the 16000+ pilots of American Airlines, serving both at the Miami domicile and national level. Some of my many involvements in the pilot union include serving as the Miami (MIA) domicile Contract Compliance Chair (CH), as a MIA domicile Strike Preparedness Committee member, as an elected MIA domicile base representative (three times as the Miami Domicile Vice Chair (VC) and one time as the MIA Domicile Chair), at the national level as one of APA's Board of Directors (BOD), and finally as the elected President of the Allied Pilots Association 16000+ pilots where I had the privilege of representing the world's largest independent pilots' union at a unique time while we negotiated our most recent Contractual Bargaining Agreement (CBA).

5.     As President, and in keeping with my commitment to more aggressively represent our disabled pilots, I formed several ad hoc committees to advocate for them, as is my right as President to do. I also expanded our outreach programs to our over 800 disabled pilots who were then on disability. I also hired additional outside legal advisors specialized in this area to help us more forcefully and properly advocate for our disabled pilots. I also spoke directly to American Airline's CEO Robert Isom, Chief Strategist and founding member Steve Johnson, and Chief Legal Counsel, Lucretia Guia, specifically about this issue and Larry Meadows.

6.     In August 2023, as APA President, I obtained what was at that time the most lucrative pilots' collective barging agreement ever in the history of the airline-labor collective bargaining, adding an estimated additional $9.6 billion of contractual improvements over five years to our CBA to include amongst other things, industry leading pilot long-term disability (LTD) benefits.

2

7.      As an APA BOD member and National Officer, I routinely communicated union business via text message and signal (during contract negotiations) on my personal electronic devices, with other APA members, committeemen, officers, and attorneys. I also primarily used my APA email hosted on APA servers, to which I was denied access after I left office.

8.      Based on my extensive and longstanding union experience listed above, and for the reasons stated below, I am considered to be one of the foremost subject matter experts (SME) on the AA-APA's most recent collective bargaining agreement (CBA), the arguments and positions at the table which resulted in the gains we made and the items we were denied, American Airline's pilot union representation, APA's governance, and American's disabled pilots' LTD benefits and MDD pilots grievances, and associated statutes of the Railway Labor Act (RLA), Labor Management Reporting and Disclosure Act (LMRDA), Americans' with Disabilities Act (ADA), and the National Mediation Board (NMB), all of which I had to know and navigate as President of the labor association during this critical time.

9.      On or around 2014 while serving my first term as MIA domicile's VC, I first met the Plaintiff, First Officer (FO) Lawrence Meadows, who was a disabled MIA pilot on LTD and MDD. As FO Meadow's local union representative I was given responsibility for the LTD and MDD issue by then MIA CH CA Thomas Copeland. FO Meadows engaged in significant protected activity, as a whistleblower, and an outspoken advocate for his fellow LTD and MDD union brothers and sisters, who were openly critical of their representation by APA during 2007-2011 time period for reasons which I will explain.

10.      This was a particularly critical time for the MDD pilots due to the fact that AA had recently declared bankruptcy and was in the process of merging with US Air, leaving in doubt these pilots' positions on the new combined seniority list with the US Air Pilots and the America West Pilots,

if any position at all, should these pilots ever regain their medicals and be reinstated. It also left in question the status of the MDD pilots' many pending grievances such as DFW Domicile Grievance 20-012 (see attachments) over wrongful termination. Finally, it was also an increasingly unpopular topic to breach at the board table during the intensive merger negotiations as it increasingly appeared that APA had failed in achieving one of its most fundamental objectives and one which is sought by every labor union; the protection of it's members employment. It appeared that APA was complicit in allowing AA management to selectively choose which pilots it wanted to reinstate and which they did not (the company claiming that these pilots were "administratively removed"), while simultaneously allowing others to be reinstated. There was never any contractual provision for removal from employment for this reason nor was any proper notice given to these pilots. It also appeared to me that all of the pilots who were being refused reinstatement, at least all of them that I could identify, were those pilots that chose to fight AA in court instead of accepting AA management's decisions regarding their status and benefits without question. This disparate treatment appeared to be retaliation by the company and I was adamant that our union should be strongly advocating for each and every one of them.

11.     In 2016, while serving as the MIA VC, and in an effort to get our union more aligned with the objective of reinstating our MDD pilots, I proposed a Resolution (R2016-30; see attachments) which sought to more clearly define our official union policy towards these MDD pilots and expedite the grievances which had been filed seeking their reinstatement to the seniority list. Although the legislation eventually passed, I was personally surprised at the push-back from APA's legal department. The only reason this legislation passed, after more than a year of deliberation by the BOD and objection by APA In-House Legal, was that President Dan Carey

4

had recently won the election for President of APA and summarily replaced the long-standing General Counsel of the union, Ed James from James and Hoffman, with Mr. George Buckley. Mr. Buckley had a fresh perspective and was willing to put the union on the right side of the issue. Also, at or about this time, long-serving Chief In-House Legal Counsel, Mr. Bennett Boggess, was replaced. Mr. Boggess had been the catalyst in allowing the company to pick and choose which pilots they chose to reinstate instead of advocating equally for all of them. Once he was gone progress towards getting APA to advocate for it's disabled members could begin

12.    In performing my due-diligence in preparing Resolution R2016-30 for debate, I talked via telephone with American Airline's Director of Flight Administration, Mr. Scott Hanson, on whether I could expect his support on reinstating the MDD pilots to the seniority list, and he replied "Absolutely not". When I inquired as to why he replied, "Because I have a business to run". It was then I realized that I was going to fight a mostly uphill battle in the next several years to make any progress at all on this issue.

13.    Also in researching this issue, I interviewed prior APA President Lloyd Hill, another MIA domicile member who served as national President from approximately 2008 until 2010. He and I discussed, amongst other issues, the hiring of an ERISA counsel in the 2008 to help APA fight this battle but then the union soon dismissed the counsel. When asked directly why this issue was abandoned Lloyd remarked that the union was in an increasingly precarious financial situation in the late 2000's and difficult decisions had to made concerning APA's expenses. For this reason he chose to concentrate APA's resources on those pilots still on the seniority list. Lloyd Hill, not coincidentally, was also the President who chose to reinstate Bennett Boggess as Chief In-House Legal counsel after he was fired in the mid-2000's.

14.      On May 14 2012, and before I took my seat on the APA BOD, APA filed a collective LTD MDD Pilot seniority reinstatement grievance, DFW Domicile Grievance 12-012; "protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been in inactive status, unpaid sick, or disability for more than five years." (Grievance 12-012 is attached as an exhibit). This grievance was fortunately preserved through the bankruptcy proceedings and still on the books when I started as a BOD member in 2014 (See attachment preserving the grievance through the bankruptcy). Unfortunately, American Airlines did not want to hear the grievance and therefore, with APA's complicity, continually pushed back on the hearing of the grievance for almost a decade. The union allowed the continual dismissal of the hearing and arbitration of this grievance until I became President and put additional resources and emphasis into the closure on this issue, rolling it into an expedited Presidential Grievance (G2023-31). A copy of Grievance 12-012 and it Sicher Presidential Expedited version 23-031 1 is attached hereto as **Exhibits A and B.**

15.      Of noticeable importance during the 2014-2016 timeframe when I was starting my elective service to APA, was that the three pilot groups merging into the new American Airlines (Legacy American Airlines pilots, US Air pilots, and America West pilots) were all being treated in disparate manners in the forming of the new combined seniority list integration (SLI). Legacy AA Pilots were sometimes being denied reinstatement after 5-years off of the seniority list for an LTD condition, US Air Pilots were allowed to retain their position on the merged seniority list despite not possessing a current FAA medical until mandatory retirement age of 65, and America West pilots were removed without any provision to regain their seniority after 8-years LTD.

6

16.     APA had chosen to lockout the MDD pilots from the social media and chat platforms of the union at the time so getting the membership and other board members to hear all sides of the story was increasingly difficult. As the Miami VC with responsibility for the LTD/MDD issue in MIA. I was Kathy Emery's representative in her objections to the unions lock-out of her ability to access the social media platforms. With the new General Counsel in place we soon reached agreement on a settlement for Emery's lock out. Unfortunately, the agreement, although getting Kathy an undisclosed settlement, did not include the other LTD pilots who were likewise locked out. I did not consider this a victory. A copy of AUD Newsletter and *Emery* v. APA Court Order and is attached hereto as **Exhibits C and D.**

17.     Also, of interest during the timeframe that I worked to get APA to change it's position on the MDD pilots and was attempting to achieve passage of R2016-30, work was done behind the scenes by APA Attorney Mark Meyers, Director of Negotiations, and unknown to those on the Board of Directors such as myself. Myers solicited the legal opinion of an outside law firm, Babbs-Denison. This law firm issued a legal opinion letter justifying APA's abandonment of its MDD pilots (Babbs-Dennison legal opinion letter attached). However, this opinion was based on the information that had been provided to them by Myers, and it was later discovered during my representation of another MDD pilot, Wallace Preitz, that Babbs-Dennison was never provided with the key piece of information being that APA had previously filed multiple grievances on behalf of these pilots seeking their reinstatement and protesting their wrongful termination, thus giving these pilots "rays of hope" that the union would advocate for them. I believe that there is various case-law deliberating on this very issue and stating that by establishing these "rays of hope", the union had, "by default", established a Duty of Fair Representation (DFR), although I am no longer in possession of my electronic notes kept on APA

7

servers regarding this issue, I believe this letter, as flawed as it was, was used to justify the APA's

Legal Department abandonment of the representation of these MDD pilots. Furthermore, the

Babbs-Dennison legal opinion letter stated that although APA did not owe these pilots a duty of

fair representation (DFR), a duty would be in order if action or representation was taken on behalf

of any one of them, hence the importance of reporting the grievances that APA had filed when

soliciting Babbs-Dennison for an opinion. A copy of Babb-Dennison legal opinion is attached

hereto as **Exhibit E.**

18.     Immediately after receiving the Babbs-Dennison letter, APA legal switched from

obstructing my Resolution R2016-30, to reluctantly allowing its passage. On December 13,

2026, the APA Board of Directors ("BOD") voted in 19-3 to approve R2016-30 which stated in

part;

> "the three separate contracts prior to the merger of US Air East, America West, and American Airlines **treated disability retirements differently**...the American Airlines contract, which has been subjectively reinterpreted by the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous disability...**the merging of the seniority lists is creating a disparate treatment amongst the individual pilot groups**...the most beneficial treatment of all of our disabled pilots is **to allow them reinstatement from long-term disability in as expeditious and fair a manner as possible**... there has been some evidence indicating that the **company has unfairly withheld reinstatement to long-term disabled pilots** who have regained their Class A medicals from being reinstated if they were **considered problematic employees...**"... [Emphasis Added].

And further created a BOD directive to the APA negotiating committee, which stated;

> ***BE IT RESOLVED, that the Negotiating Committee expeditiously engage the company in negotiations which seek to: 3. Negotiate contractual language that provides for the immediate reinstatement and return to the Pilot System Seniority List of all pilots who are currently out sick or on disability and who have been removed from the seniority list...*** [Emphasis Added].

A copy of APA BOD Resolution 2016-30 is attached hereto as **Exhibit F.**

19.     During the January 2020 investigation of the MDD issue (and before I was President of the union but serving as the MIA domicile CH and BOD Member), the committee I chaired interviewed two APA attorneys, Director of Negotiations Mark Myers, and APA Director of Representation, James Clark, who both made material misstatements of the facts with respect to the existence of the legal department's secret December 12, 2016, Babb-Denison legal opinion letter obtained without knowledge or authorization from APA's Board of Directors, which appeared to be used as justification of APA legal's prior abandonment of the duty of representation of the over 240 MDD pilots; to include, improperly excluding them from their full share payout of the $1.1B Equity Distribution, estimated to be approximately $100,000.00 per MDD pilot, or $24M collectively. I informed then President Ferguson of these attorney's ethical violations and recommended they be terminated due to ethics violations of the APA Constitution and Bylaws (C&B"), but he declined, stating he "must safeguard the best interests of APA", and instead abruptly disbanded the committee before it could issue its findings. I therefore re-started the committee up as an ad-hoc committee immediately upon my winning of the Presidential election, this time under a different name. See Deposition transcript of Edward Sicher in; *Preitz v. APA* (Case No. 2:17-cv-01166-MSG, Doc 107-4, Jan 6, 2021) stating both Mr. Myers and Clark both lied about Babb-Denison letter).

20.     In or around April 2022, while serving as the Miami Domicile representative, I appointed FO Meadows to the APA National Aeromedical Committee, Disabled Pilots Awareness Sub-Committee (DPASC), to serve as the MIA Domicile Pilot LTD Coordinator to assist other disabled pilots. The APA legal department pushed back on this appointment, arguing that FO Meadows was not a "member in good standing" and was therefore ineligible to serve on a national committee. This disagreement boiled out in my issuance of a Presidential

Interpretation on Sep 2, 2022, defining "members in good standing" (The APA President is the only union official allowed to interpret the Constitution and By-Laws at APA).

21.     The formal Constitutional Interpretation (see attachment) confirmed that inactive members, including MDD pilots, like FO Meadows, who had fulfilled all prior membership requirements, were "members in good standing." And could certainly serve on APA committees and in official APA capacities. A copy of that Presidential interpretation is attached hereto as **Exhibit G.**

22.     As a direct result of my Constitutional Interpretation FO Meadows, as a member in good standing, was able to serve as the MIA Domicile LTD Coordinator, where he sponsored and helped scores of disabled pilots.

23.     As APA President, I also took steps to address FO Meadows' long-pending individual and collective seniority reinstatement grievances. On March 13, 2023, at FO Meadows request, I converted the collective Grievance 12-012 into expedited Presidential Grievance 23-031. A copy of G-23-031 is previously attached as **Exhibit B.**

24.     I also created the National Dropped Reinstatement ad hoc Committee ("NDRC"), and around April 2023, I appointed First Officer ("FO") Thomas Rempfer as Chairman, to ensure that APA leaves "no pilot behind". The NDRC was tasked with finding avenues of reinstatement for those who have been dropped from the seniority list, by virtue of disability, merger, or other reason, not including retirement or discipline. This was intended to help obtain reinstatement of FO Meadows and other similarly situated MDD pilots. A copy of the NDRC power point presentation that FO Rempfer created in collaboration with MDD pilots FOs Meadows and Preitz is attached hereto as **Exhibit H.**

25.     During the AOA Spring BOD Meeting, FO Rempfer presented the NDRC PowerPoint to the BOD, and APA Attorney Tricia Kennedy and Former APA BOD CA Thomas Westbrook attempted to orchestrate a recall of MDD advocate FO Rempfer. A copy of FO Rempfer's Memo For Record is attached hereto as **Exhibit I.**

26.     In early 2024, and due to the fact that it increasingly appeared that AA was unwilling to reinstate Larry Meadows without a legal fight, I hired attorney Sue Edwards, Esq., to personally represent FO Meadows in his individually filed ADA lawsuit against American Airlines. The objective was to put a set of professional eyes on Meadow's filings as he had up to then primarily been representing himself pro-se. Sue Edwards was trusted by the MDD pilots and had recently achieved a win for APA in a prior lawsuit against the FAA for the wrongful termination of one of our pilots for being improperly notified of a drug test. I felt that to truly succeed in court he would need professional guidance. Victory in court would hopefully persuade AA to drop its obstruction to reinstating our MDD pilots and result in the mutually beneficial outcome to both our pilots and the company. As President and the primary fiduciary of the APA, the reason I gave to the Board of Directors and legal counsel for this expenditure was that I had reached an agreement with Meadows that he would drop the lawsuits against APA if the union put the bulk of its collective resources behind what was increasingly becoming an individual fight. Meadows had originally agreed to this "quid pro quo", but when it became clear to him that he would have to drop his claims against APA before he would receive surety that his claims for reinstatement as a pilot against AA would succeed he reneged and declined to drop his claims against APA. When this occurred I directed Ms. Edwards to terminate her representation of Meadows.

27.     Furthermore, on or about June 13, 2024, I directed the APA Director Of Grievances, Tricia Kennedy, to move FO Meadows' individual Grievance 12-011 forward and schedule it for an arbitration hearing. To my knowledge, that grievance was still open, active, and in the queue for a an arbitration hearing at least until I left office on October of 2024. Text messages between myself and Tom Remper attached hereto as **Exhibit J.**

28.     On or around late September 2024, I was presented with a proposed settlement agreement with American Airlines concerning Grievances 12-012 and 23-031. That proposal would have reinstated several other MDD pilots, some out on disability for much as 24-years, but explicitly excluded FO Meadows, despite the fact he was holding an FAA Airman's First Class Medical Certificate and working as current and qualified B-777 Captain and Instructor pilot in Boeings Miami Flight Training Center. I refused to sign because it was a "go-no-go decision point" to leave any pilot behind. I truly felt that to have continued the fight to this point and finally settle by letting the company decide who to reinstate and who to refuse would have left this issue unresolved, thus resulting in returning right back to where we started.

29.     In late 2024 and after an internal battle with my Board of Directors over the possible merger of our union with the Air Line Pilots Association (ALPA), a merger which I was adamantly against, I was removed from office by the Board of Directors. The Board of Directors was able to install another President they were allowed to choose due to the short remaining time left on my tenure. The replacement they chose, FO Nick Silva, had never served in a membership elected position and had very little experience, particularly dealing with APA grievances or its legal department. He had only served as a costing analyst on the negotiating committee. He summoned me down to APA to discuss the handoff from one President to the next. Despite the fact that there were hundreds of issues in play at the time, such as staff issues,

12

IT upgrades. problems with AA's Safety program and the FAA oversight of the airline, etc. etc. all Nick wanted to discuss was the issue of Larry Meadows. This was a huge surprise to me and indicative of how much pressure he was under by the APA legal department to fold on APA's advocacy for Meadows and the grievances I had filed as President. The question he dwelled on for most of the 45' he had scheduled for me was "Why wouldn't you approve the proposed MDD settlement by removing Larry Meadows?"

30.     I have since learned that on January 15, 2025, the new APA President FO Silva executed a settlement that finalized the exclusion of FO Meadows and falsely claimed that his individual Grievance 12-011, the very same grievance I had ordered to arbitration months earlier, was now being declared "closed since 2013." A copy of this January 15. 2025 Grievance 12-012/23-031 Settlement are attached hereto as **Exhibit K.**

31.     I have also been informed by FO Meadows that on or around May 1, 2025. the current APA President Nick Silva. terminated Meadows 34-years of APA membership via a letter, in response his request to speak during membership guest hour at the 2025 Spring Board of Directors Meeting. A copy of this correspondence is attached hereto as **Exhibit L.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of January, 2026.

Captain Edward F. Sicher
MIA/777/International

13

# EXHIBIT J

Messages - Tom Rempfer (+15208696590)                    +13053339534, annamaria717@yahoo.com, annamaria717@icloud.com

10/9/2025 5:13:40 AM

Tom Rempfer (+15208696590)
Missed your call, Landing sim early, talk after

10/10/2025 2:13:22 PM

Tom Rempfer (+15208696590)
June 14, 2024, assume the below text was from Ed to Larry, relayed to me via text from Larry:

No. I have had it with you. I have done no to king but expend time, money and resources despite the fact I have been left twisting in the wind. I have been warned by APA legal that you would do just what you are doing right now. Should have e listened to them a long time ago. They were right all along. It is about the $$
I've held up multimillion dollar grievances for you. I've held up the probable reinstatement of other pilots for you. I've cut across the wishes of my own board to advocate and find outside counsel to advocate for you. And at the end of the day you will give nothing to help me make your case. It's over Larry. You're on your own. I'll drop your grievance. You can make the case that APA isn't advocating for you now. Treat the union as your enemy.
I've given official word to Sue and Jim to expend no more resources on you. You are on your own now Larry. APA will slot your grievance and that's all. Good luck


Next was from me to Larry:


Only update is a fourteen or fifteen october grievance scheduling request for 12-12. 12-11 still in the cue with over 50 other unresolved grievances.

Next was from Larry to me:

In agreed to Additional 14-day on the condition we discuss...

"tAPA taking two actions on my behalf;

1) an immediate vigorous good faith effort for the APA President to meet with AA CEO within the next 14-days, to negotiate and obtain my reinstatement as an active line pilot at my relative seniority at B777 CA pay, and

2), also simultaneously immediately moving my individual Grievance 12-011 to a System Board on Presidential Expedited Basis in accordance were CBA Sec 23, to be heard in the next available

Messages - Tom Rempfer (+15208696590)                    +13053339534, annamaria717@yahoo.com, annamaria717@icloud.com

arbitration slot with a pilot friendly arbitrator, using unconflicted outside counsel of my choice, with a System Board panel members picked by me or subject to my approval. The second step will put pressure on AA,"

→ Sicher text to me was apparently on the same day he texted Larry on June 14, 2024

→ We will slot his grievance 12-11 for hearing. That is all.

Conclusion, my testimony is actually irrelevant. You evidently received the same text info and commitment directly from Ed via text re 12-011 that you shared with me above. And evidently had the same commitment or expectation from your 14-day extension conference call. Plus I also gave you the same impression related to the October grievance scheduling, which indicated your grievance was in the cue, probably verifiable based on union records from that committee. Perhaps check with Tracy Parrella?

Bottom line, second hand info from your committee chairman is likely irrelevant compared to direct communications from your union President and the grievance resolution docket records. If you're grievance was closed how could it be in the queue?

Suggest you cnx my deposition and save that money since I've coordinated with legal as you suggested and they've relayed extensive restrictions on what I can testify about.

Flying tmrw morning.

10/10/2025 5:53:00 PM

Tom Rempfer (+15208696590)

Themselves

# EXHIBIT D

## TO MEADOWS DECLARATION

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**LAWRENCE M. MEADOWS,**
    Plaintiff,

    v.

**ALLIED PILOTS ASSOCIATION, et al.,**
    Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**

_____/

## DECLARATION OF CAPTAIN EDWARD F. SICHER

    I, Captain Edward F. Sicher, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am over the age of eighteen and all statements made herein are true and correct to the best of my knowledge.

2. I am a veteran who served over 20-years as a U.S. Air Force Officer, am a decorated combat fighter pilot, who retired at the rank of Lt. Colonel, and was hired as a pilot for American Airlines in 1998, where I've worked for over 27 years, and am currently a B-777 Captain (CA) flying intentional routes.

3. During my military career I was disabled and grounded from flying to due to being temporarily paralyzed as the result of a vaccine reaction during Desert Storm. My wife was pregnant with my first-born at the time and the Air Force threatened me with removal. Thus, I have experienced first-hand what it means to be a long-term disabled (LTD) pilot who has lost their flying career and suffered the associated difficulties and long fight to get medically re-certified and return to the cockpit. This is a primary reason why I am a staunch advocate for American Airline's LTD and MDD (Medical Disabled Dropped from AA seniority list) pilots.

1

4.    I devoted over a decade of my 27+ year career at American Airlines (AA) as a volunteer and elected representative at the American Airlines Pilots' union, the Allied Pilots Association (APA) which serves the 16000+ pilots of American Airlines, serving both at the Miami domicile and national level. Some of my many involvements in the pilot union include serving as the Miami (MIA) domicile Contract Compliance Chair (CH), as a MIA domicile Strike Preparedness Committee member, as an elected MIA domicile base representative (three times as the Miami Domicile Vice Chair (VC) and one time as the MIA Domicile Chair), at the national level as one of APA's Board of Directors (BOD), and finally as the elected President of the Allied Pilots Association 16000+ pilots where I had the privilege of representing the world's largest independent pilots' union at a unique time while we negotiated our most recent Contractual Bargaining Agreement (CBA).

5.    As President, and in keeping with my commitment to more aggressively represent our disabled pilots, I formed several ad hoc committees to advocate for them, as is my right as President to do. I also expanded our outreach programs to our over 800 disabled pilots who were then on disability. I also hired additional outside legal advisors specialized in this area to help us more forcefully and properly advocate for our disabled pilots. I also spoke directly to American Airline's CEO Robert Isom, Chief Strategist and founding member Steve Johnson, and Chief Legal Counsel, Lucretia Guia, specifically about this issue and Larry Meadows.

6.    In August 2023, as APA President, I obtained what was at that time the most lucrative pilots' collective barging agreement ever in the history of the airline-labor collective bargaining, adding an estimated additional $9.6 billion of contractual improvements over five years to our CBA to include amongst other things, industry leading pilot long-term disability (LTD) benefits.

2

7.      As an APA BOD member and National Officer, I routinely communicated union business via text message and signal (during contract negotiations) on my personal electronic devices, with other APA members, committeemen, officers, and attorneys. I also primarily used my APA email hosted on APA servers, to which I was denied access after I left office.

8.      Based on my extensive and longstanding union experience listed above, and for the reasons stated below, I am considered to be one of the foremost subject matter experts (SME) on the AA-APA's most recent collective bargaining agreement (CBA), the arguments and positions at the table which resulted in the gains we made and the items we were denied, American Airline's pilot union representation, APA's governance, and American's disabled pilots' LTD benefits and MDD pilots grievances, and associated statutes of the Railway Labor Act (RLA), Labor Management Reporting and Disclosure Act (LMRDA), Americans' with Disabilities Act (ADA), and the National Mediation Board (NMB), all of which I had to know and navigate as President of the labor association during this critical time.

9.      On or around 2014 while serving my first term as MIA domicile's VC, I first met the Plaintiff, First Officer (FO) Lawrence Meadows, who was a disabled MIA pilot on LTD and MDD. As FO Meadow's local union representative I was given responsibility for the LTD and MDD issue by then MIA CH CA Thomas Copeland. FO Meadows engaged in significant protected activity, as a whistleblower, and an outspoken advocate for his fellow LTD and MDD union brothers and sisters, who were openly critical of their representation by APA during 2007-2011 time period for reasons which I will explain.

10.     This was a particularly critical time for the MDD pilots due to the fact that AA had recently declared bankruptcy and was in the process of merging with US Air, leaving in doubt these pilots' positions on the new combined seniority list with the US Air Pilots and the America West Pilots,

3

if any position at all, should these pilots ever regain their medicals and be reinstated. It also left in question the status of the MDD pilots' many pending grievances such as DFW Domicile Grievance 20-012 (see attachments) over wrongful termination. Finally, it was also an increasingly unpopular topic to breach at the board table during the intensive merger negotiations as it increasingly appeared that APA had failed in achieving one of its most fundamental objectives and one which is sought by every labor union; the protection of it's members employment. It appeared that APA was complicit in allowing AA management to selectively choose which pilots it wanted to reinstate and which they did not (the company claiming that these pilots were "administratively removed"), while simultaneously allowing others to be reinstated. There was never any contractual provision for removal from employment for this reason nor was any proper notice given to these pilots. It also appeared to me that all of the pilots who were being refused reinstatement, at least all of them that I could identify, were those pilots that chose to fight AA in court instead of accepting AA management's decisions regarding their status and benefits without question. This disparate treatment appeared to be retaliation by the company and I was adamant that our union should be strongly advocating for each and every one of them.

11.     In 2016, while serving as the MIA VC, and in an effort to get our union more aligned with the objective of reinstating our MDD pilots, I proposed a Resolution (R2016-30; see attachments) which sought to more clearly define our official union policy towards these MDD pilots and expedite the grievances which had been filed seeking their reinstatement to the seniority list. Although the legislation eventually passed, I was personally surprised at the push-back from APA's legal department. The only reason this legislation passed, after more than a year of deliberation by the BOD and objection by APA In-House Legal, was that President Dan Carey

had recently won the election for President of APA and summarily replaced the long-standing
General Counsel of the union, Ed James from James and Hoffman, with Mr. George
Buckley. Mr. Buckley had a fresh perspective and was willing to put the union on the right side
of the issue. Also, at or about this time, long-serving Chief In-House Legal Counsel, Mr. Bennett
Boggess, was replaced. Mr. Boggess had been the catalyst in allowing the company to pick and
choose which pilots they chose to reinstate instead of advocating equally for all of them. Once
he was gone progress towards getting APA to advocate for it's disabled members could begin

12.   In performing my due-diligence in preparing Resolution R2016-30 for debate, I talked via
telephone with American Airline's Director of Flight Administration, Mr. Scott Hanson, on
whether I could expect his support on reinstating the MDD pilots to the seniority list, and he
replied "Absolutely not". When I inquired as to why he replied, "Because I have a business to
run". It was then I realized that I was going to fight a mostly uphill battle in the next several
years to make any progress at all on this issue.

13.   Also in researching this issue, I interviewed prior APA President Lloyd Hill, another MIA
domicile member who served as national President from approximately 2008 until 2010. He and
I discussed, amongst other issues, the hiring of an ERISA counsel in the 2008 to help APA fight
this battle but then the union soon dismissed the counsel. When asked directly why this issue
was abandoned Lloyd remarked that the union was in an increasingly precarious financial
situation in the late 2000's and difficult decisions had to made concerning APA's expenses. For
this reason he chose to concentrate APA's resources on those pilots still on the seniority
list. Lloyd Hill, not coincidentally, was also the President who chose to reinstate Bennett
Boggess as Chief In-House Legal counsel after he was fired in the mid-2000's.

14.     On May 14 2012, and before I took my seat on the APA BOD, APA filed a collective LTD MDD Pilot seniority reinstatement grievance, DFW Domicile Grievance 12-012; "protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been in inactive status, unpaid sick, or disability for more than five years." (Grievance 12-012 is attached as an exhibit). This grievance was fortunately preserved through the bankruptcy proceedings and still on the books when I started as a BOD member in 2014 (See attachment preserving the grievance through the bankruptcy).  Unfortunately, American Airlines did not want to hear the grievance and therefore, with APA's complicity, continually pushed back on the hearing of the grievance for almost a decade. The union allowed the continual dismissal of the hearing and arbitration of this grievance until I became President and put additional resources and emphasis into the closure on this issue, rolling it into an expedited Presidential Grievance (G2023-31). A copy of Grievance 12-012 and it Sicher Presidential Expedited version 23-031 1 is attached hereto as **Exhibits A and B.**

15.     Of noticeable importance during the 2014-2016 timeframe when I was starting my elective service to APA, was that the three pilot groups merging into the new American Airlines (Legacy American Airlines pilots, US Air pilots, and America West pilots) were all being treated in disparate manners in the forming of the new combined seniority list integration (SLI). Legacy AA Pilots were sometimes being denied reinstatement after 5-years off of the seniority list for an LTD condition, US Air Pilots were allowed to retain their position on the merged seniority list despite not possessing a current FAA medical until mandatory retirement age of 65, and America West pilots were removed without any provision to regain their seniority after 8-years LTD.

6

16.     APA had chosen to lockout the MDD pilots from the social media and chat platforms of the union at the time so getting the membership and other board members to hear all sides of the story was increasingly difficult. As the Miami VC with responsibility for the LTD/MDD issue in MIA, I was Kathy Emery's representative in her objections to the unions lock-out of her ability to access the social media platforms. With the new General Counsel in place we soon reached agreement on a settlement for Emery's lock out. Unfortunately, the agreement, although getting Kathy an undisclosed settlement, did not include the other LTD pilots who were likewise locked out. I did not consider this a victory. A copy of AUD Newsletter and *Emery* v. APA Court Order and is attached hereto as **Exhibits C and D.**

17.     Also, of interest during the timeframe that I worked to get APA to change it's position on the MDD pilots and was attempting to achieve passage of R2016-30, work was done behind the scenes by APA Attorney Mark Meyers, Director of Negotiations, and unknown to those on the Board of Directors such as myself. Myers solicited the legal opinion of an outside law firm, Babbs-Denison. This law firm issued a legal opinion letter justifying APA's abandonment of its MDD pilots (Babbs-Dennison legal opinion letter attached). However, this opinion was based on the information that had been provided to them by Myers, and it was later discovered during my representation of another MDD pilot, Wallace Preitz, that Babbs-Dennison was never provided with the key piece of information being that APA had previously filed multiple grievances on behalf of these pilots seeking their reinstatement and protesting their wrongful termination, thus giving these pilots "rays of hope" that the union would advocate for them. I believe that there is various case-law deliberating on this very issue and stating that by establishing these "rays of hope", the union had, "by default", established a Duty of Fair Representation (DFR), although I am no longer in possession of my electronic notes kept on APA

7

Case 1:17-cv-22589-EA    Document 251-1    Entered on FLSD Docket 04/15/2026    Page 80 of
216
Case 1:17-cv-22589-EA    Document 180    Entered on FLSD Docket 01/29/2026    Page 23 of 85

servers regarding this issue, I believe this letter, as flawed as it was, was used to justify the APA's

Legal Department abandonment of the representation of these MDD pilots. Furthermore, the

Babbs-Dennison legal opinion letter stated that although APA did not owe these pilots a duty of

fair representation (DFR), a duty would be in order if action or representation was taken on behalf

of any one of them, hence the importance of reporting the grievances that APA had filed when

soliciting Babbs-Dennison for an opinion. A copy of Babb-Dennison legal opinion is attached

hereto as **Exhibit E.**

18.     Immediately after receiving the Babbs-Dennison letter, APA legal switched from

obstructing my Resolution R2016-30, to reluctantly allowing its passage. On December 13,

2026, the APA Board of Directors ("BOD") voted in 19-3 to approve R2016-30 which stated in

part;

> "the three separate contracts prior to the merger of US Air East, America West, and
> American Airlines **treated disability retirements differently**...the American Airlines
> contract, which has been subjectively reinterpreted by the Company to allow the removal
> of a pilot from the seniority list after five (5) years of continuous disability...**the merging
> of the seniority lists is creating a disparate treatment amongst the individual pilot
> groups**...the most beneficial treatment of all of our disabled pilots is **to allow them
> reinstatement from long-term disability in as expeditious and fair a manner as
> possible**... there has been some evidence indicating that the **company has unfairly
> withheld reinstatement to long-term disabled pilots** who have regained their Class A
> medicals from being reinstated if they were **considered problematic employees...**"...
> [Emphasis Added].

And further created a BOD directive to the APA negotiating committee, which stated;

> ***BE IT RESOLVED, that the Negotiating Committee expeditiously engage the company
> in negotiations which seek to: 3. Negotiate contractual language that provides for
> the immediate reinstatement and return to the Pilot System Seniority List of all pilots
> who are currently out sick or on disability and who have been removed from the seniority
> list...*** [Emphasis Added].

A copy of APA BOD Resolution 2016-30 is attached hereto as **Exhibit F.**

8

19.     During the January 2020 investigation of the MDD issue (and before I was President of the union but serving as the MIA domicile CH and BOD Member), the committee I chaired interviewed two APA attorneys, Director of Negotiations Mark Myers, and APA Director of Representation, James Clark, who both made material misstatements of the facts with respect to the existence of the legal department's secret December 12, 2016, Babb-Denison legal opinion letter obtained without knowledge or authorization from APA's Board of Directors, which appeared to be used as justification of APA legal's prior abandonment of the duty of representation of the over 240 MDD pilots; to include, improperly excluding them from their full share payout of the $1.1B Equity Distribution, estimated to be approximately $100,000.00 per MDD pilot, or $24M collectively. I informed then President Ferguson of these attorney's ethical violations and recommended they be terminated due to ethics violations of the APA Constitution and Bylaws (C&B"), but he declined, stating he "must safeguard the best interests of APA", and instead abruptly disbanded the committee before it could issue its findings. I therefore re-started the committee up as an ad-hoc committee immediately upon my winning of the Presidential election, this time under a different name. See Deposition transcript of Edward Sicher in; *Preitz v. APA* (Case No. 2:17-cv-01166-MSG, Doc 107-4, Jan 6, 2021) stating both Mr. Myers and Clark both lied about Babb-Denison letter).

20.     In or around April 2022, while serving as the Miami Domicile representative, I appointed FO Meadows to the APA National Aeromedical Committee, Disabled Pilots Awareness Sub-Committee (DPASC), to serve as the MIA Domicile Pilot LTD Coordinator to assist other disabled pilots. The APA legal department pushed back on this appointment, arguing that FO Meadows was not a "member in good standing" and was therefore ineligible to serve on a national committee. This disagreement boiled out in my issuance of a Presidential

9

Interpretation on Sep 2, 2022, defining "members in good standing" (The APA President is the only union official allowed to interpret the Constitution and By-Laws at APA).

21. The formal Constitutional Interpretation (see attachment) confirmed that inactive members, including MDD pilots, like FO Meadows, who had fulfilled all prior membership requirements, were "members in good standing." And could certainly serve on APA committees and in official APA capacities. A copy of that Presidential interpretation is attached hereto as **Exhibit G.**

22. As a direct result of my Constitutional Interpretation FO Meadows, as a member in good standing, was able to serve as the MIA Domicile LTD Coordinator, where he sponsored and helped scores of disabled pilots.

23. As APA President, I also took steps to address FO Meadows' long-pending individual and collective seniority reinstatement grievances. On March 13, 2023, at FO Meadows request, I converted the collective Grievance 12-012 into expedited Presidential Grievance 23-031. A copy of G-23-031 is previously attached as **Exhibit B.**

24. I also created the National Dropped Reinstatement ad hoc Committee ("NDRC"), and around April 2023, I appointed First Officer ("FO") Thomas Rempfer as Chairman, to ensure that APA leaves "no pilot behind". The NDRC was tasked with finding avenues of reinstatement for those who have been dropped from the seniority list, by virtue of disability, merger, or other reason, not including retirement or discipline. This was intended to help obtain reinstatement of FO Meadows and other similarly situated MDD pilots. A copy of the NDRC power point presentation that FO Rempfer created in collaboration with MDD pilots FOs Meadows and Preitz is attached hereto as **Exhibit H.**

25. During the AOA Spring BOD Meeting, FO Rempfer presented the NDRC PowerPoint to the BOD, and APA Attorney Tricia Kennedy and Former APA BOD CA Thomas Westbrook attempted to orchestrate a recall of MDD advocate FO Rempfer. A copy of FO Rempfer's Memo For Record is attached hereto as **Exhibit I.**

26. In early 2024, and due to the fact that it increasingly appeared that AA was unwilling to reinstate Larry Meadows without a legal fight, I hired attorney Sue Edwards, Esq., to personally represent FO Meadows in his individually filed ADA lawsuit against American Airlines. The objective was to put a set of professional eyes on Meadow's filings as he had up to then primarily been representing himself pro-se. Sue Edwards was trusted by the MDD pilots and had recently achieved a win for APA in a prior lawsuit against the FAA for the wrongful termination of one of our pilots for being improperly notified of a drug test. I felt that to truly succeed in court he would need professional guidance. Victory in court would hopefully persuade AA to drop its obstruction to reinstating our MDD pilots and result in the mutually beneficial outcome to both our pilots and the company. As President and the primary fiduciary of the APA, the reason I gave to the Board of Directors and legal counsel for this expenditure was that I had reached an agreement with Meadows that he would drop the lawsuits against APA if the union put the bulk of its collective resources behind what was increasingly becoming an individual fight. Meadows had originally agreed to this "quid pro quo", but when it became clear to him that he would have to drop his claims against APA before he would receive surety that his claims for reinstatement as a pilot against AA would succeed he reneged and declined to drop his claims against APA. When this occurred I directed Ms. Edwards to terminate her representation of Meadows.

11

27.    Furthermore, on or about June 13, 2024, I directed the APA Director Of Grievances, Tricia Kennedy, to move FO Meadows' individual Grievance 12-011 forward and schedule it for an arbitration hearing. To my knowledge, that grievance was still open, active, and in the queue for a an arbitration hearing at least until I left office on October of 2024. Text messages between myself and Tom Remper attached hereto as **Exhibit J.**

28.    On or around late September 2024, I was presented with a proposed settlement agreement with American Airlines concerning Grievances 12-012 and 23-031. That proposal would have reinstated several other MDD pilots, some out on disability for much as 24-years, but explicitly excluded FO Meadows, despite the fact he was holding an FAA Airman's First Class Medical Certificate and working as current and qualified B-777 Captain and Instructor pilot in Boeings Miami Flight Training Center. I refused to sign because it was a "go-no-go decision point" to leave any pilot behind. I truly felt that to have continued the fight to this point and finally settle by letting the company decide who to reinstate and who to refuse would have left this issue unresolved, thus resulting in returning right back to where we started.

29.    In late 2024 and after an internal battle with my Board of Directors over the possible merger of our union with the Air Line Pilots Association (ALPA), a merger which I was adamantly against, I was removed from office by the Board of Directors. The Board of Directors was able to install another President they were allowed to choose due to the short remaining time left on my tenure. The replacement they chose, FO Nick Silva, had never served in a membership elected position and had very little experience, particularly dealing with APA grievances or its legal department. He had only served as a costing analyst on the negotiating committee. He summoned me down to APA to discuss the handoff from one President to the next. Despite the fact that there were hundreds of issues in play at the time, such as staff issues,

12

Case 1:17-cv-22589-EA Document 251-1 Entered on FLSD Docket 04/15/2026 Page 85 of
216
Case 1:17-cv-22589-EA Document 180 Entered on FLSD Docket 01/29/2026 Page 28 of 85

IT upgrades. problems with AA's Safety program and the FAA oversight of the airline, etc. etc. all Nick wanted to discuss was the issue of Larry Meadows. This was a huge surprise to me and indicative of how much pressure he was under by the APA legal department to fold on APA's advocacy for Meadows and the grievances I had filed as President. The question he dwelled on for most of the 45' he had scheduled for me was "Why wouldn't you approve the proposed MDD settlement by removing Larry Meadows?"

30.    I have since learned that on January 15, 2025, the new APA President FO Silva executed a settlement that finalized the exclusion of FO Meadows and falsely claimed that his individual Grievance 12-011, the very same grievance I had ordered to arbitration months earlier, was now being declared "closed since 2013." A copy of this January 15, 2025 Grievance 12-012/23-031 Settlement are attached hereto as **Exhibit K.**

31.    I have also been informed by FO Meadows that on or around May 1, 2025, the current APA President Nick Silva, terminated Meadows 34-years of APA membership via a letter, in response his request to speak during membership guest hour at the 2025 Spring Board of Directors Meeting, A copy of this correspondence is attached hereto as **Exhibit L.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of January, 2026.

_____
Captain Edward F. Sicher
MIA/777/International

13

Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 29 of 85

# EXHIBIT A

**ALLIED PILOTS ASSOCIATION**

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

May 22, 2012

VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED # 7011 0470 0000 9113 1546

Captain John Hale
Vice President Flight
American Airlines, Inc.
P. O. Box 619617 MD851
DFW Airport, TX 75261-9617

     Re:    DFW Domicile Grievance No. 12-012

Dear Captain Hale:

    Pursuant to the May 1, 2003, Agreement ("Agreement"), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

    In accordance with Section 21.F.3 of the Agreement, I hereby elect to waive the Initial Hearing in this matter so that an Appeal Hearing can be held at the earliest possible date.

    In addition, we request that the Company send a copy of all hearing notices and decisions rendered in this case to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512.

                                           Sincerely,

Captain Rusty McDaniels                 First Officer Russell Moore
Chairman - DFW                       Vice Chairman - DFW

cc:    Ms. Reagan Heine, AA Specialist HR Ops Support (via Shelley Handman)
       Captain Tom Kachmar, Grievance Coordinator – DFW
       First Officer Neil Roghair, Negotiating Committee Chairman
       Captain Frank McGill, Contract Compliance Committee Chairman
       APA Legal Department (JBB)

# EXHIBIT B

**ALLIED PILOTS ASSOCIATION**
Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

March 13, 2023

VIA ELECTRONIC MAIL ONLY

Captain Russ Moore
Vice President – Flight Ops
American Airlines, Inc.
P. O. Box 619617 MD851
DFW Airport, TX 75261-9617

> Re: Conversion of DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance No. 23-031

Dear Captain Moore:

On May 22, 2012, the DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's violation of Sections 11.D, Supplement F(1), all other related sections of the Agreement, and past practice for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. The Initial Hearing was waived, and the grievance is pending at the Vice President - Flight Appeal Hearing level.

The APA hereby converts DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance No. 23-031. In accordance with Agreement Section 21.D.3., I hereby submit this grievance directly to the System Board of Adjustment. Moreover, I respectfully demand expedited arbitration of this grievance in accordance with Agreement Section 23.

I request that the Company send a copy of all hearing notices and decisions relating to this grievance to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, Texas 76155-2512.

Sincerely,

Captain Edward F. Sicher
President

cc:  APA National Officers and Board of Directors
     Captain John Owens, Chair, APA Negotiating Committee
     Captain Jason Saxer, Chair, APA Contract Compliance Committee
     Captain Tracy Parrella, Chair, Grievance Resolution Committee Ad Hoc
     Captain BJ West, Member, Negotiating Committee
     APA Legal Department (TEK/GD/JK)
     Miranda Rosenthal, Esq., Managing Director Labor Relations (via Michelle Montgomery)
     Ms. Michelle Montgomery, Senior Manager Labor Relations

## EXHIBIT C

# Union Democracy Review

No. 204                    Published by the Association for Union Democracy



## Member Discussion Board closed off with No Explanation:
## 233 Disabled Pilots Barred from Allied Pilots Association website

By Kurt Richwerger

Without explanation or warning, on April 22nd, 2014 the Allied Pilots Association (APA), the collective bargaining agent for all 10,000 American Airlines (AA) pilots, locked out 233 of its members - all of whom are medically disabled - from what is called the "challenge and response (C&R)" section of the APA website. C&R is a members-only discussion forum. The 233 pilots are all classified by the APA as "MDD" or medically disabled and dropped from the seniority list. AA policy is that after 5 years of disability members lose their seniority. This policy has been the subject of an ongoing dispute between the APA and its disabled pilots, and many pilots wish the APA to grieve the policy on grounds that it violates the CBA and the Americans with Disabilities Act (ADA). Regardless, MDDs have always been classified as members in good standing by the APA, but now have been prevented from entering what APA calls its "virtual union hall."

The lockout, according to some disabled pilots, is meant to prevent them from discussing the allegedly poor treatment of disabled pilots by the APA and by American Airlines (AA). According to one pilot, an active website discussion began with a member's posting of a press release regarding a March 2014 lawsuit against AA brought by Lawrence Meadows, one of the AA disabled pilots. The lawsuit, filed in federal court, accuses AA of violating the employee whistleblower protections of the Sarbanes Oxley Act by retaliating against Meadows and terminating him after Meadows informed AA of suspected fraud in its cost savings program scheme to terminate pilot disability payments funded by AA pension plans.

Disabled members began commenting and posting on C&R and told their own "horror stories," in the words of one disabled pilot, stories which did not paint the APA in a very favorable light.

### Inside Stories

| | | | |
|---|---|---|---|
| New book by Bill Barry | 3 | IAM election protest | 5 |
| NLRB win for carpenter | 3 | Where we stand | 5 |
| Oppression in the AMO | 4 | AFGE election | 6 |
| IBEW campaign | 5 | UBC free speech case | 8 |

June/July 2014



Meanwhile in mid- April 2014 Meadows requested that APA represent him in a seniority reinstatement grievance hearing and APA refused; he responded to the APA legal department that he would file EEOC disability charges against APA and would advise others to do the same. Two hours later, he and all other 233 MDDs were locked out of the website.

Meadows' Sarbanes Oxley lawsuit provides some background and context for the above events. It alleges that AA targeted him in a fraudulent "cost-savings" initiative, as American faced the threat of bankruptcy and its pension obligations were badly underfunded.

The lawsuit alleges that in 2004 Meadows, at that time a 13-year APA member and pilot, became disabled and began receiving disability benefits as his application was approved by the AA Medical Director. In the 2004-07 period when he received benefits, Meadows attempted to get clearance to return to work twice, but was unable to obtain a required FAA medical recertification to fly for AA due to his condition. In fact, regular medical updates of his condition, required under the plan, found it worsening, reflected in AA records.

But despite his worsening condition, he was suddenly terminated from disability benefits in December 2007 -- not even told of this termination by AA - checks just stopped coming. Meadows appealed the loss of disability status to the AA's Pension Benefits Administration Committee (PBAC). PBAC had hired an outside party, "Western Medical Evaluators" (WME), to review such appeals. The WME review concluded that Meadows' claim be denied in 2008. But Meadows learned from his 2010 ERISA lawsuit against AA that WME was not really a third party clinical source as required by the CBA, but rather a small worker's compensation claims processor that had a history of falsifying claims and records, and in fact WME was permanently shut down by the Texas State Insurance Board in 2010 for fraudulent practices. In discovery during his ERISA suit, WME could produce no medical records that they relied upon in conducting their peer review of Meadows' case.

Meadows' ERISA lawsuit also revealed the AA "cost savings program," which tracked some 84 disabled pilots including himself in a spreadsheet, and he was one of five designated for "cost savings." APA also challenged the PBAC review process in a 2009 lawsuit and the clinical review was moved to the Mayo Clinic.

continued on page 2...

FIRST AMENDED COMPLAINT

# Disabled pilots continued from page 1...

The suit continues: after denial of benefits Meadows was placed on unpaid sick leave and told he had to return to full time pilot work by getting medical clearance. He applied again for the FAA clearance to return to work but was again denied due to his condition. But instead of returning to disability status, Meadows was kept on unpaid sick leave. The 2010 ERISA lawsuit meanwhile went to federal mediation and in the process Meadows revealed the use of WME and the existence of the fraudulent cost savings initiative to AA's corporate directors and AA's legal counsel, and told AA that his lawyers were intending to bring additional actions. Meadows was then told by AA he had exceeded AA's sick leave maximum of five years and threatened with termination – odd, because Meadows had already exceeded that policy by three and a half years and was never threatened with termination. The AA Reasonable Accommodation Policy requires that if a disabled pilot cannot obtain FAA clearance to fly an aircraft he may request a reasonable accommodation in another craft or class so Meadows requested an accommodation in one of AAs non flying pilot positions – which would have kept him in the CBA , kept his seniority and eligibility for benefits, but he was refused. Meadows was terminated in 2011, after refusing to accept an accommodation outside of the CBA, which would have inferior status and benefits and prevented him from ever returning to work as a pilot.

The suit asks for relief in the form of a new assignment to a position in the bargaining unit with full wages commensurate with his seniority status and suggests three possible positions. It also asks for reinstatement of his benefit package, back pay and lost benefits. It also asks for a money sum for "intentional infliction of emotional distress" which the suit alleges has led to a significant exacerbation of Meadows' condition, and asks for attorney fees.

After Meadows' press release appeared on the C&R portion of the APA website, another disabled pilot, Kathy Emery, posted a document in which she alleges she was also the target of the AA cost savings plan. Like Meadows, her disability benefits were unex-

pectedly discontinued, she had been receiving disability payments for several years and a doctor selected by AA provide updates to AA on her condition. But in Jan. 2007 she wa stripped of all disability benefits without notice, just around th time Meadows lost his benefits.

Emery describes in her posting that like Meadows, she exercise her right to appeal the loss of her disability to the AA PBAC an suffered the same fate -- WME denied her appeal. After he appeal was denied she was placed on unauthorized leave o absence and told to appear at a hearing. The hearing officer direct ed her to obtain a First Class Medical Clearance so she could g back to work. But soon after, she was told by the same AA Medical Director that had stopped her disability payments, that h would not give her such clearance but suggested she might be given a "reasonable accommodation" "stapling papers."

Like Meadows, Emery then filed an ERISA suit against AA in federal court in Florida. Her ERISA case unearthed the same fraudulent practices by WME that allegedly took place in Meadows case.

But Emery has issues with APA that Meadows did not. Emery and APA filed a grievance against AA in December 2007 but it was not settled and she is still awaiting an arbitration date. Emery was also entitled to disability benefits under the APA disability plan. So in 2003 she filed for benefits. No payments were received for five years. She filed another ERISA suit this time against the APA , and won a settlement of $48,000 from a federal court for the back years.

But there is even more to Emery's dispute with APA. Emery alleges she received far less than her fair share of the AA "Equity Distribution," which has become the basis for her EEOC complaint against APA. In the formation of the new American Airlines, AA pilots were given a 13.5 percent equity stake, as pilots became part owners of the new AA. Emery received an award estimated at $23,000, but similarly situated male pilots who had also been "terminated" received 5 to 6 times that amount. The reason: male pilots that had been "terminated" filed grievances that were given a presumption of likely success – thus they were held to be still on "active status." Emery alleges disparate treatment when her grievance was not given the same presumption, so she was not treated as "active" resulting in a much lower share of the equity. Emery also alleges in her complaint that the APA discriminated against other disabled pilots in the equity distribution.

Both Emery and Meadows are exploring ways to remove the website lockout.

No. 204                          June/July 2014
Published by:
Association for Union Democracy
104 Montgomery Street
Brooklyn NY 11225
www.uniondemocracy.org
Phone (718) 564-1114
Email:info@uniondemocracy.org

Miriam Lazewatsky, Editor
Kurt Richwerger, Executive Director

Subscription rates: regular $30; institutions/foreign: $40; low income/student/retired: $15. (Additional contributions to AUD are tax deductible.)

Union Democracy Review aims to promote the principles and practices of internal union democracy in the North American labor movement. Toward this end, it makes its pages available for discussion.

107
## FIRST AMENDED COMPLAINT

Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 36 of 85

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-80518-CIV-HURLEY

KATHY E. EMERY,

    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

    Defendant.

_____/

### ORDER CONTAINING FINDINGS OF
### OF FACT & CONCLUSIONS OF LAW

Certain aspects of the employment relationship between American Airlines, a major commercial air carrier, and its pilots form the background to this case. The dispute at issue, however, involves a policy promulgated by the pilots' union, the Allied Pilots Association. The policy denies a minority of disabled pilots, who are inactive members of the union and are referred to as "MDD" (medically disabled dropped) pilots, access to "Challenge & Response," a website chat room maintained by the union. For reasons that will be apparent, the Court concludes that the union's policy violates the union member's "bill of rights" contained in the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2).

Based upon the testimony and evidence presented, the Court makes the following

### FINDINGS OF FACT

1. American Airlines ("American" or "the airline") has approximately 15,000 pilots

1

Case 1:17-cv-22589-EA Document 251-1 Entered on FLSD Docket 04/15/2026 Page 95 of 216
Case 1:17-cv-22589-EA Document 180 Entered on FLSD Docket 01/29/2026 Page 38 of 85
Case: 9:14-cv-80518-DTKH Document #: 159 Entered on FLSD Docket: 01/04/2017 Page 6 of 18

a comment on C&R, the software listed the writer's name above the term "Member." However, when an MDD pilot posted an item on C&R, the software listed the writer's name above the term "Anonymous."

17. The status of MDD pilots within the APA was not resolved conclusively until June 30, 2016, when APA President Keith Wilson issued a written "presidential constitutional interpretation" indicating that MDD pilots are inactive members of the APA. Def. Ex. 16.

18. American declared bankruptcy in November 2011. Prior to this time, MDD pilots had begun to complain vigorously about the airline's imposition of unduly stringent reviews of their entitlement to disability benefits. Also, they often voiced the criticism that the APA was not taking sufficient steps to protect their benefits.

19. As a result of the airline's bankruptcy, a new collective bargaining agreement was negotiated between American and the APA. In exchange for various concessions, American granted a 13.5% equity share in the ownership of the airline to the members of the APA. Furthermore, the APA was given the authority to distribute the equity among its members. Suffice it to say this proved to be a major bone of contention between the APA and some MDD pilots who received lesser amounts than active pilots.

20. Tension between MDD pilots and the APA grew in the post-bankruptcy period. This is evidenced by posts on C&R. For example, Plaintiff Emery posted this comment on April 7, 2014:

> I am one of the pilots who was stripped of disability benefits when AA implemented the "disability nurse case management and cost savings program." Even though I was not on disability more than 5 years and still have sick time, I was also stripped on my seniority number and according to the APA terminated, (while awaiting

6

scheduling of my arbitration) which was submitted to the System Board by Loyd Hill [in] 2009. Anyone know what the average time to have an arbitration scheduled? . . . I still have not received any positive feed back from my January 23rd meeting with APA and my request to have APA form a disability committee make (sic) up of disabled pilots.

Steven Salmirs, a non-MDD pilot, posted this comment on April 22nd, 2014:

Don, Thanks for posting this and keeping it alive. It is something the membership needs to know about their union that when the time comes when they need help, the union will arbitrarily ignore you and actually work against you WITH management. Unheard of but there you are . . . I hope Larry is successful in his court cases.

On the same day, Larry Meadows, an MDD pilot, posted the following comment:

Don, I see you posted last week's news story that ran on April 15th about my SEC-Whistleblower Complaint under another thread. I don't know how you find all this stuff but thanks for posting it, and informing the membership. I'm going to repost it here (in-line text below), as that story directly related to this thread.

[Mr. Meadows reprinted the following assertions from his pending law suit.]

American knowingly failed to pay many of its pilots their otherwise rightful long-term disability benefits, which amounted to well over a 100 million dollars of obligations under its defined benefit pension plans. . . . American's Medical Department implemented the Nurse Case Management Pilot Disability Cost Savings scheme . . . . This scheme targeted the most costly pilot claimants by prematurely terminating their long-term disability benefits.

Ptf. Ex. 25.

21. The APA's board of directors held its spring meeting on April 22, 2014. By this time, American had emerged from two years in bankruptcy and had merged with U.S. Airlines. The APA was confronting a host of difficult issues including significant changes in the collective bargaining

7

216
85

agreement and the task of integrating the two airlines' seniority lists. Captain McDaniels explained, "There had been major changes in our contract. Many of the changes were in dispute . . . and not being implemented as we believed they were supposed to be implemented." Trial Tr. vol. 1, 146. In the midst of these discussions, as the board was about to take a short recess, one member drew the board's attention to recent comments posted by MDD pilots on C&R. In response, Captain McDaniels reviewed the Acceptable Use Policy and pointed out that MDD pilots were not listed as permitted users. He urged the board to enforce the policy as written. The board acceded to this suggestion and directed Captain McDaniels, the chairman of the IT steering committee, to implement the board's decision.

22. The APA's 2007 Acceptable Use Policy for Challenge & Response was intentionally confirmed in April 2014 to exclude MDD pilots. While the Court finds that the board member who raised the topic of the MDD pilots' postings was likely motivated by a desire to silence a group he viewed as combative and litigious, his motivation cannot be ascribed to the board as a whole. Rather, the Court finds the following testimony of Captain McDaniels to be credible and worthy of belief. He explained,

> I looked up what the [Acceptable Use Policy] was to see what it said, and we quickly . . . saw . . . . only active members, furloughs and retirees . . . are supposed to be on C&R. The board more or less – the concept was, okay, fine, this [Acceptable Use Policy] is not being enforced by the IT department, somebody go tell the IT department to fix the programming, and we are done and moving on. We have other things to talk about.
>
> I don't think we spent three to five minutes in casual conversation on it. From the board's standpoint, it never should have come up as a subject, it was an administrative programming glitch even to allow it

8

around the country to attend local union meetings, all lack the ease. spontaneity and scope of C&R.

While not designed to do so, the APA's policy of denying MDD pilots access to C&R acts to silence criticism of the union's management by a discreet minority of disabled members. Inasmuch as the evidence in the record fails to establish that the APA's policy can be justified under the second clause in § 101(a(2), it is

ORDERED and ADJUDGED  the APA's policy of denying MDD pilots access to Challenge & Response constitutes in an impermissible infringement on Plaintiff's right to free speech guaranteed by LMRDA.  Therefore, the Court, by separate order, will issue a mandatory injunction requiring the Defendant Allied Pilots Association to grant Plaintiff Kathy E. Emery access to Challenge & Response.

DONE and SIGNED in Chambers at West Palm Beach, Florida, this 4th day of January, 2017.

Daniel T. K. Hurley
United States District Judge

cc: Copies provided to both parties.

18

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 99 of
Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 42 of 85
216

## EXHIBIT E

# BAAB & DENISON, L.L.P.

G. William Baab*
Sanford R. Denison*

L. N. D. Wells, Jr.
(1914    2000)

ATTORNEYS
6301 GASTON AVE., STE 550
DALLAS, TEXAS 75214

Tele: 214-637-0750 • Fax: 214-637-0730
denison@baabdenison.com

*Board Certified
Labor and Employment Law
Texas Board of Legal Specialization

December 12, 2016

Mark R. Myers
Attorney
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Fort Worth, Texas 76155-2512

Re:   Duty of Fair Representation to Former Pilots Who Have Fallen off the Seniority List and
      Been Terminated by the Company Because of the Expiration of their Contractual
      Disability or Sick Leave

Dear Mark:

This letter is in response to your request for our opinion as to whether APA owes a duty of fair representation, and, if so, the nature and temporal extent of that duty, with regard to pilots who have fallen off, or will fall off, the seniority list, and who thus have or will be terminated from their AA employment, by operation of Section 11.D and Supplement F(1), §5(d).

Specifically, you have advised that APA has a group of former pilots who have fallen off the seniority list (and thus are no longer employees of AA and are no longer in the class or craft of represented employees) as a result of the operation of two sections in the CBA: First, under Section 11.D, a pilot is allowed to take a 3-year unpaid sick leave of absence (which can be extended to 5 years by mutual agreement between APA and AA) at the expiration of which leave the pilot is automatically dropped from the seniority list and terminated. Second, under Supplement F(1), §5(d), until a recent amendment which went into effect September 30, 2016, a pilot who was on long-term disability leave was also automatically dropped from the seniority list and terminated at the expiration of 5 years of disability leave. Under both provisions, the pilots are automatically dropped without the need for any formal hearing. These two CBA sections have been in the CBA for decades and have never been contested by APA.

You have further advised that Supplement F(1), §5(d) was recently amended by a LOA signed on October 19, 2016, as a result of which no additional pilots will be dropped from the seniority list under Supplement F(1), §5(d) effective September 30, 2016. Thus, a pilot on disability leave who has already hit the 5-year mark prior to September 30 will have fallen off the seniority list, but a pilot on disability leave who hit, or will hit the 5-year mark on or after September 30 will no longer be dropped from the seniority list and will retain AA employee status. Section 11.D. remains unchanged, such that a pilot who is on sick leave - as opposed to disability leave - will still be dropped from the seniority list and terminated at the expiration of the applicable 3 or 5 year period on which the pilot remained on sick leave. You have advised that in the negotiations which led to the amendment of Supplement F(1), §5(d) that the APA negotiating committee proposed that the elimination of the 5 year limitation on disability leave be applied retroactively, such that pilots who have previously been dropped from the seniority list and terminated by operation of that section would be reinstated. However, it was the Company's position that it would only agree to elimination of the 5 year limitation on disability leave for pilots who have not

PREITZ003348

Case 1:17-cv-22589-EA Document 251-1 Entered on FLSD Docket 04/15/2026 Page 101 of 216
Case 1:17-cv-22589-EA Document 180 Entered on FLSD Docket 01/29/2026 Page 44 of 85
Case 2:17-cv-01166-MSG Document 107-75 Filed 10/01/21 Page 1 of 12

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 2

reached the 5 year mark as of September 30, 2016. Similarly, APA proposed in those negotiations that the 3 year limitation (or as may be applicable the extended 5 year limitation) on sick leave in Section 11.D. also be eliminated. However, the Company would not agree to any modification of that provision, even prospectively with regard to pilots who would hit their 3 or 5 year mark on sick leave on or after September 30, 2016.

With regard to pilots who in the past have fallen off the seniority list and been terminated by AA as a result of operation of either Section 11.D or Supplement F(1), §5(d), you have advised that former pilots who subsequently regain their first class medical certificate are often reinstated to their AA employment and to their relative position on the seniority list as if they had never been dropped. This is an extra-contractual practice, which the Company reminds APA each time it occurs is on a no-cite, no-precedent and case-by-case basis. You have advised that APA has always supported pilots seeking return, but that the Company has not always agreed to bring them back. While there is no contractual basis for APA to force or grieve the Company's decision, you have advised that the APA Board has adopted resolutions which set forth APA policy with respect to former pilots who seek reinstatement by AA and restoration of their seniority. Specifically, you have advised that the APA Board has passed resolutions R3006- 61 Rev.1, adopted on November 4, 2006, and R2014-07 Rev.1, adopted on March 2014, which set forth APA policy when a pilot who has regained his first class medical certificate, but who has already fallen off the seniority list and been terminated as a result of the operation of either of these two CBA provisions, petitions the APA for support of his request to AA for reinstatement to his or her employment and original relative AA seniority number.

**Questions Presented:**

With regard to pilots who have already dropped off the seniority list and been terminated as a result of the operation of Section 11.D. or Supplement F(1), §5(d), you have advised that a question has arisen as to what duty, if any, is owed to those former pilots to advocate for their return, or to advocate on their behalf with the Company on any issue.

A secondary question is whether, if no duty exists, does APA voluntarily assume a duty if it makes promises to the pilots or makes efforts on their behalf to seek their return? Do these voluntary actions expose APA to any DFR liability?

**Answers:**

To answer these questions one must begin by examining the case law with regard to whether a union owes a duty of fair representation to former employees who were, but are no longer members of the applicable bargaining unit, or to persons who are otherwise outside the bargaining unit. A union obviously has a duty to represent former employees who were members of the bargaining unit with respect to their rights which accrued under the contract prior to their termination, such as would be the case with an employee discharged without just cause in violation of the CBA or an employee denied post-termination some right or benefit accrued under the CBA. However, as discussed in section "I" below, the law is settled that, in general, a union only owes a duty of fair representation to those currently employed in the bargaining unit which the union is certified to represent.

**PREITZ003349**

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 3

This general rule, however, has two exceptions. First, as noted above, a union has a duty to represent former employees as to their previously accrued rights under the CBA. Second, as relevant here, a duty of fair representation can be imposed with regard to former employees when a union by its conduct assumes an obligation to represent those outside, or no longer employed within the bargaining unit or undertakes functions beyond its duties as the exclusive representative of the bargaining unit. This exception is discussed in section "II" below.

In short, in answer to the questions presented, it is our opinion, based on this case law and the facts presented, that as a general proposition APA has no statutory duty to represent former pilots who have been dropped off the seniority list and terminated by AA by operation of Section 11.D. or Supplement F(1), §5(d) with respect to any issue other than contract rights which accrued prior to their termination. However, having said that, APA has arguably assumed a limited duty, beyond its statutory duty as certified bargaining agent, to represent such former pilots with regard to their efforts to seek reinstatement in accordance with APA policy as set forth in the two above referenced Board resolutions and its past practice of assisting such pilots in their extra-contractual efforts to secure reinstatement by AA upon their regaining their first class medical certification.

We do not believe however, that such assumed duty would include the requirement that APA *must actually negotiate* contractual reinstatement rights for such former pilots. Moreover, even assuming APA had a duty to *seek to negotiate* contractual reinstatement rights for such former employees (as distinct from any duty that APA actually negotiate such reinstatement rights), APA has already discharged that duty by proposing in negotiations the elimination of the temporal leave limitations on sick and disability leave of Section 11.D. and Supplement F(1), §5(d), and proposing that such elimination be applied retroactively to former pilots who have already been dropped from the seniority list.

The duty of fair representation does not mandate that a union obtain an employer's agreement to that to which the employer will not agree, only that in the conduct of negotiations the union take positions which are not arbitrary, capricious or in bad faith. See *Vaca v Sipes*, 386 U. S. 171, 190 (1967); *O'Neill v. ALPA*, 939 F.2d 1199, 1203, (5th Cir. 1991); and *McCall v. Southwest Airlines Co., et. al*, 661 F.Supp.2d 647, 654 (N.D.Tex. 2009).

Therefore, while APA's efforts to support and assist such former pilots, who are no longer members the bargaining unit and for whom there is this no statutory duty to represent, to obtain reinstatement may impose an assumed duty on APA, and thus the potential for DFR liability, such duty would be limited to acting in a manner which could not be construed as arbitrary, discriminatory, or in bad faith in relation to APA's actions in "representing" a former pilot who petitions APA for support and assistance in securing reinstatement of his or her AA employment and seniority. *Id*. In other words, APA could not refuse to assist or support a former pilot in his or her reinstatement efforts based on arbitrary, discriminatory, or bad faith factors or in the course of assisting or supporting such former pilot to secure reinstatement provide such assistance or support in an arbitrary, discriminatory or bad faith manner. This limited duty of support and assistance to former pilots with their efforts to secure reinstatement with the Company would not require that APA become an advocate on behalf of these former pilots with respect to any other matters beyond those which arose or which involve rights already accrued under the CBA prior to their terminations.

**PREITZ003350**

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 103 of
216
Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 46 of 85
Case 2:17-cv-01166-MSG   Document 107-75   Filed 10/01/21   Page 3 of 12

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 4

### 1. The Duty of Fair Representation, as a General Rule, Does Not Extend to Those Who Are Not, Or Are No Longer, Members of the Bargaining Unit

As noted in our November 17, 2016 opinion memo regarding APA's duty of fair representation in the context of resolution of the issue of whether the Supp C narrowbody fence remained in effect. APA's duty of fair representation extends, as a general rule, only to those pilots who are current members of the bargaining unit. (*i.e.*, the craft or class of AA pilots on the current integrated seniority list).

In Bensel v. APA, et al., 387 F.3d 298, 312-15 (3rd Cir. 2004) the Third Circuit, citing Humphrey v. Moore, 375 U.S. 335 (1964), stated that "[a] union has the statutory duty to represent all members of the appropriate bargaining unit fairly [but that] [t]he scope of the duty ... is commensurate with the scope of the union's statutory authority as the exclusive bargaining agent." Id. at 312. As such, the Court concluded that "[c]onversely, the union's statutory duty of fair representation does not extend to those persons who are not members of the pertinent bargaining unit." Id. On that basis, the Court went on to hold that until such time as APA was certified as the exclusive bargaining agent for the pilots of TWA-LCC it owed them no duty and that, therefore, APA's duty was "to protect the interests of American's pilots, for whom APA did have a statutory duty to fairly represent." Id. at 314. See *Barnes v. Air Line Pilots Ass'n*, 141 F. Supp. 3d 836, 844 (N.D. Ill. 2015) ("the DFR attaches only to those employees for whom the union serves as the exclusive bargaining representative.")

Accordingly, as analogous to whether APA has any duty to former APA pilots in general, with regard to retired employees, it has long been held that the duty of fair representation in contract negotiation and administration generally does not extend to retirees, who are once members of the bargaining unit prior to their retirement. The seminal case on this point is *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971). In *Allied*, the Court stated that "[s]ince retirees are not members of the bargaining unit, the bargaining agent [ *i.e.*, the union] is under no statutory duty to represent them in negotiations with the employer." *Id.* at 181 n. 20. Put another way: "A union's statutory duty of fair representation traditionally runs only to the members of its collective-bargaining unit, and is coextensive with its statutory authority to act as the exclusive representative for all the employees within the unit." *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n. 22 (1984); *see also In re UAL Corp.*, 468 F.3d 456, 459 (7th Cir. 2006) ("A union's duty to bargain collectively on behalf of the members of the bargaining unit that the union represents does not extend to retired workers, because they are not members of the unit.") and *Santiago v. United Air Lines, Inc.*, 2012 WL 3583057 (N.D. Ill. Aug. 17, 2012) (union had no duty to represent retired flight attendant regarding United's changes to its travel policy which allegedly benefited current employees at the expense of retirees).

Similarly, as a general rule, courts have held that, as with retirees, a union has no duty of fair representation with regard to managers, supervisors, nonemployees, or others who are outside the bargaining unit. *Karo v San Diego Symphony Orchestra Assn.*, 762 F.2d 819, 821 (9th Cir., 1985) ("If a union owes no duty of fair representation to retired employees of the bargaining unit it follows that no such duty would be owed to one who never was a member of the unit. Because the union owed no duty to Karo as a nonemployee of the bargaining unit, he lacks standing to sue for breach of such a duty.") *Cooper v. General Motors Corp.*, 651 F.2d 249, 250 (5th Cir. 1981) (union owes no duty to supervisors who were formerly members of bargaining unit).

**PREITZ003351**

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 104 of
Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 47 of 85
Case 2:17-cv-01166-MSG   Document 107-75   Filed 10/01/21   Page 4 of 12

Mark R. Myers
Attorney
Allied Pilots Association
December 12, 2016
Page 5

**II.  While it is the General Rule That a Union Owes No Duty of Fair Representation to Those Outside the Bargaining Unit, If a Union Voluntarily Undertakes the Representation of Those Outside the Bargaining Unit, the Duty of Fair Representation May Attach**

However, if a union undertakes the representation of those outside the bargaining unit or takes on functions beyond its duties as the exclusive representative of the bargaining unit, along with the assumption of those functions and representation comes the obligation to carry out those functions and representation consistent with the duty of fair representation. *Barnes v. Air Line Pilots Ass'n*, 141 F. Supp. 3d 836, 844-45 (N.D. Ill. 2015); *Diaz v International Longshore and Warehouse Union Local 134*, 74 F.3d 1202, 1205 (9th. Cir, 2007).

In *Barnes* management pilots alleged that ALPA owed, and breached, a duty of fair representation to them with respect to collective bargaining negotiations with United in general and specifically on an issue of retro pay.  While noting that "the DFR attaches only to those employees for whom a union serves as the exclusive bargaining representative". *Barnes*, 141 F. Supp. 3d at 844, based on record evidence that ALPA arguably led the management pilots to believe that ALPA was representing them by having negotiated specific contract provisions applicable to management pilots and by accepting dues and contract maintenance fees from the management pilots, the Court held that the issue of whether ALPA owed a duty of fair presentation to the management pilots could not be resolved on a Rule 12(c) motion to dismiss. Based on those facts the *Barnes* court concluded that "a reasonable observer could find that ALPA, through both omission and commission, conveyed to the management pilots that it was negotiating on their behalf and representing their interests in the retro pay allocation, even if it was not legally required to do so." *Id.* The *Barnes* court, as authority for its conclusion that a union, by its conduct assuming the representation of those who are not members of the bargaining unit and for whom the union had no statutory duty to represent, could nevertheless become subject to the to the DFR with respect to such assumed representation, cited the following authority:

> *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 540 (7th Cir. 1997) ("Although a union has no duty to represent retirees, and retirees need not submit to union representation, retirees are free to make a union their agent if they so choose. And, of course, retiree benefits are a permissive subject of bargaining— a union may bargain for retirees if the employer agrees.").
>
> . . . .
>
> . . . *Rossetto*, 128 F.3d at 538 (holding that a DFR can attach to a union acting as the representative of retirees even though retired workers are not covered under the RLA): *Foust v. Int'l Bhd. of Elec. Workers*, 572 F.2d 710, 717 (10th Cir. 1978) ("[h]aving undertaken to act affirmatively on behalf of [the plaintiff], the Union is precluded from escaping responsibility by asserting that" the plaintiff should not have "depend[ed] on" the union): *Nedd v United Mine Workers of Am.*, 556 F.2d 190, 200 (3d Cir. 1977) ("While *Chemical Workers v. Pittsburgh Glass*, 404 U.S. 157, 92 S. Ct. 383, 30 L. Ed. 2d 341 (1971),] held that future retiree benefits were not the subject of mandatory collective bargaining, it also recognized that such benefits were a permissive subject of bargaining. When the Union elects to undertake such bargaining, the union's duty of fair representation must apply. ... The Union need not have done so, and if it had not, the pensioners would have had a remedy against the employers for any delinquencies. But

**PREITZ003352**

**EXHIBIT F**

*Disposition: Adopted 19-3-0-0 on 12/13/2016*

R2016 – 30 Rev 1      SOURCE:    MIA      FOR      19
BOD MTG:      AGAINST      3
06/07-09/2016      ABSTAIN      0
     ABSENT      0

Title:   Supplement F and Section 11.D.1. - Negotiating Committee Tasking

Presented by:   CA Ed Sicher      Seconded by:   CA Billyray Read

Policy Manual: _____ Cons. & Bylaws: _____

**WHEREAS**, the three separate contracts prior to the merger of US Air East, America West, and American Airlines treated disability retirements differently; and,

**WHEREAS**, the JCBA Supplement F. (1) 5. (d) and Section 11.D.1 adopted the most restrictive of the three, the American Airlines contract, which has been subjectively reinterpreted by the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous disability; and,

**WHEREAS**, the former U.S. Air East contract allowed disabled pilots to remain on the seniority list until they reach the federally mandatory retirement age for pilots; and,

**WHEREAS**, the former America West contract effectively removed pilots from the seniority list for retirement disabilities longer than eight (8) years without a provision to be reinstated in the event that pilot should ever regain his or her Class A medical; and,

**WHEREAS**, the merging of the seniority lists is creating a disparate treatment amongst the individual pilot groups; and,

**WHEREAS**, the most beneficial treatment of all of our disabled pilots is to allow them reinstatement from long-term disability in as expeditious and fair a manner as possible; and,

**WHEREAS**, there has been some evidence indicating that the company has unfairly withheld reinstatement to long-term disabled pilots who have regained their Class A medicals from being reinstated if they were considered problematic employees; therefore,

R2016-30 Rev 1      1

**Meadows 015637**

**BE IT RESOLVED,** that the Negotiating Committee expeditiously engage the company in in negotiations which seek to:

1. Modify the language in the JCBA Sup F. (1) 5. (d) Disability Retirement and Section 11.D.1 so that it will not prevent a pilot from retaining and accruing seniority after a disability period of more than five (5) years commencing at the expiration of the pilot's paid sick leave and thus results in effectively removing the pilot from the seniority list;

2. Negotiate language which allows pilots with long term disabilities from being removed from the seniority list until they reach the federally mandated retirement age for pilots;

3. Negotiate contractual language that provides for the immediate reinstatement and return to the Pilot System Seniority List of all pilots who are currently out sick or on disability and who have been removed from the seniority list as a result of the provisions previously contained in the respective contracts, and;

4. Prevent the further removal of pilots from the Pilot System Seniority List as a result of sickness or disability until they reach the mandatory pilot retirement age, and;

5. Gather the names of the pilots from the three separate pilot groups that were medically retired due to long-term disability or disabilities and thus removed from their respective seniority lists and include them on the Seniority List Integration currently being negotiated.

R2016-30 Rev 1

2

Meadows 015638

**EXHIBIT G**

# ALLIED PILOTS ASSOCIATION
### Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500, Fort Worth, TX 76155-2512 • 817.302.2270 • www.alliedpilots.org

**From:** CA Ed Sicher, APA President

**Date:** September 2, 2022

**Re:** Presidential Constitutional Interpretation, Inactive Member Standing

---

The Allied Pilots Association Constitution and Bylaws (C&B) gives the President the authority to "enforce" the C&B and issue "written interpretations" thereof. *See* Article IV, Section 8.A.3. A question has arisen as to the standing afforded to Inactive Members.

## Article III.2.D

D. Inactive Membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. Pilots in the following employment statuses shall be eligible for inactive membership: *(06/07/2006)*

1. Furlough
2. Medical or Personal Leave of Absence
3. Military Leave of Absence
4. Pilots not on active flying status with AA concurrently owing back dues. *(02/28/2008)*

Inactive Member. A member in good standing shall automatically be transferred to inactive membership status upon: *(02/25/99)*

1. Being furloughed by the Company.
2. Being on leave of absence from the Company thirty-six (36) months after the expiration of paid sick leave, or *(11/02/2018, R2018-45 Rev 2)*
3. Being in the United States military forces on continuous active duty in excess of sixty (60) months. *(02/28/2008)*
4. When that pilot is not on active flying status with AA and that pilot owes back dues, that pilot will remain on inactive membership status until he/she returns to work at AA. At that time, he/she will resume payment of back dues and will be returned to active membership. *(02/28/2008)*

## Article III.5.A

### Section 5. Membership Status

A. A member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association. The Secretary-Treasurer shall transfer a member from good to bad standing if such member shall be delinquent in either dues, assessments or other financial obligations due to the Association. A member will be placed in inactive

Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 53 of 85



# ALLIED PILOTS ASSOCIATION

*Representing the pilots of American Airlines*

O'Connell Building • 14600 Trinity Boulevard, Suite 500, Fort Worth, TX 76155-2512 • 817.302.2270 • www.alliedpilots.org

membership status by the APA Secretary-Treasurer when that member owes back dues and is not on active flying status. *(03/18/2011)*

## Interpretation

Prior to October 2017, Inactive Members who were members in good standing at the time that they became inactive retained their good standing while in Inactive Member status. Following an arbitration award in the matter of *Meadows v. Wilson*, in which the arbitrator found that Inactive Members have no standing, neither good or bad, a Presidential constitutional interpretation was issued adopting that same position. For the reasons set forth below, I hereby rescind that interpretation and issue the following interpretation:

Article III, Section 2.A of the Constitution & By-Laws provides that "[a] member in good standing shall automatically be transferred to inactive membership status upon the occurrence of one of the specifically identified events therein. Article III, Section 5.A of the Constitution & By-Laws provides that "[a] member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association."

Per Article III.2.A, only a member in good standing may be transferred to inactive membership status. As a result, at the time a member is transferred to inactive status, he or she must be in good standing. Article III.5.A provides that a member in good standing shall remain in good standing "as long as such member has paid current dues, assessments or other financial obligations due to the Association." Inactive Members do not receive compensation from American Airlines and thus do not have any ongoing dues, assessments or other financial obligations to the Association while they are in inactive status.

The C&B clearly provides that an Inactive Member must be a member in good standing at the time he/she becomes an Inactive Member. The C&B further provides that a member in good standing shall retain such standing as long as the member is current on all financial obligations to the Association. Because Inactive Members have no ongoing financial obligations to the Association while in such status, it is my interpretation that under the relevant provisions of the Constitution & By-Laws, Inactive Members, other than those who owed back dues at the time they went into inactive status, retain their good standing while in Inactive Member status.

This interpretation is solely intended to address the issue of standing of Inactive Members and does not bestow or vest any rights or privileges not already provide by the APA Constitution & By-Laws or APA benefit plans.

Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 54 of 85



# ALLIED PILOTS ASSOCIATION

## DROPPED REINSTATEMENT AD HOC BRIEFING TO THE sBoD MAY 2023

# DRC MISSION STATEMENT HIGHLIGHTS...

**APA**

- Allied Pilots Association leaves "no pilot behind"... This committee is tasked with finding avenues of reinstatement for those who have been dropped from the seniority list, by virtue of disability, merger, or other reason, not including retirement or discipline.

- ... examine possible avenues for reinstatement, helping to blunt the shortage of pilots we have available to employ, avoid future litigation of APA by its members, and eventually guide the reinstatement of members that have been dropped from the seniority list for reasons other than retirement or discipline.

- ... not authorized to interview our in-house counsel...

- In Unity, CA Edward F. Sicher, President, Allied Pilots Association

- Currently, multiple pilots were left behind and await reinstatement
  - For over ten years, despite APA BoD's Resolution to fix it 7 years ago

# LOSS OF SENIORITY IAW THE JCBA



## F. Loss of Seniority

1. Resignations, Retirement and Discharges

   A pilot who resigns from the service of the Company, retires, or is discharged for just cause, shall forfeit all seniority as a pilot.

2. Failure to Return from Furlough

   When a pilot who has been furloughed is offered, by written notice from the Company, the opportunity to return to duty as a pilot and such pilot elects, by written statement to the Company, not to return to such duty, or if a recalled pilot fails to comply with the requirements of Section 17.W. of this Agreement, his seniority right of preference in re-employment shall at that time terminate, and all his seniority as a pilot shall be forfeited.

3. Duration of Recall Rights

   A pilot shall retain recall rights indefinitely until refused under 2. above.

4. Retention of Company Benefits

   Upon return from furlough, a pilot shall receive all Company benefits accruing by reason of his previous active service.

# JCBA, SEC 13, items F of B, ON SENIORITY LOSS DOES NOT INCLUDE LTD/DISABILITY

 **APA**

## B. Seniority Date

Seniority shall begin to accrue from the date a pilot is first assigned to air line flying duty and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement.

## C. Retention of Seniority

A pilot once having established seniority shall not lose such seniority except as provided in this Section, nor shall such pilot's relative position on the Pilots' System Seniority List be changed for any reason, including disciplinary action, except as provided in paragraph B. of this Section.

➡ Loss of seniority is "relative position" only under Sec 13.B/C, NOT TOTAL SENIORITY LOSS

4

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 115 of
Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 58 of 85
216

# SEC 13 REFERS TO SEC 11 ON LEAVES

**APA**

## D. Sickness or Injury Leaves

1. When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty. A leave of absence for sickness or injury shall not commence until after a pilot has exhausted

JCBA Rev.1                              SECTION 11 - 1                        November 1, 2015

accrued sick leave credits in accordance with Section 10.C.8 of this Agreement. Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years. Length of service for pay purposes shall accrue during leaves granted because of injury on duty, and during the first ninety (90) days of any leave granted for sickness or injury sustained off duty.

2. A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by seniority upon return to active flying duty.

# SUPP F(1)5(d) REQUIRED FIXING AS WELL

*APA*

(d) A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F only for a period of five (5) years commencing at the expiration of his paid sick leave.  In the event such a pilot member recovers and returns to the Company as a pilot, during the five (5) year period in which he has not lost his seniority, his monthly disability pension shall cease. He will again become a participant in the Plan for the accrual of additional Basic and Variable Annuity benefits payable at Normal Retirement Date, subject to the eligibility provisions of the Plan.  In the event such a pilot member works for the Company in a capacity other than as a pilot, his pilot benefits shall not be paid while he is employed in such a capacity.  However, during such period he shall be eligible to participate in the pension programs applicable to his job category.

6

Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/20/2026   Page 50 of 85

# FRESH SETS OF EYES ON AGREED UPON SOLUTIONS RELATED TO GRIEVANCE 12-012, NOW 23-031

**APA**

Re:    DFW Domicile Grievance No. 12-012

Dear Captain Hale:

Pursuant to the May 1, 2003, Agreement ("Agreement"), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

In accordance with Section 21.F.3 of the Agreement, I hereby elect to waive the Initial Hearing in this matter so that an Appeal Hearing can be held at the earliest possible date.

In addition, we request that the Company send a copy of all hearing notices and decisions rendered in this case to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512.

Sincerely,

Captain Rusty McDaniels
Chairman - DFW

First Officer Russell Moore
Vice Chairman - DFW



7

**CAREY MEMO FIXED SUPP F(1), BUT NOT SEC 11, AND ONLY PROSEPCTIVELY, NOT RETRO**

**APA**

The Parties agree to the following amendment to the Collective Bargaining Agreement ("CBA") to effect this agreement:

Supplement F(1).5.d

A pilot shall retain and continue to accrue his seniority for the purposes of this Supplement F while disabled. In the event such a pilot member recovers and returns to the Company as a pilot, his monthly disability pension shall cease. He will again become a participant in the Plan for the accrual of additional Basic and Variable Annuity benefits payable at Normal Retirement Date, subject to the eligibility provisions of the Plan. In the event such a pilot member works for the Company in a capacity other than as a pilot, his pilot benefits shall not be paid while he is employed in such a capacity. However, during such period he shall be eligible to participate in the pension programs applicable to his job category.

The parties agree that this amendment is prospective only. That is, this amendment has no application to pilots whose employment terminated prior to the effective date of this Agreement. The effective date of this agreement shall be September 30, 2016.

Please indicate your concurrence with the foregoing by execution in the space provided below.

Sincerely,

_Kimball R Stone_
Captain Kimball Stone
Vice President, Flight Operations
Flight
American Airlines, Inc.

_Beth Holdren_
Beth Holdren
Managing Director Labor Relations,

American Airlines, Inc.

# AA's JAMES ANDERSON DEPOSITION, JCBA SME & former AA Director of Crew Qualifications

**APA**

- Sec 21 - B. Investigation and Rights of Representation
- 1. A pilot shall not be disciplined or dismissed from service with the Company without an investigation and written notification of such action, including the precise charge(s) and an explanation for any action taken. A pilot shall be provided with an opportunity to meet with that pilot's Flight Department supervisor prior to the rendering of the Company's decision with regard to discipline or dismissal.
- Sec 24 - I. Orders to be in Writing
- 1. All orders to pilots involving a change in status or leave of absence shall be stated in writing… & 13.D requires notice as well!

- Pg 18, line 4 ?: Does 11d 5-year allow termination for disability? – "No"

9

# IN 2016 THE BoD's AGREED TO FIX IT BOTH SUPP F(1)5D & SEC 11D RE THE 5-YEAR ISSUE

**APA**

- BE IT RESOLVED

- Modify the language in the JCBA

- Sup F. (1) 5. (d) Disability Retirement

- And Section 11.D.1… REF five (5) years

- Removing the pilot from the seniority list

- Negotiate language [PRECLUDING] pilots with long term disabilities from being removed from the seniority

- Negotiate contractual language … for the immediate reinstatement

- Prevent the further removal of pilots from the Pilot System Seniority List

- Gather the names of the pilots

---

*Disposition: Adopted 19-3-0-0 on 12/13/2016*

| | | |
|---|---|---|
| R2016 – 30 Rev 1 | SOURCE: MIA | FOR 19 |
| BOD MTG: | | AGAINST 3 |
| 06/07-09/2016 | | ABSTAIN 0 |
| | | ABSENT 0 |

Title: Supplement F and Section 11.D.1. - Negotiating Committee Tasking

Presented by: CA Ed Sicher          Seconded by: CA Billyray Read

Policy Manual: _____          Cons. & Bylaws: _____

WHEREAS, the three separate contracts prior to the merger of US Air East, America West, and American Airlines treated disability retirements differently; and,

WHEREAS, the JCBA Supplement F. (1) 5. (d) and Section 11.D.1 adopted the most restrictive of the three, the American Airlines contract, which has been subjectively reinterpreted by the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous disability; and,

WHEREAS, the former U.S. Air East contract allowed disabled pilots to remain on the seniority list until they reach the federally mandatory retirement age for pilots; and,

WHEREAS, the former America West contract effectively removed pilots from the seniority list for retirement disabilities longer than eight (8) years without a provision to be reinstated in the event that pilot should ever regain his or her Class A medical; and,

WHEREAS, the merging of the seniority lists is creating a disparate treatment amongst the individual pilot groups; and,

WHEREAS, the most beneficial treatment of all of our disabled pilots is to allow them reinstatement from long-term disability in as expeditious and fair a manner as possible; and,

WHEREAS, there has been some evidence indicating that the company has unfairly withheld reinstatement to long-term disabled pilots who have regained their Class A medicals from being reinstated if they were considered problematic employees; therefore,

R2016-30 Rev 1                                                                                    1

# NEW JCBA LANGUAGE SHOULD FIX IT

## Delete the 5-year language per BoD R2016-030

*APA*

- D. Sickness or Injury Leaves

- 1. When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his relative seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty. Leave of absence for sickness or injury shall not commence until after a pilot has exhausted accrued sick bank in accordance with Section 10.C.8 of this Agreement. Any loss of seniority is strictly governed by Sect. 13.F. Length of service for pay purposes shall accrue during leaves granted because of injury on duty, and during the first ninety (90) days of any leave granted for sickness or injury sustained off duty.

- 2. A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by relative seniority upon return to active flying duty.

11

# PREITZ v. APA "judgment for Allied [APA]"

**APA**

- "Long-running dispute over Allied's representation of pilots who were medically disqualified from flying"

- "American Airlines and Allied interpreted a provision of the applicable collective bargaining agreement as automatically terminating the employment of pilots, such as Plaintiff, who had been on disability leave for longer than five years, referring to such pilots "medically disabled dropped" ("MDD")"

- "Allied argues that MDD pilots were not members of its bargaining unit because they were automatically terminated…But Allied offers no documentation defining the scope of its bargaining unit during 2011 through 2016 and merely asserts that nonemployees were not members."

- "A factfinder could infer that terminated MDD pilots, including Plaintiff, were members of the bargaining unit."

12

Case 1:17-cv-22589-EA   Document 180-1   Entered on FLSD Docket 01/29/2026   Page 66 of 85

# PREITZ v. APA, continued…

**APA**

- "Allied's present position that MDD pilots should have had their relative seniority restored upon returning"

- "… 2016, Allied and American Airlines agreed that disabled pilots would no longer be removed from the seniority list after being on leave for five years— essentially, that no new pilots would be designated MDD" – "prospective-only"

- "… 2016, Allied's Board of Directors passed a resolution to seek "the immediate reinstatement and return to the Pilot System Seniority List" of all MDD pilots"

- "Dallas grievance …advocated an interpretation of CBA § 11.D consistent with Plaintiff's view that MDD pilots did not automatically lose seniority."

13

Case 1:17-cv-22589-EA Document 180-1 Entered on FLSD Docket 01/29/2026 Page 87 of 85

# STATUS & SUGGESTED COURSES OF ACTION

**APA**

- THE PREITZ CASE WAS DECIDED IN APA'S FAVOR - COURT NOTED: "The Dallas grievance was never arbitrated. Instead, Allied and American Airlines repeatedly agreed to hold the Dallas grievance "in abeyance every sixty days"

- AND THAT 12-012 (Now 23-031) "advocated an interpretation of CBA § 11.D… that MDD pilots did not automatically lose seniority."

- WHILE APA'S ACTIONS WERE NOT A DFR VIOLATION…
- NOTHING BARS APA FROM BOARD DIRECTED JCBA FIXES
- E.G., NOTHING BARS APA FROM INSTITUTING BoD R2016-30
- I.E., REMOVE THE TIME LIMITS FROM 11.D & SUPP F(1)

14

Case 1:17-cv-22589-EA Document 150-1 Entered on FLSD Docket 01/29/2020 Page 68 of 85

# DANGLING CHADS...



- NC PRIORITIES
  - SUPP F SHOULD BE FIXED TO MEMORIALIZE CAREY MEMO
  - IAW BoD Resolution, REMOVE 5-YEARS LANGUAGE IN SEC 11.D
  - IAW BoD Resolution, ENFORCE NOTIFICATION OF STATUS CHANGES
  - DEFINE RELATIVE SENIORITY IN SEC 13
  - UPHOLD APA C&B: "MAINTAIN UNIFORM PRINCIPLES OF SENIORITY"
  - TIMELY RESOLUTION OF GRIEVANCES PER APA C&Bs Art II.B., & JCBA sec 23.D.4, 2 year & 28-month grievance limits; plus, JCBA Sec 21.H.3 language: expedite all hearings, decisions and appeals"
- SUPPORT APA PRESIDENT & DROPPED REINSTATEMENT AD HOC COMM TO COMPLETE TASKS IN PRES GREIVANCE 12-012/23-031 & BoD R2016-30
- BL – JCBA, C&B's, seniority preservation principles support the above priorities

15

# NOTES & QUESTIONS

*APA*

- Note – APA BoD's meeting video reference on 3/5-year time issues:
- "20221102_SBOD_Recent Events Discussion - Early Afternoon"
- LTD vs Sec 11d discussion starting at time stamp 02:50 thru 14:00
- Summary: it's happened before and could happen again unless negotiated contract modifications occur IAW BoD R2016-030
- https://www.alliedpilots.org/Videos?VideoId=d39ed5bd1c1be6c25a

- ????????

16

# EXHIBIT H

# EXHIBIT I

On Saturday, September 27, 2025, 2:00 PM, trempfer <trempfer@aol.com> wrote:
Fyi, my MFR below to Ed after the eavesdropping, and on the day of Kennedy reporting it to the board, and the subsequent first failed recall attempt, all interfering and overshadowing my planned briefing to the BoD on the MDD matters on that day.


Tom Rempfer
(520) 869-6590


———— Original message ————
From: "Rempfer, Thomas" <trempfer@alliedpilots.org>
Date: 5/18/23 19:21 (GMT-05:00)
To: trempfer <trempfer@aol.com>
Subject: Fwd: MFR


Sent from my T-Mobile 5G Device
Get Outlook for Android

From: Rempfer, Thomas
Sent: Thursday, May 18, 2023 6:01:51 PM
To: President <president@alliedpilots.org>
Subject: MFR

Ed,


Regarding today's events, before I came into the boardroom, Chris Torres and Larry Cutler asked me to look at my phone, which I willingly allowed. They told me they were worried I had taken pictures in the back room when I went back there to get a soda when the board was in closed session. I didn't take it personally but found the encounter inappropriate, especially the demand to inspect someone's personal electronic device. Regardless, I was completely transparent with those officers and let them go through my phone. I was subsequently equally transparent with the board in an equally odd inquisition.

Once I heard from you with respect to someone eavesdropping on my dinner conversation with our dropped disabled pilot, and the related allegations regarding that conversation, it added to the uncomfortable working environment. I appreciated the heads up on that, and I again attempted to be fully transparent in the board meeting as I was with Torres and Cutler.


The main issue seemed to be if I said the APA would "withhold" the contract. I replied that I did not "recall," but I did promptly follow that up by frankly disclosing that I told the pilot about my hopes and the full pallet option possible resolutions, including my hope that the President could get it resolved directly with the company shy of arbitration. Feel free to call Tim Curren to verify -- 972-814-6509. Bottom line is, as I forthrightly told the board, I've discussed the full history of this case with all the MDD members. But I always speak my own opinions, and never speak for others, and I've specifically told that very thing to the MDD pilots, multiple times, which they will attest to.

When you look at an issue like this one, you come to the realization that there have been some extremely disappointing behaviors by our own Association, but also laudable events like the grievance, the resolution, and your advocacy for our MDD pilots. I also talked about that over dinner, but it sounds like that wasn't conveyed. If talking about the history, plus my hopes for resolution, and being overheard, becomes an issue it warrants counseling, which you did. I'll have better SA in the future. But any criticism also warrants a discussion of the root causes of the disappointment. Hopefully, I did that successfully, candidly, and professionally with the BoD.

Regarding that event, it sounds like my dinner discussion with the MDD pilot was only overheard by Ms. Kennedy and CA Westbrook, so there was no disclosure of any sensitive information publicly. While it was a public venue, it was not a public forum, and you know I don't discuss the matter in the online forums. No harm, no foul - lesson learned, especially about the nature of our own legal team. Whereas they listened into my dinner conversation, and then went straight to the BoD the next day, any professional in our Association could have introduced themselves and just as easily had said, 'hey, careful, you're talking too loud.'

Regardless of this odd chain of events, thank you for moving me over to the DRC to continue helping CA Coburn. If my involvement hinders the solution, you should remove me, not the BoD. But that doesn't course correct the observations about the cultural problems within our association, of which this appears to be a classic example. The idea that Association lawyers, of whom I'm disappointed with based on a deliberate review of their past conduct, but exceedingly professional about regarding that conclusion, can report to the BoD and it results in our union members being removed from their duties, this seems to be a more unhealthy dynamic then my treating an MDD pilot to dinner and discussing how I hope to help him correct a long standing injustice that the Association's legal department did not previously fix. In the lawyer's parlance, there appears to be a conflict of interest in this chain of events to have attorneys that have a bias on this matter, and a former BoD member who does as well, to be the impetus to remove a union officer that has developed the opposite bias based on a thorough study of the history.

To the extent these points assist you in advocating for me to continue advocating for our disabled pilots tomorrow, please by all means relay for me, unless you'd like me to be there myself as I was last December when the BoD tried to recall me previously. In both cases, as with our previous professions, when you're taking flak you know you're getting close to the target.

Sincerely,
Tom Rempfer
520-869-6590

Sent from my T-Mobile 5G Device
Get Outlook for Android

**EXHIBIT J**

Messages - Tom Rempfer (+15208696590)          +13053339534, annamaria717@yahoo.com, annamaria717@icloud.com

10/9/2025 5:13:40 AM

Tom Rempfer (+15208696590)

Missed your call, Landing sim early, talk after

10/10/2025 2:13:22 PM

Tom Rempfer (+15208696590)

June 14, 2024, assume the below text was from Ed to Larry, relayed to me via text from Larry:

No. I have had it with you. I have done no to king but expend time, money and resources despite the fact I have been left twisting in the wind. I have been warned by APA legal that you would do just what you are doing right now. Should have e listened to them a long time ago. They were right all along. It is about the $$
I've held up multimillion dollar grievances for you. I've held up the probable reinstatement of other pilots for you. I've cut across the wishes of my own board to advocate and find outside counsel to advocate for you. And at the end of the day you will give nothing to help me make your case. It's over Larry. You're on your own. I'll drop your grievance. You can make the case that APA isn't advocating for you now. Treat the union as your enemy.
I've given official word to Sue and Jim to expend no more resources on you. You are on your own now Larry. APA will slot your grievance and that's all. Good luck

 Next was from me to Larry:

Only update is a fourteen or fifteen october grievance scheduling request for 12-12. 12-11 still in the cue with over 50 other unresolved grievances.

Next was from Larry to me:

In agreed to Additional 14-day on the condition we discuss...

"tAPA taking two actions on my behalf;

1) an immediate vigorous good faith effort for the APA President to meet with AA CEO within the next 14-days, to negotiate and obtain my reinstatement as an active line pilot at my relative seniority at B777 CA pay, and

2), also simultaneously immediately moving my individual Grievance 12-011 to a System Board on Presidential Expedited Basis in accordance were CBA Sec 23, to be heard in the next available

Messages - Tom Rempfer (+15208696590)                    +13053339534, annamaria717@yahoo.com, annamaria717@icloud.com

arbitration slot with a pilot friendly arbitrator, using unconflicted outside counsel of my choice, with a System Board panel members picked by me or subject to my approval. The second step will put pressure on AA,"

Sicher text to me was apparently on the same day he texted Larry on June 14, 2024

We will slot his grievance 12-11 for hearing. That is all.

Conclusion, my testimony is actually irrelevant. You evidently received the same text info and commitment directly from Ed via text re 12-011 that you shared with me above. And evidently had the same commitment or expectation from your 14-day extension conference call. Plus I also gave you the same impression related to the October grievance scheduling, which indicated your grievance was in the cue, probably verifiable based on union records from that committee. Perhaps check with Tracy Parrella?

Bottom line, second-hand info from your committee chairman is likely irrelevant compared to direct communications from your union President and the grievance resolution docket records. If you're grievance was closed how could it be in the queue?

Suggest you cnx my deposition and save that money since I've coordinated with legal as you suggested and they've relayed extensive restrictions on what I can testify about.

Flying tmrw morning.

10/10/2025 5:53:00 PM

Tom Rempfer (+15208696590)

Themselves

# EXHIBIT K

# SETTLEMENT AGREEMENT

## Between

## AMERICAN AIRLINES, INC.

### and the

## ALLIED PILOTS ASSOCIATION

American Airlines, Inc., including its subsidiaries, affiliates, and parent companies, (collectively "American" or "Company"), and the Allied Pilots Association ("APA" or "Union") (collectively referred to as the "Parties"), mutually desire to settle and resolve Sicher Expedited Presidential Grievance 23-031 (converted from DFW Domicile Grievance No. 12-012). Accordingly, the Parties hereby agree to the following terms to compromise, settle, fully and finally resolve Sicher Expedited Presidential Grievance 23-031, including the underlying DFW Domicile Grievance No. 12-012, in its entirety, as follows:

WHEREAS, on May 22, 2012, the APA DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's alleged violation of the 2003 Collectively Bargained Agreement for failing to provide pilots notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five (5) years; and

WHEREAS, on March 13, 2023, the APA converted the DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance 23-031 (collectively with DFW Domicile Grievance No. 12-012, the "Presidential Grievance"). The Presidential Grievance continued to protest the Company's alleged violation of the Collectively Bargained Agreement for failing to provide pilot notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years; and

WHEREAS, in the Presidential Grievance the APA contended that the Company's failure to provide notice to pilots of their impending removal from the seniority list and separation from employment precluded those pilots from either attempting to return to service prior to being dropped from the seniority list and separated from their employment, and/or filing a grievance challenging the Company's decision to drop them from the seniority list and separate them from employment; and

WHEREAS, the remedy sought in the Presidential Grievance was an award ordering the Company to provide affected individuals with notice of their removal from the seniority list and separation from service thereby allowing them to then file a grievance challenging that action based upon the facts that existed at the time the original notice should have been given; and

WHEREAS, the Company contends the APA may not convert a domicile grievance into a presidential grievance and the APA disagrees with same;

WHEREAS, the Company contends the Presidential Grievance is without merit; and

WHEREAS, the Parties conducted a mediation on November 7, 2024, before a Neutral, and

Settlement Agreement                                                    Page 1 of 6

through subsequent discussions, reached an agreement to resolve the Presidential Grievance; and

WHEREAS, the Parties desire to avoid further controversy and fully settle and compromise the Presidential Grievance, without any further proceedings.

NOW, THEREFORE, in exchange for the mutual considerations described herein, the sufficiency of which is hereby acknowledged, the Parties agree to fully resolve the Presidential Grievance, as follows:

1.  Although no specific pilots are referenced in the Presidential Grievance or the underlying Domicile Grievance, the Parties have identified the following four (4) individuals who were on inactive status, unpaid sick, or disability for more than five years, were removed from the pilot seniority list and separated from employment with the Company, and have represented that they have since obtained, or have filed paperwork to obtain, an FAA First Class Medical Certificate, and expressed a desire to be reinstated to employment as a pilot with the Company: Timothy Curren (354581), Dale Churovich (354629), Lawrence Meadows (332713), and Roger Wagner (318588) (collectively the "Identified Individuals").

2.  One of the Identified Individuals, however, Lawrence Meadows, was provided and received the notice attached as Exhibit A during his prior employment in advance of his removal from the seniority list and separation from employment in 2011, and the Parties agree that none of the other Identified Individuals received similar communications from the Company prior to their separation from employment. Following Mr. Meadows' removal from the seniority list and separation from employment, he filed two grievances challenging the Company's actions. The Company disputes that the notice given was required by the CBA while the APA contends that the notice was required and that the provided notice may not have been compliant in form. However, the APA has concluded that, under the totality of circumstances of this case, it is unlikely to prevail on its argument before the System Board, particularly in light of the fact that Mr. Meadows filed Grievance 12-011 and Grievance 13-064 challenging the Company's decision to separate him from employment at the time. Both grievance 12-011 and 13-064 were subsequently disposed of and closed after the APA declined to advance them in 2013 and 2014, respectively. As a result, Mr. Meadows is deemed not to be an Eligible Individual under this Agreement, and thus, he is not eligible for reinstatement under this Agreement.

3.  Based on the Parties' knowledge, Timothy Curren (354581), Dale Churovich (354629), and Roger Wagner (318588) (collectively "Eligible Individuals") did not receive notice prior to their removal from the seniority list and separation from employment and did not file a grievance challenging the Company's actions at the time. The Eligible Individuals may elect to utilize the process detailed below for possible reinstatement to the Pilot Seniority List and return to employment and active status at the Company, provided they satisfy the conditions detailed below.

4.  The Parties agree to offer a one-time opportunity to the Eligible Individuals to utilize the following process for possible reinstatement to the Pilot Seniority List and return to

employment with the Company (the "Process for Possible Reinstatement"). The Process for Possible Reinstatement must commence within thirty (30) days of the full execution of this Settlement Agreement. Each Eligible Individual may elect to pursue or may decline to pursue this one-time opportunity to pursue the Process for Possible Reinstatement as described below.

a.   The APA will provide each Eligible Individual with the terms of the Process for Possible Reinstatement and advise them of their right to opt into pursuing reinstatement through the Process for Possible Reinstatement and that, regardless of whether they seek reinstatement, the Presidential Grievance will be withdrawn with prejudice pursuant to this Agreement. In the event an Eligible Individual does not timely and properly opt to pursue the Process for Possible Reinstatement, then the Eligible Individual will have waived his right to pursue the Process for Possible Reinstatement and will have elected not to return to employment with the Company and the APA will not advance any subsequent request for reinstatement, reemployment, or rehire on their behalf.

5.   Process for Possible Reinstatement. The Parties agree the following steps comprise the Process for Possible Reinstatement for the Eligible Individuals:

a.   **Step 1**: In the event an Eligible Individual opts to pursue the Process for Possible Reinstatement, the Eligible Individual must send an email to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org) so indicating no later than thirty (30) consecutive calendar days after the date this Settlement Agreement is fully executed. The Eligible Individual must include a true and correct copy of his First Class Medical Certificate along with the email.

b.   **Step 2**: Within 14 days of providing the Notice in Step 1, the Eligible Individual must execute a General Release (attached as Exhibit B) and email it to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org).

c.   **Step 3**: The Eligible Individual shall submit to and successfully clear the standard pre-employment background checks for American pilots, including PRIA records review, submission to the Rap Back Program, fingerprinting, drug and alcohol testing, and any other standard, pre-employment requirement for New Hire American pilots.

d.   **Step 4**: The Eligible Individual shall execute and submit a request to the FAA for a complete copy of their medical file (commonly referred to as a "Blue Ribbon File") to be released and sent to Natasha Narayan, MD, American's Corporate Medical Director. Dr. Narayan will review the Blue Ribbon File received from the FAA. Dr. Narayan shall have twenty (20) days to review the file upon receipt of same. In the event American's Corporate Medical Director concludes that the Blue Ribbon File is complete and accurate on its face, the Company will accept the determination rendered by the FAA in granting the medical certificate.

In the event American's Corporate Medical Director determines that the Blue Ribbon File indicates a need for further information or clarification in order for the Eligible Individual to continue on the Process for Possible Reinstatement, the Company will notify the Eligible Individual and APA in writing and identify the information/clarification needed. The criteria used in determining whether further information/clarification is necessary will be limited to: (a) suspected non-disclosure of material information; (b) evidence of non-compliance with an established treatment plan, (c) a prescribed treatment plan being inconsistent with a diagnosis or evaluation, or (d) clearance reports from a physician or specialist whose credentials are not consistent with the reported diagnosis. The Eligible Individual will then have the opportunity to provide additional information/clarification in response to the item(s) identified by the Medical Director.

Within ten (10) days of receipt of a response from the Eligible Individual, the Company will notify the Eligible Individual and APA in writing if additional information/clarification is needed and detail the basis for such determination. The Eligible Individual will be given an opportunity to withdraw their reinstatement request in writing to both the Company and the APA within ten (10) days of receipt of notification. If the Eligible Individual elects to withdraw their reinstatement request, then the Company will not take any further action. If the Eligible Individual does not withdraw his request for reinstatement or affirmatively confirms in writing his intention to continue with the reinstatement process under this Agreement, the Company shall copy the pilot on an email submission of Dr. Narayan's request for an FAA aeromedical general review at 9-AMC-GRCustomerSvc@faa.gov. An FAA request for information is not a denial. If the FAA denies the Eligible Individual's medical certificate, such Eligible Individual's reinstatement request shall be denied. If the FAA does not deny the Eligible Individual's medical certificate in response to the request for review, then the FAA determination on the medical certificate will be deemed final and binding with regard to reinstatement of the Eligible Individual.

If the Company seeks a general review of an Eligible Individual's medical certificate and the FAA confirms the medical certificate, the Eligible Individual will be entitled to be paid retroactive to the date the request for FAA general review was made at the hourly pay rate based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold. This period of retro pay will not be included in the 18-month guarantee provided in paragraph 6(b) below. In the event the FAA requests information directly from the Eligible Individual during the general review process, the period of time between when the request is made and when the Eligible Individual responds to the request will not be considered compensable in the event retroactive pay is required under this paragraph.

e.   **Step 5**: If an Eligible Individual successfully completes Steps 1 through 4, he will be reinstated to employment with the Company and placed on the Pilot Seniority list at the number representing approximately where he would have

Settlement Agreement                                                           Page 4 of 6

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 139 of
Case 1:17-cv-22589-EA   Document 180   Entered on FLSD Docket 01/29/2026   Page 82 of 85

USCA11 Case: 25-10297   Document: 30   Date Filed: 10/06/2025   Page: 16 of 17

been had he remained continuously employed by the Company ("relative seniority"). Reinstatement will begin effective with the commencement of training.

f.  **Step 6**: The Eligible Individual shall be assigned the first available training spot within three (3) months of the date reinstatement is approved, and will be given five (5) days' notice of same. The Eligible Individual will receive the standard AQP training course proffered to New Hire American pilots, inclusive of the standard remedial training offered to New Hire American pilots. Once the Eligible Individual successfully completes his training, he is considered an active employee and governed by the 2023 AA-APA Agreement and Company policies except as noted herein. In the event the Eligible Individual does not successfully complete training due to a training failure, he will not advance any further on the Process for Possible Reinstatement, and APA will not advance any subsequent request for reinstatement, reemployment, or rehire on his behalf.

6.  The following terms apply to each Eligible Individual who successfully completes the Process for Possible Reinstatement ("Reinstated Pilot"):

a.  Upon successful completion of training, each Reinstated Pilot shall be assigned as a First Officer on a narrow body aircraft until such time as the Reinstated Pilot has accomplished 1,000 hours of flight time as a narrowbody First Officer. After the completion of the required 1,000 hours of flight time, the Reinstated Pilot may exercise his seniority to bid for and be awarded whatever bid status his relative seniority can hold in the first vacancy bid award following completion. Prior to assigning the Reinstated Pilot a narrow body bid status, the Company shall confer with the Reinstated Pilot about his aircraft and base preferences and take such preferences into consideration when assigning the Reinstated Pilot a narrow body bid status.

b.  Compensation will commence once the Eligible Individual successfully completes Steps 1 through 4 above and timely reports for training as directed and described in this Settlement Agreement. Regardless of what seat and equipment is being flown, the Reinstated Pilot's hourly pay rate will be based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold for the first 18 months of his reinstatement. At the conclusion of the first 18 months, the Reinstated Pilot will assume the pay rate associated with whatever bid status the Reinstated Pilot holds at that time.

c.  Upon completion of training, the Reinstated Pilot's vacation bank and sick bank will reflect zero hours and will begin to accrue based upon the pilot's length of service in accordance with the 2023 Agreement. The Parties agree that the terms of LOA 18-001 do not apply to the Eligible Individuals. The Parties agree that the Reinstated Pilot's length of service will reflect the following upon timely reporting for training at the Training Academy:

Timothy Curren (354581) – updated Class Date 1/20/2016 – 9 years

Dale Churovich (354629) – updated Class Date 1/29/2017 – 8 years
Roger Wagner (318588) – updated Class Date 2/16/2020 – 5 years

7.  The Parties agree that the Eligible Individuals defined above cannot be changed, expanded, or modified in any way.

8.  The APA agrees to immediately withdraw with prejudice the Presidential Grievance and is resolved on a no citation and no precedence setting basis.

9.  This Agreement does not constitute an admission of any kind by the Company or the APA and is being entered into to avoid the expense and uncertainty of arbitrating the Presidential Grievance.

10.  The Parties agree that this Agreement constitutes the complete agreement between the Parties concerning the Presidential Grievance and that no other representations or promises have been made by the Parties in that regard.

11.  This Agreement may not be modified in any manner except in a writing signed by both Parties.

**ALLIED PILOTS ASSOCIATION**

By: _____
First Officer Nick Silva
President

Dated:  January 15, 2025

**AMERICAN AIRLINES, INC.**

By: _____
Maranda Rosenthal
Managing Director, Labor Relations/Flight
Assoc. General Counsel

Dated:  January 15, 2025

# EXHIBIT L



# ALLIED PILOTS ASSOCIATION
### Representing the pilots of American Airlines

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

May 1, 2025

CA Lawrence Meadows
*Via Electronic Mail*

Dear Mr. Meadows,

It has been brought to my attention that you have requested to be included as a speaker during the Membership/Guest hour at the upcoming Spring Board of Directors meeting as a "member in good standing" of the Association.

As has been recently reaffirmed by the United States District Court for the Southern District of Florida, you were terminated from your employment as a pilot with American Airlines in 2011 pursuant to the terms of the Pilot Collective Bargaining Agreement. Following your termination by American, you were converted to Inactive Member status based on the fact that you were dropped from the seniority list, and thus terminated, due to having been out for more than five years due to a disability.

In 2018, you were able to obtain a first-class medical certificate and sought reinstatement to your position as a pilot with American Airlines. APA supported your request for reinstatement in accordance with its established protocols for seeking reinstatement for MDD pilots who regained their medical certificates. As you are aware, the decision to reinstate a pilot to employment is solely within the discretion of the Company and MDD pilots have no right to reinstatement. As you alleged in your recent lawsuit against the Company, American denied your request for reinstatement in 2019.

In light of the fact that you have not been employed by American Airlines as a flight deck crewmember since 2011 and then subsequently sought and were denied reinstatement by the Company after regaining your first class medical certificate, you are not qualified to retain any membership status in APA under Article III of our Constitution & Bylaws. Accordingly, you are not a member of APA, and you are thus not eligible to speak as a member during the membership hour of the upcoming Board of Directors meeting.

Respectfully,

First Officer Nick Silva
President, Allied Pilots Association

# EXHIBIT E

## TO MEADOWS DECLARATION

September 20th, 2013
Lawrence M. Meadows
777FO/MIA AA# 332713
PO Box 4344
Park City, UT 84060

Bennett Boggess
APA Dir. of Legal
Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Blvd.
Fort Worth, TX 76155-2512

Via E-mail Certified Mail

**RE: Preservation of Electronic Records of the Allied Pilots Association, Bennett Boggess (as an individual), Chuck Hairston (as an individual), Mark Meyers (as an individual), Amie Aronhalt Para Legal (as an individual), Linda Compton (as an individual), Mike Knoerr (as an individual), Keith Wilson (as an individual), Neil Roghair (as an individual), Scott Shankland (as an individual), Pam Torell (an individual), Mickey Mellerski (an individual), Mark Stephens (as an individual), David Quinlan (as an individual), Doug Pinion (as an individual), Rusty McDaniel's(as an individual), David Bates (as an individual), Lloyd Hill (as an individual), Tom Westbrook (as an individual), Bill Haug (as an individual), Thomas Copeland (as an individual), Ivan Rivera( as an individual), and Scott I ovine (as an individual), and James and Hoffman (APA's general counsel).**

Dear Bennett Boggess:

Please ensure that all the named parties above, and other applicable APA Staff, NO's, BOD, Committee Members, Representatives, Volunteers, Associates, or Affiliates who have in their possession any electronic records or documents as it related to APA's representation of First Officer Lawrence M. Meadows are put on notice to preserve such.

Based on information and belief, and continued investigation into the breach of duty of fair representation, breach of fiduciary duty, discrimination, retaliation, ADA violations, and potential conspiracy targeted at disabled pilots has led to the reasonable belief that certain electronic communications, and/or documents may exist which potentially implicate the above-referenced parties.

Furthermore, it is clear from the record that APA has failed to uphold it statutory and contractual duties, especially with respect to its disabled pilots.

We hereby put you on notice that we intend to seek discovery of all relevant electronic records, which may or may not include emails, IM's, text messages and other

electronic media generated on "work" computers and/or Allied Pilots Association's networks. Additionally, mirror-images of each parties relevant hard-drives will be sought. To the extent those communications are relevant, they will become discoverable, and we intend to exercise any rights or remedies to allow us access to the necessary information.

Based on APA's recent conduct and inconsistencies with APA's verbal statements, written communications, and other evidence, we have reason to believe each of you may attempt to delete or destroy evidence pertaining to First Officer Meadows, and other similarly situated disabled pilots. This letter is intended to put each of you on notice of your duties not to destroy evidence, or in any way compromise our future ability to obtain discovery. On information and belief, each of you possess or control certain electronic records and other documents pertaining to this matter. As critical evidence in this matter exists in the form of electronic data contained on your "personal" and "work" computers and in the computer networks of APA and James and Hoffman, and other affiliated entities, this is a notice and demand that such evidence must be immediately preserved and retained by you personally and the affiliated entities until further written notice from the undersigned. This request is essential, as a paper printout of text contained in a computer file does not completely reflect all information contained within the electronic files, to include all metadata.

For purposes of this notice, "Electronic Data" shall include, but not be limited to, all text files (including word processing documents), spread sheets, text messages, IM's, e-mail files and information concerning e-mail (including logs of e-mail history and usage, header information and "deleted" files) e-mail attachments, internet history files and preferences, graphical image format ("GIF") files, data bases, calendar and scheduling information, computer system activity logs, and all file fragments and backup files containing Electronic Data.

Any attempt to destroy or alter data will be construed as an admission of guilt. Please contact me to discuss any issues set forth herein.

Sincerely,

*Lawrence Meadows*

Lawrence Meadows
777FO/MIA  AA# 332713

cc: APA President, Cap. Keith Wilson

or

February 11, 2020

First Officer Lawrence M. Meadows
MIA/FO/777/LTD/MDD
1900 Sunset Harbor Dr.  2112
Miami Beach, FL 33139
lawrencemeadows@yahoo.com
(516) 982-7718

*__Sent via Email and U.S. Certified Mail__*

Mark Myers, Esq., Director of Pilot Negotiations
Allied Pilots Association
O'Connell Building - Suite 500
14600 Trinity Boulevard
Fort Worth, TX 76155

**Re: Your Litigation Hold and Duty To Preserve Evidence - Electronic Data**

Dear Mr. Myers,

Based on information and belief, and continued investigation into the breaches of fiduciary duty, discrimination, retaliation, violations of several federal statutes; it is reasonably believed that documents may exist which potentially implicate the above-referenced parties in a civil conspiracy targeted at APA's disabled pilots.

Furthermore, record evidence indicates that the above referenced parties have failed to uphold their duty to protect the individual and collective contractual and statutory duties rights of APA's disabled MDD pilots.

This has led to the reasonable belief that certain documents and/or communications, electronic or otherwise may exist which potentially implicate the above-referenced parties.

By operation of this certified litigation hold/electronic preservation letter, the above referenced parties are hereby  on notice that you are under the threat of imminent litigation which has triggered a litigation hold and your duty to preserve evidence in both your business and personal capacities. To be certain, litigation hold letters such as this one, are issued in anticipation of litigation instructing recipients to preserve relevant documents and other information. The duty to preserve relevant information is triggered when litigation is "reasonably anticipated." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612-613 n. 7 (S.D. Tex. 2010). The test for "reasonable anticipation of litigation" varies by jurisdiction, but, in general, reasonable anticipation of litigation arises when a party knows there is a credible threat that it will become involved in litigation. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).

We intend to seek discovery of any or all relevant records, documents, and communications, electronic or otherwise; which may or may not include emails, IM's, text messages and other electronic media generated on personal computers, and/or "work" computers, and/or on Allied Pilots Association's networks. Additionally, mirror-images of each parties relevant hard-drives will be sought.

To the extent any of those communications are privileged, they are still relevant, and will become discoverable; moreover, we intend to seek to have any privilege modified or overturned using the doctrine of *"crime-fraud exception"*, and will obtain an court orders necessary to allow us access to the necessary information.

Based on recent conduct and inconsistencies with relevant parties verbal statements, written communications, and other evidence to date, we have reason to believe each of you may attempt to delete or destroy evidence pertaining to First Officer Meadows, and any other similarly situated disabled MDD pilots.

This letter is also intended to put the above referenced parties on notice of your duties not to destroy evidence, or in any way compromise our future ability to obtain discovery. On information and belief, each of you possess or control certain electronic records pertaining to this matter. As critical evidence in this matter exists in the form of electronic data contained on your personal and computers and in the computer networks of APA, and other affiliated entities, this is a notice and demand that such evidence must be immediately preserved and retained by you personally and the affiliated entities until further written notice from the undersigned. This request is essential, as a paper printout of text contained in a computer file does not completely reflect all information contained within the electronic files, to include all metadata.

For purposes of this notice, "Electronic Data" shall include, but not be limited to, all text files (including word processing documents), spread sheets, text messages, IM's, e-mail files and information concerning e-mail (including logs of e-mail history and usage, header information and "deleted" files) e-mail attachments, internet history files and preferences, graphical image format ("GIF") files, data bases, calendar and scheduling information, computer system activity logs, and all file fragments and backup files containing Electronic Data.

Finally, you are hereby cautioned that any attempt to destroy or alter data will be construed as an admission of your guilt, and we will vigorously seek any and all appropriate remedies to the maximum extent permitted by law, to include spoliation sanctions, and up to default judgment.

Furthermore, under the threat of and during the pendency of this litigation, transfer of any personal or business assets, including but not limited to any and all real property, personal property, cash, investments, retirement plans, motor, vehicles, boats, planes, etc. will be deemed a Fraudulent Conveyance subject to the claw-back provisions of any judicial Charging Order.

Please contact me to discuss any issues set forth herein.

Sincerely,

*L. M. Meadows*

Lawrence Meadows
First Officer American Airlines
MIA/FO/777/LTD/MDD
Founder, DisabledAirlinePilotsFoundaton.org

2

# EXHIBIT F

## TO MEADOWS DECLARATION

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 149 of
216
Case 1:17-cv-22589-EA   Document 187   Entered on FLSD Docket 02/04/2026   Page 10 of 29

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**LAWRENCE MEADOWS,**
**Plaintiff,**

**v.**

**ALLIED PILOTS ASSOCIATION,**
**Defendant.**

**CASE NO. 1:17-cv-22589-EA**
**HONORABLE JUDGE ED ARTAU**

_____/

### SUPPLEMENTAL DECLARATION OF CAPTAIN EDWARD F. SICHER

I, Captain Edward F. Sicher, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the former President of the Allied Pilots Association ("APA") and APA Board of Directors, having served from 2014 until October 2024. I submit this supplemental declaration based on my personal knowledge to provide further information regarding ESI preservation at APA and APA's retention of counsel for Lawrence Meadows.

2. I have no recollection of, nor any document to corroborate the fact, that at anytime during my service as an APA National Officer starting in 2014, as an APA Board Member, or while serving as the APA National President, I was ever notified by APA's Legal Department of a "litigation hold" in the matter of *Meadows v. APA*. I was never instructed by APA counsel to preserve my emails, text messages, or other ESI related to my union duties with respect to Mr. Meadows, nor did I receive a litigation hold letter related to Mr. Meadows until months after I had left office in 2024, despite being notified by the Plaintiff that he sent preservation letters to APA as early as 2013.

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 150 of
Case 1:17-cv-22589-EA   Document 187   Entered on FLSD Docket 02/04/2026   Page 11 of 29
216

3.  Because I was under no instruction from APA to preserve such communications, I routinely deleted text messages from my personal devices during my tenure as President.

4.  Shortly after I was removed from office in October 2024, my APA-issued laptop became inoperable. When I brought the laptop to APA headquarters to be serviced, the hard drive was effectively wiped clean, rendering all stored data, including emails and documents related to my duties as APA President, permanently inaccessible to me from that device. Thus, almost all of the electronic documents generated during the time of my Presidency, if they still exist, reside on APA's servers which I was obligated use in the performance of my official duties.

5.  As APA President, I authorized and recall signing several payments for outside legal counsel to represent Mr. Meadows. Specifically, on or around May 2024, I signed an Authorization for Expenditure ("AFE") for a retainer to be paid to attorney Sue Edwards, Esq., for her individual representation of Mr. Meadows in connection with his disability discrimination claims against American Airlines.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 29th day of January, 2026.

_____
Captain Edward F. Sicher

# EXHIBIT  G

## TO MEADOWS DECLARATION

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED BY _____ D.C.

FEB 18 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

LAWRENCE M. MEADOWS,
    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION, et al.,
    Defendants.

CASE NO. 17-cv-22589-EA
Honorable Judge Ed Artau

_____/

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER OF FEBRUARY 17, 2026 (ECF No. 204)

Pursuant to Federal Rule of Civil Procedure Rule 72(a), Plaintiff Lawrence Meadows respectfully objects to the Magistrate Judge's Order of February 17, 2026 (ECF No. 204), and its decision to quash the deposition of key fact witness Marjorie Powell and to deny Plaintiff's motions to compel the depositions of Nick Silva, Mark Myers, and James Clark. The Magistrate Judge's Order is clearly erroneous and contrary to law, as it ignores uncontroverted evidence and improperly shields wrongdoers from accountability.

## I. BACKGROUND

On February 10, 2026, the Magistrate Judge held a hearing on American Airlines' motion to quash the deposition of its former attorney, Marjorie Powell. In advance of that hearing, Plaintiff submitted to the Magistrate a detailed Memorandum of Law (**Exhibit 1**) and two sworn declarations from himself (**Exhibit 2**), and decorated military veteran Captain Brian Ostrom (**Exhibit 3**). These submissions established, with documentary proof, that Ms. Powell had engaged in a pattern of misconduct against other disabled pilots, and in Plaintiff's case personally fabricated

1

the pretextual "termination letter: that is the genesis of this DFR case The Magistrate Judge's order quashing the subpoena summarily ignores this entire factual record.

## II. ARGUMENT

**A. The Order Quashing the Powell Deposition is Clearly Erroneous and an Abuse of Discretion.**

The Magistrate Judge's conclusion that deposing Ms. Powell was unwarranted is contrary to law and the facts on the record. The order is based on a flawed application of attorney-client privilege and ignores that Ms. Powell is a key fact witness who was listed on Plaintiff's initial disclosures.

1. **Ms. Powell is a Central Fact Witness, Not Merely an Attorney:** The declarations of Plaintiff and Captain Ostrom established that Ms. Powell personally drafted Plaintiff's pre-textual 2011 "termination letter" from non-supervisory administrator, Scott Hansen, that deliberately bypassed the collective bargaining agreement ("CBA")[1] to create a false basis for Plaintiff's removal form the seniority list and "administrative separation." Her testimony is not about privileged legal advice; it is about her direct, personal actions as a primary actor to interacted and negotiated with Plaintiff for fifteen months during the relevant time-frames in this lawsuit, involving the events giving rise to this litigation. It is a clear error to shield a fact witness from a deposition simply because she is also an attorney.

2. **Powell is a Necessary Rebuttal Witness:** APA and American's counsel made Ms. Powell a central figure by introducing Plaintiff's 2015 voicemail to her, and subsequent cease and

---

[1]      Section 21 of the American Airlines Pilots' CBA mandates that a pilot can only be terminated by his Chief Pilot supervisor for "just cause", and only after full due process of initial notice, investigation, hearing and final notice, which didn't occur here.

2

desist letter from American's outside counsel Mark Roberston to portray him as harassing

They cannot use this communication as a sword and then use privilege as a shield to prevent

Plaintiff from questioning her under oath to establish the context of that communication.

Moreover, Mark Robertson, is now also a fact witness for his collusion with APA counsel

(evidenced by New Years Day emails between him and APA's counsel regarding a "time

sensitive matter regarding Larry Meadows') and his misrepresentations to the Magistrate

by submitting an erroneous unsigned subpoena in an attempt to discredit Plaintiff an

invalidate his otherwise proper service upon his client, Ms. Powell. In sum, denying

Plaintiff the right to rebut this character attack is a denial of due process.

**B. The Order Denying Reconsideration of the Silva, Myers, and Clark Depositions is Contrary to Law.**

The Magistrate's refusal to permit these depositions is clearly erroneous and an abuse of

discretion.

1. **The Court's Own Condition Was Met:** The Magistrate's prior order quashing Silva

   (ECF No. 193) was expressly conditioned on Plaintiff first deposing the expert, stating;

   "If Plaintiff wants more information regarding APA's rebuttal expert's report, then

   Plaintiff must ask those questions to the expert during the expert's deposition." Plaintiff

   complied. That deposition yielded new, direct evidence that President Silva personally

   signed the retention agreement as the "client" and that APA attorneys Myers and Clark

   provided the data and factual assumptions used in their expert's report. The Magistrate's

   refusal to reconsider in light of this new evidence, which directly satisfies the condition

   she herself set, is clearly erroneous and an abuse of discretion.

2. **The Ruling Ignores APA's "Discovery Ambush":** The Magistrate's denial of a

   continued deposition of APA's corporate designee, Mr. Myers, ignores the severe

prejudice caused by APA's tactic of producing thousands of pages of documents five minutes *after* the deposition was scheduled to begin. This rewards bad-faith litigation conduct and has caused the Plaintiff severe prejudice.

## CONCLUSION

The Magistrate Judge's Order (ECF No. 204) is clearly erroneous and contrary to law. It ignores uncontroverted evidence of misconduct, denies Plaintiff the right to depose key fact witnesses, and rewards Defendants' bad-faith discovery tactics. Plaintiff respectfully requests that the District Judge **set aside** the Magistrate's Order, **deny** the motion to quash the Powell subpoena, and **grant** Plaintiff's motion to permit the depositions of Silva, Myers, and Clark, as originally sought in Plaintiff's underlying legal memorandum (**Exhibit 1**).

Dated February 18, 2026.

Respectfully Submitted,

Lawrence M. Meadows, *Pro Se*
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

**Exhibits:**
1. Plaintiff's Memorandum of Law submitted Feb. 9, 2026
2. Declaration of Lawrence Meadows submitted Feb. 9, 2026
3. Declaration of Brian Ostrom submitted Feb. 9, 2026

4

## CERTIFICATE OF SERVICE

I, Lawrence M. Meadows, Pro Se Plaintiff, hereby certify that on February 18, 2026, a true and correct copy of the foregoing was served via the Court's CM/ECF system, email, and U.S. Mail on all counsel of record.

Lawrence M. Meadows

## SERVICE LIST

**Capri Trigo, Esq.**
Gordon & Rees LLP
100 SE Second Street, Suite 3900
Miami, FL 33131
Email: ctrigo@gordonrees.com
*Lead Counsel for Defendant*

**John M. Pellettieri, Esq.**
**Grace Rybak, Esq.**
**Joshua B. Shiffrin, Esq.**
Bredhoff & Kaiser, P.L.L.C.
805 15th Street N.W., Suite 1000
Washington, D.C. 20005
Emails: jshiffrin@bredhoff.com;
jpellettieri@bredhoff.com;
grybak@bredhoff.com;
*Pro Hac Vice Counsel for Defendant*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**LAWRENCE M. MEADOWS,**
    Plaintiff,

    v.

**ALLIED PILOTS ASSOCIATION, et al.,**
    Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**
_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF DEPOSITION OF MARJORIE POWELL AND OTHER RELATED DISCOVERY

Plaintiff Lawrence Meadows submits this memorandum to demonstrate that the deposition of non-party witness Marjorie Powell, former counsel for American Airlines ("American"), is essential to this litigation and must be permitted to proceed. APA and American have sought to quash the deposition, claiming Ms. Powell lacks relevant knowledge. This argument fails not only because Ms. Powell is a direct, percipient witness to the central facts of this case, but also because her conduct is part of a broader pattern of bad-faith litigation tactics and collusion between APA and American's counsel that must be explored.

**I. Ms. Powell is a Necessary Witness to Foundational Events and a Pattern of Misconduct.**

Ms. Powell's testimony is directly relevant for two primary reasons. First, she is a key rebuttal witness. APA has made Ms. Powell a central figure in this litigation by introducing a voicemail Plaintiff left for her in 2015 to portray him in a false and threatening light. APA cannot use these communications as a sword and then shield Ms. Powell from being questioned

under oath about the context that provoked them – namely, her bad-faith conduct against Plaintiff and other pilots, including Captain Brian Ostrom.

Second, and more critically, Ms. Powell is a percipient witness to the collusive acts that form the basis of this DFR case. As detailed in the attached Declaration of Lawrence Meadows (attached herewith as **Exhibit A**), she personally drafted the pretextual 2011 "termination" letter that APA and American later used to extinguish Plaintiff's grievance rights. Captain Brian Ostrom's forthcoming declaration (to later be submitted as **Exhibit B**) will further establish Ms. Powell's pattern of fabricating documents and interfering with pilots' FAA medical certifications. Her conduct is not ancillary; it is foundational to proving pretext and bad faith.

**II. The Powell Deposition is Further Warranted by a Pattern of Collusion Between APA and American's Counsel.**

The attempt to quash Ms. Powell's deposition cannot be viewed in a vacuum. It is part of a broader pattern of collusion between APA's counsel and American's counsel. Newly discovered evidence, obtained on Friday, February 6, 2026, reveals that on January 1 and 2, 2026 – a federal holiday weekend, just two days after Plaintiff served both entities with a joint EEOC charge American's lead outside counsel, Mark Robertson of O'Melveny & Myers, was engaged in "time sensitive" communications with APA's counsel, Joshua Shiffrin, regarding the assumptions for APA's *own* economic expert rebuttal report against Plaintiff. (See **Exhibit A,** Decl. of L. Meadows at ¶ 13; APA_000033963).

This evidence demonstrates that Mr. Robertson is not merely an advocate for a non-party; he is a fact witness to the very collusion and bad faith at the heart of this case. The active coordination between a union's counsel and management's counsel to strategize against a union member's damages claims destroys any claim of common interest privilege. It is untenable for Mr. Robertson to appear before this Court to shield one attorney-witness (Powell) while he

himself is implicated in improper, collusive conduct. This pattern of misconduct makes it imperative that Plaintiff be permitted to depose all attorneys involved, starting with Ms. Powell.

**III. The Court Should Reconsider Its Order Quashing the Depositions of Silva, Myers, and Clark.**

Finally, Plaintiff asks the Court to reconsider its Order of February 5, 2026 (ECF No. 193) quashing the subpoena for APA President Nick Silva. That Order was based on the express premise that Plaintiff must first depose the expert. Plaintiff has now done so. That deposition yielded direct evidence—a consulting agreement personally signed by Mr. Silva and non-privileged emails from attorneys Mark Myers and James Clark—proving all three were personally involved in formulating APA's expert report. This new evidence satisfies the Court's prerequisite and establishes them as essential percipient witnesses.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests the Court deny the motion to quash the deposition of Marjorie Powell and reconsider its prior order to permit the depositions of Nick Silva, Mark Myers, and James Clark.


Respectfully Submitted,

_L. M. Meadows_

_____
Lawrence M. Meadows
*Plaintiff, Pro Se*

3

## EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE M. MEADOWS,
     Plaintiff,

v.

ALLIED PILOTS ASSOCIATION, et al.,
     Defendants.

CASE NO. 17-cv-22589-EA
Honorable Judge Ed Artau
_____/

## DECLARATION OF LAWRENCE M. MEADOWS

I, Lawrence M. Meadows, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am the Plaintiff in this matter and have direct, personal knowledge of the facts stated

herein. I submit this declaration in support of my opposition to the motion to quash the

deposition of Marjorie Powell and in support of my renewed request to depose other key

witnesses.

### Ms. Powell's Direct Involvement in My Purported Termination

2.      In late July 2011, at an Eleventh Circuit-ordered mediation regarding my ERISA

disability benefits litigation, my attorney, in the presence of Marjorie Powell, put American

Airlines ("American") on notice of a fraudulent disability cost-savings scheme.

3.      Approximately two weeks later, on August 5, 2011, I received a letter from Scott Hansen,

an American administrator, threatening that my employment would end. This letter was not from

my Chief Pilot - the only person with contractual authority to terminate me under the CBA - nor

was it copied to my union, the APA. It was a pretextual document designed to create the illusion

of a termination.

1

4.      I have personal knowledge, including from conversations with Mr. Hansen, that Marjorie Powell drafted or directed the drafting of this August 5, 2011 letter.

5.      This pretextual letter is the exact "notice" of termination that APA and American relied upon in their secret January 15, 2025 settlement agreement to extinguish my meritorious grievance rights and exclude me from reinstatement.

6.      Ms. Powell's direct knowledge of the creation and purpose of this letter is therefore not peripheral; it is foundational to proving that the basis for APA's adverse settlement was a pretext she personally helped create.

### A Pattern of Retaliation and APA's Misuse of Evidence

7.      During a April 2015 mediation, I confronted Ms. Powell about her bad-faith conduct in the case of another disabled pilot, Captain Brian Ostrom, whose return to work she had obstructed after inducing a settlement. Ms. Powell became irate and walked out of the mediation. The following week, my own LTD benefits were abruptly and retaliatorily suspended.

8.      In response to this retaliation, I left Ms. Powell a voicemail demanding binding Rule 9019 arbitration in American's Bankruptcy Proceedings to resolve our dispute.

9.      In my recent deposition, counsel for APA introduced this decade-old voicemail to portray me in a false and threatening light. APA cannot use communications provoked by Ms. Powell's own misconduct as a sword against me, and then use her purported "discomfort" as a shield to prevent her deposition. Her testimony is essential for me to rebut the false narrative APA is constructing.

### Newly Discovered Evidence Warranting Further Depositions

2

10.     On January 27, 2026, I deposed APA's economic expert, Matt Barton. In that deposition and the documents produced for it (the evening before on January 26), I obtained new evidence that was not before this Court when it previously quashed certain subpoenas.

11.     This evidence includes a consulting agreement for the expert report, which was **personally signed by APA President Nick Silva**, identifying him as the "client." (APA_000033905).  It also includes non-privileged emails showing that APA attorneys **Mark Myers** and **James Clark** were directly involved in providing the factual assumptions for the expert's report. (APA 000033872).

12.     This new evidence directly contradicts the Court's prior assumption that these individuals lacked percipient knowledge and establishes them as key witnesses to the creation of APA's damages theory against me.

13.     On Friday, February 6, 2026, while reviewing APA's document production, I discovered an email chain (bearing Bates number APA_000033963) between American's lead outside counsel, **Mark Robertson**, and APA's counsel, **Joshua Shiffrin**.

14.     These emails, dated January 1 and 2, 2026, show them coordinating on a "time sensitive matter regarding Larry Meadows" just two days after I served both parties with a joint EEOC charge. This is direct evidence of collusion between hostile adversaries. This conduct makes Mr. Robertson a fact witness and underscores the need to depose all.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of February, 2026.

_____
Lawrence M. Meadows

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LAWRENCE M. MEADOWS,
　　Plaintiff,

v.

ALLIED PILOTS ASSOCIATION, et al.,
Defendants.

CASE NO. 17-cv-22589-EA
Honorable Judge Ed Artau

_____/

## DECLARATION OF CAPTAIN BRIAN OSTROM

I, Captain Brian Ostrom, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am over eighteen years of age, a resident of Maricopa County, Arizona, and am fully competent to make this declaration. The facts stated herein are based on my personal knowledge.

2. I am a retired Captain from American Airlines, Inc. ("American").

3. I am familiar with Marjory Powell from her former role as an in-house attorney for American. This familiarity is based on my direct personal experiences with Ms. Powell and my observations of her involvement in matters concerning other similarly situated disabled pilots.

### I. Background and Professional Experience

4. I am a graduate of the United States Naval Academy. I served as a commissioned Naval Officer and Naval Aviator in the United States Navy, attaining the rank of Lieutenant and flying the P-3B/C Orion and the F/A-18 Hornet.

Page 1 of 8

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 167 of
216
Case 1:17-cv-22589-EA   Document 208   Entered on FLSD Docket 02/19/2026   Page 16 of 39

5. I was employed by American Airlines for approximately thirty-three years. During my career, I held type ratings on the Boeing 737, 757, 767, 777, and 787 aircraft. I served as a Captain on the Boeing 737-800 and the Boeing 787 Dreamliner. I retired in good standing in February 2024.

6. My career at American included several notable roles. I was among the first pilots to introduce the Boeing 737-800 into the American Airlines fleet and conducted initial operational training, including touch-and-goes. I flew the inaugural American Airlines international flight from San Jose, California, to Paris, France. I was also part of the first group of pilots to introduce the Boeing 787 Dreamliner into the American Airlines fleet.

7. I was qualified and proficient to operate into all special-qualification airports served by American Airlines. Just prior to September 11, 2001, I was selected for the next Boeing 737 Check Airman training class.

8. In addition to my line-flying duties, I was selected for numerous high-profile and charitable missions. These included flying World War II veterans from the 80th anniversary of Pearl Harbor, flying for the Snowball Express charity for families of fallen service members, and flying the Los Angeles Rams to a playoff game during their Super Bowl-winning season.

9. From 2008 until my retirement, I served as a federally sworn Federal Flight Deck Officer (FFDO), a federal law-enforcement position authorized by the Department of Homeland Security.

**II. Personal Experience with American Airlines Legal and Medical Departments.**

10. In July 2010, an intruder broke into my then-girlfriend's residence while I was present. I announced my law-enforcement status to encourage the intruder to depart, dialed 911, and retrieved my lawfully owned off-duty firearm for self-defense.

11. The intruder proceeded upstairs and physically assaulted me. I discharged my firearm to stop the threat. The Orange County Sheriff's Department investigated the incident. After reviewing all police reports and evidence, the Orange County District Attorney's Office concluded there was insufficient evidence to warrant the filing of criminal charges against me, and I was never arrested or charged. A true and correct copy of the December 8, 2010 letter from the Orange County District Attorney's Office is attached hereto as **Exhibit A**.

12. Shortly thereafter, my Chief Pilot at American, Greg Smith, contacted the lead homicide investigator on my case, Detective Daniel J. Salcedo. This contact was made at the direction of American's HR and legal departments. Detective Salcedo later confirmed the substance of this contact to me directly and in a sworn affidavit, stating that Mr. Smith initiated the communication and attempted to interfere in the active criminal investigation by:

    1. Offering to provide my confidential personnel and medical records to law enforcement

    2. Asserting that I had "anger issues" and was "medically unfit"; and

    3. Offering to provide additional information to assist in building a criminal case against me.

    A true and correct copy of Detective Salcedo's February 18, 2011 sworn affidavit is attached hereto as **Exhibit B**.

13. As stated in his affidavit (**Exhibit B**), Detective Salcedo attested that he declined Mr. Smith's offers, deeming the information improper and irrelevant to his self-defense investigation after consulting with the District Attorney.

14. Following this incident, American removed me from flight status and placed me on long-term disability. This action was taken without a precipitating medical examination, diagnosis, or any

Page 3 of 8

determination by a qualified medical professional that I was unfit for duty. I remained on disability for approximately four and a half years.

15. To contest my improper removal from flight status, I pursued multiple actions against American, including filing charges with the Equal Employment Opportunity Commission, asserting claims under the Americans with Disabilities Act, and filing grievances through the Allied Pilots Association ("APA").

16. Upon information and belief, approximately five months before a required medical examination under Section 20 of the Collective Bargaining Agreement ("CBA"), agents or employees of American caused adverse medical diagnoses to be entered into my electronic pilot medical file. This was done even though I had not been evaluated or diagnosed with any such conditions by a physician. I became aware of these entries only after an American Airlines nurse with access to the system discovered and informed me of them.

17. Around 2015, my legal claims against American were resolved through a settlement agreement. The most critical and material term of that settlement was my full reinstatement to active flight status.

18. As a condition of my reinstatement, American's counsel, Marjory Powell (also known as Marjory Howell), required that my FAA First-Class Medical Certificate be sent directly to her in the legal department. This was after the FAA's Federal Air Surgeon had already evaluated my case and granted me a Special Issuance certificate, clearing me to fly. Ms. Powell's directive was contrary to the CBA, which required such certification be provided only to my Chief Pilot. This interference by the legal department delayed my return to duty by approximately sixty-one days.

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 170 of
216
Case 1:17-cv-22589-EA   Document 208   Entered on FLSD Docket 02/19/2026   Page 19 of 39

19. After my claims were settled in exchange for my return to work, Ms. Powell caused a new letter to be sent to the FAA under the signature of American's interim Medical Director, Dr. Jeral Ahtone. This letter challenged the very Special Issuance medical certificate the FAA had just granted me. A true and correct copy of this April 2, 2015 letter is attached hereto as **Exhibit C**. This appeared to be a bad-faith tactic designed to honor the settlement in name only while simultaneously engineering a basis to prevent my return to active flight status. The letter misrepresented findings from my treating psychologist, Dr. Charles Green, prompting him to send a corrective letter to Dr. Ahtone and the FAA. A true and correct copy of Dr. Green's April 15, 2015 corrective letter is attached hereto as **Exhibit D**. The FAA did not revoke or rescind my Special Issuance.

20. Dr. Ahtone later confirmed to me, in a recorded conversation, that the letter to the FAA (**Exhibit C**) was drafted by and at the direction of American's legal counsel. His sworn deposition testimony in *Patterson v. American Airlines*, No. 1:17-cv-60533-JEM (S.D. Fla.), corroborates this. When asked if he had assistance writing the letter, Dr. Ahtone testified, "I had assistance with legal." When asked if that assistance was from "Margaret Howell" (an alias for Marjory Powell), counsel for American asserted attorney-client privilege and instructed Dr. Ahtone not to answer. A true and correct copy of the relevant excerpts from Dr. Ahtone's March 14, 2018 deposition is attached hereto as **Exhibit E**.

21. I filed a formal ethics complaint with American against my supervisor, Greg Smith, for his improper attempt to interfere in an active criminal investigation. The HR department refused to investigate, and to my knowledge, no disciplinary action was ever taken against Mr. Smith.

**III. Observed Pattern of Conduct and Relevance to Plaintiff Meadows**

22. Based on my direct personal experiences detailed above, I came to recognize a recurring pattern of conduct employed by American's legal and medical departments, in which Ms. Powell was often a central figure. The pattern I personally experienced and later observed in the cases of other pilots involved:

1. Targeting pilots disfavored by management or the legal department;

2. Manufacturing pretextual medical concerns or inserting adverse diagnoses into a pilot's file without a proper examination or basis;

3. Using these pretextual medical issues to ground pilots and force them onto long-term disability;

4. Creating procedural and bureaucratic hurdles to make it exceedingly difficult for pilots to disprove the unfounded medical allegations and regain FAA clearance; and

5. Exploiting the pilot's disability status and the resulting financial and emotional distress as leverage in legal or contractual negotiations, often in concert with the APA.

23. After I was eventually reinstated, I volunteered with the APA's Disabled Pilots Assistance and Support Committee (DPASC), where I used my firsthand experience to assist other pilots facing similar systemic obstacles.

24. Based on my direct personal experiences, the actions taken against Plaintiff Lawrence Meadows, including the documented involvement of Ms. Powell, are consistent with and reflective of the same pattern of conduct that I personally experienced and observed being used against other pilots.

25. I am aware that Ms. Powell has represented to this Court that she does not recall her interactions with the APA regarding Mr. Meadows' grievances and has had no contact with him for over a decade. Contrary to these representations, and based on my direct experience, Ms. Powell

maintained a central and active operational role in disability and reinstatement matters affecting pilots during the relevant time periods.

26. I am also personally aware of Ms. Powell's involvement in matters concerning other disabled pilots, including but not limited to Lawrence Meadows and Colonel Patterson. In my experience, her involvement consistently demonstrated a pattern of actions adverse to disabled pilots seeking reinstatement. This included direct interference with FAA medical recertification processes and her participation in the drafting or direction of medical and regulatory correspondence designed to negatively impact a pilot's certification status, as evidenced by Dr. Ahtone's letter regarding my case (**Exhibit C**) and his deposition testimony regarding her involvement (**Exhibit E**).

27. Based on my direct experience with the individuals and processes at issue, I believe Ms. Powell possesses unique, firsthand knowledge of American's policies and practices toward disabled pilots and the specific facts underlying Plaintiff's claims in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 8th day of February, 2026.

Captain Brian Ostrom.
American Airlines Ret.

**Index of Exhibits to the Declaration of Captain Brian Ostrom**

- **Exhibit A:** A true and correct copy of the December 8, 2010 letter from the Orange County District Attorney's Office, confirming its decision not to file criminal charges against Brian Ostrom.

- **Exhibit B:** A true and correct copy of the February 18, 2011 sworn affidavit of Detective Daniel J. Salcedo, describing an unsolicited call from American Airlines supervisor Greg Smith and his attempt to interfere in an active investigation.

- **Exhibit C:** A true and correct copy of the April 2, 2015 letter from Dr. Jeral Ahtone of American Airlines to the FAA, questioning Captain Ostrom's recently issued medical certificate.

- **Exhibit D:** A true and correct copy of the April 15, 2015 corrective letter from Dr. Charles B. Green to Dr. Jeral Ahtone and the FAA, clarifying misrepresentations made in Dr. Ahtone's letter (Exhibit C).

- **Exhibit E:** A true and correct copy of relevant excerpts from the March 14, 2018 deposition of Dr. Jeral Ahtone in *Patterson v. American Airlines*, where he testified that he received "assistance with legal" in drafting the letter to the FAA and was instructed not to identify the attorney involved.

# EXHIBIT A

Case 1:17-cv-22589-EA   Document 251-1   Entered on FLSD Docket 04/15/2026   Page 175 of
Case 1:17-cv-22589-EA   Document 208   Entered on FLSD Docket 02/19/2026   Page 24 of 89
12/08/2010   11:55   714-647-4005   21 HOMICIDE



OFFICE OF THE

# DISTRICT ATTORNEY

<u>ORANGE COUNTY, CALIFORNIA</u>
TONY RACKAUCKAS, DISTRICT ATTORNEY

JIM TANIZAKI
SENIOR ASSISTANT D.A.
VERTICAL PROSECUTIONS/
VIOLENT CRIMES

WILLIAM FECCIA
SENIOR ASSISTANT D.A.
SPECIAL PROJECTS

MARY ANNE McCAULEY
SENIOR ASSISTANT D.A.
BRANCH COURT OPERATIONS

JOSEPH D'AGOSTINO
SENIOR ASSISTANT D.A.
GENERAL FELONIES/
ECONOMIC CRIMES

MIKE MAJOR
CHIEF
BUREAU OF INVESTIGATION

LISA BOKAN - JOHNSTON
DIRECTOR
ADMINISTRATIVE SERVICES

December 8, 2010

Orange County Sheriff's Department
Investigator Dan Salcedo
Homicide Unit

RE:       Death of Dean Maldonado
          OCSO DR # 10-131789

Dear Investigator Salcedo:

After reviewing the police reports and all the information you provided to our office regarding the July 17, 2010 shooting that resulted in the death of Mr. Dean Maldonado, we are of the opinion that there is insufficient evidence to warrant the filing of criminal charges against the shooter, Brian Scott Ostrom, and to prove his guilt beyond any reasonable doubt.

Accordingly, the Office of the District Attorney is closing its inquiry into this matter. If you have any questions, please feel free to contact me at your convenience.

Sincerely,

Ebrahim Baytieh
Senior Deputy District Attorney
Homicide Unit

cc:     DA File

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

WEB PAGE: www.OrangeCountyDA.com

☒ MAIN OFFICE
401 CIVIC CENTER DR W.
P.O. BOX 808
SANTA ANA, CA 92701
(714) 834-3600

☐ NORTH OFFICE
1275 N. BERKELEY AVE.
FULLERTON, CA 92832
(714) 773-4600

☐ WEST OFFICE
8141 13TH STREET
WESTMINSTER, CA 92683
(714) 896-7261

☐ SOUTH OFFICE
30143 CROWN VALLEY PKWY.
LAGUNA NIGUEL, CA 92677
(949) 249-6226

☐ HARBOR OFFICE
4601 JAMBOREE RD.
NEWPORT BEACH, CA 92660
(949) 476-4650

☐ JUVENILE OFFICE
341 CITY DRIVE SOUTH
ORANGE, CA 92868
(714) 935-7624

☐ CENTRAL OFFICE
401 CIVIC CENTER DR. W
P.O. BOX 808
SANTA ANA, CA 92701
(714) 834-3952

# EXHIBIT B

SALCEDO AFFIDAVIT

## AFFIDAVIT OF FACTS

I, Daniel J. Salcedo, the undersigned, being duly sworn, do herby swear, certify, and affirm that:

(1) I am over the age of eighteen (18) and am a resident of the State of California. I have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.

(2) I am a Homicide Investigator for the Orange County Sheriff-Coroner Department, located at 550 N. Flower Street, Santa Ana, CA 92703.

(3) While I was investigating the shooting death of Dean Maldonado, I received an unsolicited call from Greg Smith.

(4) I received the call from Greg Smith, while my investigation was still on-going.

(5) Greg Smith identified himself as a Supervisor for American Airlines.

(6) Greg Smith indicated that he was the immediate supervisor for Brian Ostrom.

(7) Greg Smith declared, in part, Ostrom to be possibly unfit to adequately perform his job as an airline captain.

(8) Greg Smith stated that Ostrom was removed from flight status for being medically unfit.

(9) Greg Smith stated, in part, that Ostrom had "anger issues".

(10) Greg Smith offered to share more employment and medical history on Ostrom.

(11) Greg Smith invited me to meet with him at his American Airlines Los Angeles office.

(12) Greg Smith informed me that he would provide "all the *intell*" that I would need to

SALCEDO AFFIDAVIT

help build a case against Ostrom.

(13)    I declined Greg Smith's invitation, after consulting with my District Attorney,

because that information was irrelevant to the investigation.

(14)    I meet with Brian Ostrom on December 17th, 2010 at an Orange County

Sheriff-Coroner's office to discuss the incident he had been involved in on July

17, 2010 and, during this meeting, informed him of these facts.

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct. Executed this _18_ day of _February_____, 2011

_____     DANIEL  J.  SALCEDO
(TYPE OR PRINT NAME)

_____
(SIGNATURE)


STATE OF CALIFORNIA

COUNTY OF ORANGE

Subscribed and sworn to before me, this the _____ day of

_____ , ____

_____see attached_____ Notary Public

My Commission Expires: ___10·25·12_____

Page 2 of 2

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____          _____
Signature of Document Signer No. 1                        Signature of Document Signer No. 2 (if any)

State of California

County of ___ORANGE___

**C. ERGUETA**
**COMM.# 1818513**
**NOTARY PUBLIC-CALIFORNIA**
**ORANGE COUNTY**
**My Comm. Exp. Oct. 25, 2012**

**C. ERGUETA**
**COMM.# 1818513**
**NOTARY PUBLIC-CALIFORNIA**
**ORANGE COUNTY**
**My Comm. Exp. Oct. 25, 2012**

Place Notary Seal Above

Subscribed and sworn to (or affirmed) before me on this

___18___ day of ___February___, 20 _11_, by
Date            Month                       Year

(1)___Daniel   J.  Salcedo___,
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me (.) (,)

(and

(2)_____N/A_____.
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me.)

Signature _____
Signature of Notary Public

———————————— OPTIONAL ————————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: ___Affidavit of Facts___

Document Date: ___2-18-11___  Number of Pages: ___2___

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT C



VIA FEDERAL EXPRESS

April 2, 2015

James R. Fraser, M.D., Federal Air Surgeon
U.S. Department of Transportation
Office of Aerospace Medicine
Federal Aviation Administration
800 Independence Ave., S.W.
Washington, D.C. 20591
1-866-835-5322

Re:     Brian Scott Ostrom
        PI #:    2226244
        APP ID#:1999311441

Dear Dr. Fraser,

I am the Corporate Medical Director for American Airlines (AME #1319) and writing with respect to
Captain Brian Scott Ostrom.

I recently received Captain Ostrom's Blue Ribbon Medical File (FOIA# 2015-004081CA) and have
reviewed it, on behalf of American Airlines, in connection with the March 9, 2015, issuance of a First
Class Medical Certificate to him.  In reviewing the file, I have some observations that I would like to
respectfully submit for your review and consideration:

- As noted by Dr. Charles Chesanow in his memorandum to Nicholas Lomangino, M.D., dated
  November 7, 2014, there is disagreement between the conclusions of Dr. Anna Scherzer and other
  clinicians on Captain Ostrom's diagnosis.

- In March 2011, Dr. Scherzer conducted an Independent Psychiatric Evaluation and rendered the
  opinion that Captain Ostrom exhibits psychiatric signs and symptoms that potentially interfere with
  his ability to safely fulfill the functions of a commercial airline pilot and FFDO.  Further, her opinion
  is that Captain Ostrom's 2010 lethal use of a firearm, combined with his lack of psychological insight
  and diagnosis of Acute Trauma Reaction increase the risk of Captain Ostrom responding to
  ambivalent or threatening circumstances with the use of deadly force, placing him at an increased
  risk for an untoward event while functioning in a safety sensitive position.

- More recent medical opinions in the file disagree with Dr. Scherzer's conclusions. These more recent
  opinions indicate that Captain Ostrom has made significant progress while away from his job at
  American Airlines.

Occupational Health Services
4255 Amon Carter Blvd. MD 4100
Fort Worth, TX 76155
817 963 1200 Office
817 963 6378 Fax



Despite the generally favorable recent opinions, a letter dated February 7, 2014 by Charles Green, Ph.D. states, "Caution: It is my professional opinion that should this "Limbo" state continue, Captain Ostrom's emotional state will predictably deteriorate rapidly." (Emphasis is in the original). As noted in the July 9, 2014 memorandum from Dr. Chesanow to Roger Bisson, this statement "appears to confirm Captain Ostrom's disability status." Dr. Green's statement combined with his opinion that Captain Ostrom's difficulties were caused by an "occupational problem," (4/15/14 report) and Susan L. Simmons' (M.S.) conclusion (December 8, 2011) that Captain Ostrom never suffered from PTSD, but that "his frustration, anxiety, and stress were all related to issues involving American Airlines' management staff," raise the concern of how Ostrom's "occupational problem" with American Airlines might affect, if at all, Captain Ostrom's ability to perform his duties safely upon return to the work environment at American Airlines.

I'm raising these issues only to ensure that I have done what I reasonably can to ensure the safety of our passengers, employees, and Captain Ostrom himself. Obviously, American Airlines will rely upon and defer to the judgment of the FAA in this matter.

I understand that the FAA has 60 days from the time of issuance to review or modify medical certificates and/or to request additional information. To the extent there are any such modifications or requests for information, please let me know. If I do not receive such notice from you within the prescribed time period, by May 9, 2015, I will proceed with our process to return Captain Ostrom to active duty status.

Thank you in advance for your attention to this matter, and feel free to contact me if you have any questions.

Sincerely,

Jeral Ahtone, M.D.
Corporate Medical Director
Occupational Health Services
American Airlines

cc:    Captain Brian Ostrom

# EXHIBIT D

04/19/2015  04:34  7143782485   WITTE BESLEY MAHMCCA   PAGE  02/04

**CHARLES B. GREEN, PH.D.**
Practice of Clinical Psychology
NPI# 1770691446    LIC# PSY4442
19582 Beach Blvd., Ste. 207
Huntington Beach, CA 92648
Telephone: (714)378-2428        Fax: (714)964-6919

April 15, 2015

American Airlines, Occupational Health Services
4255 Amon Carter Blvd.
Fort Worth, Texas 76155

Attn: Jeral Ahtone, M.D.,   Corporate Medical Director, Occupational Health Services

Re:  Ostrom, Scott Brian, Captain,   PI # 2226244
     APP ID#: 1999311441, and the letter sent to you by one James R. Fraser, M.D.,
     Federal Air Surgeon Surgeon, dated 4-2-15

Dear Dr. Ahtone:

After reviewing the above-indicated letter (supra), I feel compelled to correct the record
as it relates to my assertion related to Captain Ostrom's "occupational problem". Let me
be very clear, it is and has been all along my clinical opinion/judgment that Captain
Ostrom's "occupational problem" clearly stems from his not being permitted not only to
return to his job as qualified pilot with TSA clearance regarding the carrying of a weapon
but the repeated efforts by American Airlines to allow and/or consider alternative "Test
Based Analysis" of his personality confirming no contraindications why he should not be
reinstated as a pilot timely.

Finally, Captain Ostrom has not only continued his treatment with me but has carried
out an alternative constructive avocation to help him keep hoping and moving while still
awaiting his rightful reinstatement as a Pilot.

Finally it is hoped that this will clarify any misinterpretation of "occupational problem"
other then that of a most remarkable but positive healthy effort on Captain Ostrom's part
to keep up the fight to regain his rightful status as a qualified Pilot.

Sincerely,

Charles B Green, Ph.D.

cc:  Pt. Chart
     James R Fraser, M.D., Federal Air Surgeon; and Dr. Keith Martin, Fax:303-341-4803

## **EXHIBIT E**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

RODNEY SCOTT PATTERSON,

                    Plaintiff,                    CASE NO.:

Vs.                                     1:17-cv-60533-JEM

AMERICAN AIRLINES, INC.,
a Delaware Corporation,

                    Defendant.

****************************************************

ORAL DEPOSITION OF

JERAL L. AHTONE, MD

March 14th, 2018

****************************************************

          ORAL DEPOSITION OF JERAL L. AHTONE, MD,
produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 14th of
March, 2018, from 9:53 a.m. to 3:05 p.m., before
Daniel J. Skur, Notary Public and Certified
Shorthand Reporter in and for the State of Texas,
reported by stenographic means, at the offices of
Veritext Legal Services, 300 Throckmorton Street,
Suite 1600, Fort Worth, Texas, pursuant to the
Federal Rules of Civil Procedure.

Page 2

A P P E A R A N C E S

FOR PLAINTIFF:

William R. Amlong, Esq.

(Via Teleconference)

Amlong & Amlong, PA

500 Northeast Fourth Street

Second Floor

Fort Lauderdale, Florida 33301

P 954.462.1983 | F 954.463.5008

wramlong@theamlongfirm.com


FOR DEFENDANT:

Cameron Cloar-Zavaleta, Esq.

American Airlines, Inc.

4333 Amon Carter Boulevard

MD5675

Fort Worth, Texas 76155

P 817.963.5213

cameron.cloar@aa.com



ALSO PRESENT:

Noel Pace, Esq., Via Teleconference

Mr. Rodney Scott Patterson, Via Teleconference

Page 61

correct?

MR. CLOAR-ZAVALETA:  Object to the form.

A.    No, I'm unable to determine that. That's not enough information to give someone a career-ending diagnosis.

BY MR. AMLONG:

Q.    Dr. Ahtone, have you, as the corporate medical director of American Airlines, ever written to the Federal Air Surgeon seeking a modification of a pilot's first-class medical certificate?

A.    No.

Q.    Have you ever written to the Federal Air Surgeon concerning Captain Brian Scott Ostrom?

MR. CLOAR-ZAVALETA:  Object to the form.

A.    Yes, I have written to him regarding that pilot.

BY MR. AMLONG:

Q.    Seeking to have his first-class medical certificate altered, correct?

A.    No, not that I recall.

Q.    Why did you write to the Federal Air Surgeon about Captain Ostrom?

MR. CLOAR-ZAVALETA:  Object to the form.

A.    Can I just talk to Cameron one sec?

THE WITNESS:  Can meet with me for one

Page 62

sec?

MR. CLOAR-ZAVALETA:  No, that's okay.

THE WITNESS:  Okay.  This is -- I haven't been given permission to talk about this.

MR. CLOAR-ZAVALETA:  It's okay.  Object to the form.

A.    Okay.  The letter was written to him to ask the flight surgeon to make sure that -- that Mr. Ostrom had disclosed all of the things that he had done in the past in regards to evaluations or acts, activities, or whatever.

BY MR. AMLONG:

Q.    Did the Federal Air Surgeon take any adverse action towards Captain Ostrom?

A.    Not --

MR. CLOAR-ZAVALETA:  Object to the form.

A.    Not to my knowledge.

BY MR. AMLONG:

Q.    Did you personally write the letter to Dr. Frazer?

MR. CLOAR-ZAVALETA:  Object to the form.

A.    I had assistance with legal.

BY MR. AMLONG:

Q.    Margaret Howell?

MR. CLOAR-ZAVALETA:  So, again, this

Case 1:17-cv-22589-EA   Document 208   Entered on FLSD Docket 02/19/2026   Page 39 of 39

Page 63

is -- I'm going to object on privilege.  Instruct the witness not to answer.

BY MR. AMLONG:

Q.     Is Captain Ostrom still flying?

MR. CLOAR-ZAVALETA:  Object to the form.

A.     To my knowledge, he is.

BY MR. AMLONG:

Q.     Did you ever discuss First Officer Patterson with Dr. Tordella?

A.     Yes.  I believe he called me.

Q.     And what -- what did Dr. Tordella say to you, and how did you respond to him?

MR. CLOAR-ZAVALETA:  Object to the form.

A.     I don't remember the exact conversation. It was a short conversation, but I do not remember the details of the conversation other than that he called me.  I wouldn't have remembered that if you hadn't brought it up.

BY MR. AMLONG:

Q.     And this is Joseph R. Tordella, correct?

A.     Yes.  I just know him as "Joe."

Q.     And he's an AME?

A.     Yes.

Q.     Was he suggesting that First Officer Patterson should be put back into the air?

# EXHIBIT H

## TO MEADOWS DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**LAWRENCE MEADOWS,**

       Plaintiff,

**CASE NO. 1:17-CV-22589-EA**

**v.**

**ALLIED PILOTS ASSOCIATION,** *et al.*

       Defendants.

_____/

## DEFENDANT'S CORRECTED STATEMENT OF MATERIAL FACTS[1]

---

[1] In addition to this Statement of Material Facts required by S.D. Fla. Rule 56.1, this Court's scheduling order requires the parties to "also file a Joint Statement of Undisputed Facts." ECF No. 177 at 4. APA contacted Plaintiff on March 24, 2026, to request his position on the facts set forth below. Plaintiff responded that it would not be "feasible" or "appropriate" for him to review the proposed facts. APA is therefore unable to file a Joint Statement of Undisputed Facts.

## I.   The Collective Bargaining Agreement (CBA)

1.      Defendant Allied Pilots Association (APA) is a labor organization that has been the certified collective-bargaining representative for pilots at American Airlines (American) since 1963. Myers Decl. ¶ 4.

2.      APA represents a bargaining unit composed of over 16,000 pilots at American. Myers Decl. ¶ 5.

3.      All positions within the bargaining unit represented by APA at American are pilot positions. Myers Decl. ¶ 20, Ex. 1 (Constitution and Bylaws) Art. III § 1.A.

4.      A pilot must possess a Federal Aviation Administration (FAA) Medical Certificate to fly a commercial aircraft, including for American. Myers Decl. ¶ 21; *see* DX2[2]; DX3, at 1, 2.

5.      It is APA's understanding that every pilot position at American covered by the CBA between APA and American requires a pilot to have an FAA Medical Certificate because each pilot position covered by the CBA includes the duties of flying commercial aircraft. Myers Decl. ¶ 22.

6.      APA and American have negotiated a series of collective-bargaining agreements (CBAs) to set the terms and conditions of employment for pilots at American. Myers Decl. ¶ 14.

7.      APA and American have periodically renegotiated the CBA, including in 2003. Myers Decl. ¶¶ 14-16, Ex. 2 (2003 CBA).

8.      The 2003 CBA and all other relevant versions of the CBA contained rules that govern how pilots at American accrue and retain seniority. Myers Dec. ¶ 23, 2003 CBA §§ 11, 13, & Supp. F(1).

---

[2] Documents with the prefix "DX" or "CX" are appended to the Declaration of Joshua B. Shiffrin, as are excerpted transcripts from the depositions of Plaintiff, Mark Myers, and Dan Carey.

9.      Seniority determines many aspects of a pilot's working conditions and quality of life, including what aircraft they fly, what positions they hold, and their schedules, which consequently impacts their compensation. Meadows Dep. Tr. 173; Myers Day 2 Dep. Tr. 232-33; Carey Dep. Tr. 332-33[3]; Stephens Decl. ¶ 6.

10.     The 2003 CBA and all other relevant versions of the CBA provided that American was responsible for maintaining a pilot seniority list that listed the American-employed pilots in order of seniority. 2003 CBA § 13.G; *see also* Carey Dep. Tr. 184 ("I don't believe that APA . . . has the ability to put anybody back on the seniority list. . . . [T]hat is up to the company").

11.     Under the 2003 CBA and all other relevant versions of the CBA, all flying at American had to be performed by pilots whose names appeared on the pilot seniority list, subject to certain exceptions inapplicable to this case. 2003 CBA § 1.C.1; Myers Decl. ¶ 23.

12.     If a pilot at American loses their FAA Medical Certificate, is unable to operate under their unexpired medical certificate, or is unable to renew their medical certificate, that pilot is unable to operate and fly a commercial aircraft. A pilot in that position may take paid sick leave, unpaid sick leave, or disability leave, depending on their personal circumstances, pursuant to the terms of the CBA, until they regain their certification. Myers Decl. ¶ 24.

13.     The 2003 CBA contained provisions that permitted American to terminate pilots who had been on unpaid sick or disability leave for five years or longer. 2003 CBA § 11.D.1.; 2003 CBA Supp. F(1)5(d).

---

[3] Dan Carey's deposition occurred on March 4, 2026. The court reporter, due to health issues, was unable to produce a certified transcript by April 1, 2026, so APA submitted a rough transcript with its original Statement of Material Facts. *See* ECF No. 238. As indicated in that document, this Corrected Statement of Material Facts includes citations to an updated, certified transcript of the Carey Deposition. Those updated citations are the only substantive change to the document.

14. Section 11.D of the 2003 CBA stated that while a pilot would retain and accrue seniority while on leave for sickness or injury, a "leave of absence for sickness or injury . . . may not exceed a total continuous period of five (5) years." 2003 CBA § 11.D.1.

15. Another section of the 2003 CBA stated that "[a] pilot shall retain and continue to accrue his seniority for the purposes of [retirement benefit calculations] only for a period of five (5) years commencing at the expiration of his paid sick leave." 2003 CBA Supp. F(1)5(d).

16. American and APA had a shared understanding, which both APA and American communicated to Plaintiff as early as 2011, that these provisions permitted American to terminate a pilot's employment and remove the pilot from the seniority after the pilot had been on unpaid sick or disability leave for more than five years. DX2; Myers Decl. ¶ 27, Exs. 3, 4, 5 (at 2); Myers Day 1 (Vol. 1) Dep. Tr. 105, 123; *see also* Carey Dep. Tr. 343-44.

17. APA internally referred to pilots terminated and removed from the seniority list by American after five years of unpaid sick or disability leave as Medical Disability Dropped (MDD) pilots. Myers Decl. ¶ 31; Boggess Decl.[4] ¶¶ 3-4.

18. APA communicated to Plaintiff in fall 2011 that if an MDD pilot regained their FAA First Class Medical Certificate, APA could request that American reinstate that pilot and return them to the seniority list at their prior relative seniority position. Myers Decl. ¶ 32, Ex. 5 at 2.

19. There is no contractual right to reinstatement once a pilot has been terminated after being out for more than five years. The decision whether to reinstate a pilot who has regained their FAA First Class Medical Certificate ultimately falls within American's sole discretion. Myers Decl. ¶ 33, Ex. 4; Stone Decl. ¶ 5; Carey Dep. Tr. 145, 164, 184.

---

[4] Declarations from APA Officials Keith Wilson, Arthur McDaniels, and J. Bennett Boggess, originally submitted in other proceedings, are appended to the Declaration of Joshua B. Shiffrin.

3

## II.    Plaintiff Lawrence Meadows

20.    Plaintiff Lawrence Meadows started working as a pilot at American and became a member of APA in 1991. Meadows Dep. Tr. 18; Myers Decl. ¶ 17.

21.    Plaintiff stopped flying for American in or around 2003 due to a disability and began a long period of unpaid sick and/or disability leave. Meadows Dep. Tr. 18; DX2.

22.    Plaintiff's FAA First Class Medical Certificate expired in or around 2004. Meadows Dep. Tr. 24.

23.    Plaintiff did not regain his FAA First Class Medical Certificate until November or December 2018. Meadows Dep. Tr. 23; DX46.

24.    On August 5, 2011, Scott Hansen—the Director of Flight Administration at American—wrote to Plaintiff to inform him that, per the 2003 CBA and company policy, and because Plaintiff had been on a sick leave of absence for more than five years, his employment at American would end unless he either (a) regained his FAA First Class Medical Certificate and returned to his pilot position, or (b) "work[ed] with the Company" to identify a reasonable accommodation to return to work in a non-pilot position. DX2; *see also* DX3; DX4 at 5.

25.    On October 7, 2011, Scott Hansen wrote to Plaintiff to confirm that Plaintiff and American had been unable to identify a reasonable accommodation, in part because Plaintiff declined to pursue non-pilot positions outside the APA bargaining unit. DX4 at 5; *see also* DX3.

26.    On November 4, 2011, Scott Hansen informed Plaintiff that he had been "removed from the pilot seniority list and administratively separated from" American as of October 21, 2011. DX4 at 2.

27.    Since his termination, Plaintiff has not been an employee of American. *Meadows v. Am. Airlines*, No. 24-CV-20518, 2024 WL 5248006, at *8, *13 (S.D. Fla. Oct. 22, 2024) (holding

4

that judicial and collateral estoppel bar Plaintiff from arguing otherwise); *In re AMR Corp.*, No. 11-15463 (SHL), 2016 WL 1559294, at \*6 (Bankr. S.D.N.Y. Apr. 14, 2016), *aff'd*, 764 F. App'x 88 (2d Cir. 2019) (noting that "three neutral decision makers have determined that Mr. Meadows was terminated" and invoking judicial estoppel to preclude his arguing otherwise).

28.     In November 2011, APA informed Plaintiff in writing that American's termination of Plaintiff and removal of Plaintiff from the pilot seniority list were consistent with the 2003 CBA and that APA would be available to assist Plaintiff with requesting his reinstatement if he were to regain his FAA First Class Medical Certificate. Myers Decl. Ex. 5 at 2.

**III.     Grievance 12-011**

29.     The 2003 CBA permitted pilots or APA to file grievances asserting that American violated its contractual obligations under the CBA. 2003 CBA § 21.D.2.

30.     The 2003 CBA created a procedure for resolving grievances that involved the following steps: (1) American made a decision on the grievance after an initial hearing; (2) if American denied the grievance, the grievant could appeal to American for a decision after an appeal hearing; (3) if American denied the grievance after an appeal hearing, APA could advance the grievance to a pre-arbitration conference; (4) if the grievance could not be resolved in a pre-arbitration conference, APA could advance the grievance to arbitration before the System Board of Adjustment. 2003 CBA §§ 21-23.

31.     On or about February 4, 2012, Plaintiff filed an individual grievance (Grievance 12-011) asserting that his "discharge" from American and removal from the pilot seniority list was a "[b]latant violation" of the Americans with Disability Act and the Sarbanes-Oxley Act. DX13; *see also* DX15 at 1 (describing statutory basis for Grievance 12-011).

5

32.    On or about June 6, 2013, American denied Plaintiff's appeal of Grievance 12-011 after a hearing. DX14.

33.    On or about August 20, 2013, APA and American did not resolve Grievance 12-011 at a pre-arbitration conference. Myers Decl. ¶ 42, Ex. 7.

34.    On or about August 29, 2013, APA President Keith Wilson informed Plaintiff that APA would not advance Grievance 12-011 to arbitration before the System Board of Adjustment, explaining that advancing the grievance to arbitration would be inappropriate because it was "based on federal statutory claims." Myers Decl. ¶ 43, Ex. 8.

35.    On January 17, 2014, counsel for APA informed Plaintiff that Grievance 12-011 "has been closed"; Plaintiff responded, "I understand that 12-011 is closed." DX20 at 1.

36.    In February 2014, Plaintiff sued APA in the U.S. District Court for the District of Utah, alleging, among other things, that (1) APA's decision not to advance Grievance 12-011 to the System Board of Adjustment violated his statutory right to arbitrate grievances, and (2) APA violated its duty of fair representation under the Railway Labor Act by failing to advance Grievance 12-011 to arbitration. *See Meadows v. APA*, No. 2:14-CV-00115-DS, 2015 WL 13650044, at *1 (D. Utah Apr. 27, 2015), *aff'd*, 822 F. App'x 653 (10th Cir. 2020).

37.    In March 2014, Plaintiff told APA that he believed APA's decision not to advance Grievance 12-011 to arbitration was retaliatory. Myers Decl. Ex. 10; *see* Meadows Dep. Tr. 149.

38.    On July 22, 2014, Plaintiff filed an amended complaint in the Utah litigation. Shiffrin Decl. Ex. 11 (Amended Complaint); Ex. 12, at 10 (granting motion to amend).

39.    Both issues described in SMF ¶ 36 were fully briefed in connection with APA's motion to dismiss, and the court granted APA's motion, holding that (1) Plaintiff did not have an individual right to arbitration of his grievances, and (2) APA did not violate its duty of fair

representation when it did not submit Grievance 12-011 to arbitration. Shiffrin Decl. Ex. 12 (Utah Order), at 3-9; *see also Meadows v. APA*, 2015 WL 13650044, at *1.

**IV.   Grievance 13-064**

40.   In 2013, Plaintiff filed an individual grievance (Grievance 13-064) asserting that American violated the 2003 CBA by terminating him and removing him from the pilot seniority list after five years of disability leave. DX19; *see Meadows v. APA*, 2015 WL 13650044, at *1.

41.   American denied the grievance after a hearing, concluding that Plaintiff's removal from the seniority list complied with the CBA. Myers Decl. Ex. 11.

42.   On April 23, 2014, APA President Keith Wilson informed Plaintiff that APA had decided not to advance Grievance 13-064 to a pre-arbitration conference, explaining that the claims in the grievance were "contrary to the plain language" of the CBA and therefore submission to a pre-arbitration conference "would not be appropriate." Myers Decl. Ex. 12.

43.   In his lawsuit in the U.S. District Court for the District of Utah, Plaintiff asserted a claim that APA had violated its duty of fair representation by failing to advance Grievance 13-064. Shiffrin Decl. Ex. 11 (Am. Compl.) ¶¶ 144-91; *see id.* Ex. 12 (Order), at 2, 6-7.

44.   The district court in Utah dismissed the claim, concluding that "the CBA . . . expressly allows American to remove a pilot from the Seniority List if the pilot exhausts his or her sick leave of absence," and "[t]hus, when American removed Plaintiff from the Seniority List, it acted within the confines of the CBA." Shiffrin Decl. Ex. 12 (Order), at 6-7; *see Meadows v. APA*, 2015 WL 13650044, at *1 (concluding that Grievance 13-064 was "not supported by the CBA").

**V.   Grievance 12-012**

45.   Pilots at American are assigned to ten different geographical "bases" or "domiciles," corresponding to major hubs for the airline. Myers Decl. ¶ 12.

46.     APA's governance structure is similarly organized by domicile. Myers Decl. ¶ 13.

47.     Each domicile has a chair and vice chair, and each APA member is assigned to a domicile that coincides with his or her employment assignment from American. Myers Decl. ¶ 13.

48.     On May 22, 2012, the Chairman and Vice Chairman of APA's Dallas/Fort Worth (DFW) base filed a grievance "on behalf of all DFW-based pilots." DX21.

49.     Grievance 12-012 was a "base grievance," *see* 2003 CBA § 21.D.2.a(2); Meadows Dep. Tr. 151, which meant that it was not filed by an individual pilot but rather by an APA base representative on behalf of affected pilots at the representative's base—for example "DFW-based pilots." DX21; *see* Myers Day 1 (Vol. 2) Dep. Tr. 8, 14.

50.     When APA prevails in a base grievance, relief is awarded to all similarly situated pilots at the base on whose behalf it was filed. Myers Day 1 (Vol. 2) Dep. Tr. 15-16.

51.     If APA prevails in a base grievance, it can try to convince American to apply the resolution to similarly situated pilots across all bases. Myers Day 1 (Vol. 2) Dep. Tr. 11-12.

52.     Plaintiff was not a DFW-based pilot at the time of his termination in 2011. Myers Decl. 19; *see* Myers Day 1 (Vol. 2) Dep Tr. 21.

53.     Grievance 12-012 asserted that American violated the CBA by (1) "failing to reinstate pilots" to the pilot seniority list, and (2) "failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years." DX21.

54.     Grievance 12-012 was intended to challenge (1) American's practice of terminating pilots who had been on unpaid sick or disability leave for five years without first providing adequate notice, and (2) American's then-recent practice of categorically refusing to reinstate pilots who had been terminated after five years of unpaid sick or disability leave but who had regained

8

their FAA First Class Medical Certificate and thereafter sought reemployment with American. Myers Day 1 (Vol. 2) Dep. Tr. 9-11; Myers Day 2 Dep. Tr. 54-55; McDaniels Decl. ¶¶ 28-30.

55. Grievance 12-012 did not seek reinstatement of all pilots who had been terminated after being on unpaid sick or disability leave for five years. Myers Day 1 (Vol. 2) Dep. Tr. 13; Myers Day 2 Dep. Tr. 55, 109; Boggess Decl. ¶ 11.

56. If successful, Grievance 12-012 would not have resulted in the blanket reinstatement of all MDD pilots, let alone an MDD pilot who still lacked an FAA First Class Medical Certificate. Myers Day 1 (Vol. 2) Dept. Tr. 12, 21; Myers Day 2 Dep. Tr. 110.

57. As of the filing of the Amended Complaint in this case in October 2018, APA had not advanced Grievance 12-012 to arbitration. Myers Day 2 Dep. Tr. 55-56.

58. It is not unusual at APA for a grievance to take years to get to arbitration. Myers Decl. ¶ 52.

59. Between 2012 and 2021, APA had on average approximately 155 grievances in any given year that were filed on behalf of American pilots. It also inherited hundreds of open grievances filed on behalf of former US Airways pilots prior to the merger between US Airways and American, which became APA's responsibility when it became the certified bargaining representative for those pilots in September 2014. Myers Decl. ¶ 54.

60. When Captain Dan Carey came into office as APA's president in July 2016, there were approximately 700 pending grievances, some up to 11 years old. Carey Dep. Tr. 246, 271.

61. APA needs American's agreement to schedule grievances for arbitration, and between 2012 and 2021, APA and American scheduled for arbitration an average of approximately 11 grievances per year. Myers Decl. ¶¶ 53, 55; Carey Dep. Tr. 246, 248.

62. Between the filing of Grievance 12-012 in 2012 and the filing of Plaintiff's Amended Complaint in 2018, APA addressed many of the concerns raised by Grievance 12-012 through other avenues. Myers Day 2 Dep. Tr. 61, 225-26.

63. After Grievance 12-012 was filed, APA persuaded American to give notice to pilots before they were terminated and dropped from the seniority list after being on unpaid sick or disability leave for five years. Myers Day 2 Dep. Tr. 226.

64. After Grievance 12-012 was filed, American ceased its blanket refusal to reinstate MDD pilots who had regained their FAA First Class Medical Certificate and resumed considering reinstatement requests on a case-by-case basis. *See* Myers Decl. ¶ 36; Myers Day 2 Dep. Tr. 226; Carey Dep. Tr. 164, 344-45.

65. In 2016, APA negotiated a Letter of Agreement with American to amend Supp. F(1) of the CBA such that pilots on disability leave would no longer be terminated and removed from the seniority list after five years. Myers Decl. Ex. 6; *see* Myers Day 2 Dep. Tr. 225-26.

66. APA's representatives sought to make that change retroactive, but American would only agree to the change if the change was prospective. Myers Day 1 (Vol. 2) Dep. Tr. 50-54; Carey Dep. Tr. 345.

67. Several MDD pilots who regained their FAA First Class Medical Certificate have been reinstated to their position and placed on the seniority list on a case-by-case basis at American's discretion. Myers Decl. ¶ 36; Myers Day 1 (Vol. 1) Dep. Tr. 216; Myers Day 2 Dep. Tr. 226; Carey Dep. Tr. 161-64.

68. Joe Barkate was a pilot who was terminated after he had been on unpaid sick or disability leave for five years or longer. Myers Day 1 (Vol. 2) Dep. Tr. 47-48.

10

69.     Mr. Barkate was reinstated at American in 2019 at his prior relative seniority position, but only after he had regained his FAA Medical Certificate. Myers Day 1 (Vol. 2) Dep. Tr. 55-56; *see* Carey Dep. Tr. 355.

70.     Then-APA president Dan Carey requested that American reinstate Mr. Barkate in the same manner he made the request for Plaintiff and other pilots. Carey Dep. Tr. 352-56.

## VI.     Seniority List Integration

71.     In November 2011, American filed for Chapter 11 bankruptcy. Myers Decl. ¶ 44.

72.     In 2013, while it was in bankruptcy, American agreed to merge with U.S. Airways. Myers Decl. ¶ 56.

73.     In connection with that merger, the two airlines and the two unions representing the pilots at the airlines (APA and the U.S. Airline Pilots Association) entered into a Memorandum of Understanding (MOU) that addressed, among other things, steps the parties would take toward merging the pilot seniority lists from the two airlines. Myers Decl. ¶ 57, Ex. 13 (MOU).

74.     Section 10 of the MOU provided that "[a] seniority integration process consistent with McCaskill-Bond shall begin as soon as possible after" the effective date of the MOU and the parties would enter into a "Seniority Integration Protocol Agreement" that would "set forth the process and protocol for conducting negotiations and arbitration," MOU ¶¶ 10(a), (f), and Section 20 provided that any dispute "over the interpretation or application" of the MOU "shall be arbitrated on an expedited basis directly before a specially-created one-person System Board of Adjustment" and "shall be heard no later than thirty (30) days following the submission to the System Board" and "shall be decided no later than thirty (30) days following the first day of the hearing, unless otherwise agreed to in writing." MOU ¶ 20.

11

75.     On September 24, 2014, the parties entered into a Seniority Integration Protocol Agreement that established a process for integrating the pilot seniority lists. Stephens Decl. Ex. A (Protocol Agreement).

76.     The process called for merger committees established by APA and U.S. Airline Pilots Association to compile and exchange certified seniority lists containing data "for each pilot on their respective pre-merger seniority lists." Protocol Agreement ¶ 2.

77.     The Seniority Integration Protocol Agreement provided that "the certified seniority lists will reflect the status quo of the . . . seniority lists in effect at the carriers on December 9, 2013." Protocol Agreement ¶ 2(b).

78.     The Seniority Integration Protocol Agreement also required the merger committees to compile and exchange lists of pilots "who ha[ve] been terminated or otherwise removed from the pre-merger seniority list, whose status is the subject of any pending litigation or dispute." Protocol Agreement ¶ 2.a.7.

79.     The Seniority Integration Protocol Agreement provided for the creation of a three-member "Arbitration Board" that would "have the authority to establish a fair and equitable integrated seniority list." Protocol Agreement ¶¶ 6-7.

80.     APA established a merger committee called the American Airlines Pilot Seniority Integration Committee (AAPSIC). Stephens Decl. ¶ 10.

81.     AAPSIC requested and received employment data from American that it used to create a certified pilot seniority list that it submitted pursuant to the Seniority Integration Protocol Agreement. Stephens Decl. ¶¶ 18-19, 23-24.

82.     Plaintiff was not included in AAPSIC's certified seniority list because he was not included in the data that AAPSIC received from American as to pilots on the American pilot

seniority list on or around December 9, 2013, but he was included in a separate list of pilots who were challenging their separation from American. Stephens Decl. ¶ 25; *see id.* ¶¶ 16-23.

83.     On March 1, 2016, Plaintiff wrote to Mark Stephens, the chairman of AAPSIC, to complain about his omission from the list, and on March 6, 2016, Mr. Stephens responded that (1) Plaintiff was absent from the list because he was not on American's seniority list as of December 9, 2013, and (2) Plaintiff's name was included on a separate list identifying pilots known to be disputing their termination or removal from the seniority list. Stephens Decl. ¶ 27, Ex. G.

84.     On or about March 21, 2016, Plaintiff sent a letter to APA and American that purported to commence a grievance challenging the seniority list integration process pursuant to provisions in the MOU. Myers Decl. Ex. 14 (MOU Grievance).

85.     Plaintiff asserted that under Paragraph 20 of the MOU, he was entitled to an expedited process that required arbitration before a System Board of Adjustment within 30 days of submission. Myers Decl. Ex. 14 at 3-4.

86.     American sent a letter to Plaintiff saying that it considered the MOU Grievance that Plaintiff purported to file to be a breach of an injunction that had been entered in bankruptcy court enjoining Plaintiff from commencing or continuing any grievance arising from his termination from American or removal from the pilot seniority list. Shiffrin Decl. Ex. 7.

87.     APA did not initiate arbitration in response to Plaintiff's letter. Myers Decl. ¶ 62.

88.     In a joint letter sent to another pilot—which was shared with Plaintiff—APA and American took the position that individual pilots did not have a right to file a grievance under the MOU arbitration provisions, stating that "the MOU dispute resolution process in Paragraph 20 did not create and was never intended by the parties to create an avenue for pilots to lodge collateral

13

attacks on the [seniority list integration] process itself, or to have an arbitrator rule on the contours of federal statutes." Shiffrin Decl. Ex. 6, at 1, 2.

89.    The integrated seniority list was finalized by the Arbitration Board on September 6, 2016. Stephens Decl. ¶ 26; Myers Decl. ¶ 63.

90.    On September 19, 2016, Plaintiff sent an email to Mark Stephens stating that "APA Legal refused to submit" his grievance that he sought to file under the MOU to the System Board of Adjustment. Stephens Decl. ¶ 27, Ex. H at 2.

91.    On or about November 9, 2016, Plaintiff submitted a claim to the Dispute Resolution Committee established by the Arbitration Board for purposes of resolving disputes regarding the interpretation or application of the integrated seniority list award. DX28.

92.    The Dispute Resolution Committee informed Plaintiff on January 9, 2017, that it had declined to pursue Plaintiff's complaint. DX29; DX30.

93.    On December 19, 2016, Plaintiff filed internal union charges against individual members of APA's merger committee (AAPSIC). DX33.

94.    For relief, those internal union charges sought that AAPSIC members "be held to account for failure to comply with their duties" under the APA Constitution and Bylaws, including "whatever disciplinary action, fines, and sanctions" the Appeal Board should deem appropriate. DX33 at 5.

95.    In June 2017, Plaintiff sent an email to APA stating that he had a deadline of July 8, 2017, to file a federal lawsuit asserting a duty-of-fair representation claim pertaining to the seniority list integration process. DX32.

## VII.    Request for Reinstatement

96.    After APA adopted a resolution in 2014 addressing the process by which an MDD pilot could ask APA to petition American for reinstatement, Plaintiff wrote to APA to request reinstatement to the seniority list. DX38; *see* DX39.

97.    An APA representative wrote back to Plaintiff informing him that APA would not consider forwarding his request to American until he regained an FAA First Class Medical Certificate, as required by the 2014 resolution. DX40; *see* DX39.

98.    On or about December 10, 2018, Plaintiff informed APA President Dan Carey that he had regained his FAA First Class Medical Certificate, and he requested "immediate and unconditional reinstatement" to his "original relative position" on the seniority list. DX46.

99.    On December 26, 2018, President Carey emailed American requesting that Plaintiff be reinstated to his relative position on the seniority list. Stone Decl. ¶ 4, Ex. 1.

100.    A few months later, on or about April 8, 2019, President Carey sent a letter to American, again requesting that American return Plaintiff to flying status and restore Plaintiff to the seniority list. Stone Decl. ¶ 4, Ex. 2.

101.    The April 8, 2019, letter was part of a batch of four nearly identical letters sent by President Carey to American on behalf of pilots who had been terminated under the five-year rule and subsequently re-obtained their FAA First Class Medical Certificate. *See* CX31.

102.    American received and considered President Carey's requests but declined to reinstate Plaintiff to the seniority list or return him to flying status. Stone Decl. ¶¶ 4, 5; Carey Dep. Tr. 169 (recounting statement that "American Airlines reserves the right to put in the cockpit who they feel they deem safe and airworthy . . . . [W]e'll continue paying Larry Meadows' disability, but we—we're not going to put him back in the cockpit.").

15

103.   On or about April 4, 2019, July 10, 2019, and December 10, 2019, a legal representative from American wrote to Plaintiff demanding that he cease and desist communicating with American employees seeking to return to work. DX57.

## VIII.   APA Constitution and Bylaws

104.   APA's associational affairs are governed by its Constitution and Bylaws. Myers Decl. ¶ 11, Ex. 1 (Constitution and Bylaws)

105.   At all times relevant to this matter, the Constitution and Bylaws articulated criteria for membership in APA and established several categories of membership in APA: apprentice, active, inactive, and honorary. Constitution and Bylaws Art. III §§ 1-2.

106.   The Constitution and Bylaws provide that "[a] member in good standing is entitled to participate actively in all APA activities and is entitled to all of the rights, privileges, and benefits of membership in the APA." Constitution and Bylaws Art. III § 7.A.

107.   The Constitution and Bylaws provide that "inactive members shall enjoy all of the benefits of active membership except the privileges of voting, holding elected office, and participation in Association sponsored programs where specific requirements prohibit such participation." Constitution and Bylaws Art. III § 7.B.

108.   "Active Membership" applies to "flight deck operating crew members" who meet certain other qualifications, Constitution and Bylaws Art. III § 2.B, and pilots who do not actively fly for American, such as pilots on "[m]edical or [p]ersonal [l]eave of [a]bsence," are eligible for inactive membership, Constitution and Bylaws Art. III § 2.C.

109.   An active "member in good standing shall automatically be transferred to inactive membership status upon … [b]eing on leave of absence form the Company twelve (12) months after the expiration of paid sick leave." Constitution and Bylaws Art. III § 2.C.

110.    Dues for APA members are assessed as a percentage of contractual pay received from American; thus pilots on unpaid leaves of absence do not pay dues to APA. Constitution and Bylaws Art. III § 6.A; Myers Decl. ¶ 77.

111.    Prior to 2016, there had been internal debate within APA about the membership status of MDD pilots who could potentially regain their FAA Medical Certificate (and thus be eligible to fly) and seek reinstatement from American. Myers Decl. ¶ 68.

112.    APA's president has the authority to "issue, as necessary, written interpretations of the Constitutional and Bylaws," Constitution and Bylaws Art. IV § 8.A.3, which are binding unless disapproved by the Board of Directors, Constitution and Bylaws Art. V § 1.A.

113.    On June 30, 2016, APA President Keith Wilson issued a binding constitutional interpretation, stating that, under the Constitution and Bylaws, a pilot who "loses his or her seniority under Section 11.D or Supplement F(1) of the CBA," *i.e.*, an MDD pilot, "retains his or her status as an inactive APA member until such time as the pilot returns to active pilot employment." Myers Decl. Ex. 15.

114.    On January 10, 2017, after Plaintiff had filed internal union charges against President Wilson, an arbitrator issued an award (the Valverde Award) determining that Plaintiff was an inactive member of APA under the Constitution and Bylaws. Myers Decl. Ex. 18 (Valverde Award) at 14.

115.    The arbitrator further concluded that an inactive member of APA cannot be a member in "good standing" and therefore Plaintiff lost his "good standing" status when he became an inactive member. Valverde Award at 16.

116.    These issues were fully litigated in the arbitration proceedings. Meadows Dep. Tr. 212.

117.   During those proceedings, Plaintiff submitted evidence, presented witnesses, and submitted a post-hearing brief. Meadows Dep. Tr. 212; Myers Decl. ¶ 71, Exs. 16, 17.

118.   Plaintiff threatened to file a federal lawsuit seeking to overturn the Valverde Award but never did so. Myers Decl. ¶ 75, Ex. 19; Meadows Dep. Tr. 215.

119.   On October 18, 2017, APA President Carey sent Plaintiff a letter confirming the arbitrator's finding that inactive members are not members in good standing. Myers Decl. Ex. 20.

IX.   **Challenge & Response**

120.   APA maintains a password-protected website with several components. Myers Decl. ¶ 78; Wilson Decl. ¶ 16.

121.   One part of APA's website is an electronic forum where authorized users can post and read messages posted by others. During the relevant period that forum was called Challenge & Response (or "C&R"). Myers Decl. ¶ 78; Wilson Decl. ¶¶ 16, 17; McDaniels Decl. ¶ 33.

122.   Prior to 2014, the use of Challenge & Response was governed by an Acceptable Use Policy that limited access to Challenge & Response to certain classes of membership, which did not include inactive members. Wilson Decl. ¶¶ 20, 25; McDaniels Decl. ¶¶ 33, 34.

123.   Prior to April 2014, that policy was not enforced, and inactive members, including MDD pilots, had access to Challenge & Response. Wilson Decl. ¶¶ 32-34, 36.

124.   At 1:55 PM on April 22, 2014, Plaintiff emailed an APA lawyer and stated that: "Just to be clear, if APA is absolutely refusing to process my petition on the basis of medical disability, then please advise Bennett [Boggess], that myself and many other similarly situated pilots will be filing EEOC charges on that matter." DX43.

125.   At a meeting on or about April 22, 2014, the APA Board of Directors decided to enforce the Acceptable Use Policy and revoke access to Challenge & Response by inactive pilots,

including MDD pilots. Wilson Decl. ¶¶ 32-34, Ex. 6; McDaniels Decl. ¶ 35. That decision was made sometime before 3:47 PM, when an email was sent instructing members of the IT team to remove MDD's access. Wilson Decl. ¶ 36, Ex. 8.

126.   As a result of the Board's decision on April 22, 2014, more than 200 MDD pilots, and more than 900 pilots total, lost their access to Challenge & Response. Meadows Dep. Tr. 263.

127.   An MDD pilot named Kathy Emery subsequently sued APA regarding the Challenge & Response restrictions and prevailed. *Emery v. Allied Pilots Ass'n*, 227 F. Supp. 3d 1292 (S.D. Fla. 2017) (Hurley, J.).

128.   In January 2017, the court in the *Emery* case found that, while APA's justifications for enforcing the restrictions in the Acceptable Use Policy "were not offered to mask an impermissible discriminatory animus," 227 F. Supp. 3d at 1299, APA's "policy of denying MDD pilots access to Challenge & Response constitutes . . . an impermissible infringement on [Plaintiff Emery]'s right to free speech guaranteed by [the] LMRDA," *id.* at 1302.

129.   The court ordered that APA grant Ms. Emery "complete access to 'Challenge & Response,' the union's website chat room on the same terms and conditions as exist today for all active members of the APA." Shiffrin Dec. Ex. 13 (Final Judgment), at 2.

130.   On January 13, 2017, APA restored access to Challenge & Response for all MDD pilots—including Plaintiff—and consequently Plaintiff had access as of the filing of his Amended Complaint. Meadows Dep. Tr. 271; DX45.

131.   On January 13, 2017, APA President Dan Carey informed Plaintiff that his access to Challenge & Response had been restored, along with all the MDD pilots. DX45.

19

## X.  Additional Retaliation Allegations

132.  In November 2012, American and APA negotiated a Letter of Agreement that included a list of 37 grievances that they agreed were not resolved as of that date and would be preserved under APA's proof of claim in the bankruptcy proceedings. Myers Decl. Ex. 9 at Ex. A.

133.  On January 17, 2014, Plaintiff emailed APA that it was his understanding that APA would be amending its proof of claim in the American bankruptcy, and he asked if his remedies under Grievance 12-011 would be preserved under APA's proof of claim. DX20 at 2.

134.  On January 20, 2014, an APA attorney wrote back to Plaintiff and stated that "APA will be taking no further action to support Grievance No. 12-011, which is closed and has no value associated with it at this point." DX20 at 1.

135.  On March 7, 2014, APA filed an amended proof of claim in the American bankruptcy. Myers Decl. Ex. 9. That document included a list of "APA Legal Active Grievances as of 2/28/14," and did not include Grievance 12-011. Myers Decl. Ex. 9 at Ex. B.

136.  On or around April 17, 2014, APA's then-general counsel Steven Hoffman, appeared at a hearing during the American bankruptcy and explained that (1) APA had informed Plaintiff that it would not be advancing Grievance 12-011 to arbitration because it did not assert a contractual violation and instead asserted statutory claims that were not within the jurisdiction of the System Board arbitration panel, and (2) APA was taking no position on the timeliness or validity of the statutory claims asserted in Grievance 12-011. DX42 at 8, 69-71.

137.  On March 2, 2017, Plaintiff was temporarily denied access to APA's headquarters and was let into the building after he called then-President Dan Carey. Meadows Dep. Tr. 341-43.

138.  Plaintiff considered Dan Carey, who was president of APA from July 2016 to June 30, 2019, to be a friend and strong supporter. Carey Dep. Tr. 113, 296; Meadows Dep. Tr. 218.

20

Dated: April 6, 2026

Respectfully submitted,

*/s/ Andrew Dymowski*
Andrew Dymowski, Esq.
Florida Bar No.1058209
Capri Trigo, Esq.
Florida Bar No. 28564
GORDON REES SCULLY MANSUKHANI
Miami Tower
100 S.E. Second Street, Suite 3900
Miami, Florida 33131
Telephone: (305) 428-5309
Email: ctrigo@grsm.com

*/s/ Joshua B. Shiffrin*
Joshua B. Shiffrin*
John M. Pellettieri*
Lane Shadgett*
BREDHOFF & KAISER PLLC
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Email: jshiffrin@bredhoff.com
Email: jpellettieri@bredhoff.com
Email: lshadgett@bredhoff.com
*Admitted *Pro Hac Vice*

*Counsel for Defendant Allied Pilots Association*

21

# EXHIBIT I

## TO MEADOWS DECLARATION

Activity in Case 1:17-cv-22589-EA Meadows v. Allied Pilots Association et al Order on Motion for Extension of Time to File Response/Reply/Answer

From: cmecfautosender@flsd.uscourts.gov (cmecfautosender@flsd.uscourts.gov)

To:   flsd_cmecf_notice@flsd.uscourts.gov

Date: Friday, April 3, 2026 at 10:17 AM EDT

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Southern District of Florida**

## Notice of Electronic Filing

The following transaction was entered on 4/3/2026 at 10:16 AM EDT and filed on 4/3/2026
**Case Name:**        Meadows v. Allied Pilots Association et al
**Case Number:**      1:17-cv-22589-EA
**Filer:**
**Document Number:** 243(No document attached)

**Docket Text:**
**PAPERLESS ORDER denying [241] Motion for Extension of Time to File Response/Reply/Answer; granting [241] Motion for Leave to File Excess Pages.**

**The Court notes that this case has been pending since 2017 and sees no reason to delay the summary judgment briefing schedule. Further, although the Court would like Plaintiff to be as succinct as possible in his response, the Court will allow him to file a response to Defendant Allied Pilots Association's summary judgment motion that is the same number of pages as APA's summary judgment motion and statement of facts. Thus, Plaintiff's response may not exceed 55 pages in length. Signed by Magistrate Judge Lisette M. Reid on 4/3/2026. (rgz)**

**1:17-cv-22589-EA Notice has been electronically mailed to:**

Andrew James Dymowski     ddymowski@grsm.com, ctrigo@grsm.com, jzmartinez@grsm.com

Capri Trigo     ctrigo@gordonrees.com, ddymowski@grsm.com, efarmer@grsm.com, jshiffrin@bredhoff.com, jzmartinez@grsm.com, mia_eservice@gordonrees.com

John M. Pellettieri     jpellettieri@bredhoff.com

Joshua B. Shiffrin     jshiffrin@bredhoff.com

Lane Shadgett     lshadgett@bredhoff.com

Lawrence Meadows     Lawrencemeadows@yahoo.com

Ryan K. Stumphauzer     rstumphauzer@sknlaw.com, rstumphauzer@ecf.courtdrive.com

**1:17-cv-22589-EA Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**